

**FILED**

Oct 19 2022

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY          s/ gloriav          DEPUTY

JUSTIN S. BECK
3501 ROSELLE ST.
OCEANSIDE, CA 92056
760-449-2509
justintimesd@gmail.com
*In Propria Persona*

## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF CALIFORNIA

JUSTIN S. BECK, individually,
and as *guardian ad litem* to
ROES 1-150,000

    Plaintiff,

vs.

CATANZARITE LAW CORPORATION;
THE STATE BAR OF CALIFORNIA;
RUBEN DURAN, ESQ.; SUZANNE CELIA
GRANDT, ESQ.; RICHARD FRANCIS
O'CONNOR JR.; MOHAMMED ZAKHIREH;
JAMES DUFFY; STATE OF CALIFORNIA;
KENNETH CATANZARITE, ESQ.; JIM
TRAVIS TICE, ESQ.; NICOLE MARIE
CATANZARITE WOODWARD, ESQ.;
BRANDON WOODWARD, ESQ.; TIM
JAMES O'KEEFE, ESQ.; AMY JEANETTE
COOPER; CLIFF HIGGERSON; JAMES
DUFFY, ELI DAVID MORGENSTERN,
ESQ.; LEAH WILSON, ESQ.; and DOES 1-10

    Defendants

ATTORNEY GENERAL
OF THE UNITED STATES

Nominal Defendant (42 U.S.C. § 1956 and
Equal Protection Challenge)

STATE OF CALIFORNIA

Nominal Defendant (Tort Liability and
Judgment Guarantor)

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: **'22 CV 1616 BAS DDL**

**COMPLAINT FOR DAMAGES AND
EXTRAORDINARY RELIEF**

[COUNT I] 18 U.S.C. § 1962(c)
Racketeering

[COUNT II] 18 U.S.C. § 1962(a)
RICO Investing Proceeds of Racketeering

[COUNT III] 18 U.S.C. § 1962(b)
RICO Control of Racketeering Enterprise

[COUNT IV] 18 U.S.C. § 1962(d)
RICO Conspiracy under Subsections (a)-(c)

[COUNT V] 42 U.S.C. § 1981
Equal Protection 14th Amendment (U.S.)

[COUNTS VI – XI] 42 U.S.C. § 1983
Malicious Prosecution via Enterprise Control

[COUNT XII] 42 U.S.C. § 1981
Equal Protection 14th Amendment (U.S.)

[COUNT XIII] 18 U.S.C. § 1956
Federal Receiver

[COUNT XIV] 42 U.S.C. § 1981
Provisional Federal Bar Licensure/Alternative

[COUNT XV] 42 U.S.C. § 1983
Judicial Deception; Obstruction of Justice

[COUNTS XVI] 42 U.S.C. § 1983 Malicious
Defense of Malicious Prosecution

1

## COMPLAINT

Plaintiff JUSTIN S. BECK individually, and as attorney-in-fact *guardian ad litem* for ROES 1-150,000 who can't help themselves, for his Complaint against defendants CATANZARITE LAW CORPORATION; THE STATE BAR OF CALIFORNIA; RUBEN DURAN, ESQ.; SUZANNE CELIA GRANDT, ESQ.; RICHARD FRANCIS O'CONNOR JR.; JAMES DUFFY; STATE OF CALIFORNIA; KENNETH CATANZARITE, ESQ.; JIM TRAVIS TICE, ESQ.; NICOLE MARIE CATANZARITE WOODWARD, ESQ.; BRANDON WOODWARD, ESQ.; TIM JAMES O'KEEFE, ESQ.; AMY JEANETTE COOPER; CLIFF HIGGERSON; MOHAMMED ZAKHIREH, JAMES DUFFY, ELI DAVID MORGENSTERN, ESQ.; LEAH WILSON, ESQ.; DOES 1-10; nominal defendants ATTORNEY GENERAL OF THE UNITED STATES and STATE OF CALIFORNIA ("Defendants") alleges:

"Because attorney-client privilege shares at least one basic policy rationale with Section 6068(e), one is tempted to treat them as one in the same. However, they should not be conflated. The professional obligations of an attorney…are broader….[requiring]…to preserve clients' secrets, not simply information covered by the attorney-client privilege…outside of judicial and other proceedings…. don't include the same exceptions…information may not be subject to the attorney-client privilege and yet it is his client's secret. An attorney who discloses such a secret may not violate Section 955, but he does violate Section 6068(e). *Dixon v. State Bar,* 653 P.2d 321 (Cal. Ct. Appeal 1982). [and he cannot violate Section § 956, or privilege is moot].

As Sir Francis Bacon Put It: **"The greatest trust, between man and man, is the trust of giving counsel. For in other confidences, men commit the parts of life; their lands; their goods, their children, some particular affair; but to such as they make their counselors, they commit the whole: by how much more, they [counselors] are obliged to all faith and integrity."**

Francis Bacon, A Harmony of the Essays 310-11 (E. Arber ed., Kings College 1871) (1610) (modernized)." "*Secrets Must Be Kept Even When Not Privileged*" by Allen Matkins Leck Gamble Mallory & Natsis LLP, June 19, 2013 "CaseText.com" Analysis

### ATTN: ATTORNEY GENERAL OF UNITED STATES
### EXTERNAL RACKETEERING INVESTIGATOR DEMAND UNDER 42 U.S.C. § 1956
### EQUAL PROTECTION DEMAND UNDER 14th AMENDMENT AND U.S.C. § 1981

**INTRODUCTION**

1.      For 10+ years continuing, under artifice of state law and a designed monopoly over the judiciary in California, from California to Florida, trial courts to Courts of Appeal, this case arises from deliberate schemes to defraud judicial officers, litigants, insurance carriers, banks, issuers of securities, and ongoing payments derived from unlawful activity that damaged Plaintiff JUSTIN S. BECK's business, property, and civil rights under the United States Constitution.

2.      "In this [case], [] we [will re-visit the failed] union of the legislative and judicial components of government [in California]. It [has failed to serve the 14th Amendment requirements], it certainly isn't pretty, [and] seems antithetical to the constitutional design . . ." – Justice Brown (In re Rose, 22 Cal.4th 430, 470 (2000) [adjusted by Plaintiff in accordance with the skepticism Honorable Justice Brown foretold with her dissenting Honorable Justice Kennard].

3.      Twenty-two years later, Justice Brown's words ring truer than ever among her peers and the Honorable United States Supreme Court Justices discussing the 1871 premises of malicious prosecution, civil rights violations, in *Thompson v. Clarke*, 596 U.S.____(2022); § 1983 ("*Thompson*") which is instructive here; even in dissent by Honorable Justice Alito. There is simply no place for the conduct at issue in the United States, and the lack of precedent is a result of a threat of fear and monopolistic powers of a corrupt organization: The State Bar of California.

4.      Reflected by final rulings, defendants used the judiciary and government functions *ultra vires*, with *per se* antitrust/competitive violations, to further or conceal fraudulent schemes.

5.      Defendants each had corrupt motives or interests, and they acted with actual malice or at least disregard of Plaintiff, his known harm, and his federally protected rights.

6.      Lacking probable case for claims against Plaintiff, defendants repeatedly used postal mail, wire communications including email, cellular calls, and FAX, as well as overt acts

or active concealment by overt acts of coercion, extortion, threats, and/or bribery to achieve their goals to harm Plaintiff, make money, or conceal in furtherance of individual goals.

7.      Each defendant is associated with, acting under license, or prior or ongoing threat of, acting through or under the protection of, defendant culpable persons THE STATE BAR OF CALIFORNIA including CATANZARITE LAW CORPORATION ("Racket"). Here, fraudulent schemes knowingly and willfully destroyed more than $261 million in property value among purported "clients" of the Racket. The Racket is deliberately malicious, the lines among it obscure.

8.      Beyond Plaintiff, acutely threatening, Racket schemes to defraud exist for "proceeds of $437,315,00" among a "putative class of 13,858" investors filed for a "plaintiff" "Richard Carlson" who testified that he did not believe he had suffered damages, nor was he looking for an attorney when KJC and the Racket he operates through visited his home.

9.      Plaintiff shows ongoing schemes to defraud, advanced through the wire and mail using inanimate corporate entities or "guardians" like Denise Pinkerton, or Richard Carlson, or Amy Cooper, or Renato Corzo, using the protection of nonsovereign state actors in conspiracy.

10.     Plaintiff was actually damaged in his business, property, and person in fact, and seeks his damages, plus treble damages in this case for violations of 18 U.S.C. § 1962(a)-(d).

11.     In addition to treble damages, Plaintiff seeks federal receivership under § 1956.

12.     Plaintiff seeks a racketeering investigator who is not a licensee of The State Bar of California, who would otherwise be subject to the racketeering activity or coercion shown.

13.     Plaintiff sues STATE OF CALIFORNIA for its agents here after claim presentation October 14, 2021; receipt thereof by THE STATE BAR OF CALIFORNIA on October 18, 2021; formal claim denial on November 12, 2021, by "Claims Officer" Sarah L. Cohen acting officially; and Plaintiff's prompt filing of suit on December 21, 2021, with conforming pleadings in *Justin S. Beck v. The State Bar of California et al.* (OCSC Case No. 30-2021-01237499) ("State Action 2").

14.     Plaintiff sues STATE OF CALIFORNIA because it has a nondelegable duty to uphold the United States Constitution, and because it has delegated duty and authority to nonsovereign actors that destroyed Plaintiff's business and property under artificial authority cited by them to justify it as being a matter of "discretion" under authority of State.

15.     Plaintiff sues STATE OF CALIFORNIA for all violations of its nonsovereign actors acting officially under 42 U.S.C. § 1981 and 42 U.S.C. § 1983, which Plaintiff alleges to be ongoing, with deliberate disregard for the truth or the oath of attorneys to uphold the United States Constitution under Cal. Bus. & Prof. § 6068(a).

16.     Plaintiff sues STATE OF CALIFORNIA under Cal. Gov. Cod. § 815.2, Cal.Gov. Cod. § 815.3(b) (where DURAN and STATE BAR are named in this action), and Cal. Gov. Cod § 815.6 under the 5th and 14th Amendments to the United States Constitution and specifically equal protection clause and eminent domain.

17.     Plaintiff sues STATE OF CALIFORNIA because its assigned nonsovereign actors operating through, with, or under STATE BAR have no immunity where they are controlled by active market participants after 2015 as being "regulators."

18.     Plaintiff sues STATE OF CALIFORNIA here and other culpable defendants concurrently in *Justin S. Beck v. Kenneth Catanzarite, Esq*. (OCSC Case No 30-2020-01145998) ("State Action 1") as being a substantial factor in the malicious prosecution of three lawsuits, unfair business practices under state and federal law and/or ratification of the same with malice; slander/conversion to Plaintiffs business/property at issue here all of which may become federal question if improper influence of judicial officers succeeds through GRANDT, DURAN, KJC.

19.     Plaintiff directs to each defendant, under the binding doctrine of issue preclusion, the facts and law cited by Court of Appeal in "G059766" *Beck v. Catanzarite Law Corp.*, No.

G059766, (Cal. Ct. App. Jul. 13, 2022) as being *per se*, finally adjudicated "racketeering activity" under 18 U.S.C. § 1961 that damaged his business, property, and federally protected rights.

20.     Evidence of racketeering activity that harmed Plaintiff is final, is overwhelming, and shown through Court of Appeal cases that aren't just instructive, they are specific to Plaintiff and Defendants. The rulings reflect deliberate use of email transmissions in furtherance of schemes since adjudicated as fraudulent, involving securities, monetary instruments and even financial institutions Scottsdale Insurance Co. and the IOLTAs "governed" by STATE BAR. (G059766, incorporating G058700 and G059457). Cal. Rule 8.1115(b)(1)-(2). Plaintiff shows improper, corrupt use of Enterprise 2, per California State Auditor as recently as Report 2022-030, with an acute threat of continuing, and a refusal to investigate IOLTA complaints suggests **sinister plots**.

21.     Plaintiff's moving papers, and the responses from the Racket in G059766 which are not subject to any form of privilege, show how the fraudulent schemes involve more than one overt act of extortion, and the ongoing threat of harm that exists from the Racket (officially and unofficially) to collect fees, or avoid damages, always in favor of their own profession and 700 lawyers affecting interstate commerce, over anyone else using Enterprise 2 protection.

22.     There exists an acute threat of continuing schemes to defraud non-active market participants like Plaintiff, even COOPER, HIGGERSON, ZAKHIREH, DUFFY, O'CONNOR who are now but ignorant, self-interested conspirator pawns for Enterprise 1 and Enterprise 3+ actors seeking to harm Plaintiff or conceal their own conduct, but now under coercion of KJC, and thus EDM, DURAN, GRANDT using Enterprise 2 for corrupt motives and undisclosed interests.

23.     The Racket serves to restrain and control trade among the markets affecting interstate commerce: State Action 1, State Action 2; intake; investigation; State Bar Court; Office of General Counsel; Office of Chief Trial Counsel; Client Security Fund; Board of Trustees, and approximately 25% of the national market for legal services in any form.

24.     The **Racket controls $3.4 trillion in annual gross state product** in California, and from across state lines. The Racket's monopoly uses artificial state laws cited by each predicated upon the Racket's protection and Enterprise 2's deliberate complacency and disregard for public members and monies like Plaintiff and his suspect class harmed by the Racket (or improper use).

25.     There exists an acute threat of continuing schemes to defraud and/or conceal from State Legislature, insurance companies like Scottsdale Insurance Co., and virtually every stakeholder among our democracy, thereby obstructing justice among the judicial and legislative branches wherever there exists a licensee among Enterprise 1 or associated Enterprise 3+.

26.     STATE BAR, using its "discretion" and "lack of resources" treats unknown sums as being "de minimis" and "not worth" DURAN's time. DURAN is concealing these acts' nature.

27.     Other acutely threatening, parallel schemes to defraud exist through "Attorney Misconduct Complaint in 200+ Languages," "Complaint Review Unit," "In RE: Walker," "Client Security Fund" and "Legal Aid" distributed from IOLTA "income" to active market participants.

28.     Plaintiff shows the predicate and parallel patterns of racketeering activity have similar beneficiaries (Enterprise 1 and Enterprise 3+), similar methods of non-judicial fraud and fabrication of evidence followed by or supporting judicial fraud; cases that seek, prioritize, or pay only legal fees that are filed without standing or probable cause. Put simply, the method is fraudulent cases used to extort the public and Courts via protection of the Racket, the stakes high.

29.     Investigations by Los Angeles Times for which defendant RUBEN DURAN thanked them in September 2022 into Enterprise 1 and Enterprise 2's own Thomas Girardi discuss the Los Angeles Superior Court Complex division as a "bank" where Enterprise 1 Girardi was the "Banker" and Enterprise 1 actors working for Enterprise 2 were receiving payments and other consideration to enable and conceal ongoing fraud and laundering of money or monetary instruments through the California judiciary while currying favors.

30.     Plaintiff shows the Racket's involvement in ongoing civil "cases" built upon non-judicial fraud and false evidence used to fund IOLTAs and thereby Enterprise 2 so it can go back to Enterprise 1 and/or Enterprise 3+ using majority of active market participants' control.

31.     Plaintiff shows all schemes are advanced by electronic Court transmission of fraudulent documents sometimes across state lines supported by email or cellular communication; where Racket members are required in most instances to file electronically (although Enterprise 2 and CLC use both or neither, to induce fear or conceal evidence, to meet goals and circumstance).

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964. This Court has original jurisdiction under 42 U.S.C. § 1983 and *Thompson v. Clarke*, 596 U.S.____ (2022) (malicious prosecution; inc. dissenting); judicial fraud under 42 U.S.C. § 1983 and § 1981 claims under "No. 16-16568" *Keates v. Koile*, 883 F.3d 1228, (9th Cir. 2018); and equal protection challenges under 42 U.S.C. § 1981 where Plaintiff is entitled to equal protection, and is not being granted equal protection; and requires reference for per se violations of 15 U.S.C. § 1 and *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015).

33.     This Court has supplemental jurisdiction where pending state claims may become federal question under 28 U.S.C. § 1331 after protectionist behavior led to "sustained demurrer."

34.     Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because defendants do business in this district and are each subject to personal jurisdiction in this judicial district and reside in this district, where process may be served in any judicial district of the United States per 18 U.S.C. § 1965(b), when required by the ends of justice. Nationwide service of process confers personal jurisdiction over a defendant in any judicial district where each defendant has minimum contacts with United States.

**PARTIES**

35.     Plaintiff JUSTIN S. BECK ("BECK" or "Beck" or "Plaintiff") is a United States citizen, member of the public, individual entrepreneur, and person, with his principal place of business in Oceanside, California. Plaintiff is in the business of founding or starting companies, mergers, and acquisitions. Plaintiff is a member of the public, never admitted to any bar.

36.     Defendant CATANZARITE LAW CORPORATION ("CLC") is a California law corporation and culpable person with its principal place of business in Anaheim, California. CLC is subject to fee-based licensing annually by THE STATE BAR OF CALIFORNIA to provide legal services through its associated persons KENNETH CATANZARITE, ESQ.; NICOLE MARIE CATANZARITE WOODWARD, ESQ.; JIM TRAVIS TICE, ESQ.; BRANDON WOODWARD, ESQ.; TIM JAMES OKEEFE, ESQ.; who then act as duly authorized court officials (bound to Cal. Bus. and Prof. Code §§ 6068, 6077) on behalf of other persons controlled by THE STATE BAR OF CALIFORNIA (in operational practice, and at law). CLC has an interest only lawyer trust account (IOLTA) with a bank approved by STATE BAR, paying STATE BAR IOLTA "income." CLC fraudulently schemes through the judiciary, presenting U.S. citizens and judicial officers a danger of imminent lawless action, obstruction, through its associated actors.

37.     Defendant THE STATE BAR OF CALIFORNIA ("STATE BAR" and/or Enterprise 2 operating here through DURAN, EDM, KJC, and GRANDT) is a public corporation that can be sued, and nonsovereign culpable person, whose principal places of business are San Francisco and Los Angeles, California respectively. According to its state agency website, "The State Bar [of California] licenses more than 250,000 attorneys, investigates approximately 16,000 complaints of attorney misconduct annually, and distributes over $78 million in grants to legal aid organizations. We serve the people of California through careful oversight of the legal profession." https://www.calbar.ca.gov/About-Us/Our-Mission

38.     Defendant STATE OF CALIFORNIA ("STATE" or "State") is a sovereign public entity among the United States of America ("U.S. or "United States") and subject to Plaintiff's denied claim, and culpable person, whose agents or assigns may claim immunity or indemnification as codified explicitly to meet causes of action, or acts, when clearly articulated policy backs statutorily codified immunities, only upon showing operational or ministerial decisions of state actors accord with the same, and that active supervision of State exists after 2015.

39.     Defendant KENNETH JOSEPH CATANZARITE, ESQ. ("KJC") is an individual, and culpable person residing in Orange County, California in the business of defrauding others and calling it legal services as a court official under fee-based license and authority of STATE BAR annually under SBN# 113750, and in the business of registered investment advisory (RIA) (individual CRD# 1193073) services under jurisdiction of the United States Securities Exchange Commission (SEC), and in the business of real estate brokerage, insurance sales, and pensions which help with his direct or indirect money and monetary instrument laundering aided by Enterprise 2. KJC is principal of CLC which is a control person of the RIA AEGIS ASSET MANAGEMENT, INC. ("AEGIS") (entity CRD# 305008). Using his credentials and Enterprise 2, KJC fraudulently schemes through the judiciary, presenting U.S. citizens and judicial officers the danger of imminent lawless action, and thereby posing a clear and present danger in the U.S.

https://reports.adviserinfo.sec.gov/reports/ADV/305008/PDF/305008.pdf

40.     Defendant NICOLE MARIE CATANZARITE WOODWARD, ESQ. ("NMC") is an individual, and culpable person residing in Orange County, California in the business of defrauding others and calling it legal services as a court official under fee-based license and authority of STATE BAR annually under SBN# 205746. NMC is a principal of CLC with KJC. NMC is the daughter of KJC, and wife of BRANDON WOODWARD, ESQ. NMC regularly defrauds California Courts of Appeal in furtherance of KJC and Racket schemes.

41.     Defendant BRANDON WOODWARD, ESQ. ("BW") is an individual, and culpable person residing in Orange County, California in the business of defrauding others and calling it legal services as a court official under fee-based license and authority of STATE BAR annually under SBN# 284621. BW is husband of NMC, and associate of CLC. He appears on Racket communications, notice of motion, and similar papers.

42.     Defendant TIM JAMES OKEEFE, ESQ. ("TJO") is an individual, and culpable person residing in Orange County, California or Los Angeles County, California in the business of providing legal services as a court official under fee-based license and authority of STATE BAR annually under SBN #290175. TJO is listed as the primary point of contact on the press release for one fraudulent derivative action filed by CLC, which shows an acute threat of continuing based on a parallel series of fraudulent, overt acts using the color of official right from Enterprise 2. He appears on Racket communications and assumes "counsel" alternatively with Tice when disqualification orders are imposed on other members of the Racket, to preserve their schemes.

43.     Defendant SUZANNE CELIA GRANDT, ESQ. ("GRANDT") is an individual, and culpable person, in the business of providing legal services as a court official under fee-based license and authority of STATE BAR annually under SBN# 304794, providing protection for CLC, KJC, NMC, JTT, TJO, BW, EDM and RUBEN DURAN, ESQ. through "Office of General Counsel," and for "Complaint Review Unit," and for STATE BAR's public insurance Client Security Fund ("CSF") scheme to recover damages paid by CSF to victims on behalf of a disbarred STATE BAR attorney in federal bankruptcy proceedings, concurrently defending individual, nonsovereign state actors Enterprise 2, STATE BAR, EDM, DURAN against claims lying in finally adjudicated acts of fraud, malicious prosecution, corruption where DURAN is defended by GRANDT in his capacity as Board of Trustees Chairman for law firm STATE BAR, Partner of law firm Best Best & Krieger ("BBK"), and individual defendant, DURAN, and as Enterprise 2.

11

44.     Defendant RUBEN DURAN, ESQ. ("DURAN") is an individual, and culpable person, in the business of concealing the true operations of Enterprise 2, and providing legal services as a court official under fee-based license and authority of STATE BAR annually, also providing legal services as officer Chairman of STATE BAR, and providing legal services as Chairman to its Board of Trustees, and providing legal services concurrently controlling the conduct of STATE BAR, CLC, KJC, NMC, JTT, DURAN, GRANDT, CSF, BW, while STATE BAR and STATE each prosecute and defend or fail to prosecute and defend the same (administratively, criminally, or civilly) while being paid indirectly or directly or through IOLTAs, by the conduct at issue, also represented by GRANDT directly and derivatively for Board of Trustees in a unity of interests to conceal or commit overt acts together, part of Complaint Review Unit separately regulating the conduct at issue, and for EDM. DURAN currently controls Enterprise 2 through STATE BAR. DURAN fraudulently controls the Racket and judiciary, presenting U.S. citizens and judicial officers the ongoing danger of imminent lawless action, and thereby posing a clear and present danger in the U.S.

45.     Defendant AMY JEANETTE COOPER ("COOPER") is an individual, and culpable person, with a principal business address in or around Tiburon, California. COOPER is in the business of founding or starting companies, mergers, acquisitions, and venture capital. COOPER is the daughter of Bay Area venture capitalist CLIFF HIGGERSON, investing in interstate securities. COOPER is among the pawns extorted by KJC for the Racket with DURAN and GRANDT, also protected by the Racket, in pursuit of corrupt motives and interests unrelated to COOPER claims or defenses.

46.     Defendant CLIFF HIGGERSON ("HIGGERSON") is an individual, and culpable person, with a principal business address in or around Menlo Park, California. HIGGERSON is in the business of founding or starting companies, mergers, acquisitions, investing, and venture

capital. HIGGERSON is a partner at one or more venture capital funds or firms and is the father of COOPER. HIGGERSON and COOPER are clients of CATANZARITE LAW CORPORATION despite Federal Rules of Civil Procedure 23.1(c), also defendants to an adverse derivative action filed by CLC against nominal defendant Mobile Farming Systems, Inc. ("MFS") without standing. Plaintiff incorporates G059766 references to each COOPER and HIGGERSON's roles, and his verification of the same as his own testimony in support of the same facts and law relevant here. Although he has acted in furtherance of the schemes, HIGGERSON is among the pawns extorted by KJC for the Racket, also protected by the Racket, in pursuit of corrupt motives and interests unrelated to COOPER or her father HIGGERSON claims or defenses (despite facts shown and known to HIGGERSON and COOPER).

47.     Defendant ELI DAVID MORGENSTERN, ESQ. ("EDM") is an individual, and culpable person, with a principal business address in Los Angeles, California. EDM is in the business of providing legal services as a court official under license and authority of STATE BAR annually in exchange of a fee under SBN# 190560. EDM is in the parallel business of providing legal services to STATE BAR in prosecution of KJC, CLC, BW, DURAN, GRANDT, TJO, NMC, and JTT, while GRANDT defends EDM against civil claims in State Action 1 and State Action 2 for the exact conduct at issue involving the same among Enterprise 1, and while STATE BAR receives funds from Enterprise 1 or Enterprise 3+ IOLTAs before they are invested back into the same parallel profession and trade of providing legal services through Enterprise 2; deliberately disregarding or concealing Plaintiff's severe injuries, emotional harm, and damages to his business and property. EDM knowingly allows and freely permits fraudulent use of the judiciary against Plaintiff so he can "gather adduced evidence" for EDM  without remuneration, and civil rights violations known and adjudicated, with EDM thereby presenting U.S. citizens and judicial officers danger of imminent lawless action, and thereby posing a clear and present danger in the U.S.

48.     Defendant JIM TRAVIS TICE, ESQ. ("JTT") is an individual, and culpable person, with a principal place of business address in Orange County, California. JTT is in the business of providing legal and judicial fraud services as a court official under fee-based license and authority of STATE BAR annually under SBN# 153867, [purported "former"] associate of CLC, conceding to represent COOPER as "class" plaintiff in Orange County Superior Court [in a fraudulent class action] while KJC defends COOPER in the same Orange County Superior Court today [for her role in three maliciously prosecuted CLC, KJC, TJO, BW, EDM, NCM cases preceding JTT and COOPER's "class action"], while GRANDT, DURAN, EDM, and STATE BAR are regulating the conduct of JTT, KJC, NMC, BW, CLC, EDM, DURAN, and GRANDT at issue by providing legal services to STATE BAR and its Board of Trustees run by DURAN and other active market participants, or STATE in defense and prosecution and indemnification and concealment of the same conduct at any given time. JTT specializes in assuming the role of "counsel" within fraudulent schemes commenced by KJC and the Racket, often after TJO and/or other CLC "counsel" have been disqualified or exhausted through procedural extortion. JTT does this through his purported sole practice role, but he is a proxy for KJC in fact and law. JTT has assumed the role in a fraudulent "class action" on behalf of Richard Mesa, Tom Mebane, and COOPER. Not reflected by Court filings, Richard Mesa terminated JTT in July 2022 in writing, while COOPER has aided the schemes under defined threat of KJC to create evidence for the Racket or face securities fraud charges from "law enforcement." Mebane is unawares, as are many Racket victims having similar characteristics as being old, indigent, or unaware of the actions undertaken on their behalf or against them due to the real protectionist aspects of the monopoly, control factors over the enterprises, and the ongoing threat of improper purposes where JTT fraudulently schemes through the judiciary, presenting U.S. citizens and judicial officers the danger of imminent lawless action, and thereby posing a clear and present danger in the U.S.

14

49.    Defendant RICHARD FRANCIS O'CONNOR JR. ("O'CONNOR") is an individual, and culpable person, with a principal place of business address in the United States. O'CONNOR has engaged in fraud, and acted for improper purposes to harm Plaintiff, and in conspiracy through overt acts in furtherance of the schemes, although he has also been unknowingly used as a pawn for legal fees toward unlawful enterprise business interests. O'CONNOR is defendant to a derivative action and securities fraud charges filed by the Racket, but also defended by the Racket while the same claims are purportedly "tolled" to "bring later" so "no conflict" per KJC, on behalf of O'CONNOR, as communicated by CLC's HAN LE in 2019.

50.    Defendant MOHAMMED ZAKHIREH ("ZAKHIREH") is an individual, and culpable person, with a principal place of business address in the United States. ZAKHIREH has conspired as shown, and by G059766, and acted for improper purposes to harm Plaintiff with actual malice, and in conspiracy through overt acts in furtherance of the schemes, although he has also unknowingly been used as a pawn for legal fees toward unlawful enterprise business interests.

51.    Defendant JAMES DUFFY ("DUFFY") is an individual, and person, with a principal place of business address in the United States. DUFFY has conspired as shown, with actual malice, and by G059766 as per ZAKHIREH, and acted for improper purposes to harm Plaintiff, although DUFFY has also been unknowingly used as a pawn for legal fees toward enterprise business interests.

52.    Defendant LEAH WILSON, ESQ. ("WILSON") is an individual, and person, with principal place of business address in California, and Executive Director of STATE BAR.



## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

53.    Plaintiff incorporates his exhibit list as being set forth here fully, including the operative complaint in State Action 1, the operative complaint in State Action 2, and the associated moving papers supporting his motion for summary judgment [ROA #733] or in the alternative summary adjudication of 14 issues or both [ROA #729] in State Action 1 scheduled for hearing on January 6, 2023, and his moving papers supporting his motion for summary judgment [ROA #107] or in the alternative for summary adjudication [ROA #103] of 22 issues in State Action 2 scheduled for hearing on March 14, 2023.

54.    The following are incorporated as if set forth fully, and thereby binding under California Rules of Court 8.1115(b)(1)-(2) for 18 U.S.C. § 1964(a)-(d) claims in this case via direct, indirect roles of Defendants and each of them:

A) **"G059766"** *Beck v. Catanzarite Law Corp.*, No. G059766, (Cal. Ct. App. Jul. 13, 2022) lying in overt acts of fraud, malicious prosecution, shown acts of extortion or coercion.

B) **"G058700"** *Fincanna Capital Corp. v. Cultivation Tech.*, No. G058700, G058942, G058931 (Cal. Ct. App. Jun. 28, 2021) for case summaries of six directly adverse lawsuits filed by CLC within a year, ratified by STATE BAR, cited by Court of Appeal in G059766.

C) **"G059457"** *Cultivation Techs. v. Duffy*, No. G059457, (Cal. Ct. App. Nov. 12, 2021) and the use of email/wire communications in furtherance of fraudulent judicial/non-judicial schemes, with malice to Plaintiff specifically, also cited by Court of Appeal in G059766.

55.    Plaintiff incorporates as set forth herein the Amicus Curiae by Phil Kay before his untimely death in pursuit of justice before the Legislature passed AB 3249 and the Board of Trustees was "required" to protect the public and "prohibited" from advancing the interests of Enterprise 1 and Enterprise 3+, which Amicus Curiae was not previously known by Plaintiff, and

16

all acts as set forth fully herein as being predicate conduct backed by parallel conduct showing an acute threat of continuance. It is copy and pasted in pleading as being published online.

56.    https://www.tvmix.com/the-state-bar-of-california-desperately-wants-ronald-gottschalk-to-shut-up-go-away/123

57.    Plaintiff notes that judicial fraud, racketeering through the judiciary, money laundering, and anti-competitive behavior has no place in democracy. Even a majority-led, conservative United States Supreme Court agrees in *Thompson v. Clark*, 596 U.S.____(2022), with Justice Alito's dissenting opinion only on nuances of the common law tort, not the equities or fundamental premise of this tort. Defendants have engaged in malicious prosecution and 14th amendment violations against Plaintiff willfully, continuing, and it is shown here.

58.    While not "criminally prosecuted," Plaintiff has been, *and continues to be*, charged and prosecuted unduly with claims of securities fraud and unlawful conduct among at least six fake lawsuits, concealed by Enterprise 2, through musical chairs among Enterprise 1 or Enterprise 3+ while the same persons are engaged in violating the statutory conduct that they falsely direct at Plaintiff. **This is the worst kind of fraud**, and it all violates RICO where bad actors are using the three plus enterprises while destroying lives and taking from others under purported sovereignty they receive through United States, to California, from California Supreme Court, because…nobody will/can challenge them (by design and the Racket protection).

17

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS (Cont'd)

59.    "I I. INTRODUCTION – Amicus Curiae by Phil Kay

60.    This matter has borne out the inevitable unconstitutional misuse and abuse of the State Bar anticipated by California Supreme Court (CSC) Justices Brown and Kennard in their dissenting opinions in the In re Rose and Obrien decisions [Plaintiff is NOT among those affected, as a non-licensee and non-attorney of any bar] of the CSC, in which Justice George, who authored the In re Rose decision, ceded the Court's authority to the State Bar [as it relates to licensees]."

61.    In this corner of the law, at least, we seem to be presiding over a union of the legislative and judicial components of government. It may be efficient; it certainly isn't pretty. And because it seems antithetical to the constitutional design . . ." – Justice Brown (In re Rose, 22 Cal.4th 430, 470 (2000).)

62.    "Because the law at issue makes State Bar Court judges subservient to members of the political branches, and because it alters the composition of the State Bar Court in a way likely to reduce public confidence in the attorney discipline system, the law is invalid under the separation of powers clause of the California Constitution." – Justice Kennard (Obrien v. Jones 23 Cal.4th 40, 63 (2000).)

63.    The State Bar desperately wants the Los Angeles attorney to shut up, go away and stop giving voice to the egregious corruption taking place in the State Bar. To accomplish this, the State Bar has pursued a malicious State Bar case and criminal prosecution to cover up the criminal malfeasance of Thomas Girardi for purely political reasons. The CSC's abdication of its former duty to hear oral argument and issue a written decision in State Bar disciplinary proceedings has resulted in this egregious denial of federal constitutional – due process rights and privilege.

64.    The solution is provided in the State Bar Act, as discussed by dissenting Justice Kennard, in In re Rose, supra, at 465:

18

65.     The majority asserts that this court can no longer spare the time and resources required to hold oral argument and write an opinion in every attorney suspension and disbarment proceeding. (Maj. opn., ante, at pp. 457-458.) Even if the majority is correct, as it may be, the proper solution is not an expedient but unreasonable construction of the state Constitution to deny attorneys the privileges granted to holders of all other occupational licenses. The Legislature has already given this court a better solution. In 1988, the Legislature amended Business and Professions Code section 6082 to permit review of an attorney discipline recommendation "by the California Supreme Court *or by a California Court of Appeal* in accordance with the procedure prescribed by the California Supreme Court." (Italics added.) Under the statute as amended, this court need only establish a suitable procedure, and the burden of giving disciplined attorneys their day in court can be broadly distributed among the Courts of Appeal. At current levels-attorneys sought review in roughly 40 suspension and disbarment matters in 1990 (see maj. opn., ante, at p. 457)-these attorney discipline cases would not substantially add to the workload of the nearly 90 justices of the Courts of Appeal. Should the volume of attorney discipline cases at any point begin to strain the capacity of the Courts of Appeal, the number of Court of Appeal justices could be increased. (Emphasis.)

66.     However, as long as In re Rose remains the law, the State Bar will continue to plague innocent respondents.

67.     Based on this Court's holding in In re Kramer, 193 Fed.3d 1131, 1132-1333, Mr. Doe is entitled an examination of the record in the State Bar proceeding, which denied him federal constitutional – due process.

68.     In *Selling v. Radford*, 243 U.S. 46, 50-51, 37 S.Ct. 377, 61 L.Ed. 585 (1917), the Court held that a federal court could impose reciprocal discipline on a member of its bar based on a state's disciplinary adjudication, if an independent review of the record reveals: (1) no

19

deprivation of due process; (2) sufficient proof of misconduct; and (3) no grave injustice would result from the imposition of such discipline. Thus, while federal courts generally lack subject matter jurisdiction to review the state court decisions, see D.C. Court of Appeals v. Feldman, 460 U.S. 462, 486, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); Rooker v. Fidelity Trust Co., 263 U.S. 413, 415-16, 44 S.Ct. 149, 68 L.Ed. 362 (1923), a federal court may "examine a state court disciplinary proceeding if the state court's order is offered as the basis for suspending or disbarring an attorney from practice before a federal court." *MacKay v. Nesbett*, 412 F.2d 846, 847 (9th Cir.1969) (citing *Theard v. United States*, 354 U.S. at 281-82, 77 S.Ct. 1274). (Id.)

69.     Mr. Doe was never found culpable of misconduct by any constitutional court. Moreover, he was not found culpable in the State Bar based on any evidence, a trial on the merits and review. Rather, he was the victim of an unconstitutional ultra vires void default strategy, which required him to be in two places at the same time. Doe was never allowed to present a defense by calling his clients or any other witnesses, cross-examine witnesses or challenge the false charges to establish a record to be reviewed by the CSC. (See State Bar Act – [Bus. & Prof. Code] §60852.) Rather, based on the default, there was no record to review and thus, no review under In re Rose. Thus, without a record to review, he received no review in the CSC and has been denied the federal constitutional – due process, which In re Rose, supra, at 439 references but does not provide.

70.     State Bar Court Hearing Department (Hearing Department) conducts evidentiary hearings on the merits in disciplinary matters. (Rules Proc. of State Bar (hereafter, Rules of Procedure), rules 2.60, 3.16.) An attorney charged with misconduct is entitled to receive reasonable notice, to conduct discovery, to have a reasonable opportunity to defend against the charge by the introduction of evidence, to be represented by counsel, and to examine and cross-examine witnesses. (§ 6085.) The Hearing Department renders a written decision recommending whether the attorney should be disciplined. (Rules Proc., rule 220.) Any disciplinary decision of the Hearing

Department is reviewable by the State Bar Court Review Department (Review Department) at the request of the attorney or the State Bar. (Id., rule 301(a).) In such a review proceeding, the matter is fully briefed, and the parties are given an opportunity for oral argument. (Id., rules 302-304.) The Review Department independently reviews the record, files a written opinion, and may adopt findings, conclusions, and a decision or recommendation at variance with those of the Hearing Department. (Id., rule 305.) A recommendation of suspension or disbarment, and the accompanying record, is transmitted to this court after the State Bar Court's decision becomes final. (§ 6081; Rules Proc., rule 250.)

71.     The CSC is not a trial court and cannot determine facts regarding the federal constitutional claims. The State Bar cannot determine these facts under Cal. Const. Art. III, sec. 3.5. (See Hirsh v. Justices of Supreme Court of California, 67 Fed.3d 708, 712-713 (1995). The CSC should have either dismissed the politically motivated charges against Mr. Doe or assigned the evidentiary issues raised by Doe's Petition for Review to a constitutional — article VI court for fact- finding to afford him the right to contest the charges, present evidence, cross-examine witnesses and establish a record for CSC review. However, based on the lack of any record resulting from the default and lack of jurisdiction in the State Bar, the federal constitutional claims cannot be determined through an unconstitutional summary denial afforded under In re Rose.

72.     **I. RELEVANT FACTS**

73.     **A. Mr. Girardi's Fraud Is the Motivating Factor for the State Bar Proceeding against Mr. Doe**

74.     Mr. Doe was co-counsel with Mr. Girardi personally and Girardi & Keese in multiple class actions and personal injury lawsuits. The cases were generated by Dor. Also assisting Girardi was senior partner Howard Miller, who subsequently became State Bar President during the time that the Ninth Circuit Court of Appeals had filed disciplinary charges against

Girardi, personally, together with others arising out of a $500 million fraudulent judgment pertaining to the Dole Fruit Company. (See In re Girardi, 611 Fed.3d 1027.)

75.     In Doe's class actions with Girardi — Girardi secretly received $10 million compensation to himself, which was paid to him by opposing counsel and their insurers in the class action. Each of these opposing counsels were members of the State Bar Board of Governors with Miller. The class members were awarded a judgment, which was not collectible because Girardi had misappropriated more than $10 million belonging to the class and to the medical lienors, including Medicare, Medicaid, and Medi-Cal.

76.     Doe had personal knowledge in connection with Girardi's fraudulent activities in his cases and in other cases of Girardi, Miller and their law firm that should have resulted in Girardi's substantial discipline by the Ninth Circuit Court of Appeals, including disbarment. Girardi's testimony and that of Walter Lack and others before the Ninth Circuit Court of Appeals was fabricated and intentionally false. Girardi feared that Gottschalk would testify against him in connection with the disciplinary proceedings. **<u>Doe filed complaints to require Girardi to return more than a billion dollars that Girardi had misappropriated together with Lack and others</u>**, including the $10 million that by court order was required to be paid to the class members and no money was awarded to Girardi or his firm. Girardi had breached fiduciary duties and engaged in <u>actual conflicts of interest together</u> with Lack and others and were terminated as class counsel and personal injury counsel by the plaintiffs. [emphasis added as to the patterns; predicate]

77.     **B. The Malicious State Bar Charges and Default Strategy**

78.     To attempt to prevent Doe from testifying against Girardi and bringing Girardi's misconduct to the attention of the Ninth Circuit judges, including with respect to other similar fraud schemes to the Dole Fruit Company investigation and void judgment, Girardi launched an unprecedented malicious and criminal attack against Gottschalk. Girardi and Miller, the President

of the State Bar, secretly filed a State Bar complaint against Doe seeking the State Bar to take over Doe's law practice, make Doe ineligible to practice law, and transfer the class action cases and the personal injury cases to Girardi, Miller and their firm. The trial judge in these cases warned the defense counsel that their conduct against Doe was not privileged and that he would disqualify defense counsel if they participated in such intentional fraud scheme and obstruction of justice against Doe, acting in concert with Girardi and others. As a result of Girardi's misconduct in seeking to punish Doe and to take over these cases to conceal Girardi's receipt of more than $10 million in sub rosa unlawful compensation, <u>Doe and his clients lost more than $20 million in settlement funds that would have been paid to these plaintiffs who received no moneys from the class action judgment of more than $30 million.</u> [who is paying this?]

79.     The State Bar prosecutor Paul O'Brien stated that the State Bar had no jurisdiction to take over Doe's law practice because there were no formal proceedings against him. Subsequently, Doe learned that Girardi and Miller, as President of the State Bar, had promised O'Brien a judgship in the Los Angeles Superior Court if he filed disciplinary charges against Doe and then sought to have Doe be deemed mentally incompetent by the State Bar so that he could not testify against Girardi in the federal disciplinary proceedings and in the civil litigation. O'Brien brought a fabricated disciplinary complaint against Doe based on knowingly fabricated evidence and withheld from Doe exculpatory evidence that showed that Doe was completely innocent.

80.     Thereafter, Doe and his counsel prepared the case to go to trial, filed an extensive answer to the fabricated charges, produced voluminous documents that showed that Doe was innocent, and listed more than 150 witnesses to be called at trial, including Girardi and Miller. However, on the eve of trial, O'Brien filed an emergency motion with the State Bar supervising judge stating that the State Bar had violated Doe's constitutional rights by withholding for more

than three years O'Brien's belief that Doe was mentally incompetent and therefore should be deemed involuntarily inactive.

81.     The State Bar hearing officer [Patrice McElroy] did not believe O'Brien and stated on the record that Doe was perfectly sane. However, Girardi and Miller approached McElroy ex parte and promised to renew her hearing officer judgeship if she caused Doe to become inactive.

82.     The proceedings dragged on for more than six months, in which Doe could not represent himself or testify against Girardi. Doe finally prevailed in the State Bar Court mental health hearing. The State Bar Court [McElroy] ruled that the declarations of the witnesses against Doe were not credible and that any witnesses against Doe would have to testify in person and be subject to vigorous cross-examination.

83.     After Doe had won the parallel civil cases to the fraudulent case in the State Bar Court, the State Bar prosecutor O'Brien, acting in concert with Girardi and Miller, caused the District Attorney to charge Doe with the crime of embezzlement with the District Attorney of Los Angeles County, even though Doe won the parallel civil cases regarding the same issues and the same complainants. Doe was arrested an incarcerated for 29 days in the Twin Tower's Psychiatric Ward at the direction of O'Brien, Girardi, Miller and others. However, as discussed, immediately prior to this, the State Bar Court [McElroy] had ruled at trial that Doe was perfectly sane and was able to practice law without a monitor.

84.     Immediately thereafter, McElroy, acting in concert with Girardi, Miller, and O'Brien, stated that Doe's State Bar case would go to trial on the same date and time as the preliminary hearing in the Criminal Court. Thus, the State Bar and Criminal proceedings would take place simultaneously in two courts at the same time unless Doe surrendered his license to practice law.

85.     Doe was mistreated in the County Jail and Mr. O'Brien, acting in concert with Mr. Girardi and Mr. Miller, told the Los Angeles County Sheriff's Dept. And their high command to withhold Doe's diabetic diet and diabetic medication and to substitute his vitamins for diabetes with anti-psychotic drugs without the knowldege or consent of Doe. Doe was held in solitary confinement for 29 days even though excessive bail was available within one day of his arrest.

86.     In the mean time, the CSC mandated the State Bar Court and the State Bar Board of Governors, including Miller, as President of the State Bar, to vacate its intentional default rules against respondents and to no longer engage in an intentional default strategy to discipline lawyers in violation of their constitutional rights, including their due process rights. This was contained in a memorandum by Colin Wong to the State Bar judges and the State Bar prosecutors from the CSC

87.     Regardless, O'Brien, acting in concert with Girardi and Miller, proceeded to engage in the same intentional default strategy that had been condemned by the CSC and ordered to be vacated and not utilized by the State Bar prosecutors and State Bar judges against respondents and similarly situated persons such as Mr. Doe.

88.     O'Brien had been offered a judgship in the Los Angeles Superior Court and other unlawful consideration by Girardi if he intentionally defaulted Doe and thereby caused Doe to be deemed inactive and disbarred without a trial. O'Brien was ordered to attend a multi-day evidentiary hearing in the Criminal Court preparatory to the preliminary hearing that was to take place at the same time and date as the State Bar Court trial. O'Brien secretly went before the State Bar Court prior to attending the evidentiary hearing in the Criminal Court with respect to the intentional withholding of exculpatory evidence by the prosecutors in both the State Bar Court and the Criminal Court. He spent five minutes to intentionally default Doe to make him inactive and to recommend Doe's disbarment without serving the pleadings on Doe's counsel. O'Brien prepared fabricated declarations for each of the complainants and told them that, if they signed the

fabricated declarations, they would receive money from the Client Security Fund to irreparably prejudice Doe.

89.     O'Brien was the subject matter of multiple media reports as to his prosecutorial misconduct and fabrication of evidence against multiple attorneys. Leader of the Criminal Court Bar and others asked former Governor Schwarzenegger to withdraw O'Brien's name from nomination as a judge, which the Governor did based on the pattern of prosecutorial misconduct not disclosed by O'Brien in his applications to be a judge.

90.     Doe's attorneys filed six (6) declarations of fault under Code Civ. Proc. §§473(b)&(d),which was not contested by the State Bar prosecutor, but ignored by the State Bar judge. The proposed recommendation of disbarment was prepared by the prosecutor and included a provision that Girardi was entitled to the $10 million that he received. This is contrary to the court's order denying Girardi any moneys whatsoever, especially since he had been fired by the class lead counsel and the plaintiffs for breaches of fiduciary of duty and actual conflicts of interest, without any disclosure on the record.

91.     **C. Girardi's Connection to Doe's State Bar Proceeding**

92.     Girardi is the chief power broker in connection with the State Bar and with the State Bar Board of Governors. He is also the largest contributor to the State Bar Foundation, which he also controls together with his associates commonly referred to as the Girardi Group. This includes Jerome Falk, who was appointed by the State Bar to be the special prosecutor in the State Bar disciplinary case against Girardi and Lack.

93.     Falk did not disclose on the record that he and his firm were long time personal attorneys for Girardi and Lack, including with respect to the misappropriation of $20 million of class members' moneys rom the settlement of a San Diego Superior Court class action. Falk and his firm Howard Rice did not disclose to Doe when they were representing Doe that they also

represented Girardi and Girardi & Keese. Howard Rice requested Doe to provide them under an attorney/client relationship with information as to moneys misappropriated by Girardi from class actions and mass settlements, as well as similar fraud schemes to that practiced against Dole Fruit Company. This information that was provided in confidence to Howard Rice was provided to Girardi by said Howard Rice and their attorneys.

94.     Girardi and Miller then conceived a corrupt plan and scheme to try and shut Doe up to prevent him from testifying in the federal disciplinary case against Girardi and in conjunction with major misappropriations of client moneys in multi-million dollar settlements and without paying the super priority medical liens in connection therewith in excess of billions of dollars. Girardi instigated the State Bar proceedings and offered a judgship in the Los Angeles Superior Court to O'Brien to intentionally default Doe and to cause him to be falsely charged with fabricated crimes, even though he was innocent and had prevailed in the parallel civil cases.

95.     Girardi has continued to seek disbarment sub rosa with respect to his co-counsel in litigation after Girardi is caught settling cases for moneys that belong to the clients and not Mr. Girardi. For example, Girardi received sub rosa more than $50 million in the Erin Brockovich case, which was reported to Mr. Doe by multiple attorneys in connection with those transactions. Girardi misappropriated more than $120 million in connection with the Gutierrez class action in a published opinion, Gutierrez v. Girardi, (2011) 194 Cal.App.4th 925. Girardi was involved in massive illegal campaign contributions to the John Edwards national campaign for President and in other election campaigns, including elections of judges of the Los Angeles Superior Court. Girardi had his private investigator Tom Layton put on the State Bar payroll to be used to dig up dirt against his opponents and to intervene on behalf of candidates for judgeships with the Governor to secure their appointment, without disclosure that they were hand picked by Girardi.

96.     **D. Girardi's State Bar Connections**

97.     Girardi cemented his power broker status and political connections with the State Bar hierarchy with the use of illegal contributions and funding to supplement their income. He supported each State Bar chief trial counsel with illegal contributions that were not reported for income tax purposes. This included former State Bar Chief Prosecutor Michael Nisperos for whom Girardi underwrote his extensive illegal drug consumption, including heroin. Girardi illegally funded the campaigns of Joe Dunn with Medicare Trust Funds and other illegal contributions. Girardi gave massive gifts to the State Bar hierarchy, including the use of his private planes for their transportation, including Beth Jay and Joe Dunn. Girardi personally intervened on behalf of his clients, such as Ron Burkle, to fabricate State Bar cases against Burkle's opponents. Girardi withheld major settlements from Doe's former clients, without providing them an accounting or copies of the settlements when they occurred and utilized a substantial portion of that money to fund illegal contributions in judicial campaigns to put his friends on the court and to funnel moneys illegally to politicians that he controlled and would reward Girardi with financial favors.

98.     Girardi, Miller and the Girardi Organization control the State Bar through its inter-relationship with the Judicial Council and CSC, including the extensive relationship with the former Chief Justice George and with the present personal counsel Beth Jay to the current Chief Justice and former Justice George.

99.     The major misappropriation of moneys by the Administration of Courts (AOC) is traceable directly to those who were appointed at the direction of Girardi to executive positions with the AOC. Girardi is known as the banker with regard to class action and complex lawsuits filed in the Los Angeles Superior Court, whose complex department is commonly referred to as the bank. In one recent case, Girardi did not disclose his personal relationship with the chief opposing counsel, who made arrangements to give Girardi $90 million for essentially services that were never performed and to defraud the insureds of Farmers Insurance Co. in excess of one billion

dollars. None of the judges of the complex department disclosed on their economic forms 700 the receipt of millions of dollars from Girardi over multiple years, which is why Girardi is known as the banker nationwide. He is also the banker for the State Bar and the State Bar Foundation. He has also arranged for unlawful moneys to be paid to State Bar officials, including the Executive Director of the State Bar and the former head of State Bar Discipline Judy Johnson, her friends and associates.

100.    Girardi did not disclose that he was actively seeking a federal judgeship for Rory Little, the special prosecutor in his disciplinary case, and had personally intervened with multiple U.S. Senators on his behalf. Girardi also did not disclose his relationship with Little's wife and her law firm when he sought the appointment as the special prosecutor in his case. Additionally, Girardi sought intervention to appoint the current President of the State Bar to a federal judgeship who assisted Girardi in connection with the appointment of Little as the special prosecutor in Girardi's discipline case, knowing that Mrs. Little was a partner of that firm.

101.    **E. The Politically Connected Thomas Girardi Is Found Not Culpable by the State Bar – Contrary to the Decision of this Court**

102.    The politically connected Girardi, Lack and Paul Traina were sanctioned $390,000 and admonished and/or suspended by the Ninth Circuit for committing fraud on the court, but never subjected to any proceeding or discipline by the State Bar. Due to Girardi being the law partner of State Bar President Miller and Miller's involvement in the fraudulent matter, a State Bar insider and colleague of Miller's, Falk of the Howard Rice firm, was appointed as a special prosecutor. [Falk's partner Douglas Winthrop is an officer of the State Bar and serves on the Board of the California Bar Foundation with Miller.] Falk then ignored the Ninth Circuit findings that these lawyers committed a fraud on the Court.

103.     In the Ninth Circuit, special master Judge A. Wallace Tashima concluded Girardi "recklessly" made false statements, while Lack and Traina acted "knowingly, intentionally and recklessly" and assessed sanctions ($390,000), which the offending firms and lawyers did not oppose. However, based on the lawyers' objections to the findings regarding their intent to defraud the Court, the Ninth Circuit appointed Hastings law professor Little as a special prosecutor, who found Judge Tashima's findings to be "accurate and provable by clear and convincing evidence." The Ninth Circuit then adopted Judge Tashima's report and conclusions in a published opinion – In re Girardi, 611 Fed.3d 1027, 1039-1040 (2006).

104.     "The history of the enforcement action demonstrates the multiple occasions on which they chose to remain willfully blind to the fact that they were making false statements. By the time they appeared in this court, the attempt to salvage their case became indistinguishable from a knowing submission of false documents. Suspension is the appropriate discipline for these Respondents . . . Respondents in this case have been respected members of the bar, and each has presented significant mitigating evidence. Their conduct in this case, however, cannot be excused on that basis, given their culpability and the substantial injury their conduct caused the opposing parties and this court. We have carefully considered the recommendations of Judge Tashima and Professor Little, who have made our task substantially easier and whose assistance we gratefully acknowledge. We impose discipline as follows:

105.     THOMAS V. GIRARDI is formally reprimanded.

106.     WALTER J. LACK and PAUL A. TRAINA are suspended from practice before the Ninth Circuit for six months.

107.     These disciplinary orders and findings satisfy the State Bar's standard of proof for imposing discipline and are considered res judicata (proven), which State Bar respondents are collaterally estopped from denying or disputing. (§ 6049.1; In re Kittrell, supra, 4 Cal. State Bar

Ct. Rptr. 195, p.7.) Regardless, the State Bar and Falk exonerated these lawyers solely on political grounds.

108.    Thus, without having been found to have engaged in misconduct by any constitutional court, Doe is severely disciplined [disbarred]; whereas, the State Bar exonerated Girardi, Lack and Traina; all of whom were found to have engaged in severe misconduct by this Court.

109.    The State Bar's pursuit of charges against Gottschalk on such an improper and selective basis constitutes an egregious abuse of the prosecutor's duties and a denial of due process. (Freeman v. City of Santa Ana (9th Cir. 1995) 68 Fed.3d 1180, 1187.) As arm of the California Supreme Court, the State Bar must regulate "impartially" to ensure that "justice shall be done." (Berger v. United States (1935) 295 U.S. 78, 85, 88 [government not "an ordinary party," but is a 'sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done"].) Plainly, that was not done here." [end Amicus Curiaea/Facts; Phil Kay]

## CALIFORNIA STATE AUDITOR PROVIDES CLEAR AND CONVINCING
## EVIDENTIARY SUPPORT, PREDICATE, PARALLEL AND ONGOING THREATS

1 1 0 .   According to Plaintiff's judicially noticed record and the California State Auditor's published reports, predicate acts of racketeering activity with protectionist behavior exist in plain sight.

1 1 1 .   Specifically, and as noticed in each State Action 1 and State Action 2,

---

15. AB 3249 reads "(2) The act [amending BPC 6001.1, BPC 6094, and other statutes] **requires** protection of the public to be the highest priority for the State Bar and the board of trustees in exercising their licensing, regulatory, and disciplinary functions."

Assembly Bill No. 3249, Ch. 659, p. 2

112.

| | |
|---|---|
| 21. | In considering the *Rowland* factors, "[t]he most important policy consideration is the foreseeability of harm."<br><br>*Johnson v. County of Los Angeles* (1983) 143 Cal.App.3d 298, 307-308 [191 Cal. Rptr.704] |
| 22. | "[3] However, where a complaint alleges injuries resulting from the criminal acts of third persons as here "the common law, reluctant to impose liability for nonfeasance, generally does not impose a duty upon a defendant to control the conduct of another (*Richards v. Stanley* (1954) 43 Cal. 2d 60, 65 [271 P.2d 23]; Rest.2d Torts (1965) § 315), or to warn of such conduct (Rest.2d Torts, supra, § 314, com. c; Prosser, Law of Torts (4th ed. 1971) § 56, p. 341), <u>unless the defendant stands in some special relationship either to the person whose conduct needs to be controlled, or to the foreseeable victim of such conduct</u>."<br><br>*Tarasoff v. Regents of University of California*, supra, 17 Cal.3d at p. 435;<br><br>[ROA #49] Declaration [of Carissa Andresen] in Support Filed by Kumar, Anand; Morgenstern, Eli David; Nunley, Joy; The State Bar of California on 2/14/2022<br><br>[ROA #60] FAC p. 34-35, ¶ 78 |

## INTERSTATE COMMERCE IS ACUTELY THREATENED

1 1 3 . There are several parallel and subsidiary enterprises within the horizontal profession of providing legal services in California which uniquely affect interstate commerce in the United States, controlling an estimated $3.4 trillion gross state product annually.

1 1 4 . The enterprises are associated-in-fact or associated-in-acts or associated-in-interests or associated-in-control. Together, they hold $5 billion or more at any given point in client funds held in interest only lawyer trust accounts (IOLTA). They distribute and receive $250M+ yearly from themselves or from the government to themselves in their horizontal profession, among them 700 lawyers who received 4+ "private letters" according to Report 2022-030.

1 1 5 . In restraint of trade, non-licensees of STATE BAR seeking to provide legal services within California (e.g., to sue The State Bar of California or its official agents) from inside or outside of California must obtain Enterprise 2 (and Court) authorization under Rule 9.40. When viewed with the misuse of STATE BAR by its private actors, 15 U.S.C. § 1 violations are *per se*.

1 1 6 . In restraint of trade, STATE BAR is controlled at every level of its operations by majority of active market participants purporting to regulate themselves without state supervision, where the Racket exists, and similar rackets exist using Enterprise 2 to further interests of Enterprise 3+ under the presumption of competence associated with Enterprise 1, and the schemes to delay, oppress, and render victim persons like Plaintiff. For Enterprise 1, if you fail to play by the rules, Enterprise 2 will get you, or Enterprise 2 will help you, depending on what skin in the game exists undisclosed to the public or Legislature without clearly articulated state policy for the taking from Plaintiff in their favor.

1 1 7 . Specifically, the abuse of *pro hac vice* privileges – which slanders title to all ethical STATE BAR licensee credentials across state lines – is shown by example federally in *Catanzarite v. GCL, LLC (In re Daymark Realty Advisors, Inc.)*, No. 21-12766, (11th Cir. Mar. 9, 2022).

33

118.   Specifically, all functions of STATE BAR from Board of Trustees, Executive Director, Office of General Counsel (Complaint Review Unit), Office of Chief Trial Counsel, Complaint Review Unit (Office of General Counsel), State Bar Court, Client Security Fund, intake, investigation, prosecution, defense, licensing, regulatory, disciplinary functions, and antitrust determinations in California are used to advance private interests of bad actor Enterprise 1 careers and Enterprise 3+ money, business, and property, while taking away from public interests.

119.   In this case, it took from Plaintiff's business, property, and freedom by enabling deliberate schemes to defraud financial institutions, issuers of interstate securities, and courts.

120.   In this case, nonsovereign defendants with CLC say they are allowed to do it to Plaintiff because they are among Enterprise 1 as in their conduct as court officials is "privileged" or "protected activity" merely on "behalf of clients". They know this is fraudulent and false.

121.   Conveniently, as to DURAN, GRANDT, JTT, NMC, TJO, BW, and KJC's discipline or lack thereof despite the evidence here: Enterprise 2 will not do anything because STATE BAR didn't do anything before and The State Bar of California policy or operations are shown to disregard Court of Appeal rulings from California or the United States Circuits.

122.   Generally, the subjective interpretation of any (state or federal) law comes from the Office of General Counsel and thereby becomes gospel, which is used to establish whatever unreasonable conduct may be undertaken.

123.   In restraint of trade and federally protected rights, STATE BAR is oppressing United States citizens not limited to Plaintiff under artifice of sovereignty through the threat of Enterprise 2 and in accounted and unaccounted interests of Enterprise 1 and Enterprise 3+, even using Cal. Cod. Civ. Proc. § 425.16 which Legislature codified citing 1st Amendment of the United States Constitution rights to protect free speech and the right of petition.

34

124. Cal. Cod. Civ. Proc. § 425.16 was converted to legal fees by Enterprise 2 in favor of Enterprise 1 and Enterprise 3+, while *restricting* the right of free speech and petition for United States citizens and other non-active market participants, among them Plaintiff and ROES 1-150,000, and/or by delaying unnecessarily their rights to life, liberty, and equal protection under state law under color of sovereignty.

125. The conduct at issue is stealing from old or indigent people like Roger Root and Tom Mebane, using corporate shells or "guardian" positions where Plaintiff can barely keep up with and document the fraud he identifies. These "clients" will thus never ask for an accounting of an IOLTA account, especially where Enterprise 2 decides what goes to "abatement," or how "Complaint Review Unit" decisions might influence the imposition of "discipline" or "regulation."

126. As to the CSF scheme… "The Fund does not reimburse interest, expenses or incidental or consequential losses caused by the attorney, such as fees paid to another attorney or damages caused by the attorney's malpractice, negligence or incompetence. You must show that the attorney received the money or property."

127. "The Client Security Fund Commission administers the Client Security Fund and is supported by legal counsel who issue decisions on behalf of the Commission. The Commission is made up of five volunteers – three lawyers and two nonlawyer public members – appointed by the State Bar's Board of Trustees. The Fund determines if your application qualifies for reimbursement and whether all or part of the application will be paid."

128. "If you have not already done so, you need to file a discipline complaint against the lawyer. The online complaint form is available on the State Bar website in English, Spanish, Vietnamese, Korean, Russian, and Chinese. You may also write or call toll-free: The State Bar of California, Intake Unit, 845 South Figueroa Street, Los Angeles, CA 90017-2515 800-843-9053." [noting how STATE BAR links discipline to damages here, and the gaps shown].

35

129.   "This fund was designed to [conceal, selectively pay] attorney theft or an act equivalent to theft. In order for your request to be considered, you must establish that the money or property you are seeking to have reimbursed actually was received by the attorney and was wrongfully retained by the attorney. You may not request and will not be paid interest on any money you state that you have lost. You also may not request and will not be paid any incidental or consequential losses or expenses caused by the attorney. Examples of incidental or consequential losses would include fees you paid another attorney or damages caused by

4.  a.  What did you hire the attorney to do?
☐ Criminal Matter              ☐ Probate                    ☐ Other: _____
☐ Marriage Dissolution         ☐ Workers' Compensation
☐ Personal Injury              ☐ Loan Mod/Foreclosure

b.  **VERY IMPORTANT** Describe in chronological order, **on a separate piece of paper**, the attorney's conduct that led to the loss. Please be as detailed as possible and specify amounts and dates. You **MUST provide copies of documents** which support your loss—such as **retainer agreements, the front and back of cancelled checks, receipts and other documents** that show the attorney received money or property.

5.  a.  **AMOUNT YOU ARE REQUESTING FROM THIS FUND (Reminder: You may only request an amount that was received by the attorney. Other types of losses are not covered. See front of application for explanation.):**   $ _____

b.  How would you describe your loss?
☐ Advanced fees and costs      ☐ Loan
☐ Entrusted funds              ☐ Settlement funds
☐ Investment                   ☐ Other: _____

6.  a.  Date loss occurred _____
                                month          day          year
b.  Date loss was discovered _____
                                month          day          year

7.  a.  Did any family or other personal relationship exist between you and the attorney at any time?
☐ Yes      ☐ No
b.  If yes, explain the relationship _____

malpractice, negligence or incompetence."

130.   https://www.calbar.ca.gov/Portals/0/documents/forms/csf/CSF_Reimbursement_Application.pdf

36

1 3 1 .  This is a public insurance scheme, misrepresented to the public and but a de minimis line item for Racket, although it is also designed to bring everything back to <u>Enterprise 2</u>.

**ASSIGNMENT OF APPLICANT'S RIGHTS AND SUBROGATION:**

Upon payment of all or any portion of the sums requested, you, the undersigned, to the extent of such payment, hereby assign to The State Bar of California your claims, lawsuits and judgments against any and all persons who are primarily and or secondarily liable arising out of the above described dishonest acts, including lawsuits against banks, insurance companies, etc. You authorize The State Bar of California to prosecute all claims, lawsuits and judgments either in your name, that of the State Bar of California or its Client Security Fund, or in the names of both as the State Bar of California alone shall decide.

In the event that the amount paid to you by the Client Security Fund is not payment in full for all losses which you have suffered, then any amounts recovered by the State Bar in excess of the amount paid to you plus its costs of collection, shall be paid to you.

You agree that following any payment to you by the State Bar, you will cooperate with it in prosecuting any claim, lawsuit or judgment.  You also agree that all civil actions to be taken or continued will be taken or continued under the full control of the State Bar upon payment to you in any amount by the Client Security Fund.  You also agree that the State Bar may, as it alone decides, prosecute or fail to prosecute, or abandon the claim, lawsuit or judgment without obtaining your consent.

You agree to cooperate in the investigation of this reimbursement request and any related disciplinary proceedings against the lawyer in question.  You agree to provide any additional information and sign and deliver to the State Bar of California such documents as may be required related to any matter pertaining to the application.

You waive any rights that you may have against the Client Security Fund, State Bar of California, any of their officers, employees, members of the Board of Trustees, and all other committees regarding the payment or denial of this reimbursement request; or for failure of any of them to pursue or achieve any particular outcome regarding any claim, lawsuit, or judgment.  Applicant shall inform the State Bar of California of the status of any proceeding against any person or party who is liable for the losses which are the basis of this application.  In the event applicant receives any recovery while this application is pending, applicant shall inform the Client Security Fund and the State Bar of California.

Your rights and remedies are subject to the Client Security Fund rules, which may be amended from time to time.

NOTICE TO APPLICANT

**THE STATE BAR OF CALIFORNIA HAS NO LEGAL RESPONSIBILITY FOR THE ACTS OF ATTORNEYS. PAYMENTS FROM THE CLIENT SECURITY FUND ARE SOLELY WITHIN THE DISCRETION OF THE STATE BAR.  BY APPLYING TO THE CLIENT SECURITY FUND, THE APPLICANT ACKNOWLEDGES THAT HE OR SHE MAY BE GIVING UP THE RIGHT TO PURSUE A CIVIL ACTION FOR THE SAME RECOVERY AGAINST A THIRD PARTY.**

1 3 2 .  Where less than 5% of cases saw "discipline" for the last decade or so according to the California Staet Auditor, CSF Rule 3.432 Required status of attorney [to request reimbursement from the Client Security Fund scheme] (A) To qualify for reimbursement, an application must establish that the attorney whose dishonest conduct is alleged has (1) been disbarred, disciplined, or voluntarily resigned from the State Bar; (2) died or been adjudicated mentally incompetent; or (3) because of the dishonest conduct become a judgment debtor of the applicant in a contested proceeding or been convicted of a crime. (B) The Commission or Fund Counsel may waive provision (A) of this rule Pursuant to guidelines set by the Commission. Rule 3.432 adopted effective January 1, 2010; amended effective May 17, 2019.

1 3 3 .  In short, as a layman, this is what all the jargon means: "**attention corrupt lawyers**, ensure each amount you steal is $100,000+, use your IOLTA, limit documents. We got you."

37

## ENTERPRISE DESCRIPTIONS

134. <u>Enterprise 1</u>. The first association-in-fact enterprise consists of "more than 250,000 [STATE BAR licensed] attorneys…[including subject active market participants detailed within] 16,000 complaints of attorney misconduct annually…[and the same active market participants who receive, or who] distribute[] over \$78 million in [annual] grants to legal aid organizations [operated by active market participants in the same horizontal trade or profession, all of whom are regulated by the same active market participants without supervision of STATE, now necessarily U.S.]."

135. <u>Enterprise 2</u>. The second enterprise operates via DURAN through nonsovereign public entity corporation THE STATE BAR OF CALIFORNIA with legal malice by active market participants furthering their own interests, before July 20, 2022. Board of Trustees for <u>Enterprise 2</u>, in special relationship to Plaintiff victim, ratified fraudulent schemes July 20, 2022, as shown.

136. <u>Enterprise 2</u>, Directly controlled by active market participants falsely purporting to regulate, THE STATE BAR OF CALIFORNIA operates several shown, deliberate schemes to defraud members of the public in favor of active market participants that damaged Plaintiff. <u>Enterprise 2</u> is concealed among the corruptly asserted immunities, state codified privileges, or otherwise to influence judicial officers – in each case backed by their monopoly and ability to threaten, coerce, or take from anyone at any time for any reason under "sovereignty" or politically.

137. <u>Enterprise 3+</u>. Parallel or subsidiary enterprises consist of nonsovereign associations-in-fact or association-in-acts, control, or unity of interest law firms* (public and private), entities they create or control together to move assets and monetary instruments such as property owners' associations, LLCs, other "trusts," and the bank accounts associated therewith including but not limited to IOLTAs (all without supervision of State, or US).

138. Among <u>Enterprise 3+</u> is CLC, and AEGIS. Interests in <u>Enterprise 3+</u> were owned, operated, licensed, regulated, disciplined, and controlled for all matters including corporate

governance, administrative, management, criminal prosecution and defense of the same conduct, administrative prosecution and defense of the same conduct, civil prosecution or defense of the same conduct, and even judicial officers among Enterprise 1's "more than 250,000 attorneys…[including the subject active market participants detailed within] 16,000 complaints of attorney misconduct annually…[and those active market participants who receive, or who] distribute[] over $78 million in [annual] grants to legal aid organizations [operated by active market participants in the same horizontal trade or profession, all of whom are regulated by the same active market participants without supervision of STATE]."

139. Enterprise 2 is factually operated to the ongoing benefit of Enterprise 1 and Enterprise 3+ via STATE BAR and its roller coaster of bad actors and scandals. Plaintiff incorporates 2012 to 2022 State Auditor reports here, including "money laundering" (2+ acts).

140. Active market participants also operate Enterprise 2 postal mail and wire schemes overtly to dismiss, diminish, label non-active market participant losses as "de minimis," delay, conceal, estop, limit, disclaim responsibility for, oppress and obscure severe injuries, loss of money, and damages inflicted upon non-active market participants like Plaintiff using artifice of State law. At the same time, each defendant shown deliberately, and unjustly enriches Enterprise 1 and/or Enterprise 3+ in exercising daily licensing, regulatory, and discipline functions of Enterprise 2 without any form of applicable sovereignty, while citing irrelevant immunities and non-existent discretion to take from Plaintiff that is unlawful in the United States (since 1871).

141. Enterprise 2 is funded by active market participant fees paid annually, which are paid back to their own horizontal profession, sometimes funded by Legislature or even the federal government for "legal aid" for "homelessness" which funds Plaintiff did not see to aid him in preventing his own threatened homelessness.

142. Unequally, the funds are instead sent back to its horizontal profession. Converse with public statements of its operations falsely claiming STATE BAR protects the public (or tries to), Enterprise 2 makes parallel payments to Enterprise 1 and Enterprise 3+ which exceed annual payouts from the "Client Security Fund" public insurance scheme executed by wire and postal mail by a magnitude of approximately **25X or greater**. Client Security Fund was converted by Enterprise 2 and the attorney needs to be disciplined for an application to conclude. In other words, the actual liabilities are probably 1,000X greater than what is disclosed from this scheme, where not even the facts underlying the instant action were disclosed to the auditors in 2022 before publications in April and May.

143. Enterprise 3+ includes some combination directly or indirectly among Enterprise 1, among them persons KJC, CLC, AEGIS, STATE BAR, JTT, NMC, BW, EDM, Aegis Builders, Inc., Best Best Krieger, "$5B" in IOLTAs, and entities formed by, with, under, entrusted, in trust, or managed among them by DURAN, KJC, JTT, GRANDT, NMC, BW associated therewith using STATE BAR authority to engage in racketeering activity shown directly or indirectly by control, or to use the proceeds, and to re-invest them back among Enterprise 1 and Enterprise 3+ as needed.

144. Schemes of Enterprise 2 prove anticompetitive conduct is not only shown difficult to discern, but willfully disregarded, and flagrantly violated under color of STATE law as recently as October 4, 2022. Judicially noticed evidence in State Action 1 and State Action 2 show beyond reasonable doubt for the twenty-year period 2002-2022: THE STATE BAR OF CALIFORNIA is a protection agency for Enterprise 1 and Enterprise 3+ and GRANDT, DURAN (as in, the Board of Trustees acting with Office of General Counsel in prosecution, regulation, defense, discipline, recovery for insurance claims from CSF, appointment of payors for CSF who are also majority active market participants, and "abatement" where EDM knows of at least two parallel schemes but does nothing) are involved and in privity with the conduct at issue as a matter of law.

145.    STATE BAR and DURAN's operational decisions and overt acts communicated by wire to Plaintiff July 20, 2022, conflict directly with statements made by the same nonsovereign actors, including purported "strategic plans" by wire press release containing deliberate misstatements of material facts affecting not less than 39 million persons in California alone.

146.    The following fraudulent schemes are used to advance the interests of active market participants at every stage by mail, wire, violative of RICO 1961 thousands of times each year through Enterprise 2 by Enterprise 2 and Enterprise 3+, and in perpetuity, continuing, and severely causing injury to public persons under artifice of state authority, discretion, and sovereignty:

> A) Attorney Discipline Complaint in 200+ Languages (Notice of Public Injury)
>
> B) Office of Chief Trial Counsel ("Intake," "Abatement" [Selective Concealment])
>
> C) Complaint Review Unit (Office of General Counsel, Defending Tort Claims)
>
> D) "*In RE: Walker*" ([Active Concealment] + [Artificial Authority and § 1962(d)])
>
> E) "Client Security Fund" (Fraudulent* Public Insurance Scheme) CRPC 1.01[4].
>
> F) Government Claims Act Form (After Which Enterprise 2 Conceals, Oppresses)
>
> G) Office of General Counsel as Defense Law Firm (also Complaint Review Unit)
>
> H) Grandt, Duran Willfully Oppress Plaintiff via CCP § 425.16, *Pro Se* Legal Fees
>
> I) Schemes "Recommend" Retention of More (Fearful) Active Market Participants

147.    Enterprise 1 and Enterprise 3+ actors are shown to take or convert money, business interests, property, capital stocks, insurance policies, funds held on behalf of clients for which STATE BAR via Enterprise 2 which is engaged in the conduct at issue, as evidenced by the simple fact that even deliberately fraudulent cases and claims maintained under self-purported California Supreme Court-granted sovereignty are ratified in favor of active market participants. Here, there exists final adjudication of predicate, parallel, and ongoing acts of serial non-judicial and judicial fraud, with an ongoing lack of standing, damaging Plaintiff under full authority of state actors.

**CULPABLE PERSONS IN THIS ACTION UNDER RICO**

148. Defendant THE STATE BAR OF CALIFORNIA is a culpable person and bad actor who can't operate distinctly of DURAN, EDM, GRANDT, nor WILSON here, who each use and direct Enterprise 2 as conduit to acquire, directly or indirectly, Enterprise 1 and Enterprise 3+ interests or monies and affecting interstate commerce through a pattern of racketeering activity with at least legal malice, fraudulent concealment, ratification, and judicial fraud. Enterprise 2 also acts as its own purported supervisor for IOLTAs, governance by its majority active market participants among Board of Trustees from Enterprise 1 and Enterprise 3+. Plaintiff's business and property were directly and proximately injured by reason of defendant THE STATE BAR OF CALIFORNIA's violation of § 1962(a)-(b), and by its official actors bad acts under § 1962(c)-(d) and Cal. Gov. § 815.6. Defendant THE STATE BAR OF CALIFORNIA had a negative duty under Cal. Gov. Cod. § 815.6 not to engage in conduct listed under 18 U.S.C. § 1961. STATE BAR and DURAN are both named defendants. Cal. Gov. Cod. § 815.3(b). This entity is used for protection, is not sovereign, and must be liable. Official acts of DURAN are subject to 42. U.S.C. § 1983 claims, here, too, for which STATE OF CALIFORNIA is liable under Cal. Gov. Cod. § 815.3(b).

149. Defendant CATANZARITE LAW CORPORATION is a culpable person, who conducts or acquires one or more aspects of Enterprise 3+ among Enterprise 1 constituents affecting interstate commerce through a pattern of racketeering activity through overt acts of judicial fraud, legal malice, actual malice, wire fraud, mail fraud, extortion, coercion, securities fraud, larceny, insurance fraud, with ongoing intent to defraud litigants, judicial officers, insurance companies, regulators, and issuers using similar methods with similar victims as being non-active market participants. Plaintiff's business and property were directly and proximately injured by reason of defendant CATANZARITE LAW CORPORATION's violation of RICO § 1962(a)-(b). Defendant THE STATE BAR OF CALIFORNIA, EDM, DURAN, and GRANDT are each a

42

substantial factor in the conduct, fraud, and racketeering activity of CATANZARITE LAW CORPORATION actors among Enterprise 1, because any reasonable person would agree that each contributed to the damages to Plaintiff's business/property, where control is a substantial factor and substantial factor is the test, here, and moral turpitude is self-evident. CACI 430. CRPC 8.4.

150. Defendant KENNETH J. CATANZARITE, ESQ. is a culpable person, who conducts or acquires one or more aspects of Enterprise 3+ alike CLC, AEGIS, and Aegis Builders, Inc. among Enterprise 1 affecting interstate commerce through a pattern of racketeering activity through overt acts of non-judicial fraud, judicial fraud predicated upon nonjudicial fraud, legal malice, actual malice, wire fraud, mail fraud, extortion, coercion, securities fraud, larceny, insurance fraud, with ongoing intent to defraud litigants, judicial officers, insurance companies, regulators, and issuers. Plaintiff's business and property were directly and proximately injured by defendant KENNETH J. CATANZARITE, ESQ.'s violation of RICO § 1962(a)-(d).

151. Defendant NICOLE MARIE CATANZARITE WOODWARD, ESQ. is a culpable person, who conducts or acquires one or more aspects of Enterprise 3+ among Enterprise 1 affecting interstate commerce through a pattern of racketeering activity through overt acts of judicial fraud, appellate fraud, legal malice, actual malice, via wire fraud, mail fraud, extortion, coercion, securities fraud, larceny, insurance fraud, ultra vires representations with ongoing intent to defraud litigants, judicial officers, appellate justices, insurance companies, regulators, and issuers. NMC's specialty among Enterprise 1 is appellate pettifoggery at best, but usually advancing or maintaining fraudulent schemes through California Court of Appeal. Plaintiff's business and property were directly and proximately injured by reason of defendant NICOLE MARIE CATANZARITE WOODWARD, ESQ.'s violations of RICO § 1962(a)-(d).

## PATTERNS OF RACKETEERING

## AFFECTING INTERSTATE AND FOREIGN COMMERCE

## TITLE 10 U.S.C. § 1961(5)

152.   Under Cal. Rul. Court 8.1115(b), showing deliberate disregard and in furtherance of fraudulent schemes undertaken through the Racket: "OPINION Kenneth Catanzarite appeals the trial court's order setting aside the dismissal of the action against him by Rebecca Lawrence for failure to bring the case to trial within three years after the issuance of the remittitur. Catanzarite contends Lawrence's motion to set aside the dismissal was untimely and, in any event, no exception applies to prevent the mandatory dismissal. We affirm. FACTS Kenneth Catanzarite provided legal representation to Rebecca Lawrence in the collection of a personal injury judgment in her favor. He also rented an apartment to her and caused several corporations he controlled to employ her. But problems between them ensued: Lawrence filed workers compensation claims and wage claims against some of the employing corporations and complained about Catanzarite's legal fees.After a portion of the personal injury judgment was collected, Lawrence and Catanzarite entered into an agreement settling their claims against each other in which Lawrence agreed to drop several of the workers compensation claims. Nonetheless, Lawrence subsequently filed this action against Catanzarite, seeking to rescind the settlement agreement and recover damages for legal malpractice, fraud, breach of contract, wrongful termination, and breach of fiduciary duty.Catanzarite raised the settlement agreement as a defense and obtained summary judgment on the complaint. Lawrence substituted in Boyd S. Lemon as her trial counsel; he listed his address as 12304 Santa Monica Blvd., Los Angeles, CA 90025-2551. Lemon filed a motion for new trial and a notice of appeal after the new trial motion was denied. He prosecuted the appeal up to the filing of the opening brief; at that point, Donald P. Wagner substituted in for Lawrence "as her counsel of record in the above-captioned appeal . . . ."This court reversed the summary judgment,

44

finding the agreement was not enforceable "[b]ecause the settlement agreement disposes of several workers compensation claims and was executed without approval by either a workers compensation appeals board or referee." (Lawrence v. Catanzarite (Nov. 26, 2001, G025832) [nonpub. opn. p.6].) The case was remanded "for additional proceedings consistent with this opinion." (Ibid.)The remittitur was filed in the superior court on February 4, 2002. The case languished until January 6, 2005, when the presiding judge assigned it to Judge James M. Brooks. Notice of the assignment was mailed to Wagner and to Lemon at his Santa Monica Blvd. address. On January 21, the court set a status conference for February 9; notice of the conference was mailed to Lemon at the Santa Monica Blvd. address. No one appeared at the status conference, and the case was dismissed. Notice of the dismissal was mailed to Lemon, this time to a Marina del Rey address.On August 9, 2005, Lawrence, through Wagner, filed a motion to vacate the dismissal under Code of Civil Procedure section 473, subdivision (b).1 The motion was served by personal service on Catanzarite's counsel on August 24, 2005.Wagner declared he was never trial counsel for Lawrence. When he received notice of the assignment of the case to Judge Brooks, about January 10, 2005, he immediately called Lawrence to inform her. Lemon declared he became attorney of record for Lawrence "solely for the purpose of filing a motion for new trial on her behalf. When the motion was denied, in order to preserve her rights, I filed a Notice of Appeal. On December 21, 1999, I caused to be filed in the Court of Appeal a substitution of attorneys substituting attorney Donald P. Wagner in my place." Lemon declared he moved from the Santa Monica Blvd. address in July 2000 and stopped receiving forwarded mail a year later. He received none of the minute orders in this case. Lawrence declared she "suffered from a variety of serious illnesses" since the remittitur was issued. She was "hospitalized, on bed rest or made necessary visits to a physician or rehabilitation professionals for a total of 286 days since the Remittitur was filed on February 4, 2002." She knew she had won the appeal in late 2001, but she received no

information since that time until January 2005, when she "was able to function enough to go to the Orange County Court to review the docket . . . ." The clerk at the records section told her there was no record of her case. She returned several times in February and March 2005 but was unable to obtain any further information. "It was not until late April or early May that in another visit to the Court, for the first time I was told by a clerk that my case had been assigned to a Court and had been dismissed in February 2005." She called Lemon, who prepared the motion for relief from dismissal.The trial court set aside the dismissal. Acknowledging it was an "old case," the court explained, "[B]ottom line is, it's not the lady's fault, and I don't think they should punish her for it." The court's tentative ruling was to grant the motion: "Plaintiff's motion to set aside the dismissal order of 2/09/05 is granted pursuant to C.C.P § 473(b) because this court is satisfied that this plaintiff was undone by: defective notice from our court, her attorneys that retired or relocated, and health problems that apparently incapacitated plaintiff for almost 300 days within the last few years. This adds-up to `excusable neglect' here, and plaintiff's motion isn't deemed untimely just because it was served a few days late." During oral argument, however, the court indicated it thought the section 473 motion was untimely because although it was filed within six months of the dismissal, it was not served until after six months had expired. "[B]ut based upon the other factors here, it appears that Plaintiff's entitled to relief from the three-year rule [three years from issuance of remittitur to bring case to trial]." The court found Lawrence was incapacitated for 286 days, which tolled the three-year statute for that amount of time. It also found the fact that Lemon did not get notice of the status conference constituted "excusable neglect or surprise."DISCUSSION Catanzarite contends the trial court had no jurisdiction to hear the section 473 motion because it was untimely filed. Section 473 allows a trial court to relieve a party from a dismissal "taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect" as long as the application for relief is "made within a reasonable time, in no

case exceeding six months," after the dismissal. (§ 473, subd. (b).) The six-month limit is mandatory, and the trial court has no discretion to waive the time limitation. (Arambula v. Union Carbide Corporation (2005) 128 Cal.App.4th 333, 340.)Lawrence's motion was filed on the last day of the six-month period, but it was not served until two more weeks had passed. She argues the timely filing of the motion is all that is necessary to meet the requirement of the statute.This issue was recently resolved against Lawrence's position in Arambula v. Union Carbide Corporation, supra, 128 Cal.App.4th 333. There, the plaintiff filed a motion for relief from summary judgment under section 473 for her failure to file documents in opposition. The motion was filed within the six-month period but service was made later. The court relied on section 1005.5, which states: "A motion upon all the grounds stated in the written notice thereof is deemed to have been made and to be pending before the court for all purposes, upon the due service and filing of the notice of motion . . . ." It also considered section 1003: "An application for an order is a motion." Based on these sections, the court concluded that "an application for relief under section 473, subdivision (b), is a motion and that an application for relief under the statute is deemed to be made upon filing in court of a notice of motion and service of the notice of motion on the adverse party. [Citation.] Therefore, absent service on the adverse party, there is no `application' for relief." (Id. at p. 341.)Lawrence argues even if the section 473 motion was not timely, the dismissal was based on extrinsic mistake and can be set aside at any time. Courts retain inherent power to set aside a judgment based on extrinsic fraud or mistake even after the six-month period of section 473 has passed. (Zamora v. Clayborn Contracting Group, Inc. (2002) 28 Cal.4th 249, 260.) "Extrinsic mistake involves the excusable neglect of a party. [Citation.] When this neglect results in an unjust judgment, without a fair adversary hearing, and the basis for equitable relief is present, this is extrinsic mistake. [Citation.] Reliance on an attorney who becomes incapacitated, or incompetence of the party without appointment of a guardian ad litem, are

examples of extrinsic mistake. [Citation.]" (In re Marriage of Varner (1997) 55 Cal.App.4th 128, 140; see also In re Marriage of Damico (1994) 7 Cal.4th 673, 688.)Here, the trial court was clearly exercising its equitable jurisdiction in favor of Lawrence. It is difficult to tell which of her two attorneys was responsible to monitor her case, but at least one of them certainly was. Lemon remained trial counsel of record, and Wagner was the last attorney formally substituted in as her counsel. While litigation is pending, an attorney cannot withdraw without either a signed substitution or an order of the court. (Vapnek et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2005) §§ 10.76-10.80, pp. 10-10 to 10-11.)But Catanzarite argues the court had no discretion to set aside the dismissal of the case even under equitable grounds because it was subject to the mandatory dismissal provisions of section 583.320, subdivision (b), which provides that an action shall be brought to trial within three years "[i]f on appeal an order granting a new trial is affirmed or judgment is reversed and the action remanded for a new trial . . . ." (§ 583.320, subd. (a)(3).) Lawrence argues the mandatory dismissal provision does not apply because this court's opinion did not remand for a new trial but for "proceedings consistent with this opinion." Because Lawrence sought rescission of the settlement agreement and the opinion found the agreement unenforceable, all the trial court had to do was enter judgment of rescission for Lawrence. Lawrence's reasoning is incorrect. In granting the summary judgment, the trial court found all causes of action were barred by the settlement agreement. This court's reversal of the summary judgment removed that bar. While the reversal may have disposed of the cause of action for rescission of the settlement agreement, it did not resolve the remaining ones. Accordingly, the case was remanded for a new trial within the meaning of section 583.320, subdivision (a)(3). (See, McDonough Power Equipment Co. v. Superior Court (1972) 8 Cal.3d 527, 532-533.)If a case is not brought to trial within three years after the remittitur issues, it must be dismissed. "The requirements of this article are mandatory and are not subject to extension,

excuse, or exception except as expressly provided by statute." (§ 583.360, subd. (b).) Mistake, inadvertence, surprise or excusable neglect cannot relieve a party from the mandatory dismissal provisions. (Wilcox v. Ford (1988) 206 Cal.App.3d 1170, 1175-1179; see also English v. IKON Business Solutions, Inc. (2001) 94 Cal.App.4th 130, 146; Peltier v. McCloud River R.R. Co. (1995) 34 Cal.App.4th 1809, 1817-1822.) The only escape valve Lawrence had available to her was a showing that "[b]ringing the action to trial . . . was impossible, impracticable, or futile." (§ 583.340, subd. (c).) "What is impossible, impracticable, or futile is determined in light of all the circumstances of a particular case, including the conduct of the parties and the nature of the proceedings. The critical factor is whether the plaintiff exercised reasonable diligence in prosecuting its case. [Citation.] The statute must be liberally construed, consistent with the policy favoring trial on the merits." (Brown & Bryant, Inc. v. Hartford Accident & Indemnity Co. (1994) 24 Cal.App.4th 247, 251.)The trial court found Lawrence had made a showing of impossibility, impracticability, or futility for 286 days, or roughly nine and one-half months, which it concluded had tolled the three-year period by that amount of time. "[T]he determination of whether the prosecution of an action was indeed impossible, impracticable, or futile during any period of time, and hence, the determination of whether the impossibility exception to the five-year statute applies, is a matter within the trial court's discretion. Such determination will not be disturbed on appeal unless an abuse of discretion is shown. [Citations.]" (Hughes v. Kimble (1992) 5 Cal.App.4th 59, 71.)2 An abuse of discretion "exists only if there is no reasonable basis for the trial court's action, so that the trial court's decision exceeds the bounds of reason. [Citations.]" (Sanchez v. City of Los Angeles (2003) 109 Cal.App.4th 1262, 1271.)Lawrence's medical problems, which consumed 286 noncontiguous days during the more than 1000 days since the remittitur issued, were not the cause of her failure to bring the case to trial within the three-year period. The reason was the failure of her counsel to diligently monitor the progress of her case, which amounts to a total failure of

representation. This "positive misconduct" of counsel cannot be attributed to Lawrence; until she received notice of the dismissal, it was impossible for her to bring her case to trial. (See Moss v. Stockdale, Peckham & Werner (1996) 47 Cal.App.4th 494, 502.)We must affirm the trial court's ruling if correct on any ground. (Day v. Alta Bates Medical Center (2002) 98 Cal.App.4th 243, 252; Eisenberg et al., Cal. Practice Guide: Civil Writs and Appeals (The Rutter Group 2005) § 8:214, p. 8-128.) Under the unique circumstances of this case, we find it was impossible for Lawrence to bring her case to trial within three years of the filing of the remittitur. Accordingly, the dismissal should be set aside.DISPOSITIONThe order setting aside the dismissal is affirmed. Respondent is entitled to costs on appeal.WE CONCUR: RYLAARSDAM, J., MOORE, J.1. All statutory references are to the Code of Civil Procedure.2. The same tolling principles that apply to a mandatory dismissal for failure to bring a case to trial within five years (§ 583.310) apply to the failure to bring a case to retrial within three years after reversal on appeal (§ 583.320). (Hattersley v. American Nucleonics Corporation (1992) 3 Cal.App.4th 397, 401.) *Lawrence v. Catanzarite, 2006*

153.   Using the postal mail, wire communications, with intent to defraud, and ongoing protection of the Racket, Catanzarite Law Corporation foreclosed upon home of a Deborah Breuner Davis in 2006 located in 26000 Vista Valley Ct. Steamboat Springs, CO 80487 according to a report from Ownerly.com showing market value of "$1,313,610" which is "owner occupied" and various transfers of monetary instruments related to the transaction are reflected below.

**New Loan Recorded**

2005-03-17 – CATAZARITE LAW CORP to DEBORAH BREUNER DAVIS

Primary Lender Details

| | |
|---|---|
| **Lender** | CATAZARITE LAW CORP |
| **Loan Amount** | $120,000 |
| **Lender Type** | Unknown or not provided |
| **Loan Type** | Conventional or Unknown |
| **Line of Credit Loan** | Not a Credit Line or Unknown |

## Deeds
2 | Deeds Found

### Ownership Change

2017-12-01 – From KENNETH J CATANZARITE to VALUSEK, ROBERT J|VALUSEK, CHARLA L

## Owners
2 | Owners Found

**ROBERT J VALUSEK**

**CHARLA L VALUSEK**

## County Assessor Records

| | |
|---|---|
| **Owner Occupied** | |
| **Ownership Vesting Type** | Heirs |
| **Mailing Address for Taxes** | 26075 Vista Valley Ct Steamboat Springs, CO 80487 |

## Market Value

| | |
|---|---|
| **Land Value** | $285,000 |
| **Improvements** | $1,028,610 |
| **Total Value** | $1,313,610 |

1 5 4 .   Using the postal mail, wire communications, with intent to defraud, and ongoing

protection of the Racket, also known to EDM, STATE BAR, and Enterprise 2, "*In Re Perrine*

(2007), Catanzarite did not tell the Court that his client, who was declaring bankruptcy, deeded his

home to Catanzarite. In bankruptcy, the person declaring bankruptcy cannot sell or give away

without telling the Court. Catanzarite took the property to pay for his fees, but did not tell the Court

about this, violating this strict rule. The Court took away all of Catanzarite 's fees: "Given the gravity of Catanzarite's non-disclosure. the court will deny all fees to Catanzarite for legal services rendered to Perrine to the petition date due to its failure to comply with Section 329(a) and Rule 2016(b). Catanzarite was ordered to give back either his fees, or the property he took. (p. 586)." State Action 2, [ROA #93] Beck RJN 1 [Ex. 27] p. 1107

155.    Using the wire communications with intent to defraud the public and establish credibility for itself and conceal its adjacent and parallels, the following was **Catanzarite Law Corporation and Rosen Law Firm Announce Jury Verdict of Securities Fraud Against Wedbush Morgan Securities, Inc.**

156.    [Distributed <u>internationally</u>]. 23 sept. 2009 08h29 HE | Source: <u>The Rosen Law Firm PA</u>

157.    LOS ANGELES, Sept. 23, 2009 (GLOBE NEWSWIRE) -- On July 28, 2009, following an eight day trial in Los Angeles Superior Court, the jury returned a verdict finding Wedbush Morgan Securities, Inc. liable for securities fraud in the sale of preferred stock to Alex Meruelo and Meruelo Capital Partners LLC in February of 2005. The plaintiff was represented at trial by Ken Catanzarite of the Catanzarite Law Corporation and Laurence Rosen of the Rosen Law Firm. As a result of the verdict, the trial court has entered judgment in the amount of $3.3 million in favor of plaintiff, less a credit for $1.0 million paid in settlement by a co-defendant.

158.    At trial, the plaintiff contended that Wedbush Morgan assisted in the sale of Dwango North America, Inc. preferred stock by providing written financial and business information that was materially false and misleading. The defendant admitted the information was misleading, but claimed it had corrected the false statements in a telephone conversation with plaintiff a few days prior to the stock sale. When asked about the verdict, **Ken Catanzarite** explained, "The jury didn't believe Wedbush's kitbag of excuses. These folks knew that any