correction would have been in writing. **Why would the defendant provide false written information, only to correct it on a telephone call? Not only that, defendants managed to lose or destroy all written evidence of the purported phone call. Wedbush's story didn't make any sense."**

159.    Attorney Laurence Rosen stated that, "Banks and brokerage houses that commit securities fraud should know that justice still resides in our court system. We won't hesitate to take these cases to trial."

160.    About The Firms:

161.    The Catanzarite Law Corporation, based in Orange County, California, represents plaintiffs in business litigation disputes, including securities litigation. The firm also represents investors in securities fraud and corporate misconduct cases throughout the United States. To contact Ken Catanzarite, please call (714) 520-5544.

di **Mot-clé**

CLASS ACTION LAWSUITS

**Coordonnées**

Catanzarite Law Corporation

Kenneth J. Catanzarite

(714) 520-5544

kcatanzarite@catanzarite.com


The Rosen Law Firm, P.A.

Laurence Rosen

(212) 686-1060

lrosen@rosenlegal.com

162.   Using the postal mail, wire communications, with intent to defraud, and ongoing protection of the Racket, "*In Alexandros v. Cole* (2011), Catanzarite violated court rules by making statements to the court without any proof. The court said: "But here plaintiffs [Catanzarite] admit they violated several rules. They also continued to cite the excluded evidence in their reply brief even after defendants noted the error in their briefs." The Court pointed out that Catanzarite's brief made **39 unsupported factual statements** [emphasis added] and paragraphs lacking references. Some statements were completely incorrect. **Catanzarite does not care about the truth in making statements to the Court**." [ROA #93] Beck RJN 1 [Ex. 27] p. 1107.

163.   Using the postal mail, wire communications, with intent to defraud, and ongoing protection of the Racket, "In July 2011, Catanzarite substituted into five actions pending in Los Angeles Superior Court, representing a group of clients that included Ronald Weinstock. Catanzarite alleged it had a written fee agreement with these clients providing that the firm would be paid on contingency. Its compensation was to include membership interests in **Newlife Sciences, LLC,** at that point in the (allegedly wrongful) possession of some of the adverse parties. Catanzarite also alleged it had a lien on any recovery in the five Weinstock actions [which is an ongoing scheme of ultra vires representation, extortion for fees, followed by relentless litigation without a retainer or legal authority against its own clients]. In February 2012, Catanzarite moved to withdraw from representing the Weinstock parties, and the trial court granted the motion. Catanzarite alleged that a Gordon & Rees lawyer was told about the attorney lien at that time [see the foregoing article about telephone juxtaposed with operational practices]. The Weinstock parties hired another law firm to represent them." *Catanzarite Law Corporation v. Gordon Reese, LLP*, No. G047968, 2-3 (Cal. Ct. App. Oct. 15, 2013)

164.   Using the postal mail, wire communications, with intent to defraud, and ongoing protection of the Racket, "In *Edwards v. Noroski* (2013), the Court punished Catanzarite for

54

saying one thing, then switching his story. **The court stated that Catanzarite's case was a "sham."** First, Catanzarite claimed that the dental practice run by Dr. Noroski and Dr. Schneider should give back money to patients who had been treated at the dental office, but did not say anything was wrong with the dentistry. Then, Catanzarite realized he had no case, because the plaintiffs who were former patients had their depositions and said they were happy with Dr. Noroski and happy with Dr. Schneider. **The plaintiffs dropped out and Catanzarite had no case. Catanzarite asked to file an amended complaint that now said that the dental services were bad. The Court punished Catanzarite…for wasting everybody's time**."

165. Using the postal mail, wire communications, with intent to defraud, and ongoing protection of the Racket, "In or around [2017], Catanzarite solicited plaintiff Richard Carlson at his home – who also testified that he did not believe he had suffered any damages before Catanzarite enrolled him as a client." [leading to Daymark Matter]. "This complaint is on behalf of a putative class of 13,858 beneficiaries who invested an average of $31,561 per person…gross proceeds of $437,315,000." [ROA #12] Beck Decl. ISO TRO/OSC p. 5, Ex. V.

166. Parallel to this in Orange County Superior Court, according to a press release from the federal government as cited for "IMMEDIATE RELEASE, Friday, September 22, 2017

167. **Former Clerk in <u>Orange County Superior Court</u> Sentenced to Over 11 Years in Federal Prison for Racketeering Offense Stemming from Bribery Scheme to 'Fix' Criminal Cases and Traffic Charges**

168.     *SANTA ANA, California* – A former clerk of the Orange County Superior Court was sentenced today to 135 months in federal prison for orchestrating a scheme in which he was paid approximately $420,000 dollars in bribes to "fix" criminal cases and traffic offenses on terms favorable to hundreds of defendants without the knowledge of prosecutors or judges.

169.      Jose Lopez Jr., 36, of Anaheim, **was sentenced this morning after pleading guilty in March to one count of conspiring to violate the federal Racketeer Influenced and Corrupt Organizations Act (RICO)**.

170.      Lopez was sentenced by United States District Judge Josephine L. Staton, who said Lopez created, led and profited from the scheme.

171.      "This [criminal conduct] was not an aberration from his character – this was his character," the judge said.

172.      Lopez admitted that he was at the center of a scheme in which bribes as high as $8,000 were paid to co-conspirators to fraudulently resolve cases for hundreds of defendants. The co-conspirators were middlemen who recruited individuals with pending cases to pay money that was given to Lopez to **resolve their cases without the authorization of the court**.

173.      "People who were facing their second drunk driving offense were able to bribe their way out of mandatory jail sentences," said Acting United States Attorney Sandra R. Brown. "Mr. Lopez led a long-running scheme that brought him well over $400,000 and caused untold damage to the operations and reputation of the criminal justice system in Orange County."

174.      According to court documents, Lopez improperly resolved approximately 1,034 cases, including 69 misdemeanor driving under the influence cases, 160 other misdemeanor cases and 805 traffic-related infraction cases.

175.      Over the course of more than five years, Lopez "resolved" cases by entering information into the court's computers to make it appear that a defendant had pleaded guilty, paid required fees or had performed community service. In some cases, Lopez fraudulently created records that made it appear drunk driving charges had been dismissed or defendants had served mandatory jail time.

176.     In addition to taking the bribes and falsifying court records, Lopez forged the signature of a prosecutor with the Orange County District Attorney's Office.

177.     The conspiracy ended in the spring of 2015 when the Orange County Superior Court learned about the misconduct and took steps to reopen the cases that Lopez tampered with.

178.     "Because of [Lopez]'s corrupt actions, the Orange County Superior Court audited each and every case that [Lopez] handled," prosecutors wrote in a sentencing memorandum filed with the court. "The state court recalled the cases where fraud was found to restore the integrity of its records." According to a victim impact statement submitted by the Orange County Superior Court, Lopez's corruption scheme cost the Orange County Superior Court about $170,000 to clean up.

179.     Lopez used the money he received as part of the scheme to pay for, among other things, international vacations, trips to Las Vegas and the opening of a restaurant in Garden Grove.

180.     "Defendant Lopez was entrusted with protecting the interests of justice but instead made a lucrative income operating an underground business for clients seeking a pass on criminal activity," said Danny Kennedy, the Assistant Director in Charge of the FBI's Los Angeles Field Office. "The successful investigation and prosecution of Mr. Lopez and his many co-conspirators is a result of a collaborative effort by multiple agencies and should serve as a warning to public officials who use their access to benefit personally."

181.     "Mr. Lopez used his public position of trust to enrich himself and undermined public safety," stated IRS Criminal Investigation's Acting Special Agent in Charge Aimee Schabilion. "IRS Criminal Investigation will continue to use our financial investigative expertise to combat public corruption and hold officers of the court accountable for their actions."

182. **Lopez is one of a dozen defendants who have been convicted of participating in the racketeering conspiracy.** The other 10 defendants who have pleaded guilty before Judge Staton are:

183. Ricardo Quinones, 33, of Santa Ana, who was sentenced to 15 months in federal prison;

184. Juan C. Rosas Santillana, 33, of Chino Hills, who is scheduled to be sentenced on October 13;

185. Ramon Salvador Vasquez, 28, of Santa Ana, who was sentenced to two years in prison;

186. Manuel Galindo Jr., 27, of Santa Ana, who was sentenced to one year and one day in prison;

187. Gibram Rene Lopez, also known as "Ivan," 27, of Anaheim, who was also sentenced today to 15 months in prison;

188. Agustin Sanchez Jr., 33, of Santa Ana, who was sentenced to one year and one day in prison;

189. Luis Alberto Flores Guillen, also known as "Bills," 27, of Santa Ana, who was sentenced last Friday to 10 months (five months in jail and five months of home confinement);

190. Oscar Centeno, also known as "Mosquito," 27, of Santa Ana, who is scheduled to be sentenced on November 17;

191. Jeff Reynes Fernandez, also known as "Lean," 25, of Fullerton, who was sentenced last Friday to one year and one day in prison ; and

192. Jesus Saldana, 29, of Garden Grove, who was sentenced to 10 months (five months in jail and five months of home confinement).

193.    The twelfth defendant, Javed Asefi, also known as "Joey," 44, of Ladera Ranch, was found guilty by a federal jury earlier this month and is scheduled to be sentenced on December 8.

194.    Prior to the 12-defendant indictment being returned by a federal grand jury last fall, three other recruiters pleaded guilty to federal bribery charges, including Rebeca Sarai Rosell, who worked at a Santa Ana bail bonds company and funneled a bribe to Lopez so a second-time drunk driving offender could avoid serving his mandatory 60-day jail sentence.

195.    This case was investigated by special agents with the Federal Bureau of Investigation and IRS Criminal Investigation.

196.    This case was prosecuted by Assistant United States Attorney Vib Mittal of the Santa Ana Branch Office.

197.    **Component(s):**

198.    USAO - California, Central

199.    **Contact:** Thom Mrozek Spokesperson/Public Affairs Officer United States Attorney's Office Central District of California (Los Angeles) 213-894-6947

200.    **Press Release Number:** 17-166" **[End Federal Government Announcement]**

2 0 1 .  Using the postal mail, wire communications, with intent to defraud within the same judicial district, and ongoing protection of the Racket, another series of "cases" involving JTT, says: "Catanzarite Law Corporation, Kenneth J. Catanzarite and Tim James O'Keefe for Plaintiffs and Appellants…Renato Corzo and his partnership sued the partnership's accountants for malpractice and breach of fiduciary duty. Defendant accountants filed a demurrer arguing that the lawsuit was barred by the statute of limitations. The trial court agreed. Corzo asked for and received leave to amend his complaint. Corzo's next complaint included new facts he believed tolled the statute of limitations. Defendants demurred again. The trial court sustained the demurrer

without leave to amend, finding that the amended complaint was a "sham" pleading engineered to avoid the statute of limitations. Was it? Yes. We agree with the trial court that Corzo's amended complaint was a sham pleading. Because Corzo has not demonstrated he can amend the pleading to state a viable cause of action not barred by the applicable statute of limitations, we affirm the trial court's dismissal of the amended complaint with prejudice." State Action 2, [ROA #2], Exhibit O. B285691.

202. With intent to defraud, using the Racket in furtherance of Enterprise 3+ schemes using postal mail, fax, and wire communications and Enterprise 2 protection, KJC did send STATE BAR and DOES among Racket 2 a letter by FAX or email on June 20, 2020, stating "[e]nclosed are three Reports of Judicial Sanctions and one Report of Discipline. These reports arise out of my client [Richard Carlson] representation in hotly contested matters cases styled *In Re Daymark Realty Advisors, Inc.* (Case No. 18-23750), *In Re Daymark Residential Management* (Case NO. 18-23751), *In Re Daymark Properties Realty, Inc.* (Case No. 18-23752)…in the United States Bankruptcy Court for the Southern District of Florida, where we [Enterprise 1 actors, seeking to further Enterprise 3+ using Enterprise 2 and conceal the same by delivering this notice] represent directly, and by proposed classes, 14,000 adversely affected investors in each case [without standing or probable cause]. As a matter of context, I attach as Exhibit 1 the Richard Carlson class action complaint filed on behalf of 13,800 adversely affected investors. The key figure in the fraud perpetrated on investors is [me, as usual]." RJN 1 Ex. 29 [ROA #93] p. 1150.

203. Registered investment advisor KJC did not disclose in his postal/wire scheme that the key figure in the fraud perpetrated on everyone remains KJC, Enterprise 2, and KJC's own interests and control in Enterprise 3+; thus making deliberate misstatement of material fact among "$437,315,000" in securities imputed by agency to STATE BAR. See Akins-Gump Memo, 10b-5, or disseminators of false statements involving interstate securities (STATE BAR).

204. In the United States Court of Appeals for the 11th Circuit (No. 21-12766) regarding the Daymark matter, "Kenneth Catanzarite appeals the denial of relief from a judgment of the bankruptcy court. The district court affirmed the award of sanctions against Catanzarite for violating a preliminary injunction that barred "the commencement of any further actions under the same or similar facts or circumstances to" lawsuits he had filed against bankruptcy creditors. The district court also ruled that Catanzarite forfeited his opportunity to object to the amount of sanctions imposed. We affirm. p. 1156. Catanzarite, an attorney licensed in California and admitted pro hac vice [using STATE BAR authority] in the bankruptcy court, filed adversary complaints for Richard Carlson [who swore under oath that he did not believe he had suffered damages when KJC visited him at his home, when he wasn't seeking an attorney] and eleven other plaintiffs (the Carlson plaintiffs) and for Katherine Looper and six other plaintiffs (who only exist but for Richard Carlson's false role as class lead, which is what COOPER would assume later against Plaintiff).

205. No. 21-12766 goes on "Catanzarite filed nine putative class action complaints [without standing or authority, using the postal mail and or wire] for the Carlson plaintiffs in California and Utah courts against various combinations of the Mikles creditors. The complaints alleged that the creditors were alter egos of and shared common control of and culpability for the Daymark companies' mishandling of investments [which standing and accusation relies upon Richard Carlson as putative class representative, who did not believe he had suffered any damages]. The motion to enforce outlined Catanzarite's willful disobedience of the injunction."

206. No 21-12766 shows similar methods used by the Racket to harm Plaintiff, where "[t]he district court affirmed the imposition of sanctions...Carlson was bound by the Preliminary Injunction" and violated it by filing [by postal mail or wire communication] an action "based on similar ownership interests and the same or similar facts or circumstances. The district court

rejected Catanzarite's argument that he could engage in prohibited conduct for another client." See G059766, and also G058700 of "six lawsuits."

207.  "The bankruptcy court did not err in determining that Catanzarite was bound by the injunction. Federal Rule of Civil Procedure 65 binds three categories of persons to comply with an injunction: "the parties; the parties' . . . attorneys; and other persons who are in active concert or participation" with persons in the first two categories. Fed. R. Civ. P. 65(d)(2)(B). The Rule binds an attorney to an injunction to the same extent as a party. So, as the bankruptcy court explained, Catanzarite could not "engag[e] in conduct in which [the parties,] the Carlson [plaintiffs,] themselves could not engage." The Racket uses this strategy to obtain and exert individual monopolies among cases between itself where there often exists no choice for innocent persons but to settle or be subject to ongoing extortion as shown.

208.  If persons seek to defend the Racket or avoid its fraudulent schemes even after the are adjudicated as such, that won't work because of Enterprise 2. "Catanzarite violated the injunction [using the postal mail and/or wire communications]. The injunction expressly prohibited "the commencement of any further actions un-der same or similar facts or circumstances to the Subject Lawsuits." Two of the subject lawsuits [advanced by postal mail and/or wire communications] involved Mikles creditors mishandling investors' tenancy-in-common interests in the Congress Center. In the complaint and lis pendens, Catanzarite repeated many of the facts and legal arguments made in the subject lawsuits. And the bankruptcy court stated that it earlier had sanctioned Catanzarite for creating a website containing false and misleading statements about the Daymark bankruptcy" [involving the securities of 13,800+ investors]." ROA #729, p. 53. See again Akin Gump Memo and Supreme Court 10b-5 decisions.

## A WELL DOCUMENTED HISTORY AND PATTERN OF ACTIVITY

209. Targeting the unified Racket expressly, Plaintiff incorporates his separate statement of undisputed material facts in support of his motion for summary judgment or in the alternative for summary adjudication or both as being set forth fully herein. See [ROA #729] Separate Statement in State Action 1, Issues [1]-[14] p. 1-138. There exist more than two, if not dozens, of overt acts beyond reasonable doubt meeting the definition of racketeering activity according to final rulings in Courts of Appeal before they harmed Plaintiff, and thereby constituting predicate acts, too.

210. With intent to defraud, Enterprise 1 actor defendants KJC, NMC, TJO, BW, JTT undertook a series of related non-judicial acts to create "evidence" in furtherance of judicial schemes to enrich themselves from 2007-2022 using Enterprise 2 protection and active concealment by positions presently occupied by DURAN, EDM, GRANDT, and DOES.

211. With intent to defraud, Enterprise 1 actor defendants KJC, NMC, TJO, BW, JTT undertook a series of related judicial acts to advance the fraudulent schemes for the same or similar purposes from 2007-2022 to enrich themselves by taking from or defrauding other active market participants in some instances, but always to the severe injury or irreparable harm of non-active market participants like Plainitff, COOPER, HIGGERSON, ZAKHIREH, and whoever they can swindle or extort using Racket protection or concealment of its Board of Trustees, including DURAN and his personal counsel, as well as counsel to Board of Trustees, GRANDT.

212. In more than two instances, fraudulent schemes were advanced, and judicial acts were predicated, upon non-judicial acts obtained under coercion, extortion, bribery, corruption, or threat by KJC and/or the Racket.

213. In more than two instances relevant to Plaintiff, racketeering is finally adjudicated under California Rules of Court 8.1115 (b) and it would be unreasonable to suggest otherwise.

214. With intent to defraud, <u>Enterprise 2</u> undertook a series of judicial and non-judicial acts to advance their "regulatory and disciplinary" schemes, which deliberately enrich active market participants while non-sovereign actors fraudulently state publicly that they are helping Plaintiff and others in his suspect class. Using the wire, the Board of Trustees disseminated public statements about their official acts, but they concealed Plaintiff's claims, evidence, and allegations to oppress him under purported state law authority and their non-existent, personal discretion.

215. With intent to conceal material State liability, but moreso and in furtherance of <u>Enterprise 1</u> and <u>Enterprise 3+</u> schemes that followed, DURAN, Board of Trustees, "State Bar Announces Additional Investigation into Handling of Past Complaints Against Thomas Girardi"

216. Monday, January 24, 2022 Categories: <u>News Releases</u>

217. "The State Bar of California's Board of Trustees announced today that it has been conducting an additional investigation into whether the State Bar's handling of past discipline complaints against former licensee Thomas V. Girardi was affected by Girardi's connections to or influence at the State Bar. The investigation is intended to identify actions by anyone with ties to the State Bar that may constitute malfeasance in how discipline complaints against Girardi were handled.

218. "The State Bar Board leadership and staff take very seriously the immense harm done by Thomas Girardi to innocent victims," said Ruben Duran, Board Chair. "We have been **proactively doing everything in our power** to learn from the past and do better in the future to prevent harms like this from recurring. This necessarily includes assessing whether intentional wrongdoing by anyone associated with the State Bar may have influenced how complaints against Girardi were handled. Details of the investigation, including details of past closed complaints and investigations, must remain confidential to comply with the law and to give this investigation the greatest chance of success. Mark our words: we will go wherever the evidence leads us."

219.    "The State Bar has retained the law firm of Halpern May Ybarra Gelberg LLP to conduct the investigation.

220.    Today's news follows the State Bar Court of California issuing on January 10 its decision and order recommending that the California Supreme Court disbar Girardi. Girardi was charged with numerous violations of the State Bar Act and Rules of Professional Conduct in three separate matters, including several acts of moral turpitude. He did not file a response to the notice of disciplinary charges (NDC), and his default was entered on August 6, 2021."

221.    With intent to conceal material state liability, operational failures to act without state supervision involving actual fraud and racketeering, or to avoid personal liability in favor of Plaintiff for their roles, each overt act was ratified through one or more overt acts communicated to Plaintiff by STATE BAR, DURAN, GRANDT, Board of Trustees on July 20, 2022. Plaintiff incorporates that letter and exhibit here, juxtaposed with G059766, G058700, G059457, and 11th Cir. Kenneth J. Catanzarite v. GCL, LLC and the implications of these operational decisions.

222.    All overt acts meeting the definition of racketeering activity shown from 2002-2022 were overtly in favor of Enterprise 1, taking from Plaintiff or others in his suspect class, using Enterprise 2 combined with deliberate misstatements of material facts about the operational practices of defendants as being bound by oaths of attorneys or as being public protectors and the ongoing threat of law enforcement (criminal or civil) existing through monopoly.

223.    Specifically, some among Enterprise 1 and Enterprise 3+, specifically CLC actors, use false plaintiffs lacking standing like Denise Pinkerton, MFS, Renato Corzo, or Richard Carlson to disrupt, file, compromise, and seek to settle or mediate knowingly fraudulent claims and litigation predicated upon Racket, Enterprise 2 and EDM protection. There is no "res judicata" for them where they have the protection Racket. The evidence is overwhelming, and final.

65

224. Specifically, Plaintiff defeated three fraudulent derivative actions filed on behalf of directly adverse corporations by the same STATE BAR actors, ratified by the same as if it were reasonable. Federal Rules of Civil Procedure 23.1(c) is carried through *Whitten v. Dabney* (1915), but moreso the reasonable attorney standard which is objectively governed by the California Rules of Professional Conduct, adopted and binding as of November 1, 2018, by California Supreme Court.

225. No clearly articulated policies exist in California law or regulation exist to justify the purportedly sovereign acts that destroyed Plaintiff's business, property, and life in all material respects. But the Defendants used California law and control of the enterprise to harm Plaintiff.

226. The racketeering activity and judicial fraud that harmed Plaintiff were and remain so clearly obvious to anyone acting reasonably. Defendants continue the conduct, or they seek to conceal it, no matter the costs to Plaintiff's constitutional rights, emotional state, tremendous grief, overwhelming sense of betrayal, or damages to business and property shown to be more than $138 million before treble damages.

227. Some individual schemes to defraud are closed-ended (as to series of "cases" where litigants cannot afford to be extorted longer and "cases" die on the vine or are sent to STATE BAR's vacuum).

228. All shown schemes for <u>Enterprise 1</u>, <u>Enterprise 2</u>, and <u>Enterprise 3</u> are each related and open-ended in that all acts will continue, as they continue today. Without the imposition of treble damages and injunctive relief, criminal conduct shown will harm persons like Plaintiff or others similarly and reverberate throughout commerce within and among the United States in perpetuity. This is shown from 2002-2022 for the avoidance of doubt, objectively reported by California State Auditor Elaine Howell for years, and now Michael Tilden as recently as Report 2022-030. Mr. Tilden goes so far as to show the various means by which IOLTAs can be used.

66

229.    On October 4, 2022, to the email justin@corruptlawyers.com Plaintiff received the

following from a ROE who suffered from protectionist behavior: "This year I filed 6 State Bar

complaints and have turned into the whistleblower exposing a well-known Encino Law firm that

is a part of a probate racket that has engaged in elder abuse and fraud against families for at least

10 years. I could use any help with competent attorneys, the media, investigators, forensic

accountants and protection. The attorney my mom hired from this firm was involved with the death

of my uncle and then the very suspicious and untimely death of my mother. My mother was

investigating the abuse and death of my Uncle and had planned to sue this attorney for the

mishandling of my uncle's estate but became very ill quickly from the stress and died under very

suspicious circumstances 5 months after she was fraudulently forced into probate litigation. The

attorney was caught conspiring with my uncle's abuser to steal my Uncle's estate. My uncle was a

well-known entertainment attorney and my mother was a personal injury attorney. Through

investigations this year, we discovered that this attorney then orchestrated the isolation of my Mom

and declining her continuous hospice care nurses from being in the home on the date they produced

and notarized 7 documents seizing her estate. They put their own physician in charge of her care,

emptied out her checking accounts and my mom was dead the next day with no autopsy performed

upon my request. The attorney used my drug addicted brother (who had just surfaced, had just had

a restraining order put on him, was facing divorce, was suicidal and needing money) to put in

charge of all the families assets. The attorney then went on a full-blown vendetta against me falsely

accusing me of a burglary that occurred and stealing in addition to having multiple people file

lawsuits against me without serving me, getting default judgments and levying my checking

accounts. The attorney used her bogus documents she drafted and notarized to then get control of

my uncle's estate with the damage totaling about $2 million so far. They have not accounted for

the money from my mom's estate from 2018 and claim that the notary book and banking records

can't be located since my brother moved out of state. Successfully using the probate courts, the attorney is working on paying off about $500,000 to her law firm and others connected to her through the fraudulent litigation she created. I have been through almost 5 years of hell since this attorney entered our lives and have not felt safe since my mom died. Would love to work with you or at least speak with you to see how we can further expose the state bars protection of crooked attorneys. There's another one involved who has been disciplined by the State Bar multiple times but still practicing after he was convicted of attacking someone in public and filed bogus lawsuits. He sued me in a bogus lawsuit after I filed a State Bar complaint against him for mishandling a fire insurance claim after he stormed out of my mediation in a rage and began threatening me depriving me of my right to settle and then withdrew. I was unable to come up with 20 grand plus to defend it myself in this lawsuit plus was dealing with the death of my uncle and Mom and became very ill. He committed fraud on the court by falsely claiming he settled hundreds of thousands of dollars for me in his lawsuit when in fact he settled nothing. He was able to get a default judgment against me of over 100,000 which I have tried to force the State Bar to also investigate but they continue to drop the investigations and I continue to get them reopened. Hope to connect with you."

230.    Opining on evidence re: sole practitioner licensee Sanjay Bhardawaj against Enterprise 2, who does not appear to benefit from Enterprise 2, a handwriting expert Professor with the Department of Linguistics at California State University Fresno…employed at CSU Fresno continuously since 2004…[whose] specialization include Phonetics and Speech Signal Processing…applied to the questions [his expertise]…Full Member of the Acoustical Society of America…associate editor for the society Journal…[published] book Speech Spectrum Analysis (Springer, 2011) in which a number of advanced techniques for the analysis of speech sound."

231.    The expert says "the statement of the oath from the court clerk for the swearing in of Paul Thorndal [in prosecution of Bhardawaj] shows strong evidence of tampering" and "proposition that the segment of the recorded court proceeding involving witness Paul Thorndal has been tampered with has been established with 100% certainty, [this finding] as the proverbial "smoking gun."

232.    Disparities exist among persons in California where Plaintiff is treated differently than other members of the public just because he is a victim of an Enterprise 3+ group associated with one of the 700 lawyers (e.g. Thomas Girardi or Kenneth Catanzarite or his proxies) who has been victimized. Because that "live" problem is acute, Plaintiff is disregarded under color of law.

233.    Notice is served to any who travel to or do business in or with California because there exists selective, unequal use of government funds being spent in furtherance of undisclosed private interests. If one assumes an argument is fair that active market participant lawyers are worth more than regular folks, and that it must be them controlling the entire judiciary and legislative branches of government in California, then perhaps federal control over how liability is asserted and when it should be asserted would ensure less abuse of the United States Constitution in California under the purported discretion and sovereignty of Enterprise 2.

### RACKETEERING ACTIVITY [OVERT ACTS #1-40,960]

234.    Overt acts of "racketeering activity" are specified as defined per 18 U.S.C. § 1961, et seq. Plaintiff relies upon evidence in his possession, judicially noticed evidence California/California Supreme Court unobjected and unanswered by defendants, and public statements or reports disseminated by each. Evidence is also pouring into Plaintiff in support, where these victims have previously been rendered silent by the Enterprise 2 vacuum. (14th)

235.    Final rulings from Courts of Appeal, and wire or postal communications from defendants, give context to the various *ultra vires* acts in furtherance of fraudulent schemes.

**[OVERT ACT #1] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343</u>**

236. With intent to defraud, KJC, BW, TJO, did prepare fraudulent documents that contradicted facts known to each, using the Racket, then electronically file through Orange County Superior Court's filing system and Racket at 12:36:59 PM on September 14, 2018, and then serve upon Plaintiff and others, a fraudulent derivative action for "Plaintiffs" "Denise Pinkerton, an individual as attorney in fact for ROGER D. ROOT, individually and as successor in interest to the claims of his deceased Spouse Sharon K. Root, and derivatively on behalf of MOBILE FARMING SYSTEMS, INC., a California corporation" using protection of <u>Enterprise 2</u> and <u>Enterprise 1</u> credentials ("Pinkerton [Root] Action"). See OCSC Case No. 30-2018-01018922.

237. As summarized by Fourth District, Division Three Court of Appeal in California: "Pinkerton claimed to be acting as attorney in fact for Root, individually and as successor in interest to the claims of his deceased spouse (Sharon Root). The complaint alleged the Roots owned MFS common stock and that the lawsuit was also a shareholder derivative action on behalf of MFS." *Beck v. Catanzarite Law Corp.*, No. G059766, 6 (Cal. Ct. App. Jul. 13, 2022)

238. "The complaint alleged multiple causes of action against CTI, the original board members (O'Connor, Cooper, and Probst), Joseph R. Porche (MFS's securities salesperson), and all parties having a connection to CTI." *Beck v. Catanzarite Law Corp.*, No. G059766, 6 (Cal. Ct. App. Jul. 13, 2022)

239. Parties to the communication include COOPER, HIGGERSON, O'CONNOR, Orange County Superior Court, Mobile Farming Systems, Inc. ("MFS"), Cultivation Technologies, Inc. ("CTI"), and Plaintiff, others among <u>Enterprise 1</u> like Samuel Edgerton, Esq. as Plaintiff's counsel, and <u>Enterprise 3+</u>, as further detailed within G059766, incorporated by reference from Court of Appeal.

240. Other parties to the communication include as "ELECTRONICALLY FILED" "Clerk of the Superior Court by Clarissa Bustamante, Deputy Clerk," Honorable Judge Geoffrey T. Glass, later Honorable Judge Randall J. Sherman (Complex), Honorable Judge Deborah Servino, later Honorable Justices of the Fourth District, Division Three Court of Appeal in California under each G058700, G059746, and G059766, and former United States Securities Exchange Commission attorney and civic servant Irving Einhorn, Esq. who served on the board of Plaintiff's company CTI at the time of the wire communication. Now deceased and despite his service to the United States as former head of the Los Angeles Office of the SEC, he was previously, and is still fraudulently sued by Racket schemes through JTT and KJC acting in concert on facts known by JTT and KJC to be false, and by COOPER to be false, using the Racket.

241.  **[OVERT ACT #2A] in violation of 18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343**

On Oct 4, 2018, at 7:32 AM, Kenneth Catanzarite <kcatanzarite@catanzarite.com> wrote:

> Sam: Thanks for the time yesterday I reviewed your proposal with Mr. Root's power holder. Obviously, you and the directors and officers are working from a fully informed position with all the financial information. Keep in mind that what we demand in settlement come is the main from the Founders who from our perspective should be more than willing to put this behind them. I have reviewed the matter with my client and our response is as follows:
>
> 1. The founders collectively will deliver 10,000,000 Founders shares to Root along with whatever proportionate rights to other shares they obtained as a result of that ownership. In other words they will convey as well any stock, options, warrants and/or convertible note rights and interests to Root in proportion to 10 million to the 23 million shares issued. The founders should be willing to do this because if as you say the company has no value then they should be more than wiling to convey these shares. It allows them to retain in our view 13 million shares and rights that they bought for $13,000 and had no right to in the first place. And of course conveying the 10 million shares are shares they paid only $10,000 for in full.
> 2. Such securities delivery to Root shall be lien free and coupled with a representation and warranty by the conveying defendant and CTI that the same are validly issued and acknowledge the transfer.
> 3. The Defendants will pay $600,000 to Root payable $200,000 now and the balance of $400,000 over 5 years at 8% fully amortized. Secured by the remaining 13 million Founders shares. Again they paid only $13,000 for these shares.
> 4. Root's designee gets a seat on the CTI board.
> 5. Mutual releases.
> 6. Confidentially.
> 7. Note that if we settle this among the Founders as a group they can agree to make these payments and CTI does not book this as a liability.
> 8. Carve out for New Body MD claims against those named defendants.
>
> This offer shall remain open until the close of business on Friday October 5 whereupon the same if not unconditionally accepted is withdrawn.
> Ken

The foregoing wire communication also violates Federal Rules of Procedure 23.1(c), Cal. Evid.

Cod. § 956 has fraud/crime provisions, and is part of the fraud and malicious prosecution scheme.

**[OVERT ACT #2B] in violation of 18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343**

242. Approximately two and a half hours after OVERT ACT #2, via electronic wire press release with intent to defraud, and to extort and malign Plaintiff, O'CONNOR, COOPER, HIGGERSON, who were maligned, without legal authority to do so, using Racket's protection, it was announced: "Orange County-Based Catanzarite Law Corporation Files a Lawsuit against Cultivation Technologies, Inc. Contesting Stock Ownership, Breaches of Fiduciary Duty and Director and Officer Misconduct" "October 04, 2018 07:07 AM Eastern Daylight Time" "Orange County-Based Catanzarite Law Corporation Files a [Direct and Derivative] Lawsuit [Without Standing or Probable Cause] against Cultivation Technologies, Inc. [COOPER, HIGGERSON, O'CONNOR, MFS and Plaintiff] [Fraudulently] Contesting Stock Ownership, Breaches of Fiduciary Duty and Director and Officer Misconduct" "October 04, 2018 07:07 AM Eastern Daylight Time""ANAHEIM, Calif.--(BUSINESS WIRE)--On September 14, 2018, Catanzarite Law Corporation filed a lawsuit against Cultivation Technologies, Inc. ("CTI"), its shareholders, directors, officers and others. The matter styled *Denise Pinkerton, an individual as attorney in fact for Roger D. Root, et al. vs. Cultivation Technologies, Inc., et al.* was filed in the Orange County Superior Court as Case No. 30-2018 01018922. A copy of the complaint can be accessed at www.ctilitigation.com."

243. The complaint asserts claims on behalf of investor Roger Root, derivatively on behalf of Mobile Farming Systems, Inc. ("MFS"). Root, a resident of Florida, invested over $400,000 in MFS stock and was told by MFS representatives, including directors and officers...Richard O'Connor and Amy Cooper, that MFS owned CTI as a subsidiary. The lawsuit contends that MFS is the sole shareholder of CTI as of March 30, 2015 and that CTI directors and officers breached fiduciary duties to MFS as its shareholder including that CTI stock sales and other actions on and after June 30, 2015 are improper. Root also asserts individual claims for

securities fraud" [against COOPER, O'CONNOR, now coerced and providing evidence to support the schemes in Superior Court].

244. "For further information, contact Catanzarite Law Corporation." "Contacts" "Catanzarite Law Corporation" "Timothy J. O'Keefe" "Telephone: (714) 520-5544" "Facsimile: (714) 520-0680" "Email: tokeefe@catanzarite.com"

**[OVERT ACT #3] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343</u>**

245. In *bona fide* defense of the fraudulent scheme, "attorney of record for Mobile Farming Systems" "Kenneth Watnick" "was retained by MFS on December 21, 2018" to defend the derivative action filed by Catanzarite Law Corporation. "Watnick declared under penalty of perjury: "Upon being retained [by MFS], [Watnick] contacted [KJC]…[who] advised he had or was serving discovery on MFS. Specifically, on December 21, [in knowing furtherance of the scheme and for improper purposes unrelated to the merits or derivative claims, KJC] served over 500 separate discovery requests for testimony, documents, and information [from MFS]." See ROA #97 in State Action 2, RJN 1, Ex. 1 p. 23, ¶ 4.

**[OVERT ACT #4] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343</u>**

246. In furtherance of the scheme, on January 4, 2019, using electronic filing systems for Orange County Superior Court, KJC, CLC did compromise the Pinkerton Action without Court approval by dismissing Tony Scudder and Aroha Holdings, Inc. from the derivative action in violation of Federal Rules of Procedure 23.1(c). KJC *knew* the Racket lacked standing.

247. A derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval. Notice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders. California case law *Kennedy v. Kennedy, 235 Cal. App. 4th 1474, 1485 (2015)* [dismissal of a derivative claim requires court approval] and its century-old parent *Whitten v. Dabney*, 171 Cal. 621, (Cal. 1915) is derived

from fundamental tenets of *guardian ad litem* and derivative law. Parties to communication were Plaintiff, other scheme targets, Courts, and internet users.

**[OVERT ACT #5] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343</u>**

248. With intent to defraud through a knowing lack of standing to file, maintain, compromise, or settle a derivative action, and to fraudulently conceal, and in furtherance of the scheme while the Pinkerton Action was pending, KJC or one or more Racket agents did use the electronic filing system for the State of Washington to update "JOLLY ROGERS INVESTMENTS INC." (Unified Business Identifier of 601600166) after its filed "Articles of Dissolution" on "2015-05-01" in order that it be "Reinstated" on "2019-01-17" and to reflect a new address of 2331 West Lincoln Avenue, Anaheim, California 92801 ("Racket Base"), which is the same address of at least CLC, KJC, JTT, BW, NMC, from which they send or receive electronic communications related to the Racket.

249. Parties to the communication include the Secretary of State of Washington or his/her/their assign, as well as all those persons who use the internet inside and outside State of Washington. "The documents revealed Jolly Roger filed articles of dissolution in early 2015 and was not reinstated until January 17, 2019." *Beck v. Catanzarite Law Corp.*, No. G059766, 10 (Cal. Ct. App. Jul. 13, 2022) This was after a motion for security targeted the same lack of standing.

**[OVERT ACT #6] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343</u>**

250. With intent to defraud through a knowing lack of standing to file, maintain, compromise, or settle a derivative action, and to fraudulently conceal, and in furtherance of the scheme, on "01/22/2019" KJC "(SBN 113750)" for "CATANZARITE LAW CORPORATION" did electronically "REQUEST FOR DISMISSAL" "Richard Francis O'Connor, II, TGAP Holdings, LLC and Scott Unfug Only from the Complaint" also reading "[t]his form may not be used for dismissal of a derivative action…or of any party or cause of action."

**[OVERT ACT #7] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343</u>**

251. With intent to defraud through a knowing lack of standing to file, maintain, compromise, or settle a derivative action, and to fraudulently conceal, and in furtherance of the scheme, on "01/23/2019" KJC "(SBN 113750)" for "CATANZARITE LAW CORPORATION" did electronically "REQUEST FOR DISMISSAL" "Amy Jeanette Cooper and Cliff Higgerson Only from Complaint" also reading "[t]his form may not be used for dismissal of a derivative action…or of any party or cause of action" served by the Racket's "Marilyn Andalon" 1/23/19.

**[OVERT ACT #8] Multiple Violations including Extortion Under California Law**

252. With intent to defraud, and to extort Plaintiff by threatening letter by wire and affecting securities and in violation of Cal. Pen. Cod. § 523 which is alone felony offense with a maximum sentence of up to 4 years in jail or prison, and a fine of up to $10,000, which occurred after extorting O'CONNOR, COOPER, HIGGERSON to manufacture evidence in support of the Racket schemes, as communicated and threatened by KJC, CLC the following letter by wire to the email addresses shown on January 25, 2019. Plaintiff waives privilege for the express purposes of malice, civil rights violations, and that this waiver is in his benefit, and that the appearance was ultra vires by the Racket, and that it was fraudulent:

**CATANZARITE LAW CORPORATION**
ATTORNEYS & COUNSELORS AT LAW

KENNETH J. CATANZARITE
ATTORNEY AT LAW

DIRECT DIAL:
(714) 678-2100

2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
(714) 520-5544
FACSIMILE: (714) 520-0680

E-MAIL ADDRESS:
KCATANZARITE@CATANZARITE.COM

DIRECT FAX:
(714) 399-0577

January 25, 2019

**Via U.S. Mail & Email:**
Samuel Y. Egerton, III
Jonnny L. Antwiler
O'HAGAN MEYER, LLC
4695 MacArthur Court, Ste. 210
Newport Beach, CA 92660
sedgerton@ohaganmeyer.com
jantwiler@ohaganmeyer.com

Ken Watnick
Anderson, McPharlin & Conners
707 Wilshire Blvd, Suite 4000
Los Angeles, California 90017-3623
kdw@amclaw.com

Stephen J. Erigero, Esq.
Ivan L. Tjoe, Esq.
Alan J. Hart, Esq.
Ropers Majeski Kohn & Bentley PC
445 South Figueroa St., Ste 3000
Los Angeles, CA 90071-1608
Facsimile: (213) 312-2001
Email: stephen.erigero@rmkb.com
Email: ivan.tjoe@rmkb.com
Email: alan.hart@rmkb.com

Re: *Denise Pinkerton v. Cultivation Technologies, Inc., et al.,* Case No. 30-2018-01018922: Meet & Confer Re CTI's Discovery Responses.

Notice by Mobile Farming Systems, Inc. ("MFS") as sole shareholder of Cultivation Technologies, Inc. ("CTI") of Actions

Notice of MFS Shareholders that Board of Directors is Removed

Counsel,

I write this letter to provide notice of the enclosed actions. We would like to immediately take control of the assets and operations of CTI for the benefit of the sole shareholder MFS. We have confirmation now that the share issuance on March 30, 2015 was in fact fully paid and that the shares were issued and due to MFS which is therefore the sole shareholder.

MFS will now assert all claims directly not derivatively and this firm will serve as counsel. An amended complaint is being prepared and will be circulated for possible stipulation or motion if necessary.

We would like to avoid any unnecessary disruption of corporate activity and therefore notify you that we will defer notice to all third parties until Monday January 28 in the hope that your clients will handle the transition in the interests of the shareholders. All shares issued after March 30, 2015 are a nullity, including the highly dilutive unauthorized shares issued to Messrs.

77

Samuel Y. Egerton, III
Jonnny L. Antwiler
O'HAGAN MEYER, LLC
January 25, 2019
Page 2

Probst and Beck. It is our intention to offer those persons who purchased CTI shares, MFS shares after a determination of amounts of money actually invested. The new directors and officers will require turnover of:

1.      All books and records
2.      Probst and Beck to leave offices and turnover records and keys
3.      Bank accounts to be turned over
4.      Cash control to be turned over to new board
5.      Hand off of operative contracts
6.      Inventory of subsidiaries
7.      Personnel lists
8.      Office security codes and systems
9.      All computer pass codes to computer and security systems
10.     All office pass codes and security systems

        This is also notice that law enforcement is looking at both MFS and CTI. We are fully cooperating with them and expect that your clients will do the same.

        After you review the above please call me.

                                Very truly yours,

                                CATANZARITE LAW CORPORATION

                                Kenneth J. Catanzarite

**[OVERT ACT #9] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343</u>**

2 5 3 .   In knowing furtherance of the scheme, using the coerced or extorted signatures and property of each COOPER, O'CONNOR, and HIGGERSON under a threat of prosecution and "law enforcement" for "securities fraud" from KJC, KJC and the Racket filed or caused to be filed electronically: "(2) The MFS Action [after assuming the role of counsel for the inanimate corporate entity and shell to sabotage; under threats to COOPER, HIGGERSON, and O'CONNOR]. *Mobile Farming Systems, Inc. v. Cultivation Technologies, Inc., et al.*, OCSC No. 30-2019-01046904. Catanzarite filed this lawsuit [o]n January 28, 2019, for MFS and "derivatively on behalf of its wholly owned subsidiary [n]nominal [d]defendant [CTI]." KJC knew this to be false, because the electronic communications were based on the knowingly fraudulent premise that MFS was CTI's shareholder, despite facts known to him and other agents with the Racket. The Court later cited "overwhelming" evidence that proved this and other communications by wire were deliberately false, material misstatements of fact regarding interstate securities in MFS and CTI (by RIA KJC, using the Racket's protection; AEGIS and CLC, KJC as control person).

2 5 4 .   Even though the cases ultimately filed and maintained were all fraudulent, KJC knew the Racket would protect him and others among <u>Enterprise 1</u> and <u>Enterprise 3+</u> no matter what, and that his relationship with EDM, or threats against EDM, would prevail or at least delay.

**[OVERT ACT #10] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343</u>**

2 5 5 .   In knowing furtherance of the scheme, using the coerced or extorted signatures and property of each COOPER, O'CONNOR, and HIGGERSON under a threat of prosecution of "law enforcement" for "securities fraud" from KJC, KJC and the Racket filed or caused to be filed electronically on April 16, 2019, "(3) The Mesa Action. *Mesa, et al. v. Probst, et al.*, OCSC No. 30-2019-01064267. Catanzarite filed this shareholder derivative class action on April 16, 2019.

Separate Statement, p. 40, ¶ 38. Richard Mesa initiated the lawsuit [] (1) individually as a "shareholder of both" MFS and CTI shares; (2) in a representative capacity on behalf of over 100 similarly situated shareholders; and (3) derivatively on behalf of CTI.  The Mesa Action asserted nine causes of action against…[Plaintiff] and CTI as a nominal defendant.  Identical to allegations in the MFS Action, the Mesa Action sought to enjoin [Plainitff] from operating CTI until there could be an expedited section 709 hearing [that failed on overwhelming evidence known].  In addition to damages, the class sought punitive damages and attorney fees [scheme].   One month later, [CLC] [added] Cooper as plaintiff," (*Ibid*.) where COOPER is still acting under Racket coercion, Mesa an unknowing pawn who has since terminated "class" counsel JTT.

**[OVERT ACT #11] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343</u>**

256.   With intent to defraud, and to extort Plaintiff and other litigants without probable cause through the protection Racket, CLC electronically filed in Orange County Superior Court, later transferred to federal Court, "[6] The Scottsdale Action. The Scottsdale Action. Cultivation Technologies, Inc., v. Scottsdale Insurance Company, OCSC No. 30-2019-01096233.   On September 6, 2019, Catanzarite filed this declaratory relief action purporting to represent CTI [once more, without authority, corruptly and willfully, for improper purposes in pursuit of and furtherance of the scheme].  In [electronic filings in State and federal court], [Racket] demanded that [CTI, it's purported client's own] insurance company, Scottsdale, stop providing a defense or indemnity to [Plaintiff and other] defendants in the Mesa Action.   The complaint asserted Scottsdale "refused to communicate with the officers and directors elected by the common shareholders of CTI and who are of the position that only they and their elected officers and directors speak for CTI."  In the complaint, CTI sought the court's declaration of its rights under the insurance policy and orders forbidding Scottsdale from providing a defense "unless and until the vote of the disinterested common shareholders of CTI [was] obtained."

257. "[The Court of Appeal] note[s] that immediately before filing the Scottsdale Action, Catanzarite amended the complaints in the first two derivative actions transforming them into direct actions against individuals [including Plaintiff] (the Pinkerton and MFS Actions). Additionally, after filing the Scottsdale Action, Catanzarite dismissed the Cooper Action on September 13, 2019." G058700, p. 9. Cal. Rules of Court 8.1115(b) and issue preclusion.

**[OVERT ACT #12] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343</u>**

258. On April 30, 2019, and May 1, 2019 during an evidentiary trial estopping associated false claims that lacked probable cause to begin with as shown and adjudicated in G059766 as to Plaintiff with specificity and to shown evidence reflecting a complete lack of standing underlying a deliberate scheme to defraud even while its parallel "Daymark" scheme is ongoing through a "Richard Carlson," Catanzarite Law Corporation was representing MFS "on the premise that no CTI shareholders, other than MFS shareholders, had any valid stock or voting rights while representing CTI" G059766. ROA #729, p. 42, ¶ 40, and Beck Decl., ¶ 35, Exhibit 13 as cited.

259. The Court rejected those claims with "every fiber of [its] being" citing "overwhelming" [evidence] against MFS' position, the trial court found that to the extent CTI had once intended to issue its shares to MFS, there was "repudiation of the agreement by people who were [authorized, at the time as] the same principals [O'CONNOR, COOPER] in [MFS]." (RJN, Ex. K.) There were also "repeated actions taken subsequently consistent with the notion that [MFS] was not a stockholder." (Id.) And the court noted that MFS' "delay in bringing" [in 2019 after years of operations] an action was also consistent with MFS believing it was not a CTI shareholder prior to filing the complaint. (Id.) The Court concluded that MFS was not a CTI stockholder and issued an order to that effect. (Id.)  Despite this and facts known to each of them, and for corrupt motives of the Racket schemes, "[i]n October 2019, [COOPER, through CLC] [electronically] filed a motion [with Orange County Superior Court] requesting the court appoint a receiver for

CTI" through the Racket SBN#'s, based on her [renounced in January 2019, in furtherance of the same scheme, as shown] status as CTI shareholder. The communication and receiver action had nothing to do with merits of COOPER's claims, and everything to do with enriching Enterprise 1 and Enterprise 3+ actors through the scheme using Enterprise 2 protection and/or concealment at all times, as shown.  As Racket fee pawn acting under a defined threat of prosecution for "securities fraud" and even an ambiguous threat of "law enforcement" "looking into" the conduct at issue by CLC's central figure KJC, COOPER previously participated in the 709 hearing to unwind all shares of CTI on the knowingly false premise that MFS was a shareholder. G058700, p. 6-7. Cal. Pen. Cod. § 518. While it all failed legally, the overt act harmed Plaintiff's business and property through the fraudulent scheme generally.

**[OVERT ACT #13] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343</u>**

260.  On "April 19, 2019 at 2:27:53 PM PDT" with intent to defraud, Han Le acting on behalf of KJC, did send, and copy KJC, Becky Phillips, O'CONNOR, and Jennifer Weaver, via email wire communication the following, which was not privileged and was *ultra vires*, and reflects the scheme as of that date, which no reasonable attorney would undertake except one protected by the Racket, for improper purposes and no regulator would ever allow at least not one who cared about the public, the courts, or their profession generally:

**From:** Han Le <hle@catanzarite.com>
**Date:** April 19, 2019 at 2:27:53 PM PDT
**Cc:** Kenneth Catanzarite <kcatanzarite@catanzarite.com>, Becky Phillips <bphillips@catanzarite.com>, Jenifer Weaver <jweaver@catanzarite.com>, "Richard O'Connor (Richard@tgapholdings.com)" <Richard@tgapholdings.com>
**Subject: MFS SHAREHOLDERS - DO NOT SIGN CONSENT DOCUMENT JUST SENT BY POBST-- SUPPLEMENTAL EMAIL**

Dear Shareholders:

**Supplement to Email**

I want to be clear that neither I, Richard O'Connor, Tony Scudder nor anyone else sued in the Root Case or the Mobile Farming Case have settled any claims with Root or anyone else. All we did was agree to toll the statute of limitations to allow claims to be brought against us later.  No conflict. <u>Instead we are working together in the best interests of Mobile Farming and Cultivation Technologies</u>.

There is no conflict as they contend.  Instead **<u>the conflict identified is those named Defendants taking the 17,000,000 Series A Preferred Shares with 3 times voting to your common shares, for $0, control of the company and their undisclosed compensation. That is the conflict. They want to keep that against your interest and we seek to cancel those shares and secret compensation arrangements. THEY COULD HAVE SETTLED THIS CASE BY AGREEING TO CANCEL THEIR PREFERRED SHARES AND CONTROL AND SALARIES--- *YOU NEED TO KNOW THAT THEY REFUSED. THAT IS WHY WE HAVE THIS DISPUTE.*</u>**

**The consent form should not be signed**. It does not allow you to reject the proposal so any signature would approve their request which I say is against the interests of Mobile Farming and Cultivation Technologies shareholders. If you have any questions feel free to call my cell at 760-409-6464.

Richard O'Connor
Director and Officer

***Kenneth J. Catanzarite For Richard O'Connor***
Catanzarite Law Corporation
2331 West Lincoln Avenue
Anaheim, CA  92801
**Direct Dial: (714) 678-2100**
**Direct Fax: (714) 399-0577**
Office Phone: (714) 520-5544
Office Fax: (714) 520-0680

**[OVERT ACT #14] in violation of 18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343**

2 6 1 .   The Court of Appeal found "[p]articularly troubling…Catanzarite's active role in helping its clients forcibly remove CTI's directors [through postal mail and email communications, directing a control dispute manufactured by the Racket under the knowingly false guise of client advocacy], after Catanzarite was unable to achieve this same result in the MFS Action's section 709 hearing." G058700, p. 4-6.

2 6 2 .   Specific wire and/or email communications around this overt act or series of overt acts indirectly evidenced, CTI shareholder Carlos Calixto declares as follows under penalty of perjury: "[o]n or about May 6, 2019, I began receiving calls, text messages, and voicemails from Anthony Scudder ("Scudder") requesting that I execute a document…to facilitate replacement of CTI management [under different factual pretenses than January 23, 2019]. On or about May 8, 2019…I spoke with…Kenneth J. Catanzarite of Catanzarite Law Corporation…Catanzarite explained to me [by wire communication/cellular phone] the purpose…was to remove the board of directors of CTI through an action by majority written consent [by mail and/or wire] of the shareholders of CTI ("Shareholder Consent") [among whom MFS was notably not one and hasn't been; but here not even claimed by the Racket despite the ongoing, knowingly fraudulent 'MFS Action' and 'Pinkerton Action' and 'Mesa Action']. Following our conversation, Catanzarite sent me the Proxy and requested my signature…I explained to Scudder that I did not want to get involved and declined to execute the Proxy. On May 10, 2019, Richard O'Connor ("O'Connor") sent me text messages and voicemails offering me $5,000 to execute the Proxy; which I declined. On May 14, 2019, I was provided a copy of the Shareholder Consent dated as of May 14, 2019, executed by O'Connor as proxy holder for certain CTI shareholders with a register of purported proxies attached…Page 28 of the Shareholder Consent is a forged Proxy authorizing O'Connor to

vote my shares." [ROA #2] Verified Complaint in State Action 2, Exhibit P – Declaration of Carlos Calixto."

**[OVERT ACT #15] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343</u>**

263. After the foregoing acts and for improper purposes in furtherance of the scheme to defraud, as summarized by the Court of Appeal, Catanzarite Law Corporation electronically filed in Orange County Superior Court while the Pinkerton Action and MFS Actions were both pending, each also intended to preserve or maintain the fraudulent scheme, "(4) The Cooper Action. Cooper, et al., v. Cultivation Technologies, Inc., OCSC No. 30-2019-01072443. On May 23, 2019, Catanzarite filed an action directly against CTI on behalf of two CTI shareholders (Cooper and Mebane), who were members of the O'Connor Faction. The previous day, FinCanna had filed a breach of contract action against CTI and CTI Subsidiaries and requested a receivership [because of the fraudulent Racket litigation that destroyed Plaintiff's property, business, in fact]. The Cooper Action requested the court direct CTI to (1) hold a shareholder's meeting to elect a board of directors [where Cooper sought to unwind all shares of CTI through the Racket less than a month previously]; (2) deliver an annual report [which was underway through an independent auditor, in conjunction with the $261 million merger destroyed by the Racket; thereby Plaintiff's property and business as second largest stakeholder and CEO]; (3) appoint an accountant to conduct an audit [which was already done, it just didn't suit the fraudulent scheme of the Racket and posed a direct threat of evidencing the same and the Racket could not control them as they apparently control MGO in April 2022]; and (4) order CTI to pay the costs for an investigation, audit, and costs of the suit [aka, the ultimate purpose of all the conduct at issue – take from the public and give to <u>Enterprise 1</u> or <u>Enteprise 3+</u> at all costs, and conceal the evidence or destroy it]. Winget, on behalf of CTI filed an opposition, asserting a shareholder meeting was scheduled for August 2019." Any legal pleadings and papers give context to fraudulent schemes of the Racket.