**[OVERT ACT #16] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343</u>**

264. In knowing furtherance of the scheme on July 2, 2019, Catanzarite [electronically] filed [with Orange County Superior Court] a cross-complaint on behalf of CTI and CTI Subsidiaries [corruptly and willfully, without authority as the Racket was also suing CTI itself at the same time, and its officers and directors and Plaintiff, and tolling claims against COOPER, O'CONNOR, and HIGGERSON to "bring later" while they provide evidence to the Racket], against FinCanna [CTI's largest investor and security interest holder] and three of its directors [where O'CONNOR, ZAKHIREH, and DUFFY previously sued Plaintiff after $14 million in funding was announced in April 2017 before they improperly used the United States Securities Exchange Commission in July 2017 to pursue their own malicious goals; See LA-4837; when Irving Einhorn, Esq. joined as independent director]. Large sections of the cross-complaint appear to have been cut and pasted from the Mesa Action complaint. Catanzarite purported to represent CTI and its subsidiaries." This was an egregious violation with multiple overt acts, unbelievably undertaken by, then ratified by, authorized Court officials and the Racket as if it were reasonable.

**[OVERT ACT #17] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343</u>**

265. In knowing furtherance of the scheme, on Wednesday, July 10, 2019 at 10:01 AM "From: Becky Phillips [mailto:bphillips@catanzarite.com]" delivered a wire communication for, and copying, "CC: Kenneth Catanzarite kcatanzarite@catanzarite.com" an email "Subject: Cultivation Technologies, Inc. – Confidential Settlement Negotiations – Evidence Code §§ 1152 and 1154" without regard for the fraud and crime exceptions of Evidence Code § 956, reading: "Mr. Edgerton, Please see the attached settlement negotiations/agreement for your client(s) if there is an interest. This proposal, if not accepted, shall expire at 5:00 p.m. Thursday, July 19, 2019....Very truly yours, Becky Phillips for Kenneth J. Catanzarite" "Legal Assistant" "Catanzarite Law Corporation" "2331 West Lincoln Avenue, Anaheim, CA 92801" "Direct Dial:

(714) 678-2108" "Direct Fax: (714) 399-0589" "Office Phone: (714) 520-5544" "Office Fax: (714) 520-0680" to which my defense counsel, Sam Y. Edgerton, III Partner of law firm Ohagan Meyer wrote back to "To: 'Kenneth Catanzarite' kcatanzarite@catanzarite.com "[b]ecause of the obvious fraud issue regarding your purported representation of CTI, this is not a protected settlement communication." The wire communications give more context to the improper purposes and schemes to defraud public, courts, and legal profession for the Racket.

**[OVERT ACT #18] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343</u>**

266. With intent to defraud, and to fraudulently conceal further after Plaintiff filed State Action 1, and in furtherance of the scheme while the Pinkerton Action was pending, and on behalf of directly adverse parties in knowing violation of California Rules of Professional Conduct and ABA model 1.7; KJC or one or more Racket agents did use the electronic filing system for State of Washington to update "JOLLY ROGERS INVESTMENTS INC." with a "Statement of Change" on "2020-06-26." KJC and the Racket agents knew the change was false, and that they lacked standing to file or maintain actions related to MFS or CTI, but KJC didn't and still doesn't care where he is "made."

**[OVERT ACT #19] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343</u>**

267. On Friday, December 13, 2019, it was announced by public wire press release that Leah T. Wilson was stepping away, with "her decision to leave the role of Executive Director effective January 17, 2020, to pursue other career interests. Chief of Programs Donna Hershkowitz has been named Interim Executive Director. At the request of Board of Trustees leadership, Wilson has agreed to support the transition in a consulting capacity. Wilson joined the State Bar in 2015 as its first chief operations officer, part of a new management team charged with transformational reform of the agency after a period of significant upheaval and controversy."

268. In an "Advertorial" published by LA Business Journal on February 5, 2020 – two weeks after Ms. Wilson's retirement was to become effective – the following statements were disseminated, which provide context to the schemes. ADVERTORIALS.

**State Bar Launches Leadership Bank Program to Maximize Funds for Legal Aid**

"Financial institutions in California hold nearly $5 billion in IOLTA accounts, the interest on which goes to support legal aid," said Leah Wilson, Executive Director. "We know that attorneys and law firms care about increasing the availability of legal services for the millions of Californians who cannot afford to pay for these services. We are excited to highlight banks that choose to be a leader in supporting this work, recognizing and leveraging their tremendous economic power to do good for the neediest in the state." To become a designated Leadership Bank, financial institutions need to [provide each enterprise with laundering capacity, and]:

• Pay at least the established compliance rate (ECR) on their Interest on Lawyers' Trust Accounts (IOLTA). The current ECR is 68 percent of the Federal Funds Rate (FFR); and

• Waive fees and charges on all IOLTA accounts, regardless of the account's size.

The State Bar distributes grants to nearly 100 legal aid organizations who deliver crucial legal services to the most vulnerable low-income Californians [through active market participants that it funds horizontally, while actively disregarding the threat of homelessness that the Racket poses to Plaintiff and others]. Examples of the impact these legal aid organizations have include:

• Enabling nearly 4,900 families to stay in their homes (2017); • Obtaining more than 4,800 restraining orders to protect survivors from domestic violence (2017); • Serving over 11,000 clients in the areas of consumer protection and financial matters (2018); and • Supporting tens of thousands of seniors, veterans, and individuals with disabilities with civil legal issues (2018). [Destroying Plaintiff's life, CTI, business, property, nearly causing him to be homeless].

For 2020, the State Bar Board of Trustees approved a record distribution of $55.6 million in IOLTA funds. This dramatic leap [of 2X or greater within a year of AB 3249 effective 1/1/19, conveniently] in IOLTA revenue is [purportedly, without any reasonable basis] largely the result of two factors: an improving economy that has driven rising interest rates, and the State Bar's work with banks to maximize interest revenue [but mostly, shifting around of the Racket's schemes].

However, the vast majority of need for legal aid in California remains unmet [especially Plaintiff, who can't even retain a lawyer to fight us for rightly placed fear, where DURAN and I will exercise our "discretion" to disbar them as may be necessary to suit the schemes]. The California Justice Gap Study estimates that 60 percent of low-income Californians (in households at or below 125 percent of the federal poverty level) reported experiencing at least one civil legal problem in their households in the past year, but only a small portion of those problems were addressed by legal aid. Meanwhile, legal aid organizations are able to fully resolve only 30 percent of the cases brought to them, with insufficient resources being a major limiter [and where we horizontally send all of our money to support and construct a false narrative, knowingly].

Becoming a leadership bank will afford the following benefits to financial institutions:

• **Visibility as a partner in access to justice:** The State Bar will highlight Leadership Banks on its website, publishing the inaugural list in January 2020. The State Bar will make attorneys aware that selecting a Leadership Bank for IOLTA funds will increase funding for and the impact of civil legal aid [which gives the federal receiver a great list to start from].

• **Marketing edge:** Financial institutions will have permission to advertise their Leadership Bank designation as evidence of their support for [the protection Racket],

Ability to obtain Community Reinvestment Act (CRA) credit: Being a Leadership Bank will help financial institutions fulfill their CRA obligations by generating funds that will go directly towards assisting those most in need [and will support our deviance, when necessary and directed].

• **Demonstrated social responsibility:** Financial institutions care about their customers and their communities. This is another way to support veterans, seniors, and low-income Californians struggling with disability benefits, medical care, and other issues affecting their financial health. [This is another way we can distract you from instances where we conceal and deliberately disregard people like Plaintiff to oppress in dereliction of our duty.]

*The State Bar of California's mission is to protect the public and includes the primary functions of licensing, regulation and discipline of attorneys; the advancement of the ethical and competent practice of law; and support of efforts for greater access to, and inclusion in, the legal system.*

**[OVERT ACT #20] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343</u>**

269.    "After its meeting on June 9, 2021, the Board of Trustees announced it had unanimously appointed Leah T. Wilson as the State Bar's next Executive Director. Wilson served in the same role from September 2017 to January 2020."

<u>https://www.calbar.ca.gov/About-Us/News/state-bar-board-of-trustees-announces-leah-wilson-as-next-executive-director</u>

"The Board welcomes the return of Leah to lead the State Bar—she is the right person at the right time," said Board Chair Sean SeLegue. "Leah previously served with distinction as Executive Director. She is a standout leader who possesses a unique set of skills—to both think big and lead staff to get things done. Her track record shows that she is committed to and capable of carrying out the State Bar's mission of protecting the public, increasing access to justice, and enhancing diversity in the profession. We greatly look forward to working with her again."

"I am honored that the Board has selected me to lead the State Bar again at this challenging time," said Wilson. "I believe deeply in the State Bar's public protection mission and know that it demands accountability, transparency, and bold action as well as continuous improvement. As

with all public agencies and organizations, the State Bar must navigate a significant transition as we emerge from the pandemic. I look forward to working with the Board and the agency's dedicated, hard-working staff to write the State Bar's next chapter."

**[OVERT ACT #21] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343</u>**

270.  In furtherance of schemes to defraud the public, Courts, and Plaintiff and to protect Enterprise 1's KJC, TJO, BW, CLC, JTT, NMC, and Tom Girardi "Alex Hackert, Senior Trial Counsel" delivered "via e-mail only – justintimesd@gmail.com" on "May 20, 2022" the following from OTC.CPRA@calbar.ca.gov at 11:14 AM on June 14, 2022 in response to Plaintiff's formal request for information about members of Enterprise 1, Enterprise 3+ controlled by Enterprise 2 engaged in the conduct at issue in this case. Responses follow each respective defendant. **Defendant KJC.** (1) "Please be advised that State Bar disciplinary complaints and investigatory records are confidential and not subject to disclosure. (Gov. Code, § 6254 subd. (f) [Investigatory files compiled by a state agency for licensing purposes are not subject to disclosure under the California Public Records Act]; Bus. & Prof. Code, § 6086.1 subd. (b) ["[D]isciplinary investigations ... shall not be disclosed pursuant to any state law, including, but not limited to the California Public Records Act."].) Without waiving said exemptions, please see the enclosed records. Additionally, a 28-day extension is needed to search for potentially responsive records from field facilities or other establishments that are separate from the office processing the request. (Gov. Code, § 6253(c).)" **Defendant BW.** (2) "State Bar disciplinary complaints and investigatory records are confidential and not subject to disclosure. (Gov. Code, § 6254 subd. (f); Bus. & Prof. Code, § 6086.1 subd. (b).). Without waiving said exemptions, the State Bar has conducted a diligent search of its records and has located no documents responsive to your request. The State Bar reserves the right to determine whether the requested records are exempt from disclosure pursuant to the California Public Records Act should we later locate responsive documents."

**Defendant TJO**. "State Bar disciplinary complaints and investigatory records are confidential and not subject to disclosure. (Gov. Code, § 6254 subd. (f); Bus. & Prof. Code, § 6086.1 subd. (b).) Without waiving said exemptions, please see the enclosed records." **Defendant JTT**. "State Bar disciplinary complaints and investigatory records are confidential and not subject to disclosure. (Gov. Code, § 6254 subd. (f); Bus. & Prof. Code, § 6086.1 subd. (b).) Without waiving said exemptions, the State Bar has conducted a diligent search of its records and has located no documents responsive to your request. The State Bar reserves the right to determine whether the requested records are exempt from disclosure pursuant to the California Public Records Act should we later locate responsive documents."

**[OVERT ACT #22] in violation of 18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1343**

271. On "Wednesday, July 13, 2022" in a press release entitled "State Bar Secures More than $105 Million in Legal Aid Assistance" sent through the wire to all internet users, giving context to the unprotected activity and schemes shown, the following was delivered:

"The State Bar of California announced today that this year's $308 billion State Budget will furnish more than **$105 million in funding for access to justice efforts through the State Bar**, **supporting legal aid organizations** that serve low-income Californians facing evictions and other forms of housing insecurity, mounting debt, and other legal problems [while we use Enterprise 2 to oppress Plaintiff, delivering him housing insecurity, despite his mounting debt, and knowing the legal problems he faces are actually our problems that we created, but we rely money from IOLTAs to send our peers]. This [scheme] supplements the more than $50.5 million in funds the State Bar plans to distribute for similar assistance from Interest on Lawyers' Trust Accounts (IOLTA) earnings in 2023" and it helps resolve the publicly presented separation of California Lawyers Association from the Racket, which reduces our control on the market and thus this helps replace that stream of income while we maintain the same fraudulent public statements]. **[$155.5M]**

"Whenever we speak about funds of this magnitude, it is easy to lose sight of the fact that each dollar spent represents profound change in the lives of the [the Racket and its beneficiaries]" said Leah Wilson, State Bar Executive Director. "When a [public servant lawyer can pad pockets while actively disregarding individual civil rights], or a large debt is [created by us, and converted in favor of our licensees] [or if] someone [is] on the verge of bankruptcy [caused by us], what we are really providing [is a scam and protection racket]."

"The funding comes from **state General Fund dollars** as well as **$20 million in federal homeless prevention funds**."

[To make it seem real, the Racket has prepared] "State Bar Stories" YouTube videos to highlight the legal issues that Californians face [but please don't read what the Auditor says, we prefer these flowery presentations, and not the reality of our operations, which remain concealed].

In the 2021 –22 state budget, the State Bar of California received a record amount, nearly $110 million, in similar funding to assist low-income Californians with their legal needs.

The legal aid funds recently approved by the Legislature and signed by the Governor will be allocated over one to three years.

For a list of free legal aid providers for low-income Californians, please go to [LawHelpCa.org](LawHelpCa.org). [Like Office of Chief Trial Counsel, "Complaint Review Unit," this is also a lead generation tool and the way we ensure our monopoly is not compromised].

###

*The State Bar of California's mission is to protect the public and includes the primary functions of licensing, regulation and discipline of attorneys; the advancement of the ethical and competent practice of law; and support of efforts for greater access to, and inclusion in, the legal system.*

**[OVERT ACT #23] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1341</u>**

272. For Los Angeles Times ongoing scrutiny… "A team of auditors pored over the State Bar's internal data and identified examples of specific lawyers with disturbing track records who received little or no discipline [of which there are 700]. None of the attorneys were named in the report [because they are protected and "made"]. One was the subject of 165 complaints over seven years, but auditors found that many of the complaints were dismissed outright or closed after the bar issued private letters to the lawyer." Postal mail letters to further schemes to defraud.

273. "Although the volume of complaints against the attorney has increased over time, the State Bar has imposed no discipline, and the attorney maintains an active license," Tilden said in a letter summarizing his office's findings.

274. <u>The Pulitzer prize winning journalist, Matt Hamilton and Los Angeles Times story,</u> goes on: "[a]nother unidentified attorney had been the subject of several complaints alleging a failure to give clients money from their settlements. "When the State Bar finally examined the attorney's bank records, it found that the attorney had misappropriated nearly $41,000 from several clients," Tilden wrote. Federal conviction for money laundering is cited in the same report.

275. "The chair of the State Bar's board of trustees, Ruben Duran, said in an interview that he was troubled by the audit's findings, calling its conclusions "some of the hardest-hitting discoveries" that the State Auditor has ever made about the agency. He said that staff and leadership wanted to ensure the public was better protected, and that many reforms had been implemented after the Girardi case exposed deficiencies." [noting that DURAN is full of shit].

276. "It shouldn't matter whether your lawyer is an A-list celebrity or a solo practitioner down the street. Everyone deserves competent, ethical legal services," Duran said. He noted that the State Bar went about two decades without fee increases, and said some of the problems at the

94

bar stem from this long-term underfunding at an agency that has to monitor more than 250,000 attorneys." DURAN's comments, in light of Plaintiff's adjacent treatment, were fraudulent.*

277. "Duran noted that the bar had implemented reforms that address some of the issues highlighted by the audit, including proposing a new program to monitor attorney trust accounts, increased oversight of the chief trial counsel's office, and twice yearly reviews of closed cases by an outside auditor. Last summer, the agency also hired George Cardona, a former federal prosecutor, to serve as chief trial counsel." DURAN's comments are similar to those in 2002 from those in his position or similarly situated.

278. "But fully implementing the State Auditor's recommendations would require about 30 new employees and $1 million in one-time funds," Duran said. [Which they refuse to impose on their racketeers by way of disciplinary costs, and use this as lacking to conceal racketeering].

279. Assemblymember Mark Stone (D-Scotts Valley), who is chair of the Assembly's Judiciary Committee, said the audit was "profoundly eye-opening." [DURAN company line]

280. "Victims of unscrupulous lawyers [like Plaintiff] should not be re-victimized by a State Bar that too often has protected those lawyers from full scrutiny," [not unless Enterprise 2 says its ok]" Stone said in a statement. "We will continue to push the Bar to get back to basics and reform its discipline system once and for all." **Live, in 2022, the results are exactly the same.**

281. "Girardi was once a top plaintiffs' attorney and Democratic powerbroker who gained reality TV fame on "Real Housewives of Beverly Hills" alongside his third wife, Erika. His downfall in December 2020 was in part triggered by a judge finding that he had misappropriated millions from families of those killed in an Indonesian plane crash. But after the collapse of his Wilshire Boulevard law firm, scores of clients came forward saying they were swindled by Girardi and The Times documented a trail of misconduct allegations going back decades."

282. "Earlier this month, a Chicago law firm accused Girardi and other lawyers at his defunct firm of running "the largest criminal racketeering enterprise in the history of plaintiffs' law," pocketing millions from clients, vendors and fellow attorneys."

283. "That Girardi's serial misconduct went unchecked for decades has forced a reckoning among the legal establishment. In addition to the State Bar's acknowledgement of past mistakes [while concealing live, current ones of similar veracity], the agency has also been conducting a broad investigation into whether its own employees or other agency insiders helped Girardi skirt scrutiny. That investigation is ongoing," [and concealed], Duran confirmed.

284. "Girardi is not named in Thursday's report by the State Auditor, but the findings make clear that he was not alone in sidestepping sanction by the bar's disciplinary system."

285. "I think we definitely identified misconduct that does impact the average Californian if they are using the legal system," said Jon Kline, a principal at the auditor's office who helped lead the review. "Misappropriation is a concern: That's money that should be going to clients that the attorney has absconded with." This is also called Larceny or unlawful transmission of moneys, with intent to defraud and as part of a pattern of racketeering activity.

286. "The audit found that the State Bar failed to fully identify patterns of misconduct and investigate further, either because of its case management system or because of how it treats complaints that are withdrawn. For example, one attorney was named in multiple complaints for failing to pay settlement funds. The bar closed each after the attorney "finally paid the client," but the audit states that the bar did not obtain the lawyer's bank records until it received more than 10 complaints over two years."

287. "When the State Bar finally examined the client trust account, it found that the attorney had misappropriated nearly $41,000 in total from several clients," the audit states.

288. "The audit found that the State Bar had also prematurely closed cases that needed further investigation or potential discipline, often through a *host of confidential methods*, like issuing private warning letters that are not knowable to the public. The audit found **inconsistencies in the use of nonpublic methods**, and indicated the agency had relied too much on such **secretive forms of discipline**." These confidential letters and operations provide context to the Racket.

289. "From 2010 to 2021, the bar used confidential letters or warnings to attorneys twice as often as it sought public discipline. During that time frame, **more than 700 attorneys had at least four or more complaints each that were closed through private measures**. The auditors reviewed five attorneys' cases and found the cases were closed "despite indications in its case files that further investigation or actual discipline may have been warranted." [Enterprise 2].

290. "<u>**The State Bar had only one outside reviewer, and that person had been the sole person examining closed cases since 2012**</u>. The State Bar's staff was also selecting which cases the reviewer examined, and the reviewer's findings went to management, not its board of trustees."

291. "Anytime findings are going through management, it introduces the risk that what is provided ultimately to the governing body is altered," said Kline, the principal auditor. [As Plaintiff shows, Leah Wilson operates for the Board of Trustees in a horizontally managed Racket.]

292. "Other errors were basic investigatory lapses [60-day+ lapses show obvious tampering and collusion], like accepting poor levels of evidence. An attorney who had overdrawn a client trust account twice in a month was asked by the bar to provide bank records. The attorney turned over bank statements but left out the month when the trust account was overdrawn. Instead, the lawyer provided a narrative of transactions in that month. Rather than request the bank statement, the State Bar accepted the lawyer's explanation and closed the case." "**There is this focus on closing cases quickly in order to**" [launder money, blame funding, distract scrutiny].

**[OVERT ACT #24] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. §§ 1341/1343</u>**

293.  With intent to defraud or to conceal while oppressing Plaintiff in violation of Cal. Bus. & Prof. Cod. § 6068(a) which protects his rights under the United States Constitution, for CLC, KJC, NMC, BW, TJO, and Racket, Joy Nunley and EDM did deliver/cause to be sent April 3, 2020, the following letter by postal mail to Plaintiff in response to binding Court orders showing mandatory disqualification, malice, fraud by the Racket, to which it replied [with shown operational reality by Plaintiff in brackets]: "After carefully reviewing the [predicate, parallel, and ongoing pattern of conduct meeting the federal definition of racketeering activity that harmed you], as well as information from other sources [we choose not to name], including the Superior and Appellate Courts [supporting your assertions beyond reasonable doubt and our own internal records from 2007-2020], the [Racket]…has decided to [allow the extortion, wire fraud, securities fraud, obstruction of justice, bank fraud, insurance fraud, money laundering, and mail fraud in favor of these particular active market participants on the false pretense that our rules suggest racketeering is not] serious enough to support both a finding of culpability and the imposition of professional discipline."[]"[The Racket] invite[s] you to file a new complaint against [us] once all of the disqualification orders become final [since we don't agree with the trial court nor Court of Appeal about several mandatory law violations that harmed you, subjectively, per our discretion]. Please include a copy of all of the relevant orders or Court of Appeal's Decisions with your new complaint, [so we can destroy or conceal those, too.]."[]"You may telephone my legal advisor, Senior Trial Counsel Eli Morgenstern, at 213-765-1334 [who is being paid by, or threatened by, KJC]"[]" [if] you disagree with the [Racket's] decision to [allow racketeering and unlawful taking from you under our express authority and despite your severe injuries, without regard for the 14th Amendment or Cal. Bus. and Prof. Cod. § 6068(a), you may request that the State Bar's Complaint Review Unit [further disclaim liability for our official agents again, understanding they will also

cite irrelevant immunities that no reasonable attorney would proffer, and assert we are all authorized by California Supreme Court][and therefore] your [final rulings in California, Florida, Courts of Appeal from 2007-2022 showing beyond any reasonable doubt do indeed support criminal proceedings against us, that will never happen due to our monopoly]. The [Office of General Counsel] will [be happy to help conceal, make excuses for, dispose of, and ensure] that your complaint [is never] reopened [especially] if [we] determine[] that further investigation [proves serial fraud that would undermine us]. [However, "re-opening" is unlikely as it would undermine the legal profession, IOLTA revenue to distribute horizontally, and careers of Enterprise 1 members who rely on Enterprise 2 in furtherance of their own interests, to your detriment]. To request [oppression] by the [Office of General Counsel and those they protect above all else unequally], you must [so that we can conceal or destroy the evidence], submit your [cry and prayer for help and protection from criminals acting under our authority as Court officials] in writing, post-marked [by postal mail so it's hard to track] within [an arbitrary] 90 days of the date of this [frivolous] letter [intended to defraud you and everyone, and to give you a false sense of security that we do stuff to justify $250M+ annually in funding and while the Racket destroys your life, liberty and property without probable cause or standing], to: The State Bar of California Complaint Review Unit Office of General Counsel 180 Howard Street San Francisco, CA 94105-1617" (also a "Racket Base" with CLC HQ in Anaheim).

294.   Based on evidence known to Ms. Nunley and Enterprise 2, no reasonable person or attorney would write this letter to Plaintiff and deliver it by postal mail. Indeed, the discipline complaints in over 200+ languages in the State of California has but one true purpose: to conceal racketeering in furtherance of fraudulent schemes involving Enterprise 1 and Enterprise 3+ and to ensure all the leads go back to the vacuum that is Enterprise 2 in furtherance of Enterprise 3+.

**[OVERT ACT #25] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. §§ 1343/1341</u>**

295. On September 24, 2022, Plaintiff delivered "Supreme Court Case to Exhaust State Remedies v. Ruben Duran (State Bar) (Admin. Order. 2020-09-17)" by email at 9:18 AM to mark@geragos.com, tina@geragos.com, ben@geragos.com.

296. In apparent retaliation, not dissimilar to Doe as cited by the late Mr. Kay as cited, and to obscure its conduct while oppressing Plaintiff ten-days after a Supreme Court case was filed targeting protectionist behavior, four days after Plaintiff delivered this to Geragos, September 27, 2022, another wire communication delivered to the general public on the internet via press release reads: "The State Bar is charged with protecting the public," said Ruben Duran, Board Chair. "Confidence in our ability to do so has unfortunately been shaken in recent times by [disclosure of the 700 lawyers who are using the Racket, reflected by] the Girardi matter and what it represents. [Giving the impression of] [r]estoring and maintaining the public's trust in the disciplinary apparatus of this agency is imperative [although less important than funding us through IOLTA and distributing unlawful proceeds from racketeering to ourselves]. To that end, it is important to emphasize that the State Bar investigates possible misconduct wherever it might occur [except when it involves interstate commerce, deliberate schemes to defraud in which we participate, and $500+ million in interstate securities, and up to $1B+ in damages to Plaintiff, as here]. The status of attorneys, or the size of their practice [except for Bhadarwaj juxtaposed with my own conduct, that of GRANDT's, or of those among CLC], cannot and will not impact our decisions to investigate misconduct [which is solely driven on how much they pay, and to whom, or what they do in furtherance of our schemes to control the judiciary and enterprise]. I want to stress that in and of itself this announcement is not an indication of any misconduct by the attorneys being investigated [until we can resolve this behind closed doors, and we remind everyone that the Court of Appeal's rulings mean nothing to us, because we are above the law]. Lastly, the State Bar

expresses gratitude to the LA Times for its excellent reporting on…[our ongoing, unlawful distribution of funds from IOLTA accounts over which the Racket has exclusive review and over which no scrutiny will be allowed]."

297. DURAN delivered these statements, and the Racket distributed this wire communication, with intend to defraud the public, courts, and legal profession – because KJC, CLC, JTT, NMC, BW, and TJO would not be practicing law if the statements were even remotely true (nor DURAN, nor GRANDT). No reasonable person or attorney would deliver these statements in light of the facts known regarding Plaintiff.

**[OVERT ACTs #26] in violation of 18 U.S.C. 1961(1)(B) and 18 U.S.C. § 134**

298. An August 31, 2022, article from Los Angeles Times reads: "The wire [to buy a judge a condo] did not come from Girardi's personal bank account, but rather from a [IOLTA] containing settlement money for clients of his Wilshire Boulevard law firm, Girardi Keese. At the time of the transfer to Bigelow, the account held funds owed to cancer victims and other residents of a polluted Inland Empire community, who had sued cement manufacturers in Riverside Superior Court in 2008, according to the state court records." "Following the Los Angeles Times article and investigation into IOLTAs that Ruben Duran was purportedly thankful for, a September 22, 2022 article reads "legal legend [Enterprise 1's Tom Girardi] was a major party donor for decades, a self-described "limousine liberal" who bragged about the influence his money bought him in the selection of judges. He poured millions into local, state and national races personally and lined up additional donations from his wife, "Real Housewives of Beverly Hills" star Erika; the employees of his law firm; and the multitude of California trial lawyers who did business with him — or hoped to." "Girardi kept throwing splashy fundraisers and writing big checks even as his financial situation grew dire. In the last decade, he defaulted on a series of high-interest loans and was forced to liquidate his stock portfolio yet he and his wife still doled out more than $2 million to the

national Democratic Party and individual candidates, election filings show. Those receiving funds included presidential contenders Joe Biden ($11,200), Barack Obama ($62,500) and Hillary Clinton ($60,400), Gov. Gavin Newsom ($66,900), U.S. Sen. Dianne Feinstein ($18,700), former state Insurance Commissioner Dave Jones ($37,244), L.A. Mayor Eric Garcetti ($9,500) and City Atty. Mike Feuer ($11,000)." In the years that he and his wife gave $2 million to candidates, Girardi treated a bank account meant to safeguard settlement money for clients as "his personal piggy bank… to support his lavish lifestyle," according to a recent filing by the trustee overseeing the bankruptcy of his law firm, Girardi Keese. In that same time frame, the trustee wrote, Girardi "stole at least $14,000,000 in settlement funds that should have gone to the Firm's clients." "Those clients were mainly of modest means and already suffering from health problems because of toxic contamination, recalled pharmaceuticals, motor vehicle crashes or other misfortunes. Many are still trying to collect their full settlements, according to bankruptcy claims they have filed seeking compensation." "Former client Christina Fulton, who was seriously injured in a car accident and contends Girardi embezzled about $745,000 from her settlement, called on politicians to reevaluate accepting the donations." "Girardi's decision to continue funding candidates in the face of crushing financial problems offers additional evidence that he regarded political connections as central to maintaining his facade." The settlement Tom Girardi reached with a drug company in 2005 was characteristically large and righteous: some $66 million the famed Los Angeles trial attorney won on behalf of patients who said a diabetes medication caused liver failure and other maladies. An article on August 4, 2022 published by Los Angeles Times says "At Girardi's suggestion, a nationally renowned mediator was appointed to ensure proper distribution of the funds. For overseeing the settlement, retired California appellate Justice John K. Trotter Jr. and his private judging firm, JAMS (formerly known as Judicial Arbitration and Mediation Services), received a $500,000 cut." "Yet in the years that followed, Girardi diverted money Trotter was hired to

safeguard for purposes that were highly questionable and even, in the recent assessment of one federal judge, "a crime." Girardi sent $750,000 to a jeweler for what Bankruptcy Court records show was the purchase of an enormous pair of diamond earrings for his wife, "The Real Housewives of Beverly Hills" star Erika Girardi. He dipped into the settlement account [IOLTA] again and again for supposed case expenses, sometimes writing multiple seven-figure checks to his law firm in the same week, according to the records." This unprotected activity among Enterprise 1 and Enterprise 3+ actors gives context to KJC, NMC, BW, JTT and others among the Racket as communicated to Plaintiff between September 20, 2022 and September 29, 2022 – all known to the Racket and Enterprise 2. More importantly, building on evidence beyond reasonable doubt provided to the Federal Bureau of Investigation in North County San Diego by Plaintiff of the schemes.

[OVERT ACT #27] in violation of 18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1341

299. Giving context to unprotected racketeering activity, published statements disseminated by wire communication containing material misstatements of facts, showing the anticompetitive nature in restraint of trade on August 14, 2022 in furtherance of their schemes [with Plaintiff interpretation], defendant DURAN said the following in an Los Angeles Times article entitled California State Bar, under scrutiny for Tom Girardi scandal, gives director $43,000 raise [I run an anti-competitive, per se trust] "for lawyers," said Ruben Duran, a San Bernardino County attorney [and Partner with private law firm Best Best & Krieger] who [concurrently] chairs the [nonsovereign] state bar's governing board. He said comparisons to the salaries of the governor and others are unfair. "I don't want to go so far as to say apples and oranges, but it is a very specific type of role we're filling" [to obscure and conceal our true operations, and to restrict commerce].

300. "The bar, the largest in the country, licenses California's 260,000 attorneys and is supposed to investigate and discipline lawyers who cheat clients or engage in other types of

misconduct. In the wake of Girardi's spectacular downfall, amid evidence he misappropriated millions in settlement money, critics have lambasted the agency for bungling complaints against him." [Plaintiff shows that Girardi is a public scapegoat, and but a **symptom of the disease**.]

301. "After a Times report last year about the legendary lawyer's cultivation of bar officials, the agency conducted its own audit, which found "mistakes made in some investigations over the many decades of Mr. Girardi's career going back some 40 years." A separate audit ordered by legislators found systemic shortcomings, with lawyers avoiding public accountability despite lengthy records of misconduct complaints. Currently, a law firm hired by the bar is investigating whether officials within the agency helped Girardi elude punishment." [*Obviously*.]

302. The bar has [fraudulently, knowingly] pledged to reform itself [through active market participants who are shown to carry on and ratify schemes to defraud again]; Duran, the board chair, said Wilson's role as executive director is key to those efforts [and schemes]. Wilson began working at the bar in 2015, served as executive director from 2017 until 2020 and served as a paid consultant for the agency until last summer [while she setup the parallel distribution of funds after the United States Supreme Court decision in 2015, after which] she returned to the executive director's post."

**[OVERT ACT #28] in violation of 18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1341**

303. On Friday September 23, 2022, disseminated to the public by Enterprise 2 in furtherance of and to conceal Enterprise 1 and Enterprise 3+ schemes, a wire communication giving context to various unprotected racketeering activity reads "Board [of Majority Active Market Participants] Approves Client Trust Account Protection Program Rules and Furthers Other Initiatives to Improve the Discipline System." "**Discipline Costs and Sanctions**: Reevaluate the current discipline cost model to **reduce costs and seek a statutory amendment to eliminate disciplinary sanctions** [which does nothing for public interest, Courts, nor legal profession,