particularly relevant to these material misstatements]. The State Bar's discipline costs, which disciplined attorneys must pay [yet still account for <1% of revenues to Enterprise 2 thus ensuring the public and ethical Enterprise 1 members are subsidizing the Racket], are higher than those of other comparable agencies [and officials that perform their job despite being paid less than the President of the United States or Governor of their state], and other states typically do not impose sanctions [because they don't have the Racket, and seek to protect the public instead of pad their own pockets through their monopoly]. Attorneys who do not pay discipline costs have their license to practice suspended until payment is made [showing the control exerted by the Racket, why the conduct at issue should never have damaged Plaintiff in the United States, and why the "annual fee bill" is not an impediment to increasing access to the legal system….the Racket that refuses to impose disciplinary costs on those that launder money, defraud, steal, lie, transmit money unlawfully, perjure, and cheat the public are responsible, even if the Racket prefers the public and lawyers who aren't corrupt to increase their unlawful takings and gains]. The recommendations are intended to better [protect the Racket, misdirect public scrutiny, and launder money] with other similar agencies and improve [active market participants' protection under the guise of] fairness.

304.    "In its role overseeing the discipline system [without accountability for our actions, also due to our monopoly, run by our peers, which is fraudulently misrepresented to provide a false sense of security for those retaining Enterprise 1 members under an expectation of competency, also abused for those among Enterprise 1 wishing to conduct racketeering activity in other states pro hac vice, or in United States Courts**],** the Board [comprised of majority of active market participants regulating and distributing funds to their horizontal profession] heard other important reports [created and controlled by themselves without State supervision], including the ongoing development of new faster case processing standards [internally created and fraudulently misrepresented where cases are disposed fast, and not justly; as not even racketeering activity

warrants discipline if the right persons are coerced sufficiently], and a review of performance metrics for OCTC [also internally created, fraudulently concealed or misrepresented; where changes have been discussed since 2002 yet repeatedly operated to further Enterprise 1 and Enterprise 3+ interests and take from the public; speed of processing is not an indication of success or performance of duty – offset of discipline costs plus licensing fees = income; where defendants have shown that all licensing fees will go horizontally]. In another change signaling the importance of discipline system improvements [that don't exist] the September meeting [which still lacked public disclosure of Plaintiff's claims despite the overwhelming evidence lacking answers because Office of General Counsel subjectively believes Board of Trustees are above federal law] will be the last for the Board's Regulation and Discipline Committee [as we have determined it easier to conceal and misdirect these matters behind closed doors, and/or through IOLTAs, and/or private letters that you'll never see because we say so]. Going forward, all [crime] previously heard by the committee will go before the full Board, which will sit as the Discipline Committee [until Board of Trustees can sort out more ways to conceal and take from the public through antitrust/competitive violations while deliberately misstating our operational practices, because we're using Enterprise 2 to enrich ourselves and Enterprise 3+]."

305.    Further enriching the Enterprises, ensuring no person can possibly challenge the Racket, "[t]he Board also approved dissolving the Closing the Justice Gap Working Group in light of the restrictions imposed by AB 2958, the annual fee bill, signed into law on September 18, 2022. [We prefer placing this onus on the "fee bill" and not on the deliberate disregard by the Board of Trustees, or our ongoing lack of competency and managerial capacity in protection of the public, because it sounds better and we prefer all funding to come from Legislature and the public because we're used to doing things this way no matter what the law says]. The new statute [which we will use for our benefit without regard for the public, courts, or legal profession where it suits us while

disregarding the other statutes or federal law under binding decisional law] prohibits any proposals that would permit nonlawyer ownership, the sharing of fees with nonlawyers [which helps us keep our prices beyond reach except through our "legal aid" organizations that charge similar rates to control the markets while actually inflicting homelessness on others], or any proposed changes in current limitations on the unauthorized practice of law [which only we are allowed to do, and specifically those involved with CATANZARITE LAW CORPORATION], leaving nothing left to test in a sandbox [since its ours, and nobody else is playing in it because we've declared that Legislature didn't give us enough money, and it isn't coming from the Racket]. As permitted by the new law [and notwithstanding the United States Constitution or the equities], the State Bar will seek feedback from legal services organizations, community-based organizations, small businesses, and consumers [who don't know what the hell we are talking about, and are intimidated by us and our predatory practices] about options for increasing access to legal services [to pay us more] and will report periodically to the Board on these efforts [but will not allow such feedback to change our pricing dominance or control over who provides legal services in California, and who doesn't]. In other words, the lawyers ensured their markets would remain tightly controlled, from the Board of Trustees and defendant DURAN. This conduct violates the Sherman Act under 15 U.S.C. § 1 and California Supreme Court's administrative order embodying the principles of binding decisional law in 2015. More cherry-picking of laws, converting of statutes, for the Racket.

306.    This conduct is per se anticompetitive, which the Racket still has no answer to despite being noticed of antitrust administrative action in California Supreme Court (S276517) on September 17, 2022. This complaint was stricken by California Supreme Court as "untimely" on September 27, 2022, and in furtherance of the schemes, Office of General Counsel is now silent and purportedly making antitrust determinations for itself while participating in anticompetitive conduct restricted under federal law and common sense. Where the California Supreme Court has

avoided making Sherman Act determinations for itself and its own nonsovereign actors since it is not a trial court, the improper motives and purposes of the Racket become evident with each day that passes. The Racket is merely doubling down through its mouthpiece DURAN and his counsel GRANDT, while even KJC, JTT, CLC, NMC, TJO and BW are scrambling for their protection.

307.    Plaintiff notes that case metrics are not reflective of State Bar's effectiveness; it's evidence of the Racket's effectiveness through Enterprise 2 in disposing of public injury with disregard. Case metrics show how effectively the Racket is concealing its operations to take from the public under artificial sovereignty, because Plaintiff's cases show the reality of Racket operations under color of State law and against virtually every tenet of legal ethics (objectively).

308.    When DURAN made these statements, he not only knew they were anticompetitive, but he knew that he and Office of General Counsel were facing an antitrust administrative action as of September 17, 2022. Not only that, DURAN and GRANDT knew of the conduct in this case, but DURAN still chose to deliver these fraudulent statements about the Racket in furtherance of his own corrupt motives of passion or interest as Partner of Best Best & Krieger, and other per se interests that must exist among Enterprise 3+ associated with the Racket's parallel investments of proceeds. Put simply, this press release, like others giving context to the schemes shown, are intended to defraud the public, Legislature, and anyone who isn't enriched by Enterprise 2 design.

**[OVERT ACT #29] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. § 1341</u>**

309.    Using the postal mail on August 12, 2020, with intent to defraud and/or conceal for

the Racket, the "Complaint Review Unit" did send a letter [lead generation tool] to Plaintiff.

three attorneys. Specifically, OCTC noted that in two of the lawsuits you referenced, the court granted motions to disqualify the attorneys (and in one case to disqualify the entire Catanzarite Law Corporation). However, the attorneys have filed appeals of these orders, which appeals are still currently pending. Additionally, motions to disqualify the attorney then pending with the trial court in two of the other lawsuits identified in your complaint. Because the disqualification motions were not the subject of final orders, OCTC informed that it would exercise its discretion not to take further action on your complaint. Howeve OCTC specifically invited you to file a new complaint once all of the disqualification orders become final.

In your request for review, you did not make reference to the pending disqualification mot or appeals. Rather, you stated that you believe the State Bar should pursue further investigation because the attorneys "have weaponized California Courts and their license t practice law" against you and because you believe your initial complaint thoroughly documented the basis for such investigation. You also attached a copy of a lawsuit you hav filed against the attorneys. Most recently, you also forwarded to the State Bar a copy of th attorneys' cross-complaint against you in that matter.

The Complaint Review Unit has carefully reviewed your initial complaint as well as your req for review and we affirm the decision of OCTC to close your complaint without further investigation. The circumstances at issue in your complaint are the subject of multiple mot for disqualification, appeals thereof, and now a new civil suit. The court with appropriate jurisdiction over these issues is in the best position to resolve and rule on these disputes initially. The State Bar cannot substitute its judgment for that of th

310.   The letter had improper purposes of preventing Plaintiff a fair forum in California in furtherance of schemes, and to avoid Enterprise liability, Office of General Counsel did send this letter. Plaintiff directs the parties and Court to G058700, all known to Enterprise 2. Anticompetitive conduct is difficult for active market participants, like whoever wrote this letter, to discern.

initially.  The State Bar cannot substitute its judgment for that of the court.  We also note that OCTC invited you to renew your complaint after final rulings regarding the motions to disqualify.  While your request for review did not mention these pending rulings, it appears that none of the appeals has yet been resolved by the Court of Appeal.  We again echo OCTC's statement to you that you may file a new complaint against the attorneys once the various pending disqualification orders become final.  Such rulings from the courts could then be properly evaluated by the State Bar to determine whether they can provide a basis for the State Bar to prove by clear and convincing evidence that a violation of the Rules of Professional Conduct or State Bar Act occurred.

For these reasons, we conclude that your complaint was properly closed.

If you disagree with this decision, you may file an accusation against the attorney with the California Supreme Court.  A copy of the applicable rule is enclosed.  (See Rule 9.13, subsections (d) through (f), California Rules of Court.)  If you choose to file an accusation, you must do so **within 60 days of the date of the mailing of this letter**.  Together with your accusation, you should provide the Supreme Court (1) a copy of this letter and (2) a copy of the original closing letter from the Office of Chief Trial Counsel.

August 12, 2020
Case No.: 20-O-01012; 20-O-01013; 20-O-01014
Page 3

The State Bar cannot give you legal advice or representation.  If you have not already done so, you may wish to consult with an attorney for advice regarding any other remedies which may be available to you.  Attorneys can be located by contacting a lawyer referral service certified by the State Bar in your area. You may obtain a list of  State Bar certified lawyer referral services by calling the State Bar at 866-442-2529 or by visiting the State Bar website at:

http://www.calbar.ca.gov/Public/Need-Legal-Help/Lawyer-Referral-Service

Sincerely,
Complaint Review Unit
Enclosure

311.    This "Complaint Review Unit" scheme is willfully operated or caused it to be operated through undisclosed influence and consideration unrelated to public interest, and this one is shown to have one primary purpose: To stop those among Enterprise 1 who would dare challenge the Racket, and further that the Racket can exert its influence and false sovereignty among any provider of "legal services" through this selective lead generation tool that also served to carry improper purposes of Enterprise 1 and Enterprise 3+ via Enterprise 2's concealed operations.

312.    No clearly articulated State policy exists for "referrals" in furtherance of the Racket, conveniently among recipients of more than "$78 million" [$155.5 million in 2022-2023] in annual grants for "legal aid" while Plaintiff is actively disregarded and oppressed by the same actors. BPC 6068(a). Court of Appeal found the exact appeal upon which the Office of General Counsel/Complaint Review Unit relied in favor of its own, as being completely "meritless." Whoever sent the foregoing postal mail letter to defraud Plaintiff intended to keep the facts about Plaintiff, their own schemes or corrupt motives, and damages to Plaintiff, concealed from the public scrutiny as shown.

**[OVERT ACT #30] in violation of <u>18 U.S.C. 1961(1)(B) and 18 U.S.C. 1341/1343</u>**

313.    With intent to defraud, with legal malice, and to conceal the conduct at issue where EDM cannot carry on for or allow racketeering activity, nor unlawfully take from Plaintiff, nevertheless:

 **The State Bar**
*of California*

OFFICE OF CHIEF TRIAL COUNSEL

845 S. Figueroa Street, Los Angeles, CA 90017      213-765-1334      eli.morgenstern@calbar.ca.gov

November 22, 2021

**PERSONAL AND CONFIDENTIAL**

Via email only to justintimesd@gmail.com

Justin Beck
3501 Roselle St
Oceanside, CA 92056

Re:   Respondent:      Kenneth Catanzarite
      Case Number:     21-O-12371

      Respondent:      Nicole Catanzarite-Woodward
      Case Number:     21-O-05698

Dear Mr. Beck:

The State Bar of California has decided to abate the matters involving attorney Kenneth Catanzarite's representation of CTI.

The decision was based on the factors outlined in rule 5.50 of the Rules of Procedure of the State Bar, which are also considered by the Office of the Chief Trial Counsel ("State Bar") in evaluating whether to abate an investigation.

For instance, we considered that there are pending civil matter(s) which involve substantially the same misconduct that is it at issue in the State Bar matters, i.e. the conflict of interest created by Mr. Catanzarite and his law firm's representation of CTI even though he was concurrently, or had formerly, sued CTI.  (See Rules Proc. of State Bar, rule 5.50(B)(1).

Further, the pending civil matters charge Mr. Catanzarite and other attorneys within the Catanzarite Law Corporation with committing additional, potential acts of professional misconduct.

Consequently, the evidence "adduced" in the related civil matter(s) will aid the State Bar in its: (i) investigation of Mr. Catanzarite's conduct with respect to his representation of CTI; and (ii) potential prosecution of Mr. Catanzarite in State Bar Court. (See Rules Proc. of State Bar, rule 5.50(B)(4).

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 S. Figueroa Street
Los Angeles, CA 90017

Justin Beck
Case Nos.: 21-O-12371, 21-O-05698
Page 2

We were also guided by Standard 2.5(a) of the Standards For Attorney Sanctions For Professional Misconduct, which provides that the harm caused to an attorney's client is a significant factor in determining the appropriate level of discipline for a violation of the conflict rules.

Again, the harm caused by Mr. Catanzarite's violation of the conflict rules, as well as his other alleged misconduct, is an issue in pending litigation.

For instance, in the complaint that Mr. Horwitz filed on behalf of CTI against Mr. Catanzarite and his law firm and others in the matter titled *CTI v. James Duffy, et.al*, it is alleged that Mr. Catanzarite's breach of fiduciary duty and malpractice caused significant financial harm to CTI.

Accordingly, the State Bar has decided to abate our investigation of Mr. Catanzarite until the resolution of the related, pending civil matter(s). We will take no further action on your complaints at this time.

Please keep the records related to your complaint and inform this office if your address or telephone number changes.

Thank you for bringing this matter to our attention and for the valuable assistance you have provided to us. The State Bar depends on the assistance of the public in effectively monitoring the conduct of California attorneys.

Sincerely,

Eli D. Morgenstern
Senior Trial Counsel

EM/jn

When this letter was delivered by postal mail to Plaintiff in furtherance of the scheme, EDM knew

it was frivolous and false, and with deliberate disregard of Plaintiff and his severe emotional harm,

and damage to his business and property which he shows as being $138 million, serves the Racket.

## OVERT ACTS CONSTITUTING FINANCIAL INSTITUTION FRAUD

314.    With Under 18 U.S.C. § 1344 – Bank Fraud, "Whoever knowingly executes, or attempts to execute, a scheme or artifice—**(1)** to defraud a financial institution; or **(2)** to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

**[OVERT ACT 31] in violation of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1344**

315.    With intent to defraud financial institutions through parallel schemes, the Racket, KJC, CLC did use wire and postal mail to file and cause to be filed, and further in pursuit of the schemes to defraud as shown before in all preceding sections, another series of lawsuits plaguing the Courts unnecessarily **if the 19 Court of Appeal rulings are to be trusted** for "Plaintiffs (and appellants)…(1) WA Southwest 2, LLC; (2) WA Southwest 15, LLC; (3) WA Southwest 19, LLC; (4) James Shee; (5) Jensen Enterprises, Inc.; (6) Thomas Olson; and (7) LaVonne Misner." *WA Southwest 2, LLC v. First American Title Insurance Co.*, 240 Cal.App.4th 148, 151 n.1 (Cal. Ct. App. 2015) "arising from] rubble of a failed multimillion dollar investment in commercial real estate. The trial court sustained a series of demurrers and entered judgments of dismissal as to numerous defendants. We affirm the three judgments of dismissal at issue here because the applicable statutes of limitations foreclose recovery. *WA Southwest 2, LLC v. First American Title Insurance Co.*, 240 Cal.App.4th 148, 150 (Cal. Ct. App. 2015) "G050445" *WA Southwest 2, LLC v. First American Title Insurance Co.*, 240 Cal.App.4th 148, (Cal. Ct. App. 2015) "09-04-2015 WA SOUTHWEST 2, LLC et al., Plaintiffs and Appellants, v. FIRST AMERICAN TITLE INSURANCE COMPANY et al., Defendants and Respondents. Catanzarite Law Corporation, Kenneth J. Catanzarite and Eric V. Anderton, for Plaintiffs and Appellants" *WA Southwest 2, LLC v. First American Title Insurance Co.*, 240 Cal.App.4th 148, (Cal. Ct. App. 2015)

316.    With intent to defraud, using the Racket all while Plaintiff's business and property were damaged through ongoing overt acts shown, this particular (and all the foregoing patterns of) conduct continued so as to obtain through unlawful means the money or property of others which would be paid or indemnified by a financial institution for improper purposes and paid among Enterprise 1 or Enterprise 3+, using the protection schemes of the Racket, even though "[b]because the basic structure of the real estate transaction at issue here ha[d] been detailed in no fewer than **19 appellate court opinions**, and because this is an appeal from an order confirming an arbitration award, we will not engage in a detailed recitation here. We refer the reader to *Stella*, *supra*, 8 Cal.App.5th 181 and *WA Southwest 2*, *supra*, 240 Cal.App.4th 148, both of which contain detailed descriptions of the investments. The specific investment at issue here was detailed in *Aerovault Kornievsky, LLC v. Cushman & Wakefield, Inc.* (Aug. 5, 2016, G051702) [nonpub. opn.]. For present purposes, the most important fact is that appellants entered into the subject transactions in 2006. *Asset Mgmt. Consultants v. Kornievsky*, G058399, 5-6 (Cal. Ct. App. Jan. 5, 2021)

**[OVERT ACT #32] in violation of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1344**

317.    Plaintiff incorporates the improper purposes shown against Scottsdale Insurance Co., which was sued without standing by the Racket's Catanzarite Law Corporation, defrauding the Court with actual malice and intent to harm Plaintiff in particular, all under the protection Racket and ongoing help of EDM, GRANDT, and DURAN.

318.    "It is undisputed Catanzarite voluntarily dismissed the Root Action and the MFS Action on March 5, 2020. It dismissed the Scottsdale Action on November 18, 2019. "[A] voluntary dismissal is presumed to be a favorable termination on the merits[.] [Citation.]" (*Lee, supra,* 41 Cal.App.5th at p. 720.)" *Beck v. Catanzarite Law Corp.*, No. G059766, 31 (Cal. Ct. App. Jul. 13, 2022) In this case, Catanzarite dismissed two complaints on the same day, March 5, 2020. There was no evidence these dismissals occurred as a result of a settlement between Beck and

115

plaintiffs. The trial court reasoned the dismissals were likely due to the previous Corporations Code section 709 ruling, holding MFS was not one of CTI's shareholders. However, the record shows that when Catanzarite learned MFS lacked standing to bring a derivative suit on CTI's behalf, it did not dismiss the lawsuits. Catanzarite filed FACs instead. *Beck v. Catanzarite Law Corp.*, No. G059766, 32 (Cal. Ct. App. Jul. 13, 2022) It is more likely Catanzarite's voluntary dismissal of the two lawsuits was related to a later disqualification ruling and the lack of tenable claims. The dismissals took place just a few months after the court disqualified Catanzarite and its attorneys from representing CTI and the Mesa Action plaintiffs (the class action shareholder derivative lawsuit). Given Catanzarite's zeal for filing multiple lawsuits against the same defendants, we can assume it would not abandon a meritorious action already initiated. Thus, we conclude the voluntary dismissal in this case should be regarded as a favorable termination of the two lawsuits (Pinkerton Action and MFS Action). *Beck v. Catanzarite Law Corp.*, No. G059766, 33 (Cal. Ct. App. Jul. 13, 2022).

319.    "The document reflected that on November 18, 2019, CTI [via CLC] dismissed the action against CTI's insurance company "in its entirety." As noted in our prior opinion, on November 15, 2019, the court granted the motion disqualifying Catanzarite from representing CTI. (*FinCanna, supra,* G058700.) In making its ruling, the court noted Catanzarite could not represent two client adversaries and in the Scottsdale Action [Catanzarite] claimed to be representing the corporation and at the same time sought to invalidate a defense and indemnity [Plaintiff under] CTI's insurance policy [and, Side A]. (*Ibid.*) The court stated a denial of coverage could put CTI "'on the hook for the individuals' costs of defense and/or liability.'" In other words, the court recognized Catanzarite was improperly using the Scottsdale Action for an improper purpose, i.e., to help [himself above anyone else, by any means through the ongoing, knowingly fraudulent "class" or "derivative"] Mesa Action [Mesa terminated JTT]. Accordingly, this dismissal was a

116

favorable termination on the merits. *Beck v. Catanzarite Law Corp.*, No. G059766, 33 (Cal. Ct. App. Jul. 13, 2022)

### [OVERT ACT #33] in violation of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1344

320.    In Report 2022-030 – the Auditor states "[a]dditionally, we relied on data in the State Bar's conflicts list. As our testing identified that the State Bar had not consistently used the conflicts list, we did not assess the accuracy or completeness of the list. As such, we found these data to be of undetermined reliability."

321.    The Racket, seeking more resources, **The State Bar of California**

322.    RE: State Bar of California Response to Audit Report No. 2022-030

323.    Dear Mr. Tilden:

324.    The State Bar has been working diligently to improve the effectiveness, timeliness, and fairness of its discipline system [but not for Plaintiff, which we selectively avoid]. Based on proposals from the Board of Trustees' (Board) Special Discipline Case Audit Committee convened in response to clear failings in responding to complaints regarding licensee Thomas Girardi [and notwithstanding our superviosory conduct under CRPC 5.1 or 8.4 under BPC 6077], the State Bar is currently implementing a comprehensive Client Trust Account Protection Program [to preserve the status quo], among other efforts [to distract from reality]. Additionally, in accordance with directives in Senate Bill 211 (Umberg), we are working with outside experts to develop and propose new case processing standards aimed at resolving attorney discipline cases in a timely, effective, and efficient manner while [without affecting th Racket's bottom line, it will sound good and give us cover in light of other misstatements I've made]. We continue…to address previous reports regarding racial disparities in the discipline system [and use this to beat our chest]. And, just last week, we adopted a five-year strategic plan that [misrepresents] our commitment to administer an attorney discipline system that is efficient, accountable, and transparent."

117

325.    "Given the Board's intense focus on the discipline system, and our understanding of the gravity of the deficiencies that [our operations have caused], some of the findings in your recent report are profoundly eye-opening and troubling [which we've agreed is the Racket line]. In particular, our failure to promulgate clear and comprehensive policies in the areas identified, and to develop corresponding accountability measures to ensure compliance with those policies, are unacceptable [over the last 95 years; but especially in the last 20, and moreso the last two years]. We are proud to have appointed a new chief trial counsel who manifests this sentiment [yet somehow continues the same predicate and parallel acts], as reflected by the many steps he has already taken to address identified deficiencies so far in his short tenure [while disregarding Plaintiff[, as well as his responsiveness during the audit process itself, a characteristic well-documented in your report [even though you relied mostly on the stuff we fed you]. Our executive director shares [in the undisclosed proceeds of our schemes], and her responsiveness during the audit process is also well-documented [since she planned for this] We appreciate the insights provided by your report, and we will continue to [place them behind our own intersts, thank you.]

326.    "As outlined below, we generally agree with the majority of your recommendations; there is only one area where we disagree on policy grounds. We also believe it is important that we explicitly address the resource needs associated with the implementation of the reforms you have outlined. To that end, we have included a fiscal impact section in this response. Because of the very real resource constraints we face, our agreement with any particular recommendation is, respectfully, not a commitment to implement that recommendation absent new resources. We have made this distinction where applicable." [Plaintiff notes that the Office of Chief Trial Counsel recovered less than $1M, and spent more than $60M, in one year. More money will not improve this. More money will enrich the Enterprises, and fund Enterprise 2.]

327.    **State Bar Responses to Audit Recommendations**

118

328. *Recommendation:* To ensure that it uses nonpublic measures to close complaints only when such use is consistent and appropriate, the State Bar should revise its policies by October 2022 to define specific criteria for which cases are eligible to be closed using nonpublic measures and which are not eligible.

329. *Response:* Agree. As noted, the Office of Chief Trial Counsel (OCTC) has in place a policy, issued in June 2021, that addresses nonpublic alternatives to discipline—resource, directional, and warning letters and agreements in lieu of discipline (ALDs)—and provides guidance on their content and how to decide when to issue them. We agree that this policy should be modified to address private reprovals issued prior to filing of a Notice of Disciplinary Action—a nonpublic form of discipline—and to provide additional and more specific criteria for which cases are and are not eligible for closure or resolution using any of these nonpublic measures. No later than October 2022, OCTC will adopt specific criteria that provide more guidance for the exercise of staff discretion in determining whether use of any of these nonpublic measures is or is not appropriate based on the particular facts.

330. *Recommendation:* To ensure that it fulfills its duties to investigate attorney misconduct, by April 2023, the State Bar should begin monitoring compliance with its new policy for identifying the circumstances in which investigators should continue to investigate even if the complainant withdraws the complaint.

331. *Response:* Agree; full implementation dependent on resources.

332. ①As noted, in February 2022, OCTC put in place a new policy making clear that a complainant's withdrawal of or failure to cooperate in the investigation of their complaint is not alone a basis for closure and setting out the circumstances under which, in both intake and investigation, complaints should continue to be pursued despite a complainant's withdrawal or failure to cooperate. In conjunction with the implementation of the new policy, closing codes in

119

OCTC's case management system have been modified to accord with the policy. We will monitor compliance with this policy by regularly conducting a randomized review of files closed using certain of these codes. This will require State Bar staff to pull files closed using these codes, review the substance of the files, and check the closing letters to ensure that closures complied with the policy. As noted below, such monitoring will require additional resources.

333.   *Recommendation:* The State Bar should notify the public on its website when other jurisdictions determine that an attorney that is also licensed in California presents a substantial threat of harm to the public.

334.   *Response:* The State Bar agrees that if we learn of an interim action and finding in another jurisdiction regarding an attorney that is also licensed in California, we will notify the public on our website by posting of a consumer alert setting out the nature of the interim action and finding while also advising that the attorney is presumed innocent of the disciplinary charges in the other jurisdiction unless and until those charges have been established.

335.   ②Please understand that our ability to learn of interim actions in other jurisdictions is limited, however. The American Bar Association (ABA) data bank referenced in the next recommendation depends on reporting to that data bank by other jurisdictions, and it is not clear how often interim actions are reported.

336.   *Recommendation:* To ensure that it identifies discipline imposed on California attorneys in other jurisdictions, the State Bar should use the American Bar Association's data bank to identify attorneys disciplined in other jurisdictions who do not report that discipline.

337.   *Response:* Agree. OCTC staff have access to the ABA data bank and are now set up to receive automated emails when another jurisdiction notifies the ABA data bank of discipline imposed on an attorney identified in the data bank as also being admitted in California.

120

338.    *Recommendation:* To allow its staff to more easily identify patterns of similar complaints made against attorneys, by July 2022, the State Bar should begin using its general complaint type categorizations when determining whether to investigate a complaint.

339.    *Response:* Agree; full implementation dependent on resources.

340.    As noted, in February 2022 OCTC implemented a policy regarding intake's consideration of prior closed complaints in determining whether to move a current complaint forward for investigation. As also noted, the State Bar has recently developed a set of general complaint type categorizations that group particular allegations into more general categories. We agree that OCTC should begin using the general complaint type categorizations for the purpose of identifying possible patterns of similar complaints among both previously closed and currently open complaints. The identification of a pattern may signal additional steps that should be taken, either in intake or investigation, before making a determination as to how to proceed with the current complaint or whether to reopen older complaints for further action.

341.    Pursuant to a Board resolution adopted to address findings regarding racial disparities in the discipline system, complaints closed without discipline or an alternative to discipline that are more than five years old are archived and will not be reviewed as part of the effort to identify patterns of similar complaints.

342.    *Recommendation:* To improve its ability to identify and prevent conflicts of interest that its staff may have with attorneys who are subjects of complaints, the State Bar should develop a process by July 2022 for monitoring the accuracy of the information in its case management system used to flag attorneys with whom its staff have declared that they have a conflict of interest.

343.    *Response:* Agree; full implementation dependent on resources.

344.    *Recommendation:* To ensure that State Bar staff do not inappropriately close cases against attorneys on the conflict list, the State Bar should create a formal process by October 2022

121

for determining whether it is able to objectively assess whether such a complaint should be closed or whether the decision should be made by the independent administrator. The State Bar should document this assessment in its case files for each case against an attorney on the conflict list.

345.     *Response:* Agree; full implementation dependent on resources.

346.     The Board's Special Discipline Case Audit Committee identified as a priority the need to ensure that all OCTC investigative and charging decisions are free from conflicts or outside influence. Accordingly, we agree that decisions to close cases should be made only after conflicts determinations are made and documented. We will work with the chief trial counsel to establish a formal process under which OCTC staff are required to review cases prior to closure to identify potential conflicts, refer any cases posing a potential conflict to the independent administrator of the Special Deputy Trial Counsel program for a final determination regarding the potential conflict, and document this process and the final determination regarding conflicts in OCTC's case management system.

347.     *Recommendation:* To ensure the independence and objectivity of the external review of its case files, the State Bar should amend its policies by July 2022 to do the following:

348.     Require the external reviewer to select the cases for the semiannual review.

349.     Establish formal oversight to ensure that it follows up and addresses the external reviewer's findings.

350.     *Response:* Agree; full implementation dependent on resources.

351.     In November 2021 the chief trial counsel began providing to the Board a summary of the external reviewer's report and recommendations together with OCTC's response to the recommendations. In January 2022, with the Board's agreement, the chief trial counsel issued a policy formalizing this practice. We will work with the chief trial counsel to implement policies

and procedures for OCTC to also report back to the Board on its progress in implementing actions to address the external reviewer's findings.

352.    *Recommendation:* To ensure it appropriately reviews complaints involving overdrafts and alleged misappropriations from client trust accounts, the State Bar should perform the following by July 2022:

353.    Discontinue its use of informal guidance for review of bank reportable actions and direct all staff to follow the policies established in it is intake manual.

354.    Revise its intake manual to disallow de minimis closures if the attorney has a pending or prior bank reportable action or case alleging a client trust account violation.

355.    Establish a monitoring system to ensure staff are following its policies for de minimis closures.

356.    When investigating client trust account related cases and bank reportable actions not closed de minimis, require its staff to obtain both the bank statements and the attorney's contemporaneous reconciliation of the client trust account, and determine if the relevant transactions are appropriate.

357.    Require a letter with client trust account resources to be sent to the attorney after the closure of every bank reportable action.

358.    *Response:* Agree in part, disagree in part, as outlined below.

359.    9a. Discontinue its use of informal guidance for review of bank reportable actions and direct all staff to follow the policies established in it is intake manual.

360.    Agree.

361.    9b. Revise its intake manual to disallow de minimis closures if the attorney has a pending or prior bank reportable action or case alleging a client trust account violation.

362.    ③Agree in part. While manual revisions are still pending, there will be some exceptions to the approach recommended by the State Auditor, primarily designed to take into account the age and amount of prior reportable actions and the age and disposition of prior client trust account violation complaints.

363.    9c. Establish a monitoring system to ensure staff are following its policies for de minimis closures.

364.    Agree; full implementation dependent on resources.

365.    ④To monitor compliance with policies for de minimis closures of bank reportable actions, a randomized review of such closures will need to be conducted at regular intervals. This will require State Bar staff to pull files underlying these closures, review the substance of the files, and check closing letters to ensure that closures have accorded with policies. As noted below, we believe such monitoring will require additional resources.

366.    **9d. When investigating client trust account related cases and bank reportable actions not closed de minimis, require its staff to obtain both the bank statements and the attorney's contemporaneous reconciliation of the client trust account, and determine if the relevant transactions are appropriate.**

367.    Disagree.

368.    ⑤      ⑥This approach would consume inordinate amounts of resources and time, requiring the State Bar in every such case to: (a) request from the attorney and/or subpoena from the bank statements for the account and wait for their receipt; (b) request the attorney's contemporaneous reconciliation and wait for its receipt; and (c) do a financial analysis of the statements and reconciliation to determine if the relevant transactions are appropriate. Many bank reportable actions and client trust account complaints do not warrant this level of investigation. For example, some non de minimis bank reportable actions are explained by extended holds on

deposits of which the attorney was unaware, resulting in the issuance of checks at a time when the attorney believed funds had cleared but they had not—if a more truncated investigation shows this to be the case, there is no justification for the more extensive further investigation recommended by the State Auditor. A study the State Bar conducted last year of over 70,000 bank reportable action matters found that 22 percent did not involve a negative bank balance in actuality—the reportable action was triggered only by check deposit holds. Doing an investigation of the scope recommended by the State Auditor for every bank reportable action and client trust account complaint regardless of the underlying facts and merits would result in a waste of limited investigative resources and is not sound public policy.

369.   ⑦In addition, given data that shows that Black male attorneys are ten times more likely than their white male counterparts to be the subject of bank reportable actions, the impact of the approach recommended by the State Auditor will fall heavily on this group of attorneys. Black male attorneys will be disproportionately required to take time away from their practices to gather and submit documentation to the bar and respond to investigative inquiries. Given that the data indicates that there is a significant percentage of cases for which this level of intervention is not required, the potentially disparate impact of the State Auditor's approach is difficult to justify.

370.   As noted above, OCTC has already modified its policy for identifying the circumstances in which complaints should continue to be pursued despite a complainant's withdrawal or failure to cooperate, and it will be revising its policies and practices regarding the use of alternatives to discipline and the identification of patterns of similar complaints against attorneys. All of these policy changes will apply to the State Bar's handling of bank reportable actions and complaints alleging client trust account violations. In addition, OCTC will revise its policies to define specific criteria in which bank reportable actions and complaints alleging client trust account violations should not be closed in the absence of obtaining both bank statements and

the attorney's contemporaneous reconciliation of a client trust account and determining if the relevant transactions are appropriate and will implement a monitoring system to ensure these policies are being followed. We believe that this more targeted approach will more efficiently and effectively use the State Bar's **limited investigative resources to further the goal of public protection** while at the same time minimizing disparate impacts from increased investigations of bank reportable actions and client trust account complaints.

371.    9e. Require a letter with client trust account resources to be sent to the attorney after the closure of every bank reportable action.

372.    Agree [; we can always throw those away, or tell the attorney to do the same.]

373.    **Resources Needed to Implement the State Auditor's Recommendations**

374.    ⑧The fiscal impact of the State Auditor's recommendations are as follows:

375.    Increased oversight and monitoring. [recommendations 2, 6, 7, 8, and 9c]

376.    Given the volume of complaints handled by OCTC, the proactive regulation and compliance monitoring mechanisms reflected in the audit recommendations will require both human and technological capital [even though we won't report, nor account, for what we get]:

377.    Identifying patterns of complaints using new complaint categorizations. [recommendation 5]

378.    Implementation of this recommendation will require significant work to categorize previously closed and currently open cases in accordance with the general complaint type categorizations and ensure that this categorization is available in a readily accessible way to investigators and attorneys.

379.    Investigate all reportable actions not closed as de minimis and all client trust account complaints. [recommendation 9d]

380.   As noted above, the State Bar disagrees with this recommendation on policy grounds. That being said, irrespective of policy concerns, the fiscal impact of this recommendation is significant:

381.   In total, full implementation of the State Auditor's recommendations would require an additional 30.5 FTE and $200,000 annually on a go-forward basis, as well as $1 million in one-time funds. Absent new resources, the State Bar's implementation of these recommendations will be limited to what can be done within existing funding parameters.

382.   (10)In closing, we thank you for your review, which has helped sharpen the focus of discipline system improvements currently underway and identified areas for further improvement. It is gratifying to know that the Board's and our staff's focused efforts align with issues and recommendations set forth in your report. We have set improvement of the attorney discipline system as our number one goal in our recently adopted five-year strategic plan and have worked with the executive director and new chief trial counsel to identify strategies and implementation steps for accomplishing this goal beyond those already underway. Current externally facing efforts include the Client Trust Account Protection Program, which, when fully implemented, will reflect the first comprehensive proactive regulation of legal client trust accounts in the state's history, and the Ad Hoc Commission on the Discipline System, which is charged with conducting a wide-ranging review of the efficiency, effectiveness, and fairness of the attorney discipline system. Less visible has been our inward focus on strengthening Board oversight of the chief trial counsel and OCTC. Of particular note is the fact that beginning in 2021, performance targets have been set for the chief trial counsel; progress in relation to those targets is formally assessed on a quarterly basis under the direction of the leadership of the Board's Regulation and Discipline Committee.

383.   Reflecting the value we see in many of your recommendations as well as their alignment with initiatives in progress under the leadership of the new chief trial counsel, we have

already taken significant steps towards implementing several. In November 2021 the chief trial counsel began to present to the Board of Trustees a summary of the external reviewer's report and recommendations together with OCTC's response to those recommendations. In February 2022 several reforms were initiated including issuance of a new policy outlining the circumstances in which staff should continue to pursue allegations of misconduct even if a complainant withdraws their complaint, and a clarification of office policy regarding consideration of prior closed complaints. Information technology staff has also been engaged to ensure that conflicts information in the case management system reflects the most current information from the conflict-of-interest database. While it is undeniable that there is much work to do to address challenges that have been decades in the making and are reflective of a complex and unproductive cycle of insufficient funding, poor outcomes, and low morale, I am confident that the Board will continue to both demand and support meaningful improvement in all areas of OCTC's operations.

384.   We are committed to doing the internal work needed to ensure that our attorney discipline system is effective, efficient, transparent, and fair. Although we cannot fully implement the State Auditor's recommendations absent additional funding, we will advance the majority of them to the full extent possible given the resource constraints we face.

385.   Sincerely,

386.   Ruben Duran

387.   Chair, Board of Trustees"

---

388.   **CALIFORNIA STATE AUDITOR'S COMMENTS ON THE RESPONSE FROM THE STATE BAR OF CALIFORNIA**

389.    To provide clarity and perspective, we are commenting on the response to our audit from the State Bar. The numbers below correspond to the numbers we have placed in the margin of the response.

390.    ①We did not assess the changes the State Bar made to its case management system. As we noted, the State Bar issued a policy directive in February 2022 regarding those cases in which the complainant withdraws the complaint or otherwise fails to cooperate in the investigation. Because our audit fieldwork was substantially complete, we did not perform testing to determine whether the State Bar's modification of closing codes would help alleviate our concern. We look forward to reviewing the details of the State Bar's efforts to address this issue in its 60-day response to our recommendations.

391.    ②The State Bar's reference to the American Bar Association's data bank in response to this recommendation is misleading. Our recommendation regarding the data bank pertains to final orders of discipline. We did not recommend that the State Bar use the data bank for identifying interim actions. Therefore, the State Bar's mention of the data bank in this context is not relevant.

392.    ③**The State Bar's response addressing proposed revisions to its intake manual may not result in a meaningful change to its existing policy. As Figure 4 shows, one attorney had 34 cases closed as *de minimis* and was ultimately disbarred based on a federal conviction of money laundering through their client trust accounts. Without additional details on the exceptions that the State Bar plans to make to the approach that we recommended, it is unclear whether this policy will address this type of concern and others we describe.**

393.    ④The State Bar's description of the actions necessary to monitor compliance with policies for closing bank reportable actions indicates that it does not plan to implement our

recommendation for limiting *de minimis* closures as we stated. If the State Bar were to implement our recommendation for revising its intake manual, there would be no need to review the underlying files or check the closing letters. Instead, supervisors could determine whether staff followed the change to the State Bar's policies we recommend by simply reviewing an attorney's case history whenever a case is closed as *de minimis*.

394.    ⑤The State Bar's response overstates the level of review we recommended and does not address the significant failures of its investigative process that we identified. Our recommendation does not suggest that the State Bar should conduct a full financial analysis involving a forensic accountant for every bank reportable action or client trust account case. Rather, when investigating such cases the State Bar should, at a minimum, obtain more reliable evidence, including bank statements and the client trust account reconciliations that the attorney is already required to maintain.

395.    The recommendation is intended to address the inadequate evidence that the State Bar has relied on in the past when closing cases, such as those instances we identified in which the State Bar should have conducted a more thorough review. For example, in its investigation of the attorney we describe in Case Example 9, the State Bar relied on the attorney's narrative detailing certain transactions pertaining to overdrafts in a particular month and a bank statement for a different month. Similarly, the State Bar accepted the attorney's explanation when investigating a complaint described in Case Example 6 and closed the complaint without taking further action. Ultimately, the State Bar determined that the attorney had been withdrawing funds from the client trust account to pay for personal expenses. Finally, as we illustrate in Figure 4, after a long history of closing complaints against an attorney as *de minimis*, the State Bar determined that the attorney had used the client trust account for impermissible purposes to pay for personal

expenses. **The inappropriate transactions that the State Bar did ultimately find were identified through its review of bank records.**

396.     Accordingly, we stand by our recommendation regarding obtaining bank statements and the attorney's contemporaneous reconciliations, which are more reliable forms of evidence for investigating client trust account related cases and bank reportable actions than attorney assertions.

397.     ⑥The statistic that the State Bar describes does not support its conclusions. Based on the State Bar's statement that 22 percent of the bank reportable action matters it reviewed did not involve a negative balance, it appears to be acknowledging that the remaining 78 percent of those matters did involve a negative balance. Such a substantial number of bank reportable actions involving actual negative bank balances is indicative of high risk and the need for more thorough investigations. In contrast, the State Bar suggests that investigating these matters without considering the underlying facts and merits would be a waste of limited investigative resources and is not sound public policy. However, as we illustrate throughout the report, the State Bar has regularly failed to effectively assess the underlying facts and merits of bank reportable actions, resulting in harm to the public. **Thus, the State Bar's objections to investigating bank reportable actions on a more consistent basis are unreasonable [and now we know why].**

398.     ⑦We disagree with the State Bar's assertion that our recommendation would disproportionately require certain attorneys to take time away from their practices to gather and submit documentation. Providing the information we recommend should not represent a significant workload. As we noted, the State Bar's Rules of Professional Conduct require attorneys to maintain, among other things, monthly reconciliations of their client trust accounts. Thus, attorneys should have the required information readily available to comply with a request from the State Bar. Further, as we described, in some cases the State Bar closed complaints without

contacting the attorney to obtain additional information or to provide guidance for avoiding future complaints. If the State Bar were to consistently provide information on client trust account resources to attorneys after closing each bank reportable action, as we recommended, this information may help reduce the number of bank reportable actions for all attorneys. With respect to the State Bar's disparate impact concerns, it is the responsibility of the State Bar, just like all auditees, to implement our recommendations in a manner consistent with federal and state law.

399.   ⑧The resources the State Bar asserts that it needs to implement our recommendations appear to be significantly inflated and based on questionable estimates. For example, the State Bar indicates that it needs three full-time staff to monitor *de minimis* closures of bank reportable actions. This number appears excessive because its supervisors should already be performing some monitoring of staff's compliance with the existing policy. Moreover, the change described in our recommendation regarding *de minimis* closures would not require the State Bar to randomly select and review case files, as it proposes to do.

400.   The State Bar also asserts that it would need contractual resources to develop a platform for the automated transmittal of bank and attorney records, as well as personnel to maintain that platform. However, it already maintains an electronic case management system that documents records of the type that it would collect pursuant to our recommendation. Thus, we question why the State Bar believes that it needs a new platform for the collection of such information.

401.   Further, as we discussed, the State Bar overstates the level of review we recommend, thereby inflating its estimate of the resources it would need to investigate client trust account complaints. In particular, it states that our recommendation would add about 1,500 cases to its investigation caseload per year. Such a statement is misleading because the State Bar already performs some level of review during the intake stage for each case, as Figure 1 illustrates. In

addition, the State Bar's estimated resource needs for addressing these cases is unreasonably high because it is including staff resources for conducting a financial analysis of each of these cases—an action that we did not recommend. Rather, we recommended that the State Bar obtain bank statements and attorneys' client trust account reconciliations when reviewing overdrafts and alleged misappropriations from client trust accounts, which would be more reliable evidence for determining whether the relevant transactions are appropriate. Moreover, although obtaining documents for cases that were previously closed as *de minimis* would require some additional effort, we question whether that additional effort requires the resources that the State Bar estimates.

402.　⑨The State Bar misrepresents our conclusions regarding its 2018 workforce plan. A state law that took effect in 2016 required the State Bar to implement a workforce plan that included the development of an appropriate backlog goal and an assessment of needed staffing. The resulting workforce plan made numerous recommendations, including that the State Bar reorganize the structure of its trial counsel's office. However, in our 2019 report titled *State Bar of California: It Should Balance Fee Increases With Other Actions to Raise Revenue and Decrease Costs*, Report 2018-030, we did not recommend that the State Bar should add positions based on the workforce plan. Rather, we recommended a fee increase that would allow the State Bar to hire 19 additional staff—constituting one additional investigative team—and we recommended that the State Bar analyze performance data to make more informed estimates of its future staffing needs. We made that recommendation because the staffing study the State Bar performed as part of its workforce plan was conducted in the midst of its efforts to make a number of significant changes to how it performed its work, including the implementation of a digital case management system, which may have had a significant impact on staff workloads and the associated case processing times. Therefore, we question whether the State Bar's estimated resource needs are accurate, given

the nature of the changes it has implemented since it conducted the staffing study it used as the basis for those estimates.

403.    ⑩We question why the State Bar is proposing a new system of proactively monitoring attorney client trust accounts when it is not yet effectively responding to the risks represented by bank reportable actions and complaints. As we describe in Case Example 6, Case Example 7, and Case Example 8, the State Bar did not effectively investigate cases involving bank reportable actions and complaints against attorneys regarding their client trust accounts. According to a November 2021 report to its board, the State Bar's proposal would include financial and compliance reviews of attorney client trust accounts chosen using both random and risk-based methods. It is not clear why the State Bar believes that random reviews of attorney client trust accounts would be a more effective method of identifying client trust account violations than thoroughly reviewing the complaints it receives regarding specific attorneys. Further, the State Bar's proposed new program may be more expensive than its estimates of the costs to implement our recommendations—which it describes as unreasonable. In its presentation to its board, the State Bar estimated that its program would cost $500,000 initially and $3.35 million annually."

**[OVERT ACTs #34] in violation of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1344**

404.    With actual knowledge that Plaintiff at one time considered taking his own life as a direct result of STATE BAR and Enterprise 2, or that he faces the threat of homelessness due to the conduct at issue where it has in fact occurred as shown to others yet "$78 million" is distributed to "legal aid organizations" annually and not even serial coast-to-coast fraud is sufficient due to their "limited resources" to perform their Constitutional duties, and which theft or unlawful taking of houses, property, life, and liberty could in fact occur further to each COOPER, HIGGERSON, ZAKHIREH, DUFFY, all while DURAN, EDM, GRANDT, WILSON are facing corruption