

1  JUSTIN S. BECK
2  3501 ROSELLE ST.
   OCEANSIDE, CA 92056
3  760-449-2509
   justintimesd@gmail.com
4  *In Pro Per + Guardian Ad Litem*

5

6              **UNITED STATES DISTRICT COURT**

7                        **FOR THE**

8          **SOUTHERN DISTRICT OF CALIFORNIA**

9  _____        Case No.: <u>3:22-CV-01616-BAS-DDL</u>

10 JUSTIN S. BECK, individually, and
   as *guardian ad litem* to ROES 1-150,000, and   **THREE JUDGE COURT REQUESTED**
11 as *guardian ad litem* to U.S.A.
                                      FIRST AMENDED COMPLAINT FOR
12            Plaintiff,              DAMAGES & EXTRAORDINARY RELIEF

13       vs.                         [COUNT I]   18 U.S.C. § 1962(c)
                                     (RICO) RACKETEERING
14 CATANZARITE LAW CORPORATION;
   STATE OF CALIFORNIA; THE STATE BAR  [COUNT II]   18 U.S.C. § 1962(a)
15 OF CALIFORNIA; ORANGE COUNTY       (RICO) INVESTING PROCEEDS OF
   SUPERIOR COURT; ORANGE COUNTY      RACKETEERING IN AN ENTERPRISE
16 DISTRICT ATTORNEY'S OFFICE; RUBEN
   DURAN, ESQ.; SUZANNE CELIA GRANDT,  [COUNT III]   18 U.S.C. § 1962(b)
17 ESQ.; RICHARD FRANCIS O'CONNOR, JR.; (RICO) ACQUIRED INTERESTS OR
   MOHAMMED ZAKHIREH; JAMES DUFFY;    CONTROL OF ENTERPRISE VIA "PORA"
18 KENNETH CATANZARITE, ESQ.; JIM
   TRAVIS TICE, ESQ.; NICOLE MARIE     [COUNT IV]   18 U.S.C. § 1962(d)
19 CATANZARITE WOODWARD, ESQ.;        (RICO) CONSPIRACY TO VIOLATE
   BRANDON WOODWARD, ESQ.; TIM JAMES  18 U.S.C. § 1962 (a)-(c)
20 O'KEEFE, ESQ.; AMY JEANETTE COOPER;
   CLIFF HIGGERSON; JAMES DUFFY, ELI   [COUNT V]   42 U.S.C. § 1983
21 DAVID MORGENSTERN, ESQ.; LEAH      CONSTITUTIONAL RIGHTS
   WILSON, ESQ.; ROBERT GEORGE RETANA,
22 ESQ.; ELLIN DAVTYAN, ESQ.; JOHN C.  [COUNT VI]   15 U.S.C. § 1
   GASTELUM; JORGE E. NAVARETTE;      SHERMAN ACT (DEMAND FUTILITY)
23 GEORGE SARGENT CARDONA, ESQ.;
   ANTHONY B. SCUDDER                  [COUNT VII]   42 U.S.C. § 1983
24                                    MALICIOUS PROSECUTION
            Defendants,
25                                     [COUNT VIII]   42 U.S.C. § 1983
                                      FEDERAL DISBARMENT
26
                                       [COUNT IX]   18 U.S.C. § 1956
27                                    FEDERAL RECEIVER

28                                     [COUNT X]   42 U.S.C. § 1983
                                      JUDICIAL DECEPTION


                   CONTINUED NEXT PAGE          22-CV-1616-BAS-DDL

1  ATTORNEY GENERAL OF THE UNITED    )    [COUNT XI]    **42 U.S.C. § 1983**
2  STATES; STATE OF CALIFORNIA; UNITED )   MALICIOUS DEFENSE
   STATES OF AMERICA:                  )
3                                      )    [COUNT XII]   **18 U.S.C. § 1968**
            Nominal Defendants         )    RACKETEERING INVESTIGATOR
4                                      )
5                                      )
6  _____ )

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        22-CV-1616-BAS-DDL

TABLE OF CONTENTS

I.    BACKGROUND

II.   INTRODUCTION

      A. Honorable Supreme Court Justice Ketanji Brown-Jackson Foretold This Day

      B. The State Bar of California's Designed Monopoly Over State & Federal Judiciary

      C. Political Reform Act of 1974 and the Unfortunate Kingdom of California

      D. Biggest Lie Ever Told by via Mail & Wire Daily with Intent to Defraud U.S. Citizens

      E. Thomas Girardi, Public Scapegoat, and Fraudulent Misrepresentations in Real Time

III.  JURISDICTION AND VENUE

      A. U.S. District Court Has Original Subject Matter Jurisdiction Under 18 U.S.C. § 1964

      B. U.S. District Court Has Supplemental Jurisdiction Under 28 U.S.C. § 1331

      C. Venue is Proper Under 18 U.S.C. § 1965 and 28 U.S.C. § 1391

      D. Demand on State and State Bar is Futile Under 15 U.S.C. § 1

      E. United States Congress Has Jurisdiction and Duty on Plaintiff's Petition for the U.S.

IV.   PARTY IDENTIFICATION

      A. Plaintiffs

      B. Sovereign Defendants

      C. Components of the RICO Enterprise (Together "Enterprise")

      D. Individual 700+ Club Defendants

      E. Individual, Coerced Defendants Aiding and Conspiring with 700+ Club with Malice

      F. Nominal Defendants

V.    PATTERNS OF RACKETEERING ACTIVITY ("PORA")

      A. Similar Methods, Threat of Continuing without Federal Intervention

      B. Similar Victims, Threat of Continuing without Federal Intervention

      C. Similar Beneficiaries, Threat of Continuing without Federal Intervention

      D. RICO Facilities Using the Mail and Wire and Threat of Continuing

      E. PORA Code Section Violated Under 18 U.S.C. § 1961(1)

22-CV-1616-BAS-DDL

| | | |
|---|---|---|
| **VI.** | **INJURY STANDING UNDER RICO** | |
| | **A. Breakdown of Plaintiff's Damages** | |
| | **B. Breakdown of Plaintiff's Lifelong, Irreparable Emotional Harm** | |
| | **C. ROES 1-150,000 Could Not Have Known of Schemes to Defraud by Enterprise Sooner** | |
| | **D. Instant Action Filed within RICO Statute of Limitations on October 19, 2022** | |
| **VII.** | **COUNTS** | |
| | **A.** | **[COUNT I]** |
| | **(RICO) RACKETEERING** | |
| | **B.** | **[COUNT II]** |
| | **(RICO) INVESTING PROCEEDS OF RACKETEERING IN AN ENTERPRISE** | |
| | **C.** | **[COUNT III]** |
| | **(RICO) ACQ. INTERESTS OR CONTROL OF ENTERPRISE VIA "PORA"** | |
| | **D.** | **[COUNT IV]** |
| | **(RICO) CONSPIRACY TO VIOLATE 18 U.S.C. § 1962 (a)-(c)** | |

**VI.  INJURY STANDING UNDER RICO**

**A. Breakdown of Plaintiff's Damages**

**B. Breakdown of Plaintiff's Lifelong, Irreparable Emotional Harm**

**C. ROES 1-150,000 Could Not Have Known of Schemes to Defraud by Enterprise Sooner**

**D. Instant Action Filed within RICO Statute of Limitations on October 19, 2022**

**VII.  COUNTS**

    **A.**    **[COUNT I]**    **18 U.S.C. § 1962(c)**

    **(RICO) RACKETEERING**

    **B.**    **[COUNT II]**    **18 U.S.C. § 1962(a)**

    **(RICO) INVESTING PROCEEDS OF RACKETEERING IN AN ENTERPRISE**

    **C.**    **[COUNT III]**    **18 U.S.C. § 1962(b)**

    **(RICO) ACQ. INTERESTS OR CONTROL OF ENTERPRISE VIA "PORA"**

    **D.**    **[COUNT IV]**    **18 U.S.C.  § 1962(d)**

    **(RICO) CONSPIRACY TO VIOLATE 18 U.S.C. § 1962 (a)-(c)**

    **E.**    **[COUNT V]**    **42 U.S.C. § 1983**

    **CONSTITUTIONAL RIGHTS**

    **F.**    **[COUNT VI]**    **15 U.S.C. § 1**

    **SHERMAN ACT (DEMAND FUTILITY)**

    **G.**    **[COUNT VII]**    **42 U.S.C. § 1983**

    **MALICIOUS PROSECUTION**

    **H.**    **[COUNT VIII]**    **42 U.S.C. § 1983**

    **FEDERAL DISBARMENT**

    **I.**    **[COUNT IX]**    **18 U.S.C. § 1956**

    **FEDERAL RECEIVER**

    **J.**    **[COUNT X]**    **42 U.S.C. § 1983**

    **JUDICIAL DECEPTION**

    **K.**    **[COUNT XI]**    **42 U.S.C. § 1983**

    **MALICIOUS DEFENSE**

    **L.**    **[COUNT XII]**    **18 U.S.C. § 1968 RACKETEERING INVESTIGATOR**

3

22-CV-1616-BAS-DDL

<u>COMPLAINT</u>

Plaintiff JUSTIN S. BECK for his Complaint against Defendants CATANZARITE LAW CORPORATION; STATE OF CALIFORNIA; ORANGE COUNTY SUPERIOR COURT; ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE; THE STATE BAR OF CALIFORNIA; RUBEN DURAN, ESQ.; SUZANNE CELIA GRANDT, ESQ.; ROBERT GEORGE RETANA, ESQ.; ELLIN DAVTYAN, ESQ.; RICHARD FRANCIS O'CONNOR JR.; JAMES DUFFY; KENNETH CATANZARITE, ESQ.; JIM TRAVIS TICE, ESQ.; NICOLE MARIE CATANZARITE WOODWARD, ESQ.; BRANDON WOODWARD, ESQ.; TIM JAMES O'KEEFE, ESQ.; AMY JEANETTE COOPER; CLIFF HIGGERSON; MOHAMMED ZAKHIREH; ELI DAVID MORGENSTERN, ESQ.; LEAH WILSON, ESQ.; GEORGE SARGENT CARDONA, ESQ.; JOHN C. GASTELUM; JORGE E. NAVARETTE; ANTHONY B. SCUDDER and against Nominal Defendants ATTORNEY GENERAL OF THE UNITED STATES; UNITED STATES OF AMERICA; STATE OF CALIFORNIA, (together "Defendants"), alleges as follows, with designation "ESQ." to distinguish lawyers from non-lawyers:

1. For at least 20 years, according to official reports of California State Auditor and evidence reflecting a designed monopoly over the judiciary in California, this case arises from deliberate schemes to defraud the non-lawyer public, litigants, judicial officers, banks holding lawyer trust accounts, insurance companies, underwriters, issuers of securities, and the United States itself that damaged Plaintiff JUSTIN S. BECK's business, property, and clearly established civil rights under the United States Constitution.

2. Beyond Plaintiff individually, acutely threatening schemes to defraud United States citizens exist, where ROES 1-150,000 were already denied forum by California through one or more aspects of the RICO enterprise having one corrupt common denominator: THE STATE BAR OF CALIFORNIA.

3. Defendants each had corrupt motives or interests, and they acted with actual malice or at least disregard of Plaintiff, his known harm, and his federally protected rights.

4. Lacking probable cause against Plaintiff, which is governed by an objective standard and not the subjective interpretation of defendants, each used postal mail, wire communications including email, cellular calls, and overt acts or active concealment in furtherance of fraudulent schemes to harm him, make money, or conceal in furtherance of personal goals unrelated to the merits and without regard of Plaintiff.

5. Plaintiff was actually damaged in his business, property, and person in fact, and seeks his damages, treble damages, injunctions, and extraordinary relief on behalf of himself and the United States derivatively. Plaintiff will move for summary judgment in this action upon summons issuance, failing, he demands trial by jury, joint prosecution by U.S. for ROES 1-150,000, and equal protection under the law.

## I.     BACKGROUND

6. Plaintiff JUSTIN S. BECK is an entrepreneur continuously subject to an unlawful scheme involving malicious prosecution of five lawsuits without lawful standing or objective probable cause, violation of criminal statutes shown with impunity and control of an interstate enterprise, public corruption, deliberate concealment of liability to STATE OF CALIFORNIA, and active conspiracy to harm him and others through the improper use of the California judiciary from ORANGE COUNTY SUPERIOR COURT, to Court of Appeal, all the way to the California Supreme Court's Executive Officer JORGE E. NAVARETTE and potentially its retiring Chief Justice Tani Cantil Sakauye. In seeking to recover his damages in a compromised court system shown to unreasonably favor corrupt lawyers engaged in actual fraud, he identified and shows what may be the longest, most harmful scandal in UNITED STATES OF AMERICA history, surpassing that of Enron and Watergate combined.

## II.     INTRODUCTION

### A. Honorable Supreme Court Justice Ketanji Brown-Jackson Foretold This Day

7. "In this [instant case], [] we [will re-visit the failed and unlawful] union of the legislative [, executive] and judicial components of government [in California]. It [does not serve the Fourteenth or Fifth Amendment requirements, it mocks the Equal Protection Clause for every American, is destroying lives of United States citizens, acutely threatens interstate commerce], it certainly isn't pretty, [and is] antithetical to the constitutional design." [Plaintiff updates and edits].

– Justice Ketanji Brown-Jackson in dissent (*In re Rose*, 22 Cal.4th 430, 470 (2000)

### B. The State Bar of California's Designed Monopoly Over State & Federal Judiciary

8. Wikipedia on December 29, 2022 reads: "The State Bar of California is California's official attorney licensing agency.[2] It is responsible for managing the admission of lawyers to the practice of law, investigating complaints of professional misconduct, prescribing appropriate discipline, accepting attorney-member fees, and financially distributing sums paid through attorney trust accounts to fund nonprofit legal entities. It is directly responsible to the Supreme Court of California, however, its Trustees are now appointed by the Supreme Court, the California Legislature, and Governor of California.[3] All attorney admissions are issued as recommendations of the State Bar, which are then

routinely ratified by the Supreme Court.[4] Attorney discipline is handled by the State Bar Office of Chief Trial Counsel, which acts as prosecutor before the State Bar Court of California.[5]"

9. The Wikipedia entry on December 29, 2022 continues "The State Bar was legally established on July 29, 1927, when the State Bar Act went into effect.[6]:xiii–xix The State Bar of California is the largest in the United States, with over 286,000 living members as of December 2022, of whom nearly 197,000 are on active status.[1] It is headquartered in San Francisco, with a branch office in Los Angeles."

10. A related entry reads "The State Bar Court of California serves as the administrative arm of the California Supreme Court in the adjudication of disciplinary and regulatory matters involving California attorneys.[2] Although it is not formally a court of record, its judges are subject to admonition, censure, removal, or retirement by the Supreme Court upon the same grounds as provided for judges of courts of record in the state of California. The Court holds adversarial hearings between attorneys accused of misconduct and the Office of Chief Trial Counsel of the California State Bar."

11. According to California Rules of Court Rule 9.40:

Counsel pro hac vice (a) Eligibility A person who is not a licensee of the State Bar of California but who is an attorney in good standing of and eligible to practice before the bar of any United States court or the highest court in any state, territory, or insular possession of the United States, and who has been retained to appear in a particular cause pending in a court of this state, may in the discretion of such court be permitted upon written application to appear as counsel *pro hac vice*, provided that an active licensee of the State Bar of California is associated as attorney of record. No person is eligible to appear as counsel *pro hac vice* under this rule if the person is: (1) A resident of the State of California; (2) Regularly employed in the State of California; or (3) Regularly engaged in substantial business, professional, or other activities in the State of California.

12. According to U.S. Southern District of Cal. Local Civil Rule 83.3, "a) Admission to the Bar of this Court.  Admission to and continuing membership in the bar of this court is limited to attorneys of good moral character who are active members in good standing of the State Bar of California."

13. THE STATE BAR OF CALIFORNIA, without separation of powers, despite control by active market participants purporting to regulate themselves after *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015), controls all aspects of public rights and equity in the State of California, for those practicing law in California from out of state, including within United States District Courts, and evidence suggests that it controls the judiciary, too.

6                                    22-CV-1616-BAS-DDL

14. THE STATE BAR OF CALIFORNIA controls all proceedings without objective neutrality for all those seeking redress of grievances against it, its actors including but not limited to those named in this complaint, involving any politician or dispute involving elections, against any agency of the state including those it imputes liability to, and for any other reason under the law including all those protected by the United States Constitution as being inalienable, extending to civil and criminal justice alike.

14. For the foregoing reasons, and as outlined herein, irreparable damage will be caused Plaintiff, ROES 1-150,000, and the UNITED STATES OF AMERICA unless a three-judge panel is assigned to this case. In addition, UNITED STATES ATTORNEY GENERAL must appoint counsel outside U.S. Attorney's Office for Southern District of California for the same reasons, because those attorneys are in fact also under the actual and perceived *control* of defendants to this case.

**C. Political Reform Act of 1974 and the Unfortunate Kingdom of California**

15. According to Proposition 9 (The Act), as published online on December 29, 2022 at domain "fppc.ca.gov," "[i]n 1974, during the fallout from Watergate, a coalition of political reformers presented a statewide ballot initiative that they claimed would "put an end to corruption in politics." These reform groups sought to end corruption by reducing the amount of money spent in elections and by eliminating secret or anonymous contributions. With the advent of the new law, the campaign activities and the personal financial affairs of state and local officials were subjected to greater public scrutiny than at any other time in California's history. And the initiative directed that the law be vigorously enforced by the newly created Fair Political Practices Commission. Proposition 9 had six main provisions, it: 3. Imposed strict conflict of interest laws and required state and local agencies to establish conflict of interest codes, requiring agency officials who routinely participate in decisions to publicly disclose personal financial information....6. Created an independent centralized authority to secure compliance with the Act. Prior to creation of the FPPC, campaign disclosure laws were rarely enforced."

16. "Often in cooperation with the FPPC, the Legislature added various provisions to the original version of the Act over the years: 2. In 1980, the Legislature imposed restrictions on state employees who leave state service to join the private sector. These restrictions are commonly referred to as the "permanent ban" and prohibit state employees who work on specified proceedings such as procurements and lawsuits from being paid to "switch sides" after leaving state employment."

22-CV-1616-BAS-DDL

17. Due to control of the enterprise as outlined herein, and a monopoly over the judiciary, Political Reform Act of 1974 which followed the Watergate scandal has also become subordinate to the corrupt motives of passion or interests of non-sovereign state actors who further their own interests.

18. STATE OF CALIFORNIA has become akin to a despotic kingdom, not a democracy, where lives, liberty, and property of United States citizens are unjustly subject to partisanship and corruption.

19. At 8:31AM PST on Thursday, December 29, 2022, Plaintiff did deliver an email containing "advance[] notice of a forthcoming complaint under the Political Reform Act of 1974 related to materially conflicted transactions of The State Bar of California, an ongoing lack of disclosure of material claims against the government, and related party transactions with actual conflicts of financial interest in violation of state and federal law" to Complaint@fppc.ca.gov , Efile.dkt.civ@usdoj.gov

**D. Greatest Lie Ever Told by via Mail & Wire Daily with Intent to Defraud U.S. Citizens**

20. Following the United States Supreme Court decision in *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015) which applies to all lawyer defendants here (as regulators, and as being regulated), AB 3249 amended State Bar Act, holding, in relevant part as of January 1, 2019, "(2) The act requires protection of the public to be the highest priority for the State Bar and the board of trustees in exercising their licensing, regulatory, and disciplinary functions" and its amendment "eliminate[d] the authorization of the board to aid in all matters that may advance the professional interests of the members of the State Bar." Under color of law, regulators *further* fraudulent schemes.

21. As of December 29, 2022, the website "calbar.ca.gov/About-Us" reads:



22. Cal Bus. & Prof Cod. 6001.1 reads:

"Protection of the public, which includes support for greater access to, and inclusion in, the legal system, shall be the highest priority for the State Bar of California and the board of trustees in exercising their licensing, regulatory, and disciplinary functions. Whenever the protection of the public is inconsistent with other interests sought to be promoted, the protection of the public shall be paramount." *(Amended by Stats. 2018, Ch. 659, Sec. 3. (AB 3249) Effective January 1, 2019.)*

22-CV-1616-BAS-DDL

23. Report 2022-030 from Cal. State Auditor reflects reality, e.g. "State bar failed to adequately investigate <u>some attorneys</u>, despite lengthy patterns of complaints." *Ex. 105, p. 4*.

24. "State Bar has not consistently identified or addressed the conflicts of interest that exist between its own staff members and the attorneys they investigate. In more than one-third of the cases we reviewed, the State Bar did not document its consideration of conflicts before it closed these cases." *Id. at p. 4*. Indeed, State Bar uses these conflicts to conceal racketeering for itself and its' own.

25. The report discloses 221,185 notices of public injuries from January 2010 through November 10, 2021. State Bar "investigates 16,000 [injuries caused by its] attorney[s] annually," or ~44 per day.

**E. Thomas Girardi, Public Scapegoat, and Fraudulent Misrepresentations in Real Time**

26. According to a fraudulently concealed "Independent Investigation for the State Bar of California: Summary of Findings and Recommendations" cites "a July 31, 2014 Report of Improper Activity from the Bar's Chief Trial Counsel, Jayne Kim" with "concerns related to certain actions by Executive Director Joseph Dunn (ED), Chief Financial Officer Peggy Van Horn (CFO) and General Counsel Thomas Miller (GC) that demonstrate a disturbing [] lack of transparency at the highest levels within the organization." *Ex. 1, p. 3*. In other words, conduct in the instant case is not a surprise.

27. Ms. Kim claims "State Bar leadership is failing to adhere to basic principles of governance" and that a "five layer chess game' with key stakeholders and other executives" has "systemically fostered a culture of intimidation and isolation within the organization and resulted in dishonest communication to the Board of Trustees." *Ibid*.

28. The "investigation probed the issues…with particular focus on the following issues: Whether Joseph Dunn misled the Board or allowed the public to be misled about the use of Bar funds in connection with travel to Mongolia; [] Whether Dunn engaged in cronyism or violated Bar procedures in his hiring of certain Bar employees (including General Counsel Thomas Miller), his handling of certain contracts for the provisions of services, and/or offers of assistance to Board members and others." *Id. at p. 4*.

29. "In January 2014, Dunn, Bar employee Thomas Layton, and former State Bar President Howard Miller of the Girardi Keese law firm traveled to Mongolia in response to a request from the Mongolian government for help in implementing a new regulatory system for lawyers." *Id. at p. 5*.

22-CV-1616-BAS-DDL

30. "The extent to which Bar funds were used for the trip is complicated somewhat by the deposit into a State Bar fund on April 3, 2014 of a $5,000 check from the Girardi Keese firm dated March 20, 2014." *Id. at p. 6.*

31. "G. Perceived Girardi Keese Influence at the Bar…the closeness of the relationship of some senior managers and that firm does raise potentially troubling perceptions that the Board should take action to rectify going forward. The frequency with which Girardi's firm has surfaced in matters we investigated is striking."[]in emails we reviewed on other topics, we noted that Miller was being consulted on matters related to A.B. 1515, a bill concerning <u>client trust accounts</u>." [emph.] *Id. at p. 6.*

32. "During the investigation, Girardi suddenly and unexpectedly appeared as counsel for Sonja Oehler…launched into an unprofessional tirade of threats…Girardi claims he became involved because our firm was rude during interviews…his involvement can also be explained because he perceives a threat to Dunn as a threat to his possibly favored position with the Bar." *Id. at p. 23.*

32. "We investigated certain governance issues arising from promises of assistance to Board members or others. In her interview, Kim said that Tom Layton came to her when she first became Chief Trial Counsel to offer assistance from Tom Girardi in helping her to become a judge or to achieve some other professional goal. Although Layton denies this, it is undisputed that Dunn made similar offers (without necessarily mentioning Girardi) to various Bar Presidents." *Id. at p. 28.*

33. "The Board should instruct senior management how important it is to cultivate and maintain a public perception that the Bar represents all attorneys, and that no one law firm or segment of the bar has a special position. It should further instruct management that its conduct to date may have created an unhealthy perception that Girardi and his firm have special influence or receive special treatment – and that management should take steps to dispel and avoid contributing further to this perception in the future." *Id. at p. 34.*

34. In a public press release on Monday, January 24, 2022, "The State Bar of California's Board of Trustees announced today that it has been conducting an additional investigation into whether the State Bar's handling of past discipline complaints against former licensee Thomas V. Girardi was affected by Girardi's connections to or influence at the State Bar." [] "The State Bar Board leadership and staff take very seriously the immense harm done by Thomas Girardi to innocent victims," said

10

1   Ruben Duran, Board Chair. "We have been proactively doing everything in our power to learn from the

2   past and do better in the future to prevent harms like this from recurring." This statement is an overt lie.

3       35. On November 3, 2022, with actual knowledge of the instant case and Plaintiff's severe harm,

4   "the State Bar of California [released information] about disciplinary matters that were opened and

5   closed over the past 40 years involving now-disbarred attorney Thomas V. Girardi….brought to light

6   serious failures in the State Bar's attorney discipline system, failures that have contributed to a lack of

7   confidence in the State Bar's ability to carry out our core responsibility of protecting the public. There

8   is no excuse being offered here; [] "We can never allow something like this to happen again." [emph.]

9   **III.    JURISDICTION AND VENUE**

10       **A. U.S. District Court Has Original Subject Matter Jurisdiction Under 18 U.S.C. § 1964**

11       36. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 under

12   the Racketeer Influenced Corrupt Organizations Act ("RICO") for 18 U.S.C. § 1962(a)-(d) claims.

13       **B. U.S. District Court has Original Subject Matter Jurisdiction Under 42 U.S.C. § 1983**

14       37. Due to the compromised STATE OF CALIFORNIA judiciary, this Court has jurisdiction

15   over this action under 42 U.S.C. § 1983 and *Thompson v. Clarke*, 596 U.S.___(2022); *Keates v. Koile*,

16   883 F.3d 1228, (9th Cir. 2018); and Equal Protection challenges under the Fourteenth Amendment of the

17   United States Constitution where Plaintiff and ROES 1-150,000 are entitled to equal protection under

18   the law, and are not being granted equal protection due anticompetitive conduct in regulation in violation

19   of *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015).

20       **B. U.S. District Court Has Supplemental Jurisdiction Under 28 U.S.C. § 1331**

21       38. This Court has supplemental jurisdiction over state claims which are now federal question

22   under 28 U.S.C. § 1331, as having been compromised by anticompetitive conduct in regulation.

23       **C. Venue is Proper Under 18 U.S.C. § 1965 and 28 U.S.C. § 1391**

24       39. Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391

25   because defendants do business in this district and are each subject to personal jurisdiction in this judicial

26   district and reside in this district, where process may be served in any judicial district of the United

27   States per 18 U.S.C. § 1965(b), when required by the ends of justice. Nationwide service of process

28

1  confers personal jurisdiction over a defendant in any judicial district where each defendant has minimum

2  contacts with the United States.

**D. Demand on State Bar, State is Futile under 15 U.S.C. § 1**

4      40. Plaintiff filed an antitrust petition in California Supreme Court, after which Office of General

5  Counsel for THE STATE BAR OF CALIFORNIA was instructed to make a decision for itself by

6  California Supreme Court before removing all evidence, citing *Parker v. Brown*, 317 U.S. 341, 63 S.Ct.

7  307, 87 L.Ed. 315 with deliberate regard of the United States Supreme Court decision *N.C. State Bd. of*

8  *Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015).

**E. United States Congress and United States of America Have Jurisdiction and Duty**

10      41. STATE OF CALIFORNIA has abused its sovereignty through assignment of active market

11  participants in regulation and conspiracy, and thereby cannot be trusted to meet its obligations after

12  concealment of citizen harm and material financial conflicts of interest, and so UNITED STATES OF

13  AMERICA is obligated to remunerate Plaintiff and ROES 1-150,000 for damages done and to ensure

14  justice is done without further obstruction or concealment, if STATE OF CALIFORNIA fails.

**IV.    PARTY IDENTIFICATION**

**A. Plaintiffs**

17      42. Plaintiff JUSTIN S. BECK ("Beck" or "Plaintiff") is an individual United States citizen,

18  member of the public among the protected class lacking equal protection under the law, individual

19  entrepreneur, and person, with his principal place of business at 3501 Roselle St., Oceanside, California,

20  92056. Plaintiff is in the business of founding or starting companies, mergers, and acquisitions. Plaintiff

21  is a layman, never admitted to any bar, who cannot be further prejudiced by lawyers in conspiracy.

22  Plaintiff has vested rights, undisputed, to sue STATE OF CALIFORNIA, its persons, and entities.

23      43. Plaintiff JUSTIN S. BECK is *guardian ad litem* to ROES 1-150,000 ("ROES"), who either

24  noticed THE STATE BAR OF CALIFORNIA of their injuries which were disregarded under color of

25  state law, inapplicable sovereignty, or unlawful "discretion," or in the alternative, who did not notice

26  THE STATE BAR OF CALIFORNIA because each among ROES could not have known that THE

27  STATE BAR OF CALIFORNIA and STATE OF CALIFORNIA were establishing, carrying on, and

28  accepting the proceeds from the unlawful activity that harmed each of them.

22-CV-1616-BAS-DDL

44. Plaintiff JUSTIN S. BECK is *guardian ad litem* to UNITED STATES OF AMERICA, a sovereignty whose citizens are, and continue to be, threatened acutely by the conduct at issue in this case and whose states each require federal intervention to acutely threatened interstate commerce.

**B. Sovereign Defendants**

45. Defendant STATE OF CALIFORNIA, a sovereign public entity among the UNITED STATES OF AMERICA, is liable in this action for all conduct of state actors and its court officials, and for the damages that its state actors and antitrust violations have caused Plaintiff and others. Plaintiff sues STATE OF CALIFORNIA for the official constitutional violations of its official actors and its duly authorized court officials under 42 U.S.C. § 1983, and as having mandatory duty under Cal. Gov. Cod. § 815.6 violated, and as having liability for public officials under Cal. Gov. Cod. § 815.3 where violations of criminal statutes are intentional torts. Plaintiff has a vested right to sue STATE OF CALIFORNIA, THE STATE BAR OF CALIFORNIA, and ORANGE COUNTY SUPERIOR COURT, having received claim denials, and having promptly filed suits.

46. Defendant UNITES STATES OF AMERICA, a sovereign nation, is liable for all conduct in this action if STATE OF CALIFORNIA fails to rise to its obligations by reverse incorporation of the Fourteenth Amendment into the Fifth Amendment. In California, lawyers are treated as superior to the public, and are protected unjustly, thereby harming the United States where "(b) [d]iscrimination [is] so unjustifiable as to be violative of due process. P. 499." *Bolling v. Sharpe*, 347 U.S. 497, (1954)

**C. Components of the RICO Enterprise**

47. Defendant THE STATE BAR OF CALIFORNIA is a public entity and non-sovereign assignee from STATE OF CALIFORNIA controlled by active market participants with its principal places of business being 180 Howard St., San Francisco, CA 94105 and 845 S. Figueroa Ave., Los Angeles, CA 90017. THE STATE BAR OF CALIFORNIA is engaged in or affects interstate commerce.

48. Defendant ORANGE COUNTY SUPERIOR COURT is a public entity and non-sovereign assignee from STATE OF CALIFORNIA controlled by active market participants, with its principal places of business being 700 W. Civic Center Dr., Santa Ana, CA 92701 and 751 W. Santa Ana Blvd., Santa Ana, CA 92701. ORANGE COUNTY SUPERIOR COURT is engaged in or affects interstate commerce.

49. Defendant ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE is a public entity and non-sovereign assignee from STATE OF CALIFORNIA controlled by active market participants, with its principal place of business being 300 N. Flower Street, Santa Ana, CA 92703. ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE is engaged in or affects interstate commerce.

50. Defendant CATANZARITE LAW CORPORATION is a California law corporation established and controlled by THE STATE BAR OF CALIFORNIA, with its principal place of business being 2331 W. Lincoln Ave Frnt, Anaheim, CA 92801. CATANZARITE LAW CORPORATION is engaged in or affects interstate commerce.

51. 700+ CLUB is an illegal trust of lawyers established, carried on, and actually controlled by THE STATE BAR OF CALIFORNIA in furtherance of private interests and schemes to defraud non-lawyers, identified in Report 2022-030, where "patterns of [racketeering activity] suggest that the State Bar is overusing nonpublic measures. From 2010 to 2021, the State Bar closed more cases through nonpublic measures—a total of 22,600, or 10 percent of all case closures—than it did through public discipline, which totaled 11,200, or 5 percent of all case closures. During the same period, more than 700 attorneys each had four or more cases that the State Bar closed through nonpublic measures." 700+ CLUB is engaged in or affects interstate commerce.

**D. Individual Defendants**

52. Defendant KENNETH CATANZARITE, ESQ., an individual and culpable person, is a lawyer established and carried on by THE STATE BAR OF CALIFORNIA, with a principal business address being 2331 W. Lincoln Ave, Anaheim, CA 92801, and SBN #113750.

53. Defendant RUBEN DURAN, ESQ., an individual elected official and culpable person, is a lawyer established and carried on by THE STATE BAR OF CALIFORNIA, with a principal business address being 2855 E. Guasti Rd., 4th Floor, Ontario, CA 91761, and SBN #197780.

54. Defendant ELLIN DAVTYAN, ESQ., an individual public official and culpable person, is a lawyer established and carried on by THE STATE BAR OF CALIFORNIA, with a principal business address being 845 S. Figueroa St., Los Angeles, CA 90017, and SBN #238608.

22-CV-1616-BAS-DDL

55. Defendant SUZANNE CELIA GRANDT, ESQ., an individual public employee and culpable person, is a lawyer established and carried on by THE STATE BAR OF CALIFORNIA, with a principal business address being 180 Howard Street, San Francisco, CA 94105, and SBN #304794.

56. Defendant JOHN C. GASTELUM, an individual public employee and culpable person, is a judicial officer established and carried on by THE STATE BAR OF CALIFORNIA, working for ORANGE COUNTY SUPERIOR COURT, with a principal business address being 700 W. Civic Center Drive, Department C11, Santa Ana, CA 92801, and SBN #110495.

57. Defendant JIM TRAVIS TICE, ESQ., an individual and culpable person, is a lawyer established and carried on by THE STATE BAR OF CALIFORNIA, with a purported business address of 38 Sorrento, Irvine, CA 92614, and SBN #153867.

58. Defendant NICOLE MARIE CATANZARITE WOODARD, ESQ., an individual and culpable person, is a lawyer established and carried on by THE STATE BAR OF CALIFORNIA, with a principal place of business being 2331 W. Lincoln Ave. Frnt., Anaheim, CA 92801, and SBN #205746.

59. Defendant BRANDON WOODWARD, ESQ., an individual and culpable person, is a lawyer established and carried on by THE STATE BAR OF CALIFORNIA, with a principal place of business being 2331 W. Lincoln Ave., Anaheim, CA 92801, and SBN #284621.

60. Defendant TIM JAMES O'KEEFE, ESQ., an individual and culpable person, is a lawyer established and carried on by THE STATE BAR OF CALIFORNIA, with a principal place of business being 2331 W. Lincoln Ave, Anaheim, CA 92801, and SBN #290175

61. Defendant LEAH WILSON, ESQ., an individual elected official and culpable person, is a lawyer established and carried on by THE STATE BAR OF CALIFORNIA, with a principal place of business being 180 Howard Street, San Francisco, CA 94105, and SBN #222790.

62. Defendant ROBERT GEORGE RETANA, ESQ., an individual public employee and culpable person, is a lawyer established and carried on by THE STATE BAR OF CALIFORNIA, with a principal place of business being 180 Howard Street, San Francisco, CA 94105, and SBN #148677.

63. Defendant GEORGE SARGENT CARDONA, ESQ., an individual elected official and culpable person, is a lawyer established and carried on by THE STATE BAR OF CALIFORNIA, with a principal place of business being 845 S. Figueroa St., Los Angeles, CA 90017, and SBN #135439.

22-CV-1616-BAS-DDL

64. Defendant JORGE E. NAVARETTE, an individual public employee and culpable person, is Executive Officer and Clerk of the Supreme Court, with a principal place of business being 350 McAllister Street, San Francisco, CA 94102.

**E. Individual, Coerced Defendants Aiding and Conspiring Lawyers with Malice**

65. Defendant RICHARD FRANCIS O'CONNOR, JR., an individual and culpable person, is a non-lawyer with a personal and business address unknown to Plaintiff at this time.

66. Defendant AMY JEANETTE COOPER, an individual and culpable person, is a non-lawyer with a personal address being 42 Lower North Terrace, Belvedere Tiburon, CA 94920.

67. Defendant CLIFF HIGGERSON, an individual and culpable person, is a non-lawyer with a personal address being 12365 Garwood Dean, Truckee, CA, 96161.

68. Defendant MOHAMMED ZAKHIREH, an individual and culpable person, is a non-lawyer with a business address being Cosmetic Surgery Institute of Palm Desert, Suite A1, 73-710 Alessandro Drive, Palm Desert, CA 92260.

69. Defendant JAMES DUFFY, an individual and culpable person, is a non-lawyer with a personal address being 403 E. Park Drive, Anacortes, WA 98221.

70. Defendant ANTHONY B. SCUDDER, an individual and culpable person, is a non-lawyer with a personal address being 23711 Mariner Dr. Apt. #46, Dana Point, CA 92629.

**F. Nominal Defendants**

71. Nominal defendant STATE OF CALIFORNIA, whose sovereignty is derived from UNITED STATES OF AMERICA, has assigned its sovereignty to active market participant lawyers in regulation of lawyers, and thereby has caused all damages described herein, and as being liable, therefore.

72. Nominal defendant UNITED STATES ATTORNEY GENERAL, whose duties are to UNITED STATES OF AMERICA, is responsible for protecting all United States citizens, here. Nominal defendant UNITED STATES OF AMERICA is liable where California fails, and it must prosecute this action for damages to ROES 1-150,000 neutrally where Plaintiff is not a lawyer, and each ROES 1-150,000 is not granted equal protection under the law or a neutral forum in California.

**V.    PATTERNS OF RACKETEERING ACTIVITY ("PORA")**

**A. Similar Methods of Racketeering All Use the Corrupted California Judiciary**

16

22-CV-1616-BAS-DDL

73. The patterns of racketeering activity ("PORA") at issue all involve lawyers established and carried on by THE STATE BAR OF CALIFORNIA through the following processes: licensing, retainer, litigation, mediation, adverse representation before the same tribunal or in substantially related matters, intake of Office of Chief Trial Counsel, investigation by Office of Chief Trial Counsel, abatement by Office of Chief Trial Counsel, "Complaint Review Unit" controlled by Office of General Counsel, civil defense by Office of General Counsel against unrepresented parties with malice, improper purposes resulting from conflicts, "Client Security Fund," "State Bar Court," "In RE: Walker," and conspiracy.

74. The methods include, but are not limited to, non-judicial fraud involving the manufacturing or manipulation of evidence, leading to judicial fraud or deception involving the concealing of evidence, in each case under color of California Code of Civil Procedure or Business and Professions Code, and in all cases of detriment to non-lawyers.

75. The methods are furthered through protectionist behavior of active market participants intended to delay, conceal, inhibit, restrict, estop, or destroy public rights of non-lawyers – even after passage of Cal. Assembly Bill 3249 which prohibits Board of Trustees for The State Bar of California from advancing lawyer interests, as each are shown to do as a matter of practice, via enterprise control.

76. The collateral attack present to all lawyers, even prosecutors which affects all non-lawyers who do not understand these schemes to defraud, is present through the "State Bar Court" at all times.

77. Specifically, all "licensing, regulatory, and disciplinary functions" which are required by statute to protect the public are cherry-picked to further private lawyer interests, political benefit, but always to the detriment of non-lawyers who are generally disregarded with impunity and malice.

78. As to defendant CATANZARITE LAW CORPORATION, the methods of its associated lawyer defendants KENNETH CATANZARITE, ESQ.; JIM TRAVIS TICE, ESQ.; NICOLE MARIE CATANZARITE WOODWARD, ESQ.; BRANDON WOODWARD, ESQ.;TIM JAMES O'KEEFE, ESQ. and Eric Anderton rely upon fraudulent litigation or cases lacking objective probable cause, the theft of information from persons who mistakenly believe it to be good faith discovery, representation of directly adverse parties in the same or substantially related matters as if it were legal of which this Court is hereby noticed, and the re-filing of fake claims or cases in perpetuity as a weapon of extortion.

22-CV-1616-BAS-DDL

79. Living trusts, lawyer trusts, IOLTA, and banks are all used to conceal, transfer, and launder the gains with the help of Office of Chief Trial Counsel, Office of General Counsel, Board of Trustees and others at THE STATE BAR OF CALIFORNIA in conspiracy. One example is Aegis Asset Management, Inc., a registered investment advisor (RIA) with CRD #305008 whose President & CEO is listed as KENNETH CATANZARITE, ESQ. CRD #1193073 and whose primary owner appears to be "ELLEN C CATANZARITE LIVING TRUST" with KENNETH JOSEPH CATANZARITE, Trustee starting October 2018, after the schemes targeted Plaintiff in particular.

**B. Similar Victims of the Racketeering All Target the Non-Lawyer Public and U.S.**

80.. Non-lawyers, who lack the specialized skills or sophistication and thereby trust in the absent integrity of THE STATE BAR OF CALIFORNIA, are always the victims of the enterprise PORA.

81. Non-lawyers, who have no idea that THE STATE BAR OF CALIFORNIA in fact conceals and furthers fraudulent schemes, lack any recourse in California due to enterprise PORA and control.

82. From 700+ CLUB, non-lawyers cannot obtain reliable accounting of retainers or any funds that may be paid to them stored in trusts or IOLTA, nor will THE STATE BAR OF CALIFORNIA provide non-lawyers resolution, each subject to predatory practices in conspiracy while active market participants apply misnomers of "misappropriation" and "misconduct" to larceny, fraud, and crimes.

83. Businesses and persons in litigation with CATANZARITE LAW CORPORATION or other 700+ CLUB lawyers are denied neutrality, where due process rights are monopolized, adverse representation is a practice, and active market participants protect each other in conspiracy, ratification.

84. Every business or person in the United States who buys insurance is a victim of the PORA, because the enterprise PORA increases insurance rates due to false claims, abuse of "Anti-SLAPP," lawyer fraud, and active market participant conspiracies in favor of the enterprise and 700+ CLUB.

85. Every ethical lawyer and Court in the United States is harmed by the enterprise PORA, where most don't know, and couldn't know before now, that THE STATE BAR OF CALIFORNIA actually aids in and conspires to defraud the public, and that they accept proceeds from it, then re-invest them.

86. Courts, who lack disclosure of the larceny, fraud, and crimes, are harmed – including the taxpayers that fund them – throughout the United States by the enterprise PORA.

22-CV-1616-BAS-DDL

87. Shareholders, beneficiaries, and creditors of inanimate entities overtaken by enterprise PORA are victims such as Plaintiff's companies, where Plaintiff shows that the amount of damages increasing means that the unlawful trust and enterprise are only *less* apt to act in reasonable mitigation.

88. Sole-practice or small-practice lawyers like Sanjay Bhardwaj, who are subject to selective prosecution in order that the enterprise justify its funding, are thereby subject to enterprise PORA.

89. Black or ethnic minority lawyers, particularly those in sole-practice or small-practice roles, are subject to selective prosecution in order that the enterprise justify its funding, too, to conduct PORA.

90. The similar victims include the United States, all 50 states, and all United States citizens.

**C. Similar Beneficiaries All Involve Lawyers Among The State Bar of California**

91. Enterprise PORA always benefits lawyers established and carried on by THE STATE BAR OF CALIFORNIA, especially the 700+ CLUB who launder money, buy real estate, using the enterprise.

92. Enterprise PORA can be wielded to influence local, state, and federal elections through the collateral attack present by the improper use of "State Bar Court" which is unconstitutional.

93. Enterprise PORA benefits THE STATE BAR OF CALIFORNIA, where PORA funds IOLTA and trust accounts without regulation or oversight, and thereby causing more money to be paid from interest thus a conflict, which money is paid horizontally back to other active market participants.

94. Enterprise PORA benefits those charged or convicted or not of crimes, where the 700+ CLUB is allowed free reign to conduct racketeering with impunity, such as that shown by CATANZARITE LAW CORPORATION and the concealment and ratification by ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE under color of law and enterprise protection with taxpayer money.

95. Politicians like Governor Gavin Newsom, who appoints the Board of Trustees for THE STATE BAR OF CALIFORNIA controlled by active market participants, and then appointed justices to Fourth District, Division Three in apparent obstruction of justice, benefit from the enterprise PORA.

96. Where each holds the dirty secrets of the others, an unlawful trust of the 700+ CLUB always benefits from the enterprise PORA – whether directly, or indirectly, as having knowledge and thereby power over the regulators, public, and other 700+ CLUB persons in conspiracy.

22-CV-1616-BAS-DDL

97. Undisclosed persons similarly benefit, where IOLTA are used for everything from settlement payments to retainers, to M&A, and even up to $700 billion of federal and state funding used during the pandemic by emergency orders of Governor Newsom.

98. Legal aid organizations all benefit from the enterprise PORA, because they get more money when THE STATE BAR OF CALIFORNIA regulates less (e.g., the interest payments they receive through the investments of Board of Trustees are reduced when THE STATE BAR OF CALIFORNIA stops people like Thomas Girardi, KENNETH CATANZARITE, ESQ., or JIM TRAVIS TICE, ESQ.)

99. Large corporations benefit when they donate to legal aid organizations receiving investments from Board of Trustees, including Kaiser Permanente who received a no-bid agreement in 2022 for Medi-CAL, without disclosure of the consideration associated therewith, or justification.

**D. RICO Facilities Using the Mail and Wire to Conceal Lawyer Schemes to Defraud**

100. One fraudulent scheme of the enterprise is the "Attorney Misconduct Complaint." With these postal mail and wire communications, the enterprise can select what members of the public are harmed, and what members of the public are protected, in each case based entirely on the lawyers associated therewith (and not the conduct or harm), or malice of the public employees involved (as here).

101. When there is clear evidence of misconduct, fraud, or crime, Office of Chief Trial Counsel ensures the files go to "abatement" to allow the lawyers to finish each particular fraudulent scheme.

102. "Complaint Review Unit" is another fraudulent scheme. Undisclosed in these postal mail and wire communications seeking to defraud the public, the enterprise members communicate by and between each other, making decisions unrelated to public rights – in order to avoid liability, conceal, and increase unlawful gains to distribute back to their peers through trusts and IOLTA.

103. Under guise of "privilege" and "discretion," Office of General Counsel defends tort claims on behalf of individuals and elected officials against members of the public – who are almost always self-represented – where the enterprise can use the collateral State Bar Court threat against lawyers.

104. Office of General Counsel also wields the enterprise by influencing judicial officers such as JOHN C. GASTELUM, where Board of Trustees and Judicial Council persons work to obstruct Court of Appeal and Supreme Court proceedings, in furtherance of the schemes to defraud the public.

22-CV-1616-BAS-DDL

105. Conduct of CATANZARITE LAW CORPORATION from its headquarters in Anaheim, CA is reflected by dozens of Court of Appeal rulings known to lawyer defendants and regulators, and public filings prove they steal houses through unlawful debts acquired by PORA. The firm uses postal mail, wire communications, and extortion on behalf of adverse parties and inanimate corporate entities carried on and ratified repeatedly by THE STATE BAR OF CALIFORNIA.

106. California Supreme Court Executive Officer and Clerk JORGE E. NAVARETTE screens the "In: Re Walker" accusations for 700+ CLUB members and disposes of them through artificial processes, procedural waste, unfounded in the U.S. Constitution, under color of state law and procedure.

107. Office of General Counsel, including ELLIN DAVTYAN, ESQ., SUZANNE CELIA GRANDT, ESQ. and ROBERT GEORGE RETANA, ESQ. who communicate with California Supreme Court justices, can obstruct any threat to the enterprise in conspiracy with JORGE E. NAVARETTE.

108. Crime Victim Bureaus for CA, US Attorneys, and in DA offices, screen and conceal, too. The California Crime Victim Bureau is controlled by Governor Gavin Newsom, and ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE purports that it does not handle federal racketeering or its state action equivalents in order to conceal and enable lawyer schemes to defraud shown.

## VI.   FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A. Federal Statutes at Issue by Enterprise and Enterprise Actors

Wire Fraud – 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1343; Mail Fraud 18 U.S.C. § 1341

109. Shown repeatedly in this action through predicate, parallel, and ongoing acts threatening harm to U.S. citizens, "[c]riminal mail and wire fraud involves: (1) a scheme based on an intent to defraud; and (2) the use of the mails or wires to further that scheme." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017); *Bui v. Nguyen*, 712 Fed. Appx. 606, 609 (9th Cir. 2017).

Bank Fraud – 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1344

110. Also shown repeatedly, the bank fraud statute under 18 U.S.C. § 1344 holds:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both. (Added Pub. L. 98–473, title II, § 1108(a), Oct. 12, 1984, 98 Stat. 2147; amended Pub.

21

22-CV-1616-BAS-DDL

L. 101–73, title IX, § 961(k), Aug. 9, 1989, 103 Stat. 500; Pub. L. 101–647, title XXV, § 2504(j), Nov. 29, 1990, 104 Stat. 4861.)

Obstruction of Justice – 18 U.S.C. § 1961(1)(B), 18 U.S.C. § 1503

111.   Also shown to be a matter of enterprise practice, 18 U.S.C. § 1503 holds:

(a) Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, [], or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b). If the offense under this section occurs in connection with a trial of a criminal case, and the act in violation of this section involves the threat of physical force or physical force, the maximum term of imprisonment which may be imposed for the offense shall be the higher of that otherwise provided by law or the maximum term that could have been imposed for any offense charged in such case. (b) The punishment for an offense under this section is- imprisonment for not more than 10 years, a fine under this title, or both.

June 25, 1948, ch. 645, 62 Stat. 769; Pub. L. 97-291, §4(c), Oct. 12, 1982, 96 Stat. 1253; Pub. L. 103-322, title VI, §60016, title XXXIII, §330016(1)(K), Sept. 13, 1994, 108 Stat. 1974, 2147; Pub. L. 104-214, §1(3), Oct. 1, 1996, 110 Stat. 3017." 18 U.S.C. § 1503

Mailing Threatening Comms. – 18 U.S.C. § 1961(1)(A) and § 18 U.S.C. § 876

112.   Shown by KENNETH CATANZARITE, ESQ., SUZANNE CELIA GRANDT, ESQ., and then ELLIN DAVTYAN, ESQ., 18 U.S.C. § 876 holds:

(d) Whoever, with intent to extort from any person any money or other thing of value, knowingly so deposits or causes to be delivered, as aforesaid, any communication, with or without a name or designating mark subscribed thereto, addressed to any other person and containing any threat to injure the property or reputation of the addressee or of another, or the reputation of a deceased person, or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both.

Receiving Proceeds of Extortion – 18 U.S.C. § 1961(1)(A) and 18 U.S.C. § 880

113.   Where THE STATE BAR OF CALIFORNIA and CATANZARITE LAW CORPORATION each receive proceeds of money and property of extortion, and each employee of THE STATE BAR OF CALIFORNIA thereby does, too – 18 U.S.C. § 880 reads:

22                                22-CV-1616-BAS-DDL

A person who receives, possesses, conceals, or disposes of any money or other property which was obtained from the commission of any offense under this chapter that is punishable by imprisonment for more than 1 year, knowing the same to have been unlawfully obtained, shall be imprisoned not more than 3 years, fined under this title, or both.

114.    California equivalent statutes of § 880, each being racketeering activity undertaken by KENNETH CATANZARITE, ESQ. and CATANZARITE LAW CORPORATION regularly, are:

Cal. Pen. Cod. § 518, (a) Extortion is the obtaining of property or other consideration from another, with his or her consent, or the obtaining of an official act of a public officer, induced by a wrongful use of force or fear, or under color of official right.(b) For purposes of this chapter, "consideration" means anything of value, including sexual conduct as defined in subdivision (b) of Section 311.3, or an image of an intimate body part as defined in subparagraph (C) of paragraph (4) of subdivision (j) of Section 647"

Cal. Pen. Cod. § 522 "[e]very person who, by any extortionate means, obtains from another his signature to any paper or instrument, whereby, if such signature were freely given, any property would be transferred, or any debt, demand, charge, or right of action created, is punishable in the same manner as if the actual delivery of such debt, demand, charge, or right of action were obtained."

Cal. Pen. Cod. § 523 "(a) "[e]very person who, with intent to extort property or other consideration from another, sends or delivers to any person any letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat such as is specified in Section 519 is punishable in the same manner as if such property or other consideration were actually obtained by means of such threat."

<u>Distributing Unlawful Activity Proceeds – 18 U.S.C. § 1961(1)(B), 18 U.S.C. § 1952(a)(1)</u>

115.    Where CATANZARITE LAW CORPORATION operates at least one, and THE STATE BAR OF CALIFORNIA operates at least two facilities using the mail with intent to distribute the proceeds of unlawful activity, and individual defendants use them, 18 U.S.C. § 1952(a)(1) holds:

(a) Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to—(1) distribute the proceeds of any unlawful activity; and thereafter performs or attempts to perform—(A) an act described in paragraph (1) or (3) to [otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity [] shall be fined under this title, imprisoned not more than 5 years, or both; [and] **(b)** As used in this section (i) "unlawful activity" means [] (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States, or (3) any act which is indictable under subchapter II of chapter 53 of title 31, United States Code, or under section 1956 or 1957 of this title and (ii) the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States. **(c)** Investigations of

23                                                                      22-CV-1616-BAS-DDL

violations under this section involving liquor shall be conducted under the supervision of the Attorney General. **(d)** If the offense under this section involves an act described in paragraph (1) or (3) of subsection (a) and also involves a pre-retail medical product (as defined in section 670), the punishment for the offense shall be the same as the punishment for an offense under section 670 unless the punishment under subsection (a) is greater. (B) the term "insured depository institution" shall have the meaning given the term in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813).

Carrying on Unlawful Activity – 18 U.S.C. § 1961(1)(B), 18 U.S.C. § 1952(a)(3)

116.    Where THE STATE BAR OF CALIFORNIA, ORANGE COUNTY SUPERIOR COURT, and ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE have each carried on the unlawful activity of THE STATE BAR OF CALIFORNIA and CATANZARITE LAW CORPORATION, including but not limited to through acts of JOHN C. GASTELUM, ELI DAVID MORGENSTERN, ESQ., SUZANNE CELIA GRANDT, ESQ., ELLIN DAVTYAN, ESQ., RUBEN DURAN, ESQ., LEAH WILSON, ESQ., GEORGE SARGENT CARDONA, ESQ., and ROBERT GEORGE RETANA, ESQ., 18 U.S.C. § 1952(a)(3) holds:

> Whoever…uses the mail or any facility in interstate or foreign commerce, with intent to-(1) distribute the proceeds of any unlawful activity; or…(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment or carrying on, of any unlawful activity, and thereafter performs or attempts to perform-(A) an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both.

Laundering of Monetary Instruments – 18 U.S.C. § 1961(1)(B), 18 U.S.C. § 1956

117.    Where THE STATE BAR OF CALIFORNIA, ORANGE COUNTY SUPERIOR COURT, have each taken proceeds from the unlawful activity of THE STATE BAR OF CALIFORNIA and CATANZARITE LAW CORPORATION, including but not limited to through acts of JOHN C. GASTELUM, ELI DAVID MORGENSTERN, ESQ., SUZANNE CELIA GRANDT, ESQ., KENNETH CATANZARITE, ESQ., knowing it was unlawful activity, 18 U.S.C. § 1956 holds:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity-(A)(i) with the intent to promote the carrying on of specified unlawful activity; or (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of

the Internal Revenue Code of 1986; or (B) knowing that the transaction is designed in whole or in part-(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both. For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States-(A) with the intent to promote the carrying on of specified unlawful activity; or (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part-(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or (ii) to avoid a transaction reporting requirement under State or Federal law, shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer, whichever is greater, or imprisonment for not more than twenty years, or both. For the purpose of the offense described in subparagraph (B), the defendant's knowledge may be established by proof that a law enforcement officer represented the matter specified in subparagraph (B) as true, and the defendant's subsequent statements or actions indicate that the defendant believed such representations to be true.

(3) Whoever, with the intent-(A) to promote the carrying on of specified unlawful activity; (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or (C) to avoid a transaction reporting requirement under State or Federal law, conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both. For purposes of this paragraph and paragraph (2), the term "represented" means any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section.

Receiving Unlawful Money/Property – 18 U.S.C. § 1961(1)(B), 18 U.S.C. § 1957

118.    Where THE STATE BAR OF CALIFORNIA, ORANGE COUNTY SUPERIOR COURT, have each carried on the unlawful activity of THE STATE BAR OF CALIFORNIA actors knowingly as well as those acts of CATANZARITE LAW CORPORATION, and KENNETH

25

22-CV-1616-BAS-DDL

1    CATANZARITE, ESQ., THE STATE BAR OF CALIFORNIA, and others have received, knowing
2    it was unlawful activity, 18 U.S.C. § 1957 holds:

3    (a) Whoever, in any of the circumstances set forth in subsection (d), knowingly engages
4    or attempts to engage in a monetary transaction in criminally derived property of a value
     greater than $10,000 and is derived from specified unlawful activity, shall be punished
5    as provided in subsection (b). (b)(1) Except as provided in paragraph (2), the punishment
6    for an offense under this section is a fine under title 18, United States Code, or
     imprisonment for not more than ten years or both. If the offense involves a pre-retail
7    medical product (as defined in section 670) the punishment for the offense shall be the
     same as the punishment for an offense under section 670 unless the punishment under
8    this subsection is greater.(2) The court may impose an alternate fine to that imposable
9    under paragraph (1) of not more than twice the amount of the criminally derived property
     involved in the transaction. (c) In a prosecution for an offense under this section, the
10   Government is not required to prove the defendant knew that the offense from which the
11   criminally derived property was derived was specified unlawful activity. (d) The
     circumstances referred to in subsection (a) are-(1) that the offense under this section takes
12   place in the United States or in the special maritime and territorial jurisdiction of the
13   United States; or (2) that the offense under this section takes place outside the United
     States and such special jurisdiction, but the defendant is a United States person (as
14   defined in section 3077 of this title, but excluding the class described in paragraph (2)(D)
15   of such section).(e) Violations of this section may be investigated by such components
     of the Department of Justice as the Attorney General may direct, and by such components
16   of the Department of the Treasury as the Secretary of the Treasury may direct, as
17   appropriate, and, with respect to offenses over which the Department of Homeland
     Security has jurisdiction, by such components of the Department of Homeland Security
18   as the Secretary of Homeland Security may direct, and, with respect to offenses over
19   which the United States Postal Service has jurisdiction, by the Postal Service. Such
     authority of the Secretary of the Treasury, the Secretary of Homeland Security, and the
20   Postal Service shall be exercised in accordance with an agreement which shall be entered
21   into by the Secretary of the Treasury, the Secretary of Homeland Security, the Postal
     Service, and the Attorney General. (f) As used in this section-(1) the term "monetary
22   transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting
23   interstate or foreign commerce, of funds or a monetary instrument (as defined in
     section 1956(c)(5) of this title) by, through, or to a financial institution (as defined in
24   section 1956 of this title), including any transaction that would be a financial transaction
25   under section 1956(c)(4)(B) of this title, but such term does not include any transaction
     necessary to preserve a person's right to representation as guaranteed by the sixth
26   amendment to the Constitution;(2) the term "criminally derived property" means any
     property constituting, or derived from, proceeds obtained from a criminal offense;
27   and(3) the terms "specified unlawful activity" and "proceeds" shall have the meaning
     given those terms in section 1956 of this title.
28

26                                        22-CV-1616-BAS-DDL

Added Pub. L. 99-570, title I, §1352(a), Oct. 27, 1986, 100 Stat. 3207-21; amended Pub. L. 100-690, title VI, §§6182, 6184, 6469(a)(2), Nov. 18, 1988, 102 Stat. 4354, 4377; Pub. L. 102-550, title XV, §§1526(b), Oct. 28, 1992, 1527, Oct. 28, 1992, 106 Stat. 4065; Pub. L. 103-322, title XXXIII, §3300200020,, 108 Stat. 2149; Pub. L. 103-325, title IV, §413(c)(2), Sept. 23, 1994, 108 Stat. 2255; Pub. L. 109-177, title IV, §403(c)(2), Mar. 9, 2006, 120 Stat. 243; Pub. L. 111-21, §2(f)(2), May 20, 2009, 123 Stat. 1618; Pub. L. 112-186, §4(b)(2), Oct. 5, 2012, 126 Stat. 1429

<u>Illegal Money Transmitters -- 18 U.S.C. § 1961(1)(B), 18 U.S.C. § 1960</u>

119.    Where THE STATE BAR OF CALIFORNIA, through overt acts of RUBEN DURAN, ESQ, and LEAH T. WILSON, ESQ. in conspiracy with Board of Trustees and others, knowingly conduct an unlicensed money transmitting business amidst $5 billion in daily average balances through domestic and Chinese banks, and through the distribution of approximate $80 million yearly, and potentially $150 million in 2023, 18 U.S.C. § 1960 holds:

(a) Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both. (b) As used in this section-(1) the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and-(A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable; (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or (C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity; (2) the term "money transmitting" includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier; and (3) the term "State" means any State of the United States, the District of Columbia, the Northern Mariana Islands, and any commonwealth, territory, or possession of the United States.

Added Pub. L. 102-550, title XV, §1512(a), Oct. 28, 1992, 106 Stat. 4057; amended Pub. L. 103-325, title IV, §408(c), Sept. 23, 1994, 108 Stat. 2252; Pub. L. 107-56, title III, §373(a), Oct. 26, 2001, 115 Stat. 339; Pub. L. 109-162, title XI, §1171(a)(2), Jan. 5, 2006, 119 Stat. 3123.

**B. The Late Phil Kay's Amicus Re-Visited After Public Fraud by Duran, Others**

**INTRODUCTION – Amicus Curiae by Phil Kay**

27                                        22-CV-1616-BAS-DDL

120.    This matter has borne out the inevitable unconstitutional misuse and abuse of the State Bar anticipated by California Supreme Court (CSC) Justices Brown and Kennard in their dissenting opinions in the In re Rose and Obrien decisions of the CSC, in which Justice George, who authored the In re Rose decision, ceded the Court's authority to the State Bar."

121.    In this corner of the law, at least, we seem to be presiding over a union of the legislative and judicial components of government. It may be efficient; it certainly isn't pretty. And because it seems antithetical to the constitutional design . . ." – Justice Brown (In re Rose, 22 Cal.4th 430, 470 (2000).)

122.    "Because the law at issue makes **State Bar Court judges subservient to members of the political branches**, and because it alters the composition of the State Bar Court in a way likely to reduce public confidence in the attorney discipline system, the law is invalid under the separation of powers clause of the California Constitution." – Justice Kennard (*Obrien v. Jones* 23 Cal.4th 40, 63 (2000).)

123.    The State Bar desperately wants the Los Angeles attorney to shut up, go away and stop giving voice to the egregious corruption taking place in the State Bar. To accomplish this, the State Bar has pursued a malicious State Bar case and criminal prosecution to cover up the criminal malfeasance of Thomas Girardi for purely political reasons. The CSC's abdication of its former duty to hear oral argument and issue a written decision in State Bar disciplinary proceedings has resulted in this egregious denial of federal constitutional – due process rights and privilege.

124.    The solution is provided in the State Bar Act, as discussed by dissenting Justice Kennard, in In re Rose, supra, at 465:

125.    The majority asserts that this court can no longer spare the time and resources required to hold oral argument and write an opinion in every attorney suspension and disbarment proceeding. (Maj. opn., ante, at pp. 457-458.) Even if the majority is correct, as it may be, the proper solution is not an expedient but unreasonable construction of the state Constitution to deny attorneys the privileges granted to holders of all other occupational licenses. The Legislature has already given this court a better solution. In 1988, the Legislature amended Business and Professions Code section 6082 to permit review of an attorney discipline recommendation "by the California Supreme Court *or by a*

22-CV-1616-BAS-DDL

*California Court of Appeal* in accordance with the procedure prescribed by the California Supreme Court." (Italics added.) Under the statute as amended, this court need only establish a suitable procedure, and the burden of giving disciplined attorneys their day in court can be broadly distributed among the Courts of Appeal. At current levels-attorneys sought review in roughly 40 suspension and disbarment matters in 1990 (see maj. opn., ante, at p. 457)-these attorney discipline cases would not substantially add to the workload of the nearly 90 justices of the Courts of Appeal. Should the volume of attorney discipline cases at any point begin to strain the capacity of the Courts of Appeal, the number of Court of Appeal justices could be increased. (Emphasis.)

126.    However, as long as *In re Rose* remains the law, the State Bar will continue to plague innocent respondents. [Plaintiff notes that *In re Rose* is NOT the law applied to him, a non-lawyer]

127.    Based on this Court's holding in *In re Kramer*, 193 Fed.3d 1131, 1132-1333, Mr. Doe is entitled an examination of the record in the State Bar proceeding, which denied him federal constitutional – due process.

128.    In *Selling v. Radford*, 243 U.S. 46, 50-51, 37 S.Ct. 377, 61 L.Ed. 585 (1917), the Court held that a federal court could impose reciprocal discipline on a member of its bar based on a state's disciplinary adjudication, if an independent review of the record reveals: (1) no deprivation of due process; (2) sufficient proof of misconduct; and (3) no grave injustice would result from the imposition of such discipline. Thus, while federal courts generally lack subject matter jurisdiction to review the state court decisions, see D.C. Court of Appeals v. Feldman, 460 U.S. 462, 486, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16, 44 S.Ct. 149, 68 L.Ed. 362 (1923), a federal court may "examine a state court disciplinary proceeding if the state court's order is offered as the basis for suspending or disbarring an attorney from practice before a federal court." *MacKay v. Nesbett*, 412 F.2d 846, 847 (9th Cir.1969) (citing *Theard v. United States*, 354 U.S. at 281-82, 77 S.Ct. 1274). (Id.)

129.    Mr. Doe was never found culpable of misconduct by any constitutional court. Moreover, he was not found culpable in the State Bar based on any evidence, a trial on the merits and review. Rather, he was the victim of an unconstitutional ultra vires void default strategy, which required him to be in two places at the same time. Doe was never allowed to present a defense by

29

22-CV-1616-BAS-DDL

calling his clients or any other witnesses, cross-examine witnesses or challenge the false charges to establish a record to be reviewed by the CSC. (See State Bar Act – [Bus. & Prof. Code] §6085.2.) Rather, based on the default, there was no record to review and thus, no review under In re Rose. Thus, without a record to review, he received no review in the CSC and has been denied the federal constitutional – due process, which *In re Rose*, supra, at 439 references but does not provide.

130.    State Bar Court Hearing Department (Hearing Department) conducts evidentiary hearings on the merits in disciplinary matters. (Rules Proc. of State Bar (hereafter, Rules of Procedure), rules 2.60, 3.16.) An attorney charged with misconduct is entitled to receive reasonable notice, to conduct discovery, to have a reasonable opportunity to defend against the charge by the introduction of evidence, to be represented by counsel, and to examine and cross-examine witnesses. (§ 6085.) The Hearing Department renders a written decision recommending whether the attorney should be disciplined. (Rules Proc., rule 220.) Any disciplinary decision of the Hearing Department is reviewable by the State Bar Court Review Department (Review Department) at the request of the attorney or the State Bar. (Id., rule 301(a).) In such a review proceeding, the matter is fully briefed, and the parties are given an opportunity for oral argument. (Id., rules 302-304.) The Review Department independently reviews the record, files a written opinion, and may adopt findings, conclusions, and a decision or recommendation at variance with those of the Hearing Department. (Id., rule 305.) A recommendation of suspension or disbarment, and the accompanying record, is transmitted to this court after the State Bar Court's decision becomes final. (§ 6081; Rules Proc., rule 250.)

131.    The CSC is not a trial court and cannot determine facts regarding the federal constitutional claims. The State Bar cannot determine these facts under Cal. Const. Art. III, sec. 3.5. (See *Hirsh v. Justices of Supreme Court of California*, 67 Fed.3d 708, 712-713 (1995). The CSC should have either dismissed the politically motivated charges against Mr. Doe or assigned the evidentiary issues raised by Doe's Petition for Review to a constitutional — article VI court for fact-finding to afford him the right to contest the charges, present evidence, cross-examine witnesses and establish a record for CSC review. However, based on the lack of any record resulting from the default

and lack of jurisdiction in the State Bar, the federal constitutional claims cannot be determined through an unconstitutional summary denial afforded under *In re Rose*.

**RELEVANT FACTS [Phil Kay Amicus Continues]**

132.   **Mr. Girardi's Fraud Is the Motivating Factor for the State Bar Proceeding against Mr. Doe**

133.   Mr. Doe was co-counsel with Mr. Girardi personally and Girardi & Keese in multiple class actions and personal injury lawsuits. The cases were generated by Dor. Also assisting Girardi was senior partner Howard Miller, who subsequently became State Bar President during the time that the Ninth Circuit Court of Appeals had filed disciplinary charges against Girardi, personally, together with others arising out of a $500 million fraudulent judgment pertaining to the Dole Fruit Company. (*See In re Girardi*, 611 Fed.3d 1027.)

134.   In Doe's class actions with Girardi — Girardi secretly received $10 million compensation to himself, which was paid to him by opposing counsel and their insurers in the class action. Each of these opposing counsels were members of the State Bar Board of Governors with Miller. The class members were awarded a judgment, which was not collectible because Girardi had misappropriated more than $10 million belonging to the class and to the medical lienors, including Medicare, Medicaid, and Medi-Cal.

135.   Doe had personal knowledge in connection with Girardi's fraudulent activities in his cases and in other cases of Girardi, Miller and their law firm that should have resulted in Girardi's substantial discipline by the Ninth Circuit Court of Appeals, including disbarment. Girardi's testimony and that of Walter Lack and others before the Ninth Circuit Court of Appeals was fabricated and intentionally false. Girardi feared that Gottschalk would testify against him in connection with the disciplinary proceedings. Doe filed complaints to require Girardi to return **more than a billion dollars that Girardi** had misappropriated together with Lack and others, including the $10 million that by court order was required to be paid to the class members and no money was awarded to Girardi or his firm. Girardi had breached fiduciary duties and engaged in **actual conflicts of interest together with Lack and others** and were terminated as class counsel and personal injury counsel by the plaintiffs. [emphasis added as to the PORA of material conflicts for Catanzarite and State Bar, *here*]

22-CV-1616-BAS-DDL

136.   **The Malicious State Bar Charges and Default Strategy**

137.   To attempt to prevent Doe from testifying against Girardi and bringing Girardi's misconduct to the attention of the Ninth Circuit judges, including with respect to other similar fraud schemes to the Dole Fruit Company investigation and void judgment, Girardi launched an unprecedented malicious and criminal attack against Gottschalk. Girardi and Miller, the President of the State Bar, secretly filed a State Bar complaint against Doe seeking the State Bar to take over Doe's law practice, make Doe ineligible to practice law, and transfer the class action cases and the personal injury cases to Girardi, Miller and their firm. The trial judge in these cases warned the defense counsel that their conduct against Doe was not privileged and that he would disqualify defense counsel if they participated in such intentional fraud scheme and obstruction of justice against Doe, acting in concert with Girardi and others. As a result of Girardi's misconduct in seeking to punish Doe and to take over these cases to conceal Girardi's receipt of more than $10 million in sub rosa unlawful compensation, Doe and his clients lost more than $20 million in settlement funds that would have been paid to these plaintiffs who received no moneys from the class action judgment of more than $30 million. [PORA]

138.   The State Bar prosecutor Paul O'Brien stated that the State Bar had no jurisdiction to take over Doe's law practice because there were no formal proceedings against him. Subsequently, Doe learned that Girardi and Miller, as President of the State Bar, had promised O'Brien a judgship in the Los Angeles Superior Court if he filed disciplinary charges against Doe and then sought to have Doe be deemed mentally incompetent by the State Bar so that he could not testify against Girardi in the federal disciplinary proceedings and in the civil litigation. O'Brien brought a fabricated disciplinary complaint against Doe based on knowingly fabricated evidence and withheld from Doe exculpatory evidence that showed that Doe was completely innocent.

139.   Thereafter, Doe and his counsel prepared the case to go to trial, filed an extensive answer to the fabricated charges, produced voluminous documents that showed that Doe was innocent, and listed more than 150 witnesses to be called at trial, including Girardi and Miller. However, on the eve of trial, O'Brien filed an emergency motion with the State Bar supervising judge stating that the State Bar had violated Doe's constitutional rights by withholding for more than three years O'Brien's belief that Doe was mentally incompetent and therefore should be deemed involuntarily inactive.

22-CV-1616-BAS-DDL

140.     The State Bar hearing officer [Patrice McElroy] did not believe O'Brien and stated on the record that Doe was perfectly sane. However, Girardi and Miller approached McElroy ex parte and promised to renew her hearing officer judgeship if she caused Doe to become inactive.

141.     The proceedings dragged on for more than six months, in which Doe could not represent himself or testify against Girardi. Doe finally prevailed in the State Bar Court mental health hearing. The State Bar Court [McElroy] ruled that the declarations of the witnesses against Doe were not credible and that any witnesses against Doe would have to testify in person and be subject to vigorous cross-examination.

142.     After Doe had won the parallel civil cases to the fraudulent case in the State Bar Court, the State Bar prosecutor O'Brien, acting in concert with Girardi and Miller, caused the District Attorney to charge Doe with the crime of embezzlement with the District Attorney of Los Angeles County, even though Doe won the parallel civil cases regarding the same issues and the same complainants. Doe was arrested an incarcerated for 29 days in the Twin Tower's Psychiatric Ward at the direction of O'Brien, Girardi, Miller and others. However, as discussed, immediately prior to this, the State Bar Court [McElroy] had ruled at trial that Doe was perfectly sane and was able to practice law without a monitor.

143.     Immediately thereafter, McElroy, acting in concert with Girardi, Miller, and O'Brien, stated that Doe's State Bar case would go to trial on the same date and time as the preliminary hearing in the Criminal Court. Thus, the State Bar and Criminal proceedings would take place simultaneously in two courts at the same time unless Doe surrendered his license to practice law.

144.     Doe was mistreated in the County Jail and Mr. O'Brien, acting in concert with Mr. Girardi and Mr. Miller, told the Los Angeles County Sheriff's Dept. And their high command to withhold Doe's diabetic diet and diabetic medication and to substitute his vitamins for diabetes with anti-psychotic drugs without the knowldege or consent of Doe. Doe was held in solitary confinement for 29 days even though excessive bail was available within one day of his arrest.

145.     In the mean time, the CSC mandated the State Bar Court and the State Bar Board of Governors, including Miller, as President of the State Bar, to vacate its intentional default rules against respondents and to no longer engage in an intentional default strategy to discipline lawyers in violation

22-CV-1616-BAS-DDL

of their constitutional rights, including their due process rights. This was contained in a memorandum by Colin Wong to the State Bar judges and the State Bar prosecutors from the CSC

146.    Regardless, O'Brien, acting in concert with Girardi and Miller, proceeded to engage in the same intentional default strategy that had been condemned by the CSC and ordered to be vacated and not utilized by the State Bar prosecutors and State Bar judges against respondents and similarly situated persons such as Mr. Doe.

147.    O'Brien had been offered a judgship in the Los Angeles Superior Court and other unlawful consideration by Girardi if he intentionally defaulted Doe and thereby caused Doe to be deemed inactive and disbarred without a trial. O'Brien was ordered to attend a multi-day evidentiary hearing in the Criminal Court preparatory to the preliminary hearing that was to take place at the same time and date as the State Bar Court trial. O'Brien secretly went before the State Bar Court prior to attending the evidentiary hearing in the Criminal Court with respect to the intentional withholding of exculpatory evidence by the prosecutors in both the State Bar Court and the Criminal Court. He spent five minutes to intentionally default Doe to make him inactive and to recommend Doe's disbarment without serving the pleadings on Doe's counsel. O'Brien prepared fabricated declarations for each of the complainants and told them that, if they signed the fabricated declarations, they would receive money from the Client Security Fund to irreparably prejudice Doe.

148.    O'Brien was the subject matter of multiple media reports as to his prosecutorial misconduct and fabrication of evidence against multiple attorneys. Leader of the Criminal Court Bar and others asked former Governor Schwarzenegger to withdraw O'Brien's name from nomination as a judge, which the Governor did based on the pattern of prosecutorial misconduct not disclosed by O'Brien in his applications to be a judge.

149.    Doe's attorneys filed six (6) declarations of fault under Code Civ. Proc. §§473(b) & (d),which was not contested by the State Bar prosecutor, but ignored by the State Bar judge. The proposed recommendation of disbarment was prepared by the prosecutor and included a provision that Girardi was entitled to the $10 million that he received. This is contrary to the court's order denying Girardi any moneys whatsoever, especially since he had been fired by the class lead

counsel and the plaintiffs for breaches of fiduciary of duty and actual conflicts of interest, without any disclosure on the record.

150.   **Girardi's Connection to Doe's State Bar Proceeding**

151.   Girardi is the chief power broker in connection with the State Bar and with the State Bar Board of Governors. He is also the largest contributor to the State Bar Foundation, which he also controls together with his associates commonly referred to as the Girardi Group. This includes Jerome Falk, who was appointed by the State Bar to be the special prosecutor in the State Bar disciplinary case against Girardi and Lack.

152.   Falk did not disclose on the record that he and his firm were long time personal attorneys for Girardi and Lack, including with respect to the misappropriation of $20 million of class members' moneys rom the settlement of a San Diego Superior Court class action. Falk and his firm Howard Rice did not disclose to Doe when they were representing Doe that they also represented Girardi and Girardi & Keese. Howard Rice requested Doe to provide them under an attorney/client relationship with information as to moneys misappropriated by Girardi from class actions and mass settlements, as well as similar fraud schemes to that practiced against Dole Fruit Company. This information that was provided in confidence to Howard Rice was provided to Girardi by said Howard Rice and their attorneys.

153.   Girardi and Miller then conceived a corrupt plan and scheme to try and shut Doe up to prevent him from testifying in the federal disciplinary case against Girardi and in conjunction with major misappropriations of client moneys in multi-million dollar settlements and without paying the super priority medical liens in connection therewith in excess of billions of dollars. Girardi instigated the State Bar proceedings and offered a judgship in the Los Angeles Superior Court to O'Brien to intentionally default Doe and to cause him to be falsely charged with fabricated crimes, even though he was innocent and had prevailed in the parallel civil cases.

154.   Girardi has continued to seek disbarment sub rosa with respect to his co-counsel in litigation after Girardi is caught settling cases for moneys that belong to the clients and not Mr. Girardi. For example, Girardi received sub rosa more than $50 million in the Erin Brockovich case, which was reported to Mr. Doe by multiple attorneys in connection with those transactions. Girardi

22-CV-1616-BAS-DDL

misappropriated more than $120 million in connection with the Gutierrez class action in a published opinion, Gutierrez v. Girardi, (2011) 194 Cal.App.4th 925. Girardi was involved in massive illegal campaign contributions to the John Edwards national campaign for President and in other election campaigns, including elections of judges of the Los Angeles Superior Court. Girardi had his private investigator Tom Layton put on the State Bar payroll to be used to dig up dirt against his opponents and to intervene on behalf of candidates for judgeships with the Governor to secure their appointment, without disclosure that they were hand picked by Girardi.

155. **Girardi's State Bar Connections**

156. Girardi cemented his power broker status and political connections with the State Bar hierarchy with the use of illegal contributions and funding to supplement their income. He supported each State Bar chief trial counsel with illegal contributions that were not reported for income tax purposes. This included former State Bar Chief Prosecutor Michael Nisperos for whom Girardi underwrote his extensive illegal drug consumption, including heroin. Girardi illegally funded the campaigns of Joe Dunn with Medicare Trust Funds and other illegal contributions. Girardi gave massive gifts to the State Bar hierarchy, including the use of his private planes for their transportation, including Beth Jay and Joe Dunn. Girardi personally intervened on behalf of his clients, such as Ron Burkle, to fabricate State Bar cases against Burkle's opponents. Girardi withheld major settlements from Doe's former clients, without providing them an accounting or copies of the settlements when they occurred and utilized a substantial portion of that money to fund illegal contributions in judicial campaigns to put his friends on the court and to funnel moneys illegally to politicians that he controlled and would reward Girardi with financial favors.

157. Girardi, Miller and the Girardi Organization control the State Bar through its inter-relationship with the Judicial Council and CSC, including the extensive relationship with the former Chief Justice George and with the present personal counsel Beth Jay to the current Chief Justice and former Justice George.

158. The major misappropriation of moneys by the Administration of Courts (AOC) is traceable directly to those who were appointed at the direction of Girardi to executive positions with the AOC. Girardi is known as the banker with regard to class action and complex lawsuits filed in the

36

22-CV-1616-BAS-DDL

Los Angeles Superior Court, whose complex department is commonly referred to as the bank. In one recent case, Girardi did not disclose his personal relationship with the chief opposing counsel, who made arrangements to give Girardi $90 million for essentially services that were never performed and to defraud the insureds of Farmers Insurance Co. in excess of one billion dollars. None of the judges of the complex department disclosed on their economic forms 700 the receipt of millions of dollars from Girardi over multiple years, which is why Girardi is known as the banker nationwide. He is also the banker for the State Bar and the State Bar Foundation. He has also arranged for unlawful moneys to be paid to State Bar officials, including the Executive Director of the State Bar and the former head of State Bar Discipline Judy Johnson, her friends and associates.

159.   Girardi did not disclose that he was actively seeking a federal judgeship for Rory Little, the special prosecutor in his disciplinary case, and had personally intervened with multiple U.S. Senators on his behalf. Girardi also did not disclose his relationship with Little's wife and her law firm when he sought the appointment as the special prosecutor in his case. Additionally, Girardi sought intervention to appoint the current President of the State Bar to a federal judgeship who assisted Girardi in connection with the appointment of Little as the special prosecutor in Girardi's discipline case, knowing that Mrs. Little was a partner of that firm.

160.   **The Politically Connected Thomas Girardi Is Found Not Culpable by the State Bar – Contrary to the Decision of this Court**

161.   The politically connected Girardi, Lack and Paul Traina were sanctioned $390,000 and admonished and/or suspended by the Ninth Circuit for committing fraud on the court, but never subjected to any proceeding or discipline by the State Bar. Due to Girardi being the law partner of State Bar President Miller and Miller's involvement in the fraudulent matter, a State Bar insider and colleague of Miller's, Falk of the Howard Rice firm, was appointed as a special prosecutor. [Falk's partner Douglas Winthrop is an officer of the State Bar and serves on the Board of the California Bar Foundation with Miller.] Falk then ignored the Ninth Circuit findings that these lawyers committed a fraud on the Court.

162.   In the Ninth Circuit, special master Judge A. Wallace Tashima concluded Girardi "recklessly" made false statements, while Lack and Traina acted "knowingly, intentionally and

22-CV-1616-BAS-DDL

recklessly" and assessed sanctions ($390,000), which the offending firms and lawyers did not oppose. However, based on the lawyers' objections to the findings regarding their intent to defraud the Court, the Ninth Circuit appointed Hastings law professor Little as a special prosecutor, who found Judge Tashima's findings to be "accurate and provable by clear and convincing evidence." The Ninth Circuit then adopted Judge Tashima's report and conclusions in a published opinion – *In re Girardi*, 611 Fed.3d 1027, 1039-1040 (2006).

163.    "The history of the enforcement action demonstrates the multiple occasions on which they chose to remain willfully blind to the fact that they were making false statements. By the time they appeared in this court, the attempt to salvage their case became indistinguishable from a knowing submission of false documents. Suspension is the appropriate discipline for these Respondents . . . Respondents in this case have been respected members of the bar, and each has presented significant mitigating evidence. Their conduct in this case, however, cannot be excused on that basis, given their culpability and the substantial injury their conduct caused the opposing parties and this court. We have carefully considered the recommendations of Judge Tashima and Professor Little, who have made our task substantially easier and whose assistance we gratefully acknowledge. We impose discipline as follows:

164.    THOMAS V. GIRARDI is formally reprimanded.

165.    WALTER J. LACK and PAUL A. TRAINA are suspended from practice before the Ninth Circuit for six months.

166.    These disciplinary orders and findings satisfy the State Bar's standard of proof for imposing discipline and are considered res judicata (proven), which State Bar respondents are collaterally estopped from denying or disputing. (§ 6049.1; *In re Kittrell*, supra, 4 Cal. State Bar Ct. Rptr. 195, p.7.) Regardless, the State Bar and Falk exonerated these lawyers solely on political grounds.

167.    Thus, without having been found to have engaged in misconduct by any constitutional court, Doe is severely disciplined [disbarred]; whereas, the State Bar exonerated Girardi, Lack and Traina; all of whom were found to have engaged in severe misconduct by this Court.

168.   The State Bar's pursuit of charges against Gottschalk on such an improper and selective basis constitutes an egregious abuse of the prosecutor's duties and a denial of due process. (*Freeman v. City of Santa Ana* (9th Cir. 1995) 68 Fed.3d 1180, 1187.) As arm of the California Supreme Court, the State Bar must regulate "impartially" to ensure that "justice shall be done." (*Berger v. United States* (1935) 295 U.S. 78, 85, 88 [government not "an ordinary party," but is a 'sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done"].) Plainly, that was not done here." [end Amicus Curiaea/Facts; Phil Kay]

**B. Girardi, Lira, and 700+ CLUB Carried on by State Bar with Actual Knowledge**

169.   Revisiting Phil Kay's Amicus after Girardi was carried on, where the MTO Report in Exhibit 1 shows actual knowledge of the Board of Trustees as per the preceding paragraphs:

Case: 1:18-cv-07686 Document #: 1450 Filed: 11/02/22 Page 1 of 14 PageID #:15898

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE LION AIR
FLIGHT JT 610 CRASH

No. 18 C 7686

Judge Thomas M. Durkin

MEMORANDUM OPINION AND ORDER

Tragically, on October 29, 2018, Lion Air Flight 610 crashed shortly after takeoff killing all aboard. That tragedy was compounded when attorney Thomas Girardi stole some of the money five of his clients were owed from settlements with defendant Boeing of claims arising out of the crash.

"The Court alerted the U.S. Attorney for this district to the facts of this case when this motion was first filed because Girardi's conduct is **unquestionably criminal**. The Court is aware that the State Bar of California (the state in which Griffin and Lira are admitted) is monitoring these proceedings." R. 1296-58 at 2 (Ex. 167-002); see also R. 1296-61 at

2 (Ex. 170-002) (similar letter claiming that Girardi was "dealing with the head of the IRS" regarding the supposed tax issue). These letters contained outrageous lies. Before sending the letters, Girardi's secretary shared them with Griffin and Lira. See R. 1296-57 (Ex. 166); R. 1296-58 (Ex. 167)
The order concludes (See *Ex. 42*):

Thomas Girardi's actions are a stain on the legal profession and, due to the international nature of this case, have damaged the reputation of the American legal system. All of the plaintiffs in this case were citizens and residents of another country, many of whom do not speak English and have little to no experience with American society and certainly not its court system. Most are not very well-off. They all suffered the tragic loss of family members.

In need of help, they trusted American attorneys to shepherd them through the legal process and achieve at least some relief for their losses with amounts of money that are likely life-changing in their country. Girardi took advantage of vulnerable people at their most vulnerable moments, and he used the prestige of his profession, the reputation of American courts, and the imprimatur of this Court to do it. It is nearly impossible to mend such a breach of trust. The best we can do is demonstrate that the legal system Girardi besmirched has the ability to rectify its errors and bring bad actors to account. With the hearings and settlements initiated by the Edelson firm, a step has been taken in that direction.

**[End Court Order] See *Ex. 42* for Entire Court Order November 2, 2022**

170.    In May 2022 while prosecuting THE STATE BAR OF CALIFORNIA and its actors in Government Claims Act litigation before it was obstructed via enterprise control with JOHN C.

40                                            22-CV-1616-BAS-DDL

GASTELUM, ROBERT GEORGE RETANA, ESQ. and SUZANNE CELIA GRANDT, ESQ. Plaintiff delivered a public records request for information known to The State Bar of California about CATANZARITE LAW CORPORATION actors, and about Thomas Girardi.

171.   After noticing Plaintiff of extending production time in May 2022, Girardi's disbarment was announced, which would otherwise seem a coincidence if not for the related "read and react" strategy of the enterprise.. His penalty for his "unquestionably criminal" conduct was a mere $2.2 million, after perhaps $1 billion or more was stolen using *protection* of THE STATE BAR OF CALIFORNIA, using trust accounts and IOLTA.

172.   *Stolen*, an insurance company foot the bill for the conduct knowingly carried on by THE STATE BAR OF CALIFORNIA, ratified by the Board of Trustees and others, and concealed from the public: where THE STATE BAR OF CALIFORNIA acted only in the most extreme circumstance perhaps ever witnessed, *after* Plaintiff made a public records request.

**C. State Auditor Reveals More PORA, Protectionist Acts, Threat of Continuing**

173.   According to the California State Auditor, "An attorney exhibited a pattern of failing to provide settlement payments or to provide files to clients until the client complained. The State Bar closed cases against this attorney 28 times over 16 years using nonpublic measures and all of the other closed cases were closed outright. However, complaints against the attorney continued to increase. From 2014 to 2021, the attorney was the subject of 165 complaints, Despite the high number of complaints, many for similar matters, the State Bar has imposed no discipline, and the attorney still maintains an active license.   In one early case, the State Bar issued a warning letter to the attorney for failing to release a client's file for nearly a year. However, the attorney has continued to generate complaints from other clients for this same issue. In the 11 years since the State Bar issued that warning letter, complaints have led the State Bar to issue 11 directional letters requiring the attorney to return client files."

174.   According to the California State Auditor, "The State Bar closed multiple complaints that were made against an attorney over the course of about 18 months, each alleging that the attorney had failed to pay clients their settlement funds. Generally, the State Bar closed each complaint after the attorney finally paid the client, noting either that the matter was resolved between the attorneys

and the complainant after the client withdrew their complaint or that there was insufficient evidence to support that the attorney's misconduct warranted discipline. A pattern was discernible from five complaints the State Bar received within one year alleging that the attorney's clients were not receiving settlement payments. However, the State Bar did not identify the need to examine the attorney's bank records until it had received more than 10 complaints over two years. It did not examine the records for another six months, during which time the State Bar continued to receive similar complaints. When the State Bar finally examined the client trust account, it found that the attorney had misappropriated nearly $41,000 in total from several clients. The State Bar ultimately filed charges against the attorney stemming from these more recent complaints. After the State Bar questioned the attorney about discrepancies in the client trust account, the attorney admitted to using client funds for personal reasons."

175.    According to the California State Auditor, "In another state, an attorney was charged with several violations of that state's Rules of Professional Conduct, including continuing to advertise and practice law while suspended." The attorney requested to permanently resign from practicing law in that state and in all other jurisdictions—specifically including an agreement to resign in California—in lieu of receiving discipline in that state. The supreme court of that state issued an order approving the request and further ordered that the attorney be permanently prohibited from practicing law, an action that state considered to be a public reprimand. With limited exceptions, California state law provides that the final order of discipline from the other jurisdiction is conclusive evidence that the attorney is culpable of misconduct in California. However, the State Bar concluded that it could not use the other state's supreme court order permanently prohibiting this attorney from practicing law as conclusive evidence of a final order of discipline because the other state's supreme court order did not include a final determination or finding on the attorney's misconduct. Instead, the State Bar used its authority to open an investigation against the attorney. Ultimately, the State Bar issued the attorney only a private warning letter, thereby permitting the attorney to continue to practice law in California despite the attorney's agreement in another state to resign from practicing law in all jurisdictions. Subsequent to the warning letter, the attorney resigned from the California State Bar."

22-CV-1616-BAS-DDL

176.   According to the California State Auditor, "The supreme court of another state temporarily suspended an attorney in that state in 2020 for misappropriating and misusing client funds. The attorney was also licensed to practice law in California. The supreme court in that state also placed restrictions on the attorney's handling of client funds, concluding that the attorney posed a substantial threat of serious harm to the public. According to documents in the State Bar case file, that state's supreme court ultimately disbarred the attorney in early 2022. Although the State Bar had been aware of the attorney's temporary suspension in the other state since April 2021, it had not imposed discipline as of February 2022."

177.   According to the California State Auditor, "An attorney licensed to practice law in California and in another state was suspended in the other state in 2007. The attorney did not notify the State Bar of the suspension within the statutory 30-day deadline and, in 2008, let their California license become inactive. When seeking to become active again in 2021, the attorney informed the State Bar of the 2007 discipline. The State Bar might have readmitted the attorney without considering the past misconduct if the attorney had not shared this information. As of February 2022, the State Bar is considering potential discipline of the attorney for the misconduct in the other state and for failing to disclose the past misconduct to the State Bar."

178.   According to the California State Auditor, ""Early one year, the State Bar closed five cases alleging client trust account violations by an attorney as de minimis. Later that same year, the State Bar received another complaint pertaining to a $435 overdraft of the attorney's client trust account and contacted the attorney to obtain further information. The attorney explained that the complaint was due to a mistake. The State Bar accepted this explanation and closed the complaint without taking further action, incorrectly noting that the attorney had no prior history of reportable actions.   During this period, the State Bar was investigating another complaint against the same attorney that involved, among other issues, an alleged client trust account violation. The State Bar did not forward any of the complaints described above to the investigative team to determine whether they were connected and ultimately closed the client trust account violation complaint it was investigating as well. Within a month, the State Bar received three more client trust account complaints. The State Bar requested additional information from the attorney, who early in the next

22-CV-1616-BAS-DDL

year informed the State Bar that the violations were due to a series of personal crises. By the time the State Bar subpoenaed the attorney's client trust account records, the attorney had withdrawn or attempted to withdraw funds from the client trust account nearly 50 times, totaling approximately $5,400 for the payment of personal expenses. Although the attorney deposited personal funds to reimburse the expenses, the State Bar concluded that the attorney had commingled assets in a client trust account in willful violation of the Rules of Professional Conduct and suspended the attorney."

179.    According to the California State Auditor, "From 2015 through 2021, an attorney was the subject of 35 complaints, 30 of which were alleged client trust account violations. Of these complaints, the State Bar closed 12 with warning letters, five with resource letters, and one with a directional letter. The rest, including the attorney's most recent client trust account complaint in December 2021, were closed in the intake phase without further investigation. The State Bar inappropriately closed the December 2021 client trust account complaint without contacting the attorney for additional information, despite having issued a warning letter to the attorney just one month earlier for 11 complaints of alleged client trust account violations."

180.    According to the California State Auditor, "An attorney was the subject of 28 complaints over a five-year period, one of which was initiated after a bank notified the State Bar that the attorney failed to maintain funds that were received for a client in a client trust account. Over this period, 10 of the 28 complaints involving the attorney alleged client trust account violations. At the time the State Bar reviewed the violation reported by the bank, the attorney had two other disciplinary matters open, one of which alleged a client trust account violation. Although State Bar intake staff noted the open investigations in their review of the violation reported by the bank, they did not forward the complaint to be investigated by the staff who were investigating the other open complaints. Instead, the State Bar closed the complaint as de minimis."

181.    According to the California State Auditor, "To explain two overdrafts of a client trust account that occurred in a particular month, an attorney submitted a copy of the account's bank statement for the prior month, but not for the month when the client trust account was actually overdrawn. Instead, the attorney submitted a narrative providing details of certain transactions for the month in question and then asserted that the overdraft was caused by charges the attorney expected

44                                    22-CV-1616-BAS-DDL

would be paid from a different account. Instead of requesting the bank statement for the month in question, the State Bar accepted the attorney's explanation and closed the case."

182.    The foregoing conduct constitutes wire fraud, bank fraud, mail fraud, carrying on of unlawful activity, accepting proceeds of unlawful activity, not to mention antitrust violations.

**D. More PORA of the Enterprise**

183.    Disclosed to Plaintiff by THE STATE BAR OF CALIFORNIA, but still carried on, "*In Re Perrine* (2007), Catanzarite did not tell the Court that his client, who was declaring bankruptcy, deeded his home to Catanzarite. In bankruptcy, the person declaring bankruptcy cannot sell or give away without telling the Court. Catanzarite took the property to pay for his fees, but did not tell the Court about this, violating this strict rule. The Court took away all of Catanzarite 's fees: "Given the gravity of Catanzarite's non-disclosure. the court will deny all fees to Catanzarite for legal services rendered to Perrine to the petition date due to its failure to comply with Section 329(a) and Rule 2016(b). Catanzarite was ordered to give back either his fees, or the property he took. (p. 586)."

184.    Disclosed to Plaintiff by THE STATE BAR OF CALIFORNIA, but still carried on, using the postal mail, wire communications, with intent to defraud, and ongoing protection of the enterprise, "*In Alexandros v. Cole* (2011), Catanzarite violated court rules by making statements to the court without any proof. The court said: "But here plaintiffs [Catanzarite] admit they violated several rules. They also continued to cite the excluded evidence in their reply brief even after defendants noted the error in their briefs." The Court pointed out that Catanzarite' s brief made 39 unsupported factual statements and paragraphs lacking references. Some statements were completely incorrect. **Catanzarite does not care about the truth in making statements to the Court.**" [emph.]

185.    Also using the postal mail, wire communications, with intent to defraud, and ongoing protection of the enterprise, carried on by THE STATE BAR OF CALIFORNIA, "In July 2011, Catanzarite substituted into five actions pending in Los Angeles Superior Court, representing a group of clients that included Ronald Weinstock. Catanzarite alleged it had a written fee agreement [but did not produce one] with these clients providing that the firm would be paid on contingency. Its compensation was to include membership interests in Newlife Sciences, LLC, at that point in the (allegedly wrongful) possession of some of the adverse parties. Catanzarite also alleged it had a lien

45                        22-CV-1616-BAS-DDL

on any recovery in the five Weinstock actions [which is an ongoing scheme of *ultra vires* representation as shown for ANTHONY B. SCUDDER for instance, extortion for fees to produce false evidence or testimony or conceal material facts under that threat, followed by relentless litigation without a retainer or legal authority against its *own clients* which sometimes involves theft of their homes in the collection of unlawful debts]. In February 2012, Catanzarite moved to withdraw from representing the Weinstock parties, and the trial court granted the motion. Catanzarite alleged that a Gordon & Rees lawyer was told about the attorney lien at that time. The Weinstock parties hired another law firm to represent them." *Catanzarite Law Corporation v. Gordon Reese, LLP*, No. G047968, 2-3 (Cal. Ct. App. Oct. 15, 2013)

186.    Using the postal mail, wire communications, with intent to defraud, and ongoing protection of the enterprise, "[i]n *Edwards v. Noroski* (2013), the Court punished Catanzarite for saying one thing, then switching his story. **The court stated that Catanzarite's case was a "sham."** First, Catanzarite claimed that the dental practice run by Dr. Noroski and Dr. Schneider should give back money to patients who had been treated at the dental office, but did not say anything was wrong with the dentistry. Then, Catanzarite realized he had no case, because the plaintiffs who were former patients had their depositions and said they were happy with Dr. Noroski and happy with Dr. Schneider. The plaintiffs dropped out and Catanzarite had no case. Catanzarite asked to file an amended complaint that now said that the dental services were bad. The Court punished Catanzarite...for wasting everybody's time." This Court cannot trust one filing from these criminals.

187.    Seeking to defraud defendant Bank of America through Denise Pinkerton under false pretenses violative of 18 U.S.C. § 1344, CATANZARITE LAW CORPORATION "[p]laintiffs' reliance on the fraudulent joinder standard is misplaced; that analysis is used when the removing party asserts that a defendant named before removal was fraudulently joined." *Pinkerton v. Bank of Am., N.A.*, Case No. 5:19-cv-374-Oc-32PRL, 2 (M.D. Fla. Nov. 26, 2019)

188.    The foregoing is not only known to, carried on, and ratified by THE STATE BAR OF CALIFORNIA, but also to JOHN C. GASTELUM in OCSC Case No. 30-2021-01237499. *Ex. #36*.

46                          22-CV-1616-BAS-DDL

189.    Upon the filing of Plaintiff's application for a restraining order in OCSC Case No. 30-2021-01237499, Honorable Richard Lee recused, showing the control of Office of General Counsel over enterprise interests, where Carissa Andresen represented THE STATE BAR OF CALIFORNIA.

190.    JOHN C. GASTELUM knows "[e]xhibit R, that "Order Affirming Order of Bankruptcy Court" upholds sanctions for "violation of a preliminary injunction." *Id.* **at p. 4.**

191.    Knowing that Plaintiff faced irreparable harm by the enterprise, JOHN C. GASTELUM also disregarded "[e]xhibit S, that May 9, 2020 "Order Liquidating and Awarding Compensatory Sanctions" orders Mr. Catanzarite must pay $49,020.50" and "$11,639.25" for sanctionable conduct." ***Ibid.***

192.    To protect the enterprise, JOHN C. GASTELUM ignored "[e]xhibit T, that January 15, 2020 "Order for Preliminary Injunction and Imposing Sanctions" finds that Catanzarite violated a court-ordered preliminary injunction by "filing of the Henkin-Looper Case and the associated lis pendens," (¶ 3), and "[a]ny further violations of this Court's Orders, the Bankruptcy Code, Bankruptcy Rules, or the Local Rules will result in an order requiring Mr. Catanzarite to show cause why his pro hac vice status should not be revoked." (¶ 11). ***Ibid.***

193.    JOHN C. GASTELUM knows that ¶ 18: "For Exhibit U, that May 8, 2020 Order to Show Cause Why Attorney Kenneth Catanzarite, Esq.'s Pro Hac Vice Status Should Not Be Revoked" found Mr. Catanzarite filed a "false affidavit" to certify his pro hac vice status, and that he was in fact suspended from the practice of law in New York, that he "refuses to be governed by" the rules of the court and professional conduct in that jurisdiction, that a website he published "contained misleading information" and "otherwise sought to undermine the bankruptcy process," that he engaged in "numerous discovery violations" resulting in "sanctions," that he engaged in "unilaterally noticing depositions at an inconsiderate and inconvenient time and place," "violation of preliminary injunction," and that he filed a "false emergency" that was "completely meritless." ***Ibid.***

194.    JOHN C GASTELUM knows "[f]or Exhibit V, testimony from a party [Richard Carlson] involved shows that Catanzarite improperly solicited him at his home and the party did not believe he had suffered any damages." ***Id.*** **at p. 5.**

47                                22-CV-1616-BAS-DDL

195.   JOHN C. GASTELUM knows "[f]or Exhibit X, an order to expunge notice of pendency of action (lis pendens) was ordered removed in Orange County Superior Court on June 11, 2021 by Honorable Judge Randall Sherman. As per the foregoing, the lis pendens was found to violate a court order, and $13,600 in costs were imputed to Catanzarite or his client." *Ibid.*

196.   JOHN C. GASTELUM knows the patterns of racketeering converging on Plaintiff, and with deliberate disregard, did deny Plaintiff's application for a restraining order, even though: "Exhibit Y, a ruling is listed (#5) grants the Application to Expunge Notice of Pendency of Action [Lis Pendens]" "as to all three lis pendens." Notably, the same docket of rulings from Honorable Judge Sherman reflects a separate ruling (#2) in "Mobile Farming Systems, Inc. ("MFS") vs. Probst" which notes that "MFS's attorney [Catanzarite Law Corporation] wasn't duly hired by MFS," without noting that Catanzarite was suing MFS in the Pinkerton/Root Action derivatively, or that it corruptly assumed the role of legal counsel for Cultivation Technologies, Inc. ("CTI") which it was also suing through MFS." *Id. at p. 5.*

197.   JOHN C. GASTELUM knows "[s]ince September 14, 2018, I [Plaintiff] have had, at various times, suicidal thoughts in having to defend frivolous actions where the Courts hold Catanzarite, and each of them, to be unethical and the same claims are rejected or result in their disqualification – and the State Bar willfully enables the conduct against public interest. [Plaintiff had] since commenced a regimen of anti-depressants through psychiatric care [leading to an initial onset seizure in December 2022], although [he does] still suffer from severe loss of enjoyment of life, embarrassment, shame, depression, fear, and anxiety resulting from Defendants' abuse of their position of authority. [He is] unable to obtain director and officers insurance because of the unlawful scheme directed toward me and Defendants' failure to act. As an entrepreneur, [he doesn't] know how [he] will start another company, thereby affecting [his] career [and happiness] in perpetuity."

198.   On Wednesday, February 12, 2020, a telephonic deposition of Richard Carlson shows deliberate obstruction of justice and judicial fraud by KENNETH CATANZARITE, ESQ., and implies ongoing enterprise protection schemes to defraud the public in his favor. *Ex. 36, pp. 7-206.*

199.   Consistent with the enterprise patterns, and much like ANTHONY B. SCUDDER, AMY JEANETTE COOPER, CLIFF HIGGERSON, JAMES DUFFY, each enterprise pawns despite

48

22-CV-1616-BAS-DDL

their malice toward Plaintiff – Carlson does not understand what is being filed on his behalf in state and federal courts across the country by CATANZARITE LAW CORPORATION actors. ***Ibid***.

200.    On Tuesday, October 4, 2022, the U.S. Attorney's Office for Central District of California announced a "former California lawyer has been sentenced to 37 months in federal prison for lying to his clients about winning cases for them and then deceiving them with bogus documents – some with the forged signatures of judges, the Justice Department announced today. Matthew Charles Elstein, 52, of Redondo Beach, was sentenced late Monday afternoon by United States District Judge Mark C. Scarsi, who also ordered him to pay $254,354 in restitution. Elstein pleaded guilty in November 2021 to one count of wire fraud. Elstein was a licensed California attorney from December 1994 until the State Bar of California ordered him inactive in March 2019. From June 2015 to July 2018, Elstein engaged in a scheme to defraud his clients by falsely claiming he obtained favorable legal resolutions for them, when in fact the favorable resolutions had never been obtained" ***Ex. 81, p. 2.***

201.    On May 12, 2021, Bloomberg Law announced "A jury returned the first conviction [in an illegal referral scheme; see Richard Carlson deposition] April 15, finding lawyer Robert Slater guilty of 11 felonies involving conspiracy and fraudulent insurance benefit claims." ***Ex. 44, p. 3***.

202.    For Robert Irving Slater SBN #67572, he was only "suspended" by THE STATE BAR OF CALIFORNIA because he "failed to pay fees" as of July 1, 2022. ***Ex. 46, p. 2***.

203.    A United States Department of Justice release on Friday, September 22, 2017 reads "Former Clerk in Orange County Superior Court Sentenced to Over 11 Years in Federal Prison for Racketeering Offense Stemming from Bribery Scheme to 'Fix' Criminal Cases and Traffic Charges." ***Ex. 13, p. 2.***

204.    A United States Department of Justice release from Office of Public Affairs on Thursday, October 13, 2022 headline reads "Justice Department Finds Civil Rights Violations by Orange County, California, District Attorney's Office and Sheriff's Department in Use of Jailhouse Informants" and "Assistant Attorney General Kristen Clarke of the Justice Department's Civil Rights Division announced today, based upon a thorough investigation focused on custodial informant activity from 2007 through 2016, that the Orange County District Attorney's Office and the Orange

22-CV-1616-BAS-DDL

County Sheriff's Department operated a custodial informant program that systematically violated criminal defendants' Sixth Amendment right to counsel and Fourteenth Amendment right to due process of law. Specifically, the department found reasonable cause to believe that Orange County prosecutors and Sheriff deputies violated the Sixth Amendment by using jailhouse informants to elicit incriminating statements from people who had been arrested, after those individuals had been charged with a crime. The department also found that Orange County prosecutors violated the Fourteenth Amendment by failing to disclose exculpatory evidence about those custodial informants to criminal defendants. The department believes that OCDA and OCSD stopped using informants as agents of law enforcement to obtain statements from charged defendants in the Orange County Jail in 2016." *Ex. 12, p. 2.*

205.    An article from Los Angeles Times on December 5, 2022, headlines about THE STATE BAR OF CALIFORNIA's "Michael Avenatti facing more prison time for stealing millions of dollars from clients" and reads "Michael Avenatti, the once swaggering celebrity lawyer who was undone by his proclivity for embezzlement and fraud, faces a potentially long prison term when he is sentenced Monday for dodging taxes and stealing millions of dollars from clients. Avenatti, 51, is already serving five years in prison for his extortion and fraud convictions at two trials in New York. Federal prosecutors in California have asked Selna to order Avenatti locked up for an additional 17 years and six months. Avenatti pleaded guilty in June to four counts of wire fraud for stealing money from clients and one count of obstructing collection of federal payroll taxes from his Seattle coffee business, now defunct. One of the law clients he robbed, Geoffrey Ernest Johnson, was a mentally ill paraplegic on disability." *Ex. 83, p. 2-3*.

206.    On March 7, 2022, it was announced that "Orange County embattled District Attorney Todd Spitzer is now under investigation by OC's top law enforcement watchdog." *Ex. 53, p. 2.*

207.    Amid calls for his resignation, "we are seeking to establish the necessary relevant facts about what was said at the meeting and what the consequences of those statements were and continue to be," O.C. Office of Independent Review Executive Director Sergio Perez said. "We want to make sure that folks can trust the criminal justice system, and that prosecutions are being carried out lawfully and justly, and so that's our goal at the end of the day." *Id. at p. 3.*

208.   *People for Ethical Operation of Prosecutors & Law Enf't v. Spitzer*, 53 Cal.App.5th 391, (Cal. Ct. App. 2020) suggests that the extortion for evidence through threat of violence of death and constitutional violations continue in Orange County between the enterprise and local law enforcement. *Ex. 11.*

209.   According to an article in U.S. News & World Report entitled "Prosecutor fired in California County Over Evidence Scandal," "A former Prosecutor of the Year who is campaigning to become a judge has been fired from his job in the Orange County district attorney's office after an internal investigation into the withholding of evidence in a murder case." *Ex. #47, p. 2.*

210.   According to THE STATE BAR OF CALIFORNIA, Ebrahim Baytieh SBN #184987 has no disiciplinary history despite ¶ 198. *Ex. 48.*

211.   According to an announcement from California Department of Insurance, "Moses Luna, 73, of Newport Beach, was arrested yesterday on 20 felony counts of insurance fraud...An investigation by the Department of Insurance and the Orange County District Attorney's Office found Luna, a worker's compensation attorney, created Adelante Interpreting, Inc...then fraudulently billed 20 separate insurance carriers for translation and interpreting services." *Ex. 49.*

212.   According to THE STATE BAR OF CALIFORNIA, Moses Luna maintains an active license to practice law. *Ex. 50.*

213.   According to the US Attorney's Office September 1, 2015, "Orange County Attorney Charged with Fraud and Money Laundered Related to Real Estate Purchases and Other Investments...Stephen Young Kang...was named in a 25-count indictment filed in United States District Court of Los Angeles" *Ex. 51.*

214.   According to U.S. Attorney's Office for Central District of California on Monday, February 29, 2016 "Orange County Attorney Who Pleaded Guilty to Federal Charges in $8 Million Fraud Scheme Sentenced to Over Five Years in Prison." USAO – California, Central Component. Press Release Number: 16-039.

215.   Years later, THE STATE BAR OF CALIFORNIA decided Mr. Kang's conduct apparently gave rise to its disciplinary duties, and thereby submitted "Recommendation of Summary Disbarment" on September 21, 2018. *Ex. 52.*

216.   For defendants SUZANNE CELIA GRANDT, ESQ. and ROBERT GEORGE RETANA, ESQ., obstruction of federal proceedings and judicial deception for the enterprise is not new. As shown Thursday, July 20, 2017, they appeared for defendant THE STATE BAR OF CALIFORNIA in No. C 17-02798 before the Honorable William H. Alsup in Northern District of California to suppress the rights of a Ty Clevenger. *Ex. 2.*

217.   According to the transcript before the Honorable William H. Alsup:

"THE COURT: Well, all right. I want -- I want you all -- I'm very familiar with what happened here. And I was misled on purpose last time we were here, because it was important for me to know -- it could be that Mr. Clevenger is some kind of shyster and deserves to be disbarred. I don't know. I know nothing about him. But he brought this lawsuit trying to stop what he said was a First Amendment violation that you, the State Bar, were punishing him because he wrote unflattering things about the State Bar. I haven't read any of them. I don't know if it's unflattering or not. It was important to me at the last hearing, and I think you were the one who was here, I said: Will he be able to take discovery in the State Bar court and raise all these issues in the State Bar court? And you told me flat out "yes" at least three times. Then about two weeks later we get a letter from your side saying that was false, untrue, and you wanted to correct it. Well, fine. I'm letting you correct it. But maybe the punishment for that is he's going to get a chance to take some depositions in this Court that he could use because your court won't allow it. Now, you can now respond. Go ahead.

MR. RETANA: Okay. Thank you, Your Honor.

So first of all, first and foremost, you know, we apologize to the Court for any misunderstanding.

THE COURT: Any? There was -- I don't know if it was false on purpose, but it was reckless --

MR. RETANA: Well --

THE COURT: -- what you told me.

MR. RETANA: Your Honor, I could assure you that Ms. Grandt -- it was not her intention to make any false statements. *Ex. 2, p. 4.*

THE COURT: Get the State Bar to look into [SUZANNE CELIA GRANDT's] conduct. Maybe my committee here in this Court, the committee that we have here for admitting to practice in this Court ought to look into Ms. Grandt's conduct. Maybe we'll have two investigations going at once. *Ex. 2, p. 5.*

22-CV-1616-BAS-DDL

MR. RETANA:  Well, Your Honor, the point I would like to make is that there's a couple of different issues here. First of all, the misstatements that were made, or inaccurate statements, deal with the extent to which discovery is available in the State Bar court.

…THE COURT:  Well, then take a writ. I'm sorry. I believe I've got enough jurisdiction to impose the sanction that I am imposing, which is that he gets to take a two-hour deposition.  And next time the State Bar will be a little bit more honest with the poor federal judge….This is strictly because you -- I'm making this order because Ms. Grandt told me something that wasn't true, and I relied on it." *Ex. 2, p 15.*

218.    Sole practitioner and ethnic minority lawyer Sanjay Bhardwaj shows reality of State Bar Court's proceedings within the enterprise, too. Opining on evidence presented leading to his disbarment and while the Caucasian group CATANZARITE LAW CORPORATION, KENNETH CATANZARITE, ESQ., NICOLE MARIE CATANZARITE WOODWARD, ESQ., JIM TRAVIS TICE, ESQ., BRANDON WOODWARD, ESQ., and TIM JAME O'KEEFE, ESQ. commit serial schemes to defraud by wire known to Board of Trustees and Office of General Counsel, "a handwriting expert Professor with the Department of Linguistics at California State University Fresno…employed at CSU Fresno continuously since 2004…[whose] specialization include Phonetics and Speech Signal Processing…applied to the questions [his expertise]…Full Member of the Acoustical Society of America…associate editor for the society Journal…[published] book Speech Spectrum Analysis (Springer, 2011) in which a number of advanced techniques for the analysis of speech sound." *Ex. 38.*

219.    The expert Sean A. Fulop professionally opines "the statement of the oath from the court clerk for the swearing in of Paul Thorndal [in prosecution of Bhardwaj] shows strong evidence of tampering" and "proposition that the segment of the recorded court proceeding involving witness Paul Thorndal has been tampered with has been established with 100% certainty, [this finding] as the proverbial "smoking gun." *Ex. 38.*

**E. Predicate Racketeering Activity Harming Plaintiff in Particular Before Converging**

220.    Case No. 94-O-19410 filed "04/03/1998" against "Respondent Catanzarite, Kenneth Joseph" with "Lead Attorney: Tice, Jim Travis" and "Prosecutor: Office of Chief Trial Counsel" leads to a "Plea" on "05/29/1998." *Ex. 85.*

22-CV-1616-BAS-DDL

221.   Through the accrual of unlawful debts of legal fees to steal its own client's home, CATANAZARITE LAW CORPORATION did record a loan for them on March 17, 2005.

**New Loan Recorded**

2005-03-17 – CATAZARITE LAW CORP to DEBORAH BREUNER DAVIS

Primary Lender Details

| | |
|---|---|
| Lender | CATAZARITE LAW CORP |
| Loan Amount | $120,000 |
| Lender Type | Unknown or not provided |
| Loan Type | Conventional or Unknown |
| Line of Credit Loan | Not a Credit Line or Unknown |

222.   Using the postal mail and wire communications, with intent to defraud, and ongoing protection of the enterprise, CATANZARITE LAW CORPORATION did foreclose upon the home of its own client Deborah Breuner Davis in 2006 located in 26000 Vista Valley Ct. Steamboat Springs, CO 80487 according to a report from Ownerly.com showing market value of "$1,313,610."

## Owners

2 | Owners Found

ROBERT J VALUSEK

CHARLA L VALUSEK

## County Assessor Records

| | |
|---|---|
| Owner Occupied | |
| Ownership Vesting Type | Heirs |
| Mailing Address for Taxes | 26075 Vista Valley Ct Steamboat Springs, CO 80487 |

## Market Value

| | |
|---|---|
| Land Value | $285,000 |
| Improvements | $1,028,610 |
| Total Value | $1,313,610 |

223.   With intent to conceal and conceal its racketeering gains after the collection of an unlawful debt, KENNETH J. CATANZARITE of CATANZARITE LAW CORPORATION did

transfer the home to ROBERT J. VALUSEK and CHARLA L VALUSEK for a value of $99,500 with vesting in "Heirs" indicating a trust is used.

## Deeds

2 | Deeds
    | Found

### Ownership Change

2017-12-01 – From KENNETH J CATANZARITE to VALUSEK, ROBERT J|VALUSEK, CHARLA L

224.    Deborah Breuner Davis did publish online dozens of ORANGE COUNTY SUPERIOR COURT case numbers in which CATANZARITE LAW CORPORATION was sued therein, where the records were alleged to have been manipulated by court clerks, for which clerks were convicted of racketeering for the same in ORANGE COUNTY SUPERIOR COURT in 2017.

225.    Using the postal mail, wire communications, with intent to defraud, and ongoing protection of the enterprise, also known to JOHN C. GASTELUM and THE STATE BAR OF CALIFORNIA, "In or around [2017], Catanzarite solicited plaintiff Richard Carlson at his home – who also testified that he did not believe he had suffered any damages before Catanzarite enrolled him as a client." [leading to Daymark Matter]. "This complaint is on behalf of a putative class of 13,858 beneficiaries who invested an average of $31,561 per person…gross proceeds of $437,315,000." This, alone, constitutes 13,858 violations of Bus. & Prof. Cod. § 6104.

226.    Using the postal mail, wire communications, with intent to defraud within the same judicial district, and ongoing protection of the enterprise, another series of "cases" involving JIM TRAVIS TICE, ESQ, says: "Catanzarite Law Corporation, Kenneth J. Catanzarite and Tim James O'Keefe for Plaintiffs and Appellants…Renato Corzo and his partnership sued the partnership's accountants for malpractice and breach of fiduciary duty. Defendant accountants filed a demurrer arguing that the lawsuit was barred by the statute of limitations. The trial court agreed. Corzo asked for and received leave to amend his complaint. Corzo's next complaint included new facts he believed tolled the statute of limitations. Defendants demurred again. The trial court sustained the demurrer without leave to amend, finding that the amended complaint was a "sham" pleading engineered to avoid the statute of limitations. Was it? Yes. We agree with the trial court that Corzo's amended complaint was a sham pleading. Because Corzo has not demonstrated he can amend the pleading to

55                          22-CV-1616-BAS-DDL

state a viable cause of action not barred by the applicable statute of limitations, we affirm the trial court's dismissal of the amended complaint with prejudice." State Action 2, [ROA #2], Exhibit O. B285691. JIM TRAVIS TICE, ESQ. was disqualified by Court of Appeal, also found to have appeared for "Corbell Partnership" without authority, and having filed an appeal without authority, too.

227.   Using wire communications with intent to defraud after a $14 million dollar financing was announced with a headline "CTI Shareholders from DR MO ZAKHIREH!!! Urgent!!!," ANTHONY B. SCUDDER from the email tony.scudder@yahoo.com commences with "Dear CTI Shareholders, By way of brief introduction my name is Dr. Mo Zakhireh, and I am a fellow CTI shareholder....What I would like to see, for all our best interest, is the current team being replaced and the original 13 or more million shares they diluted out of our company be restored....Please respond to Tony Scudder at 714-718-3123. He has agreed to coordinate our efforts." Attached file: "CTI Forced Disclosure 4.24.17.pdf" ANTHONY B. SCUDDER knew this was to obtain money and property and used the wire with intent to defraud.

228.   Importantly as it relates to the fraudulent scheme and improper purposes of later overt acts intending to defraud by wire involving ANTHONY B. SCUDDER, the "CTI Forced Disclosure" contained no reference to Mobile Farming Systems, Inc. as being a shareholder of CTI, because MOHAMMED ZAKHIREH and ANTHONY B. SCUDDER knew that it was not and is not.

229.   With intent to defraud Plaintiff and with malice on May 2, 2017, MOHAMMED ZAKHIREH and ANTHONY B. SCUDDER contacted Alan Brochstein, CFA leading to an article headlined "Cultivation Technologies, Inc. Sued for Alleged Fraud, Insiders Self Dealing and Gross Mismanagement." Importantly as it relates to each MOHAMMED ZAKHIREH and ANTHONY B. SCUDDER's later conduct, MOHAMMED ZAKHIREH is quoted "[t]here are approximately 92 shareholders who have invested in this company [CTI]."

230.   Through THE STATE BAR OF CALIFORNIA attorney James Cato Ferguson, JAMES DUFFY, RICHARD FRANCIS O'CONNOR, and MOHAMMED ZAKHIREH agree to dismiss the predicate lawsuit challenging CTI's Preferred Series A shares with prejudice, and RICHARD FRANCIS O'CONNOR, JR. is paid $75,000 on or around June 13, 2017 as consideration.

231. With intent to defraud, and for the improper purpose of obtaining more money from CTI, and to malign Plaintiff with malice, RICHARD FRANCIS O'CONNOR, JR. and MOHAMMED ZAKHIREH did contact and conspire to have Plaintiff investigated by the United States Securities Exchange Commission (SEC) without regard for the truth and material facts known to each of them.

232. In July 2017, Plaintiff informed the SEC's Janet Moser that the United States Securities Exchange Commission is being defrauded by RICHARD FRANCIS O'CONNOR, JR. to extort more money from the company, but that Plaintiff would cooperate with the SEC as may be requested.

233. Starting July 2017, the SEC did waste resources in furtherance of RICHARD FRANCIS O'CONNOR, JR., ANTHONY B. SCUDDER, and MOHAMMED ZAKHIREH's malice against Plaintiff, and thereafter did investigate Plaintiff and CTI, and subsequently determine that neither Plaintiff nor CTI's conduct gave rise to the SEC's administrative powers in January 2018.

234. Importantly, as it relates to KENNETH CATANZARITE, ESQ., JIM TRAVIS TICE, ESQ., and other conspiring with them at THE STATE BAR OF CALIFORNIA including ELI DAVID MORGENSTERN, ESQ., GEORGE SARGENT CARDONA, ESQ., SUZANNE CELIA GRANDT, ESQ., and RUBEN DURAN, ESQ. – the United States possesses approximately 25,000 pages of securities documents from its investigation of Plaintiff LA-4837. Plaintiff incorporates those documents here to show what was actually known by each person signing each securities document, and what followed as part of this fraudulent scheme using the mail, wire, in conspiracy to defraud the UNITED STATES OF AMERICA knowingly, violative of 18 U.S.C. § 371.

235. In August 2018, Plaintiff's company CTI where he was Chief Executive Officer, growing rapidly and after retaining investment bank DelMorgan & Co. to raise $25 million and pursue other transactions including M&A, announces $5 million financing with Tidal Royalty Co.

236. With intent to defraud, KENNETH CATANZARITE, ESQ. and CATANZARITE LAW CORPORATION did contact Plaintiff's company for Roger Root through Denise Pinkerton as "attorney-in-fact," then informed that Mr. Root was offered stock in CTI but declined. Undeterred due to enterprise control, CATANZARITE LAW CORPORATION continues its schemes to defraud.

237. PDF'ed by Plaintiff on "8/17/2018," an email from ANTHONY B. SCUDDER sent from "Tony Scudder tony@cultivationtech.com" delivered on Friday, August 21, 2015 To: "Richard

O'Connor richard@cultivationtech.com, Justin Beck justin@cultivationtech.com, Richard Probst rick@cultivationtech.com, Amy Cooper amy@cultivationtech.com" and CC: "Christopher Tinen ctinen@horwitzarmstrong.com, Rana Foroughi rana@cultivationtech.com headlined

**"Roger Root – Jolly Roger Bus Opportunity"** reads:

"Roger [Root] is excited about what we are doing. Is trying to figure out a way to come up with funds for his [CTI] shares.

He has a son who has a dispensary in Aberdeen Washington.
His sons Name is  Brent Rothwell
360.591.9732 Cell
360.627.9421 Dispensary

Roger said we could use his name to see if we could connect with his son for a Washington presence.

We need to have someone from our team call to explore.

Best Regards,
Tony Scudder
Executive Vice President of Client Relations
Cultivations Technologies Inc.
3 Park Plaza
Irvine, CA 92614
Cell 714.728.3123
Office (888) 851-9802
tony@cultivationtech.com
https://www.linkedin.com/in/tonyscudder1"

*Ex. 107, p. 5*

**F. Predicate Patterns of Racketeering Converge on Plaintiff's Business & Property**

238.    Confirmed by Plaintiff as being his own testimony, and later confirmed by order:

"In June 2015, O'Connor, Probst, and Cooper executed a document titled, "unanimous written consent of directors of [CTI] [¶] amended organizational acts &resolutions" (hereafter Amended Acts). The Amended Acts stated the original organization consent of CTI's board (Organizational Consent) executed at the end of March 2015 was "made in error" and needed to be amended regarding the issuance of securities. Specifically, the Organization Consent authorized the issuance of 28,000,000 shares of CTI's common stock to MFS in exchange for the contribution of certain assets and cash consideration. The Amended Acts stated MFS failed to provide consideration and the board determined it was in CTI's "best interests" to sell the stock to its founding shareholders "the 'Founders'" pursuant to a purchase agreement attached as an exhibit. The Amended Acts listed the following Founders: (1) O'Connor; (2) Probst; (3) Cooper; (4)

TGAP Holdings (owned by Cooper/O'Connor); (5) I'm Rad (RAD) and EM2 Strategies (EM2) (owned by Beck); (6) Higgerson; (7) Aroha Holdings (owned by Scudder); and (8) Scott Unfug.

Cooper's father, Higgerson, was named one of CTI's Founders because at the time CTI was formed, MFS's "few remaining major liabilities was a $500,000 unpaid loan" owed to Higgerson. The board members of MFS/CTI negotiated a deal whereby Higgerson relinquished payment on the loan and in exchange he acquired 1,000,000 CTI Founder shares for a mere $1,000.

Beck explained Aroha acquired 1,000,000 CTI Founder shares due to Scudder's personal and professional relationship with O'Connor. Beck asserted in his complaint that the Amended Acts essentially granted all MFS shareholders the opportunity to purchase stock in CTI.

One shareholder at the time was Jolly Roger, Inc., owned by Roger Root. Beck alleged Root was contacted about whether Jolly Roger was interested in investing in CTI but Root stated he did not have the capital to pay $4,500 for 450,000 common CTI shares. Beck noted Root "expressed to Scudder that he 'supported' the structure under which CTI was being created."

Beck's complaint alleged CTI complied with the federal law requirement of authorizing a private placement memorandum (PPM) regarding the sale of its securities. CTI was obligated to disclose shareholders owning or controlling more than five percent of CTI's capital stock. MFS was not listed in the PPM. Thereafter, the Founders sold their CTI shares to others. Scudder acted as O'Connor's agent and earned commissions from selling O'Connor's shares. Cooper and O'Connor retained a transfer agent to sell CTI stock to their company TGAP. In October 2015, Duffy subscribed to buy CTI shares through the PPM. Duffy often invested in the same projects as O'Connor. In March 2016, Zakhireh (O'Connor's plastic surgeon) also subscribed to buy CTI shares through the PPM. Thus, Duffy and Zakhireh received the PPM stating MFS was not a shareholder. In addition to the above mentioned new CTI shareholders, CTI issued stock certificates to approximately 70 new shareholders and MFS was not one of them.

Beck alleged that from 2015 until his resignation from CTI's board in May 2019, the company raised $3.5 million from private investors and approximately $5.9 million from a venture capital lender, FinCanna. Beck, who had initially been retained as a CTI's consultant, was appointed as a director and officer. He occupied various positions including chairman of the board, CEO, President, and chief strategy officer.

*Beck v. Catanzarite Law Corp.*, No. G059766, 3-5 (Cal. Ct. App. Jul. 13, 2022)

239.   On September 14, 2018, with intent to defraud, KENNETH CATANZARITE, ESQ. and CATANZARITE LAW CORPORATION, using protection of THE STATE BAR OF CALIFORNIA, did use the wire to file a fraudulent derivative *and* direct action lacking standing against Plaintiff, ANTHONY B. SCUDDER, RICHARD FRANCIS O'CONNOR, JR., AMY JEANETTE COOPER, CLIFF HIGGERSON, and others. *Fincanna Capital Corp. v. Cultivation Tech.*, No. G058700, 3 (Cal. Ct. App. Jun. 28, 2021) ("(1) The Pinkerton Action. *Denise Pinkerton v. Cultivation Technologies, Inc., et al.,* OCSC No. 30-2018-01018922.")

22-CV-1616-BAS-DDL

240.    The California Court of Appeal describes the pleading:

"Catanzarite filed this lawsuit on September 14, 2018, on behalf of an elderly woman (via an attorney in fact) who invested all her retirement savings in MFS shares. This shareholder, individually and derivatively on behalf of MFS, asserted CTI, Probst, **O'Connor, Cooper**, and others involved with CTI, engaged in fraud, conversion, breach of fiduciary duty, conspiracy, fraudulent concealment, and theft of trade secrets. In addition to damages, this derivative action demanded the cancellation of CTI stock certificates, an injunction preventing the sale of CTI stock, an injunction forcing CTI to stop using MFS's trade secrets, and the payment of punitive damages and attorney fees. For this lawsuit, CTI attorney of record was Winget, Spadafora, Schwartzberg LLP (Winget). On January 23, 2019, a few days before Catanzarite filed a shareholder derivative action involving CTI shareholders, Catanzarite dismissed several defendants from the Pinkerton Action, including CTI and members of the O'Connor Faction (**O'Connor and Cooper**). It also deleted causes of action for misappropriation of trade secrets, unfair competition, and declaratory relief against CTI. In August 2019, Catanzarite amended the complaint to remove all shareholder derivative causes of action on behalf of MFS. Thus, the only defendants remaining were members of the Probst Faction (Probst, Justin Beck, I'm Rad, LLC, Robert Kamm, Robert Bernheimer, Irving Einhorn, and Miguel Motta). *Fincanna Capital Corp. v. Cultivation Tech.*, No. G058700, 3 (Cal. Ct. App. Jun. 28, 2021)

241.    The lawsuit was knowingly fraudulent, as Jolly Roger, Inc. was an MFS shareholder, and its principal Roger Root failed to provide consideration to CTI, a different company, knowingly. Every act using the wire, postal mail, also involving banks, intends to conceal the true purpose of these schemes: to pay KENNETH CATANZARITE, ESQ., CATANZARITE LAW CORPORATION, JIM TRAVIS TICE, ESQ., TIM JAMES O'KEEFE, ESQ., BRANDON WOODWARD, ESQ., NICOLE MARIE CATANZARITE WOODWARD, ESQ. without regard for the truth and without regard for any non-lawyer or even their own purported clients.

242.    In furtherance of the scheme on October 4, 2018, settlement demands from the enterprise show its fraudulent nature and improper purposes, later described by Court of Appeal.

243.   **OVERT ACT #1 in Violation of 18 U.S.C. § 1343:**

On Oct 4, 2018, at 7:32 AM, Kenneth Catanzarite <kcatanzarite@catanzarite.com> wrote:

Sam: Thanks for the time yesterday I reviewed your proposal with Mr. Root's power holder. Obviously, you and the directors and officers are working from a fully informed position with all the financial information. Keep in mind that what we demand in settlement come is the main from the Founders who from our perspective should be more than willing to put this behind them. I have reviewed the matter with my client and our response is as follows:

1. The founders collectively will deliver 10,000,000 Founders shares to Root along with whatever proportionate rights to other shares they obtained as a result of that ownership. In other words they will convey as well any stock, options, warrants and/or convertible note rights and interests to Root in proportion to 10 million to the 23 million shares issued. The founders should be willing to do this because if as you say the company has no value then they should be more than wiling to convey these shares. It allows them to retain in our view 13 million shares and rights that they bought for $13,000 and had no right to in the first place. And of course conveying the 10 million shares are shares they paid only $10,000 for in full.

2. Such securities delivery to Root shall be lien free and coupled with a representation and warranty by the  conveying defendant and CTI that the same are validly issued and acknowledge the transfer.

3. The Defendants will pay $600,000 to Root payable $200,000 now and the balance of $400,000 over 5 years at 8% fully amortized. Secured by the remaining 13 million Founders shares. Again they paid only $13,000 for these shares.

4. Root's designee gets a seat on the CTI board.

5. Mutual releases.

6. Confidentially.

7. Note that if we settle this among the Founders as a group they can agree to make these payments and CTI does not book this as a liability.

8. Carve out for New Body MD claims against those named defendants.

This offer shall remain open until the close of business on Friday October 5 whereupon the same if not unconditionally accepted is withdrawn.
Ken

The foregoing violates Federal Rules of Procedure 23.1(c) and Cal. Evid. Cod. § 956 as fraud and crime – meaning that it is not privileged, and was intended to take money and property.

61                          22-CV-1616-BAS-DDL

244.   Confirmed by Plaintiff:

"Beck maintained the Pinkerton Action has several problems from the start. First, Jolly Roger, not the Roots, purchased MFS stocks. More importantly, Roger Root knew CTI was not MFS's subsidiary because he was invited (on Jolly Roger's behalf) to participate in CTI's stock offering but he had declined. Second, Beck submitted evidence showing Jolly Roger was a "defunct" corporation when the lawsuit was filed. The documents revealed Jolly Roger filed articles of dissolution in early 2015 and was not reinstated until January 17, 2019." In other words, CATANZARITE LAW CORPORATION used the wire to revive the corporation to cover up its scheme to defraud.

Another issue was the inherent inconsistency in the requested remedies. On one hand, the Roots were willing to settle their direct action for 10,000,000 CTI Founders shares and a seat on the CTI board. On the other hand, the Roots derivative claims sought cancellation of all CTI stock certificates because MFS allegedly owned 100 percent of CTI."

*Beck v. Catanzarite Law Corp.*, No. G059766, 10 (Cal. Ct. App. Jul. 13, 2022)

245.   **OVERT ACT #2 in Violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1344**

246.   Failing the "settlement" offer intending to defraud Plaintiff and all bona fide shareholders of CTI, and to defraud its creditor FinCanna of $5.9 million and extort defendants RICHARD FRANCIS O'CONNOR, JR., AMY JEANETTE COOPER, ANTHONY B. SCUDDER, and CLIFF HIGGERSON – CATANZARITE LAW CORPORATION and TIM JAMES O'KEEFE did use the wire to disseminate a press release headlined "Catanzarite Law Corporation Files a Lawsuit against Cultivation Technologies, Inc.  Contesting Stock Ownership, Breaches of Fiduciary Duty and Director and Officer Conduct" on "October 4, 2018" reading:


ANAHEIM, Calif.--(BUSINESS WIRE)--Oct 4, 2018--On September 14, 2018, Catanzarite Law Corporation filed a lawsuit against Cultivation Technologies, Inc. ("CTI"), its shareholders, directors, officers and others. The matter styled *Denise Pinkerton, an individual as attorney in fact for Roger D. Root, et al. vs. Cultivation Technologies, Inc., et al.* was filed in the Orange County Superior Court as Case No. 30-2018 01018922. A copy of the complaint can be accessed at www.ctilitigation.com.

The complaint asserts claims on behalf of investor Roger Root, derivatively on behalf of Mobile Farming Systems, Inc. ("MFS"). Root, a resident of Florida, invested over $400,000 in MFS stock and was told by MFS representatives, including directors and officers Richard Probst, Richard O'Connor and Amy Cooper, that MFS owned CTI as a subsidiary. The lawsuit contends that MFS is the sole shareholder of CTI as of March 30, 2015 and that CTI directors and officers breached fiduciary duties to MFS as its shareholder including that CTI stock sales and other actions on and after June 30, 2015 are improper. Root also asserts individual claims for securities fraud.

For further information, contact Catanzarite Law Corporation.

View source version on businesswire.com:https://www.businesswire.com/news/home/20181004005149/en/

CONTACT: Catanzarite Law Corporation

Timothy J. O'Keefe

Telephone: (714) 520-5544

Facsimile: (714) 520-0680

Email: tokeefe@catanzarite.com

KEYWORD: UNITED STATES NORTH AMERICA CALIFORNIA

INDUSTRY KEYWORD: PROFESSIONAL SERVICES LEGAL

SOURCE: Catanzarite Law Corporation

Copyright Business Wire 2018.

PUB: 10/04/2018 07:07 AM/DISC: 10/04/2018 07:07 AM

http://www.businesswire.com/news/home/20181004005149/en

63                                                   22-CV-1616-BAS-DDL

247. On October 2, 2018 from the email address amycooper05@yahoo.com to rick@mobilefarming.com, Cooper acknowledges that Jolly Roger, Inc. was offered stock in CTI writing "[w]e wouldn't be here if Roger could've gotten his act together and signed his paperwork."

248. Confirmed by Plaintiff:

> "[S]ometime between November 2018 and January 2019, Catanzarite and the O'Connor Faction struck a deal [in a false derivative action, without court approval]. Specifically, they set into motion a scheme to save members of the O'Connor Faction from liability in the Pinkerton Action [namely, the payment of $340,000 in illegal commission to Porche long before Beck met each]. Beck provided evidence showing that around January 2019 many Pinkerton Action defendants entered into settlement agreements with Catanzarite. They agreed to "renounce" their CTI shares in favor of MFS and entered "into separate agreements to allege-now, for the first time-that CTI had been a subsidiary of MFS all along ...." On December 13, 2018, Catanzarite dismissed Porche, and in early January it dismissed Mobin, two of the primary wrongdoers named in the Pinkerton Action."

*Beck v. Catanzarite Law Corp.*, No. G059766, 10-11 (Cal. Ct. App. Jul. 13, 2022)

249. **OVERT ACT #3 in Violation of 18 U.S.C. § 1343**

250. In furtherance of the scheme, using the wire with intent to defraud on December 21, 2018, "[d]espite these issues, Catanzarite diligently prosecuted the case by serving MFS's counsel (Anderson, McPharlin & Conners) with over 500 discovery requests. Cooper was assigned counsel under CTI's policy." *Beck v. Catanzarite Law Corp.*, No. G059766, 10 (Cal. Ct. App. Jul. 13, 2022)

251. On January 3, 2019 through attorney David M. Friedman (SBN #209214), Higgerson files "DEFENDANT CLIFF HIGGERSON'S NOTICE OF DEMURRER AND DEMURRER TO PLAINTIFF'S COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF regarding the derivative action as Root was not and has never been a shareholder of MFS nor CTI – pleading:

> But Root does not just seek to hold the directors and officers of MFS/CTI liable for this allegedly wrongful conduct. Instead, he asserts derivative causes of action, purportedly on behalf of MFS, against Higgerson merely because Higgerson allegedly invested in, and received shares of, CTI. The complaint makes no other factual allegations regarding Higgerson. It does not allege that Higgerson is a director or officer or otherwise a fiduciary with duties to Root, MFS, or any other shareholder. Nor does it allege that Higgerson made any representations to Root, was involved in the formation of MFS or CTI (in any way), or engaged in any other act other than making an investment in CTI.

252. **OVERT ACT #4 in Violation of 18 U.S.C. § 1343 and Cal. Pen. Cod. § 518**

253. With intent to defraud, using the wire, also using a threat of fear against ANTHONY B. SCUDDER and Aroha Holdings, Inc., and the color of official right under false pretenses that it was prosecuting a genuine derivative action, on January 4, 2019, CATANZARITE LAW CORPORATION did dismiss ANTHONONY B. SCUDDER and Aroha Holdings, Inc. from the false derivative action without court approval in violation of Federal Rules of Procedure 23.1(c) and California case law. Later, it would use the accrual of legal fees, consistent with the pattern, to bribe.

254. On January 6, 2019, at 6:59 PM, RICHARD FRANCIS O'CONNOR, JR. from the email address richard@tgapholdings.com to Miguel Motta at the email address miguel@cultivationtech.com, first says he "wanted to discuss a finder's fee" for making introductions (which is unlawful, which he did pay Joseph Porche $340,000 through MFS years before meeting Plaintiff), for which he wants "$75k and spread the cash over time with some common shares" of CTI before concluding "Tony Scudder has decided to trade his testimony for being removed from the Root lawsuit. I think we should discuss off line. I just found out today. I'll be available to do whatever you need me to do. We have an opportunity here to unite the management of CTI with it's shareholders."

255. **OVERT ACT #5 in Violation of 18 U.S.C. § 1343 and in Judicial Deception**

256. On January 15, 2019, with intent to defraud in furtherance of the scheme and to conceal its lack of standing to file a derivative action against MFS for non-shareholder Denise Pinkerton for Roger Root, "Becky Phillips" from the email address bphillips@catanzarite.com did deliver to Plaintiff's defense counsel Sam Edgerton at the email sedgerton@ohaganmeyer.com and did copy "Tony Scudder" at the email address tony.scudder@yahoo.com with the Subject: Pinkerton v. Cultivation Technologies, Inc., et al.; Case No. 30-2018-01018922 – Ex Parte Notice

22-CV-1616-BAS-DDL

Counsel,

Attached please find correspondence from Mr. Catanzarite dated today, January 15, 2019 providing ex parte notice for tomorrow, January 16, 2019 I the above referenced matter.

Should you have any problems opening the attachment, please advise.

Thank you.

Very truly yours,

**Becky Phillips**
Legal Assistant
Catanzarite Law Corporation
2331 West Lincoln Avenue
Anaheim, CA 92801
**Direct Dial: (714) 678-2108**
**Direct Fax: (714) 399-0589**
Office Phone: (714) 520-5544
Office Fax: (714) 520-0680

257.   **OVERT ACT #6 in Violation of 18 U.S.C. § 1343 and in Judicial Deception**

258.   With intent to defraud through a knowing lack of standing to file, maintain, compromise, or settle a derivative action, and to fraudulently conceal, and in furtherance of the scheme while the Pinkerton Action was pending, KENNETH JOSEPH CATANZARITE, ESQ. or another person associated with the enterprise did use the electronic filing system for the State of Washington to update "JOLLY ROGERS INVESTMENTS INC." (Unified Business Identifier of 601600166) after its filed "Articles of Dissolution" on "2015-05-01" in order that it be "Reinstated" on "2019-01-17" and to reflect a new address of 2331 West Lincoln Avenue, Anaheim, California 92801" which is the address of CATANZARITE LAW CORPORATION.

259.   Parties to the wire communication include the Secretary of State of Washington or his/her/their assign, as well as all those persons who use the internet inside and outside State of Washington. "The documents revealed Jolly Roger filed articles of dissolution in early 2015 and was not reinstated until January 17, 2019." *Beck v. Catanzarite Law Corp.*, No. G059766, 10 (Cal. Ct. App. Jul. 13, 2022) This was after a motion for security targeted the same lack of standing.

260.   **OVERT ACT #7 in Violation of 18 U.S.C. § 1343 and in Judicial Deception**

261.   In knowing furtherance of the scheme with intent to defraud, also using the wire, to conceal its lack of standing, under color of official right using securities fraud charges, on January 22, 2019, CATANZARITE LAW CORPORATION did dismiss from the direct and derivative action RICHARD FRANCIS O'CONNOR, JR., TGAP Holdings, LLC, and Scott Unfug.

262.   **OVERT ACT #8 in Violation of 18 U.S.C. § 1343 and in Judicial Deception**

263.   In knowing furtherance of the scheme with intent to defraud, also using the wire, to conceal its lack of standing, under color of official right using securities fraud charges, on January 23, 2019, CATANZARITE LAW CORPORATION did dismiss from the direct and derivative action 23, 2019, AMY JEANETTE COOPER and CLIFF HIGGERSON.

264.   The same day, AMY JEANETTE COOPER's counsel Stephen Erigero terminates, later declares under penalty of perjury he was not involved in the discussion, meaning the enterprise had direct or indirect contact with AMY JEANETTE COOPER to coerce her with intent to defraud.

265.   **OVERT ACT #9 in Violation of 18 U.S.C. § 1343 and Cal. Pen. Cod. § 518**

266.   On January 23, 2019, using the wire in knowing furtherance of the scheme, aided by ANTHONY B. SCUDDER, CATANZARITE LAW CORPORATION actors did use the threat of fear from direct securities fraud claims against RICHARD FRANCIS O'CONNOR, JR. and AMY JEANETTE COOPER (whose father is CLIFF HIGGERSON), where  they did pay $340,000 in illegal commission to Joseph Porche in connection with Jolly Roger, Inc.'s investment in the failed company MFS, RICHARD FRANCIS O'CONNOR, JR., AMY JEANETTE COOPER, MOHAMMED ZAKHIREH, JAMES DUFFY, KENNETH CATANZARITE, ESQ., Denise Pinkerton, and others did engage in a series of acts taken by MFS to remove its board of directors.

267.   **OVERT ACT #10 in Violation of 18 U.S.C. § 1343 and Cal. Pen. Cod. § 523**

268.   On January 23, 2019, using the wire, with intent to defraud, RICHARD FRANCIS O'CONNOR, JR., MOHAMMED ZAKHIREH, and JAMES DUFFY did engage in acts on behalf of each MFS and CTI to unwind millions of dollars in securities transactions previously reviewed by the United States Securities Exchange Commission (LA-4837), also seeking to defraud CTI's creditor FinCanna Capital Corp. which had invested $5.9 million in violation of 18 U.S.C. § 1344.

269.   On January 25, 2019, with intent to defraud using control of the enterprise in violation of Cal. Pen. Cod. § 523, Plaintiff received a communication threatening that Catanzarite was "working with law enforcement" and that Plaintiff was to turn over all operations of CTI on the false pretenses that MFS was suddenly a shareholder – indeed – the only shareholder of CTI. In other words, CATANZARITE LAW CORPORATION, through its registered investment advisor principal KENNETH CATANZARITE, ESQ. conducted or directed securities fraud using the wire with intent to defraud in violation of Cal. Corp. Cod. § 25401 for corrupt motives of passion or interest in violation of Cal. Bus. & Prof. Cod. § 6068 to unwind more than one hundred securities transactions.

270.   On January 29, 2019, JAMES DUFFY did send an email asking about $75,000 for RICHARD FRANCIS O'CONNOR, JR. – which was not among the relief requested in the fraudulent "MFS Action."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CATANZARITE LAW CORPORATION**
**ATTORNEYS & COUNSELORS AT LAW**
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
(714) 520-5544
FACSIMILE: (714) 520-0680

KENNETH J. CATANZARITE
ATTORNEY AT LAW

DIRECT DIAL:
(714) 678-2100

E-MAIL ADDRESS:
KCATANZARITE@CATANZARITE.COM

DIRECT FAX:
(714) 399-0577

January 25, 2019

**Via U.S. Mail & Email:**

Samuel Y. Egerton, III
Jonnny L. Antwiler
O'HAGAN MEYER, LLC
4695 MacArthur Court, Ste. 210
Newport Beach, CA 92660
sedgerton@ohaganmeyer.com
jantwiler@ohaganmeyer.com

Ken Watnick
Anderson, McPharlin & Conners
707 Wilshire Blvd, Suite 4000
Los Angeles, California 90017-3623
kdw@amclaw.com

Stephen J. Erigero, Esq.
Ivan L. Tjoe, Esq.
Alan J. Hart, Esq.
Ropers Majeski Kohn & Bentley PC
445 South Figueroa St., Ste 3000
Los Angeles, CA 90071-1608
Facsimile: (213) 312-2001
Email: stephen.erigero@rmkb.com
Email: ivan.tjoe@rmkb.com
Email: alan.hart@rmkb.com

Re:  *Denise Pinkerton v. Cultivation Technologies, Inc., et al.,* Case No. 30-2018-01018922: Meet & Confer Re CTI's Discovery Responses.

Notice by Mobile Farming Systems, Inc. ("MFS") as sole shareholder of Cultivation Technologies, Inc. ("CTI") of Actions

Notice of MFS Shareholders that Board of Directors is Removed

Counsel,

I write this letter to provide notice of the enclosed actions. We would like to immediately take control of the assets and operations of CTI for the benefit of the sole shareholder MFS. We have confirmation now that the share issuance on March 30, 2015 was in fact fully paid and that the shares were issued and due to MFS which is therefore the sole shareholder.

MFS will now assert all claims directly not derivatively and this firm will serve as counsel. An amended complaint is being prepared and will be circulated for possible stipulation or motion if necessary.

We would like to avoid any unnecessary disruption of corporate activity and therefore notify you that we will defer notice to all third parties until Monday January 28 in the hope that your clients will handle the transition in the interests of the shareholders. All shares issued after March 30, 2015 are a nullity, including the highly dilutive unauthorized shares issued to Messrs.

22-CV-1616-BAS-DDL

Samuel Y. Egerton, III
Jonnny L. Antwiler
O'HAGAN MEYER, LLC
January 25, 2019
Page 2

Probst and Beck. It is our intention to offer those persons who purchased CTI shares, MFS shares after a determination of amounts of money actually invested. The new directors and officers will require turnover of:

1. All books and records
2. Probst and Beck to leave offices and turnover records and keys
3. Bank accounts to be turned over
4. Cash control to be turned over to new board
5. Hand off of operative contracts
6. Inventory of subsidiaries
7. Personnel lists
8. Office security codes and systems
9. All computer pass codes to computer and security systems
10. All office pass codes and security systems

This is also notice that law enforcement is looking at both MFS and CTI. We are fully cooperating with them and expect that your clients will do the same.

After you review the above please call me.

Very truly yours,

CATANZARITE LAW CORPORATION

Kenneth J. Catanzarite

70

22-CV-1616-BAS-DDL

271.  **OVERT ACT #11 in Violation of 18 U.S.C. § 1343 and Judicial Deception**

272.  Using the newly manufactured, ante-dated evidence while concealing the truth, and assuming the role of counsel for MFS after suing the company derivatively without court approval, the MFS Action was filed on January 28, 2019, wherein it was declared that AMY JEANETTE COOPER, RICHARD FRANCIS O'CONNOR, CLIFF HIGGERSON, ANTHONY SCUDDER, and AROHA HOLDINGS, INC. all agreed to "renounce their CTI shares in favor of MFS."

273.  Filed by wire with intent to defraud:

"Catanzarite drafted a complaint telling a remarkably different story from the one set forth in the Pinkerton Action. The lawsuit reflected an abrupt shift in allegiances. O'Connor and his allies turned against their former board members Probst and Beck. Indeed, the MFS Action did not allege O'Connor, Cooper, TGAP, Higgerson, Aroha, or Unfug took part in any wrongdoing while they were in control of CTI. Rather these parties were portrayed as "the good guys" who were victimized by Probst, Beck, and other parties who wrongfully sold and purchased CTI shares that belonged to MFS. We note Catanzarite filed the MFS Action acting as MFS's purported corporate counsel while still representing different a shareholder in a derivative action against both MFS and CTI (Pinkerton Action)."

*Beck v. Catanzarite Law Corp.*, No. G059766, 13 (Cal. Ct. App. Jul. 13, 2022)

274.  Further using the wire with intent to defraud:

"In the MFS Action, the complaint asserted Probst and Beck conspired with and were aided and abetted by other Founders to falsely claim CTI's shares were not transferred to MFS and wrongfully reissued those shares. With respect to the other CTI directors and shareholders, the complaint offered the following explanation: "O'Connor, Cooper, TGAP, . . . Higgerson, Aroha, [and] Unfug have agreed to renounce their Founders' Shares in favor of MFS." The complaint failed to explain why renouncing shares and forming an alliance with MFS absolved O'Connor and Cooper from their role in executing the Amended Acts. Nor did the complaint reveal O'Connor's authority to publicize the 2019 Consent, which rescinded the Amended Acts, ousted the board members, and fired CTI's legal counsel. O'Connor's 2019 Consent rescinded CTI shares he and others sold to third parties such as Zakhireh, Cooper, and Higgerson." *Beck v. Catanzarite Law Corp.*, No. G059766, 13 (Cal. Ct. App. Jul. 13, 2022)

275.  And more uses of the judicial system and wire to defraud;

"To further meddle in CTI's business operations, the MFS Action's complaint asserted CTI's current board of directors were violating Corporations Code section 1507 by "preparing, signing and circulating false minutes, issuing securities, transacting business with insiders, [and] borrowing money from insiders and records relating to CTI." MFS requested that the court enjoin the CTI's board from operating the company until the court held a Corporations Code section 709 hearing (709 hearing) "to determine the rightful

71

ownership of CTI, its appropriate [b]oard of [d]irectors, and executive structure." The court initially granted a temporary restraining order (TRO), which was highly disruptive to CTI's ability to operate its business."

*Beck v. Catanzarite Law Corp.*, No. G059766, 13-14 (Cal. Ct. App. Jul. 13, 2022)

276.   On February 5, 2019, Plaintiff delivered CATANZARITE LAW CORPORATION notice of direct damages caused by their scheme, namely fair market value of $261 million in securities in a pending merger setup by Plaintiff on behalf of CTI shareholders.

277.   **OVERT ACT #11 in Violation of 18 U.S.C. § 1343**

278.   "On February 20, 2019, CTI and Western Troy, acting through their respective Boards of Directors, executed a Letter of Intent for CTI to complete the [merger] with Western Troy ("LOI") some of the largest transactions to that date…were done using this [merger] method, at valuations of many hundreds of dollars with some over $1 billion USD." *Ex. 33.*

279.   And further, using the wire and mail with intent to defraud:

"While Catanzarite was negotiating agreements with other defendants, it continued litigating the Pinkerton Action. Beck asserted the parties eventually designed a scheme that involved misusing the judicial process, publicizing unlawful CTI shareholder written consents, and sending e-mails intent on destabilizing CTI's operations by interfering in merger negotiations and other business prospects. If this plan worked, MFS (controlled by the O'Connor Faction) would be able to regain control of CTI's business/profits and reallocate all the stock shares. MFS shareholders (including the Roots) would likely also benefit from the shift in power."
*Beck v. Catanzarite Law Corp.*, No. G059766, 11 (Cal. Ct. App. Jul. 13, 2022)

280.   And further, using the wire and mail with intent to defraud:

"[a]round this same time, Catanzarite sent CTI's largest secured creditor, FinCanna, an e-mail stating future modifications or agreements between them must be signed by the new CTI board members (O'Connor, Zakhireh, and Duffy). (See *Cultivation, supra,* G059457 [detailed discussion of Catanzarite's damaging e-mails to CTI's business partners]). Catanzarite also took steps to interfere with CTI's proposed merger with Western Troy Capital Resources, Inc, by writing an e-mail to the company stating the new CTI directors objected to the merger. (*Ibid.*)

*Beck v. Catanzarite Law Corp.*, No. G059766, 12 (Cal. Ct. App. Jul. 13, 2022)

281.   And further, using the wire and mail with intent to defraud:

"Catanzarite's misuse of the judicial process that formed the basis for Beck's malicious prosecution claims. On January 28, 2019, Catanzarite filed the MFS Action. The claims were brought "derivatively on behalf of its wholly owned subsidiary [n]ominal

[d]efendant [CTI]." It named as defendants CTI's board of directors (Probst, Beck, Kamm, and Motta), CTI attorneys (Einhorn and Bernheimer) and several entities (EM2, RAD, and Tow and Grow). CTI was named as a nominal defendant. MFS raised nine causes of action and sought declaratory relief and a permanent injunction. MFS asserted it was entitled to file a derivative action because it organized CTI and acquired 28,000,000 shares of CTI common stock, and therefore, CTI was its wholly owned subsidiary."

*Beck v. Catanzarite Law Corp.*, No. G059766, 12 (Cal. Ct. App. Jul. 13, 2022)

282. **OVERT ACT #12 in Violation of 18 U.S.C. § 1343 and Judicial Deception**

283.    Showing how fraudulent every claim is against Plaintiff, now "MFS Cross Action":

"The trial court (Judge Randall J. Sherman) dissolved the TRO in May 2019 after the 709 hearing. Catanzarite argued MFS had the right to vote in CTI's last board meeting when it elected new officers. The court examined the original Organizational Consent, the Amended Acts, the 2019 Consent, MFS loan documents, and other relevant evidence. It noted CTI's securities agreements, which are required to contain a list of issued shares, did not mention MFS was a shareholder. It found telling that O'Connor signed 50 subscription agreements to sell CTI stock directly to MFS shareholders and all but six of MFS's 59 shareholders purchased CTI stock. It considered an e-mail Probst sent to Cooper and O'Conner in 2017 that discussed closing MFS or declaring bankruptcy because the only asset was a note from CTI. And no one disagreed with Probst's failure to list CTI stock as another MFS asset. The court considered CTI's assertion that beginning in 2015 CTI's board raised over 3,000,000 from over 60 private investors and 6,000,000 in financing based on representations MFS did not own any shares of CTI stock. At the hearing, Catanzarite represented Cooper and O'Connor would testify they signed documents making CTI a separate entity but did not understand it meant they were rescinding the shares promised to MFS. Finally, the court questioned Catanzarite about the reasons for the long delay in bringing the motion, during which CTI and MFS operated as separate entities."

*Beck v. Catanzarite Law Corp.*, No. G059766, 14 (Cal. Ct. App. Jul. 13, 2022)

284.    Showing again the ongoing schemes thereafter and enterprise control:

"The court determined CTI's election was valid and stated that "every fiber of my being says that the facts are overwhelming against" Catanzarite's position. It stated there was a repudiation of an agreement (the Subsidiary Promise) by people who were the same principles in MFS and then there was evidence of repeated actions after the Amended Actions that were consistent with the notion MFS was not a stockholder. The court concluded the delay in bring this claim further supported the conclusion MFS "has been of the view that they are not a shareholder." "So the court concludes that the challenge [to CTI's] election is denied, and the court concludes that [MFS] is not a stockholder in CTI."

22-CV-1616-BAS-DDL

1    *Beck v. Catanzarite Law Corp.*, No. G059766, 14-15 (Cal. Ct. App. Jul. 13, 2022)

2    285.    Plaintiff incorporates the trial court proceedings, deliberately concealed time and time

3    again under color of California Civil Procedure as being "hearsay" by CATANZARITE LAW

4    CORPORATION using protection of THE STATE BAR OF CALIFORNIA, ELI DAVID

5    MORGENSTERN, ESQ., SUZANNE CELIA GRANDT, ESQ., and others in conspiracy who

6    propound knowingly false statements at THE STATE BAR OF CALIFORNIA to protect the schemes

7    to defraud. ***Ex. 107, pp. 44-100.***

8    286.    **OVERT ACT #13 in Violation of 18 U.S.C. § 1343 and Judicial Deception**

9    287.    Using the wire, after the trial of fact seeking to unwind all CTI shares in favor of MFS,

10   "that same month, Beck resigned from CTI's board. Meanwhile, Catanzarite resumed
11   filing lawsuits to further the O'Connor Faction's and MFS's interests. Each version
     represented a slight shift in trial tactics, but all were aimed at achieving the same result
12   set forth in the MFS Action. Beck claimed the litigation against CTI created a sense of
     instability with CTI's business partners and lenders causing the company to lose money."
13
14   288.    **OVERT ACT #13 in Violation of 18 U.S.C. § 1343 and in Judicial Deception**

15   289.    Later adopted by JIM TRAVIS TICE, ESQ. with intent to defraud using the wire:

16   "For example, Catanzarite filed the Mesa Action in April 2019 for Richard Mesa and
     a *putative class* of MFS shareholders who also purchased CTI shares. The complaint was
17   framed as both a class action and a shareholder derivative action filed "on behalf of" CTI.
     The complaint asserted the class of MFS/CTI shareholders wanted to consolidate their
18   lawsuit with MFS's derivative action "and to among other relief, recognize the ownership
     and control of CTI" by MFS's ownership of 28,000,000 shares, 5,000,000 "Friends
19   &Family CTI shares," and 3,000,000 CTI shares issued pursuant to the 2015 PPM."

20   290.    **OVERT ACT #14 in Violation of 18 U.S.C. § 1343 and in Judicial Deception**

21   291.    Again, also adopted by JIM TRAVIS TICE, ESQ. on September 8, 2021 using the wire
22   to substitute for his friend and client KENNETH CATANZARITE, ESQ. and CATANZARITE LAW
23   CORPORATION with intent to defraud and conceal in furtherance of the schemes:

24   "This Mesa Action grouped the "'[d]irector [d]efendants'" separately from the
25   "'[p]referred [s]hares [d]efendants." The director defendants included members of the
     Probst Faction (Probst, Beck, Bernheimer, Kamm, Einhorn, and Motta). Ten defendants
26   holding CTI series A preferred stock were collectively referred to as the preferred shares
27   defendants. CTI was listed as a nominal defendant."

28   Plaintiff notes that Irving Einhorn, Esq., who sat on the board of his company as
     independent director, is the former head of the SEC office in Los Angeles, California.

292. **OVERT ACT #15 in Violation of 18 U.S.C. § 1343 and in Judicial Deception**

293. In knowing furtherance of the scheme, using the wire:

"One month later, Catanzarite amended the Mesa Action complaint to add Cooper and Tom Mebane as plaintiffs and FinCanna as a defendant. (See *FinCanna, supra,* G58700.) Catanzarite also changed the nature of the action to focus on unraveling CTI's financial dealings with FinCanna and declare CTI's actions and contracts void. The shareholder no longer wished to join the MFS Action or seek recognition of MFS's controlling stock shares over CTI. (*Ibid.*)

*Beck v. Catanzarite Law Corp.*, No. G059766, 15-16 (Cal. Ct. App. Jul. 13, 2022)

294. This Court is hereby noticed of Plaintiff's objection to the continuance of these practices by THE STATE BAR OF CALIFORNIA's Office of General Counsel and CATANZARITE LAW CORPORATION:

"Thus, to briefly recap, at this point Catanzarite's concurrent and successive representation of adverse parties included the following: (1) Catanzarite was representing the Roots' elder abuse lawsuit against CTI and some of its Founders (the Probst Faction) as well as a derivative action against MFS; (2) Catanzarite had made a deal with a handful of CTI Founders to dismiss them from the Pinkerton Action; (3) it became MFS's counsel of record; (4) Catanzarite filed a derivative shareholder lawsuit for MFS, claiming 100 percent control and ownership of CTI, despite having lawsuits filed by other people claiming to be MFS shareholders; and (5) after filing two *derivative* shareholder lawsuits, Catanzarite filed a third derivative action (the Mesa Action) claiming to represent a different set of outsider shareholders, i.e., a class of derivative shareholders willing to join in the MFS Action but also independently seeking damages from CTI, its current shareholders, and board of directors.

*Beck v. Catanzarite Law Corp.*, No. G059766, 16 (Cal. Ct. App. Jul. 13, 2022)

295. **OVERT ACT #16 in Violation of 18 U.S.C. § 1343 and in Obstruction of Justice**

296. Using wire communications with intent to defraud, in knowing furtherance of the scheme, "Han Le" from the email address hle@catanzarite.com on April 19, 2019 at 2:27:53 PM PDT with "CC: Kenneth Catanzarite kcatanzarite@catanzarite.com , Beck Phillips bphillips@catanzarite.com , Jennifer Weaver jweaver@catanzarite.com , Richard O'Connor richard@tgapholdings.com " as follows:

**From:** Han Le <hle@catanzarite.com>
**Date:** April 19, 2019 at 2:27:53 PM PDT
**Cc:** Kenneth Catanzarite <kcatanzarite@catanzarite.com>, Becky Phillips <bphillips@catanzarite.com>, Jenifer Weaver <jweaver@catanzarite.com>, "Richard O'Connor (Richard@tgapholdings.com)" <Richard@tgapholdings.com>
**Subject: MFS SHAREHOLDERS - DO NOT SIGN CONSENT DOCUMENT JUST SENT BY POBST-- SUPPLEMENTAL EMAIL**

Dear Shareholders:

**Supplement to Email**

I want to be clear that neither I, Richard O'Connor, Tony Scudder nor anyone else sued in the Root Case or the Mobile Farming Case have settled any claims with Root or anyone else. All we did was agree to toll the statute of limitations to allow claims to be brought against us later.  No conflict. Instead we are working together in the best interests of Mobile Farming and Cultivation Technologies.

There is no conflict as they contend.  Instead **the conflict identified is those named Defendants taking the 17,000,000 Series A Preferred Shares with 3 times voting to your common shares, for $0, control of the company and their undisclosed compensation. That is the conflict. They want to keep that against your interest and we seek to cancel those shares and secret compensation arrangements. THEY COULD HAVE SETTLED THIS CASE BY AGREEING TO CANCEL THEIR PREFERRED SHARES AND CONTROL AND SALARIES--- *YOU NEED TO KNOW THAT THEY REFUSED. THAT IS WHY WE HAVE THIS DISPUTE.***

**The consent form should not be signed.** It does not allow you to reject the proposal so any signature would approve their request which I say is against the interests of Mobile Farming and Cultivation Technologies shareholders. If you have any questions feel free to call my cell at 760-409-6464.

Richard O'Connor
Director and Officer

76                                    22-CV-1616-BAS-DDL

297. **OVERT ACT #17 in Violation of 18 U.S.C. § 1343 and in Obstruction of Justice**

298.    In active concert with ANTHONY B. SCUDDER, with intent to defraud, and to conceal its ongoing lack of standing or objective probable cause using the phone, email, and wire:

> "Particularly troubling...Catanzarite's active role in helping its clients forcibly remove CTI's directors [through postal mail and email communications, directing a control dispute manufactured under the knowingly false guise of client advocacy], after Catanzarite was unable to achieve this same result in the MFS Action's [trial of fact]." G058700, p. 4-6.

299.    Specific wire and/or email communications around this overt act or series of overt acts indirectly evidenced, CTI shareholder Carlos Calixto declares as follows under penalty of perjury:

> "[o]n or about May 6, 2019, I began receiving calls, text messages, and voicemails from Anthony Scudder ("Scudder") requesting that I execute a document...to facilitate replacement of CTI management [under different factual pretenses from January 23, 2019]. On or about May 8, 2019...I spoke with...Kenneth J. Catanzarite of Catanzarite Law Corporation...Catanzarite explained to me [by wire communication/cellular phone] the purpose...was to remove the board of directors of CTI through an action by majority written consent [by mail and/or wire] of the shareholders of CTI ("Shareholder Consent") [among whom MFS was notably not one and hasn't been; but here not even claimed by the Racket despite the ongoing, knowingly fraudulent 'MFS Action' and 'Pinkerton Action' and 'Mesa Action']. Following our conversation, Catanzarite sent me the Proxy and requested my signature...I explained to Scudder that I did not want to get involved and declined to execute the Proxy. On May 10, 2019, Richard O'Connor ("O'Connor") sent me text messages and voicemails offering me $5,000 to execute the Proxy; which I declined. On May 14, 2019, I was provided a copy of the Shareholder Consent dated as of May 14, 2019, executed by O'Connor as proxy holder for certain CTI shareholders with a register of purported proxies attached...Page 28 of the Shareholder Consent is a forged Proxy authorizing O'Connor to vote my shares."

300. **OVERT ACT #18 in Violation of 18 U.S.C. § 1343 and in Judicial Deception**

301.    In knowing furtherance of the scheme, with intent to defraud using the wire in ORANGE COUNTY SUPERIOR COURT:

> "[a]t the end of May 2019, Catanzarite filed a lawsuit on behalf of Cooper and Mebane against CTI. The Cooper Action requested the court direct CTI to (1) hold a shareholder's meeting to elect a board of directors; (2) deliver an annual report; (3) appoint an accountant to conduct an audit; and (4) order CTI to pay the costs for an investigation, audit, and costs of the suit. CTI's corporate counsel filed an opposition, asserting a shareholder meeting was scheduled for August 2019. (See *FinCanna, supra,* G058700 [description of Catanzarite's six lawsuits].)"

*Beck v. Catanzarite Law Corp.*, No. G059766, 16 (Cal. Ct. App. Jul. 13, 2022)

302.   **OVERT ACT #17 in Violation of 18 U.S.C. § 1343 and in Judicial Deception**

303.   In knowing furtherance of the scheme, with intent to defraud using the wire in ORANGE COUNTY SUPERIOR COURT, "[i]n July 2019, Catanzarite filed first amended complaints (FAC) in the Pinkerton Action and the MFS Action. It removed all derivative action claims made on behalf of MFS and CTI. Catanzarite claimed to be MFS's and CTI's corporate counsel."

304.   **OVERT ACT #18 in Violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1344**

305.   In knowing furtherance of the scheme, with intent to defraud,

"Catanzarite next filed two lawsuits as CTI's corporate counsel (the FinCanna Action and Scottsdale Action). The Scottsdale Action is noteworthy in that Catanzarite demanded that CTI's insurance company stop providing a defense or indemnify Beck and other Probst Faction defendants in the Mesa Action. (See *FinCanna, supra,* G058700 [description of Catanzarite's six lawsuits].)"

In other words, the defendants added bank fraud to the mix, and they egregiously appeared on behalf of Plaintiff's company, *ultra vires,* with impunity, using enterprise control and interests.

*Beck v. Catanzarite Law Corp.,* No. G059766, 16-17 (Cal. Ct. App. Jul. 13, 2022)

306.   **OVERT ACT #19 in Violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1344**

307.   In knowing furtherance of the scheme, on Wednesday, July 10, 2019 at 10:01 AM "From: Becky Phillips [mailto:bphillips@catanzarite.com]" delivered a wire communication for, and copying, "CC: Kenneth Catanzarite kcatanzarite@catanzarite.com" an email "Subject: Cultivation Technologies, Inc. – Confidential Settlement Negotiations – Evidence Code §§ 1152 and 1154" without regard for the fraud and crime exceptions of Evidence Code § 956, reading: "Mr. Edgerton, Please see the attached settlement negotiations/agreement for your client(s) if there is an interest. This proposal, if not accepted, shall expire at 5:00 p.m. Thursday, July 19, 2019....Very truly yours, Becky Phillips for Kenneth J. Catanzarite" "Legal Assistant" "Catanzarite Law Corporation" "2331 West Lincoln Avenue, Anaheim, CA 92801" "Direct Dial: (714) 678-2108" "Direct Fax: (714) 399-0589" "Office Phone: (714) 520-5544" "Office Fax: (714) 520-0680" to which my defense counsel, Sam Y. Edgerton, III Partner of law firm Ohagan Meyer wrote back to "To: 'Kenneth Catanzarite' kcatanzarite@catanzarite.com "[b]ecause of the obvious fraud issue regarding your purported representation of CTI, this is not a protected settlement communication."

308.   **OVERT ACT #20 in Violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1344**

309.   Before later being obstructed by Office of General Counsel in furtherance of the schemes, Court of Appeal aptly stated:

> "[w]e note the Pinkerton Action FAC was deeply sanitized to remove all traces of accusations against the [O'Connor] Faction, Porche, Mobin, and TGAP. Where the original complaint specified four people (O'Connell, Probst, Porche, and Mobin) befriended the Roots to swindle the elderly couple out of their retirement funds, the FAC asserted Probst was acting alone."

*Beck v. Catanzarite Law Corp.*, No. G059766, 17 n.6 (Cal. Ct. App. Jul. 13, 2022)

310.   Plaintiff confirms that RICHARD FRANCIS O'CONNOR, JR. and AMY JEANETTE COOPER admitted to him that they visited Roger Root in Florida, and did pay $340,000 in illegal commissions to Joseph Porche out of a $450,000 investment in the failed company MFS. Using this information, CATANZARITE LAW CORPORATION extorted them to manufacture evidence under the threat of "law enforcement" and control over the enterprise.

311.   **OVERT ACT #21 in Violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1952(a)(1)**

312.   On Friday, December 13, 2019, it was announced by public wire press release that Leah T. Wilson was stepping away, with "her decision to leave the role of Executive Director effective January 17, 2020, to pursue other career interests. Chief of Programs Donna Hershkowitz has been named Interim Executive Director. At the request of Board of Trustees leadership, Wilson has agreed to support the transition in a consulting capacity. Wilson joined the State Bar in 2015 as its first chief operations officer, part of a new management team charged with transformational reform of the agency after a period of significant upheaval and controversy."

313.   LEAH WILSON, ESQ. left to go setup illegal money transmissions violative of 18 U.S.C. § 1960, in order to launder in violation of 18 U.S.C. § 1956 through THE STATE BAR OF CALIFORNIA's "Leadership Banking Program" which includes a number of banks in China.

314.   **OVERT ACT #22 in Violation of 18 U.S.C. § 1344, 18 U.S.C. §§ 1957, and 1960**

315.   In an "Advertorial" published by LA Business Journal on February 5, 2020 – two weeks after LEAH WILSON, ESQ. "stepping away" was to become effective – the following statements were disseminated, which provide context to the schemes. ADVERTORIALS.

79

22-CV-1616-BAS-DDL

316.   **State Bar Launches Leadership Bank Program to Maximize Funds for Legal Aid**

"Financial institutions in California hold nearly $5 billion in IOLTA accounts, the interest on which goes to support legal aid," said Leah Wilson, Executive Director. "We know that attorneys and law firms care about increasing the availability of legal services for the millions of Californians who cannot afford to pay for these services. We are excited to highlight banks that choose to be a leader in supporting this work, recognizing and leveraging their tremendous economic power to do good for the neediest in the state." To become a designated Leadership Bank, financial institutions need to [PLAINTIFF EDITS in brackets] [provide the enterprise with laundering capacity, and]:

• Pay at least the established compliance rate (ECR) on their Interest on Lawyers' Trust Accounts (IOLTA). The current ECR is 68 percent of the Federal Funds Rate (FFR); and
• Waive fees and charges on all IOLTA accounts, regardless of the account's size.

The State Bar distributes grants to nearly 100 legal aid organizations who deliver crucial legal services to the most vulnerable low-income Californians [through active market participants that it funds horizontally, while actively disregarding the threat of homelessness that the enterprise poses to Plaintiff and others]. Examples of the impact these legal aid organizations have include:

• Enabling nearly 4,900 families to stay in their homes (2017); • Obtaining more than 4,800 restraining orders to protect survivors from domestic violence (2017); • Serving over 11,000 clients in the areas of consumer protection and financial matters (2018); and

• Supporting tens of thousands of seniors, veterans, and individuals with disabilities with civil legal issues (2018). [Destroying Plaintiff's life, CTI, business, property, nearly causing him to be homeless].

For 2020, the State Bar Board of Trustees approved a record distribution of $55.6 million in IOLTA funds. This dramatic leap [of 2X or greater within a year of AB 3249 passage, conveniently] in IOLTA revenue is [purportedly, without any reasonable basis] largely the result of two factors: an improving economy that has driven rising interest rates, and the State Bar's work with banks to maximize interest revenue [but mostly, shifting around of the enterprsie schemes to launder money and defraud the public].

However, the vast majority of need for legal aid in California remains unmet [especially Plaintiff, who can't even retain a lawyer to fight us for rightly placed fear, where DURAN and I will exercise our "discretion" to disbar them as may be necessary to suit the schemes]. The California Justice Gap Study estimates that 60 percent of low-income Californians (in households at or below 125 percent of the federal poverty level) reported experiencing at least one civil legal problem in their households in the past year, but only a small portion of those problems were addressed by legal aid. Meanwhile, legal aid organizations are able to fully resolve only 30 percent of the cases brought to them, with insufficient resources being a major limiter [and where we horizontally send all of our money to support and construct a false narrative, knowingly].

22-CV-1616-BAS-DDL

Becoming a leadership bank will afford the following benefits to financial institutions:

• **Visibility as a partner in access to justice:** The State Bar will highlight Leadership Banks on its website, publishing the inaugural list in January 2020. The State Bar will make attorneys aware that selecting a Leadership Bank for IOLTA funds will increase funding for and the impact of civil legal aid [which gives the federal receiver and UNITED STATES ATTORNEY GENERAL a great list to start from].

• **Marketing edge:** Financial institutions will have permission to advertise their Leadership Bank designation as evidence of their support for [the protection racket], Ability to obtain Community Reinvestment Act (CRA) credit: Being a Leadership Bank will help financial institutions fulfill their CRA obligations by generating funds that will go directly towards assisting those most in need [and will support our deviance, when necessary and directed, including distribution of funds to or from China].

• **Demonstrated social responsibility:** Financial institutions care about their customers and their communities. This is another way to support veterans, seniors, and low-income Californians struggling with disability benefits, medical care, and other issues affecting their financial health. [This is another way we can distract you from instances where we conceal and deliberately disregard people like Plaintiff to oppress in dereliction of our duty, also under color of California law and non-existent discretion using enterprise control]

*The State Bar of California's mission is to protect the public and includes the primary functions of licensing, regulation and discipline of attorneys; the advancement of the ethical and competent practice of law; and support of efforts for greater access to, and inclusion in, the legal system.*

317.   **OVERT ACT #23 in Violation of 18 U.S.C. § 1343 and in Judicial Deception**

318.   In January 2020, the trial court disqualified Catanzarite and its attorneys from representing CTI and the Mesa Action plaintiffs. (*FinCanna, supra,* G058700.)" It continues.

*Beck v. Catanzarite Law Corp.*, No. G059766, 17 (Cal. Ct. App. Jul. 13, 2022)

319.   **OVERT ACT #24 in Violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343**

320.   Between November 2019 and January 2020, Plaintiff delivered notice of injury and evidence to Joy Nunley and ELI DAVID MORGNESTERN, ESQ. of THE STATE BAR OF CALIFORNIA. At that time, Plaintiff did not yet know that THE STATE BAR OF CALIFORNIA was actively engaged in schemes to defraud the public, or that they would protect CATANZARITE LAW CORPORATION and its actors, *especially* given the volume of evidence against the enterprise. The postal letter shows how these schemes *abuse* the public, enable fraud, delay neutral forum access.

321.    **OVERT ACT #25 in Violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1341**

322.    Using the postal mail and wire communications with intent to defraud Plaintiff, banks, his insurance carrier Scottsdale Insurance Co. and its underwriter Nationwide, ELI DAVID MORGENSTERN, ESQ. did deliver Plaintiff a letter in March 2020 stating he chose to allow the fraudulent scheme, and that "State Bar Court" would not proceed unless the "alleged violations" were "serious enough." In other words, the use of State Bar Court is shown to delay Plaintiff's rights in furtherance of fraudulent enterprise schemes without regard of public interest.

323.    **OVERT ACT #26 in Violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1952(a)(3)**

324.    Between March 2020 upon receipt of the fraudulent letter from ELI DAVID MORGENSTERN, ESQ. and August 10, 2020, Plaintiff delivered questions to THE STATE BAR OF CALIFORNIA that went unanswered, and he delivered a request to the "Complaint Review Unit." At the time, he did not know that it was also Office of General Counsel also using a mail facility to defraud, which was actually conspiring with ELI DAVID MORGENSTERN, ESQ. and later Board of Trustees in order to conceal the schemes to defraud in favor of CATANZARITE LAW CORPORATION actors. Plaintiff wasted time and resources he could have spent here, instead.

325.    **OVERT ACT #27 in Violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1952(a)(3)**

326.    Where Plaintiff ultimately filed a malicious prosecution action in state court where THE STATE BAR OF CALIFORNIA refused to act in reasonable mitigation despite Plaintiff's clearly articulated and obvious constitutional right to equal protection – CATANZARITE LAW CORPORATION re-filed the adjudicated "MFS Cross Action" as a weapon of extortion which was just a regurgitation of false claims dismissed with "every fiber of [Court's] being" on May 1, 2019.

327.    Using the postal mail and wire communications with intent to defraud, "Complaint Review Unit" (Office of General Counsel, also defending tort claims against members of the public) disposed of Plaintiff's notice of injury to THE STATE BAR OF CALIFORNIA on the knowingly false pretenses that it was a "pending" matter in "civil litigation." In other words, THE STATE BAR OF CALIFORNIA's Office of General Counsel knowingly ratified and participated in the fraudulent scheme, even after the foregoing facts, which no reasonable person or attorney would do in regulation to protect Plaintiff (a member of the public in the protected class).

22-CV-1616-BAS-DDL

328.   **OVERT ACT #28 in Violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1952(a)(3)**

329.   Plaintiff delivers notice to the California Supreme Court of his desire for a fair hearing to enjoin serial fraud by CATANZARITE LAW CORPORATION and shows the proof.

330.   With intent to defraud Plaintiff and to carry on the criminal conduct of the enterprise, JORGE E. NAVARETTE did send a letter by postal mail on September 29, 2020 stating "it appears" Plaintiff wanted to file an accusation, to which an ambiguous case from 1948 is attached ("In RE: Walker" scheme to defraud).

331.   Specifically, Plaintiff's diligence and the utter disregard shown him by JORGE E. NAVARETTE and apparently the California Supreme Justices themselves prove that this entire "In RE: Walker" scheme is not developed for the public, rather, it is developed and it used to defraud the public by postal mail and wire communication to screen for the 700+ CLUB.

332.   **OVERT ACT #29 in Violation of 18 U.S.C. § 1343 and 42 U.S.C. § 1983**

333.   Between October 2020 and February 2021, Plaintiff spends most of his time preparing the "accusations" and conforming to various demands of JORGE E. NAVARETTE to file copies, send them to various places including THE STATE BAR OF CALIFORNIA and then all justices. After finally meeting JORGE E. NAVARETTE's unreasonable demands under the circumstances, JORGE E. NAVARETTE fraudulently claims that Plaintiff did not conform to the prejudicial, lawyer protecting timeline through a postal mail letter in March 2021.

334.   Plaintiff considers taking his own life, overcome with anxiety, humiliation, severe depression, humiliation, and fear after all he has learned about what KENNETH CATANZARITE, ESQ. and other CATANZARITE LAW CORPORATION actors have done to other people, and he experiences an emotional breakdown.

335.   As direct and proximate cause of JORGE E. NAVARETTE's decisions, or that of California Supreme Court justices without regard of Plaintiff's harm and the adjudicative facts proving his allegations, he steps down as CEO of his then role at a new company which was favorably positioned in the public health market using software he designed that won several national awards. He has not been employed since, dedicated to resolving the issues on behalf of himself, and enraged of what these crimes must be doing to people less fortunate or less determined than he.

22-CV-1616-BAS-DDL

336.   **<u>OVERT ACT #30 in Violation of 18 U.S.C. § 1343 and in Judicial Deception</u>**

337.   Where it was not lawful for CATANZARITE LAW CORPORATION, KENNETH CATANZARITE, ESQ., NICOLE MARIE CATANZARITE WOODWARD, ESQ., TIM JAMES O'KEEFE, nor BRANDON WOODWARD, ESQ. *to sue and then represent* AMY JEANETTE COOPER, ANTHONY B. SCUDDER, RICHARD FRANCIS O'CONNOR, JR. CLIFF HIGGERSON, in the first instance under the circumstances under ABA 1.7 and California Rules of Professional Conduct 1.7(d)(3), each would continue to do so in defense or prosecution depending on which tribunal each appeared before, indeed, which *filing*.

338.   Plaintiff shows that the 700+ CLUB can do whatever it wants, whenever it wants, on behalf of whoever it wants, using the wire in ORANGE COUNTY SUPERIOR COURT to defraud the public using the ongoing protection and control of the enterprise.

339.   In furtherance of the scheme, with intent to defraud, JIM TRAVIS TICE, ESQ. did assume the role of counsel for the fraudulent securities "Mesa" "class action" (and derivative action, aka, another monopoly of due process) filed for improper purposes on behalf of AMY JEANETTE COOPER, Tom Mebane, and Rick Mesa – even though the claims are knowingly false, and the allegations that Plaintiff or CTI lacked disclosure fall apart when one considers that the United States Securities Commission was already defrauded previously by RICHARD FRANCIS O'CONNOR, JR. and MOHAMMED ZAKHIREH about the very same claims, and the very same preferred shares purportedly lacking disclosure. They also fall apart when AMY JEANETTE COOPER provided Richard Probst a proxy to vote her 4,900,000 CTI shares in November 2018 before being extorted by the enterprise to manufacture evidence in furtherance of CATANZARITE LAW CORPORATION schemes under defined threat against AMY JEANETTE COOPER, violative of Cal. Pen. Cod. § 518.

340.   On September 8, 2021, using the wire to substitute, and taking all the personal information stolen by CATANZARITE LAW CORPORATION actors using "discovery" from the foregoing fraudulent schemes – JIM TRAVIS TICE, ESQ. continued the pattern of racketeering activity in which he has engaged previously with KENNETH CATANZARITE, ESQ., playing musical chairs to assume the role of "counsel" in fake litigation in order to defraud litigants, courts, banks, and others using protection of THE STATE BAR OF CALIFORNIA for all times relevant.

22-CV-1616-BAS-DDL

341. Finally, Plaintiff recognized that THE STATE BAR OF CALIFORNIA was a substantial factor, indeed, the greatest factor, in schemes to defraud the public through its lawyers – and that the entirety of their operations not only failed, but they were ***intended to defraud the public*** using false wires and mailers from an interstate enterprise. ***And that's when things got _worse_***.

342. **OVERT ACT #31 in Violation of 18 U.S.C. § 1343 and in Judicial Deception**

343. While appealing anti-SLAPP rulings (successfully) showing he is the victim of three lawsuits maliciously prosecuted under state law, as well as unfair business practices, intentional infliction of emotional distress, and slander of title or conversion, and five lawsuits maliciously prosected under federal law – Plaintiff delivers a preservation of evidence to ELI DAVID MORGENSTERN, ESQ., Joy Nunley, and Anand Kumar on October 14, 2021. Each disregards the letter as if that were reasonable, despite Plaintiff's constitutional right to sue for redress of grievances.

344. With intent to conceal what is actually known and by whom, the letter is not acknowledged until May 12, 2022, by Carissa Andresen, and it was not confirmed until Plaintiff files a public records request – which request apparently led to the disbarment of Thomas Girardi on June 1, 2022 whose public records were requested alongside KENNETH CATANZARITE, ESQ., JIM TRAVIS TICE, ESQ., TIM JAMES O'KEEFE, ESQ., BRANDON WOODWARD, ESQ., NICOLE MARIE CATANZARITE WOODWARD, ESQ. among the enterprise where Girardi appears in Plaintiff's May 2, 2022 FAC as being compared to KENNETH CATANZARITE, ESQ. due to the similar veracity of their criminal conduct carried on using enterprise control.

345. **OVERT ACT #32 in Violation of 18 U.S.C. § 1343 and in Actual Conspiracy**

346. Plaintiff's Government Claims Act form is delivered to Board of Trustees of THE STATE BAR OF CALIFORNIA between October 14, 2021 and received October 18, 2021, alleging fraud and corruption, or carrying on of unlawful activity and schemes to defraud using the mail and wire. He includes a breakdown of his damages, the range, how he determined them, and the actors involved in the fraudulent schemes at THE STATE BAR OF CALIFORNIA known to him.

347. Despite the material, actual financial conflicts inherent and Political Reform Act of 1974 related thereto – Board of Trustees makes decisions for itself and appears to be the only state agency in California to do so. Other agencies all go to Department of General Services (DGS).

22-CV-1616-BAS-DDL

348.   **OVERT ACT #33 in Violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1952(a)(3)**



**The State Bar**
*of California*

OFFICE OF CHIEF TRIAL COUNSEL

845 S. Figueroa Street, Los Angeles, CA 90017      213-765-1334      eli.morgenstern@calbar.ca.gov

November 22, 2021

<u>PERSONAL AND CONFIDENTIAL</u>

Via email only to <u>justintimesd@gmail.com</u>

Justin Beck
3501 Roselle St
Oceanside, CA 92056

Re:   Respondent:      Kenneth Catanzarite
        Case Number:    21-O-12371

        Respondent:      Nicole Catanzarite-Woodward
        Case Number:    21-O-05698

Dear Mr. Beck:

The State Bar of California has decided to abate the matters involving attorney Kenneth Catanzarite's representation of CTI.

The decision was based on the factors outlined in rule 5.50 of the Rules of Procedure of the State Bar, which are also considered by the Office of the Chief Trial Counsel ("State Bar") in evaluating whether to abate an investigation.

For instance, we considered that there are pending civil matter(s) which involve substantially the same misconduct that is it at issue in the State Bar matters, i.e. the conflict of interest created by Mr. Catanzarite and his law firm's representation of CTI even though he was concurrently, or had formerly, sued CTI.  (See Rules Proc. of State Bar, rule 5.50(B)(1).

Further, the pending civil matters charge Mr. Catanzarite and other attorneys within the Catanzarite Law Corporation with committing additional, potential acts of professional misconduct.

Consequently, the evidence "adduced" in the related civil matter(s) will aid the State Bar in its: (i) investigation of Mr. Catanzarite's conduct with respect to his representation of CTI; and (ii) potential prosecution of Mr. Catanzarite in State Bar Court. (See Rules Proc. of State Bar, rule 5.50(B)(4).

San Francisco Office                                            Los Angeles Office
180 Howard Street                                              845 S. Figueroa Street
San Francisco, CA 94105          www.calbar.ca.gov             Los Angeles, CA 90017

22-CV-1616-BAS-DDL

Justin Beck
Case Nos.: 21-O-12371, 21-O-05698
Page 2

We were also guided by Standard 2.5(a) of the Standards For Attorney Sanctions For Professional Misconduct, which provides that the harm caused to an attorney's client is a significant factor in determining the appropriate level of discipline for a violation of the conflict rules.

Again, the harm caused by Mr. Catanzarite's violation of the conflict rules, as well as his other alleged misconduct, is an issue in pending litigation.

For instance, in the complaint that Mr. Horwitz filed on behalf of CTI against Mr. Catanzarite and his law firm and others in the matter titled *CTI v. James Duffy, et.al*, it is alleged that Mr. Catanzarite's breach of fiduciary duty and malpractice caused significant financial harm to CTI.

Accordingly, the State Bar has decided to abate our investigation of Mr. Catanzarite until the resolution of the related, pending civil matter(s).  We will take no further action on your complaints at this time.

Please keep the records related to your complaint and inform this office if your address or telephone number changes.

Thank you for bringing this matter to our attention and for the valuable assistance you have provided to us.  The State Bar depends on the assistance of the public in effectively monitoring the conduct of California attorneys.

Sincerely,

Eli D. Morgenstern
Senior Trial Counsel

EM/jn

The foregoing letter by email intended to defraud Plaintiff in favor of CATANZARITE LAW CORPORATION, KENNETH CATANZARITE, ESQ., NICOLE MARIE CATANZARITE WOODWARD, ESQ., JIM TRAVIS TICE, ESQ., TIM JAMES O'KEEFE, and it disregarded all material facts and law shown ELI DAVID MORGENSTERN, ESQ.

349. **OVERT ACT #34 in Violation of 18 U.S.C. § 1344 and 18 U.S.C. § 1952(a)(3)**

350.    With intent to defraud financial institutions through parallel schemes, the Racket, KJC, CLC did use wire and postal mail to file and cause to be filed, and further in pursuit of the schemes to defraud as shown before in all preceding sections, another series of lawsuits plaguing the Courts unnecessarily **if the 19 Court of Appeal rulings are to be trusted** for

"Plaintiffs (and appellants)...(1) WA Southwest 2, LLC; (2) WA Southwest 15, LLC; (3) WA Southwest 19, LLC; (4) James Shee; (5) Jensen Enterprises, Inc.; (6) Thomas Olson; and (7) LaVonne Misner." *WA Southwest 2, LLC v. First American Title Insurance Co.*, 240 Cal.App.4th 148, 151 n.1 (Cal. Ct. App. 2015) "arising from] rubble of a failed multimillion dollar investment in commercial real estate. The trial court sustained a series of demurrers and entered judgments of dismissal as to numerous defendants. We affirm the three judgments of dismissal at issue here because the applicable statutes of limitations foreclose recovery. *WA Southwest 2, LLC v. First American Title Insurance Co.*, 240 Cal.App.4th 148, 150 (Cal. Ct. App. 2015) "G050445" *WA Southwest 2, LLC v. First American Title Insurance Co.*, 240 Cal.App.4th 148, (Cal. Ct. App. 2015) "09-04-2015 WA SOUTHWEST 2, LLC et al., Plaintiffs and Appellants, v. FIRST AMERICAN TITLE INSURANCE COMPANY et al., Defendants and Respondents. Catanzarite Law Corporation, Kenneth J. Catanzarite and Eric V. Anderton, for Plaintiffs and Appellants"

*WA Southwest 2, LLC v. First American Title Insurance Co.*,
        240 Cal.App.4th 148, (Cal. Ct. App. 2015)

351.    With intent to defraud banks and creditors, shown,

"[b]because the basic structure of the real estate transaction at issue here ha[d] been detailed in no fewer than **19 appellate court opinions**, and because this is an appeal from an order confirming an arbitration award, we will not engage in a detailed recitation here. We refer the reader to *Stella, supra,* 8 Cal.App.5th 181 and *WA Southwest 2, supra,* 240 Cal.App.4th 148, both of which contain detailed descriptions of the investments. The specific investment at issue here was detailed in *Aerovault Kornievsky, LLC v. Cushman & Wakefield, Inc.* (Aug. 5, 2016, G051702) [nonpub. opn.]. For present purposes, the most important fact is that appellants entered into the subject transactions in 2006."

*Asset Mgmt. Consultants v. Kornievsky*, G058399, 5-6 (Cal. Ct. App. Jan. 5, 2021)

352.    **OVERT ACT #35 in Violation of 18 U.S.C. § 1344 and 18 U.S.C. § 1952(a)(3)**

353.    Plaintiff incorporates the improper purposes shown against Scottsdale Insurance Co., which was sued without standing by the Racket's Catanzarite Law Corporation, defrauding the Court with actual malice and intent to harm Plaintiff in particular, all under the protection Racket and ongoing help of EDM, GRANDT, and DURAN.

88

22-CV-1616-BAS-DDL

"It is undisputed Catanzarite voluntarily dismissed the Root Action and the MFS Action on March 5, 2020. It dismissed the Scottsdale Action on November 18, 2019. "[A] voluntary dismissal is presumed to be a favorable termination on the merits[.] [Citation.]" (*Lee, supra,* 41 Cal.App.5th at p. 720.)" *Beck v. Catanzarite Law Corp.*, No. G059766, 31 (Cal. Ct. App. Jul. 13, 2022) In this case, Catanzarite dismissed two complaints on the same day, March 5, 2020. There was no evidence these dismissals occurred as a result of a settlement between Beck and plaintiffs. The trial court reasoned the dismissals were likely due to the previous Corporations Code section 709 ruling, holding MFS was not one of CTI's shareholders. However, the record shows that when Catanzarite learned MFS lacked standing to bring a derivative suit on CTI's behalf, it did not dismiss the lawsuits. Catanzarite filed FACs instead. *Beck v. Catanzarite Law Corp.*, No. G059766, 32 (Cal. Ct. App. Jul. 13, 2022) It is more likely Catanzarite's voluntary dismissal of the two lawsuits was related to a later disqualification ruling and the lack of tenable claims. The dismissals took place just a few months after the court disqualified Catanzarite and its attorneys from representing CTI and the Mesa Action plaintiffs (the class action shareholder derivative lawsuit). Given Catanzarite's zeal for filing multiple lawsuits against the same defendants, we can assume it would not abandon a meritorious action already initiated. Thus, we conclude the voluntary dismissal in this case should be regarded as a favorable termination of the two lawsuits (Pinkerton Action and MFS Action)."

*Beck v. Catanzarite Law Corp.*, No. G059766, 33 (Cal. Ct. App. Jul. 13, 2022).

354.   Showing the bank fraud by more than a preponderance, also carried on:

"The document reflected that on November 18, 2019, CTI [via CLC] dismissed the action against CTI's insurance company "in its entirety." As noted in our prior opinion, on November 15, 2019, the court granted the motion disqualifying Catanzarite from representing CTI. (*FinCanna, supra,* G058700.) In making its ruling, the court noted Catanzarite could not represent two client adversaries and in the Scottsdale Action [Catanzarite] claimed to be representing the corporation and at the same time sought to invalidate a defense and indemnity [Plaintiff under] CTI's insurance policy [and, Side A]. (*Ibid.*) The court stated a denial of coverage could put CTI "'on the hook for the individuals' costs of defense and/or liability.'" In other words, the court recognized Catanzarite was improperly using the Scottsdale Action for an improper purpose, i.e., to help [himself above anyone else, by any means through the ongoing, knowingly fraudulent "class" or "derivative"] Mesa Action [Mesa terminated JTT]. Accordingly, this dismissal was a favorable termination on the merits."

*Beck v. Catanzarite Law Corp.*, No. G059766, 33 (Cal. Ct. App. Jul. 13, 2022)

22-CV-1616-BAS-DDL

355.    **OVERT ACT #36 in Violation of 18 U.S.C. § 1956 and 18 U.S.C. § 1960**

356.    Responding by wire communication to Michael Tilden, RUBEN DURAN engaged in materially false statements with intend to defraud the public and California State Auditor, while showing the delibrerate concealment of money laundering and admitting to the unequal protection of Black mail attorneys in one fell swoop.

357.    9d. When investigating client trust account related cases and bank reportable actions not closed de minimis, require its staff to obtain both the bank statements and the attorney's contemporaneous reconciliation of the client trust account, and determine if the relevant transactions are appropriate.

358.    Disagree. [RUBEN DURAN, ESQ. prefers to carry on money laundering].

359.    ⑤    ⑥This approach would consume inordinate amounts of resources and time, requiring the State Bar in every such case to: (a) request from the attorney and/or subpoena from the bank statements for the account and wait for their receipt; (b) request the attorney's contemporaneous reconciliation and wait for its receipt; and (c) do a financial analysis of the statements and reconciliation to determine if the relevant transactions are appropriate. Many bank reportable actions and client trust account complaints do not warrant this level of investigation. For example, some non de minimis bank reportable actions are explained by extended holds on deposits of which the attorney was unaware, resulting in the issuance of checks at a time when the attorney believed funds had cleared but they had not—if a more truncated investigation shows this to be the case, there is no justification for the more extensive further investigation recommended by the State Auditor. A study the State Bar conducted last year of over 70,000 bank reportable action matters found that 22 percent did not involve a negative bank balance in actuality—the reportable action was triggered only by check deposit holds. Doing an investigation of the scope recommended by the State Auditor for every bank reportable action and client trust account complaint regardless of the underlying facts and merits would result in a waste of limited investigative resources and is not sound public policy.

360.    ⑦In addition, given data that shows that Black male attorneys are ten times more likely than their white male counterparts to be the subject of bank reportable actions, the impact of the approach recommended by the State Auditor will fall heavily on this group of attorneys. Black

22-CV-1616-BAS-DDL

male attorneys will be disproportionately required to take time away from their practices to gather and submit documentation to the bar and respond to investigative inquiries. Given that the data indicates that there is a significant percentage of cases for which this level of intervention is not required, the potentially disparate impact of the State Auditor's approach is difficult to justify.

361.    As noted above, OCTC has already modified its policy for identifying the circumstances in which complaints should continue to be pursued despite a complainant's withdrawal or failure to cooperate, and it will be revising its policies and practices regarding the use of alternatives to discipline and the identification of patterns of similar complaints against attorneys. All of these policy changes will apply to the State Bar's handling of bank reportable actions and complaints alleging client trust account violations. In addition, OCTC will revise its policies to define specific criteria in which bank reportable actions and complaints alleging client trust account violations should not be closed in the absence of obtaining both bank statements and the attorney's contemporaneous reconciliation of a client trust account and determining if the relevant transactions are appropriate and will implement a monitoring system to ensure these policies are being followed. We believe that this more targeted approach will more efficiently and effectively use the State Bar's **limited investigative resources to further the goal of public protection** while at the same time minimizing disparate impacts from increased investigations of bank reportable actions and client trust account complaints. [If limited ($60 million annually) were at issue, DURAN would charge the criminals, not others].

362.    For instance, in response, Michael Tilden writes: "⑥The statistic that the State Bar describes does not support its conclusions. Based on the State Bar's statement that 22 percent of the bank reportable action matters it reviewed did not involve a negative balance, it appears to be acknowledging that the remaining 78 percent of those matters did involve a negative balance. Such a substantial number of bank reportable actions involving actual negative bank balances is indicative of high risk and the need for more thorough investigations. In contrast, the State Bar suggests that investigating these matters without considering the underlying facts and merits would be a waste of limited investigative resources and is not sound public policy. However, as we illustrate throughout the report, the State Bar has regularly failed to effectively assess the underlying facts and merits of bank reportable actions, resulting in harm to the public.

22-CV-1616-BAS-DDL

363.    "Thus, the State Bar's objections to investigating bank reportable actions on a more consistent basis are unreasonable" [and now we know why; because RUBEN DURAN, ESQ. is engaged in money laundering, or carrying it on, at least by a preponderance].

364.    **OVERT ACT #37 in Violation of 18 U.S.C. § 1952(a)(3), Conspiracy, Control**

365.    With intent to defraud, and to conceal material state liability through exercise of the control of the RICO enterprise, Governor Gavin Newsom did overtly appoint Maurice Sanchez to the Fourth District, Division Three the date that Plaintiff's Government Claims Act notice was rejected.

# Maurice Sanchez, Associate Justice

🖶 Print



On November 10, 2021, Governor Gavin Newsom nominated Maurice Sanchez to serve as an Associate Justice of the Fourth District Court of Appeal, Division Three. Justice Sanchez was rated "exceptionally well qualified" for the position by the Commission of the California State Bar on Judicial Nominees Evaluation. He was confirmed by unanimous vote of the Commission on Judicial Appointments on January 6, 2022. Prior to his appointment to the Court of Appeal, Justice Sanchez served on the Family Law Panel of the Superior Court of Orange County. He was appointed to the Superior Court by Governor Jerry Brown on October 27, 2018.

Justice Sanchez was born in Orange, California, the fourth child of Mexican immigrants. Spanish was his first language. Justice Sanchez graduated from Mater Dei High School in 1974. He earned a Bachelor of Arts Degree from the University of California, Irvine in 1978 and a Juris Doctorate from the University of California, Berkeley in 1981. While in law school, he was an extern for Justice Mathew O. Tobriner of the California Supreme Court and co-director of the McBaine Honors Moot Court Board.

366.    **OVERT ACT #38 in Violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1952(a)(3)**

367.    Using its mail facility carrying on the serial schemes to defraud, two days after Maurice Sanchez is appointed to the same judicial district Court of Appeal for ORANGE COUNTY SUPERIOR COURT, November 12, 2021, a postal mail letter by Sarah Cohen, Claims Officer, vests Plaintiff rights to sue the government. In hindsight, this letter was intended to defraud Plaintiff.

368.    This letter and the related acts were also intended to conceal material state liability under color of law using enterprise control and conspiracy.

369.    **OVERT ACT #39 in Violation of 18 U.S.C. § 1952(a)(3) and 42 U.S.C. § 1983**

370.    Plaintiff files his state action case styled *Justin S. Beck v. The State Bar of California, et al.* (Orange County Superior Court Case No. 30-2021-01237499) on December 21, 2021.

371.    Plaintiff files a temporary restraining order application with a series of orders proving his allegations of ongoing schemes to defraud targeting him.

372.     Upon Plaintiff filing the TRO on January 12, 2022, Honorable Richard Lee recuses, and JOHN C. GASTELUM denies the TRO application despite the irreparable harm shown, and patterns of racketeering activity proven by court orders across several series of lawsuits. In other words, JOHN C. GASTELUM was appointed to carry on the enterprise schemes to defraud, and he deliberately ignored Plaintiff's clearly established rights and his harm under color of law.

373.     **OVERT ACT #40 in Violation of 18 U.S.C. § 1952(a)(3) and 42 US.C. § 1343**

374.     On February 7, 2022, using the wire, Carissa Andresen for the Office of General Counsel filed a demurrer on the frivolous grounds that THE STATE BAR OF CALIFORNIA and each of its actors are entirely immune from any and all claims in tort for any reason.

375.     When THE STATE BAR OF CALIFORNIA filed this through Andresen, it knew this to blanket immunity was false, but that she could rely upon control of the enterprise and judiciary, specifically the placement of JOHN C. GASTELUM under direction of Office of General Counsel.

376.     Accompanying the demurrer is ROA #49 in OCSC Case No. 30-2021-01237499, which shows the accusation Plaintiff sought to try in California Supreme Court that was disposed by JORGE E. NAVARETTE without regard for his constitutional rights or harm as being "returned unfiled." Instead, it is missing all exhibits, and it is frivolously asserted by THE STATE BAR OF CALIFORNIA as estopping Plaintiff's notices of injury, or the duties held by each public employee to stop crime (and not enable it). This fraudulent assertion is repeated in May 2022, shown later.

377.     **OVERT ACT #41 in Violation of 18 U.S.C. § 1952(a)(3) and 42 US.C. § 1343**

378.     Also on February 7, 2022, Vanessa Holton announces her retirement to take place in July 2022, which would seem like a coincidence but for the pattern of racketeering activity related.

379.     This wire communication publicly announces that Office of General Counsel is also the Complaint Review Unit, but does not disclose that it also defends tort claims against itself, which is an egregious use of power intended to defraud the public and enable enterprise schemes violative of the Political Reform Act of 1974. And it did and it does defraud the public.

380.     This wire communication was intended to preserve non-existent privilege or confidentiality, which is a pattern for THE STATE BAR OF CALIFORNIA and each of its actors, who claim these things only due to enterprise control and impunity without regard for public harm.

22-CV-1616-BAS-DDL

381.   **OVERT ACT #42 in Violation of 18 U.S.C. § 1343 and in Obstruction of Justice**

382.   On May 2, 2022 as more facts are learned without any discovery production, Plaintiff files his first amended complaint in Government Claims Act litigation without recognizing that JOHN C. GASTELUM is under enterprise control

383.   With intent to defraud, without regard for Plaintiff's ongoing harm, and to conceal material state liability in furtherance of enterprise money laundering setup by LEAH WILSON, ESQ. and other schemes with RUBEN DURAN, ESQ., another nomination is made to the Fourth District, Division Three by Governor Gavin Newsom the *exact same day*.

### Joanne Motoike, Associate Justice



🖨 Print

Justice Joanne Motoike was nominated to the 4th District Court of Appeal, Division 3, by Governor Gavin Newsom on May 2, 2022. She was rated "exceptionally well qualified" for the position by the Commission on Judicial Nominees Evaluation of the State Bar of California. On June 16, 2022, she was confirmed by unanimous vote of the Commission on Judicial Appointments.
Prior to her appointment to the Court of Appeal, Justice Motoike was assigned to the Orange County Juvenile Court and served as the Presiding Judge of the Juvenile Court from 2018 to 2022 during which time she was responsible for the administration of the county's juvenile justice and child welfare courts, services, and programs. From 2013 to 2015, she was assigned to the Stephen K. Tamura - West Justice Center where she presided over adult criminal matters.

384.   The improper purposes of appointing these justices (of which there were three) is made manifest in December 2022 to obstruct writ proceedings at the direction of either Chief Justice Tani Sakil Sakauye, or at the direction of Board of Trustees, or at the direction of Office of General Counsel and ROBERT GEORGE RETANA, ESQ. and SUZANNE CELIA GRANDT, ESQ. – who operate at all times through a unity of unlawful interests without regard for public interest or federal civil rights.

385.   **OVERT ACT #43 in Violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1952(a)(3)**

386.   With intent to defraud and to carry on unlawful activity using the wire, on Thursday, May 19, 2022 which was the day before Alex Hackert stated an extension was needed on a public records request concerning Thomas Girardi, KENNETH CATANZARITE, ESQ., JIM TRAVIS TICE, ESQ., NICOLE MARIE CATANZARITE WOODWARD, ESQ., BRANDON WOODWARD, ESQ., and TIM JAMES O'KEEFE – RUBEN DURAN, ESQ. copying GEORGE SARGENT CARDONA, ESQ., LEAH WILSON, ESQ., and CARISSA ANDRESEN, ESQ, with THE STATE BAR OF CALIFORNIA show a unity of unlawful interests in regulation, civil defense, prosecution, fraudulent concealment, and constructive fraud. *Ex. 120*.

387.   With intent to defraud and to carry on unlawful activity using the wire, and without disclosing material state liability using control of the enterprise, GEORGE SARGENT CARDONA, ESQ. does use the wire and propounds materially false statements in favor of KENNETH CATANZARITE, ESQ., JIM TRAVIS TICE, ESQ., NICOLE MARIE CATANZARITE WOODWARD, ESQ., BRANDON WOODWARD, ESQ., and TIM JAMES O'KEEFE without regard of the Court of Appeal rulings, which are frivolously dismissed as being "unpublished" without regard of Cal. Rules of Court 8.1115(b)(1)-(2) (fraud, crime, and discipline exceptions) and without regard for the truth or their duties at law, and without regard for public interest. *Ibid.*

388.   Despite the ongoing scheme involving directly adverse representation of parties before the same tribunal, GEORGE SARGENT CARDONA, ESQ. confirms that the civil litigation against THE STATE BAR OF CALIFORNIA (or the improper purpose) is what is driving these decisions.

389.   Despite the ongoing scheme to defraud the public, namely Plaintiff, GEORGE SARGENT CARDONA, ESQ. suggests that approximately 50 violations of California Rules of Professional Conduct 1.7(d)(3) is not sufficient to discipline criminal conduct and judicial fraud.

390.   Because of the ongoing scheme to defraud, ANTHONY B. SCUDDER is later extorted or bribed by KENNETH CATANZARITE, ESQ. under the threat of $13,000 in legal fees where ANTHONY B. SCUDDER apparently believes that the instant action to be less foreboding than face any form of judgment from lawyers who steal houses and ruin lives as a practice. *Ibid.*

391.   The conflicts would manifest, and the harm would show, in December 2022. *Ibid.*

392.   **OVERT ACT #44 U.S.C. § 1343 and 18 U.S.C. § 1503**

393.   With intent to defraud, and to conceal material state and personal liability, even after a notice of potentiated obstruction of justice in this proceeding, and to carry on the unlawful conduct of herself, RUBEN DURAN, ESQ., LEAH WILSON, ESQ., GEORGE SARGENT CARDONA, ESQ., KENNETH CATANZARITE, ESQ., JIM TRAVIS TICE, ESQ., NICOLE MARIE CATANZARITE WOODWARD, ESQ., BRANDON WOODWARD, ESQ., and TIM JAMES O'KEEFE – SUZANNE CELIA GRANDT, ESQ. did use the wie again, and did obstruct, and did carry on the unlawful conduct, and did send this threatening letter under color of law (*Ex. 120, p. 2*)

On Mon, Dec 12, 2022 at 10:40 AM Grandt, Suzanne <Suzanne.Grandt@calbar.ca.gov> wrote:

Mr. Beck,

On December 12, 2022 at approximately 9:56 AM, you received an email containing communication that is confidential and privileged, pursuant to and without limitation Business and Professions Code section 6086.1(b), and attorney-work product and attorney-client privileges. The forwarding of this email was inadvertent and should not be construed as a waiver of state confidentiality law. We request that you do not use, share, or retain any copy of this email.  Please inform us immediately if you have disseminated this record to any third parties, or confirm in writing that you have not done so.

Please immediately destroy all copies of this record in your possession and inform us in writing when you have complied with this request and no later than end of business day today.

Thank you for your cooperation,

Suzanne C. Grandt | Assistant General Counsel

Office of General Counsel

The State Bar of California | 180 Howard St. | San Francisco, CA 94105

415.538.2388 | Suzanne.Grandt@calbar.ca.gov

394.    Plaintiff did reply to this, clarifying the misapplication of privilege and color of law through which they operate, stating:

As repeatedly referenced -- your communications are not privileged under state law.

Evidence Code section 956 provides that "[t]here is no privilege under this article if the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit a crime or a fraud."

The information is in the hands of the FBI, United States DOJ, and the public corruption unit -- as with everything else.

395.    **OVERT ACT #45 in Violation of U.S.C. § 1343/1341 and 18 U.S.C. § 876**

396.    With intent to obstruct justice, and to intimidate Plaintiff, using the postal mail and wire communications, also intending to conceal material state liability, also to carry on the unlawful activity of each actor above, and in furtherance of control or attempted control of the interstate enterprise under 18 U.S.C. § 1962(b), ELLIN DAVTYAN, ESQ. did send the following to Plaintiff:

22-CV-1616-BAS-DDL

1
2
3

**The State Bar**
*of California*

OFFICE OF GENERAL COUNSEL

180 Howard Street, San Francisco, CA 94105

ellin.davtyan@calbar.ca.gov
415-538-2000

4
5

December 15, 2022

6
7

**Via U.S. Mail and Email: justintimesd@gmail.com**
Justin S. Beck
3501 Roselle Street
Oceanside CA 92056

8

Dear Mr. Beck:

9
10
11

As we have already informed you, on December 12, 2022 at approximately 9:56 a.m., you received an email containing communication that is confidential and privileged, pursuant to and without limitation Business and Professions Code section 6086.1(b), and attorney-work product and attorney-client privileges. The forwarding of this email was inadvertent and should not be construed as a waiver of state confidentiality laws.

12
13
14
15

You assert that the State Bar's internal communications with its counsel are not privileged because of your mistaken belief that the State Bar performing its public function differently than you believe it should constitutes a "fraud." Setting aside the fact that your mischaracterizations do not control the application of the privilege, the crime-fraud exception you cite only applies where the specific communication was made for the purpose of aiding a crime or fraud. On its face, the communication you were inadvertently sent related to whether to grant *your* request to waive confidentiality as to certain complaints you have made against various attorneys. The State Bar's consideration of your request that it exercise its discretion in such a manner is neither a crime nor a fraud.

16
17

We reiterate that you have no right to share or retain the State Bar's privileged communications, and request that you identify all persons to whom you have distributed the communication and destroy any copies in your possession.

18

Thank you for your anticipated cooperation.

19

Sincerely,

20
21

Ellin Davtyan
General Counsel

22
23

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 South Figueroa Street
Los Angeles, CA 90017

24   397.   **OVERT ACT #46 in Violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1952(a)(3)**

25   398.   For Los Angeles Times ongoing scrutiny... "A team of auditors pored over the State

26   Bar's internal data and identified examples of specific lawyers with disturbing track records who

27   received little or no discipline [of which there are more than 700]. None of the attorneys were named

28   in the report [because they are protected and "made"]. One was the subject of 165 complaints over

seven years, but auditors found that many of the complaints were dismissed outright or closed after the bar issued private letters to the lawyer." [Postal mail letters to further schemes to defraud].

399.    "Although the volume of complaints against the attorney has increased over time, the State Bar has imposed no discipline, and the attorney maintains an active license," Tilden said in a letter summarizing his office's findings.

400.    The Pulitzer prize winning journalist, Matt Hamilton and Los Angeles Times story, goes on: "[a]nother unidentified attorney had been the subject of several complaints alleging a failure to give clients money from their settlements. "When the State Bar finally examined the attorney's bank records, it found that the attorney had misappropriated nearly $41,000 from several clients," Tilden wrote. [Federal conviction for money laundering is cited in the same report].

401.    "The chair of the State Bar's board of trustees, Ruben Duran, said in an interview that he was troubled by the audit's findings [he does not care], calling its conclusions "some of the hardest-hitting discoveries" that the State Auditor has ever made about the agency. He said that staff and leadership wanted to ensure the public was better protected, and that many reforms had been implemented after the Girardi case exposed deficiencies." [noting that DURAN is full of shit].

402.    "It shouldn't matter whether your lawyer is an A-list celebrity or a solo practitioner down the street. Everyone deserves competent, ethical legal services," Duran said. He noted that the State Bar went about two decades without fee increases, and said some of the problems at the bar stem from this long-term underfunding at an agency that has to monitor more than 250,000 attorneys." DURAN's comments, in light of Plaintiff's adjacent treatment, and concealment, were intended to defraud the public.

403.    "Duran noted that the bar had implemented reforms that address some of the issues highlighted by the audit, including proposing a new program to monitor attorney trust accounts, increased oversight of the chief trial counsel's office, and twice yearly reviews of closed cases by an outside auditor. Last summer, the agency also hired George Cardona, a former federal prosecutor, to serve as chief trial counsel." [DURAN's comments are similar to those in 2002 from those in his position or similarly situated engaged in carrying on schemes to defraud the public, as shown here].

22-CV-1616-BAS-DDL

404. "But fully implementing the State Auditor's recommendations would require about 30 new employees and $1 million in one-time funds," Duran said. [Which DURAN refuses to impose on their racketeers by way of disciplinary costs, and use this "lacking" to conceal racketeering].

405. Assemblymember Mark Stone (D-Scotts Valley), who is chair of the Assembly's Judiciary Committee, said the audit was "profoundly eye-opening." [RUBEN DURAN company line]

406. "Victims of unscrupulous lawyers [like Plaintiff] should not be re-victimized by a State Bar that too often has protected those lawyers from full scrutiny," [not unless the enterprise says its ok]" Stone said in a statement. "We will continue to push the Bar to get back to basics and reform its discipline system once and for all." **Live, in 2022, results are worse, deliberate, unconscionable.**

407. "Girardi was once a top plaintiffs' attorney and Democratic powerbroker who gained reality TV fame on "Real Housewives of Beverly Hills" alongside his third wife, Erika. His downfall in December 2020 was in part triggered by a judge finding that he had misappropriated millions from families of those killed in an Indonesian plane crash. But after the collapse of his Wilshire Boulevard law firm, scores of clients came forward saying they were swindled by Girardi and The Times documented a trail of misconduct allegations going back decades." [Girardi is a scapegoat].

408. "Earlier this month, a Chicago law firm accused Girardi and other lawyers at his defunct firm of running "the largest criminal racketeering enterprise in the history of plaintiffs' law," pocketing millions from clients, vendors and fellow attorneys." [David Lira is carried on, still].

409. "That Girardi's serial misconduct went unchecked for decades has forced a reckoning among the legal establishment. In addition to the State Bar's acknowledgement of past mistakes [while concealing live, current ones of greater veracity and state liability], the agency has also been conducting a [fraudulent] investigation into whether its own employees or other agency insiders helped Girardi skirt scrutiny. That investigation is ongoing," [and concealed], Duran confirmed.

410. "Girardi is not named in Thursday's report by the State Auditor, but the findings make clear that he was not alone in sidestepping sanction by the bar's disciplinary system."

411. "I think we definitely identified misconduct that does impact the average Californian if they are using the legal system," said Jon Kline, a principal at the auditor's office who helped lead the review. "Misappropriation is a concern: That's money that should be going to clients that the

22-CV-1616-BAS-DDL

attorney has absconded with." [This is also called Larceny or unlawful transmission of moneys, with intent to defraud and as part of a pattern of racketeering activity].

412.    "The audit found that the State Bar failed to fully identify patterns of misconduct and investigate further, either because of its case management system or because of how it treats complaints that are withdrawn. For example, one attorney was named in multiple complaints for failing to pay settlement funds. The bar closed each after the attorney "finally paid the client," but the audit states that the bar did not obtain the lawyer's bank records until it received more than 10 complaints over two years."

413.    "When the State Bar finally examined the client trust account, it found that the attorney had misappropriated nearly $41,000 in total from several clients," the audit states.

414.    "The audit found that the State Bar had also prematurely closed cases that needed further investigation or potential discipline, often through a host of confidential methods, like issuing private warning letters that are not knowable to the public. The audit found inconsistencies in the use of nonpublic methods, and indicated the agency had relied too much on such **secretive forms of discipline**." [In light of the foregoing, virtually everything Board of Trustees engages in is fraudulent].

415.    "From 2010 to 2021, the bar used confidential letters or warnings to attorneys twice as often as it sought public discipline. During that time frame, **more than 700 attorneys had at least four or more complaints each that were closed through private measures [700+ CLUB]**. The auditors reviewed five attorneys' cases and found the cases were closed "despite indications in its case files that further investigation or actual discipline may have been warranted."

416.    "The State Bar had only one outside reviewer, and that person had been the sole person examining closed cases since 2012. The State Bar's staff was also selecting which cases the reviewer examined, and the reviewer's findings went to management, not its board of trustees."

417.    "Anytime findings are going through management, it introduces the risk that what is provided ultimately to the governing body is altered," said Kline, the principal auditor. [As Plaintiff shows, LEAH WILSON, ESQ. operates for the Board of Trustees, and now controls "ombuds" too.]

418.    "Other errors were basic investigatory lapses [60-day+ lapses show obvious tampering and collusion], like accepting poor levels of evidence. An attorney who had overdrawn a client trust

account twice in a month was asked by the bar to provide bank records. The attorney turned over bank statements but left out the month when the trust account was overdrawn. Instead, the lawyer provided a narrative of transactions in that month. Rather than request the bank statement, the State Bar accepted the lawyer's explanation and closed the case." **"There is this focus on closing cases quickly in order to"** [launder money, blame funding, distract scrutiny]. [plaintiff edits, emphasis]

419.   **OVERT ACT #47 in Violation of Political Reform Act of 1974 by DURAN**

420.   On June 1, 2022, during the pendency of his extended Public Records Request, and after conspiring to conceal the material harm to Plaintiff while protecting the schemes of CATANZARITE LAW CORPORATION and with intent to defraud – the disbarment of Thomas Girardi, subject of his public records request, was announced by "State Bar Court."

421.   **OVERT ACT #48 in Violation of 18 U.S.C. § 1343 and 15 U.S.C. § 1, Etc.**

422.   On July 20, 2022, SUZANNE CELIA GRANDT, ESQ. delivers ratification of serial schemes intending to defraud Plaintiff and others in favor of CATANZARITE LAW CORPORATION, KENNETH CATANZARITE, ESQ., NICOLE MARIE CATANZARITE WOODWARD, ESQ., BRANDON WOODWARD, ESQ., JIM TRAVIS TICE, ESQ., and TIM JAMES O'KEEFE. Specifically, the Board of Trustees and Grandt had actual knowledge of court orders in three series of cases, but chose to carry them on anyway without regard of Plaintiff.

423.   **OVERT ACT #49 in Violation of United States Constitution and 18 U.S.C. § 1343**

424.   After Platiniff delivered a deposition subpoena upon THE STATE BAR OF CALIFORNIA to appear at its own public address on September 9, 2022, SUZANNE CELIA GRANDT, ESQ. files a frivolous "Anti-SLAPP" under color of California law. Importantly, Cal. Cod. of Civ. Proc. § 425.16 was intended to protect free speech and to defraud and oppress Plaintiff further.

425.   In California, the enterprise intentionally converted the right to petition and the right of free speech, as well as the right to sue for redress into grievances, into legal fees for itself and lawyer schemes while actually inhibiting or destroying all of the protected rights under color of law.

426.   The meritless "Anti-SLAPP" was filed 7-months into proceedings with intent to conceal liability; Cal. Cod. Civ. Proc. § 425.16 purportedly intended an "early screening tool" to be filed within 60-days, instead used to abuse Plaintiff under color of law using enterprise control.

22-CV-1616-BAS-DDL

427.    **OVERT ACT #50 in Violation of 18 U.S.C. § 1343, and in Obstruction of Justice**

428.    Where Plaintiff filed a motion for summary judgment in that action, too, defeating all immunities as a matter of law and proving his case beyond a preponderance for seven causes of action, SUZANNE CELIA GRANDT, ESQ. moved JOHN C. GASTELUM's court *ex parte* on August 22, 2022 with intent to defraud and further conceal material state and personal liability using the wire.

429.    **OVERT ACT #51 in Violation of 18 U.S.C. § 1343, and 18 U.S.C. § 1962(b)**

430.    On August 8, 2022, Plaintiff did file a motion for summary judgment in CX105 before Judge Randall Sherman in Orange County Superior Court scheduled for November 4, 2022. The same day, Thomas A. Delaney is nominated by Governor Gavin Newsom to conceal material state liability in furtherance of the schemes to defraud, using control of the enterprise.

## Thomas A. Delaney, Associate Justice



🖨 Print

Thomas A. Delaney was nominated to the California Court of Appeal, Fourth Appellate District, Division Three, by Governor Gavin Newsom on August 8, 2022, and was confirmed by unanimous vote of the Commission on Judicial Appointments on October 11, 2022. Prior to his confirmation, Justice Delaney served as a judge of the Superior Court in Orange County since 2014. At the time of his nomination, he served as Supervising Judge of the Collaborate Courts, where he presided over the Veterans Courts, among others. He previously served on the Unlimited Civil Panel at the Central Justice Center and the Limited Criminal Panel at the Harbor Justice Center.

431.    **OVERT ACT #52 in Violation of 18 U.S.C. § 1343, and 18 U.S.C. § 1962(b)**

432.    Giving context to unprotected racketeering activity, published statements disseminated by wire communication containing material misstatements of facts, showing the anticompetitive nature in restraint of trade on August 14, 2022 in furtherance of their schemes [with Plaintiff interpretation], defendant DURAN said the following in an Los Angeles Times article entitled California State Bar, under scrutiny for Tom Girardi scandal, gives director $43,000 raise [I run an anti-competitive, per se trust] "for lawyers," said Ruben Duran, a San Bernardino County attorney [and Partner with private law firm Best Best & Krieger] who [concurrently] chairs the [nonsovereign] state bar's governing board. He said comparisons to the salaries of the governor and others are unfair. "I don't want to go so far as to say apples and oranges, but it is a very specific type of role we're filling" [to obscure and conceal our true operations, and to restrict commerce].

22-CV-1616-BAS-DDL

433.    "The bar, the largest in the country, licenses California's 260,000 attorneys and is supposed to investigate and discipline lawyers who cheat clients or engage in other types of misconduct. In the wake of Girardi's spectacular downfall, amid evidence he misappropriated millions in settlement money, critics have lambasted the agency for bungling complaints against him." [Girardi is a convenient, quieted, **symptom of the disease**.]

434.    "After a Times report last year about the legendary lawyer's cultivation of bar officials, the agency conducted its own audit, which found "mistakes made in some investigations over the many decades of Mr. Girardi's career going back some 40 years." A separate audit ordered by legislators found systemic shortcomings, with lawyers avoiding public accountability despite lengthy records of misconduct complaints. Currently, a law firm hired by the bar is investigating whether officials within the agency helped Girardi elude punishment." [*They knew, and know, and conceal*].

435.    The bar has [fraudulently, knowingly] pledged to reform itself [through active market participants who are shown to carry on and ratify schemes to defraud again]; Duran, the board chair, said Wilson's role as executive director is key to those efforts [and schemes]. Wilson began working at the bar in 2015, served as executive director from 2017 until 2020 and served as a paid consultant for the agency until last summer [while she setup the parallel distribution of funds after the United States Supreme Court decision in 2015, after which] she returned to the executive director's post."

436.    **OVERT ACT #53 in Violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1952(a)(3)**

437.    The night before the August 22, 2022, *ex parte* hearing on a Sunday before JOHN C. GASTELUM, ELI DAVID MORGENSTERN, ESQ. did send Plaintiff a new notice of investigation.

438.    JOHN C. GASTELUM did protect the enterprise, without regard of Plaintiff's due process rights in furtherance of the schemes to defraud, and despite the pendency of a duly noticed hearing on October 4, 2022, he did move Plaintiff's hearing to December 27, 2022, to be heard the same day as the frivolous "Anti-SLAPP" intending to suppress Plaintiff's right of petition and despite his right to sue for redress of grievances protected by the United States Constitution.

439.    JOHN C GASTELUM did this in order that the "demurrer" would be heard first, which had been scheduled for October 11, 2022, where his motion for summary judgment was scheduled for October 4, 2022, using enterprise control, and at the direction of SUZANNE CELIA GRANDT, ESQ.

440. **OVERT ACT #54 in Violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1952(a)(3)**

441.   On September 22, 2022, a status conference in CX105 was unattended by THE STATE BAR OF CALIFORNIA, nor STATE OF CALIFORNIA, nor other state defendants, in ORANGE COUNTY SUPERIOR COURT where each intended to conceal material state liability using the enterprise control exerted.

442.   On September 22, 2022, JIM TRAVIS TICE, ESQ. purported "securities class counsel" in the fraudulent "Mesa Action" was not present, either. He knew he could rely upon enterprise control through others, and that he was protected by other actors working in conspiracy.

443.   On or around October 4, 2022, an order was filed by CX105 about the case management conference stating that JIM TRAVIS TICE, ESQ. *was* present, when he was not.

444.   NICOLE MARIE CATANZARITE WOODWARD, ESQ. attended by audio, but her "video was not working" which she knew to be fraudulent, and did use the wire, too.

445. **OVERT ACT #55 in Violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343**

446.   On September 21, 2022, California Supreme Court clerk and witness Ines Calanoc accepts Plaintiff's antitrust petition filed under *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015) and 15 U.S.C. § 1. The petition includes four volumes of exhibits.

447.   On September 27, 2022, using the wire with intend to defraud, California Supreme Court Chief Justice Tania Cantil Sakauye strikes it as being "premature" and it is delivered by postal mail to Plaintiff.

448.   With intent to defraud, and in knowing violation of federal antitrust laws, the antitrust petition is sent back to Office of General Counsel to make an antitrust determination for itself.

449.   With intent to defraud, the antitrust determination by SUZANNE CELIA GRANDT, ESQ. or ROBERT GEORGE RETANA, ESQ. frivolously ignores *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015) while citing stale case law *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315. In other words, THE STATE BAR OF CALIFORNIA has no regard for the United States Supreme Court, either, due to control of the enterprise in California.

450.   **OVERT ACT #56 in Violation of 18 U.S.C. § 1956 and 18 U.S.C. § 1952(a)(3)**

451.   An August 31, 2022, article from Los Angeles Times reads: "The wire [to buy a judge a condo] did not come from Girardi's personal bank account, but rather from a [IOLTA] containing settlement money for clients of his Wilshire Boulevard law firm, Girardi Keese. At the time of the transfer to Bigelow, the account held funds owed to cancer victims and other residents of a polluted Inland Empire community, who had sued cement manufacturers in Riverside Superior Court in 2008, according to the state court records." "Following the Los Angeles Times article and investigation into IOLTAs that Ruben Duran was purportedly thankful for, a September 22, 2022 article reads "legal legend [700+ CLUB Tom Girardi] was a major party donor for decades, a self-described "limousine liberal" who bragged about the influence his money bought him in the selection of judges. He poured millions into local, state and national races personally and lined up additional donations from his wife, "Real Housewives of Beverly Hills" star Erika; the employees of his law firm; and the multitude of California trial lawyers who did business with him — or hoped to." "Girardi kept throwing splashy fundraisers and writing big checks even as his financial situation grew dire. In the last decade, he defaulted on a series of high-interest loans and was forced to liquidate his stock portfolio yet he and his wife still doled out more than $2 million to the national Democratic Party and individual candidates, election filings show. Those receiving funds included presidential contenders Joe Biden ($11,200), Barack Obama ($62,500) and Hillary Clinton ($60,400), Gov. Gavin Newsom ($66,900), U.S. Sen. Dianne Feinstein ($18,700), former state Insurance Commissioner Dave Jones ($37,244), L.A. Mayor Eric Garcetti ($9,500) and City Atty. Mike Feuer ($11,000)." In the years that he and his wife gave $2 million to candidates, Girardi treated a bank account meant to safeguard settlement money for clients as "his personal piggy bank… to support his lavish lifestyle," according to a recent filing by the trustee overseeing the bankruptcy of his law firm, Girardi Keese. In that same time frame, the trustee wrote, Girardi "stole at least $14,000,000 in settlement funds that should have gone to the Firm's clients." "Those clients were mainly of modest means and already suffering from health problems because of toxic contamination, recalled pharmaceuticals, motor vehicle crashes or other misfortunes. Many are still trying to collect their full settlements, according to bankruptcy claims they have filed seeking compensation." "Former client Christina Fulton, who was seriously injured in a car

105                                          22-CV-1616-BAS-DDL

accident and contends Girardi embezzled about $745,000 from her settlement, called on politicians to reevaluate accepting the donations." "Girardi's decision to continue funding candidates in the face of crushing financial problems offers additional evidence that he regarded political connections as central to maintaining his facade." The settlement Tom Girardi reached with a drug company in 2005 was characteristically large and righteous: some $66 million the famed Los Angeles trial attorney won on behalf of patients who said a diabetes medication caused liver failure and other maladies. An article on August 4, 2022 published by Los Angeles Times says "At Girardi's suggestion, a nationally renowned mediator was appointed to ensure proper distribution of the funds. For overseeing the settlement, retired California appellate Justice John K. Trotter Jr. and his private judging firm, JAMS (formerly known as Judicial Arbitration and Mediation Services), received a $500,000 cut." "Yet in the years that followed, Girardi diverted money Trotter was hired to safeguard for purposes that were highly questionable and even, in the recent assessment of one federal judge, "a crime." Girardi sent $750,000 to a jeweler for what Bankruptcy Court records show was the purchase of an enormous pair of diamond earrings for his wife, "The Real Housewives of Beverly Hills" star Erika Girardi. He dipped into the settlement account [IOLTA] again and again for supposed case expenses, sometimes writing multiple seven-figure checks to his law firm in the same week, according to the records."

452.    Showing the enterprise schemes to defraud, KENNETH CATANZARITE, ESQ., his daughter NICOLE MARIE CATANZARITE WOODWARD, ESQ., his personal counsel JIM TRAVIS TICE, ESQ., his daughter's husband BRANDON WOODWARD, ESQ., and TIM JAMES O'KEEFE of CATANZARITE LAW CORPORATION are carried on in similar fashion, here.

453.    **OVERT ACT #57 in Violation of 18 U.S.C. § 1962(d) and 18 U.S.C. § 1962(b)**

454.    In conspiracy with SUZANNE CELIA GRANDT, ESQ., and without regard of Plaintiff's clearly established rights under the United States Constitution, on October 11, 2022, Plaintiff did appear in C11 before JOHN C GASTELUM, where demurrer is sustained without leave to amend, with intent to defraud Plaintiff, conceal material state liability, and protect the enterprise under color of law.

22-CV-1616-BAS-DDL

455.   With intent to defraud, under control of the enterprise, JOHN C GASTELUM ignores a motion for summary judgment and more than one thousand pages of evidence, not to mention the entire pleadings upon which his Government Claims Act litigation is based.

456.   With intent to defraud, during the October 11, 2022 hearing, SUZANNE CELIA GRANDT, ESQ. asked JOHN C. GASTELUM if the Court would dismiss Plaintiff's entire Government Claims Act lawsuit, which has public interest standing, or Plaintiff would keep "adding defendants without any relation to the facts."

457.   The same day on October 11, 2022, in apparent obstruction of justice and intent to conceal material state liabilities, newly nominated Thomas A. Delaney is confirmed by unanimous vote of the Commission on Judicial Appointments.

458.   **OVERT ACT #58 in Violation of 15 U.S.C. § 1 and 18 U.S.C. § 1962(b)**

459.   On October 13, 2022, Plaintiff files a writ petition challenging the frivolous and unlawful sustaining of demurrer without leave to amend from JOHN C. GASTELUM.

460.   With intent to defraud, and to conceal material state liability, while aiding CATANZARITE LAW CORPORATION, on October 13, 2022, despite being served several times in OCSC Case No. 30-2020-01145998, SUZANNE CELIA GRANDT, ESQ. states that the Court has no jurisdiction because she wasn't served, and therefore she, RUBEN DURAN, and ELI DAVID MORGENSTERN would not produce special interrogatories, which she knew was false and did intend to defraud Plaintiff and conceal material state liability, further.

461.   **OVERT ACT #59 in Violation of 18 § 1343 and 18 U.S.C. § 1962(b)**

462.   Also on October 13, 2022, in apparent conspiracy with intent to defraud using the wire, KENNETH CATANZARITE, ESQ. delivers voluminous discovery on behalf of adverse party AMY JEANETTE COOPER and others seeking answers to questions that he already knows, many of which are about adjudicative facts shown in the preceding paragraphs. KENNETH CATANZARITE, ESQ. knew he could rely on enterprise control to continue his scheme to defraud non-lawyers.

463.   **OVERT ACT #60 in Violation of 15 U.S.C. § 1 and 18 U.S.C. § 1962(b)**

464.   On October 17, 2022, Fourth District Division Three accepts G061896 and nine volumes of exhibits, which evidence is known to each defendant, or reasonably should be known.

465.    With intent to defraud, and to conceal material state liability, on October 18, 2022, Office of General Counsel removes all exhibits from Plaintiff's September 21, 2022 antitrust petition.

466.    With intent to defraud, using the wire, on October 18, 2022, Office of General Counsel files an antitrust petition on behalf of Plaintiff that was not authorized by him, after SUZANNE CELIA GRANDT, ESQ. and ROBERT GEORGE RETANA, ESQ. remove all exhibits in deliberate obstruction of justice, in each case using control the enterprise.

467.    With intent to defraud, using the wire, SUZANNE CELIA GRANDT, ESQ. and ROBERT GEORGE RETANA, ESQ., did these acts with JORGE E. NAVARETTE of the California Supreme Court, and they did it knowingly in furtherance of the scheme.

468.    **OVERT ACT #61 in Violation of 18 U.S.C. § 1503 and 18 U.S.C. § 1962(b)**

469.    On November 29, 2022, Plaintiff delivers notice of potentiated obstruction of justice of pending federal proceedings, including the instant action, Congressional petition, and proceedings demanded before Federal Trade Commission concerning ongoing antitcompetiive conduct undertaken using enterprise control in regulation by active market participant regulators.

470.    With intent to defraud using the wire and postal mail, on November 30, 2022, JORGE E. NAVARETTE did deliver an "En Banc" decision from California Supreme Court on the petition that Plaintiff did not file.

471.    With intent to defraud, and to conceal material state liability using control of Judicial Council and herself of the enterprise, California Supreme Court Chief Justice Tani Cantil Sakauye, who had actual knowledge of Plaintiff's original petition, and who knew that the conduct was flagrantly violative of federal antitrust law of the highest Court in the United States, without regard for her duty, and without regard for Plaintiff's harm or the damage to the sanctity of democracy, did sign or authorized JORGE E. NAVARETTE to place her signature upon the fraudulent "En Banc" decision, and she did authorize it to be sent to Plaintiff by postal mail after November 30, 2022.

472.    **OVERT ACT #62 in Violation of 18 U.S.C § 1343 and 18 U.S.C. § 1962(b)**

473.    Plaintiff moved the Court for defaults and showed that he had served THE STATE BAR OF CALIFORNIA, SUZANNE CELIA GRANDT, ELI DAVID MORGENSTERN, and

22-CV-1616-BAS-DDL

RUBEN DURAN, and STATE OF CALIFORNIA each eight times from September through November 2022.

474.     With intent to conceal material state liability, and to exercise control over the enterprise, SUZANNE CELIA GRANDT, ESQ. did inadvertently disclose the May 19, 2022 overt acts involving GEORGE SARGENT CARDONA, ESQ., RUBEN DURAN, ESQ., Carissa Andresen, Esq., copying LEAH WILSON, ESQ.

475.     With intent to conceal and to carry on the fraudulent scheme, using the wire, SUZANNE CELIA GRANDT, ESQ. did seek to "RECALL" the electronic transmission to Plaintiff.

476.     **OVERT ACT #63 in Violation of 18 U.S.C § 1343 and 18 U.S.C. § 1962(b)**

477.     With intent to defraud, seeking to settle false derivative and class claims that were already adjudicated and lacked standing or probable cause, KENNETH CATANZARITE ESQ. family friend James P. Gray of ADR Services, Inc. still conducted "mediation" December 19, 2022.

478.     Plaintiff refused to attend with a pending hearing on January 6, 2023 for summary judgment and for summary adjudication of fourteen issues lacking material response other than artificial procedures seeking unnecessary delay.

479.     With intent to defraud, using control of the enterprise, and in conspiracy with CATANZARITE LAW CORPORATION, KENNETH CATANZARITE, ESQ., BRANDON WOODWARD, ESQ., TIM JAMES O'KEEFE, ESQ., TIM JAMES O'KEEFE, ESQ., NICOLE MARIE CATANZARITE WOODWARD, ESQ., James P. Gray and ADR Services, Inc. did seek to release these fraudsters despite the lack of standing or probable cause, or the fraudulent nature of "class" claims maintained by JIM TRAVIS TICE, ESQ. in furtherance of the schemes.

480.     With intent to defraud, James P. Gray and ADR Services, Inc. did send by wire two proposals, each of which unreasonably seek dismissal of more than $200 million in actual claims for those persons not named Plaintiff in this action under 18 U.S.C. § 1962(d), as outlined in his original complaint, and with actual knowledge of the schemes to defraud.

481.     **OVERT ACT #64 in Violation of 18 U.S.C. 1962(b)**

22-CV-1616-BAS-DDL

482.    Plaintiff contacted the California State Auditor, who informed him he could commence an audit of THE STATE BAR OF CALIFORNIA and its Board of Trustees' actual, material financial conflicts under Political Reform Act of 1974, on or around December 6, 2022.

483.    At the direction of California State Auditor, Plaintiff did contact Laurie Davies, his local Assemblywoman, whose staff Kristen Vallandi did communicate with Plaintiff and purported to deliver the request to Sacramento to commence formal audits.

484.    With intent to defraud and conceal material state liability, and based on the control of the enterprise, Plaintiff has not heard back despite the veracity of his accusations, and the need to hold those responsible accountable by Legislature for the State of California.

485.    Despite being named defendants in OCSC Case No. 30-2021-01237499 before JOHN C. GASTELUM, having been served repeatedly, defendant Legislature for the State of California refuses to answer the proceedings, nor defendant Speaker of the Assembly Rendon, nor President Pro Tempore Atkins, in each case due to control of the interstate enterprise by THE STATE BAR OF CALIFORNIA, and its apparent control over the Legislature, too.

486.    **OVERT ACT #65 in Violation of 15 U.S.C. § 1 and 18 U.S.C. § 1962(b)**

487.    Seeking to enjoin the antitrust violations, Plaintiff requested a case worker through his United States representative Mike Levin.

488.    Due to apparent control of the enterprise, Congressman Mike Levin has not responded, and conversations with his staff asserted that this is a "state" issue, frivolously.

489.    **OVERT ACT #66 n Violation of 18 U.S.C. § 1962(b)**

490.    For her letter to Plaintiff on December 15, 2022, seeking to control the enterprise, ELLIN DAVTYAN, ESQ. did demand a list of all persons to whom Plaintiff delivered the fraudulent concealment of material state liability, after which Plaintiff did reply that he sent it to United States Department of Justice in Washington, D.C., the Federal Bureau of Investigation, and as many people as he could, as quickly as he could.

491.    The wire communications and preceding communications further show that SUZANNE CELIA GRANDT, ESQ., in another deliberate act of fraud on the Court similar to those engaged with ROBERT GEORGE RETANA, ESQ. before Honorable William Alsup in 2017 to harm

Ty Clevenger, defrauded JOHN C. GASTELUM in filings claiming that Office of General Counsel, Office of Chief Trial Counsel, and Board of Trustees did not coordinate decisions.

492. **OVERT ACT #67 in Violation of 18 U.S.C. § 1962(b) and 18 U.S.C. § 1343**

493. Plaintiff delivered a settlement offer to Hailyn Chen and ROBERT GEORGE RETANA, ESQ. in which Plaintiff proclaimed that, after his request for judicial notice that there were three justices appointed to the Fourth District Division Three during exact dates of his Government Claims Act Litigation – they could not possibly overtly obstruct Plaintiff's writ proceedings which even had public interest standing.

494. Using wire communications and control of the enterprsie, upon receipt of his vested right to sue ORANGE COUNTY SUPERIOR COURT dated December 20, 2022 and JOHN C. GASTELUM for racketeering and constitutional violations, and after notice to Judicial Council and Office of General Counsel, the Fourth District, Division Three immediately disposed of two writ petitions without cause or explanation on December 28, 2022.

495. For the writ petition G061896, Plaintiff waited from October 13, 2022, and judicially noticed three different times. The evidence shows beyond reasonable doubt that defendants in this case are engaged in criminal racketeering with impunity to steal from Plaintiff and the public.

496. **OVERT ACT #68 in Violation of 18 U.S.C. § 1962(b) and 18 U.S.C. § 1343**

497. Using the wire with intent to defraud, KENNETH CATANZARITE, ESQ. did file for a judgment against Plaintiff for legal fees on behalf of ANTHONY B. SCUDDER and Aroha Holdings, Inc.

498. A party defendant to a fraudulent derivative action, dismissed without court approval on January 4, 2019, and subsequently extorted to further the fraudulent enterprise schemes – ANTHONY B. SCUDDER seeks $13,000+ in legal fees through CATANZARITE LAW CORPORATION on December 30, 2022.

499. Through ORANGE COUNTY SUPERIOR COURT, a judgment is entered against Plaintiff despite the fraudulent nature and criminal conduct from which the "legal fees" are derived.

500. **OVERT ACT #69 in Violation of 18 U.S.C. § 1962(b) and 18 U.S.C. § 1343**

501.   Using the wire, with intent to defraud, in furtherance of the schemes, KENNETH CATANZARITE, ESQ. did seek to conceal the schemes by controlling ANTHONY B. SCUDDER, where ORANGE COUNTY SUPERIOR COURT allows directly adverse representation before the same tribunal because it is carried on by THE STATE BAR OF CALIFORNIA.

---

**3:22-CV-01616-BAS-DDL and 30-2020-01145998 RE: Tony Scudder and State Bar's Legal Fees**

**Justin Beck** <justintimesd@gmail.com>                                                Thu, Dec 29, 2022 at 12:09 PM
To: Kenneth Catanzarite <kcatanzarite@catanzarite.com>
Cc: Nicole Catanzarite-Woodward <ncatanzarite@catanzarite.com>, Tim O'Keefe <tokeefe@catanzarite.com>, Brandon Woodward <bwoodward@catanzarite.com>, Eric Anderton <eanderton@catanzarite.com>, "Retana, Robert" <robert.retana@calbar.ca.gov>, "Duran, Ruben" <Ruben.Duran@calbar.ca.gov>, "george.cardona@calbar.ca.gov" <george.cardona@calbar.ca.gov>, "jimpgray@sbcglobal.net" <jimpgray@sbcglobal.net>, Jim Tice <jtt@tice.lawyer>, "Davtyan, Ellin" <Ellin.Davtyan@calbar.ca.gov>, "Andresen, Carissa" <Carissa.Andresen@calbar.ca.gov>

I was merely informing him of reality since he lacked any information on the material issues -- indeed -- he had *no idea* what was going on.

I'm entitled to speak with him directly. I agreed to settle with him before you filed the motion.

You are choosing to use the $13K and hang it over his head and mine.

He is informed directly, and you are informed as you have been, of what that means to him and to you and your firm (and so is The State Bar of California after passage of AB 3249).

On Thu, Dec 29, 2022 at 12:06 PM Kenneth Catanzarite <kcatanzarite@catanzarite.com> wrote:

We represent Tony Scudder and his company. He told you that I represent him and to talk to me.

You are harassing him and he asked that we direct you to discontinue any further contact.

Kindly comply and direct all future communications to the undersigned.

Ken

---

502.   **OVERT ACT #70 in Violation of 18 U.S.C. § 1962(b) and 18 U.S.C. § 1343**

503.   Using the wire on Wednesday, December 28, 2022 at 8:59AM, with intent to defraud, and to conceal material state liability, while exercising control over the enterprise in order to control the false narratives and to monopolize Plaintiff's due process rights, ROBERT GEORGE RETANA, ESQ. did sign service waivers on behalf of individual defendants using funds from licensees of THE STATE BAR OF CALIFORNIA, without regard of the material conflict or violation of CRPC 1.7(d)(3) and without regard of the Political Reform Act of 1974's conflict of interest policies.

1

**Randolph, Joan**                                           ✉ Wed, Dec 28, 2022, 8:59 AM (4 days ago)   ☆   ↩   ⋮
to me, Robert ▾

2

Mr. Beck,

3

In reference to the above matter, please see attached executed Waivers of Service of Summons. Originals are being sent via U.S. Mail.

4

5

Joan Randolph | Legal Secretary
Office of General Counsel

6

The State Bar of California | 180 Howard St. | San Francisco, CA 94105
415.538.2186 | Joan.Randolph@calbar.ca.gov

7

8

**4 Attachments** · Scanned by Gmail ⓘ                                              ⬇   ⟳

9

10

11

📄 Waiver_State_Bar...   📄 Waiver_Wilson_Si...   📄 Waiver_Morgenst...   📄 Waiver_Grandt_Si...

12

13

14

    504.   <u>**OVERT ACT #71 in Violation of 18 U.S.C. § 1962(b) and 18 U.S.C. § 1343**</u>

15

    505.   Using the wire, with intent to defraud, and exercising control over the enterprise in

16

order to control the false narratives and to monopolize Plaintiff's due process rights, KENNETH

17

CATANZARITE, ESQ. did send defective waivers of service to Plaintiff one day later after ROBERT

18

GEORGE RETANA, ESQ.

19

**Kenneth Catanzarite**                                           ✉ Thu, Dec 29, 2022, 4:43 PM (3 days ago)   ☆   ↩   ⋮
to me ▾

20

21

Mr. Beck,

22

Attached hereto is the Waiver of the Service of Summons signed by me for myself, Catanzarite Law Corporation, Nicole Catanzarite-Woodward, Brandon Woodward, Tim James O'Keefe, Amy Cooper, Cliff Higgerson, Mohammed Zakhireh, Jim Duffy and Richard O'Connor.

23

24

***Kenneth J. Catanzarite***
**Catanzarite Law Corporation**

25

2331 West Lincoln Avenue
Anaheim, CA 92801

26

**Direct Dial: (714) 678-2100**

27

**Direct Fax: (714) 399-0577**
Office Phone: (714) 520-5544

28

Office Fax: (714) 520-0680

506.   **OVERT ACT #72 in Violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1962(d)**

507.   Where ANTHONY B. SCUDDER did confirm to Plaintiff that KENNETH CATANZARITE, ESQ. does bribe witnesses and victims to further his schemes to defraud, and with actual knowledge that KENNETH CATANZARITE, ESQ. is a career criminal, ANTHONY B. SCUDDER did send the following by wire, and it did intend to defraud him, and it did intend to continue the schemes.



## VI.   INJURY STANDING UNDER RICO AND 42 U.S.C. § 1983

508.   Plaintiff JUSTIN S. BECK's personal standing for civil RICO claims are established through four factors, satisfied, as Plaintiff is: (1) a "person" (2) who sustained injury (3) to his "business or property" (4) "by reason of" defendants' violation of § 1962 as shown through all of the foregoing overt acts and all other such acts as may be evidenced or shown.

### A. Breakdown of Plaintiff's Damages to Business and Property

509.   Plaintiff's injuries to business or property derived from overt acts, or "conduct constituting the violation" as specified, with business and property injuries specific to: (1) § 1962(c) arising from the predicate acts detailed; (2) § 1962(a) arising from the investment of racketeering income; (3) § 1962(b) arising from the acquisition of an interest on or control over an enterprise; (4) § 1962(d) from the overt acts committed in furtherance of schemes to defraud him in conspiracy. For his damages attributed to criminal conduct shown, he seeks and has already shown defendants:

510.   $1,282,000 Immediate Judgment against STATE OF CALIFORNIA for Cause Shown

511.   $8,433,000 Total Past & Future Lost Earnings to Business and Property

512.   $27,407,250 Total Lost Earnings Capacity to Business and Property

513.   $32,667,351 Business and Property Deliberately Compromised (Merger Shares)

514.   $365,000 from 2921 Deer Hollow Way, Unit 314, Fairfax, VA 22031 (Predicate)

114

22-CV-1616-BAS-DDL

515. $5,649,297 Shares (Business/Property; JORGE E. NAVARETTE, CSC Acts 3/21/21)

516. $1,700,000 Fees and Costs, Converted Side A Policy by Enterprise Schemes

517. $32,667,351 as Direct Result of Insurance, Bank Fraud Harming Plaintiff (Future)

518. $25,000,000 Due to Credit Score, Benefits, Etc. and Special Value of Certain Assets

519. $1,000,000 Inherited IRA Depleted Shamefully by Racketeering Damages (Predicate)

**B. Breakdown of Plaintiff's Harm Due to Constitutional Violations, Emotional Harms**

520. For pain, suffering, inconvenience, and oppression, Plaintiff seeks $138,889,249.

521. For severe emotional distress leading to a seizure, Plaintiff seeks $138,889,249.

522. For loss of consortium, inability to marry his boyfriend, Plaintiff seeks $138,889,249.

523. For violation of his right to Equal Protection (14th, U.S.), Plaintiff seeks $138,889,249.

524. For privacy violations by court official fraud (4th, U.S.), Plaintiff seeks $138,889,249.

525. For loss of enjoyment of life, consideration of suicide, Plaintiff seeks $138,889,249.

526. For severe grief in losing a mentor and his parents, Plaintiff seeks $138,889,249.

527. For humiliation, loss of friends, and colleagues, Plaintiff seeks $138,889,249.

528. For violation of his right of petition under color of CCP, Plaintiff seeks $138,889,249.

529. For unlawful taking by court official fraud (5th, U.S.) Plaintiff seeks $138,889,249.

530. For punitive damages, Plaintiff seeks the maximum amount permissible under the law.

**C. ROES 1-150,000 Could Not Have Known of Schemes to Defraud by Enterprise Sooner**

531. For CTI shareholder ROES, Plaintiff seeks $228,332,649 of the $261 million merger[1].

532. For other ROES shown pending disposition here Plaintiff seeks their damages.

533. For other ROES after disposition of this case, Plaintiff demands the U.S. act swiftly.

534. For other ROES, Plaintiff will aid the UNITED STATES to prove as he is capable.

535. For other ROES, Plaintiff demands UNITED STATES assume control of State Bar.

**D. Instant Action Filed within RICO Statute of Limitations on October 19, 2022**

536. Plaintiff did not identify, nor could he have possibly identified previously as shown by his reasonable diligence, binding federal law for regulators from United States Supreme Court until

---

[1] This amount of $228,332,649 represents the "fair market value" minus $32,667,251.

22-CV-1616-BAS-DDL

September 2022. As soon as he understood the laws and RICO statutes, he filed, and had already filed state actions shown to be corrupted by the enterprise. Plaintiff could not have acted faster, under the circumstances.

537.    Plaintiff could not have and did not know of the pattern of racketeering activity, nor the multi-scheme nature with similar actors, participants, and methods of judicial fraud and active concealment by nonsovereign actors, and where he has further been denied discovery by nonsovereign actors on a claim of sovereignty for the conduct at issue despite his timely filing of all claims pending now in State and Federal Court as appropriate, and despite his right to sue for redress of grievances.

538.    Plaintiff mistakenly assumed that "good standing" licensees of THE STATE BAR OF CALIFORNIA would not be allowed or carried on to commit serial fraud and racketeering that injured him, so he could not have possibly filed this action sooner.

539.    Plaintiff promptly filed this action upon learning of the criminal nature of the conduct at issue which continues, and defendants fraudulently concealed information needed to bring a RICO claim before now, and the Plaintiff could not have discovered all of the foregoing facts or overt acts despite his exercise of reasonable diligence before 2021 after he commenced prosecution of THE STATE BAR OF CALIFORNIA and STATE OF CALIFORNIA.

540.    Ratification of the conduct did not occur, or was not occurring with complete actual knowledge, until it was communicated on July 20, 2022, by GRANDT, DURAN, STATE BAR, and its Board of Trustees – also showing the improper purposes and concealment existing here.

541.    Proof that GEORGE SARGENT CARDONA, ESQ., RUBEN DURAN, ESQ., SUZANNE CELIA GRANDT, ESQ. conspired with CATANZARITE LAW CORPORATION actors was not known until December 2022.

542.    This action is filed, including Plaintiff's right to all claims and damages, and for federal intervention due to a threat of continuance and the veracity of evidence existing without discovery, and to help ROES 1-150,000 who can't help themselves, within RICO statute of limitations.

## VIII.   COUNTS [FOLLOW]

**[COUNT I]:**

**RACKETEERING**

**Violation of 18 U.S.C. 1962(c)**

543. The allegations of paragraphs ¶ 1 through ¶ 542 are incorporated by reference.

544. Plaintiff did suffer injuries under § 1962(c) arising from converging predicate acts.

545. This Count I is against Defendants KENNETH CATANZARITE, ESQ.; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA (the "Count I Defendant(s)").

546. THE STATE BAR OF CALIFORNIA is an enterprise engaged in and whose activities affect interstate commerce. The Count I Defendant(s) are employed by or associated with the enterprise.

547. ORANGE COUNTY SUPERIOR COURT is an enterprise engaged in and whose activities affect interstate commerce. The Count I Defendant(s) are employed by or associated with the enterprise.

548. For approximately 40 years, Thomas Girardi used THE STATE BAR OF CALIFORNIA to conduct a pattern of racketeering activity to enrich himself, and it did corrupt the California judicial system.

549. For more than 10 years, KENNETH CATANZARITE, ESQ. did use ORANGE COUNTY SUPERIOR COURT in a similar manner as Thomas Girardi used Los Angeles Superior Court to conduct a pattern of racketeering activity to enrich himself.

550. Before April 2015 when Plaintiff met them, following a visit to Florida to meet Roger Root, RICHARD FRANCIS O'CONNOR, JR. and AMY JEANETTE COOPER did pay Joseph Porche $340,000 in illegal commission from Mobile Farming Systems, Inc. ("MFS") from approximately $450,000 invested by Jolly Roger, Inc. whose principal was Roger Root.

551. In July 2017, RICHARD FRANCIS O'CONNOR, JR. and MOHAMMED ZAKHIREH did conspire and abuse the United States Securities Exchange Commission's (SEC) investigatory powers to pursue their own motives.

552. The malicious purposes of RICHARD FRANCIS O'CONNOR, JR. and MOHAMMED ZAKHIREH, plus their disregard for the truth did result in the undue expense and resources of the SEC despite their actual knowledge of the falsity of their accusations.

553. On Wednesday, March 29, 2017, the United States Department of Justice did announce that a former ORANGE COUNTY SUPERIOR COURT clerk pled guilty to a RICO charge in a bribery scheme to fix cases. A total of 10 other defendants pleaded guilty or agreed to plead guilty.

554. The foregoing predicate acts converged on Plaintiff and did cause him damages.

555. The preceding acts, including the Over Acts #1-#72 set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

556. The Count I Defendant(s) have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

557. As direct and proximate result of the Count I Defendant(s) racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in his business and property and seeks his damages, treble damages, and attorneys fees:

558. $8,433,000 Total Past & Future Lost Earnings to Business and Property

559. $1,000,000 Inherited IRA Shamefully Depleted by Racketeering

560. $365,000 from Plaintiff's Mother's 2921 Deer Hollow Way, #314, Fairfax, VA 22031

561. WHEREFORE, Plaintiff requests that this Court enter judgment as follows:

- JUDGMENT in favor of Plaintiff JUSTIN S. BECK Against Defendants KENNETH CATANZARITE, ESQ.; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA for Violation of 18 U.S.C. § 1962(c)

- MONEY JUDGMENT in favor of JUSTIN S. BECK against KENNETH CATANZARITE, ESQ.; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for **$9,798,000** for damages

- MONEY JUDGMENT in favor of JUSTIN S. BECK against KENNETH CATANZARITE, ESQ.; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for **$29,394,000** for treble damages

22-CV-1616-BAS-DDL

**[COUNT II]:**

**INVESTING PROCEEDS OF RACKETEERING IN AN ENTERPRISE**

**Violation of 18 U.S.C. § 1962(a)**

562.     The allegations of paragraphs ¶ 1 through ¶ 561 are incorporated herein by reference.

563.     This Count II is against Defendant(s) THE STATE BAR OF CALIFORNIA; CATANZARITE LAW CORPORATION; RUBEN DURAN, ESQ.; LEAH WILSON, ESQ.; and STATE OF CALIFORNIA (the "Count II Defendant(s)")

564.     THE STATE BAR OF CALIFORNIA is an enterprise engaged in and whose activities affect interstate commerce. The Count II Defendant(s) are employed by or associated with the enterprise.

565.     CATANZARITE LAW CORPORATION is an enterprise engaged in and whose activities affect interstate commerce. The Count II Defendant(s) are employed by or associated with the enterprise.

566.     ORANGE COUNTY SUPERIOR COURT is an enterprise engaged in and whose activities affect interstate commerce. The Count II Defendant(s) are employed by or associated with the enterprise.

567.     The Count II Defendant(s) used and invested income in an enterprise that was derived from a pattern of racketeering activity.

568.     Using ORANGE COUNTY SUPERIOR COURT, carried on by THE STATE BAR OF CALIFORNIA just like Girardi-Keese, CATANZARITE LAW CORPORATION derived income from unlawful debts, wire fraud, mail fraud, and bank fraud, and then did invest it into THE STATE BAR OF CALIFORNIA through IOLTA, Aegis Asset Management, Inc. and real estate entities, trusts, and home owner's associations in Orange County to conceal the gains.

569.     RUBEN DURAN, ESQ. and LEAH WILSON, ESQ. did use and invest income derived from a pattern of racketeering activity from Girardi-Keese, CATANZARITE LAW CORPORATION, and the 700+ CLUB back into THE STATE BAR OF CALIFORNIA's association-in-fact enterprise of lawyers without a money transmitting business license. RUBEN DURAN, ESQ. and LEAH WILSON, ESQ. knew some of the money was from unlawful activity.

22-CV-1616-BAS-DDL

570.    LEAH WILSON, ESQ. did setup the "Leadership Bank Program," adding a number of Chinese banks after Dunn and Miller visited Mongolia, while Miller advised on trust account laws.

571.    RUBEN DURAN, ESQ. and LEAH WILSON, ESQ. did use and invest income derived from a pattern of racketeering activity to THE STATE BAR OF CALIFORNIA association-in-fact lawyers without regard of public interest, or Plaintiff specifically.

572.    THE STATE BAR OF CALIFORNIA used and invested approximately $78 million horizontally back to the association-in-fact active market participants of THE STATE BAR OF CALIFORNIA in 2020-2021 while Plaintiff suffered.

573.    THE STATE BAR OF CALIFORNIA used and invested approximately $155.5 million horizontally back to the association-in-fact active market participants of THE STATE BAR OF CALIFORNIA in 2022-2023 while Plaintiff is suffering.

574.    While CATANZARITE LAW CORPORATION, THE STATE BAR OF CALIFORNIA, RUBEN DURAN, ESQ., and LEAH WILSON, ESQ. use and invest this income derived from a pattern of racketeering activity, members of the public like Plaintiff are suffering due to the unequal use of a protection racket in favor of active market participants and criminals, severely injuring members of the public knowingly, including Plaintiff.

575.    The racketeering activity detailed in the preceding paragraphs, including Overt Acts #1-72, constitute a pattern of pattern of racketeering activity under 18 U.S.C. § 1961(5).

576.    As direct and proximate cause of the Count II Defendant(s) racketeering activities, including money laundering, laundering of monetary instruments like fraudulent judgments and unlawful legal debts, and unlawful transmission of moneys without a license while engaging in material conflicts, Plaintiff has been injured in his business and property.

577.    Specifically, Plaintiff has been injured in his business and property because RUBEN DURAN, ESQ., LEAH WILSON, ESQ. prioritize paying active market participants among the enterprise legal fees instead of helping people they actually know are harmed by racketeering activity.

578.    Specifically, Plaintiff has been injured in his business and property in that THE STATE BAR OF CALIFORNIA, ELI DAVID MORGENSTERN, ESQ., GEORGE SARGENT CARDONA, ESQ., SUZANNE CELIA GRANDT, ESQ., and RUBEN DURAN, ESQ. allow CATANZARITE

1    LAW CORPORATION to engage in racketeering, then use and invest its unlawful gains through

2    KENNETH CATANZARITE, ESQ. into IOLTA, State Bar's approved banks, lawyer trusts, Orange

3    County real estate, and otherwise to conceal the gains to keep it away from Plaintiff to recover his

4    judgments, the federal government, and others.

5         579.    As direct and proximate result of the Count II Defendant(s)' racketeering activities and

6    violations of 18 U.S.C. § 1962(a), Plaintiff has been injured in his business and property and seeks

7    his damages and treble damages, plus injunctive relief:

8         580.    $25,000,000 Converted Credit Score, Benefits, Special Value of IRA, and Other Assets

9         581.    $27,407,250 Lost Earnings Capacity to Business and Property as Former CEO

10        582.    WHEREFORE, Plaintiff requests that this Court enter judgment against the Count II

11   Defendant(s) as follows:

12   •         JUDGMENT in favor of Plaintiff JUSTIN S. BECK Against Defendants THE STATE

13        BAR OF CALIFORNIA; CATANZARITE LAW CORPORATION; RUBEN DURAN, ESQ;

14        LEAH WILSON, ESQ.; and Nominal Defendant STATE OF CALIFORNIA for Violation of 18

15        U.S.C. § 1962(a).

16   •         MONEY JUDGMENT in favor of JUSTIN S. BECK Against THE STATE BAR OF

17        CALIFORNIA; CATANZARITE LAW CORPORATION; RUBEN DURAN, ESQ; LEAH

18        WILSON, ESQ.; and STATE OF CALIFORNIA jointly and severally for damages in the amount

19        of $52,407,250.

20   •         MONEY JUDGMENT in favor of JUSTIN S. BECK Against THE STATE BAR OF

21        CALIFORNIA; CATANZARITE LAW CORPORATION; RUBEN DURAN, ESQ; LEAH

22        WILSON, ESQ.; and STATE OF CALIFORNIA jointly and severally for treble damages in the

23        amount of $157,221,750.

24   •         PERMANENT INJUNCTION against THE STATE BAR OF CALIFORNIA;

25        CATANZARITE LAW CORPORATION; RUBEN DURAN, ESQ.; LEAH WILSON, ESQ.; and

26        STATE OF CALIFORNIA from using and investing income derived from a pattern of

27        racketeering activity.

28

**[COUNT III]:**

**ACQUIRED INTERESTS OR CONTROL OF AN ENTERPRISE**

**THROUGH A PATTERN OF RACKETEERING ACTIVITY**

**Violation of 18 U.S.C. § 1962(b)**

583.    The allegations of paragraphs ¶ 1 through ¶ 582 are incorporated herein by reference.

584.    This Count III is against Defendant(s) SUZANNE CELIA GRANDT, ESQ.; ROBERT GEORGE RETANA, ESQ.; RUBEN DURAN, ESQ.; GEORGE SARGENT CARDONA, ESQ.; ELLIN DAVTYAN, ESQ.; ELI DAVID MORGENSTERN, ESQ.; KENNETH CATANZARITE, ESQ.; JORGE E. NAVARETTE; ORANGE COUNTY SUPERIOR COURT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA (the "Count III Defendant(s)".)

585.    THE STATE BAR OF CALIFORNIA is an enterprise engaged in and whose activities affect interstate commerce. The Count III Defendant(s) are employed by or associated with the enterprise.

586.    ORANGE COUNTY SUPERIOR COURT is an enterprise engaged in and whose activities affect interstate commerce. The Count III Defendant(s) are employed by or associated with the enterprise.

587.    CATANZARITE LAW CORPORATION is an enterprise engaged in and whose activities affect interstate commerce. The Count III Defendant(s) are employed by or associated with the enterprise.

588.    The Count III Defendant(s) each acquired or maintained interests in or control of an enterprise through a pattern of racketeering activity.

589.    Overt Acts #1-72 show SUZANNE CELIA GRANDT, ESQ. interests in or control of an enterprise acquired through a pattern of racketeering activity.

590.    Overt Acts #1-72 show ROBERT GEORGE RETANA, ESQ. interests in or control of an enterprise acquired through a pattern of racketeering activity.

591.    Overt Acts #1-72 show RUBEN DURAN, ESQ. interests in or control of an enterprise acquired through a pattern of racketeering activity.

122                              22-CV-1616-BAS-DDL

592. Overt Acts #1-72 show GEORGE SARGENT CARDONA, ESQ. interests in or control of an enterprise through a pattern of racketeering activity.

593. Overt Acts #1-72 show KENNETH CATANZARITE, ESQ. interests in or control of an enterprise through a pattern of racketeering activity.

594. Overt Acts #1-72 show ELLIN DAVTYAN, ESQ. interests in or control of an enterprise through a pattern of racketeering activity.

595. Overt Acts #1-72 show ELI DAVID MORGENSTERN, ESQ. interests in or control of an enterprise through a pattern of racketeering activity.

596. Overt Acts #1-72 show JORGE E. NAVARETTE interests in or control of an enterprise through a pattern of racketeering activity.

597. THE STATE OF CALIFORNIA has assigned its sovereignty to each of these active market participants without direct supervision, and thereby is liable for all damages because there exists no clearly articulated policy to conduct racketeering, and which racketeering is not conducted equally against all persons in California.

598. The Count III Defendant(s)' interests in or control of an interstate enterprise allowed STATE OF CALIFORNIA Governor Gavin Newsom to obstruct Plaintiff's Government Claims Act litigation in SUPERIOR COURT OF ORANGE COUNTY in order to conceal state liability and for unknown benefit or consideration, without regard of Plaintiff's harm or due process rights.

599. STATE OF CALIFORNIA interests in or control of an enterprise screened Plaintiff's harm through "California Crime Victim's Bureau" in order to conceal it further.

600. The Count III Defendant(s)' interests in or control of an interstate enterprise acquired through a pattern of racketeering activity allow each to exculpate conflict waivers on behalf of themselves or any inanimate corporate entity they choose, as court officers engaged in fraud with impunity, in order to achieve their one-time, short-term, or long-term goals.

601. The Count III Defendant(s)' interests and control of an interstate enterprise acquired through a pattern of racketeering activity allow them to represent adverse parties before the same tribunal, or in the same or substantially related matters as if it were legal or reasonable.

123                           22-CV-1616-BAS-DDL

602.    The Count III Defendant(s)' interests in or control of an interstate enterprise allow them to procure judgments or settlements on behalf of straw clients like Denise Pinkerton, Richard Carlson, ANTHONY B. SCUDDER through abuse of Cal. Cod. Civ. Proc. § 425.16, or Renato Corzo.

603.    The Count III Defendant(s)' interests in or control of an interstate enterprise allow them to sue without standing or probable cause, or to ratify schemes to defraud so they can accept more income from it to invest back to their peers, or to use the income to avoid scrutiny for criminal conduct.

604.    The Count III Defendant(s)' interests in or control of an interstate enterprise carried on the "unquestionably criminal" fraudulent schemes of Thomas Girardi previously, and only acted when he was bankrupt and after Plaintiff submitted a public records request in May 2022 about him.

605.    The Count III Defendant(s)' interests in or control of an interstate enterprise now enabled KENNETH CATANZARITE, ESQ., and cannot wait until his bankruptcy.

606.    The Count III Defendant(s)' interests in or control of an interstate enterprise allowed THE STATE BAR OF CALIFORNIA as association-in-fact to exhaust Plaintiff's directors and officers insurance for $1,268,036 as of July 30, 2022 through fraudulent schemes, and thereby restrict Plaintiff's future insurability, and thereby restrict Plaintiff's ability to obtain property or do business in perpetuity.

607.    The preceding acts, including Overt Acts #1-#72 constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

608.    The Count III Defendant(s) have directly and indirectly acquired and maintained interest in or control of an enterprise through a pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

609.    As direct and proximate result of the Count III Defendant(s)' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff seeks his actual damages, treble damages, and attorneys' fees.

610.    As direct and proximate result of the Count III Defendant(s)' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff has been injured in his business and property in that it destroyed a $261 million merger in which he was CEO and his corresponding ownership worth $32,667,351.

611.     As a reasonable basis and direct and proximate result of the Count III Defendant(s)' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff seeks an additional $32,667,351 as being the same amount in ¶ 610 for the remainder of his career lost in at least one equivalent transaction, where Plaintiff is only 42 years old today.

612.     As direct and proximate result of the Count III Defendant(s)' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff has been injured in his business and property in that he experienced an emotional breakdown and resigned from another company he started after JORGE E. NAVARETTE and California Supreme Court defrauded him in March 2021 which caused him $5,649,297 in damages, and further tainted his ability to develop business and obtain property.

613.     As direct and proximate result of the Count III Defendant(s)' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff seeks actual damages of $1,700,000 from fees, policies, and other assets converted in favor of the enterprise participants.

614.     As direct and proximate result of the Count III Defendant(s)' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff seeks actual severe emotional damages, benefits, and other lifetime remuneration he will not receive of $138,889,249.

615.     WHEREFORE, Plaintiff requests this Court enter judgment against the Count III Defendant(s) as follows:

• JUDGMENT in favor of Plaintiff JUSTIN S. BECK Against Defendants SUZANNE CELIA GRANDT, ESQ.; ROBERT GEORGE RETANA, ESQ.; RUBEN DURAN, ESQ.; GEORGE SARGENT CARDONA, ESQ.; ELLIN DAVTYAN, ESQ.; ELI DAVID MORGENSTERN, ESQ.; KENNETH CATANZARITE, ESQ.; JORGE E. NAVARETTE; ORANGE COUNTY SUPERIOR COURT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA for Violation of 18 U.S.C. § 1962(b)

• MONEY JUDGMENT in favor of JUSTIN S. BECK Against SUZANNE CELIA GRANDT, ESQ.; ROBERT GEORGE RETANA, ESQ.; RUBEN DURAN, ESQ.; GEORGE SARGENT CARDONA, ESQ.; ELLIN DAVTYAN, ESQ.; ELI DAVID MORGENSTERN, ESQ.; KENNETH CATANZARITE, ESQ.; JORGE E. NAVARETTE; ORANGE COUNTY SUPERIOR

22-CV-1616-BAS-DDL

COURT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for damages in the amount of **$210,683,999**.

- MONEY JUDGMENT in favor of JUSTIN S. BECK Against SUZANNE CELIA GRANDT, ESQ.; ROBERT GEORGE RETANA, ESQ.; RUBEN DURAN, ESQ.; GEORGE SARGENT CARDONA, ESQ.; ELLIN DAVTYAN, ESQ.; ELI DAVID MORGENSTERN, ESQ.; KENNETH CATANZARITE, ESQ.; JORGE E. NAVARETTE; ORANGE COUNTY SUPERIOR COURT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for treble damages in the amount of **$632,051,997**.

- PERMANENT INJUNCTION against SUZANNE CELIA GRANDT, ESQ.; ROBERT GEORGE RETANA, ESQ.; RUBEN DURAN, ESQ.; GEORGE SARGENT CARDONA, ESQ.; ELLIN DAVTYAN, ESQ.; ELI DAVID MORGENSTERN, ESQ.; KENNETH CATANZARITE, ESQ.; JORGE E. NAVARETTE; ORANGE COUNTY SUPERIOR COURT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA from acquiring or maintaining interests in or control of any interstate enterprise through a pattern of racketeering activity.

- ORDER SEC REFERRAL TO INVESTIGATE REGISTERED INVESTMENT ADVISOR (RIA) KENNETH CATANZARITE, ESQ. OF RIA AEGIS ASSET MANAGEMENT, INC.; COMPARING HIS SECURITIES-RELATED CONDUCT FOR MOBILE FARMING SYSTEMS, INC. AGAINST THE RECORDS CONTAINED WITHIN SEC INVESTIGATION OF PLAINTIFF LA-4837, INCLUDING ~25,000 PAGES OF SECURITIES TRANSACTIONS UNDER REGULATION D, COMPARED AGAINST THE CONDUCT OF KENNETH CATANZARITE, ESQ. AND JIM TRAVIS TICE, ESQ. DIRECTING ACTS TO DEFRAUD BY AMY JEANETTE COOPER, RICHARD FRANCIS O'CONNOR, JR., MOHAMMED ZAKHIREH, JAMES DUFFY; AND FOR KENNETH CATANZARITE, ESQ. CONDUCT ON BEHALF OF RICHARD CARLSON WHO DID NOT BELIEVE HE SUFFERED DAMAGES BEFORE ENGAGING IN MATERIAL MISSTATEMENTS OF FACT CONCERNING SECURITIES FOR "13,858" INVESTORS AND $437,315,000 IN PROCEEDS, AND FOR THE SEC TO ORDER RESTITUTION FOR ITS LOSSES AND WASTE UPON ITS FINDINGS.

22-CV-1616-BAS-DDL

**[COUNT IV]:**

**RICO CONSPIRACY**

**Violation of 18 U.S.C. § 1962(d)**

616. The allegations of paragraphs ¶ 1 through ¶ 615 are incorporated herein by reference.

617. This Count IV is against Defendant(s) ANTHONY B. SCUDDER; AMY JEANETTE COOPER; CLIFF HIGGERSON; JAMES DUFFY; MOHAMMED ZAKHIREH; RICHARD FRANCIS O'CONNOR, JR.; SUZANNE CELIA GRANDT, ESQ.; ROBERT GEORGE RETANA, ESQ.; RUBEN DURAN, ESQ.; LEAH WILSON, ESQ.; GEORGE SARGENT CARDONA, ESQ.; ELLIN DAVTYAN, ESQ.; ELI DAVID MORGENSTERN, ESQ.; KENNETH CATANZARITE, ESQ.; NICOLE MARIE CATANZARITE WOODWARD, ESQ.; BRANDON WOODWARD, ESQ.; TIM JAMES O'KEEFE, ESQ.; JIM TRAVIS TICE, ESQ.; JORGE E. NAVARETTE; ORANGE COUNTY SUPERIOR COURT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA (the "Count IV Defendant(s)".)

618. Specifically, RUBEN DURAN, ESQ. and LEAH WILSON, ESQ. knowingly conspired to use or invest IOLTA income derived from a pattern of racketeering in an interstate enterprise under 18 U.S.C. § 1962(a), which cumulative assets according to LEAH WILSON. ESQ. more than doubled while LEAH WILSON, ESQ. engaged in "private and public" "philanthropy" and "consulting" for THE STATE BAR OF CALIFORNIA and before "returning" to THE STATE BAR OF CALIFORNIA.

619. Specifically, RUBEN DURAN, ESQ.; SUZANNE CELIA GRANDT, ESQ., LEAH WILSON, ESQ.; ROBERT GEORGE RETANA, ESQ.; JORGE NAVARETTE; ELI DAVID MORGENSTERN, ESQ.; and KENNETH CATANZARITE, ESQ. did conspire to acquire interests in or control of aspects of an interstate enterprise THE STATE BAR OF CALIFORNIA; ORANGE COUNTY SUPERIOR COURT; CATANZARITE LAW CORPORATION; and State Bar Court. Each was engaging in the activity or carrying on and establishing the activity knowing of its illegal nature and origins.

620. Specifically, JIM TRAVIS TICE, ESQ.; TIM JAMES O'KEEFE, ESQ.; ANTHONY B. SCUDDER; RICHARD FRANCIS O'CONNOR, JR.; AMY JEANETTE COOPER; CLIFF

127

22-CV-1616-BAS-DDL

HIGGERSON; JAMES DUFFY; BRANDON WOODWARD, ESQ.; GEORGE SARGENT CARDONA, ESQ.; JORGE E. NAVARETTE; and NICOLE MARIE CATANZARITE WOODWARD, ESQ. did conspire to conduct and participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Each was engaging in the activity or carrying on and establishing the activity knowing of its illegal nature and origins.

621. As set forth above, the Count IV Defendant(s) agreed and conspired to violate 18 U.S.C. § 1962(a), (b), and (c).

622. The Count IV Defendant(s) have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

623. The Count IV Defendant(s) knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(a), (b), and (c), in violation of 18 U.S.C. § 1962(d).

624. As direct and proximate cause of the foregoing conspiracy, Plaintiff has been injured in his business and property in that his due process rights are monopolized under color of state law and artificial procedures, he has been humiliated and denied neutral forums in California, and he has been subject to repeated overt acts of fraud, perjury, subornation of perjury in order that he yield to the fraudulent schemes, where Plaintiff cannot enjoy his life, continue any business, or obtain property without federal intervention as he has exhausted all of the purported remedies existing within the monopoly that has become the California judicial system.

625. In proving conspiracy, each of the Defendants to this action are liable for the conduct of their co-Defendants.

626. Plaintiff seeks his actual damages, treble damages, as well as damages to those bona fide shareholders of the company CTI destroyed by these schemes (balance of $261 million).

128                                    22-CV-1616-BAS-DDL

627.   WHEREFORE, Plaintiff requests that this Court enter judgment against the Count IV Defendant(s):

- JUDGMENT in favor of Plaintiff JUSTIN S. BECK Against Defendants ANTHONY B. SCUDDER; AMY JEANETTE COOPER; CLIFF HIGGERSON; JAMES DUFFY; MOHAMMED ZAKHIREH; RICHARD FRANCIS O'CONNOR, JR.; SUZANNE CELIA GRANDT, ESQ.; ROBERT GEORGE RETANA, ESQ.; RUBEN DURAN, ESQ.; LEAH WILSON, ESQ.; GEORGE SARGENT CARDONA, ESQ.; ELLIN DAVTYAN, ESQ.; ELI DAVID MORGENSTERN, ESQ.; KENNETH CATANZARITE, ESQ.; NICOLE MARIE CATANZARITE WOODWARD, ESQ.; BRANDON WOODWARD, ESQ.; TIM JAMES O'KEEFE, ESQ.; JIM TRAVIS TICE, ESQ.; JORGE E. NAVARETTE; ORANGE COUNTY SUPERIOR COURT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA for Violation of 18 U.S.C. § 1962(d).

- MONEY JUDGMENT in favor of JUSTIN S. BECK Against STATE OF CALIFORNIA for emergency relief order for damages in the amount of **$1,282,000** at the commencement of this action for cause or upon application by Plaintiff, as the case may be.

- MONEY JUDGMENT in favor of JUSTIN S. BECK Against ANTHONY B. SCUDDER; AMY JEANETTE COOPER; CLIFF HIGGERSON; JAMES DUFFY; MOHAMMED ZAKHIREH; RICHARD FRANCIS O'CONNOR, JR.; SUZANNE CELIA GRANDT, ESQ.; ROBERT GEORGE RETANA, ESQ.; RUBEN DURAN, ESQ.; LEAH WILSON, ESQ.; GEORGE SARGENT CARDONA, ESQ.; ELLIN DAVTYAN, ESQ.; ELI DAVID MORGENSTERN, ESQ.; KENNETH CATANZARITE, ESQ.; NICOLE MARIE CATANZARITE WOODWARD, ESQ.; BRANDON WOODWARD, ESQ.; TIM JAMES O'KEEFE, ESQ.; JIM TRAVIS TICE, ESQ.; JORGE E. NAVARETTE; ORANGE COUNTY SUPERIOR COURT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for all amounts listed previously under Count I, Count I, and Count III for conspiracy.

- MONEY JUDGMENT in favor of Actual CTI Shareholders ROES [1-150] as of May 14, 2019, Paid/Managed through Plaintiff (and Not a Lawyer of THE STATE BAR OF CALIFORNIA) Against ANTHONY B. SCUDDER; AMY JEANETTE COOPER; CLIFF

HIGGERSON; JAMES DUFFY; MOHAMMED ZAKHIREH; RICHARD FRANCIS O'CONNOR, JR.; SUZANNE CELIA GRANDT, ESQ.; ROBERT GEORGE RETANA, ESQ.; RUBEN DURAN, ESQ.; LEAH WILSON, ESQ.; GEORGE SARGENT CARDONA, ESQ.; ELLIN DAVTYAN, ESQ.; ELI DAVID MORGENSTERN, ESQ.; KENNETH CATANZARITE, ESQ.; NICOLE MARIE CATANZARITE WOODWARD, ESQ.; BRANDON WOODWARD, ESQ.; TIM JAMES O'KEEFE, ESQ.; JIM TRAVIS TICE, ESQ.; JORGE E. NAVARETTE; ORANGE COUNTY SUPERIOR COURT; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally in the amount of **$228,332,649**.

- EXTRAORDINARY RELIEF in favor of JUSTIN S. BECK: STATE OF CALIFORNIA to guarantee all judgments awarded JUSTIN S. BECK as being substantial factor in all damages and harm.

## [COUNT V]:

## CONSTITUTIONAL RIGHTS

### Violation of 18 U.S.C. § 1983

628. The allegations of paragraphs ¶ 1 through ¶ 627 are incorporated herein by reference.

629. This Count V is against Defendants THE STATE BAR OF CALIFORNIA; STATE OF CALIFORNIA; ORANGE COUNTY SUPERIOR COURT; ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE; RUBEN DURAN, ESQ.; GEORGE SARGENT CARDONA, ESQ.; ELI DAVID MORGENSTERN, ESQ.; ELLIN DAVTYAN, ESQ.; SUZANNE CELIA GRANDT, ESQ.; and JOHN C. GASTELUM ("Count V Defendant(s).")

630. According to 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

> (R.S. § 1979; Pub. L. 96-170, § 1, Dec. 29, 1979, 93 Stat. 1284; Pub. L. 104-317, title III, § 309(c), Oct. 19, 1996, 110 Stat. 3853)

631. According to the Fourteenth Amendment, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property; nor deny to any person within its jurisdiction the equal protection of the laws."

632. Plaintiff had a clearly established right to equal protection under the laws of the United States in California, but the Count V Defendant(s) chose to protect criminals instead, to Plaintiff's actual and ongoing detriment of life, liberty, and property.

22-CV-1616-BAS-DDL

633.   Plaintiff also had a clearly established right of petition and to sue for redress of grievances, but Count V Defendant(s) chose to further the interests of criminals instead to Plaintiff's detriment, and in fact used Cal. Cod. of Civ. Proc. § 425.16 intended to protect Plaintiff for their own use.

634.   Plaintiff had a clearly established right to privacy, but Count V Defendant(s) used color of California Civil Procedure, Business and Professions Code, and unconstitutional decisional law to enable the theft of personally identifiable information about him and CTI shareholders to further fraudulent lawyer schemes in California, still carried on.

635.   Plaintiff had a right against impairment to his business and property, but Count V Defendant(s) abused their duties at law, and actually aided, concealed and ratified schemes to defraud him.

636.   Plaintiff had a right to life, liberty, and property, but SUZANNE CELIA GRANDT, ESQ. appearing in ORANGE COUNTY SUPERIOR COURT within the district of STATE OF CALIFORNIA and ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE declared the United States Constitution "irrelevant" in California in writing before JOHN C. GASTELUM.

637.   Before ROES 1-150,000 engaged one among THE STATE BAR OF CALIFORNIA associated-in-fact enterprise, they had a right to know that one or more of the Count V Defendant(s) were conspiring to defraud them under color of California law, non-existent sovereignty due to active market participant control, or artificial "discretion."

638.   Before ROES 1-150,000 engaged one among THE STATE BAR OF CALIFORNIA associated-in-fact enterprise, they had a right to know that THE STATE BAR OF CALIFORNIA's RUBEN DURAN, ESQ.; LEAH WILSON, ESQ., or others similarly situated considered their money as being "de minimis."

639.   Before "clients" of CATANZARITE LAW CORPORATION "retained" its corrupt lawyers, each had a right to know that KENNETH CATANZARITE, ESQ.; JIM TRAVIS TICE, ESQ.; NICOLE MARIE CATANZARITE WOODWARD, ESQ.; BRANDON WOODWARD, ESQ.; and TIM JAMES O'KEEFE, ESQ. were among the 700+ CLUB who could not be trusted in a Court of law or outside a Court of law for any reason, and that they were engaged in serial racketeering using protection of THE STATE BAR OF CALIFORNIA, unequally.

640. Before each among the association-in-fact enterprise THE STATE BAR OF CALIFORNIA paid their annual dues as lawyers, they had a right to know that some of those dues were being used by Office of General Counsel to defraud the public and defend tort claims against individuals in violation of Political Reform Act of 1974 with actual, material financial conflicts, such as those shown among RUBEN DURAN, ESQ.; LEAH WILSON, ESQ.; ELI DAVID MORGENSTERN, ESQ. and the adverse representation by SUZANNE CELIA GRANDT, ESQ. or ELLIN DAVTYAN, ESQ.

641. Before Plaintiff, and before ROES 1-150,000 were offered "Attorney Misconduct Complaint" services, each had a right to know about the 700+ CLUB, but THE STATE BAR OF CALIFORNIA unequally protects criminals, accepts proceeds from their activities, and then re-invests them back to others in the enterprise, unequally.

642. Before Plaintiff, and before ROES 1-150,000 were offered "Complaint Review Unit" services, they had a right to know it was Office of General Counsel working in conspiracy to defraud them with Office of Chief Trial Counsel, and that "abatement" was used to further the schemes.

643. Before Plaintiff appeared before JOHN C. GASTELUM, he had a right to know that JOHN C. GASTELUM was conspiring with SUZANNE CELIA GRANDT, ESQ. to defraud Plaintiff through the unequal application of the law only because Plaintiff chose to stand up to THE STATE BAR OF CALIFORNIA's ongoing schemes to defraud him and the public generally.

644. Before ROES 1-150,000 retained a lawyer among the association-in-fact enterprise THE STATE BAR OF CALIFORNIA, they had a right to know THE STATE BAR OF CALIFORNIA as law firm was engaged in daily violation of California Rules of Professional Conduct 5.1, 8.4, and 18 U.S.C. § 1962(d).

645. Plaintiff had a right to equal protection, but ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE in October 2022 ratified the schemes to defraud him in writing, because they are also controlled by THE STATE BAR OF CALIFORNIA as part of a RICO enterprise.

646. Plaintiff had a right to equal protection, but ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE in October 2022 and all times thereafter chose to protect the criminals associated with

CATANZARITE LAW CORPORATION, only because they are part of the 700+ CLUB, and without regard for Plaintiff's harm.

647. Plaintiff had a right to equal protection, but ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE and its "Victim Advocates" – even after confirming they read adjudicative facts, and even after receiving Anaheim Police Department Report #22-197470 – chose to ratify the schemes in favor of local criminals in Anaheim, to the ongoing detriment of Plaintiff, unequally.

648. Plaintiff had a right to equal protection, but STATE OF CALIFORNIA through Office of the Governor assigned three Court of Appeal Justices to obstruct his writ proceedings, with actual knowledge of his severe harm, with actual intent to defraud him.

649. Plaintiff had a right to equal protection, but United States District Attorney's Office for the Southern District of California declared that it did not have victim advocate services for attorney racketeering.

650. Plaintiff had a right to equal protection, but the United States District Attorney's Office for the Southern District of California did not respond to his request to meet and confer after filing this action, even after he wrote a letter, even after he left voicemails, and even after he visited the office. Indeed, United States District Attorneys Office for the Southern District of California also ignores Plaintiff.

651. THE STATE BAR OF CALIFORNIA was under a mandatory duty under § Cal. Gov. Cod. 815.6 not to violate Plaintiff's Fifth and Fourteenth Amendment rights, which prohibits any state from depriving a person of life, liberty, and property without due process of law.

652. Plaintiff has not received due process of law due to the RICO enterprise, and its historical and continuing corruption, and it has destroyed his life, liberty, and property under color of California law and local customs.

653. The protections under the Fifth Amendment and Fourteenth Amendment of the United States Constitution to life, liberty, and property unencumbered is the only item repeated twice in the United States Constitution.

654. UNITED STATES OF AMERICA must act where STATE OF CALIFORNIA refuses and fails.

22-CV-1616-BAS-DDL

655. Cal. Gov. Cod. § 815.3 holds, in relevant part: "(a)…unless the elected official and the public entity are named as codefendants in the same action, a public entity is not liable to a plaintiff under this part for any act or omission of an elected official employed by or otherwise representing that public entity, which act or omission constitutes an intentional tort, including, but not limited to, harassment in violation of state or federal law constitutes an intentional tort, to the extent permitted by federal law."

656. Elected officials RUBEN DURAN, ESQ.; ELLIN DAVTYAN, ESQ.; GEORGE SARGENT CARDONA, ESQ.; and JOHN C. GASTELUM are named in this lawsuit, and violations of Plaintiff's Fifth and Fourteenth Amendment rights constitute harassment and are thereby intentional torts subject of Cal. Gov. Cod. § 815.3.

657. If "(b) [RUBEN DURAN, ESQ.; ELLIN DAVTYAN, ESQ.; GEORGE SARGENT CARDONA, ESQ.; or JOHN C. GASTELUM] is held liable for an intentional tort [here]…the trier of fact in reaching the verdict shall determine if the act or omission constituting the intentional tort arose from and was directly related to the elected official's performance of his or her official duties…[in which instance] the [STATE OF CALIFORNIA, THE STATE BAR OF CALIFORNIA, and ORANGE COUNTY SUPERIOR COURT] shall be liable for the judgment…[f]or purposes of this subdivision, employee managerial functions shall be deemed to arise from, and to directly relate to, [each] official's duties."

658. As direct and proximate cause of Count V Defendant(s) violation of Plaintiff's protected federal rights, Plaintiff has been actually damaged, and has suffered non-economic damages, and the conduct requires punitive damages.

659. As direct and proximate result of Count V Defendant(s) violation of Plaintiff's protected federal rights, Plaintiff seeks his actual damages of $138,889,249 under 42 U.S.C. § 1983, and:

660. For pain, suffering, inconvenience, and oppression, Plaintiff seeks $138,889,249.

661. For severe emotional distress leading to a seizure, Plaintiff seeks $138,889,249.

662. For loss of consortium, inability to marry his boyfriend, Plaintiff seeks $138,889,249.

663. For violation of his right to Equal Protection (14th, U.S.), Plaintiff seeks $138,889,249.

664. For privacy violations by court official fraud (4th, U.S.), Plaintiff seeks $138,889,249.

135

22-CV-1616-BAS-DDL

665. For loss of enjoyment of life, consideration of suicide, Plaintiff seeks $138,889,249.

666. For severe grief in losing a mentor and his parents, Plaintiff seeks $138,889,249.

667. For humiliation, loss of friends, and colleagues, Plaintiff seeks $138,889,249.

668. For violation of his right of petition (1st, U.S.) under color of CCP, Plaintiff seeks $138,889,249.

669. For unlawful taking by court official fraud (5th, U.S.) Plaintiff seeks $138,889,249.

670. For punitive damages, Plaintiff seeks the maximum amount permissible by law.

671. WHEREFORE, Plaintiff requests that this Court enter judgment against the Count V Defendant(s) as follows:

- JUDGMENT in favor of Plaintiff JUSTIN S. BECK Against Defendants THE STATE BAR OF CALIFORNIA; STATE OF CALIFORNIA; ORANGE COUNTY SUPERIOR COURT; ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE; RUBEN DURAN, ESQ.; GEORGE SARGENT CARDONA, ESQ.; ELI DAVID MORGENSTERN, ESQ.; ELLIN DAVTYAN, ESQ.; SUZANNE CELIA GRANDT, ESQ.; and JOHN C. GASTELUM for Violation of 42 U.S.C. § 1983.

- MONEY JUDGMENT in favor of JUSTIN S. BECK Against THE STATE BAR OF CALIFORNIA; STATE OF CALIFORNIA; ORANGE COUNTY SUPERIOR COURT; ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE; RUBEN DURAN, ESQ.; GEORGE SARGENT CARDONA, ESQ.; ELI DAVID MORGENSTERN, ESQ.; ELLIN DAVTYAN, ESQ.; SUZANNE CELIA GRANDT, ESQ.; and JOHN C. GASTELUM jointly and severally for damages in the amount of **$138,889,249**.

- MONEY JUDGMENT in favor of JUSTIN S. BECK Against THE STATE BAR OF CALIFORNIA; STATE OF CALIFORNIA; ORANGE COUNTY SUPERIOR COURT; ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE; RUBEN DURAN, ESQ.; GEORGE SARGENT CARDONA, ESQ.; ELI DAVID MORGENSTERN, ESQ.; ELLIN DAVTYAN, ESQ.; SUZANNE CELIA GRANDT, ESQ.; and JOHN C. GASTELUM jointly and severally for damages in the amount of **$1,388,892,490**.

- MONEY JUDGMENT in favor of JUSTIN S. BECK Against THE STATE BAR OF CALIFORNIA; STATE OF CALIFORNIA; ORANGE COUNTY SUPERIOR COURT;

1  ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE; RUBEN DURAN, ESQ.; GEORGE

2  SARGENT CARDONA, ESQ.; ELI DAVID MORGENSTERN, ESQ.; ELLIN DAVTYAN,

3  ESQ.; SUZANNE CELIA GRANDT, ESQ.; and JOHN C. GASTELUM jointly and severally

4  for damages in an amount determined by a neutral Court or jury of JUSTIN S. BECK's peers

5  comprised of non-lawyers, but not less than **$1,388,892,490**.

6  •  EXTRAORDINARY RELIEF in favor of ROES 1-150,000 Against THE STATE

7  BAR OF CALIFORNIA of forced dissolution, federal receivership, and payment by STATE OF

8  CALIFORNIA according to damages determined by UNITED STATES OF AMERICA or by

9  investigation of the UNITED STATES Congress on Plaintiff's petition.

**[COUNT VI]:**

**SHERMAN ACT (DEMAND FUTILITY)**

**Violation of 15 U.S.C. § 1**

672. The preceding paragraphs ¶ 1 through ¶ 671 are incorporated herein by reference.

673. This Count VI is against Defendants STATE OF CALIFORNIA; THE STATE BAR OF CALIFORNIA; RUBEN DURAN, ESQ.; ELLIN DAVTYAN, ESQ.; SUZANNE CELIA GRANDT, ESQ.; ROBERT GEORGE RETANA, ESQ.; JORGE E. NAVARETTE; and nominal Defendant UNITED STATES OF AMERICA ("Count VI Defendant(s).")

674. According to 15 U.S.C. § 1:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

> (July 2, 1890, ch. 647, § 1, 26 Stat. 209; Aug. 17, 1937, ch. 690, title VIII, 50 Stat. 693; July 7, 1955, ch. 281, 69 Stat. 282; Pub. L. 93-258, § 3, Dec. 21, 1974, 88 Stat. 1708; Pub. L. 94-145, § 2, Dec. 12, 1975, 89 Stat. 801; Pub. L. 101-588, § 4(a), Nov. 16, 1990, 104 Stat. 2880; Pub. L. 108-237, title II, § 215(a), June 22, 2004, 118 Stat. 668.)

675. THE STATE BAR OF CALIFORNIA is majority-controlled by active market participants within the Office of Chief Trial Counsel, Office of General Counsel, Board of Trustees, and Executive Director's office who operate in a unity of interests with 700+ CLUB.

676. In frivolously being directed by California Supreme Court Chief Justice Tani Sakil Sakauye, and then by frivolously making an antitrust determination for their own conduct, SUZANNE CELIA GRANDT, ESQ. and ROBERT GEORGE RETANA, ESQ. did knowingly disregard or conspired to disregard the United States Supreme Court decision in *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015) to defraud Plaintiff and the public.

677. With intent to defraud Plaintiff, the public, and California Supreme Court, SUZANNE CELIA GRANDT, ESQ. and ROBERT GEORGE RETANA, ESQ. or others working with Office of General Counsel for THE STATE BAR OF CALIFORNIA did knowingly remove four volumes of exhibits from Plaintiff's filing in California Supreme Court styled *Justin S. Beck v. Ruben*

1     *Duran (The State Bar of California) et al.*, S276517, accepted on September 21, 2022, witnessed

2     by California Supreme Court clerk Ines Calanoc, before "Antitrust Determination 2022-001."

678.   With intent to defraud Plaintiff, the public, and UNITED STATES OF AMERICA in restraint of trade and for the benefit of an unlawful trust, JORGE E. NAVARETTE did accept on October 18, 2022, the deliberately obstructed files as if they were filed or authorized by Plaintiff.

679.   With intent to defraud Plaintiff, the public, and UNITED STATES OF AMERICA, after Plaintiff noticed the pendency of federal proceedings before the Federal Trade Commission and Antitrust Division of United States Department of Justice on November 29, 2022, JORGE E. NAVARETTE did obtain a fraudulent "En Banc" decision from California Supreme Court on an unauthorized petition on November 30, 2022.

680.   With intent to defraud Plaintiff and the public, with the signature of California Supreme Court Justice Tania Sakil Sakauye, JORGE E. NAVARETTE did use the postal mail to send Plaintiff the same fraudulently obtained "En Banc" decision, and he did know that the "En Banc" decision did not reflect the filing of Plaintiff on September 21, 2022 filed under federal law.

681.   STATE OF CALIFORNIA has assigned its sovereignty to active market participants in regulation, thereby making THE STATE BAR OF CALIFORNIA an unlawful trust.

682.   In restraint of trade and in deliberate violation of the UNITED STATES OF AMERICA's Highest Supreme Court decision in 2015, neither THE STATE BAR OF CALIFORNIA, nor any of its actor defendants here, possess the opportunity to even claim state-action immunity, much less defeat Plaintiff's preceding causes of action, or any cause of action, in this Complaint.

683.   In restraint of trade, the 700+ CLUB is an unlawful combination or trust defrauding UNITED STATES OF AMERICA in conspiracy with THE STATE BAR OF CALIFORNIA and persons working for California Supreme Court, including but not limited to JORGE E. NAVARETTE.

684.   Even after Plaintiff judicially noticed JOHN C. GASTELUM of *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015) before October 11, 2022, and even after discussing the United States Supreme Court decision on October 11, 2022, with SUZANNE CELIA GRANDT, ESQ. present in open Court, JOHN C. GASTELUM proclaimed "well, I think you are wrong" without regard for UNITED STATES OF AMERICA or Plaintiff.

22-CV-1616-BAS-DDL

685.  Due to anticompetitive conduct in restraint of trade, there exists no lawyer who can bring 15 U.S.C. § 1 claims in California, and so Plaintiff brings this Count VI individually, and on behalf of the interests of UNITED STATES OF AMERICA.

686.  WHEREFORE, Plaintiff requests that this Court enter judgment against the Count VI Defendant(s) as follows:

• JUDGMENT in favor of Plaintiff JUSTIN S. BECK Against Defendants STATE OF CALIFORNIA; THE STATE BAR OF CALIFORNIA; RUBEN DURAN, ESQ.; ELLIN DAVTYAN, ESQ.; SUZANNE CELIA GRANDT, ESQ.; ROBERT GEORGE RETANA, ESQ.; JORGE E. NAVARETTE; and JOHN C. GASTELUM for Violation of 15 U.S.C. § 1.

• JUDGMENT in favor of UNITED STATES OF AMERICA Against Defendants STATE OF CALIFORNIA; THE STATE BAR OF CALIFORNIA; RUBEN DURAN, ESQ.; ELLIN DAVTYAN, ESQ.; SUZANNE CELIA GRANDT, ESQ.; ROBERT GEORGE RETANA, ESQ.; JORGE E. NAVARETTE; and JOHN C. GASTELUM for Violation of 15 U.S.C. § 1.

• MONEY JUDGMENT in favor of Plaintiff JUSTIN S. BECK Against STATE OF CALIFORNIA; THE STATE BAR OF CALIFORNIA; RUBEN DURAN, ESQ.; ELLIN DAVTYAN, ESQ.; SUZANNE CELIA GRANDT, ESQ.; ROBERT GEORGE RETANA, ESQ.; JORGE E. NAVARETTE under 15 U.S.C. § 1 as an alternative to any single failed relief in the preceding Counts I through Count V should any single form of relief for money or otherwise fail.

• MONEY JUDGMENT in favor of UNITED STATES OF AMERICA Against STATE OF CALIFORNIA and THE STATE BAR OF CALIFORNIA jointly and severally in the amount of **$100,000,000**.

• MONEY JUDGMENT in favor of UNITED STATES OF AMERICA Against RUBEN DURAN, ESQ. in the amount of **$1,000,000**.

• MONEY JUDGMENT in favor of UNITED STATES OF AMERICA Against ELLIN DAVTYAN, ESQ. in the amount of **$1,000,000**.

• MONEY JUDGMENT in favor of UNITED STATES OF AMERICA Against SUZANNE CELIA GRANDT, ESQ. in the amount of **$1,000,000**.

22-CV-1616-BAS-DDL

- MONEY JUDGMENT in favor of UNITED STATES OF AMERICA Against ROBERT GEORGE RETANA, ESQ. in the amount of **$1,000,000**.

- MONEY JUDGMENT in favor of UNITED STATES OF AMERICA Against JORGE E. NAVARETTE in the amount of **$1,000,000**.

- MONEY JUDGMENT in favor of UNITED STATES OF AMERICA Against JOHN C. GASTELUM in the amount of **$1,000,000**.

- PERMANENT INJUNCTION Against "State Bar Court" from performing any proceedings or being used to delay any proceedings by Office of General Counsel or Office of Chief Trial Counsel for any reason.

- PERMANENT INJUNCTION Against THE STATE BAR OF CALIFORNIA making any antitrust determination for itself or any of its operations, officials, or employees.

- PERMANENT INJUNCTION Against California Supreme Court from assigning Office of General Counsel from making antitrust determinations.

- PERMANENT INJUNCTION Against Office of General Counsel defending tort claims against itself or its individual actors lying in fraud or corruption.

- PERMANENT INJUNCTION Against California Supreme Court from delivering postal mail or wire communications for the "In Re: Walker" scheme to defraud U.S. Citizens.

- PERMANENT INJUNCTION Against THE STATE BAR OF CALIFORNIA from performing any function related to attorney discipline, which functions should be referred to a Federal receiver until such time that a process adhering to the United States Constitution is enacted by UNITED STATES OF AMERICA where STATE OF CALIFORNIA refuses.

- EXTRAORDINARY RELIEF of Referral or Assignment of a Joint Investigation Between Federal Trade Commission (FTC), ATTORNEY GENERAL OF THE UNITED STATES, and United States Congress of THE STATE BAR OF CALIFORNIA with an emphasis on the ongoing activities of the 700+ CLUB, persons associated with Office of General Counsel, members of Board of Trustees from 2014 to present for THE STATE BAR OF CALIFORNIA, and persons associated with California Supreme Court from 2014 to present, and any others acting in conspiracy.

**[COUNT VII]:**

**MALICIOUS PROSECUTION**

**Violation of 42 U.S.C. § 1983**

687. The preceding paragraphs ¶ 1 through ¶ 686 are incorporated herein by reference.

688. This Count VII is against Defendants KENNETH CATANZARITE, ESQ.; JIM TRAVIS TICE, ESQ.; TIM JAMES O'KEEFE, ESQ.; BRANDON WOODWARD, ESQ.; NICOLE MARIE CATANZARITE WOODWARD, ESQ.; ELI DAVID MORGENSTERN, ESQ.; SUZANNE CELIA GRANDT, ESQ.; GEORGE SARGENT CARDONA, ESQ.; RICHARD FRANCIS O'CONNOR, JR.; AMY JEANETTE COOPER; CLIFF HIGGERSON; ANTHONY B. SCUDDER; JAMES DUFFY; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA (the "Count VII Defendant(s).")

689. For improper purposes, the Count VII Defendant(s) filed, furthered, or ratified "multiple but similar lawsuits within a one-year period, all of which arise from a [fraudulently schemed] dispute between shareholders of MFS and Cultivation Technologies, Inc. (CTI)" which would not exist but for CATANZARITE LAW CORPORATION or THE STATE BAR OF CALIFORNIA. *Beck v. Catanzarite Law Corp.*, No. G059766, 1 (Cal. Ct. App. Jul. 13, 2022)

690. Plaintiff incorporates the Court of Appeal's summary of "(1) The Pinkerton Action. *Denise Pinkerton v. Cultivation Technologies, Inc., et al.,* OCSC No. 30-2018-01018922." *Fincanna Capital Corp. v. Cultivation Tech.*, No. G058700, 3 (Cal. Ct. App. Jun. 28, 2021); "(2) The MFS Action. *Mobile Farming Systems, Inc. v. Cultivation Technologies, Inc., et al.,* OCSC No. 30-2019-01046904" *Fincanna Capital Corp. v. Cultivation Tech.*, No. G058700, 4 (Cal. Ct. App. Jun. 28, 2021); "(3) The Mesa Action. *Mesa, et al. v. Probst, et al.,* OCSC No. 30-2019-01064267" *Fincanna Capital Corp. v. Cultivation Tech.*, No. G058700, 5 (Cal. Ct. App. Jun. 28, 2021); "(5) The FinCanna Action Cross-complaint. *FinCanna v. Cultivation Technologies, Inc., et al.,* OCSC No. 30-2019-01072088" *Fincanna Capital Corp. v. Cultivation Tech.*, No. G058700, 7 (Cal. Ct. App. Jun. 28, 2021); and "(6) The Scottsdale Action. *Cultivation Technologies, Inc., v. Scottsdale Insurance Company,* OCSC No. 30-2019-01096233" *Fincanna Capital Corp. v. Cultivation Tech.*, No. G058700, 7 (Cal. Ct. App. Jun. 28, 2021)

691.  Each of the lawsuits targeting Plaintiff, his interests, his insurance policy, and his privacy lacked objective probable cause, as they were filed, re-filed, furthered, or ratified on behalf of adverse parties that were coerced or extorted by KENNETH CATANZARITE, ESQ. to commit serial perjury, violations of 18 U.S.C. § 1962(d), and manufacturing of evidence.

692.  Plaintiff incorporates the entire description from Court of Appeal here, and verifies it as being true, where in State Court, "Justin S. Beck filed a malicious prosecution action against Catanzarite Law Corporation, its attorneys Kenneth J. Catanzarite, Brandon Woodward, Tim James O'Keefe (collectively Catanzarite unless the context requires otherwise) and the firm's clients (Amy Jeanette Cooper, Cliff Higgerson, and Mohammed Zakhireh). He alleged some of these defendants were also liable for unfair business practices, slander of title, and intentional infliction of emotional distress (IIED)...We conclude his contentions have merit."

*Beck v. Catanzarite Law Corp.*, No. G059766, 1-42 (Cal. Ct. App. Jul. 13, 2022)

693.  The Court of Appeal's decision not to disqualify these attorneys from adverse representation does not make it legal under the United States Constitution, nor does it reflect upon the merits of that representation, which is illegal in any jurisdiction, rather it was not within the scope of review at that time.

694.  JIM TRAVIS TICE, ESQ. chose to further the scheme on September 8, 2021 by substituting in as counsel, accepting all the stolen private information from CATANZARITE LAW CORPORATION which was disqualified previously, and JIM TRAVIS TICE, ESQ. had actual knowledge that UNITED STATES OF AMERICA previously reviewed approximately 25,000 pages of securities documents, and yet JIM TRAVIS TICE, ESQ. assumed the role of "counsel" for AMY JEANETTE COOPER, Richard Mesa, and Tom Mebane as "class" because he thought he could rely upon control of the enterprise to extort Plaintiff and other persons.

695.  In violation of Plaintiff's right of privacy, Count VII Defendants used THE STATE BAR OF CALIFORNIA and ORANGE COUNTY SUPERIOR COURT to maliciously prosecute Plaintiff under *Thompson v. Clark*, 142 S. Ct. 1332, (2022) and the Fourth Amendment.

696.  In violation of common federal law, Count VII Defendants maliciously prosecuted Plaintiff.

22-CV-1616-BAS-DDL

697. Each of the Count VII Defendants were either parties to the fraudulent scheme, or they provided false evidence under penalty of perjury, or they appeared on notices of motion, motions, pleadings, and similar papers, or they suborned evidence under the penalty of perjury, or they adopted as true materially conflicting facts in separate lawsuits against Plaintiff as if that were supported by objective reasonable belief, or they ratified and carried on the scheme to defraud Plaintiff as it pertains to SUZANNE CELIA GRANDT, ESQ., GEORGE SARGENT CARDONA, ESQ., or THE STATE BAR OF CALIFORNIA.

698. In order to conceal state liability and in furtherance of the scheme, STATE OF CALIFORNIA through Office of the Governor appointed justices to Fourth District, Division Three even when it had actual knowledge of these schemes to defraud Plaintiff and others, in order to obstruct writ proceedings because Plaintiff targeted corruption of THE STATE BAR OF CALIFORNIA.

699. Plaintiff had clearly established Constitutional rights, and each of the Count VII Defendant(s) did knowingly violate them, and they did so under color of law or custom unfounded in the United States Constitution, and in doing so, they did violate 42 U.S.C. § 1983.

700. As direct and proximate cause of Count VII Defendant(s) violation of Plaintiff's protected federal rights through malicious prosecution under 42 U.S.C. § 1983, Plaintiff has been actually damaged, and has suffered non-economic damages, and the conduct requires punitive damages.

701. As direct and proximate result of Count VII Defendant(s) violation of Plaintiff's protected federal rights, in malicious prosecution, Plaintiff seeks his actual damages of $138,889,249, and:

702. For malicious prosecution, Plaintiff seeks $1,388,892,490.

703. Plaintiff also seeks the maximum amount of punitive damages available under the law.

704. WHEREFORE, Plaintiff requests that this Court enter judgment against the Count VII Defendant(s) as follows:

• JUDGMENT in favor of Plaintiff JUSTIN S. BECK Against Defendants KENNETH CATANZARITE, ESQ.; JIM TRAVIS TICE, ESQ.; TIM JAMES O'KEEFE, ESQ.; BRANDON WOODWARD, ESQ.; NICOLE MARIE CATANZARITE WOODWARD, ESQ.; ELI DAVID MORGENSTERN, ESQ.; SUZANNE CELIA GRANDT, ESQ.; GEORGE SARGENT CARDONA, ESQ.; RICHARD FRANCIS O'CONNOR, JR.; AMY JEANETTE COOPER; CLIFF

144

22-CV-1616-BAS-DDL

HIGGERSON; ANTHONY B. SCUDDER; JAMES DUFFY; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA for Malicious Prosecution and Violation of 42 U.S.C. § 1983.

- MONEY JUDGMENT in favor of JUSTIN S. BECK Against KENNETH CATANZARITE, ESQ.; JIM TRAVIS TICE, ESQ.; TIM JAMES O'KEEFE, ESQ.; BRANDON WOODWARD, ESQ.; NICOLE MARIE CATANZARITE WOODWARD, ESQ.; ELI DAVID MORGENSTERN, ESQ.; SUZANNE CELIA GRANDT, ESQ.; GEORGE SARGENT CARDONA, ESQ.; RICHARD FRANCIS O'CONNOR, JR; AMY JEANETTE COOPER; CLIFF HIGGERSON; ANTHONY B. SCUDDER; JAMES DUFFY; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for damages in the amount of **$138,889,249**.

- MONEY JUDGMENT in favor of JUSTIN S. BECK Against KENNETH CATANZARITE, ESQ.; JIM TRAVIS TICE, ESQ.; TIM JAMES O'KEEFE, ESQ.; BRANDON WOODWARD, ESQ.; NICOLE MARIE CATANZARITE WOODWARD, ESQ.; ELI DAVID MORGENSTERN, ESQ.; SUZANNE CELIA GRANDT, ESQ.; GEORGE SARGENT CARDONA, ESQ.; RICHARD FRANCIS O'CONNOR, JR.; AMY JEANETTE COOPER; CLIFF HIGGERSON; ANTHONY B. SCUDDER; JAMES DUFFY; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for damages in the amount of **$1,388,892,490**.

- MONEY JUDGMENT in favor of JUSTIN S. BECK Against KENNETH CATANZARITE, ESQ.; JIM TRAVIS TICE, ESQ.; TIM JAMES O'KEEFE, ESQ.; BRANDON WOODWARD, ESQ.; NICOLE MARIE CATANZARITE WOODWARD, ESQ.; ELI DAVID MORGENSTERN, ESQ.; SUZANNE CELIA GRANDT, ESQ.; GEORGE SARGENT CARDONA, ESQ.; RICHARD FRANCIS O'CONNOR, JR.; AMY JEANETTE COOPER; CLIFF HIGGERSON; ANTHONY B. SCUDDER; JAMES DUFFY; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA jointly and severally for damages in the maximum amount available under the law, but not less than **$1,388,892,490**.

**[COUNT VIII]:**

**FEDERAL DISBARMENT**

**Violation of 42 U.S.C. § 1983**

705.   The preceding paragraphs ¶ 1 through ¶ 704 are incorporated herein by reference.

706.   This Count VIII is against KENNETH CATANZARITE, ESQ.; JIM TRAVIS TICE, ESQ.; RUBEN DURAN, ESQ.; LEAH WILSON, ESQ.; ELLIN DAVTYAN, ESQ.; TIM JAMES O'KEEFE, ESQ.; BRANDON WOODWARD, ESQ.; NICOLE MARIE CATANZARITE WOODWARD, ESQ.; ELI DAVID MORGENSTERN, ESQ.; SUZANNE CELIA GRANDT, ESQ.; ROBERT GEORGE RETANA, ESQ. and GEORGE SARGENT CARDONA, ESQ. (the "Count VIII Defendant(s).")

707.   The Count VIII Defendant(s) have engaged in serial moral turpitude, fraud, judicial deception, racketeering, antitrust violations, or conspiracy in the practice of law.

708.   WHEREFORE, Plaintiff requests that this Court enter judgment against the Count VIII Defendant(s) as follows:

- JUDGMENT in favor of UNITED STATES OF AMERICA, the Public, Courts, and Legal Profession Against Defendants KENNETH CATANZARITE, ESQ.; JIM TRAVIS TICE, ESQ.; RUBEN DURAN, ESQ.; LEAH WILSON, ESQ.; ELLIN DAVTYAN, ESQ.; TIM JAMES O'KEEFE, ESQ.; BRANDON WOODWARD, ESQ.; NICOLE MARIE CATANZARITE WOODWARD, ESQ.; ELI DAVID MORGENSTERN, ESQ.; SUZANNE CELIA GRANDT, ESQ.; ROBERT GEORGE RETANA, ESQ., and GEORGE SARGENT CARDONA, ESQ. for Violation of 42 U.S.C. § 1983 and Cal. Bus. & Prof. Cod. 6068(a).

- EXTRAORDINARY RELIEF in favor of UNITED STATES OF AMERICA, the Public, Courts, and Legal Profession Against KENNETH CATANZARITE, ESQ.; JIM TRAVIS TICE, ESQ.; RUBEN DURAN, ESQ.; LEAH WILSON, ESQ.; ELLIN DAVTYAN, ESQ.; TIM JAMES O'KEEFE, ESQ.; BRANDON WOODWARD, ESQ.; NICOLE MARIE CATANZARITE WOODWARD, ESQ.; ELI DAVID MORGENSTERN, ESQ.; SUZANNE CELIA GRANDT, ESQ.; ROBERT GEORGE RETANA, ESQ. and GEORGE SARGENT CARDONA, ESQ. of disbarment from federal courts, and permanent injunction from representing adverse parties here.

**[COUNT IX]:**

**FEDERAL RECEIVER**

**Violation of 18 U.S.C. § 1956 and 18 U.S.C. § 1957**

709.    The preceding paragraphs ¶ 1 through ¶ 708 are incorporated by reference.

710.    This Count IX is against THE STATE BAR OF CALIFORNIA and CATANZARITE LAW CORPORATION (the "Count IX Defendant(s).")

711.    Where Plaintiff shows beyond any reasonable doubt that the Count IX Defendant(s) have engaged in specified unlawful activity as defined by 18 U.S.C. 1956(a)(1), subs. (3)-(4) hold:

> **(3)** COURT AUTHORITY OVER ASSETS.-A court may issue a pretrial restraining order or take any other action necessary to ensure that any bank account or other property held by the defendant in the United States is available to satisfy a judgment under this section.

> **(4)** FEDERAL RECEIVER.-**(A)** IN GENERAL.-A court may appoint a Federal Receiver, in accordance with subparagraph (B) of this paragraph, to collect, marshal, and take custody, control, and possession of all assets of the defendant, wherever located, to satisfy a civil judgment under this subsection, a forfeiture judgment under section 981 or 982, or a criminal sentence under section 1957 or subsection (a) of this section, including an order of restitution to any victim of a specified unlawful activity.

712.    WHEREFORE, Plaintiff requests that this Court enter judgment against the Count IX Defendants as follows:

▪        JUDGMENT in favor of Plaintiff JUSTIN S. BECK against Defendants THE STATE BAR OF CALIFORNIA and CATANZARITE LAW CORPORATION for violation of 18 U.S.C. § 1956.

▪        JUDGMENT in favor of UNITED STATES OF AMERICA against Defendant THE STATE BAR OF CALIFORNIA for violation of 18 U.S.C. § 1956 and 18 U.S.C. § 1952(a)(3).

▪        EXTRAORDINDARY RELIEF granting COURT AUTHORITY OVER ASSETS of CATANZARITE LAW CORPORATION and THE STATE BAR OF CALIFORNIA through PRETRIAL RESTRAINING ORDER or by any other such action necessary to ensure that any bank account or property held by the defendant in the United States is available to satisfy a judgment under this section (which is among the acts under 18 U.S.C. § 1962(a)-(d).)

1                 EXTRAORDINARY RELIEF appointing FEDERAL RECEIVER to collect, marshal,

2 and take custody, control, and possession of all assets of CATANZARITE LAW CORPORATION

3 and THE STATE BAR OF CALIFORNIA.

22-CV-1616-BAS-DDL

**[COUNT X]:**

**JUDICIAL DECEPTION**

**Violation of 42 U.S.C. § 1983**

713. The preceding paragraphs ¶ 1 through ¶ 712 are incorporated herein by reference.

714. This Count X is against Defendants THE STATE BAR OF CALIFORNIA; STATE OF CALIFORNIA; KENNETH CATANZARITE, ESQ.; JIM TRAVIS TICE, ESQ.; RICHARD FRANCIS O'CONNOR, JR.; JORGE E. NAVARETTE; ROBERT GEORGE RETANA, ESQ.; and SUZANNE CELIA GRANDT, ESQ. (the "Count X Defendant(s).")

715. In order to prevail on a judicial deception claim, a plaintiff must prove that "(1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). If a state official "submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth, ... he cannot be said to have acted in a reasonable manner, and the shield of qualified immunity is lost." *Chism v. Washington State*, 661 F.3d 380, 393 (9th Cir. 2011) (quoting *Branch v. Tunnell*, 937 F.2d 1382, 1387 (9th Cir. 1991) ).

*Keates v. Koile*, 883 F.3d 1228, 1240 (9th Cir. 2018)

716. Count X Defendant(s), in furtherance of fraudulent schemes using the California judicial system including ORANGE COUNTY SUPERIOR COURT and the Clerk of California Supreme Court, have deliberately engaged in serial perjury and subornation of perjury, or they have fabricated evidence, or they have submitted affidavits or declarations that contained statements each knew to be false or would have known to be false had each not recklessly disregarded truth.

717. Count X Defendant(s) cannot claim qualified immunity in this case due to judicial deception.

718. Count X Defendant(s)' deliberate fabrication of evidence and concealment of truth did cause Plainitff's deprivation of liberty.

719. As direct and proximate cause of Count X Defendant(s)' judicial deception, Plaintiff has been actually injured, and continues to be injured in ORANGE COUNTY SUPERIOR COURT, California Court of Appeal, and California Supreme Court.

22-CV-1616-BAS-DDL

720. THE STATE BAR OF CALIFORNIA and STATE OF CALIFORNIA have enabled and ratified the conduct of these individual Count X Defendant(s), including the judicial deception that caused Plaintiff's deprivation of liberty, in violation of 42 U.S.C. § 1983, and are liable here.

721. As direct and proximate result of Count X Defendant(s)' judicial deception, Plaintiff has been damaged in accordance with the preceding paragraphs.

722. WHEREFORE, Plaintiff requests that this Court enter judgment against the Count X Defendant(s) as follows:

• JUDGMENT in favor of JUSTIN S. BECK against THE STATE BAR OF CALIFORNIA; STATE OF CALIFORNIA; KENNETH CATANZARITE, ESQ.; JIM TRAVIS TICE, ESQ.; RICHARD FRANCIS O'CONNOR, JR.; JORGE E. NAVARETTE; ROBERT GEORGE RETANA, ESQ.; and SUZANNE CELIA GRANDT, ESQ. for judicial deception in violation of 42 U.S.C. § 1983.

• MONEY JUDGMENT in favor of JUSTIN S. BECK against THE STATE BAR OF CALIFORNIA; STATE OF CALIFORNIA; KENNETH CATANZARITE, ESQ.; JIM TRAVIS TICE, ESQ.; RICHARD FRANCIS O'CONNOR, JR.; JORGE E. NAVARETTE; ROBERT GEORGE RETANA, ESQ.; and SUZANNE CELIA GRANDT, ESQ. in an amount equal to any single form of relief failing the preceding Counts I through Count IX as an alternative.

### [COUNT XI]:

### MALICIOUS DEFENSE

### Violation of 42 U.S.C. § 1983

723. The preceding paragraphs ¶ 1 through ¶ 722 are incorporated herein by reference.

724. This Count XI is against Defendants SUZANNE CELIA GRANDT, ESQ.; GEORGE SARGENT CARDONA, ESQ.; ROBERT GEORGE RETANA, ESQ.; ELLIN DAVTYAN, ESQ.; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA (the "Count XI Defendant(s).")

725. Where Plaintiff has been subject of a four-year fraudulent scheme, Count XI Defendant(s) sought to further the interests of persons engaged in actual crimes, knowing that Plaintiff was suffering.

726. Where Plaintiff filed Government Claims Act Litigation, Count XI Defendant(s) sought to obstruct his proceedings, where the purpose of the Courts are to do justice, and the purpose of THE STATE BAR OF CALIFORNIA is to protect Plaintiff and others like ROES 1-150,000.

727. Where Plaintiff had a clearly established right to recover his damages, and where he provided proof beyond reasonable doubt of his accusations, Count XI Defendant(s) used color of state law, artificial procedures, and active concealment to harm Plaintiff or to further their own goals.

728. Count XI Defendant(s) have no regard for truth, and they have no regard for due process rights.

729. STATE OF CALIFORNIA deliberately obstructed Plaintiff's Government Claims Act litigation.

730. As direct and proximate cause of Count XI Defendant(s) malicious defense, Plaintiff has been denied timely resolution to his claims, and has become disenfranchised as a former voting citizen who has lost all trust in California's government and its purported democratic institutions.

731. As direct and proximate cause of Count XI Defendant(s) malicious defense, Plaintiff has actually feared for his life, and has required to arm himself, and to invoke the self-defense doctrine should he need to take "reasonable force" to protect himself, others, and his family from these crimes.

732. As direct and proximate result of Count XI Defendant(s) malicious defense, Plaintiff has been actually harmed in that he has been unable to dedicate time to his family, friends, or pets, in order to resolve these claims, and thereby been caused more emotional harm. He has not travelled to any global destinations since 2020, where he previously did so 2-3 times per year.

733.   WHEREFORE, Plaintiff requests that this Court enter judgment against the Count XI Defendant(s) as follows:

- JUDGMENT in favor of JUSTIN S. BECK against SUZANNE CELIA GRANDT, ESQ.; GEORGE SARGENT CARDONA, ESQ.; ROBERT GEORGE RETANA, ESQ.; ELLIN DAVTYAN, ESQ.; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA for malicious defense in violation of 42 U.S.C. § 1983.

- MONEY JUDGMENT in favor of JUSTIN S. BECK against SUZANNE CELIA GRANDT, ESQ.; GEORGE SARGENT CARDONA, ESQ.; ROBERT GEORGE RETANA, ESQ.; ELLIN DAVTYAN, ESQ.; THE STATE BAR OF CALIFORNIA; and STATE OF CALIFORNIA in an amount equal to any single form of relief failing the preceding Counts I through Count IX as an alternative.

- MONEY JUDGMENT in favor of JUSTIN S. BECK against STATE OF CALIFORNIA for **$1,000,000,000**.

22-CV-1616-BAS-DDL

**[COUNT XII]:**

**APPPOINTMENT OF RACKETEERING INVESTIGATOR**

**18 U.S.C. § 1968**

734.   The preceding paragraphs ¶ 1 through ¶ 733 are incorporated herein by reference.

735.   This Count XII is filed on behalf of UNITED STATES OF AMERICA against STATE OF CALIFORNIA, THE STATE BAR OF CALIFORNIA, and CATANZARITE LAW CORPORATION.

736.   Count XII defendants have engaged in serial racketeering as shown by California State Auditor from 2002-2022, also by Plaintiff's proof, and through final Court of Appeal rulings subject of California Rules of Court 8.1115(b)(1)-(2), and through United States District and Circuit rulings showing felonies under 18 U.S.C. § 1961(1), all involving THE STATE BAR OF CALIFORNIA as common denominator.

737.   UNITED STATES ATTORNEY GENERAL thereby has reason to believe that Count XII Defendants, and each other Defendant in this case, has information relevant to the interests of UNITED STATES OF AMERICA.

738.   Plaintiff demands civil and criminal investigations on behalf of himself and the citizens of UNITED STATES OF AMERICA.

739.   Plaintiff claims that the antitrust violations shown and impunity, as well as the control over U.S. Attorney's Offices in California by THE STATE BAR OF CALIFORNIA, require that the racketeering investigation is conducted by persons appointed by the United States Congress, or by the United States Department of Justice in Washington, D.C., and with the express direction that such investigations are bi-partisan, conducted neutrally, and not in protection of racketeers.

740.   ATTORNEY GENERAL OF THE UNITED STATES, having an actual duty not only to Plaintiff, but also to UNITED STATES OF AMERICA, and to protect the citizens of STATE OF CALIFORNIA from THE STATE BAR OF CALIFORNIA, 18 U.S.C. § 1968 holds:

(a) Whenever     the Attorney     General has     reason     to     believe     that any person or enterprise may be in possession, custody, or control of any documentary materials relevant to a racketeering investigation, he may, prior to the institution of a civil or criminal proceeding thereon, issue in writing, and cause to be served upon such person, a   civil   investigative   demand   requiring   such person to   produce   such   material   for

22-CV-1616-BAS-DDL

examination.(b) Each such demand shall-(1) state the nature of the conduct constituting the alleged racketeering violation which is under investigation and the provision of law applicable thereto;(2) describe the class or classes of documentary material produced thereunder with such definiteness and certainty as to permit such material to be fairly identified;(3) state that the demand is returnable forthwith or prescribe a return date which will provide a reasonable period of time within which the material so demanded may be assembled and made available for inspection and copying or reproduction; and(4) identify the custodian to whom such material shall be made available.(c) No such demand shall-(1) contain any requirement which would be held to be unreasonable if contained in a subpena duces tecum issued by a court of the United States in aid of a grand jury investigation of such alleged racketeering violation; or(2) require the production of any documentary evidence which would be privileged from disclosure if demanded by a subpena duces tecum issued by a court of the United States in aid of a grand jury investigation of such alleged racketeering violation.(d) Service of any such demand or any petition filed under this section may be made upon a person by-(1) delivering a duly executed copy thereof to any partner, executive officer, managing agent, or general agent thereof, or to any agent thereof authorized by appointment or by law to receive service of process on behalf of such person, or upon any individual person;(2) delivering a duly executed copy thereof to the principal office or place of business of the person to be served; or(3) depositing such copy in the United States mail, by registered or certified mail duly addressed to such person at its principal office or place of business.(e) A verified return by the individual serving any such demand or petition setting forth the manner of such service shall be prima facie proof of such service. In the case of service by registered or certified mail, such return shall be accompanied by the return post office receipt of delivery of such demand.(f)(1) The Attorney General shall designate a racketeering investigator to serve as racketeer document custodian, and such additional racketeering investigators as he shall determine from time to time to be necessary to serve as deputies to such officer.(2) Any person upon whom any demand issued under this section has been duly served shall make such material available for inspection and copying or reproduction to the custodian designated therein at the principal place of business of such person, or at such other place as such custodian and such person thereafter may agree and prescribe in writing or as the court may direct, pursuant to this section on the return date specified in such demand, or on such later date as such custodian may prescribe in writing. Such person may upon written agreement between such person and the custodian substitute for copies of all or any part of such material originals thereof.(3) The custodian to whom any documentary material is so delivered shall take physical possession thereof, and shall be responsible for the use made thereof and for the return thereof pursuant to this chapter. The custodian may cause the preparation of such copies of such documentary material as may be required for official use under regulations which shall be promulgated by the Attorney General. While in the possession of the custodian, no material so produced shall be available for examination, without the consent of the person who produced such material, by any individual other than the Attorney General. Under such reasonable terms and conditions as the Attorney General shall prescribe, documentary material while in the possession of the custodian shall be available for examination by the person who produced such material or any duly

154

authorized representatives of such person.(4) Whenever any attorney has been designated to appear on behalf of the United States before any court or grand jury in any case or proceeding involving any alleged violation of this chapter, the custodian may deliver to such attorney such documentary material in the possession of the custodian as such attorney determines to be required for use in the presentation of such case or proceeding on behalf of the United States. Upon the conclusion of any such case or proceeding, such attorney shall return to the custodian any documentary material so withdrawn which has not passed into the control of such court or grand jury through the introduction thereof into the record of such case or proceeding.(5) Upon the completion of-(i) the racketeering investigation for which any documentary material was produced under this chapter, and(ii) any case or proceeding arising from such investigation, the custodian shall return to the person who produced such material all such material other than copies thereof made by the Attorney General pursuant to this subsection which has not passed into the control of any court or grand jury through the introduction thereof into the record of such case or proceeding.(6) When any documentary material has been produced by any person under this section for use in any racketeering investigation, and no such case or proceeding arising therefrom has been instituted within a reasonable time after completion of the examination and analysis of all evidence assembled in the course of such investigation, such person shall be entitled, upon written demand made upon the Attorney General, to the return of all documentary material other than copies thereof made pursuant to this subsection so produced by such person.(7) In the event of the death, disability, or separation from service of the custodian of any documentary material produced under any demand issued under this section or the official relief of such custodian from responsibility for the custody and control of such material, the Attorney General shall promptly-(i) designate another racketeering investigator to serve as custodian thereof, and(ii) transmit notice in writing to the person who produced such material as to the identity and address of the successor so designated.

Any successor so designated shall have with regard to such materials all duties and responsibilities imposed by this section upon his predecessor in office with regard thereto, except that he shall not be held responsible for any default or dereliction which occurred before his designation as custodian.

(g) Whenever any person fails to comply with any civil investigative demand duly served upon him under this section or whenever satisfactory copying or reproduction of any such material cannot be done and such person refuses to surrender such material, the Attorney General may file, in the district court of the United States for any judicial district in which such person resides, is found, or transacts business, and serve upon such person a petition for an order of such court for the enforcement of this section, except that if such person transacts business in more than one such district such petition shall be filed in the district in which such person maintains his principal place of business, or in such other district in which such person transacts business as may be agreed upon by the parties to such petition.(h) Within twenty days after the service of any such demand upon any person, or at any time before the return date specified in the demand, whichever period is shorter, such person may file, in the district court of the United States for the judicial district within which such person resides, is found, or transacts business, and serve upon such custodian a petition for an order of such court

22-CV-1616-BAS-DDL

modifying or setting aside such demand. The time allowed for compliance with the demand in whole or in part as deemed proper and ordered by the court shall not run during the pendency of such petition in the court. Such petition shall specify each ground upon which the petitioner relies in seeking such relief, and may be based upon any failure of such demand to comply with the provisions of this section or upon any constitutional or other legal right or privilege of such person.(i) At any time during which any custodian is in custody or control of any documentary material delivered by any person in compliance with any such demand, such person may file, in the district court of the United States for the judicial district within which the office of such custodian is situated, and serve upon such custodian a petition for an order of such court requiring the performance by such custodian of any duty imposed upon him by this section.(j) Whenever any petition is filed in any district court of the United States under this section, such court shall have jurisdiction to hear and determine the matter so presented, and to enter such order or orders as may be required to carry into effect the provisions of this section.

741.    WHEREFORE, Plaintiff requests that this Court enter judgment against the Count XII Defendant(s) as follows:

•       JUDGMENT in favor of UNITED STATES OF AMERICA against STATE OF CALIFORNIA, THE STATE BAR OF CALIFORNIA, and CATANZARITE LAW CORPORATION for bi-partisan racketeering investigations under 18 U.S.C. § 1968.

**PLAINTIFF DEMANDS TRIAL BY JURY**

742.    For the foregoing reasons, Plaintiff requests the Court order judgment in his favor.

743.    CERTIFICATION AND CLOSING. Under F. R. Civ. P. 112, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support[]; and (4) the complaint otherwise complies with the requirements of Rule 11.

JANUARY 2, 2023

Certified, Verified as True

JUSTIN S. BECK, as Individual Plaintiff, *In Propria Persona*

JUSTIN S. BECK, as *Guardian Ad Litem* to ROES 1-150,000

JUSTIN S. BECK, as *Guardian Ad Litem* to U.S.A.

156                                          22-CV-1616-BAS-DDL