# EXHIBIT
# 5

Court of Appeal, Fourth Appellate District, Division Three
Kevin J. Lane, Clerk/Executive Officer
Electronically FILED on 7/13/2022 by M. Castaneda, Deputy Clerk

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JUSTIN S. BECK, | G059766 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 30-2020-01145998) |
| CATANZARITE LAW CORPORATION et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from orders of the Superior Court of Orange County, Deborah C. Servino, Judge. Affirmed in part and reversed in part. Motions to disqualify and for sanctions denied. Request for judicial notice granted. Motion to augment granted.

Justin S. Beck, in pro. per., for Plaintiff and Appellant.

Catanzarite Law Corporation, Kenneth J. Catanzarite and Nicole M. Catanzarite-Woodward for Defendants and Respondents.

Exhibit #5: 002
22-CV-01616-BAS-DDL

Justin S. Beck filed a malicious prosecution action against Catanzarite Law Corporation, its attorneys Kenneth J. Catanzarite, Brandon Woodward, Tim James O'Keefe (collectively Catanzarite unless the context requires otherwise) and the firm's clients (Amy Jeanette Cooper, Cliff Higgerson, and Mohammed Zakhireh).[1]  He alleged some of these defendants were also liable for unfair business practices, slander of title, and intentional infliction of emotional distress (IIED).  The trial court granted four special motions to strike (anti-SLAPP motion) (Code Civ. Proc., § 425.16).[2]  On appeal, Beck asserts most of his claims are not based on petitioning activity and he would be successful on the merits of his malicious prosecution action.  We conclude his contentions have merit and reverse the court's orders.[3]

## HISTORY PRIOR APPEALS

Catanzarite filed multiple but similar lawsuits within a one-year period, all of which arise from a dispute between shareholders of MFS and Cultivation Technologies, Inc. (CTI).  We incorporate by reference a detailed description of these cases from our opinion *FinCanna Capital Corp. v. Cultivation Technologies, Inc.* (June 28, 2021, G058700) [nonpub. opn.] (*FinCanna*) [for consistency we will continue to refer to these superior court cases as the Pinkerton Action, the MFS Action, the Mesa Action, the Cooper Action, the FinCanna Action, and the Scottsdale Action].)

---

[1]      The lawsuit included other defendants who are not parties to this appeal, including Mobile Farming Systems (MFS), Richard Francis O'Connor, Jr., Tony Scudder, James Duffy, TGAP Holdings (owned by Cooper/O'Connor), and Aroha Holdings (owned by Scudder).

[2]      All further statutory references are to the Code of Civil Procedure, unless otherwise indicated.

[3]      In this lawsuit, Catanzarite filed a cross-complaint on behalf of MFS against Beck and CTI's attorneys Horwitz + Armstrong.  In a case filed concurrently with this appeal, we considered Catanzarite's appeal of the ruling granting Horwitz's anti-SLAPP motion. (*Mobile Farming Systems, Inc. v. Horwitz + Armstrong et al.* (July 13, 2022, G060315) [nonpub. opn.] (*Mobile Farming Systems*).)  We reversed the order.

Earlier this year we considered three consolidated appeals concerning CTI's motion to disqualify Catanzarite in four of the six cases mentioned above. (*FinCanna, supra,* G058700.) As will be described in more detail below, we affirmed the trial court's determination Catanzarite could not represent CTI in any manner (including its prosecution of the FinCanna Action). We also concluded neither Catanzarite nor its attorneys could continue advocating for a group of shareholders bringing a derivative lawsuit against CTI and its board members in the Mesa Action. (*Ibid.*) We held in *FinCanna,* "The undisputed nature of the lawsuits, involving parties with conflicting interests, and a corporation with adversarial directors, supported mandatory disqualification as a matter of law." (*Ibid.*)

As for the remaining two cases (the Pinkerton and MFS Actions), we did not review the ruling denying disqualification because neither CTI nor the affected clients filed a notice of appeal challenging those rulings. In the *FinCanna* opinion, we noted a group of defendants in the Pinkerton Action and MFS Action attempted to join in CTI's disqualification motion. However, the trial court rejected the joinder motions as untimely and, alternatively, determined the moving parties lacked standing. The moving parties (Beck, Miguel Motta, Robert Bernheimer, Robert Kamm, and Irving Einhorn) did not appeal this ruling and, accordingly, we did not review it in the *FinCanna* opinion.

Following Catanzarite's disqualification, CTI and Beck filed lawsuits against Catanzarite and some of the firm's clients. Recently, we considered two appeals arising from anti-SLAPP rulings made in CTI's lawsuit. (*Cultivation Technologies, Inc., v. Duffy* (Nov. 12, 2021, G059457) [nonpub. opn.] (*Cultivation*).) We considered and found meritless Catanzarite's appeal of the order denying its anti-SLAPP motion. (*Ibid.*) We also affirmed the trial court's orders denying Cooper and Duffy's anti-SLAPP motion regarding breach of fiduciary claims. (*Ibid.*) We reversed orders granting Cooper and Duffy's anti-SLAPP motion on the remaining claims, concluding they qualified as mixed causes of action that required a claim by claim approach as discussed in *Bonni v. St.*

3

*Joseph Health System* (2021) 11 Cal.5th 995, 1010 (*Bonni*).  (*Cultivation, supra,*
G059457.)

BACKGROUND FACTS[4]

As set forth in Beck's complaint, the history of this case begins in 2015
when a failing corporation sought a new business opportunity in the cultivation and use
of cannabis products.  MFS's board members, O'Connor, Cooper, and Richard J. Probst
formed CTI and appointed themselves to CTI's board of directors.  Initially, the directors
told MFS shareholders that CTI would become MFS's subsidiary, but their plans changed
and they created a separate entity.  Beck asserts this was due to the board's concern CTI
would be burdened by MFS's previous business failures.  The board hired Beck, who was
experienced in the cannabis industry and with transitioning small investor-based start-up
companies through "an exit or a public merger."  Eventually, Beck joined CTI's board of
directors and became the president and chief executive officer (CEO) of the company.

In June 2015, O'Connor, Probst, and Cooper executed a document titled,
"unanimous written consent of directors of [CTI] [¶] amended organizational acts &
resolutions" (hereafter Amended Acts).  The Amended Acts stated the original
organization consent of CTI's board (Organizational Consent) executed at the end of
March 2015 was "made in error" and needed to be amended regarding the issuance of
securities.  Specifically, the Organization Consent authorized the issuance of 28,000,000
shares of CTI's common stock to MFS in exchange for the contribution of certain assets
and cash consideration.  The Amended Acts stated MFS failed to provide consideration

---

[4]      Our factual summary is a compilation of allegations of the operative
complaint, declarations, and other evidence submitted in support of the anti-SLAPP
motion. (*Ralphs Grocery Co. v. Victory Consultants, Inc.* (2017) 17 Cal.App.5th 245,
249.)  It should go without saying, these are not litigated facts nor findings, and we imply
no view on what actually happened in this case.
        For ease of reading, some formatting (such as boldface, underlining, or
capitalization) has been omitted from our quotations from the complaint, documentary
evidence, and briefing.

4

and the board determined it was in CTI's "best interests" to sell the stock to its founding shareholders "the 'Founders'" pursuant to a purchase agreement attached as an exhibit. The Amended Acts listed the following Founders: (1) O'Connor; (2) Probst; (3) Cooper; (4) TGAP Holdings (owned by Cooper/O'Connor); (5) I'm Rad (RAD) and EM2 Strategies (EM2) (owned by Beck); (6) Higgerson; (7) Aroha Holdings (owned by Scudder); and (8) Scott Unfug.

Cooper's father, Higgerson, was named one of CTI's Founders because at the time CTI was formed, MFS's "few remaining major liabilities was a $500,000 unpaid loan" owed to Higgerson. The board members of MFS/CTI negotiated a deal whereby Higgerson relinquished payment on the loan and in exchange he acquired 1,000,000 CTI Founder shares for a mere $1,000.

Beck explained Aroha acquired 1,000,000 CTI Founder shares due to Scudder's personal and professional relationship with O'Connor. Beck asserted in his complaint that the Amended Acts essentially granted all MFS shareholders the opportunity to purchase stock in CTI.

One shareholder at the time was Jolly Roger, Inc., owned by Roger Root. Beck alleged Root was contacted about whether Jolly Roger was interested in investing in CTI but Root stated he did not have the capital to pay $4,500 for 450,000 common CTI shares. Beck noted Root "expressed to Scudder that he 'supported' the structure under which CTI was being created."

Beck's complaint alleged CTI complied with the federal law requirement of authorizing a private placement memorandum (PPM) regarding the sale of its securities. CTI was obligated to disclose shareholders owning or controlling more than five percent of CTI's capital stock. MFS was not listed in the PPM. Thereafter, the Founders sold their CTI shares to others. Scudder acted as O'Connor's agent and earned commissions from selling O'Connor's shares. Cooper and O'Connor retained a transfer agent to sell CTI stock to their company TGAP. In October 2015, Duffy subscribed to buy CTI shares

Exhibit #5: 006
22-CV-01616-BAS-DDL

through the PPM.  Duffy often invested in the same projects as O'Connor.  In March

2016, Zakhireh (O'Connor's plastic surgeon) also subscribed to buy CTI shares through

the PPM.  Thus, Duffy and Zakhireh received the PPM stating MFS was not a

shareholder.  In addition to the above mentioned new CTI shareholders, CTI issued stock

certificates to approximately 70 new shareholders and MFS was not one of them.

Beck alleged that from 2015 until his resignation from CTI's board in May

2019, the company raised $3.5 million from private investors and approximately $5.9

million from a venture capital lender, FinCanna.  Beck, who had initially been retained as

a CTI's consultant, was appointed as a director and officer.  He occupied various

positions including chairman of the board, CEO, President, and chief strategy officer.

In his complaint, Beck asserted that soon after CTI adopted the Amended

Acts, MFS stopped operating.  The MFS board discussed shutting down the business.

MFS's primary asset was a $676,000 executive loan O'Connor owed to MFS.

Beck asserted the rift between CTI board members started in October 2015,

when Cooper "left CTI due to complications" arising from her extra-marital affair with

O'Connor.  Thereafter, in April 2016, CTI's board members asked O'Connor to resign.

Beck explained O'Connor "had conducted himself in a manner contrary—and

detrimental—to CTI's best interests, including not coming into the office, spending

money irrationally, and other 'erratic behaviors.'"  Beck believed O'Connor blamed him

personally for his removal, and thereafter, began making threats of revenge.

The following year, CTI executed a $14 million funding agreement with

FinCanna, which allowed the company to begin constructing manufacturing facilities in

Southern California.  Beck maintained CTI became "an attractive business opportunity

for potential additional investors" which also made it a deep pocket target for those who

"bore a grudge."  Relevant to this appeal, O'Connor and Zakhireh each filed complaints

against CTI.  O'Connor's lawsuit asserted CTI breached its contract "related to payments

associated with his 2016 settlement agreement."  Zakhireh, on behalf of himself and other

CTI shareholders, filed a complaint challenging the board's decision to borrow money from FinCanna and disputing the issuance of "Preferred Series A shares." CTI settled these lawsuits. Zakhireh agreed to receive more CTI shares.

Beck produced evidence that after Cooper's resignation, she continued to work with CTI as an unpaid consultant. Beck recalled speaking with Cooper about Zakhireh's complaints and before he filed a lawsuit she agreed to speak with Zakhireh on CTI's behalf. Cooper told Beck that as a CTI shareholder she was not the only one who had a personal stake in the company's success, and the board was responsible for dozens of other CTI shareholders. In all their discussions about the duties of CTI leadership, Cooper never discussed MFS or that CTI was MFS's subsidiary.

Despite these setbacks due to the lawsuits, CTI pressed forward in the summer of 2018 with its business plan to build a $40 million cultivation and manufacturing facility. Beck maintained CTI engaged an investment bank to raise an additional $25 million and signed a letter of intent with Tidal Royalty for $5 million in financing. Meanwhile, CTI generated over $500,000 in revenue per month, and the board modified its business plan to shift away from cultivation and manufacturing to cannabis extraction. CTI entered several production and distribution agreements with retail cannabis companies and brands.

Beck's complaint alleged all was going well until Catanzarite filed a complaint in September 2018 for Denise Pinkerton. Pinkerton claimed to be acting as attorney in fact for Root, individually and as successor in interest to the claims of his deceased spouse (Sharon Root). The complaint alleged the Roots owned MFS common stock and that the lawsuit was also a shareholder derivative action on behalf of MFS.

The complaint alleged multiple causes of action against CTI, the original board members (O'Connor, Cooper, and Probst), Joseph R. Porche (MFS's securities salesperson), and all parties having a connection to CTI. This included Beck, as CTI's chief strategy officer and his two companies (RAD and EM2), which held CTI Founder's

Exhibit #5: 008
22-CV-01616-BAS-DDL

stock. Similarly, the complaint named TGAP, Higgerson, Aroha, Scudder, and Unfug as defendants holding shares of CTI Founder's stock. The complaint included, Mobin, who held 250,000 shares of CTI stock, shared an office with Porche, and acted as vice president of shareholders relations of MFS and CTI. The complaint explained Bernheimer was included in the lawsuit because he was an attorney who worked with CTI's management team "since inception" and served as chief counsel since 2017. Another defendant, Einhorn, was an attorney and director of CTI. Finally, Motta was included due to his current role as CTI's CEO and a director.

The Roots alleged that in 2012 and 2013, MFS identified itself as an agricultural technology company that manufactured residential hydroponic growing systems. The Roots understood growing marijuana was the anticipated use of MFS's products. In 2014, they heard MFS's directors and Mobin discuss the business opportunities created by the anticipated legalization of marijuana. Root asserted the MFS shareholders were told about the formation of CTI and that it would become MFS's subsidiary. The complaint cited to CTI's Organizational Consent stating MFS would hold 28,000,000 CTI shares of common stock. The Roots claimed they received letters signed by Probst, O'Connor, Cooper, and Mobin about CTI's progress. The complaint also referred to CTI's Amended Acts, which stated the CTI "shares had not been transferred or provided" to MFS. The Roots quoted from the Amended Acts, explaining MFS's board members rescinded MFS's promised shares and instead issued 23,000,000 shares to the Founders. Specifically, the complaint noted O'Connor, Probst, Cooper, and TGAP spent a total of $15,500 to acquire 15,500,000 out of the 23,000,000 shares, giving them 67.3913 percent control of CTI. This percentage was "materially greater than their control ownership of MFS."

For the derivative claims, the Roots asserted Probst, O'Connor, and Cooper, while acting as MFS directors, worked against the interests of company by rescinding MFS's ownership of 100 percent of the outstanding shares of CTI "so that

they, simultaneously acting as the sole directors of the CTI and MFS boards of directors, could capture the entire business opportunity which belonged to MFS for themselves and their co-conspirators." The derivative claims on behalf of MFS included causes of action for breach of fiduciary duty, constructive fraud, conversion, misappropriation of trade secrets, and unfair competition. They sought declaratory relief in the form of a court order that CTI, Probst, O'Connor, Cooper, Beck, Higgerson, and the other defendants "surrender the certificate (or certificates) in their names for cancellation and or reissuance, costs, and expenses incurred in bringing this action and such other relief as the court" deemed proper.

In the constructive fraud cause of action, the Roots asserted "MFS and Root" relied on their fiduciaries, Probst, O'Connor, Cooper, and Mobin. The Roots claimed they were deceived and defrauded by these four specific individuals. They alleged EM2, RAD, Higgerson, Aroha, Scudder, Unfug, Beck, and Bernheimer were liable because they aided and abetted in the fiduciaries' breach of their duties. Alternatively, they maintained Probst, O'Connor, Cooper, and Mobin conspired to breach their fiduciary duties to MFS, while Kamm, Bernheimer, Einhorn, and Motta agreed to cover up their misconduct "in order to maintain their board positions, stock ownership and options, and compensation."

The Roots raised several claims on their own behalf, based on the following factual circumstances: Probst, O'Connor, Cooper, Mobin, and Porche took advantage of frail, elderly, and unsophisticated investors. Starting in 2012, O'Connor, Porche, and Mobin met with 75-year-old Root and his 69-year-old wife. They unscrupulously convinced the Roots to invest virtually all their retirement savings ($437,500) for 1,537,500 shares of MFS common stock "at a price grossly above the true fair market value of said securities."

The Roots initially wire transferred two payments of $125,000 in December 2012. Thereafter, Probst, O'Connor, Cooper, Mobin, and Porche continued to call and

Exhibit #5: 010
22-CV-01616-BAS-DDL

e-mail the Roots asking for more money at an increasing MFS stock price per share. Root sent seven more checks from February to May 2013 to purchase additional shares. The exploitation of the elder abuse cause of action specifically alleged Probst, O'Connor, Cooper, Mobin, and Porche stayed at the Roots' home as house guests.  It was alleged the group pretended to be friends with the Roots to gain their confidence and "reduce their guard and caution with the intent of deceiving and taking their retirement savings."  In addition to compensatory damages, the Roots sought attorney fees, punitive damages, exemplary damages, treble damages, and the return of all MFS's property.

Several causes of actions were based on the factual allegation Probst, O'Connor, Cooper, Mobin, and Porche received illegal commissions on the sale of MFS securities to the Roots.  These defendants were not licensed broker-dealers in California or Florida when they sold the shares.  These specific five defendants told the Roots the MFS shares were being sold pursuant to a PPM, and therefore, "purportedly exempt from registration under the federal and state securities laws" when in fact "MFS securities did not qualify as exempt private placements" and were sold in violation of the federal and state securities laws.  The Roots believed these individuals knew there were security law violations but rather than tell the Roots about their right to rescind the transactions, they concealed the illegal nature of the transactions.

The complaint alleged these specific individuals also misrepresented or failed to disclose the following material facts:  (1) the risks with investing in MFS; (2) their commissions from the stock sales; (3) they claimed to be taking minimal salary compensation when in fact they were receiving excessive compensation and paying personal expenses from the stock subscription money; and (4) Porche was the subject of SEC civil and administrative proceedings resulting in permanent injunctions such as barring him from associating with any brokers, dealers, or investment advisors.  Beck recalled that during a meeting with O'Connor and Cooper they revealed MFS's board directed a $340,000 commission payment using the Roots' investment funds.

Beck maintained the Pinkerton Action has several problems from the start. First, Jolly Roger, not the Roots, purchased MFS stocks. More importantly, Roger Root knew CTI was not MFS's subsidiary because he was invited (on Jolly Roger's behalf) to participate in CTI's stock offering but he had declined. Second, Beck submitted evidence showing Jolly Roger was a "defunct" corporation when the lawsuit was filed. The documents revealed Jolly Roger filed articles of dissolution in early 2015 and was not reinstated until January 17, 2019.

Another issue was the inherent inconsistency in the requested remedies. On one hand, the Roots were willing to settle their direct action for 10,000,000 CTI Founders shares and a seat on the CTI board. On the other hand, the Roots derivative claims sought cancellation of all CTI stock certificates because MFS allegedly owned 100 percent of CTI.

Despite these issues, Catanzarite diligently prosecuted the case by serving MFS's counsel (Anderson, McPharlin & Conners) with over 500 discovery requests. Cooper was assigned counsel under CTI's policy.

Beck declared CTI held a shareholder meeting in November 2018 (two months after the Pinkerton Action was filed). He noted Cooper and O'Connor at that time were acting as if CTI was a separate entity from MFS. They did not discuss MFS or whether MFS had a right to vote in CTI's corporate affairs. Rather, Cooper furnished a proxy to vote 4,900,000 shares of her CTI stock, which would not have been possible if MFS supposedly owned all of CTI's stock. Beck recalled hearing Probst, O'Connor, and Cooper discuss whether to settle the Pinkerton Action derivative claims with Root, without involving Catanzarite or its lawyers.

The gravamen of Beck's complaint is the theory that sometime between November 2018 and January 2019, Catanzarite and the O'Connor Faction struck a deal. Specifically, they set into motion a scheme to save members of the O'Connor Faction from liability in the Pinkerton Action. Beck provided evidence showing that around

11

Exhibit #5: 012
22-CV-01616-BAS-DDL

January 2019 many Pinkerton Action defendants entered into settlement agreements with Catanzarite. They agreed to "renounce" their CTI shares in favor of MFS and entered "into separate agreements to allege—now, for the first time—that CTI had been a subsidiary of MFS all along . . . ." On December 13, 2018, Catanzarite dismissed Porche, and in early January it dismissed Mobin, two of the primary wrongdoers named in the Pinkerton Action.

While Catanzarite was negotiating agreements with other defendants, it continued litigating the Pinkerton Action. Beck asserted the parties eventually designed a scheme that involved misusing the judicial process, publicizing unlawful CTI shareholder written consents, and sending e-mails intent on destabilizing CTI's operations by interfering in merger negotiations and other business prospects. If this plan worked, MFS (controlled by the O'Connor Faction) would be able to regain control of CTI's business/profits and reallocate all the stock shares. MFS shareholders (including the Roots) would likely also benefit from the shift in power.

January 2019 was a busy month for Catanzarite, setting in motion the group's corporate takeover scheme. On January 4, 2019, it dismissed Scudder and Aroha from the Pinkerton Action. On January 22, 2019, it dismissed O'Connor, TGAP, and Unfug. The following day, Catanzarite dismissed Cooper and Higgerson. Thereafter, O'Connor and Cooper used their MFS shareholder votes to reconstitute the MFS board of directors. MFS hired Catanzarite as corporate counsel.

On January 23, 2019, O'Connor executed a "unanimous written consent of the sole shareholder of [CTI]" (2019 Consent), stating he was CEO of MFS and had authority to act by unanimous written consent without a meeting to adopt several resolutions. The first resolution stated MFS was the sole shareholder of CTI and O'Connor, in his capacity as CEO, could issue the written consent stating MFS fully paid for 28,000,000 shares of CTI common stock in March 2015. The next resolution stated the Amended Acts contained the false contention MFS "had not fully paid for all of its

stock [was] facilitated by the wrongful and self-serving conduct" of Probst and Beck. Accordingly, all actions, issuance of shares, and promisors were void or voidable acts. In essence, the written consent sought to unwind three years of CTI's corporate acts.

In addition, the 2019 Consent "resolved" that the entire CTI board of directors was wrongly elected "by shareholders other than MFS" and they were immediately removed. MFS rescinded all CTI's stocks and promissory notes. It elected O'Connor, Zakhireh, and Murphy to serve as CTI's directors. It terminated CTI's auditor and legal counsel.

Around this same time, Catanzarite sent CTI's largest secured creditor, FinCanna, an e-mail stating future modifications or agreements between them must be signed by the new CTI board members (O'Connor, Zakhireh, and Duffy). (See *Cultivation, supra,* G059457 [detailed discussion of Catanzarite's damaging e-mails to CTI's business partners]). Catanzarite also took steps to interfere with CTI's proposed merger with Western Troy Capital Resources, Inc, by writing an e-mail to the company stating the new CTI directors objected to the merger. (*Ibid.*)

However, it was Catanzarite's misuse of the judicial process that formed the basis for Beck's malicious prosecution claims. On January 28, 2019, Catanzarite filed the MFS Action. The claims were brought "derivatively on behalf of its wholly owned subsidiary [n]ominal [d]efendant [CTI]." It named as defendants CTI's board of directors (Probst, Beck, Kamm, and Motta), CTI attorneys (Einhorn and Bernheimer) and several entities (EM2, RAD, and Tow and Grow).[5] CTI was named as a nominal defendant. MFS raised nine causes of action and sought declaratory relief and a permanent injunction. MFS asserted it was entitled to file a derivative action because it organized CTI and acquired 28,000,000 shares of CTI common stock, and therefore, CTI was its wholly owned subsidiary.

---

[5]     Tow and Grow is not a party to this appeal. The complaint alleged CTI purchased this company, but it was for Probst's personal benefit.

13

Catanzarite drafted a complaint telling a remarkably different story from the one set forth in the Pinkerton Action. The lawsuit reflected an abrupt shift in allegiances. O'Connor and his allies turned against their former board members Probst and Beck. Indeed, the MFS Action did not allege O'Connor, Cooper, TGAP, Higgerson, Aroha, or Unfug took part in any wrongdoing while they were in control of CTI. Rather these parties were portrayed as "the good guys" who were victimized by Probst, Beck, and other parties who wrongfully sold and purchased CTI shares that belonged to MFS. We note Catanzarite filed the MFS Action acting as MFS's purported corporate counsel while still representing different a shareholder in a derivative action against both MFS and CTI (Pinkerton Action).

In the MFS Action, the complaint asserted Probst and Beck conspired with and were aided and abetted by other Founders to falsely claim CTI's shares were not transferred to MFS and wrongfully reissued those shares. With respect to the other CTI directors and shareholders, the complaint offered the following explanation: "O'Connor, Cooper, TGAP, . . . Higgerson, Aroha, [and] Unfug have agreed to renounce their Founders' Shares in favor of MFS." The complaint failed to explain why renouncing shares and forming an alliance with MFS absolved O'Connor and Cooper from their role in executing the Amended Acts. Nor did the complaint reveal O'Connor's authority to publicize the 2019 Consent, which rescinded the Amended Acts, ousted the board members, and fired CTI's legal counsel. O'Connor's 2019 Consent rescinded CTI shares he and others sold to third parties such as Zakhireh, Cooper, and Higgerson.

To further meddle in CTI's business operations, the MFS Action's complaint asserted CTI's current board of directors were violating Corporations Code section 1507 by "preparing, signing and circulating false minutes, issuing securities, transacting business with insiders, [and] borrowing money from insiders and records relating to CTI." MFS requested that the court enjoin the CTI's board from operating the company until the court held a Corporations Code section 709 hearing (709 hearing) "to

14

determine the rightful ownership of CTI, its appropriate [b]oard of [d]irectors, and executive structure." The court initially granted a temporary restraining order (TRO), which was highly disruptive to CTI's ability to operate its business.

The trial court (Judge Randall J. Sherman) dissolved the TRO in May 2019 after the 709 hearing. Catanzarite argued MFS had the right to vote in CTI's last board meeting when it elected new officers. The court examined the original Organizational Consent, the Amended Acts, the 2019 Consent, MFS loan documents, and other relevant evidence. It noted CTI's securities agreements, which are required to contain a list of issued shares, did not mention MFS was a shareholder. It found telling that O'Connor signed 50 subscription agreements to sell CTI stock directly to MFS shareholders and all but six of MFS's 59 shareholders purchased CTI stock. It considered an e-mail Probst sent to Cooper and O'Conner in 2017 that discussed closing MFS or declaring bankruptcy because the only asset was a note from CTI. And no one disagreed with Probst's failure to list CTI stock as another MFS asset. The court considered CTI's assertion that beginning in 2015 CTI's board raised over 3,000,000 from over 60 private investors and 6,000,000 in financing based on representations MFS did not own any shares of CTI stock. At the hearing, Catanzarite represented Cooper and O'Connor would testify they signed documents making CTI a separate entity but did not understand it meant they were rescinding the shares promised to MFS. Finally, the court questioned Catanzarite about the reasons for the long delay in bringing the motion, during which CTI and MFS operated as separate entities.

The court determined CTI's election was valid and stated that "every fiber of my being says that the facts are overwhelming against" Catanzarite's position. It stated there was a repudiation of an agreement (the Subsidiary Promise) by people who were the same principles in MFS and then there was evidence of repeated actions after the Amended Actions that were consistent with the notion MFS was not a stockholder. The court concluded the delay in bring this claim further supported the conclusion MFS

15

"has been of the view that they are not a shareholder." "So the court concludes that the challenge [to CTI's] election is denied, and the court concludes that [MFS] is not a stockholder in CTI."

That same month, Beck resigned from CTI's board. Meanwhile, Catanzarite resumed filing lawsuits to further the O'Connor Faction's and MFS's interests. Each version represented a slight shift in trial tactics, but all were aimed at achieving the same result set forth in the MFS Action. Beck claimed the litigation against CTI created a sense of instability with CTI's business partners and lenders causing the company to lose money.

For example, Catanzarite filed the Mesa Action in April 2019 for Richard Mesa and a *putative class* of MFS shareholders who also purchased CTI shares. The complaint was framed as both a class action and a shareholder derivative action filed "on behalf of" CTI. The complaint asserted the class of MFS/CTI shareholders wanted to consolidate their lawsuit with MFS's derivative action "and to among other relief, recognize the ownership and control of CTI" by MFS's ownership of 28,000,000 shares, 5,000,000 "Friends & Family CTI shares," and 3,000,000 CTI shares issued pursuant to the 2015 PPM.

This Mesa Action grouped the "'[d]irector [d]efendants'" separately from the "'[p]referred [s]hares [d]efendants." The director defendants included members of the Probst Faction (Probst, Beck, Bernheimer, Kamm, Einhorn, and Motta). Ten defendants holding CTI series A preferred stock were collectively referred to as the preferred shares defendants. CTI was listed as a nominal defendant.

One month later, Catanzarite amended the Mesa Action complaint to add Cooper and Tom Mebane as plaintiffs and FinCanna as a defendant. (See *FinCanna, supra,* G58700.) Catanzarite also changed the nature of the action to focus on unraveling CTI's financial dealings with FinCanna and declare CTI's actions and contracts void.

16

The shareholder no longer wished to join the MFS Action or seek recognition of MFS's controlling stock shares over CTI.  (*Ibid.*)

Thus, to briefly recap, at this point Catanzarite's concurrent and successive representation of adverse parties included the following:  (1) Catanzarite was representing the Roots' elder abuse lawsuit against CTI and some of its Founders (the Probst Faction) as well as a derivative action against MFS; (2) Catanzarite had made a deal with a handful of CTI Founders to dismiss them from the Pinkerton Action; (3) it became MFS's counsel of record; (4) Catanzarite filed a derivative shareholder lawsuit for MFS, claiming 100 percent control and ownership of CTI, despite having lawsuits filed by other people claiming to be MFS shareholders; and (5) after filing two *derivative* shareholder lawsuits, Catanzarite filed a third derivative action (the Mesa Action) claiming to represent a different set of outsider shareholders, i.e., a class of derivative shareholders willing to join in the MFS Action but also independently seeking damages from CTI, its current shareholders, and board of directors.

At the end of May 2019, Catanzarite filed a lawsuit on behalf of Cooper and Mebane against CTI.  The Cooper Action requested the court direct CTI to (1) hold a shareholder's meeting to elect a board of directors; (2) deliver an annual report; (3) appoint an accountant to conduct an audit; and (4) order CTI to pay the costs for an investigation, audit, and costs of the suit.  CTI's corporate counsel filed an opposition, asserting a shareholder meeting was scheduled for August 2019.  (See *FinCanna, supra,* G058700 [description of Catanzarite's six lawsuits].)

In July 2019, Catanzarite filed first amended complaints (FAC) in the Pinkerton Action and the MFS Action.  It removed all derivative action claims made on

behalf of MFS and CTI.[6]  Catanzarite claimed to be MFS's and CTI's corporate counsel. Catanzarite next filed two lawsuits as CTI's corporate counsel (the FinCanna Action and Scottsdale Action).  The Scottsdale Action is noteworthy in that Catanzarite demanded that CTI's insurance company stop providing a defense or indemnify Beck and other Probst Faction defendants in the Mesa Action.  (See *FinCanna, supra,* G058700 [description of Catanzarite's six lawsuits].)

In January 2020, the trial court disqualified Catanzarite and its attorneys from representing CTI and the Mesa Action plaintiffs.  (*FinCanna, supra,* G058700.) What happened next is described in full detail in our *FinCanna* and *Cultivation* opinions. (*FinCanna, supra,* G058700; *Cultivation, supra,* G059457), which we incorporate by reference.  Relevant to this appeal, on March 5, 2020, Catanzarite dismissed the Pinkerton Action and MFS Action.

Meanwhile, CTI filed a lawsuit against Cooper, Duffy, and Catanzarite for interfering in its business relationships, breaching fiduciary duties, legal malpractice and other allegations related to their misconduct.  As discussed in *Cultivation, supra,* G059457, defendants anti-SLAPP motions (for the most part) failed.

Beck, represented by counsel, filed the case underlying this appeal.  MFS filed a cross-complaint against Beck, Probst, Bernheimer, Horwitz + Armstrong, Horwitz, Armstrong and other entities (discussed in more detail in our concurrently filed opinion *Mobile Farming Systems, supra,* G060315).

Beck filed a demur to the cross-complaint, a motion to disqualify Catanzarite, and a request for judicial notice of documents supporting these motions.  Out of the 13 defendants named in Beck's lawsuit, a handful filed anti-SLAPP motions.  Beck

---

[6]        We note the Pinkerton Action FAC was deeply sanitized to remove all traces of accusations against the O'Connell Faction, Porche, Mobin, and TGAP.  Where the original complaint specified four people (O'Connell, Probst, Porche, and Mobin) befriended the Roots to swindle the elderly couple out of their retirement funds, the FAC asserted Probst was acting alone.

Exhibit #5: 019
22-CV-01616-BAS-DDL

opposed the anti-SLAPP motions and submitted declarations and a request for judicial notice.[7]

In his opposition to Cooper's motion, Beck asserted Cooper turned her back on CTI and Beck when she and O'Connor were asked to resign from CTI. Beck alleged Cooper, joined by her father Higgerson, had been harassing Beck and CTI for two years. He maintained they helped the other defendants in a two-prong scheme. "First, Cooper and Higgerson assisted [in] the creation of false shareholder consents and other corporate acts claiming that MFS was the 'sole shareholder' of CTI. [This was] a false statement that contradicted the fact that Cooper herself had facilitated sales of CTI shares to dozens of individual CTI shareholders. The MFS Action could not exist without their signatures and alleged collusion with [Catanzarite] and other [d]efendants, because Cooper as a major shareholder of MFS and as its largest debt-holder of MFS had to cooperate. Cooper's cooperation was needed to remove the existing MFS board and purportedly retain [Catanzarite] to file the MFS Action on facts known to be false. Second, both falsified testimony for the purpose of engaging in malicious litigation against Beck and CTI, a second track that [d]efendants hoped would give them the leverage to obtain through illicit means what they could not otherwise have." Beck argued his non-malicious prosecution causes of action did not arise from protected speech, but rather "from corporate actions aided and abetted by Cooper and Higgerson." Moreover, Cooper and Higgerson participated in defendants' malicious prosecution scheme by creating false testimony to support MFS's narrative it was CTI's sole shareholder.

---

[7]    Our appellate record is lengthy and disorganized. Appellant's appendix and Respondent's appendix contain only select parts of the record. As will be explained in further detail anon, we granted Beck's motion to augment the record with additional relevant exhibits, i.e., copies of his written oppositions and some of the anti-SLAPP motions. However, all the oppositions refer to Beck's 1,209-page request for judicial notice, which is not part of our record. On our own motion, we augment the record to include this document as it was considered by the trial court and necessary for our required de novo review.

Beck's opposition to Zakhireh's motion contained similar arguments. Beck acknowledged Zakhireh was not a plaintiff in any of Catanzarite's previous lawsuits. He argued the malicious prosecution claim could be based on Zakhireh's participation in the conspiracy to prosecute frivolous actions. In addition, "Zakhireh is liable for the other claims against him because he participated directly in various non-judicial actions that constituted corporate sabotage against CTI and Beck. Beck can offer evidence establishing a prima facie case for these claims, and Zakhireh acts as a corporate director or officer to sabotage CTI are not privileged under . . . Civil Code section 47."

Beck filed separate oppositions to Catanzarite's and the attorney's motions, but the arguments overlapped. He alleged anti-SLAPP should not apply when these defendants conspired to use MFS as a vehicle for corporate sabotage of CTI, and "engaged in a series of private, corporate acts to slander and destroy CTI and Beck." He added the basis for liability against the individual lawyers was their direct participation in "various non-judicial actions that constituted corporate sabotage against CTI and Beck."

On October 23, 2020, the trial court considered Zakhireh and Catanzarite's anti-SLAPP motions. It granted Zakhireh's motion as to all claims other than slander of title and granted Catanzarite's motion in full. On November 20, 2020, the court considered and granted Cooper and Higgerson's anti-SLAPP motions.

## MOTIONS ON APPEAL

### I. *Disqualification Motion*

Beck filed a motion to disqualify Catanzarite (and the firm's attorneys Kenneth Catanzarite (Kenneth), Nicole Marie Catanzarite-Woodward (Nicole), Brandon Woodward (Brandon), and O'Keefe) from this appeal.[8] He argues that for the same reasons this court upheld the disqualification orders regarding the Mesa Action shareholders (Cooper, Higgerson, and Duffy), we must now disqualify Catanzarite from

---

[8]     For the sake of clarity, we will refer to parties having the same last names by their first given names.

representing MFS/CTI shareholders in this appeal.  Specifically, he asserts Catanzarite's ongoing concurrent representation of clients with conflicting interests triggered mandatory disqualification.  (Citing *FinCanna, supra,* G058700.)  We disagree.

As explained in *FinCanna, supra,* G058700, at the same time the trial court granted CTI's disqualification motion, it denied Beck's motion seeking joinder for Catanzarite's disqualification in the Pinkerton and MFS Actions.  Beck filed a disqualification motion in his malicious prosecution action, but it appears from our record that the court did not rule on it before granting the defendants' anti-SLAPP motions. Beck waited eight months after filing his notice of appeal to file a disqualification motion directed at the respondents' counsel.

The disqualification motion in this appeal was filed too late.  The trial court's order denying Beck's original disqualification motion was immediately appealable.  (*Meehan v. Hopps* (1955) 45 Cal.2d 213, 217 [order denying motion for disqualification "left nothing further of a judicial nature for a final determination of his rights regarding opposing counsel, [and] the order was final for purposes of appeal"]; *Apple Computer, Inc. v. Superior Court* (2005) 126 Cal.App.4th 1253, 1263-1264 [either writ petition or appeal may be filed following denial of motion to disqualify].)  In *FinCanna, supra,* G058700, we noted Catanzarite was the only party to appeal the court's disqualification rulings.  To consider Beck's current motion on appeal, we would essentially be reviewing an order from which a separate appeal should have been pursued.

"'Collateral estoppel precludes a party from relitigating in a second proceeding the matters litigated and determined in a prior proceeding.  The requirements for invoking collateral estoppel are the following:  (1) the issue necessarily decided in the previous proceeding is identical to the one that is sought to be relitigated; (2) the previous proceedings terminated with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party to or in privity with a party in the

previous proceeding.' [Citation.] An order disqualifying an attorney, which was not appealed, has collateral estoppel effect in a subsequent action involving the same issue. [Citation.]" (*A.I. Credit Corp. Inc. v. Aguilar & Sebastinelli* (2003) 113 Cal.App.4th 1072, 1078.) The disqualification issue in the previous proceeding is identical to the one sought to be relitigated. The trial court determined Beck and his codefendants did not have standing to bring the motion, which qualifies as a judgment on the merits. The third element is satisfied in that this malicious prosecution action involves the same parties as the previous proceeding. Beck is collaterally estopped from relitigating the issue of Catanzarite's disqualification.

II. *Request for Judicial Notice (RJN)*

Our court's docket reflects that on August 19, 2021, this court rejected Beck's motion to augment the record with several documents because there was a problem with the pagination. That same day, Beck filed a separate RJN with the following unhelpful caption: "Filed concurrently with index of exhibits and exhibits in support of motion to augment record on appeal." This court filed the RJN and determined the matter would be decided in conjunction with the decision on appeal.

Defendants separately filed an opposition and evidentiary objections to the RJN. They argued the motion was moot because this court rejected Beck's motion to augment. Alternatively, they maintained the motion should be denied because Beck failed to show good cause for the delay and some of the matters were not admissible. These contentions are frivolous. We were dismayed that the evidentiary objections simply repeated the meritless arguments raised in the opposition. The only new argument alleged the documents listed in the RJN lacked relevance, which also turns out to be a frivolous argument.

The RJN includes copies of Beck's oppositions to three different anti-SLAPP motions considered by the trial court, but that were not included in either the appellant's appendix or respondent's appendix. Because we review the trial court's

ruling on the anti-SLAPP motion de novo, these documents are highly relevant to resolving this appeal. Similarly, a copy of Beck's declaration supporting one of the oppositions was relevant for our de novo review. Finally, Beck sought judicial notice of our prior *FinCanna* opinion. As demonstrated above, we frequently refer to it and incorporate portions in this opinion. The opinion certainly was relevant to this appeal.

Contrary to defendants' assertion, appellate courts routinely take judicial notice of the records of their own cases under Evidence Code sections 452, subdivision (d) and 459.2. (See, e.g., *Rel v. Pacific Bell Mobile Services* (2019) 33 Cal.App.5th 882, 886 [on court's own motion, took judicial notice of two prior opinions in the same case as well as underlying appellate records]; *People v. Bilbrey* (2018) 25 Cal.App.5th 764, 769, fn. 7 [taking judicial notice of related appeal in writ proceeding]; *Eden Township Healthcare Dist. v. Eden Medical Center* (2013) 220 Cal.App.4th 418, 421 ["We quote at length from our discussion of the facts in our prior opinion"].)

As for the oppositions and declarations, the trial court considered these documents and we could, on our own motion, augment the record. However, we conclude it would be more time efficient to construe Becks RJN as a motion to augment the record on appeal. Thus, we will grant Beck's motion to augment the record with the exhibits attached to his RJN.

Beck also filed a motion for sanctions against Catanzarite and its attorneys for filing frivolous lawsuits below and baseless objections to his motions on appeal. While sanctions are tempting due to the repetitive and groundless objections, we conclude the opposition to the disqualification motion was at least partially correct. At this time, we deny Beck's motion for sanctions.

## DISCUSSION

Section 425.16 authorizes a special motion to strike claims arising from any act "in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16,

Exhibit #5: 024
22-CV-01616-BAS-DDL

subd. (b)(1).)  The purpose of the anti-SLAPP statute is to encourage participation in matters of public significance by allowing defendants "to request early judicial screening of legal claims targeting free speech or petitioning activities."  (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 880-881.)

"Resolution of an anti-SLAPP motion involves two steps.  First, the defendant must establish that the challenged claim arises from activity protected by section 425.16, and if the defendant makes this showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success.  [Citation.]  On appeal, we review the trial court's ruling on the anti-SLAPP motion de novo.  [Citation.]"  (*Wittenberg v. Bornstein* (2020) 50 Cal.App.5th 303, 311-312 (*Wittenberg*).)

"To establish a probability of prevailing, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'  [Citations.]  For purposes of this inquiry, 'the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.'  [Citation.]  In making this assessment it is 'the court's responsibility . . . to accept as true the evidence favorable to the plaintiff . . . .'  [Citation.]  The plaintiff need only establish that his or her claim has 'minimal merit' [citation] to avoid being stricken as a SLAPP.  [Citations.]"  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291-292 (*Soukup*).)  We will address each cause of action separately.

I.  *Slander of Title*

Beck's complaint alleged, inter alia, that Zakhireh, Catanzarite, and Kenneth were liable for slander of title.  The complaint stated: "Defendants effected, or

caused to be effected, certain shareholder consents of MFS and CTI which they knew to be false, stating that MFS was the sole shareholder of CTI. On the basis of these alleged consents, title to ownership by Plaintiff of CTI shares was thereby compromised. Indeed, such slander also prevented [Beck] from pursuing valuable business opportunities or growth capital on behalf of CTI." He alleged these defendants acted "with reckless regard in making statements that they knew were false. Defendants knew that other parties would rely upon their statements. Here, the slander of title by [d]efendants destroyed [Beck's] opportunity to sell shares in the public markets through a proposed merger with Troy, or other public offering as an alternative, each at times when public market valuations in 2019 were superior to current market conditions."

Thus, Beck's claim appears to be based on publication of the 2019 Consent, which was intended to reinstate MFS as CTI's primary shareholder and purportedly replaced CTI's board members. As pled, this conduct does not obviously relate to protected litigation-related activity, which the first prong of anti-SLAPP requires. Accordingly, we agree with the trial court's determination Zakhireh failed to meet his burden on the first prong and properly denied the motion as to this claim.

With respect to Catanzarite/Kenneth, the trial court concluded these moving parties met their burden on first prong because Beck "conceded" in his opposition the law firm "published" the 2019 Consent when drafting the MFS Action's complaint. Filing a complaint certainly falls under section 425.16 subdivision (e)(1) [writing made in judicial proceeding]. However, we read Beck's opposition differently. While he mentions Catanzarite's reference to the 2019 Consents in the complaint, he adamantly refuted the contention his slander of title claim was entirely based on protected activity. He asserted Catanzarite/Kenneth "was one of those responsible for the non-privileged publications that directly slandered Beck's title to CTI shares." He explained that *after* publishing the written consent in the MFS Action's complaint, Catanzarite/Kenneth and their "allies" changed tactics because the MFS Action and Pinkerton Action failed. Beck maintained

the scheming defendants tried to take control of CTI through a shareholder vote with O'Connor holding the shareholders' proxies. Beck concluded the alleged actions of corporate sabotage outside of the courtroom were not protected actions. "[R]ecission of the Amended Acts through the issuance of the shareholder consent" were not dependent on the pursuit of litigation.

Beck's opposition revisited this line of argument when discussing the second prong of anti-SLAPP. He repeated the slander of title claim was not based "on acts that were made in any kind of 'judicial proceeding.'" He asserted, "the most damaging representations made regarding Beck's CTI shares were made completely separate from litigation, when [Catanzarite/Kenneth] and the individuals purporting to make up the MFS board issued the supposed consent that knowingly claimed false ownership of CTI." None of the above language suggests Beck conceded the basis of his slander of title claim was litigation-related conduct.

Because we read the complaint and Beck's opposition differently than the trial court, we reverse the decision to grant Catanzarite/Kenneth's anti-SLAPP motion with respect to the slander of title claim. Catanzarite did not meet its burden of showing this claim was based on protected activity. We conclude Beck's reference to allegations in the complaint merely served to provide context to the timing of the publication of the 2019 Consent and events amounting to acts of corporate sabotage following the lawsuits. "'Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute.' [Citation]" (*Bonni, supra,* 11 Cal.5th at p. 1012 [incidental or collateral assertions not subject to section 425.16].)

## II. *Intentional Infliction of Emotional Distress (IIED)*

Beck's complaint contains a very short discussion of a factual basis for this cause of action. It alleged all the defendants caused him to suffer emotional distress, including those involved in "conducting their malicious prosecution scheme." He

26

asserted these defendants engaged in reckless disregard, knowing he "would be required to answer baseless claims made against him on the basis of knowingly false statements made by [d]efendants." We agree with the trial court's determination that to the extent this claim is dependent on the malicious prosecution claim, it satisfies the first prong of anti-SLAPP. (*Lee v. Kim* (2019) 41 Cal.App.5th 705, 719 (*Lee*) ["every claim of malicious prosecution is a cause of action arising from protected activity, because every such claim necessarily depends upon written and oral statements in a prior judicial proceeding"].)

Beck's complaint also contains the broadly worded allegation the defendants "engaged in a pattern of despicable conduct, as set forth in the allegations described herein." As mentioned, the "pattern of despicable conduct" includes non-litigation claims, such as the publication of the 2019 Consent (supporting the slander of title cause of action). Because this cause of action refers to both protected conduct and non-litigation actions, it qualifies as a "mixed cause[] of action," a concept discussed at length in our prior opinion *Cultivation, supra,* G059457, which we incorporate by reference.

As discussed in more detail in our prior opinion, our Supreme Court has recently clarified that courts must take a claim by claim approach when considering each cause of action subject to an anti-SLAPP motion. (*Bonni, supra,* 11 Cal.5th at p. 1010; *Baral v. Schnitt* (2016) 1 Cal.5th 376, 382 (*Baral*).) "Section 425.16 is not concerned with how a complaint is framed, or how the primary right theory might define a cause of action. While an anti-SLAPP motion may challenge any claim for relief founded on allegations of protected activity, it does not reach claims based on unprotected activity." (*Baral, supra,* 1 Cal.5th at p. 382.) Accordingly, "'[C]ourts should analyze each claim for relief—each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected

27

and, if so, whether the claim they give rise to has the requisite degree of merit to survive the motion. [Citation.]'" (*Ibid.*)

In light of this case authority, we conclude the moving parties did not meet their burden of showing Beck's *entire* IIED claim rested on protected activity. Taking a claim by claim approach, it appears there were non-litigation allegations supporting the cause of action that cannot be stricken under anti-SLAPP. The claims relating to malicious prosecution satisfy the first prong, but as we will discuss in more detail below, Beck met his burden on the second prong, i.e., regarding probability of prevailing. Therefore, we must reverse the ruling on this cause of action.

III. *Unfair Business Practices*

Like the IIED cause of action, we conclude the unfair business practices claims were a mixed cause of action. In addition to the moving parties' actions of filing frivolous lawsuits (the malicious prosecution allegations), this cause of action referred to unprotected acts of attorney malpractice (violations of the Rules of Professional Conduct), violation of Corporations Code section 1507 regarding the false publication of documents about a corporate entity (the 2019 Consent), and violation of Business and Professions Code section 6104 regarding an attorney appearing without authority.

The trial court viewed the attorney malpractice allegations as relating to protected conduct because Beck did not prove he was Catanzarite's client. It reasoned anti-SLAPP must apply when a non-client raises a professional negligence claim against an opponent's attorney. This ruling improperly conflates the first and second prongs of anti-SLAPP.

The existence or nonexistence of an attorney client relationship is a dispute that relates only to the second prong. "'The sole inquiry' under the first prong of the test is whether the plaintiff's claims arise from protected speech or petitioning activity. [Citation.] In making this determination, '[w]e do not consider the veracity of [the plaintiff's] allegations' [citation] nor do we consider '[m]erits based arguments.'

28

[Citations.]  If the defendant demonstrates the plaintiff's claims do arise from protected activity, we then review the potential merits of the plaintiff's claims in the second step of the analysis.  [Citation.] . . . Whether [plaintiff] actually shared an attorney-client relationship with defendants relates to the merits of [his] claims and is therefore not relevant to our first prong analysis.  Although defendants may ultimately defeat [Beck's] claims by proving the absence of an attorney-client relationship, that does not alter the substance of [his] claims.  [Citation.]"  (*Sprengel v. Zbylut* (2015) 241 Cal.App.4th 140, 156-158, fns. omitted.)

    Beck's unfair business practices cause of action was also based on an alleged violation of Corporations Code section 1507.  In the briefing, the moving parties assert the acts giving rise to liability under the statute "are the lawsuits and related litigation activity concerning MFS's status as CTI's sole shareholder and the veracity of the CTI preferred stock issuance."  As aptly stated by Beck in his opposition, the moving parties "assume[]" this cause of action arises from protected activity because there was clear evidence of Catanzarite's "pattern of litigation abuse."  Beck explained, "Though this pattern exists and [was] discussed [by both parties regarding the malicious prosecution cause of action, Catanzarite] wrongly assumes that Beck's other causes of action arise from litigation acts.  To the contrary, they arise from non-expressive acts of what amounts to corporate sabotage of CTI and Beck.  These are not acts that the Legislature meant the anti-SLAPP statute to protect."  Beck asserts his causes of action were not based on protected activity, "but instead on the fact that [Catanzarite] willingly participated in MFS's use as a corporate shell to sabotage CTI and Beck.  [Catanzarite's] participation in this conspiracy, even if contemporaneous with its abuses of the judicial process, [should] not mean that Beck's claims arises from protected activity."

    To support this argument, Beck referred to allegations in the complaint regarding several defendants (including Zakhireh) who "reconstituted the MFS board of directors" to sabotage CTI and Beck.  Beck asserts these defendants adopted corporate

29

documents to renounce the Amended Acts and attempted to remove CTI's board, none of which was protected litigation-related conduct. He alleged Catanzarite "was the hub of the [d]efendant's scheme" because it "arranged and maintained the agreements by which the [d]efendants asserted control of MFS and agreed to attack Beck and CTI, then divide the soils among themselves." We agree the factual basis for the Corporations Code violation allegations do not satisfy the first prong, and should not be stricken pursuant to the anti-SLAPP statute.

Finally, Beck's unfair business practices cause of action contained allegations Catanzarite/Kenneth (aided by Zakhireh) violated Business and Professions Code section 6104. The moving parties assert this cause of action relates to protected conduct because it includes the factual allegation Zakhireh aided MFS's attorneys by providing false supporting declarations for lawsuits. Supplying a written declaration for a lawsuit would qualify as protected activity, however, the complaint specifies a different factual basis for the claim. Specifically, Beck's complaint set forth the following three points: (1) Business and Professions Code section 6104 provided an attorney cannot appear for a party corruptly or without authority; (2) Catanzarite and its attorneys "were well aware that they lacked authority to appear on behalf of CTI and other parties" but they did so anyway; and (3) Zakhireh, O'Conner, and Duffy aided the other defendants in violating this statute.

We conclude the activity underlying the claim—Catanzarite's representation of CTI in the trial court—is constitutionally protected conduct. "[A]ll communicative acts performed by attorneys as part of their representation of a client in a judicial proceeding or other petitioning context are per se protected as petitioning activity by the anti-SLAPP statute. [Citation.]" (*Cabral v. Martins* (2009) 177 Cal.App.4th 471, 479-480.) Thus, the moving parties established the first prong of the SLAPP analysis.

Turning to the second prong, we conclude Beck cannot show minimal merit on this sub-claim of the unfair business practices cause of action. Violations of Business

and Professions Code section 6104 does not authorize Beck to sue or recover damages from Catanzarite or its aider and abettors.  Violation of a disciplinary rule allows the Supreme Court to suspend or disbar an attorney.  (Bus. & Prof. Code, § 6100.)  It does not give "'an antagonist in a collateral proceeding or transaction . . . standing to seek enforcement of the rule.'  [Citation.]"  (*Gregori v. Bank of America* (1989) 207 Cal.App.3d 291, 303.)  Beck cannot prevail on this claim and it must be stricken from the cause of action.

IV.  *Malicious Prosecution*

Beck alleged all the defendants were liable for malicious prosecution because the Pinkerton Action, MFS Action, and Scottsdale Action were initiated and prosecuted without probable cause and with malice.  He maintained the first two lawsuits were "rooted on the fraudulent assertion of MFS's ownership of CTI," which each defendant knew was untrue.  He added Catanzarite filed the Scottsdale Action without any authorization from CTI's board, and therefore knew it also lacked probable cause.

The first step of the anti-SLAPP inquiry, whether defendants made a threshold showing the malicious prosecution claim arose from protected activity, is not disputed here.  "The plain language of the anti-SLAPP statute dictates that every claim of malicious prosecution is a cause of action arising from protected activity, because every such claim necessarily depends upon written and oral statements in a prior judicial proceeding.  [Citation.]  Accordingly, our inquiry shifts to whether [Beck] satisfied [his] burden[] to demonstrate a probability of prevailing on the merits of [his] claims for malicious prosecution.  [Citations.]"  (*Lee, supra,* 41 Cal.App.5th at p. 719.)

"To prevail on a malicious prosecution claim, the plaintiff must show that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination favorable to the plaintiff; (2) was brought without probable cause; and (3) was initiated with malice.  [Citation.]"  (*Soukup, supra,* 39 Cal.4th at p. 292.)

31

A. *Favorable Termination*

It is undisputed Catanzarite voluntarily dismissed the Root Action and the MFS Action on March 5, 2020. It dismissed the Scottsdale Action on November 18, 2019. "[A] voluntary dismissal is presumed to be a favorable termination on the merits[.] [Citation.]" (*Lee, supra,* 41 Cal.App.5th at p. 720.)

In its briefing, Catanzarite notes the trial court questioned whether Beck satisfied his burden of showing there were favorable dismissals. The court opined Catanzarite likely dismissed the action after it received the ruling at the Corporations Code section 709 hearing that MFS was not a shareholder (and therefore lacked standing to bring the derivative action). The court added a dismissal for this kind of technical reason would not indicate Beck was innocent of wrongdoing, especially when he was still a defendant in the ongoing Mesa Action. We disagree with this analysis.

"It is not essential to maintenance of an action for malicious prosecution that the prior proceeding was favorably terminated following trial on the merits." (*Lackner v. LaCroix* (1979) 25 Cal.3d 747, 750 (*Lackner*).) "'The fact that such legal termination would not be a bar to another civil suit or criminal prosecution founded on the same alleged cause is no defense to the action for malicious prosecution; otherwise a party might be continuously harassed by one suit after another, each dismissed before any opportunity for a trial on the merits.' [Citation.]" (*Kennedy v. Byrum* (1962) 201 Cal.App.2d 474, 480.) Thus, Beck's status as a defendant in a different action has little relevance.

We appreciate the trial court's concern that "termination must *reflect* on the merits of the underlying action. [Citation.]" (*Lackner, supra,* 25 Cal.3d at p. 750.) "To determine 'whether there was a favorable termination,' we 'look at the judgment as a whole in the prior action . . . .' [Citation.]" (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 341.) "[C]ourt[s] must examine the reasons for termination to see if the disposition reflects the opinion of the court or the prosecuting party that the action would

not succeed." (*Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1149.)
Dismissals that result from negotiation, settlement or consent are generally considered
not to be a favorable termination, because such a dismissal "reflects ambiguously on the
merits of the action . . . ." (*Minasian v. Sapse* (1978) 80 Cal.App.3d 823, 827 fn. 4
(*Minasian*).) Likewise, a dismissal based upon the statute of limitations is not a favorable
termination, because it is technical or procedural termination rather than one on the
merits. (*Lackner, supra,* 25 Cal.3d at p. 751.)

In contrast, a dismissal for failure to prosecute is "not a dismissal on
technical grounds" but rather reflects on the merits based upon "the natural assumption
that one does not simply abandon a meritorious action once instituted." (*Minasian,
supra,* 80 Cal.App.3d at p. 827.) A voluntary dismissal not based upon the parties'
settlement or consent, even where it is made without prejudice, is generally considered to
be a favorable termination to support a malicious prosecution action. (*Fuentes v. Berry*
(1995) 38 Cal.App.4th 1800, 1808; *Villa v. Cole* (1992) 4 Cal.App.4th 1327, 1335.) In
the *Sycamore Ridge Apartment* case, the court held that a voluntary dismissal is presumed
to be a favorable termination, unless proved to the contrary by the party who prosecuted
the underlying action and dismissed it. (*Sycamore Ridge Apartments, LLC v. Naumann*
(2007) 157 Cal.App.4th 1385, 1400 (*Sycamore*).)

In this case, Catanzarite dismissed two complaints on the same day, March
5, 2020. There was no evidence these dismissals occurred as a result of a settlement
between Beck and plaintiffs. The trial court reasoned the dismissals were likely due to
the previous Corporations Code section 709 ruling, holding MFS was not one of CTI's
shareholders. However, the record shows that when Catanzarite learned MFS lacked
standing to bring a derivative suit on CTI's behalf, it did not dismiss the lawsuits.
Catanzarite filed FACs instead.

The record shows that three months after the court ruled MFS was not
CTI's shareholder, Catanzarite amended the complaints in the Pinkerton Action and MFS

33

Action by deleting the derivative causes of action. Catanzarite transformed both lawsuits into direct actions against Probst, Beck, and other CTI-related entities. Thus, the record does not support the court's conclusion Catanzarite dismissed the lawsuits for the mere technical reason MFS was not a shareholder. The complaints were amended to purportedly reflect this correction.

It is more likely Catanzarite's voluntary dismissal of the two lawsuits was related to a later disqualification ruling and the lack of tenable claims. The dismissals took place just a few months after the court disqualified Catanzarite and its attorneys from representing CTI and the Mesa Action plaintiffs (the class action shareholder derivative lawsuit). Given Catanzarite's zeal for filing multiple lawsuits against the same defendants, we can assume it would not abandon a meritorious action already initiated. Thus, we conclude the voluntary dismissal in this case should be regarded as a favorable termination of the two lawsuits (Pinkerton Action and MFS Action).

There is very little information in our record about the Scottsdale Action. Beck submitted a document filed in the United States District Court, Central District, showing Catanzarite filed the Scottsdale Action claiming to be CTI's authorized corporate counsel. The document reflected that on November 18, 2019, CTI dismissed the action against CTI's insurance company "in its entirety." As noted in our prior opinion, on November 15, 2019, the court granted the motion disqualifying Catanzarite from representing CTI. (*FinCanna, supra,* G058700.) In making its ruling, the court noted Catanzarite could not represent two client adversaries and in the Scottsdale Action CTI claimed to be representing the corporation and at the same time sought to invalidate a defense and indemnity for CTI directors under CTI's insurance policy. (*Ibid.*) The court stated a denial of coverage could put CTI "'on the hook for the individuals' costs of defense and/or liability.'" In other words, the court recognized Catanzarite was improperly using the Scottsdale Action for an improper purpose, i.e., to help his clients in the Mesa Action. Accordingly, this dismissal was a favorable termination on the merits.

B. *Commencement of Action*

As for the issue of commencement, the parties do not dispute Catanzarite and Attorneys were responsible for filing the lawsuits at issue in this case.

Zakhireh asserts he was not a party to the lawsuits at issue and cannot be held liable. We disagree. While he did not direct the commencement of the Pinkerton Action, there was evidence supporting the conclusion he was instrumental in the MFS Action. As mentioned, the complaint alleged that after O'Connor and Cooper secured their dismissals from the Pinkerton Action, they used the near-bankrupt MFS as a litigation tool to raise untenable claims against their former business partners (Probst and Beck). Beck presented evidence showing O'Connor (on behalf of MFS) selected Zakhireh to be CTI's treasurer and chief financial officer. Beck alleged Zakhireh, at the same time, was part of MFS's new board comprised of O'Connor's allies. In his newfound position with MFS, Zakhireh would have the duty of discussing litigation plans with MFS's corporate counsel Catanzarite and the other MFS board members. How could MFS have filed the MFS Action without the approval of its board members?

We conclude Zakhireh's position as both an MFS and CTI director raises a strong inference he aided the O'Connor Faction and MFS's corporate counsel (Catanzarite) with the group's plans for an illegal corporate takeover. As noted by Beck, a person who aids and abets a malicious prosecution can be held liable. (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1131, fn. 11 ["A person who is injured by groundless litigation may seek compensation from any person who procures or is actively instrumental in putting the litigation in motion or participates after the institution of the action"].)

As for Cooper and Higgerson, they were not responsible for commencing the Pinkerton Action because they were the defendants. However, one can reasonably infer Cooper and Higgerson, like O'Connor, made a deal with Catanzarite in exchange for their dismissal from the Pinkerton Action. Beck alleged Cooper and Higgerson were

35

instrumental in assisting MFS and its shareholders in their efforts to take over CTI. These dismissed defendants helped by agreeing to testify in support of MFS's new allegedly fabricated claim to own 100 percent of CTI. Cooper's participation was further demonstrated by Beck's evidence her vote was needed before MFS's corporate counsel (Catanzarite) could file the lawsuit, because she held five million MFS shares. Cooper did not refute this evidence.

C. *Probable Cause*

"An action is deemed to have been pursued without probable cause if it was not legally tenable when viewed in an objective manner as of the time the action was initiated or while it was being prosecuted. The court must 'determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable.' [Citation.] 'The resolution of that question of law calls for the application of an *objective* standard to the facts on which the defendant acted. [Citation.]' [Citation.] The test the court is to apply is whether 'any reasonable attorney would have thought the claim tenable . . . .' [Citation.] The tort of malicious prosecution also includes the act of 'continuing to prosecute a lawsuit discovered to lack probable cause.' [Citation.] In determining the probable cause issue, the same standard applies 'to the continuation as to the initiation of a suit.' [Citation.]" (*Sycamore, supra,* 157 Cal.App.4th at p. 1402.)

"'Continuing an action one discovers to be baseless harms the defendant and burdens the court system just as much as initiating an action known to be baseless from the outset.' [Citation.] 'A person who had no part in the commencement of the action, but who participated in it at a later time, may be held liable for malicious prosecution.' [Citations.]" (*Sycamore, supra,* 157 Cal.App.4th at p. 1398.) "A claim for malicious prosecution may also apply to a defendant who has brought an action charging multiple grounds of liability when some, but not all, of the grounds were asserted without probable cause and with malice. [Citations.]" (*Id.* at p. 1399.)

"In analyzing the issue of probable cause in a malicious prosecution context, the trial court must consider both the factual circumstances established by the evidence and the legal theory upon which relief is sought.  A litigant will lack probable cause for his action either if he relies upon facts which he has no reasonable cause to believe to be true, or if he seeks recovery upon a legal theory which is untenable under the facts known to him."  (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 164-165.)  "In making its determination whether the prior action was legally tenable, the trial court must construe the allegations of the underlying complaint liberally in a light most favorable to the malicious prosecution defendant. [Citation.]"  (*Id.* at p. 165.)

We conclude Beck met the low burden of proving his claim had minimal merit with respect to Catanzarite.  Unlike the trial court, we find it relevant Catanzarite initiated the Pinkerton Action, a shareholder derivative action on behalf of MFS, without first verifying the Roots owned shares in MFS.  Beck presented evidence they did not.  He submitted stock certificates showing the Roots' corporation, Jolly Roger, invested in MFS, but this entity lost its corporate status between 2015 to 2019.  Thus, both the Roots and Jolly Roger lacked standing to bring a shareholder derivative lawsuit.  Before agreeing to become an attorney of record in a case, an attorney should, at a minimum, be familiar with the client's claims as a purported shareholder, and should have made a preliminary determination about whether probable cause existed to support the asserted claims.

Here, Catanzarite filed a shareholder derivative lawsuit on behalf of clients who were not actually shareholders.  The basic nature of a shareholder derivative action is to *permit shareholders* to "'bring a derivative suit to enforce the corporation's rights and redress its injuries when the board of directors fails or refuses to do so.' [Citation.]" (*Patrick v. Alacer Corp.* (2008) 167 Cal.App.4th 995, 1003.)  There are stock ownership requirements for standing to pursue a shareholder's derivative suit.  (See Corp. Code, § 800.)

Exhibit #5: 038
22-CV-01616-BAS-DDL

Catanzarite also drafted a complaint seeking recovery upon two legal theories which were untenable under the facts known to the firm's attorneys. The Pinkerton Action's derivative shareholder claims all related to the following factual circumstances: In 2015, MFS board of directors (Probst, O'Connor, and Cooper) promised its shareholders MFS owned 100 percent of the CTI's outstanding shares (a total of 28,000,000 CTI common stock) (hereafter referred to as the Subsidiary Promise). MFS's board of directors became CTI's board of directors and "captured the entire business opportunity" for themselves, reneging on the Subsidiary Promise. And thereafter, CTI entered into agreements with third parties to implement its marijuana business plan and sold shares to investors. The MFS board members' recission of the Subsidiary Promise was the basis for the following shareholder derivative claims: constructive fraud; breach of fiduciary duty; misappropriation of trade secrets; and unfair competition.

The Roots' direct claims related to misconduct by the MFS board members but the Roots indicated they were willing to settle the case in exchange for a large quantity of CTI Founder shares and a seat on CTI's board. The Roots inexplicably did not want to be on MFS's board, despite their allegations about the Subsidiary Promise and decision to raise claims on MFS's behalf. The complaint's internal inconsistency and standing issues certainly raise red flags.

Given the Roots' settlement request for CTI shares, it is reasonable to infer Catanzarite and his clients knew only those shares had value and also understood those shares were available because MFS did not own 100 percent of CTI. Under these circumstances, a reasonable attorney may not have found the Pinkerton Action claims tenable. Moreover, when the factual allegations of the Pinkerton Action and the MFS Action are compared in an objective manner, no reasonable attorney would conclude both had merit. Simply stated, one action was based on the factual premise CTI's board members improperly renounced the Subsidiary Promise, leaving MFS *without any* CTI

38

shares, and the other was based on the factual premise MFS *currently owned* 100 percent of CTI's shares, rendering any other CTI stock certificates worthless.

The lack of probable cause for maintaining the two lawsuits was further demonstrated by evidence Catanzarite filed multiple lawsuits while unethically representing clients with conflicting interests. For good reason, it is difficult to apply the "reasonable attorney" test when there is evidence the attorneys initiating the cases violated multiple rules of professional conduct. For example, no reasonable attorney would agree to act as corporate counsel of MFS while at the same time representing shareholders in a derivative lawsuit against that corporation. Yet this is exactly what happened when Catanzarite filed the MFS Action while also litigating the Pinkerton Action. We conclude the concurrent representation of directly adverse parties creates a strong inference the attorneys and litigants knew the claims in one or both lawsuits were untenable.

Beck also presented evidence Catanzarite and the O'Conner Faction created a mutually beneficial alliance. In exchange for their dismissal from the Pinkerton Action, these former defendants agreed to help opposing counsel file a different lawsuit against CTI and the Probst Faction (which included Beck). Beck's evidence suggested these CTI shareholders agreed to create and support a false story about MFS's ownership of CTI, revive MFS by reconfiguring its board of directors, and then use MFS as a litigation tool to sabotage CTI and its board members. In addition to providing testimony that MFS owned CTI, the O'Connor Faction members publicly renounced their CTI stock shares. O'Connor executed the 2019 Consent, without objection from his cohorts, which rendered worthless all their CTI stocks. As pointed out by Beck, all of this anti-CTI activity, following their dismissals from the Pinkerton Action, was highly suspect especially when one considers their actions and business dealings as CTI board members and shareholders from 2015 to 2019.

As discussed in more detail in our factual summary, after the formation of an alliance between Catanzarite and the O'Conner Faction, Catanzarite embarked on a spectacularly relentless mission (inside and outside of the courtroom) to replace CTI's board members with members of the O'Connor Faction.  MFS/Catanzarite could not have initiated the MFS Action without the evidence and testimony provided by members of the O'Connor Faction.  Accordingly, there was enough evidentiary support for Beck's claim Cooper, Higgerson, and Zakhireh, who were O'Connor's loyal allies, were instrumental in the maintenance of MFS Action knowing it lacked probable cause.  We conclude Beck submitted enough evidence to satisfy his low burden at this stage of the proceedings with respect to the element of probable cause as to all the moving parties.

D.  *Malice*

The above evidence also lends support to the malice requirement of anti-SLAPP.  "'Malice "may range anywhere from open hostility to indifference." [Citations.]' [Citation.]  While the mere absence of probable cause, without more, 'is not sufficient to demonstrate malice' [citation] "'[m]alice may also be inferred from the facts establishing lack of probable cause." [Citation.]' [Citation.] . . . '[T]he extent of a defendant attorney's investigation and research may be relevant to the further question of whether or not the attorney acted with malice.' [Citation.]" (*Sycamore, supra,* 157 Cal.App.4th at p. 1409.)

It appears the complaints were filed by plaintiffs lacking standing and/or included untenable claims.  If Catanzarite knew the relevant facts, and only dismissed the O'Conner Faction and not the entire CTI board, we can infer the continued prosecution of those claims was motivated by malicious intent.  If Catanzarite was not aware of the plaintiffs' lack of standing because it failed to adequately familiarize itself with the case before filing the lawsuit, this too would indicate indifference, and therefore also, the inference of malice.

Exhibit #5: 041
22-CV-01616-BAS-DDL

Malice can also be inferred from evidence the MFS Action was initiated and maintained as part of a larger scheme to replace CTI's board with MFS shareholders, i.e., a hostile corporate takeover. The MFS Action complaint included a request for declaratory relief in the form of a court order declaring MFS owed 100 percent of CTI's stock, replacement of CTI's board, and confirmation CTI's business deals were invalidated. Catanzarite also separately filed a motion under Corporations Code section 709, asking the court to confirm MFS was a shareholder and must be permitted a vote in CTI's board elections. After losing the motion and hearing the court rule MFS was not CTI's shareholder, the parties did not immediately dismiss the lawsuit. Instead, Catanzarite filed more lawsuits and began acting as corporate counsel of both MFS and CTI. It can be inferred O'Connor, Cooper, Higgerson, and Zakhireh continued to authorize and support Catanzarite's efforts to reallocate CTI's shares to MFS and oust the Probst Faction from CTI's board.

In light of all of the above, we conclude Beck submitted enough evidence to satisfy his burden with respect to the element of malice. "'[T]he defendant's motivation is a question of fact to be determined by the jury.' [Citation] 'Because direct evidence of malice is rarely available, "malice is usually proven by circumstantial evidence and inferences drawn from the evidence." [Citation.]' [Citation.]" (*Citizens of Human., LLC v. Hass* (2020) 46 Cal.App.5th 589, 607.) We conclude the evidence supports a reasonable inference Catanzarite, O'Connor, Cooper, Higgerson, and Zakhireh were working together and pursuing litigation lacking probable cause against Beck with an improper purpose.

## DISPOSITION

We affirm the court's orders granting the moving party's anti-SLAPP motion regarding paragraph 124 of the complaint, regarding violation of Business and Professions Code section 6104.

Exhibit #5: 042
22-CV-01616-BAS-DDL

We affirm the court's order denying Zakhireh's anti-SLAPP motion regarding the slander of title cause of action.

We reverse the court's orders granting the moving party's anti-SLAPP motion regarding Beck's causes of action for malicious prosecution, unfair business practices, slander of title, and intentional infliction of emotional distress. The matter is remanded for further proceedings.

We treat Beck's request for judicial notice as a motion to augment and grant it. We deny all requests for sanctions on appeal. We deny Beck's disqualification motion. On our own motion, we augment the record with the request for judicial notice Beck filed with his oppositions to the anti-SLAPP motions. In the interests of justice, each party shall bear their own costs on appeal.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


SANCHEZ, J.

42