(C)   This rule does not apply to a qualified legal services project[21] or qualified support center[22] incorporated as a nonprofit public benefit corporation.[23]

*Rule 3.156 adopted September 22, 2010; approved by the Supreme Court effective April 15, 2011.*

Rule 3.157  Shares

(A)   A shareholder of a law corporation must be licensed and entitled to practice law.[24]

(B)   The shares of a law corporation must be owned only by that corporation or a shareholder.[25]

(C)   The shares of a deceased shareholder must be sold or transferred to the law corporation or its shareholders within six months and one day following the date of death.[26]

(D)   The share certificates of the law corporation must set forth the preceding restrictions of this rule regarding ownership, sale, or transfer of shares. These restrictions must also be set forth in the articles of incorporation or bylaws.

(E)   The shares of a shareholder who is ineligible to practice law or legally disqualified[27] to render professional services to the law corporation must be sold or transferred to a qualified shareholder within ninety days after the date of ineligibility or disqualification. The terms of such a sale or transfer of shares must be set forth in the articles, the bylaws, or a written agreement.

(F)   The shares of a shareholder disqualified for any reason may be resold to that shareholder upon his or her becoming eligible to practice law.

(G)   This rule does not apply to nonprofit public benefit corporations.

*Rule 3.157 adopted September 22, 2010; approved by the Supreme Court effective April 15, 2011.*

Rule 3.158  Security

(A)   Each law corporation must provide the State Bar with proof of security for claims for errors and omissions of the corporation or any person who practices law on

---

[21] Business & Professions Code § 6213(a).
[22] Business & Professions Code § 6213(b).
[23] Corporations Code § 13406(c).
[24] Business & Professions Code § 6165.
[25] Corporations Code § 13406(a).
[26] Business & Professions Code §§ 6171(a) & 6171.1.
[27] Business & Professions Code §§ 6166, 6171(a), and Corporations Code § 13401(e).

behalf of the corporation, on its behalf as an employee or otherwise. The law corporation must provide proof of security with its Application to Register as a Law Corporation and provide new proof of security when that last provided is no longer current. Proof of security must be provided as indicated below.

    (1)    All law corporations, except as otherwise provided in this rule, must provide a Law Corporation Guarantee providing that the shareholders jointly and severally agree to pay all claims established against the law corporation for errors and omissions arising out of the rendering of professional services. The guarantee must name each shareholder and be executed by each.[28]

    (2)    A nonprofit public benefit corporation[29] must provide a certificate of annual insurance.

    (3)    Law corporations incorporated and registered with the State Bar before October 27, 1971, and that have elected to provide security by insurance, must provide a certificate of insurance.

(B)    For purposes of determining the amount required as proof of security, a person who practices law on behalf of a law corporation includes

    (1)    any employee, other person, or partnership in which the law corporation is a partner and that the law corporation holds out as being of counsel or otherwise available to practice law on behalf of the law corporation; and

    (2)    any association that has a continuous relationship with the law corporation for the practice of law, or that the association, with the consent of the law corporation, holds out as being of counsel or otherwise available to practice law on behalf of the association.

(C)    The Schedule of Charges and Deadlines sets forth the minimum amount of security that a law corporation must provide annually for a single claim and for all claims, whether against the corporation or a person practicing law on behalf of the corporation.

*Rule 3.158 adopted September 22, 2010; approved by the Supreme Court effective April 15, 2011. Amended March 2, 2012; amendment approved by the Supreme Court effective December 1, 2014.*

Rule 3.159  Voluntary termination of registration

A law corporation may by resolution request that the State Bar terminate its registration. The date of termination will be the date of the resolution, a later date requested by the law corporation, or an earlier date at the discretion of the State Bar.

---

[28] Business & Professions Code § 6171(b).
[29] Corporations Code § 13406(b).

*Rule 3.159 adopted September 22, 2010; approved by the Supreme Court effective April 15, 2011. Amended March 2, 2012; amendment approved by the Supreme Court effective December 1, 2014.*

Rule 3.160  Involuntary termination of registration

(A)    A law corporation that fails to submit a complete Annual Renewal and fee is suspended and is not entitled to practice law.[30]

(B)    The State Bar may terminate the certification of a law corporation for failure to comply with these rules or applicable law.[31]  Termination is effective sixty days after it has issued a notice to the law corporation stating the grounds for the termination. The law corporation may request Supreme Court review of the termination.[32]

*Rule 3.160 adopted September 22, 2010; approved by the Supreme Court effective April 15, 2011.*

Rule 3.161  Public information

State Bar records regarding the certification of a law corporation are public information, except for correspondence, internal memoranda, complaints, and any other document for which disclosure is prohibited by law.

*Rule 3.161 adopted September 22, 2010; approved by the Supreme Court effective April 15, 2011.*

---

[30] Rule 3.156(B).

[31] Business & Professions Code § 6169.

[32] Rule of Court 9.13(d). And see Business & Professions Code § 6170.

Court of Appeal, Fourth Appellate District, Division Three
Kevin J. Lane, Clerk/Executive Officer
Electronically FILED on 7/13/2022 by M. Castaneda, Deputy Clerk

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JUSTIN S. BECK, | G059766 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 30-2020-01145998) |
| CATANZARITE LAW CORPORATION et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from orders of the Superior Court of Orange County, Deborah C. Servino, Judge. Affirmed in part and reversed in part. Motions to disqualify and for sanctions denied. Request for judicial notice granted. Motion to augment granted.

Justin S. Beck, in pro. per., for Plaintiff and Appellant.

Catanzarite Law Corporation, Kenneth J. Catanzarite and Nicole M. Catanzarite-Woodward for Defendants and Respondents.

Justin S. Beck filed a malicious prosecution action against Catanzarite Law Corporation, its attorneys Kenneth J. Catanzarite, Brandon Woodward, Tim James O'Keefe (collectively Catanzarite unless the context requires otherwise) and the firm's clients (Amy Jeanette Cooper, Cliff Higgerson, and Mohammed Zakhireh).[1]  He alleged some of these defendants were also liable for unfair business practices, slander of title, and intentional infliction of emotional distress (IIED).  The trial court granted four special motions to strike (anti-SLAPP motion) (Code Civ. Proc., § 425.16).[2]  On appeal, Beck asserts most of his claims are not based on petitioning activity and he would be successful on the merits of his malicious prosecution action.  We conclude his contentions have merit and reverse the court's orders.[3]

### HISTORY PRIOR APPEALS

Catanzarite filed multiple but similar lawsuits within a one-year period, all of which arise from a dispute between shareholders of MFS and Cultivation Technologies, Inc. (CTI).  We incorporate by reference a detailed description of these cases from our opinion *FinCanna Capital Corp. v. Cultivation Technologies, Inc.* (June 28, 2021, G058700) [nonpub. opn.] (*FinCanna*) [for consistency we will continue to refer to these superior court cases as the Pinkerton Action, the MFS Action, the Mesa Action, the Cooper Action, the FinCanna Action, and the Scottsdale Action].)

---

[1]     The lawsuit included other defendants who are not parties to this appeal, including Mobile Farming Systems (MFS), Richard Francis O'Connor, Jr., Tony Scudder, James Duffy, TGAP Holdings (owned by Cooper/O'Connor), and Aroha Holdings (owned by Scudder).

[2]     All further statutory references are to the Code of Civil Procedure, unless otherwise indicated.

[3]     In this lawsuit, Catanzarite filed a cross-complaint on behalf of MFS against Beck and CTI's attorneys Horwitz + Armstrong.  In a case filed concurrently with this appeal, we considered Catanzarite's appeal of the ruling granting Horwitz's anti-SLAPP motion. (*Mobile Farming Systems, Inc. v. Horwitz + Armstrong et al.* (July 13, 2022, G060315) [nonpub. opn.] (*Mobile Farming Systems*).)  We reversed the order.

Exhibit 21: 236
22-CV-01616-BAS-DDL

Earlier this year we considered three consolidated appeals concerning CTI's motion to disqualify Catanzarite in four of the six cases mentioned above. (*FinCanna, supra,* G058700.) As will be described in more detail below, we affirmed the trial court's determination Catanzarite could not represent CTI in any manner (including its prosecution of the FinCanna Action). We also concluded neither Catanzarite nor its attorneys could continue advocating for a group of shareholders bringing a derivative lawsuit against CTI and its board members in the Mesa Action. (*Ibid.*) We held in *FinCanna,* "The undisputed nature of the lawsuits, involving parties with conflicting interests, and a corporation with adversarial directors, supported mandatory disqualification as a matter of law." (*Ibid.*)

As for the remaining two cases (the Pinkerton and MFS Actions), we did not review the ruling denying disqualification because neither CTI nor the affected clients filed a notice of appeal challenging those rulings. In the *FinCanna* opinion, we noted a group of defendants in the Pinkerton Action and MFS Action attempted to join in CTI's disqualification motion. However, the trial court rejected the joinder motions as untimely and, alternatively, determined the moving parties lacked standing. The moving parties (Beck, Miguel Motta, Robert Bernheimer, Robert Kamm, and Irving Einhorn) did not appeal this ruling and, accordingly, we did not review it in the *FinCanna* opinion.

Following Catanzarite's disqualification, CTI and Beck filed lawsuits against Catanzarite and some of the firm's clients. Recently, we considered two appeals arising from anti-SLAPP rulings made in CTI's lawsuit. (*Cultivation Technologies, Inc., v. Duffy* (Nov. 12, 2021, G059457) [nonpub. opn.] (*Cultivation*).) We considered and found meritless Catanzarite's appeal of the order denying its anti-SLAPP motion. (*Ibid.*) We also affirmed the trial court's orders denying Cooper and Duffy's anti-SLAPP motion regarding breach of fiduciary claims. (*Ibid.*) We reversed orders granting Cooper and Duffy's anti-SLAPP motion on the remaining claims, concluding they qualified as mixed causes of action that required a claim by claim approach as discussed in *Bonni v. St.*

3

*Joseph Health System* (2021) 11 Cal.5th 995, 1010 (*Bonni*).  (*Cultivation, supra,*
G059457.)

BACKGROUND FACTS[4]

As set forth in Beck's complaint, the history of this case begins in 2015
when a failing corporation sought a new business opportunity in the cultivation and use
of cannabis products.  MFS's board members, O'Connor, Cooper, and Richard J. Probst
formed CTI and appointed themselves to CTI's board of directors.  Initially, the directors
told MFS shareholders that CTI would become MFS's subsidiary, but their plans changed
and they created a separate entity.  Beck asserts this was due to the board's concern CTI
would be burdened by MFS's previous business failures.  The board hired Beck, who was
experienced in the cannabis industry and with transitioning small investor-based start-up
companies through "an exit or a public merger."  Eventually, Beck joined CTI's board of
directors and became the president and chief executive officer (CEO) of the company.

In June 2015, O'Connor, Probst, and Cooper executed a document titled,
"unanimous written consent of directors of [CTI] [¶] amended organizational acts &
resolutions" (hereafter Amended Acts).  The Amended Acts stated the original
organization consent of CTI's board (Organizational Consent) executed at the end of
March 2015 was "made in error" and needed to be amended regarding the issuance of
securities.  Specifically, the Organization Consent authorized the issuance of 28,000,000
shares of CTI's common stock to MFS in exchange for the contribution of certain assets
and cash consideration.  The Amended Acts stated MFS failed to provide consideration

---

[4]         Our factual summary is a compilation of allegations of the operative
complaint, declarations, and other evidence submitted in support of the anti-SLAPP
motion.  (*Ralphs Grocery Co. v. Victory Consultants, Inc.* (2017) 17 Cal.App.5th 245,
249.)  It should go without saying, these are not litigated facts nor findings, and we imply
no view on what actually happened in this case.
            For ease of reading, some formatting (such as boldface, underlining, or
capitalization) has been omitted from our quotations from the complaint, documentary
evidence, and briefing.

4

and the board determined it was in CTI's "best interests" to sell the stock to its founding shareholders "the 'Founders'" pursuant to a purchase agreement attached as an exhibit. The Amended Acts listed the following Founders: (1) O'Connor; (2) Probst; (3) Cooper; (4) TGAP Holdings (owned by Cooper/O'Connor); (5) I'm Rad (RAD) and EM2 Strategies (EM2) (owned by Beck); (6) Higgerson; (7) Aroha Holdings (owned by Scudder); and (8) Scott Unfug.

Cooper's father, Higgerson, was named one of CTI's Founders because at the time CTI was formed, MFS's "few remaining major liabilities was a $500,000 unpaid loan" owed to Higgerson. The board members of MFS/CTI negotiated a deal whereby Higgerson relinquished payment on the loan and in exchange he acquired 1,000,000 CTI Founder shares for a mere $1,000.

Beck explained Aroha acquired 1,000,000 CTI Founder shares due to Scudder's personal and professional relationship with O'Connor. Beck asserted in his complaint that the Amended Acts essentially granted all MFS shareholders the opportunity to purchase stock in CTI.

One shareholder at the time was Jolly Roger, Inc., owned by Roger Root. Beck alleged Root was contacted about whether Jolly Roger was interested in investing in CTI but Root stated he did not have the capital to pay $4,500 for 450,000 common CTI shares. Beck noted Root "expressed to Scudder that he 'supported' the structure under which CTI was being created."

Beck's complaint alleged CTI complied with the federal law requirement of authorizing a private placement memorandum (PPM) regarding the sale of its securities. CTI was obligated to disclose shareholders owning or controlling more than five percent of CTI's capital stock. MFS was not listed in the PPM. Thereafter, the Founders sold their CTI shares to others. Scudder acted as O'Connor's agent and earned commissions from selling O'Connor's shares. Cooper and O'Connor retained a transfer agent to sell CTI stock to their company TGAP. In October 2015, Duffy subscribed to buy CTI shares

5

through the PPM. Duffy often invested in the same projects as O'Connor. In March 2016, Zakhireh (O'Connor's plastic surgeon) also subscribed to buy CTI shares through the PPM. Thus, Duffy and Zakhireh received the PPM stating MFS was not a shareholder. In addition to the above mentioned new CTI shareholders, CTI issued stock certificates to approximately 70 new shareholders and MFS was not one of them.

Beck alleged that from 2015 until his resignation from CTI's board in May 2019, the company raised $3.5 million from private investors and approximately $5.9 million from a venture capital lender, FinCanna. Beck, who had initially been retained as a CTI's consultant, was appointed as a director and officer. He occupied various positions including chairman of the board, CEO, President, and chief strategy officer.

In his complaint, Beck asserted that soon after CTI adopted the Amended Acts, MFS stopped operating. The MFS board discussed shutting down the business. MFS's primary asset was a $676,000 executive loan O'Connor owed to MFS.

Beck asserted the rift between CTI board members started in October 2015, when Cooper "left CTI due to complications" arising from her extra-marital affair with O'Connor. Thereafter, in April 2016, CTI's board members asked O'Connor to resign. Beck explained O'Connor "had conducted himself in a manner contrary—and detrimental—to CTI's best interests, including not coming into the office, spending money irrationally, and other 'erratic behaviors.'" Beck believed O'Connor blamed him personally for his removal, and thereafter, began making threats of revenge.

The following year, CTI executed a $14 million funding agreement with FinCanna, which allowed the company to begin constructing manufacturing facilities in Southern California. Beck maintained CTI became "an attractive business opportunity for potential additional investors" which also made it a deep pocket target for those who "bore a grudge." Relevant to this appeal, O'Connor and Zakhireh each filed complaints against CTI. O'Connor's lawsuit asserted CTI breached its contract "related to payments associated with his 2016 settlement agreement." Zakhireh, on behalf of himself and other

CTI shareholders, filed a complaint challenging the board's decision to borrow money from FinCanna and disputing the issuance of "Preferred Series A shares." CTI settled these lawsuits. Zakhireh agreed to receive more CTI shares.

Beck produced evidence that after Cooper's resignation, she continued to work with CTI as an unpaid consultant. Beck recalled speaking with Cooper about Zakhireh's complaints and before he filed a lawsuit she agreed to speak with Zakhireh on CTI's behalf. Cooper told Beck that as a CTI shareholder she was not the only one who had a personal stake in the company's success, and the board was responsible for dozens of other CTI shareholders. In all their discussions about the duties of CTI leadership, Cooper never discussed MFS or that CTI was MFS's subsidiary.

Despite these setbacks due to the lawsuits, CTI pressed forward in the summer of 2018 with its business plan to build a $40 million cultivation and manufacturing facility. Beck maintained CTI engaged an investment bank to raise an additional $25 million and signed a letter of intent with Tidal Royalty for $5 million in financing. Meanwhile, CTI generated over $500,000 in revenue per month, and the board modified its business plan to shift away from cultivation and manufacturing to cannabis extraction. CTI entered several production and distribution agreements with retail cannabis companies and brands.

Beck's complaint alleged all was going well until Catanzarite filed a complaint in September 2018 for Denise Pinkerton. Pinkerton claimed to be acting as attorney in fact for Root, individually and as successor in interest to the claims of his deceased spouse (Sharon Root). The complaint alleged the Roots owned MFS common stock and that the lawsuit was also a shareholder derivative action on behalf of MFS.

The complaint alleged multiple causes of action against CTI, the original board members (O'Connor, Cooper, and Probst), Joseph R. Porche (MFS's securities salesperson), and all parties having a connection to CTI. This included Beck, as CTI's chief strategy officer and his two companies (RAD and EM2), which held CTI Founder's

7

stock. Similarly, the complaint named TGAP, Higgerson, Aroha, Scudder, and Unfug as defendants holding shares of CTI Founder's stock. The complaint included, Mobin, who held 250,000 shares of CTI stock, shared an office with Porche, and acted as vice president of shareholders relations of MFS and CTI. The complaint explained Bernheimer was included in the lawsuit because he was an attorney who worked with CTI's management team "since inception" and served as chief counsel since 2017. Another defendant, Einhorn, was an attorney and director of CTI. Finally, Motta was included due to his current role as CTI's CEO and a director.

The Roots alleged that in 2012 and 2013, MFS identified itself as an agricultural technology company that manufactured residential hydroponic growing systems. The Roots understood growing marijuana was the anticipated use of MFS's products. In 2014, they heard MFS's directors and Mobin discuss the business opportunities created by the anticipated legalization of marijuana. Root asserted the MFS shareholders were told about the formation of CTI and that it would become MFS's subsidiary. The complaint cited to CTI's Organizational Consent stating MFS would hold 28,000,000 CTI shares of common stock. The Roots claimed they received letters signed by Probst, O'Connor, Cooper, and Mobin about CTI's progress. The complaint also referred to CTI's Amended Acts, which stated the CTI "shares had not been transferred or provided" to MFS. The Roots quoted from the Amended Acts, explaining MFS's board members rescinded MFS's promised shares and instead issued 23,000,000 shares to the Founders. Specifically, the complaint noted O'Connor, Probst, Cooper, and TGAP spent a total of $15,500 to acquire 15,500,000 out of the 23,000,000 shares, giving them 67.3913 percent control of CTI. This percentage was "materially greater than their control ownership of MFS."

For the derivative claims, the Roots asserted Probst, O'Connor, and Cooper, while acting as MFS directors, worked against the interests of company by rescinding MFS's ownership of 100 percent of the outstanding shares of CTI "so that

8

they, simultaneously acting as the sole directors of the CTI and MFS boards of directors, could capture the entire business opportunity which belonged to MFS for themselves and their co-conspirators." The derivative claims on behalf of MFS included causes of action for breach of fiduciary duty, constructive fraud, conversion, misappropriation of trade secrets, and unfair competition. They sought declaratory relief in the form of a court order that CTI, Probst, O'Connor, Cooper, Beck, Higgerson, and the other defendants "surrender the certificate (or certificates) in their names for cancellation and or reissuance, costs, and expenses incurred in bringing this action and such other relief as the court" deemed proper.

In the constructive fraud cause of action, the Roots asserted "MFS and Root" relied on their fiduciaries, Probst, O'Connor, Cooper, and Mobin. The Roots claimed they were deceived and defrauded by these four specific individuals. They alleged EM2, RAD, Higgerson, Aroha, Scudder, Unfug, Beck, and Bernheimer were liable because they aided and abetted in the fiduciaries' breach of their duties. Alternatively, they maintained Probst, O'Connor, Cooper, and Mobin conspired to breach their fiduciary duties to MFS, while Kamm, Bernheimer, Einhorn, and Motta agreed to cover up their misconduct "in order to maintain their board positions, stock ownership and options, and compensation."

The Roots raised several claims on their own behalf, based on the following factual circumstances: Probst, O'Connor, Cooper, Mobin, and Porche took advantage of frail, elderly, and unsophisticated investors. Starting in 2012, O'Connor, Porche, and Mobin met with 75-year-old Root and his 69-year-old wife. They unscrupulously convinced the Roots to invest virtually all their retirement savings ($437,500) for 1,537,500 shares of MFS common stock "at a price grossly above the true fair market value of said securities."

The Roots initially wire transferred two payments of $125,000 in December 2012. Thereafter, Probst, O'Connor, Cooper, Mobin, and Porche continued to call and

e-mail the Roots asking for more money at an increasing MFS stock price per share. Root sent seven more checks from February to May 2013 to purchase additional shares. The exploitation of the elder abuse cause of action specifically alleged Probst, O'Connor, Cooper, Mobin, and Porche stayed at the Roots' home as house guests.  It was alleged the group pretended to be friends with the Roots to gain their confidence and "reduce their guard and caution with the intent of deceiving and taking their retirement savings."  In addition to compensatory damages, the Roots sought attorney fees, punitive damages, exemplary damages, treble damages, and the return of all MFS's property.

Several causes of actions were based on the factual allegation Probst, O'Connor, Cooper, Mobin, and Porche received illegal commissions on the sale of MFS securities to the Roots.  These defendants were not licensed broker-dealers in California or Florida when they sold the shares.  These specific five defendants told the Roots the MFS shares were being sold pursuant to a PPM, and therefore, "purportedly exempt from registration under the federal and state securities laws" when in fact "MFS securities did not qualify as exempt private placements" and were sold in violation of the federal and state securities laws.  The Roots believed these individuals knew there were security law violations but rather than tell the Roots about their right to rescind the transactions, they concealed the illegal nature of the transactions.

The complaint alleged these specific individuals also misrepresented or failed to disclose the following material facts:  (1) the risks with investing in MFS; (2) their commissions from the stock sales; (3) they claimed to be taking minimal salary compensation when in fact they were receiving excessive compensation and paying personal expenses from the stock subscription money; and (4) Porche was the subject of SEC civil and administrative proceedings resulting in permanent injunctions such as barring him from associating with any brokers, dealers, or investment advisors.  Beck recalled that during a meeting with O'Connor and Cooper they revealed MFS's board directed a $340,000 commission payment using the Roots' investment funds.

10

Beck maintained the Pinkerton Action has several problems from the start. First, Jolly Roger, not the Roots, purchased MFS stocks. More importantly, Roger Root knew CTI was not MFS's subsidiary because he was invited (on Jolly Roger's behalf) to participate in CTI's stock offering but he had declined. Second, Beck submitted evidence showing Jolly Roger was a "defunct" corporation when the lawsuit was filed. The documents revealed Jolly Roger filed articles of dissolution in early 2015 and was not reinstated until January 17, 2019.

Another issue was the inherent inconsistency in the requested remedies. On one hand, the Roots were willing to settle their direct action for 10,000,000 CTI Founders shares and a seat on the CTI board. On the other hand, the Roots derivative claims sought cancellation of all CTI stock certificates because MFS allegedly owned 100 percent of CTI.

Despite these issues, Catanzarite diligently prosecuted the case by serving MFS's counsel (Anderson, McPharlin & Conners) with over 500 discovery requests. Cooper was assigned counsel under CTI's policy.

Beck declared CTI held a shareholder meeting in November 2018 (two months after the Pinkerton Action was filed). He noted Cooper and O'Connor at that time were acting as if CTI was a separate entity from MFS. They did not discuss MFS or whether MFS had a right to vote in CTI's corporate affairs. Rather, Cooper furnished a proxy to vote 4,900,000 shares of her CTI stock, which would not have been possible if MFS supposedly owned all of CTI's stock. Beck recalled hearing Probst, O'Connor, and Cooper discuss whether to settle the Pinkerton Action derivative claims with Root, without involving Catanzarite or its lawyers.

The gravamen of Beck's complaint is the theory that sometime between November 2018 and January 2019, Catanzarite and the O'Connor Faction struck a deal. Specifically, they set into motion a scheme to save members of the O'Connor Faction from liability in the Pinkerton Action. Beck provided evidence showing that around

11

January 2019 many Pinkerton Action defendants entered into settlement agreements with Catanzarite. They agreed to "renounce" their CTI shares in favor of MFS and entered "into separate agreements to allege—now, for the first time—that CTI had been a subsidiary of MFS all along . . . ." On December 13, 2018, Catanzarite dismissed Porche, and in early January it dismissed Mobin, two of the primary wrongdoers named in the Pinkerton Action.

While Catanzarite was negotiating agreements with other defendants, it continued litigating the Pinkerton Action. Beck asserted the parties eventually designed a scheme that involved misusing the judicial process, publicizing unlawful CTI shareholder written consents, and sending e-mails intent on destabilizing CTI's operations by interfering in merger negotiations and other business prospects. If this plan worked, MFS (controlled by the O'Connor Faction) would be able to regain control of CTI's business/profits and reallocate all the stock shares. MFS shareholders (including the Roots) would likely also benefit from the shift in power.

January 2019 was a busy month for Catanzarite, setting in motion the group's corporate takeover scheme. On January 4, 2019, it dismissed Scudder and Aroha from the Pinkerton Action. On January 22, 2019, it dismissed O'Connor, TGAP, and Unfug. The following day, Catanzarite dismissed Cooper and Higgerson. Thereafter, O'Connor and Cooper used their MFS shareholder votes to reconstitute the MFS board of directors. MFS hired Catanzarite as corporate counsel.

On January 23, 2019, O'Connor executed a "unanimous written consent of the sole shareholder of [CTI]" (2019 Consent), stating he was CEO of MFS and had authority to act by unanimous written consent without a meeting to adopt several resolutions. The first resolution stated MFS was the sole shareholder of CTI and O'Connor, in his capacity as CEO, could issue the written consent stating MFS fully paid for 28,000,000 shares of CTI common stock in March 2015. The next resolution stated the Amended Acts contained the false contention MFS "had not fully paid for all of its

12

stock [was] facilitated by the wrongful and self-serving conduct" of Probst and Beck. Accordingly, all actions, issuance of shares, and promisors were void or voidable acts. In essence, the written consent sought to unwind three years of CTI's corporate acts.

In addition, the 2019 Consent "resolved" that the entire CTI board of directors was wrongly elected "by shareholders other than MFS" and they were immediately removed. MFS rescinded all CTI's stocks and promissory notes. It elected O'Connor, Zakhireh, and Murphy to serve as CTI's directors. It terminated CTI's auditor and legal counsel.

Around this same time, Catanzarite sent CTI's largest secured creditor, FinCanna, an e-mail stating future modifications or agreements between them must be signed by the new CTI board members (O'Connor, Zakhireh, and Duffy). (See *Cultivation, supra,* G059457 [detailed discussion of Catanzarite's damaging e-mails to CTI's business partners]). Catanzarite also took steps to interfere with CTI's proposed merger with Western Troy Capital Resources, Inc, by writing an e-mail to the company stating the new CTI directors objected to the merger. (*Ibid.*)

However, it was Catanzarite's misuse of the judicial process that formed the basis for Beck's malicious prosecution claims. On January 28, 2019, Catanzarite filed the MFS Action. The claims were brought "derivatively on behalf of its wholly owned subsidiary [n]ominal [d]efendant [CTI]." It named as defendants CTI's board of directors (Probst, Beck, Kamm, and Motta), CTI attorneys (Einhorn and Bernheimer) and several entities (EM2, RAD, and Tow and Grow).[5] CTI was named as a nominal defendant. MFS raised nine causes of action and sought declaratory relief and a permanent injunction. MFS asserted it was entitled to file a derivative action because it organized CTI and acquired 28,000,000 shares of CTI common stock, and therefore, CTI was its wholly owned subsidiary.

---

[5]        Tow and Grow is not a party to this appeal. The complaint alleged CTI purchased this company, but it was for Probst's personal benefit.

13

Catanzarite drafted a complaint telling a remarkably different story from the one set forth in the Pinkerton Action. The lawsuit reflected an abrupt shift in allegiances. O'Connor and his allies turned against their former board members Probst and Beck. Indeed, the MFS Action did not allege O'Connor, Cooper, TGAP, Higgerson, Aroha, or Unfug took part in any wrongdoing while they were in control of CTI. Rather these parties were portrayed as "the good guys" who were victimized by Probst, Beck, and other parties who wrongfully sold and purchased CTI shares that belonged to MFS. We note Catanzarite filed the MFS Action acting as MFS's purported corporate counsel while still representing different a shareholder in a derivative action against both MFS and CTI (Pinkerton Action).

In the MFS Action, the complaint asserted Probst and Beck conspired with and were aided and abetted by other Founders to falsely claim CTI's shares were not transferred to MFS and wrongfully reissued those shares. With respect to the other CTI directors and shareholders, the complaint offered the following explanation: "O'Connor, Cooper, TGAP, . . . Higgerson, Aroha, [and] Unfug have agreed to renounce their Founders' Shares in favor of MFS." The complaint failed to explain why renouncing shares and forming an alliance with MFS absolved O'Connor and Cooper from their role in executing the Amended Acts. Nor did the complaint reveal O'Connor's authority to publicize the 2019 Consent, which rescinded the Amended Acts, ousted the board members, and fired CTI's legal counsel. O'Connor's 2019 Consent rescinded CTI shares he and others sold to third parties such as Zakhireh, Cooper, and Higgerson.

To further meddle in CTI's business operations, the MFS Action's complaint asserted CTI's current board of directors were violating Corporations Code section 1507 by "preparing, signing and circulating false minutes, issuing securities, transacting business with insiders, [and] borrowing money from insiders and records relating to CTI." MFS requested that the court enjoin the CTI's board from operating the company until the court held a Corporations Code section 709 hearing (709 hearing) "to

14

determine the rightful ownership of CTI, its appropriate [b]oard of [d]irectors, and executive structure." The court initially granted a temporary restraining order (TRO), which was highly disruptive to CTI's ability to operate its business.

The trial court (Judge Randall J. Sherman) dissolved the TRO in May 2019 after the 709 hearing. Catanzarite argued MFS had the right to vote in CTI's last board meeting when it elected new officers. The court examined the original Organizational Consent, the Amended Acts, the 2019 Consent, MFS loan documents, and other relevant evidence. It noted CTI's securities agreements, which are required to contain a list of issued shares, did not mention MFS was a shareholder. It found telling that O'Connor signed 50 subscription agreements to sell CTI stock directly to MFS shareholders and all but six of MFS's 59 shareholders purchased CTI stock. It considered an e-mail Probst sent to Cooper and O'Conner in 2017 that discussed closing MFS or declaring bankruptcy because the only asset was a note from CTI. And no one disagreed with Probst's failure to list CTI stock as another MFS asset. The court considered CTI's assertion that beginning in 2015 CTI's board raised over 3,000,000 from over 60 private investors and 6,000,000 in financing based on representations MFS did not own any shares of CTI stock. At the hearing, Catanzarite represented Cooper and O'Connor would testify they signed documents making CTI a separate entity but did not understand it meant they were rescinding the shares promised to MFS. Finally, the court questioned Catanzarite about the reasons for the long delay in bringing the motion, during which CTI and MFS operated as separate entities.

The court determined CTI's election was valid and stated that "every fiber of my being says that the facts are overwhelming against" Catanzarite's position. It stated there was a repudiation of an agreement (the Subsidiary Promise) by people who were the same principles in MFS and then there was evidence of repeated actions after the Amended Actions that were consistent with the notion MFS was not a stockholder. The court concluded the delay in bring this claim further supported the conclusion MFS

15

"has been of the view that they are not a shareholder." "So the court concludes that the challenge [to CTI's] election is denied, and the court concludes that [MFS] is not a stockholder in CTI."

That same month, Beck resigned from CTI's board. Meanwhile, Catanzarite resumed filing lawsuits to further the O'Connor Faction's and MFS's interests. Each version represented a slight shift in trial tactics, but all were aimed at achieving the same result set forth in the MFS Action. Beck claimed the litigation against CTI created a sense of instability with CTI's business partners and lenders causing the company to lose money.

For example, Catanzarite filed the Mesa Action in April 2019 for Richard Mesa and a *putative class* of MFS shareholders who also purchased CTI shares. The complaint was framed as both a class action and a shareholder derivative action filed "on behalf of" CTI. The complaint asserted the class of MFS/CTI shareholders wanted to consolidate their lawsuit with MFS's derivative action "and to among other relief, recognize the ownership and control of CTI" by MFS's ownership of 28,000,000 shares, 5,000,000 "Friends & Family CTI shares," and 3,000,000 CTI shares issued pursuant to the 2015 PPM.

This Mesa Action grouped the "'[d]irector [d]efendants'" separately from the "'[p]referred [s]hares [d]efendants." The director defendants included members of the Probst Faction (Probst, Beck, Bernheimer, Kamm, Einhorn, and Motta). Ten defendants holding CTI series A preferred stock were collectively referred to as the preferred shares defendants. CTI was listed as a nominal defendant.

One month later, Catanzarite amended the Mesa Action complaint to add Cooper and Tom Mebane as plaintiffs and FinCanna as a defendant. (See *FinCanna, supra,* G58700.) Catanzarite also changed the nature of the action to focus on unraveling CTI's financial dealings with FinCanna and declare CTI's actions and contracts void.

16

The shareholder no longer wished to join the MFS Action or seek recognition of MFS's controlling stock shares over CTI. (*Ibid.*)

Thus, to briefly recap, at this point Catanzarite's concurrent and successive representation of adverse parties included the following: (1) Catanzarite was representing the Roots' elder abuse lawsuit against CTI and some of its Founders (the Probst Faction) as well as a derivative action against MFS; (2) Catanzarite had made a deal with a handful of CTI Founders to dismiss them from the Pinkerton Action; (3) it became MFS's counsel of record; (4) Catanzarite filed a derivative shareholder lawsuit for MFS, claiming 100 percent control and ownership of CTI, despite having lawsuits filed by other people claiming to be MFS shareholders; and (5) after filing two *derivative* shareholder lawsuits, Catanzarite filed a third derivative action (the Mesa Action) claiming to represent a different set of outsider shareholders, i.e., a class of derivative shareholders willing to join in the MFS Action but also independently seeking damages from CTI, its current shareholders, and board of directors.

At the end of May 2019, Catanzarite filed a lawsuit on behalf of Cooper and Mebane against CTI. The Cooper Action requested the court direct CTI to (1) hold a shareholder's meeting to elect a board of directors; (2) deliver an annual report; (3) appoint an accountant to conduct an audit; and (4) order CTI to pay the costs for an investigation, audit, and costs of the suit. CTI's corporate counsel filed an opposition, asserting a shareholder meeting was scheduled for August 2019. (See *FinCanna, supra,* G058700 [description of Catanzarite's six lawsuits].)

In July 2019, Catanzarite filed first amended complaints (FAC) in the Pinkerton Action and the MFS Action. It removed all derivative action claims made on

17

behalf of MFS and CTI.[6]  Catanzarite claimed to be MFS's and CTI's corporate counsel. Catanzarite next filed two lawsuits as CTI's corporate counsel (the FinCanna Action and Scottsdale Action).  The Scottsdale Action is noteworthy in that Catanzarite demanded that CTI's insurance company stop providing a defense or indemnify Beck and other Probst Faction defendants in the Mesa Action.  (See *FinCanna, supra,* G058700 [description of Catanzarite's six lawsuits].)

In January 2020, the trial court disqualified Catanzarite and its attorneys from representing CTI and the Mesa Action plaintiffs.  (*FinCanna, supra,* G058700.) What happened next is described in full detail in our *FinCanna* and *Cultivation* opinions. (*FinCanna, supra,* G058700; *Cultivation, supra,* G059457), which we incorporate by reference.  Relevant to this appeal, on March 5, 2020, Catanzarite dismissed the Pinkerton Action and MFS Action.

Meanwhile, CTI filed a lawsuit against Cooper, Duffy, and Catanzarite for interfering in its business relationships, breaching fiduciary duties, legal malpractice and other allegations related to their misconduct.  As discussed in *Cultivation, supra,* G059457, defendants anti-SLAPP motions (for the most part) failed.

Beck, represented by counsel, filed the case underlying this appeal.  MFS filed a cross-complaint against Beck, Probst, Bernheimer, Horwitz + Armstrong, Horwitz, Armstrong and other entities (discussed in more detail in our concurrently filed opinion *Mobile Farming Systems, supra,* G060315).

Beck filed a demur to the cross-complaint, a motion to disqualify Catanzarite, and a request for judicial notice of documents supporting these motions.  Out of the 13 defendants named in Beck's lawsuit, a handful filed anti-SLAPP motions.  Beck

---

[6]     We note the Pinkerton Action FAC was deeply sanitized to remove all traces of accusations against the O'Connell Faction, Porche, Mobin, and TGAP.  Where the original complaint specified four people (O'Connell, Probst, Porche, and Mobin) befriended the Roots to swindle the elderly couple out of their retirement funds, the FAC asserted Probst was acting alone.

18

opposed the anti-SLAPP motions and submitted declarations and a request for judicial notice.[7]

In his opposition to Cooper's motion, Beck asserted Cooper turned her back on CTI and Beck when she and O'Connor were asked to resign from CTI. Beck alleged Cooper, joined by her father Higgerson, had been harassing Beck and CTI for two years. He maintained they helped the other defendants in a two-prong scheme. "First, Cooper and Higgerson assisted [in] the creation of false shareholder consents and other corporate acts claiming that MFS was the 'sole shareholder' of CTI. [This was] a false statement that contradicted the fact that Cooper herself had facilitated sales of CTI shares to dozens of individual CTI shareholders. The MFS Action could not exist without their signatures and alleged collusion with [Catanzarite] and other [d]efendants, because Cooper as a major shareholder of MFS and as its largest debt-holder of MFS had to cooperate. Cooper's cooperation was needed to remove the existing MFS board and purportedly retain [Catanzarite] to file the MFS Action on facts known to be false. Second, both falsified testimony for the purpose of engaging in malicious litigation against Beck and CTI, a second track that [d]efendants hoped would give them the leverage to obtain through illicit means what they could not otherwise have." Beck argued his non-malicious prosecution causes of action did not arise from protected speech, but rather "from corporate actions aided and abetted by Cooper and Higgerson." Moreover, Cooper and Higgerson participated in defendants' malicious prosecution scheme by creating false testimony to support MFS's narrative it was CTI's sole shareholder.

---

[7]        Our appellate record is lengthy and disorganized.  Appellant's appendix and Respondent's appendix contain only select parts of the record.  As will be explained in further detail anon, we granted Beck's motion to augment the record with additional relevant exhibits, i.e., copies of his written oppositions and some of the anti-SLAPP motions.  However, all the oppositions refer to Beck's 1,209-page request for judicial notice, which is not part of our record.  On our own motion, we augment the record to include this document as it was considered by the trial court and necessary for our required de novo review.

Beck's opposition to Zakhireh's motion contained similar arguments. Beck acknowledged Zakhireh was not a plaintiff in any of Catanzarite's previous lawsuits. He argued the malicious prosecution claim could be based on Zakhireh's participation in the conspiracy to prosecute frivolous actions. In addition, "Zakhireh is liable for the other claims against him because he participated directly in various non-judicial actions that constituted corporate sabotage against CTI and Beck. Beck can offer evidence establishing a prima facie case for these claims, and Zakhireh acts as a corporate director or officer to sabotage CTI are not privileged under . . . Civil Code section 47."

Beck filed separate oppositions to Catanzarite's and the attorney's motions, but the arguments overlapped. He alleged anti-SLAPP should not apply when these defendants conspired to use MFS as a vehicle for corporate sabotage of CTI, and "engaged in a series of private, corporate acts to slander and destroy CTI and Beck." He added the basis for liability against the individual lawyers was their direct participation in "various non-judicial actions that constituted corporate sabotage against CTI and Beck."

On October 23, 2020, the trial court considered Zakhireh and Catanzarite's anti-SLAPP motions. It granted Zakhireh's motion as to all claims other than slander of title and granted Catanzarite's motion in full. On November 20, 2020, the court considered and granted Cooper and Higgerson's anti-SLAPP motions.

MOTIONS ON APPEAL

I. *Disqualification Motion*

Beck filed a motion to disqualify Catanzarite (and the firm's attorneys Kenneth Catanzarite (Kenneth), Nicole Marie Catanzarite-Woodward (Nicole), Brandon Woodward (Brandon), and O'Keefe) from this appeal.[8] He argues that for the same reasons this court upheld the disqualification orders regarding the Mesa Action shareholders (Cooper, Higgerson, and Duffy), we must now disqualify Catanzarite from

---

[8]     For the sake of clarity, we will refer to parties having the same last names by their first given names.

20

representing MFS/CTI shareholders in this appeal.  Specifically, he asserts Catanzarite's ongoing concurrent representation of clients with conflicting interests triggered mandatory disqualification.  (Citing *FinCanna, supra,* G058700.)  We disagree.

As explained in *FinCanna, supra,* G058700, at the same time the trial court granted CTI's disqualification motion, it denied Beck's motion seeking joinder for Catanzarite's disqualification in the Pinkerton and MFS Actions.  Beck filed a disqualification motion in his malicious prosecution action, but it appears from our record that the court did not rule on it before granting the defendants' anti-SLAPP motions.  Beck waited eight months after filing his notice of appeal to file a disqualification motion directed at the respondents' counsel.

The disqualification motion in this appeal was filed too late.  The trial court's order denying Beck's original disqualification motion was immediately appealable.  (*Meehan v. Hopps* (1955) 45 Cal.2d 213, 217 [order denying motion for disqualification "left nothing further of a judicial nature for a final determination of his rights regarding opposing counsel, [and] the order was final for purposes of appeal"]; *Apple Computer, Inc. v. Superior Court* (2005) 126 Cal.App.4th 1253, 1263-1264 [either writ petition or appeal may be filed following denial of motion to disqualify].)  In *FinCanna, supra,* G058700, we noted Catanzarite was the only party to appeal the court's disqualification rulings.  To consider Beck's current motion on appeal, we would essentially be reviewing an order from which a separate appeal should have been pursued.

"'Collateral estoppel precludes a party from relitigating in a second proceeding the matters litigated and determined in a prior proceeding.  The requirements for invoking collateral estoppel are the following: (1) the issue necessarily decided in the previous proceeding is identical to the one that is sought to be relitigated; (2) the previous proceedings terminated with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party to or in privity with a party in the

Exhibit 21: 255
22-CV-01616-BAS-DDL

previous proceeding.' [Citation.] An order disqualifying an attorney, which was not appealed, has collateral estoppel effect in a subsequent action involving the same issue. [Citation.]" (*A.I. Credit Corp. Inc. v. Aguilar & Sebastinelli* (2003) 113 Cal.App.4th 1072, 1078.) The disqualification issue in the previous proceeding is identical to the one sought to be relitigated. The trial court determined Beck and his codefendants did not have standing to bring the motion, which qualifies as a judgment on the merits. The third element is satisfied in that this malicious prosecution action involves the same parties as the previous proceeding. Beck is collaterally estopped from relitigating the issue of Catanzarite's disqualification.

II. *Request for Judicial Notice (RJN)*

Our court's docket reflects that on August 19, 2021, this court rejected Beck's motion to augment the record with several documents because there was a problem with the pagination. That same day, Beck filed a separate RJN with the following unhelpful caption: "Filed concurrently with index of exhibits and exhibits in support of motion to augment record on appeal." This court filed the RJN and determined the matter would be decided in conjunction with the decision on appeal.

Defendants separately filed an opposition and evidentiary objections to the RJN. They argued the motion was moot because this court rejected Beck's motion to augment. Alternatively, they maintained the motion should be denied because Beck failed to show good cause for the delay and some of the matters were not admissible. These contentions are frivolous. We were dismayed that the evidentiary objections simply repeated the meritless arguments raised in the opposition. The only new argument alleged the documents listed in the RJN lacked relevance, which also turns out to be a frivolous argument.

The RJN includes copies of Beck's oppositions to three different anti-SLAPP motions considered by the trial court, but that were not included in either the appellant's appendix or respondent's appendix. Because we review the trial court's

22

ruling on the anti-SLAPP motion de novo, these documents are highly relevant to resolving this appeal. Similarly, a copy of Beck's declaration supporting one of the oppositions was relevant for our de novo review. Finally, Beck sought judicial notice of our prior *FinCanna* opinion. As demonstrated above, we frequently refer to it and incorporate portions in this opinion. The opinion certainly was relevant to this appeal.

Contrary to defendants' assertion, appellate courts routinely take judicial notice of the records of their own cases under Evidence Code sections 452, subdivision (d) and 459.2. (See, e.g., *Rel v. Pacific Bell Mobile Services* (2019) 33 Cal.App.5th 882, 886 [on court's own motion, took judicial notice of two prior opinions in the same case as well as underlying appellate records]; *People v. Bilbrey* (2018) 25 Cal.App.5th 764, 769, fn. 7 [taking judicial notice of related appeal in writ proceeding]; *Eden Township Healthcare Dist. v. Eden Medical Center* (2013) 220 Cal.App.4th 418, 421 ["We quote at length from our discussion of the facts in our prior opinion"].)

As for the oppositions and declarations, the trial court considered these documents and we could, on our own motion, augment the record. However, we conclude it would be more time efficient to construe Becks RJN as a motion to augment the record on appeal. Thus, we will grant Beck's motion to augment the record with the exhibits attached to his RJN.

Beck also filed a motion for sanctions against Catanzarite and its attorneys for filing frivolous lawsuits below and baseless objections to his motions on appeal. While sanctions are tempting due to the repetitive and groundless objections, we conclude the opposition to the disqualification motion was at least partially correct. At this time, we deny Beck's motion for sanctions.

## DISCUSSION

Section 425.16 authorizes a special motion to strike claims arising from any act "in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16,

subd. (b)(1).)  The purpose of the anti-SLAPP statute is to encourage participation in matters of public significance by allowing defendants "to request early judicial screening of legal claims targeting free speech or petitioning activities."  (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 880-881.)

       "Resolution of an anti-SLAPP motion involves two steps.  First, the defendant must establish that the challenged claim arises from activity protected by section 425.16, and if the defendant makes this showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success.  [Citation.]  On appeal, we review the trial court's ruling on the anti-SLAPP motion de novo.  [Citation.]"  (*Wittenberg v. Bornstein* (2020) 50 Cal.App.5th 303, 311-312 (*Wittenberg*).)

       "To establish a probability of prevailing, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'  [Citations.]  For purposes of this inquiry, 'the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.'  [Citation.]  In making this assessment it is 'the court's responsibility . . . to accept as true the evidence favorable to the plaintiff . . . .'  [Citation.]  The plaintiff need only establish that his or her claim has 'minimal merit' [citation] to avoid being stricken as a SLAPP.  [Citations.]"  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291-292 (*Soukup*).)  We will address each cause of action separately.

I.  *Slander of Title*

       Beck's complaint alleged, inter alia, that Zakhireh, Catanzarite, and Kenneth were liable for slander of title.  The complaint stated: "Defendants effected, or

caused to be effected, certain shareholder consents of MFS and CTI which they knew to be false, stating that MFS was the sole shareholder of CTI.  On the basis of these alleged consents, title to ownership by Plaintiff of CTI shares was thereby compromised.  Indeed, such slander also prevented [Beck] from pursuing valuable business opportunities or growth capital on behalf of CTI."  He alleged these defendants acted "with reckless regard in making statements that they knew were false.  Defendants knew that other parties would rely upon their statements.  Here, the slander of title by [d]efendants destroyed [Beck's] opportunity to sell shares in the public markets through a proposed merger with Troy, or other public offering as an alternative, each at times when public market valuations in 2019 were superior to current market conditions."

Thus, Beck's claim appears to be based on publication of the 2019 Consent, which was intended to reinstate MFS as CTI's primary shareholder and purportedly replaced CTI's board members.  As pled, this conduct does not obviously relate to protected litigation-related activity, which the first prong of anti-SLAPP requires. Accordingly, we agree with the trial court's determination Zakhireh failed to meet his burden on the first prong and properly denied the motion as to this claim.

With respect to Catanzarite/Kenneth, the trial court concluded these moving parties met their burden on first prong because Beck "conceded" in his opposition the law firm "published" the 2019 Consent when drafting the MFS Action's complaint.  Filing a complaint certainly falls under section 425.16 subdivision (e)(1) [writing made in judicial proceeding].  However, we read Beck's opposition differently.  While he mentions Catanzarite's reference to the 2019 Consents in the complaint, he adamantly refuted the contention his slander of title claim was entirely based on protected activity.  He asserted Catanzarite/Kenneth "was one of those responsible for the non-privileged publications that directly slandered Beck's title to CTI shares."  He explained that *after* publishing the written consent in the MFS Action's complaint, Catanzarite/Kenneth and their "allies" changed tactics because the MFS Action and Pinkerton Action failed.  Beck maintained

the scheming defendants tried to take control of CTI through a shareholder vote with O'Connor holding the shareholders' proxies. Beck concluded the alleged actions of corporate sabotage outside of the courtroom were not protected actions. "[R]ecission of the Amended Acts through the issuance of the shareholder consent" were not dependent on the pursuit of litigation.

Beck's opposition revisited this line of argument when discussing the second prong of anti-SLAPP. He repeated the slander of title claim was not based "on acts that were made in any kind of 'judicial proceeding.'" He asserted, "the most damaging representations made regarding Beck's CTI shares were made completely separate from litigation, when [Catanzarite/Kenneth] and the individuals purporting to make up the MFS board issued the supposed consent that knowingly claimed false ownership of CTI." None of the above language suggests Beck conceded the basis of his slander of title claim was litigation-related conduct.

Because we read the complaint and Beck's opposition differently than the trial court, we reverse the decision to grant Catanzarite/Kenneth's anti-SLAPP motion with respect to the slander of title claim. Catanzarite did not meet its burden of showing this claim was based on protected activity. We conclude Beck's reference to allegations in the complaint merely served to provide context to the timing of the publication of the 2019 Consent and events amounting to acts of corporate sabotage following the lawsuits. "'Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute.' [Citation]" (*Bonni, supra,* 11 Cal.5th at p. 1012 [incidental or collateral assertions not subject to section 425.16].)

II. *Intentional Infliction of Emotional Distress (IIED)*

Beck's complaint contains a very short discussion of a factual basis for this cause of action. It alleged all the defendants caused him to suffer emotional distress, including those involved in "conducting their malicious prosecution scheme." He

26

asserted these defendants engaged in reckless disregard, knowing he "would be required to answer baseless claims made against him on the basis of knowingly false statements made by [d]efendants." We agree with the trial court's determination that to the extent this claim is dependent on the malicious prosecution claim, it satisfies the first prong of anti-SLAPP. (*Lee v. Kim* (2019) 41 Cal.App.5th 705, 719 (*Lee*) ["every claim of malicious prosecution is a cause of action arising from protected activity, because every such claim necessarily depends upon written and oral statements in a prior judicial proceeding"].)

Beck's complaint also contains the broadly worded allegation the defendants "engaged in a pattern of despicable conduct, as set forth in the allegations described herein." As mentioned, the "pattern of despicable conduct" includes non-litigation claims, such as the publication of the 2019 Consent (supporting the slander of title cause of action). Because this cause of action refers to both protected conduct and non-litigation actions, it qualifies as a "mixed cause[] of action," a concept discussed at length in our prior opinion *Cultivation, supra,* G059457, which we incorporate by reference.

As discussed in more detail in our prior opinion, our Supreme Court has recently clarified that courts must take a claim by claim approach when considering each cause of action subject to an anti-SLAPP motion. (*Bonni, supra,* 11 Cal.5th at p. 1010; *Baral v. Schnitt* (2016) 1 Cal.5th 376, 382 (*Baral*).) "Section 425.16 is not concerned with how a complaint is framed, or how the primary right theory might define a cause of action. While an anti-SLAPP motion may challenge any claim for relief founded on allegations of protected activity, it does not reach claims based on unprotected activity." (*Baral, supra,* 1 Cal.5th at p. 382.) Accordingly, "'[C]ourts should analyze each claim for relief—each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected

27

and, if so, whether the claim they give rise to has the requisite degree of merit to survive the motion. [Citation.]'" (*Ibid.*)

  In light of this case authority, we conclude the moving parties did not meet their burden of showing Beck's *entire* IIED claim rested on protected activity. Taking a claim by claim approach, it appears there were non-litigation allegations supporting the cause of action that cannot be stricken under anti-SLAPP. The claims relating to malicious prosecution satisfy the first prong, but as we will discuss in more detail below, Beck met his burden on the second prong, i.e., regarding probability of prevailing. Therefore, we must reverse the ruling on this cause of action.

III. *Unfair Business Practices*

  Like the IIED cause of action, we conclude the unfair business practices claims were a mixed cause of action. In addition to the moving parties' actions of filing frivolous lawsuits (the malicious prosecution allegations), this cause of action referred to unprotected acts of attorney malpractice (violations of the Rules of Professional Conduct), violation of Corporations Code section 1507 regarding the false publication of documents about a corporate entity (the 2019 Consent), and violation of Business and Professions Code section 6104 regarding an attorney appearing without authority.

  The trial court viewed the attorney malpractice allegations as relating to protected conduct because Beck did not prove he was Catanzarite's client. It reasoned anti-SLAPP must apply when a non-client raises a professional negligence claim against an opponent's attorney. This ruling improperly conflates the first and second prongs of anti-SLAPP.

  The existence or nonexistence of an attorney client relationship is a dispute that relates only to the second prong. "'The sole inquiry' under the first prong of the test is whether the plaintiff's claims arise from protected speech or petitioning activity. [Citation.] In making this determination, '[w]e do not consider the veracity of [the plaintiff's] allegations' [citation] nor do we consider '[m]erits based arguments.'

28

[Citations.] If the defendant demonstrates the plaintiff's claims do arise from protected activity, we then review the potential merits of the plaintiff's claims in the second step of the analysis. [Citation.] . . . Whether [plaintiff] actually shared an attorney-client relationship with defendants relates to the merits of [his] claims and is therefore not relevant to our first prong analysis. Although defendants may ultimately defeat [Beck's] claims by proving the absence of an attorney-client relationship, that does not alter the substance of [his] claims. [Citation.]" (*Sprengel v. Zbylut* (2015) 241 Cal.App.4th 140, 156-158, fns. omitted.)

      Beck's unfair business practices cause of action was also based on an alleged violation of Corporations Code section 1507. In the briefing, the moving parties assert the acts giving rise to liability under the statute "are the lawsuits and related litigation activity concerning MFS's status as CTI's sole shareholder and the veracity of the CTI preferred stock issuance." As aptly stated by Beck in his opposition, the moving parties "assume[]" this cause of action arises from protected activity because there was clear evidence of Catanzarite's "pattern of litigation abuse." Beck explained, "Though this pattern exists and [was] discussed [by both parties regarding the malicious prosecution cause of action, Catanzarite] wrongly assumes that Beck's other causes of action arise from litigation acts. To the contrary, they arise from non-expressive acts of what amounts to corporate sabotage of CTI and Beck. These are not acts that the Legislature meant the anti-SLAPP statute to protect." Beck asserts his causes of action were not based on protected activity, "but instead on the fact that [Catanzarite] willingly participated in MFS's use as a corporate shell to sabotage CTI and Beck. [Catanzarite's] participation in this conspiracy, even if contemporaneous with its abuses of the judicial process, [should] not mean that Beck's claims arises from protected activity."

      To support this argument, Beck referred to allegations in the complaint regarding several defendants (including Zakhireh) who "reconstituted the MFS board of directors" to sabotage CTI and Beck. Beck asserts these defendants adopted corporate

29

documents to renounce the Amended Acts and attempted to remove CTI's board, none of which was protected litigation-related conduct.  He alleged Catanzarite "was the hub of the [d]efendant's scheme" because it "arranged and maintained the agreements by which the [d]efendants asserted control of MFS and agreed to attack Beck and CTI, then divide the soils among themselves."  We agree the factual basis for the Corporations Code violation allegations do not satisfy the first prong, and should not be stricken pursuant to the anti-SLAPP statute.

Finally, Beck's unfair business practices cause of action contained allegations Catanzarite/Kenneth (aided by Zakhireh) violated Business and Professions Code section 6104.  The moving parties assert this cause of action relates to protected conduct because it includes the factual allegation Zakhireh aided MFS's attorneys by providing false supporting declarations for lawsuits.  Supplying a written declaration for a lawsuit would qualify as protected activity, however, the complaint specifies a different factual basis for the claim.  Specifically, Beck's complaint set forth the following three points:  (1) Business and Professions Code section 6104 provided an attorney cannot appear for a party corruptly or without authority; (2) Catanzarite and its attorneys "were well aware that they lacked authority to appear on behalf of CTI and other parties" but they did so anyway; and (3) Zakhireh, O'Conner, and Duffy aided the other defendants in violating this statute.

We conclude the activity underlying the claim—Catanzarite's representation of CTI in the trial court—is constitutionally protected conduct.  "[A]ll communicative acts performed by attorneys as part of their representation of a client in a judicial proceeding or other petitioning context are per se protected as petitioning activity by the anti-SLAPP statute. [Citation.]" (*Cabral v. Martins* (2009) 177 Cal.App.4th 471, 479-480.)  Thus, the moving parties established the first prong of the SLAPP analysis.

Turning to the second prong, we conclude Beck cannot show minimal merit on this sub-claim of the unfair business practices cause of action.  Violations of Business

30

and Professions Code section 6104 does not authorize Beck to sue or recover damages from Catanzarite or its aider and abettors.  Violation of a disciplinary rule allows the Supreme Court to suspend or disbar an attorney.  (Bus. & Prof. Code, § 6100.)  It does not give "'an antagonist in a collateral proceeding or transaction . . . standing to seek enforcement of the rule.'  [Citation.]"  (*Gregori v. Bank of America* (1989) 207 Cal.App.3d 291, 303.)  Beck cannot prevail on this claim and it must be stricken from the cause of action.

IV. *Malicious Prosecution*

      Beck alleged all the defendants were liable for malicious prosecution because the Pinkerton Action, MFS Action, and Scottsdale Action were initiated and prosecuted without probable cause and with malice.  He maintained the first two lawsuits were "rooted on the fraudulent assertion of MFS's ownership of CTI," which each defendant knew was untrue.  He added Catanzarite filed the Scottsdale Action without any authorization from CTI's board, and therefore knew it also lacked probable cause.

      The first step of the anti-SLAPP inquiry, whether defendants made a threshold showing the malicious prosecution claim arose from protected activity, is not disputed here.  "The plain language of the anti-SLAPP statute dictates that every claim of malicious prosecution is a cause of action arising from protected activity, because every such claim necessarily depends upon written and oral statements in a prior judicial proceeding.  [Citation.]  Accordingly, our inquiry shifts to whether [Beck] satisfied [his] burden[] to demonstrate a probability of prevailing on the merits of [his] claims for malicious prosecution.  [Citations.]"  (*Lee, supra,* 41 Cal.App.5th at p. 719.)

      "To prevail on a malicious prosecution claim, the plaintiff must show that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination favorable to the plaintiff; (2) was brought without probable cause; and (3) was initiated with malice.  [Citation.]"  (*Soukup, supra,* 39 Cal.4th at p. 292.)

A. *Favorable Termination*

It is undisputed Catanzarite voluntarily dismissed the Root Action and the MFS Action on March 5, 2020. It dismissed the Scottsdale Action on November 18, 2019. "[A] voluntary dismissal is presumed to be a favorable termination on the merits[.] [Citation.]" (*Lee, supra,* 41 Cal.App.5th at p. 720.)

In its briefing, Catanzarite notes the trial court questioned whether Beck satisfied his burden of showing there were favorable dismissals. The court opined Catanzarite likely dismissed the action after it received the ruling at the Corporations Code section 709 hearing that MFS was not a shareholder (and therefore lacked standing to bring the derivative action). The court added a dismissal for this kind of technical reason would not indicate Beck was innocent of wrongdoing, especially when he was still a defendant in the ongoing Mesa Action. We disagree with this analysis.

"It is not essential to maintenance of an action for malicious prosecution that the prior proceeding was favorably terminated following trial on the merits." (*Lackner v. LaCroix* (1979) 25 Cal.3d 747, 750 (*Lackner*).) "'The fact that such legal termination would not be a bar to another civil suit or criminal prosecution founded on the same alleged cause is no defense to the action for malicious prosecution; otherwise a party might be continuously harassed by one suit after another, each dismissed before any opportunity for a trial on the merits.' [Citation.]" (*Kennedy v. Byrum* (1962) 201 Cal.App.2d 474, 480.) Thus, Beck's status as a defendant in a different action has little relevance.

We appreciate the trial court's concern that "termination must *reflect* on the merits of the underlying action. [Citation.]" (*Lackner, supra,* 25 Cal.3d at p. 750.) "To determine 'whether there was a favorable termination,' we 'look at the judgment as a whole in the prior action . . . .' [Citation.]" (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 341.) "[C]ourt[s] must examine the reasons for termination to see if the disposition reflects the opinion of the court or the prosecuting party that the action would

32

not succeed." (*Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1149.)
Dismissals that result from negotiation, settlement or consent are generally considered
not to be a favorable termination, because such a dismissal "reflects ambiguously on the
merits of the action . . . ." (*Minasian v. Sapse* (1978) 80 Cal.App.3d 823, 827 fn. 4
(*Minasian*).) Likewise, a dismissal based upon the statute of limitations is not a favorable
termination, because it is technical or procedural termination rather than one on the
merits. (*Lackner, supra,* 25 Cal.3d at p. 751.)

In contrast, a dismissal for failure to prosecute is "not a dismissal on
technical grounds" but rather reflects on the merits based upon "the natural assumption
that one does not simply abandon a meritorious action once instituted." (*Minasian,
supra,* 80 Cal.App.3d at p. 827.) A voluntary dismissal not based upon the parties'
settlement or consent, even where it is made without prejudice, is generally considered to
be a favorable termination to support a malicious prosecution action. (*Fuentes v. Berry*
(1995) 38 Cal.App.4th 1800, 1808; *Villa v. Cole* (1992) 4 Cal.App.4th 1327, 1335.) In
the *Sycamore Ridge Apartment* case, the court held that a voluntary dismissal is presumed
to be a favorable termination, unless proved to the contrary by the party who prosecuted
the underlying action and dismissed it. (*Sycamore Ridge Apartments, LLC v. Naumann*
(2007) 157 Cal.App.4th 1385, 1400 (*Sycamore*).)

In this case, Catanzarite dismissed two complaints on the same day, March
5, 2020. There was no evidence these dismissals occurred as a result of a settlement
between Beck and plaintiffs. The trial court reasoned the dismissals were likely due to
the previous Corporations Code section 709 ruling, holding MFS was not one of CTI's
shareholders. However, the record shows that when Catanzarite learned MFS lacked
standing to bring a derivative suit on CTI's behalf, it did not dismiss the lawsuits.
Catanzarite filed FACs instead.

The record shows that three months after the court ruled MFS was not
CTI's shareholder, Catanzarite amended the complaints in the Pinkerton Action and MFS

33

Action by deleting the derivative causes of action. Catanzarite transformed both lawsuits into direct actions against Probst, Beck, and other CTI-related entities. Thus, the record does not support the court's conclusion Catanzarite dismissed the lawsuits for the mere technical reason MFS was not a shareholder. The complaints were amended to purportedly reflect this correction.

It is more likely Catanzarite's voluntary dismissal of the two lawsuits was related to a later disqualification ruling and the lack of tenable claims. The dismissals took place just a few months after the court disqualified Catanzarite and its attorneys from representing CTI and the Mesa Action plaintiffs (the class action shareholder derivative lawsuit). Given Catanzarite's zeal for filing multiple lawsuits against the same defendants, we can assume it would not abandon a meritorious action already initiated. Thus, we conclude the voluntary dismissal in this case should be regarded as a favorable termination of the two lawsuits (Pinkerton Action and MFS Action).

There is very little information in our record about the Scottsdale Action. Beck submitted a document filed in the United States District Court, Central District, showing Catanzarite filed the Scottsdale Action claiming to be CTI's authorized corporate counsel. The document reflected that on November 18, 2019, CTI dismissed the action against CTI's insurance company "in its entirety." As noted in our prior opinion, on November 15, 2019, the court granted the motion disqualifying Catanzarite from representing CTI. (*FinCanna, supra,* G058700.) In making its ruling, the court noted Catanzarite could not represent two client adversaries and in the Scottsdale Action CTI claimed to be representing the corporation and at the same time sought to invalidate a defense and indemnity for CTI directors under CTI's insurance policy. (*Ibid.*) The court stated a denial of coverage could put CTI "'on the hook for the individuals' costs of defense and/or liability.'" In other words, the court recognized Catanzarite was improperly using the Scottsdale Action for an improper purpose, i.e., to help his clients in the Mesa Action. Accordingly, this dismissal was a favorable termination on the merits.

B. *Commencement of Action*

As for the issue of commencement, the parties do not dispute Catanzarite and Attorneys were responsible for filing the lawsuits at issue in this case.

Zakhireh asserts he was not a party to the lawsuits at issue and cannot be held liable. We disagree. While he did not direct the commencement of the Pinkerton Action, there was evidence supporting the conclusion he was instrumental in the MFS Action. As mentioned, the complaint alleged that after O'Connor and Cooper secured their dismissals from the Pinkerton Action, they used the near-bankrupt MFS as a litigation tool to raise untenable claims against their former business partners (Probst and Beck). Beck presented evidence showing O'Connor (on behalf of MFS) selected Zakhireh to be CTI's treasurer and chief financial officer. Beck alleged Zakhireh, at the same time, was part of MFS's new board comprised of O'Connor's allies. In his newfound position with MFS, Zakhireh would have the duty of discussing litigation plans with MFS's corporate counsel Catanzarite and the other MFS board members. How could MFS have filed the MFS Action without the approval of its board members?

We conclude Zakhireh's position as both an MFS and CTI director raises a strong inference he aided the O'Connor Faction and MFS's corporate counsel (Catanzarite) with the group's plans for an illegal corporate takeover. As noted by Beck, a person who aids and abets a malicious prosecution can be held liable. (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1131, fn. 11 ["A person who is injured by groundless litigation may seek compensation from any person who procures or is actively instrumental in putting the litigation in motion or participates after the institution of the action"].)

As for Cooper and Higgerson, they were not responsible for commencing the Pinkerton Action because they were the defendants. However, one can reasonably infer Cooper and Higgerson, like O'Connor, made a deal with Catanzarite in exchange for their dismissal from the Pinkerton Action. Beck alleged Cooper and Higgerson were

35

instrumental in assisting MFS and its shareholders in their efforts to take over CTI. These dismissed defendants helped by agreeing to testify in support of MFS's new allegedly fabricated claim to own 100 percent of CTI. Cooper's participation was further demonstrated by Beck's evidence her vote was needed before MFS's corporate counsel (Catanzarite) could file the lawsuit, because she held five million MFS shares. Cooper did not refute this evidence.

C. *Probable Cause*

"An action is deemed to have been pursued without probable cause if it was not legally tenable when viewed in an objective manner as of the time the action was initiated or while it was being prosecuted. The court must 'determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable.' [Citation.] 'The resolution of that question of law calls for the application of an *objective* standard to the facts on which the defendant acted. [Citation.]' [Citation.] The test the court is to apply is whether 'any reasonable attorney would have thought the claim tenable . . . .' [Citation.] The tort of malicious prosecution also includes the act of 'continuing to prosecute a lawsuit discovered to lack probable cause.' [Citation.] In determining the probable cause issue, the same standard applies 'to the continuation as to the initiation of a suit.' [Citation.]" (*Sycamore, supra,* 157 Cal.App.4th at p. 1402.)

"'Continuing an action one discovers to be baseless harms the defendant and burdens the court system just as much as initiating an action known to be baseless from the outset.' [Citation.] 'A person who had no part in the commencement of the action, but who participated in it at a later time, may be held liable for malicious prosecution.' [Citations.]" (*Sycamore, supra,* 157 Cal.App.4th at p. 1398.) "A claim for malicious prosecution may also apply to a defendant who has brought an action charging multiple grounds of liability when some, but not all, of the grounds were asserted without probable cause and with malice. [Citations.]" (*Id.* at p. 1399.)

36

"In analyzing the issue of probable cause in a malicious prosecution context, the trial court must consider both the factual circumstances established by the evidence and the legal theory upon which relief is sought. A litigant will lack probable cause for his action either if he relies upon facts which he has no reasonable cause to believe to be true, or if he seeks recovery upon a legal theory which is untenable under the facts known to him." (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 164-165.) "In making its determination whether the prior action was legally tenable, the trial court must construe the allegations of the underlying complaint liberally in a light most favorable to the malicious prosecution defendant. [Citation.]" (*Id.* at p. 165.)

We conclude Beck met the low burden of proving his claim had minimal merit with respect to Catanzarite. Unlike the trial court, we find it relevant Catanzarite initiated the Pinkerton Action, a shareholder derivative action on behalf of MFS, without first verifying the Roots owned shares in MFS. Beck presented evidence they did not. He submitted stock certificates showing the Roots' corporation, Jolly Roger, invested in MFS, but this entity lost its corporate status between 2015 to 2019. Thus, both the Roots and Jolly Roger lacked standing to bring a shareholder derivative lawsuit. Before agreeing to become an attorney of record in a case, an attorney should, at a minimum, be familiar with the client's claims as a purported shareholder, and should have made a preliminary determination about whether probable cause existed to support the asserted claims.

Here, Catanzarite filed a shareholder derivative lawsuit on behalf of clients who were not actually shareholders. The basic nature of a shareholder derivative action is to *permit shareholders* to "'bring a derivative suit to enforce the corporation's rights and redress its injuries when the board of directors fails or refuses to do so.' [Citation.]" (*Patrick v. Alacer Corp.* (2008) 167 Cal.App.4th 995, 1003.) There are stock ownership requirements for standing to pursue a shareholder's derivative suit. (See Corp. Code, § 800.)

37

Catanzarite also drafted a complaint seeking recovery upon two legal theories which were untenable under the facts known to the firm's attorneys. The Pinkerton Action's derivative shareholder claims all related to the following factual circumstances: In 2015, MFS board of directors (Probst, O'Connor, and Cooper) promised its shareholders MFS owned 100 percent of the CTI's outstanding shares (a total of 28,000,000 CTI common stock) (hereafter referred to as the Subsidiary Promise). MFS's board of directors became CTI's board of directors and "captured the entire business opportunity" for themselves, reneging on the Subsidiary Promise. And thereafter, CTI entered into agreements with third parties to implement its marijuana business plan and sold shares to investors. The MFS board members' recission of the Subsidiary Promise was the basis for the following shareholder derivative claims: constructive fraud; breach of fiduciary duty; misappropriation of trade secrets; and unfair competition.

The Roots' direct claims related to misconduct by the MFS board members but the Roots indicated they were willing to settle the case in exchange for a large quantity of CTI Founder shares and a seat on CTI's board. The Roots inexplicably did not want to be on MFS's board, despite their allegations about the Subsidiary Promise and decision to raise claims on MFS's behalf. The complaint's internal inconsistency and standing issues certainly raise red flags.

Given the Roots' settlement request for CTI shares, it is reasonable to infer Catanzarite and his clients knew only those shares had value and also understood those shares were available because MFS did not own 100 percent of CTI. Under these circumstances, a reasonable attorney may not have found the Pinkerton Action claims tenable. Moreover, when the factual allegations of the Pinkerton Action and the MFS Action are compared in an objective manner, no reasonable attorney would conclude both had merit. Simply stated, one action was based on the factual premise CTI's board members improperly renounced the Subsidiary Promise, leaving MFS *without any* CTI

38

shares, and the other was based on the factual premise MFS *currently owned* 100 percent of CTI's shares, rendering any other CTI stock certificates worthless.

The lack of probable cause for maintaining the two lawsuits was further demonstrated by evidence Catanzarite filed multiple lawsuits while unethically representing clients with conflicting interests. For good reason, it is difficult to apply the "reasonable attorney" test when there is evidence the attorneys initiating the cases violated multiple rules of professional conduct. For example, no reasonable attorney would agree to act as corporate counsel of MFS while at the same time representing shareholders in a derivative lawsuit against that corporation. Yet this is exactly what happened when Catanzarite filed the MFS Action while also litigating the Pinkerton Action. We conclude the concurrent representation of directly adverse parties creates a strong inference the attorneys and litigants knew the claims in one or both lawsuits were untenable.

Beck also presented evidence Catanzarite and the O'Conner Faction created a mutually beneficial alliance. In exchange for their dismissal from the Pinkerton Action, these former defendants agreed to help opposing counsel file a different lawsuit against CTI and the Probst Faction (which included Beck). Beck's evidence suggested these CTI shareholders agreed to create and support a false story about MFS's ownership of CTI, revive MFS by reconfiguring its board of directors, and then use MFS as a litigation tool to sabotage CTI and its board members. In addition to providing testimony that MFS owned CTI, the O'Connor Faction members publicly renounced their CTI stock shares. O'Connor executed the 2019 Consent, without objection from his cohorts, which rendered worthless all their CTI stocks. As pointed out by Beck, all of this anti-CTI activity, following their dismissals from the Pinkerton Action, was highly suspect especially when one considers their actions and business dealings as CTI board members and shareholders from 2015 to 2019.

Exhibit 21: 273
22-CV-01616-BAS-DDL

As discussed in more detail in our factual summary, after the formation of an alliance between Catanzarite and the O'Conner Faction, Catanzarite embarked on a spectacularly relentless mission (inside and outside of the courtroom) to replace CTI's board members with members of the O'Connor Faction.  MFS/Catanzarite could not have initiated the MFS Action without the evidence and testimony provided by members of the O'Connor Faction.  Accordingly, there was enough evidentiary support for Beck's claim Cooper, Higgerson, and Zakhireh, who were O'Connor's loyal allies, were instrumental in the maintenance of MFS Action knowing it lacked probable cause.  We conclude Beck submitted enough evidence to satisfy his low burden at this stage of the proceedings with respect to the element of probable cause as to all the moving parties.

D. *Malice*

The above evidence also lends support to the malice requirement of anti-SLAPP.  "'Malice "may range anywhere from open hostility to indifference." [Citations.]' [Citation.]  While the mere absence of probable cause, without more, 'is not sufficient to demonstrate malice' [citation] "'[m]alice may also be inferred from the facts establishing lack of probable cause." [Citation.]' [Citation.] . . . '[T]he extent of a defendant attorney's investigation and research may be relevant to the further question of whether or not the attorney acted with malice.' [Citation.]" (*Sycamore, supra,* 157 Cal.App.4th at p. 1409.)

It appears the complaints were filed by plaintiffs lacking standing and/or included untenable claims.  If Catanzarite knew the relevant facts, and only dismissed the O'Conner Faction and not the entire CTI board, we can infer the continued prosecution of those claims was motivated by malicious intent.  If Catanzarite was not aware of the plaintiffs' lack of standing because it failed to adequately familiarize itself with the case before filing the lawsuit, this too would indicate indifference, and therefore also, the inference of malice.

Exhibit 21: 274
22-CV-01616-BAS-DDL

Malice can also be inferred from evidence the MFS Action was initiated and maintained as part of a larger scheme to replace CTI's board with MFS shareholders, i.e., a hostile corporate takeover. The MFS Action complaint included a request for declaratory relief in the form of a court order declaring MFS owed 100 percent of CTI's stock, replacement of CTI's board, and confirmation CTI's business deals were invalidated. Catanzarite also separately filed a motion under Corporations Code section 709, asking the court to confirm MFS was a shareholder and must be permitted a vote in CTI's board elections. After losing the motion and hearing the court rule MFS was not CTI's shareholder, the parties did not immediately dismiss the lawsuit. Instead, Catanzarite filed more lawsuits and began acting as corporate counsel of both MFS and CTI. It can be inferred O'Connor, Cooper, Higgerson, and Zakhireh continued to authorize and support Catanzarite's efforts to reallocate CTI's shares to MFS and oust the Probst Faction from CTI's board.

In light of all of the above, we conclude Beck submitted enough evidence to satisfy his burden with respect to the element of malice. "'[T]he defendant's motivation is a question of fact to be determined by the jury.' [Citation] 'Because direct evidence of malice is rarely available, "malice is usually proven by circumstantial evidence and inferences drawn from the evidence." [Citation.]' [Citation.]" (*Citizens of Human., LLC v. Hass* (2020) 46 Cal.App.5th 589, 607.) We conclude the evidence supports a reasonable inference Catanzarite, O'Connor, Cooper, Higgerson, and Zakhireh were working together and pursuing litigation lacking probable cause against Beck with an improper purpose.

## DISPOSITION

We affirm the court's orders granting the moving party's anti-SLAPP motion regarding paragraph 124 of the complaint, regarding violation of Business and Professions Code section 6104.

Exhibit 21: 275
22-CV-01616-BAS-DDL

We affirm the court's order denying Zakhireh's anti-SLAPP motion regarding the slander of title cause of action.

We reverse the court's orders granting the moving party's anti-SLAPP motion regarding Beck's causes of action for malicious prosecution, unfair business practices, slander of title, and intentional infliction of emotional distress. The matter is remanded for further proceedings.

We treat Beck's request for judicial notice as a motion to augment and grant it. We deny all requests for sanctions on appeal. We deny Beck's disqualification motion. On our own motion, we augment the record with the request for judicial notice Beck filed with his oppositions to the anti-SLAPP motions. In the interests of justice, each party shall bear their own costs on appeal.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


SANCHEZ, J.


42

## JUSTIN BECK SECURITIES SUMMARY
## CONTAKT WORLD TECHNOLOGIES CORP (CSE: HELP)

**Acquired September 2020**

Performance Warrants as Outlined

- 600,000 Tier 1 Retained ($.10 CAD Strike, vested @ $1M CAD revenue)
- 600,000 Tier 2 Retained ($.10 CAD Strike, vested @ $2M CAD revenue)
- 600,000 Tier 3 Retained ($.10 CAD Strike, vested @ $5M CAD revenue)
- 3.25% Tier 4 Retained (vested on NYSE/Nasdaq Cross-Listing, $500M+ CAD valuation)

**Acquired September 25, 2020***

| | |
|---|---|
| 4,500,000 | Subordinate Voting |
| 45,000 | Compressed Convertible Into 4,500,000 Subordinate Voting |

*First membership interests in Contakt LLC, acquired by CWT, then amalgamated into CSE: HELP*

**Acquired November 27, 2020****

| | |
|---|---|
| 49,609 | Subordinate Voting |
| 496 | Compressed Convertible into 49,609 Subordinate Voting |
| 99,218 | $1 CAD warrants to buy subordinate voting shares |

**First acquired via CWT sub. agreements, then amalgamated into CSE: HELP*

## FULL DETAIL

**9/20**      **Acquired Warrants via Original Employment Agreement**

- Acquired performance warrants at revenue and valuation/cross-listing thresholds

  - 1,000,000 (5-year) Tier 1 @ $1.0M CAD in revenue for CWT as public issuer

    - Assigned 400,000 of the 1,000,000 to other parties

    - Retained 600,000 of the 1,000,000 personally

  - 1,000,000 (5-year) Tier 2 @ $2.0M CAD in revenue for CWT as public issuer

    - Assigned 400,000 of the 1,000,000 to other parties

    - Retained 600,000 of the 1,000,000 personally

- 1,000,000 (5-year) Tier 3 @ $5.0M CAD in revenue for CWT as public issuer
  - Assigned 400,000 of the 1,000,000 to other parties
  - Retained 600,000 of the 1,000,000 personally
- 5% (5-year) warrant coverage upon achieving cross-listing
  - Nasdaq or NYSE listing with $500M+ CAD valuation
    - Price at lower of $4.00, or
    - Half share price of last capital financing of $50M or greater
  - Assigned 1.75% of the 5% to other parties
  - Retained 3.25% of the 5% personally

**9/25/20    Acquisition of Membership Interests of Contakt LLC**

- Acquired 9,000,000 membership interests in Contakt LLC out of 20,000,000 total
  - $.001 per membership interest, or $9,000 total cost basis
  - Subscription Agreement (later audited per 12/3/20 confirmation)
- 9/25/20 reflects date of original beneficial ownership for purposes of capital gains for:
  - 4,500,000 subordinate shares in CSE: HELP
  - 45,000 Compressed shares in CSE: HELP (1:100)
    - Convertible to 4,500,000 add'l subordinate voting shares

**10/9/20    Share Exchange Contakt LLC <> Contakt World Technologies Corp. (CWT)**

- Swapped 9,000,000 membership interests of Contakt LLC
- Acquired 9,000,000 shares of CWT
- Amended 10/28/20 respecting the tax treatment for US-holders

**11/27/20      Contakt Private Placement**

- Acquired 65,000 units in CWT in exchange of $32,500 CAD

    o Subscription Agreement

- Each unit reflects 1 common share of CW + 1 warrant of CWT

    o Reflects 65,000 common shares of CWT @ $.50 CAD cost basis

    o Reflects 65,000 warrants to buy common shares @ $1.00 CAD (24-months)

**11/27/20      Debt Settlement w/Contakt LLC & Subscription Agreement w/CWT**

- Acquired 34,218 units in CWT in exchange of $13,174 USD ($17,109 CAD) debt settled

    o Subscription Agreement

    o Approval

- Each unit reflects 1 common share of CW + 1 warrant of CWT

    o Reflects 34,218 common shares of CWT @ $.50 CAD cost basis

    o Reflects 34,218 warrants to buy common shares @ $1.00 CAD (24-months)

**12/3/20      Amalgamation Contakt LLC <> Contakt World Technologies Corp.**

- Approval by Contakt LLC of 12/3/20 Amalgamation (Tracker, Tracker Subco, CWT)

- Approval by CWT of 12/3/20 Amalgamation (Tracker, Tracker Subco, CWT)

- Approval of Audited Financials

**7/12/21      Amalgamation Closes, Name Change to CWT**

- Sub. voting shares approved for CSE listing on 6/29/21 under CSE: HELP

- Amalgamation closes pursuant to 12/3/20 agreement

- Resulting issuer completes name change 7/13/20 to Contakt World Technologies Corp.

**7/19/21      Trading Commences Under CSE: HELP**

## 10.     DESCRIPTION OF THE SECURITIES

### 10.1     General

(1)   On November 27, 2020, Contakt Parent Co. settled debt payable to Justin Beck through the issuance of 34,218 units having the same terms as the units described in Note (2) above.

(2)   Each unit is composed of one common share and one common share purchase warrant, with each warrant exercisable into one common share at $1.00 for a period of two (2) years from the date of issuance.

| Name | Class of Securities Held | Number of Securities Held | Type of Ownership | Percentage of Class[1] |
|---|---|---|---|---|
| Justin Beck | Compressed Shares | 45,496 [Equivalent to 4,549,600 Upon Conversion at 1:100] | Direct | 45.3% |
| | Subordinate Voting Shares | 4,549,609 | Direct | 12.8% |
| | Subordinate Voting Share Warrants @ $1.00 CAD Strike | 34,218 | Direct | NA |
| | Subordinate Voting Share Warrants Tier 1 Performance @ $.10 CAD Strike | 600,000 | Direct | NA |
| | Subordinate Voting Share Warrants Tier 2 Performance @ $.10 CAD Strike | 600,000 | Direct | NA |
| | Subordinate Voting Share Warrants Tier 3 Performance @ $.10 CAD Strike | 600,000 | Direct | NA |
| | Tier 4 Performance | [2.5% on Cross-Listing to Major Exchange] | Direct | NA |

<u>Subordinate Voting Shares (formerly common shares of the Company)</u>

| | |
|---|---|
| Right to Notice and Vote | Holders of Subordinate Voting Shares will be entitled to notice of and to attend at any meeting of the shareholders of the Resulting Issuer, except a meeting of which only holders of another particular class or series of shares of the Resulting Issuer will have the right to vote. At each such meeting, holders of Subordinate Voting Shares will be entitled to one vote in respect of each Subordinate Voting Share held. |
| Class Rights | As long as any Subordinate Voting Shares remain outstanding, the Resulting Issuer will not, without the consent of the holders of the Subordinate Voting Shares by separate special resolution, prejudice or interfere with any right attached to the Subordinate Voting Shares. Holders of Subordinate Voting Shares will not be entitled to a right of first refusal to subscribe for, purchase or receive any part of any issue of Subordinate Voting Shares, or bonds, debentures or other securities of the Resulting Issuer. |
| Dividends | Holders of Subordinate Voting Shares will be entitled to receive as and when declared by the directors of the Resulting Issuer, dividends in cash or property of the Resulting Issuer. No dividend will be declared or paid on the Subordinate Voting Shares unless the Resulting Issuer simultaneously declares or pays, as applicable, equivalent dividends (on an as-converted to Subordinate Voting Share basis) on the Compressed Shares. |
| Participation | In the event of the liquidation, dissolution or winding-up of the Resulting Issuer, whether voluntary or involuntary, or in the event of any other distribution of assets of the Resulting Issuer among its shareholders for the purpose of winding up its affairs, the holders of Subordinate Voting Shares will, subject to the prior rights of the holders of any shares of the Resulting Issuer ranking in priority to the Subordinate Voting Shares, be entitled to participate ratably along with all other holders of Subordinate Voting Shares and Compressed Shares (on an as-converted to Subordinate Voting Share basis). |
| Coattail Rights | The Founding Contakt Shareholders have entered into a coattail agreement respecting their Compressed Shares, which provides in effect that in the event that an offer is made to purchase Compressed Shares, and the offer is one which is required, pursuant to applicable securities legislation and regulations or the rules of a stock exchange, if any, on which the Compressed Shares are then listed, to be made to all or substantially all the holders of Compressed Shares in a province or territory of Canada to which the requirement applies (without taking into consideration any statutory or regulatory exemption from such obligation), such offer cannot be accepted by the holders of Compressed Shares unless an equivalent offer is made to the holders of Subordinate Voting Shares that: (i) offers a price per Subordinate Voting Share at least as high as the highest price per share paid or required to be paid pursuant to the take-over bid for the Compressed Shares (on an as-converted to Subordinate Voting Share basis); (ii) provides that the percentage of outstanding Subordinate Voting Shares to be taken up (exclusive of shares owned immediately prior to the offer by the offeror or persons acting jointly |

or in concert with the offeror) is at least as high as the percentage of outstanding Compressed Shares to be sold (exclusive of Compressed Shares owned immediately prior to the offer by the offeror and persons acting jointly or in concert with the offeror); has no condition attached other than the right not to take up and pay for Subordinate Voting Shares tendered if no shares are purchased pursuant to the offer for Compressed Shares; and is in all other material respects identical to the offer for Compressed Shares.

<u>Compressed Shares</u>

| | |
|---|---|
| Right to Notice and Vote | Holders of Compressed Shares will be entitled to notice of and to attend at any meeting of the shareholders of the Resulting Issuer, except a meeting of which only holders of another particular class or series of shares of the Resulting Issuer will have the right to vote. At each such meeting, holders of Compressed Shares will be entitled to one vote in respect of each Subordinate Voting Share into which such Compressed Share could then be converted (currently 100 votes per Compressed Share). |
| Class Rights | As long as any Compressed Shares remain outstanding, the Resulting Issuer will not, without the consent of the holders of the Compressed Shares by separate special resolution, prejudice or interfere with any right attached to the Compressed Shares. Holders of Compressed Shares will not be entitled to a right of first refusal to subscribe for, purchase or receive any part of any issue of Compressed Shares, or bonds, debentures or other securities of the Resulting Issuer. |
| Dividends | Holders of Compressed Shares will be entitled to receive as and when declared by the directors of the Resulting Issuer, dividends in cash or property of the Resulting Issuer. If a dividend is declared for the Subordinate Voting Shares, holders of the Compressed Shares shall be entitled to receive the same dividend with respect to each Subordinate Voting Share into which such Compressed Share could then be converted. |
| Participation | In the event of the liquidation, dissolution or winding-up of the Resulting Issuer, whether voluntary or involuntary, or in the event of any other distribution of assets of the Resulting Issuer among its shareholders for the purpose of winding up its affairs, the holders of Compressed Shares will, subject to the prior rights of the holders of any shares of the Resulting Issuer ranking in priority to the Compressed Shares, be entitled to participate ratably along with all other holders of Compressed Shares (on an as-converted to Subordinate Voting Share basis) and Subordinate Voting Shares. |
| Conversion | The Compressed Shares each have a restricted right to convert into 100 Subordinate Voting Shares, subject to adjustments for certain customary corporate changes. The ability to convert the Compressed Shares is subject to a restriction that the aggregate number of Subordinate Voting Shares and Compressed Shares held of record, directly or indirectly, by residents of the United States (as determined in accordance with Rules 3b-4 under the U.S. Exchange Act), may not exceed forty percent (40%) of the aggregate number of Subordinate Voting Shares |

Exhibit 21: 283
22-CV-01616-BAS-DDL

and Compressed Shares issued and outstanding after giving effect to such conversions and to a restriction on beneficial ownership of Subordinate Voting Shares exceeding certain levels. In addition, the Compressed Shares will be automatically converted into Subordinate Voting Shares in certain circumstances, including upon the registration of the Subordinate Voting Shares issuable upon conversion of all the Compressed Shares for resale under the U.S. Securities Act.

**CSE Escrow**

In connection with closing of the Transaction, all Subordinate Voting Shares and Compressed Shares held by Principals (as defined under NP 46-201 – Escrow for Initial Public Offerings) are subject to escrow in accordance with CSE Policy 8 – *Fundamental Changes & Changes of Business*. The aforementioned shares are subject to release from escrow over 36 months, with 10% of such shares released on the Listing Date and an additional 15% to be released every six months thereafter.

The following table sets forth details of the shares of the Resulting Issuer held in escrow:

| Designation of Class Held in Escrow | Number of Shares Held in Escrow | Percentage of Class[1] |
|---|---|---|
| Subordinate Voting Shares | 6,567,109 | 18.5% |
| Compressed Shares | 65,496 | 65.2% |

**Note:**

(1)   Percentages are respectively based on 35,448,359 Subordinate Voting Shares and 100,497 Compressed Shares issued and outstanding as of the date of this Listing Statement.

**Voluntary Pooling**

The Founding Contakt Shareholders have agreed pursuant to the Amalgamation Agreement to pool 10,049,659 of their Subordinate Voting Shares and their 100,497 Compressed Shares issued in connection with the Transaction under the Pooling Agreement. Under the terms of the Amalgamation Agreement, the Subordinate Voting Shares and Compressed Shares issued in connection with the Transaction are subject to resale restrictions pursuant to the Pooling Agreement and release therefrom as follows:

(a)   12.5% of such securities are exempt from the Pooling Agreement;

(b)   On ◆, 2021, being the date that is three (3) months from Closing, an additional 12.5% of such securities will released from the Pooling Agreement;

(c)   On ◆, 2021, being the date that is six (6) months from Closing, an additional 12.5% of such securities will released from the Pooling Agreement;

(d)   On ◆, 2021, being the date that is nine (9) months from Closing, an additional 12.5% of such securities will released from the Pooling Agreement;

(e)   On ◆, 2021, being the date that is twelve (12) months from Closing, an additional 12.5% of such securities will released from the Pooling Agreement;

(f) On ◈, 2021, being the date that is fifteen (15) months from Closing, an additional 12.5% of such securities will released from the Pooling Agreement;

(g) On ◈, 2021, being the date that is eighteen (18) months from Closing, an additional 12.5% of such securities will released from the Pooling Agreement; and

(h) On ◈, 2021, being the date that is twenty-one (21) months from Closing, the final 12.5% of such securities will released from the Pooling Agreement.

The following table sets forth details of the securities of the Resulting Issuer subject to the Pooling Agreement:

| Designation of Class | Number of Securities Subject to Pooling Agreement | Percentage of Class[1] |
|---|---|---|
| Subordinate Voting Shares | 10,049,659 | 28.4% |
| Compressed Shares | 100,497 | 100% |

Note:

(1) Percentages are respectively based on 35,448,359 Subordinate Voting Shares and 100,497 Compressed Shares issued and outstanding as of the date of this Listing Statement.

## 3901. Introduction to Tort Damages—Liability Established

If the [Court] found Justin Beck was harmed and that any one of the defendants':

The State Bar of California, or
Eli David Morgenstern, acting officially, or as a licensee of State Bar, or
Anand Kumar, acting officially, or as a licensee of State Bar, or
Joy Nunley, acting officially as a "Special Investigator" for State Bar, or
Any single public employee acting officially (DOES 1-30), or
Any single elected official acting officially (DOES 1-30), and

where any single act or series of acts in combination of any one or more of these persons':

1) Violation of any mandatory duty to Beck, and/or
2) Negligence (high culpability evidenced by understaffing), and/or
3) Negligence (violation of a reasonable standard of care), and/or
4) Dangerous condition of State Bar's premises, and/or
4) Taking or destruction of Beck's property, and/or
5) Intentional infliction of emotional distress

...was a substantial factor in causing the harm, you also must decide how much money will reasonably compensate Justin Beck for the harm. This compensation is called "damages."

The amount of damages must include an award for each item of harm that was caused by the wrongful official conduct of State Bar, even if the particular harm to Justin Beck could not have been anticipated.

Justin Beck does not have to prove the exact amount of damages that will provide reasonable compensation for the harm, but he claims that some damages are defined as the "maximum" someone would have paid at the time. However, you must not speculate or guess in awarding damages.

## 3902.  Economic and Noneconomic Damages

The damages claimed by Justin Beck for the harm caused by The State Bar of California fall into two categories called economic damages and noneconomic damages. You will be asked on the verdict form to state the two categories of damages separately.

## 3903.  Items of Economic Damage

The following are the specific items of economic damages claimed by Justin Beck:

**#1 Past and Future Lost Earnings for Beck**         (CACI 3903C)

**#2 Lost Earning Capacity for Beck**         (CACI 3903D)

**#3 Damage/Dest. To Property w/Special Value**   (CACI 3903L/K)

### 3903C.  Past and Future Lost Earnings (Economic Damage)

---

**#1 Past and Future lost earnings for Beck.**

To recover damages for past lost earnings, Justin Beck must prove the amount of income, earnings, salary, and benefits that he has lost to date.

To recover damages for past lost earnings, Justin Beck must prove the amount of income, earnings, salary, and benefits that he will be reasonably certain to lose in the future as a result of the injury.

Beck claims loss of past earnings are as follows:

$133,333 as CEO of Cultivation Technologies, Inc.

$325,000 as CEO of [No Company] from May 2019 – May 2020

$175,000 as CEO of Contakt World Technologies Corp.

Beck claims loss of future earnings are as follows:

$325,000 x 25 years = $8,125,000

Beck claims that this number should not be adjusted down because executive or CEO roles implicitly cause salary growth commensurate with the size of future companies, so this number, today, is less than "fair" if it already below average for the same role each year. For instance, Beck claims Salary.com shows "$460k-1.3M per year Chief Executive Officer" in "San Diego, CA." Beck claims the "median" in California overall shows "$889,292." Beck was born in 1980 and believes the loss will extend for 25-years for at least $325,000 in today's dollars each year.

Beck claims fair compensation for the loss of past earnings and future earnings to be:

<u>**$8,433,000 TOTAL PAST & FUTURE LOST EARNINGS**</u>

<u>**[Discrete of, and in Addition to, Lost Earning Capacity]**</u>

³

## 3903D. Lost Earning Capacity (Economic Damage)

#2. Lost Earning Capacity of Justin Beck, or the loss of Justin Beck's ability to earn certain money.

To recover damages for the loss of the ability to earn money as a result of the injury, Justin Beck must prove:

1. That it is reasonably certain that the injury that Justin Beck sustained will cause him to earn less  money in the future than he otherwise could have earned; and

2. The reasonable value of that loss to him.

In determining the reasonable value of the loss, compare what it is reasonably probable that Justin Beck could have earned without the injury to what he can still earn with the injury. Consider the career choices that Justin Beck would have had a reasonable probability of achieving. It is not necessary that he have a work history, although he was CEO of the last two companies that were subject of his injury.

Beck claims for lost earning capacity that he would have otherwise earned if not for one or more acts proven, as follows over 25-years as the absolute minimum (TOTAL):

$8,433,000 in bonuses based on 1X his salary each year of $325K

$2,108,250 in total employer matching to a 401(k) as an executive

$8,433,000 in board, advisory, or fees from other issuers (cash)

$8,433,000 in board, advisory, or fees from other issuers (stock)

Beck claims fair compensation for his lost earning capacity to be:

### $27,407,250 TOAL LOST EARNING CAPACITY
### [Discrete of, and in Addition to, Past and Future Lost Earnings]

### 3903L. Damage to Personal Property Having Special Value (Civ. Code, § 3355) (Economic Damage)

The value of, and unique value of, Justin Beck's personal property.

To recover damages for the unique value, Justin Beck must prove all of the following:

1.  That each item of personal property had some market value;

> CTI/Pubco Shares ($32,667,351)
>
> IRA Inherited from Mom/Grandma worth ~$1M
>
> 2921 Deer Hollow Way, Unit 314, Fairfax, VA 22031 Cash
>
> 9,500,000 Shares of CSE: HELP @ $.80 CAD Fair Market Value
>
> Scottsdale Insurance Co. Policy (Pers.) Capped at [$2M]
>
> Credit Score/Benefits/Etc.

2.  That the items each had unique value to Justin Beck; namely:

> As to the CTI/Pubco Shares, Beck claims unique value because the company was able to obtain approval to list on a senior exchange in its merger, and it had significant revenue growth month over month before September 14, 2018. Using only the fair market value of his 12.6% position without regard for other rights or customary compensation as CEO, Beck claims the fair market value of his shares to be $32,667,351.

> For this damaged property value, Beck claims $32,667,351.

> As to the IRA, the ~$1M value was sheltered from income tax or capital gains for about 25 years and had significant emotional value to Beck as familial inheritance from his mother and grandmother (an uneducated immigrant from Europe), and thus acts as another aggravator to Beck's severe emotional distress beyond the economic damages.

> For this damaged property value, Beck claims $5,000,000.

> As to the $365,000 proceeds from his Mother's condo sold on

April 8, 2018 used to support Beck and his family when he had only accruals for income, those funds were not subject to gains or tax. These proceeds had significant emotional value to Beck beyond those financial benefits, and act as another aggravator to Beck's severe emotional distress beyond the economic damages. Beck also used these proceeds so he could help take CTI public, and believed that the unique value of these proceeds enabled the Western Troy<>CTI merger and the fair market value of $3.87 per CTI share.

For this damaged property value, since it has unique value captured elsewhere, Beck claims only $365,000.

As to Contakt World Technologies Corp. shares, the $.775 CAD in value damaged were unique value to Beck, and the unique future value the company held – supported by its receipt of honorable mention for "World Changing Idea" from Fast Company and a "BIG" Innovation Award," and more that would further his career if not for his injuries (reasonably). After hosting a successful podcast with iHeartMedia that received a Webby Award nomination and (2) AVA Awards, Beck even had an opportunity in principal to host a new podcast featuring an "A-List" celebrity comedian as creative director through this company. This opportunity was lost due to damages to Contakt's stock in which Beck claims State Bar was at least a substantial factor. Where Beck had warrants @ $.10 CAD and a fair market value of $.80 CAD in March 2021, he previously surpassed similar metrics with CTI, which led to the CTI <> Western Troy merger. It is more than reasonable that this would have been earned but for the injuries sustained by Beck and damages to this property or business interest.

Despite the other forms of potential damages Beck could claim and may claim before judgment, for this damaged property value, Beck claims only $5,649,297 as being the $.80 CAD fair market value of the public securities held by Beck from March 2021 – July 2021 minus the $.025 CAD cost basis (and sell price, where State Bar was a substantial factor in the damages).

For this damaged property value, since it has unique value captured elsewhere, Beck claims only $5,649,297.

Where D&O insurance allows retention of premium talent within a Beck startup like CTI or Contakt to offset other risks – Beck's policy and insurability is now slandered in that it was fraudulently depleted without standing and through non-judicial acts. Beck claims this will actually impact his life and career in retaining talent for his companies forever. That's because it appears on the surface, despite the judicial findings in Beck's favor, that Beck did something wrong to warrant approximately

$1,700,000 in legal fees being paid, and depleted from his collateral source across at least six lawsuits (for instance). This, Beck claims, renders him a far greater risk than statistical mean, and he could not obtain a D&O policy for Contakt World Technologies Corp. which is already evidence of long-term pain and suffering, but also damage to any property upon which Beck's coverage may reasonably rely, which happens to be his area of expertise.

For this damaged property having special value, Beck claims $1,700,000 as being only the estimated legal fees paid, using his personal and startup's collateral source, plus the equivalent value of his CTI position.

For this damaged property having special value, Beck also claims $32,667,351 as being equivalent value to only one interest, or cumulative forms of interest and equivalent value of money, from one startup that Beck will be unable to realize.

3. That State Bar had notice of this unique value before and during the harm in January 2020 and again in March 2021. State Bar was specifically aware that fraudulent litigation (in violation of mandatory law) was unfairly and unlawfully depleting Beck's insurance policy and assets;

and/or

That one or more persons acting officially for The State Bar of California's conduct was intentional and wrongful, in that it least involved legal malice, including those acts described in G059766.

You must use your judgment to decide a reasonable amount based on the evidence and your common sense.

[Non-Economic Damages Follow]

## 3905. Items of Noneconomic Damage

The following are the specific items of noneconomic damages claimed by Justin Beck:

Mental Suffering and Emotional Distress     (CAC 3905A)
Extraordinary Relief     (GOV 814)

### 3905A.   Physical Pain, Mental Suffering, and Emotional Distress (Noneconomic Damage)

Beck claims to have experienced and suffered:

Mental suffering (past and future)

Loss of enjoyment of life (past and future)

Inconvenience (past and future)

Grief (past and future)

Anxiety (past and future)

Humiliation (past and future)

Emotional distress (past and future)

Violation of inalienable rights life, liberty and property (past and future)

No fixed standard exists for deciding the amount of these noneconomic damages [but Beck believes that cases typically range from 1X to 10X economic damages, with the middle to higher damage multiples reserved for the most severe or extreme of cases].

You must use your judgment to decide a reasonable amount based on the evidence and your common sense.

To recover for future mental suffering, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation, emotional distress, and disruption to inalienable rights, Justin Beck must prove that he is reasonably certain to suffer that harm.

For future mental suffering, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation, emotional distress, and disruption to inalienable rights, determine the amount in current dollars paid at the time of judgment that will compensate Justin Beck for future mental suffering, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation, emotional distress, and disruption to inalienable rights.

*New September 2003; Revised April 2008,*

Exhibit 21: 295
22-CV-01616-BAS-DDL

**GOV 814 (Relief Request of Court)**
**"Relief Other Than Money or Damages against" Public Entity,**
**Public Employees, and Elected Officials**

Beck claims to have proven that The State Bar of California is engaged in intentional acts of fraud, oppression, corruption, legal malice without regard for injury, and/or corruption subject to GOV 815.3 and GOV 815.6 that causes serious injury to members of the public.

Beck claims, as a matter of law, that The State Bar of California has a duty to protect him and the public codified by enactments and according to the express intent of legislature,

Beck claims to have proven that The State Bar of California lacks capacity as a matter of fact and law, because the issues identified by the California State Auditor in 2002 are materially similar to 2022 (if not worse, which Beck claims is a keystone of corruption and thereby good cause for extraordinary relief).

Beck claims to have evidenced that The State Bar of California, through its licensees including public employees or elected officials and persons acting in a managerial capacity for them, have engaged in and/or enabled conduct that meets the definition of "racketeering activity" (namely, 18 U.S.C. § § 1343 and 1960) or have used the proceeds of such activity to make investments that further the interests or control of persons unknown to the public. Beck claims to have evidenced that there are predicate and parallel acts meeting the definition of racketeering activity, thereby constituting a pattern.

Beck claims that the licensing, regulatory, and disciplinary functions of State Bar are injurious (not "protective") of the public, courts, and legal profession because the pattern of results, victims, and methods to cause injury continue and are an acute threat to continue to any person acting reasonably.

Beck claims that persons generally injured by State Bar or its public employees will not or cannot reasonably obtain counsel because the lawyers licensed by the State Bar are subject to acts of fraud, oppression, legal malice without regard for injury, and corruption, too. Put simply, Beck claims that few, if any, licensees of State Bar will sue State Bar, even though it is expressly subject to the liability sections of Government Claims Act.

Exhibit 21: 296
22-CV-01616-BAS-DDL

Beck claims to have proven that The State Bar of California's deliberate, selective use of its licensing, regulatory, and disciplinary functions evidence an acute risk does indeed exist to any attorney that takes these cases.

Beck seeks only provisional licensure from State Bar or the Court to pursue just claims that were denied under Government Claims Act.

Beck claims the Court can and should reasonably grant him provisional licensure to practice law under its inherent powers under Cal. Cod. Civ. Proc. 128 and BPC 6001 on the condition that he have at least one supervisory licensee on the pleadings. Beck claims that this will further satisfy State Bar's mission to increase diversity by allowing him to practice on his own after five years under supervision. He claims this form of program generally will further BPC 6001.1 with decisional law in a way that is more practical than funding The State Bar of California, or asking members of the public to prepare a Supreme Court case predicated upon "specific violations" that require disposition in the first instance ("*I. RE: Walker*")

**[END DRAFT CACI JURY]**