# EXHIBIT 33

Lawrence W. Horwitz, SBN 122640
**LOCKETT + HORWITZ, PC**
2 South Pointe, Ste. 275
Lake Forest, CA 90
Telephone: 949-540-6540
Facsimile: 949-540-6578
Email: lhorwitz@lhlaw.com

Attorneys for Plaintiff,
Cultivation Technologies, Inc.

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ORANGE

| | |
|---|---|
| CULTIVATION TECHNOLOGIES, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>JAMES DUFFY, an individual; AMY COOPER, an individual; CATANZARITE LAW CORPORATION, a California corporation, KENNETH CATAZANZARITE, an individual, and DOES 1 through 20,<br><br>Defendants. | CASE NO. 30-2019-01120155-CU-BT-CJC<br><br>*[Assigned for all purposes to Judge Deborah Servino*<br><br>**DECLARATION OF REX LOESBY** |

I, Rex Loesby, make this declaration based on my personal knowledge of each fact set forth below and, if called as a witness, I could and would testify competently and truthfully to those matters before the Court. I hereby declare as follows:

1. During the fourth quarter of 2018 and the first quarter of 2019 I was the duly authorized and elected Chief Executive Officer of Western Troy Capital Resources, Inc.

("Western Troy"), which at that time traded under the symbol WRY on the Canadian Venture Exchange. At that time Western Troy had ceased all its material business operations and was searching for a merger partner to merge an operating business into Western Troy.

2. As a result of the federal prohibition against cannabis operations in the United States, a number of American companies were seeking merger partners on the Canadian stock exchanges. During the fourth quarter of 2018 we began detailed merger discussions with a California company by the name of Cultivation Technologies, Inc. ("CTI"). We had examined a number of merger partners, and CTI, relative to these other parties, had material traction in the marketplace and appeared well financed.

3. Upon completion of our initial due diligence we negotiated a Letter of Intent to complete what is referred to as a reverse takeover transaction ("RTO"), meaning that an operating company (in this case CTI) would receive a controlling interest in Western Troy and begin trading on the CSE after Western Troy moved its listing to that exchange. We negotiated with who we understood to be the management team of CTI which included Justin Beck and Richard Probst.

4. On February 20, 2019, CTI and Western Troy, acting through their respective Boards of Directors, executed a Letter of Intent for CTI to complete the RTO with Western Troy ("LOI"). Attached hereto as **Exhibit A** is a true and correct copy of the LOI. Western Troy publicly announced the fully executed Letter of Intent on its website on February 26, 2019. This transaction was not unusual as many American companies were looking to circumvent the severe capital raising constraints associated with the American capital markets for the more supportive environment in Canada. Some of the largest transactions to that date in the cannabis

industry were done using this method, at valuations of many hundreds of millions with some over $1 billion USD.

5. The CTI-Western Troy merger would have caused CTI shares to be listed publicly on the CSE thereby providing liquidity for CTI shareholders looking to sell their CTI shares and would have enhanced CTI's ability to raise capital by opening up the Canadian capital markets (which had proven extremely friendly to American cannabis companies). We estimated at the time that upon completion of the contemplated merger, CTI's potential valuation ranged from $100,000,000.00 and $240,000,000.00 (which was at the low end of what these sorts of transactions demanded in the marketplace).

6. Up to this point, we had found CTI's management to be responsive, fully capable of continuing with CTI's operations, completing the proposed merger and then supporting the CTI stock price with improved operations after the merger. The relationship with CTI had been very constructive and all concerned on the Western Troy side were very excited about CTI becoming a public company.

7. The same day that Western Troy issued its press release announcing the Letter of Intent, Western Troy received an email communication from Kenneth Catanzarite, a California attorney we had had no previous contact with purporting to represent CTI. Attached hereto as **Exhibit B** is a true and correct copy of that email.

8. The email stated in summary that we had not been dealing with the duly authorized board of CTI, but that in fact Catanzarite had been authorized by the duly elected board (through what he claimed was a written consent dated January 23, 2019) to communicate directly with Western Troy. This email indicated that CTI did not agree to the RTO and that in fact the LOI had been executed by parties who did not have authority to bind CTI. Catanzarite

then listed his claimed management of CTI and further indicated that he had investigated Western Troy and that Western Troy had no assets. This statement, that Western Troy had no assets, certainly demonstrated that Catanzarite had no idea why the LOI was executed: the entire point was for a shell public company with no assets (such as Western Troy) to merge with an operating company (such as CTI) to "take CTI public".

9. Upon receiving Catanzarite's email, we immediately contacted Messrs. Beck and Probst (the CTI representatives we had been dealing with) attempting to ascertain what exactly was going on. Beck and Probst assured us (and we believed them) that they were the properly authorized representatives of CTI.

10. Prior to receiving these communications from Catanzarite Western Troy had every intention of completing the proposed merger. It was the type of transaction being done throughout Canada (American cannabis companies merging into CSE public shells) and we viewed CTI as a very valuable merger partner.

11. Upon receiving the Catanzarite communications, Western Troy began to reconsider its decision to merge with CTI. As previously indicated there were many potential merger partners and while we believed CTI was a very good opportunity, it made absolutely no sense to complete a merger where immediate litigation was apparently the result. This was on top of the confusion associated with authority, board composition, attorney representation etc.

12. As a direct result of Catanzarite's claims CTI and Western Troy jointly determined that they could not fulfill conditions of the Letter of Intent and decided to terminate the venture and CTI paid the $30,000 breakup fee as called for in the Letter of Intent. The transaction never occurred. It is not unusual for a merger partner such as CTI to pay $1 million USD or even more for what is referred to as a "clean public shell" trading on the CSE. Clean

refers to no assets, no liabilities and the ability of the merger partner to quickly commence trading; Western Troy was certainly a clean public shell. By merging into the public shell, it is our experience that a company like CTI would receive at least three benefits:

 a. Liquidity for its shareholders by allowing CTI's shareholders to sell their stock in the stock market;

 b. Improved valuation; as a result of public status generally companies are valued with a substantial premium which in the cannabis industry, at the time of the LOI, meant many times the gross revenues of the operating company; in this case we estimate that CTI would have commenced trading at a valuation of at least $100 million; and

 c. Improved potential for capital raising; not only will capital be raised at a higher valuation (and therefore less of the company would be sold), but many investors and investment funds prefer investing in a public company as this then provides them with a predictable ability to cash out of their investment according to their own time requirements.

13. CTI and its shareholders never received any of these benefits as a direct result of the communications from Attorney Catanzarite.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: 9/27/21

Rex Loesby, Declarant

# EXHIBIT A

EXHIBIT A
*Cultivation Technologies, Inc. v. James Duffy, et al. OCSC Case No. 30-2019-01120155*

Exhibit #33: 007
22-CV-01616-BAS-DDL

## LETTER OF INTENT

WHEREAS, Cultivation Technologies, Inc. ("CTI" or a "Party"), including its operating subsidiaries, is engaged in manufacturing and distribution in the commercial cannabis industry in California;

WHEREAS, Western Troy Capital Resources, Inc. ("WRY" or a "Party," and together with CTI the "Parties"), including its operating subsidiaries, is engaged in mineral exploration and mine development, as well as to seek business combinations that will benefit its shareholders;

WHEREAS, CTI and WRY wish to finalize a reverse takeover transaction ("RTO") whereby CTI will become the surviving issuer under a new name ("Merged Company") and list on the Aequitas NEO Exchange ("NEO").

NOW, THEREFORE, by affixing their signature hereto as of the February 6, 2019 ("Effective Date"), the Parties declare their intent to enter into a binding definitive agreement ("Definitive Agreement") on or before March 15, 2019 according to the material terms and conditions contained within this letter of intent ("LOI"). This LOI is further intended to govern the parties' conduct until such time as the parties execute a binding Definitive Agreement or this LOI has been terminated in accordance with its terms. This LOI shall be superseded in its entirety by the Definitive Agreement.

### 1. NAME OF MERGED COMPANY

At closing of the RTO, and unless otherwise agreed by the Parties within the Definitive Agreement, the Merged Company and surviving issuer shall be named "SCARAB CO.", or such other name as agreed to by the parties and acceptable to the NEO.



### 2. PRE-RTO SHARE STRUCTURE AND SHARE STRUCTURE OF MERGED COMPANY

Prior to the RTO, CTI has:

- 32,730,569 common shares issued and outstanding
- 18,750,000 preferred shares issued and outstanding
- 800,000 common options outstanding at a strike price of $.01
- 4,063,500 common options outstanding at a strike price of $1.00
- 932,119 common warrants outstanding at a strike price of $5.00
- 500,000 common warrants outstanding at a strike price of $.25
- 833,333 common warrants outstanding at a strike price of $.05

Prior to the RTO, WRY has:

- 8,182,994 common shares issued and outstanding
- 400,000 common options issued and outstanding at a strike price of **C$0.25**
- 200,000 common warrants issued and outstanding at a strike price of **C$0.25**

As consideration for the RTO, and contingent to signing a full release of claims, CTI shareholders shall exchange on a one-for-one basis, each common share and preferred share in CTI for common shares in the Merged Company. CTI warrant holders shall receive one warrant in the Merged Company on substantially even terms and conditions as the warrants issued by CTI, in exchange for every warrant held in CTI. The Parties shall mutually agree on the conversion or exchange of options issued by CTI. The 200,000 existing WRY warrants shall expire in December 9, 2019. The 400,000 WRY options held by current WRY board members shall expire two (2) years following the date in which the Merged Company commences trading on any exchange.

After completion of the RTO, the Board of the Merged Company shall create a new pool of stock options which will not exceed ten percent (10%) of the issued and outstanding shares of the Merged Company ("Option Pool"), at a strike price to be defined by the Board and in accordance with the rules of the NEO. WRY currently is subject to its Stock Option Plan as required by the TSX Venture Exchange ("TSXV") and it is intended that the Merged Company will assume such Stock Option Plan. It is anticipated that the special shareholder meeting held to approve the RTO and the delisting from the TSXV, if required by applicable securities laws and NEO rules, will be combined with WRY's Annual General Meeting of Shareholders ("**AGM**") and any Stock Option Plan required by the NEO will also be presented for shareholder approval at the AGM.

So as to meet requirements necessary to meet Foreign Private Issuer ("FPI") designation, the Definitive Agreement shall define voting rights associated with certain shareholders, and in the interest of shareholders of the Merged Company, the Merged Company shall achieve and maintain FPI designation on a best-efforts basis.

### 3. POST-RTO SHAREHOLDER SALE PROVISIONS

The Parties agree that it is in the interest of each Party and their respective shareholders that the Merged Company structure allows for the orderly formation of a public market for the shares in the Merged Company.

Within the Definitive Agreement, the Parties shall agree upon lock-up and escrow, and/or drip provisions which legally moderate the sale of certain shares into the public market. These provisions shall apply to all shares in CTI which feature a known cost-basis less than $1 per share (the "CTI Shareholder Drip"). The CTI Shareholder Drip shall be communicated within, and approved by, each respective shareholder of CTI receiving shares in the Merged Company as part of the RTO approval and contingent to receiving shares in the Merged Company.

Within the Definitive Agreement, the Parties shall agree upon lock-up, escrow, and/or drip provisions which legally moderate the sale of shares into the public market. These provisions shall apply to at least all shares in WRY which are held by WRY shareholders who are present management or members of the WRY board (the "WRY Shareholder Drip"). WRY shall seek approvals from other WRY shareholders on a best-efforts basis.

Both the CTI Shareholder Drip and the WRY Shareholder Drip shall utilize some combination of third-party escrow and release of shares in the Merged Company by the Merged Company transfer agent.

No provisions detailed in this section shall apply to shares issued in the Bridge or the RTO Financing as defined herein.

### 4. EXCHANGE FOR THE MERGED COMPANY

The Merged Company shall list on the NEO, unless such listing is not approved by the NEO for any reason, in which case the Merged Company will apply to list on the Canadian Securities Exchange ("CSE"). The Merged Company may seek any additional listing in the United States or abroad which provides additional liquidity or capital resources to the Merged Company.

### 5. BOARD OF DIRECTORS

The Parties shall agree upon the initial composition of the board of directors ("Board") of the Merged Company within the Definitive Agreement. The Board shall be comprised of up to seven (7) members, with no less than two (2) qualifying as independents under applicable listing regulations.

WRY shall have the right, but not the obligation, to assign one (1) board member for a term of no less than twelve (12) months, with the objective of representing the interests of the existing shareholders of WRY within the Merged Company. Notwithstanding the foregoing, the Board shall at all times meet the listing requirements of either the NEO or CSE, as applicable.

### 6. MANAGEMENT

The Board shall define the management team of the Merged Company, and shall create a committee to govern compensation, benefits, and time commitments of management ("Compensation Committee"). The Compensation Committee shall include no less than one (1) independent director.

### 7. PRE-RTO FEES & EXPENSES ASSOCIATED WITH RTO

Each Party shall be responsible for its own costs and expenses until such time that the RTO is completed, unless such costs are paid through the Bridge as defined herein, or unless the RTO is not completed prior to May 31, 2019 ("Targeted Completion Date").

For every additional month required to close the RTO after the Targeted Completion Date, CTI agrees to provide WRY with $10,000 USD in working capital ("WRY Burn") on the 1st of each month until such time that the RTO is closed.

## 8. PRE-RTO FINANCING & RTO FINANCING

The Parties shall agree upon an interim financing vehicle which pays for both Party's costs and expenses associated with the RTO (the "Bridge"). The Bridge shall be used exclusively for the payment of legal, accounting, audit, banking, investor relations, consulting, exchange fees, the WRY Burn, or equipment for CTI.

CTI intends to complete an equity or convertible debt financing of up to $5,000,000 USD either prior to, upon closing, or within ninety (90) days of closing the RTO (the "RTO Financing") so that the Merged Company has sufficient working capital to meet or exceed either NEO or CSE listing requirements. Should the RTO Financing be completed before the RTO is finalized, every share issued pursuant to the RTO Financing will be exchanged for one share of the resulting issuer at closing of the RTO, thereby increasing the shares outlined within Section 2 of this LOI. The Parties shall agree to the terms of the RTO Financing.

The Definitive Agreement shall grant the Parties the exclusive right to define the RTO Financing terms without additional shareholder approval. As the terms and conditions associated with the RTO Financing may differ from the terms and conditions associated with other financings conducted by the Parties, the Pre-RTO Financing may be offered to all shareholders of the Merged Company ("Rights Offering"), the mechanics of which shall be outlined within the Definitive Agreement based upon the advice of counsel.

## 9. ASSETS & LIABILITIES OF PARTIES

The Merged Company shall absorb all assets and liabilities of CTI and WRY as part of the RTO.

## 10. CONDITIONS PRECEDENT

Closing of the RTO is subject to the following conditions, which shall be expanded within the Definitive Agreement:

(1) Execution of the Definitive Agreement;

(2) Review and approval of the RTO by the Board of Directors of each Party;

(3) Reduction or elimination of liabilities of CTI by way of long-term payment arrangements or conversion into shares of Merged Company with one share issued for each $1 outstanding at close of RTO;

(4) Requisite shareholder approval of each Party for the RTO and related matters;

(5) Full release of claims from CTI shareholders who receive shares in Merged Company;

(6) Settlement of all outstanding derivative actions against CTI, with no further material legal complaints filed against either CTI or WRY prior to closing of the RTO;

(7) Review and approval of the TSX Venture, NEO or the CSE exchanges as required and all other regulatory bodies having jurisdiction in connection with the RTO;

(8) Satisfactory completion of due diligence by each Party, acting reasonably, to be completed on or before March 15, 2019; and

(9) Binding amendments to the structure of CTI's agreement(s) with FinCanna Capital Corp. ("FinCanna") before the expiration of the FinCanna Negotiation Period as defined herein, which amendments shall provide not less than the following, in all instances as approved by FinCanna, CTI, and WRY:

   a. Complete clarity concerning FinCanna's total participation in the Merged Company in all material respects ("FinCanna Interest");

   b. Removal of all negative covenants which may impede the Merged Company's ability to operate, or attract the Bridge, RTO Financing, future financing, or strategic partners;

   c. Flexibility for CTI or the Merged Company, at their sole discretion, to amend the characterization of the FinCanna Interest on CTI or the Merged Company's balance sheet with the mutual objectives of meeting listing requirements of NEO or CSE, and attracting future financing;

## 11. INVESTMENT BANKING FEES

CTI hereby discloses that the RTO and RTO Financing may be subject to transaction fees payable to DelMorgan & Co. of Santa Monica, California ("DelMorgan"). Any such fees and warrants shall be payable at closing of the RTO, and shall impact the share structure outlined in Section 2 of this LOI. The fee structure and role of DelMorgan will be included within the Definitive Agreement.

## 12. BREAK-UP FEE PRIOR TO EXECUTION OF DEFINITIVE AGREEMENT

CTI shall have until February 20, 2019 to document binding provisions with FinCanna to restructure the relationship with CTI and FinCanna in a matter satisfactory to CTI, FinCanna, and WRY as per Section 10(9) of this LOI ("FinCanna Negotiation Period"). After the FinCanna Negotiation Period, the Parties hereby agree to negotiate in good faith and finalize the Definitive Agreement prior to March 15, 2019, or be subject to a penalty of $30,000 USD ("Breakup Fee").

Should either Party withdraw from this LOI or elect not to execute the Definitive Agreement for any reason after the FinCanna Negotiation Period, the Breakup Fee shall be payable by the terminating Party. Upon complete execution of the Definitive Agreement this provision and the Breakup Fee shall be of no force or effect.

### 13. LOAN BY CTI UPON EXECUTION OF DEFINITIVE AGREEMENT

Upon execution of the Definitive Agreement and after approval by the board of directors of both CTI and the board of directors of WRY of the Definitive Agreement, CTI hereby agrees to provide WRY a loan of thirty-thousand dollars ($30,000 USD) (the "RTO Loan"). In the event that CTI either terminates the Definitive Agreement, or if the RTO does not close before May 31, 2019 ("Loan Deadline Date"), the RTO Loan shall be forgiven by CTI. The Parties may agree to extend the Loan Deadline Date. The RTO Loan shall only be forgiven if CTI is responsible for the termination of the Definitive Agreement by not meeting conditions precedent set forth in Section 10 of this LOI by the Deadline Date, or in the event of outright termination by CTI for any other reason. The terms and conditions of the RTO Loan shall be completely set forth in a promissory note executed in connection with the Definitive Agreement.

### 14. GOVERNING LAW

This LOI shall be governed by and construed in the accordance with the laws of the State of California without regard for conflict of law principles.

### 15. DISPUTES

In the event of a dispute related to or arising from the terms of this LOI, which cannot first be resolved through mediation, such dispute shall be resolved through binding arbitration before a single arbitrator mutual chosen by the parties from JAMS located in Orange County, California. The cost of the arbitration proceeding and any proceeding in court to confirm or to vacate any arbitration award, or any other court action as applicable, including, without limitation, reasonable attorneys' fees and costs, shall be borne by the unsuccessful party, as determined by the arbitrator, and shall be awarded as part of the arbitrator's award. It is specifically understood and agreed that any party may enforce any award rendered pursuant to the arbitration provisions of this Section by bringing suit in any court of competent jurisdiction. This agreement to arbitrate shall be specifically enforceable. The Parties agree that the arbitrator shall have authority to grant injunctive or other forms of equitable relief to any party. This Section shall survive the termination or cancellation of this LOI. Each party shall pay its own proportionate share of arbitrator fees and expenses. The arbitrator[s] shall be entitled to award the foregoing arbitration and administrative fees and expenses as damages in his/her discretion. If a party fails to submit the fees specified by JAMS, such party may not participate or continue to participate in the arbitration proceedings. The arbitrator shall deem such party in default as if such party were in default in a court of law. Default judgment may be entered against such party.

**16. CONFIDENTIALITY**

The Parties acknowledge and confirm that they are bound by the terms of a certain non-disclosure and confidentiality agreement entered into between WRY and CTI (the "Confidentiality Agreement") concurrently with the execution of this LOI. If the Definitive Agreement is not executed by the Deadline Date, or if this LOI is otherwise terminated, all documents, if any, of a confidential nature, delivered by one Party to another Party, or to their respective representatives, and copies thereof, will be immediately returned to the Party that supplied such confidential documentation.

**17. OTHER**

**17.1 Publicity.** WRY and CTI shall not, without the prior written consent of the other party, make any public announcement concerning the nature, existence or content of this LOI, the transactions contemplated herein, the content and status of any discussions between the Parties, or any other documents or communications concerning the RTO, including the Confidentiality Agreement, unless such disclosure is required by applicable law or stock exchange rules or policies (in which case the party so advised will promptly notify the other party).

**17.2 Severability.** If any part of this LOI is declared or held invalid for any reason, such invalidity will not affect the validity of the remainder which shall continue in force and effect and be construed as if this LOI had been executed without such invalid portion and intent of the Parties is that this LOI would been signed without reference to any portion of which may, for any reason, be declared or held invalid.

**17.3 Good Faith.** From and after the date of this LOI, the Parties shall negotiate in a timely manner and in good faith to settle terms of the Definitive Agreement. Such Definitive Agreement shall contain normal and usual representations, warranties, covenants and conditions as applicable to similar commercial transactions in Canada.

**17.4 Final Agreement; Amendment.** This LOI terminates and supersedes all prior understandings or agreements between the parties regarding the transactions contemplated herein. This LOI may only be modified or amended by further writing that is duly executed by all Parties hereto.

**17.5 Termination** This LOI shall terminate: (i) upon mutual agreement in writing of all the parties hereto; (ii) upon execution of the Definitive Agreement; (iii) upon notice by a party hereto of termination of this LOI due to a breach of the terms of this LOI by the other party hereto, provided such breach has not been cured to the reasonable satisfaction of the other party; (iv) upon written notice by one party to the other party that on having completed its due diligence review in good faith, the terminating party is not prepared to complete the RTO as a result of its due diligence review, as provided in paragraph 12 (in each case, a "Termination Date").

**17.6    Binding Provisions.** It is the parties' intention that paragraphs 7, 12, 14, 15, 16 and 17 shall be legally binding on the parties when they or their representatives have executed this LOI or an instrument expressing the parties' wish to be bound hereby, the consideration for which shall be the mutual covenants of the parties contained herein. The other provisions of this LOI are not intended to be legally binding. The invalidity or unenforceability of any particular provision of this LOI shall not affect or limit the validity or enforceability of the remaining provisions of this letter agreement.

**17.6    Counterparts and Electronic Signatures.** This LOI may be executed in counterparts, each of which shall be deemed an original, but all of which shall together constitute one and the same instrument. The parties agree that this LOI may be electronically signed and that electronic signatures appearing on this LOI are the same as handwritten signatures for the purposes of validity, enforceability and admissibility. A signature of a party transmitted electronically, including, but not limited to email or facsimile, shall be as valid and as binding on the signer as an original signature.

By affixing their signature hereto, the Parties hereby agree to these terms and conditions, with the intention of finalizing the RTO as defined by the Definitive Agreement.

**AGREED AND ACCEPTED**

**For CTI**

By: _Justin Beck_ (DocuSigned)

Name: Justin Beck

Title (if applicable): CEO & President

**For WRY**

By: _Rex Loesby_ (DocuSigned)

Name: Rex Loesby

Title (if applicable): CEO