# EXHIBIT
# 34

Exhibit #34: 001
22-CV-01616-BAS-DDL



# *The State Bar of California's Attorney Discipline Process*

Weak Policies Limit Its Ability to Protect the
Public From Attorney Misconduct

*April 2022*

REPORT 2022-030



22-CV-01616-BAS-DDL

 **CALIFORNIA STATE AUDITOR**
621 Capitol Mall, Suite 1200 | Sacramento | CA | 95814

 **916.445.0255** | TTY **916.445.0033**

 For complaints of state employee misconduct,
contact us through the **Whistleblower Hotline:**
**1.800.952.5665**

*Don't want to miss any of our reports? Subscribe to our email list at* 

*For questions regarding the contents of this report, please contact our Public Affairs Office at* 916.445.0255
This report is also available online at www.auditor.ca.gov | Alternative format reports available upon request | Permission is granted to reproduce reports

**Michael S. Tilden** *Acting State Auditor*



April 14, 2022
**2022-030**

The Governor of California
President pro Tempore of the Senate
Speaker of the Assembly
State Capitol
Sacramento, California 95814

Dear Governor and Legislative Leaders:

The State Bar of California (State Bar) is responsible for protecting the public from attorneys who fail to fulfill their professional duties, and it works to meet this obligation by administering a disciplinary system that investigates and prosecutes complaints. However, our audit of the State Bar found that it failed to effectively deter or prevent some attorneys from repeatedly violating professional standards.

We found that the State Bar prematurely closed some cases that warranted further investigation and potential discipline. We reviewed files for one attorney who was the subject of 165 complaints over seven years, many of which the State Bar dismissed outright or closed after sending private letters to the attorney. Although the volume of complaints against the attorney has increased over time, the State Bar has imposed no discipline, and the attorney maintains an active license. The State Bar dismisses about 10 percent of all complaints using nonpublic measures such as private letters, which did not deter some attorneys we reviewed from continuing to engage in similar misconduct.

The State Bar failed to adequately investigate some attorneys, despite lengthy patterns of complaints against them. In one example, it closed multiple complaints alleging that an attorney failed to pay clients their settlement funds. When the State Bar finally examined the attorney's bank records, it found that the attorney had misappropriated nearly $41,000 from several clients. In another example, the State Bar closed 87 complaints spanning 20 years before it sought disbarment of an attorney due to a federal conviction for money laundering. Had the State Bar taken the pattern of complaints into account when deciding whether to request additional evidence, it might have discovered the misconduct sooner and mitigated harm to clients.

Finally, the State Bar has not consistently identified or addressed the conflicts of interest that exist between its own staff members and the attorneys they investigate. In more than one-third of the cases we reviewed, the State Bar did not document its consideration of conflicts before it closed these cases.

To remedy these weaknesses, the State Bar needs to make significant improvements to the safeguards that help ensure its staff conduct thorough investigations, and the Legislature should take additional steps to ensure the State Bar's compliance with its revised policies and procedures.

Respectfully submitted,

*Michael Til*

MICHAEL S. TILDEN, CPA
Acting California State Auditor

Exhibit #84-004
22-CV-01616-BAS-DDL

iv   California State Auditor Report 2022-030
April 2022

Exhibit #34: 005
22-CV-01616-BAS-DDL

# Contents

Summary                                                                          1

Recommendations                                                                  5

Introduction                                                                     9

**Audit Results**
Weaknesses in the State Bar's Attorney Discipline System Have Resulted
in Some Attorneys Not Being Held Accountable for Misconduct                      13

The State Bar Failed to Accurately Track or Document Its Consideration
of Some Staff Members' Potential Conflicts of Interest                           26

The State Bar's Weak Safeguards Have Hampered Its Ability to Prevent
Repeated Client Trust Account Violations                                         27

Weaknesses in the State Bar's Monitoring of Its Attorney Discipline
System Limit the Independence of That Monitoring                                 36

**Appendix A**
Demographic Data Pertaining to Complaints Against Attorneys                      43

**Appendix B**
Scope and Methodology                                                            51

**Response to the Audit**
The State Bar of California                                                      53

California State Auditor's Comments on the Response From
the State Bar of California                                                      65

Exhibit #34: 007
22-CV-01616-BAS-DDL

Case 3:22-cv-01616-AGS-DDL   Document 10-35   Filed 01/09/23   PageID.1377   Page 8 of 76

# Summary

## Results in Brief

Attorneys hold significant responsibility as representatives and advisers of their clients. Clients often seek an attorney during times of crisis when they are in a particularly vulnerable situation. To protect the public from attorneys who fail to fulfill their professional responsibilities competently, the State Bar of California (State Bar) administers a disciplinary system that investigates and prosecutes complaints of professional misconduct against the more than 250,000 lawyers licensed in California. After investigating complaints, it may bring a case to the State Bar Court of California seeking discipline against an attorney. A case may be closed for reasons such as insufficient evidence; it may be resolved through a nondisciplinary measure, such as a warning letter; or it may result in discipline. To ensure that complaints of attorney misconduct are reviewed consistently, the State Bar establishes policies and processes for its staff to follow.

The State Bar closes many cases without notice to the public through certain methods, such as warning letters—which we describe as *nonpublic measures*—but it lacks clear policies on when staff should use these nonpublic measures. Cases that are confidential and not made public may not deter attorney misconduct because current and potential clients cannot find out about the behavior. Similarly, the State Bar lacks clear policies on what its staff should do when a complainant withdraws from a case, which can result in cases being closed without determining whether misconduct occurred. For example, we identified an attorney for whom the State Bar closed four cases when the clients withdrew their complaints. These cases demonstrated that the State Bar knew that multiple clients had similar complaints about the attorney not promptly distributing funds to which the clients were entitled. Had the State Bar investigated these cases, it might have found sufficient grounds for discipline and thus might have prevented further harm to the attorney's clients.

The State Bar does not proactively seek out information regarding disciplinary actions against attorneys in other jurisdictions; instead it relies on the attorneys themselves or the other jurisdictions to report the discipline to the State Bar. However, we found several examples of discipline imposed by other jurisdictions that were not communicated to the State Bar for one year or more. The American Bar Association maintains a National Lawyer Regulatory Data Bank (data bank) of discipline imposed in other jurisdictions, but the State Bar has not used it on any regular basis to proactively identify California-licensed attorneys disciplined in other jurisdictions, thereby increasing the risk that attorneys who have committed

*Audit Highlights . . .*

*Our audit of the State Bar's attorney discipline process found that it failed to effectively prevent attorneys from repeatedly violating professional standards.*

» *The State Bar prematurely closed some cases that may have warranted further investigation and potential discipline.*

» *It lacks clear policies on the use of nonpublic measures for closing complaints.*

  • *It dismissed many investigations by nonpublic measures, such as private warning letters to attorneys.*

» *It did not adequately investigate some attorneys with lengthy patterns of complaints.*

  • *It closed multiple complaints alleging that an attorney failed to pay clients their settlement funds because the clients withdrew their complaints, which allowed the attorney to continue misappropriating client funds.*

» *It has not consistently identified or addressed the conflicts of interest that may exist between its own staff members and the attorneys they investigate.*

  • *In more than one-third of the cases we reviewed, the State Bar did not document its consideration of conflicts before it closed complaint cases.*

» *These issues are illustrated in the State Bar's handling of client trust account violations, in which it repeatedly used nonpublic measures to close complaints.*

Exhibit #34: 008
22-CV-01616-BAS-DDL

misconduct in other jurisdictions will continue to practice in California. Further, the State Bar's ability to analyze patterns of similar complaints is hampered because its case management system has 672 types of allegations but does not group these complaints into similar categories. Without more general categories of allegations, it can be difficult for State Bar staff to identify patterns of complaints alleging similar behavior.

Additionally, the State Bar requires its employees to complete an annual questionnaire in which they disclose personal, financial, and professional relationships they have with licensed California attorneys. However, in 11 of 30 cases we reviewed, the State Bar did not document its consideration of conflicts of interest. It is critical that the State Bar objectively assess and document its consideration of conflicts of interest when closing a case, particularly at the intake stage. The chief trial counsel agreed with our findings and indicated that management of conflicts of interest is an area where the State Bar needs much improvement. He further noted that conflict-of-interest information has not been consistently updated in its current case management system, and he is working with his staff to correct the issue.

The issues we identified are illustrated in the State Bar's handling of many complaints related to client trust accounts. These accounts hold funds paid to attorneys on behalf of a client, such as an advance fee for future services or funds received as the result of a settlement. Our review identified that the State Bar closed many client trust account complaints using nonpublic measures, sometimes without even notifying the attorney about the complaint, and that an attorney's prior history of allegations did not appear to affect the State Bar's decision to close certain client trust account cases. For example, for one attorney we reviewed, the State Bar closed 87 complaints spanning 20 years, some through nonpublic measures and some through a policy that allowed it to close certain cases without contacting the attorney for additional information because the monetary amounts involved were relatively low (a *de minimis* closing). However, the State Bar eventually sought disbarment based on this attorney's conviction in federal court for money laundering through client trust accounts.

Finally, weaknesses in the State Bar's monitoring processes diminish the value of those processes in ensuring that it is closing attorney discipline cases appropriately. It closes the majority of cases without discipline. Although it allows complainants to appeal its decisions to close complaints, relatively few complainants do so. Thus, it appears that individuals may need additional assistance in filing complaints and appeals. One option for assisting complainants with these actions would be to establish an independent ombudsperson for attorney discipline. Moreover, the State Bar uses an external

Exhibit #34: 009
22-CV-01616-BAS-DDL

reviewer to conduct a semiannual review of a selection of its closed cases to identify errors and areas for staff improvement. However, several flaws in the design of the external review process limit its independence, such as not alternating among different reviewers; having the reviewer submit its report to State Bar management instead of directly to the Board of Trustees of the State Bar; and not having the external reviewer select cases for review. All of these factors increase the risk that the review is not objective.

**Agency Comments**

The State Bar generally agreed with our findings and recommendations, with one exception. However, it asserted that it would need significant additional resources to implement the recommendations.

**4** | California State Auditor Report 2022-030
| **April 2022**

# Recommendations

The following are the recommendations we made as a result of our audit. Descriptions of the findings and conclusions that led to these recommendations can be found in the Audit Results section of this report.

### Legislature

To improve the independence and objectivity of the semiannual review of the State Bar of California (State Bar) case files, the Legislature should require the State Bar to do the following:

- Regularly change its external reviewer.

- Have its external reviewer present its findings and recommendations, with all confidential information redacted, directly to the Board of Trustees of the State Bar (board).

- Require the State Bar to report periodically to the board on the actions it takes to address the external reviewer's recommendations.

To ensure that the State Bar implements the policy and procedure changes identified in this audit, the Legislature should require an assessment by no later than December 2023 of the State Bar's compliance with those policies and procedures.

### State Bar

To ensure that it uses nonpublic measures to close complaints only when such use is consistent and appropriate, the State Bar should revise its policies by October 2022 to define specific criteria that describe which cases are eligible to be closed using nonpublic measures and which are not eligible.

To ensure that it fulfills its duties to investigate attorney misconduct, by April 2023, the State Bar should begin monitoring compliance with its new policy for identifying the circumstances in which investigators should continue to investigate even if the complainant withdraws the complaint.

The State Bar should notify the public on its website when other jurisdictions have determined that an attorney who is also licensed in California presents a substantial threat of harm to the public.

Exhibit #34: 012
22-CV-01616-BAS-DDL

To ensure that it identifies discipline imposed on California attorneys in other jurisdictions, the State Bar should use the American Bar Association's data bank to identify attorneys disciplined in other jurisdictions who have not reported that discipline to the State Bar.

To allow its staff to more easily identify patterns of similar complaints made against attorneys, by July 2022, the State Bar should begin using its general complaint type categorizations when determining whether to investigate a complaint.

To improve its ability to identify and prevent conflicts of interest that its staff may have with attorneys who are subjects of complaints, the State Bar should develop a process by July 2022 for monitoring the accuracy of the information in its case management system used to flag attorneys with whom its staff have declared a conflict of interest.

To ensure that State Bar staff do not inappropriately close cases against attorneys on the conflict list, the State Bar should create a formal process by October 2022 for determining whether it is able to objectively assess whether such a complaint should be closed or whether the decision should be made by an independent administrator. The State Bar should document this assessment in its case files for each case against an attorney on the conflict list.

To increase the independence and objectivity of the external review of its case files, the State Bar should amend its policies by July 2022 to do the following:

- Require its external reviewer to select the cases for the semiannual review.

- Establish formal oversight to ensure that it follows up and addresses the external reviewer's findings.

To ensure that it appropriately reviews complaints involving overdrafts and alleged misappropriations from client trust accounts, the State Bar should perform the following by July 2022:

- Discontinue its use of informal guidance for review of bank reportable actions and direct all staff to follow the policies established in its intake procedures manual (intake manual).

- Revise its intake manual to disallow *de minimis* closures if the attorney has a pending or prior bank reportable action or case alleging a client trust account violation.

Exhibit #34: 013
22-CV-01616-BAS-DDL

- Establish a monitoring system to ensure staff are following its policies for *de minimis* closures.

- When investigating client trust account-related cases and bank reportable actions not closed *de minimis*, require its staff to obtain both the bank statements and the attorney's contemporaneous reconciliations of the client trust account, and determine if the relevant transactions are appropriate.

- Require a letter with client trust account resources be sent to the attorney after the closure of every bank reportable action.

8 | California State Auditor Report 2022-030
| April 2022

Exhibit #34: 015
22-CV-01616-BAS-DDL

# Introduction

## Background

The California Constitution establishes three branches of state government: the executive, legislative, and judicial branches. The judicial branch is responsible for interpreting the laws of the State and, among other functions, providing access to the courts for individuals to defend their personal and property rights, determining the guilt or innocence of those accused of violating laws, and protecting the rights of individuals. The Supreme Court of California (Supreme Court) holds the power to admit, disbar, and suspend attorneys who are considered officers of the court. Attorneys hold significant responsibility as representatives of and advisers to their clients. Clients often seek the services of an attorney during times of crisis when they are in a particularly vulnerable situation. To fulfill their role, attorneys are accorded a great degree of trust, as well as certain privileges and responsibilities: they may legally represent their clients, may hold funds on behalf of their clients, and must maintain the confidentiality of the information that their clients provide them.

Every person who is admitted and licensed to practice law in California must be a member of the State Bar of California (State Bar), except for judges currently serving in that capacity. The State Bar is a public corporation within the judicial branch. As the text box shows, state law establishes public protection as the highest priority of the State Bar. The State Bar provides this protection by, among other activities, licensing attorneys, regulating the profession and practice of law, enforcing its Rules of Professional Conduct for attorneys, and disciplining attorneys who violate rules and laws. To prevent attorney misconduct, the State Bar encourages ethical behavior through resources such as education programs and a hotline for attorneys seeking guidance on their professional responsibilities.

The State Bar is governed by the 13-member Board of Trustees of the State Bar (board), seven of whom are attorneys appointed by the Supreme Court or the Legislature. The remaining six are members of the public who are not attorneys and who are appointed by the Legislature or the Governor. The board adopts a strategic plan with goals for meeting the State Bar's responsibilities, such as ensuring timely, fair, and appropriately resourced admission, discipline, and regulatory systems for the more than 250,000 lawyers

---

**The State Bar's
Core Mission and Selected Responsibilities**

**Core Mission**

State law establishes that "Protection of the public… shall be the highest priority for the State Bar of California and the board of trustees in exercising their licensing, regulatory, and disciplinary functions. Whenever the protection of the public is inconsistent with other interests sought to be promoted, the protection of the public shall be paramount."

**Selected Functions**

- License attorneys in California.

- Enforce the Rules of Professional Conduct for attorneys.

- Discipline attorneys who violate rules and laws.

- Administer the California bar exam.

Source: State law and the State Bar's website.

Exhibit #34: 016
22-CV-01616-BAS-DDL

**Examples of Allegations of
Professional Misconduct**

The State Bar receives allegations of attorney misconduct, including the following general types:

**Failure to perform competently:** When an attorney does not perform agreed-upon services, such as appearing in court or drafting a document for the client.

**Untimely communication:** When an attorney does not promptly inform a client of decisions or circumstances that require informed consent or disclosure according to the State Bar Act or the Rules of Professional Conduct.

**Commingling of funds:** When an attorney holds certain funds received for the benefit of a client in an account that holds the attorney's own funds.

**False advertising:** When an attorney guarantees results or outcomes.

Source: State law, the State Bar's Rules of Professional Conduct, the State Bar's intake procedures manual (intake manual), a state court case, and the State Bar's 2021 annual discipline report.

licensed in California. The board also establishes committees composed of its own members, including a regulation and discipline committee that oversees the State Bar's management of the attorney discipline process.

## Attorney Discipline

To protect the public from attorneys who fail to fulfill their professional responsibilities competently, the State Bar administers a discipline system through which it receives, investigates, and prosecutes claims of attorney misconduct. The State Bar receives complaints from the public by mail or through an online submission form. In addition, it can initiate inquiries or investigation into attorney conduct based on information it receives from third-party sources. For example, the State Bar may open cases based on sources it terms *reportable actions*, such as a notification from a bank that an attorney's client trust account has insufficient funds. The text box identifies some major categories of professional misconduct allegations.

Two of the primary components of the State Bar's attorney discipline system are the Office of Chief Trial Counsel of the State Bar (trial counsel's office) and the State Bar Court of California (State Bar Court). For 2021 the State Bar adopted a budget of nearly $75 million for these divisions. As Figure 1 indicates, the State Bar's process for reviewing complaints of alleged attorney misconduct includes multiple levels of reviews, and it closes many complaints at the intake level. At the intake level, the trial counsel's office conducts a review to determine whether misconduct alleged in a complaint warrants an investigation. When the State Bar closes a complaint at the intake level, it informs the individual who made the complaint of the decision in writing and describes how to request an appeal of the decision or provide additional facts. From January 2010 to November 2021, more than one-third of complaints received were investigated, and slightly more than 5 percent of cases resulted in formal discipline of the attorney.

For those complaints that it does not close at the intake phase, the trial counsel's office investigates and, where appropriate, prosecutes attorneys for violations of the State Bar Act or the State Bar's Rules of Professional Conduct, which establish professional and ethical standards for attorneys to follow. The State Bar Court adjudicates the matters that the trial counsel's office files and may privately

**Figure 1**
**The State Bar's Attorney Discipline Process Includes Multiple Levels of Review**

### INTAKE

When the trial counsel's office receives a complaint, it conducts a legal review to determine whether the alleged misconduct constitutes a disciplinable violation. In doing so, the trial counsel's office may close the complaint or forward it for investigation.

*64.5%* of cases were closed during **INTAKE**.

**35.5%** of cases went to

### INVESTIGATION

If forwarded, the trial counsel's office conducts an investigation to determine whether there is sufficient evidence to support the allegation of attorney misconduct. If so, the complaint advances to prefiling. The trial counsel's office may, at its discretion, close a case at this stage without imposing discipline, such as by issuing a warning letter.

*22.2%* of cases were closed during **INVESTIGATION**.

**13.3%** of cases went to

### PREFILING

The trial counsel's office drafts disciplinary charges for cases that it has determined have sufficient evidence for prosecution in the State Bar Court. Either party may request an early conference before a judge to discuss a potential settlement.

*6.2%* of cases were closed during **PREFILING**.

**7.1%** of cases went to

### HEARING AND DISCIPLINE

- The State Bar Court conducts evidentiary hearings and then renders a decision with findings and recommendations of discipline or closes the case without discipline. The State Bar Court's authority to discipline attorneys includes issuing reprovals, which can be public or private.

- In cases that warrant the imposition of suspension or disbarment, the State Bar Court recommends the appropriate disciplinary actions to the Supreme Court for review.

*1.8%* of cases were closed during **HEARING** and **DISCIPLINE** without discipline.

**5.3%** of cases were closed with

### FORMAL DISCIPLINE

**0.5%** of cases were closed with **REPROVALS** or **RESIGNATION WITH CHARGES PENDING**
**STATE BAR COURT**

**4.8%** of cases were closed with **SUSPENSIONS** and **DISBARMENTS**
**SUPREME COURT**

Source:  Analysis of the State Bar's case data, state law, the Rules of Professional Conduct, the Rules of Procedure of the State Bar, the State Bar's intake manual, and the State Bar's 2021 annual discipline report.

Note:  Percentages in this figure are derived from the more than 221,000 cases that the State Bar closed between January 1, 2010, and November 10, 2021, which include cases opened in previous years.

Exhibit #34: 018
22-CV-01616-BAS-DDL

**Examples of Potential Outcomes of the State Bar's Disciplinary Cases**

**Disbarment:** A public disciplinary sanction whereby the Supreme Court orders the attorney's name to be stricken from the roll of California attorneys; during this time, the attorney is precluded from practicing law in the State.

**Suspension:** A public disciplinary sanction that generally prohibits a licensee from practicing law or from presenting himself or herself as entitled to practice law for a period of time ordered by the Supreme Court. A suspension can include a period of actual suspension, stayed suspension, or both.

**Reproval:** The lowest level of court-imposed discipline, wherein the State Bar Court censures or reprimands the offending attorney for misconduct. Reprovals may include conditions such as making restitution, completing probation, or completing education on subjects such as ethics or the law. Reprovals can be public or private.

**Dismissal:** The disposal or closure of a disciplinary matter, for reasons such as insufficient evidence. The State Bar may close cases using methods that do not provide notice to the public, such as a warning letter. Such methods are known as *nonpublic measures.*

Source: State law, Rules of Procedure of the State Bar, the State Bar's investigation manual, and the State Bar's training material on determining the level of discipline.

or publicly reprove an attorney or, if warranted, may recommend that the Supreme Court—which makes the final decision for such discipline—suspend or disbar the attorney in question. The text box identifies some of the possible outcomes of the State Bar's disciplinary cases.

According to the clerk of the State Bar Court, in some instances, the State Bar Court chooses to place an attorney on probation for all or part of the time he or she would otherwise be suspended. The goals of attorney probation include protection of the public and rehabilitation of the attorney. Probation may include a variety of conditions, such as financial restitution or State Bar ethics school. The State Bar's Office of Probation supervises attorneys placed on probation, and when an attorney does not comply with the terms of probation, the State Bar has established three potential outcomes: close the matter without further action; revoke the probation, which may result in the attorney's suspension; or prosecute the noncompliance as a new offense, which may result in the imposition of new discipline.

The Legislature passed a law, which became effective on January 1, 2022, requiring the California State Auditor's Office to conduct an audit of the State Bar's attorney complaint and discipline process. The Legislature included this requirement in the law because the State Bar did not take action against one attorney for misconduct until recently, despite repeated allegations of this attorney's misconduct over decades.

# Audit Results

### Weaknesses in the State Bar's Attorney Discipline System Have Resulted in Some Attorneys Not Being Held Accountable for Misconduct

To assess the State Bar's attorney discipline system, we focused on key aspects of that process and determined whether the State Bar had established safeguards that are sufficient to ensure that it identifies attorney misconduct and imposes appropriate discipline. To ensure that its reviews of complaints of attorney misconduct are consistent, the State Bar must establish policies and processes for its staff to follow. However, we found that the State Bar's policies on how it should use certain methods to close cases without public notice—known as nonpublic measures—lack clarity and that it overused these methods. Until recently, the State Bar's policies did not identify the factors staff should consider when deciding whether to close cases in which an attorney has likely committed misconduct but the complainant withdraws the complaint. In addition, although the State Bar established policies for addressing misconduct by California attorneys in other jurisdictions and for addressing patterns of complaints against attorneys, its failure to develop and use tools that would help it identify these issues has led to inconsistencies and missed opportunities to inform and protect the public.

### *The State Bar Prematurely Closed Some Cases That Should Have Warranted Further Investigation and Potential Discipline*

The State Bar's official policy describes three primary purposes of attorney discipline: protection of the public, the courts, and the legal profession through deterrence; maintenance of the highest professional standards; and preservation of public confidence in the legal profession. However, some of the State Bar's policies lack clarity, which has resulted in its staff closing cases when further investigation would likely have better protected the public. Specifically, the State Bar closes many cases through *nonpublic measures*, such as warning letters, but it lacks clear policies on when it is appropriate for staff to use these nonpublic measures. Complaints that are closed through nonpublic measures are confidential and may have less of a deterrent effect on attorney misconduct because current and potential clients cannot find out about the behavior. Similarly, the State Bar has lacked clear policies on whether its staff should proceed with cases when a complainant withdraws the complaint, and it closed several such cases we reviewed without determining whether misconduct had occurred.

Although the State Bar's policies provide general guidelines for deciding when to use nonpublic measures, the policies lack the details necessary to ensure that they are implemented consistently. The State Bar uses a number of types of nonpublic measures, which Figure 2 details. Its policy directs staff to pursue nonpublic measures only when doing so will reasonably protect against future misconduct. Nevertheless, the policy does not identify the factors that staff should consider to determine whether future misconduct is likely to occur. The policy also states that nonpublic measures should be used for minor violations that did not cause significant harm or for violations that would likely not result in the imposition of discipline. However, the policy does not define minor violations or levels of harm resulting from an attorney's conduct. The chief trial counsel stated that staff should use their experience, judgment, training, and knowledge of applicable standards to implement the policy, but we found that the State Bar's use of these measures is not achieving the intent of its policy regarding their use.

*The State Bar's use of nonpublic measures to close complaints is not providing reasonable protection against future misconduct, as its policy requires.*

The State Bar's data indicate that the use of nonpublic measures is not providing reasonable protection against future misconduct, as its policy requires. A State Bar study from July 2021 showed that a significant number of attorneys were investigated for misconduct within two years after being disciplined. It also showed that nearly 26 percent of attorneys whose cases were closed with a warning letter in 2019 had a new complaint about their professional conduct investigated by the State Bar within two years of the original case being closed. The State Bar's executive director indicated that the State Bar has taken steps to address repeated misconduct, including issuing a new policy addressing alternatives to discipline and adding information to the closing letters for reportable actions that it sends to attorneys, but its efforts to reduce recidivism are centered around a redesign of its probation process for attorneys convicted of misconduct.

Notwithstanding these steps, patterns of attorney misconduct suggest that the State Bar is overusing nonpublic measures. From 2010 to 2021, the State Bar closed more cases through nonpublic measures—a total of 22,600, or 10 percent of all case closures—than it did through public discipline, which totaled 11,200, or 5 percent of all case closures. During the same period, more than 700 attorneys each had four or more cases that the State Bar closed through nonpublic measures. Our review of a selection of cases associated with five of these attorneys determined that State Bar staff closed cases through nonpublic measures despite indications in its case files that further investigation or actual discipline may have been warranted. Of the five attorneys, four had at least one previous complaint for similar misconduct that was closed

**Figure 2**
Nonpublic Measures That the State Bar Uses to Close Cases

## RESOURCE LETTER



Describes resources, such as ethics training or client trust account training, along with a summary of the conduct of concern and ways to rectify it.

## DIRECTIONAL LETTER



Directs action on the part of an attorney. This can include direction to return a client file or to communicate with a client.

## WARNING LETTER



Informs an attorney of his or her ethical obligations when there is substantial evidence that he or she committed a violation that may be misconduct.

## AGREEMENT IN LIEU OF DISCIPLINE



A written agreement that may involve conditions of practice or further legal education or rehabilitation.

## PRIVATE REPROVAL



A censure or reprimand that may include conditions. Private reproval is the only nonpublic measure that the State Bar considers to be discipline.

Source:  The State Bar's policy directives, website, and 2021 annual discipline report; Rules of Procedure of the State Bar; the State Bar's intake manual; State Bar discipline case files; and state law.

through nonpublic measures. In total, we reviewed 42 cases for these five attorneys and found indications that the State Bar had inappropriately closed 13 of them through nonpublic measures.

Case Example 1 demonstrates how, for one of these attorneys, the complaints against the attorney increased over time even as the State Bar closed multiple cases involving this attorney through nonpublic measures. The State Bar's legal adviser reviewing the complaints against this individual asserted that the complaints related more to the attorney's poor office management than to misconduct and stated that education and outreach might be more appropriate than discipline for this attorney. However, the nature of the complaints against the attorney call into question the legal adviser's assertions.

The cases involving this attorney that were closed using nonpublic measures not only included failing to provide settlement payments or to provide client files, but also included the attorney threatening to report another attorney to the State Bar if the other attorney did not provide requested information as well as offering to pay a complainant to withdraw a complaint made to the State Bar. Further, the State Bar's use of nonpublic measures to address complaints made against this attorney were ineffective as the number of complaints against this attorney per year have increased. This increase in cases may have resulted in further harm to the public as well as representing an additional workload for the State Bar.

In cases where complainants no longer wish to pursue their allegations, the State Bar's policies previously gave it discretion to continue the investigation but did not require that it do so, regardless of whether it already possessed evidence of misconduct. The Rules of Procedure of the State Bar allow it to investigate and prosecute misconduct at its discretion, even if a complainant asks to withdraw his or her complaint. The inconsistencies identified as a result of this audit led the State Bar to issue a policy directive in February 2022 clarifying how to proceed when a complainant withdraws the complaint or otherwise fails to cooperate in the investigation. Before this new policy, the State Bar's policies did not identify what factors should prevent it from closing a case when a complainant considers a matter resolved or withdraws the allegation, and we determined that the State Bar closed some cases even when there was evidence of misconduct. To examine the possible effects of this unclear guidance, we reviewed 33 closed cases for which the State Bar indicated that the complainant no longer wished to pursue the complaint or the attorney and complainant had resolved the issue. In seven of those cases, there was evidence of misconduct by the attorney.

*The inconsistencies identified as a result of this audit led the State Bar to issue a policy directive in February 2022 clarifying how to proceed when a complainant withdraws the complaint or otherwise fails to cooperate in the investigation.*

For example, for the attorney in Case Example 2, the State Bar closed four cases from March 2019 through August 2019 after the client in each case withdrew the complaint. A senior trial counsel at the State Bar stated that, in practice, the State Bar closes cases when the complainant withdraws the complaint, in part because

**Case Example 1**



## Case Example 1

An attorney exhibited a pattern of failing to provide settlement payments or to provide files to clients until the client complained. The State Bar closed cases against this attorney 28 times over 16 years using nonpublic measures and all of the other closed cases were closed outright. However, complaints against the attorney continued to increase. From 2014 to 2021, the attorney was the subject of 165 complaints. Despite the high number of complaints, many for similar matters, the State Bar has imposed no discipline, and the attorney still maintains an active license.

In one early case, the State Bar issued a warning letter to the attorney for failing to release a client's case file for nearly a year. However, the attorney has continued to generate complaints from other clients for this same issue. In the 11 years since the State Bar issued that warning letter, complaints have led the State Bar to issue 11 directional letters requiring the attorney to return client files.

Complaints against the attorney

Complaints closed using a nonpublic measure

Note: We changed the demographics depicted in some of our case examples to protect the confidentiality of these investigations.

the State Bar would need further evidence and testimony from the complainant to be able to prosecute a case, and it does not have an effective way of compelling cooperation from a complainant. However, the complaints against the attorney described in Case Example 2 demonstrate that closing a case because a complainant no longer wishes to pursue the complaint may not be in the public's best interest. These cases demonstrate that the

**Case Example 2**

### Case Example 2

The State Bar closed multiple complaints that were made against an attorney over the course of about 18 months, each alleging that the attorney had failed to pay clients their settlement funds. Generally, the State Bar closed each complaint after the attorney finally paid the client, noting either that the matter was resolved between the attorney and the complainant after the client withdrew their complaint or that there was insufficient evidence to support that the attorney's conduct warranted discipline. A pattern was discernible from five complaints the State Bar received within one year alleging that the attorney's clients were not receiving settlement payments. However, the State Bar did not identify the need to examine the attorney's bank records until it had received more than 10 complaints over two years. It did not examine the records for another six months, during which time the State Bar continued to receive similar complaints.

When the State Bar finally examined the client trust account, it found that the attorney had misappropriated nearly $41,000 in total from several clients. The State Bar ultimately filed charges against the attorney stemming from these more recent complaints. After the State Bar questioned the attorney about discrepancies in the client trust account, the attorney admitted to using client funds for personal reasons.

State Bar was informed that multiple clients had complained about the attorney not promptly distributing funds the clients were entitled to, which may be sufficient grounds for discipline. Had the State Bar investigated these cases, it might have prevented further harm to the attorney's clients.

The State Bar's practices and its staff's responses to our inquiries illustrated a common theme: the State Bar is generally focused on closing cases expeditiously. This emphasis on closing cases quickly appears to be in response to criticism the State Bar has faced for the amount of time it has taken to close some cases.

Exhibit #34: 025
22-CV-01616-BAS-DDL

The State Bar has long struggled to process all of the complaints that it receives each year. Audits our office issued in April 2019 and in April 2021 identified concerns about the backlog of unclosed cases.[1] According to its executive director, addressing the complaint backlog has been the most significant driving factor in the State Bar's development of performance measures and processes, in part because of the focus of our office and the Legislature on the backlog. Nevertheless, the patterns we observed suggest that staff following some of the State Bar's policies may be contributing to the large number of complaints it must address. As Case Examples 1 and 2 illustrate, the State Bar's actions have failed to prevent additional misconduct of a similar nature, leading to an increase in the volume of subsequent complaints about a specific attorney for the same misconduct. In turn, this has increased the State Bar's workload, which makes it more difficult for it to address its backlog and fulfill its primary mission of protecting the public.

### Weak Processes Allow Attorneys Who Committed Misconduct in Other Jurisdictions to Continue Practicing in California

Although state law clearly sets forth expectations regarding discipline for attorneys who have committed misconduct in other jurisdictions, the State Bar's implementation of this law has not protected the public in some instances and has led to significant delays in identifying some cases of attorney discipline imposed on California attorneys in other jurisdictions. Attorneys practicing law in other jurisdictions may also be licensed by the State Bar to practice law in California. The text box shows examples of other jurisdictions. According to state law, a final determination of professional misconduct in other jurisdictions, such as a federal court or another state court, is evidence that the attorney is culpable of professional misconduct in California, with limited exceptions. When another attorney disciplinary authority, such as the state bar of another state, disciplines an attorney who is also licensed to practice in California, the State Bar's policy is to determine whether it should pursue imposing discipline on the attorney based on the discipline imposed in the other jurisdiction, a practice known as *reciprocal discipline.*

> **Examples of Other Jurisdictions**
>
> - Federal courts, including district courts and bankruptcy courts.
> - Courts of other states.
> - Regulatory agencies with authority to discipline attorneys, such as the U.S. Patent and Trademark Office.
>
> Source: Federal law, State Bar intake manual, State Bar guidelines for attorney mandatory reportable actions, the U.S. Court's website, and State Bar case files.

Imposing reciprocal discipline helps to protect the public and maintain confidence in the legal profession by preventing attorneys who are suspended or disbarred for misconduct in one jurisdiction from practicing in California.

---

[1]   *State Bar of California: It Should Balance Fee Increases With Other Actions to Raise Revenue and Decrease Costs,* Report 2018-030; and *The State Bar of California: It Is Not Effectively Managing Its System for Investigating and Disciplining Attorneys Who Abuse the Public Trust,* Report 2020-030.

Exhibit #34: 026
22-CV-01616-BAS-DDL

*The State Bar does not proactively identify discipline imposed by other jurisdictions.*

According to the assistant chief trial counsel who manages intake staff (intake manager), the State Bar initiates cases related to discipline in other jurisdictions in three instances: when attorneys self-report the discipline as required by state law; when the State Bar receives notifications from other jurisdictions; or when the State Bar becomes aware of the discipline through other means, such as media reports. However, as we discuss later, the State Bar's processes do not proactively identify discipline imposed by other jurisdictions.

From 2010 through 2021, the State Bar closed more than 700 cases relating to attorney misconduct in other jurisdictions. We reviewed 32 of those cases and identified issues with nine of them, including four for which the State Bar failed to impose public discipline even though it was aware that another jurisdiction had done so, such as in Case Example 3. In that case, before the attorney's resignation in California, the State Bar issued the attorney a warning letter instead of taking other disciplinary action on the basis that it deemed the attorney a minimal risk to the public due to their age and lack of ties with California. The State Bar's intake manager did not provide any additional rationale for the State Bar's decision to close the case. However, the attorney's age does not seem relevant, as the other jurisdiction indicated that the alleged misconduct had recently occurred—less than five years before the State Bar's decision to close the case with a warning letter. The State Bar does not consider a warning letter to be a disciplinary action, and thus its response was not reciprocal, given that the other jurisdiction ordered that the attorney be permanently prohibited from practicing law. Because the State Bar did not impose any public reciprocal discipline, the attorney has no public record of misconduct in California. Based on the attorney's history of practicing law with a suspended license and failing to comply with the agreement with the other state to resign from practice in California, the lack of public discipline by the State Bar increases the risk that this attorney could engage in similar inappropriate behavior in the future.

In another of the cases we reviewed, the State Bar did not take proactive steps to inform the public that another jurisdiction had temporarily suspended the attorney to protect the public from further misconduct while the case was being decided. Case Example 4 describes this instance. State law considers a certified copy of a final order determining that an attorney committed professional misconduct by a court or body authorized to discipline attorneys in another jurisdiction as conclusive evidence that the attorney is culpable of professional misconduct in California. Because the case in the other jurisdiction was not final until January 2022, the State Bar could not have imposed discipline before then based solely on the actions of that other jurisdiction. However, state law does allow the State Bar to initiate and conduct

**Case Example 3**

## Case Example 3

In another state, an attorney was charged with several violations of that state's Rules of Professional Conduct, including continuing to advertise and practice law while suspended. The attorney requested to permanently resign from practicing law in that state and in all other jurisdictions—specifically including an agreement to resign in California—in lieu of receiving discipline in that state. The supreme court of that state issued an order approving the request and further ordered that the attorney be permanently prohibited from practicing law, an action that state considered to be a public reprimand. With limited exceptions, California state law provides that the final order of discipline from the other jurisdiction is conclusive evidence that the attorney is culpable of misconduct in California.

However, the State Bar concluded that it could not use the other state's supreme court order permanently prohibiting this attorney from practicing law as conclusive evidence of a final order of discipline because the other state's supreme court order did not include a final determination or finding on the attorney's misconduct. Instead, the State Bar used its authority to open an investigation against the attorney. Ultimately, the State Bar issued the attorney only a private warning letter, thereby permitting the attorney to continue to practice law in California despite the attorney's agreement in another state to resign from practicing law in all jurisdictions. Subsequent to the warning letter, the attorney resigned from the California State Bar.

Case Example 3

investigations of the conduct in other jurisdictions of attorneys licensed in California. According to the intake manager, it seemed more prudent to allow this case to reach its conclusion in the other jurisdiction, at which point all of the facts that the other jurisdiction could prove would be available to the State Bar. However, there are other options available to the State Bar to address the risk of harm the attorney posed to the public. According to the Rules of Procedure of the State Bar of California, if an attorney is under investigation by a regulatory or licensing agency, the chief trial counsel may disclose information for the protection of the public after privately notifying the attorney. Thus, the State Bar could have informed the public on its website that this attorney had been

**Case Example 4**

### Case Example 4

The supreme court of another state temporarily suspended an attorney in that state in 2020 for misappropriating and misusing client funds. The attorney was also licensed to practice law in California. The supreme court in that state also placed restrictions on the attorney's handling of client funds, concluding that the attorney posed a substantial threat of serious harm to the public. According to documents in the State Bar case file, that state's supreme court ultimately disbarred the attorney in early 2022. Although the State Bar had been aware of the attorney's temporary suspension in the other state since April 2021, it had not imposed discipline as of February 2022.



suspended in another state. The chief trial counsel agreed that doing so could enhance public protection when another state has concluded that an attorney presents a threat of harm to the public. However, because of the State Bar's inaction, current and potential clients in California were not informed of the threat the attorney posed for more than a year after the attorney was suspended in the other jurisdiction.

The State Bar also has not actively sought information on attorney discipline in other jurisdictions. The intake manager said that the State Bar may open a case if it becomes aware of discipline imposed on a California attorney in another jurisdiction through media reports or other means. However, he also stated that there is no unit within the State Bar charged with proactively seeking information on discipline imposed in other jurisdictions. According to the intake manager, the State Bar opens cases based on attorney self-reporting and reporting from other jurisdictions. However, relying on attorneys to volunteer that they have been disciplined is not an effective process, as they do not always do so in a timely manner. Further, attorneys who commit misconduct warranting disbarment in other jurisdictions have little incentive to report that misconduct to the California State Bar. According to the intake manager, there is no attorney discipline beyond disbarment. Therefore, an attorney may not be motivated to report the misconduct if they anticipate that they will be disbarred.

**Exhibit #34: 029
22-CV-01616-BAS-DDL**

State law requires the State Bar to notify the appropriate discipline agencies in any other jurisdictions where an attorney is admitted to practice if it suspends or disbars an attorney or if it reinstates a suspended or disbarred attorney. Other jurisdictions may have similar rules. The special assistant to the chief trial counsel stated that he is not aware of any agreements that the State Bar has with other jurisdictions to share such information.

An attorney discipline agency in another state may not necessarily report to the State Bar the discipline it imposes on attorneys also licensed in California. For example, in one State Bar discipline case we reviewed, another state's attorney discipline oversight body noted in court documents requesting a suspension that the attorney was admitted to the California State Bar. However, according to the California State Bar, it has no record of receiving information about this disciplinary action.

Because it has relied on attorneys and other discipline agencies to report instances of discipline in other jurisdictions, the State Bar did not learn about some disciplinary actions until a year or more after they were imposed. Of the 32 cases that we reviewed related to 20 attorneys that pertained to discipline in other jurisdictions, we found 10 instances in which discipline was imposed by the other jurisdiction, but the State Bar was not notified for one year or longer. For example, as Case Example 5 describes, had the attorney not chosen to self-report the discipline when reapplying to practice law in California, the State Bar might never have learned of the misconduct.

*We found 10 instances among the 32 cases we reviewed in which discipline was imposed on an attorney by another jurisdiction, but the State Bar was not notified for one year or longer.*

In contrast to its current approach, the State Bar could take advantage of existing information about attorney discipline imposed in other jurisdictions. The American Bar Association maintains the National Lawyer Regulatory Data Bank (data bank) for regulators, such as the State Bar, to use to facilitate reciprocal discipline. The data bank is a repository of information concerning public regulatory actions related to lawyers throughout the United States. According to the intake manager, State Bar staff do not regularly use the databank to proactively identify attorneys disciplined in other jurisdictions. The State Bar's failure to use this resource increases the risk that those attorneys will continue to practice in California and engage in misconduct here.

### The Information That the State Bar Provides Its Staff Limits Their Ability to Identify Patterns of Complaints

Patterns of complaints can provide useful information about the impact of the State Bar's corrective actions and whether new complaints merit investigation. Although the State Bar directs its staff to look for patterns when reviewing new complaints, we found that the tools available to staff limit their ability to effectively do so.

Exhibit #34: 030
22-CV-01616-BAS-DDL

**Case Example 5**

### Case Example 5

An attorney licensed to practice law in California and in another state was suspended in the other state in 2007. The attorney did not notify the State Bar of the suspension within the statutory 30-day deadline and, in 2008, let their California license become inactive. When seeking to become active again in 2021, the attorney informed the State Bar of the 2007 discipline. The State Bar might have readmitted the attorney without considering the past misconduct if the attorney had not shared this information. As of February 2022, the State Bar is considering potential discipline of the attorney for the misconduct in the other state and for failing to disclose the past misconduct to the State Bar.



Case Example 5

For the purposes of this audit, we defined three or more separate complaints for a single attorney involving similar allegations within a span of 12 months to be a *pattern of complaints*. Although patterns of complaints are not evidence of misconduct, they can indicate whether the disciplinary or nondisciplinary measures that the State Bar imposes are having an effect on the attorney's behavior. A pattern of complaints may also indicate that a new complaint merits additional investigation. The State Bar's procedures require intake attorneys reviewing a new complaint to research whether the attorney has a history of closed complaints, closed investigations, discipline, or pending matters in order to assess the possibility of a pattern of complaints or misconduct.

We reviewed the case history of 19 attorneys who each had 25 or more complaints. Of those attorneys, we identified 17 who exhibited a pattern of complaints. In some cases, the pattern involved a significant number of complaints over an extended period. For example, over the course of about two and a half years, there were 29 cases opened against the attorney in Case Example 2, all based on allegations that the attorney failed to provide funds owed to clients.

The patterns of complaints against some attorneys suggest that the State Bar's responses to those complaints did not influence the attorneys' subsequent behavior. We determined that there were 212 attorneys with six or more complaints that were closed through nonpublic measures from 2010 through 2021. The patterns of complaints we identified for 10 of the 19 attorneys we reviewed occurred after the State Bar had closed cases involving allegations of similar types of misconduct through nonpublic measures. For example, the timing of the pattern of failing to provide settlement payments or return client files described in Case Example 1 demonstrates that the State Bar's use of nonpublic measures did not deter the attorney from continuing the conduct and generating similar complaints. Had the State Bar considered the pattern of past conduct, it might have conducted further investigation, which could have resulted in more severe corrective action and discouraged the attorney from continuing this conduct.

In addition, a pattern of past complaints can indicate that a new complaint merits further investigation. For instance, Case Example 2 describes a pattern of complaints against an attorney alleging that the attorney had not provided funds to several clients, and the State Bar closed these complaints as resolved after the attorney paid each complainant. Had the State Bar treated the pattern of complaints as an indicator that new complaints warranted investigation, it might have discovered the misappropriation sooner and mitigated harm to the attorney's clients.

*A pattern of past complaints of attorney misconduct can indicate that a new complaint merits further investigation.*

After we brought our concerns about its process for identifying patterns of complaints to the State Bar's attention, it issued a policy directive clarifying procedures for intake staff to use when considering prior closed complaints in their determination of whether to close or investigate a complaint. The policy directive states that prior closed complaints of a similar nature may support the plausibility of certain allegations. It also notes that a history of similar closed complaints may suggest the need for investigative steps to generate sufficient evidence about whether a violation has occurred.

Although it has now clarified how patterns of complaints should be addressed, State Bar staff lack the tools to effectively and efficiently conduct such a review. The State Bar's case management system allows staff to access all cases against an attorney for the most recent five years, and cases older than five years that resulted in discipline and nondisciplinary measures. However, the report showing the past cases against an attorney that the State Bar's case management system generates describes those cases using individual allegation types rather than general categories. As of January 2022, there were 672 different allegation types. For example, the State Bar has established 46 allegation types related to client or entrusted funds. Because the case management system uses a

detailed allegation type for each case, the numerous types makes it difficult to identify patterns of similar behavior. The chief trial counsel agreed that categorizing allegations into broader categories would allow staff to more easily identify patterns of complaints. The State Bar has already grouped the allegation types into 25 general categories for use as a research tool outside of the case management system. However, according to the chief trial counsel, the State Bar is still assessing how best to use this case categorization in its handling of cases.

### The State Bar Failed to Accurately Track or Document Its Consideration of Some Staff Members' Potential Conflicts of Interest

According to the Rules of Procedure of the State Bar, the chief trial counsel is required to recuse the trial counsel's office from inquiries or complaints against attorneys if a conflict of interest or the appearance of a conflict of interest could raise doubts that the chief trial counsel would be impartial. To make this determination, the State Bar requires its employees to complete an annual questionnaire in which they disclose personal, financial, and professional relationships they have with licensed California attorneys. The State Bar then adds these attorneys to a list (conflicts list). Further, the State Bar can flag these attorneys in its case management system. When the State Bar identifies a conflict, the trial counsel's office can assign the case to outside prosecutors, who are attorneys contracted by the State Bar or, in certain situations, recuse only those employees who have a connection to the case.

*The State Bar relies on its employees to identify potential conflicts of interest at both the intake and investigation stages.*

The State Bar relies on its employees to identify potential conflicts of interest at both the intake and investigation stages. Its intake manual requires the employee processing a complaint to check whether the attorney identified in each complaint has a relationship with the State Bar that presents a potential conflict. If the employee then identifies such a potential conflict, a supervising attorney refers the case to an independent administrator contracted by the State Bar, who recommends whether the case should be processed by a State Bar employee with no declared relationship to the case or by an outside prosecutor. In addition, State Bar policy requires that employees notify their supervisors as soon as possible if a potential conflict arises or becomes known after a case has been opened.

Despite its staff identifying attorneys with whom they have a conflict of interest, in 11 of 30 cases we reviewed where the attorney was on the conflicts list, the State Bar did not document its consideration of those conflicts. In seven of those 11 cases, the attorney was on the conflicts list but was not flagged in the State Bar's case management system, and the case notes do not describe any evaluation of the conflict of interest. In the other

four cases, the attorney was flagged as having a conflict of interest, but intake staff proceeded to review the cases and ultimately closed the cases without involving the independent administrator or documenting the steps the State Bar took to mitigate the conflict of interest.

The State Bar does not appear to recognize the significance of the risk associated with dismissing a case against an attorney on the conflicts list. For one of the cases, the intake attorney documented an email exchange with his supervisor in which the supervisor acknowledged the conflict of interest but nonetheless directed the intake attorney to review the case anyway and agreed with the intake attorney's proposal to dismiss the case. In another case, the intake attorney did not document any evaluation of the conflict of interest in the case file, but in response to our questions, she provided an email from her supervisor stating that the conflict-of-interest requirements were waived and he approved closing the case. The chief trial counsel believes that the cases in which an attorney attempts to exert undue influence on a State Bar employee or in which a State Bar investigator or attorney intentionally attempts to influence the case are extremely rare and would be difficult to prevent. Nevertheless, the decisions to close cases described above illustrate that the State Bar is not appropriately assessing how conflicts of interest pose a risk that staff will close cases inappropriately. Thus, it is critical that the State Bar objectively assess and document its consideration of conflicts of interest when closing a case at the intake stage against an attorney on the conflicts list.

The chief trial counsel agreed with our findings and indicated management of conflicts of interest is an area where the State Bar needs much improvement. He further noted that conflict-of-interest information has not been consistently updated in its current case management system, and he is working with his staff to correct that issue.

*It is critical that the State Bar objectively assess and document its consideration of conflicts of interest when closing a case at the intake stage against an attorney on the conflicts list.*

### The State Bar's Weak Safeguards Have Hampered Its Ability to Prevent Repeated Client Trust Account Violations

Despite establishing formal guidance in an intake manual in 2018 for reviewing certain complaints related to client trust accounts, the State Bar has not consistently followed it. In several instances, the issues we describe in the previous sections have contributed to the State Bar's failure to appropriately review cases of alleged client trust account violations. For example, the State Bar has used nonpublic measures to close cases involving client trust account violations, and an attorney's prior history of allegations did not appear to affect the State Bar's decision to close certain client trust account cases.

When attorneys or law firms receive funds on behalf of clients, such as fees paid in advance for future services or proceeds from insurance settlements, the State Bar's Rules of Professional Conduct require these funds be deposited into one or more *client trust accounts*. A primary reason for maintaining client trust accounts is to ensure that funds being held for the benefit of clients are not commingled with those of the attorney or law firm. A client trust account also provides protection against seizure of client funds by third parties or in the event that the attorney declares bankruptcy. According to the State Bar's *Handbook on Client Trust Accounting for California Attorneys*, an attorney may deposit funds related to multiple clients into a single client trust account if the attorney keeps an accurate record of the amounts that belong to each client. As part of the requirements for safekeeping of funds and property of clients and other persons, the State Bar's Rules of Professional Conduct require attorneys to maintain, among other things, monthly reconciliations of their client trust accounts. The reconciliation process involves comparing the three basic types of records attorneys are required to keep—bank statements, client ledgers, and account journals—against each other to find and correct any mistakes.

*From 2010 through 2021, 23 percent of all State Bar cases involved allegations related to client trust accounts.*

From 2010 through 2021, 23 percent of all State Bar cases involved allegations related to client trust accounts. The State Bar receives complaints about alleged client trust account violations from different sources, such as from clients who believe that an attorney has acted improperly, or through *reportable actions*, which are mandatory reports about events concerning attorneys. Reportable actions are submitted by entities such as courts and banks and include court orders, sanctions, and overdraft notices for client trust accounts. According to the State Bar, bank notifications about insufficient funds in client trust accounts, or *bank reportable actions*, make up the largest number of reportable actions.

It is critical for the State Bar to thoroughly review complaints regarding client trust accounts because of the potential for attorneys to misuse funds in these accounts and the harm that such misuse can cause to the attorney's clients. For example, an attorney could commingle personal assets with a client's assets, making it unclear to whom the funds belong and risking that the attorney or his or her creditors will seize the client's funds. A serious misuse of a client trust account, known as *misappropriation*, occurs when an attorney uses client funds for personal benefit or otherwise fails to maintain the required balance of client funds in the account.

When an attorney misappropriates client trust account funds for personal use, one method to conceal the misappropriation is to repay the client with funds belonging to another client or to use subsequent deposits intended for other purposes to pay off amounts that are due to a different client. In some situations, the attorney may continue this pattern of misappropriating client funds until so much money has been

diverted that there are insufficient funds to cover checks for even small amounts, and the attorney is unable to pay clients for long periods of time. Figure 3 shows that for this reason, even small overdrafts of client funds may be indicative of a larger misappropriation. In the hypothetical example in Figure 3, the attorney siphons a substantial portion of his or her clients' funds for personal use, even though the account shows only a small overdraft. Depending on the circumstances, clients may suffer significant financial harm from a misappropriation, which may be cause for the attorney to be disbarred.

Because funds received for the benefit of a client must be deposited into the client trust account before they can be paid out, the State Bar's guidance references a past court opinion indicating that the mere fact that there are insufficient funds in a client trust account supports a conclusion of misappropriation. That opinion also indicates that misappropriation is a serious violation of professional ethics likely to undermine public confidence in the legal profession.

Moreover, because overdrafts and misappropriations from client trust accounts are serious problems, the Legislature has determined that it is in the public interest to ensure prompt detection and investigation of these occurrences. However, the State Bar's current policies allow it to rapidly close certain client trust account cases without ever contacting the offending attorney for additional information. Specifically, the State Bar's procedures allow its staff the discretion to close certain reportable actions as *de minimis* if the amount of the insufficient funds activity is under $50 and there are no other pending—or no prior history of—bank reportable actions. From 2010 through 2021, the State Bar closed roughly 11 percent of client trust account cases as *de minimis*. According to the chief trial counsel, the phrase *de minimis* defines misconduct that is trifling or of so little importance that it would be unlikely to result in discipline of any significance if the State Bar pursued it.

*The State Bar's current policies allow it to rapidly close certain client trust account cases without ever contacting the offending attorney for additional information.*

However, according to a State Bar analysis performed in 2020, the likelihood of an attorney being disciplined is actually greater when the amount of a client trust account overdraft is smaller. The analysis quoted a State Bar attorney who specializes in bank reportable actions and asserted that larger overdrafts tend to result from occasional mistakes in account maintenance whereas smaller overdraft amounts, especially involving multiple incidents, tend to be a reflection of more serious misconduct. For example, as Figure 3 illustrates, the amount of an overdraft can be small compared to the amount of client funds that have been misappropriated. Nevertheless, under its current policy, the State Bar would likely have dismissed the bank reportable action in this hypothetical example as *de minimis*. When the State Bar closes a complaint as *de minimis*, it may send a letter to the attorney suggesting that he or she pay greater attention to the management of the client trust account and to take appropriate corrective action to avoid future reports of insufficient funds activity.

**Figure 3**
**A Small Overdraft in a Hypothetical Attorney's Client Trust Account Is Indicative of a Larger Misappropriation Scheme**



| DESCRIPTION | PAYMENT | CLIENT TRUST ACCOUNT BALANCE | AMOUNT OWED TO CLIENTS |
|---|---|---|---|
| **Client A** Settlement | $8,000 | $8,000 | $8,000 |
| **Attorney** Personal Use | (4,000) | 4,000 | 8,000 |
| **Client B** Settlement | 6,000 | 10,000 | 14,000 |
| **Client C** Funds for Future Case-Related Expenses | 2,000 | 12,000 | 16,000 |
| **Client A** Payout | (8,000) | 4,000 | 8,000 |
| **Attorney** Personal Use | (4,000) | (0) | 8,000 |
| **Client C** Case-Related Expense | (50) | (50) | 7,950 |

Source: Interviews with State Bar staff.

Exhibit #34: 037
22-CV-01616-BAS-DDL

In some cases, however, the State Bar closes complaints as *de minimis* without contacting the attorney to obtain additional information or to provide guidance for avoiding future complaints. For one attorney we reviewed, the State Bar closed three bank reportable actions as *de minimis* over the course of four years but did not send the attorney a resource letter when it closed any of the cases. The assistant chief trial counsel stated that it is the State Bar's practice to give attorneys the benefit of the doubt on these initial minor overdrafts. Nevertheless, because of the State Bar's practice, the attorney may not be aware that, as the *de minimis* resource letter describes, even minor transgressions related to client trust fund accounting may create a track record warranting closer scrutiny and investigation. Further, because the attorney did not receive the resource letter, he or she was not referred to the various resources the State Bar provides attorneys to help them avoid client trust account issues in the future.

Even when the State Bar does send a resource letter to an attorney upon closing a case as *de minimis*, in some circumstances its use of *de minimis* closures has been excessive. Figure 4 shows the long-standing pattern of complaints against one attorney, including 75 bank reportable actions. The State Bar closed 34 of these cases as *de minimis*, allowing the attorney to continue to practice without any disciplinary action for nearly 16 years before being subsequently suspended from practice for using their client trust account funds for personal use.

*The State Bar closed 34 cases against an attorney as de minimis, allowing the attorney to continue to practice without any disciplinary action for nearly 16 years before subsequent suspension from practice for using client trust account funds for personal use.*

Although the State Bar has an intake manual describing the specific circumstances under which staff may close bank reportable actions as *de minimis*, the State Bar has failed to follow this formal guidance, in part because staff have created and follow informal guidance that differs from it. This informal guidance describes different standards for closing a case as *de minimis*, because—unlike the intake manual—it does not limit the use of *de minimis* closures to attorneys who do not have a pending or prior history of bank reportable actions. According to the chief trial counsel, the informal guidance has not been vetted by State Bar management for use when reviewing reportable actions, nor does that guidance supersede the intake manual. He further stated that the State Bar is working to update its intake manual so that it can eliminate the use of the informal guidance. Notwithstanding its unofficial status, the informal guidance allows for the closure of certain cases that the intake manual does not specify as eligible to be closed as *de minimis*.

According to a State Bar deputy trial counsel, staff refer to the informal guidance because it is sometimes unclear when to close a reportable action as *de minimis* if the attorney has a prior history of reportable actions, and the informal guidance consists of institutional knowledge for resolving reportable actions. However, it is not clear why the deputy trial counsel believes that it is sometimes unclear whether a reportable action should be closed as *de minimis* in such a situation. The State Bar's intake manual clearly states that one of the criteria for closing an attorney's reportable action as *de minimis* is the lack of a prior history of bank reportable actions.

**Figure 4**
After Closing 87 Complaints Spanning 20 Years, the State Bar Eventually Sought Disbarment Based on an Attorney's Conviction in Federal Court

## Complaint Summary

After closing 87 complaints spanning 20 years, 75 of which were bank reportable actions, the State Bar eventually sought disbarment based on the attorney's conviction in federal court.



## Discipline Summary

The State Bar consolidated seven cases into one case and then disciplined the attorney.

In response to two bank reportable actions, the attorney explained that a client agreed to repair vehicles the attorney owned, and the attorney used the client trust account to pay for parts. Although this is not a permissible use of a client trust account, the State Bar closed the two cases due to insufficient evidence.

Through a random internal audit, the State Bar determined the decision to close the two cases was an error. The State Bar reopened the complaints and consolidated them with five new bank reportable actions.

The State Bar found that, over 15 months, the attorney had made 161 payments from the client trust account for personal transactions. The State Bar Court recommended the attorney be suspended for 90 days, but noted that the attorney's record was discipline-free as a significant mitigating circumstance when determining the discipline.

## Disbarment Summary

The State Bar requested that the attorney be disbarred after it learned about the attorney's conviction in federal court for using client trust accounts for money laundering.

Source: Trial counsel's office case files and the State Bar Court's stipulation of facts.

Our review of case files indicates that the State Bar's practices for closing complaints as *de minimis* were not always in the best interests of either the public or the attorneys. We reviewed 13 complaints against five attorneys that were closed as *de minimis*, and we found that in all of them the State Bar did not follow its formal policy for not closing complaints as *de minimis* against attorneys with a prior history of bank reportable actions. Its failure to follow its policy may have resulted in inadequate public protection. For example, had the State Bar intervened when it began receiving reportable action notifications for the attorney described in Case Example 6 instead of closing multiple complaints as *de minimis*, it might have imposed discipline or provided guidance that would have prevented the attorney's subsequent client trust account violations. Following the State Bar's investigation, the attorney was suspended from the practice of law and was disbarred the following year for different charges.

Exhibit #34: 039
22-CV-01616-BAS-DDL

Case Example 6

## Case Example 6

Early one year, the State Bar closed five cases alleging client trust account violations by an attorney as *de minimis*. Later that same year, the State Bar received another complaint pertaining to a $435 overdraft of the attorney's client trust account and contacted the attorney to obtain further information. The attorney explained that the complaint was due to a mistake. The State Bar accepted this explanation and closed the complaint without taking further action, incorrectly noting that the attorney had no prior history of reportable actions.

During this period, the State Bar was investigating another complaint against the same attorney that involved, among other issues, an alleged client trust account violation. The State Bar did not forward any of the complaints described above to the investigative team to determine whether they were connected and ultimately closed the client trust account violation complaint it was investigating as well. Within a month, the State Bar received three more client trust account complaints. The State Bar requested additional information from the attorney, who early in the next year informed the State Bar that the violations were due to a series of personal crises. By the time the State Bar subpoenaed the attorney's client trust account records, the attorney had withdrawn or attempted to withdraw funds from the client trust account nearly 50 times, totaling approximately $5,400 for the payment of personal expenses. Although the attorney deposited personal funds to reimburse the expenses, the State Bar concluded that the attorney had commingled assets in a client trust account in willful violation of the Rules of Professional Conduct and suspended the attorney.

As we discuss previously, according to the State Bar's intake manual, staff should consider prior complaints when deciding whether to forward cases for investigation. However, a history of prior complaints, such as the pattern shown for the attorney in Figure 4, has not always resulted in the State Bar investigating new cases, even when the complaints were bank reportable actions. For example, the State Bar used nonpublic measures to close multiple complaints related to client trust accounts against the attorney in

Case Example 7, despite the existence of prior client trust account complaints. According to the assistant chief trial counsel, the deputy trial counsel who reviewed this case stated that the State Bar could have issued a letter to the attorney to request additional information regarding the December 2021 complaint, but because the State Bar had recently sent the attorney a warning letter, the trial counsel's office did not believe further action was necessary. However, the State Bar's intake manual states that if the attorney previously received a warning letter or discipline for similar misconduct, a new complaint will likely result in the pending matter being forwarded for investigation. Although the attorney had a pattern of cases closed through nonpublic measures going back to 2017, the State Bar had not investigated any of the attorney's 30 bank reportable actions as of February 2022.

**Case Example 7**

### Case Example 7



From 2015 through 2021, an attorney was the subject of 35 complaints, 30 of which were alleged client trust account violations. Of these complaints, the State Bar closed 12 with warning letters, five with resource letters, and one with a directional letter. The rest, including the attorney's most recent client trust account complaint in December 2021, were closed in the intake phase without further investigation. The State Bar inappropriately closed the December 2021 client trust account complaint without contacting the attorney for additional information, despite having issued a warning letter to the attorney just one month earlier for 11 complaints of alleged client trust account violations.

Further, the State Bar did not always follow its intake manual regarding client trust account complaints when it was actively investigating an attorney for other client trust account violations. The State Bar's intake manual states that if there are other pending disciplinary matters regarding the attorney in question, staff should determine whether to forward the bank reportable action

**Exhibit #34: 041
22-CV-01616-BAS-DDL**

for investigation before requesting a response to the complaint from the attorney. As Case Example 8 shows, the State Bar did not forward a bank reportable action for investigation even though the State Bar was pursuing investigations of multiple complaints against the attorney. According to the assistant chief trial counsel, the deputy trial counsel who originally reviewed this case agreed that State Bar staff should have emailed the investigator and legal adviser to determine whether they wanted the matter forwarded for investigation, but staff did not do so in this case.

**Case Example 8**



### Case Example 8

An attorney was the subject of 28 complaints over a five-year period, one of which was initiated after a bank notified the State Bar that the attorney failed to maintain funds that were received for a client in a client trust account. Over this period, 10 of the 28 complaints involving the attorney alleged client trust account violations. At the time the State Bar reviewed the violation reported by the bank, the attorney had two other disciplinary matters open, one of which alleged a client trust account violation. Although State Bar intake staff noted the open investigations in their review of the violation reported by the bank, they did not forward the complaint to be investigated by the staff who were investigating the other open complaints. Instead, the State Bar closed the complaint as *de minimis.*

Although the State Bar implemented new training in 2021 for reviewing client trust account complaints, in some cases its staff have not followed the guidance provided in that training. State law allows the State Bar to subpoena any and all of an attorney's financial records held by financial institutions. In 2021 the State Bar held a series of mandatory training sessions on the fundamentals of effective client trust account investigations that included guidance on when to subpoena bank records. The first session, in July 2021, directed staff to subpoena client trust account records in any of the circumstances described in the text box. Based on this training, State Bar staff should have subpoenaed the bank records for the

---

**State Bar Guidelines on Subpoenaing Client Trust Account Records**

State Bar staff should subpoena client trust account records when an attorney has the following:

- A history of closed reportable actions with warning and resource letters.

- Prior discipline for client trust account violations.

- Multiple closed investigations involving client trust account allegations.

Source: State Bar training materials.

---

attorney in Case Example 7 when they received the December 2021 reportable action because the attorney had multiple previous client trust account allegations. Instead, the State Bar closed the bank reportable action as *de minimis* without contacting the attorney for additional information.

According to the assistant chief trial counsel, the deputy trial counsel who reviewed this case did not believe further action was necessary because the attorney did not have multiple consecutive overdrafts, and the December 2021 overdraft itself was small. Nevertheless, given that the State Bar had received 30 bank reportable actions regarding the attorney and closed 18 cases with nonpublic measures, the State Bar should have followed guidance from its training and subpoenaed the attorney's financial records.

Although the State Bar provides training to its staff on investigating client trust account violations, it may need additional expertise to investigate such misconduct. For example, an individual with expertise in financial matters would have likely questioned the evidence that the State Bar accepted from the attorney in Case Example 9. In February 2022, the board's finance committee approved the establishment of one forensic auditor position to handle financial investigations involving high-dollar client trust accounts and other complex tracings of funds.

Nevertheless, the State Bar will need to encourage its staff to seek advice from this expert. According to the chief trial counsel, the State Bar maintains a list of contract forensic auditors who are available for assistance with client trust account complaints. The State Bar has informed its staff during training sessions that they should consider using these forensic auditors in certain circumstances, such as when an attorney exhibits a pattern of withholding funds from clients for periods of time but subsequently pays after the State Bar becomes involved. However, according to the chief trial counsel, the State Bar has retained a forensic auditor for only two cases since 2018. Based on the attorneys we identified with patterns matching the example that the State Bar describes, such as the attorney in Case Example 2, we would expect the State Bar to have used the expertise of forensic auditors more frequently.

## Weaknesses in the State Bar's Monitoring of Its Attorney Discipline System Limit the Independence of That Monitoring

We identified instances in which the State Bar's decisions to close complaints do not appear to have been justified based on the information available, as we describe in the previous sections. Best

Exhibit #34: 043
22-CV-01616-BAS-DDL

**Case Example 9**

### Case Example 9

To explain two overdrafts of a client trust account that occurred in a particular month, an attorney submitted a copy of the account's bank statement for the prior month, but not for the month when the client trust account was actually overdrawn. Instead, the attorney submitted a narrative providing details of certain transactions for the month in question and then asserted that the overdraft was caused by charges the attorney expected would be paid from a different account. Instead of requesting the bank statement for the month in question, the State Bar accepted the attorney's explanation and closed the case.

practices suggest that monitoring the safeguards in a system is essential to assessing performance over time and providing assurance that the organization's goals are being carried out. However, weaknesses in the State Bar's monitoring of its attorney discipline system threaten to diminish its ability to ensure that it is closing attorney discipline cases appropriately. Following the decision to close a case, the State Bar has two processes it can use to identify cases that staff closed inappropriately—the appeals process and its external review process—and we identified areas for improvement in both of these processes.

### *The State Bar Could Improve Its Appeals Process by Using an Ombudsperson*

The State Bar's appeals process is one method of assessing whether it has closed cases inappropriately. Complainants can appeal the decision to close a case, but they must do so within 90 days of the case being closed. From 2017 to 2020, the State Bar received only about 5,300 appeals of the more than 49,000 cases it dismissed, and it reopened only 158 of those cases. The difference between the number of dismissed cases and the number of closed cases that are appealed suggests that one of two situations is occurring: either many of the original complaints that the State Bar received have no merit,

or individuals had difficulty navigating the appeals process. In either case, it appears that individuals need additional assistance in understanding the complaint process and in filing complaints and appeals.

One option for assisting complainants with filing complaints and appeals would be to establish an ombudsperson for attorney discipline. A public sector ombudsperson is an official appointed to receive and impartially investigate citizen grievances about administrative acts of government. Some ombudsperson duties may include responding to questions and concerns raised by the public, such as how the complaint and appeals system operates; how to access the system; and how to file a complaint or appeal as well as reporting trends and systemic problems to executives. An ombudsperson can also make recommendations to oversight entities, such as a state supreme court, for improvements to an attorney discipline system.

The state of Texas has established an ombudsperson for attorney discipline that fulfills such purposes. The Texas attorney discipline ombudsperson is responsible for receiving grievances about its state bar system and investigating those grievances to make sure its state bar followed proper procedures. The ombudsperson is also responsible for making recommendations to the Supreme Court of Texas and its state bar board of directors for improving the state's attorney discipline system.

The California State Bar may similarly benefit from an ombudsperson for attorney discipline because the ombudsperson's role could include educating the public about the complaint process, such as how to access the complaint system and file complaints. We discussed the benefits of implementing an ombudsperson office for attorney discipline with the executive director, and she agreed that an ombudsperson for the California attorney discipline system is something that is needed and could be a useful resource for the public in terms of navigating the State Bar's attorney discipline system. Further, she agreed that having the ombudsperson independent from the State Bar makes sense. However, she stated that it would be important to have adequate communication and coordination between the State Bar and the ombudsperson so that trends identified by the ombudsperson could inform the State Bar's consumer education, attorney education, and internal compliance activities. The State Bar identified in its 2022 budget that it will use funds to implement an ombudsperson office within the State Bar that will initially focus on admissions and discipline-related complaints.

Exhibit #34: 045
22-CV-01616-BAS-DDL

### Limitations in the State Bar's External Review Reduce Its Independence

Another method the State Bar has established to monitor the outcomes of its attorney discipline system is a semiannual review of closed cases by an external reviewer. However, flaws in the design of the external review process limit its independence, which increases the risk that the review is not objective. According to the U.S. Government Accountability Office, an external review can identify results that are not consistent with a program's objectives, reduce the risk of incorrect outcomes, and potentially detect fraud. However, an improperly designed external review can reduce or nullify these benefits. The State Bar's external review is limited in several ways as identified in the text box.

> **Limitations to the State Bar's External Review Process**
>
> - The State Bar has a long association with a single external reviewer.
>
> - The State Bar selects cases for review.
>
> - Findings are reported to the chief trial counsel instead of directly to the State Bar's board.
>
> - The State Bar lacks a process to track the review's findings.
>
> Source: Auditor analysis of the State Bar's external review policy and interviews with State Bar staff.

A key aspect of a properly designed external review is its independence, but several aspects of the State Bar's external review process call into question whether it is truly independent. For example, best practices state that a long association between the external reviewer and the entity can represent a threat to independence. For this reason, the external reviewer should be rotated to ensure that the reviewer does not become too familiar with the entity, which could affect the reviewer's objectivity. However, the State Bar contracted with a former employee as its external reviewer in 2012, and that same individual has conducted reviews for the State Bar since then. Although the executive director indicated that it is very difficult to find qualified people willing to perform this work, if the external review is not objective and independent, it may be providing a false sense of assurance.

Second, interfering with an external reviewer's selection of items to be examined or the procedures they use is considered to be an undue influence and a threat to the reviewer's independence. The State Bar's policy requires that the semiannual review include at least 260 case files that should be randomly selected but must include a minimum number of cases closed at the intake, investigation, and trial stages. However, according to the current policy, the State Bar selects each of the cases for the external reviewer. Not allowing the external reviewer to select the cases introduces the risk that the State Bar could withhold from review cases for which its staff did not follow prescribed policies. The chief trial counsel asserted that the selection of cases is random, using an algorithm developed by the State Bar, and that there is nothing to suggest that the State Bar has sought to influence the random selection of cases for the review. Nevertheless, the entity being reviewed should not select the items to be reviewed.

Best practices also indicate that the results of external reviews should be presented to those charged with governance—in this case the State Bar's board—and communicating those results should be free from interference. This arrangement can help ensure that the governing body receives objective information directly from the external reviewer upon which to base decisions for appropriate corrective action. However, instead of having the external reviewer present the findings to the board, the State Bar's policy until recently was for the trial counsel's office to prepare a memorandum summarizing the external review's findings and provide it to the trial counsel's office's management. In November 2021, the trial counsel's office began a practice of presenting the findings and recommendations of the external reviewer to the board, and it formalized this practice in a January 2022 policy directive. In the January 2022 policy, the State Bar indicated that the external reviewer is responsible for summarizing the external review's findings and any recommendations. The trial counsel's office prepares a written response to the review that it provides to a board committee along with the reviewer's summary. Although this new policy represents an improvement in how information is shared, the external reviewer should still be provided the opportunity to present the results of his or her review directly to the board. The chief trial counsel stated that he did not object to having the external reviewer report findings directly to the board as long as appropriate confidentiality could be maintained.

The benefits of the external review are further limited by the State Bar's lack of monitoring to ensure that it follows up on and corrects any deficiencies identified during the review. Best practices state that management should complete and document the corrective actions it takes to resolve findings from reviews. Currently, the State Bar's process for addressing recommendations from the external review is to consider them and, if its trial counsel managers deem them appropriate, to present its plans for implementing any agreed-upon recommendations to the board. However, according to the chief trial counsel, the State Bar does not have a formal process for tracking the implementation of recommendations from the external reviews. Without a method to track recommendations and the corrective actions it takes to resolve them, the State Bar increases the risk that it will overlook a recommendation or the corrective actions it should take to resolve an issue the external reviewer identifies. Neither the chief trial counsel nor the executive director objected to the establishment of a formal process to track progress on implementing recommendations from past external reviews, other than asserting that it would require additional resources to implement.

Please refer to page 5 to find the recommendations that we have made as a result of these audit findings.

Exhibit #34: 047
22-CV-01616-BAS-DDL

We conducted this performance audit in accordance with generally accepted government auditing standards and under the authority vested in the California State Auditor by Government Code section 8543 et seq. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on the audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

Respectfully submitted,

MICHAEL S. TILDEN, CPA
Acting California State Auditor

April 14, 2022

42 | California State Auditor Report 2022-030
April 2022

Exhibit #34: 049
22-CV-01616-BAS-DDL

# Appendix A

**Demographic Data Pertaining to Complaints Against Attorneys**

Table A displays by demographic group the number of cases closed from January 2010 through November 2021 and outcomes resulting in discipline. The State Bar collects demographic information when it administers the bar exam and when attorneys pay their annual dues. As respondents are not always required to provide such data, a large group of attorneys is categorized in the table as "information unavailable." To be consistent with the data collected by the State Bar, we have not altered the descriptions of the demographic categories. We present the descriptions as they appear in the State Bar's data.

We present the following information to provide perspective on cases and outcomes for the various demographic groups. However, to avoid interfering with ongoing litigation regarding disparate treatment in the State Bar's attorney discipline system, we do not draw conclusions on these data.

**Table A**
Attorney Discipline Cases and Disciplinary Outcomes by Race and Gender, 2010 through 2021

| RACE | GENDER | TOTAL CASES | PERCENTAGE CLOSED AT: | | | |
|---|---|---|---|---|---|---|
| | | | INTAKE | INVESTIGATION | PREFILING | POSTFILING |
| American Indian/ Alaska Native | Female | 209 | 61.7% | 17.7% | 9.1% | 11.5% |
| | Gender variant/ Nonconforming/ Nonbinary | 11 | 72.7 | 27.3 | 0 | 0 |
| | Male | 612 | 50.5 | 25.8 | 13.2 | 10.5 |
| | Multiple | 3 | 100 | 0 | 0 | 0 |
| | Not listed | 1 | 100 | 0 | 0 | 0 |
| | Two spirit* | 4 | 100 | 0 | 0 | 0 |
| *Totals for American Indian/Alaska Native* | | *840* | *54%* | *23.6%* | *11.9%* | *10.5%* |
| Asian | Female | 3,772 | 73.2% | 19.9% | 2.5% | 4.4% |
| | Gender variant/ Nonconforming/ Nonbinary | 6 | 83.3 | 16.7 | 0 | 0 |
| | Information unavailable | 169 | 18.9 | 17.8 | 37.9 | 25.4 |
| | Male | 10,962 | 56.5 | 21.4 | 14.6 | 7.4 |
| | Multiple | 18 | 66.7 | 33.3 | 0 | 0 |
| | Not listed | 2 | 100 | 0 | 0 | 0 |
| | Two spirit | 1 | 100 | 0 | 0 | 0 |
| *Totals for Asian* | | *14,930* | *60.4%* | *21%* | *11.8%* | *6.9%* |
| Black/African American | Female | 3,125 | 69.1% | 20.2% | 3.7% | 7% |
| | Gender variant/ Nonconforming/ Nonbinary | 4 | 100 | 0 | 0 | 0 |
| | Information unavailable | 2 | 100 | 0 | 0 | 0 |
| | Male | 7,186 | 56.7 | 24.7 | 7.3 | 11.3 |
| | Multiple | 32 | 65.6 | 31.3 | 0 | 3.1 |
| | Not listed | 3 | 0 | 0 | 100 | 0 |
| | Two spirit | 27 | 81.5 | 18.5 | 0 | 0 |
| *Totals for Black/African American* | | *10,379* | *60.5%* | *23.4%* | *6.2%* | *9.9%* |
| Hispanic/Latino | Female | 3,966 | 66.1% | 26% | 3% | 4.9% |
| | Gender variant/ Nonconforming/ Nonbinary | 3 | 100 | 0 | 0 | 0 |
| | Information unavailable | 40 | 60 | 10 | 7.5 | 22.5 |
| | Male | 11,522 | 62 | 25.7 | 5.1 | 7.2 |
| | Multiple | 39 | 64.1 | 33.3 | 0 | 2.6 |
| *Totals for Hispanic/Latino* | | *15,570* | *63.1%* | *25.7%* | *4.5%* | *6.7%* |

| RESULT | | | | | |
| PUBLIC DISCIPLINE | | | | NONPUBLIC MEASURES | |
| DISBARRED | SUSPENDED | PUBLIC REPROVAL | RESIGN WITH CHARGES PENDING | PRIVATE REPROVAL | NONDISCIPLINARY ACTIONS |
|---|---|---|---|---|---|
| 6.2% | 1.9% | 1% | 0% | 0% | 12.9% |
| 0 | 0 | 0 | 0 | 0 | 27.3 |
| | | | | | |
| 2.9 | 2.6 | 0.2 | 0 | 0.7 | 7.2 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| *3.7%* | *2.4%* | *0.4%* | *0%* | *0.5%* | *8.8%* |
| 0.9% | 2.3% | 0.2% | 0.1% | 0.2% | 10.4% |
| 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | |
| 21.9 | 1.8 | 0 | 0 | 0 | 4.1 |
| 2.3 | 3.2 | 0.2 | 0 | 0.2 | 9.5 |
| 0 | 0 | 0 | 0 | 0 | 5.6 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| *2.2%* | *2.9%* | *0.2%* | *0.1%* | *0.2%* | *9.7%* |
| 1.9% | 2.9% | 0.2% | 0.1% | 0.3% | 11.7% |
| 0 | 0 | 0 | 0 | 0 | 25 |
| | | | | | |
| 0 | 0 | 0 | 0 | 0 | 50 |
| 2.7 | 4.3 | 0.4 | 0 | 0.2 | 11.6 |
| 0 | 3.1 | 0 | 0 | 0 | 15.6 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 25.9 |
| *2.4%* | *3.9%* | *0.3%* | *0%* | *0.2%* | *11.7%* |
| 1.1% | 2% | 0.3% | 0.1% | 0.1% | 11.3% |
| 0 | 0 | 0 | 0 | 0 | 33.3 |
| | | | | | |
| 5 | 10 | 0 | 0 | 2.5 | 10 |
| 1.7 | 3.4 | 0.2 | 0 | 0.2 | 11.5 |
| 0 | 2.6 | 0 | 0 | 0 | 20.5 |
| *1.6%* | *3%* | *0.2%* | *0%* | *0.2%* | *11.4%* |

continued on next page...

Exhibit #34: 052
22-CV-01616-BAS-DDL

| RACE | GENDER | TOTAL CASES | PERCENTAGE CLOSED AT: | | | |
|---|---|---|---|---|---|---|
| | | | INTAKE | INVESTIGATION | PREFILING | POSTFILING |
| Information unavailable | Female | 587 | 63.4% | 16.9% | 14.1% | 5.6% |
| | Information unavailable | 32,425 | 54.5 | 22.9 | 11.3 | 11.2 |
| | Male | 2,500 | 61.2 | 23.3 | 9 | 6.5 |
| | Multiple | 36 | 63.9 | 22.2 | 2.8 | 11.1 |
| | Not listed | 5 | 80 | 20 | 0 | 0 |
| | Two spirit | 1 | 100 | 0 | 0 | 0 |
| *Totals for Information unavailable* | | *35,554* | *55.2%* | *22.8%* | *11.2%* | *10.8%* |
| Middle Eastern/ North African | Female | 829 | 72.9% | 24.7% | 1% | 1.4% |
| | Gender variant/ Nonconforming/ Nonbinary | 4 | 50 | 0 | 50 | 0 |
| | Male | 3,606 | 60.6 | 35.6 | 1.4 | 2.4 |
| | Multiple | 2 | 100 | 0 | 0 | 0 |
| | Not listed | 9 | 100 | 0 | 0 | 0 |
| | Two spirit | 1 | 0 | 0 | 0 | 100 |
| *Totals for Middle Eastern/North African* | | *4,451* | *63%* | *33.5%* | *1.4%* | *2.2%* |
| Multiracial | Female | 2,628 | 73.7% | 22.4% | 1.3% | 2.5% |
| | Gender variant/ Nonconforming/ Nonbinary | 18 | 66.7 | 27.8 | 0 | 5.6 |
| | Information unavailable | 14 | 64.3 | 28.6 | 0 | 7.1 |
| | Male | 5,209 | 65.7 | 27.1 | 1.8 | 5.4 |
| | Multiple | 259 | 57.9 | 30.1 | 5.4 | 6.6 |
| | Not listed | 36 | 86.1 | 8.3 | 2.8 | 2.8 |
| | Two spirit | 16 | 62.5 | 18.8 | 6.3 | 12.5 |
| *Totals for Multiracial* | | *8,180* | *68.1%* | *25.6%* | *1.8%* | *4.5%* |
| Native Hawaiian/ Other Pacific Islander | Female | 187 | 75.4% | 20.9% | 0.5% | 3.2% |
| | Information unavailable | 6 | 83.3 | 16.7 | 0 | 0 |
| | Male | 478 | 70.1 | 23.8 | 1.3 | 4.8 |
| | Multiple | 1 | 0 | 100 | 0 | 0 |
| | Two spirit | 10 | 70 | 20 | 0 | 10 |
| *Totals for Native Hawaiian/Other Pacific Islander* | | *682* | *71.6%* | *23%* | *1%* | *4.4%* |
| Other race, ethnicity, or origin | Female | 1,121 | 76.8% | 20.1% | 1.2% | 2% |
| | Gender variant/ Nonconforming/ Nonbinary | 12 | 75 | 25 | 0 | 0 |
| | Information unavailable | 28 | 85.7 | 14.3 | 0 | 0 |
| | Male | 3,778 | 69.3 | 24.8 | 2.4 | 3.5 |
| | Multiple | 97 | 64.9 | 25.8 | 3.1 | 6.2 |
| | Not listed | 557 | 70 | 22.3 | 3.8 | 3.9 |
| | Two spirit | 37 | 81.1 | 18.9 | 0 | 0 |
| *Totals for Other race, ethnicity, or origin* | | *5,630* | *71%* | *23.6%* | *2.2%* | *3.2%* |

Exhibit #34: 053
22-CV-01616-BAS-DDL

| RESULT | | | | | |
| PUBLIC DISCIPLINE | | | | NONPUBLIC MEASURES | |
| DISBARRED | SUSPENDED | PUBLIC REPROVAL | RESIGN WITH CHARGES PENDING | PRIVATE REPROVAL | NONDISCIPLINARY ACTIONS |
|---|---|---|---|---|---|
| 2.6% | 2.6% | 0.2% | 0% | 0% | 8.9% |
| 3.9 | 3.1 | 0.2 | 0.4 | 0.1 | 6 |
| 1.2 | 3.8 | 0.2 | 0.2 | 0.1 | 9.8 |
| 0 | 11.1 | 0 | 0 | 0 | 5.6 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| *3.7%* | *3.2%* | *0.2%* | *0.3%* | *0.1%* | *6.3%* |
| 0% | 0.8% | 0.1% | 0% | 0% | 15.2% |
| 0 | 0 | 0 | 0 | 0 | 50 |
| 0 | 1.6 | 0.1 | 0 | 0.1 | 14.1 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 11.1 |
| 0 | 100 | 0 | 0 | 0 | 0 |
| *0%* | *1.5%* | *0.1%* | *0%* | *0.1%* | *14.3%* |
| 0.1% | 1.3% | 0.1% | 0.1% | 0.2% | 11.3% |
| 0 | 0 | 0 | 0 | 0 | 16.7 |
| 0 | 0 | 0 | 0 | 0 | 35.7 |
| 0.3 | 2.6 | 0.3 | 0 | 0.3 | 11.2 |
| 0 | 5 | 0 | 0 | 0.4 | 11.2 |
| 0 | 0 | 0 | 0 | 2.8 | 13.9 |
| 6.3 | 0 | 6.3 | 0 | 0 | 18.8 |
| *0.3%* | *2.2%* | *0.2%* | *0%* | *0.3%* | *11.3%* |
| 0.5% | 2.7% | 0% | 0% | 0% | 11.2% |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | 2.3 | 0.2 | 0 | 0.2 | 15.9 |
| 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 10 | 0 | 0 | 0 | 20 |
| *0.9%* | *2.5%* | *0.1%* | *0%* | *0.1%* | *14.5%* |
| 0.1% | 0.8% | 0.3% | 0% | 0.4% | 13.3% |
| 0 | 0 | 0 | 0 | 0 | 25 |
| 0 | 0 | 0 | 0 | 0 | 17.9 |
| 0.2 | 1.9 | 0.3 | 0 | 0.2 | 13.2 |
| 0 | 6.2 | 0 | 0 | 0 | 6.2 |
| 0.2 | 2.3 | 0.4 | 0.2 | 0.2 | 12.6 |
| 0 | 0 | 0 | 0 | 0 | 16.2 |
| *0.2%* | *1.8%* | *0.3%* | *0%* | *0.2%* | *13.1%* |

*continued on next page…*

Exhibit #34: 054
22-CV-01616-BAS-DDL

| RACE | GENDER | TOTAL CASES | PERCENTAGE CLOSED AT: | | | |
|------|--------|-------------|--------|---------------|-----------|------------|
| | | | INTAKE | INVESTIGATION | PREFILING | POSTFILING |
| White | Female | 28,348 | 73.4% | 18.2% | 3.5% | 4.8% |
| | Gender variant/ Nonconforming/ Nonbinary | 73 | 75.3 | 16.4 | 1.4 | 6.8 |
| | Information unavailable | 507 | 68.8 | 18.1 | 9.7 | 3.4 |
| | Male | 95,480 | 66.2 | 21.7 | 5.3 | 6.8 |
| | Multiple | 376 | 65.4 | 32.2 | 0.5 | 1.9 |
| | Not listed | 148 | 60.8 | 27 | 2 | 10.1 |
| | Two spirit | 37 | 83.8 | 16.2 | 0 | 0 |
| *Totals for White* | | *124,969* | *67.8%* | *21%* | *4.9%* | *6.3%* |
| **Totals for All** | | **221,185** | **64.5%** | **22.2%** | **6.2%** | **7.1%** |

Source:  The State Bar's case data from January 2010 through November 10, 2021, and attorney demographic data reported to the State Bar through its administration of the bar exam and during the collection of annual dues.

\* California state law includes two spirit as a non-binary gender identity. According to the Federal Indian Health Service, traditionally, in most Native American tribes two spirit people occupy a distinct, alternative gender status, but not all cultures perceive two spirit people the same way.

Exhibit #34: 055
22-CV-01616-BAS-DDL

| RESULT | | | | | |
| PUBLIC DISCIPLINE | | | | NONPUBLIC MEASURES | |
| DISBARRED | SUSPENDED | PUBLIC REPROVAL | RESIGN WITH CHARGES PENDING | PRIVATE REPROVAL | NONDISCIPLINARY ACTIONS |
|---|---|---|---|---|---|
| 1.2% | 1.6% | 0.2% | 0% | 0.2% | 9.7% |
| 0 | 5.5 | 0 | 0 | 0 | 9.6 |
| 0.8 | 1.2 | 0.2 | 0 | 0.2 | 8.1 |
| 1.9 | 2.9 | 0.2 | 0.1 | 0.2 | 10.6 |
| 0 | 1.3 | 0 | 0.3 | 0 | 15.7 |
| 0 | 8.8 | 0 | 0 | 0.7 | 8.1 |
| 0 | 0 | 0 | 0 | 0 | 10.8 |
| 1.8% | 2.6% | 0.2% | 0.1% | 0.2% | 10.4% |
| 2% | 2.8% | 0.2% | 0.1% | 0.2% | 10% |

50 | California State Auditor Report 2022-030
**April 2022**

# Appendix B

### Scope and Methodology

We conducted this audit pursuant to the requirements contained in the Business and Professions Code section 6145. Specifically, we assessed the State Bar's management of its attorney discipline system by reviewing its policies and procedures and how it implemented that guidance by reviewing a selection of attorney misconduct complaints. Table B lists the audit objectives and the methods we used to address them.

**Table B**
**Audit Objectives and the Methods Used to Address Them**

| | AUDIT OBJECTIVE | METHOD |
|---|---|---|
| 1 | Review and evaluate the laws, rules, and regulations significant to the State Bar's operations. | Reviewed laws, regulations, and other background material related to the regulation of attorneys in California. |
| 2 | Analyze whether the State Bar adequately reviews complaints against attorneys to determine the existence and extent of alleged misconduct and whether it takes appropriate disciplinary action. | Based on our assessment of the sufficiency of the State Bar's controls in Objective 3, we reviewed the State Bar's handling of a judgmental selection of attorney discipline cases in the following areas:<br>• Cases closed through nonpublic measures.<br>• Cases closed when the complaint was withdrawn.<br>• Cases resulting from misconduct in other jurisdictions.<br>• Cases closed for a lack of sufficient evidence.<br>• Cases representing a pattern of complaints.<br>• Cases regarding client trust accounts. |
| 3 | Assess the sufficiency of the State Bar's management controls, including conflict-of-interest policies, to ensure that investigations of attorney complaints are not compromised by undue influence. | • Reviewed the State Bar's policies and interviewed staff regarding its processes for investigating and disciplining attorneys accused of misconduct.<br>• Assessed the State Bar's conflict-of-interest policies and reviewed its methods for tracking, identifying, and mitigating potential conflicts between its staff and the attorneys the State Bar regulates.<br>• Evaluated the State Bar's external review of its attorney discipline complaint process. |
| 4 | Examine any data trends that could suggest racial or gender inequities in outcomes from the discipline process. | • Presented data on outcomes in the discipline system by race and gender in Appendix A.<br>• Because of ongoing litigation regarding allegations of disparate treatment in the State Bar's attorney discipline system, we do not make conclusions on the demographic data provided by the State Bar. |
| 5 | Identify potential options for the State Bar to more proactively protect the public from misconduct by licensed attorneys, including, to the extent possible, the implementation of an independent discipline monitor, an independent ombudsperson, or other options to protect the public. | • Assessed actions taken by other entities engaged in the regulation of attorney conduct that could benefit the State Bar in accomplishing its mission.<br>• Interviewed State Bar staff to obtain perspective on the feasibility of the implementation of practices identified in this objective. |
| 6 | Review and assess any other issues that are significant to the audit. | Did not identify any areas outside of those identified in the objectives above as being significant to the audit. |

Source: Audit workpapers.

Exhibit #34: 058
22-CV-01616-BAS-DDL

**Assessment of Data Reliability**

The U.S. Government Accountability Office, whose standards we are statutorily required to follow, requires us to assess the sufficiency and appropriateness of the computer-processed information that we use to support our findings, conclusions, or recommendations.

In performing this audit, we relied on the State Bar's discipline case management data. To evaluate these data, we reviewed existing information about the data, interviewed staff knowledgeable about the data, and performed electronic testing of the data. We found that these data were sufficiently reliable for the purposes of this audit. We also obtained attorney demographic data from the State Bar. We found these data to be of undetermined reliability because the data are self-reported to the State Bar by each individual when paying annual dues or applying to take the bar exam.

Additionally, we relied on data in the State Bar's conflicts list. As our testing identified that the State Bar had not consistently used the conflicts list, we did not assess the accuracy or completeness of the list. As such, we found these data to be of undetermined reliability.

 **The State Bar** *of California*

**BOARD OF TRUSTEES**

180 Howard Street, San Francisco, CA 94105

Ruben.Duran@calbar.ca.gov

Michael Tilden, CPA*
Acting California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, CA 95814

RE: State Bar of California Response to Audit Report No. 2022-030

Dear Mr. Tilden:

The State Bar has been working diligently to improve the effectiveness, timeliness, and fairness of its discipline system. Based on proposals from the Board of Trustees' (Board) Special Discipline Case Audit Committee convened in response to clear failings in responding to complaints regarding licensee Thomas Girardi, the State Bar is currently implementing a comprehensive Client Trust Account Protection Program, among other efforts. Additionally, in accordance with directives in Senate Bill 211 (Umberg), we are working with outside experts to develop and propose new case processing standards aimed at resolving attorney discipline cases in a timely, effective, and efficient manner while minimizing backlogs of attorney discipline cases and best protecting the public. We continue our efforts to address previous reports regarding racial disparities in the discipline system. And, just last week, we adopted a five-year strategic plan that puts front and center our commitment to administer an attorney discipline system that is efficient, accountable, and transparent.

Given the Board's intense focus on the discipline system, and our understanding of the gravity of the deficiencies that the Girardi matter laid bare, some of the findings in your recent report are profoundly eye-opening and troubling. In particular, our failure to promulgate clear and comprehensive policies in the areas identified, and to develop corresponding accountability measures to ensure compliance with those policies, are unacceptable. We are proud to have appointed a new chief trial counsel who manifests this sentiment, as reflected by the many steps he has already taken to address identified deficiencies so far in his short tenure, as well as his responsiveness during the audit process itself, a characteristic well-documented in your report. Our executive director shares this sentiment as well, and her responsiveness during the audit process is also well-documented in your report. We appreciate the insights provided by your report, and we will continue to work with both the executive director and the chief trial

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 South Figueroa Street
Los Angeles, CA 90017

* California State Auditor's comments begin on page 65.

Exhibit #34: 060
22-CV-01616-BAS-DDL

Michael Tilden
April 1, 2022
Page 2

counsel to incorporate your findings into our ongoing efforts to improve the attorney discipline system.

As outlined below, we generally agree with the majority of your recommendations; there is only one area where we disagree on policy grounds. We also believe it is important that we explicitly address the resource needs associated with the implementation of the reforms you have outlined. To that end, we have included a fiscal impact section in this response. Because of the very real resource constraints we face, our agreement with any particular recommendation is, respectfully, not a commitment to implement that recommendation absent new resources. We have made this distinction where applicable.

**State Bar Responses to Audit Recommendations**

1. *Recommendation*: To ensure that it uses nonpublic measures to close complaints only when such use is consistent and appropriate, the State Bar should revise its policies by October 2022 to define specific criteria for which cases are eligible to be closed using nonpublic measures and which are not eligible.

   *Response*: Agree. As noted, the Office of Chief Trial Counsel (OCTC) has in place a policy, issued in June 2021, that addresses nonpublic alternatives to discipline—resource, directional, and warning letters and agreements in lieu of discipline (ALDs)—and provides guidance on their content and how to decide when to issue them. We agree that this policy should be modified to address private reprovals issued prior to filing of a Notice of Disciplinary Action—a nonpublic form of discipline—and to provide additional and more specific criteria for which cases are and are not eligible for closure or resolution using any of these nonpublic measures. No later than October 2022, OCTC will adopt specific criteria that provide more guidance for the exercise of staff discretion in determining whether use of any of these nonpublic measures is or is not appropriate based on the particular facts.

2. *Recommendation*: To ensure that it fulfills its duties to investigate attorney misconduct, by April 2023, the State Bar should begin monitoring compliance with its new policy for identifying the circumstances in which investigators should continue to investigate even if the complainant withdraws the complaint.

   *Response*: Agree; full implementation dependent on resources.

   As noted, in February 2022, OCTC put in place a new policy making clear that a complainant's withdrawal of or failure to cooperate in the investigation of their

Michael Tilden
April 1, 2022
Page 3

complaint is not alone a basis for closure and setting out the circumstances under which, in both intake and investigation, complaints should continue to be pursued despite a complainant's withdrawal or failure to cooperate. In conjunction with the implementation of the new policy, closing codes in OCTC's case management system have been modified to accord with the policy. We will monitor compliance with this policy by regularly conducting a randomized review of files closed using certain of these codes. This will require State Bar staff to pull files closed using these codes, review the substance of the files, and check the closing letters to ensure that closures complied with the policy. As noted below, such monitoring will require additional resources.   ①

3. *Recommendation*: The State Bar should notify the public on its website when other jurisdictions determine that an attorney that is also licensed in California presents a substantial threat of harm to the public.

   *Response*: The State Bar agrees that if we learn of an interim action and finding in another jurisdiction regarding an attorney that is also licensed in California, we will notify the public on our website by posting of a consumer alert setting out the nature of the interim action and finding while also advising that the attorney is presumed innocent of the disciplinary charges in the other jurisdiction unless and until those charges have been established.

   Please understand that our ability to learn of interim actions in other jurisdictions is limited, however. The American Bar Association (ABA) data bank referenced in the next recommendation depends on reporting to that data bank by other jurisdictions, and it is not clear how often interim actions are reported.   ②

4. *Recommendation*: To ensure that it identifies discipline imposed on California attorneys in other jurisdictions, the State Bar should use the American Bar Association's data bank to identify attorneys disciplined in other jurisdictions who do not report that discipline.

   *Response*: Agree. OCTC staff have access to the ABA data bank and are now set up to receive automated emails when another jurisdiction notifies the ABA data bank of discipline imposed on an attorney identified in the data bank as also being admitted in California.

5. *Recommendation*: To allow its staff to more easily identify patterns of similar complaints made against attorneys, by July 2022, the State Bar should begin using its general complaint type categorizations when determining whether to investigate a complaint.

Exhibit #34: 062
22-CV-01616-BAS-DDL

56 | California State Auditor Report 2022-030
April 2022

Michael Tilden
April 1, 2022
Page 4

*Response*: Agree; full implementation dependent on resources.

As noted, in February 2022 OCTC implemented a policy regarding intake's consideration of prior closed complaints in determining whether to move a current complaint forward for investigation. As also noted, the State Bar has recently developed a set of general complaint type categorizations that group particular allegations into more general categories. We agree that OCTC should begin using the general complaint type categorizations for the purpose of identifying possible patterns of similar complaints among both previously closed and currently open complaints. The identification of a pattern may signal additional steps that should be taken, either in intake or investigation, before making a determination as to how to proceed with the current complaint or whether to reopen older complaints for further action.

Pursuant to a Board resolution adopted to address findings regarding racial disparities in the discipline system, complaints closed without discipline or an alternative to discipline that are more than five years old are archived and will not be reviewed as part of the effort to identify patterns of similar complaints.

6. *Recommendation*: To improve its ability to identify and prevent conflicts of interest that its staff may have with attorneys who are subjects of complaints, the State Bar should develop a process by July 2022 for monitoring the accuracy of the information in its case management system used to flag attorneys with whom its staff have declared that they have a conflict of interest.

*Response*: Agree; full implementation dependent on resources.

7. *Recommendation*: To ensure that State Bar staff do not inappropriately close cases against attorneys on the conflict list, the State Bar should create a formal process by October 2022 for determining whether it is able to objectively assess whether such a complaint should be closed or whether the decision should be made by the independent administrator. The State Bar should document this assessment in its case files for each case against an attorney on the conflict list.

*Response*: Agree; full implementation dependent on resources.

The Board's Special Discipline Case Audit Committee identified as a priority the need to ensure that all OCTC investigative and charging decisions are free from conflicts or outside influence. Accordingly, we agree that decisions to close cases should be made only after conflicts determinations are made and documented. We will work with the

Michael Tilden
April 1, 2022
Page 5

chief trial counsel to establish a formal process under which OCTC staff are required to review cases prior to closure to identify potential conflicts, refer any cases posing a potential conflict to the independent administrator of the Special Deputy Trial Counsel program for a final determination regarding the potential conflict, and document this process and the final determination regarding conflicts in OCTC's case management system.

8. *Recommendation*: To ensure the independence and objectivity of the external review of its case files, the State Bar should amend its policies by July 2022 to do the following:

- Require the external reviewer to select the cases for the semiannual review.
- Establish formal oversight to ensure that it follows up and addresses the external reviewer's findings.

*Response*: Agree; full implementation dependent on resources.

In November 2021 the chief trial counsel began providing to the Board a summary of the external reviewer's report and recommendations together with OCTC's response to the recommendations. In January 2022, with the Board's agreement, the chief trial counsel issued a policy formalizing this practice. We will work with the chief trial counsel to implement policies and procedures for OCTC to also report back to the Board on its progress in implementing actions to address the external reviewer's findings.

9. *Recommendation*: To ensure it appropriately reviews complaints involving overdrafts and alleged misappropriations from client trust accounts, the State Bar should perform the following by July 2022:

a. Discontinue its use of informal guidance for review of bank reportable actions and direct all staff to follow the policies established in it is intake manual.
b. Revise its intake manual to disallow de minimis closures if the attorney has a pending or prior bank reportable action or case alleging a client trust account violation.
c. Establish a monitoring system to ensure staff are following its policies for de minimis closures.
d. When investigating client trust account related cases and bank reportable actions not closed de minimis, require its staff to obtain both the bank statements and the attorney's contemporaneous reconciliation of the client trust account, and determine if the relevant transactions are appropriate.
e. Require a letter with client trust account resources to be sent to the attorney after the closure of every bank reportable action.

Exhibit #34: 064
22-CV-01616-BAS-DDL

Michael Tilden
April 1, 2022
Page 6

*Response*: Agree in part, disagree in part, as outlined below.

9a.   Discontinue its use of informal guidance for review of bank reportable actions and direct all staff to follow the policies established in it is intake manual.

Agree.

9b.   Revise its intake manual to disallow de minimis closures if the attorney has a pending or prior bank reportable action or case alleging a client trust account violation.

③    Agree in part. While manual revisions are still pending, there will be some exceptions to the approach recommended by the State Auditor, primarily designed to take into account the age and amount of prior reportable actions and the age and disposition of prior client trust account violation complaints.

9c.   Establish a monitoring system to ensure staff are following its policies for de minimis closures.

Agree; full implementation dependent on resources.

④    To monitor compliance with policies for de minimis closures of bank reportable actions, a randomized review of such closures will need to be conducted at regular intervals. This will require State Bar staff to pull files underlying these closures, review the substance of the files, and check closing letters to ensure that closures have accorded with policies. As noted below, we believe such monitoring will require additional resources.

9d.   When investigating client trust account related cases and bank reportable actions not closed de minimis, require its staff to obtain both the bank statements and the attorney's contemporaneous reconciliation of the client trust account, and determine if the relevant transactions are appropriate.

Disagree.

This approach would consume inordinate amounts of resources and time, requiring the State Bar in every such case to: (a) request from the attorney and/or subpoena from the bank statements for the account and wait for their

Exhibit #34: 065
22-CV-01616-BAS-DDL

Michael Tilden
April 1, 2022
Page 7

receipt; (b) request the attorney's contemporaneous reconciliation and wait for its receipt; and (c) do a financial analysis of the statements and reconciliation to determine if the relevant transactions are appropriate. Many bank reportable actions and client trust account complaints do not warrant this level of investigation. For example, some non de minimis bank reportable actions are explained by extended holds on deposits of which the attorney was unaware, resulting in the issuance of checks at a time when the attorney believed funds had cleared but they had not—if a more truncated investigation shows this to be the case, there is no justification for the more extensive further investigation recommended by the State Auditor. A study the State Bar conducted last year of over 70,000 bank reportable action matters found that 22 percent did not involve a negative bank balance in actuality—the reportable action was triggered only by check deposit holds. Doing an investigation of the scope recommended by the State Auditor for every bank reportable action and client trust account complaint regardless of the underlying facts and merits would result in a waste of limited investigative resources and is not sound public policy.

⑤

⑥

In addition, given data that shows that Black male attorneys are ten times more likely than their white male counterparts to be the subject of bank reportable actions, the impact of the approach recommended by the State Auditor will fall heavily on this group of attorneys. Black male attorneys will be disproportionately required to take time away from their practices to gather and submit documentation to the bar and respond to investigative inquiries. Given that the data indicates that there is a significant percentage of cases for which this level of intervention is not required, the potentially disparate impact of the State Auditor's approach is difficult to justify.

⑦

As noted above, OCTC has already modified its policy for identifying the circumstances in which complaints should continue to be pursued despite a complainant's withdrawal or failure to cooperate, and it will be revising its policies and practices regarding the use of alternatives to discipline and the identification of patterns of similar complaints against attorneys. All of these policy changes will apply to the State Bar's handling of bank reportable actions and complaints alleging client trust account violations. In addition, OCTC will revise its policies to define specific criteria in which bank reportable actions and complaints alleging client trust account violations should not be closed in the absence of obtaining both bank statements and the attorney's contemporaneous reconciliation of a client trust account and determining if the relevant transactions are appropriate and will implement a monitoring system to

Michael Tilden
April 1, 2022
Page 8

ensure these policies are being followed. We believe that this more targeted approach will more efficiently and effectively use the State Bar's limited investigative resources to further the goal of public protection while at the same time minimizing disparate impacts from increased investigations of bank reportable actions and client trust account complaints.

9e.  Require a letter with client trust account resources to be sent to the attorney after the closure of every bank reportable action.

Agree.

**Resources Needed to Implement the State Auditor's Recommendations**

⑧  The fiscal impact of the State Auditor's recommendations are as follows:

A.  Increased oversight and monitoring. [recommendations 2, 6, 7, 8, and 9c]

Given the volume of complaints handled by OCTC, the proactive regulation and compliance monitoring mechanisms reflected in the audit recommendations will require both human and technological capital:

| Recommendation | FTE Impact | Contractual Impact | Notes |
|---|---|---|---|
| #2: Withdrawn Complaint Policy | 1 | | Additional staff resources needed to audit compliance with policy. This effort will involve random selection and review of a statistically significant sample of case files. |
| #6 and #7: Improve Conflict Identification and Response | 1.5 | $200,000 annually | Additional staff resources needed to audit conflict flags in case management system against staff reported conflicts of interest as well as to implement more rigorous approach to case closure determination where conflict identified; additional workload for the Special Deputy Trial |

Michael Tilden
April 1, 2022
Page 9

| | | | |
|---|---|---|---|
| | | | Counsel program (conflicts counsel) also anticipated as more cases will be directed to that program for closure determination. |
| #8: Oversight of Compliance with External Reviewer's Findings | 1 | | Formal monitoring and tracking of implementation actions taken in response to each external review (two per year) will require additional staff resources. |
| #9c: Monitor de minimis closures of bank reportable actions | 3 | | Additional staff resources needed to audit compliance with policy. This effort will involve random selection and review of a statistically significant sample of case files. |

B.    Identifying patterns of complaints using new complaint categorizations. [recommendation 5]

Implementation of this recommendation will require significant work to categorize previously closed and currently open cases in accordance with the general complaint type categorizations and ensure that this categorization is available in a readily accessible way to investigators and attorneys.

| FTE Impact | Contractual Impact | Notes |
|---|---|---|
| 2 | $500,000 | Contractual dollars needed to configure case management system to reflect new categorization system and to identify complaint patterns; additional staff needed to support continued implementation of categorization system and analysis of results. |

C.    Investigate all reportable actions not closed as de minimis and all client trust account complaints. [recommendation 9d]

As noted above, the State Bar disagrees with this recommendation on policy grounds.

Michael Tilden
April 1, 2022
Page 10

That being said, irrespective of policy concerns, the fiscal impact of this recommendation is significant:

| FTE Impact | Contractual Impact | Notes |
|---|---|---|
| 22 | $500,000 | Contractual resources needed to develop platform for automated transmittal of bank and attorney records and 1 FTE needed to maintain platform; one trial team (19 FTE[1]) needed to investigate all reportable actions not closed as de minimis (estimated at approximately 1,500 annually) and all client trust account complaints (estimated at 1,000 annually); additionally, 2 forensic accountants needed to support review of bank and reconciliation records. |

In total, full implementation of the State Auditor's recommendations would require an additional **30.5 FTE** and **$200,000 annually** on a go-forward basis, as well as **$1 million in one-time funds.** Absent new resources, the State Bar's implementation of these recommendations will be limited to what can be done within existing funding parameters.

In closing, we thank you for your review, which has helped sharpen the focus of discipline system improvements currently underway and identified areas for further improvement. It is gratifying to know that the Board's and our staff's focused efforts align with issues and recommendations set forth in your report. We have set improvement of the attorney discipline system as our number one goal in our recently adopted five-year strategic plan and have worked with the executive director and new chief trial counsel to identify strategies and implementation steps for accomplishing this goal beyond those already underway. Current externally facing efforts include the Client Trust Account Protection Program, which, when fully

---

[1] The recommendation for investigating reportable action matters and CTA-related complaints would add approximately 1,500 cases to OCTC's investigation caseload per year.

⑨ The State Bar completed a workload study in 2018 that was reviewed by the State Auditor; you recommended an additional 19 new positions for OCTC based on that review. Applying the previously vetted 2018 workload study methodology, the additional investigation cases that will result from implementation of recommendation 9d. will require an estimated 19 additional investigators:

As outlined in the 2018 workload study, 67 budgeted investigator positions handled approximately 5,600 cases per year. The 19 new positions recommended by the State Auditor at that time included 5 new investigator positions, bringing the total to 72. The relationship between 72 investigator positions and 5,600 cases translated to 78 cases per investigator per year. Applying this caseload to the 1,500 additional cases in investigation that will result from implementation of recommendation 9d. will thus result in the need for 19 additional investigators.

Michael Tilden
April 1, 2022
Page 11

implemented, will reflect the first comprehensive proactive regulation of legal client trust accounts in the state's history, and the Ad Hoc Commission on the Discipline System, which is charged with conducting a wide-ranging review of the efficiency, effectiveness, and fairness of the attorney discipline system. Less visible has been our inward focus on strengthening Board oversight of the chief trial counsel and OCTC. Of particular note is the fact that beginning in 2021, performance targets have been set for the chief trial counsel; progress in relation to those targets is formally assessed on a quarterly basis under the direction of the leadership of the Board's Regulation and Discipline Committee.

(10)

Reflecting the value we see in many of your recommendations as well as their alignment with initiatives in progress under the leadership of the new chief trial counsel, we have already taken significant steps towards implementing several. In November 2021 the chief trial counsel began to present to the Board of Trustees a summary of the external reviewer's report and recommendations together with OCTC's response to those recommendations. In February 2022 several reforms were initiated including issuance of a new policy outlining the circumstances in which staff should continue to pursue allegations of misconduct even if a complainant withdraws their complaint, and a clarification of office policy regarding consideration of prior closed complaints. Information technology staff has also been engaged to ensure that conflicts information in the case management system reflects the most current information from the conflict-of-interest database. While it is undeniable that there is much work to do to address challenges that have been decades in the making and are reflective of a complex and unproductive cycle of insufficient funding, poor outcomes, and low morale, I am confident that the Board will continue to both demand and support meaningful improvement in all areas of OCTC's operations.

We are committed to doing the internal work needed to ensure that our attorney discipline system is effective, efficient, transparent, and fair. Although we cannot fully implement the State Auditor's recommendations absent additional funding, we will advance the majority of them to the full extent possible given the resource constraints we face.

Sincerely,

Ruben Duran
Chair, Board of Trustees

# Comments

## CALIFORNIA STATE AUDITOR'S COMMENTS ON THE RESPONSE FROM THE STATE BAR OF CALIFORNIA

To provide clarity and perspective, we are commenting on the response to our audit from the State Bar. The numbers below correspond to the numbers we have placed in the margin of the response.

We did not assess the changes the State Bar made to its case management system. As we note on page 16, the State Bar issued a policy directive in February 2022 regarding those cases in which the complainant withdraws the complaint or otherwise fails to cooperate in the investigation. Because our audit fieldwork was substantially complete, we did not perform testing to determine whether the State Bar's modification of closing codes would help alleviate our concern. We look forward to reviewing the details of the State Bar's efforts to address this issue in its 60-day response to our recommendations.

①

The State Bar's reference to the American Bar Association's data bank in response to this recommendation is misleading. Our recommendation regarding the data bank pertains to final orders of discipline. We did not recommend that the State Bar use the data bank for identifying interim actions. Therefore, the State Bar's mention of the data bank in this context is not relevant.

②

The State Bar's response addressing proposed revisions to its intake manual may not result in a meaningful change to its existing policy. As Figure 4 on page 32 shows, one attorney had 34 cases closed as *de minimis* and was ultimately disbarred based on a federal conviction of money laundering through their client trust accounts. Without additional details on the exceptions that the State Bar plans to make to the approach that we recommended, it is unclear whether this policy will address this type of concern and others we describe.

③

The State Bar's description of the actions necessary to monitor compliance with policies for closing bank reportable actions indicates that it does not plan to implement our recommendation for limiting *de minimis* closures as stated on page 6. If the State Bar were to implement our recommendation for revising its intake manual, there would be no need to review the underlying files or check the closing letters. Instead, supervisors could determine whether staff followed the change to the State Bar's policies we recommend by simply reviewing an attorney's case history whenever a case is closed as *de minimis*.

④

(5)   The State Bar's response overstates the level of review we recommended and does not address the significant failures of its investigative process that we identified. Our recommendation does not suggest that the State Bar should conduct a full financial analysis involving a forensic accountant for every bank reportable action or client trust account case. Rather, when investigating such cases the State Bar should, at a minimum, obtain more reliable evidence, including bank statements and the client trust account reconciliations that the attorney is already required to maintain.

The recommendation is intended to address the inadequate evidence that the State Bar has relied on in the past when closing cases, such as those instances we identified in which the State Bar should have conducted a more thorough review. For example, in its investigation of the attorney we describe in Case Example 9 on page 37, the State Bar relied on the attorney's narrative detailing certain transactions pertaining to overdrafts in a particular month and a bank statement for a different month. Similarly, the State Bar accepted the attorney's explanation when investigating a complaint described in Case Example 6 on page 33 and closed the complaint without taking further action. Ultimately, the State Bar determined that the attorney had been withdrawing funds from the client trust account to pay for personal expenses. Finally, as we illustrate in Figure 4 on page 32, after a long history of closing complaints against an attorney as *de minimis*, the State Bar determined that the attorney had used the client trust account for impermissible purposes to pay for personal expenses. The inappropriate transactions that the State Bar did ultimately find were identified through its review of bank records.

Accordingly, we stand by our recommendation on page 7 regarding obtaining bank statements and the attorney's contemporaneous reconciliations, which are more reliable forms of evidence for investigating client trust account related cases and bank reportable actions than attorney assertions.

(6)   The statistic that the State Bar describes does not support its conclusions. Based on the State Bar's statement that 22 percent of the bank reportable action matters it reviewed did not involve a negative balance, it appears to be acknowledging that the remaining 78 percent of those matters did involve a negative balance. Such a substantial number of bank reportable actions involving actual negative bank balances is indicative of high risk and the need for more thorough investigations. In contrast, the State Bar suggests that investigating these matters without considering the underlying facts and merits would be a waste of limited investigative resources and is not sound public policy. However, as we illustrate throughout the report, the State Bar has regularly failed to effectively assess the

underlying facts and merits of bank reportable actions, resulting in harm to the public. Thus, the State Bar's objections to investigating bank reportable actions on a more consistent basis are unreasonable.

We disagree with the State Bar's assertion that our recommendation would disproportionately require certain attorneys to take time away from their practices to gather and submit documentation. Providing the information we recommend should not represent a significant workload. As we note on page 28, the State Bar's Rules of Professional Conduct require attorneys to maintain, among other things, monthly reconciliations of their client trust accounts. Thus, attorneys should have the required information readily available to comply with a request from the State Bar. Further, as we describe on page 31, in some cases the State Bar closed complaints without contacting the attorney to obtain additional information or to provide guidance for avoiding future complaints. If the State Bar were to consistently provide information on client trust account resources to attorneys after closing each bank reportable action, as we recommend on page 7, this information may help reduce the number of bank reportable actions for all attorneys. With respect to the State Bar's disparate impact concerns, it is the responsibility of the State Bar, just like all auditees, to implement our recommendations in a manner consistent with federal and state law.

⑦

The resources the State Bar asserts that it needs to implement our recommendations appear to be significantly inflated and based on questionable estimates. For example, the State Bar indicates that it needs three full-time staff to monitor *de minimis* closures of bank reportable actions. This number appears excessive because its supervisors should already be performing some monitoring of staff's compliance with the existing policy. Moreover, the change described in our recommendation regarding *de minimis* closures on page 6 would not require the State Bar to randomly select and review case files, as it proposes to do.

⑧

The State Bar also asserts that it would need contractual resources to develop a platform for the automated transmittal of bank and attorney records, as well as personnel to maintain that platform. However, it already maintains an electronic case management system that documents records of the type that it would collect pursuant to our recommendation. Thus, we question why the State Bar believes that it needs a new platform for the collection of such information.

Further, as we discuss on page 66, the State Bar overstates the level of review we recommend, thereby inflating its estimate of the resources it would need to investigate client trust account complaints. In particular, it states that our recommendation would add about 1,500 cases to its investigation caseload per year. Such a statement is misleading because the State Bar already performs some

level of review during the intake stage for each case, as Figure 1 on page 11 illustrates. In addition, the State Bar's estimated resource needs for addressing these cases is unreasonably high because it is including staff resources for conducting a financial analysis of each of these cases--an action that we did not recommend. Rather, we recommended that the State Bar obtain bank statements and attorneys' client trust account reconciliations when reviewing overdrafts and alleged misappropriations from client trust accounts, which would be more reliable evidence for determining whether the relevant transactions are appropriate. Moreover, although obtaining documents for cases that were previously closed as *de minimis* would require some additional effort, we question whether that additional effort requires the resources that the State Bar estimates.

⑨ The State Bar misrepresents our conclusions regarding its 2018 workforce plan. A state law that took effect in 2016 required the State Bar to implement a workforce plan that included the development of an appropriate backlog goal and an assessment of needed staffing. The resulting workforce plan made numerous recommendations, including that the State Bar reorganize the structure of its trial counsel's office. However, in our 2019 report titled *State Bar of California: It Should Balance Fee Increases With Other Actions to Raise Revenue and Decrease Costs*, Report 2018-030, we did not recommend that the State Bar should add positions based on the workforce plan. Rather, we recommended a fee increase that would allow the State Bar to hire 19 additional staff—constituting one additional investigative team— and we recommended that the State Bar analyze performance data to make more informed estimates of its future staffing needs. We made that recommendation because the staffing study the State Bar performed as part of its workforce plan was conducted in the midst of its efforts to make a number of significant changes to how it performed its work, including the implementation of a digital case management system, which may have had a significant impact on staff workloads and the associated case processing times. Therefore, we question whether the State Bar's estimated resource needs are accurate, given the nature of the changes it has implemented since it conducted the staffing study it used as the basis for those estimates.

⑩ We question why the State Bar is proposing a new system of proactively monitoring attorney client trust accounts when it is not yet effectively responding to the risks represented by bank reportable actions and complaints. As we describe in Case Example 6 on page 33, Case Example 7 on page 34, and Case Example 8 on page 35, the State Bar did not effectively investigate cases involving bank reportable actions and complaints against attorneys regarding their client trust accounts. According to a November 2021 report to its board, the State Bar's proposal would include financial and compliance reviews of attorney client trust accounts chosen using

both random and risk-based methods. It is not clear why the State Bar believes that random reviews of attorney client trust accounts would be a more effective method of identifying client trust account violations than thoroughly reviewing the complaints it receives regarding specific attorneys. Further, the State Bar's proposed new program may be more expensive than its estimates of the costs to implement our recommendations—which it describes as unreasonable. In its presentation to its board, the State Bar estimated that its program would cost $500,000 initially and $3.35 million annually.