EXHIBIT 36

EXHIBIT #36: 001
22-CV-01616-BAS-DDL

Electronically Filed by Superior Court of California, County of Orange, 01/19/2022 02:44:00 PM.
30-2021-01237499-CU-PN-CJC - ROA # 33 - DAVID H. YAMASAKI, Clerk of the Court By efilinguser, Deputy Clerk.

1 | Justin S. Beck
justintimesd@gmail.com
2 | 3501 Roselle St.
Oceanside, California 92056
3 | 760-449-2509

4 | *In Pro Per*

5 | **IN THE SUPERIOR COURT OF CALIFORNIA**

6 | **COUNTY OF ORANGE**

7 | Justin S. Beck, an individual | Case No: 30-2021-01237499-CU-PN-CJC

8 | Plaintiff, | Judge Assigned:

9 |

10 | v. | Honorable Judge John C. Gastelum

11 | The State Bar of California, a public corporation;
Anand Kumar, an individual; Eli Morgenstern, an | **DECLARATION OF PLAINTIFF JUSTIN S.**
12 | individual; Joy Nunley, an individual; and DOES | **BECK IN SUPPORT OF APPLICATION**
1-20; | **FOR TEMPORARY RESTRAINING ORDER**
13 | | **AND ORDER TO SHOW CAUSE WHY**
| **PRELIMINARY INJUNCTION SHOULD**
14 | Defendants | **NOT ISSUE**

15 | | [Filed concurrently with Plaintiff Justin S. Beck's
16 | | Application for Temporary Restraining Order and
| Order to Show Cause Why Preliminary Injunction
17 | | Should Not Issue; [Proposed] Order to Show
| Cause and Temporary Restraining Order]

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

-1-

PLAINTIFF JUSTIN S. DECLARATION IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

**EXHIBIT #36: 002**
**22-CV-01616-BAS-DDL**

**Declaration under Penalty of Perjury (Code Civ. Proc., §§ 446, 2015.5)**

1. I, Justin S. Beck, declare as follows:

2. I am over the age of 18. I am a resident of Oceanside, California. I am the plaintiff in the above-entitled matter, *Justin S. Beck v. The State Bar of California, et al.* (OCSC Case No. 30-2021-01237499-CU-PN-WJC*)* and the applicant for a temporary restraining order and order to show cause why a preliminary injunction should not issue against defendants The State Bar of California, Anand Kumar, Eli Morgenstern, Joy Nunley, and DOES 1-20, inclusive.

3. I prepared and have read the legal complaint I filed in the above-entitled matter ("Verified Complaint"), it is verified by my sworn declaration under penalty of perjury, and serves, together with my application for a temporary restraining order and order to show cause, as the basis for statutory conformance to C.C.P. 525, 526, and 527. The Verified Complaint contains clear and convincing evidence that the attorneys associated with Catanzarite Law Corporation, and each of them, should and will be disbarred from the practice of law in California for serial violations of the California Rules of Professional Conduct when the State Bar acts within a reasonable standard of care, that aggravating circumstances exist to any person acting reasonably under the circumstances, and that an ongoing pattern exists of violations and aggravating circumstances that make the attorneys in question a past, current, imminent, and future threat to Applicant, public interest, legal profession, and courts.

4. I have personal knowledge of each fact set forth in this declaration and in the Verified Complaint based upon my observation of, participation in, and recollection of, the matters to which I declare, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe it to be true.

5. I offer this declaration to make further, affirmative factual showing of irreparable harm, immediate danger, or to support any other statutory basis for granting relief *ex parte*, and to support my Verified Complaint and application with other clear and convincing evidence that Catanzarite, and each of them, pose a direct threat to public interest, the legal profession, and

PLAINTIFF JUSTIN S. DECLARATION IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

EXHIBIT #36: 003
22-CV-01616-BAS-DDL

1  courts through violations of the California Rules of Professional Conduct that the State Bar is

2  bound to enforce.

6.  I have incurred more than one million dollars in legal fees defending frivolous actions filed by
    Catanzarite Law Corporation on or after September 14, 2018.

7.  After the Root/Pinkerton Action was filed directly and derivatively against Mobile Farming
    Systems, Inc., Cultivation Technologies, Inc., Amy Cooper, Richard O'Connor, me and others,
    all subsequent actions filed or later advocated by Catanzarite rely upon alleged extortion,
    apparent coercion, securities fraud, perjury, subornation of perjury, adverse representation by
    State Bar licensees where mandatory disqualification applies as a matter of law, compromise of
    derivative actions by State Bar licensees without court approval involving collusion, appearing
    corruptly and willfully without authority to remove my defense coverage, and other *prima facie*
    violations of the California Rules of Professional Conduct that were delivered to Defendants.

8.  My collateral course faces near-term depletion from frivolous litigation filed or later advocated
    by all attorneys associated with Catanzarite Law Corporation and I demand to be protected
    from officers of the Court who willfully violate the law.

9.  I have delivered clear and convincing evidence to Defendants of at least ten (10) violations of
    the California Rules of Professional Conduct for which policy upholds "actual suspension" for
    one violation, and "disbarment" for more than one or aggravating circumstances of one.

10. I have delivered clear and convincing evidence of State Bar licensees' willful disregard of court
    orders and lying on applications to appear *pro hac vice* in other jurisdictions, and evidence of
    suspensions in other jurisdictions, to Defendants.

11. Catanzarite attorneys continue to violate court orders and Court of Appeal opinions after their
    claims were ruled upon as lacking merit, where they re-file the same claims and continue to
    represent parties that are expressly barred by the court and are further subject to mandatory
    disqualification as a matter of law according to the Court of Appeal.

12. In researching my case against Defendants, I learned that a disciplinary action was filed in
    Tennessee against Kenneth Joseph Catanzarite, which resulted in his voluntary suspension to

-3-

PLAINTIFF JUSTIN S. DECLARATION IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING
ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

EXHIBIT #36: 004
22-CV-01616-BAS-DDL

practice law in that state in 2007/2008 and that he is not allowed to practice in New York but lied on his application to practice in Florida.

13. For the following exhibits, I obtained these through counsel involved in those cases via email, and separately delivered the evidence to Defendants.

14. For Exhibit Q, that May 9, 2020 court order signed by Honorable Judge Scott M. Grossman of the United States Bankruptcy Court, the order pertains to "discovery requests served by Mr. Catanzarite in violation of Federal Rule of Civil Procedure 26(g)(1)(B)" thereby resulting in sanctions.

15. For Exhibit R, that "Order Affirming Order of Bankruptcy Court" on appeal upholds sanctions for "violation of a preliminary injunction."

16. For Exhibit S, that May 9, 2020 "Order Liquidating and Awarding Compensatory Sanctions" orders Mr. Catanzarite must pay $49,020.50" and "$11,639.25" for sanctionable conduct.

17. For Exhibit T, that January 15, 2020 "Order for Preliminary Injunction and Imposing Sanctions" finds that Catanzarite violated a court-ordered preliminary injunction by "filing of the Henkin-Looper Case and the associated *lis pendens*," (¶ 3), and "[a]ny further violations of this Court's Orders, the Bankruptcy Code, Bankruptcy Rules, or the Local Rules will result in an order requiring Mr. Catanzarite to show cause why his *pro hac vice* status should not be revoked." (¶ 11).

18. For Exhibit U, that May 8, 2020 Order to Show Cause Why Attorney Kenneth Catanzarite, Esq.'s *Pro Hac Vice* Status Should Not Be Revoked" found Mr. Catanzarite filed a "false affidavit" to certify his *pro hac vice* status, and that he was in fact suspended from the practice of law in New York, that he "refuses to be governed by" the rules of the court and professional conduct in that jurisdiction, that a website he published "contained misleading information" and "otherwise sought to undermine the bankruptcy process," that he engaged in "numerous discovery violations" resulting in "sanctions," that he engaged in "unilaterally noticing depositions at an inconsiderate and inconvenient time and place," "violation of preliminary injunction," and that he filed a "false emergency" that was "completely meritless."

PLAINTIFF JUSTIN S. DECLARATION IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

EXHIBIT #36: 005
22-CV-01616-BAS-DDL

19. For <u>Exhibit V</u>, testimony from a party involved shows that Catanzarite improperly solicited him at his home and the party did not believe he had suffered any damages.

20. For <u>Exhibit X</u>, an order to expunge notice of pendency of action (*lis pendens*) was ordered removed in Orange County Superior Court on June 11, 2021 by Honorable Judge Randall Sherman. As per the foregoing, the lis pendens was found to violate a court order, and $13,600 in costs were imputed to Catanzarite or his client.

21. For <u>Exhibit Y</u>, a ruling is listed (#5) grants the Application to Expunge Notice of Pendency of Action [Lis Pendens]" "as to all three lis pendens." Notably, the same docket of rulings from Honorable Judge Sherman reflects a separate ruling (#2) in "Mobile Farming Systems, Inc. ("MFS") vs. Probst" which notes that "MFS's attorney [Catanzarite Law Corporation] wasn't duly hired by MFS," without noting that Catanzarite was suing MFS in the Pinkerton/Root Action derivatively, or that it corruptly assumed the role of legal counsel for Cultivation Technologies, Inc. ("CTI") which it was also suing through MFS.

22. For <u>Exhibit Z</u>, a notice of ruling was filed respecting the removal of the *lis pendens* filed by Catanzarite that were found to have been done in violation of a preliminary injunction and court orders.

23. I have a fundamental right to fair civil proceedings without undue harassment by officers of the court, and I question the fundament of our judicial system when the only agency that serves to protect me and other members of the public (The State Bar of California) recklessly disregards overwhelming evidence and their own standards holding all licensees associated with Catanzarite Law Corporation are a threat to me, the greater public, Defendants, courts, and legal profession.

24. Since September 14, 2018, I have had, at various times, suicidal thoughts in having to defend frivolous actions where the Courts hold Catanzarite, and each of them, to be unethical and the same claims are rejected or result in their disqualification – and the State Bar willfully enables the conduct against public interest. I have since commenced a regimen of anti-depressants through psychiatric care, although I do still suffer from severe loss of enjoyment of life, embarrassment, shame, depression, fear, and anxiety resulting from Defendants' abuse of their

-5-

PLAINTIFF JUSTIN S. DECLARATION IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

EXHIBIT #36: 006
22-CV-01616-BAS-DDL

position of authority. I am unable to obtain director and officers insurance because of the unlawful scheme directed toward me and Defendants' failure to act. As an entrepreneur, I don't know how I will start another company, thereby affecting my career in perpetuity.

25. I informed the opposing parties or their attorneys of my *ex parte* application hearing on January 20, 2022 at 1:30PM for a temporary restraining order and order to show cause why a preliminary injunction should not issue via email to the addresses I have for each of them on January 18, 2022, which is a reasonable time prior to the application in accordance with *California Code of Civil Procedure section 527 subsection (c)(2)(A)*. Upon assignment to Judge John C. Gastelum, I delivered new papers. I've included a copy of my new letter to them in Exhibit 1, delivered January 19, 2022 by email before the Friday, January 21, 2022 deadline furnished to me by the Clerk of Court.

26. As per *California Code of Civil Procedure section 527 subsection (c)(1)*, my verified complaint shows that great or irreparable injury will result to me before the matter can be heard on notice, and per *California Code of Civil Procedure section 527 subsection (c)(2)(C)*, I do not believe I should be required to inform the opposing party or the opposing party's attorney because Defendants have reasonably failed or refused thus far to respond to my good faith preservation of evidence request delivered in November 2021, and further Defendants have not reasonably served to uphold their policies and procedures despite the great injury and irreparable harm to me and public interest, which led to my request for extraordinary relief by way of temporary restraining order and order to show cause.

**Executed January 19, 2022 at Oceanside, County of San Diego, California.**
**I declare under penalty of perjury that the foregoing is true and correct.**

Justin S. Beck

-6-

PLAINTIFF JUSTIN S. DECLARATION IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

EXHIBIT #36: 007
22-CV-01616-BAS-DDL



**ORDERED in the Southern District of Florida on May 8, 2020.**

Scott M. Grossman, Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:                                    Chapter 7

Daymark Realty Advisors, Inc., *et al.*,     Case No. 18-23750-SMG
                                          (substantively consolidated)
      Debtors.

_____/

## ORDER LIQUIDATING AND AWARDING COMPENSATORY SANCTIONS

This matter came before the Court upon the *Order (1) Granting Motion by Cottonwood Entities for Protective Order and (2) Imposing Sanctions* (the "Sanctions Order"),[1] the *Notice of Filing Affidavit of Attorneys' Fees and Expenses* (the

---

[1] ECF No. 395.

EXHIBIT #36: 008
22-CV-01616-BAS-DDL

"Cottonwood Affidavits"),[2] and attorney Kenneth J. Catanzarite, Esq. and the Objecting Creditors' *Objection*[3] to the Cottonwood Affidavits.

In the Sanctions Order, the Court awarded compensatory sanctions to the Cottonwood Entities[4] under Federal Rule of Civil Procedure 26(g)(3)[5] for attorneys' fees and expenses they incurred relating to their *Expedited Motion for Protective Order*[6] (the "MPO") with respect to discovery requests served by Mr. Catanzarite in violation of Federal Rule of Civil Procedure 26(g)(1)(B).[7] The Court directed the Cottonwood Entities to file an affidavit of fees and expenses incurred and provided Mr. Catanzarite a deadline to file any objections thereto.[8]

The Cottonwood Entities timely filed the Cottonwood Affidavits, requesting $18,314.50 in fees and $36.43 in expenses, consisting of $4,350.00 in fees incurred by Henry H. Oh, Esq. and Shumener Odson & Oh LLP ("SOOLLP"),[9] and $13,964.50 in fees incurred and $36.43 in expenses advanced by Jerry M. Markowitz, Esq. and

---

[2] ECF No. 401.

[3] ECF No. 425.

[4] The Cottonwood Entities are Cottonwood Residential, O.P., LP, Cottonwood Capital Property Management II, LLC, Cottonwood Capital Management, Inc., and Daniel Shaeffer.

[5] Made applicable here by Federal Rules of Bankruptcy Procedure 9014 and 7026.

[6] ECF No. 365.

[7] Made applicable here by Federal Rules of Bankruptcy Procedure 9014 and 7026.

[8] Sanctions Order, ¶¶ 4-5. The Sanctions Order also stated that if an objection was filed, the Court would schedule a hearing to resolve the objection. Upon further reflection after review of the Cottonwood Affidavits and the Objection, however, the Court determines that a hearing is not necessary, as the Court now has everything it needs to address the matter on the papers. *See also* note 16, *infra*.

[9] Mr. Oh is a partner with the law firm of SOOLLP, which serves as co-counsel to the Cottonwood Entities in this matter.

EXHIBIT #36: 009
22-CV-01616-BAS-DDL

Markowitz, Ringel, Trusty & Hartog, P.A. ("MRTH").[10] Both Affidavits properly attached detailed time entries.

Mr. Catanzarite timely objected to the Cottonwood Affidavits, arguing that the fees are excessive with respect to both the rates charged by the attorneys, as well as the amount of time expended. According to the time entries attached to the Cottonwood Affidavits, attorneys with SOOLLP and MRTH collectively worked 33 hours in connection with filing and prosecuting the MPO, at the following rates: $725.00 per hour (Mr. Oh), $625.00 per hour (Mr. Markowitz), and $475.00/$490.00[11] per hour (Grace Robson, Esq.). Mr. Catanzarite suggests in his Objection that attorneys for the Cottonwood Entities should have spent no more than 3 hours on this matter at a rate of no more than $400.00 per hour – for a total of $1,200.00. For the reasons that follow, the Court finds no merit in Mr. Catanzarite's suggestion and will award most of the requested fees and all of the requested expenses.

Federal Rule of Civil Procedure 26(g)(3) provides that if a discovery certification "violates this rule without substantial justification, the court, on motion or on its own, *must* impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation."[12] In determining a sanctions award, the Court has significant discretion, and "may impose

---

[10] Mr. Markowitz is a partner with the law firm of MRTH, which is co-counsel to the Cottonwood Entities in this matter.

[11] According to the MRTH affidavit and time records, the hourly rate for Ms. Robson increased from $475 to $490 as of February 1, 2020.

[12] Fed. R. Civ. P. 26(g)(3) (emphasis added).

EXHIBIT #36: 010
22-CV-01616-BAS-DDL

a penalty as light as a censure and as heavy as is justified—a fine that may exceed the amount of fees incurred by the opposing party."[13] In using that discretion, courts must always be mindful of the purpose of the particular sanctions award at issue.[14] Where, as here, the sanctions are compensatory, the purpose of the sanction is, of course, to compensate the aggrieved party "for the attorneys['] fees and expenses unnecessarily incurred as a result of the sanctioned party's conduct."[15]

As noted in Mr. Catanzarite's Objection, "[i]n evaluating a claim for attorney's fees, the Court, itself being an expert on this subject, may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment."[16] Based on that knowledge and experience, the Court determines that "[t]he aggrieved party . . . is entitled to hire whichever counsel it chooses and to pay the rates charged by that counsel" in order to represent its interests.[17] Thus, in order to compensate the aggrieved party, "the fee award must be based on evidence of the actual fees and costs incurred by that party. If the attorney's fees awarded are not based on evidence of the actual fees incurred and instead are based on reasonable fees, the aggrieved party will not be made whole."[18]

---

[13] *In re Rimsat, Ltd.*, 229 B.R. 914, 921 (Bankr. N.D. Ind. 1998) (internal citation and quotation marks omitted), *aff'd*, 230 B.R. 362 (N.D. Ind. 1999), *aff'd*, 212 F.3d 1039 (7th Cir. 2000).

[14] *Id.*

[15] *Id.*

[16] *In re TLFO, LLC*, 571 B.R. 880, 887 n.4 (Bankr. S.D. Fla. 2017) (internal quotation and citation marks omitted).

[17] *Id.* at 887.

[18] *Id.*

4

EXHIBIT #36: 011
22-CV-01616-BAS-DDL

In order to make the Cottonwood Entities substantially whole, it is therefore appropriate to award most of the attorneys' fees and expenses incurred in connection with filing and prosecuting the MPO. After all, the Cottonwood Entities were entitled to hire counsel of their choice and are obligated to pay the actual amounts billed to them by both SOOLLP and MRTH. If the Court were to limit its award to what Mr. Catanzarite contends to be "reasonable" attorneys' fees, the sanctions award would cease to be compensatory in nature.

That being said, the Court agrees with Mr. Catanzarite in part, that certain time entries reflect fees that do not appear to have been billed in connection with filing and prosecuting the MPO. Further, certain entries lack sufficient detail to enable the Court to determine whether they relate to the MPO, and certain others contain multiple tasks, some of which do not appear related to the MPO. Thus, the Court is unable to determine which portion of time of these "lumped" entries may be attributable to the MPO. Accordingly, the following time entries will not be included in the compensatory sanctions award:

| Date | Attorney | Description | Hours | Rate | Amount |
|------|----------|-------------|-------|------|--------|
| 1/6/2020 | JMM | Emails regarding discovery. | 0.2 | $625.00 | $125.00 |
| 1/7/2020 | JMM | Emails regarding discovery. | 0.2 | $625.00 | $125.00 |
| 1/10/2020 | JMM | Emails regarding discovery. | 0.3 | $625.00 | $125.00[19] |
| 1/14/2020 | JMM | Review emails regarding discovery | 0.3 | $625.00 | $187.50 |
| 1/29/2020 | JMM | Review motion for protective order and related drafts; notice of appeal; conference with A. Hartley | 0.5 | $625.00 | $312.50[20] |

[19] Although 0.3 hours at $625.00 per hour, which totals $187.50, is shown on the MRTH time records, the total listed in the "Amount" column was $125.00.

[20] Because this entry shows multiple tasks – some of which do not pertain to the MPO – without a breakdown of the specific tasks, the Court is unable to determine the amount of time allocable to each task and must disallow all of the fees for this entry.

5

EXHIBIT #36: 012
22-CV-01616-BAS-DDL

| 1/30/2020 | GER | Communications regarding appeal by Catanzarite of sanctions; hearing on motion for protective order. | 0.5 | $475.00 | $237.50[21] |
|---|---|---|---|---|---|
| 1/31/2020 | JMM | Numerous emails regarding Catanzarite; review subpoenas and trustee's motion; research regarding Catanzarite's suspension. | 1.1 | $625.00 | $687.50[22] |
| 2/2/2020 | JMM | Emails regarding Catanzarite's bar admissions; research regarding same | 0.4 | $625.00 | $250.00 |
| 2/3/2020 | GER | Continue preparation for hearing; review communications regarding depositions, motion for order to show cause | 1.5 | $490.00 | $735.00[23] |
| 2/3/2020 | JMM | Review emails and pleadings | 0.3 | $625.00 | $187.50 |
| 2/7/2020 | JMM | Emails regarding discovery | 0.2 | $625.00 | $125.00 |
| **TOTAL** | | | | | **$3,097.50** |

The Court finds that the remainder of the time entries are appropriately related to the MPO and are not duplicative. Accordingly, pursuant to Rule 26(g)(3) and the Sanctions Order, the Court awards the Cottonwood Parties $15,217.00 in attorneys' fees and $36.43 in costs, as compensatory sanctions against Kenneth J. Catanzarite for serving discovery requests in violation of Federal Rule of Civil Procedure 26(g)(1)(B).

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

6

EXHIBIT #36: 013
22-CV-01616-BAS-DDL

For the reasons in the discussed in detail above and in accordance with the Court's Sanctions Order, it is therefore

**ORDERED** that:

1.      The Cottonwood Entities are awarded $15,253.43 as compensatory sanctions, consisting of $15,217.00 in attorneys' fees and $36.43 in costs incurred in filing and prosecuting the MPO.

2.      Mr. Catanzarite must pay $15,253.43 to the Cottonwood Entities within fourteen days of the entry of this Order.

###

Copies furnished to:

All interested parties

EXHIBIT #36: 014
22-CV-01616-BAS-DDL

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-61032-CIV-SMITH

KENNETH J. CATANZARITE,

          Appellant,

vs.

TODD A. MIKLES, *et al.*,

          Appellees.

_____/

## <u>ORDER AFFIRMING ORDER OF BANKRUPTCY COURT</u>

This is an appeal from an order entered by the Bankruptcy Court awarding compensatory sanctions against Appellant and to Appellees and the Chapter 7 Bankruptcy Trustee ("Trustee") for Appellant's violation of a preliminary injunction entered by the Bankruptcy Court. Appellant has appealed the Bankruptcy Court's May 8, 2020 Order Liquidating and Awarding Compensatory Sanctions ("Liquidating Order"). Prior to entry of the Liquidating Order the Bankruptcy Court had entered its Order Granting in Part Motion to Enforce Preliminary Injunction and Imposing Sanctions ("Sanctions Order"). In the Sanctions Order, the Bankruptcy Court awarded Appellees compensatory sanctions, to be paid by Appellant, for attorneys' fees and expenses incurred in connection with another lawsuit, because the Bankruptcy Court found that Appellant had violated a preliminary injunction issued by the Bankruptcy Court.

## I.    BACKGROUND

This appeal arises out of the consolidated Chapter 7 proceedings of debtors, Daymark Realty Advisors, Inc., Daymark Properties Realty, Inc., and Daymark Residential Management, Inc. ("Daymark Bankruptcy"). On July 31, 2019, Appellees filed an adversary proceeding seeking injunctive relief ("Adversary Action") against Richard Carlson, Milton O. Brown, Tyrone

EXHIBIT #36: 015
22-CV-01616-BAS-DDL

Wynfield, Dennis Dierenfield, William B. Gilmer, NNN 1600 Barberry Lane 8, LLC, NNN 1600 Barberry Lane 9, LLC, NNN Plantations at Haywood 1, LLC, NNN Plantations at Haywood 2, LLC, NNN Plantations at Haywood 13, LLC, and NNN Plantations at Haywood 23, LLC ("Carlson Defendants").  The Adversary Complaint sought to enjoin the Carlson Defendants' pending and threatened state court actions against Appellees, brought by their shared attorney, Appellant, Kenneth Catanzarite. The injunction was sought to maintain the status quo while the Bankruptcy Court decided whether to approve a settlement agreement between Appellees and the Chapter 7 Trustee (the "Settlement Agreement").  An essential term of the Settlement Agreement requires the Trustee in the Daymark Bankruptcy to obtain a bar order concerning potential causes of action by any and all conceivable parties against, among others, the Appellees.

On July 31, 2019, Appellees filed their first Motion for Temporary Restraining Order and Preliminary Injunction in the Adversary Action.  On August 27, 2019, the Bankruptcy Court granted the Motion for Preliminary Injunction and ordered:

> Plaintiffs are hereby granted a preliminary injunction for a period of sixty (60) days effective as of the Hearing, enjoining continuation of the Subject Lawsuits or the commencement of any further actions under same or similar facts or circumstances to the Subject Lawsuits, by these Defendants.

("Preliminary Injunction") (First Prelim. Inj. Order [DE 5-6] at 41.[1])  On October 18, 2019, Appellees filed their Motion to Extend the Preliminary Restraining Order.  On October 23, 2019, the Bankruptcy Court granted the extension, stating:

> The preliminary injunction is extended for an additional period through and including December 11, 2019, effective as of the Hearing, enjoining continued

---

[1] Appellant has designated as the record on appeal over 19,000 pages of documents and neither party has cited to the record as filed in this case, making it extremely difficult to find any particular document.  The Court will cite to the docket entry number containing the cited portion of the record and the page number of the docket entry, not the internal page number of the individual document cited.

EXHIBIT #36: 016
22-CV-01616-BAS-DDL

> prosecution of the Subject Lawsuits or the commencement of any further actions under same or similar facts or circumstances to the subject lawsuits by these Defendants.

(Second Prelim. Inj. Order [DE 5-7] at 1300.)   This order was in effect on November 7, 2019, when Appellant allegedly violated the preliminary injunction.   On November 8, 2019, Appellees filed a second Motion to Extend the Preliminary Restraining Order, which the Bankruptcy Court granted by extending the preliminary injunction through February 28, 2020.

On November 19, 2019, Appellees file their Motion to Enforce the Preliminary Injunction and for Sanctions against the Carlson Defendants' counsel, Appellant, Kenneth Catanzarite ("Sanctions Motion").   The Sanctions Motion alleged that on November 7, 2019, Appellant Catanzarite filed a complaint in the Superior Court of California, San Diego County (the "Henkin-Looper Case"), on behalf of Edward Henkin, Jonmar Partnership, Katherine Looper, Pat McRoberts, Chicago Houston Partners, LLC, William E. Bump, Thomas F. Scheidt, Ellen B. Friedman, Lawrence F. Leventon, and Paul L. Cohen (the "Henkin-Looper Parties") against Appellees Mikles and GCL, LLC, and against Global Lending Resources, LLC and Does 1-100. In connection with the newly filed case in San Diego County, Catanzarite filed a *lis pendens*.

On December 5, 2019, the Bankruptcy Court held a hearing at which it heard argument on the Sanctions Motion.   At the hearing, the Bankruptcy Court heard from the Appellees and Appellant. The Court also heard from the Trustee on whether Appellant's actions violated the stay or otherwise were an attempt to exercise control over property of the estate.   Appellant had an opportunity to respond to the Trustee's arguments.

On January 15, 2020, the Bankruptcy Court entered its Order Granting in Part Motion to Enforce Preliminary Injunction and Imposing Sanctions ("Sanctions Order"), in which the Bankruptcy Court found that Catanzarite had violated the Injunction by filing the Henkin-Looper

3

EXHIBIT #36: 017
22-CV-01616-BAS-DDL

Case and the associated *lis pendens*. The Bankruptcy Court concluded that the filing of the Henkin-Looper Case constituted "the commencement of [ ] further actions under same or similar facts or circumstances to the subject lawsuits by these Defendants" because the Henkin-Looper Case was based on the same interests as existing enjoined lawsuits and arose from a common nucleus of facts as existing enjoined lawsuits. Relying on Federal Rule of Civil Procedure 65(d)(2), which provides that an injunction or restraining order binds not only the parties named in the order, but also the parties' officers, agents, servants, employees, and attorneys and any other persons who are in active concert or participation with the named parties or their officers, agents, servants, employees, and attorneys, the Bankruptcy Court found that Catanzanite was the attorney for some of the parties specifically enjoined and also for the Henkin-Looper Parties. Thus, Catanzanite was prohibited from engaging in conduct in which the specifically enjoined parties could not participate. Noting that it had the power to issue sanctions for civil contempt pursuant to both its inherent power and § 105 of the Bankruptcy Code, the Bankruptcy Court found that Appellees and the Trustee were entitled to compensatory sanctions for any actual attorneys' fees and expenses incurred in connection with the filing of the Henkin-Looper Case, including the fees and expenses incurred in responding to the Henkin-Looper Complaint and in prosecuting the Motion to Enforce the Preliminary Injunction and for Sanctions.

On January 30, 2020, Catanzanite appealed the Bankruptcy Court's Sanctions Order. That appeal was dismissed on July 6, 2020, after the district court found that it was premised on a non-final sanctions order. Subsequently, the Bankruptcy Court issued an order liquidating the sanctions order (the "Liquidation Order"). The appeal of the Liquidation Order is the instant appeal. The Liquidation Order awarded monetary compensatory damages to Appellees and the Trustee and ordered Catanzanite to pay the damages within fourteen days of entry of the Liquidation Order.

4

Catanzanite filed the instant appeal on May 26, 2020. His Notice of Appeal [DE 1] states that he is appealing the Order Liquidating and Awarding Compensatory Sanctions entered by the Bankruptcy Court on May 8, 2020.

## II.     Standard of Review

A bankruptcy court's conclusions of law are reviewed *de novo* and the bankruptcy court's factual findings are reviewed for clear error. *In re Coady*, 588 F.3d 1312, 1315 (11th Cir. 2009). "A factual finding is not clearly erroneous unless, after reviewing all of the evidence, [a reviewing court is] left with 'a definite and firm conviction that a mistake has been committed.'" *In re Daughtrey*, 896 F.3d 1255, 1273 (11th Cir. 2018) (citations omitted). A decision to award sanctions is reviewed for abuse of discretion. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 55 (1991). "A bankruptcy court abuses its discretion when it either misapplies the law or bases its decision on factual findings that are clearly erroneous." *Daughtrey*, 896 F.3d at 1274.

## III.    DISCUSSION

Appellant raises eight issues on appeal:

1. Whether the Bankruptcy Court erred when it enforced a temporary restraining order and imposed sanctions.

2. Whether the Bankruptcy Court erred when it imposed sanctions against Appellant and certain real parties in interest without acquiring personal jurisdiction over the real parties in interest.

3. Whether the Bankruptcy Court erred when it granted the injunction without considering the imposition of a bond.

4. Whether the Bankruptcy Court erred when it awarded the Chapter 7 Trustee fees.

5. Whether the Bankruptcy Court erred when it awarded attorneys' fees sanction to the Chapter 7 Trustee.

5

EXHIBIT #36: 019
22-CV-01616-BAS-DDL

6. Whether the Bankruptcy Court erred when it awarded attorneys' fees to the Appellees in the absence of sufficient record substantiating the reasonableness of the hours billed and rates charged.

7. Whether the Bankruptcy Court erred when it awarded attorneys' fees to the Chapter 7 Trustee in the absence of sufficient record substantiating the reasonableness of the hours billed and rates charged.

8. Whether the Bankruptcy Court erred when it awarded attorneys' fees to Appellees that are excessive, unreasonable, and unconscionable.

First, the Court notes that a couple of the issues raised by Appellant are not properly before the Court. Appellant's issue number three is not properly before the Court because whether the Bankruptcy Court should have required a bond when it issued the Preliminary Injunction is not an issue that arose in the Sanctions Order or Liquidating Order. Appellant should have raised it in an appeal of the injunction. Thus, the Court will not address this issue. The Court also notes that issue number two is not properly before the Court because Appellant never raised the issue of personal jurisdiction below. Further, neither the Sanctions Order nor Liquidating Order found that anyone other than Appellant had violated the Preliminary Injunction and the sanctions were imposed against Appellant. Additionally, the record does not indicate that Appellant or his counsel are appearing on behalf of these "real parties in interest" and, thus, neither Appellant nor his counsel can assert arguments on their behalf. Consequently, the Court will also not address these issues.

Second, a review of Appellant's issues demonstrates that there are really only three issues on appeal: (1) whether the Bankruptcy Court erred when it entered the Sanctions Order by finding Appellant had violated the Preliminary Injunction, (2) whether the Bankruptcy Court erred in the amount of attorney's fees awarded to Appellees in the Liquidation Order; and (3) whether the

EXHIBIT #36: 020
22-CV-01616-BAS-DDL

Case 3:22-cv-01616-AGS-DDL   Document 10-37   Filed 01/09/23   PageID.1471   Page 21 of
100
Case 0:20-cv-61032-RS   Document 31   Entered on FLSD Docket 07/28/2021   Page 7 of 12

Bankruptcy Court erred in awarding attorneys' fees, and the amount of the fees awarded, to the

Chapter 7 Trustee.

### A.   Violation of the Preliminary Injunction

The Bankruptcy Court found that Appellant, as the attorney for the enjoined Carlson

Defendants, was prohibited, under Federal Rule of Civil Procedure 65(d)(2)(B), from engaging in

conduct in which the Carlson Defendants could not engage.  Thus, the Bankruptcy Court found

that Appellant's filing of the Henkin-Looper Case and the associated *lis pendens* violated the

Bankruptcy Court's second preliminary injunction order.  As a result, the Bankruptcy Court

imposed civil contempt sanctions against Appellant pursuant to its inherent powers and § 105 of

the Bankruptcy Code.  Appellant argues that this was error because he was not acting on behalf of

the Carlson Defendants when he filed the Henkin-Looper Case.

Federal Rule of Civil Procedure 65(d)(2), titled "Persons Bound," states that every

injunction "binds only the following who receive actual notice of it . . .: (A) the parties; (B) the

parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in

concert or active participation with anyone described in Rule 65(d)(2)(A) or (B)."  Thus, under

the plain language of Rule 65(d)(2)(B), Appellant, as the attorney for the enjoined Carlson

Defendants, was bound by the Preliminary Injunction.

Appellant argues that, while he could not pursue enjoined conduct on behalf of the Carlson

Defendants, he could pursue similar conduct on behalf of other clients.  However, the language of

Rule 65(d)(2)(B) is clear that Appellant, as the attorney of the Carlson Defendants, is also bound

by the terms of the injunction.  Moreover, the Bankruptcy Court found that the Henkin-Looper

Parties and the Carlson Defendants were in active participation with each other through Appellant.

Thus, even if Appellant was not acting directly on behalf of the Carlson Defendants, he was bound

7

EXHIBIT #36: 021
22-CV-01616-BAS-DDL

by the Preliminary Injunction, under Rule 65(d)(2)(C), because his filing of the Henkin-Looper Case and the associated *lis pendens* was done in concert or active participation with the Carlson Defendants and the Henkin-Looper Parties.

Appellant takes issue with the Bankruptcy Court's finding that he was acting in concert with the Carlson Defendants and the Henkin-Looper Parties. However, we review the factual findings of the Bankruptcy Court for clear error. Based on the record, this Court does not have a definite and firm conviction that a mistake has been committed. While Appellant argues that the enjoined proceedings differ from the Henkin-Looper Case, the Bankruptcy Court did not find that the proceedings were the same; it found that the enjoined lawsuits and the Henkin-Looper Case were based on similar ownership interests and the same or similar facts or circumstances. The Bankruptcy Court did not find that the Carlson Defendants and the Henkin-Looper Parties had an identity of interest nor did it find that the enjoined lawsuits and the Henkin-Looper Case sought the same relief.

Finally, Appellant argues that the Bankruptcy Court's analysis is flawed because it would allow the Henkin-Looper Parties to file the Henkin-Looper Case through different counsel. But that is exactly why the Bankruptcy Court found that Appellant violated the Preliminary Injunction. The Appellant is the one against whom the injunction applied; in the Sanction Order, the Bankruptcy Court only enjoined the Henkin-Looper Parties, and the prosecution of the Henkin-Looper Case, because they acted through Appellant[2] and in concert with the Carlson Defendants.

---

[2] Appellant also seems to argue that the Bankruptcy Court erred in finding the injunction applied to the Henkin-Looper Parties because the Henkin-Looper Parties were not properly before the Bankruptcy Court. However, the Bankruptcy Court did not find that the injunction applied to the Henkin-Looper Parties under all circumstances; instead it found that the filing of the Henkin-Looper Case and the associated *lis pendens* violated the injunction because it was done through Appellant, against whom the injunction did apply pursuant to Rule 65(d)(2).

EXHIBIT #36: 022
22-CV-01616-BAS-DDL

Consequently, the Court finds that the Bankruptcy Court did not err in imposing sanctions against Appellant.

**B.     The Amount of Sanctions Awarded to Appellees**

The Liquidating Order awarded Appellees $49,020.50 in compensatory sanctions for the attorneys' fees and expenses that Appellees incurred in connection with responding to the Henkin-Looper Complaint and filing and prosecuting the Motion to Enforce the Preliminary Injunction and for Sanctions in the Bankruptcy Court. Appellant argues that the Bankruptcy Court erred in awarding these sanctions because the affidavits submitted in support of the amount of sanctions do not show that the fees were actually billed to Appellees. Appellant also argues that the amount of time billed by Appellees counsel was unreasonable and the Bankruptcy Court did not apply the lodestar method in determining the fees.

First, the Court notes that Appellant did not timely object to Appellees' affidavits related to the fees incurred and he did not seek an extension of time in which to object. Therefore, when the Bankruptcy Court considered the fee affidavits, it did not consider Appellant's untimely objections. Appellant's failure to object to the fee affidavit and his conclusory and vague challenges to the reasonableness of the fees in his initial brief are fatal to his argument. *See Barash v. Kates*, 585 F. Supp. 2d 1368, 1375 (S.D. Fla. 2008) (stating "in the attorney's fees context, failing to object is generally deemed fatal."). Further, as a general rule, an appellate court does not consider an issue raised for the first time on appeal. *Finnegan v. Comm'r of Internal Revenue*, 926 F.3d 1261, 1271 (11th Cir. 2019). Appellant had an opportunity to challenge the reasonableness of the fees sought by Appellees in the Bankruptcy Court and failed to do so in a timely manner.

EXHIBIT #36: 023
22-CV-01616-BAS-DDL

Second, the Court finds that the Bankruptcy Court did not abuse its discretion in awarding Appellees $49,020.50 in compensatory sanctions. The Bankruptcy Court stated that it "carefully reviewed the Affidavits and time records" submitted by Appellees and found the fees were "properly incurred in connection with responding to the Henkin-Looper Complaint and in prosecuting the [Motion to Enforce the Injunction], and are not excessive." Appellant has not shown that the Bankruptcy Court misapplied the law or based its decision on factual findings that are clearly erroneous. While Appellant argues that the Bankruptcy Court failed to utilize the lodestar approach to determine the amount of fees to award, a court imposing sanctions for civil contempt does not have to utilize the lodestar method in determining the amount of attorneys' fees. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Olympia Holding Corp.*, 140 F. App'x 860, 864 n.1 (11th Cir. 2005) (stating "[s]anctions for civil contempt are not equivalent with typical payment of attorneys' fees, and civil contempt sanctions do not require the use of the lodestar method.") Thus, given the broad discretion courts have in fashioning contempt sanctions, *see F.T.C. v. Leshin*, 618 F.3d 1221, 1237 (11th Cir. 2010), the Bankruptcy Court did not abuse its discretion in awarding Appellees $49,020.50 in compensatory sanctions.

**C.     The Attorneys' Fees Awarded to the Trustee**

In the Sanctions Order, the Bankruptcy Court awarded the Trustee attorneys' fees as part of the sanction against Appellant. The Bankruptcy Court noted:

> Although Trustee Paiva is not a party to this particular adversary proceeding, in light of the pending settlement motion in the main bankruptcy case and the intent of the injunctive relief in this adversary proceeding – to maintain the status quo pending the hearing to consider approval of that settlement – the Court finds it appropriate to compensate the bankruptcy estate, in addition to the [Appellees] for any attorneys' fees and expenses incurred in connection with this matter.

10

EXHIBIT #36: 024
22-CV-01616-BAS-DDL

(Sanctions Order at 13 n.15.)   Appellant argues that the Bankruptcy Court erred in awarding attorneys' fees to the Trustee, who was not a party to the underlying Adversary Action and did not seek to enforce the Preliminary Injunction, which was issued in the Adversary Action.  The Trustee is also not a party to this appeal and has not filed an answer brief.

While Appellant argues that his due process rights were violated because he lacked notice and an opportunity to be heard on the Trustee's right to fees, Appellant seems to ignore that the fees were awarded to the Trustee as part of the contempt sanction.  Appellant had notice of the Motion to Enforce the Preliminary Injunction and for Sanctions and had an opportunity to respond in writing and at the hearing on the Motion to Enforce the Preliminary Injunction and for Sanctions. At the hearing, the Bankruptcy Court heard from the Trustee's counsel on whether Appellant's actions violated the stay or otherwise were an attempt to exercise control over property of the estate.  At the hearing, Appellant had an opportunity to respond to the Trustee's arguments.  Thus, Appellant was on notice that the Bankruptcy Court was also considering whether and how Appellant's actions may have affected the Trustee and the estate and whether that should give rise to sanctions.  Further, after the Trustee submitted his fee affidavit and accompanying records, Appellant had an opportunity to file objections but failed to timely do so.  Thus, Appellant had an opportunity to be heard on the issue.  As noted above, a court has broad discretion in fashioning contempt sanctions.  Thus, the Court finds that the Bankruptcy Court did not err in awarding the Trustee attorneys' fees as part of the sanctions against Appellant.

Appellant also challenges the amount of attorneys' fees awarded to the Trustee.  However, for the same reason that the amount awarded to Appellees was not an abuse of discretion, the $11,639.25 awarded to the Trustee was not an abuse of discretion.  Further, it is clear that the Bankruptcy Court carefully reviewed the submissions from the Trustee because it awarded only

EXHIBIT #36: 025
22-CV-01616-BAS-DDL

Case 3:22-cv-01616-AGS-DDL   Document 10-37   Filed 01/09/23   PageID.1476   Page 26 of
100
Case 0:20-cv-61032-RS   Document 31   Entered on FLSD Docket 07/28/2021   Page 12 of 12

50% of the fees billed for certain items because the record was not clear if the items related to the main case or the Adversary Action out of which the contempt arose.

Accordingly, the Bankruptcy Court's Sanctions Order and Liquidation Order are **AFFIRMED.**

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 28th day of July, 2021.

**RODNEY SMITH**
**UNITED STATES DISTRICT JUDGE**

cc:     All counsel of record

12

EXHIBIT #36: 026
22-CV-01616-BAS-DDL



**ORDERED in the Southern District of Florida on May 8, 2020.**

Scott M. Grossman, Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:

Daymark Realty Advisors, Inc., *et al.*,

    Debtors.

_____/

Todd A. Mikles, *et al.*,

    Plaintiffs,

v.

Richard Carlson, *et al.*,

    Defendants.

_____/

Chapter 7

Case No. 18-23750-SMG
(substantively consolidated)

Adv. No. 19-1291-SMG

## ORDER LIQUIDATING AND AWARDING COMPENSATORY SANCTIONS

This matter came before the Court upon the *Order Granting in Part Motion to Enforce Preliminary Injunction and Imposing Sanctions* (the "Sanctions Order"),[1] the

---

[1] ECF No. 112.

EXHIBIT #36: 027
22-CV-01616-BAS-DDL

*Plaintiff's Affidavit of Fees Sought as Compensatory Sanctions and Notice of Filing Bill of Particulars* (the "Mikles Affidavits")[2] filed by the Mikles Plaintiffs,[3] the *Notice of Filing Affidavit of Attorney's Fees and Costs Incurred by Chapter 7 Trustee Chad S. Paiva* (the "Trustee's Affidavit"),[4] the *Notice of Late Filing of Paper Pursuant to Local Rule 5005-1(F)(2)* (the "Notice of Late Filing"),[5] with an attached Objection to the Affidavits, filed by Attorney Kenneth J. Catanzarite, and the *Response to Notice of Late Filing and Untimely Filed Joint Objections to Affidavits*[6] filed by the Mikles Plaintiffs.

In the Sanctions Order, the Court awarded compensatory sanctions to the Mikles Plaintiffs and to Chapter 7 Trustee Chad S. Paiva (the "Trustee"), to be paid by Mr. Catanzarite, for attorneys' fees and expenses incurred in connection with responding to the Henkin-Looper Complaint[7] and filing and prosecuting the *Motion to Enforce the Preliminary Injunction and for Sanctions* (the "MTE").[8] The Court

---

[2] ECF No. 118. The Mikles Affidavits consist of affidavits from attorneys Adam T. Kent, Robert K. Sparks, and Thomas M. Messana and his firm Messana P.A..

[3] The Mikles Plaintiffs are Todd Mikles; Etienne Locoh; Sovereign Capital Management Group, Inc.; Sovereign Strategic Mortgage Fund, LLC; Infinity Urban Century, LLC; and GCL, LLC.

[4] ECF No. 128. The Trustee's Affidavit was filed timely pursuant to the Court's *Order Granting Motion to Extend Time* (ECF No. 166).

[5] ECF No. 146.

[6] ECF No. 155.

[7] In violation of the preliminary injunction issued in this adversary proceeding, Mr. Catanzarite filed a Complaint in the Superior Court of California, San Diego County, on behalf of Edward Henkin, Jonmar Partnership, Katherine Looper, Pat McRoberts, Chicago Houston Partners, LLC, William E. Bump, Thomas F. Scheidt, Ellen B. Friedman, Lawrence F. Leventon, and Paul L. Cohen against Mr. Mikles, GCL, LLC, Global Lending Resources, LLC, and Does 1-100. *See* Case No. 37-2019-00059373 (the "Henkin-Looper Complaint").

[8] ECF No. 95.

EXHIBIT #36: 028
22-CV-01616-BAS-DDL

directed the Mikles Plaintiffs and the Trustee to file, within fourteen days of entry of the Sanctions Order, affidavits of their fees and expenses, and provided Mr. Catanzarite a deadline to object to the affidavits.[9]

The Court entered the Sanctions Order on January 15, 2020.[10] The Mikles Plaintiffs timely filed the Mikles Affidavits on January 29, 2020.[11] The Trustee properly and timely moved for an extension of time to file his affidavit,[12] which the Court granted.[13] The Trustee then timely filed his Affidavit on February 5, 2020.[14] Mr. Catanzarite, however, failed to timely object to either affidavit.[15] He also failed to timely move for an extension of time to object. Instead, on February 25, 2020, Mr. Catanzarite filed his Notice of Late Filing, to which he attached his Objection.[16] His Notice of Late Filing cited Local Rule 5005-1(F)(2)[17] and offered a variety of excuses for missing the deadline, none of which rise to the level of excusable neglect. Mr.

---

[9] Sanctions Order, ¶¶ 9-10.

[10] Although Mr. Catanzarite has appealed the Sanctions Order to the District Court, this Court retains jurisdiction to liquidate the amount of the sanctions as the amount of sanctions is not an issue on appeal. "The filing of a proper notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the appellate court and divests the trial court of its control *over those aspects of the case involved in the appeal.*" *In re Walker*, 515 F.3d 1204, 1211 (11th Cir.2008) (emphasis added) (citation omitted); *see also, In re Barnwell Cty. Hosp.*, 491 B.R. 408, 413 (Bankr. D.S.C. 2013) (noting that an appeal does not divest a lower court of jurisdiction over issues not involved in the appeal).

[11] ECF No. 118.

[12] ECF No. 117.

[13] ECF No. 166.

[14] ECF No. 128.

[15] The Sanctions Order required objections to be filed within 7 days after the filing of the affidavits. Sanctions Order, ¶ 10.

[16] ECF No. 146.

[17] As noted by the Court at the hearing in this matter on March 5, 2020, Local Rule 5005-1(F)(2) governs submission of papers in matters *already* set for hearing and has absolutely no applicability to a deadline to file an objection set by a court order.

3

EXHIBIT #36: 029
22-CV-01616-BAS-DDL

Catanzarite's Objection is therefore untimely, and – as the Court explained at a hearing on March 5, 2020 – will not be considered.

Even though the Court is not considering Mr. Catanzarite's Objection, the Court has carefully reviewed the Affidavits and time records submitted by the Mikles Plaintiffs and the Trustee. The Court finds the Mikles Plaintiffs' attorneys' fees of $49,020.50[18] were properly incurred in connection with responding to the Henkin-Looper Complaint and filing and prosecuting the MTE, and are not excessive. The Court will therefore award $49,020.50 to the Mikles Plaintiffs as compensatory sanctions.

As to the Trustee, certain time entries include time for both main case issues as well as the pertinent issues in this adversary proceeding.[19] The Court does not fault the Trustee's counsel for failing to separate these time entries. At the time, the Trustee could not have known that the Court was going to award him fees in connection with the Henkin-Looper Complaint and the MTE. Nevertheless, because the Court is unable to determine which portion of the following entries may be

---

[18] This amount included an estimated 10 hours of work on preparing and filing the Mikles Affidavits. Noting that Mr. Catanzarite failed to timely object to these fees, the Court finds this fee estimate to be reasonable considering the detailed nature of the Mikles Affidavits.

[19] The Trustee is not a party to this adversary proceeding. But in light of the pending settlement motion in the main bankruptcy case and the intent of the injunctive relief in this adversary proceeding – to maintain the status quo pending the hearing to consider approval of that settlement – the Court found it appropriate to compensate the bankruptcy estate, in addition to the Mikles Plaintiffs, for any attorneys' fees and expenses incurred in connection with this matter. Sanctions Order at 12, n.15.

4

attributable to the Henkin-Looper Complaint and the MTE, the Court will exercise its discretion and award only 50% of the fees billed for the following time entries:

| Date | Lawyer | Work Description | Time | Rate | Value |
|---|---|---|---|---|---|
| 12/03/19 | CBH | Preparation of hearing notebook for status conference on 12/6/19; schedule E. Jacobs for courtcall appearance; review of hearing in Mikles case; update notebook. | 1.30 | 195.00 | 253.50 |
| 12/05/19 | BPG | Preparation for and attendance at hearings on Order Setting Status Conference on Order Taking Motion to Establish Procedures Under Advisement, Setting Deadlines, and Postponing Hearing on Motion to Approve Settlement and Motion to Enforce Preliminary Injunction and for Sanctions and (2.0); interoffice conferences with E. Jacobs, J. Delgado and Trustee re ;preparation for hearings in connection with Motion to Approve Settlement Motion and Establishing Notice Procedures and Motion to Enforce Preliminary Injunction and for Sanctions (.5). | 2.50 | 525.00 | 1,312.50 |
| 031/General Litigation | | | | | |
| 12/11/19 | JAD | Attended Status Conference and hearing on injunction violation. | 1.40 | 265.00 | 291.50 |

| Date | Lawyer | Work Description | Time | Rate | Value |
|---|---|---|---|---|---|
| 001/ Asset Analysis and Recovery | | | | | |
| 12/04/19- | EJ | Attention to file in preparation for hearing on status conference and injunction motion (.7). | 0.70 | 425.00 | 297.50 |
| 12/05/19 | EJ | Prepare for and participate 1n hearing on status conference and sanctions for Violating 1nJunct1on (2.6). Post hearing analysis call wt1h Barry Gruher (. 3). | 2.90 | 425.00 | 1,232.50 |
| 005/Case Administration | | | | | |

The remainder of the Trustee's counsel's time entries, however, are appropriately related to the Henkin-Looper Complaint and the MTE, and are not duplicative. Accordingly, and pursuant to the Sanctions Order, the Court will award the Trustee $11,639.25 in attorneys' fees as compensatory sanctions.

Therefore, for the reasons discussed in detail above and in accordance with the Sanctions Order, it is

**ORDERED** that:

1.     The Mikles Plaintiffs are awarded $49,020.50 as compensatory sanctions for attorneys' fees incurred in connection with the Henkin-Looper Complaint and filing and prosecuting the MTE.

5

EXHIBIT #36: 031
22-CV-01616-BAS-DDL

2.     The Trustee is awarded $11,639.25 as compensatory sanctions for attorneys' fees incurred in connection with the Henkin-Looper Complaint and the MTE.

3.     Mr. Catanzarite must pay $49,020.50 to the Mikles Plaintiffs within fourteen days of the entry of this Order.

4.     Mr. Catanzarite must pay $11,639.25 to the Trustee within fourteen days of the entry of this Order

### #

Copies furnished to:

All interested parties

6

EXHIBIT #36: 032
22-CV-01616-BAS-DDL



**ORDERED in the Southern District of Florida on January 15, 2020.**

_Scott M. Grossman_

**Scott M. Grossman, Judge**
**United States Bankruptcy Court**

---

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:                                                                    Chapter 7

Daymark Realty Advisors Inc.,                         Case No. 18-23750-SMG
Daymark Properties Realty, Inc.,                      Case No. 18-23751-SMG
Daymark Residential Management Inc.,         Case No. 18-23752-SMG
     Debtor(s).                                           (substantively consolidated)
_____/

Todd A. Mikles, _et al._,                                    Adv. No.: 19-1291-SMG
     Plaintiff(s),

v.

Richard Carlson, _et al._,
     Defendant(s).                          /

### ORDER GRANTING IN PART MOTION TO ENFORCE
### PRELIMINARY INJUNCTION AND IMPOSING SANCTIONS

This matter came before the Court for a hearing on December 5, 2019 (the

"Hearing"), upon the _Motion to Enforce the Preliminary Injunction and for Sanctions_

_against Defendants' Counsel_ (ECF No. 95) filed by the Plaintiffs (the "Mikles

1

EXHIBIT #36: 033
22-CV-01616-BAS-DDL

Plaintiffs").[1] The Court has considered the Motion, the judicially noticed court filings,[2] the *Declaration of Todd Mikles* (ECF No. 97) filed in support of the Motion, the *Response* (ECF No. 107)—including the Declaration and Exhibits attached thereto—filed by attorney Kenneth J. Catanzarite,[3] counsel for the Defendants (the "Carlson Defendants"),[4] and the arguments made at the Hearing by counsel for the Mikles Plaintiffs and by Mr. Catanzarite on behalf of himself. For the reasons that follow, the Court grants the Motion in part, and awards compensatory sanctions against Mr. Catanzarite[5] and in favor of the Mikles Plaintiffs and Chapter 7 Trustee Chad S. Paiva.

## PROCEDURAL BACKGROUND

### I.   The Daymark Bankruptcy

On November 4, 2018, Daymark Realty Advisors Inc. ("DRA"), Daymark Residential Management Inc. ("DRM"), and Daymark Properties Realty Inc. ("DPR"

---

[1] The Mikles Plaintiffs include Todd A. Mikles, Etienne Locoh, Sovereign Capital Management Group, Inc., Sovereign Strategic Mortgage Fund, LLC, Infinity Urban Century, LLC, and GCL, LLC.

[2] The Plaintiffs filed a *Request for Judicial Notice* (ECF No. 96), which the Court granted.

[3] Although licensed only in California, Mr. Catanzarite was admitted in this Court *pro hac vice* by *Order* (Case No. 18-23750, ECF No. 29) dated December 7, 2018, with Todd Frankenthal, Esq. as designated local counsel. In his Affidavit attached as Exhibit 1 to the *Motion to Appear Pro Hac Vice* (Case No. 18-23750-SMG, ECF No. 27), Mr. Catanzarite affirmed that he is "familiar with and shall be governed by the local rules of this court, the rules of professional conduct, and all other requirements governing the professional behavior of members of the Florida Bar."

[4] The Carlson Defendants include Richard Carlson; Milton O. Brown; Tyrone Wynfield; Dennis Dierenfield; William B. Gilmer; NNN 1600 Barberry Lane 8, LLC; NNN 1600 Barberry Lane 9, LLC; NNN Plantations at Haywood 1, LLC; NNN Plantations at Haywood 2, LLC; NNN Plantations at Haywood 13, LLC; and NNN Plantations at Haywood 23, LLC.

[5] At the Hearing, counsel for the Plaintiffs informed the Court that they would not be proceeding against the Defendants' local counsel, Todd Frankenthal.

EXHIBIT #36: 034
22-CV-01616-BAS-DDL

and together with DRA and DRM, the "Debtors") each filed voluntary chapter 11 bankruptcy petitions. Later, the cases were substantively consolidated, and on April 2, 2019, the consolidated cases were converted to chapter 7. *See Order Granting Mot. to Convert Case* (Case No. 18-23750-SMG, ECF No. 248).

Before the Mikles Plaintiffs filed this adversary proceeding, the Carlson Defendants had each filed adversary complaints against the Debtors (the "Carlson Adversaries").[6] In the Carlson Adversaries, the Carlson Defendants allege that the Mikles Plaintiffs were alter egos, co-conspirators, and aiders and abettors of the Debtors. Thereafter, the Mikles Plaintiffs instituted this adversary proceeding seeking injunctive relief against the Carlson Defendants. *See Complaint* (ECF No. 1) (the "Injunction Adversary").

In the Injunction Adversary, the Mikles Plaintiffs seek injunctive relief enjoining the prosecution of various lawsuits and threatened lawsuits (the "Subject Lawsuits") during the pendency of the Debtors' bankruptcy cases. The Subject Lawsuits were each brought outside of bankruptcy by certain Carlson Defendants through their shared attorney, Mr. Catanzarite, against certain Mikles Plaintiffs and the Debtors. The Mikles Plaintiffs allege that an injunction is appropriate here because (1) the Subject Lawsuits are inextricably intertwined with actions asserted against the Debtors; (2) the common nexus between the Carlson Defendants and the Mikles Plaintiffs is through the Debtors; and (3) for any claims to be proven against

---

[6] *See* Case Numbers 19-1048-SMG (Carlson), 19-1049-SMG (Brown and NNN Congress Center, LLC), 19-1051-SMG (Wynfield and NNN Capital Fund I, LLC), 19-1052-SMG (the 1600 Barberry Lane entities), 19-1053-SMG (the Plantations at Haywood entities), and 19-1053-SMG (Dierenfield and Gilmer).

3

EXHIBIT #36: 035
22-CV-01616-BAS-DDL

the Mikles Plaintiffs, the Carlson Defendants must establish some basis for liability, or must prove claims, against the Debtors—who are not participating in the Subject Lawsuits due to the chapter 7 cases.

II.    The Preliminary Injunction

On July 31, 2019, the Mikles Plaintiffs filed their first *Emergency Motion for Temporary Restraining Order and Preliminary Injunction* (ECF No. 2). After conducting a hearing, the Court entered an *Order* (ECF No. 18) on August 27, 2019 (the "First Preliminary Injunction Order") granting the Mikles Plaintiffs' Motion and providing that:

> Plaintiffs are hereby granted a preliminary injunction for a period of sixty (60) days effective as of the Hearing, enjoining continuation of the Subject Lawsuits or the commencement of any further actions under same or similar facts or circumstances to the Subject Lawsuits, by these Defendants.

First Prelim. Inj. Order at 3.

On October 18, 2019, the Mikles Plaintiffs filed a *Motion to Extend the Preliminary Restraining Order* (ECF No. 49), seeking an extension of the preliminary injunction for 75 days to maintain the status quo while allowing the Court to consider approval of the settlement reached in the Debtors' consolidated chapter 7 cases, which – if approved – would be dispositive of the Subject Lawsuits. After conducting a hearing on the Motion, the Court entered an *Order* (ECF No. 61) on October 23, 2019 (the "Second Preliminary Injunction Order"), granting the Motion to Extend the Preliminary Restraining Order and ordering that:

> The preliminary injunction is extended for an additional period through and including December 11, 2019, effective as of the Hearing, enjoining continued prosecution of the Subject Lawsuits or the commencement of

EXHIBIT #36: 036
22-CV-01616-BAS-DDL

> any further actions under same or similar facts or circumstances to the
> subject lawsuits by these Defendants.

Second Prelim. Inj. Order at 3. It was the Second Preliminary Injunction Order that

was in effect on November 7, 2019—the date Mr. Catanzarite allegedly violated the

preliminary injunction.

On November 8, 2019, the Mikles Plaintiffs filed a second *Motion to Extend the*

*Preliminary Restraining Order* (ECF No. 65). Again, the Court conducted a hearing

on the Motion and entered an *Order* (ECF No. 92) (the "Third Preliminary Injunction

Order") on November 18, 2019, further extending the preliminary injunction through

and including February 28, 2020, and "enjoining continued prosecution of the Subject

Lawsuits or the commencement of any further actions under the same or similar facts

or circumstances to the subject lawsuits by these Defendants." Third Prelim. Inj.

Order at 3.

Mr. Catanzarite appeared telephonically and presented argument at all three

preliminary injunction hearings.[7]

III.   <u>The Motion to Enforce Preliminary Injunction</u>

On November 19, 2019, the Mikles Plaintiffs filed the Motion to Enforce the

Preliminary Injunction and for Sanctions against Defendants' Counsel now before the

Court. The Mikles Plaintiffs contend that notwithstanding the preliminary injunction

covering both the Subject Lawsuits and "the commencement of any further actions

under the same or similar facts or circumstances to the subject lawsuits by these

---

[7] Todd Frankenthal, designated local counsel for Mr. Catanzarite, also appeared at all three
preliminary injunction hearings.

EXHIBIT #36: 037
22-CV-01616-BAS-DDL

Defendants," Mr. Catanzarite violated the injunction by initiating a new lawsuit on behalf of certain clients against Mr. Mikles and GCL, LLC[8] purportedly based on the same facts and circumstances as the Subject Lawsuits, and by filing a *lis pendens* against property owned by GCL, LLC (the "GCL Property").

Specifically, the Mikles Plaintiffs allege that on November 7, 2019, Mr. Catanzarite filed a Complaint in the Superior Court of California, San Diego County, on behalf of Edward Henkin, Jonmar Partnership, Katherine Looper, Pat McRoberts, Chicago Houston Partners, LLC, William E. Bump, Thomas F. Scheidt, Ellen B. Friedman, Lawrence F. Leventon, and Paul L. Cohen (the "Henkin-Looper Parties")[9] against Mr. Mikles, GCL, LLC, Global Lending Resources, LLC, and Does 1-100. *See* Case No. 37-2019-00059373 (the "Henkin-Looper Case"). In connection with the Henkin-Looper Case, Mr. Catanzarite filed the *lis pendens* at issue.[10]

The Henkin-Looper Complaint, attached to the *Request for Judicial Notice* (ECF No. 96) as Exhibit 7, alleges causes of action for avoidance and recovery of fraudulent transfers and conspiracy to defraud. The Henkin-Looper Parties allege that at all relevant times, they have had a claim against Mr. Mikles "which arises from his August 2011 acquisition of entities which owned Daymark Properties Realty, Inc. . . . , at the time the asset and property manager of [the Henkin-Looper Parties']

---

[8] Mr. Mikles and GCL, LLC are two of the Mikles Plaintiffs in the Injunction Adversary.

[9] All individuals and entities are named as plaintiffs in their capacities as successors in interest to various limited liability companies.

[10] According to Mr. Mikles' *Declaration* (ECF No. 97), on November 11, 2019, Mr. Mikles received from Catanzarite Law Corporation a copy of the *lis pendens* filed against the GCL Property in connection with the Henkin-Looper Case. A copy of the *lis pendens* is attached to the Declaration as Exhibit 1.

6

EXHIBIT #36: 038
22-CV-01616-BAS-DDL

ownership of the real estate project commonly known as the Congress Center," an office tower located in Chicago, Illinois (the "Congress Center Property"). Henkin-Looper Compl., ¶ 26. Tellingly, the Henkin-Looper Parties allege that they "learned for the first time of [Mr. Mikles'] fraudulent scheme . . . on November 1, 2019, from review of a Motion for Approval of Settlement and Compromise filed by Chad S. Paiva, as Chapter 7 Trustee . . . for the substantively consolidated bankruptcy estates of the Debtors." Henkin-Looper Compl., ¶¶ 58, 73.

The Henkin-Looper Case involves nearly identical allegations and plaintiffs as the adversary proceeding initiated by Mr. Catanzarite in this Court on March 4, 2019 (the "Looper Adversary). *See Looper v. Daymark Realty Advisors, Inc.*, Case No. 19-1050-SMG). In that adversary, it is alleged that:

> This complaint is on behalf of [the Looper] Plaintiffs . . . who invested their Internal Revenue Code Section 1031 tax deferred exchange funds . . . to acquire membership interests in various Special Purpose Entities ("SPEs") . . . in order to purchase an aggregate 16.511% tenant in common ("TIC") interest in that certain "Congress Center Property" . . . , a commercial real estate project commonly known as the "Congress Center" a 524,784 square foot Class A office tower located in Chicago, Illinois.

Looper Adv. Compl. (Case No. 19-1050-SMG, ECF No. 1), ¶ 1.[11] The Looper Plaintiffs also allege that Debtors DRA and DPR managed the Congress Center Property and DRA and DPR, through Mr. Mikles, defrauded the Looper Plaintiffs. Looper Adv. Compl., ¶¶ 21-22, 67-70.

Additionally, and particularly relevant to the Motion now before the Court, Mr. Catanzarite filed a class action in the Superior Court of Orange County,

---

[11] The Looper Adversary Complaint is also attached to the Request for Judicial Notice as Exhibit 2.

7

California, Case No. 30-2018-00982195 (the "Carlson Class Action"), on behalf of Richard Carlson as beneficiary of G REIT Liquidating Trust (the "G REIT Trust"), and all other similarly situated individuals, against Mr. Mikles, Etienne Locoh, DPR, and several other individuals and entities, alleging breach of fiduciary duty and fraudulent transfer claims. *See* Second Am. Class Action Compl. (filed March 23, 2018), Req. for Judicial Notice, Ex. 3. The plaintiffs in the Carlson Class Action alleged that the G REIT Trust owned an interest in the Congress Center Property; that the Debtors, through Mr. Mikles and Mr. Locoh, breached their fiduciary duties with respect to the Congress Center Property; and that the Debtors, Mr. Mikles, and Mr. Locoh are alter egos of each other. *See generally,* Second Am. Class Action Compl. ¶¶ 67-115. The Carlson Class Action—one of the matters explicitly enjoined by the Second Preliminary Injunction Order—is primarily based upon tenant in common ("TIC") ownership interests in the Congress Center Property, precisely the same TIC ownership interests held by the Henkin-Looper Parties that form the basis of the Henkin-Looper Case. The NNN Congress Center case, Case No. 30-2018-01015717 (the "NNN Congress Center Case"), filed by Mr. Catanzarite in the Superior Court of Orange County, California on behalf of different plaintiffs[12] also contains the same allegations regarding TIC ownership interests in the Congress Center Property as the Carlson Class Action and as the Henkin-Looper Case. *See* First Am. Compl., Req. for Judicial Notice, Ex. 5. Like the Carlson Class Action, the NNN Congress Center

---

[12] The NNN Congress Center Case involves defendants who are all defendants in the Carlson Class Action.

EXHIBIT #36: 040
22-CV-01616-BAS-DDL

Case is one of the matters explicitly enjoined by the Second Preliminary Injunction

Order.

## CONCLUSIONS OF LAW

I.   <u>Mr. Catanzarite Violated the Court's Preliminary Injunction Order</u>

For the reasons that follow, the Court finds that the filing of the Henkin-Looper

Case and the associated *lis pendens* by Mr. Catanzarite constitutes "the

commencement of any further actions under same or similar facts or circumstances

to the subject lawsuits by these Defendants," which violates the Court's preliminary

injunction that was in effect on November 7, 2019—the date the Henkin-Looper Case

was filed. *See* Second Prelim. Inj. Order.

The Court has the power to issue sanctions for civil contempt pursuant to both

its inherent powers and § 105 of the Bankruptcy Code, and the statutory power of

bankruptcy courts to issue contempt sanctions is particularly broad. *See In re Tate*,

521 B.R. 427, 439 (Bankr. S.D. Ga. 2014). Indeed, § 105(a) grants bankruptcy courts

statutory authority to "issue any order, process, or judgment that is necessary and

appropriate to carry out the provisions of this title," and the Eleventh Circuit has

noted that "Congress expressly grants [courts] independent statutory powers in

bankruptcy proceedings to 'carry out the provisions of' the Bankruptcy Code through

'any order, process, or judgment that is necessary or appropriate.'" *Jove Eng'g, Inc. v.

I.R.S.*, 92 F.3d 1539, 1553 (11th Cir. 1996).

"In a civil contempt proceeding, the petitioning party bears the burden of

establishing by 'clear and convincing' proof that the underlying order was violated."

EXHIBIT #36: 041
22-CV-01616-BAS-DDL

*PlayNation Play Sys., Inc. v. Velex Corp.*, 939 F.3d 1205, 1212 (11th Cir. 2019) (quoting *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990)). The Court's focus "is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue." *Id.* at 1212–13 (citation omitted). This standard is an objective one. *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1802 (2019).

The Second Preliminary Injunction Order prohibits the Carlson Defendants from prosecuting or commencing "any further actions under same *or similar facts or circumstances* to the subject lawsuits by these Defendants." (emphasis added). To begin with, the filing of the Henkin-Looper Case constitutes the commencement of an action "under the same or similar facts and circumstances to the Subject Lawsuits." As discussed in the preceding section, the Carlson Class Action and the NNN Congress Center Case—two of the matters explicitly enjoined by the Second Preliminary Injunction Order—are largely based upon TIC ownership interests in the Congress Center Property, precisely the same TIC ownership interests held by the Henkin-Looper Parties that form the basis of the Henkin-Looper Case. It is thus clear that the Henkin-Looper Case and the *lis pendens* filed in connection with the Henkin-Looper Case are actions based on the same or similar facts or circumstances as some, if not all, of the Subject Lawsuits.

Mr. Catanzarite points out, and it is not disputed, that none of the Henkin-Looper Parties are specifically included with the Carlson Defendants and thus are not enjoined on the face of the Second Preliminary Injunction Order. Based on their

EXHIBIT #36: 042
22-CV-01616-BAS-DDL

own allegations, however, the Henkin-Looper Parties and the Carlson Defendants are all TIC owners with similar complaints against the Debtors and the Mikles Plaintiffs arising from a common nucleus of facts. More importantly, the Henkin-Looper Parties and the Carlson Defendants all share the same attorney—Mr. Catanzarite. Indeed, Mr. Catanzarite is attempting to gain class certification with respect to the claims common to the Henkin-Looper Parties, the Carlson Defendants, and other similarly situated parties.

Rule 65(d)(2) of the Federal Rules of Civil Procedure[13] provides that an order granting an injunction or a restraining order binds not only the parties specifically named in the order, but also the parties' officers, agents, servants, employees, and attorneys and any other persons who are in active concert or participation with the named parties or their officers, agents, servants, employees, and attorneys. *See* Rule 65(d)(2)(B) and (C).

Mr. Catanzarite is the attorney for the Carlson Defendants—the parties specifically enjoined in the Second Preliminary Injunction Order. He is thus prohibited under Rule 65(d)(2)(B) from engaging in conduct in which the Carlson Defendants themselves could not engage. Moreover, it cannot be reasonably disputed that Mr. Catanzarite, the Henkin-Looper Parties, and the Carlson Defendants are in active participation with each other through Mr. Catanzarite—the attorney and the driving force behind these lawsuits he hopes to have certified as a class action. Mr. Catanzarite and the Henkin-Looper Parties are thus enjoined under Rule 65(d)(2)(C)

---

[13] Rule 65 is made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7065.

EXHIBIT #36: 043
22-CV-01616-BAS-DDL

just as the Carlson Defendants are enjoined on the face of the Second Preliminary Injunction Order.

Having determined that the commencement of the Henkin-Looper Case along with the filing of the *lis pendens* constitute the commencement of actions "under the same or similar facts and circumstances to the Subject Lawsuits" and that Mr. Catanzarite is subject to the Second Preliminary Injunction Order pursuant to subsections (B) and (C) of Rule 65(d)(2), the Court finds that Mr. Catanzarite violated the Second Preliminary Injunction Order by filing the Henkin-Looper Case and the associated *lis pendens*.[14]

## II.   Sanctions

Once a court determines that its order has been violated, the court has broad discretion to fashion an appropriate sanction. *See In re Fatsis*, 405 B.R. 1, 10 (B.A.P. 1st Cir. 2009) (sanctions are reviewed for abuse of discretion); *In re Kooyomjian*, No. 11-43408-CJP, 2018 WL 6920219, at *7 (Bankr. D. Mass. Dec. 31, 2018). "Sanctions in civil contempt proceedings may be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *In re McLean*, 794 F.3d 1313, 1323 (11th Cir. 2015) (citation omitted). Monetary sanctions assessed for the purpose of compensating for losses sustained are particularly appropriate in civil contempt proceedings. *In re*

---

[14] This is not the first time this Court has had to sanction Mr. Catanzarite. On April 4, 2019, this Court entered an *Order Granting Debtors' Motion for an Injunction Against False and Misleading Statements by Catanzarite Law Corporation and Sanctions for Violation of 11 U.S.C. §§1121 and 1125* (Case No. 18-23750-SMG, ECF No. 251).

EXHIBIT #36: 044
22-CV-01616-BAS-DDL

*Fatsis*, 405 B.R. at 10 (noting that "'make-whole relief' is a commonplace sanction for civil contempt"). Like any monetary sanction that is remedial in nature, "the amount of such a sanction must be established by competent evidence, and must bear a reasonable relationship to the actual losses sustained by the injured party." *Id.*; *see also, In re TLFO, LLC*, 571 B.R. 880, 886 (Bankr. S.D. Fla. 2017).

Here, the Court finds that compensatory sanctions are appropriate in order to compensate the Mikles Plaintiffs and Trustee Paiva[15] for any actual attorneys' fees and expenses incurred in connection with the filing of the Henkin-Looper Case, including the fees and expenses, if any, incurred in responding to the Henkin-Looper Complaint and filing and prosecuting this Motion to Enforce the Preliminary Injunction and for Sanctions.

## ORDER

Based on the foregoing, it is **ORDERED** that:

1.     The Motion to Enforce Preliminary Injunction and for Sanctions is **GRANTED** in part, with respect to the relief sought against Mr. Catanzarite.

2.     Pursuant to counsel's stipulation at the Hearing, the Motion to Enforce Preliminary Injunction and for Sanctions is denied with respect to the relief sought against Mr. Frankenthal.

---

[15] Although Trustee Paiva is not a party to this particular adversary proceeding, in light of the pending settlement motion in the main bankruptcy case and the intent of the injunctive relief in this adversary proceeding – to maintain the status quo pending the hearing to consider approval of that settlement – the Court finds it appropriate to compensate the bankruptcy estate, in addition to the Mikles Plaintiffs, for any attorneys' fees and expenses incurred in connection with this matter.

EXHIBIT #36: 045
22-CV-01616-BAS-DDL

3.      The filing of the Henkin-Looper Case and the associated *lis pendens* violated the Court's Second Preliminary Injunction Order.

4.      Any further prosecution of the Henkin-Looper Case by Mr. Catanzarite or by the Henkin-Looper Parties is enjoined by the Third Preliminary Injunction Order and by any order continuing the preliminary injunction issued by this Court.

5.      Within 7 days of the entry of this Order, Mr. Catanzarite is directed to file a copy of this Order in the Henkin-Looper Case.

6.      Within 7 days of the entry of this Order, Mr. Catanzarite is directed to cause the *lis pendens* to be removed from the San Diego County property records and to file a copy of this Order in the San Diego County property records.

7.      Mr. Catanzarite must file proof of compliance with paragraphs 5 and 6 above within 7 days of the entry of this Order.

8.      The Mikles Plaintiffs and Trustee Paiva are awarded compensatory sanctions, to be paid by Mr. Catanzarite, for attorneys' fees and expenses incurred in connection with responding to the Henkin-Looper Complaint and filing and prosecuting this Motion to Enforce the Preliminary Injunction and for Sanctions.

9.      Within 14 days of the entry of this Order, the Mikles Plaintiffs and Trustee Paiva must each file an affidavit, including redacted time records, as to the fees and expenses, if any, that they are seeking as compensatory sanctions.

10.      Any objections to the affidavits described in paragraph 9 must be filed within 7 days after the filing of the affidavits.

EXHIBIT #36: 046
22-CV-01616-BAS-DDL

11.    Any further violations of this Court's Orders, the Bankruptcy Code, Bankruptcy Rules, or the Local Rules will result in an order requiring Mr. Catanzarite to show cause why his *pro hac vice* status should not be revoked.

###

Copies furnished to:

*Thomas M. Messana, Esq., who shall serve a copy of this Order on all interested parties, including Trustee Chad S. Paiva and his counsel, and file a certificate of service pursuant to the Bankruptcy Rules and this Court's Local Rules.*

15

EXHIBIT #36: 047
22-CV-01616-BAS-DDL



**ORDERED in the Southern District of Florida on May 8, 2020.**

Scott M. Grossman, Judge
United States Bankruptcy Court

---

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 7 |
| Daymark Realty Advisors, Inc., *et al.*, | Case No. 18-23750-SMG |
| Debtors. | (substantively consolidated) |
| _____/ | |

### ORDER TO SHOW CAUSE
### WHY ATTORNEY KENNETH CATANZARITE, ESQ.'S
### *PRO HACE VICE* STATUS SHOULD NOT BE REVOKED

This matter came before the Court for a hearing on March 5, 2020 upon the

*Motion for Order to Show Cause as to Why Attorney Kenneth Catanzarite, Esq.'s Pro*

*Hac Vice Status Should Not Be Revoked* (the "Motion for Order to Show Cause")[1] filed

---

[1] ECF No. 377. Several parties in interest joined in the Motion for Order to Show Cause and filed supporting declarations. *See Joinder* (ECF No. 378) (the "Northwood Joinder") filed by Northwood Investors, LLC; NW Congress Center Owner, LLC; NW Congress Center, LLC; Northwood Employees, LP; Northwood Real Estate Partners TE LP; and Northwood Real Estate Partners LP (collectively, the "Northwood Entities"); *Joinder* (ECF No. 381) filed by Sovereign Capital Management Group, Inc.; Sovereign Strategic Mortgage Fund, LLC; GCL, LLC ("GCL"); Infinity Urban Century, LLC; Todd Mikles; and Etienne Locoh (collectively, the "Sovereign Group"); *Notice of Filing Decl. of Todd A. Mikles filed in Support of the Joinder* (ECF No. 382) filed by the Sovereign Group; *Notice of Filing*

EXHIBIT #36: 048
22-CV-01616-BAS-DDL

by Chapter 7 Trustee Chad S. Paiva (the "Trustee") and the *Opposition to Trustee's Motion for Order to Show Cause* (the "Response in Opposition")[2] filed by Attorney Kenneth J. Catanzarite.

Despite sufficient notice[3] and an opportunity to appear and be heard in person at a hearing as serious and consequential as this one, Mr. Catanzarite decided to appear by telephone at the March 5, 2020 hearing. His local counsel, Todd S. Frankenthal, Esq., however, did appear in person at the hearing. For the reasons set forth in detail below, the Court will grant the Motion for Order to Show Cause and give Mr. Catanzarite one last opportunity to show cause, in writing, why his *pro hac vice* privileges should not be revoked.

## I.    BACKGROUND.

Daymark Realty Advisors Inc., Daymark Residential Management Inc., and Daymark Properties Realty Inc. each filed voluntary chapter 11 bankruptcy petitions on November 4, 2018.[4] Shortly thereafter, Mr. Frankenthal filed a *Motion to Appear Pro Hac Vice*[5] on behalf of Mr. Catanzarite, seeking his admission *pro hac vice* in this bankruptcy case (the "Daymark Case") and related adversary proceedings, with Mr.

---

*Decl. of Adam T. Kent filed in Support of the Joinder* (ECF No. 383) (the "Kent Declaration") filed by the Sovereign Group; *Suppl. to Joinder* (ECF No. 415) filed by the Sovereign Group; and *Suppl. to the Northwood Joinder* (ECF No. 424) filed by the Northwood Entities.

[2] ECF No. 417. The Court has also considered the *Objection to Joinders by Northwood Entities and Sovereign Group* (ECF No. 418) (the "Objection to Joinders") and the *Declaration of Kenneth J. Catanzarite* (ECF No. 419) (the "Catanzarite Declaration") filed by Mr. Catanzarite.

[3] ECF No. 380.

[4] The cases were later substantively consolidated, and then – upon motion by the Objecting Creditors – the consolidated cases were converted to chapter 7 on April 2, 2019. *See Order Granting Mot. to Convert Case* (ECF No. 248).

[5] ECF No. 27.

EXHIBIT #36: 049
22-CV-01616-BAS-DDL

Frankenthal acting as his designated local counsel, on behalf of twenty-three clients listed in the motion.[6] In the notarized Affidavit of Proposed Visiting Attorney, signed by Mr. Catanzarite attached to the Motion to Appear Pro Hac Vice, Mr. Catanzarite made the following certifications:[7]

- "I certify that I have never been disbarred, that I am not currently suspended from the practice of law in the State of Florida or any other state, and that I am not currently suspended from the practice of law before any United States Court Of Appeals, United States District Court, or United States Bankruptcy Court."

---

[6] Since this case has progressed, Mr. Catanzarite and Mr. Frankenthal have referred to some or all of their clients at various times and in various capacities as "objecting creditors." For purposes of the pending Settlement Motion (see note 10, infra) that is the main dispute in the Daymark Case, clients of Mr. Catanzarite and Mr. Frankenthal have filed three objections (ECF Nos. 416, 421 and 423):

(a) in ECF No. 416, the following clients have objected: Richard Carlson as Beneficiary of G REIT Liquidating Trust, a terminated trust, on behalf of himself and all others similarly situated; NNN Congress Center, LLC and the Tenant In Common Owners of the Congress Center Property described in Edward Henkin, et al. v. Todd A. Mikles et al., Superior Court of California, San Diego County, Case No. 37- 2019-00059373-CU-OR-CTL;

(b) in ECF No. 421, the following client objected: NNN Capital Fund I, LLC, a Delaware limited liability company derivatively and through its liquidating trustee Mary Jo Saul; and

(c) in ECF No. 423, the following clients have objected: 1600 Barberry Lane 8, LLC and 1600 Barberry Lane 9, LLC; Plantations at Haywood 1, LLC, Plantations at Haywood 2, LLC, Plantations at Haywood 13, LLC, and Plantations at Haywood 23, LLC; and Dennis Dierenfield, William B. Gilmer, NNN 1818 Market Street 13, LLC, a Delaware Limited Liability Company; and Mary Jo Saul as successor in interest to Tye Wynfield and all other [sic] similarly situated.

In the Response in Opposition, however, Mr. Catanzarite defined the "Objecting Creditors" as only the following six clients:

Richard Carlson; NNN Capital Fund I, LLC; NNN Congress Center, LLC; 1600 Barberry Lane 9, LC; Plantations at Haywood 1, LLC; and NNN 1818 Market Street 13, LLC.

But then in the Objection to Joinders, Mr. Catanzarite defined the Objecting Creditors as:

Richard Carlson as Beneficiary of GREIT Liquidating Trust and terminated trust on behalf of himself and all others similarly situated; Tyrone Wynfield derivatively on behalf of and as liquidating trustee for NNN Capital Fund I, LLC; Milton O. Brown as liquidating trustee for NNN Congress Center, LLC; Dennis Dierenfield, individually and in his capacity as trustee of the Dennis Dierenfield Living Trust; 350 Seventh Avenue Associates, L.P. and co-plaintiffs, Willowbrook Apartments, LLC and co-plaintiffs, Plantations at Haywood 1, LLC and co-plaintiffs, 1600 Barberry Lane 8, LLC and co-plaintiff, Dennis Dierenfield and co-plaintiffs.

While Mr. Catanzarite has filed several putative class actions in various venues, no class has been certified by any court to date.

[7] ECF No. 27, Ex. 1, ¶¶ 1, 3.

3

EXHIBIT #36: 050
22-CV-01616-BAS-DDL

- "I certify that I am familiar with and shall be governed by the local rules of this court, the rules of professional conduct, and all other requirements governing the professional behavior of members of the Florida Bar."

The Court granted the Motion and admitted Mr. Catanzarite *pro hac vice* on December 7, 2018.[8]

On November 1, 2019, the Trustee filed a motion to approve settlement agreements with the Sovereign Group, the Cottonwood Entities,[9] and the Northwood Entities, which included a request for entry of bar orders (the "Settlement Motion").[10] Anticipating that the Settlement Motion would be contested, the Trustee also filed a motion to establish procedures for notice and service of the Settlement Motion and to set a final hearing on the Settlement Motion (the "Procedures Motion").[11] The Objecting Creditors objected to the Procedures Motion and, among other relief, sought to have the Court apply the class action procedures of Federal Rule of Civil Procedure 23 to litigation of this contested matter.

The Court conducted a preliminary hearing on the Procedures Motion on November 13, 2019, at which the Court declined the Objecting Creditors' request to apply class action procedures to a bankruptcy settlement approval motion. By Order entered on November 15, 2019,[12] the Court took the Procedures Motion under

---

[8] ECF No. 29.

[9] The Cottonwood Entities are Cottonwood Residential, O.P., LP; Cottonwood Capital Property Management II, LLC; Cottonwood Capital Management, Inc.; and Daniel Shaeffer.

[10] ECF No. 319.

[11] ECF No. 321.

[12] ECF No. 325.

4

EXHIBIT #36: 051
22-CV-01616-BAS-DDL

advisement and directed the Trustee and the Objecting Creditors to meet and confer
on the proposed notice procedures, a discovery plan for litigation of the Settlement
Motion, and potential dates for an evidentiary hearing on the Settlement Motion in
January or February of 2020.

The parties were unable to agree on proposed notice procedures, a discovery
plan or dates for an evidentiary hearing, so the Court resolved those issues on its
own. On December 10, 2019, the Court entered an order[13] approving notice
procedures with respect to the Settlement Motion, and on December 11, 2019, the
Court issued a scheduling order for litigation of the Settlement Motion (the
"Scheduling Order").[14] In the Scheduling Order, the Court scheduled an evidentiary
hearing for March 18-19, 2020, and set various deadlines for discovery and other
pretrial matters leading up to that evidentiary hearing. The Court also implemented
an expedited procedure to hear discovery disputes on shortened notice, in order to
keep this contested matter moving along in a timely and efficient manner.[15]

## II.   MR. CATANZARITE'S MULTIPLE TRANSGRESSIONS.

Throughout the course of the Daymark Case and its related adversary
proceedings,[16] Mr. Catanzarite has acted contrary to the norms of accepted practice

---

[13] ECF No. 344.

[14] ECF No. 347.

[15] Unfortunately, due to the COVID-19 pandemic, the Court had to cancel the March 18-19 evidentiary
hearing (ECF No. 449). It has since been rescheduled for August 31-September 2, 2020 (ECF No. 472).

[16] In addition to their representation of the Objecting Creditors in the main bankruptcy case, Mr.
Catanzarite and Mr. Frankenthal have filed seven related adversary proceedings as plaintiffs' counsel,
and they represent the defendants in an eighth pending adversary proceeding (the Mikles Adversary
Proceeding, *see* note 24, *infra*.).

EXHIBIT #36: 052
22-CV-01616-BAS-DDL

in this District, has committed numerous transgressions, and has been sanctioned on multiple occasions, as detailed below.

### A.   False Affidavit of Proposed Visiting Attorney.

To begin, Mr. Catanzarite submitted a false certification of good standing in his Affidavit of Proposed Visiting Attorney. While he certified that he was not suspended from the practice of law in any state, it has been alleged – and Mr. Catanzarite has not disputed – that he was indeed suspended from practice by the state of New York[17] at the time he sought *pro hac vice* admission in this Court. His explanation – that his suspension was due to "failure to pay fees"[18] – does not render the certification in his affidavit any less false.

It is also clear from his subsequent conduct (as discussed in more detail below) that Mr. Catanzarite is ***not*** familiar with – and refuses to be governed by – "the local rules of this court, the rules of professional conduct, and all other requirements governing the professional behavior of members of the Florida Bar," as he certified in his affidavit.

### B.   Sanctions for Unauthorized and Misleading Website.

Then, about four months after he was granted the privilege of appearing in this Court, on April 5, 2019, the Court entered an *Order* sanctioning Mr. Catanzarite for creating a website (the "Catanzarite Website")[19] that contained misleading information related to the Daymark Case, improperly sought to solicit objections to

---

[17] Transcript of March 5, 2020 hearing (ECF No. 468) at 76:17-77:2; *see also* ECF No. 416 at 6.

[18] *Id.*

[19] The Court also ordered Mr. Catanzarite to take down the website— www.daymarkbankruptcy.com.

EXHIBIT #36: 053
22-CV-01616-BAS-DDL

confirmation of the debtors' chapter 11 plan, was confusingly similar to the official notice website in the Daymark Case, and otherwise sought to undermine the bankruptcy process.[20]

    C.    <u>Numerous Discovery Violations and Sanctions</u>.

Shortly after the Court took the Procedures Motion under advisement, Mr. Catanzarite filed a *Notice of Service of Special Interrogatories*[21] and a *First Set of Requests for Production of Documents to Chad S. Paiva, as Chapter 7 Trustee*[22] on the docket in violation of Local Rule 7026-1(C), which provides that discovery, including written interrogatories and requests for production of documents, "shall not be filed with the court, nor shall proof of service be filed, unless upon order of the court." On November 25, 2019, the Court entered an order striking these filings, stating that "[t]he Court did not order the parties to file discovery with the Court, and in fact *specially directed the parties not to do so* at the hearing conducted on November 13, 2019."[23] (emphasis added).

---

[20] ECF No. 251. The April 5, 2019 Order was entered by Judge Ray prior to his retirement.

[21] ECF No. 328. The Court further notes that "Special Interrogatories" are not a recognized form of discovery in Federal Court.

[22] ECF No. 336.

[23] ECF No. 339.

EXHIBIT #36: 054
22-CV-01616-BAS-DDL

Similarly, in the Mikles Adversary Proceeding,[24] Mr. Catanzarite filed thirteen *Notices of Deposition*[25] on the docket in violation of both Local Rule 7026-1(C) and Federal Rule of Civil Procedure 5(d)(1)(A), made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7005. The Court entered an *Order* striking these filings as well.[26]

The Court also sanctioned Mr. Catanzarite, pursuant to Federal Rule of Civil Procedure 26(g)(3), in connection with contested matter discovery related to the Settlement Motion, for issuing discovery to both the Cottonwood Entities and the Northwood Entities that grossly exceeded the permissible scope of discovery under Rule 26(b)(1).[27] In addition (and consistent with the Court's procedure for hearing and resolving discovery disputes in an expedited matter), the Court heard and resolved three other discovery disputes, each time ruling against Mr. Catanzarite and the Objecting Creditors.[28]

---

[24] *Mikles, et al. v. Carlson, et al.*, Adv. No. 19-1291-SMG (the "Mikles Adversary Proceeding"). In the Mikles Adversary Proceeding, plaintiffs Todd A. Mikles; Etienne Locoh; Sovereign Capital Management Group, Inc.; Sovereign Strategic Mortgage Fund, LLC; Infinity Urban Century, LLC; and GCL (collectively, the "Mikles Plaintiffs") are seeking injunctive relief against certain of the "Objecting Creditors," specifically Richard Carlson; Milton O. Brown; Tyrone Wynfield; Dennis Dierenfield; William B. Gilmer; NNN 1600 Barberry Lane 8, LLC; NNN 1600 Barberry Lane 9, LLC; NNN Plantations at Haywood 1, LLC; NNN Plantations at Haywood 2, LLC; NNN Plantations at Haywood 13, LLC; and NNN Plantations at Haywood 23, LLC.

[25] Mikles Adv. Pro. ECF Nos. 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, and 94.

[26] Mikles Adv. Pro. ECF No. 103.

[27] ECF No. 395. By Order entered on May 8, 2020, the Court liquidated those sanctions in the amount of $15,253.43 (ECF No. 476).

[28] ECF Nos. 363, 392, 393.

EXHIBIT #36: 055
22-CV-01616-BAS-DDL

D. Unilaterally Noticing Depositions at an Inconsiderate and Inconvenient Time and Place.

At a hearing on December 5, 2019, it was disclosed to the Court that Mr. Catanzarite had unilaterally noticed depositions of representatives of the Northwood Entities for the days immediately before and immediately after Christmas – December 24 and 26, 2019 – in New York.[29] The Court promptly admonished Mr. Catanzarite that it did not look kindly on these litigation tactics, which attorneys regularly practicing in this Court generally do not employ.[30]

The Trustee, the Northwood Entities, and the Sovereign Group, also allege that Mr. Catanzarite has since continued to engage in a "pattern of noncooperation, abuse of discovery rules, and violating both the actual rules of procedure and the norms of practicing in the Southern District of Florida," particularly with respect to noticing of depositions.[31] For example, it is alleged that on January 30, 2020, Mr. Catanzarite unilaterally noticed the deposition of Steven Kries to take place on February 20, 2020 in Aurora, Colorado.[32] Mr. Kries is former general counsel to the debtors and former counsel to the Sovereign Group. Despite this, Mr. Kent – counsel for the Sovereign Group in the Daymark Case and a related adversary proceeding – asserts that Mr. Catanzarite made no effort to meet and confer with him regarding

---

[29] Transcript of December 5, 2019 Hearing (ECF No. 399) at 21:8-12, 43:15-44:5.

[30] *Id.*

[31] *See* Mot. for Order to Show Cause, ¶¶ 16-30.

[32] *See* Kent Decl., ¶ 6.

EXHIBIT #36: 056
22-CV-01616-BAS-DDL

noticing Mr. Kries' deposition so that Mr. Kent "could attend and assert the appropriate privilege objection[s] on behalf of the Sovereign Group[.]"[33]

Additionally, according to the Northwood Entities, Mr. Catanzarite served subpoenas duces tecum under Federal Rule of Civil Procedure 45 on each of the six non-party Northwood Entities. Each subpoena included 54 separate requests for production of documents.[34] The Northwood Entities timely served detailed written objections and responses to each request and agreed to produce certain responsive documents upon the entry of a protective order.[35] Despite this, the Northwood Entities allege that Mr. Catanzarite failed to meet and confer with respect to their objections and responses to the subpoenas and failed to obtain or even propose a protective order.[36] Instead, on December 31, 2019, Mr. Catanzarite served each of the Northwood Entities with 17 interrogatories and 55 document requests under Rules 33 and 34 of the Federal Rules of Civil Procedure "as if they were parties to these bankruptcy proceedings."[37] According to the Northwood Entities, these document requests were nearly identical to the Rule 45 subpoenas Mr. Catanzarite previously served on the Northwood Entities.[38] Mr. Catanzarite then filed an "emergency" motion to deem the Northwood Entities, among others, as "parties" to the contested

---

[33] *Id.*

[34] Northwood Joinder at 1.

[35] *Id.* at 2.

[36] *Id.* at 3.

[37] *Id.*

[38] *Id.* The only additional request was for all documents identified in the "special interrogatories," which he concurrently served on the Northwood Entities.

10

EXHIBIT #36: 057
22-CV-01616-BAS-DDL

matter created by the Settlement Motion.[39] The Court denied the motion[40] after conducting a hearing on an expedited basis, and cautioned all parties that discovery must be proportionately and narrowly tailed to the Settlement Motion. Mr. Catanzarite then served yet another set of Rule 45 subpoenas on the Northwood Entities requesting the same documents he sought in the previous two requests, despite – according to the Northwood Entities – already having received objections and responses to these subpoenas upon which he failed to follow up.[41]

   E.   Violation of Preliminary Injunction.

   On November 19, 2019, the Mikles Plaintiffs filed a *Motion to Enforce the Preliminary Injunction and for Sanctions* (the "Motion to Enforce Injunction")[42] in the Mikles Adversary Proceeding. The Mikles Plaintiffs asserted that Mr. Catanzarite violated the preliminary injunction issued in that adversary proceeding[43] by initiating a new state court lawsuit on behalf of certain clients against Mr. Mikles and GCL[44] based on the same facts and circumstances as the enjoined lawsuits, and by filing a *lis pendens* against property owned by GCL. After conducting a hearing on

---

[39] ECF No. 352.

[40] ECF No. 363.

[41] Northwood Joinder at 3-4.

[42] Mikles Adv. Pro., ECF No. 95.

[43] Judge Ray entered the first preliminary injunction on August 27, 2019, in which he temporarily enjoined prosecution of several pending lawsuits and arbitrations, and the commencement of any further actions under the same or similar facts or circumstances. (Mikles Adv. Pro., ECF No. 18). The Court subsequently extended the preliminary injunction three separate times on October 23, 2019, November 18, 2019, and March 2, 2020, pending a final hearing on approval of the Settlement Motion. (Mikles Adv. Pro., ECF Nos. 61, 92, 152).

[44] Mr. Mikles and GCL are two of the Mikles Plaintiffs in the Mikles Adversary Proceeding.

11

the Motion to Enforce Injunction on December 5, 2019,[45] the Court entered an *Order* finding that Mr. Catanzarite violated the Court's preliminary injunction, sanctioning him for doing so,[46] and cautioning that "[a]ny further violations of this Court's Orders, the Bankruptcy Code, Bankruptcy Rules, or the Local Rules will result in an order requiring Mr. Catanzarite to show cause why his *pro hac vice* status should not be revoked."[47]

F.   False Emergency.

Most recently, on the afternoon of April 7, 2020, Mr. Catanzarite filed an emergency *Motion to Modify Temporary Restraining Order and Preliminary Injunction*[48] in the Mikles Adversary Proceeding, seeking a hearing on or before April 9, 2020.[49] Not only was this motion completely meritless as the Court had made its

---

[45] Mr. Catanzarite did not appear in person at this hearing, instead opting to participate by telephone.

[46] The Court has since liquidated those sanctions in the total amount of $60,659.75 (Mikles Adv. Pro., ECF No. 182), after Mr. Catanzarite failed to timely object to the affidavits of attorneys' fees and costs filed by the Mikles Plaintiffs and the Trustee. In yet another example of Mr. Catanzarite's complete disregard of our Local Rules, after his deadline to object had passed, Mr. Catanzarite tried to file a tardy objection attached to a Notice of Late Filing of Paper Pursuant to Local Rule 5005-1(F)(2). (Mikles Adv. Pro., ECF No. 146.) As noted by the Court at a hearing in this matter on March 5, 2020, however, Local Rule 5005-1(F)(2) governs submission of papers in matters *already* set for hearing and has absolutely no applicability to a deadline to file an objection set by a court order. Accordingly, the Court did not consider his tardy objection in liquidating this sanctions award.

[47] Mikles Adv. Pro., ECF No. 112, at 15. Mr. Catanzarite appealed that Order (Mikles Adv. Pro., ECF No. 116), but that appeal was dismissed because he failed to timely file a designation of record or statement of issues (Mikles Adv. Pro., ECF No. 130). Mr. Catanzarite then moved to vacate that dismissal because he – once again in violation of applicable rules – filed his designation and statement in the wrong court (the District Court) (Mikles Adv. Pro., ECF No. 139). After considering the excusable neglect standard set forth in *Pioneer Inv. Servs. v. Brunswick Assocs.*, 507 U.S. 380 (1993), as applied by the Eleventh Circuit in *Chege v. Georgia Department of Juvenile Justice*, 787 F. App'x 595, 598–99 (11th Cir. 2019), the Court granted the motion to vacate based primarily on the absence of prejudice to the nonmoving party. That appeal is now pending before the District Court.

[48] Mikles Adv. Pro., ECF No. 173.

[49] At the April 9, 2020 hearing, the Court noted that there was no reason for Mr. Catanzarite to have waited until the last minute to file this emergency motion, when the auction at issue — scheduled to take place from April 7 through 9, 2020 — was undoubtedly set sometime before April 7, 2020.

EXHIBIT #36: 059
22-CV-01616-BAS-DDL

position on the matter abundantly clear in earlier rulings,[50] but it was filed without the Local Rule 9075-1(B) certification[51] on an expedited basis in the midst of the global COVID-19 pandemic – in which court operations throughout the country have been disrupted – and during the week of both Passover and Easter. After conducting a telephonic hearing on April 9, 2020, the Court denied the emergency motion.[52]

## III.   GOVERNING LAW.

"The ability to appear pro hac vice is a privilege, not a right, and may be revoked by the Court upon a finding of misconduct."[53] Where an attorney has already been admitted to appear *pro hac vice*, the standards governing revocation of that privilege differ, depending on the circumstances.[54] For conduct that threatens disruption of the court proceedings or is a deliberate challenge to the Court's authority, the Court is given great deference to disqualify the recalcitrant attorney.[55] "If, however, the conduct at issue does not threaten the orderly administration of justice but is allegedly unethical," the Court must rest its "disqualification decisions on the violation of specific Rules of Professional Conduct, not on some 'transcendental

---

[50] The Court also noted at the April 9, 2020 hearing that it had twice before considered and dismissed the argument Mr. Catanzarite raised in his Emergency Motion to Modify Injunction.

[51] Local Rule 9075-1(B) requires "a certification that the proponent has made a bona fide effort to resolve the matter without hearing."

[52] Mikles Adv. Pro., ECF No. 180.

[53] *Blitz Telecom Consulting, LLC v. Peerless Network, Inc.*, Case No. 6:14-cv-307-Orl-40GJK, 2016 WL 6125585, at *2 (M.D. Fla. Oct. 20, 2016); *cf. Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) ("[A] federal court has the power to control admission to its bar and to discipline attorneys who appear before it.").

[54] *Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997).

[55] *Id.*

EXHIBIT #36: 060
22-CV-01616-BAS-DDL

code of conduct . . . that . . . exist[s] only in the subjective opinion of the court.'"[56]
Except in certain circumstances not present here, an attorney's *pro hac vice* privileges
may not be revoked "without notice of the charge against him or an opportunity to
explain."[57]

The Florida Rules of Professional Conduct provide that a lawyer must not
"knowingly disobey an obligation under the rules of a tribunal except for an open
refusal based on an assertion that no valid obligation exists."[58] It is also improper for
an attorney to, "in pretrial procedure, make a frivolous discovery request."[59] The
Florida Bar Guidelines for Professional Conduct further provide that "[a]ttorneys
must, except in extraordinary circumstances, communicate with opposing counsel
before scheduling depositions . . . to schedule them at times that are mutually
convenient for all interested persons."[60] The Guidelines go on to state that "[w]hen
scheduling depositions, reasonable consideration should be given to accommodating
schedules of opposing counsel and deponents, when it is possible to do so without
prejudicing the client's rights."[61]

---

[56] *Id.* (quoting *In re Finkelstein*, 901 F.2d 1560, 1565 (11th Cir. 1990)).

[57] *Kirkland v. Nat'l Mortg. Network, Inc.*, 884 F.2d 1367, 1371 (11th Cir. 1989) (quoting *Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1211 (11th Cir. 1985)).

[68] FL ST BAR Rule 4-3.4(c).

[59] FL ST BAR Rule 4-3.4(d).

[60] Florida Bar Guidelines for Professional Conduct, Section B(1).

[61] *Id.*, Section F(2).

EXHIBIT #36: 061
22-CV-01616-BAS-DDL

## IV.   ANALYSIS.

As this Court has previously found, Mr. Catanzarite deliberately violated this Court's preliminary injunction entered in the Mikles Adversary Proceeding. The Court sanctioned Mr. Catanzarite for this misconduct and warned him that further transgressions would result in an order to show cause why his *pro hac vice* status should not be revoked. He clearly did not heed the message and continues to deliberately challenge this Court's authority. After being admonished orally and in writing, and being sanctioned several times, Mr. Catanzarite continues to disobey local rules, federal rules, and court orders warning him that further misconduct will bring about the consequences now before the Court. Accordingly, his repeated violation of this Court's local rules and orders constitute deliberate challenges to this Court's authority, warranting revocation of his *pro hac vice* privileges.

Moreover, Mr. Catanzarite's violation of the preliminary injunction was also a violation of FL ST BAR Rule 4-3.4(c), and his numerous discovery transgressions – all of which resulted in rulings against him and his clients – violated FL ST BAR Rule 4-3.4(d). Additionally, his noticing of depositions – particularly the Northwood Entities' depositions that he unilaterally noticed for December 24 and 26 in New York – violated Florida Bar Guidelines for Professional Conduct, Sections B(1) and F(2).

## V.   CONCLUSION.

Mr. Catanzarite has abused his privilege to appear *pro hac vice* in this Court. This Court expects the attorneys who practice and appear before it to be civil, courteous, and cooperative. All attorneys licensed to practice law in Florida are required to swear an oath to "maintain the respect due to courts of justice and judicial

15

officers," and "to opposing parties and their counsel, [to] pledge fairness, integrity, and civility, not only in court, but also in all written and oral communications."[62] As a visiting attorney granted the privilege to practice in this Court, Mr. Catanzarite was expected to abide by these principles. His actions in the Daymark Case, however, have been inconsistent with these principles.[63] An attorney whose *pro hac vice* application was false when filed, who has thrice been sanctioned, who has repeatedly ignored our Local Rules, and who has continually failed to grasp the concept that discovery is a tool, not a weapon[64] will forfeit the privilege of appearing in this Court.

If – after giving Mr. Catanzarite a final opportunity to respond to the charges against him – the Court decides to immediately revoke his *pro hac vice* privileges, the Court still intends to proceed with the August 31-September 2, 2020 evidentiary hearing on the Settlement Motion.[65] Mr. Frankenthal, as Local Counsel to the Objecting Creditors, is certainly capable of trying this matter without Mr. Catanzarite, as he has been involved in the case from the outset. Thus, the revocation

---

[62] The Oath of Admission to the Florida Bar was amended September 12, 2011 to add this civility pledge.

[63] Mr. Catanzarite's behavior has also been inconsistent with Rule 1001 of the Federal Rules of Bankruptcy Procedure, which provides that the Rules should be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every case and proceeding." Mr. Catanzarite's tactics and behavior during this case have been contrary to this mandate.

[64] Discovery must also be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit" Fed. R. Civ. P. 26(b)(1).

[65] Public health and safety conditions permitting, of course.

EXHIBIT #36: 063
22-CV-01616-BAS-DDL

of Mr. Catanzarite's *pro hac vice* privileges will not serve as a basis for any continuance of the hearing.

Accordingly, upon consideration of the Motion for Order to Show Cause, the Response in Opposition, the Joinders, the Objection to Joinders, the Catanzarite Declaration, the Kent Declaration, the arguments made at the March 5, 2020 hearing, and the record in the Daymark Case and its related adversary proceedings, it is

**ORDERED** that:

1.      The Trustee's Motion for Order to Show Cause is **GRANTED**.

2.      Attorney Kenneth J. Catanzarite is directed to show cause why his *pro hac vice* privileges should not immediately be revoked.

3.      Mr. Catanzarite must file a written response to this Order to Show Cause **on or before May 29, 2020**. His response must include any legal citations, citations to the record, and affidavits or declarations Mr. Catanzarite would like the Court to consider in deciding whether to revoke his *pro hac vice* privileges.[66]

4.      Failure to file a written response on or before May 29, 2020, will result in the immediate revocation of Mr. Catanzarite's *pro hac vice* privileges without further notice or hearing.

---

[66] In light of the extensive briefing on the Motion for Order to Show Cause and all related filings, including Mr. Catanzarite's Response in Opposition, Objection to Joinders and his Declaration, and the extensive arguments at the March 5, 2020 hearing (which Mr. Catanzarite elected to attend by telephone), and the final opportunity afforded to Mr. Catanzarite by this Order to file another written response, affidavit or declaration, the Court finds that a further hearing on this matter is unnecessary and intends to rule on the papers. Mr. Catanzarite has had more than ample notice of the charges against him and multiple opportunities to respond and appear in person before the Court.

EXHIBIT #36: 064
22-CV-01616-BAS-DDL

5.      Any interested party wishing to reply to Mr. Catanzarite's response must file a reply **on or before June 12, 2020**. Any reply must likewise include any legal citations, citations to the record, and affidavits or declarations the party would like the Court to consider.

###

Copies furnished to:

*Barry P. Gruher, Esq., who must serve a copy of this Order on all interested parties and file a certificate of service thereof.*

EXHIBIT #36: 065
22-CV-01616-BAS-DDL

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF FLORIDA


In Re:                    Chapter 11

In Re: Daymark Realty
Advisors, Inc.                No. 18-23750-RBR
In Re: Daymark Residential        18-23751-RBR &
Management, Inc.                  18-23752-RBR
In Re: Daymark Properties     (Jointly Administered)
Realty, Inc.


            Debtors

_____


TELEPHONIC DEPOSITION OF RICHARD CARLSON

Irvine, California

Wednesday, February 12, 2020
Volume I


Reported by:
ANGELA METZ
CSR No. 12454, CLR

JOB No. 51397-A


PAGES 1 - 206

1

EXHIBIT #36: 066
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1        UNITED STATES BANKRUPTCY COURT

2        SOUTHERN DISTRICT OF FLORIDA

3

4

5   In Re:                    Chapter 11

6   In Re: Daymark Realty
    Advisors, Inc.                No. 18-23750-RBR
7   In Re: Daymark Residential        18-23751-RBR &
    Management, Inc.                   18-23752-RBR
8   In Re: Daymark Properties    (Jointly Administered)
    Realty, Inc.

9

10          Debtors

11

12   _____

13

14          Telephonic deposition of RICHARD

15      CARLSON, Volume I, taken on behalf of

16      Chapter 7 Trustees, at 17752 Skypark

17      Circle, Suite 100, Irvine, California,

18      beginning at 9:19 a.m. and ending at 3:33

19      p.m. on Wednesday, February 12th, 2020,

20      before ANGELA METZ, Certified Shorthand

21      Reporter No. 12454.

22

23

24

25

                                                    2

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855-811-3376

EXHIBIT #36: 067
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

```
1    APPEARANCES:

2

3    For Objecting Creditors and Deponent:

4        CATANZARITE LAW CORPORATION
         BY:  KENNETH J. CATANZARITE
         ATTORNEY AT LAW
5        2331 West Lincoln Avenue
         Anaheim, California 92801
6        (714) 520-7820
         kcatanzarite@catanzarite.com
7

8    For Chapter 7 Trustee:

9        GENOVESE JOBLOVE & BATTISTA
         BY:  BARRY GRUHER (Via Telephone)
10       BY:  JOYCE DELGADO
         ATTORNEYS AT LAW
11       100 North Tampa Street, Suite 2600
         Tampa, Florida 33602
12       (305) 349-2300
         bgruher@gjb-law.com
13

14
     For Northwood Investors, LLC, NW Congress Center Owner,
15   LLC, NW Congress Center, LLC, Northwood Employees, LP,
     Northwood Real Estate Partners TE, LP, and Northwood Real
16   Estate Partners, LP:

17       KIBLER, FOWLER, AND CAVE LLP
         BY:  MICHAEL KIBLER
18       ATTORNEY AT LAW
         11100 Santa Monica Boulevard, Suite 360
19       Los Angeles, California 90025
         (310) 409-0400
20       mkibler@kfc.law

21

22

23

24

25
                                                      3
```

EXHIBIT #36: 068
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

```
 1                          INDEX
 2   WITNESS                              EXAMINATION
 3   RICHARD CARLSON
     VOLUME I
 4
              BY MR. GRUHER           6, 203
 5
              BY MR. KIBLER             166
 6
              BY MR. CATANZARITE        195
 7
 8
                           EXHIBITS
 9   CHAPTER 7 TRUSTEE'S                      PAGE
10      Exhibit      First Amended Complaint    11
        T32
11
        Exhibit      Second Amended Complaint   11
12      T33
13      Exhibit      Adversary Complaint        34
        T43
14
        Exhibit      Proof of Claim             93
15      T44
16      Exhibit      Motion to Approve Settlement  120
        T45          Agreements
17
        Exhibit      Form 10-K                  40
18      T46
19      Exhibit      Form 10-K                  43
        T47
20
        Exhibit      Form 8-K                   49
21      T48
22      Exhibit      Form 8-K                   58
        T49
23
        Exhibit      Agreement and Declaration of  151
24      T50          Trust
25
```

4

EXHIBIT #36: 069
22-CV-01616-BAS-DDL

```
1                    INDEX (Continued.)
2     Exhibit        Inspection of Filing         152
      T51            Documents
3
      Exhibit        Settlement Agreement         154
4     T52
5     Exhibit        Settlement Agreement         154
      T53
6
      Exhibit        Motion to Apply Class Action  99
7     T58            Rules and Procedures to Class
                     Proof of Claim
8
      Exhibit        Declaration of Richard        99
9     T59            Carlson
10
11
12             INFORMATION REQUESTED
13                  (None.)
14
          INSTRUCTION NOT TO ANSWER
15            PAGE          LINE
              172            21
16            173             7
              174             4
17            175            20
              177             9
18            177            24
              180            25
19            191             7
              191            15
20            194            22
              195             7
21
22
23
24
25
                                              5
```

EXHIBIT #36: 070
22-CV-01616-BAS-DDL

1          Irvine, California, Wednesday, February 12th, 2020

2                          9:19 a.m.

3

4                       RICHARD CARLSON,

5    having been first duly sworn, was examined and testified

6    as follows:

7

8                         EXAMINATION

9

10   BY MR. GRUHER:

11       Q.   Mr. Carlson, good morning.  My name is Barry

12   Gruher, and I am counsel for Chad S. Paiva, who is the

13   Chapter 7 trustee for three separately consolidated

14   estates for the debtors Daymark Realty Advisors, Inc.,

15   Daymark Residential Management, Inc., Daymark Properties

16   Realty, Inc., consolidated case numbers 18-23750, 18-23751

17   and 18-23752.

18           Before we get started, I'd also like to have

19   counsel make their appearances on the record.

20           MR. CATANZARITE:  Ken Catanzarite appearing for

21   Mr. Carlson individually and as a representative of the

22   class.

23           MR. KIBLER:  Michael Kibler on behalf of the

24   Northwood entities.

25           MS. DELGADO:  Joyce Delgado on behalf of the

                                                          6

EXHIBIT #36: 071
22-CV-01616-BAS-DDL

1  Chapter 7 trustee, Chad Paiva.

2          MR. GRUHER:  And is there any other counsel in

3  the room?

4          MR. KIBLER:  No.

5          MR. CATANZARITE:  No.

6          MR. GRUHER:  Okay.  Great.

7  BY MR. GRUHER:

8     Q.   Mr. Carlson, could you please state your full

9  name for the record?

10    A.   Yes.  Richard Dennis Carlson.

11    Q.   And do you go by any other names other than

12  Richard Carlson or Richard Dennis Carlson?

13    A.   Most of the time I go by Dick.

14    Q.   Okay.

15    A.   Richard is kind of a professional name.

16    Q.   I understand.

17         I'll probably just call you Richard or

18  Mr. Carlson, so I hope you don't mind.

19         Have you ever had your deposition taken before in

20  any civil or criminal proceeding --

21    A.   No, I haven't, sir.

22    Q.   -- prior to showing up for your deposition here

23  today?

24    A.   I have not.

25    Q.   All right.  So is it your understanding this will

                                                        7

EXHIBIT #36: 072
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1  be your first time that you've ever given sworn testimony

2  in any legal proceeding?

3      A.    There probably is something else, but I can't

4  recall it right now.

5      Q.    Well, what I'm going to do, then, is I'm just

6  going to give you a couple of ground rules as we go

7  forward with the examination.  And I know you're being

8  represented by Mr. Catanzarite.  And I would suggest that

9  during the examination before answering a question you can

10  give Mr. Catanzarite some time to make any objections that

11  he may make.  However, I will tell you that unless Mr.

12  Catanzarite instructs you not to answer a question, you

13  should answer my questions to the best of your ability.

14  And please keep note that the court reporter can only take

15  down verbal or audio statements.  She can't take down head

16  nods and things of that nature.  Okay?

17      A.    Okay.

18      Q.    And, in addition, I'll ask you a series of

19  questions.  If there's any question I ask you that you do

20  not understand or perhaps I can ask it in a manner in

21  which you may be able to understand it, let me know and

22  I'll do the best that I can in order to accommodate you.

23      A.    Okay.

24      Q.    If at any time you need a break, whether you need

25  to go to the bathroom or if there's an instance where you

8

EXHIBIT #36: 073
22-CV-01616-BAS-DDL

1  believe you may need to confer with Mr. Catanzarite to the

2  extent there's any potential privilege issues, you can do

3  so.  And certainly Mr. Catanzarite will let me know if

4  there's any attorney-client privileged communications that

5  we may be touching upon, and I'll allow you some time to

6  confer with counsel.

7      A.   Okay.

8      Q.   So with that said, is there any other questions

9  that you may have before we get started on how the

10 deposition will proceed?

11     A.   No, I don't think so.

12     Q.   Okay.  Are you presently employed or are you

13 retired at this point in time?

14     A.   I'm retired.

15     Q.   And prior to your retirement, what was your

16 business or occupation?

17     A.   Electrical engineer.  I worked in aerospace at

18 five different companies.

19     Q.   And what were the five different companies that

20 you can recall?

21     A.   Aernotronic (phonetic), McDonnell Douglas,

22 Lockheed, and -- let's see.  The other one is Raytheon.

23     Q.   I'm sorry.  I didn't get that last one.

24     A.   Raytheon.

25     Q.   Oh, Raytheon.

9

EXHIBIT #36: 074
22-CV-01616-BAS-DDL

1    A.    Uh-huh.

2    Q.    Sure.  I've heard of that.

3    A.    They bought the company that I was working for at

4  the time.

5    Q.    And other than being an electrical engineer, have

6  you ever engaged or operated a business?

7    A.    No, I haven't.

8    Q.    Now, you understand that you're appearing here

9  for today's deposition as a beneficiary of the G REIT

10  Liquidating Trust; is that correct?

11    A.    That's correct.

12    Q.    And can you just in your own words describe for

13  me what your understanding is as being a, quote,

14  beneficiary under the G REIT Liquidating Trust?

15    A.    I think I have to ask for a little help on that.

16        MR. CATANZARITE:  Well, it's not attorney-client.

17  I would say it calls for a narrative.  He -- you know,

18  maybe you have some --

19  BY MR. GRUHER:

20    Q.    We'll do it in a different way.  That's okay.

21  Why don't we do this.  Why don't we go ahead and I'll show

22  you two exhibits.  One is T32 and one is T33.  And I'm

23  going to ask if you just take a moment and look at these

24  two documents and tell me if you can recognize them or

25  identify them on the record.

                                                      10

EXHIBIT #36: 075
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1              (Exhibit T32 was marked for

2              identification.)

3              (Exhibit T33 was marked for

4              identification.)

5              THE WITNESS:  I haven't gotten any of these, have

6    I?

7              MR. CATANZARITE:  Well, he's asking if you --

8    take your time to look through.  Go ahead and look through

9    that.

10   BY MR. GRUHER:

11       Q.   Mr. Carlson, let me make it easier.  All I'm

12   asking you right now, if you have exhibits T32 and T33 in

13   front of you, all I need to know is, by looking at these

14   two documents, have you ever seen or recall seeing these

15   specific documents which are -- I will represent to you

16   are complaints that were filed in the Superior Court of

17   California in Orange County.  Have you ever seen these

18   documents before today's deposition?

19       A.   No, I haven't.

20       Q.   So just to be clear, T32 and T33, this is the

21   first time you've seen these documents; is that correct?

22       A.   That's correct.

23       Q.   I'm going to focus on T33 for a moment.  So why

24   don't you just isolate that document and then open the --

25   turn to Page 1 for me.  You'll see the numbers at the

                                                          11

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855-811-3376

EXHIBIT #36: 076
22-CV-01616-BAS-DDL

1  bottom of the document, and you'll see a title called

2  "Nature of Action."

3      A.   Okay.

4      Q.   And why don't you read to yourself paragraph 1,

5  and then I'll ask you the same question I asked you before

6  about what your understanding is as being, quote, a

7  beneficiary of the G REIT Liquidating Trust.

8      A.   Does this last sentence cover it?  "The

9  beneficiaries as members of the class are now holders of

10  beneficial interest in the G REIT Liquidating Trust"?  Is

11  that what you want?

12      Q.   Sir, I'll just read -- I'll just read the first

13  paragraph that I was directing you to, and then I'll ask

14  you some questions.

15          In paragraph 1 of the complaint, which is a

16  second amended class action complaint for breach of

17  fiduciary duty and fraudulent transfer, which, by the way,

18  was filed on behalf of yourself as Richard Carlson as

19  beneficiary of G REIT Liquidating Trust, it states that:

20  "This complaint is on behalf of a putative class of

21  13,858," in quotes, "beneficiaries who invested an average

22  of $31,561 per person between July 22nd, 2002, through

23  December 31st, 2004, to acquire 43,865,000 shares of G

24  REIT," comma, "Inc., common stock at a price of $10 per

25  share pursuant to a registration statement on Form F-11/A

                                                      12

1   under the Securities Act resulting in the corporation's

2   receipt of gross proceeds of $437,315,000.  The

3   beneficiaries as members of the class are now holders of,"

4   quote, "beneficial interests," end of quote, "in G REIT

5   Liquidating Trust," which we call that in parens and

6   quotes, "the trust."

7          Do you see that paragraph that I just read to

8   you?

9      A.   Yes, I do.

10     Q.   Okay.  Now, having looked at this paragraph and

11  having me read it to you, does that help refresh your

12  recollection as to what it means by that you are a

13  beneficial -- a beneficiary of the G REIT Liquidating

14  Trust?  And I'm not asking you to guess, Mr. Carlson.  If

15  you don't know, that is fine.  I'll move onto the next

16  question.

17     A.   I don't think this -- I don't understand this

18  paragraph well enough to say.

19     Q.   Understood.  Let me ask you this question, then.

20     A.   Sure.

21     Q.   Do you recall ever investing in a company called

22  G REIT, Inc.?

23          And let me spell it for the court reporter.  It's

24  capital G, space, capital R, capital, E, capital I,

25  capital T, Inc.

                                                      13

EXHIBIT #36: 078
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1    A.   Yes, I have.

2    Q.   And do you recall how much money you invested in

3    G REIT, Inc.?

4    A.   I don't remember because there were some

5    increments added in after I started.  I don't remember.

6    It's a long time ago.

7    Q.   Can you just tell me based on your own

8    recollection what or how much money you've actually

9    invested in G REIT, Inc., whether it was from your initial

10   investment or any subsequent investment thereafter?

11   A.   It kind of has to be a guess.

12        MR. CATANZARITE:  Well, don't guess.  But you can

13   give him a range or estimate if you want to give him a

14   range or estimate.

15        THE WITNESS:  Well, I started with 10,000 and

16   possibly up to 15.

17   BY MR. GRUHER:

18   Q.   So, to be clear, just, again, based on your

19   recollection, sitting here today, you likely invested

20   between 10- to 15,000 dollars in G REIT Inc.; is that

21   correct?

22   A.   That's correct.

23   Q.   And how much money have you received back as a

24   distribution or other forms of payment based on your

25   investment in G REIT Trust between 10- to 15,000 dollars?

14

EXHIBIT #36: 079
22-CV-01616-BAS-DDL

1    A.   I have no idea since I'm here.  I didn't bring

2  any information like that.  And, you know, it's been a

3  while.

4    Q.   Do you believe that you received more than

5  $15,000 from the G REIT, Inc. -- from G REIT, Inc.?

6    A.   I don't know.  I really don't know.

7    Q.   Do you believe, sitting here today, that you have

8  suffered any loss, meaning that you've lost money that you

9  invested into G REIT, Inc.?

10        MR. CATANZARITE:  I'll object to the extent it

11  calls for expert opinion testimony.  If the witness --

12        MR. GRUHER:  No, it's not at all.  It's just that

13  he's the lead plaintiff and he can testify as to whether

14  or not he, as a beneficiary or individually, lost any

15  money as a result of his investment in G REIT, Inc., to

16  his knowledge.

17        MR. CATANZARITE:  And I have said, and I stated

18  my objection on the record, that it calls for expert

19  opinion testimony.  But he can give you his best estimate

20  if he has one.

21        MR. GRUHER:  Thank you, Ken.

22        THE WITNESS:  Right now, without a settlement, I

23  would say all of it.  If -- I don't know what the

24  settlement is going to be.

25  BY MR. GRUHER:

15

EXHIBIT #36: 080
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1    Q.   I see.  And what settlement are you referring to,
2  sir?
3    A.   This class action settlement that we're talking
4  about today.
5    Q.   All right.  So your understanding is that the
6  settlement that you're sitting here today in this
7  deposition relates to a class action settlement; is that
8  correct?
9    A.   Yes.  Uh-huh.
10   Q.   And what is your understanding of what the class
11 action settlement consists of in terms of the amount of
12 money at issue?
13         And, Mr. Carlson, if you don't know, you don't
14 know.  That is fine.  Like I said, I'll just move on to
15 another area.
16   A.   I was just trying to get it out of here, but I
17 don't know.
18   Q.   That is fine.  We'll move on.
19         Have you heard of an entity known as G REIT
20 Liquidating Trust?
21   A.   Yes, I have heard the name.
22   Q.   When did you first hear of that name, G REIT
23 Liquidating Trust?
24   A.   Is that the 2018?  Is that right?
25         MR. CATANZARITE:  You tell him.  If you don't

16

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855-811-3376

EXHIBIT #36: 081
22-CV-01616-BAS-DDL

1   know, you don't know.  If you don't recall.

2          THE WITNESS:  Yeah, I don't know for sure.

3   BY MR. GRUHER:

4      Q.    And while we're on the topic, can you tell me how

5   you first became aware of any investment opportunity with

6   respect to G REIT, Inc.?

7      A.    Yes, I can.  When I was flying quite a bit for my

8   company, I'd read the magazines in the aircraft, and I

9   found this one magazine that had an advertisement by Ty

10  Windfield where he had REIT units that you could take a

11  lot of your income taxes off.  So I made real good use of

12  that for a few years while I was working.  Since I'm

13  retired now, I'm not doing too much of that anymore.

14     Q.    So, just to be clear, Tyrone Windfield is the

15  individual that you had either contacted or became aware

16  of who then suggested to you or directed you to invest in

17  G REIT, Inc.; is that correct?

18     A.    That's correct.

19     Q.    And did you ever speak or meet with Mr. Windfield

20  personally?

21     A.    Yes.  Uh-huh.

22     Q.    And do you recall the month and year when you

23  first spoke to or met with Mr. Windfield?

24     A.    Oh, boy.  Let me see.  I can't get the exact --

25  it's been a long time.  I've had them for quite a while.

                                                          17

EXHIBIT #36: 082
22-CV-01616-BAS-DDL

1    Q.   All right.  What did you understand was

2    Mr. Windfield's role regarding investments in G REIT,

3    Inc.?

4    A.   Well, I guess like any of them he had studied the

5    program pretty good and he recommend that it would be a

6    good one for me, so I took it.  He gave me quite a few

7    different ones to invest in, and they all turned out

8    pretty good, so I did this one through them.

9    Q.   Well, would you say -- when you said he had to

10   invest in other -- I guess -- let me back up.

11          Mr. Windfield not only had you invest in G REIT,

12   Inc., he had you invest in other companies; is that

13   correct?

14   A.   Yes.  The big thing, like I said before, was he

15   had some good REITs that you could subtract your income

16   tax off of and actually end up with zero income tax.  And

17   that is where I started with him and I worked with him on

18   that while I was working.  Once I retired, then it didn't

19   benefit me so much.

20   Q.   So the -- what drew you to these investments, if

21   I'm correct, is the fact that you were able to obtain

22   certain favorable tax treatment relative to your income or

23   assets?  Is that a fair statement?

24   A.   Yeah.  Some of them that he had.  I didn't look

25   at G REIT that way, but because he had specific ones that

18

EXHIBIT #36: 083
22-CV-01616-BAS-DDL

1    he offered to me.

2        Q.    Other than G REIT, Inc., which we'll get back to,

3    what specific investments in REITs did he direct you into

4    that you determined were good investments?

5        A.    That's too long ago.  That's over 20 years ago.

6    I won't remember any of those.

7        Q.    Is it your position that G REIT, Inc., was not a

8    good investment?

9        A.    I didn't say that.

10       Q.    Okay.  Well, tell me what -- tell me what your

11   understanding is of what benefits you received by

12   investing in G REIT, Inc.?

13       A.    I don't think I've received the benefits yet, but

14   I'm planning on the trustees to get a settlement that will

15   offer me some benefits.

16       Q.    And when you're referring to the trustees, are

17   you talking about the trustees that are involved with the

18   G REIT Liquidating Trust or are you referring to the

19   Chapter 7 trustee, Chad S. Paiva?

20       A.    I believe it's the G REIT Trust.

21       Q.    All right.  So when you're talking about the

22   trustees, you're referring only to the trustees that are

23   involved with the G REIT Liquidating Trust; is that

24   correct?

25       A.    Yes, sir.

                                                            19

EXHIBIT #36: 084
22-CV-01616-BAS-DDL

1   Q.   And have you ever heard of an individual named
2   Gary Wescombe?
3   A.   No, I haven't.
4   Q.   Do you know who any of the trustees of the G REIT
5   Trust are?
6   A.   No, I don't.
7   Q.   Have you ever heard of W. Brand Inlow?
8   A.   No.
9   Q.   Have you ever heard of Edward A. Johnson?
10  A.   No.
11  Q.   Have you ever heard of D. Fleet Wallace?
12  A.   No.
13  Q.   Now, you are -- so what your issue is right now
14  with the G REIT Liquidating Trust is your understanding is
15  that there should be -- there's going to be a settlement,
16  and from that settlement you're going to be receiving
17  additional money on top of what you've already received
18  from either G REIT, Inc., or G REIT Liquidating Trust; is
19  that correct?
20  A.   Yes, I was hoping so.
21  Q.   And is this the last investment that you're aware
22  of that you have in which Tyrone Windfield was involved or
23  instrumental in having you invest your money into these
24  REITs?
25  A.   No.  There's at least one more.  I can't remember

                                                          20

EXHIBIT #36: 085
22-CV-01616-BAS-DDL

1  the name right now.  But I have switched over to Fidelity

2  for most of my investments now.

3      Q.   In your own words, can you explain to me or do

4  you understand what the word REIT means?

5      A.   Yes.  Real estate investment.

6      Q.   Real investment trust, correct?

7      A.   Uh-huh, that's correct.

8      Q.   And prior to meeting Mr. Windfield, did you have

9  any experience or knowledge about investing in real estate

10  investment trusts?

11      A.   No, I didn't.

12      Q.   And when you had testified earlier that you

13  believe that these investments into the REITs that

14  Mr. Windfield was directing you into provided favorable

15  tax benefits, can you describe for me your understanding

16  of what those tax benefits were?

17      A.   Yes.  It brought my -- the income tax amount that

18  I owed down.

19      Q.   Were you concerned about having income tax, what

20  you described as income amount -- sorry, bad question.

21  I'm going to strike that.

22          At the time that you were working with

23  Mr. Windfield and investing into real estate investment

24  trusts, what specifically were you concerned about

25  relative to tax liabilities that you owed to the IRS?

21

EXHIBIT #36: 086
22-CV-01616-BAS-DDL

1          MR. CATANZARITE:  Wait, wait, wait.  I'll object

2     to the extent that the question assumes a fact not in

3     evidence that there would be a liability.  In other words,

4     the question suggests that he has a liability when the

5     investment made may provide favorable tax benefits that do

6     not offset liability.

7          MR. GRUHER:  That's fair, Ken.  That's fair.

8     I'll ask it a different way.

9     BY MR. GRUHER:

10         Q.   Mr. Carlson, just based on your prior testimony,

11    I believe that you were indicating that these investments

12    in the real estate investment trusts was a way or a

13    mechanism for you, and I don't want to put words into your

14    mouth, but you had a concern about taxes that were owed to

15    the IRS.  And keeping in mind what your attorney said

16    about whether or not there was or was not a liability,

17    just describe for me just what your concerns were with tax

18    liabilities or tax consequences relative to moneys that

19    may have been owed to the IRS.  And I'm not suggesting

20    that you did owe money to the IRS.

21         MR. CATANZARITE:  Barry, I'll object to that

22    because I believe you're misstating his testimony.  He

23    said he had made investments with Windfield -- he didn't

24    describe them as REITs -- that had a tax benefit.  I think

25    you're conflating REITs that may carry a tax benefit and

                                                           22

EXHIBIT #36: 087
22-CV-01616-BAS-DDL

```
 1   other investments that may have provided a tax benefit.
 2   BY MR. GRUHER:
 3      Q.   Mr. Carlson, just describe for me in your own
 4   words what is it or what attributes of the investments
 5   that Mr. Windfield was directing you to put your money
 6   into that you believed or understood provided you with
 7   favorable tax benefits?
 8      A.   You know, it's been so long.  I did my own taxes,
 9   but I can't remember exactly how they took the money out.
10   It's over 20 years ago that I did that.
11      Q.   Did you understand that G REIT, Inc., was a
12   publicly traded company?
13      A.   Yes, I thought so.
14      Q.   Have you ever invested in publicly traded
15   companies prior to the time that you dealt with
16   Mr. Windfield?
17      A.   Yes, I think I have.
18      Q.   And on that note, by the way, you understand that
19   Mr. Windfield is now deceased, correct?
20      A.   No, he's not.
21      Q.   All right.  You don't know that he passed away?
22          THE WITNESS:  He's not deceased, is he?
23          MR. CATANZARITE:  Yes, he did die.
24          THE WITNESS:  Oh, he did?  I'm sorry, I didn't
25   know that.
```

23

EXHIBIT #36: 088
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

```
 1   BY MR. GRUHER:
 2       Q.   And, by the way, I was just asking if you knew.
 3   I wasn't suggesting that you should have known.  So my
 4   apologies if it came across that way.
 5       A.   That's not a problem.  I'm really sorry to hear
 6   it, though.  He's a great guy.
 7       Q.   Okay.  So this is the first you're learning of
 8   that, correct?
 9       A.   Yes, it is.
10       Q.   I don't know if you answered the question before.
11   Do you recall investing in any publicly traded companies
12   other than G REIT, Inc.?
13       A.   Yes.  There were one or two in the same -- with
14   this fund I did.  I don't remember them right now.  It's
15   been quite a while.
16       Q.   A fund that Mr. Windfield put you in, correct?
17       A.   Yes.
18       Q.   Do you also know an individual named John Weiss?
19       A.   That name sounds familiar, but I can't place him
20   right now.
21       Q.   Tell me why you believe that name sounds familiar
22   to you.
23       A.   I guess since we're here, it must be an
24   investment guy.
25       Q.   So you know him to be, quote, an investment guy?
                                                            24
```

EXHIBIT #36: 089
22-CV-01616-BAS-DDL

1           MR. CATANZARITE:  I'll object.  I think he's

2    speculating.

3           But go ahead.  You tell him as best you know.

4           THE WITNESS:  I was guessing.

5           MR. CATANZARITE:  Don't guess.

6           THE WITNESS:  I don't know about him.

7    BY MR. GRUHER:

8      Q.   But you heard the name before.  Who would you

9    have heard his name from?  Mr. Catanzarite?

10   Mr. Windfield?  How does that name ring a bell for you,

11   sir?

12     A.   I just don't know the answer to that.

13     Q.   Fair enough.  How about Tony Thompson.  Have you

14   ever heard of that individual before?

15     A.   No.

16     Q.   And did you understand that at least with respect

17   to Ty Windfield that John Weiss may have also been --

18   well, strike that.

19          Did you understand that Ty Windfield was a

20   securities broker or a dealer at the time that you started

21   investing in G REIT, Inc.?

22     A.   Yes, I did.

23     Q.   How much money would you say that you had

24   invested in the aggregate, meaning all of the money that

25   you may have invested in all of the different REITs and/or

                                                      25

EXHIBIT #36: 090
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1   other investments that Mr. Windfield had presented to you

2   as an opportunity for an investment?

3       A.   That's a tough one because it's so long ago

4   again.  I hate to guess --

5       Q.   And, again, Mr. Carlson, I don't want you to

6   guess.  If you don't know, you can tell me you don't know.

7   It's fine.

8       A.   I don't know.

9           MR. CATANZARITE:  And, Richard, let's let him

10  finish his question, pause in case I have an objection,

11  and then answer.  Because you're starting to step on each

12  other.

13          THE WITNESS:  Okay.

14          MR. GRUHER:  Thank you, Ken.

15  BY MR. GRUHER:

16      Q.   Mr. Carlson, have you ever heard of Milton O.

17  Brown?

18      A.   I don't recall him.

19      Q.   Have you ever heard of Catherine Looper?

20      A.   No, I don't recognize that either.

21      Q.   Have you ever heard of an individual named Todd

22  Mikles?

23      A.   No, I haven't sir.

24      Q.   Have you ever heard of an individual named

25  Etienne Locoh -- I'll spell the last name for you --

                                                      26

EXHIBIT #36: 091
22-CV-01616-BAS-DDL

1    L-o-c-o-h?

2        A.    No.

3        Q.    Have you ever heard of an entity Daymark

4    Properties Realty, Inc.?

5        A.    Yes.

6        Q.    Have you ever heard of an entity known as Daymark

7    Realty Advisors, Inc.?

8        A.    Yes.

9        Q.    And have you ever heard of an entity known as

10   Daymark Residential Management, Inc.?

11       A.    I'm not sure about that.  I'd say no to that one.

12       Q.    All right.  Let's then just start with the two,

13   Daymark Realty Property -- Daymark Properties Realty and

14   Daymark Realty Advisors.  And I know sometimes it could be

15   confusing.  So if I confuse you, let me know, and I'll let

16   you know if you're confusing me.  And I mean that

17   sincerely, because sometimes you can mix them up.

18            I want to just start off with Daymark Properties

19   Realty, Inc.  What is your knowledge about that particular

20   company and what it did, if any, relative to any

21   investments that you had with G REIT, Inc., or the G REIT

22   Liquidating Trust?

23       A.    Really none.  I don't recognize any use of it.  I

24   just recognize the name, but that's all.

25       Q.    And with respect to Daymark Realty Advisors,

                                                        27

EXHIBIT #36: 092
22-CV-01616-BAS-DDL

1  Inc., same question --

2     A.   Same answer.

3     Q.   -- what, if anything, do you know or understand

4  about that company's involvement in connection with any

5  investments you had in G REIT, Inc., and/or the G REIT

6  Liquidating Trust?

7     A.   I don't recognize it.  I recognize the name, but

8  I don't know how it's used there.

9     Q.   Have you ever heard of an entity called NNN

10  Realty Investors, LLC?

11    A.   No, I haven't.

12    Q.   Have you ever heard of an entity known as

13  Sovereign Capital Management Group, Inc.?

14    A.   No.

15    Q.   Have you ever heard of an entity known as

16  Sovereign Strategic Mortgage Fund, LLC?

17    A.   No.

18    Q.   Have you ever heard of an entity known as

19  Northwood Investors, LLC?

20    A.   No.

21    Q.   Have you ever heard of an entity known as GCL,

22  LLC?

23    A.   No, I haven't.

24    Q.   Have you ever heard of an entity known as GCL

25  Manager, LLC?

28

EXHIBIT #36: 093
22-CV-01616-BAS-DDL

1      A.    No.

2      Q.    Have you ever heard of an entity known as the

3   American Recovery Property Trust, Inc., or ARPT?

4      A.    I think I might have heard about that one, but I

5   don't really know anything about it.

6      Q.    What, if anything, do you believe you may have

7   heard and by whom would you have heard it?

8      A.    That is too hard to answer.  I can't answer that.

9   I don't know.

10      Q.    Have you ever heard of an entity known as

11   American Recovery Property, comma, OP, comma, LP?

12      A.    No.

13      Q.    Have you ever heard of an entity called American

14   Recovery Property Advisors, LLC?

15      A.    No.

16      Q.    Have you ever heard of an entity known as NNN

17   Realty Advisors, LLC?

18      A.    No.

19      Q.    Have you ever heard of an entity called NNN

20   Congress Center, LLC?

21      A.    No.

22      Q.    Have you ever heard of an entity known as SGR

23   Sutter's Square, LLC?

24      A.    No, I haven't.

25      Q.    Have you ever heard of an entity known as

29

EXHIBIT #36: 094
22-CV-01616-BAS-DDL

1    Northwest Congress Center Owner, LLC?

2        A.    No.

3        Q.    Have you ever heard of an entity known as

4    Northwood Employees, LP?

5        A.    No.

6        Q.    Have you ever heard of an entity known as

7    Northwood Real Estate Partners TE LP?

8        A.    I think I might have heard of that one, but I

9    don't know anything about it.

10       Q.    And do you know how you obtained any knowledge

11   about that particular entity?

12       A.    I guess probably on television or something like

13   that.

14       Q.    I see.  And how about Northwood Real Estate

15   Partners, LP?

16       A.    No.

17       Q.    Have you ever heard of an entity called

18   Cottonwood Residential OP LP?

19       A.    No.

20       Q.    Have you ever heard of an entity known as

21   Cottonwood Capital Property Management II, or Roman

22   numeral II, LLC?

23       A.    No.

24       Q.    Have you ever heard of an entity known as

25   Cottonwood Capital Management, Inc.?

30

EXHIBIT #36: 095
22-CV-01616-BAS-DDL

```
1        A.    No.

2        Q.    Do you know an individual named Daniel Shaeffer,

3   S-h-a-e-f-f-e-r?

4        A.    No.

5        Q.    Have you ever heard of an entity known as

6   Plantations at Haywood M, LLC?

7        A.    No.

8        Q.    Have you ever heard of an entity known as

9   Plantations at Hollywood O, comma, LLC?

10       A.    No.

11       Q.    Have you ever heard of an entity known as

12   Plantations at Hollywood, LLC?

13       A.    No.

14       Q.    Have you ever heard of an entity known as Haywood

15   Storage, LLC?

16       A.    No.

17       Q.    Have you ever heard of an entity known as

18   Infinity Urban Century, LLC?

19       A.    No.

20       Q.    Have you ever heard of an entity known as

21   Sovereign Strategic Mortgage Fund, LLC?

22       A.    No.

23       Q.    Now, Mr. Carlson, do you know or understand what

24   your role is as a plaintiff in the two lawsuits -- or, I'm

25   sorry, back up for a minute.  Do you have Exhibit T33 in
```

31

EXHIBIT #36: 096
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1    front of you?

2       A.   Yes, I do.

3       Q.   Okay.   Now, do you see where at the very first

4    page of this document where it says "Richard Carlson as

5    beneficiary of G REIT Liquidating Trust," comma, "a

6    Maryland trust, on behalf of himself and all others

7    similarly situated, Plaintiffs"?

8       A.   Yes.

9       Q.   Do you understand what your role is as a

10   plaintiff in connection with this action that was filed in

11   the Superior Court of Orange County in California?

12           MR. CATANZARITE:   Object to the extent it calls

13   for attorney-client communication.   He can give you his

14   best --

15   BY MR. GRUHER:

16      Q.   That's a valid point.   In answering my question,

17   please listen to Mr. Catanzarite and his objection is

18   anything that you may have learned from him -- from Mr.

19   Catanzarite as your counsel, I am not looking for you to

20   divulge those particular communications or conversations.

21   I'm only asking you based upon your own personal knowledge

22   and information you would have obtained on your own what

23   you understand and believe that your role is as the named

24   plaintiff in the lawsuit that's reflected in Exhibit T33?

25           MR. CATANZARITE:   And, for the record, I'll point

32

EXHIBIT #36: 097
22-CV-01616-BAS-DDL

1   out he did file a declaration in support of his -- our

2   motion for class certification.  If you have --

3          MR. GRUHER:  Ken, we're so not there yet.  We're

4   just in two different worlds right now.  I'm back in like

5   State of California.  You're like in bankruptcy.  I

6   haven't even gotten there yet.  So let's not deviate from

7   where I'm going.  Right now I'm in California.  State

8   court case filed there.  Let's go with that.

9          MR. CATANZARITE:  But that is the state court

10  case --

11         MR. GRUHER:  That's --

12         MR. KIBLER:  All right, Ken.  That is not an

13  objection.  If you have an objection state your form of

14  objection.  Otherwise, be quiet and let the witness answer

15  the question.

16         MR. CATANZARITE:  Don't tell me to be quiet.

17         Mr. Carlson --

18         THE WITNESS:  Yes, sir.

19         MR. CATANZARITE:  -- if you can't tell him

20  anything other than based on what I told you, then you

21  don't need to answer him.

22         THE WITNESS:  Okay.  I don't think I can answer

23  this.  I don't understand it well enough.

24  BY MR. GRUHER:

25     Q.   So your testimony is that the only knowledge or

                                                          33

```
 1   information that you would have obtained personally as to
 2   why you're a named plaintiff in the lawsuit that you have
 3   before you at T33 you would have only have learned through
 4   your counsel, Mr. Catanzarite.  Is that your testimony?
 5       A.   Yes, it is.
 6       Q.   Why don't you -- okay.  We're going to look at
 7   now -- and, Joyce, if you can hand the witness
 8   Exhibit T43.
 9            (Exhibit T43 was marked for
10            identification.)
11            MS. DELGADO:  It's there before him.
12   BY MR. GRUHER:
13       Q.   All right.  Mr. Carlson, you have Exhibit T43
14   before you; is that correct?
15       A.   Yes, I do.
16       Q.   All right.  I'm going to ask you sort of similar
17   questions that I asked you before about the two preceding
18   exhibits, T33 and T32.  I'm going to first ask you if you
19   have ever seen this document before you appeared for your
20   deposition today.  And please take a moment to look at the
21   document and let me know when you're ready to answer.
22       A.   Okay.  I'm pretty sure I haven't seen these.  I
23   haven't seen a document this thick.
24       Q.   All right.  So this is the first time you've seen
25   this document that's before you at Exhibit T43; is that
```

34

EXHIBIT #36: 099
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1  correct?

2     A.   That's correct.

3         MR. CATANZARITE:  Well, you said it was -- you

4  haven't seen a document that thick.  That would be your

5  testimony.

6         MR. KIBLER:  Stop with the speaking objections.

7  Really, Ken.  If you have an objection to form, you can

8  make your objection.  Otherwise, the witness can answer

9  the question.

10        MR. CATANZARITE:  Objection; misstates the

11 witness's testimony.

12        MR. GRUHER:  Ken, all I did was ask Mr. Carlson

13 just like one of the low-hanging-fruit questions is have

14 you ever seen the document before?  And I had him look

15 through it.  That's all.  It's not a trick question.  If

16 he hasn't seen it before, then I accept the answer and

17 we'll continue with my examination.  Is there anything

18 else that you think your client has missed in answering my

19 question?

20        MR. CATANZARITE:  Well, he said he hadn't -- he

21 doesn't recall seeing a document that thick.  That was his

22 precise answer.

23        MR. GRUHER:  Fine.

24 BY MR. GRUHER:

25    Q.   Mr. Carlson, let me ask you a more specific

                                                    35

EXHIBIT #36: 100
22-CV-01616-BAS-DDL