```
 1   question.  Before Ms. Delgado handed you Exhibit 43 for
 2   your review, do you recall ever seeing any part or this
 3   entire document before today's deposition?
 4        A.   I still don't think so.
 5        Q.   Fair enough.  Are you aware that this -- strike
 6   that.
 7             I will represent to you that this is an adversary
 8   complaint.  That's a complaint that was filed in the
 9   Daymark Realty Advisors, Daymark Residential Management,
10   and Daymark Properties Realty bankruptcy case by your
11   attorney, Mr. Catanzarite, again naming you as the lead
12   plaintiff, Richard Carlson as beneficiary of G REIT
13   Liquidating Trust.
14             My question to you, sir, is, do you know why or
15   have an understanding independently of any conversations
16   you've had with Mr. Catanzarite, why you were the named
17   plaintiff in this adversary case?
18             MR. CATANZARITE:  That would exclude
19   communications with counsel.
20             MR. GRUHER:  That is correct.
21             THE WITNESS:  I guess I first thought I was the
22   plaintiff for the G REIT things, and Daymark Realty I just
23   wasn't sure about.  I haven't looked into any of that.
24   BY MR. GRUHER:
25        Q.   Well, relative to any of the Daymark entities --
                                                        36
```

EXHIBIT #36: 101
22-CV-01616-BAS-DDL

```
 1    and you can read either of their names -- do you recall

 2    receiving any documentation or any communications directly

 3    from any of the entities that are what we're going to call

 4    the Daymark debtor entities, whether it's Daymark Realty

 5    Advisors, Inc., Daymark Residential Management, Inc., or

 6    Daymark Properties Realty, Inc., to your recollection?

 7        A.   No, I don't.

 8        Q.   Do you recall ever receiving any communications

 9    directly from Todd Mikles or Todd A. Mikles, to be more

10    specific?

11        A.   No, I think neither one of them.

12        Q.   Okay.  I'm going to -- let me ask you -- I'm

13    going to have you turn -- and what I'll have you do is

14    I'll have Ms. Delgado for ease of reference turn to

15    Exhibit A of T43.

16        A.   Okay.  I have it.

17        Q.   Okay.  Great.  You have that before you; is that

18    correct?

19        A.   Yes, I do.

20        Q.   Just looking at this agreement, and please take

21    your time if you want to look at it, and I'll suggest that

22    it runs -- do you see -- at the top of the page here,

23    you'll see pages -- it says 2 of --

24        A.   18?

25        Q.   -- it says 2 of 18?
```

37

EXHIBIT #36: 102
22-CV-01616-BAS-DDL

1    A.   Yes.

2    Q.   Right.  If you could then go to page 18 of 18,

3  which is the end of the document, and I just want to ask

4  you if you've ever seen this document which is called an

5  advisory agreement.

6    A.   No, I don't think I've seen it.

7    Q.   And so if I asked you the same question relative

8  to the lawsuits at T33 and T32 that I referred you to

9  earlier in this deposition, which attaches the same

10  advisory agreement, would your answer be that you have not

11  seen this document before today's deposition?

12    A.   Let me find that one first and see.  Do you have

13  a page number?

14    Q.   Yes.  I'll make it easier for you and for the

15  record.  If you just turn to Exhibit T33, which is really

16  the Second Amended Complaint.  And then if you turn past

17  Page 46 of the document, and you'll turn to a page called

18  Exhibit A.  And you'll see an advisory agreement and you

19  can match that one up to the advisory agreement that is

20  attached as Exhibit A to T43.  And I'm simply asking you

21  if you've seen this advisory agreement before today's

22  deposition.

23    A.   I see the one marked as Exhibit A.  I don't see

24  this -- the signature page, though.  Is it before or after

25  it?

38

```
1            MS. DELGADO:  Here.  Let me find it for you.
2            THE WITNESS:  No, I don't think I've seen that
3    one either.
4    BY MR. GRUHER:
5        Q.   All right.  You haven't seen that?
6        A.   No.
7        Q.   Have you ever heard of a company or an entity
8    known as Triple Net Properties, LLC?
9        A.   Yes, I have heard that name.  Uh-huh.
10       Q.   All right.  And what, if anything, do you know
11   about the company called Triple Net Properties, LLC?
12       A.   I don't really know anything.  I just have seen
13   the name in documents, but I haven't really used the name.
14       Q.   Now, turning to Exhibit D of T43.  And it has an
15   Exhibit D at the top.  It says, "Management Agreement."
16   And I'll have Ms. Delgado point you to that document.
17       A.   I have it.
18       Q.   Have you ever seen this management agreement
19   between -- well, it's undated, but it purports to date in
20   the year 2002.  Have you ever seen this property
21   management agreement between what we would call Tenants in
22   Common and Triple Net Properties Realty, Inc.?
23       A.   No.  2002, I'd never remember it if I did see it.
24   Because I didn't -- it isn't for any of my investments.
25       Q.   Do you know if you were ever -- strike that.
```

39

EXHIBIT #36: 104
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

```
 1          Have you ever invested in any investment vehicles
 2   where you were a tenant in common relative to an ownership
 3   of any real property, to your knowledge?
 4       A.   No, sir.
 5       Q.   So, sitting here today, you would have no
 6   knowledge about any rights, obligations, and duties of an
 7   investor that would be known as or referred to as a tenant
 8   in common or a TIC, T-I-C; is that correct?
 9       A.   That's correct.
10       Q.   And it would also be correct that you would never
11   have signed an agreement which is identified in Exhibit B
12   of T43 you would never have signed a management agreement
13   with Triple Net Properties Realty, Inc., correct?
14       A.   That's correct.
15       Q.   I'm going to show you now what's been marked as
16   Exhibit T46.
17       A.   I'm ready.
18            (Exhibit T46 was marked for
19            identification.)
20   BY MR. GRUHER:
21       Q.   Okay.  So, Mr. Carlson, I don't want to get ahead
22   of you, so tell me when you've had a opportunity to look
23   at this document that's been marked as Exhibit T46.
24       A.   Again, I know I just haven't had any documents
25   this thick to go through, so I have not seen it.
```

40

EXHIBIT #36: 105
22-CV-01616-BAS-DDL

1    Q.   Understood.  Do you know what this document is?
2    It's a Form 10-K that would have been filed with the
3    Securities and Exchange Commission for G REIT, Inc.?
4    A.   Yes.
5    Q.   You are familiar with what a Form 10-K is; is
6    that correct?
7    A.   Yes.  Slightly familiar.
8    Q.   I'm sorry, I didn't mean to talk -- I think I
9    lost your response just because it broke up over the
10   phone.
11   A.   Okay.
12   Q.   I'll just re-ask the question and bear with me.
13   A.   Sure.
14   Q.   Do you know what a Form 10-K is that is filed
15   with the Securities and Exchange Commission?
16   A.   I have a rough idea.  I know that you use that
17   for your income tax.
18   Q.   Are you aware of any other purpose for which a
19   Form 10-K would be filed with the SEC, the Securities and
20   Exchange Commission?
21   A.   No, I can't think of anything else.
22   Q.   Do you see that this Form 10-K that's before you
23   was filed by G REIT, Inc.?  You see that in big bold
24   letters at the front of this page?
25   A.   Yes, I do.

                                                        41

EXHIBIT #36: 106
22-CV-01616-BAS-DDL

1    Q.   And at the time that you were investing with

2    Mr. Windfield, did he inform or advise you that G REIT,

3    Inc., was a publicly traded company and had reporting

4    requirements or duties to the SEC and members of the

5    general public?

6    A.   I'm sure he did, but, again, that is a long time

7    ago for me.  I do remember I think there was some

8    reporting for my income tax on this too.  But it's just I

9    can't remember any details.

10    Q.   When you say you believe that this document, T46,

11    may have related to a reporting on your income taxes, can

12    you please clarify or expand on that answer?

13    A.   I just got copies.  It was not a 10-K from this.

14    It was from a smaller investment that I had.  And it

15    just -- I just added it in with my taxes and, again,

16    that's another one of my older ones.  I don't remember

17    very well what that was about.

18    Q.   Would it be fair to say that if I asked you any

19    questions relating to any information that was disclosed

20    or published in T46, you would not have any personal

21    knowledge regarding that information?  Is that a fair

22    statement?

23    A.   Yeah, I wouldn't remember any of it, no.

24    Q.   Do you -- well, let me ask it slightly

25    differently.  Have you ever even seen or recall reading

42

1  any information off this Form 10-K that's been marked as
2  T46?
3      A.   No, I have not.
4      Q.   Were you aware that G REIT, Inc., as a publicly
5  traded company had a duty and obligation to file Form
6  10-Ks with the Securities and Exchange Commission on a web
7  site commonly referred to as Edgar?
8      A.   I'm not aware of that.
9      Q.   Have you ever visited the website known as Edgar?
10     A.   No, I haven't.
11     Q.   Capital E-d-g-a-r?
12     A.   No.
13     Q.   Are you aware that publicly traded companies do
14  disseminate information that's available to any member of
15  the public through various communications and media web
16  sites like Edgar?
17     A.   No, I don't know about that.
18     Q.   I'm going to show you now what's been marked as
19  T47.
20          (Exhibit T47 was marked for
21          identification.)
22  BY MR. GRUHER:
23     Q.   Mr. Carlson, tell me when you've had an
24  opportunity to review this document.
25     A.   Okay.  I have the document.  I'll look through it
                                                          43

EXHIBIT #36: 108
22-CV-01616-BAS-DDL

```
 1    now.
 2         Q.    Okay.   Thank you, sir.
 3         A.    Okay.   I don't remember seeing this one at all
 4    either.
 5         Q.    All right.   I will represent -- well, first, I
 6    want to break it down into two parts.   And I certainly
 7    appreciate your candor, Mr. Carlson.   I know sometimes
 8    it's difficult to have a document in front of you and not
 9    be able to recognize it.   So I will try to work through
10    this as quick as I can.
11              I'm going to represent to you that this is the
12    same Form 10-K -- well, strike that.
13              It's not -- I'm going to represent to you that
14    this is a Form 10-K that was filed with the Securities and
15    Exchange Commission, and would also have appeared in
16    public records on the Edgar website maintained by the
17    Securities and Exchange Commission.   This time it was for
18    the entity G REIT Liquidating Trust.
19              Do you see that?
20         A.    Yes, I do.
21         Q.    All right.   And you understand that the Form 10-K
22    that was filed by the G REIT Liquidating Trust is the same
23    G REIT Liquidating Trust that you were named as the
24    plaintiff as being a beneficiary of that trust, correct?
25              MR. CATANZARITE:   Well, let me object to the
```

44

EXHIBIT #36: 109
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1   question as phrased.  I'll object as to form.

2         MR. GRUHER:  Okay.  Ken, if you think you have a

3   better way to communicate it to Mr. Carlson, then by all

4   means.  If you think -- it's not a trick question, but if

5   you think there was something in that question that needs

6   to be rephrased, let me know, and I'll do my best to do

7   it.

8         MR. CATANZARITE:  Well, the question linked G

9   REIT Liquidating Trust to the 10-K, and he just testified

10  that he didn't see the 10-K.  So, I mean, you could ask

11  him whether he understands whether G REIT Liquidating

12  Trust is a result of the termination or dissolution of G

13  REIT, Inc.

14        MR. GRUHER:  That's a fair question.

15  BY MR. GRUHER:

16     Q.   Mr. Carlson, based on Mr. Catanzarite's

17  statement, are you aware of the connection between G REIT,

18  Inc., and the G REIT Liquidating Trust?

19     A.   No, I'm not.

20     Q.   Are you aware of any events that occurred whereby

21  G REIT, Inc., was in a mode of liquidation of its assets

22  and that the liquidation of those assets was going to be

23  processed through G REIT Liquidating Trust?

24        MR. CATANZARITE:  Let me object to the extent

25  that calls for attorney-client communication.  But

                                                      45

EXHIBIT #36: 110
22-CV-01616-BAS-DDL

1   certainly he can tell you if he has an understanding.

2   BY MR. GRUHER:

3       Q.   I'll ask it differently.  Let me ask this a

4   little easier.  Mr. Carlson, turn to Page 35 of Exhibit

5   T47.  Tell me when you get there.

6       A.   I've got it.

7       Q.   All right.  I'm going to read something into the

8   record right out of Page 35 of this document, and then you

9   let me know if you have any understanding based on your

10  own personal knowledge and information as to any

11  additional facts other than what's stated in this public

12  document; is that fair?

13      A.   Sure.

14      Q.   Okay.  The header of this paragraph is

15  "Liquidation of G REIT, Inc.," and it states, "On

16  December 19th, 2005, the board of directors of G REIT,"

17  which is referring to G REIT, Inc., "approved a plan of

18  liquidation which was thereafter approved by stockholders

19  of G REIT, Inc. -- or G REIT at the Special Meeting of

20  Stockholders held on February 27th, 2006."

21          My first question to you, sir, is, did you ever

22  attend a special meeting of shareholders on February 27th

23  for G REIT, Inc.?

24      A.   No.

25      Q.   The public document goes on to disclose that,

                                                         46

EXHIBIT #36: 111
22-CV-01616-BAS-DDL

1  "The G REIT plan of liquidation, or the plan of

2  liquidation, contemplates the orderly sale of all of G

3  REIT's assets, the payment of its liabilities, the winding

4  up of operations, and the dissolution of G REIT."

5          Do you see that, sir?

6      A.   Yes.

7      Q.   Were you aware of the plan of liquidation

8  regarding G REIT, Inc., and its assets in payment of its

9  liabilities and winding up of its operations as set forth

10  in this document?

11      A.   Not any of the details in general I was, but I

12  was relying on Ken and the trustee to take care of it.

13  So --

14      Q.   And when you say -- and, again, I don't want you

15  to divulge any communications you had with Mr.

16  Catanzarite, at least not yet, but when you're referring

17  to the trustees, are you again referring to the trustees

18  of the G REIT Liquidating Trust?

19      A.   I'm not sure which one -- whoever -- whoever

20  would be handling this.

21      Q.   I see.  But relative to any of the information I

22  just read to you and relative to T47, you have no

23  independent knowledge or recollection of any of these

24  events, nor ever reviewing any of the contents of T47; is

25  that correct?

47

EXHIBIT #36: 112
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1    A.    That's correct.

2    Q.    Now, I want to turn in the same page, T47, and if

3  Ms. Delgado will go to the back of the document, there is

4  attached to this T46 -- sorry, T47, another document, a

5  Form 8-K for the G REIT Liquidating Trust.  And the

6  recording date was January 28th, 2008.

7          MS. DELGADO:  Is there a page number, Barry?

8          MR. GRUHER:  Joyce, if you just kind of go

9  literally almost to the very back, you'll see a blank page

10  with an Exhibit 3 at the bottom and then right behind it

11  is the Form 8-K.  It's like the last four or five pages of

12  this document.

13          MS. DELGADO:  Got it.

14          THE WITNESS:  Okay.  We're ready.

15  BY MR. GRUHER:

16    Q.    All right.  And I guess I'm going to ask you the

17  same question, and if you feel it requires the same

18  answer, you're going to let me know.  But have you ever

19  seen or reviewed any of the contents of this form 8-K for

20  the G REIT Liquidating Trust dated January 28th, 2008,

21  sir?

22    A.    No, I haven't.

23    Q.    Mr. Carlson, while we're on this topic, you do

24  have Internet access; is that correct?

25    A.    Yes, I do.

48

EXHIBIT #36: 113
22-CV-01616-BAS-DDL

1      Q.    And you had Internet access since at least as

2   early as 2008; is that correct?

3      A.    Yes.

4      Q.    And have you had Internet access as early as

5   2002?

6      A.    Yes.  My computer is down every once in a while

7   so I do lose some things from that.

8      Q.    I share a common theme with you, sir.

9          So we'll try to move through some of these

10  documents a little quicker.  And, again, if anything jogs

11  your memory as to what you may have seen or known about

12  other than what's in these documents, you'll let me know.

13     A.    Okay.

14     Q.    So you have before you Exhibit T48.  This is a

15  Form 8-K for the G REIT Liquidating Trust.

16          Do you see that?

17          (Exhibit T48 was marked for

18          identification.)

19          MR. CATANZARITE:  Did you say T48?  We are in 47.

20          MR. GRUHER:  I'm sorry, Ken.  I'm actually done

21  with 47.  My bad if that didn't come across.

22          MR. CATANZARITE:  She hasn't handed that to us

23  yet.

24          MS. DELGADO:  Okay.

25          THE WITNESS:  Okay.  We have the documents.

49

EXHIBIT #36: 114
22-CV-01616-BAS-DDL

```
1   BY MR. GRUHER:
2        Q.   Yes, sir.  Hold on one second.  Guys, give me
3   literally ten seconds.
4        A.   Okay.
5        Q.   So, Mr. Carlson, attached to T48 is actually two
6   Form 8-Ks, and I'm just going by the dates that appear on
7   the front of the documents.  That doesn't mean it was the
8   date it was published.  The date it was published could
9   appear in other channels.  In other words, on T48, the
10  Form 8-K that has the date of December 20th, 2011, on the
11  very front may have been filed on February 27th, 2012.
12  I'm just saying this for your own edification.  And
13  likewise with respect to the Form 8-K that has a date of
14  May 1st, 2012, in the same document, that document was
15  likely filed in the public records on June 29th, 2012.
16  But, in any event, the information remains the same.
17       A.   Is that in the same document?
18       Q.   No.  There is two documents.  There's two Form
19  8-Ks that are attached to T48.  The first one you're
20  looking at -- and I'm just going on the front page of each
21  of these documents -- is December 20th, 2011, is the first
22  one, and the next one is May 1st, 2012.
23       A.   Oh, okay.  They are both stapled together.
24       Q.   That's correct.  I was trying to cut down on the
25  number of exhibits and it may have helped or hurt us.  I
```

50

EXHIBIT #36: 115
22-CV-01616-BAS-DDL

1    don't know.

2        A.    That's a good idea.

3        Q.    So relative -- and let's just start off with the

4    first document, which is the Form 8-K that just has on the

5    front page date of report is December 20th, 2011.  Have

6    you ever seen any of the contents or read any of the

7    contents of this document before sitting here at today's

8    deposition?

9        A.    No, I haven't had this.

10       Q.    So if I were to ask you any questions relative to

11   this document, would it be fair to say that you would not

12   have either, A, read it or, B, have any independent

13   recollection or information regarding the contents of the

14   document?

15       A.    Yes, that's fair.

16       Q.    And the same would be true, sir, for the Form 8-K

17   for the G REIT Liquidating Trust for May 1st, 2012; is

18   that correct?

19       A.    That's correct.

20       Q.    I do want to -- I do want to actually turn to

21   Page 2, though, of the Form 8-K of the G REIT Liquidating

22   Trust, the one you have before you, and I'm going to read

23   some information to you and ask you if you have any

24   independent knowledge or recollection of these events; is

25   that fair?

                                                         51

EXHIBIT #36: 116
22-CV-01616-BAS-DDL

```
 1        A.    Sure.
 2        Q.    So on Page 2 of this document, it states that --
 3    at the top, "On May 1st, 2012, G REIT Liquidating Trust,
 4    as seller, and The American Recovery" --
 5              MR. CATANZARITE:  Hold on, hold on, hold on.
 6              MR. GRUHER:  Go ahead.  Sorry.
 7              MS. DELGADO:  You're referring to the May 1st
 8    one, right, Barry?
 9              MR. GRUHER:  That's correct.
10              MR. CATANZARITE:  He has to get to that page.
11              THE WITNESS:  Okay.  We're ready now.
12    BY MR. GRUHER:
13        Q.    Okay, sir.  I'll speed it up by just reading the
14    contents into the record, and then you'll tell me whether
15    or not you're aware of any of this information through
16    your own personal knowledge or any information you
17    obtained outside of your attorneys.  Okay?
18        A.    That's okay.  Uh-huh.
19        Q.    So it states on this document, "On May 1st, 2012,
20    G REIT Liquidating Trust, as seller, and The American
21    Recovery Property Trust, Inc., ARPT, purchaser, entered
22    into an agreement of sale with respect to certain property
23    located at 6000-6100 Western Place, Fort Worth, Texas, and
24    commonly known as Western Place I & II, and certain
25    personal property associated therewith and related
                                                              52
```

EXHIBIT #36: 117
22-CV-01616-BAS-DDL

1    thereto."

2            My first question to you, sir, are you aware of

3    any agreement between the G REIT Liquidating Trust and

4    ARPT relative to the sale of the Western Place property?

5            MR. CATANZARITE:  Excluding communications with

6    counsel.

7            MR. GRUHER:  Correct.

8            THE WITNESS:  No, I am not.

9    BY MR. GRUHER:

10       Q.   All right.  Let's go to the next paragraph.  It

11   says, "The agreement, dated as of April 27th, 2012,

12   provides for the sale by the trust of its undivided

13   78.5 percent tenant-in-common interest in Western Place,

14   together with certain additional property as the terms --

15   as that term is defined in the agreement, and operating

16   reserves to ARPT for $20 million in cash plus non-voting

17   common stock of ARPT."  And they call it the "ARPT

18   shares."

19           Are you aware of any information that you have

20   obtained outside of the presence of your counsel relative

21   to the terms of this deal regarding a 20 million dollar

22   cash payment for the purchase of the Western Place

23   property?

24       A.   No, I'm not.

25       Q.   Are you aware of any other part of this deal

                                                          53

EXHIBIT #36: 118
22-CV-01616-BAS-DDL

```
 1    whereby ARPT was also providing or pledging non-voting
 2    common stock shares of ARPT, which is referred to as the
 3    ARPT shares, as set forth in this agreement?
 4              MR. CATANZARITE:  Barry, did you mean to say
 5    "pledging"?
 6              MR. GRUHER:  No.  This was part of the deal.
 7    They provided non-voting common stock of ARPT to the G
 8    REIT Liquidating Trust.
 9              MR. CATANZARITE:  Okay.  I may have misheard your
10    question.  I thought you said "pledging."
11              MR. GRUHER:  I could have stated it incorrectly.
12    I'm correcting myself now if I did.
13              THE WITNESS:  No, I'm not familiar with this.
14    BY MR. GRUHER:
15       Q.    All right.  I'm going to continue to read on on
16    another section.  And I'm skipping one sentence and going
17    to the next sentence.  "The number of ARPT shares issuable
18    to the trust shall equal the quotient obtained by dividing
19    12 million as -- $12 million as adjusted, as provided in
20    the agreement, by $10.  The transaction will be conducted
21    as an exempt offering under Section 4(2) of the Securities
22    Act of 1933."
23              Are you aware of any information whereby the
24    total value of the ARPT shares that were being provided to
25    the G REIT Trust as part of the purchase price of the
```

                                                          54

EXHIBIT #36: 119
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1    Western property, other than what was stated in this
2    document, are you aware of any other information regarding
3    this transaction?
4         A.   No, I'm not.
5              MR. CATANZARITE:  Go ahead.  That's fine.
6              THE WITNESS:  I'm sorry.
7    BY MR. GRUHER:
8         Q.   Do you understand what a put option is or a put
9    right when it comes to one company having an obligation to
10   purchase back its shares from another company?
11        A.   Just vaguely I'm familiar with it.  Not in very
12   good detail, though.
13        Q.   All right.  Well, if you could just -- in your
14   own words, can you describe for me, and I'm not -- it's
15   not asking for an expert testimony.  I'm simply asking you
16   as an investor in G REIT, Inc., and G REIT Liquidating
17   Trust, if you can describe for me what you would
18   understand a put option or a put right would entail or
19   consist of relative to one company and the other company.
20        A.   Well, I think this one says he put the put right
21   in before not less than all of the APT shares to ARPT to
22   the date, one day prior to the second anniversary, and so
23   forth.  So they have to put them all up, right?
24        Q.   Yeah.  And I'll explain it to you in a little
25   easier terms, and I'll let Mr. Catanzarite chime in if he

55

EXHIBIT #36: 120
22-CV-01616-BAS-DDL

```
 1    feels it's necessary.  But I'll read you the statement
 2    first on Page 2, and then we'll go through it.  It says,
 3    "The trust has the right to put" -- and they call it "the
 4    put right" -- "all, but not less than all, of the ARPT
 5    shares to ARPT on the date that is one day prior to the
 6    second anniversary of the effective date as defined in the
 7    securities matters agreement for $12 million provided,"
 8    romanette one, "as of the put date, as defined in the
 9    Securities Matters Agreement, no registration statement
10    has been filed under the Securities Exchange Act covering
11    the ARPT shares or, as of the put date, such registration
12    statement is no longer in effect."
13            And then romanette two, "The trust shall have
14    provided written notice to ARPT on or before the day that
15    is 60 days prior to the second anniversary of the
16    effective date" -- call that "the put notice date" -- "of
17    its intention to exercise its put right without condition
18    of qualification" -- sorry -- "or qualification."  And
19    romanette three, "The trust is able to represent and
20    warrant ARPT, as of the date -- as of the put date, that
21    it holds good and marketable title to the shares and is
22    able to transfer the shares free and clear of any liens
23    and encumbrances."
24            So I'm going to ask you -- I'll break this down.
25    Let me ask you the first question.  Were you aware at any
```

56

EXHIBIT #36: 121
22-CV-01616-BAS-DDL

```
 1   time between May 1st, 2012 -- sorry.  Were you aware at
 2   any time between April 27th, 2012, and sitting here today
 3   of any right that the G REIT Liquidating Trust had to
 4   place a put right to ARPT in order for ARPT to purchase
 5   back its shares for $12 million?
 6             MR. CATANZARITE:  I'll object to the extent it
 7   calls for attorney-client communication.
 8             But go ahead to the extent you're able.
 9   BY MR. GRUHER:
10        Q.   Mr. Carlson, that question was directed to you,
11   sir.  Are you aware of any put right that the trust had
12   that would have required ARPT to require purchase back its
13   shares in connection with the purchase of the Western
14   Place property for $12 million, without getting into any
15   attorney-client communications you may have had?
16        A.   No, I'm not aware of it.
17        Q.   Are you aware of the trustees at any time -- and
18   when I say "the trustees," I mean the trustees of the G
19   REIT Liquidating Trust -- of ever providing written notice
20   to ARPT that ARPT should or is required to purchase back
21   its shares of stock at the amount of $12 million?
22        A.   No, I haven't heard about that.
23        Q.   Are you aware --
24             MR. KIBLER:  Hey, Barry, can we take a
25   five-minute recess?
```

EXHIBIT #36: 122
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1      MR. GRUHER:  Sure, let's take a break.  We've

2  been going at it for over an hour and 30 minutes.  Let's

3  take a five-minute break.  Thank you.

4          (Recess.)

5      MR. GRUHER:  Joyce, if you could hand the witness

6  Exhibit T49.

7          (Exhibit T49 was marked for

8          identification.)

9  BY MR. GRUHER:

10    Q.   Okay.  So, sir, I'm going to ask you sort of the

11  same questions again and I'll appreciate your answers.

12  I'm showing you now what we have marked as T49, and

13  representing to you that this is a Form 8-K that was filed

14  with the Securities and Exchange Commission on Edgar

15  website for G REIT Liquidating Trust as of October 3rd,

16  2012.  And I'll ask you the same question.  Have you ever

17  seen this document before today's deposition?

18    A.   I might have.  It's just been so long ago.  It's

19  hard -- I can't remember it very well, but I should have

20  had it probably.

21    Q.   Well, I need to be clear on this.  You think that

22  relative to T49 you may have read this Form 8-K that's a

23  public record document; is that correct?

24      MR. CATANZARITE:  Well, I'll object.  Do not

25  speculate, Mr. Carlson.

58

EXHIBIT #36: 123
22-CV-01616-BAS-DDL

1          MR. GRUHER:  He's not speculating.  I need him to

2     answer.  This is an important question.

3     BY MR. GRUHER:

4       Q.   So, sir, I need to know specifically without

5     deviating from my question, have you ever reviewed this

6     Form 8-K that's marked as T49 relative to the G REIT

7     Liquidating Trust; yes or no?

8          MR. CATANZARITE:  Well, prior to meeting to

9     counsel.  Prior to counsel.

10         MR. GRUHER:  No, no, no.  Ken, honestly, I've

11    been very, very patient with you on counsel or not.  These

12    are factual matters.  So if he talked to you about a

13    factual matter in the case, that is not an attorney-client

14    privileged communication, and I will make that point even

15    more clear as we go through this examination.  So I don't

16    care if he read this document with you, without you, knew

17    about it before he met you, knew about it after he met

18    you.

19    BY MR. GRUHER:

20      Q.   My question is very simple.  Prior to sitting in

21    this deposition today, Mr. Carlson, did you ever read this

22    Form 8-K identified as Exhibit T49; yes or no?

23      A.   I'll have to say no because I don't remember it.

24      Q.   Okay.  And so if I asked you any questions, for

25    example, about the sale of the Sutter Square property or

                                                           59

EXHIBIT #36: 124
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1    the sale of the Congress Center property that is

2    specifically referenced in this document, would it be your

3    testimony that you have no personal knowledge as to that

4    information that would have been obtained from this Form

5    8-K?

6        A.    I guess that answer would have to be yes.

7        Q.    Are you aware -- were you aware of the sale of a

8    property commonly referred to as the Sutter Square

9    property?

10       A.    I do not remember that one.

11       Q.    Okay.  Just turn to Page 2 of this exhibit.  And

12   tell me when you're there.

13       A.    I'm there.

14       Q.    In this page of the document, it is specifically

15   referring to on the Sutter Square sale, it says,

16   "Effective October 3rd, 2012, G REIT-Sutter Square, LP, as

17   seller, G REIT Liquidating Trust as guarantor, and SGR

18   Sutter Square, LLC, as purchaser, entered into an

19   agreement for the purchase and sale of real property and

20   escrow instructions" -- that they call "the Sutter Square

21   agreement" -- "with respect to certain property located at

22   2901-292 K Street, Sacramento, California, commonly known

23   as Sutter Square, and certain personal property associated

24   therewith."

25            Do you have any information other than what's set

60

EXHIBIT #36: 125
22-CV-01616-BAS-DDL

```
 1   forth in this complaint relative to the transactions
 2   regarding the sale of the Sutter Square property?
 3        A.    I'd have to say no.
 4        Q.    Turning to the next page, sir, if you can,
 5   Page 3.  And there's additional information ongoing about
 6   the Sutter Square property sale and the closing.  I'm
 7   going to read you some information and you tell me if you
 8   have independent knowledge of this -- these statements.
 9   It says, "The Sutter Square closing is not subject to
10   approval by holders of units of beneficial interest of the
11   trust.  The sale and purchase of Sutter Square is a
12   related party transaction since SGR, NNNRI, defined below,
13   and we are under common control."
14              Do you see that?
15        A.    Yes.
16        Q.    Do you have any knowledge or information that you
17   have learned either from this document or any other source
18   about the common ownership and control of the -- of SGR,
19   NNNRI as stated in this document?
20        A.    I think the big thing, I don't really understand
21   it.  So I would -- I guess I would say no based on that.
22        Q.    If you don't know, you can just say no.
23        A.    Okay.  No.
24        Q.    So is the answer no?
25        A.    Yes.
```

                                                              61

EXHIBIT #36: 126
22-CV-01616-BAS-DDL

```
 1      Q.   Okay.  Where -- the next sentence says, "SGR is

 2   managed by Sovereign Realty REIT, LP," and it's referred

 3   to in quotes and parens, "SR REIT."  "The general partner

 4   of SR REIT is Sovereign Growth REIT, Inc.," which is

 5   referred to as "SG REIT."  "The manager of SG REIT is

 6   Sovereign Capital Advisors, LLC, Sovereign Advisors, and

 7   Todd Mikles -- Todd A. Mikles is the Chief Executive

 8   Officer of Sovereign Advisors."

 9           Relative to the sentence I just read to you, do

10   you have any independent or personal knowledge regarding

11   any of the entities known as Sovereign Realty REIT, LP, SR

12   REIT, Sovereign Growth REIT, Sovereign Capital Advisors,

13   and Todd Mikles as chief officer of Sovereign Advisors?

14      A.   No, I don't have any knowledge about them.

15      Q.   Do you have any knowledge of the following

16   statement:  "Mr. Mikles is also Chairman and Chief

17   Executive Officer of one entity and the sole member and

18   manager of the other entity that owns IUC-SOV, LLC, which

19   in turn is the owner of Daymark Realty Advisors, Inc.,

20   Daymark, the parent company of NNRI Investors, LLC," in

21   parens and quotes, "NNNRI, our advisor."

22           Do you have any information regarding the

23   sentence I just read to you?

24      A.   No, I don't.

25      Q.   Have you ever heard of an entity known as
```

62

EXHIBIT #36: 127
22-CV-01616-BAS-DDL

```
1    IUC-SOV, LLC?
2         A.   I don't recognize that, no.
3         Q.   Did you know or have any information as to
4    whether or not NNRI was an advisor to the G REIT
5    Liquidating Trust?
6         A.   Let's see.  Where is that?  Oh, there.  No, I
7    don't know about that.
8         Q.   Now I want to go down to the next page -- sorry,
9    the next sale, which is called "Congress Center Sale."
10             Do you see that?
11        A.   Yes.
12        Q.   And in this document it's disclosing, and I'll
13   represent to you it's disclosing a sale of a property
14   known as the Congress Center property, which -- well, I'll
15   just represent to you that this has to deal with the sale
16   of a property known as the Congress Center property, which
17   is a 525,000 foot Class A office building located in
18   Chicago, Illinois.
19             Have you ever heard of the Congress Center
20   property?
21        A.   No, I haven't.
22        Q.   And, for the record, the Congress Center property
23   was located at 525 West Van Buren Street, Chicago,
24   Illinois.  Have you ever been to that building, sir?
25        A.   No, I've never been to Chicago.
```

63

EXHIBIT #36: 128
22-CV-01616-BAS-DDL

1     Q.    Me either.

2           Relative to the Congress Center purchase and

3     sale, are you aware that one of the claims that you're

4     asserting in these lawsuits, the complaints that I showed

5     you, relates and deals specifically with the sale of the

6     Congress Center property?

7     A.    I guess by reading it now I do kind of believe

8     that, yes.

9     Q.    Okay.  So other than what you've read today with

10    the documentation that I've put before you, prior to that

11    time, you had no independent knowledge or information

12    relating to the sale of the Congress Center property; is

13    that correct?

14    A.    No knowledge.

15    Q.    Do you know whether or not the -- either G REIT,

16    Inc., and/or the G REIT Liquidating Trust held a 30

17    percent tenant-in-common or TIC interest in the Congress

18    Center property?

19    A.    No.

20    Q.    Do you know why there are numerous allegations

21    made in the complaints that I showed you earlier in this

22    deposition that specifically allege certain acts of fraud

23    and self-dealing relative to Todd Mikles, the Sovereign

24    entities that we discussed, and Northwood -- and Northwood

25    Congress Center Owner, LLC, relative to the purchase and

64

EXHIBIT #36: 129
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1    sale of the Congress Center property?

2        A.    I don't know that firsthand.  I've heard some

3    things about that.

4        Q.    And what things, if any, did you hear about that

5    and what was the source of your information?

6        A.    Reading some of the documents that I've gotten.

7    And I can't remember the details, really.

8        Q.    And when you say reading some of the documents

9    that you've gotten, are these your documents specifically

10   or documents that were provided to you by another person?

11       A.    Provided to me.

12       Q.    And who provided that information to you?

13       A.    I'm not sure who sends them out all the time.  I

14   get them on e-mail.

15       Q.    So you --

16       A.    It'd be --

17       Q.    So you -- sorry.  I interrupted you.

18       A.    It probably be either Ken or -- that probably

19   would be the best chance.

20       Q.    All right.  So the information that you learned

21   relative to the Congress Center property would have been

22   from your attorney, Mr. Catanzarite; is that correct?

23       A.    Yes.  Uh-huh.

24       Q.    So absent the involvement of Mr. Catanzarite, you

25   would have had, according to your own testimony, no

65

EXHIBIT #36: 130
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1   knowledge or any issue with the sale of the Congress

2   Center property that involved the G REIT Liquidating

3   Trust?  Is that an accurate statement?

4       A.   Yes, it is.

5       Q.   Now, I want you to turn to Page 4 of Exhibit 49.

6   And, again, I'm going to read some information to you and

7   I'm going to ask you if you have any knowledge of this

8   information.

9            In this document the liquidating trust advises

10  that, "We have a" -- and it's at the very top -- "We have

11  a 30 percent undivided tenant-in-common or TIC interest in

12  Congress Center, NNNCC has a 28.9 percent undivided TIC

13  interest in Congress Center, and the other parties own a

14  12.1 percent interest in Congress Center.  NNNCC is under

15  common control with us.  Congress Center represented

16  approximately 10 percent of our assets and 77 percent of

17  our rents as of the date of the Congress Center

18  agreement."

19           Sir, do you have any independent knowledge or

20  information that either supports or negates the

21  information I just read to you in this document?

22      A.   No, I don't.

23      Q.   You can turn to Page 5.  I want to read you the

24  following on Page 5 of Exhibit 49, the second paragraph.

25  It says, "The Congress Center closing is not subject to

                                                          66

EXHIBIT #36: 131
22-CV-01616-BAS-DDL

1   approval by the holders of units of beneficial interest in

2   the company.  The Congress Center sellers has granted Todd

3   A. Mikles a power of attorney to execute the closing

4   statement with respect to Congress Center in Daymark

5   Properties Realty, Inc." -- in parens, in quotes, "the

6   Daymark properties" -- "the manager of Congress Center is

7   authorized to execute certain documents to be delivered at

8   closing" -- sorry, "to be delivered at the Congress Center

9   closing."

10          Do you see that information there?

11      A.   Yes.

12      Q.   Were you aware that the debtor entity known as

13  Daymark Properties Realty, Inc., was the manager for the

14  TIC members or interest in the Congress Center property?

15      A.   No, I didn't understand that.

16      Q.   Moving onto the next paragraph, it states that

17  Mr. Mikles is also chairman and chief executive officer of

18  one entity and the sole member and manager of the other

19  entity that owns IUC-SOV, LLC," in parens, "IUC-SOV,"

20  which we talked about earlier, "which in turn is the owner

21  of Daymark Realty Advisors, Inc., Daymark, the parent

22  company of NNN Realty Investors, LLC, NNNRI, our advisor.

23  Daymark properties is a wholly owned subsidiary of

24  Daymark."

25          Do you see that information there?

                                                        67

EXHIBIT #36: 132
22-CV-01616-BAS-DDL

```
 1        A.    Yes.

 2        Q.    Other than what I just read to you out of this

 3   document, do you have any independent knowledge or

 4   information that -- as to the relationship between

 5   Mr. Mikles, IUC-SOV, LLC, Daymark Realty Advisors, and NNN

 6   Realty Investors, LLC?

 7        A.    No, I don't remember it.

 8        Q.    All right.  And then let's go to the last

 9   paragraph -- the last sentence, and then we'll put this

10   document aside.  The last thing I'll read into the record

11   and ask you some questions, it says, "Prior to entering

12   into the agreement, Daymark obtained an independent

13   appraisal of Congress Center.  Pursuant to an appraisal of

14   realty, Congress office building dated March 29, 2012, the

15   appraisal report, Congress Center had a market value as is

16   of $95 million."

17              Do you see that there?

18        A.    I'm lost right now.

19        Q.    Okay.  Not a problem.

20        A.    Where is it?

21        Q.    I'm reading directly from Page 5 of T49.  I'll

22   read it more slowly.

23        A.    I've got it now.  Thank you.

24        Q.    Yeah.  No problem.

25              It says, "Prior to entering into the agreement,
```

EXHIBIT #36: 133
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1    Daymark obtained an independent appraisal of Congress

2    Center."

3           Were you aware of that prior to sitting here for

4    today's deposition?

5       A.   No, I wasn't.

6       Q.   The next sentence states that, "Pursuant to an

7    appraisal of real property, Congress office building,

8    dated March 29, 2012," which they call "the appraisal

9    report," "Congress Center had a market value," quote, "as

10   is," end of quote, "of $95 million."

11          Do you see that?

12      A.   Yes.

13      Q.   Do you have any knowledge or information to

14   dispute the appraisal report that determined that the

15   as-is market value of the Congress Center property was $95

16   million?

17      A.   No, I don't.

18      Q.   We're going to go ahead and put that document

19   down.  And I'm going to backtrack a little bit because I

20   have a couple of questions to ask you about the complaint

21   that you filed in the Orange County Superior Court action

22   at T33.  And if you could -- and that is Exhibit T33,

23   Page 37.

24      A.   Okay.  I guess we're ready.

25      Q.   I'm ready when you are, sir.

                                                          69

EXHIBIT #36: 134
22-CV-01616-BAS-DDL

1    A.    I think we're ready.

2    Q.    Okay.  I'm sorry.  Hold on one second.

3          All right.  I'm going to read at Page 37 starting

4    at Paragraph 106.  And the title of this section is

5    "Delayed Discovery and Estoppel Against Defendants to

6    Assert Statute of Limitations Defenses."  And the first

7    question is -- or the first statement made in this

8    complaint is that, "As above described the material facts

9    regarding the Locoh and Mikles acquisition of Daymark

10   causing the Congress Center loan to fall and the true

11   purpose of the Western Place sale with the 12 -- with the

12   1,200,000 non-voting share component was concealed from

13   plaintiffs and the class by the trustee defendants Locoh,

14   Mikles, NNRI, and DPR."

15         My question to you, sir, is what specific facts

16   and information do you have that supports this allegation

17   of the complaint that you filed as reflected in T33?

18   A.    I don't have any myself.  I'm sure my counsel

19   does, though.

20   Q.    Well, I appreciate that, but I need to know -- so

21   is your testimony, to be clear, that you don't have any

22   information that would be able to support the statements

23   that are made in Paragraph 106 of this complaint?

24   A.    Yeah, I'd have to say that, because I don't

25   remember seeing this.

                                                          70

EXHIBIT #36: 135
22-CV-01616-BAS-DDL

1    Q.    The next paragraph reads that, "Plaintiffs and

2    all beneficiaries reposed trust and confidence in trustee

3    defendants, NNNRI as trust advisor and as manager to G

4    REIT Congress Center, LLC, and DPR" -- which is Daymark

5    Property Realty, Inc. -- "as asset and property manager to

6    the three trust properties to discharge their fiduciary

7    duties for the benefit of plaintiffs and the class."

8         My question to you is, as the plaintiff in the

9    case, do you -- did you repose any trust and confidence in

10   the trustee defendants known as NNRI as trust advisor and

11   as manager to the G REIT Congress Center, LLC?

12   A.    No, I don't remember, so --

13   Q.    Do you have any information or were you as an

14   investor in G REIT, Inc., and/or the G REIT Liquidating

15   Trust ever take any action or not take any action on the

16   advice of NNRI for Daymark Realty Advisors, Inc., Daymark

17   Residential Property Management, or Daymark Properties

18   Realty, Inc., at any time that you held an investment with

19   the G REIT Trust?

20   A.    No.  I always relied on either Ken or the -- my

21   fund manager.

22   Q.    And your fund manager being Mr. Tyrone Windfield?

23   A.    Yes, uh-huh.

24   Q.    So Mr. Windfield wasn't just somebody that put

25   you into these investments, he was also your fund manager;

71

EXHIBIT #36: 136
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

```
 1    is that correct?
 2        A.    Yes, he was.  Uh-huh.
 3        Q.    The complaint goes on to state in Paragraph 108
 4    that, "Not until an investigation was conducted on behalf
 5    of plaintiffs in December 2017 did they discover the
 6    relationship of the Locoh and Mikles acquisition of
 7    Daymark, the Western Place property sale, the 1,200,000
 8    ARPT share issuance, and the related Congress Center and
 9    Sutter properties sales."
10            Sir, my question to you is, is the information
11    contained in that paragraph true and correct to the best
12    of your knowledge?
13        A.    I'd have to say yes.
14        Q.    All right.  Let's talk about the investigation
15    for a moment.  What, if anything, can you tell me about
16    the investigation that was conducted on behalf of yourself
17    as a plaintiff in December 2017?
18        A.    Are you talking about investigation of one of
19    these documents or an individual or what now?
20        Q.    No, sir.  In this complaint that you filed and it
21    shows up in multiple filings, including the adversary
22    complaint that I showed you in T43, one of the allegations
23    made in this complaint is that it was not until an
24    investigation was conducted on behalf of yourself as the
25    plaintiff, and let's call them what's labeled as other
```

72

1  plaintiffs, in December 2017 that you would discover the

2  relationship of Locoh and Mikles acquisition of Daymark,

3  the Western Place property sale, the 1.2 million ARPT

4  share issuance, and the related Congress Center and Sutter

5  property sales that we spoke about earlier in your

6  deposition.

7          What I want to know is, what investigation was

8  going on in December of 2017 that you can provide us

9  information about, sitting here today?

10     A.   I didn't do the investigation myself.  I know

11 that some of the other people that had larger amounts

12 involved did the investigation.  I don't remember the

13 results of it, though.

14     Q.   Okay.  Who were the other people or persons

15 you're talking about that had larger investments that

16 conducted investigations in December of 2017 relative to

17 the matters I just described?

18     A.   I don't remember because I didn't know any of

19 them and I can't remember that far back.

20     Q.   Okay.  How would you have known -- if you don't

21 know any of them, how would you know that there was an

22 investigation that was being undertaken by them in

23 December of 2017?

24     A.   I heard that it was going on.  I think I got

25 some --

73

EXHIBIT #36: 138
22-CV-01616-BAS-DDL

1    Q.   Who did you hear it was going on from?  Was it a

2    public disclosure or did you learn it personally from

3    someone?

4    A.   My memory is just not that good.  That was back

5    in 2017, you were saying.  I can't remember these details.

6    Q.   I appreciate that.  But December of '17 was less

7    than three years ago.  So what I'm trying to understand

8    is, you first stated that you were aware that there were

9    other people with larger investments in the G REIT, Inc.,

10   or G REIT Liquidating Trust, correct?

11   A.   I said I didn't know any of them.  So I'm having

12   a hard time giving you names.

13   Q.   All right.  So if you didn't know anyone, would

14   it be fair to say on the record that you would not have

15   learned of any investigation that these other individuals

16   would have conducted in December of 2017 from them?

17   A.   Yes, that's fair.

18   Q.   Now, I need to understand and know exactly where

19   you would have obtained the knowledge and information that

20   an investigation was going on on your behalf in

21   December of 2017.  Not what was going on with other

22   people, but on your behalf.  So who was conducting this

23   December 2017 investigation on your behalf as the named

24   plaintiff in the lawsuit filed in the Superior Court of

25   Orange County, for the record, case number

74

EXHIBIT #36: 139
22-CV-01616-BAS-DDL

1   30-2018-00982195?

2        A.    I would think it had to be my counsel because

3   I -- I wouldn't know how to write this up anyway.

4        Q.    All right.  Now, why -- so did you obtain --

5   first of all, when you say "counsel," who are you

6   referring to specifically?

7        A.    Well, I'm not sure if it would have been Ty or

8   Ken.  One of those two probably.

9        Q.    Was Tyrone Windfield also an attorney, sir?

10       A.    No, but he was very knowledgeable on these kinds

11  of documents.

12       Q.    Did you understand that Tyrone Windfield had a

13  relationship or knew Ken Catanzarite back in December of

14  2017?

15       A.    Yes, uh-huh.

16       Q.    And how is it that you obtained that knowledge

17  that Tyrone Windfield that you said was your fund manager

18  and had you invest in these different -- in the G REIT,

19  Inc., trust and other REITs, how is it that you learned

20  that Mr. Windfield had a relationship with Mr.

21  Catanzarite?

22       A.    It was about that point in time that Mr.

23  Catanzarite asked if Ty would introduce me to -- introduce

24  him to me, and then shortly after that he came out to my

25  home and we had some more discussions about it.  And then

75

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

```
 1   we hired him as a counsel at that time.
 2       Q.   I see.  So, just to be clear, Mr. Windfield, who
 3   was the one who put you into these investments and was
 4   your fund manager, came to you and introduced you to Ken
 5   Catanzarite for the purpose of filing these lawsuits; is
 6   that correct?
 7           MR. CATANZARITE:  Well, object.  That misstates
 8   the testimony.  It's also compound.  Form.
 9   BY MR. GRUHER:
10       Q.   Mr. Carlson, can you explain to me or describe
11   for me how is it that Mr. Catanzarite made his way to your
12   home to meet with you?
13       A.   Like I said, it's Ty Windfield directed him out
14   there, gave Ken my address.  And I don't know what else to
15   say.
16       Q.   Why would Tyrone Windfield of all people direct
17   Mr. Ken Catanzarite and provide him with your address so
18   Mr. Catanzarite could show up to your home?
19       A.   I think Mr. Catanzarite requested the
20   information, requested that he do that.
21       Q.   So Mr. Catanzarite asked Mr. Windfield to provide
22   your home address so he could come out and speak with you
23   about filing this lawsuit; is that correct?
24       A.   And introduce me and do that, yes.
25       Q.   All right.  And -- and you obtained this
```

76

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855-811-3376

EXHIBIT #36: 141
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1  knowledge and information from Mr. Windfield who told you

2  that Mr. Catanzarite had requested your personal

3  information to come meet with you?

4      A.   Yes, uh-huh.

5      Q.   Do you recall the period of when this happened?

6  Did this occur prior to December 2017?

7      A.   I think it was prior.  Very close to that same

8  time.

9      Q.   So prior to December 2017, Mr. Catanzarite

10  obtained your personal address and came and met with you

11  based upon a relationship he had with Mr. Windfield,

12  correct?

13      A.   Yes, uh-huh.

14      Q.   And you met and -- did you know Mr. Catanzarite

15  prior to the time that he appeared at your house for the

16  first time to conduct this meeting with you?

17      A.   I think we had a telephone conversation.  That's

18  how we were introduced.  But I didn't physically see him

19  then.

20      Q.   So it was a telephone conversation that you had

21  between yourself and Mr. Catanzarite; is that correct?

22      A.   And Ty Windfield.

23      Q.   All right.  And so who set up this phone call,

24  this three-way phone call?

25      A.   I think Ty did, didn't he?

                                                        77

EXHIBIT #36: 142
22-CV-01616-BAS-DDL

```
 1      Q.   All right.  And did Mr. Windfield tell you in
 2  advance as to why he wanted you to get on the phone with
 3  Mr. Catanzarite who was a lawyer that you never met
 4  before?
 5      A.   I'm sure he did.  Again, I can't remember
 6  exactly, but I'm sure he did.
 7      Q.   Well, you don't have to tell me exactly what he
 8  told you.  Why don't you just tell me and provide me with
 9  the information that you can recollect as to what he told
10  you prior to you getting on the phone call with Mr.
11  Catanzarite?
12      A.   I don't remember the discussion between myself
13  and them.  It just -- but Mr. Catanzarite came out and we
14  were talking about him representing us in this case, and
15  that was kind of the purpose of all of it.  And then we
16  did hire him at that time.
17      Q.   You did not hire him at that time?
18      A.   We did.
19      Q.   Oh, you did?  All right.  So you hired Mr.
20  Catanzarite based on a house call that he made to you and
21  Mr. Windfield who was also at your home at that time; is
22  that correct?
23      A.   No.  I -- I don't think he came.  It was just Mr.
24  Catanzarite.  He just introduced us and it went from
25  there.
```

EXHIBIT #36: 143
22-CV-01616-BAS-DDL

1    Q.   All right.  So did you even have any knowledge or

2    understanding as to what purpose or the reason why Mr.

3    Catanzarite was making a house call to you prior to the

4    time that he showed up at your home?

5    A.   I just can't remember that that far back.  I'd

6    have to say no.

7    Q.   Prior to the time that you spoke to Mr. Windfield

8    and Mr. Catanzarite, did you have any knowledge or

9    information that would have led or caused you to believe

10   that you had any damages or any claims against any of the

11   parties that you have sued in each of these lawsuits that

12   we have looked at during your testimony today?

13   A.   No, I didn't, but I think Ty Windfield did.

14   Either Ty or Ken.  And that -- so they got together on

15   that to start with.

16   Q.   And when -- and what specifically do you recall

17   that Mr. Windfield and Mr. Catanzarite told you about the

18   claims or causes of action that they were planning on

19   bringing in your name as a plaintiff in these lawsuits?

20       MR. CATANZARITE:  I'll object.  The question is

21   compound.

22   BY MR. GRUHER:

23   Q.   Mr. Carlson, let me ask it this way.  What is it

24   that you learned during your phone calls with

25   Mr. Windfield and Mr. Catanzarite, including the house

                                                    79

EXHIBIT #36: 144
22-CV-01616-BAS-DDL

1   call that Mr. Catanzarite made to you, that made you

2   believe or understand that you had claims against each of

3   the defendants that you're suing in the Complaint filed in

4   the Superior Court of California, Orange County, or the

5   adversary proceeding at T43 filed in the Daymark debtor

6   bankruptcy cases?

7          MR. CATANZARITE:  I'll object.  The question is

8   compound.  The question also calls for attorney-client

9   communication.

10         MR. GRUHER:  No, it doesn't, because I'm asking

11  Mr. Carlson about factual matters that were discussed.

12         MR. CATANZARITE:  No, you're not.  You asked

13  him --

14         MR. GRUHER:  I need to understand the facts that

15  were told to Mr. Carlson that ended up in these very

16  detailed complaints.

17         MR. CATANZARITE:  Well, you're entitled to --

18         MR. GRUHER:  When a third party is involved --

19         MR. CATANZARITE:  You're entitled to know facts.

20  You're not entitled to know legal theories.

21         MR. GRUHER:  Well, Mr. Windfield was also on that

22  call, so --

23         MR. CATANZARITE:  No, you haven't -- and that is

24  the basis of the objection as to form.  Because you're

25  deliberately conflating an introductory conversation with

                                                         80

EXHIBIT #36: 145
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1    a later meeting.

2    BY MR. GRUHER:

3        Q.   Mr. Carlson, let's start off with the

4    introductory phone call that your attorney was so

5    graciously describing for us.

6        A.   Yes.

7        Q.   What specifically did Mr. Catanzarite and

8    Mr. Windfield tell you about the reasons why you should be

9    a named plaintiff in the lawsuits that were filed in

10   Orange County Superior Court and the bankruptcy cases that

11   we've looked at during the course of your deposition here

12   today?

13           MR. CATANZARITE:  Well, I'll object.  That

14   misstates the evidence.  That is not what he said.

15           MR. GRUHER:  Thank you, Ken.  That's great.  The

16   witness is giving us the evidence, not you.  He's the one

17   providing the evidence right now.  But there's no evidence

18   to misstate because he hasn't answered my question.

19           MR. CATANZARITE:  Sure, he has.

20           MR. GRUHER:  When he answers the question, you

21   can determine whether or not it misstates the evidence.

22           MR. CATANZARITE:  You're misstating the record,

23   but go ahead.

24           MR. GRUHER:  No, I'm not.

25           MR. CATANZARITE:  Yes, you are.

                                                          81

EXHIBIT #36: 146
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1          MR. GRUHER:  I asked him a question.  Thank you.

2     BY MR. GRUHER:

3        Q.   Mr. Carlson, I appreciate your patience here.

4     I'm sorry you were interrupted.  I'll try again.

5          Please tell me in your own words without being

6     influenced by your counsel, Mr. Catanzarite, during this

7     introductory phone call, what facts and circumstance did

8     Mr. Catanzarite and Mr. Windfield provide to you that led

9     you to believe that you should be a named plaintiff in

10    these lawsuits that we have discussed during the course of

11    your deposition here today?

12          MR. CATANZARITE:  Objection; assumes facts.

13          Go ahead if you can.

14          MR. GRUHER:  Ken, the facts are being developed

15    right now.  I don't even know what that objection is.  It

16    doesn't make sense.

17    BY MR. GRUHER:

18       Q.   Mr. Carlson, you can completely answer that

19    question.

20       A.   I'll do my best.  As I remember, that was the

21    time when, let's see, Ken came out and we interviewed him

22    and hired him as our attorney.  And my understanding was

23    that there was some -- when -- some of the sales -- they

24    had those three units that were sold, were sold under

25    market value.  And that's one of the things he had.  And

                                                              82

EXHIBIT #36: 147
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1    the other was that ended the -- 2014 had ended the trust

2    for that.

3        Q.    All right.  And did they -- and, again, to be

4    clear, this introductory phone call occurred in 2017

5    before the investigation started in December of 2017; is

6    that correct?

7        A.    That's correct.

8        Q.    And what did they specifically tell you, meaning

9    Mr. Catanzarite and Mr. --

10       A.    Windfield?

11       Q.    -- Mr. Windfield about these specific

12   transactions?  Not the general statements, but did they

13   tell you anything specific about them that they believed

14   would have caused you any damages?

15            MR. CATANZARITE:  I'll object.  Form.  Compound.

16   BY MR. GRUHER:

17       Q.    You can answer the question, sir.

18       A.    What I told you is basically what we talked

19   about.  We didn't go into a lot of detail.

20       Q.    All right.  So the primary thing or principal

21   issue they discussed with you is that these properties

22   were sold under market value; is that correct?

23       A.    That's correct.

24       Q.    And did they provide you or explain to you what

25   specific facts or information that they had in their

                                                        83

EXHIBIT #36: 148
22-CV-01616-BAS-DDL

1  possession that would have substantiated their statements
2  to you that each of these properties -- and I want to make
3  sure that we're dealing with the same properties -- we're
4  talking about the Congress Center property, the Sutter
5  Square property and the Western Place property -- were
6  sold for under market value?
7         MR. KIBLER:  And the Congress Center property, I
8  think.
9  BY MR. GRUHER:
10    Q.   Sorry.  And the Congress Center property.  That's
11 correct.  I thought I had said that one before.  If I
12 didn't, I apologize.
13    A.   Can you say the question over again.
14    Q.   Yes, sir.  What I need to know is -- and I'll
15 start it this way -- first, just answer this question.
16 During this introductory phone call, was Mr. Windfield and
17 Mr. Catanzarite discussing with you the three subject
18 properties that we've referred to already in this
19 deposition known as the Congress Center property, the
20 Western Place property, and the Sutter Square property?
21    A.   I don't remember if Ty Windfield had been out
22 there to talk about that, because that was done in my
23 home.  I think it was just Ken and myself.
24    Q.   All right.  So when you were at your home, Mr.
25 Catanzarite discussed those three specific properties,

                                                    84

EXHIBIT #36: 149
22-CV-01616-BAS-DDL

1   correct?

2       A.   Yes, uh-huh.

3       Q.   Did Mr. -- so -- but during this first

4   introductory phone call that you had with Mr. Windfield

5   and Mr. Catanzarite, did you recall those two gentlemen

6   discussing those three properties with you as being sold

7   under value?

8       A.   I don't remember all three of them.  I just

9   remember Mr. Catanzarite told me that.

10      Q.   Right.  At any point in time after you learned or

11  had these conversations with Mr. Catanzarite and

12  Mr. Windfield, did you ever consider suing Mr. Windfield

13  for placing you into these G REIT investments?

14      A.   No, because he'd placed me in quite a few good

15  ones and so, you know, you have to take the good with the

16  bad every once in a while.

17      Q.   Okay.  The reason I'm asking you is that you have

18  obviously sued a number -- many, many people in these

19  lawsuits.  But yet the very person that put you into these

20  investments, Mr. Tyrone Windfield, was never sued by you;

21  is that correct?

22      A.   That's correct.

23      Q.   Did Mr. Catanzarite ever advise you as to whether

24  or not you may have a claim or a cause of action that you

25  should be pursuing against Mr. Windfield in addition to

                                                        85

EXHIBIT #36: 150
22-CV-01616-BAS-DDL

1    the claims that you're asserting in the lawsuits that we

2    have discussed during the course of your deposition today?

3        A.   No, we didn't go into detail there.  I was very

4    good friends with Ty and he's given me good advice all the

5    time, so I didn't want to nail him on that one thing.

6        Q.   Okay.  So you didn't want to nail Mr. Windfield

7    on that one thing because he was a good friend of yours,

8    but did Mr. Catanzarite ever inform you that you actually

9    may have a claim or cause of action that you should also

10   investigate against Mr. Windfield?

11       A.   I'd have to say no, I don't remember.

12       Q.   Did Mr. Windfield during this introductory phone

13   call or at any time thereafter, and I mean between the

14   time you had that first phone call with him and sitting

15   here at this deposition today, did you ever have any

16   subsequent telephone conversations or e-mail

17   communications or any other communications with

18   Mr. Windfield regarding the lawsuits that you have filed

19   either in the bankruptcy cases for the Daymark debtors or

20   the case filed in the Superior Court of Orange County and

21   California?

22       A.   No.  There was a good reason for that.

23   Mr. Windfield passed away not too long after that.

24       Q.   Now, do you -- did Mr. Windfield and Mr.

25   Catanzarite ever advise you or tell you that the lawsuit

                                                        86

EXHIBIT #36: 151
22-CV-01616-BAS-DDL

1  you were filing in the Orange County Superior Court should

2  be a class-action lawsuit not just on behalf of yourself

3  individually, but on behalf of all other investors in the

4  G REIT, Inc., or G REIT Liquidating Trust?

5      A.   I thought it was a class action.  Is that not

6  true?

7      Q.   Well, there's never been a certification of the

8  class.  So what I'm trying to ask you is, did

9  Mr. Windfield and/or Mr. Catanzarite ever advise you that

10  the lawsuit that you were going to be filing in the Orange

11  County Superior Court in California should be filed as a

12  class-action lawsuit, not just you as an individual

13  plaintiff?

14      A.   No, I didn't understand that they did that.

15      Q.   When did you first learn or understand that this

16  lawsuit that you had filed in the Los Angeles -- in the

17  Orange County Superior Court at T33 and T34 was going to

18  be proceeding as a class-action lawsuit?

19      A.   I thought it was all along.  I'm sorry.  I don't

20  remember any date that I learned that.

21      Q.   Prior to speaking with Mr. Windfield and Mr.

22  Catanzarite, did you know or believe that you had suffered

23  any damages relative to or involving your investment in G

24  REIT, Inc., and/or the G REIT Liquidating Trust prior to

25  that time?

87

EXHIBIT #36: 152
22-CV-01616-BAS-DDL

1    A.    I didn't know how to calculate how much it might

2    be, but I do believe there was -- not a tremendously large

3    one, but there was some.

4    Q.    So prior to the time that you spoke to Mr.

5    Windfield and Mr. Catanzarite, you believed that you had

6    damages as a result of your investment in the G REIT,

7    Inc., and/or the G REIT Liquidating Trust; is that

8    correct?

9    A.    No, it's not correct.  It was after they talked,

10   and talked to me about it.

11   Q.    I see.  And I know that you allege that the

12   investigation started in December of 2017.  Do you recall

13   either the month or the year when you had this

14   introductory phone call with Mr. Windfield and Mr.

15   Catanzarite?

16   A.    I really don't.

17   Q.    And do you recall the month or the year when you

18   had this meeting with Mr. Catanzarite at your home?

19   A.    It was on the few days, two or three days after

20   the phone call.  So very close together.

21   Q.    I see.  But you just can't pinpoint a specific

22   date or time?

23   A.    If I had known I was going to get all these

24   questions, I would have brought my data, but I didn't

25   think I needed to bring anything.

88

EXHIBIT #36: 153
22-CV-01616-BAS-DDL

1    Q.    I understand.  But, you know, that's
2  unfortunately not something that I would be telling you.
3         When did you first learn or understand that
4  lawsuits were going to be filed by you against anybody
5  relative to your investment in the G REIT Liquidating
6  Trust or G REIT, Inc.?
7    A.    I just don't remember at all on that one.
8  Obviously it had to be after this date, but I don't know
9  how soon after.
10    Q.    How much money have you personally spent in
11  prosecuting -- when I mean prosecuting, I mean filing
12  these lawsuits, taking discovery or depositions, or any
13  other involvement that you had after your lawsuits were
14  filed in the State of California?
15    A.    My direct involvement is zero moneywise.
16    Q.    So is it fair to say that Mr. Catanzarite and his
17  office has been picking up all of the expenses related to
18  the prosecution of these actions?
19    A.    I had assumed they were hoping to pay it out of
20  the money they get paid in after the lawsuit, but I'm not
21  sure.
22    Q.    Okay.  And you keep referring to the money that
23  is to be paid out of the lawsuit.  Can you describe for me
24  in more detail exactly how much money you believe that you
25  and potentially other members of a class that you're

89

EXHIBIT #36: 154
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

```
1    asserting are also damaged as a result of the sale of the
2    properties?
3        A.    None that -- I don't have the knowledge to
4    calculate that information.  And actually it's going to be
5    increasing every day, so it really is -- you know, just
6    really don't know.
7        Q.    And what is the basis of your knowledge that the
8    damages will be increasing every day?
9        A.    Well, pretty much general belief that, you know,
10   when you got a good investment, it grows, and so the
11   income grows with it.
12       Q.    And so --
13       A.    There's no proof, but I'm hoping there is.
14       Q.    When you say there's no proof, you're saying --
15       A.    My --
16       Q.    -- there's no proof of -- hold on -- Mr. Carlson,
17   you can't talk over me.
18           MR. CATANZARITE:  Well, you're talking over him.
19   You interrupted him.
20           MR. GRUHER:  Sorry.
21           MR. KIBLER:  No, he didn't.
22           MR. GRUHER:  Ken --
23           MR. CATANZARITE:  Yes, he did.
24   BY MR. GRUHER:
25       Q.    Mr. Carlson, my apologies if I talked over you.
```

90

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855-811-3376

EXHIBIT #36: 155
22-CV-01616-BAS-DDL

1    Were you done with your answer or did you have more to add

2    with your answer?

3         A.    Well, when you mentioned proof, I don't know

4    where -- how to get the proof.  That's what I was saying

5    to start with.  But there just seems to me like a fairly

6    good investment is going to continue growing and continue

7    making money, and that's going to be where your loss is.

8    But I can't calculate that myself.  I don't know how to do

9    that.

10        Q.    All right.  But you said the investment you're

11   referring to is the G REIT, Inc., and/or G REIT

12   Liquidating Trust investment; is that correct?  Is that

13   what you're talking about?

14        A.    That's correct.

15        Q.    And that investment continued to make money for

16   you; is that correct?

17        A.    Well, I haven't seen it yet.

18        Q.    When is the last time you received any money or

19   distribution out of the G REIT Liquidating Trust?

20        A.    It's been quite a while, but I'm just not sure

21   there either.

22        Q.    Well, can you give me a month or a year or

23   anything of that nature?

24        A.    It's just such a guess, I hate to do it.

25             MR. CATANZARITE:  Don't guess.

                                                            91

EXHIBIT #36: 156
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

```
1    BY MR. GRUHER:
2        Q.   Well, I don't need you to guess.  I mean, you
3    obviously filed a very detailed complaint.  Have you ever
4    reviewed the level of detail in the complaints that you --
5    the complaint that you filed in the State of California
6    and the adversary complaint that you filed in the Daymark
7    debtor bankruptcy cases?
8        A.   My part of that is peanuts.  You couldn't dig my
9    part out of that.  So I don't know.
10       Q.   Well, you have very specific dates and riddled
11   all through these complaints, sir.  Do you have any
12   specific knowledge as to any date that's set forth in any
13   of these complaints that were filed in your name?
14       A.   I don't know what that has to do with it, whether
15   I'm damaged or not.
16       Q.   So your testimony is that the lawsuits that were
17   filed in your name has nothing to do with your damages?
18   Is that -- I'm not sure I'm following you, but that is
19   what you said, right?
20       A.   No, I did not say that.
21       Q.   Okay.  Please explain to me what you were trying
22   to communicate in that last answer.
23       A.   Trying to say that there's a lot of people
24   involved and whoever calculates how much money, how much
25   damage there is, I'm not the one that did that.  I know
```

92

EXHIBIT #36: 157
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1   nothing about it.  And mine is a miniscule part of that.

2   It's up into the millions of dollars.  Mine are in the

3   hundreds or thousands of dollars.  So you know.

4        Q.   You just don't know?

5        A.   I really don't know.

6        Q.   Well, why don't you take -- why don't we do this.

7   Maybe this will help you along.  Why don't you take a

8   look.  I'm going to have Ms. Delgado provide to you what's

9   marked as Exhibit T44.  I want you to take a look at that

10  document.

11            (Exhibit T44 was marked for

12            identification.)

13            MS. DELGADO:  Here you go.

14  BY MR. GRUHER:

15       Q.   Do you have that document in front of you, sir?

16       A.   Yes, I do.

17       Q.   And just to be clear on one thing, prior to the

18  introductory phone call and the house call that Mr.

19  Catanzarite made to your house, you weren't actively

20  looking for an attorney to sue anybody relative to your

21  investment in the G REIT, Inc., and/or the G REIT

22  Liquidating Trust.  Is that a fair statement?

23       A.   That's correct.

24       Q.   Now, looking at T44, my first question to you is,

25  have you ever seen this document before sitting here for

93

EXHIBIT #36: 158
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1     today's deposition?

2        A.   You know, there's so many here, it's just so hard

3     to say.  I'm sure I must have gotten a copy, but I don't

4     know very many details.  And I can't sit here and

5     calculate what my share of that would be.  400,100,000

6     minus, you know, maybe 2- or 300, so --

7        Q.   So when you say 400 million, you're referring to

8     Exhibit T44; is that correct?

9        A.   That's correct.

10       Q.   You just took that number off of that exhibit?

11       A.   That's correct.

12       Q.   Is this the first time that you've ever seen this

13    document, the proof of claim?

14       A.   I think I've seen it before, but I really haven't

15    dug into it too much.  My claim is so small, I wasn't

16    worrying a lot about it.

17       Q.   And when you say your claim is so small, please

18    describe for me what you mean by your claim is so small.

19    And who is your claim against?

20       A.   Well, I guess the claim is against -- I don't

21    know who it is.  My investment there was probably in

22    the -- and I'm not even sure, but maybe 20- or 30,000

23    dollars, maybe 40,000, with some growth since I deposit.

24    So that amount compared to 400 million is peanuts.  I

25    don't know how you calculate it.

94

EXHIBIT #36: 159
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1    Q.    So your testimony is you never received any money

2    back out of your investment from the G REIT Trust and the

3    G REIT Liquidating Trust?  All of your money was lost?

4    A.    No, that's not true.  I did some, but I don't

5    know -- you see, if that was still in there, I would still

6    be earning income on it?  And maybe I --

7    Q.    Earning income from --

8    A.    Well, I'm hoping it will grow.  If it grows, I

9    earn more.  If it goes down, then I lose.  I understand

10   that.  But I don't know how to calculate that in this kind

11   of situation.  My other -- most of my other investments

12   are in stocks and bonds, and I'm not -- it's a lot easier

13   to calculate your profit and loss.

14   Q.    I'm confused, because you're now talking about

15   income growth and growth of your investment in G REIT,

16   Inc., and G REIT Liquidating Trust.  Earlier in your

17   testimony you said that the investment was good for you

18   because it provided you with certain favorable tax

19   benefits.  So I'm trying to understand which one.

20   A.    G REIT was not the one that did that.  That was

21   prior to that, and I don't remember the name of that one.

22   It was prior to G REIT that I had the one that did the

23   good tax returns for me.

24   Q.    All right.  And are you aware that you're the

25   lead plaintiff in a potential class-action lawsuit?

95

EXHIBIT #36: 160
22-CV-01616-BAS-DDL

1      A.   Yes, I am.

2      Q.   Do you know exactly what that means to be a lead

3   plaintiff in a potential class-action lawsuit?

4      A.   I'm sure I don't know every detail about it,

5   but --

6      Q.   Well, why don't you tell me the details that you

7   do know about.

8      A.   Well, I guess it's probably a lot like my mother

9   passed away a couple years ago and I was the trustee of

10   her estate.  So probably a lot of the same kinds of things

11   for what you'll do there.  Manage the money, so forth.

12      Q.   Manage what -- wait.  I'm sorry.  And, again, I'm

13   just confused.  What money are you managing?

14      A.   Well, the buying and selling the stock or

15   whatever -- you know, whatever you have to do to close it

16   out.  When I closed my mom's estate, I had to sell the

17   house.  I had to sell the farm.  I had to sell all of the

18   equipment she had.  And, you know, then distribute it

19   among her kids.  And that sounds to me like it would be

20   the same kind of thing that we have to do.

21      Q.   So your testimony is that your role as a lead

22   plaintiff in the lawsuit filed on your behalf as a

23   potential class lead plaintiff is to manage the remaining

24   assets in the G REIT Liquidating Trust?

25      A.   No.  I think there is another person that the

96

EXHIBIT #36: 161
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

```
 1    trust has to do that.
 2         Q.   So why are you talking to me about managing
 3    assets?
 4         A.   Well, this other person has to do that same kind
 5    of a thing.
 6         Q.   Okay.  But what are you doing to manage people's
 7    investments or money in the G REIT Liquidating Trust as
 8    the lead plaintiff in a potential class-action lawsuit?
 9    I'm sorry, you're confusing me.
10         A.   I'm not doing anything right now.
11         Q.   Okay.  So why are you telling me about managing
12    people's money?  I simply asked you what your
13    understanding and knowledge is to be a lead plaintiff in a
14    potential class-action lawsuit.
15         A.   I really am not really sure what a lead plaintiff
16    has to do, so I can't answer that.
17         Q.   Did anybody explain to you what a lead plaintiff
18    is supposed to do and is required to do in a lawsuit
19    similar to the one you filed?
20         MR. CATANZARITE:  I'll object to the extent it
21    calls for attorney-client communication.
22    BY MR. GRUHER:
23         Q.   Mr. Carlson?
24         A.   I thought there was an objection here.
25         Q.   No.  The objection -- remember, I said if he
```

97

EXHIBIT #36: 162
22-CV-01616-BAS-DDL

1    tells you not to answer, then that is a different story.

2    He didn't tell you not to answer. So if you could kindly

3    answer my question, I would very much appreciate that.

4          MR. CATANZARITE: That's right. Excluding

5    anything that I would have communicated to you, if you

6    have independent information, you can tell him.

7          THE WITNESS: Okay. Can I have the question

8    again, then.

9    BY MR. GRUHER:

10   Q.   I need to understand what your knowledge is about

11   your role as a lead plaintiff in a potential class-action

12   lawsuit?

13         MR. CATANZARITE: You can answer the question

14   excluding anything I would have told you. If --

15         MR. GRUHER: That's not necessarily true, Ken.

16   Because if his answer has to do with factual matters that

17   he would have learned or had to know of, that's not

18   attorney-client privilege.

19         MR. CATANZARITE: Well, he's already told you the

20   factual matters. I'm excluding anything about his role or

21   duties as a lead. Those communications you're not

22   entitled to.

23         But if you know of anything, you can --

24         MR. GRUHER: Really? I'm not -- okay. Let's do

25   this, then. We have a -- Ms. Delgado, can you kindly take

                                                        98

EXHIBIT #36: 163
22-CV-01616-BAS-DDL

1    out -- there's a document called "Declaration of Richard

2    Carlson in Support of Motion for Class Certification."

3    It's one of our unmarked exhibits.

4           MS. DELGADO:  Yes.

5           Can we mark this as Exhibit T59.

6           (Exhibit T59 was marked for

7           identification.)

8           MR. GRUHER:  I think it's -- is it T58 or T59?

9           MS. DELGADO:  T59.

10          MR. GRUHER:  Let's start off, then, with T58.

11   We're going to mark it now.

12          (Exhibit T58 was marked for

13          identification.)

14   BY MR. GRUHER:

15      Q.  We'll start with T58 and then we'll go to T59.

16          Mr. Carlson, tell me when you've had a chance to

17   read over or look at T58.

18          Have you seen this document before, sir, T58?

19      A.  I don't remember it, but that doesn't mean

20   anything for sure.

21      Q.  So when you say you don't remember, it means you

22   could have seen it, you just don't recall seeing it at the

23   moment?

24      A.  That's probably it, yes.

25      Q.  So you understand that in the Daymark debtor

                                                        99

EXHIBIT #36: 164
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1   bankruptcy cases, not in the Superior Court of California,
2   but in the Daymark bankruptcy cases, you're also looking
3   to obtain class certification of the adversary complaint
4   that was filed in your name they reflected in T43.
5           Is that your testimony?
6       A.   I guess so, yes.
7       Q.   And when did you first learn that you were going
8   to be seeking class certification in the Daymark debtor
9   bankruptcy cases?
10      A.   I just don't remember for sure.
11      Q.   Well, was it before March 8th, 2019, which is
12  reflected in T58, the Motion to Apply Class Action Rules
13  and Procedures to Class Proof of Claim?
14      A.   I assume it has to be before the first one,
15  doesn't it, whichever one that is?
16      Q.   Have you -- do you see the Exhibit A to T58, the
17  proof of claim that is attached to that document?
18      A.   Yes, here it is.
19      Q.   And did you -- now, the proof of claim that is
20  reflected in Exhibit A of T58 is identical to the proof of
21  claim that is marked as T44.
22          Do you see that?
23          Other than the received stamp of March 19th,
24  2019, by BCM Group, which is our claims administrator.
25      A.   I'm sorry.  I was gathering that out.  What was

                                                         100

EXHIBIT #36: 165
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1   the question?

2        Q.   That's fine.  Do you agree with me that the

3   document attached as Exhibit A to T58, which is the Motion

4   to Apply Class Action Rules and Procedures is the proof of

5   claim form which is substantially identical to Exhibit

6   T44?

7        A.   I'm sorry.  I still got the wrong one.

8             MR. CATANZARITE:  He's asking you to compare the

9   attachment to 58 with 44.  He's asking you to compare

10  these.

11            MR. GRUHER:  That's correct.  Thank you, Ken.

12  BY MR. GRUHER:

13       Q.   Do you see that, sir?

14       A.   Yes, I do.  I'm looking at it right now.

15       Q.   Okay.  So my questions to you is, the proofs of

16  claim that are reflected in T44 and the proof of claim

17  reflected in T58 are substantially identical, correct,

18  except for the received March 19th, 2019, BCM -- or BMC

19  Group reflected on T44, correct?

20       A.   They appear to be, yes, uh-huh.

21       Q.   Okay.  Now I want to know, relative to the filing

22  of this proof of claim in the debtor -- Daymark debtor

23  bankruptcy cases, what input, if anything, did you have in

24  the preparation and filing of this proof of claim?

25       A.   I don't believe I did anything on this.

                                                        101

EXHIBIT #36: 166
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1  Q.   Did you ever review this proof of claim and any

2  of the contents of this proof of claim that's reflected in

3  either one of these documents prior to the time that these

4  claims were filed with the bankruptcy court?

5  A.   I did see them, yes, and I looked them over.

6  Q.   And when you looked them over, did you agree that

7  the damages in this proof of claim should be $400,100,000?

8  A.   Well, that's the thing that I didn't understand.

9  How do you ever -- how do you come to that number?  I

10  wouldn't know how to do that.  So there's no way I could

11  prove that.

12  Q.   Then do you understand that a proof of claim is a

13  document that is filed under oath, meaning it's subject to

14  penalty of perjury?  Are you aware of that, sir?

15  A.   I guess so, yes, uh-huh.

16  Q.   It says that in the document if you turn to

17  Page 2 of the proof of claim and you go down below where

18  it says "Signature," it specifically states that, "I

19  understand that an authorized signature on this proof of

20  claim serves as an acknowledgment that when calculating

21  the amount to the claim, the creditor gave the debtor

22  credit for any payments received toward that debt."  It

23  then goes on to say, "I examined the information in this

24  proof of claim and have a reasonable belief that the

25  information is true and correct."  Then it states, "I

102

EXHIBIT #36: 167
22-CV-01616-BAS-DDL

1    declare under penalty of perjury that the foregoing is

2    true and correct."

3         Do you see that?  Do you see the statement that

4    says, "I declare under penalty of perjury that the

5    foregoing is true and correct"?  Yes or no?

6    A.    So far I haven't found it yet.

7         MR. GRUHER:  All right.  Joyce, can you direct

8    him to the second page of the proof of claim at the

9    bottom, Part 3?

10        MS. DELGADO:  Yeah.  That paragraph in that box.

11        MR. GRUHER:  Just point him to the wording, "I

12   declare under penalty of perjury that the foregoing is

13   true and correct."

14        THE WITNESS:  Oh, okay.  I see it.

15   BY MR. GRUHER:

16   Q.    You see that, sir?

17   A.    Yes.

18   Q.    Okay.  So, just to be clear, your testimony is,

19   one, that you don't know where this $400 million amount

20   comes from and, two, you could never be able to prove it.

21   That's your testimony, correct?

22   A.    I couldn't all by myself, no.

23   Q.    Okay.  By yourself -- do you know why Mr.

24   Catanzarite signed off on this proof of claim as opposed

25   to you as the lead plaintiff in a potential class-action

103

EXHIBIT #36: 168
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1    lawsuit that was filed both in the Superior Court of
2    California and the adversary case filed in the Daymark
3    debtor bankruptcy cases?
4          A.   Well, he's right here.  Ask him.
5          Q.   Do you have any understanding as to why Mr.
6    Catanzarite signed off on this proof of claim as opposed
7    to you as the lead plaintiff in these lawsuits, sir?  Yes
8    or no?
9          A.   No, I don't.
10         Q.   Turn to the next page where it says, "Rider to
11   Class Proof of Claim Official Form 410."
12              Do you see that document?
13         A.   Okay.  I have it.
14         Q.   Did you help assist Mr. Catanzarite with the
15   preparation of this document?
16         A.   No, I didn't.
17         Q.   Did you review the contents of this document for
18   its accuracy prior to the time that it was filed in the
19   bankruptcy court?
20         A.   I did it to the degree that I could prove it, but
21   like that 400 million, there's no way I could prove that,
22   so I took their word for it.
23         Q.   You took Mr. Catanzarite's word for it, correct?
24         A.   Whoever put the number down.  I'm not sure he did
25   or who did.

104

EXHIBIT #36: 169
22-CV-01616-BAS-DDL

```
 1        Q.    Did you ever inquire as to who put that

 2   information together?

 3        A.    I did not.

 4        Q.    Now, let's turn to -- now that we've went through

 5   the proof of claim, let's turn to T59.  Tell me when you

 6   have that document in front of you.

 7        A.    I have it.

 8        Q.    All right.  So I want you to turn to page -- you

 9   see where it says on the top "Doc 28," and then it says

10   "Page 1 of 3" at the top?

11        A.    Okay.

12        Q.    I want you to turn to Page 3 of 3 of this

13   document.

14        A.    Okay.

15        Q.    Tell me when you're there.

16        A.    I'm there.

17        Q.    All right.  Now, is that your signature that

18   appears on this document?

19        A.    Yes, it is.

20        Q.    And it says, "Corona, California."  Is that where

21   you reside?

22        A.    Really Norco, but they border each other.

23        Q.    What's your exact street -- what's your home

24   address?

25        A.    3271 Kips Korner Road, Norco, California 92860.
```

                                                          105

EXHIBIT #36: 170
22-CV-01616-BAS-DDL

1    Q.   I'm sorry.  What was that?  And I apologize.

2    Give me the name of the city.

3    A.   Norco, N-O-R-C-O.

4    Q.   Norco.  Okay.  And Norco is different than

5    Corona?

6    A.   Yes.  They border each other.

7    Q.   Do you know why Corona is -- did you put down

8    Corona or did somebody else?

9    A.   I don't think I did.  I surely would have put --

10   let me see.  I wonder if we were at -- maybe we were at a

11   location in Corona.  That might have been what happened.

12   We might have been at a location in Corona.

13   Q.   I see.

14   A.   Coffee shop or something.

15   Q.   Who presented this document to you to be signed

16   on November 1st, 2019?

17   A.   I can't remember.

18   Q.   Did Mr. -- did anyone from Mr. Catanzarite's

19   office provide you with this affidavit for your signature?

20   A.   Do you know, Ken?  I don't know for sure.

21   Q.   Did an individual named Tim O'Keefe from Mr.

22   Catanzarite's office provide you with this declaration to

23   sign on November 1st, 2019, in Corona, California?

24   A.   I just don't know.  That's all I can say.

25   Q.   All right.  Let's try to break this down, then.

106

EXHIBIT #36: 171
22-CV-01616-BAS-DDL

1    Did you know or understand that you were filing this

2    what's called a Declaration of Richard Carlson in Support

3    of Motion for Class Certification in the adversary

4    proceeding, case number 19-01048, which was formerly RBR,

5    now it's SMG, that is reflected in Exhibit T43?

6        A.    Yes, I guess so.

7        Q.    Okay.  And in the first paragraph, it states, "I

8    am over the year of 18 years of age living in Norco,

9    California."

10           That is a correct statement, right?

11       A.    That's correct.

12       Q.    And you say, "I'm a plaintiff in the

13   above-referenced matter."  Is that correct?

14       A.    Uh-huh.

15           MR. CATANZARITE:  You have to state "yes."

16   BY MR. GRUHER:

17       Q.    Right?

18       A.    Yes.

19       Q.    That was correct?

20       A.    Yes.

21       Q.    You state in Paragraph 2, "I hold 800 units in G

22   REIT Liquidating Trust and as such am a beneficiary

23   thereof."

24           Is that accurate, you hold 800 units in G REIT

25   Liquidating Trust?

107

EXHIBIT #36: 172
22-CV-01616-BAS-DDL

1    A.    That's what I had in my file that -- I'm not sure

2   if it's an up-to-date number, but that's what I started

3   with I know.

4    Q.    And who -- did you provide this information

5   that -- all of the information that's contained in this

6   declaration at T59, is this information that came from you

7   and your personal knowledge or did it come from somebody

8   else?

9    A.    I think it's probably from me because this has

10   been held up so long that I believe that that number

11   hasn't changed or not hardly at all, that 800.

12    Q.    Well, because in the second -- because in the

13   second sentence of Paragraph 2, you state, "I purchased

14   800 shares of G REIT in or around 2001 and I've held these

15   shares to the present."  And then you state, "Around

16   January 2008, the shares of G REIT, Inc., were converted

17   into beneficial interest," in quotes, "units in the G REIT

18   Liquidating Trust."

19         Are those your words or did Mr. Catanzarite write

20   those words for you?

21    A.    The last half of that sentence are not mine.  I

22   wouldn't know that.  Probably up through "G REIT, Inc.,"

23   is the information from me anyway.

24    Q.    But everything else would have come from your

25   attorney, correct?

                                                        108

EXHIBIT #36: 173
22-CV-01616-BAS-DDL

```
 1        A.   Yes.
 2        Q.   Going to Paragraph 3.  And here's where I got
 3   confused by your prior testimony.  Perhaps you can help me
 4   out.  You stated that -- you state that, "I understand my
 5   obligations and responsibilities as class representative
 6   and I agree to act as one.  I understand my
 7   responsibilities to act for the best interests of the
 8   proposed class.  I'm not aware of any conflicts or reasons
 9   why I cannot represent the interest of the class."
10            What I'm trying to understand is, you stated
11   earlier that you really didn't understand what your
12   obligations are as a potential class representative, but
13   in this sentence you're stating that you do understand
14   your obligations and responsibilities as a class
15   representative.  So I need to ask you specifically what
16   your understanding is of your obligations and
17   responsibilities as a class representative as stated in
18   this affidavit or declaration?
19        A.   I guess I had assumed I was going to get help
20   from my counsel and I could -- and that would make it
21   okay.
22        Q.   And, sir, I appreciate that, but what I need to
23   understand is -- and this is critical to your testimony
24   today, so please try to be as accurate as you can, and I
25   want to make sure that you have the ability and the time
```

109

EXHIBIT #36: 174
22-CV-01616-BAS-DDL

1   to answer it.  You have stated in a sworn declaration --

2   and if you recall right above your signature line on the

3   third page, you said, "I certify and declare under penalty

4   of perjury under the laws of the State of California,

5   Florida, and the United States that the foregoing is true

6   and correct."  That's what you attested to.  What I need

7   to understand is, what is your understanding of your

8   obligations and responsibilities as a class representative

9   in connection with this adversary proceeding that was

10  filed in the Daymark debtor bankruptcy cases?

11      A.   Well, I think just the biggest thing, hardly

12  anybody does this alone.  They have help.  And that's kind

13  of what I was assuming.  I was going to have help on this.

14      Q.   Okay.  But -- I understand that.  But this is

15  something that you attested to.  So I don't -- what I need

16  to understand from you, sir, is what, in your own words,

17  do you know or understand are your obligations and

18  responsibilities as the class representative.  I'm not

19  asking for what you know or need help on, and I appreciate

20  that you do, but I need to understand what you know are

21  your own obligations and responsibilities, irrespective of

22  any help that you may ask for or receive from anyone,

23  including your attorneys.

24          So please describe for me each of those

25  obligations and responsibilities that you believe you

110

1    have.

2        A.   I'm looking right here.  I think Paragraph 4 kind

3    of explains it.

4        Q.   All right.  Do you want to read Paragraph 4 into

5    the record and add any other additional facts or

6    information that you think is necessary to completely

7    answer my question about your obligations and

8    responsibilities as a class representative in this

9    adversary proceeding?

10            MR. CATANZARITE:  You can read it if you want.

11            THE WITNESS:  Okay.  "I have actively taken part

12   in this lawsuit and will continue to do so.  I have

13   searched for documents, made myself available to my

14   attorneys by phone and in person, met and spoken with my

15   attorneys on numerous occasions by phone and in person,

16   have been kept informed of case status and cooperated with

17   my attorneys throughout the case.  Represented by Mr. Ken

18   Catanzarite, I have made myself available by phone during

19   a two-day mediation concerning this case in Miami with the

20   Chapter 7 trustee.  I am willing to assist with mediation

21   or settlement if asked to do so and go to trial.  I will

22   continue to cooperate until this case is resolved."

23   BY MR. GRUHER:

24       Q.   All right.  So let's break this down.  I want to

25   ask you first where you say that "I am willing to assist

                                                        111

EXHIBIT #36: 176
22-CV-01616-BAS-DDL

1  with mediation or settlement if asked to do so and to go

2  to trial." If -- are you aware of a two-day evidentiary

3  proceeding or hearing in this case that is set for March

4  18th and March 19th?

5      A.   No, I wasn't.  Where is it?

6      Q.   It's -- we're going to get more detailed on that,

7  but that's going to be taking place in the Southern

8  District of Florida right here in Fort Lauderdale where

9  I'm sitting, taking your deposition today, sir.

10      A.   Okay.

11      Q.   Do you know that the adversary proceeding that

12  you filed in the Daymark debtor bankruptcy cases is also

13  pending in the Southern District of Florida, specifically

14  in the city of Fort Lauderdale at the bankruptcy court in

15  that city?

16      A.   No, I was not aware.

17      Q.   Are you planning to travel from California to the

18  state of Florida to provide live testimony in connection

19  with this lawsuit that was filed on your behalf in the

20  Daymark debtor bankruptcy cases?

21      A.   I don't think I could take the time to do it

22  right now.  I'll tell you why.  My wife had a stroke about

23  three or four months ago, and she's recovering very well,

24  but I'm not going to leave her alone.

25      Q.   Well, I understand.  I'm very sorry to hear that,

                                                           112

EXHIBIT #36: 177
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

```
 1    Mr. Carlson.
 2        A.   So my answer has to be no to that.
 3        Q.   Completely understand and I wish her well.  I
 4    hope she's doing well.
 5        A.   She's doing well, but she has a ways to go yet.
 6        Q.   I see.
 7        A.   And she can't drive and so I have to be there to
 8    chauffeur her and help her.
 9        Q.   Have you discussed with anyone any issue -- well,
10    let me back up.  Where you state in this paragraph that
11    you've actively taken part in this lawsuit and will
12    continue to do so, can you describe for me the things that
13    you have done to actively take part in this adversary
14    proceeding in which you filed this declaration here in the
15    Southern District of Florida?
16        A.   Yes.  I think the biggest thing that I played at
17    is I dug out how many shares of G REIT I had and that part
18    of it.
19        Q.   You also stated that you searched for documents.
20    What documents specifically have you searched for and
21    what, if any, documents did you find that would have been
22    relative to the adversary proceeding that was filed on
23    your behalf in the Southern District of Florida?
24        A.   I don't know right now.  I'd have to go back
25    through my files and find them.  I just don't know.
```

113

EXHIBIT #36: 178
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1      Q.    Where are your files kept and maintained, sir?

2      A.    In my office in my house.

3      Q.    So you have a room where you have all these

4   documents; is that correct?

5      A.    That's correct.

6      Q.    Sir, I hate to ask this question, but if you

7   don't mind, this affidavit was signed in November of 2019

8   on November 1st.  At what point and time did your wife

9   have her stroke, if you recall?

10     A.    It was really August 2019.

11     Q.    All right.  So it was --

12     A.    I didn't know -- I didn't know I was going to

13  have to travel that much, so it makes a big difference.

14     Q.    I appreciate that.  And, again, I'm trying to be

15  obviously sensitive to the situation.  I'm just trying to

16  get the timeline together.

17           So she unfortunately had a stroke in August 2019,

18  and you signed this affidavit in November of 2019,

19  correct?

20     A.    Yeah.  But if I have to come to a place like

21  this, I could have done that.  I can't leave her for a

22  longer period of time, though.

23     Q.    Thank you.

24           In Paragraph 6, you stated that, "In or around

25  early July 2018, I received a two-page letter from Gary

                                                    114

EXHIBIT #36: 179
22-CV-01616-BAS-DDL

1    Wescombe as chairman of the trustees for the G REIT

2    Liquidating Trust, and as concerning the administration of

3    the trust.  The letter is dated June 25th, 2018.  The

4    letter concerned administration of the trust and owed

5    funds to the trust.  The letter was addressed to me as

6    beneficiary and stated it was CC'd or courtesy copied to,"

7    quote, "all beneficiaries, as well as the members of the G

8    REIT board of trustees.  The letter did not reference this

9    action at all nor inform the beneficiaries of any suit

10   against Mr. Wescombe or other trustees.  A true and

11   correct copy of the letter I received is attached hereto

12   as Exhibit 1.  To date, I have not received any funds owed

13   to me as stated in the letter."

14        My question to you, sir, is, the letter that's

15   attached as Exhibit 1 to your declaration, is that a

16   letter that you provided to Mr. Catanzarite or Mr.

17   Catanzarite provided to you?

18        A.   Did you write this, Ken?  I can't remember.

19             MR. CATANZARITE:  You have to answer that, if you

20   know.

21             THE WITNESS:  I just don't know for sure.

22   BY MR. GRUHER:

23        Q.   Well, is this the type of letter that you would

24   have kept in your own files at your office in your home?

25        A.   Yes, it should be there, uh-huh.

                                                        115

EXHIBIT #36: 180
22-CV-01616-BAS-DDL

1    Q.   And do you know why this letter and the

2  statements made in Paragraph 6 to your declaration were

3  included within this declaration?  Do you understand why,

4  sir?

5    A.   I'm still reading it.

6         No, I'm just not sure why.

7    Q.   Turning to the letter itself, the letter states

8  in Paragraph 2, "As you are aware, the sole remaining

9  asset of the trust is a promissory note with a principal

10  amount due of $12 million, the note.  The note was issued

11  by Sovereign Strategic Mortgage Fund, LLC, SSMF, in favor

12  of the G REIT on April 15th, 2015.  The note calls for

13  interest on the loan at a rate of 5 percent and was

14  originally due on or before April 15th, 2016," which they

15  refer to as "the maturity date."

16         MR. CATANZARITE:  Hold on.  Barry, stop a second.

17  He's not in the right exhibit.  If you want him to read

18  along --

19         MR. GRUHER:  Not a problem.  That's okay.  I'll

20  go back to it.  I'm still on Exhibit 59.

21         MR. CATANZARITE:  He's got it now, Barry.

22         MR. GRUHER:  Okay.

23         THE WITNESS:  I've got it here.

24         MR. CATANZARITE:  Did you want him to read it,

25  Barry?

116

EXHIBIT #36: 181
22-CV-01616-BAS-DDL

1          MR. GRUHER:  I was going to read it to him.

2          MR. CATANZARITE:  Well, he has it now.

3     BY MR. GRUHER:

4          Q.   Sir, I'm just going to ask you dated on the June

5     25th letter attached as Exhibit 1 to T59, it states in the

6     second paragraph of the letter, "As you are aware, the

7     sole remaining asset of the trust is a promissory note

8     with a principal amount of $12 million."  It's called "the

9     note."  "The note was issued by Sovereign Strategic

10    Mortgage Fund, LLC, SSMF, in favor of the G REIT on April

11    15th, 2015.  The note calls for interest on the loan at a

12    rate of 5 percent and was originally due on or before

13    April 15th, 2016, the maturity date."

14         Then it goes on to describe, "On the original

15    maturity date, the trustees in SSMF entered into a first

16    amendment to the note which allowed SSMF to extend the

17    maturity date in consideration for a payment of an

18    extension fee.  Specifically the first amendment provided

19    that for a fee of 30,000, the maturity date would be

20    extended to September 15th, 2015.  In addition, the first

21    amendment allowed SSMF to extend the maturity date for two

22    additional 90-day periods.  In each case, SSMF would be

23    required to pay an additional $30,000 extension fee.  Thus

24    in consideration for the payment of extensions of up to

25    120,000, the maturity date would be -- could be extended

                                                        117

EXHIBIT #36: 182
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

```
1    to March 2015."
2            It then goes on to explain other aspects of the
3    relationship between SSMF, the promissory note, and the G
4    REIT Trust.  What I'm trying to understand from you is do
5    you have any independent knowledge or facts that relate to
6    the execution and delivery of the promissory note by SSMF
7    to the G REIT Liquidating Trust?
8         A.   I don't myself.  Do you have anything?
9            MR. CATANZARITE:  He just asked if you have it.
10           THE WITNESS:  Okay.  I don't have anything on
11   that.
12   BY MR. GRUHER:
13        Q.   Okay.  Do you have any -- okay.  Do you have any
14   independent knowledge or information that you're aware of
15   as to whether or not this promissory note and the
16   amendments and payments that are reflected in this
17   document were validly entered into, meaning that they
18   were -- they were properly entered into between SSMF and
19   the G REIT Liquidating Trust?
20           MR. CATANZARITE:  Objection; calls for a legal
21   conclusion.
22           Go ahead if you know.
23           THE WITNESS:  Do you want me to go ahead?
24           MR. CATANZARITE:  If you know.
25   MR. GRUHER:
```

118

EXHIBIT #36: 183
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1    Q.   Yeah, you can answer.

2    A.   I don't know.

3    Q.   Do you have any independent knowledge or

4  information as to whether or not there is any improper

5  conduct or any type of concealment or fraud related to the

6  execution and delivery of this promissory note by SSMF to

7  the G REIT Liquidating Trust?

8          MR. CATANZARITE:   Objection; calls for a legal

9  conclusion and/or expert opinion testimony.

10         You can go ahead if you know.

11         THE WITNESS:   The answer is no.

12 BY MR. GRUHER:

13   Q.   Do you have any knowledge or understanding that

14 in the adversary proceeding -- in the complaint that was

15 filed on your behalf in the adversary proceeding filed in

16 the Daymark debtor bankruptcy cases, including the second

17 amended complaint and other complaints that were filed on

18 your behalf in the Superior Orange County Court that there

19 is a claim or issue being asserted as to the promissory

20 note between SSMF and the G REIT Liquidating Trust as part

21 of the claim for damages in each of these lawsuits?

22 Mr. Carlson?

23   A.   You're asking me if I'm aware of that?

24   Q.   Yeah.

25   A.   I'm not.

119

EXHIBIT #36: 184
22-CV-01616-BAS-DDL

```
 1        Q.    Let's turn to Exhibit 45.
 2              (Exhibit T45 was marked for
 3              identification.)
 4              MS. DELGADO:  It's before him, Barry.
 5              MR. GRUHER:  Okay.  Thank you.
 6   BY MR. GRUHER:
 7        Q.    Mr. Carlson, I'm showing you what's been marked
 8   as T45.  I'll represent this is a document that was filed
 9   in the Daymark debtor bankruptcy cases at document entry
10   319 on November 1st, 2019.  I'm also going to represent to
11   you that this information could be obtained off of a
12   website, www.DaymarkSettlement.com.
13              My question to you, sir, is, have you ever seen
14   this document before today's deposition?
15        A.    I've seen things with Daymark on them, but this
16   is, again, is so thick compared to anything I get.
17        Q.    Well, why don't you take a moment to take a look
18   at it and tell me if there's anything about this document
19   that you can see or recognize.
20        A.    About the first four pages up to Roman Numeral 2,
21   it looks kind of familiar.
22        Q.    Okay.  When you say it looks familiar, do you
23   believe you've seen this document before sitting here for
24   today's deposition?
25        A.    I don't know if that was -- I don't remember ever
```

120

EXHIBIT #36: 185
22-CV-01616-BAS-DDL

1   getting them this thick.  I don't know if I got a partial

2   on it or what.

3      Q.   Do you ever recall receiving a notice from the

4   bankruptcy court directing you that you can view documents

5   on a website, www.DaymarkSettlement.com?

6      A.   I don't think I've gotten that.

7      Q.   Have you ever logged onto a website known as

8   www.DaymarkSettlement.com?

9      A.   No, I haven't.

10     Q.   Are you aware of the fact that the trustee has

11  filed a motion to approve settlement agreements with the

12  Sovereign parties, the Cottonwood parties, and the

13  Northwood parties, and a request for entry of a bar orders

14  against those entities?

15     A.   I'm not aware of it.

16     Q.   Are you aware that the trustee is seeking

17  approval of a settlement between what we have

18  identified -- and I'll go and I'll identify them for you.

19  They are identified as the Sovereign parties, the

20  Cottonwood parties, and the Northwood parties for a total

21  payment into this bankruptcy estate of $1,775,000.  Are

22  you aware of that?

23     A.   No, I'm not.

24     Q.   Are you aware that as set forth in this motion

25  that we are referring to the Sovereign parties as

121

EXHIBIT #36: 186
22-CV-01616-BAS-DDL

```
1    Sovereign Capital Management Group, Inc., Sovereign
2    Strategic Mortgage Fund, LLC, Todd Mikles, Etienne Locoh,
3    GLC, LLC, and Infinity Urban Century, LLC?
4              MR. CATANZARITE:  Barry, are you reading from
5    somewhere?  He's looking through it if you're reading.
6              MR. GRUHER:  Oh, I'm sorry.  You know what,
7    that's my apologies to Mr. Carlson.
8    BY MR. GRUHER:
9        Q.   Mr. Carlson, turn to Page 13, Paragraph 45.  This
10   shouldn't be a memory test for you.
11             MR. CATANZARITE:  He's with you, Barry.
12             THE WITNESS:  Yeah.
13   BY MR. GRUHER:
14       Q.   All right.  Okay.  So I was referring
15   specifically to Paragraph 45.  And, again, I just named
16   off several entities that we're going to call the
17   Sovereign parties.  Are you aware that the trustee is
18   seeking to settle claims that the estate has on --
19   relative to those specific parties?
20       A.   No, I'm not.
21       Q.   Are you aware that the Sovereign parties have
22   agreed to pay a total of $1.1 million into the bankruptcy
23   estate in exchange for the settlement of claims between
24   the trustee and the Sovereign parties?
25       A.   I don't think so, no.
```

                                                        122

EXHIBIT #36: 187
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1      Q.    Are you aware of a group of parties known as the

2    Cottonwood parties, same page, Paragraph 45, consisting of

3    Cottonwood Residential OP, LP, Cottonwood Capital Property

4    Management II, LLC, Cottonwood Capital Management, Inc.,

5    Daniel Shaeffer, Plantations at Haywood M., LLC,

6    Plantations at Hollywood -- at Haywood 0 (sic), LLC,

7    Plantations at Haywood, LLC, and Haywood Storage, LLC?

8      A.    No.  These are totally foreign to me.

9      Q.    I'm sorry?

10     A.    That's totally foreign to me.

11     Q.    Have you -- are you aware that the Cottonwood

12   parties have agreed to pay into this bankruptcy estate

13   $500,000 upon approval of the settlement?

14     A.    No, I'm not.

15     Q.    Turning to Paragraph 46 on page 13, are you aware

16   of a group of settling parties in this case called the

17   Northwood parties consisting of Northwood Investors, LLC,

18   NW Congress Center Owner, LLC, NW Congress Center, LLC,

19   Northwood Employees, LP, Northwood Real Estate Partners

20   TE, LP, and Northwood Real Estate Partners, LP?

21     A.    No, I'm not familiar with that.

22     Q.    Are you aware that those entities have agreed to

23   pay $175,000 into this bankruptcy estate in exchange for a

24   settlement by the Chapter 7 trustee, Mr. Chad Paiva?

25     A.    No, I'm not.

123

EXHIBIT #36: 188
22-CV-01616-BAS-DDL

1     Q.   Are you aware that the Sovereign parties in

2    addition to paying a million-one into this bankruptcy case

3    have also agreed to waive their claims against the

4    bankruptcy estate?

5    A.   No, I'm not.

6     Q.   Have you yourself, sir, filed an individual proof

7    of claim in this case or is the proof of claim that we

8    looked at earlier in T59 and -- sorry, in T58 and T44 the

9    only proof of claim involving you relative to the G REIT

10   Liquidating Trust?

11    A.   I have not filed one for myself.

12    Q.   Are you aware that the Cottonwood parties are

13   also agreeing to waive their claims that have been filed

14   in this bankruptcy case against the Daymark debtors?

15    A.   No.

16    Q.   Are you aware that the combined amount of claims

17   that the Sovereign parties and the Cottonwood parties are

18   waiving against the estate total $895 million?

19    A.   No, I'm not.

20    Q.   Are you aware that the Northwood parties are

21   agreeing to waive their claims against the estate in the

22   amount of $105 million?

23    A.   No.

24    Q.   Are you, sir, planning -- are you aware that you

25   have been identified throughout this bankruptcy case as an

124

EXHIBIT #36: 189
22-CV-01616-BAS-DDL

1   objecting creditor amongst other creditors in this case?

2        A.   I think I was aware of that, yes.

3        Q.   And can you tell me based on your own knowledge

4   who the other objecting creditors are that you're part of

5   that group?

6        A.   I don't know.

7        Q.   Do you know an individual named Dennis

8   Dierenfield?

9        A.   No.

10       Q.   Have you ever heard of 350 Seventh Avenue

11  Associates, LP?

12       A.   No.

13       Q.   Have you ever heard of Willowbrook Apartments,

14  LLC?

15       A.   No.

16       Q.   Haywood 1, LLC?

17       A.   No.

18       Q.   1600 Barberry Lane 8, LLC?

19       A.   No.

20       Q.   So you're not aware of any other what we call

21  objecting creditors in this lawsuit that are also being

22  represented by Mr. Catanzarite.

23            Is that a fair statement?

24       A.   Yes.

25       Q.   All right.  Do you know whether or not based on

                                                    125

EXHIBIT #36: 190
22-CV-01616-BAS-DDL

1    the $1,775,000 payment to the bankruptcy estate, including

2    the waiver of claims between the Sovereign parties, the

3    Cottonwood parties, and the Northwood parties, that you

4    would be objecting to the settlement that the trustee is

5    trying to obtain from these parties in connection with

6    this bankruptcy case?

7         A.   I'm not aware of that, no.

8         Q.   Have you ever reviewed the contents of the

9    settlement agreement that is attached as Exhibit B to the

10   document before you at T45?  And Ms. Delgado will help you

11   get to that document.

12        A.   Exhibit B.

13             MR. CATANZARITE:  He's got it, Barry.

14             MR. GRUHER:  Okay.  Thank you.

15   BY MR. GRUHER:

16        Q.   Mr. Carlson, have you ever seen this settlement

17   agreement prior to sitting here for today's deposition?

18        A.   No, I don't think I have.

19        Q.   Are you aware -- and I'm not asking for a legal

20   conclusion, and I really don't know how to ask it in any

21   better way, so just bear with me.  Are you aware that as

22   part of the settlement the trustee is seeking in this case

23   with the Sovereign parties, the Cottonwood parties, and

24   the Northwood parties, that those settling parties that I

25   just named to you are also going to seek, as well as the

                                                         126

1    trustee, and obtain what's called a bar order, meaning no

2    more lawsuits can be prosecuted against each of those

3    entities?  Are you aware of that?

4         A.   No, I'm not.

5         Q.   Do you object to the payment of the $1,175,000

6    that each of the settling parties combined will agree to

7    pay into this bankruptcy estate if the bankruptcy court

8    approves the settlement agreement that is attached as

9    Exhibit B to this motion?

10             MR. CATANZARITE:  That calls for a legal

11   conclusion.  Objection.

12             MR. GRUHER:  No.  It calls for his own conclusion

13   as a named plaintiff in an adversary proceeding and

14   someone who has been allowed to be called an objecting

15   creditor.  So we can disagree on that.

16             MR. CATANZARITE:  We do disagree.

17   BY MR. GRUHER:

18        Q.   Mr. Carlson, can you please tell me whether or

19   not you believe or you object to each of these settling

20   parties combined paying a total of $1,775,000 into this

21   bankruptcy estate in exchange for the settlement that's

22   reflected in Exhibit B of this motion?

23        A.   You know, I'd have to understand what the total

24   is to answer that.

25        Q.   The total that I just explained to you is

                                                        127

EXHIBIT #36: 192
22-CV-01616-BAS-DDL

1   $1,775,000.

2          Do you understand that amount?

3     A.   Do you have a calculator?  What's three times

4   175,000, then?

5     Q.   No.  It's -- I said it's combined payment of

6   1,775,000.  Not three times.

7     A.   Didn't you say there were three payments of 175,

8   though?

9     Q.   Mr. Carlson, I'll break it down for you.  Under

10  the settlement agreement -- just -- you can write it down

11  if you want.  It'll be easier.  If someone could hand Mr.

12  Carlson a pen.

13    A.   I've got one.

14    Q.   Okay.  The Sovereign parties, so I explained to

15  you before, have agreed to pay --

16    A.   I need to get some paper.

17    Q.   Sorry about that, Mr. Carlson.  My bad.

18         MS. DELGADO:  Here you go, sir.

19         THE WITNESS:  I'm ready.

20  BY MR. GRUHER:

21    Q.   By the way, Mr. Carlson, if it's easier, you can

22  write on any of these -- well, actually, we may need them

23  again.  Don't write on it.  So my apologies.  I'm just

24  trying to move it along because I don't know if anyone is

25  planning on breaking for a quick lunch break, so I wanted

                                                      128

EXHIBIT #36: 193
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1     to give Mr. Carlson an opportunity to do that.

2          Mr. Carlson, under the settlement agreement, and

3     I'll explain it to you again, the Sovereign parties that I

4     read to you are agreeing to pay a total of $1,100,000 into

5     this bankruptcy estate based upon an approval of the

6     settlement agreement that is Exhibit B to this motion to

7     approve the settlement set forth in T45.

8          Do you understand that?

9     A.   Yes.

10    Q.   Okay.  Do you have an objection to the Sovereign

11    parties paying a total sum of $1,100,000 into the

12    bankruptcy estate if the settlement agreement were to be

13    approved by the bankruptcy court?

14         MR. CATANZARITE:  Objection; calls for expert

15    opinion testimony and a legal conclusion.

16         Go ahead if you know.

17         THE WITNESS:  I have no idea.  I thought there

18    was some $175,000 ones.

19    BY MR. GRUHER:

20    Q.   Mr. Carlson, we're going to get to each of these

21    amounts, if you just bear with me.

22    A.   Okay.  I can't answer the first one without

23    knowing what the others are.

24    Q.   Okay.  You have 1.1 million written down for the

25    Sovereign parties, correct?

                                                        129

EXHIBIT #36: 194
22-CV-01616-BAS-DDL

1    A.    Yes, I do.

2    Q.    All right.  Write down "Cottonwood parties" and

3    write the sum of "$500,000."

4    A.    Is that part of the 1.1?

5    Q.    Sir, it is -- if you write the numbers down, I

6    promise you I will get you to where you can answer the

7    questions.  Just if you could kindly write down that

8    number.

9    A.    That's fine.  I got it.

10    Q.    Then if you could write down "Northwood parties"

11    and write the number "175,000."

12    A.    Okay.

13    Q.    Okay.  If you add up the total amounts of those

14    numbers -- and I am not very good at math, so bear with

15    me, and I let everybody know that's, it's no secret -- the

16    total amount comes to $1,775,000.  Would you agree with me

17    on that calculation?

18    A.    Yeah.

19    Q.    All right.  So my question to you earlier was, do

20    you object to these settling parties paying the total

21    amount of $1,775,000 based on each of their separate

22    payments that we just went through into this bankruptcy

23    estate if the bankruptcy court were to approve the

24    settlement agreement that is reflected in Exhibit B of the

25    motion to approve the settlement that's reflected in T45

130

EXHIBIT #36: 195
22-CV-01616-BAS-DDL

1    that you have before you?

2            MR. CATANZARITE:  Objection; calls for a legal

3    opinion, calls for expert opinion testimony.

4            But go ahead if are able.

5            THE WITNESS:  Well, you see now, what is the

6    total amount they would really owe?  Does that pay it off?

7    BY MR. GRUHER:

8       Q.   Well, Mr. Carlson, we wouldn't know that because,

9    as you've already testified, and candidly, is, you, one,

10   don't know if the proof of claim you filed you could ever

11   prove those damages, and, two, you didn't sign off on the

12   proof of claims, so we can't -- I can't really answer that

13   question for you, which is why I'm asking you whether you

14   have an issue with the amount that's being paid into the

15   bankruptcy estate.

16           MR. CATANZARITE:  Same objections.

17           THE WITNESS:  I guess I'll just say I do because

18   I don't have data to say differently.

19   BY MR. GRUHER:

20      Q.   Okay.  Do you know of any offers to settle your

21   lawsuits by the Sovereign parties or the Cottonwood

22   parties or the Northwood parties combined that totals

23   $1,775,000, sitting here today?

24      A.   It's news to me.

25      Q.   So do you have any knowledge or information,

                                                         131

EXHIBIT #36: 196
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1    sitting here today, that would allow you to testify that

2    your -- that you know that your recovery in your lawsuits

3    that you filed will be more than $1,775,000?

4        A.   I don't know that at all.  I have no idea.

5        Q.   Do you plan --

6        A.   I can't calculate those numbers.  I've told you

7    before.

8        Q.   Okay.  But we calculated these numbers, right?

9    That's a pretty finite number.  You would agree with me --

10       A.   Well, you calculated them with data that you know

11   how to use and how to manipulate and got them.  I have no

12   idea how to manipulate the data and I don't know what data

13   I need.  I could never figure that out.  So I don't know.

14       Q.   Mr. Carlson, I candidly cannot manipulate any

15   data.  I was just able to add up --

16       A.   Manipulate was probably the wrong word.

17            MR. CATANZARITE:  Wait a minute.  Just -- you

18   guys are really talking over each other.

19   BY MR. GRUHER:

20       Q.   Mr. Carlson, I'm not here to argue with you over

21   it.  Really.  It's not my goal to do that.  I'm just

22   talking to you.  I'm having a conversation.  It's just the

23   way I do things.

24       A.   Uh-huh.

25       Q.   I'm just looking at some simple numbers that I

132

EXHIBIT #36: 197
22-CV-01616-BAS-DDL

1    think you agree with me.  The total amount that we added

2    together, right?

3         A.   Uh-huh.

4         Q.   You and I did it together.

5         A.   Uh-huh.

6         Q.   I did not manipulate the data.  We agreed the

7    total amount was $1,775,000, correct?

8         A.   That's correct.

9         Q.   All right.  Do you have any reason to dispute

10   that number?

11        A.   I would say only if that doesn't cover all of the

12   bills that need to be paid.

13        Q.   And tell me all of the bills that need to be paid

14   that you're aware of, sitting here today.

15        A.   I'm aware of none of them.  That is my problem.

16   That's why -- I'll just say no, then.

17        Q.   So just to be clear, just to be clear, your

18   concern is that bills get paid, correct?

19        A.   Well, that they pay the balance, right.  Balance

20   due.

21        Q.   Tell me what you mean by the word "bills."  What

22   do you consider to be a bill?

23        A.   Well, the balance of the loan or whatever it is.

24   Totally paid off --

25        Q.   What loan are you referring to?

133

EXHIBIT #36: 198
22-CV-01616-BAS-DDL

1   A.   Pardon me?

2   Q.   What loan?

3   A.   Don't we have three loans for these?

4   Q.   Those aren't loans.  Those aren't three loans.

5   That's actual cash coming into the bankruptcy case, sir.

6   I don't know what loans you're referring to.  Can you

7   explain that to me?

8   A.   You got so many numbers here, I don't know.

9   Q.   No.  There's only three numbers we're dealing

10  with right now:  1 million one, 500,000, and 175,000.  And

11  those are not loans.  Those are moneys that are being paid

12  in cash into this bankruptcy estate.  So if you could

13  please clarify for me, because I don't understand.  What

14  loans are you referring to and what bills are you

15  referring to?

16  A.   I guess what I was saying is what is the total

17  balance due to the bankruptcy estate.

18  Q.   That's a good question.  We won't know that

19  because we're setting our claims.  And the settlement

20  amount is 1,775,000, and I'm asking you what facts or

21  information that you would have that you stated earlier

22  you need to know the bills are being paid.  I don't know

23  what bills you're referring to.

24  A.   I'm talking about paying off that balance.  So

25  you're saying that pays it off.

134

EXHIBIT #36: 199
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

```
1      Q.   I asked you several -- you know, Mr. Carlson, I
2   asked you several times during this deposition to tell me
3   what balance is owed to you, and you've been unable to do
4   that for me, sir.  Are you telling me that you yourself
5   are owed more than $1,775,000?
6      A.   I told you that I myself was owed nothing.
7      Q.   Okay.  Now that we've established that you're
8   owed nothing, then --
9      A.   Just me personally.
10     Q.   Well, how about you as a beneficiary under the G
11  REIT Liquidating Trust, are you owed as a beneficiary
12  under that trust more than $1,775,000?
13     A.   No.
14     Q.   Are you owed -- tell me in your own words how far
15  away we are between what you think you're owed as a
16  beneficiary under the G REIT Liquidating Trust and the
17  $1,775,000.
18     A.   I told you I can't answer that because I don't
19  have the formulas to calculate what happens as time goes
20  by.
21     Q.   And tell me how we're going to get to that
22  formula.  How much money and expense is going to be
23  involved for you to get that number for us?
24          MR. CATANZARITE:  I'll object that calls for
25  expert opinion testimony.
```

135

EXHIBIT #36: 200
22-CV-01616-BAS-DDL