1          THE WITNESS:  Yeah, I --
2    BY MR. GRUHER:
3        Q.    Is the answer you don't know, Mr. Carlson?
4        A.    Obviously don't know, right.  If you get one of
5    your people to calculate --
6          MR. CATANZARITE:  Wait.  Don't argue with him.
7    BY MR. GRUHER:
8        Q.    It's okay.  Mr. Carlson, we're not arguing.
9    We're fine.  We'll both take a deep breath.  Tell me if
10   you want to complete an answer.  You can go ahead and do
11   that, sir.
12       A.    Just let's go ahead.  Do I just say this is okay
13   and we're going on with it?
14       Q.    Sir, would you like me to proceed or did you want
15   to add something to your answer?
16       A.    Let's go ahead.
17       Q.    All right.  Would you agree with me that the
18   factual allegations in your Complaint that you filed in
19   the Superior Court of Orange County and the adversary
20   proceeding that's filed in this bankruptcy case is based
21   upon a complex set of facts and circumstances of which you
22   know nothing about?
23       A.    Yes, absolutely.
24       Q.    So you would agree with me that these are complex
25   cases and claims that are being asserted on your behalf,

136

EXHIBIT #36: 201
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1   correct?

2       A.   Right.   That's what I've been trying to say.

3       Q.   Do you have any independent knowledge or

4   information that would be able to assist the bankruptcy

5   trustee in determining the truth or veracity of any of the

6   factual allegations that you set forth in either the

7   complaint that you filed in the Superior Court of Orange

8   County or the adversary complaint in this bankruptcy case?

9           MR. CATANZARITE:   Object to the extent it calls

10   for expert opinion testimony.

11           Go ahead.

12           THE WITNESS:   No.   No, I don't.   I have no idea.

13   BY MR. GRUHER:

14       Q.   So it would be fair to say that the trustee would

15   have difficulty relying on you as a witness in prosecuting

16   any of the claims against the settling parties, the

17   Cottonwood parties, and the Northwood parties?   Would that

18   be a fair statement, based on your testimony today?

19           MR. CATANZARITE:   Objection; calls for

20   speculation and conjecture.   It's also as to what the

21   trustee is thinking.

22           MR. GRUHER:   I'm sorry.   I thought I was asking

23   Mr. Carlson his own opinion of his own ability to be a

24   witness in any of these pieces of litigation.   That's all

25   I was asking.

137

EXHIBIT #36: 202
22-CV-01616-BAS-DDL

1         THE WITNESS:  Let's see.  I think I've told you

2    many times I have no idea how you come up with these

3    numbers and I got to be able to do that to answer your

4    question.

5    BY MR. GRUHER:

6         Q.   So you would agree with me, then, that the

7    probability of success in each of the litigations that you

8    filed in the Superior Court of Orange County and/or the

9    bankruptcy case or any other matters is it's difficult to

10   evaluate and assess, correct?

11        MR. CATANZARITE:  Wait a minute.  Wait a minute.

12   I'll object.  That calls for a legal conclusion and expert

13   opinion testimony.

14        MR. GRUHER:  No.  He's a named -- wait.  I'm

15   not -- again, Mr. Catanzarite, I don't recall ever asking

16   this witness to appear as an expert witness.

17        MR. CATANZARITE:  But you're asking for a --

18   you're using a Mumford factor to describe probability of

19   success, and that is a factor that the court determines.

20   That calls for a legal opinion -- legal conclusion or

21   opinion.

22        MR. GRUHER:  Okay.  Is there anything else you

23   want to add?

24        MR. CATANZARITE:  It also calls for expert

25   opinion testimony as to what the probability -- what the

138

EXHIBIT #36: 203
22-CV-01616-BAS-DDL

```
 1   liability -- the basis of liability.

 2            MR. GRUHER:  All right.  And who -- what's the

 3   area of the expert testimony and what Daubert factors do

 4   we need to consider, Mr. Catanzarite, in understanding

 5   Mr. Carlson's own state of mind as to whether or not he

 6   thinks there is a likelihood of success on the merits of

 7   his claims?  Can you tell me the expert testimony.  Is a

 8   psychologist -- tell me how they're getting into the mind

 9   of Mr. Carlson, sir, since you brought it up.

10            MR. CATANZARITE:  Mr. Carlson will testify in

11   conjunction with --

12            MR. GRUHER:  No, no, no.  You just said

13   Mr. Carlson is not an expert.  I agree with you.  You just

14   talked about an expert witness is going to come in and

15   peer into the mindset of your client as to what your

16   client believes is the probability of success on these

17   pieces of litigation.  I just want to know what -- what --

18   what discipline we're using.  Is it going to be a

19   psychologist?  Is it going to be a psychiatrist?  What

20   discipline do we need to anticipate in this area of

21   expertise?

22            MR. CATANZARITE:  We have a designation due

23   tomorrow.

24            MR. GRUHER:  I see.

25   BY MR. GRUHER:

                                                         139
```

EXHIBIT #36: 204
22-CV-01616-BAS-DDL

1     Q.   Mr. Carlson --

2     A.   My understanding is you have three numbers here,

3  and I have no idea what they mean.  Can you -- if you

4  could tell me how you come up with those numbers, I could

5  probably come up with a number.  But I don't know how

6  you --

7     Q.   We came up -- as stated in -- sir, you

8  participated in two days of mediation according to your

9  declaration in T59 where you stated that you were going to

10  be -- that you had taken part in a mediation, in a two-day

11  mediation by phone.  Do you recall being at that

12  mediation?

13        It's in your affidavit, in T59.  Here's what you

14  stated.

15     A.   Okay.

16     Q.   You stated that, "Represented by Mr. Kenneth

17  Catanzarite, I made myself available by phone during a

18  two-day mediation concerning this case in Miami with the

19  Chapter 7 trustee.  I am willing to assist with mediation

20  or settlement if asked to do so, and to go to trial."

21        My question to you, sir, is do you recall the two

22  days of mediation?

23     A.   Did you notice it did not say I was there for the

24  mediation.  I was at home by the phone.

25     Q.   And I -- and, by the way, I appreciate that you

                                    140

EXHIBIT #36: 205
22-CV-01616-BAS-DDL

```
 1   did do that, because I do recall that you were on the
 2   phone.  So no one is criticizing that you were by the
 3   phone, sir.
 4            MR. CATANZARITE:  Barry, we've been going 2 1/2
 5   or more hours.  We need to take a break.
 6            MR. GRUHER:  Okay.  Let's do that.  We'll take a
 7   break.
 8            MR. CATANZARITE:  Now, did we -- we can take a
 9   lunch break now or you can tell me what you want to do.
10            MR. GRUHER:  I want Mr. Carlson and everyone to
11   tell me what you want to do, because I believe in lunch
12   breaks and giving people a break before we get back on the
13   record.  That is my goal is to make Mr. Carlson
14   comfortable.
15            MR. CATANZARITE:  Lunch is here and it's 1:00.
16            MR. GRUHER:  Okay.  Then, by all means, I wish
17   somebody would have told me.  By all means, go ahead and
18   eat lunch.  And you guys want to convene -- Ken, when do
19   you want to reconvene?
20            MR. CATANZARITE:  30 minutes would be good.
21            MR. GRUHER:  Sounds terrific, then.  I'm just
22   going to stay on the line and when you guys are ready, let
23   me know.
24            (Recess.)
25   BY MR. GRUHER:
```

141

EXHIBIT #36: 206
22-CV-01616-BAS-DDL

1    Q.   We are now back on the record.  We took a break
2    for lunch, Mr. Carlson.  And I wanted to pick up on the
3    area of inquiry we were talking about, the mediation,
4    where you appeared by phone.  Do you recall that part of
5    our testimony before we took the break?
6    A.   Yes, uh-huh.
7    Q.   And I'll just represent to you that the mediation
8    that we're referring to was held over two days, July 8th
9    and July 9th of 2019, in Fort Lauderdale with a mediator
10   named Les Osborne.  Were you aware of the name of the
11   mediator?
12   A.   I forgot it if I was.  I'm an old man.  You have
13   to forgive some of that.
14   Q.   Okay.  Not a problem.  I appreciate that.  Like I
15   said, I do my best to give you documents to refer to.
16   This one is probably not going to be helpful.
17        Did you understand or know that Mr. Catanzarite
18   was going to be flying out from California to Fort
19   Lauderdale to attend that two-day mediation session?
20   A.   Yes, I did.  Uh-huh.
21   Q.   So he informed you of that; is that correct?
22   A.   Yes.
23   Q.   And when you appeared by telephone I understand
24   there was some other people that had appeared by telephone
25   as well.  Do you recall that?  There were a number of

142

1   people on the phone that had announced their appearances?

2      A.   Yeah, I guess the rest of the phones were from

3   people right there with phones at the table.  Is that not

4   true or --

5      Q.   Understood.  It was partly that.  We had other

6   people that Mr. Catanzarite was representing that had also

7   made appearances.  But that's not really that important

8   right now.

9           What I'm trying to understand from you is that

10  did you understand the nature and purpose as to why the

11  trustee was agreeing to a mediation with the settling

12  parties, meaning the Sovereign parties, the Cottonwood

13  parties, and afterwards the Northwood parties, and Mr.

14  Catanzarite over that two-day period?

15          MR. CATANZARITE:  Objection; calls for

16  speculation.

17          MR. GRUHER:  No.  How is that speculation, Ken?

18  I just asked him --

19          MR. CATANZARITE:  Did you understand what the

20  trustees --

21  BY MR. GRUHER:

22     Q.   Okay.  Mr. Carlson, did you know why that

23  mediation was taking place?  That's a better question.

24     A.   The two-day thing?

25     Q.   Yes, your understanding of the mediation.  I

143

EXHIBIT #36: 208
22-CV-01616-BAS-DDL

1  think Mr. Catanzarite was concerned that I was asking you

2  about what the trustee thought or understood.  I'm

3  actually not.  It could have been a bad question.  I'm

4  asking you what your own personal knowledge and

5  information was as to why there was a mediation that was

6  taking place in this bankruptcy case over the course of

7  two days on July 8th and July 9th of 2019.

8      A.   Yeah, I would guess that it was probably to try

9  to clear up some problem areas and talk it over and be

10  ready to go into more detail when everybody gets there.

11     Q.   Okay.  What problem areas are you referring to,

12  sir?

13     A.   I don't know.  I'm assuming there must have been

14  some.

15     Q.   Did you understand that the mediation was a

16  process by which the settling parties that we refer to

17  earlier in this deposition, the Sovereign parties,

18  Cottonwood parties, and Northwood parties, and the

19  objecting creditors, of which you are a member, were there

20  to mediate and to see whether or not the parties could

21  reach a settlement of all of the issues in the bankruptcy

22  case, including your adversary proceedings with the

23  trustee?

24     A.   Okay.  Uh-huh.

25     Q.   Did you not know that?

144

EXHIBIT #36: 209
22-CV-01616-BAS-DDL

1    A.   I didn't understand it completely, but I do now.

2    Q.   All right.  Did you -- did you at any time speak

3  to any of the other objecting creditors about any aspect

4  of the mediation or any issues in the bankruptcy case

5  prior to the mediation that took place on the 8th and 9th

6  of July?

7    A.   No, I didn't.

8    Q.   Have you since the mediation and up to the date

9  of your deposition ever speak to any other objecting

10 creditors, as they are defined in this bankruptcy case,

11 that I referred to earlier in your testimony?

12   A.   No.

13   Q.   Did you speak to anyone other than Mr.

14 Catanzarite in preparation for your deposition today?

15   A.   What's the name of your partner there?

16        MR. CATANZARITE:  He's asking me for --

17 BY MR. GRUHER:

18   Q.   Are you talking about Mr. O'Keefe?

19        MR. CATANZARITE:  Tim O'Keefe.

20 BY MR. GRUHER:

21   Q.   I'm asking about anyone other than your attorneys

22 in preparing for the deposition.

23   A.   No.  Just those two.

24   Q.   Did you review any documents other than the

25 documents that I provided to you today for your review,

                                                    145

1   did you look or review any documents prior to appearing

2   for your deposition today?

3       A.   No, I didn't.

4       Q.   Have you been paid or promised anything of value

5   to be named as a plaintiff in the lawsuits that have been

6   filed on your behalf in the Superior Court of California

7   or in the adversary proceedings in this bankruptcy case?

8       A.   No, I'm not.

9       Q.   Why did you agree or allow your name or yourself

10  to be named as a plaintiff in these lawsuits and also as a

11  representative of a potential class of claimants in these

12  lawsuits?  Do you know?

13      A.   I'm not real sure.  I don't think I know an

14  answer to that.

15      Q.   Did Mr. Catanzarite or anyone prior to you

16  retaining him ever discuss the reason why or the basis as

17  to why you should be a named plaintiff in these lawsuits?

18      A.   I think the only thing I knew is you had to be an

19  investor in one of their programs.

20      Q.   Anything else that you're aware of other than

21  being an investor?

22      A.   I think that is all.

23      Q.   Do you have any independent knowledge or evidence

24  as to the net worth of any of the settling parties that

25  are part of the settlement agreement that is referenced in

146

EXHIBIT #36: 211
22-CV-01616-BAS-DDL

1   T45?

2       A.   Are you talking about for our --

3       Q.   No.  I'm talking about relative to anyone that's

4   part of the Sovereign parties, the Cottonwood parties, and

5   the Northwood parties.  And Ms. Delgado can show you those

6   names again --

7       A.   I'm sure I don't know --

8            MR. CATANZARITE:  Let him finish his question.

9   You're stepping on each other.

10           THE WITNESS:  Anyhow, I'm sure I don't know them

11  because they're all far away.  So the question was, then,

12  did I know --

13  BY MR. GRUHER:

14      Q.   Yes.  Do you have any -- wait.  Mr. Carlson,

15  let's try to do this.  Part of the way to get a good

16  transcript is we have to allow our court reporter to take

17  one person down at a time.  And sometimes I tend to --

18      A.   I'm sorry.

19      Q.   -- step over that line.  Just try to -- let's

20  slow down.  You have to let me ask my question and then

21  you can have your answer.  Okay?

22      A.   Okay.

23      Q.   I'm going to give you all of the time you need to

24  answer.

25      A.   Okay.

                                                      147

EXHIBIT #36: 212
22-CV-01616-BAS-DDL

```
1       Q.   What I need to understand from you, and my
2   question was, do you have any independent knowledge or any
3   facts or information that you're aware of that you know
4   would go to what the net worth or the ability of any of
5   the settling parties to pay a judgment relative to the
6   lawsuits that have been filed on your behalf in either the
7   Superior Court of California or in the bankruptcy case?
8       A.   No, I don't know.
9       Q.   Do you know how much money has been expended by
10  Mr. Catanzarite and his law firm in connection with the
11  filing and the prosecution of the lawsuits filed in your
12  name either in the Superior Court of California or in the
13  adversary proceedings filed in the bankruptcy case?
14      A.   No, I don't.  I'm sure it's quite a bit, though.
15      Q.   I would agree with you that it is.
16           Do you know the status of the lawsuit that was
17  filed in the Orange County action, case number 00982195,
18  as we sit here today?
19      A.   No, I don't think I know the results of that.
20      Q.   Other than yourself, do you know anyone else that
21  is in a similar situation as you relative to their
22  investments in the G REIT, Inc., or the G REIT Liquidating
23  Trust?
24      A.   No, I don't know any of the investors in either
25  one of those.
```

148

EXHIBIT #36: 213
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1    Q.   So you, for example, would have no idea how much

2   money one investor put in other than yourself as opposed

3   to another investor.  Would that be a fair statement?

4    A.   That is true, yes.

5    Q.   Would it also be a fair statement that you don't

6   know whether any other investors in either G REIT, Inc.,

7   or the G REIT Liquidating Trust have actually gone onto

8   the SEC website, Edgar -- you know, the websites that have

9   the 10-Ks and the 8-Ks that I showed you earlier in your

10   deposition -- and read the information contained in those

11   documents?  Is that an accurate statement?

12    A.   That is.  In fact, I don't know anybody else that

13   has G REIT, so --

14    Q.   Sitting here today, you've never talked to or

15   communicated with any other investor in either G REIT,

16   Inc., or G REIT Liquidating Trust; is that correct?

17    A.   That's correct, uh-huh.

18    Q.   Can you describe for me in your own words the

19   nature of the claims that are being asserted or prosecuted

20   in your name as a beneficiary of G REIT Liquidating Trust

21   against any of the defendants that are named in either the

22   lawsuit filed in the Superior Court of California or in

23   the adversary proceeding in the bankruptcy case?

24        MR. CATANZARITE:  I'll object to the extent it

25   calls for attorney-client communication.  And to the

149

EXHIBIT #36: 214
22-CV-01616-BAS-DDL

1  extent that it calls for expert opinion testimony.  If you

2  can tell him --

3  BY MR. GRUHER:

4     Q.   Mr. Carlson, I don't want any communications

5  you've had with your attorney, but if you learned any

6  facts, simply facts of these cases from your attorneys,

7  that's not a privileged communication.  It's only --

8  communications is only legal advice Mr. Catanzarite would

9  have provided to you.

10          So in answering my question, if you can either

11  provide me an answer or articulate any of the facts or

12  reasons why any of the defendants that are named in the

13  lawsuits that have been filed in your name owe you or

14  anyone else money, you can tell me that information.

15          MR. CATANZARITE:  Well, wait a minute.  So I'll

16  object, because he's asked the question again, that it

17  calls for attorney-client communications and it calls --

18  to which I would direct that he not respond, and that it

19  calls for expert testimony.

20          But if you independently have an idea, you can

21  tell him.

22          THE WITNESS:  I don't.  The answer is no.

23          MR. GRUHER:  Okay.  And, just to be clear, Mr.

24  Catanzarite, are you instructing -- are you instructing

25  your client not to answer or you're okay with the answer

150

EXHIBIT #36: 215
22-CV-01616-BAS-DDL

```
 1   he provided?

 2          MR. CATANZARITE:  I'm okay with the answer he

 3   just provided.

 4   BY MR. GRUHER:

 5      Q.   Okay.  Mr. Carlson, have you ever read any of the

 6   court papers, meaning any pleadings, any answers or

 7   affirmative defenses, any motions or any court filings

 8   that have been made in the Superior Court of California

 9   case in your name or the adversary proceedings that's been

10   filed in the bankruptcy case in your name?

11      A.   No, I haven't.

12      Q.   Put T45 aside for the moment.  I want to get to

13   some other exhibits so we can try to come to some

14   conclusion today on your deposition.  I want to show you

15   what has been premarked as Exhibit T50 and ask you if

16   you've ever seen that document before.

17      A.   We're getting it.  Thank you.

18           (Exhibit T50 was marked for

19           identification.)

20   BY MR. GRUHER:

21      Q.   Is that document before you, sir?

22      A.   It is.

23      Q.   Take a moment to review this document.  If you

24   can just tell me whether or not you've ever seen this

25   document before today's deposition.  And, for the record,
```

151

1   it's an amended -- sorry.  It's an Agreement and

2   Declaration of Trust dated January 22nd, 2008, by and

3   amongst G REIT, Inc., and Gary Hunt, W. Brand Inlow,

4   Edward A. Johnson, D. Fleet Wallace, and Gary Wescombe,

5   the trustees.

6        A.   I have not seen this.  It looks like it's got

7   some good information.

8        Q.   All right.  But is it information that you would

9   have felt was important to you prior to the time that the

10  lawsuits in your name were filed in the State of

11  California in the bankruptcy court?

12       A.   Probably would have helped some, yes.

13       Q.   I'm sorry.  I missed your last answer.

14       A.   I said it probably would have helped some.

15       Q.   It was my phone.  Sorry.  What was your answer?

16       A.   It would have probably helped some.

17       Q.   Thank you.  You can put that document down.

18       A.   Okay.

19       Q.   I'm going to show you now what we've marked as

20  T51.

21            (Exhibit T51 was marked for

22            identification.)

23  BY MR. GRUHER:

24       Q.   Just let me know when you're ready.

25       A.   I'm ready.

                                                        152

EXHIBIT #36: 217
22-CV-01616-BAS-DDL

```
 1      Q.   Have you ever seen this document before?  It's a
 2  letter dated June 25th, 2018, to the G REIT Liquidating
 3  Trust from -- and it says, attention to the trustees Gary
 4  Hunt, Mr. Inlow, Johnson, Wallace, and Wescombe, written
 5  and authored by your attorney, Ken Catanzarite?
 6      A.   Yes, I think I have seen this one.
 7      Q.   Do you know where or under what circumstances you
 8  would have seen this document before today's deposition?
 9      A.   I think it came to my home.
10      Q.   Did you -- at the time it came to your home, did
11  you read it and understand the letter?
12      A.   I thought I did pretty well, yes.
13      Q.   And what is your understanding of this letter?
14      A.   It's just really directions on what the trustee
15  should be doing.
16      Q.   Is it your position that -- that the trustees
17  that are named in this letter, Hunt, Inlow, Johnson,
18  Wallace, and Wescombe, are no longer able to act as
19  trustees of the G REIT Liquidating Trust?
20          MR. CATANZARITE:  Objection; calls for a legal
21  conclusion.
22          Go ahead if you have an opinion.
23          THE WITNESS:  I didn't realize that, no.
24  BY MR. GRUHER:
25      Q.   Are you aware that one of the allegations that
                                                         153
```

EXHIBIT #36: 218
22-CV-01616-BAS-DDL

```
 1    Mr. Catanzarite is making on your behalf in the litigation

 2    filed in your name is that the G REIT trustees are

 3    actually -- sorry -- do not have authority to act as

 4    trustees for the G REIT Liquidating Trust?

 5        A.   No, I was not aware of that.

 6        Q.   All right.  I want to show you what's been marked

 7    together so we can just get through these exhibits.  Why

 8    don't you hand Mr. Carlson exhibits T52 and T53.

 9             MS. DELGADO:   T52.

10             MR. GRUHER:   And if you can also hand Mr. Carlson

11    T53.

12             (Exhibit T52 was marked for

13             identification.)

14             (Exhibit T53 was marked for

15             identification.)

16    BY MR. GRUHER:

17        Q.   Mr. Carlson, let me know when you've had a chance

18    to review those two documents.

19        A.   Okay.

20        Q.   You can let me know when you've reviewed them,

21    Mr. Carlson.

22        A.   Okay.  I went through them pretty fast, but I

23    have a pretty good idea what it is, I think.

24        Q.   Okay.  Well, if that is the case, on T52, which

25    is the settlement agreement in connection with a court
```

154

EXHIBIT #36: 219
22-CV-01616-BAS-DDL

1  action, we call it an assignment for benefit of creditors,

2  that was filed by NNN Realty Advisors, Inc., as the

3  assignor, to Phillip J. Von Kahle, assignee, that was

4  pending in the Broward County Complex Business Division,

5  case No. 2015-CA-014636.  Do you know or have you ever

6  seen this settlement agreement prior to today's

7  deposition?

8      A.   No, I haven't.

9      Q.   When you reviewed this document, and if you're

10  not comfortable answering it completely, you said you had

11  a pretty good idea what it's about, can you tell me in

12  your own words what your impression was when you read this

13  document?

14          MR. CATANZARITE:  For the record, don't

15  speculate.

16          THE WITNESS:  I think I probably want to study it

17  more before I give a definite answer.

18  BY MR. GRUHER:

19      Q.   That's fair.  But, to be clear, then, you'd have

20  to look at this document a little more closely because

21  you've never seen it before?  That is the reason you'd

22  have to review it, correct?

23      A.   That's correct.

24      Q.   All right.  Now, I want to go through some of the

25  names in this document and tell me if you have any

155

EXHIBIT #36: 220
22-CV-01616-BAS-DDL

```
 1    information that you're aware of that pertains to the
 2    lawsuits that you filed or that have been filed in your
 3    name.  We've talked about NNN Realty Advisors, Inc.,
 4    earlier in the examination.  Is there any facts or
 5    information that you have regarding NNN Realty Advisors,
 6    Inc., that relates to any of the allegations that are set
 7    forth or alleged in the complaints filed in your name in
 8    either the California Superior Court or the bankruptcy
 9    court?
10         A.   No, I don't think so.
11         Q.   All right.  And I'm going to ask you relative to
12    the same named parties to this lawsuit the same question.
13    The same question would apply to Sovereign Capital
14    Management Group, Inc., relative to the lawsuits filed in
15    your name.  Do you have any factual information concerning
16    this entity?
17         A.   No, I don't.
18         Q.   And how about with respect to Infinity Urban
19    Century, LLC, any information that you're aware of that
20    would relate to any of the allegations set forth in the
21    complaints filed in your name?
22         A.   No, I don't.
23         Q.   And the same with regard to IUC-SOV, LLC, any
24    information?
25         A.   No.
```

156

EXHIBIT #36: 221
22-CV-01616-BAS-DDL

1    Q.   Have you ever heard of an entity known as

2    Professional Partners Group, LLC?

3    A.   No, I don't think so.

4    Q.   All right.  And how about EIS Recovery

5    Strategies, LLC?

6    A.   No, I'm not familiar with that either.

7    Q.   And how about the entity called Die Doge, Inc.,

8    D-i-e, D-o-g-e, Inc.?  And you can just follow along with

9    me on the first page.

10   A.   No, I'm not familiar with that.

11   Q.   How about Kingfisher Island, Inc.?

12   A.   No.

13   Q.   NNN WP Redevelopment Fund, LLC?

14   A.   I guess it's -- when -- it's like this document

15   from that, so -- that's one I have seen anyway.

16   Q.   I'm sorry, I didn't quite understand the answer.

17   A.   The document we have in front of us is from that

18   organization, right?

19        MR. CATANZARITE:  He's gesturing to the assignor.

20   BY MR. GRUHER:

21   Q.   Oh, I see.  No.  NNN WP Redevelopment Fund, LLC,

22   is not the assignor.  That is the first one, NNN Realty

23   Advisors, Inc., if that helps.

24   A.   Okay.

25   Q.   I understand.  They look similar to you.  I get

                                                     157

EXHIBIT #36: 222
22-CV-01616-BAS-DDL

1   it.

2       A.   That's right.

3       Q.   All right.  Not a problem.  That's okay.  Just

4   now that we've clarified it, do you have any factual

5   information or anything that you could provide us with

6   that would --

7       A.   No.

8       Q.   -- add any -- okay.

9            How about Daymark Realty Advisors, Inc., which is

10  one of the debtors that you've sued in these lawsuits?

11      A.   No, I wouldn't know any detailed things myself.

12      Q.   How about Daymark Properties Realty, Inc., or DPR

13  as it's titled here?

14      A.   I think the same thing.  I don't know in detail

15  myself.

16      Q.   And Daymark Residential Management, Inc., same

17  thing, DRM, you wouldn't have any knowledge or

18  information?

19      A.   That's correct.

20      Q.   And Todd A. Mikles, I think we've already

21  discussed him, you wouldn't have any independent knowledge

22  or information relative to any facts alleged against

23  Mr. Mikles in any of these complaints; is that correct?

24      A.   That's correct, yeah.

25      Q.   So if I asked you any -- if I referred you to any

                                                          158

EXHIBIT #36: 223
22-CV-01616-BAS-DDL

1   portion of the adversary complaints that discuss the

2   relationship between Mr. Mikles, Daymark Realty Advisors,

3   Daymark Property Advisor -- sorry, Daymark Properties

4   Realty, Inc., and Daymark Residential Management, Inc.,

5   you would not have any independent knowledge or

6   information regarding those factual allegations that are

7   set forth in these complaints.

8          Is that a fair statement?

9      A.   That's correct.

10     Q.   All right.  Now, let's go to T53, which is

11  another settlement agreement, and I'll represent to you,

12  because it could be somewhat confusing if I don't, this is

13  an assignment for benefit of creditors of another entity

14  called NNN Realty Investors, LLC, which is an assignor

15  that made an assignment to Richard N. Waltzer, assignee,

16  case number CACE-15-014067 that was also pending in

17  Broward County Circuit Court of Florida.  And my same

18  question, have you ever seen this document before today's

19  deposition?

20     A.   No, I haven't.

21     Q.   And is this the first time -- would it be fair to

22  say this is the first time you're reviewing this

23  settlement agreement?

24     A.   This particular one, yes.

25     Q.   Okay.  Well, let's just go through some of the

159

EXHIBIT #36: 224
22-CV-01616-BAS-DDL

1   names here and you can tell me whether or not you have any

2   independent knowledge or information regarding these

3   entities as they relate to any factual allegations or

4   claims asserted in your -- in the cases filed in your

5   name.

6        A.   Okay.

7        Q.   With respect to NNN Realty Investors, LLC, do you

8   have any knowledge?

9        A.   No.

10       Q.   Do you have any knowledge regarding Sovereign

11  Capital Management Group, Inc.?

12       A.   No.

13       Q.   Do you have any knowledge regarding Sovereign

14  Capital Management Holdings, LLC?

15       A.   No.

16       Q.   Tango Yankee, LLC?

17       A.   No.

18       Q.   Western Place Partners, LLC?

19       A.   No.

20       Q.   Thank you.  You can put those exhibits aside.

21            Mr. Carlson, do you have any intention of making

22  an offer or counteroffer to the trustee that would exceed

23  the $1,775,000 offer to settle these cases that the

24  settling parties are seeking approval with the trustee by

25  the bankruptcy court as reflected in Exhibit T45?

160

EXHIBIT #36: 225
22-CV-01616-BAS-DDL

1    A.   I wouldn't make that decision by myself.  I would

2   talk with Ken and some of the other people in higher

3   places that are larger donors and ask what they think.

4    Q.   Well, have you had any conversations or do you

5   intend to speak to anybody that you just referred to about

6   making a higher offer to settle these claims above --

7    A.   Again, I haven't myself.

8    Q.   -- the $1,775,000?

9        MR. CATANZARITE:  You got to let him finish.

10  You're stepping on each other.

11       THE WITNESS:  Okay.  Sorry.  Did you have a

12  comment or --

13       MR. CATANZARITE:  No, I just wanted to make sure

14  that you let him finish.

15       THE WITNESS:  I'm sorry.  I interrupted you

16  there.

17  BY MR. GRUHER:

18   Q.   That's fine, Mr. Carlson.  Don't worry about it.

19       My question to you, sir, was, do you have any

20  intention of having any discussions with either Mr.

21  Catanzarite or any other party that you would refer to

22  about offering the trustee more money relative to the

23  settlement of claims by the estate against the settling

24  parties that would exceed the sum of $1,775,000?

25   A.   I guess we could always take it up and have a

                                                        161

EXHIBIT #36: 226
22-CV-01616-BAS-DDL

1    discussion about that.  Right now I don't know how I would

2    push it either way, but I think it might be good to talk

3    about it.

4        Q.   All right.  Well, this motion, as you can see,

5    that was filed with the bankruptcy court, the motion by

6    Chad S. Paiva as Chapter 7 trustee to approve settlement

7    agreements with the Sovereign parties, the Cottonwood

8    parties, and the Northwood parties, and, D, request for

9    entry of borrowers, was filed on November 1st of 2019, the

10   same day that you filed your declaration in the adversary

11   proceeding against the Daymark debtor entities as

12   referenced in T59.  And so what I'm trying to understand

13   is, what, if anything, have you done as a plaintiff and a

14   lead plaintiff of potential class claimants to address the

15   matters that have been raised in this motion to approve

16   the settlement at T45?

17       A.   I haven't done anything myself yet, but I think

18   this would be a good situation to look into with some of

19   the other members and see if we can't clear this up.

20       Q.   Okay.  What other members, sir, are you referring

21   to?  Are you referring to these other undisclosed and

22   unnamed potential class claimants or are you referring to

23   the other objecting creditors that we referred to earlier

24   in your deposition?

25       A.   Yeah, I would think the objecting and then Ken

                                                        162

1    and anybody else like that that would -- we would need.

2    I'd like Ken's input.

3        Q.    Okay.  You are aware, though, are you not, as I

4    told you earlier, there is a two-day evidentiary hearing

5    that's scheduled for March 18th and March 19th in this

6    bankruptcy case for the bankruptcy court to determine

7    whether or not it's going to approve the settlement

8    agreement that is an exhibit to T45?  You're aware of that

9    now, right?

10       A.    Now I am, yes.

11       Q.    And are you planning on traveling to Fort

12   Lauderdale, Florida, in order to testify at that two-day

13   hearing?

14       A.    My first thought I wasn't, but my wife is down

15   here, and I talked to her today, and she said that's fine,

16   she probably would stay with my daughter while I'm gone.

17   My wife just, like I told you, had a stroke just a couple

18   months ago, and I didn't want to leave her alone.  But if

19   she can stay with our daughter, then I would love to go.

20       Q.    Okay.  So we can count on you, then, to fly in

21   from California to attend the hearing on March 18th and

22   19th for the two-day evidentiary hearing to --

23       A.    What days of the week are those?

24       Q.    You have to let me finish my question.

25       A.    Sorry.

                                                          163

1    Q.   Can we count on you to fly in from California to

2    testify at the two-day evidentiary hearing that's

3    scheduled by the bankruptcy court to consider the approval

4    of the trustees' motion to approve the settlement

5    agreement with the settling parties reflected in T45?

6    A.   Yes, I'd like to try.  I'm pretty sure I can.

7    Q.   And going to T59, I want to circle back to T59 on

8    your declaration and have you turn to Paragraph 7, which

9    appears on the signature line.

10    A.   Okay.  We're ready, I think.

11    Q.   All right.  And in this declaration you stated,

12    "I have never seen nor signed any G REIT Trust document,

13    nor have I been asked to do so.  Prior to initiation of

14    the state court class action," that is referring to

15    exhibits 32 and 33, "when the trust document was shown to

16    me by my attorneys, I was unaware of the contents of such

17    trust document."

18         Do you know what trust document is being referred

19    to in that statement?

20    A.   I believe it's the one that we were looking at

21    right at that time.  Is that 59?  There's not very much

22    difference either, is there?

23    Q.   Are you talking about Exhibit T50 or are you

24    talking about the letter attached to your declaration?

25    A.   The part that's attached to the declaration.

164

EXHIBIT #36: 229
22-CV-01616-BAS-DDL

1      Q.   All right.  That's what you believe you're being

2   referred to?

3      A.   Yes.

4           MR. GRUHER:  All right.  Let's take a quick

5   five-minute break.

6           Joyce, can you call me?

7           MS. DELGADO:  Yes.

8           (Recess.)

9   BY MR. GRUHER:

10     Q.   Mr. Carlson, I have just two or three more

11   questions, and then I'm going to turn it over to

12   Mr. Kibler.

13     A.   Okay.

14     Q.   Have you ever heard of a company called Grubb and

15   Ellis Company?

16     A.   Grubb and Ellis?

17     Q.   Yes, sir.

18     A.   Yes, I have heard that name.

19     Q.   And under what context or circumstances did you

20   hear of the name of a company called Grubb and Ellis

21   Company?

22     A.   I'm trying to remember whether they have tools or

23   something like that.

24     Q.   You said tools, correct?

25     A.   Yes, uh-huh.

                                                        165

EXHIBIT #36: 230
22-CV-01616-BAS-DDL

1     Q.   All right.  And are you aware that Grubb and

2  Ellis had filed for bankruptcy?

3     A.   I was not aware of that, no.

4     Q.   Do you know any connection or relationship

5  between Grubb and Ellis Company and any of the defendants

6  that you have sued in either of the lawsuits in the

7  Superior Court of California or the adversary proceeding

8  in the bankruptcy case?

9     A.   No.  I don't really know much about them at all.

10  I just have seen the name, and I think it was with

11  hardware stuff.

12          MR. GRUHER:  All right.  I have no further

13  questions and I will turn it over to Mr. Kibler.

14          MR. KIBLER:  Thank you.

15

16                      EXAMINATION

17

18  BY MR. KIBLER:

19     Q.   Good afternoon, Mr. Carlson.  I'm Mike Kibler.  I

20  introduced myself at the beginning of the deposition.

21     A.   That's right.

22     Q.   I represent the Northwood entities in this case.

23     A.   Okay.  Uh-huh.

24     Q.   First, thanks for your time today.  I know this

25  is not an easy day for anybody.

                                                        166

EXHIBIT #36: 231
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

```
 1      A.    Thanks.

 2      Q.    So we appreciate you coming.

 3      A.    Thank you.

 4      Q.    If you don't understand any of my questions, just

 5   please ask me to clarify or rephrase.

 6      A.    All right.  I'll do that.

 7            MR. CATANZARITE:  Let him finish.

 8            THE WITNESS:  Wait until you're done first.  I'm

 9   sorry.

10   BY MR. KIBLER:

11      Q.    So wait until I -- in normal conversation, it's

12   easy for people to talk over each other.  We do it all the

13   time.  Try to avoid doing that here.  Okay?

14      A.    I know.

15      Q.    And I'll try to do the same.

16      A.    Okay.  Good.

17      Q.    So let's try it again.  If you don't understand

18   any of my questions, just ask me to rephrase them and I'm

19   happy to try to do so.  Okay?

20      A.    Fine.

21      Q.    If you give me an answer, I'm going to assume

22   that you understood the question; is that fair?

23      A.    Okay.  Uh-huh.

24      Q.    Okay.  And I'm going to try not to cover any of

25   the ground that Mr. Gruher covered with you up to this
```

167

EXHIBIT #36: 232
22-CV-01616-BAS-DDL

1    point so that we can get out of here.

2           You don't -- prior to today, you had never heard

3    of the company called Northwood Investors, LLC, correct?

4       A.   That's correct, uh-huh.

5       Q.   And you don't have any understanding of what role

6    Northwood Investors, LLC, had in any of the transactions

7    that gave rise to the claims that you asserted both in

8    Orange County and in the bankruptcy court, correct?

9       A.   That's correct.

10      Q.   You don't have any understanding as to how

11   Northwood Investors LLC's conduct affected you or the

12   other trust beneficiaries, correct?

13      A.   That's correct.

14      Q.   And you don't have any understanding as to how

15   Northwood Investors LLC's conduct may have harmed any of

16   the trust beneficiaries, including you, correct?

17      A.   That's correct.

18      Q.   You're not aware, are you, that Mr. Catanzarite

19   has filed pleadings in the state court in California that

20   accuses Northwood Investors, LLC, of aiding and abetting

21   others' breaches of fiduciary duties to you, correct?

22      A.   I'm not aware of that.

23      Q.   You didn't even know that he had done that,

24   right?

25      A.   I did not.

168

EXHIBIT #36: 233
22-CV-01616-BAS-DDL

1      Q.   And you don't have any understanding, sitting

2  here today, of any of the grounds that you had for

3  asserting those claims against Northwood Investors, LLC,

4  correct?

5      A.   Trying to think of the timing.  Around 2014 I

6  knew that they didn't give market value for the sale, that

7  it was below market value.  I think that is in that time

8  frame, isn't it?

9      Q.   Is it your testimony -- move to strike as

10 nonresponsive.

11          Is it your testimony that in 2014 you were aware

12 that the G REIT trustees failed to obtain fair market

13 value in the sale of properties?

14     A.   I was told that, uh-huh.

15     Q.   You were told that --

16     A.   By my counsel.

17     Q.   You were told that folks knew that in 2014?

18     A.   Yeah, because that's when the trust ended too,

19 right?  I thought those two went together.

20     Q.   It was public knowledge that the trust had sold

21 the properties, correct?

22          MR. CATANZARITE:  Well -- okay.  Never mind.

23 Withdrawn.

24 BY MR. KIBLER:

25     Q.   It was public knowledge that the trust had sold

                                                        169

EXHIBIT #36: 234
22-CV-01616-BAS-DDL

```
 1    the properties, correct?
 2        A.    Yes.
 3              MR. CATANZARITE:  Let me object.  Late objection;
 4    calls for speculation and conjecture, ambiguous.
 5    BY MR. KIBLER:
 6        Q.    Your answer was yes?
 7              MR. CATANZARITE:  Well, if he knows.
 8              MR. KIBLER:  Ken, stop coaching him immediately.
 9              MR. CATANZARITE:  I'm not coaching.
10              MR. KIBLER:  Immediately.  If you have a form
11    objection, assert it.
12              MR. CATANZARITE:  Okay.  Ambiguous.
13              THE WITNESS:  Could you repeat the question.
14    BY MR. KIBLER:
15        Q.    It was public knowledge that the trust had sold
16    the properties, including the Congress Center property,
17    correct?
18        A.    I believe that's true.
19        Q.    And so you as an investor could have learned
20    about that sale by going on the SEC website, correct?
21        A.    Yes.
22              MR. CATANZARITE:  Objection; calls for
23    speculation and conjecture.
24    BY MR. KIBLER:
25        Q.    And if you had done that, you could have learned
                                                            170
```

EXHIBIT #36: 235
22-CV-01616-BAS-DDL

1   whether or not the sale was for fair market value,

2   correct?

3          MR. CATANZARITE:  Objection; calls for

4   speculation and conjecture as to what he might have done.

5          THE WITNESS:  I wouldn't know what fair market

6   value is myself.  That would be the trouble there.

7   BY MR. KIBLER:

8      Q.   But you could have determined what the sale price

9   was, correct?

10     A.   The what price?

11     Q.   The sale price.

12     A.   I don't recognize that terminology.

13     Q.   The sale price.

14     A.   Oh, sale price.

15     Q.   The sale price of the properties, including the

16  Congress Center property, you could have learned that

17  information?

18     A.   I could have learned that, but I wouldn't have

19  known the value of the place.

20     Q.   So you're not aware, as you sit here today, that

21  you are alleging that Northwood Investors, LLC,

22  asserted -- aided and abetted others who breached their

23  fiduciary duties to you, correct?

24     A.   I think that's correct, yes.

25     Q.   And when the complaint was filed in the Orange

171

EXHIBIT #36: 236
22-CV-01616-BAS-DDL

1   County Superior Court, you personally did not have any

2   reasonable grounds for asserting claims against Northwood

3   Investors, LLC, correct?

4          MR. CATANZARITE:  Well, I'll object to that.

5   That calls -- wait.  That calls for a legal conclusion.

6   Calls for expert opinion testimony.  Also calls for

7   attorney client communication as to what the grounds were.

8   BY MR. KIBLER:

9      Q.   You can answer the question.

10         MR. CATANZARITE:  Only if you can answer it

11  without disclosing attorney-client communication.

12         THE WITNESS:  I was not aware of it.

13  BY MR. KIBLER:

14     Q.   You were unaware of any grounds for asserting

15  claims against Northwood Investors, LLC, in the California

16  Superior Court, correct?

17         MR. CATANZARITE:  Objection; calls for

18  attorney-client communication.  You can't tell him

19  anything your attorney told you.

20         THE WITNESS:  I'm sorry.

21  BY MR. KIBLER:

22     Q.   Is the answer to my question correct?

23         MR. CATANZARITE:  Excluding -- I instruct him not

24  to answer unless he has some independent ground, in which

25  case he could do so.  But if it's solely based -- if the

172

EXHIBIT #36: 237
22-CV-01616-BAS-DDL

1   theory is based on what Mr. Catanzarite told him, then

2   it's attorney-client.

3          MR. KIBLER:   To be clear, I'm not asking him to

4   disclose any communications with you.   I'm asking him as a

5   plaintiff, a named plaintiff had grounds to sue Northwood

6   Investors, LLC, in the Orange County Superior Court.

7   BY MR. KIBLER:

8      Q.   So, again, you did not have any grounds to sue

9   Northwood Investors, LLC, in the Orange County Superior

10  Court, correct?

11         MR. CATANZARITE:   Objection; calls for

12  attorney-client communications.   Instruct the witness not

13  to answer.

14  BY MR. KIBLER:

15     Q.   Are you going to follow your counsel's advice and

16  not answer the question?

17         MR. CATANZARITE:   You are.   Say, "Yes, I'm not

18  going to."

19         THE WITNESS:   Yes, I'm not going to.

20  BY MR. KIBLER:

21     Q.   Do you recognize if we went to court and got an

22  order, you'd have to come back and answer the question?

23         MR. CATANZARITE:   We'll stipulate he'll do so if

24  you get such an order.

25  BY MR. KIBLER:

173

EXHIBIT #36: 238
22-CV-01616-BAS-DDL

```
 1      Q.   Okay.  Are you aware that your claims against
 2   Northwood Investors, LLC, were dismissed in November of
 3   2018 by the Orange County Superior Court judge?
 4      A.   No, I wasn't.
 5      Q.   Mr. Catanzarite didn't mention that to you?
 6           MR. CATANZARITE:  Well, I'll object.  Calls for
 7   attorney-client communication.  Instruct the witness not
 8   to answer.
 9   BY MR. KIBLER:
10      Q.   Okay.  So you don't know that --
11           MR. GRUHER:  Wait, wait.  I have to take -- I
12   want to hear the witness's answer because the public
13   knowledge of a dismissal order relative to Northwood is
14   something that I don't believe falls under an
15   attorney-client privilege communication.
16           MR. KIBLER:  Well, he already said he doesn't
17   know that Northwood was dismissed.  And the next question
18   was, did Mr. Catanzarite tell you that Northwood had been
19   dismissed.  And that is the question Mr. Catanzarite
20   instructed him not to answer.
21           MR. CATANZARITE:  Correct.
22   BY MR. KIBLER:
23      Q.   So you're learning just today for the first time
24   that the Orange County Superior Court judge dismissed
25   claims not just against Northwood Investors, LLC, but
```

                                                        174

EXHIBIT #36: 239
22-CV-01616-BAS-DDL

1    other defendants who you sued in Orange County Superior

2    Court, you're not aware of that, right?

3       A.   Not unless you could give me names.  In general,

4    I'm not aware of it.

5    BY MR. KIBLER:

6       Q.   Okay.  Do you think that as someone who's been --

7    allowed themselves to be used as a named plaintiff in the

8    case, it would be important for you to understand what the

9    status of those claims are in the court proceedings?

10      A.   Yeah, I probably should have been on top of it

11   more.  I'll have to agree.

12      Q.   Does Mr. Catanzarite's firm keep you apprised of

13   developments in the Orange County Superior Court case?

14      A.   Yes, I believe they did.

15      Q.   How do they do that?

16      A.   Just by phone when they're out away from the

17   session, yeah.

18      Q.   Do they ever send you drafts of papers before

19   they file them?

20      A.   I think they have on some of the cases, yes.

21      Q.   Do you ever comment on them?

22           MR. CATANZARITE:  That calls for attorney-client

23   communications.

24           MR. KIBLER:  It's a yes-or-no question.

25           MR. CATANZARITE:  No, he's not going to tell you

                                                              175

EXHIBIT #36: 240
22-CV-01616-BAS-DDL

1   that.

2         MR. KIBLER:  Are you instructing him not to

3   answer?

4         MR. CATANZARITE:  Yes, I am.

5   MR. KIBLER:

6     Q.   Are you following your counsel's instruction?

7         MR. CATANZARITE:  It's important that you follow

8   your counsel's instruction.

9         THE WITNESS:  Yes means I'm going to follow him,

10   no means I answer the question.  So, yes, I'm going to

11   follow him.

12   BY MR. KIBLER:

13     Q.   Okay.  You don't have any understanding, sitting

14   here today, what an entity called NW Congress Center

15   Owner, LLC, is, correct?

16     A.   No.

17     Q.   You've never heard that name before today,

18   correct?

19     A.   That's correct.

20     Q.   You don't have any understanding, sitting here

21   today, as to NW Congress Center Owner LLC's role in any of

22   the claims that you've brought in Orange County Superior

23   Court, correct?

24     A.   That's correct.

25     Q.   You're not even aware, sitting here today, that

                                                  176

EXHIBIT #36: 241
22-CV-01616-BAS-DDL

1    you have, in fact, asserted claims for aiding and abetting

2    breach of fiduciary duty against NW Congress Center Owner,

3    LLC, correct?

4        A.   Yes.

5        Q.   You don't have any understanding as to the nature

6    of the claims that you've asserted against NW Congress

7    Center Owner, LLC, correct?

8        A.   I think I have to answer that one no.  I know

9    some of the -- I've read some of the stuff that went on.

10       Q.   Okay.  What's your understanding, then, of the

11   nature of the claims that you have asserted against NW

12   Congress Center Owner, LLC?

13            MR. CATANZARITE:  I'll object and instruct the

14   witness not to answer, as it calls for attorney-client

15   communication.

16            MR. KIBLER:  Well, he just said he has an

17   understanding.

18            THE WITNESS:  No, I said I'd seen them.

19   MR. KIBLER:

20       Q.   You'd seen the name of that company?

21       A.   Yes.

22       Q.   Okay.  My question, though, sir, is a little bit

23   different.  Let me try it again.

24       A.   Okay.

25       Q.   You are not aware and don't have an understanding

177

EXHIBIT #36: 242
22-CV-01616-BAS-DDL

```
 1   of the nature of the claims that you have asserted against

 2   NW Congress Center Owner, LLC, correct?

 3           MR. CATANZARITE:  I'll object and instruct the

 4   witness not to answer to the extent it calls for

 5   attorney-client communication.

 6           MR. KIBLER:  I'm not calling for a communication

 7   with a lawyer.  I'm asking, yes or no, does he have an

 8   understanding of the nature of the claims against NW

 9   Congress Center Owner, LLC?

10           MR. CATANZARITE:  And the nature of the claims

11   would be the theory of the claims, and that I would

12   instruct him not to answer.

13           MR. KIBLER:  So it's a yes-or-no question and

14   you're instructing him not to answer that?

15           MR. CATANZARITE:  Correct.

16   BY MR. KIBLER:

17       Q.   Are you going to follow your counsel's advice?

18       A.   Yes.

19       Q.   Could you turn to Exhibit T33, please.

20       A.   I've got it right here.

21       Q.   Thank you.

22           And this is the second amended complaint that was

23   filed by Mr. Catanzarite on your behalf in Orange County

24   Superior Court, correct?

25       A.   Yes, second amended complaint.
```

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855-811-3376

EXHIBIT #36: 243
22-CV-01616-BAS-DDL

1    Q.   And do you have an understanding of why there's a
2  second amended complaint?
3    A.   Because somebody complained about something in
4  the first one, right?
5    Q.   Right.  And are you aware that the Orange County
6  Superior Court judge dismissed certain claims in the first
7  amended complaint?  Are you aware of that?
8    A.   No, I wasn't.
9    Q.   Are you just learning that today for the first
10 time?
11   A.   Yes, sir.
12   Q.   Okay.  And are you aware that the Orange County
13 Superior Court judge dismissed claims against certain
14 defendants, including Northwood Investors, LLC, that you
15 asserted in the first amended complaint?
16   A.   Oh, okay.
17   Q.   Are you aware of that?
18   A.   I was not aware of that.
19   Q.   You're just learning that fact today for the
20 first time?
21   A.   Yeah, uh-huh.
22   Q.   Okay.  And so we're on the second amended
23 complaint.  And you had not seen this document before
24 today, correct?
25   A.   The second amended?

                                                      179

EXHIBIT #36: 244
22-CV-01616-BAS-DDL

1     Q.   Correct.

2     A.   No.

3     Q.   Okay.  And I want to turn -- turn with me,

4   please, to Page 6 of the complaint.  And I want to turn

5   your attention to Paragraph 31.

6          Do you see where I am?

7     A.   Yes.

8     Q.   Paragraph 31 says, "Defendants ARPT," comma,

9   "ARP-OP," and then I'll skip a bunch.

10    A.   Yeah.

11    Q.   And then "NWCCO."

12         Do you see that?

13    A.   Yes.

14    Q.   NWCCO, I'll represent to you, is defined later in

15   the complaint as NW Congress Center Owner, LLC.  Okay?

16    A.   Uh-huh.

17    Q.   And that's my client.  Okay?

18    A.   Okay.

19    Q.   "SGR and Does 13-30 may be referred to herein

20   jointly and severally as the entity defendants, which on

21   or after January 1st, 2012, for all times relevant to this

22   complaint, were under the common control of Locoh and

23   Mikles."

24         Do you see that?

25    A.   Yes.

EXHIBIT #36: 245
22-CV-01616-BAS-DDL

1      Q.    And you have no grounds to make that allegation,

2    correct?

3          MR. CATANZARITE:   I'll object and instruct the

4    witness not to answer to the extent it calls for

5    attorney-client communications.

6          MR. KIBLER:   And so, Ken, just to save time, if I

7    walk him through the specific factual allegations he's

8    making against my client in each paragraph of the

9    complaint, are you going to give him the same instruction?

10          MR. CATANZARITE:   Well, to the extent it involves

11    legal theories such as --

12          MR. KIBLER:   None of these questions involve

13    legal theories.   All of these questions are what were the

14    grounds you had for asserting the claims against the

15    defendant.

16          MR. CATANZARITE:   And the grounds could include

17    legal theories.

18          MR. KIBLER:   Okay.   So are you going to instruct

19    him not to answer every question about the grounds he had

20    for making allegations against NW Congress Center --

21          MR. CATANZARITE:   To the extent they involve

22    legal theories, yes.

23          MR. KIBLER:   To what extent would they not

24    involve legal theories, in your view?

25          MR. CATANZARITE:   If you asked him a factual

                                                          181

EXHIBIT #36: 246
22-CV-01616-BAS-DDL

1  question as opposed to what grounds you had.

2  BY MR. KIBLER:

3      Q.   Well, Mr. Carlson, what factual grounds did you

4  have to make an allegation in Paragraph 31 of the

5  complaint that NWCCO, among others, were under the common

6  control of Locoh and Mikles?

7          MR. CATANZARITE:  And I'll object to the extent

8  it calls for expert opinion testimony and a legal

9  conclusion.

10          But go ahead if you have any facts that you know

11  of.

12          THE WITNESS:  I'm not familiar with that one at

13  all.

14  BY MR. KIBLER:

15      Q.   You have no factual grounds that support that

16  allegation, right?

17      A.   That's correct.

18      Q.   Paragraph 32, "Plaintiffs are informed and

19  believe, and on that basis allege, that at all times

20  herein mentioned, entity defendants," which includes NW

21  Congress Center Owner, LLC, "and each of them knowingly

22  and willfully conspired and participated with each other

23  in the conduct herein alleged in furtherance of a

24  conspiracy between and among Locoh, Mikles, and

25  Northwood."

                                                                 182

EXHIBIT #36: 247
22-CV-01616-BAS-DDL

1           Do you see that?

2      A.   Yes.

3      Q.   And Northwood, I'll represent to you, is defined

4  in the complaint as the entity we talked about earlier,

5  Northwood Investors, LLC.  Okay?

6      A.   Right.

7      Q.   Okay.  So --

8      A.   That's who you're representing?

9      Q.   Correct.

10          What factual grounds did you have when this

11  allegation was made in Paragraph 32 of the complaint that

12  Northwood and NWCCO conspired with Locoh, Mikles, and

13  others willfully to enrich themselves at the trust

14  beneficiaries' expense?

15          MR. CATANZARITE:  Objection to the extent it

16  requires expert opinion testimony or a legal conclusion.

17          But go ahead if you have any independent

18  knowledge of the facts.

19          THE WITNESS:  I don't have any knowledge of it,

20  so --

21  BY MR. KIBLER:

22     Q.   You had no grounds for that allegation, no

23  factual grounds for the allegation of Paragraph 32,

24  correct?

25     A.   Right.

                                                      183

EXHIBIT #36: 248
22-CV-01616-BAS-DDL

1     Q.   That was true even after Mr. Catanzarite started

2    the investigation, he says, in December 2017, correct?

3    You still, sitting here today, have no factual grounds?

4     A.   Based on what it says in this document right here

5    is all I'm saying.

6     Q.   Okay.  You have no factual grounds for what's

7    alleged in this document, T33?

8     A.   That's true.

9          MR. CATANZARITE:  Well, object to the extent it

10   calls for expert opinion testimony.

11         MR. KIBLER:  It doesn't.

12         MR. CATANZARITE:  Sure it does.

13   BY MR. KIBLER:

14    Q.   I want to direct your attention to Paragraph 34.

15   Paragraph 34 you allege, "Defendant Northwood Investors,

16   LLC, sued as Doe 12, is a Delaware limited liability

17   company doing business in Los Angeles, California, for all

18   times relevant to this complaint.  Northwood is a

19   principal of the joint venture formed upon information and

20   belief not later than March 1st, 2012, where Mikles served

21   as co-partner with an agent for the venture with the

22   objective and purpose of acquiring the Congress Center

23   property through a special purpose entity that was to be

24   funded prior to closing and became known as NWCCO.

25   Northwood was founded in 2006 by former Blackstone Real

                                                        184

EXHIBIT #36: 249
22-CV-01616-BAS-DDL

```
 1    Estate Advisors president dot, dot, dot."
 2         Question is -- same question, what factual
 3    grounds did you have for making the allegations contained
 4    in Paragraph 34 of your complaint?
 5         MR. CATANZARITE:  I'll object to the extent it
 6    calls for expert opinion testimony.
 7         But if you have independent facts you know, you
 8    can tell him.
 9         THE WITNESS:  I don't have them.
10    BY MR. KIBLER:
11      Q.   No facts, right?
12      A.   I don't have any.
13      Q.   Paragraph 36, you allege, "Plaintiffs are
14    informed and believe, and on that basis allege, that at
15    all times herein mentioned, Northwood defendants, and each
16    of them, knowingly and willfully conspired, joined, and
17    participated with each other in the conduct herein alleged
18    in furtherance of a conspiracy between and among Northwood
19    defendants to enrich themselves at plaintiffs' expense,
20    and that each such defendant is therefore liable with each
21    other defendant for the conduct herein alleged for the
22    damages suffered by plaintiffs."
23         Do you see that?
24      A.   Yes, I do.
25      Q.   Okay.  And you had no factual grounds for making
```

185

EXHIBIT #36: 250
22-CV-01616-BAS-DDL