Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

 1    the allegation in Paragraph 36 of your complaint, correct?

 2        A.    I did not --

 3              MR. CATANZARITE:  Let me make an objection.

 4              THE WITNESS:  I'm sorry.

 5              MR. CATANZARITE:  I'll object to the extent it

 6    calls for a legal conclusion and expert opinion testimony.

 7              But if you have independent facts, you can tell

 8    him.

 9    BY MR. KIBLER:

10        Q.    Do you have any -- do you know any facts that

11    would support grounds for making the allegation in

12    Paragraph 36 of your complaint?

13              MR. CATANZARITE:  Same objections.

14              THE WITNESS:  No objection.

15    BY MR. KIBLER:

16        Q.    Sorry?

17        A.    No objections.

18              MR. CATANZARITE:  No, no.  You're

19    misunderstanding.  My objection --

20              MR. KIBLER:  Let me just ask the question again.

21    You can have a standing objection based on this expert

22    nonsense if you want.

23    BY MR. KIBLER:

24        Q.    You have no factual basis for the allegations

25    that you made in Paragraph 36 of the complaint against the

                                                        186

ADVANCED DEPOSITIONS
www.advanceddepositions.com | 855-811-3376

EXHIBIT #36: 251
22-CV-01616-BAS-DDL

1   Northwood defendants, correct?

2           MR. CATANZARITE:  Objection; calls for expert

3   opinion testimony, also calls for a legal conclusion.

4           Go ahead if you have any independent facts.

5           THE WITNESS:  I think the expert is the part that

6   drives me away.  I'm not an expert at this.

7   BY MR. KIBLER:

8       Q.   Was it helpful that Mr. Catanzarite fed you that

9   word "expert" in giving your last answer?

10          MR. CATANZARITE:  Oh, come on.  Don't answer that

11  question.  That's just --

12          THE WITNESS:  I thought you did too.

13          MR. CATANZARITE:  That's just argumentative.

14  Don't answer that.

15  BY MR. KIBLER:

16      Q.   So the question again, sir, is, what factual

17  grounds did you have for making the allegations that you

18  made in Paragraph 36 of the second amended complaint?

19          MR. CATANZARITE:  Objection; calls for expert

20  opinion testimony, calls for a legal conclusion.

21          If you have independent facts you know of, you

22  can tell him.

23  BY MR. KIBLER:

24      Q.   Do you have any facts?

25      A.   I don't.

                                                        187

EXHIBIT #36: 252
22-CV-01616-BAS-DDL

1   Q.   And you didn't have any facts when this was filed

2   either, right?

3        MR. CATANZARITE:   Same objection; calls for

4   expert opinion testimony, calls for a legal conclusion.

5        If you have independent facts, you can tell him.

6   BY MR. KIBLER:

7   Q.   Turn to page 25 of the complaint with me, please.

8   In paragraph 88.  Are you with me?

9   A.   Yes.

10  Q.   Paragraph 88 says, "Three years later in 2015,

11  NWCCO, controlled by Locoh, Mikles, ARPT, and Does 13

12  through 40, sold the Congress Center property for $135

13  million and upon information and belief realized a profit

14  of $40 million in addition to substantial operating

15  profits and fees during this three-year period the

16  property was held."

17       Do you see that?

18  A.   Yes, I do.

19  Q.   Okay.  Same question.  What factual grounds did

20  you have for making those very specific factual

21  allegations in paragraph 88 of your complaint?

22       MR. CATANZARITE:   Objection; calls for expert

23  opinion testimony and a legal conclusion.

24       But you can go ahead and tell him if you have any

25  independent facts.

188

EXHIBIT #36: 253
22-CV-01616-BAS-DDL

1          THE WITNESS:  I don't have facts, but it looks

2    like somebody should have facts on that.

3    BY MR. KIBLER:

4      Q.    You would think, right?

5      A.    It's pretty straightforward, but I don't have

6    them.

7      Q.    Who would have them?  Let me withdraw the

8    question and ask a broader one.

9          As to all of the allegations that you and I just

10   looked at and all of the allegations that are in your

11   complaint, who would I go to to ask what the factual basis

12   and the reasonable grounds are for making these

13   allegations against my client?

14     A.    I'm not sure.  I guess to our attorney or --

15     Q.    Sir, you're the named plaintiff.  If you can't

16   answer the question as to the reasonable grounds that you

17   had for suing my client for several hundred million

18   dollars, who should I ask for what those reasonable

19   grounds are?

20     A.    I just don't know.  Sorry.

21     Q.    Have you ever heard the term "malicious

22   prosecution" before?

23     A.    I don't know all of the details, but I've heard

24   the words.

25     Q.    Are you aware that in the State of California

                                                        189

1    someone could be sued for malicious prosecution if they

2    bring a suit that's dismissed by a court and it's later

3    found that that person did not have reasonable grounds for

4    making the allegations they made against the dismissed

5    defendant?

6        A.    Okay.

7        Q.    I'll represent to you that that's essentially

8    what malicious prosecution is.  Okay?

9        A.    Okay.

10       Q.    Has anyone explained to you that in a claim for

11   malicious prosecution, once a claim has been dismissed,

12   the person who brought the claim, a plaintiff like you,

13   can be held liable for all of the attorneys' fees incurred

14   by the defendants in defending the case?

15       A.    Probably so.

16       Q.    Were you aware of that before I just told you

17   that today?

18       A.    Not definitely, but it sounds reasonable is all

19   I'm saying.

20       Q.    And you don't have any guess, do you, on how --

21   the amount of attorneys' fees that the defendants -- who

22   have been dismissed from the case a couple of times prior

23   to the filing of the amended complaint -- the amount of

24   the attorneys' fees that they've spent so far in defending

25   against these claims?  Do you have any idea what those

190

EXHIBIT #36: 255
22-CV-01616-BAS-DDL

```
 1    might be?

 2         A.    I have no idea.

 3         Q.    Would it surprise you that the amounts are in the

 4    hundreds of thousands of dollars?

 5         A.    No.

 6         Q.    That wouldn't surprise you?

 7         A.    Not completely.

 8         Q.    And you're aware now that under a claim for

 9    malicious prosecution, someone like you, who is a named

10    plaintiff, could be sued to recover all of those attorneys

11    fees once the defendants have been dismissed?

12              MR. CATANZARITE:  You don't need to answer this.

13    It's argumentative and threatening, and I'll instruct him

14    not to answer.

15    BY MR. KIBLER:

16         Q.    Okay.  Sitting here today, do you wish someone

17    had informed you about malicious prosecution claims before

18    you agreed to lend your name to this complaint?

19         A.    No.  That's one that I had --

20              MR. CATANZARITE:  Wait a minute.  I'll object.

21    It's argumentative and harassing, and I'll instruct him

22    not to answer.

23    BY MR. KIBLER:

24         Q.    Are you going to rely on your -- follow your

25    attorney's instruction?
```

                                                           191

EXHIBIT #36: 256
22-CV-01616-BAS-DDL

1      A.    Yes, I will.

2      Q.    Okay.  Would you agree with me that the

3  allegations that we just went through against Northwood

4  that you've made in your complaint are rather serious

5  allegations?

6      A.    Where are we right now?

7      Q.    Any of the -- you look at any one of the

8  paragraphs, but the paragraphs that you and I just read

9  together and talked about.  Would you agree with me that

10  those allegations are rather serious?

11      A.    I don't think I know, because I don't know how

12  the courts put the weight on things, not being involved in

13  the court system at all.

14      Q.    That is a fair point.  But let's look, for

15  example, at paragraph 88 that we just looked at a moment

16  ago on page 25 where you allege that three years later in

17  2015, NWCCO controlled by Locoh, Mikles, ARPT, and Does 13

18  through 40 sold the Congress property and earned

19  themselves a 40 million dollar profit.  That's a very

20  specific and serious allegation, right?

21      A.    It was three years later, looks like it.  It

22  could change quite a bit.

23      Q.    Okay.  Let's look at a different paragraph.  Take

24  a look at Paragraph 36 on Page 7, which we looked at a

25  moment ago.

192

EXHIBIT #36: 257
22-CV-01616-BAS-DDL

```
 1              Paragraph 36, you allege, "Plaintiffs are
 2     informed and believe, and on that basis allege, that at
 3     all times herein mentioned, Northwood defendants, and each
 4     of them, knowingly and willfully conspired, joined, and
 5     participated with each other in the conduct herein alleged
 6     in furtherance of a conspiracy between and among Northwood
 7     defendants to enrich themselves at the plaintiffs'
 8     expense."
 9              Do you see that?  Do you see that, sir?
10     A.   Yeah.  It's pretty bad if they can prove it.
11     Q.   It's a pretty serious allegation, isn't it?
12     A.   Yes, it is.
13     Q.   Don't you think a defendant who has a very
14     serious allegation made against them would have a right to
15     know why the person who made the allegation made it?
16     A.   I guess so.
17     Q.   That's just fair, right?
18     A.   Yeah.
19              MR. CATANZARITE:  This is -- we've
20     now (inaudible) of any of our discovery in this case.  So
21     this is cherry-picking these allegations from, as you say,
22     merits-based complaint is, I find, harassing and --
23              MR. GRUHER:  Ken, are you seriously giving
24     Mr. Kibler agita over cherry-picking allegations when you
25     served I don't know how many discovery requests related to
                                                           193
```

EXHIBIT #36: 258
22-CV-01616-BAS-DDL

1   cherry-picked allegations?  That's not -- come on.

2            MR. CATANZARITE:  I thought Mr. Kibler refused to

3   give us discovery, saying it was not -- we were in

4   merits-based discovery --

5            MR. GRUHER:  I didn't say what he gave you or

6   didn't give you.  I said --

7            MR. CATANZARITE:  Let's just.

8            MR. GRUHER:  -- you have served numerous

9   discovery requests on cherry-picked allegations.  That's

10  all I'm saying.  So you agree, then, if you're having

11  Mr. Carlson not answer the question, then Mr. Kibler

12  doesn't have to provide you with the documents.  Is that

13  what you're saying?

14           MR. CATANZARITE:  Not at all.  I'm saying that he

15  shouldn't be entitled to be harassing Mr. Carlson about

16  information that -- an allegation on information and

17  belief when he hasn't provided any discovery to us.  But

18  let's get along with it.

19           MR. KIBLER:  Are you done?

20           MR. CATANZARITE:  I am.

21           MR. GRUHER:  Okay.

22  BY MR. KIBLER:

23    Q.   Mr. Carlson, don't you think it would be fair for

24  someone in Northwood's position who's had serious

25  allegations made against it in a public filing to

                                               194

1    understand the basis that the person who made the

2    allegations had when making them?  Doesn't that just

3    strike you as fair?

4             MR. CATANZARITE:  I'll object.  Fair is not a

5    legal standard.  He doesn't need to answer that question.

6    I'll instruct him not to answer.

7    BY MR. KIBLER:

8       Q.   If you were sued for hundreds of millions of

9    dollars, wouldn't you want to know why the person who was

10   suing you was making the claim and the basis they had for

11   claiming against you?

12            MR. CATANZARITE:  Same objection and same

13   instruction.  It calls now for speculation.  He has not

14   been sued.

15            MR. KIBLER:  No more questions.

16

17                    EXAMINATION

18   BY MR. CATANZARITE:

19      Q.   I have a couple of questions, Mr. Carlson.

20            First, do you recall receiving documents at your

21   house by mail that were double-sided?

22      A.   Yes.

23      Q.   Do you recall exhibits that were two by --

24   double-sided on those same documents that you received at

25   home?

                                                          195

EXHIBIT #36: 260
22-CV-01616-BAS-DDL

1    A.    Uh-huh.

2    Q.    You have to answer audibly.

3    A.    Oh.  Yes.

4    Q.    So when you gestured that what was marked as T33,

5    T32 -- T33 and T43, T33, here they are, all three.  When

6    you gestured that those three documents were of the size

7    that you had not seen before -- do you recall that

8    testimony?

9         MR. KIBLER:  Objection; misstates the testimony.

10        THE WITNESS:  Yes.

11   BY MR. CATANZARITE:

12   Q.    Do you recall testimony in substance and effect

13   where you gestured to each of the three documents marked

14   as T32, 33, and 43 and said you had not seen documents

15   that thick before?

16        MR. KIBLER:  Objection; misstates prior

17   testimony.

18   BY MR. CATANZARITE:

19   Q.    Yes or no, do you recall saying that?

20   A.    Yes, that was my comment.

21   Q.    Okay.  Do you recall receiving documents at home

22   from my office in the mail that were double-sided and

23   sometimes two by double-sided?

24   A.    Yeah, double-sided I did receive.  I don't

25   remember them being this big.

196

EXHIBIT #36: 261
22-CV-01616-BAS-DDL

1    Q.   All right.  And so as you look at these

2    documents, were the double-sided documents that you

3    received complaints that were filed on your behalf?

4         MR. KIBLER:  Objection; leading.

5         THE WITNESS:  I don't remember right now.

6    BY MR. CATANZARITE:

7    Q.   You don't remember one way or the other; is that

8    right?

9    A.   I don't recall.

10   Q.   Now, you mentioned something about in response to

11   a question about T46, which was the G REIT 10-K, you

12   mentioned something about, "Well, I think I had something

13   for a tax return."

14   A.   Oh, yes.

15   Q.   Okay.  So and then did you attach whatever you

16   received that you identified as a K to your tax return, as

17   best you know, or used the elements of that were in the

18   document for your tax return?

19   A.   It's been so long ago, I don't remember.

20   Q.   Okay.  Are you familiar with something called a

21   K-1?

22   A.   Yes, that's really what I meant.  I think I

23   really had the K-1 is what I had used.

24   Q.   Okay.

25   A.   I'm sorry on that one.

197

EXHIBIT #36: 262
22-CV-01616-BAS-DDL

1      Q.    And then you were asked a question regarding 48.

2   Is 48 over there?

3      A.    Here's 48.

4      Q.    You were asked a question about 48 -- maybe it's

5   49.  Let me see.

6            Let's see if we can do it this way.  Do you

7   recall a question by Mr. Gruher about a valuation of the

8   Congress Center property of $95 million?

9      A.    Uh-huh.

10     Q.    Do you recall that?

11     A.    Yes, I do.

12     Q.    Okay.  And you were asked whether or not you had

13  any information or had seen any information of an

14  appraisal that was different than $95 million.

15           Do you recall that?

16     A.    And I answered no, I think.

17     Q.    Have you seen an appraisal from Duff and Phelps,

18  from my office?

19     A.    I don't think so, but I'm not sure.

20     Q.    Okay.  Have you seen another appraisal with a

21  different number in it?

22     A.    No, I haven't.

23     Q.    Okay.  You also said in terms of something to the

24  effect of, "I myself am owed nothing."  What did you mean

25  by that?

                                                        198

EXHIBIT #36: 263
22-CV-01616-BAS-DDL

1      A.   Well, what I meant relative to all of the rest of

2   the things, mine was a little tiny, tiny one, and my loss

3   would be -- would be very minimal compared to the others,

4   which would be tremendously large.

5      Q.   Okay.  So let's look at, for example, T33, and

6   turn to the first paragraph.

7      A.   Okay.

8      Q.   Okay.  The first paragraph reads, "This complaint

9   is on behalf of a putative class of 13,858 (sic)," quote,

10  "beneficiaries," end quote, "who invested an average of

11  $31,561 per person between July 22nd, 2002, and

12  December 31st, 2004, to acquire 43,865,000 shares of G

13  REIT, Inc., stock at a price of $10 per share pursuant to

14  a registration statement."

15           Do you recall being read that statement?

16     A.   Yes, uh-huh.

17     Q.   Yes?

18     A.   Uh-huh.

19     Q.   You have to answer audibly.

20     A.   Okay.  Yes.

21     Q.   On Paragraph 5 of -- on Page 2, the complaint

22  reads, quote, "Plaintiffs allege that there are

23  43,865,000," open quote, "units," close quote, "of the

24  trust outstanding, held collectively by 13,858,000 (sic)

25  beneficiaries, and that the defendants will allege no more

                                                         199

EXHIBIT #36: 264
22-CV-01616-BAS-DDL

1    than 12 million or 27 cents less expenses is due to the

2    beneficiaries on each of the units based upon the false

3    and self-serving accounting.  However, plaintiffs allege,

4    subject to proof at the time of trial, that the amounts

5    due to the beneficiaries, excluding punitive and exemplary

6    damages that may be awarded, is $100 million, collectively

7    $2.27 per unit, or 8.44 times more than is presently

8    reflected to be due by the trust's accounting provided on

9    its website," period, end quote.

10           Have I read that correctly?

11   A.    Yes, I do (sic).

12   Q.    Now, in the -- then under the description of

13   plaintiffs at paragraph 9, do you have a -- do you know

14   how many units you have --

15           MS. DELGADO:  I'm sorry.  Barry was disconnected.

16   We have to call back.

17           MR. CATANZARITE:  Oh, was he?  Okay.

18           (Discussion off the record.)

19           MR. CATANZARITE:  As to the units you have -- do

20   you recall the last thing you heard me say?

21           MR. GRUHER:  I heard something about the first

22   paragraph of T33.

23           MR. CATANZARITE:  Okay.  We'll go back to the

24   fifth paragraph of T33.

25           MR. GRUHER:  Thank you.  I'm there.

                                                        200

EXHIBIT #36: 265
22-CV-01616-BAS-DDL

```
1              MR. CATANZARITE:  I read that into the record,
2    Barry.  I don't know that I have to reread it.
3              MR. GRUHER:  Not a problem.  You do not.
4    BY MR. CATANZARITE:
5        Q.    So this alleges there's 43,865,000 units
6    outstanding.  And how many units did you have.
7        A.    43,865?
8        Q.    How many did you have out of the 43 million?
9        A.    It was 800, I guess.
10       Q.    800?
11       A.    Uh-huh.
12       Q.    So you were once an engineer or you are an
13   engineer.  So 800 as to 43,865,000 units, would you say
14   you had a big or small interest?
15             THE REPORTER:  I'm sorry.  Your answer?
16             THE WITNESS:  I would say it was small, what
17   would be compared to 4 million (sic).
18   BY MR. CATANZARITE:
19       Q.    Okay.  And when you were asked about how you were
20   damaged in terms of the allegation in Paragraph 5, if the
21   proof is that there's $100 million of damage, you would
22   receive 227 -- $2.27 per unit instead of 27 cents per
23   unit.  Would you be damaged by the difference?
24             MR. GRUHER:  Object to form.
25   BY MR. CATANZARITE:
```

201

EXHIBIT #36: 266
22-CV-01616-BAS-DDL

1   Q.   In other words, the allegation of the complaint

2   is that there's 100 million of damages, which is $2.27 a

3   unit.  How much would you get?

4   A.   I would be damaged, yes.

5   Q.   At 800 units, 1,600 bucks?  Is that a "yes"?

6   A.   Yes.

7   Q.   So when you were answering --

8        MR. KIBLER:  Objection.  Objection.  Does this

9   not call for expert opinion testimony, Ken?

10       MR. CATANZARITE:  It calls for him identifying

11  and putting in context from the experts who expertise the

12  value of 100 million what he meant when he said, "I myself

13  am owed nothing."  It's contextual.

14       MR. KIBLER:  I see.  I see.  Just trying to see

15  where you draw the expert line.

16       MR. GRUHER:  So you're trying to rehabilitate

17  your client's prior inconsistent testimony?

18       MR. CATANZARITE:  No.  Because it was -- it

19  was -- he did testify that he was damaged, but that he

20  didn't know by how much.

21       MR. GRUHER:  Okay.

22       MR. CATANZARITE:  Nothing further.

23       MR. GRUHER:  Okay.  If you say so.  I don't think

24  that's what the testimony was.  I think you're now

25  mischaracterizing his testimony.

202

EXHIBIT #36: 267
22-CV-01616-BAS-DDL

1          MR. CATANZARITE:  But I have nothing further.

2          MR. KIBLER:  Ken's done, Barry.  Do you have any

3  other questions?

4          MR. GRUHER:  Yes.

5

6                    FURTHER EXAMINATION

7

8  BY MR. GRUHER:

9      Q.   One more question, Mr. Carlson.  Now that Mr.

10  Catanzarite is pointing to you at a 100 million dollar

11  figure, can you then explain or have any understanding the

12  difference between the $100 million that is set forth in

13  Paragraph 5 of T33 versus the $400 million claim that is

14  set forth in T44, which is the proof of claim?

15     A.   We were just talking about that first one and --

16          MR. CATANZARITE:  Well, you'll have to get T44 in

17  front of you.

18          THE WITNESS:  Okay.  What was the paragraph on

19  44?

20  BY MR. GRUHER:

21     Q.   In the proof of claim, T44, and also at T59, the

22  amount of the claim that was filed in the bankruptcy case

23  that relates to this T33, the lawsuit, is 400,100,000.

24          Do you see that?

25     A.   Yeah.

                                                    203

EXHIBIT #36: 268
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1     Q.    And Mr. Catanzarite just pointed you to

2   Paragraph 5 of T33 and led you to the number of a damage

3   amount of $100 million.  And I'm trying to understand if

4   you can articulate or tell us what the difference is

5   between the 400 million dollar amount set forth in T44 and

6   the hundred million dollar amount that is set forth in

7   Paragraph 5 of T33.

8     A.    I think I can tell you --

9           MR. CATANZARITE:  Wait a minute.  Get 44 in front

10  of you.  Oh, here you have.  Okay.  You have it.  Sorry.

11          THE WITNESS:  I think I can tell you why we were

12  concerned with the number.  As I considered my little tiny

13  bit, as -- you know, if I lost all that, that didn't

14  amount to anything.  But big spenders with losing that

15  certain percentage would really get hurt.  And so just

16  saying that -- that my loss is small, and I shouldn't have

17  said that.  I should have said, yes, I did have a loss.

18  It would be small, but I would say I did have a loss.

19          MR. GRUHER:  All right.  Thank you, Mr. Carlson.

20  No further questions.

21          MR. KIBLER:  I have no further questions.

22          MR. CATANZARITE:  Nothing further.

23          [TIME NOTED 3:33 p.m.]

24

25                        -oOo-

                                                          204

EXHIBIT #36: 269
22-CV-01616-BAS-DDL

1

2

3

4

5

6

7

8    I, RICHARD CARLSON, do hereby declare under

9  penalty of perjury that I have read the foregoing

10  transcript; that I have made any corrections as appear

11  noted, in ink, initialed by me, or attached hereto; that

12  my testimony as contained herein, as corrected, is true

13  and correct.

14    EXECUTED this _____ day of _____,

15  20____, at _____, _____.
                    (City)              (State)

16

17

18

19    _____

20    RICHARD CARLSON

21

22

23

24

25

205

EXHIBIT #36: 270
22-CV-01616-BAS-DDL

Richard Carlson, 2/12/2020
In Re: Daymark Realty Advisors, Inc.

1          I, the undersigned, a Certified Shorthand
2     Reporter of the State of California, do hereby certify:
3          That the foregoing proceedings were taken before
4     me at the time and place herein set forth; that any
5     witnesses in the foregoing proceedings, prior to
6     testifying, were duly sworn; that a record of the
7     proceedings was made by me using machine shorthand which
8     was thereafter transcribed under my direction; further,
9     that the foregoing transcript is a true record of the
10    testimony given.
11          Further, that if the foregoing pertains to the
12    original transcript of a deposition in a Federal Case,
13    before completion of the proceedings, review of the
14    transcript [  ] was [  ] was not requested.
15          I further certify I am neither financially
16    interested in the action nor a relative or employee of any
17    attorney of any of this action.
18          IN WITNESS WHEREOF, I have this date subscribed
19    my name.
20                    **2/25/2020**
21    Dated: _____
22
23
24                              _____
                              ANGELA METZ
25                              CSR No. 12454

                                                          206

EXHIBIT #36: 271
22-CV-01616-BAS-DDL

Electronically Filed by Superior Court of California, County of Orange, 06/11/2021 03:00:00 PM.
30-2021-01180402-CU-FR-CXC - ROA # 140 - DAVID H. YAMASAKI, Clerk of the Court By Georgina Ramirez, Deputy Clerk.

1

2

3

4

5

6                     **IN THE SUPERIOR COURT OF CALIFORNIA**

7                 **ORANGE COUNTY—CENTRAL JUSTICE CENTER**

8

Richard Carlson as beneficiary of GREIT )   CASE NO. 30-2021-01180402
9  Liquidating Trust, a terminated Maryland Trust )
on behalf of himself and all others similarly )   Assigned to the Hon. Randall J. Sherman
10 situated;                                    )
                                               )
11                    Plaintiffs,              )   [proposed] **ORDER RE DEFENDANTS'**
                                               )   **APPLICATION TO EXPUNGE NOTICE**
12       v.                                     )   **OF PENDENCY OF ACTION (LIS**
                                               )   **PENDENS)**
13 MIKLES 2012 IRREVOCABLE TRUST              )
DATED MARCH 14, 2012, a trust form           )
14 unknown; *et al.*,                          )
                                               )   Date:  May 14, 2021
15                    Defendants.              )   Time:  10:00 a.m.
                                               )   Dept:  CX-105
16 _____ )

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT #36: 272
22-CV-01616-BAS-DDL

1    Counsel for Defendants Key Island, LLC, Kingfisher Mistral, LLC, and Kingfisher
2    Hangar 18, LLC applied to the Court seeking an order expunging the notices of pendency of
3    action heretofore filed by Plaintiff, having come on before this Court on May 14, 2021, at 10:00
4    a.m., and Defendants appearing ~~in person and~~ by counsel Adam Kent, and Plaintiff appearing ~~in~~
5    ~~person and~~ by his counsel Kenneth Catanzarite, and the Court having considered the application,
6    documents, and declarations in support of this application and opposed thereto, ~~and oral and~~
7    ~~documentary evidence having been introduced at the hearing~~ and the matter having been argued
8    and submitted,

9    It is hereby ordered, that the Court's tentative ruling is the ruling, and the notices of
10   pendency of action recorded by Plaintiff upon the real property described in the Complaint as "the
11   Indio Property," the legal description attached hereto as Exhibit A, "the Fresno Property," the
12   legal description attached hereto as Exhibit B, and "the Airport Property" the legal description
13   attached hereto as Exhibit C, are hereby expunged.

14   Further, in accordance with the Court's tentative ruling, it is ordered that Defendant's
15   request ~~motion~~ for attorney's costs and fees is granted and the costs and fees are assessed at
16   $13,600 and Plaintiff ~~is ordered to~~ must pay these within 30 days of May 14, 2021.

17   **IT IS SO ORDERED.**

18   Dated: **June 11, 2021**

     *Randall J Sherman*
19   Randall J. Sherman
     Judge of the Superior Court

20

21

22

23

24

25

26

27

28

EXHIBIT #36: 273
22-CV-01616-BAS-DDL

**Exhibit A**

EXHIBIT #36: 274
22-CV-01616-BAS-DDL

PARCEL NO. 1

Lot 1 *70* (the *"Lot"*) of Tract No. 34920-2, as shown on that certain Subdivision Map filed on April 12, 2011, in Book 433 of Tract Maps at Pages 86 through 92, filed in the Office of the Riverside County Recorder, California (the *"Map"*).

RESERVING THEREFROM, for the benefit of Grantor, its successors in interest, assigns and others, together with the right to grant and transfer all or a portion of the same:

A. Any and all remaining oil rights, mineral rights, natural gas rights and rights to all other hydrocarbons by whatsoever name known, to all geothermal heat and to all products derived from any of the foregoing (collectively, *"Subsurface Resources"*);

B. The perpetual right to drill, mine, explore and operate for and to produce, store and remove any of the Subsurface Resources on or from the Lot, including the right to whipstock or directionally drill and mine from lands other than the Lot, wells, tunnels and shafts into, through or across the subsurface of the Lot, and to bottom such whipstocked or directionally drilled wells, tunnels and shafts within or beyond the exterior limits of the Lot, and to redrill, retunnel, equip, maintain, repair, deepen and operate any such wells or mines, but without the right to drill, mine, explore, operate, produce, store or remove any of the Subsurface Resources through or in the surface or the upper five hundred feet (500') of the subsurface of the Lot; and

C. All water and water rights, if any, within and underlying the Lot.

ALSO RESERVING THEREFROM, for the benefit of Grantor, its successors in interest, assigns and others, easements for access, ingress, egress, encroachment, support, maintenance, drainage, repair, and for other purposes, all as may be shown on the Map, and as described in that certain Declaration of Covenants, Conditions and Restrictions for Sun City Shadow Hills, recorded on December 9, 2003, as Instrument No. 2003-961274 (as may be amended or supplemented, the *"Declaration"*) and Declaration of Annexation for Phase 75 of Sun City Shadow Hills, recorded April 13, 2011, as Document No. 2011-0162400 (as may be amended or restated, collectively, the *"Declaration of Annexation"*), all in the Official Records of Riverside County, California.

FURTHER RESERVING THEREFROM, the right to enter the Lot (i) to complete and repair any improvements or landscaping located thereon as determined necessary by Grantor, in its sole discretion, (ii) to comply with requirements for the recordation of the Map or the grading or construction of the Development, as defined in the Declaration, or (iii) to comply with requirements of applicable governmental agencies. Grantor shall provide reasonable notice to Grantee before such entry. If this reservation of right of entry is not complied with by Grantee, Grantor may enforce this right of entry in a court of law. Grantee shall be responsible for all damages arising out of such failure to comply, including attorneys' fees and court costs. The term of this reservation of right of entry shall automatically expire twelve (12) years from the date of recordation of this Grant Deed.

PARCEL NO. 2

Nonexclusive easements for access, drainage, encroachment, maintenance, repair, and for other purposes, all as may be shown on the Map, and as described in the Declaration and the Declaration of Annexation.

SUBJECT TO:

1. Nondelinquent general and special real property taxes, and special assessments;

2. All other covenants, conditions, restrictions, easements, reservations, rights and rights-of-way of record, including without limitation, the Declaration, the Declaration of Annexation and the Map  and

3. All (i) matters discoverable or ascertainable by inspection or survey of the Lot, (ii) zoning ordinances and regulations and any other laws, ordinances or governmental regulations restricting the use, occupancy or enjoyment of the Lot, and (iii) any other matters already permitted or approved by Grantee.

EXHIBIT #36: 275
22-CV-01616-BAS-DDL

| | | typical of the class, that plaintiff will adequately represent the class's interests, and that a class action is a superior method for the adjudication of the claims alleged.  The complaint also sufficiently pleads facts that would support a ruling that common questions of law and fact predominate over individual ones.<br><br>Plaintiff is ordered to give notice of the ruling unless notice is waived. |
|---|---|---|
| 2 | **Mobile Farming Systems, Inc. vs. Probst**<br>**2019-01046904** | Defendant Richard Joseph Probst's Motion to Uphold Designation of Documents as Confidential Pursuant to the Parties' Protective Order is granted, except that the motion is denied as to CTI's insurance policy (RP 002774-002845).  Plaintiff's Evidentiary Objection is sustained.<br><br>Pursuant to the parties' Stipulation and Protective Order filed on May 29, 2020, the Designating Party had the right to designate as "Confidential" any documents "that the Designating Party in good faith believes to contain nonpublic information that is entitled to confidential treatment under applicable law".  Since tax returns are privileged under California law, MFS's tax returns are entitled to confidential treatment.  Webb v. Standard Oil Co. (1957) 49 Cal. 3d 509, 513.  Since accounting and financial records are typically treated as confidential, and are typically labeled confidential when being produced pursuant to a protective order, MFS's accounting and financial records are entitled to similar protection.  Valley Bank of Nevada v. Superior Court (1975) 15 Cal. 3d 652, 656-57 (financial records are confidential in nature); Moskowitz v Superior Court (1982) 137 Cal. App. 3d 313, 317-18.  Design schematics for MFS's intellectual property are also a classic example of protected information under a protective order.  Bridgestone/Firestone, Inc. v. Superior Court (1992) 7 Cal. App. 4th 1384, 1393 (applying to trade secrets).  CTI's insurance policy, however, does not appear to be protectable.  Although Probst argues that policy information such as the policy number, the scope of coverage, and premium amounts are confidential, such information does not fall within Ins. Code §791.13, which applies to personal or privileged information about an individual collected or received in connection with an insurance transaction.  The parties concur that the test on this motion, as to whether information is entitled to confidential treatment under applicable law, as the parties' Protective Order requires, is the test found in CCP §2031.060(b), whether a protective order is necessary to protect any party or other person from unwarranted annoyance, embarrassment, or oppression, or undue burden and expense.  The court concludes that this test is satisfied for all the disputed documents except CTI's insurance policy.<br><br>MFS's argument that the protected documents include MFS's own records, and so MFS should be able to use them as it sees fit, disregards the fact that there are no such restrictions on MFS's use of documents it already has.  Since Probst contends that MFS's attorney wasn't duly hired by MFS, that would explain why the plaintiff in this litigation doesn't already have the MFS records that are the subject of this dispute.  Finally, MFS's argument that this court should use |

EXHIBIT #36: 290
22-CV-01616-BAS-DDL

1    Adam T. Kent (274275)
     21309 Tulsa Street
2    Chatsworth, CA 91311
     (818) 298-5614
3    adam.t.kent@gmail.com

4    Counsel for Defendants
     Key Island, LLC, Kingfisher Hangar 18, LLC, and
5    Kingfisher Mistral, LLC

6

                 **IN THE SUPERIOR COURT OF CALIFORNIA**

7

              **ORANGE COUNTY—CENTRAL JUSTICE CENTER**

8

9    Richard Carlson as beneficiary of GREIT    )    CASE NO. 30-2021-01180402
     Liquidating Trust, a terminated Maryland Trust   )
10   on behalf of himself and all others similarly    )    Assigned to the Hon. Randall J. Sherman
      situated;    )
11                           )    **NOTICE OF RULING ON**
              Plaintiffs,    )    **DEFENDANTS' APPLICATION TO**
12                       )    **EXPUNGE NOTICE OF PENDENCY OF**
       .     v.    )    **ACTION [LIS PENDENS]**
13                       )
     MIKLES 2012 IRREVOCABLE TRUST    )    **Related to ROA# 94**
14   DATED MARCH 14, 2012, a trust form    )
     unknown; *et al.*,    )    **Reservation Number: 73514177**
15                       )
            Defendants.    )    Date: May 14, 2021
16                       )
    _____ )    Time: 10:00 a.m.
17                           Dept: CX-105

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT #36: 294
22-CV-01616-BAS-DDL

1   **TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

2       **PLEASE TAKE NOTICE** that on May 14, 2021 at 10:00 a.m. in the above-entitled Court

3   the application to expunge notice of pendency of action filed in the above-entitled action by

4   Defendants Key Island, LLC, Kingfisher Hangar 18, LLC, and Kingfisher Mistral, LLC

5   ("Defendants") came before the Court for hearing as noticed. Adam T. Kent appeared for the

6   Defendants and Kenneth J. Catanzarite appeared for the Plaintiff. The Court considered the moving

7   papers, opposition papers, reply papers, and oral argument. The Court ruled that the tentative ruling

8   granting Defendants' application to expunge and awarding Defendants' reasonable attorneys' fees

9   became the final ruling. The Court ordered Defendants' Counsel to give notice of the ruling.

10  Attached hereto as Exhibit 1 is a true and correct copy of the Court's tentative ruling.

11  Dated: May 14, 2021

12                                          By: */s/ Adam T. Kent*
13                                              Adam T. Kent
                                                Counsel for Defendant Key Island, LLC,
14                                              Kingfisher Hangar 18, LLC, and
                                                Kingfisher Mistral, LLC
15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT #36: 295
22-CV-01616-BAS-DDL