JUSTIN S. BECK
3501 ROSELLE ST.
OCEANSIDE, CA 92056
760-449-2509
justintimesd@gmail.com
*In Pro Per + Guardian Ad Litem*

**FILED**

JAN 1 3 2023

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ____ DEPUTY

# UNITED STATES DISTRICT COURT

## FOR THE

## SOUTHERN DISTRICT OF CALIFORNIA

JUSTIN S. BECK, et al.

Plaintiff,

vs.

CATANZARITE LAW CORPORATION, et al.

Defendants,

Case No.: 3:22-CV-01616-BAS-DDL

Hon. Cynthia A. Bashant

**REQUEST FOR JUDICIAL NOTICE OF ADJUDICATIVE FACTS WITH MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Filed Concurrently with Attachments:

A: California Rules of Court 8.1115 (Concerning Reliance on Unpublished Opinions in Criminal Actions)

B; California Rules of Professional Conduct 1.0.1 (Concerning the Definition of "fraud" and "fraudulent" under 1.0.1(d)[3] for Each Attorney Defendant)

**REQUEST FOR JUDICIAL NOTICE OF ADJUDICATIVE FACTS**

In accordance with Federal Rules of Evidence Rule 201. Judicial Notice of Adjudicative Facts, Justin S. Beck, the plaintiff ("Beck" or "plaintiff") respectfully requests this Court take judicial notice of adjudicative facts #1 through #64 for the reasons stated supporting each. Beck asserts that no fact contained herein is subject to "reasonable" dispute beyond obfuscation, deception, or deliberate delay.

**I.     KINDS OF FACTS FOR JUDICIAL NOTICE**

Under F. R. Evid. 201(b) Kinds of Facts That May Be Judicially Noticed. The Court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

**II.    METHOD OF JUDICIAL NOTICE**

Under F. R. Evid. 201(c), the Court: (1) may take judicial notice on its own; or (2) must take judicial notice if a party requests it and the court is supplied with the necessary information. Timing under subsection (d) holds that judicial notice may occur at any stage of the proceeding.

**III.   TIMELY REQUEST IS MADE HERE**

Under F. R. Evid. 201(e), on timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed. If the court takes judicial notice before notifying a party, the party, on request, is entitled to be heard.

**IV.    INSTRUCTING THE JURY**

Plaintiff requests the Court take notice, so it must take notice, here. Under F. R. Evid. 201(f), in a civil case, the court must also instruct the jury to accept the noticed fact as conclusive.

**V.     ADJUDICATIVE FACTS FOR JUDICIAL NOTICE**

#1. **The State Bar of California is an association-in-fact enterprise engaged in, and whose activities affect interstate commerce**. This fact is generally known within the trial court's territorial jurisdiction under F. R. Evid. 201(b)(1).

#2. **The State Bar of California is a non-sovereign, public entity under majority control of active market participants in regulation**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(1).

1        **#3. Individual attorney defendants Ruben Duran, Suzanne Celia Grandt, Ellin Davtyan,**

2 **George Sargent Cardona, Robert George Retana, Eli David Morgenstern, Leah Wilson, Kenneth**

3 **Catanzarite, Jim Travis Tice, Nicole Marie Catanzarite Woodward, Brandon Woodward, and**

4 **Tim James O'Keefe are each employed by or associated with The State Bar of California**

5 **enterprise.** This fact is generally known within the trial court's territorial jurisdiction under F. R. Evid.

6 201(b)(1).

7        **#4. Entity defendants The State Bar of California, Catanzarite Law Corporation, and**

8 **Orange County District Attorney's Office are each associated with The State Bar of California**

9 **enterprise.** This fact is generally known within the trial court's territorial jurisdiction under F. R. Evid.

10 201(b)(1).

11        **#5. Individual defendants John C. Gastelum and Jorge E. Navarette are each employed by**

12 **or associated with The State Bar of California enterprise.** This fact can be accurately and readily

13 determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2),

14 namely Orange County Superior Court's or The State Bar of California's website for Gastelum, and

15 Supreme Court of California's website respecting its Headquarters, mail facility and Jorge E. Navarette.

16        **#6. Attorneys Thomas V. Girardi, David Lira, Keith Griffin, Todd Allan Spitzer, Michael**

17 **Avenatti, Stephen Young Kang, Walter J. Lack, Howard Miller, Robert Irving Slater, Ebrahim**

18 **Baytieh, Moses Luna, Eric Garner, Matthew Charles Elstein, Carissa Andresen, James Cato**

19 **Ferguson, Eric V. Anderton, James P. Gray, and John K. Trotter, Jr. are or were each employed**

20 **by or associated with The State Bar of California enterprise.** This fact can be accurately and readily

21 determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2),

22 namely, The State Bar of California's website. See also ***Docket #10***, Thomas V. Girardi (***#10-4, Ex. 1;***

23 ***#10-46, Ex. 42***), David Lira, (***#10-45, Ex. 41; #10-46, Ex. 42***), Keith Griffin (***Ibid***), Todd Allan Spitzer

24 (***#10-86, Ex. 127; #10-15, Ex. 11; #10-16, Ex. 12***); , Michael Avenatti (***#10-70, Ex. 82***), Stephen Young

25 Kang (***#10-53, Ex. 51; #10-54, Ex. 52***) Walter J. Lack (SBN #57550), Howard Miller (***#10-4, Ex. 1***),

26 Robert Irving Slater (***#10-47, Ex. 44; #10-48, Ex. 46***), Ebrahim Baytieh (***#10-49, Ex. 47; #10-50, Ex.***

27 ***48***), Moses Luna (***#10-51, Ex. 49; #10-52, Ex. 50***), Eric Garner (SBN #131232 and SBN #130665),

28 Matthew Charles Elstein (***#10-69, Ex. 91***), Carissa Andresen (SBN #278118), James Cato Ferguson

22-CV-1616-BAS-DDL

1 | (SBN #168977), Eric V. Anderton (SBN #275938), James P. Gray (SBN #51974), and John K. Trotter,

2 | Jr. (SBN #33051).

3 |   #7. **Gavin Newsom, Tani Gorre Cantil Sakauye, Hailyn Chen, Michael Redding, Tom**

4 | **Umberg, Margie Estrada, Charles Tsai, Joan Randolph, Enrique Zuniga, Kyla Lowery, James**

5 | **Chang, and Brady Dewar are each employed by or associated with The State Bar of California**

6 | **enterprise**. This fact can be accurately and readily determined from sources whose accuracy cannot be

7 | reasonably questioned under F. R. Evid. 201(b)(2), namely, The State Bar of California's website or

8 | California Supreme Court's website. Gavin Newsom (appoints Board of Trustees, Appellate Justices to

9 | Fourth District, Division Three), Tani Gorre Cantil Sakauye (Retiring Chief Justice of California

10 | Supreme Court), Hailyn Chen (Board of Trustees; Appointed by California Supreme Court), Michael

11 | Redding (SBN #295502), Thomas Umberg (SBN #94345), Margie Estrada (SBN #233957), Charles

12 | Tsai (SBN #266480), Enrique Zuniga (SBN #332710), Kyla Lowery (SBN #249377), and Brady Dewar

13 | (SBN #252776).

14 |   #8. **The State Bar of California operates a postal mail facility affecting interstate commerce**

15 | **from 180 Howard Street, San Francisco, California, 94105**. This fact is generally known within the

16 | trial court's territorial jurisdiction under F. R. Evid. 201(b)(1).

17 |   #9. **The State Bar of California operates a postal mail facility affecting interstate commerce**

18 | **from 845 S. Figueroa Ave., Los Angeles, California, 90017**. This fact is generally known within the

19 | trial court's territorial jurisdiction under F. R. Evid. 201(b)(1).

20 |   #10. **Orange County Superior Court operates a postal mail facility affecting interstate**

21 | **commerce from 700 W. Civic Center Drive, Santa Ana, California, 92701**. This fact is generally

22 | known within the trial court's territorial jurisdiction under F. R. Evid. 201(b)(1).

23 |   #11. **Orange County Superior Court operates a postal mail facility affecting interstate**

24 | **commerce from 751 W. Santa Ana Blvd., Santa Ana, California, 92701**. This fact is generally known

25 | within the trial court's territorial jurisdiction under F. R. Evid. 201(b)(1).

26 |   #12. **Catanzarite Law Corporation operates a postal mail facility affecting interstate**

27 | **commerce from 2231 W. Lincoln Ave., Anaheim, California, 92801**. This fact can be accurately and

28 | readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid.

22-CV-1616-BAS-DDL

201(b)(2), namely, reviewing Orange County Superior Court and Court of Appeal filings, notices of motion, and similar papers described herein reliant on the wire and mail. See *Fincanna Capital Corp. v. Cultivation Tech.*, No. G058700, (Cal. Ct. App. Jun. 28, 2021). See also *(Docket #10, #10-4, Ex. 0)*

#13. **Jorge E. Navarette operates a postal mail facility affecting interstate commerce from Supreme Court of California Headquarters, 350 McAllister St., San Francisco, California, 94102.** This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, *Docket #10, #10-58, Ex. 61.*

#14. **Jim Travis Tice is a former associate of Catanzarite Law Corporation**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, *Docket #10, #10-31, Ex. 30; #10-21, Ex. 21, Part 2, PageID.1038.*

#15. **Jim Travis Tice represented Kenneth Catanzarite in State Bar Court in 1998**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, State Bar Court's website. See Also *Docket #10, #10-71, Ex. 85 or State Bar Court Case No. 94-O-19410.*

#16. **Catanzarite Law Corporation filed Orange County Superior Court Case No. 30-2019-01064267 *Richard Mesa v. Cultivation Technologies, Inc.* on or around April 16, 2019**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2).

#17. **Catanzarite Law Corporation, its attorneys Kenneth Catanzarite, Nicole Marie Catanzarite Woodward, Tim James O'Keefe, Brandon Woodward, and Eric V. Anderton were disqualified by Orange County Superior Court in *Richard Mesa v. Cultivation Technologies, Inc.* Case No. 30-2019-01064267 on or around November 15, 2019**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings for which exculpatory evidence cannot be produced. (G058700)

#18. **Catanzarite Law Corporation appealed the disqualification order in *Richard Mesa v. Cultivation Technologies, Inc.* Case No. 30-2019-01064267**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2),

namely, Court of Appeal rulings for which exculpatory evidence cannot be produced. *Fincanna Capital Corp. v. Cultivation Tech.*, No. G058700, (Cal. Ct. App. Jun. 28, 2021)

#19. **The Fourth District, Division Three Court of Appeal upheld the disqualification order in *Richard Mesa v. Cultivation Technologies, Inc.* Case No. 30-2019-01064267 citing mandatory law on or around June 28, 2021 (G058700)**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings for which exculpatory evidence cannot be produced. "This case raises issues related to motions to disqualify Catanzarite, a law firm filing six lawsuits while simultaneously representing two corporations, three corporate subsidiaries, and a group of minority shareholders of both corporations. Specifically, the corporate entities are the following: (1) MFS, the plaintiff in the MFS Action, (2) CTI, the cross-complainant and defendant in the FinCanna Action, (3) CTI Subsidiaries, the cross-complainants and defendants in the FinCanna Action, and (4) CTI, the plaintiff in the Scottsdale Action. The minority shareholders groups include members of the O'Connor Faction as follows: (1) Pinkerton, a MFS shareholder and plaintiff in the Pinkerton Action; (2) Mesa, Cooper, Mebane and a class action of shareholders, all plaintiffs in the Mesa Action; (3) Cooper and Mebane, who are MFS/CTI shareholders and plaintiffs in the Cooper action." *Fincanna Capital Corp. v. Cultivation Tech.*, No. G058700, 16 (Cal. Ct. App. Jun. 28, 2021).

#20. **Jim Travis Tice is still associated with Catanzarite Law Corporation in fact**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings for which exculpatory evidence cannot be produced. "The trial court sustained the demurrer without leave to amend, finding that the amended complaint was a "sham" pleading engineered to avoid the statute of limitations. Was it? Yes. We agree with the trial court that Corzo's amended complaint was a sham pleading." *Corzo v. Parks Palmer Turner & Yemenidjian, LLP*, No. B285691, 2 (Cal. Ct. App. Nov. 29, 2018). "Where the record permits review, Corzo's arguments lack merit" *Corzo v. Bellehumeur*, No. B312676, 1 (Cal. Ct. App. Jul. 15, 2022). On June 30, 2021, the Fourth District, Division Three Court of Appeal docket in a related "Corzo" case in which Catanzarite Law Corporation, Kenneth Catanzarite, and Tim James O'keefe have appeared as well as Jim Travis Tice: "Motion granted and appeal dismissed." "In short, given the dispute

1  between SWD and its principals, on the one hand, and Corzo, on the other, Tice cannot adequately

2  represent the partnership and its general partners. Accordingly, the motion to disqualify Tice is granted.

3  Further, because Tice was without authority to file a notice of appeal on the partnership's behalf, the

4  notice of appeal filed by Corbell on May 11, 2021 must be, and is, dismissed. (See also Friedman et al.

5  Cal. Prac. Guide: Corporations (The Rutter Group 2021) ¶ 2:37.3b [entities regarded as "separate" from

6  their owners, including partnerships, may not appear pro se].)"

7       #21. **A pattern of racketeering activity exists by The State Bar of California enterprise**.

8  This fact is [now] generally known within the trial court's territorial jurisdiction under F. R. Evid.

9  201(b)(1). This fact can be accurately and readily determined from sources whose accuracy cannot be

10  reasonably questioned under F. R. Evid. 201(b)(2), namely conviction announcements by United States

11  Department of Justice, California State Auditor Report 2022-030 *(Docket #10, #10-35, Ex. 34 referred*

12  *to in Docket #7 and available online to the public),* confirmed by evidence showing wire fraud, bank

13  fraud, mail fraud, insurance fraud, money laundering, and obstruction of justice all carried on in *Docket*

14  *#10*, Thomas V. Girardi *(#10-4, Ex. 1; #10-46, Ex. 42)*, David Lira, *(#10-45, Ex. 41; #10-46, Ex. 42)*,

15  Keith Griffin *(Ibid)*, Todd Allan Spitzer *(#10-86, Ex. 127; #10-15, Ex. 11; #10-16, Ex. 12)*; , Michael

16  Avenatti *(#10-70, Ex. 82)*, Stephen Young Kang *(#10-53, Ex. 51; #10-54, Ex. 52)*, Howard Miller *(#10-*

17  *4, Ex. 1)*, Robert Irving Slater *(#10-47, Ex. 44; #10-48, Ex. 46)*, Ebrahim Baytieh *(#10-49, Ex. 47; #10-*

18  *50, Ex. 48)*, Moses Luna *(#10-51, Ex. 49; #10-52, Ex. 50)*, Matthew Charles Elstein *(#10-69, Ex. 91)*.

19       #22. **A pattern of racketeering activity exists by the Catanzarite Law Corporation**

20  **enterprise**. This fact can be accurately and readily determined from sources whose accuracy cannot be

21  reasonably questioned under F. R. Evid. 201(b)(2), namely Court of Appeal records provided by

22  plaintiff, confirmed by evidence in *Docket #10, (#10-7, Ex. 3 or* Catanzarite v. GCL, LLC (In re

23  *Daymark Realty Advisors, Inc.),* No. 21-12766, (11th Cir. Mar. 9, 2022); *(#10-30, Ex. 28;* #10-32, Ex.

24  31; #10-33, Ex. 32; #10-36, Ex. 35; #10-37 through #10-40, Ex. 36 including testimony from Richard

25  Carlson who did not believe he suffered damages before 9 putative class actions were filed on his behalf

26  in multiple jurisdictions); see also verified first amended complaint at *Docket #7, PageID.445, 9:10*

27  "Catanzarite took the property to pay for his fees: "Given the gravity of Catanzarite's non-disclosure,

28  the court will deny all fees to Catanzarite for legal services." *Docket #7, PageID.445, 21* "Catanzarite

1  does not care about the truth in making statements to the Court." *Docket #7, PageID.446, 12* "The court

2  stated that Catanzarite's case was a "sham." Linking Mr. Tice again, "Catanzarite Law Corporation,

3  Kenneth J. Catanzarite, Ronald R. Roundy and Eric V. Anderson for Petitioner and Respondent." "Tice

4  petition was filed by the same [Catanzarite] attorneys who represented Erika in objecting to the Noroski

5  petition." *Tice v. Noroski (In re Estate of Schneider)*, No. G047377, (Cal. Ct. App. Nov. 8, 2013) *Docket*

6  *#7, PageID.447, 5* "violation of a preliminary injunction." *Docket #7, PageID.447, 8:9* "Mr. Catanzarite

7  must pay $49,020.50 and $11,639.25 for sanctionable conduct." *Docket #7, PageID.447, 13:15* "any

8  further violations of this Court's Orders, the Bankruptcy Code, Bankruptcy Rules, or the Local Rules

9  will result in an order requiring Mr. Catanzarite to show cause why his pro hac vice status should not be

10  revoked." *Docket #7, PageID.447, 18:24*, "Mr. Catanzarite filed a "false affidavit" to certify his pro hac

11  vice status, and that he was in fact suspended from the practice of law in New York, that he "refuses to

12  be governed by" the rules of the court and professional conduct in that jurisdiction, that a website he

13  published "contained misleading information" and "otherwise sought to undermine the bankruptcy

14  process," that he engaged in "numerous discovery violations" resulting in "sanctions," that he engaged

15  in "unilaterally noticing depositions at an inconsiderate and inconvenient time and place," "violation of

16  preliminary injunction," and that he filed a "false emergency" that was "completely meritless." *Docket*

17  *#7, PageID.447, 26:28*, "testimony from a party [Richard Carlson] involved shows that Catanzarite

18  improperly solicited him at his home and the party did not believe he had suffered any damages" before

19  9 putative class actions were filed on his behalf. *Docket #7, PageID.448, 3:4*, "the lis pendens was found

20  to violate a court order, and $13,600 in costs were imputed to Catanzarite or his client." *Docket #7,*

21  *PageID.448, 10:13* "MFS's attorney [Catanzarite Law Corporation] wasn't duly hired by MFS,"

22  without noting that Catanzarite was suing MFS in the Pinkerton/Root Action derivatively, or that it

23  corruptly assumed the role of legal counsel for Cultivation Technologies, Inc. which it was also suing

24  through MFS."

25      #23. **A pattern of racketeering activity exists by the Orange County Superior Court**

26  **enterprise**. This fact can be accurately and readily determined from sources whose accuracy cannot be

27  reasonably questioned under F. R. Evid. 201(b)(2), namely, most of the activity carried on in ¶ 22,

28  releases from United States Department of Justice, and Court of Appeal records involving The State Bar

of California or Catanzarite Law Corporation e.g. ***Docket #10, #10-17, Ex. 13***: US DOJ Press Release Number 17-166 for USAO – California, Central "Former Clerk in Orange County Superior Court Sentenced to Over 11 Years in Federal Prison for Racketeering Offense Stemming from Bribery Scheme to 'Fix' Criminal Cases and Traffic Charges"

#24. **A pattern of racketeering activity exists by the Orange County District Attorney's Office enterprise**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, United States Department of Justice, as well as establishing or carrying on conduct within its jurisdiction by Orange County Superior Court and by Catanzarite Law Corporation. US DOJ Press Release 22-1097 (Civil Rights) provides proof. ***Docket #10; #10-86, Ex. 127; #10-15, Ex. 11; #10-16, Ex. 12; #10-56, Ex. #54 ("don't have jurisdiction over federal crimes")***

#25. **Orange County District Attorney's Office has engaged in a pattern of constitutional violations under the Fourteenth Amendment against non-attorney members of the public including Beck**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, United States Department of justice, as well as ratifying conduct within its jurisdiction by Catanzarite Law Corporation. US DOJ Press Release 22-1097 (Civil Rights) provides proof. ***Docket #10; #10-86, Ex. 127; #10-15, Ex. 11; #10-16, Ex. 12; #10-56, Ex. #54 ("don't have jurisdiction over federal crimes")***. See also ¶ 22-23 within its jurisdiction.

#26. **Catanzarite Law Corporation engaged in judicial deception that caused deprivation of Beck's liberty for all times relevant**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings for which exculpatory evidence cannot be produced. See ¶ 22. "Catanzarite tainted all litigation involving CTI after purporting to represent the corporation and at the same time prosecuting a derivative shareholder action against CTI." *Fincanna Capital Corp. v. Cultivation Tech.*, No. G058700, 29 (Cal. Ct. App. Jun. 28, 2021).

#27. **Catanzarite Law Corporation fraudulently appeared on behalf of Cultivation Technologies, Inc. using the wire without authority to defraud Beck and creditors**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under

22-CV-1616-BAS-DDL

F. R. Evid. 201(b)(2), namely, Court of Appeal, namely, rulings for which exculpatory evidence cannot be produced. G058700 and G059766. "This case raises issues related to motions to disqualify Catanzarite, a law firm filing six lawsuits while simultaneously representing two corporations, three corporate subsidiaries, and a group of minority shareholders of both corporations. Specifically, the corporate entities are the following: (1) MFS, the plaintiff in the MFS Action, (2) CTI, the cross-complainant and defendant in the FinCanna Action, (3) CTI Subsidiaries, the cross-complainants and defendants in the FinCanna Action, and (4) CTI, the plaintiff in the Scottsdale Action. The minority shareholders groups include members of the O'Connor Faction as follows: (1) Pinkerton, a MFS shareholder and plaintiff in the Pinkerton Action; (2) Mesa, Cooper, Mebane and a class action of shareholders, all plaintiffs in the Mesa Action; (3) Cooper and Mebane, who are MFS/CTI shareholders and plaintiffs in the Cooper action." *Fincanna Capital Corp. v. Cultivation Tech.*, No. G058700, 16 (Cal. Ct. App. Jun. 28, 2021) Around this same time, Catanzarite sent CTI's largest secured creditor, FinCanna, an e-mail stating future modifications or agreements between them must be signed by the new CTI board members (O'Connor, Zakhireh, and Duffy). (See *Cultivation, supra,* G059457 [detailed discussion of Catanzarite's damaging e-mails to CTI's business partners]). Catanzarite also took steps to interfere with CTI's proposed merger with Western Troy Capital Resources, Inc, by writing an e-mail to the company stating the new CTI directors objected to the merger. (*Ibid.*) *Beck v. Catanzarite Law Corp.*, No. G059766, 12 (Cal. Ct. App. Jul. 13, 2022)

    #28. **Catanzarite Law Corporation fraudulently appeared on behalf of Cultivation Technologies, Inc. using the wire without authority to defraud Beck and his insurance carrier Scottsdale Insurance Co., underwritten by Nationwide**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings for which exculpatory evidence cannot be produced. "Beck submitted a document filed in the United States District Court, Central District, showing Catanzarite filed the Scottsdale Action claiming to be CTI's authorized corporate counsel. The document reflected that on November 18, 2019, CTI dismissed the action against CTI's insurance company "in its entirety." As noted in our prior opinion, on November 15, 2019, the court granted the motion disqualifying Catanzarite from representing CTI. (*FinCanna, supra,* G058700.) In making its ruling, the court noted

Catanzarite could not represent two client adversaries and in the Scottsdale Action CTI claimed to be representing the corporation and at the same time sought to invalidate a defense and indemnity for CTI directors under CTI's insurance policy. (*Ibid.*) The court stated a denial of coverage could put CTI "'on the hook for the individuals' costs of defense and/or liability.'" In other words, the court recognized Catanzarite was improperly using the Scottsdale Action for an improper purpose, i.e., to help his clients in the Mesa Action. Accordingly, this dismissal was a favorable termination on the merits. *Beck v. Catanzarite Law Corp.*, No. G059766, 33 (Cal. Ct. App. Jul. 13, 2022) "As will be described in more detail below, we affirmed the trial court's determination Catanzarite could not represent CTI in any manner (including its prosecution of the FinCanna Action)" *Beck v. Catanzarite Law Corp.*, No. G059766, 2 (Cal. Ct. App. Jul. 13, 2022) We also concluded neither Catanzarite nor its attorneys could continue advocating for a group of shareholders bringing a derivative lawsuit against CTI and its board members in the Mesa Action. (*Ibid.*) We held in *FinCanna*, "The undisputed nature of the lawsuits, involving parties with conflicting interests, and a corporation with adversarial directors, supported mandatory disqualification as a matter of law." (*Ibid.*) *Beck v. Catanzarite Law Corp.*, No. G059766, 2 (Cal. Ct. App. Jul. 13, 2022)

#29. **The Court of Appeal agreed that Beck's malicious prosecution claims have merit through a *prima facie* case, which means that when his evidence is credited, it will sustain a judgment in his favor.** This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings for which exculpatory evidence cannot be produced. Beck also shows that Orange County Superior Court is carrying on Catanzarite Law Corporation's racketeering, with predicate convictions with clerks obstructing justice. In Court of Appeal Case No. G059766, "Beck asserts most of his claims are not based on petitioning activity and he would be successful on the merits of his malicious prosecution action. We conclude his contentions have merit" *Beck v. Catanzarite Law Corp.*, No. G059766, 1 (Cal. Ct. App. Jul. 13, 2022) "January 2019 was a busy month for Catanzarite, setting in motion the group's corporate takeover scheme. On January 4, 2019, it dismissed Scudder and Aroha from the Pinkerton Action. On January 22, 2019, it dismissed O'Connor, TGAP, and Unfug. The following day, Catanzarite dismissed Cooper and Higgerson. Thereafter, O'Connor and Cooper used their MFS shareholder votes

1      to reconstitute the MFS board of directors. MFS hired Catanzarite as corporate counsel.*Beck v.*

2      *Catanzarite Law Corp.*, No. G059766, 11 (Cal. Ct. App. Jul. 13, 2022) However, it was Catanzarite's

3      misuse of the judicial process that formed the basis for Beck's malicious prosecution claims. On January

4      28, 2019, Catanzarite filed the MFS Action. The claims were brought "derivatively on behalf of its

5      wholly owned subsidiary [n]ominal [d]efendant [CTI]." It named as defendants CTI's board of directors

6      (Probst, Beck, Kamm, and Motta), CTI attorneys (Einhorn and Bernheimer) and several entities (EM2,

7      RAD, and Tow and Grow). CTI was named as a nominal defendant. MFS raised nine causes of action

8      and sought declaratory relief and a permanent injunction. MFS asserted it was entitled to file a derivative

9      action because it organized CTI and acquired 28,000,000 shares of CTI common stock, and therefore,

10      CTI was its wholly owned subsidiary. Catanzarite drafted a complaint telling a remarkably different

11      story from the one set forth in the Pinkerton Action. The lawsuit reflected an abrupt shift in allegiances.

12      O'Connor and his allies turned against their former board members Probst and Beck. Indeed, the MFS

13      Action did not allege O'Connor, Cooper, TGAP, Higgerson, Aroha, or Unfug took part in any

14      wrongdoing while they were in control of CTI. Rather these parties were portrayed as "the good guys"

15      who were victimized by Probst, Beck, and other parties who wrongfully sold and purchased CTI shares

16      that belonged to MFS. We note Catanzarite filed the MFS Action acting as MFS's purported corporate

17      counsel while still representing different a shareholder in a derivative action against both MFS and CTI

18      (Pinkerton Action). *Beck v. Catanzarite Law Corp.*, No. G059766, 12-13 (Cal. Ct. App. Jul. 13, 2022)

19           #30. **The Pinkerton and MFS Action both achieved favorable termination reflecting Beck's**

20      **innocence**. This fact can be accurately and readily determined from sources whose accuracy cannot be

21      reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings for which

22      exculpatory evidence cannot be produced. "It is undisputed Catanzarite voluntarily dismissed the Root

23      Action and the MFS Action on March 5, 2020. It dismissed the Scottsdale Action on November 18,

24      2019. "[A] voluntary dismissal is presumed to be a favorable termination on the merits[.] [Citation.]"

25      (*Lee, supra,* 41 Cal.App.5th at p. 720.)" *Beck v. Catanzarite Law Corp.*, No. G059766, 31 (Cal. Ct. App.

26      Jul. 13, 2022).). So Catanzarite just re-filed the MFS Action instead using control of the enterprise.

27           #31. **Even after adjudication of material facts, Catanzarite continued its fraudulent scheme**

28      **in which The State Bar of California and its employees were each pivotal in ratifying**. This fact can

11

22-CV-1616-BAS-DDL

1  be accurately and readily determined from sources whose accuracy cannot be reasonably questioned

2  under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings for which exculpatory evidence cannot be

3  produced. The continuance of the conduct is proof of ratification. "The record shows that three months

4  after the court ruled MFS was not CTI's shareholder, Catanzarite amended the complaints in the

5  Pinkerton Action and MFS Action by deleting the derivative causes of action." *Beck v. Catanzarite Law*

6  *Corp.*, No. G059766, 32-33 (Cal. Ct. App. Jul. 13, 2022) ).

7  .       #32. **The Pinkerton and MFS Action both achieved favorable termination on the merits**

8  **reflecting Beck's innocence**. This fact can be accurately and readily determined from sources whose

9  accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings

10  for which exculpatory evidence cannot be produced. If exculpatory evidence is produced, it is fabricated

11  or ante-dated, or it would have been produced. "It is more likely Catanzarite's voluntary dismissal of the

12  two lawsuits was related to a later disqualification ruling and the lack of tenable claims. The dismissals

13  took place just a few months after the court disqualified Catanzarite and its attorneys from representing

14  CTI and the Mesa Action plaintiffs (the class action shareholder derivative lawsuit). Given Catanzarite's

15  zeal for filing multiple lawsuits against the same defendants, we can assume it would not abandon a

16  meritorious action already initiated. Thus, we conclude the voluntary dismissal in this case should be

17  regarded as a favorable termination of the two lawsuits (Pinkerton Action and MFS Action). *Beck v.*

18  *Catanzarite Law Corp.*, No. G059766, 33 (Cal. Ct. App. Jul. 13, 2022)

19  #33. **The State Bar of California and Catanzarite Law Corporation both played a role in**

20  **the scheme to defraud Beck's insurer and assets**. This fact can be accurately and readily determined

21  from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely,

22  Court of Appeal rulings for which exculpatory evidence cannot be produced. "Beck submitted a

23  document filed in the United States District Court, Central District, showing Catanzarite filed the

24  Scottsdale Action claiming to be CTI's authorized corporate counsel. The document reflected that on

25  November 18, 2019, CTI dismissed the action against CTI's insurance company "in its entirety." As

26  noted in our prior opinion, on November 15, 2019, the court granted the motion disqualifying

27  Catanzarite from representing CTI. (*FinCanna, supra,* G058700.) In making its ruling, the court noted

28  Catanzarite could not represent two client adversaries and in the Scottsdale Action CTI claimed to be

representing the corporation and at the same time sought to invalidate a defense and indemnity for CTI directors under CTI's insurance policy. (*Ibid.*) The court stated a denial of coverage could put CTI "'on the hook for the individuals' costs of defense and/or liability.'" In other words, the court recognized Catanzarite was improperly using the Scottsdale Action for an improper purpose, i.e., to help his clients in the Mesa Action. Accordingly, this dismissal was a favorable termination on the merits. *Beck v. Catanzarite Law Corp.*, No. G059766, 33 (Cal. Ct. App. Jul. 13, 2022)

#34. **The State Bar of California and Catanzarite Law Corporation both played a role in the scheme to defraud Beck**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings for which exculpatory evidence cannot be produced. "As for the issue of commencement, the parties do not dispute Catanzarite and Attorneys were responsible for filing the lawsuits at issue in this case." *Beck v. Catanzarite Law Corp.*, No. G059766, 34 (Cal. Ct. App. Jul. 13, 2022)

#35. **Zakhireh has engaged in judicial deception against Beck**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings for which exculpatory evidence cannot be produced. "Zakhireh asserts he was not a party to the lawsuits at issue and cannot be held liable. We disagree....How could MFS have filed the MFS Action without the approval of its board members? *Beck v. Catanzarite Law Corp.*, No. G059766, 34 (Cal. Ct. App. Jul. 13, 2022)

#36. **Mohammed Zakhireh had a role in the scheme to defraud Beck**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings for which exculpatory evidence cannot be produced. "We conclude Zakhireh's position as both an MFS and CTI director raises a strong inference he aided the O'Connor Faction and MFS's corporate counsel (Catanzarite) with the group's plans for an illegal corporate takeover. As noted by Beck, a person who aids and abets a malicious prosecution can be held liable. (*Pacific Gas &Electric Co. v. Bear Stearns &Co.* (1990) 50 Cal.3d 1118, 1131, fn. 11 ["A person who is injured by groundless litigation may seek compensation from any person who procures or is actively instrumental in putting the litigation in motion or participates after the institution of the action"].) *Beck v. Catanzarite Law Corp.*, No. G059766, 34 (Cal. Ct. App. Jul. 13, 2022)

22-CV-1616-BAS-DDL

#37. **Amy Jeanette Cooper and Cliff Higgerson each had a role in the scheme to defraud Beck**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings for which exculpatory evidence cannot be produced. "As for Cooper and Higgerson, they were not responsible for commencing the Pinkerton Action because they were the defendants. However, one can reasonably infer Cooper and Higgerson, like O'Connor, made a deal with Catanzarite in exchange for their dismissal from the Pinkerton Action. Beck alleged Cooper and Higgerson were instrumental in assisting MFS and its shareholders in their efforts to take over CTI. These dismissed defendants helped by agreeing to testify in support of MFS's new allegedly fabricated claim to own 100 percent of CTI. Cooper's participation was further demonstrated by Beck's evidence her vote was needed before MFS's corporate counsel (Catanzarite) could file the lawsuit, because she held five million MFS shares. Cooper did not refute this evidence. *Beck v. Catanzarite Law Corp.*, No. G059766, 34-35 (Cal. Ct. App. Jul. 13, 2022)

#38. **Each defendant's actions or inactions related to Beck lack objective probable cause for the scheme to defraud Beck**: This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings for which exculpatory evidence cannot be produced. "An action is deemed to have been pursued without probable cause if it was not legally tenable when viewed in an objective manner as of the time the action was initiated or while it was being prosecuted. The court must 'determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable.' [Citation.] 'The resolution of that question of law calls for the application of an *objective* standard to the facts on which the defendant acted. [Citation.]' [Citation.] The test the court is to apply is whether 'any reasonable attorney would have thought the claim tenable ....' [Citation.] The tort of malicious prosecution also includes the act of 'continuing to prosecute a lawsuit discovered to lack probable cause.' [Citation.] In determining the probable cause issue, the same standard applies 'to the continuation as to the initiation of a suit.' [Citation.]" (*Sycamore, supra,*157 Cal.App.4th at p. 1402.) *Beck v. Catanzarite Law Corp.*, No. G059766, 35 (Cal. Ct. App. Jul. 13, 2022).

#39. **Each defendant's actions or inactions related to Beck involve judicial deception that deprived Beck of liberty**. This fact can be accurately and readily determined from sources whose

22-CV-1616-BAS-DDL

accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings for which exculpatory evidence cannot be produced. "Continuing an action one discovers to be baseless harms the defendant and burdens the court system just as much as initiating an action known to be baseless from the outset.' [Citation.] 'A person who had no part in the commencement of the action, but who participated in it at a later time, may be held liable for malicious prosecution.' [Citations.]" (*Sycamore, supra,* 157 Cal.App.4th at p. 1398.) "A claim for malicious prosecution may also apply to a defendant who has brought an action charging multiple grounds of liability when some, but not all, of the grounds were asserted without probable cause and with malice. [Citations.]" (*Id.* at p. 1399.) *Beck v. Catanzarite Law Corp.*, No. G059766, 35-36 (Cal. Ct. App. Jul. 13, 2022)

#40. **Jolly Rogers Investments/Jolly Roger Inc. is an MFS shareholder, not Roger Root.** This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings for which exculpatory evidence cannot be produced. If exculpatory evidence is produced, it is fabricated or else it would have been produced. "Catanzarite initiated the Pinkerton Action, a shareholder derivative action on behalf of MFS, without first verifying the Roots owned shares in MFS. Beck presented evidence they did not. He submitted stock certificates showing the Roots' corporation, Jolly Roger, invested in MFS, but this entity lost its corporate status between 2015 to 2019. Thus, both the Roots and Jolly Roger lacked standing to bring a shareholder derivative lawsuit. Before agreeing to become an attorney of record in a case, an attorney should, at a minimum, be familiar with the client's claims as a purported shareholder, and should have made a preliminary determination about whether probable cause existed to support the asserted claims. *Beck v. Catanzarite Law Corp.*, No. G059766, 36 (Cal. Ct. App. Jul. 13, 2022) Catanzarite has never cured this material issue because each are engaged in a scheme to defraud, and they don't care as they have control or interests in the enterprise.

#41. **Catanzarite filed a fraudulent derivative action without standing on September 14, 2018 against Beck to take his money and property**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings for which exculpatory evidence is produced, it is fabricated or else it would have been produced. "Catanzarite filed a shareholder derivative

22-CV-1616-BAS-DDL

1   lawsuit on behalf of clients who were not actually shareholders. The basic nature of a shareholder

2   derivative action is to *permit shareholders* to "bring a derivative suit to enforce the corporation's rights

3   and redress its injuries when the board of directors fails or refuses to do so.' [Citation.]" (*Patrick v.*

4   *Alacer Corp.* (2008) 167 Cal.App.4th 995, 1003.) There are stock ownership requirements for standing

5   to pursue a shareholder's derivative suit. (See Corp. Code, § 800.) *Beck v. Catanzarite Law Corp.*, No.

6   G059766, 36 (Cal. Ct. App. Jul. 13, 2022)

       #42. **Catanzarite made fraudulent settlement demands in furtherance of the scheme against**

8   **Beck**. This fact can be accurately and readily determined from sources whose accuracy cannot be

9   reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings for which

10  exculpatory evidence cannot be produced. If exculpatory evidence is produced, it is fabricated or else it

11  would have been produced. On October 4, 2018, "Given the Roots' settlement request for CTI shares, it

12  is reasonable to infer Catanzarite and his clients knew only those shares had value and also understood

13  those shares were available because MFS did not own 100 percent of CTI. Under these circumstances,

14  a reasonable attorney may not have found the Pinkerton Action claims tenable. Moreover, when the

15  factual allegations of the Pinkerton Action and the MFS Action are compared in an objective manner,

16  no reasonable attorney would conclude both had merit. Simply stated, one action was based on the

17  factual premise CTI's board members improperly renounced the Subsidiary Promise, leaving

18  MFS *without any* CTI shares, and the other was based on the factual premise MFS *currently owned* 100

19  percent of CTI's shares, rendering any other CTI stock certificates worthless. *Beck v. Catanzarite Law*

20  *Corp.*, No. G059766, 37-38 (Cal. Ct. App. Jul. 13, 2022) See ***Docket #7, PageID.461 Overt Act #1***.

21       #43. **Catanzarite Law Corporation, Kenneth Catanzarite, Tim James O'Keefe, Brandon**

22  **Woodward lacked objective probable cause to prosecute Beck**. This fact can be accurately and

23  readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid.

24  201(b)(2), namely, Court of Appeal rulings for which exculpatory evidence cannot be produced. If

25  exculpatory evidence is produced, it is fabricated or else it would have been produced. Regarding

26  probable cause and the manifest of conflicts in furtherance of the scheme to defraud, "[t]he lack of

27  probable cause for maintaining the two lawsuits was further demonstrated by evidence Catanzarite filed

28  multiple lawsuits while unethically representing clients with conflicting interests. For good reason, it is

1 | difficult to apply the "reasonable attorney" test when there is evidence the attorneys initiating the cases
2 | violated multiple rules of professional conduct. For example, no reasonable attorney would agree to act
3 | as corporate counsel of MFS while at the same time representing shareholders in a derivative lawsuit
4 | against that corporation. Yet this is exactly what happened when Catanzarite filed the MFS Action while
5 | also litigating the Pinkerton Action. We conclude the concurrent representation of directly adverse
6 | parties creates a strong inference the attorneys and litigants knew the claims in one or both lawsuits were
7 | untenable." *Beck v. Catanzarite Law Corp.*, No. G059766, 38 (Cal. Ct. App. Jul. 13, 2022)

8 |     #44. **Catanzarite Law Corporation, Kenneth Catanzarite, Tim James O'Keefe, Brandon**
9 | **Woodward, Richard Francis O'Connor, Amy Jeanette Cooper, Cliff Higgerson, Anthony B.**
10 | **Scudder, Mohammed Zakhireh, and James Duffy engaged in actual fraud against Beck's money**
11 | **and property using the wire.** This fact can be accurately and readily determined from sources whose
12 | accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings
13 | for which exculpatory evidence cannot be produced. If exculpatory evidence is produced, it is fabricated
14 | or else it would have been produced. On the issues of non-judicial acts in furtherance of the scheme and
15 | extortion to produce evidence, "Catanzarite and the O'Conner Faction created a mutually beneficial
16 | alliance. In exchange for their dismissal from the Pinkerton Action, these former defendants agreed to
17 | help opposing counsel file a different lawsuit against CTI and the Probst Faction (which included Beck).
18 | Beck's evidence suggested these CTI shareholders agreed to create and support a false story about MFS's
19 | ownership of CTI, revive MFS by reconfiguring its board of directors, and then use MFS as a litigation
20 | tool to sabotage CTI and its board members. In addition to providing testimony that MFS owned CTI,
21 | the O'Connor Faction members publicly renounced their CTI stock shares. O'Connor executed the 2019
22 | Consent, without objection from his cohorts, which rendered worthless all their CTI stocks. *Beck v.*
23 | *Catanzarite Law Corp.*, No. G059766, 38 (Cal. Ct. App. Jul. 13, 2022)

24 |     #45. **Each defendant in this case has engaged in malice against Beck**. This fact can be
25 | accurately and readily determined from sources whose accuracy cannot be reasonably questioned under
26 | F. R. Evid. 201(b)(2), namely, Court of Appeal rulings for which exculpatory evidence cannot be
27 | produced. If exculpatory evidence is produced, it is fabricated or else it would have been produced.
28 | Relevant to every regulator and non-regulator attorney in this case and each of their acts since September

14, 2018, "'the extent of a defendant attorney's investigation and research may be relevant to the further question of whether or not the attorney acted with malice.' [Citation.]" (*Sycamore, supra,* <u>157 Cal.App.4th at p. 1409.</u>)" *Beck v. Catanzarite Law Corp.*, No. G059766, 39 (Cal. Ct. App. Jul. 13, 2022)

#46. **<u>Attorney defendants with Catanzarite in this lawsuit do not care about the truth in making statements to the Court</u>**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal rulings for which exculpatory evidence cannot be produced. If exculpatory evidence is produced, it is fabricated or else it would have been produced. "The [r]ecord shows that when Catanzarite learned MFS lacked standing to bring a derivative suit on CTI's behalf, it did not dismiss the lawsuits. Catanzarite filed FACs instead." *Beck v. Catanzarite Law Corp.*, No. G059766, 32 (Cal. Ct. App. Jul. 13, 2022).

#47. **<u>The State Bar of California, Eli David Morgenstern, Suzanne Grandt, George Cardona, and Ruben Duran have established and carried on the schemes to defraud Beck and other members of the public knowingly</u>**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, all filings in this case, and the defense or ratification of the conduct continuing as if it were reasonable in regulation after passage of AB 3249.

#48. **<u>The State Bar of California uses each of its postal mail facilities to defraud the public</u>**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, California State Auditor and evidence in ***Docket #10***.

#49. **<u>The State Bar of California controls the California judicial system from trial court to Supreme Court</u>**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, California State Auditor and evidence in ***Docket #10*** showing deliberate obstruction of justice for improper purposes (to avoid personal and state liability, and to conceal in furtherance of the schemes).

#50. **<u>The State Bar of California meets the federal definition of an illegal trust per 15 U.S.C. § 1</u>**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, California State Auditor Report 2022-030, evidence in ***Docket #10*** showing deliberate obstruction of justice and improper purposes (to avoid

22-CV-1616-BAS-DDL

personal and state liability, and to conceal in furtherance of the schemes), as well as decisional law from United States Supreme Court in *N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n*, 574 U.S. 494, (2015). Rather than answer that law, stale case law is cited by regulators to deceive the public while Beck's petition was altered, re-filed without authority, and deliberately obstructed by the Office of General Counsel for The State Bar of California working with Jorge E. Navarette. ***Docket #10, #10-30, Ex. 28; #10-58 through #10-66, Ex. 61-68.***

#51. **The State Bar of California and its attorneys acquired and maintain interests in or control of an interstate enterprise through a pattern of racketeering activity**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, California State Auditor Report 2022-030 and evidence in ***Docket #10*** showing deliberate obstruction of justice for improper purposes (to avoid personal and state liability, and to conceal in furtherance of the schemes). Examples are cited in ***Docket #7*** involving Grandt, Duran, and Retana. These acts could not occur without interests in or control over an interstate enterprise, e.g. ***Docket #7, PageID.497, 16:17*** "identify all persons to whom you have distributed the communication and destroy any copies in your possession."

#52. **Catanzarite Law Corporation and its attorneys acquired and maintain interests in or control of an interstate enterprise through a pattern of racketeering activity**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal and Federal Circuit rulings as well as evidence in ***Docket #10*** showing ongoing schemes to defraud through Orange County Superior Court with impunity, all of ***Docket #7***, and the response to the TRO at ***Docket #10*** by Kenneth Catanzarite and Jim Travis Tice.

#53. **The State Bar of California, Leah Wilson, and Ruben Duran have invested at least some income in an interstate enterprise that was derived from a pattern of racketeering activity**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, California State Auditor Report 2022-030 and public press releases from The State Bar of California reflecting its investments. ***Docket #10, #10-44, Ex. 40.***

#54. **The State Bar of California establishes and carries on attorney schemes to defraud**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably

1    questioned under F. R. Evid. 201(b)(2), namely, that Thomas Girardi's conduct as specified in Exhibit

2    1 of *Docket #10, #10-5, Ex. 1* was known to have compromised the judiciary, and he was not disbarred

3    until 2022, that David Lira still has a spotless disciplinary history, and each of the Catanzarite Law

4    Corporation attorneys are carried on in that they are still seeking to practice law in this Court.

5        #55. **Office of General Counsel for The State Bar of California played a central role in**

6    **attorney schemes to defraud that harmed Beck**. This fact can be accurately and readily determined

7    from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, that

8    Office of General Counsel tried to appear in this lawsuit defending the conduct of attorneys associated

9    with The State Bar of California who have knowingly harmed Beck after passage of AB 3249. Limits

10   on state-action immunity are most essential when the State seeks to delegate its regulatory power to

11   active market participants, for established ethical standards may blend with private anticompetitive

12   motives in a way difficult even for market participants to discern. Dual allegiances are not always

13   apparent to an actor. In consequence, active market participants cannot be allowed to regulate their own

14   markets free from antitrust accountability. See *Midcal, supra,* at 106, 100 S.Ct. 937 (" The national

15   policy in favor of competition cannot be thwarted by casting ... gauzy cloak of state involvement over

16   what is essentially a private price-fixing arrangement"). Indeed, prohibitions against anticompetitive

17   self-regulation by active market participants are an axiom of federal antitrust policy. See, *e.g.,Allied*

18   *Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 501, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988)

19   ; *Hoover, supra,* at 584, 104 S.Ct. 1989 (Stevens, J., dissenting) (" The risk that private regulation of

20   market entry, prices, or output may be designed to confer monopoly profits on members of an industry

21   at the expense of the consuming public has been the central concern of ... our antitrust jurisprudence");

22   see also Elhauge, The Scope of Antitrust Process, 104 Harv. L.Rev. 667, 672 (1991). So it follows that,

23   under *Parker* and the Supremacy Clause, the States' greater power to attain an end does not include the

24   lesser power to negate the congressional judgment embodied in the Sherman Act through unsupervised

25   delegations to active market participants. See Garland, Antitrust and State Action: Economic Efficiency

26   and the Political Process, 96 Yale L.J. 486, 500 (1986). *N.C. State Bd. of Dental Examiners v. Fed.*

27   *Trade Comm'n*, 574 U.S. 494, 505-6 (2015)

28

22-CV-1616-BAS-DDL

#56. **Kenneth Catanzarite committed wire fraud targeting Beck's money and property**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal findings that "Catanzarite wrote a lengthy e-mail to Western Troy, warning the company it must speak with MFS's chief executive operating officer because there was currently litigation about whether MFS was CTI's sole shareholder. Catanzarite attached a copy of the MFS complaint to the e-mail. Catanzarite stated MFS disagreed with the merger and "we dispute and object to any agreement purportedly by and between Western Troy and CTI." (Bold and underline omitted.) Catanzarite demanded Western Troy withdraw its public notice about the merger and negotiate with MFS. Finally, Catanzarite insulted Western Troy. It started the e-mail by commenting it was unexpected the company did not have a receptionist to answer calls. Catanzarite noted Western Troy "appear[ed] to have no assets or operations of any value" and saw "no justification for Western Troy shareholders with a valueless company" to be entitled to CTI's shares via the merger. Catanzarite cut and pasted entries from Western Troy's Web site and called them "disturbing." *Cultivation Techs. v. Duffy*, No. G059457, 15 (Cal. Ct. App. Nov. 12, 2021)

#57. **Kenneth Catanzarite committed  wire fraud targeting Beck's property, reputation, and CTI's creditor**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal who reviewed it and concluded "[a]t first glance, Catanzarite's e-mail to Fincanna simply looks like a notification about CTI's newly installed board of directors. The e-mail explains the new board was interested in working with Fincanna. However, later in the e-mail Catanzarite reveals MFS was litigating its right to control CTI as the sole shareholder and it attached a copy of the complaint to the e-mail. The remaining and largest section of the e-mail is devoted to discussing statements written by Justin Beck on behalf of CTI. Catanzarite discusses Beck's suspension by the SEC and opines Beck's recommendations are suspect. While many of the statements in the e-mail are jumbled and difficult to understand, the concluding paragraphs stated the purpose of the e-mail was to inform Fincanna there "is a dispute as to who speaks for CTI that we seek to resolve on an expedited basis." They added, "It is our position that any modifications or agreements between CTI and Fincanna at this point must be signed by" the newly

22-CV-1616-BAS-DDL

installed officers (Zakhireh, O'Connor, and Duffy). *Cultivation Techs. v. Duffy*, No. G059457, 17-18 (Cal. Ct. App. Nov. 12, 2021)

#58. **Malicious prosecution, wire fraud, mail fraud, bank fraud, perjury, subornation of perjury, money laundering, extortion, and carrying on schemes to defraud are all exempt from litigation privilege**. This fact is generally known within the trial court's territorial jurisdiction under F. R. Evid. 201(b)(1).

#59. **For improper purposes unrelated to the merits, Office of Chief Trial Counsel ratified schemes to defraud Beck**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal and Federal Circuit rulings as well as evidence in *Docket #10* showing ongoing schemes to defraud through Orange County Superior Court with impunity. *Docket #7, PageID.496* also shows attempts to conceal it under color of state law and as being "discretion."

#60. **For improper purposes unrelated to the merits, Board of Trustees ratified schemes to defraud Beck**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal and Federal Circuit rulings as well as evidence in Docket #10 showing ongoing schemes to defraud through Orange County Superior Court with impunity. Specifically, *Docket #10-28, Ex. 26* shows malice in that the decisions to allow this conduct relate to Beck's decision to stand up to The State Bar of California enterprise.

#61. **The State Bar of California and its Board of Trustees are engaged in fraudulent concealment**. This fact is generally known within the trial court's territorial jurisdiction under F. R. Evid. 201(b)(1). This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal and Federal Circuit rulings as well as evidence in Docket #10 showing ongoing schemes to defraud through Orange County Superior Court with impunity that lack public disclosure by the government protection agency.

#62. **Office of General Counsel is defending tort claims lying in fraud and corruption against individual non-sovereign attorneys and officials whose interests are being advanced, using funds from other licensees or United States citizens**. This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2),

1    namely, the record including attempts to appear by Robert George Retana for Eli David Morgenstern,

2    Suzanne Grandt, and Leah Wilson after passage of AB 3249, and all evidence in *Docket #10*.

3    #63. **The State Bar of California and State of California cannot defeat any of Beck's claims**

4    **without proving them and thereby supporting judgment in Beck's favor**. This fact is generally

5    known within the trial court's territorial jurisdiction under F. R. Evid. 201(b)(1) where The State Bar of

6    California and State of California are bound to protect Beck as a member of the public, *not criminals*.

7    This fact can be accurately and readily determined from sources whose accuracy cannot be reasonably

8    questioned under F. R. Evid. 201(b)(2), namely, passage of AB 3249 prohibiting The State Bar of

9    California and board of trustees from advancing the interests of licensees, and all evidence in *Docket*

10   *#10* in support of a temporary restraining order. "The United States Attorney [and California Attorney

11   General] are representative not of an ordinary party to a controversy, but of a sovereignty whose

12   obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest,

13   therefore, in a [antitrust and RICO] prosecution is not that it shall win a case, but that justice shall be

14   done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which

15   is that guilt shall not escape or innocence suffer. *Berger v. United States*, 295 U.S. 78, 88 (1935)

16   #64. **Catanzarite Law Corporation is unduly protected by The State Bar of California just**

17   **like Girardi Keese, David Lira, et al**. This fact can be accurately and readily determined from sources

18   whose accuracy cannot be reasonably questioned under F. R. Evid. 201(b)(2), namely, Court of Appeal

19   rulings, United States Circuit rulings, public records requests, all evidence in *Docket #10*, and California

20   State Auditor Report 2022-030 in foundation and the reality that The State Bar of California knew about

21   Thomas Girardi's compromise of the California State judiciary but chose to carry it on to untold

22   consequences of life, liberty, property, insurance premiums, and innocent people like Beck because its

23   trust members are involved in it. *Docket #7. Docket #10, #10-5, Ex. 1*. As to the 700+ CLUB disclosed

24   by California State Auditor in Report 2022-030, or the "cabal" as Mr. Catanzarite aptly calls it, "State

25   Bar is overusing nonpublic measures. From 2010 to 2021, [it] closed more cases through nonpublic

26   measures—a total of 22,600, or 10 percent of all case closures—than it did through public discipline,

27   which totaled 11,200, or 5 percent of all case closures. **During the same period, more than 700**

28   **attorneys each had four or more cases that the State Bar closed through nonpublic measures.**"

None of State Bar's "protection" processes do *anything* for the public. They *selectively* enable and conceal lawyer schemes to defraud for Catanzarite Law Corporation actors, and others like David Lira and those others convicted as part of the pattern of racketeering activity.

**RESOURCE LETTER**



Describes resources, such as ethics training or client trust account training, along with a summary of the conduct of concern and ways to rectify it.

**DIRECTIONAL LETTER**



Directs action on the part of an attorney. This can include direction to return a client file or to communicate with a client.

**WARNING LETTER**



Informs an attorney of his or her ethical obligations when there is substantial evidence that he or she committed a violation that may be misconduct.

**AGREEMENT IN LIEU OF DISCIPLINE**

A written agreement that may involve conditions of practice or further legal education or rehabilitation.

**PRIVATE REPROVAL**

A censure or reprimand that may include conditions. Private reproval is the only nonpublic measure that the State Bar considers to be discipline.

22-CV-1616-BAS-DDL

1

## **CONCLUSION**

2       For the foregoing reasons, plaintiff Beck requests this Court take judicial notice of each of the

3 foregoing facts #1 - #64 which are not subject to reasonable dispute. In the alternative, allow defendants

4 (without narratives being controlled by the lawyers engaged in the conduct, for the avoidance of doubt)

5 dispute or support further without ante-dated, manufactured evidence to deceive the Court.

6       Judicial efficiency requires the Court control its calendar and isolate issues of actual dispute,

7 where "Catanzarite does not care about the truth in making statements to the Court" and does not care

8 about any Court order, either. This is already rearing its head in opposition to ***Docket #10*** and in seeking

9 to appear for directly adverse parties that were extorted to produce evidence and are now "stuck"

10 continuing the schemes under ongoing threat of "legal fees" as shown.

11       Kenneth Catanzarite and Jim Travis Tice opposing Beck's TRO at ***Docket #10*** seeking antitrust

12 claims on behalf of the United States while ignoring the basis therefore are anticompetitive and fail to

13 see the forest for the trees. Respectfully, if not Beck, then who will stop The State Bar of California

14 from these designed schemes to defraud the public? A lawyer who will be thrown in jail or "State Bar

15 Court" for standing up for the United States and interstate commerce? Is the United States to trust Ruben

16 Duran's promises that it will "never happen again" -- while it is happening and concealed *again*?

17       The antitrust violations in California are ongoing for 20 years since the *Rose* decision as

18 Honorable U.S. Supreme Court Justice Ketanji Brown-Jackson predicted.  Beck seeks no fees for the

19 role and concedes his self-appointment as *guardian ad litem* if this Honorable Court rejects it, if the

20 Attorney General or United States Department of Justice in Washington, D.C. or the Congress asserts

21 itself, but pleads that the United States of America has no other ally, here. Objections to this role from

22 attorneys engaged in the conduct at issue are borderline treasonous, at least obstruction of justice, where

23 justice must be done. The point is not to defeat Beck's claims or cater to The State Bar of California.

24       THURSDAY, JANUARY 12, 2023

25       Respectfully Submitted,

26

27       _____

28       Justin S. Beck

22-CV-1616-BAS-DDL

ATTACHMENT A

California Rules of Court 8.1115

 **California Rules of Court**

**(Revised January 1, 2022)**

## Rule 8.1115. Citation of opinions

### (a) Unpublished opinion

Except as provided in (b), an opinion of a California Court of Appeal or superior court appellate division that is not certified for publication or ordered published must not be cited or relied on by a court or a party in any other action.

### (b) Exceptions

An unpublished opinion may be cited or relied on:

(1) When the opinion is relevant under the doctrines of law of the case, res judicata, or collateral estoppel; or

(2) When the opinion is relevant to a criminal or disciplinary action because it states reasons for a decision affecting the same defendant or respondent in another such action.

*(Subd (b) amended effective January 1, 2007.)*

### (c) Citation procedure

On request of the court or a party, a copy of an opinion citable under (b) must be promptly furnished to the court or the requesting party.

*(Subd (c) amended effective July 1, 2016.)*

### (d) When a published opinion may be cited

A published California opinion may be cited or relied on as soon as it is certified for publication or ordered published.

### (e) When review of published opinion has been granted

(1) *While review is pending*

Pending review and filing of the Supreme Court's opinion, unless otherwise ordered by the Supreme Court under (3), a published opinion of a Court of Appeal in the matter has no binding or precedential effect, and may be cited for potentially persuasive value only. Any citation to the Court of Appeal opinion must also note the grant of review and any subsequent action by the Supreme Court.

(2) *After decision on review*

After decision on review by the Supreme Court, unless otherwise ordered by the Supreme Court under (3), a published opinion of a Court of Appeal in the matter, and any published opinion of a Court of Appeal in a matter in which the Supreme Court has ordered review and deferred action pending the decision, is citable and has binding or precedential effect, except to the extent it is inconsistent with the decision of the Supreme Court or is disapproved by that court.

(3) *Supreme Court order*

At any time after granting review or after decision on review, the Supreme Court may order that all or part of an opinion covered by (1) or (2) is not citable or has a binding or precedential effect different from that specified in (1) or (2).

*(Subd (e) adopted effective July 1, 2016.)*

*Rule 8.1115 amended effective July 1, 2016; repealed and adopted as rule 977 effective January 1, 2005; previously amended and renumbered as rule 8.115 effective January 1, 2007.*

**Comment**

**Subdivision (e)(1).** The practice and rule in effect before July 1, 2016, automatically depublished the Court of Appeal decision under review, rendering it uncitable. Under subdivision (e)(1) of this rule, if the Supreme Court grants review of a published Court of Appeal decision, that decision now remains published and citable for its potentially persuasive value while review is pending unless the Supreme Court orders otherwise.

Under the authority recognized by subdivision (e)(3) of this rule, and as explained in the second paragraph of the comment to that subdivision, by standing administrative order of the Supreme Court, superior courts may choose to be bound by parts of a published Court of Appeal decision under review when those parts conflict with another published appellate court decision. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 456 (*Auto Equity*) ["where there is more than one appellate court decision, and such appellate decisions are in conflict[,] . . . the court exercising inferior jurisdiction can and must make a choice between the conflicting decisions"].)

Finally, it has long been the rule that no published Court of Appeal decision has *binding* effect on any other Court of Appeal (e.g., *In re Marriage of Hayden* (1981) 124 Cal.App.3d 72, 77, fn. 1; *Froyd v. Cook* (E.D.Cal. 1988) 681 F.Supp. 669, 672, fn. 9, and cases cited) or on the Supreme Court. Under prior practice and the former rule, a grant of review automatically depublished the decision under review. For this reason, the Court of Appeal was not allowed to cite or quote that review-granted decision concerning any substantive point. Under this subdivision, a published Court of Appeal decision as to which review has been granted remains published and is citable, while review is pending, for any potentially persuasive value.

**Subdivision (e)(2).** The fact that a Supreme Court decision does not discuss an issue addressed in the prior Court of Appeal decision does not constitute an expression of the Supreme Court's opinion concerning the correctness of the decision on that issue or of any law stated in the Court of Appeal decision with respect to any such issue.

**Subdivision (e)(3).** This subdivision specifically provides that the Supreme Court can order that an opinion under review by that court, or after decision on review by that court, have an effect other than the effect otherwise specified under this rule. For example, the court could order that, while review is pending, specified parts of the published Court of Appeal opinion have binding or precedential effect, rather than only potentially persuasive value. For purposes of subdivision (e)(2) and (3), a "decision on review" includes any order by the Supreme Court dismissing review. (See rules 8.528(b) [addressing an "order dismissing review"] & 8.532(b)(2)(B) [listing, among "decisions final on filing," an order filed under rule 8.528(b)].) Accordingly, upon dismissal of review, any published Court of Appeal opinion regains binding or precedential effect under rule 8.1115(e)(2) unless the court orders otherwise under that rule's subdivision (e)(3).

As provided in *Standing Order Exercising Authority Under California Rules of Court, Rule 8.1115(e)(3), Upon Grant of Review or Transfer of a Matter with an Underlying Published Court of Appeal Opinion,* Administrative Order 2021-04-21, under this subdivision, when the Supreme Court grants review of a published Court of Appeal opinion, the opinion may be cited, not only for its persuasive value, but also for the limited purpose of establishing the existence of a conflict in authority that would in turn allow *superior courts* to exercise discretion under *Auto Equity, supra,* 57 Cal.2d at page 456, to choose between sides of any such conflict. Superior courts may, in the exercise of their discretion, choose to follow a published review-granted Court of Appeal opinion, even if that opinion conflicts with a published, precedential Court of Appeal opinion. Such a review-granted Court of Appeal opinion has only this limited and potential precedential effect, however; superior courts are not *required* to follow that opinion's holding on the issue in conflict. Nor does such a Court of Appeal opinion, during the time when review is pending, have *any* precedential effect regarding any aspect or holding of the Court of Appeal opinion outside the part(s) or holding(s) in conflict. Instead it remains, in all other respects, "potentially persuasive only." This means, for example, that if a published Court of Appeal opinion as to which review has been granted addresses "conflict issue A," as well as another issue as to which there is no present conflict-"issue B"-the Court of Appeal's discussion of "issue B" remains "potentially persuasive" only, unless and until a published Court of Appeal opinion creates a conflict as to that issue. This paragraph of this comment applies with respect to all published Court of Appeal opinions giving rise to a grant of review by the Supreme Court on or after April 21, 2021.

Finally, as also provided in the administrative order, *supra,* under this subdivision, unless the Supreme Court specifies otherwise, an order transferring a matter to the Court of Appeal with directions to vacate its published opinion and reconsider the matter has the following effect: (1) If the Court of Appeal opinion has not yet been published in the bound volumes of the Official Appellate Reports, the opinion is deemed to be depublished (that is, the Reporter of Decisions is directed not to publish it in the Official Appellate Reports); or (2) If the underlying Court of Appeal opinion has already been published in the bound volumes of the Official Appellate Reports (or publication is imminent and hence as a practical matter the volume cannot be revised to eliminate the opinion), the underlying Court of Appeal opinion is deemed to be "not citable"-meaning it has neither precedential nor even potentially persuasive value, even though it will not be removed from the Official Appellate Reports. This paragraph of this comment applies only to such transfers occurring on and after April 21, 2021.

ATTACHMENT B

California Rules of Professional Conduct 1.0.1

Defining Fraud or Fraudulent Conduct for Attorneys

 The State Bar *of California*

### Rule 1.0.1 Terminology
**(Rule Approved by the Supreme Court, Effective November 1, 2018)**

(a)  "Belief" or "believes" means that the person* involved actually supposes the fact in question to be true.  A person's* belief may be inferred from circumstances.

(b)  [Reserved]

(c)  "Firm" or "law firm" means a law partnership; a professional law corporation; a lawyer acting as a sole proprietorship; an association authorized to practice law; or lawyers employed in a legal services organization or in the legal department, division or office of a corporation, of a government organization, or of another organization.

(d)  "Fraud" or "fraudulent" means conduct that is fraudulent under the law of the applicable jurisdiction and has a purpose to deceive.

(e)  "Informed consent" means a person's* agreement to a proposed course of conduct after the lawyer has communicated and explained (i) the relevant circumstances and (ii) the material risks, including any actual and reasonably* foreseeable adverse consequences of the proposed course of conduct.

(e-1)  "Informed written consent" means that the disclosures and the consent required by paragraph (e) must be in writing.*

(f)  "Knowingly," "known," or "knows" means actual knowledge of the fact in question.  A person's* knowledge may be inferred from circumstances.

(g)  "Partner" means a member of a partnership, a shareholder in a law firm* organized as a professional corporation, or a member of an association authorized to practice law.

(g-1)  "Person" has the meaning stated in Evidence Code section 175.

(h)  "Reasonable" or "reasonably" when used in relation to conduct by a lawyer means the conduct of a reasonably prudent and competent lawyer.

(i)  "Reasonable belief" or "reasonably believes" when used in reference to a lawyer means that the lawyer believes the matter in question and that the circumstances are such that the belief is reasonable.

(j)  "Reasonably should know" when used in reference to a lawyer means that a lawyer of reasonable prudence and competence would ascertain the matter in question.

(k)  "Screened" means the isolation of a lawyer from any participation in a matter, including the timely imposition of procedures within a law firm* that are adequate under the circumstances (i) to protect information that the isolated lawyer is

obligated to protect under these rules or other law; and (ii) to protect against other law firm* lawyers and nonlawyer personnel communicating with the lawyer with respect to the matter.

(l)    "Substantial" when used in reference to degree or extent means a material matter of clear and weighty importance.

(m)    "Tribunal" means: (i) a court, an arbitrator, an administrative law judge, or an administrative body acting in an adjudicative capacity and authorized to make a decision that can be binding on the parties involved; or (ii) a special master or other person* to whom a court refers one or more issues and whose decision or recommendation can be binding on the parties if approved by the court.

(n)    "Writing" or "written" has the meaning stated in Evidence Code section 250. A "signed" writing includes an electronic sound, symbol, or process attached to or logically associated with a writing and executed, inserted, or adopted by or at the direction of a person* with the intent to sign the writing.

**Comment**

*Firm\* or Law Firm\**

[1]    Practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a law firm.* However, if they present themselves to the public in a way that suggests that they are a law firm* or conduct themselves as a law firm,* they may be regarded as a law firm* for purposes of these rules. The terms of any formal agreement between associated lawyers are relevant in determining whether they are a firm,* as is the fact that they have mutual access to information concerning the clients they serve.

[2]    The term "of counsel" implies that the lawyer so designated has a relationship with the law firm,* other than as a partner* or associate, or officer or shareholder, that is close, personal, continuous, and regular. Whether a lawyer who is denominated as "of counsel" or by a similar term should be deemed a member of a law firm* for purposes of these rules will also depend on the specific facts. (Compare *People ex rel. Department of Corporations v. Speedee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135 [86 Cal.Rptr.2d 816] with *Chambers v. Kay* (2002) 29 Cal.4th 142 [126 Cal.Rptr.2d 536].)

*Fraud**

[3]    When the terms "fraud"* or "fraudulent"* are used in these rules, it is not necessary that anyone has suffered damages or relied on the misrepresentation or failure to inform because requiring the proof of those elements of fraud* would impede the purpose of certain rules to prevent fraud* or avoid a lawyer assisting in the perpetration of a fraud,* or otherwise frustrate the imposition of discipline on lawyers who engage in fraudulent* conduct.  The term "fraud"* or "fraudulent"* when used in these rules does not include merely negligent misrepresentation or negligent failure to apprise another of relevant information.

*Informed Consent* and Informed Written Consent**

[4]    The communication necessary to obtain informed consent* or informed written consent* will vary according to the rule involved and the circumstances giving rise to the need to obtain consent.

*Screened**

[5]    The purpose of screening* is to assure the affected client, former client, or prospective client that confidential information known* by the personally prohibited lawyer is neither disclosed to other law firm* lawyers or nonlawyer personnel nor used to the detriment of the person* to whom the duty of confidentiality is owed.   The personally prohibited lawyer shall acknowledge the obligation not to communicate with any of the other lawyers and nonlawyer personnel in the law firm* with respect to the matter.   Similarly, other lawyers and nonlawyer personnel in the law firm* who are working on the matter promptly shall be informed that the screening* is in place and that they may not communicate with the personally prohibited lawyer with respect to the matter.   Additional screening* measures that are appropriate for the particular matter will depend on the circumstances.  To implement, reinforce and remind all affected law firm* personnel of the presence of the screening,* it may be appropriate for the law firm* to undertake such procedures as a written* undertaking by the personally prohibited lawyer to avoid any communication with other law firm* personnel and any contact with any law firm* files or other materials relating to the matter, written* notice and instructions to all other law firm* personnel forbidding any communication with the personally prohibited lawyer relating to the matter, denial of access by that lawyer to law firm* files or other materials relating to the matter, and periodic reminders of the screen* to the personally prohibited lawyer and all other law firm* personnel.

[6]    In order to be effective, screening* measures must be implemented as soon as practical after a lawyer or law firm* knows* or reasonably should know* that there is a need for screening.*

**NEW RULE OF PROFESSIONAL CONDUCT 1.0.1**
**(Former Rule 1-100(B))**
**Terminology**

**EXECUTIVE SUMMARY**

In connection with consideration of current rule 1-100 (Rules of Professional Conduct, In General), the Commission for the Revision of the Rules of Professional Conduct ("Commission") evaluated current rule 1-100(B) (Definitions) in accordance with the Commission Charter, including the national standard of the ABA counterpart, Model Rule 1.0 (Terminology), as well as the Terminology section of the California Code of Judicial Ethics. The result of this evaluation is proposed rule 1.0.1 (Terminology) which expands upon the five definitions currently contained in rule 1-100(B).

**Rule As Issued For 90-day Public Comment**

The proposed rule provides a global terminology section with definitions of terms that are used throughout the proposed Rules of Professional Conduct. Similar to the ABA Model Rules and the California Code of Judicial Ethics, proposed rule 1.0.1 would provide a central location for significant terms whose meaning is critical to understanding the duties contained in the proposed Rules of Professional Conduct. Adoption of proposed rule 1.0.1 would obviate a lawyer's need to consult case law or ethics opinions to comprehend the legal standard with which he or she must comply, thereby enhancing both enforcement and compliance with the rules.

The content of the definitions is derived from ABA Model Rule 1.0 where the Model Rule and California meanings of a term are aligned. The Commission believes adopting the Model Rule definition will remove unnecessary differences between the California rule and the corresponding rule in other jurisdictions, an important consideration in regulating lawyers from other jurisdictions who practice in California under one of the multijurisdictional practice rules of court.[1] However, where the Model Rule definition and California law or settled public policy are not aligned, the Commission revised those definitions to reflect California law or policy to ensure continuation of important public policies, including client protection, that are reflected in the California approach.[2]

Paragraph (a) of proposed rule 1.0.1 defines "belief" or "believes" and is nearly identical to ABA Model Rule 1.0(a). The only changes are non-substantive and they include substituting "means" for "denotes,"[3] and the present tense "supposes" for "supposed" to correspond to the tense of "believes."

---

[1]  See, e.g., California Rules of Court 9.45 – 9.48.

[2]  An example of this is California's approach to "informed written consent" which is a heightened standard requiring that both the client's consent, as well as the attorney's disclosure to the client of the relevant circumstances and the material risks, including reasonably foreseeable adverse consequences, be in writing. The Model Rules approach is for the client to confirm in writing that the lawyer orally communicated adequate information and explanation regarding the material risks of and reasonably available alternatives to the proposed course of conduct.

[3]  The Commission has substituted "means" for "denotes" throughout the rule because the Commission believes "means" is more specific and definite than "denotes."

Paragraph (c) defines "firm" or "law firm" and is derived from ABA Model Rule 1.0(c). The proposed rule includes a reference to a government organization. This addition emphasizes the need to comply with the California principle that all lawyers are bound by the Rules of Professional Conduct, including government lawyers.[4] The proposed rule substitutes "engaged in" for "authorized to," as stated in the Model Rule, to assure that the requirements of the rules apply to everyone acting as a law firm even if not authorized to do so.[5]

Paragraph (d) defines "fraud" or "fraudulent" and is nearly identical to ABA Model Rule 1.0(d). The Commission believes it is appropriate that the components of fraud under paragraph (d) be determined under the law of the applicable jurisdiction.[6] In addition, Comment [3], discussed below, clarifies that neither damages nor reliance need to be proven because that would frustrate the rule's intent to prevent the fraud or avoid the lawyer providing assistance to the defrauder.

Paragraph (e) provides a definition for "informed consent" and differs from ABA Model Rule 1.0(e) by, among other things, adding the term "relevant circumstances" and the phrase "actual and reasonably foreseeable" to the required disclosure points for obtaining informed consent. These terms are consistent with California policy and case law. (See, e.g., current rule 3-310(A)(1) and *Sharp v. Next Entertainment, Inc.* (2008) 163 Cal.App.4th 410, 429-31.)

Paragraph (e-1) defines "informed written consent" which has no counterpart in the Model Rules. The definition is based on current rule 3-310(A)(2). Unlike the Model Rules, or the jurisdictions that have largely adopted the Model Rules approach to consent, California has a heightened standard that requires a client's consent not only be informed, but also in writing. This means that not only must the client's consent be in writing but also that the disclosure be in writing. California's current approach to this standard is more client protective.

Paragraph (f) defines "knowingly," "known," or "knows" and is nearly identical to ABA Model Rule 1.0(f).

Paragraph (g) defines "partner" and is nearly identical to ABA Model Rule 1.0(g).

Paragraph (g-1) defines "person" which has no counterpart in the Model Rule. The proposed definition will eliminate potential confusion over whether the term "person" when used throughout the rules includes an organization. Six other jurisdictions have adopted a definition for the term "person."

Paragraph (h) defines "reasonable" or "reasonably" and is identical to ABA Model Rule 1.0(h). Paragraph (i) defines "reasonable belief" or "reasonably believes" and is identical to ABA Model Rule 1.0(i).

Paragraph (j) defines "reasonably should know" and is identical to ABA Model Rule 1.0(j).

Paragraph (k) defines "screened" and modifies ABA Model Rule 1.0(k) primarily by adding the clause "(ii) to protect against other law firm lawyers and non-lawyer personnel communicating with the lawyer with respect to the matter."

---

[4]   See, *People ex rel. Deukmejian v. Brown* (1981) 29 Cal.3d 150.

[5]   Maryland, Michigan, and South Carolina have similarly removed the phrase "authorized to."

[6]   See, proposed rule 8.5(b), concerning choice of law.

Paragraph (l) defines "substantial" and is identical to ABA Model Rule 1.0(l).

Paragraph (m) defines "tribunal" and differs from ABA Model Rule 1.0(m). There was debate as to whether the definition should reference "an administrative body acting in an adjudicative capacity and authorized to make a decision that can be binding on the parties involved" for fear that imposing the same duties of candor on lawyers appearing before such a body as they owe courts of general jurisdiction may violate the lawyer's client's right of petition. Ultimately, the Commission determined that the proposed definition would not inhibit a client's right of petition because the definition is limited to administrative bodies acting in an adjudicative capacity. The Commission could not find anything to suggest that the right to petition is different in scope when a court, arbitrator, or administrative law judge is acting in an adjudicative capacity versus when an administrative body is acting in an adjudicative capacity. The Commission is not aware of any issues relating to the right to petition in the numerous jurisdictions that have adopted the ABA Model Rule definition of "tribunal."

Paragraph (n) defines "writing" or "written" which is based on Evidence Code section 250 and includes a second sentence clarifying that an electronic signature (or other modern forms of signature) are sufficient to establish that a writing is "signed."

There are six comments to the rule. Comment [1] provides interpretative guidance for determining whether a grouping of lawyers might constitute a law firm. Comment [2] provides interpretative guidance concerning use of the term "of counsel." Comment [3] provides important qualifications on what constitutes fraud for purposes of the rules and also provides an explanation for the qualifications. Neither damages nor reliance need to be proven because as the term "fraud" is typically used in these rules, it is as a "trigger" for imposing a lawyer's duty to prevent fraud or avoid assisting a client in perpetrating a fraud. Comment [4] clarifies the term "informed consent" and "informed written consent." Comments [5] and [6] provide guidance on the implementation of an effective ethical screen for purposes of the rules.

### Post-Public Comment Revisions

After consideration of comments received in response to the initial 90-day public comment period, the Commission made non-substantive stylistic edits and voted to recommend that the Board adopt the proposed rule. A member of the Commission submitted a dissent to this rule that can be found following the Report and Recommendation.

The Board adopted proposed rule 1.0.1 at its November 17, 2016 meeting.

### Supreme Court Action (May 10, 2018)

The Supreme Court approved the rule as modified by the Court to be effective November 1, 2018. The Court revised the definition of "person" under paragraph (g-1) as having the meaning stated in Evidence Code section 175.

~~Rule 1-100(B) Rules of Professional Conduct, in General~~ Rule 1.0.1 Terminology
**(Redline Comparison to the California Rule Operative Until October 31, 2018)**

~~(B)~~    ~~Definitions.~~

   ~~(1)    "Law Firm" means:~~

      ~~(a)    two or more lawyers whose activities constitute the practice of law, and who share its profits, expenses, and liabilities; or~~

(a)    "Belief" or "believes" means that the person* involved actually supposes the fact in question to be true.  A person's* belief may be inferred from circumstances.

(b)    ~~a law corporation which employs more than one lawyer; or~~[Reserved]

(c)    ~~a division, department, office, or group within a business entity, which includes more than one lawyer who performs legal services for the business entity; or~~"Firm" or "law firm" means a law partnership; a professional law corporation; a lawyer acting as a sole proprietorship; an association authorized to practice law; or lawyers employed in a legal services organization or in the legal department, division or office of a corporation, of a government organization, or of another organization.

(d)    ~~a publicly funded entity which employs more than one lawyer to perform legal services~~"Fraud" or "fraudulent" means conduct that is fraudulent under the law of the applicable jurisdiction and has a purpose to deceive.

(e)    "Informed consent" means a person's* agreement to a proposed course of conduct after the lawyer has communicated and explained (i) the relevant circumstances and (ii) the material risks, including any actual and reasonably* foreseeable adverse consequences of the proposed course of conduct.

(e-1)    "Informed written consent" means that the disclosures and the consent required by paragraph (e) must be in writing.*

(f)    "Knowingly," "known," or "knows" means actual knowledge of the fact in question. A person's* knowledge may be inferred from circumstances.

(~~2~~g)    "~~Member~~Partner" means a member of ~~the State Bar of California~~a partnership, a shareholder in a law firm* organized as a professional corporation, or a member of an association authorized to practice law.

   ~~(3)    "Lawyer" means a member of the State Bar of California or a person who is admitted in good standing of and eligible to practice before the bar of any United States court or the highest court of the District of Columbia or any state, territory, or insular possession of the United States, or is licensed to practice law in, or is admitted in good standing and eligible to~~

practice ~~before the bar of the highest court of, a foreign country or any political subdivision thereof.~~

~~(4)~~  ~~"Associate" means an employee or fellow employee who is employed as a lawyer.~~

(5g-1) "~~Shareholder" means a shareholder in a professional corporation pursuant to Business and Professions~~Person" has the meaning stated in Evidence Code section ~~6160 et seq~~175.

(h)  "Reasonable" or "reasonably" when used in relation to conduct by a lawyer means the conduct of a reasonably prudent and competent lawyer.

(i)  "Reasonable belief" or "reasonably believes" when used in reference to a lawyer means that the lawyer believes the matter in question and that the circumstances are such that the belief is reasonable.

(j)  "Reasonably should know" when used in reference to a lawyer means that a lawyer of reasonable prudence and competence would ascertain the matter in question.

(k)  "Screened" means the isolation of a lawyer from any participation in a matter, including the timely imposition of procedures within a law firm* that are adequate under the circumstances (i) to protect information that the isolated lawyer is obligated to protect under these rules or other law; and (ii) to protect against other law firm* lawyers and nonlawyer personnel communicating with the lawyer with respect to the matter.

(l)  "Substantial" when used in reference to degree or extent means a material matter of clear and weighty importance.

(m)  "Tribunal" means: (i) a court, an arbitrator, an administrative law judge, or an administrative body acting in an adjudicative capacity and authorized to make a decision that can be binding on the parties involved; or (ii) a special master or other person* to whom a court refers one or more issues and whose decision or recommendation can be binding on the parties if approved by the court.

(n)  "Writing" or "written" has the meaning stated in Evidence Code section 250.  A "signed" writing includes an electronic sound, symbol, or process attached to or logically associated with a writing and executed, inserted, or adopted by or at the direction of a person* with the intent to sign the writing.

**~~Discussion:~~Comment**

*Firm\* or Law Firm\**

[1]    Practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a law firm.*  However, if they

2

present themselves to the public in a way that suggests that they are a law firm* or conduct themselves as a law firm,* they may be regarded as a law firm* for purposes of these rules. The terms of any formal agreement between associated lawyers are relevant in determining whether they are a firm,* as is the fact that they have mutual access to information concerning the clients they serve.

[2]     The term "of counsel" implies that the lawyer so designated has a relationship with the law firm,* other than as a partner* or associate, or officer or shareholder, that is close, personal, continuous, and regular.  Whether a lawyer who is denominated as "of counsel" or by a similar term should be deemed a member of a law firm* for purposes of these rules will also depend on the specific facts.  (Compare *People ex rel. Department of Corporations v. Speedee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135 [86 Cal.Rptr.2d 816] with *Chambers v. Kay* (2002) 29 Cal.4th 142 [126 Cal.Rptr.2d 536].)

~~Law firm, as defined by subparagraph (B)(1), is not intended to include an association of lawyers who do not share profits, expenses, and liabilities. The subparagraph is not intended to imply that a law firm may include a person who is not a member in violation of the law governing the unauthorized practice of law.~~

*Fraud**

[3]     When the terms "fraud"* or "fraudulent"* are used in these rules, it is not necessary that anyone has suffered damages or relied on the misrepresentation or failure to inform because requiring the proof of those elements of fraud* would impede the purpose of certain rules to prevent fraud* or avoid a lawyer assisting in the perpetration of a fraud,* or otherwise frustrate the imposition of discipline on lawyers who engage in fraudulent* conduct.  The term "fraud"* or "fraudulent"* when used in these rules does not include merely negligent misrepresentation or negligent failure to apprise another of relevant information.

*Informed Consent** and *Informed Written Consent**

[4]     The communication necessary to obtain informed consent* or informed written consent* will vary according to the rule involved and the circumstances giving rise to the need to obtain consent.

*Screened**

[5]     The purpose of screening* is to assure the affected client, former client, or prospective client that confidential information known* by the personally prohibited lawyer is neither disclosed to other law firm* lawyers or nonlawyer personnel nor used to the detriment of the person* to whom the duty of confidentiality is owed.  The personally prohibited lawyer shall acknowledge the obligation not to communicate with any of the other lawyers and nonlawyer personnel in the law firm* with respect to the matter.  Similarly, other lawyers and nonlawyer personnel in the law firm* who are working on the matter promptly shall be informed that the screening* is in place and that they may not communicate with the personally prohibited lawyer with respect to the matter.  Additional screening* measures that are appropriate for the particular matter

will depend on the circumstances.  To implement, reinforce and remind all affected law firm* personnel of the presence of the screening,* it may be appropriate for the law firm* to undertake such procedures as a written* undertaking by the personally prohibited lawyer to avoid any communication with other law firm* personnel and any contact with any law firm* files or other materials relating to the matter, written* notice and instructions to all other law firm* personnel forbidding any communication with the personally prohibited lawyer relating to the matter, denial of access by that lawyer to law firm* files or other materials relating to the matter, and periodic reminders of the screen* to the personally prohibited lawyer and all other law firm* personnel.

[6]     In order to be effective, screening* measures must be implemented as soon as practical after a lawyer or law firm* knows* or reasonably should know* that there is a need for screening.*