1  Justin S. Beck
2  3501 Roselle St.,
   Oceanside, CA 92056
3  760-449-2509
   justintimesd@gmail.com
4  *In Propria Persona*

```
        FILED

       JAN 3 0 2023

   CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY      MØ          DEPUTY
```

5

## IN THE UNITED STATES DISTRICT COURT
6  ## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

7

8  JUSTIN S. BECK, individually, and for U.S.  )   Case No.: 3:22-CV-01616-BAS-DDL
                                              )
9              Plaintiff,                      )   Judge:         Hon. Cynthia A. Bashant
                                              )   Courtroom:     12B (12th Floor)
10  vs.                                        )   Hearing Date:  March 6, 2023
                                              )
11  CATANZARITE LAW CORPORATION;               )   NO ORAL ARGUMENT UNLESS
12  STATE OF CALIFORNIA; THE STATE BAR )          ORDERED BY THE COURT
    OF CALIFORNIA; ORANGE COUNTY              )
13  SUPERIOR COURT; ORANGE COUNTY              )   **NOTICE OF MOTION AND MOTION**
    DISTRICT ATTORNEY'S OFFICE; RUBEN )          **FOR SUMMARY JUDGMENT**
14  DURAN, ESQ.; SUZANNE CELIA                 )
15  GRANDT, ESQ.; RICHARD FRANCIS              )   Filed concurrently with:
    O'CONNOR, JR.; MOHAMMED                   )
16  ZAKHIREH; JAMES DUFFY; KENNETH             )     Memorandum in Support
17  CATANZARITE, ESQ.; JIM TRAVIS TICE, )
    ESQ.; NICOLE MARIE CATANZARITE             )     Declaration of Justin S. Beck in Support
18  WOODWARD, ESQ.; BRANDON                    )
19  WOODWWARD, ESQ.; TIM JAMES                 )     Exhibits in Support of Elements
    O'KEEFE, ESQ.; AMY JEANETTE                )
20  COOPER; CLIFF HIGGERSON; JAMES             )     Declared Damages and Computations
    DUFFY; ELI DAVID MORGENSTERN,             )
21  ESQ.; LEAH WILSON, ESQ.; ROBERT            )     Exhibits in Support of Damages
    GEORGE RETANA, ESQ.; ELLIN                 )
22  DAVTYAN, ESQ.; JOHN C. GASTELUM;           )
23  JORGE E. NAVARETTE; GEORGE                 )
    SARGENT CARDONA, ESQ.; ANTHONY B.)
24  SCUDDER                                    )
               Defendants,                     )
25                                             )
26  UNITED STATES ATTORNEY GENERAL; )
    UNITED STATES OF AMERICA                   )
27                                             )
28             Nominal Defendants              )
    _____)

i                                    3:22-CV-01616-BAS-DDL

TABLE OF CONTENTS

TABLE OF AUTHORITIES..............................................................................................v

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT........................xi

MEMORANDUM OF POINTS AND AUTHORITIES...................................................1

**I.     INTRODUCTION**...............................................................................................1

**II.    LEGAL STANDARD**..........................................................................................2

**III.   CLAIMS & ELEMENTS FOR SUMMARY JUDGMENT (OR ADJUDICATION)**........3

**COUNT I: RACKETEERING – 18 U.S.C. § 1962(c)** ...................................................3

(1) Orange County Superior Court is an enterprise. ...................................................3

(2) The Orange County Superior Court enterprise engaged in or had some effect ...............3
on interstate commerce.

(3) Kenneth Catanzarite, The State Bar of California, and State of California were ...............4
each employed by or associated with the Orange County Superior Court enterprise.

(4) Kenneth Catanzarite, The State Bar of California, and State of California .....................4
participated in the conduct of the affairs of the Orange County Superior Court
enterprise.

(5) Kenneth Catanzarite, The State Bar of California, and State of California .....................5
participated in the Orange County Superior Court enterprise conduct through
a pattern of racketeering activity.

a. Pattern of Racketeering Activity for Kenneth Catanzarite Against Beck...........................6

    1. Filing Derivative Action by Wire in OCSC Sep. 14, 2018, for Non-Shareholder

    2. Improper Settlement Demands by Wire on October 4, 2018, for Root, not MFS

    3. Extorting Shareholder Consents by Wire in January 2019

    4. "Tolling Claims" Against O'Connor, Cooper, Higgerson Producing Evidence

    5. Suborning (4) Acts of Perjury by Wire of Richard Francis O'Connor, Jr.

    6. Re-Filing Adjudicated, False Claims by Wire in OCSC Aug. 10, 2020 against Beck

b. Pattern of Racketeering Activity for The State Bar of California Against Beck...............11

    1. Carrying on Serial Fraud of Catanzarite Law Corporation Before Sep. 14, 2018

2. April 3, 2020, Postal Mail from State Bar's Eli David Morgenstern

3. August 12, 2020, Postal Mail from "Complaint Review Unit"

4. May 2022 Wire Communications of Duran, Andresen, Cardona, Wilson

5. July 20, 2022, Malicious Wire Communications of Grandt for Board of Trustees

6. July 29, 2022, False Assertions of Law to Delay OCSC Adjudication for Beck

7. Judicial Fraud by Wire on Demurrer of Grandt, Duran, and Andresen in OCSC

8. Manipulation of Beck's Antitrust Petition S276517 by Grandt, Retana, OGC

9. Threatening Letter of Davtyan by Postal Mail and Wire December 15, 2022

10. Overt Recommendation of Three Court of Appeal Justices to Obstruct OCSC

11. Refusal to Investigate Board of Trustees and Management by Postal Mail

c. Pattern of Racketeering Activity for State of California Against Beck...........................17

1. Postal Mail for "In Re: Walker" Scheme by Jorge E. Navarette in CSC, OGC

2. Overt Appointment of Three Court of Appeal Justices to Obstruct OCSC Cases

3. Filing of a Fraudulent Antitrust Petition for Beck by Jorge E. Navarette in CSC

4. Postal Mail Refusing to Appear in OCSC Despite Being Named Defendant

(6) Damages to Beck's business or property by the conduct constituting...........................19

the violations.

**COUNT II: INVESTING OR USING PROCEEDS OF RACKETEERING IN** ................20

**AN INTERSTATE ENTERPRISE – 18 U.S.C. § 1962(a)**

(1) The State Bar of California enterprise derived income, either directly ...........................20

or indirectly, from a pattern of racketeering activity.

(2) The State Bar of California, Ruben Duran, Leah Wilson, and State of ...........................20

California participated as a principal in the pattern of racketeering activity.

a. Ruben Duran as Chairman of The State Bar of California

b. Leah Wilson as Executive Director of The State Bar of California

(3) Some part of that income, or proceeds of that income, was used to ...............................22

acquire or maintain an interest in, or to operate, The State Bar of California

enterprise.

1

(4) The State Bar of California enterprise engaged in, or had some effect on, ....................22

2     interstate commerce.

3     (5) Investments in The State Bar of California enterprise injured Beck's...........................22

4     business or property.

5     **COUNT VI: SHERMAN ACT**..............................................................................23

6     **Violation of 15 U.S.C. § 1**

7     (1) There exist no clearly articulated state policies for State Bar's ...................................24

8     anticompetitive acts.

9     (2) There exists no active state supervision, as defined by federal law, ............................24

10     for the foregoing acts.

11     (3) Justin S. Beck and the United States were damaged by State Bar's..............................24

12     antitrust violations.

13   **IV.**    **CONCLUSION** ...................................................................................................**25**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3:22-CV-01616-BAS-DDL

1

## TABLE OF AUTHORITIES

2

### **Cases – State**

3   Action Apartment Ass'n, Inc. v. City of Santa Monica,.....................................................1

4         41 Cal. 4th at 1246

5   Beck v. Catanzarite Law Corp., ...............................................................6-11, 16

6         No. G059766, 1, 6, 8-12, 30, 32-33 (Cal. Ct. App. Jul. 13, 2022)

7   Cultivation Techs., Inc. v. James Duffy...................................................................15

8         No. G059457, 10-11 (Cal. Ct. App. Nov. 12, 2021)

9   Fincanna Capital Corp. v. Cultivation Tech., ...............................................15

10        No. G058700, 3-8 (Cal. Ct. App. Jun. 28, 2021)

11  Kimmel v. Goland, .......................................................................................1

12        51 Cal.3d 202, 204 (Cal. 1990)

13  People v. Persolve, ......................................................................................1

14        218 Cal.App.4th 1267, 1274 (2013)

15  Wirin v. Parker, ..........................................................................................1

16        48 Cal.2d 890, 89 (Cal. 1957)

17

### **Statutes & Rules**

18  Cal. Gov. Cod. § 815.6...........................................................................18, 24

19        Liability Statute Causing Public Entity Liability in Failing Mandatory Duties

20  Cal. Evid. Cod. § 956....................................................................................1

21        Crime/Fraud Exception to Attorney-Client Privilege & Work Product

22  Cal. Cod. Civ. P. § 47(b) ............................................................................1

23        Litigation Privilege Not Applicable to Racketeering

24  Cal. Cod. Civ. P. § 425.16...........................................................................16

25        State Anti-SLAPP Law Used to Suppress First Amendment Right of Petition

26  Cal. R. Ct. 8.1115(b)(1)-(2) ........................................................................1

27        Reliance Upon Unpublished Opinion

28

Cal. R. Prof. Cond. 1.0.1(d)[3] ...........................................................................1

Definition, and Reduced Elements, for Attorney Fraud/Fraudulent Conduct

### **Cases – Federal**

Alexander Grant & Co. v. Tiffany Indus., Inc., ...............................................19

    770 F.2d 717, 719 (8th Cir. 1985)

Allwaste, Inc. v. Hecht, ........................................................................................6

    65 F.3d at 1528

Anderson v. Liberty Lobby, Inc., ........................................................................2

    477 U.S. 242, 248, 255-56 (1986)

Bolling v. Sharpe, ...............................................................................................25

    347 U.S. 497, 498-99 (1954)

Boyle v. United States, .................................................................................passim

    556 U.S. 938, 945-46 (2009)

Brittingham v. Mobil Corp., ..............................................................................20

    943 F.2d 297, 303 (3d Cir. 1991)

Bui v. Nguyen, ......................................................................................................5

    712 Fed. Appx. 606, 609 (9th Cir. 2017)

Celotex Corp. v. Catrett, ......................................................................................2

    477 U.S. 317, 322-23 (1986)

Diaz v. Gates, ...............................................................................................19, 20

    420 F.3d 897 (9th Cir. 2005)

Doe I v. Reddy, ...................................................................................................20

    No. C02-05570, 20023 WL 23893010, at *5-6 (N.D. Cal. Aug. 4, 2003)

Edelson PC v. Girardi, .......................................................................................22

    20 C 7115, (N.D. Ill. Aug. 9, 2022)

Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc., ............................3

    831 F.3d 815, 827 (7th Cir. 2016)

Envtl. Tectonics v. W.S. Kirkpatrick, Inc., ...................................................................3

    847 F.2d 1052, 1067 (3d Cir. 1988)

Goldfarb v. Virginia State Bar, .....................................................................................23

    421 U.S. 773, 791, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975)

Hanover 3201 Realty, LLC v. Village Supermarkets, Inc., ...........................................24

    806 F.3d 162 (3d Cir. 2015)

H.J., Inc. v. Northwestern Bell Telephone Co. ...............................................................6

    492 U.S. at 240 (1989)

Ikuno v. Yip, ...................................................................................................................6

    912 F.2d 306, 310 (9th Cir. 1990)

In re ClassicStar Mare Lease Litig., ............................................................................20

    361 F.Supp.3d 677, 686 (E.D. Ky. 2019)

In re Grand Jury Subpoena, ...........................................................................................1

    419 F.3d 329, 335 (5th Cir. 2005)

Jaguar Cars, Inc. v. Royal Oak Motor Car Co., ..........................................................20

    46 F.3d 258 (3d Cir. 1995)

Kane v. Bank of Am., ....................................................................................................20

    No. 13 C 8053, 2015 WL 3798142, at *5 (N.D. Ill. June 17, 2015

Knight v. U.S. Fire Ins. Co., ...........................................................................................2

    804 F.2d 9, 11 (2d Cir. 1986)

Lewis v. Lhu, .................................................................................................................19

    696 F. Supp. 723, 727 (D.D.C. 1988)

Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc., ...........................................passim

    709 F. Supp. 438, 452 (S.D.N.Y. 1989) order rev'd on other grounds, 967 F.2d 742 (2d Cir. 1992)

Lies v. Farrell Lines, Inc., ..............................................................................................2

    641 F.2d 765, 769 n.3 (9th Cir. 1981)

3:22-CV-01616-BAS-DDL

Living Designs, Inc. v. E.I. Dupont de Nemours & Co., ....................................................3, 4

    431 F.3d 353, 361 (9th Cir. 2005)

Medallion Television Enters., Inc. v. SelecTV of Cal., Inc., ..............................................6

    833 F.2d 1360, 1363 (9th Cir. 1987)

Nat'l Org. for Women, Inc. v. Scheidler, .........................................................................18

    510 U.S. 249, 262 (1994)

N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n, ...........................................23

    574 U.S. 494, 505 (2015)

Odom, v. Microsoft Corp. ...........................................................................................3, 21

    486 F.3d at 548-49, 551

Parker v. Brown, ...................................................................................................passim

    317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315

Quarles v. General Motors Corp., .....................................................................................2

    758 F.2d 839, 840 (2d Cir. 1985)

Rae v. Union Bank, ..........................................................................................................3

    725 F.2d 478, 481 (9th Cir. 1984)

Rodriguez v. Inglewood Unified School Dist. ..................................................................25

    (1986) 186 Cal.App.3d 707

Sedima, S.P.R.L. v. Imrex Co., Inc., .................................................................................5

    473 U.S. 479, 495 (1985)

Sever v. Alaska Pulp Corp., ...............................................................................................6

    978 F.2d 1529, 1534 (9th Cir. 1992)

Spectrum Sports, Inc. v. McQuillan, ...............................................................................23

    506 U.S. 447, 448 (1993)

United States v. Murphy, ..................................................................................................3

    768 F.2d 1518 (7th Cir. 1985)

United States v. Weaver, ..................................................................................................5

    860 F.3d 90, 94 (2d Cir. 2017)

3:22-CV-01616-BAS-DDL

<u>Vicom, Inc.</u> v. <u>Harbridge Merch. Servs., Inc.,</u> ................................................................2

No. 92-CV-2808, 1993 WL 8340 (N.D. Ill. Jan. 8, 1993) judgment aff'd, 20 F.3d 771    (7th

Cir. 1994)

<u>Waste Mgmt. of Louisiana, L.L.C.</u> v. <u>River Birch, Inc.,</u> ................................................3

920 F.3d 958, 964-73 (5th Cir. 2019), cert. denied, 140 S. Ct. 628, 205 L. Ed. 2d 390

(2019)

<u>Waste Mgmt. of La. v. River Birch, Inc.,</u> ................................................................1

CIVIL ACTION NO: 11-2405 SECTION: "J"(4), 3 (E.D. La. Jun. 4, 2020)

<u>Wilcox v. First interstate Bank,</u> ................................................................5

815 F.2d 522, 531-32 (9th Cir. 1987)

### <u>Federal – Statutes</u>

15. U.S.C. § 1................................................................23, 24

Sherman Act

15 U.S.C. § 15................................................................24

Suits By Private Persons Injured by Antitrust Violations

18 U.S.C. § 1341................................................................*passim*

Mail Fraud

18 U.S.C. § 1343................................................................*passim*

Wire Fraud

18 U.S.C. § 1961................................................................5

Racketeering Section

18 U.S.C. § 1961(4) ................................................................3

Enterprise Definition

18 U.S.C. § 1961(5) ................................................................5

Pattern of Racketeering Activity Definition

18 U.S.C. § 1962(c) ................................................................2, 3, 18

Racketeering

18 U.S.C. § 1962(a) ........................................................................................................20

    Investing Proceeds of Racketeering in an Enterprise

18 U.S.C. § 1964(a) ......................................................................................*passim*

    District Court Authority to Prevent and Restrain RICO Violations

18 U.S.C. § 1968.............................................................................................20

    Civil Investigative Demand, Procedures for U.S. Attorney General

**<u>Federal – Rules & Regulations</u>**

F.R.Civ.P. 23.1(c) .............................................................................................7

    Dismissal of Derivative Claims Require Court Approval

Fed.R.Civ.P. 56...........................................................................................*passim*

    Summary Judgment

Fed.R.Civ.P. 56(a) ...........................................................................................2

    Summary Judgment Grounds

Fed.R.Civ.P. 56(b) .......................................................................................*passim*

    Summary Judgment at Commencement of Action

Fed.R.Civ.P. 56(a)(1)(A) ...............................................................................*passim*

    No Genuine Dispute to Facts Can Exist to Deny Summary Judgment or Adjudication

Fed.R.Civ.P. 56(e)(2) ........................................................................................2

    Assertions of Fact on Summary Judgment Motion and Disputes

Fed.R.Civ.P. 56(h) ......................................................................................*passim*

    Bad Faith Declarations or Affidavits Opposing Summary Judgment or Adjudication

Fed.R.Civ.P. 65.............................................................................................25

    Injunctive Relief

**<u>Other Authorities</u>**

U.S. Department of Justice Archives 1988.....................................................................25

    Public Corruption is Not a Victimless Crime

1    <u>NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT</u>

2    COME NOW Plaintiff Justin S. Beck individually ("plaintiff" or "Beck"), who moves for

3    summary judgment on Count I—18 U.S.C. § 1962(c), Count II—18 U.S.C. § 1962(a), and Count VI—

4    15 U.S.C. § 1, of his complaint against Kenneth Catanzarite, Esq, The State Bar of California, Ruben

5    Duran, Esq., Leah Wilson, Esq., and State of California (Docket #7, pp. 1-157) for hearing March 6,

6    2023 pursuant to Fed. R.Civ.P.56. ("motion"). F.R.Civ.P.56(b) allows "a party to file a motion for

7    summary judgment at any time until 30 days after the close of discovery."[1] Beck's complaint noticed

8    defendants of this motion's pendency. (Docket #7, PageID.404, ¶5, Lines 27:28)

9        The motion is made on the grounds that Count I, Count II, and Count VI cannot be defeated as

10   a matter of law. F.R.Civ.P.56(a). Each fact set forth herein cannot be genuinely disputed in accordance

11   with F.R.Civ.P.56(c)(1)(A) because they rely upon filings by Catanzarite Law Corporation, reports from

12   California State Auditor, adjudicative facts, press releases from The State Bar of California, or other

13   evidence that is exempt from privilege as being related to crime or fraud. Beck includes his declaration

14   to support the motion under F.R.Civ.P.56(c)(4) with verified evidence. Any opposition to adjudicative

15   facts would be made in bad faith in accordance with F.R.Civ.P.56(h) and further violate 18 U.S.C. §

16   1341 or §1343.  Citations of opinions under California Rules of Court, Rule 8.1115 subsection (a) are

17   proper: "except as provided in (b), an opinion of a California Court of Appeal…that is not certified for

18   publication or ordered published must not be cited or relied on by a court or a party in any other action."

19   Subsection (b) holds "an unpublished opinion may be cited or relied on: (2) When the opinion is relevant

20   to a criminal or disciplinary action because it states the reasons for a decision affecting the same

21   defendant or respondent in another such action." California Rules of Court 8.1115(b) allows reliance on

22   opinions by this Court when it is relevant for stating the reasons for a criminal action. This action is for

23   civil relief in favor of Justin S. Beck and the United States for criminal conduct.

24       Respectfully Submitted January 28, 2023        Justin S. Beck

---

27
28
[1] Committee Notes on Rules-2009 Amendment cites "the new rule [56] allows a party to move for summary judgment at any time, even as early as the commencement of the action." "If a motion for summary judgment is filed before a responsive pleading is due from a party affected by the motion, the time for responding to the motion is 21 days after the responsive pleading is due."

3:22-CV-01616-BAS-DDL

1  **I.    INTRODUCTION TO MEMORANDUM OF POINTS AND AUTHORITIES**

2  "It is elementary that public officials must themselves obey the law." Wirin v. Parker, 48 Cal.2d

3  890, 89 (Cal. 1957). Public officials in this case have participated in ongoing fraud against the public,

4  and namely Beck. Rule 1.0.1 Terminology (Rule Approved by the [California] Supreme Court, Effective

5  November 1, 2018) subsection (d) "'Fraud' or 'fraudulent' means conduct that is fraudulent under the

6  law of the applicable jurisdiction and has a purpose to deceive. In footnote [3] "When the terms "fraud"

7  or "fraudulent" are used in these rules, it is not necessary that anyone suffered damages or relied upon

8  the misrepresentation or failure to inform because requiring the proof of those elements of fraud* would

9  impede the purpose of certain rules to prevent fraud* or avoid a lawyer assisting in the perpetration of a

10  fraud*[]." Here, the jurisdiction is the United States; the law is 18 U.S.C. § 1341 and 18 U.S.C § 1343.

11  Cal. Evid. Cod. § 956 holds "(a) There is no privilege [] if the services of the lawyer were sought

12  or obtained to enable or aid anyone to commit or plan to commit a crime or a fraud." California case

13  law holds "[i]n this case, we are called upon to determine whether the privilege…shields a person from

14  liability for [racketeering activity]…section 47(2) precludes recovery for tortiously inflicted injury

15  resulting from publications or broadcasts made during the course of judicial and quasi-judicial

16  proceedings, but [not] from tortious conduct regardless of the purpose for which such conduct is

17  undertaken." Kimmel v. Goland, 51 Cal.3d 202, 204 (Cal. 1990). See People v. Persolve, 218

18  Cal.App.4th 1267, 1274 (2013) (holding that the litigation privilege does not apply to alleged violations

19  of certain state and federal unfair debt collection statutes); see Action Apartment Ass'n, Inc. v. City of

20  Santa Monica, at 1246 (the litigation privilege does not apply to criminal prosecution of perjury, false

21  reporting, and attorney deceit because the statutes at issue are "more specific than the litigation privilege

22  and would be significantly or wholly inoperable if its enforcement were barred when in conflict with

23  the privilege.") ""Under the crime-fraud exception to the attorney-client privilege, the privilege can be

24  overcome where communication or work product is intended to further continuing or future criminal or

25  fraudulent activity." In re Grand Jury Subpoena, 419 F.3d 329, 335 (5th Cir. 2005)" Waste Mgmt. of

26  La. v. River Birch, Inc., CIVIL ACTION NO: 11-2405 SECTION: "J"(4), 3 (E.D. La. Jun. 4, 2020)

27  Each overt communication in this case is exempt from privilege because it relates in some manner to

28  the fraud or crime of Catanzarite Law Corporation, or the fraud or crime of The State Bar of California.

1

3:22-CV-01616-BAS-DDL

## II.   LEGAL STANDARD

Summary judgment is appropriate where the record, read in the light most favorable to the nonmovant, indicates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P.56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Summary adjudication, or partial summary judgment "upon all or any part of [a] claim," is appropriate where there is no genuine dispute as to any material fact regarding that portion of the claim. Fed.R.Civ.P.56(a); see also Lies v. Farrell Lines, Inc., 641 F.2d 765, 769 n.3 (9th Cir. 1981). ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim...") Material facts in this case are adjudicated already or indisputable.

Material facts are those necessary to the proof or defense of a claim, and are determined by referring to substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.[2]

The moving party has the initial burden of establishing the absence of a material fact for trial. Anderson, 477 U.S. at 256. "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact...,the court may...consider the fact undisputed." Fed.R.Civ.P. 56(e)(2). Furthermore, "Rule 56[(a)][3] mandates the entry of summary judgment...against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. Therefore, if the nonmovant does not make a sufficient showing to establish the elements of its claims or defenses, the Court must grant the motion.

---

[2] The State Bar of California knows, and the Court is noticed as it relates to any responsive documents to this motion, that "Catanzarite does not care about the truth in making statements to the Court." (Ex. 34, p. 4) The mere existence of disputed factual issues, however, is not enough to defeat a motion for summary judgment. Knight, 804 F.2d at 11-12; Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985) (per curiam)" Litton Industries v. Lehman Bros. Kuhn Loeb Inc., 709 F. Supp. 438, 442 (S.D.N.Y. 1989). State Bar and Catanzarite would need to unwind their own wires and mail, here.

[3] Rule 56 was amended in 2010. Subdivision (a), as amended, "carries forward the summary judgment standard expressed in former subdivision (c), changing only one word—genuine "issue" becomes genuine 'dispute.'" Fed. R. Civ. P. 56, Notes of Advisory Committee on 2010 amendments.

2

III.     **CLAIMS & ELEMENTS FOR SUMMARY JUDGMENT (OR ADJUDICATION)**

**COUNT I: RACKETEERING – 18 U.S.C. § 1962(c)**

To recover under § 1962(c), plaintiff must prove (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity (known as "predicate acts"), (5) causing injury to the plaintiff's "business or property" by the conduct constituting the violation. See Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361 (9th Cir. 2005).

Public corruption is not a victimless crime. (Ex. 279, from DOJ NCJRS Acquisitions). Plaintiffs can bring RICO actions for acts of public corruption that resulted in pecuniary injury to them, and the burden of proof for crime-fraud exceptions to privilege is minimal in civil actions. Waste Mgmt. of Louisiana, L.L.C. v. River Birch, Inc., 920 F.3d 958, 964-73 (5th Cir. 2019), cert. denied, 140 S. Ct. 628, 205 L. Ed. 2d 390 (2019); Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc., 831 F.3d 815, 827 (7th Cir. 2016); Envtl. Tectonics v. W.S. Kirkpatrick, Inc., 847 F.2d 1052, 1067 (3d Cir. 1988). Here, the corruption involves nonsovereign state actors who claim to protect the public (Ex. 278, p. 2 "we can never allow something like this to happen again") but refuse to do so repeatedly, with malice.

Beck moves for summary judgment or adjudication on this Count I against Kenneth Catanzarite, Esq., The State Bar of California ("State Bar"), and State of California ("State") ("Count I Defendants"). To succeed on this claim, Beck must prove each element by a preponderance of the evidence.

(1) **Orange County Superior Court is an enterprise**.

Orange County Superior Court is an enterprise. The "enterprise" may be the court system itself. United States v. Murphy, 768 F.2d 1518 (7th Cir. 1985). "An enterprise includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The "definition is not very demanding." Odom, 486 F.3d at 548. For purposes of § 1962(c), a single individual or entity cannot be both the RICO enterprise and an individual defendant. Rae v. Union Bank, 725 F.2d 478, 481 (9th Cir. 1984) (holding that plaintiff could not assert RICO claim against defendant bank because bank was also alleged to be RICO enterprise). OCSC had racketeering conviction of a clerk in 2017. (Ex. 13, p. 2)

(2) **The Orange County Superior Court enterprise engaged in or had some effect on interstate commerce**.

3                                  3:22-CV-01616-BAS-DDL

1    "Insured Person" (<u>Declared Statement of Damages to Justin S. Beck, "Damages," Ex. A1, p. 14-</u>

2    <u>5</u>) Justin S. Beck's policy with Scottsdale Insurance Co. of Arizona, using E-Risk Services, LLC of New

3    Jersey as Agent for Policy No. EKS3206247 uses claims management by Nationwide (<u>Damages, Ex. A,</u>

4    <u>p. 2</u>). The Orange County Superior Court ("OCSC") enterprise was used by Kenneth Catanzarite of

5    Catanzarite Law Corporation (<u>Ex. 311, pp. 2-40</u>) to deplete Beck's policy by more than $1.268 million

6    between September 14, 2018 (<u>Ex. 311, p. 2</u>) and July 30, 2022. (<u>Damages, Ex. A, p. 2</u>)

7    **(3) <u>Kenneth Catanzarite, The State Bar of California, and State of California were each employed</u>**

8    **<u>by or associated with the Orange County Superior Court enterprise</u>.**

9        Kenneth Catanzarite (SBN #113750) had an active status with The State Bar of California at

10   9:44 AM PDT on December 6, 2022, with no prior inactive status. (<u>Ex. 94, p. 7</u>). Kenneth Catanzarite

11   used his active status with The State Bar of California to file the Scottsdale Action OCSC Case No. 30-

12   2019-01096233 in Orange County Superior Court on 9/11/2019 (<u>Ex. 311, p. 26</u>). Orange County

13   Superior Court "is the branch of the California superior court with jurisdiction over Orange County."

14   (<u>Ex. 320, p. 2</u>). State of "California has 58 trial courts, one in each county" (<u>Ex. 321, p. 2</u>) of which

15   Orange County Superior Court is one (<u>Ex. 320, p. 2</u>)

16       For State Bar and State, an organizational defendant can be a member of a larger associated in-

17   fact enterprise, here Orange County Superior Court enterprise includes Kenneth Catanzarite, Catanzarite

18   Law Corporation, The State Bar of California, and State of California. See <u>Living Designs</u>, 431 F.3d at

19   361 (finding associated-in-fact enterprise could be formed between defendant corporation, law firms

20   employed by it and expert witnesses retained by law firm).

21   **(4) <u>Kenneth Catanzarite, The State Bar of California, and State of California participated in the</u>**

22   **<u>conduct of the affairs of the Orange County Superior Court enterprise</u>.**

23       Kenneth Catanzarite is CEO of Catanzarite Law Corporation ("CLC") (<u>Ex. 216, p. 3</u>). CLC is

24   associated-in-fact with State Bar according to public records provided Beck for Certificate of

25   Registration No. 09009 (<u>Ex. 21, pp. 65-227</u>). In 1982, the Fourth District, Division Three Court of

26   Appeal was formed "and assumed jurisdiction of all cases from Orange County. Division Three is the

27   only state appellate court whose jurisdiction is limited to a single county." (<u>Ex. 322, p. 2</u>) Beck's claims

28   act litigation started in OCSC December 21, 2021 (<u>Ex. 335, p. 2</u>).

4                    3:22-CV-01616-BAS-DDL

The State Bar of California overtly recommended (Ex. 252, p. 2) and/or Governor Newsom overtly nominated based on that recommendation three Court of Appeal Justices on specific dates of Beck's cases against The State Bar of California and State of California in Orange County Superior Court in Government Claims Act litigation: (1) Associate Justice Maurice Sanchez on November 10, 2021 (Ex. 227, p. 2) two days before Beck's government claim was denied November 12, 2021 (Ex. 187, p. 2), (2) Associate Justice Joanne Motoike on May 2, 2022 (Ex. 230, p. 2) the same day Beck filed his first amended complaint in OCSC Case No. 30-2021-01237499 at 8:00 AM (Ex. 323, p. 2), (3) Associate Justice Thomas A. Delaney (Ex. 231, p. 2) nominated August 8, 2022 when Beck moved for summary judgment (Ex. 324, p. 2) against defendants State of California (Ex. 324A, p. 4) and The State Bar of California (Ex. 324B, p. 6) then appointed Associate Justice Thomas A. Delaney October 11, 2022 when Orange County Superior Court sustained demurrer without leave to amend Beck's May 2, 2022 first amended complaint (Ex. 102, p. 2 for letter from The State Bar of California's Suzanne Grandt: "As you are no doubt aware, the Superior Court sustained Defendants The State Bar of California...demurrer to the First Amended Complaint" with "Notice of Ruling" and "Hearing Date" October 11, 2022 at p. 4).

(5) **Kenneth Catanzarite, The State Bar of California, and State of California participated in the Orange County Superior Court enterprise conduct through a pattern of racketeering activity**.

To constitute racketeering activity, the relevant conduct must consist of at least one of the indictable predicate acts listed in 18 U.S.C. § 1961. Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 495 (1985) ("'[R]acketeering activity' consists of no more and no less than commission of a predicate act.") Predicate acts must be proven by a preponderance of the evidence. See Wilcox v. First interstate Bank, 815 F.2d 522, 531-32 (9th Cir. 1987).

Criminal mail and wire fraud under 18 U.S.C. §§ 1341 and 1343 involves: (1) a scheme based on an intent to defraud; and (2) the use of the mails or wires to further that scheme. United States v. Weaver, 860 F.3d 90, 94 (2d Cir. 2017); Bui v. Nguyen, 712 Fed. Appx. 606, 609 (9th Cir. 2017). A scheme to defraud encompasses "acts of artifice or deceit which are intended to deprive [Beck] of his property or money." Vicom, Inc. v. Harbridge Merch. Servs., Inc., No. 92-CV-2808, 1993 WL 8340 (N.D. Ill. Jan. 8, 1993), judgment aff'd, 20 F.3d 771 (7th Cir. 1994). A pattern is defined as "at least two

1 acts of racketeering activity" within ten years of each other. 18 U.S.C. § 1961(5). Proving two predicate
2 acts is necessary condition for finding a violation, but may not be sufficient. To establish a "pattern of
3 racketeering activity," the predicate acts must be both "related" and "continuous." Id.; Sever, 978 F.2d
4 at 1529.

5       Related conduct "embraces criminal acts that have the same or similar purposes, results,
6 participants, victims, or methods of commission, or otherwise are interrelated by distinguishing
7 characteristics and are not isolated events." H.J., Inc., 492 U.S. at 240 (1989). Relatedness of the alleged
8 or proven predicate acts is rarely an issue. See Medallion Television Enters., Inc. v. SelecTV of Cal.,
9 Inc., 833 F.2d 1360, 1363 (9th Cir. 1987) (finding alleged predicate acts to be related when all were
10 directed toward inducing plaintiff to obtain certain rights.) Open-ended continuity shows via "predicate
11 acts that specifically threaten repetition or that become a regular way of doing business." Allwaste, 65
12 F.3d at 1528; see, e.g., Ikuno v. Yip, 912 F.2d 306, 308 (9th Cir. 1990) Here, the racketeering activity
13 constitutes wire fraud or mail fraud directed at Beck, his rights, or interests.

14      **a. Pattern of Racketeering Activity for Kenneth Catanzarite Against Beck**

15         1. Filing Derivative Action by Wire in OCSC Sep. 14, 2018, for Non-Shareholder
16      September 14, 2018, Catanzarite filed a complaint "for Denise Pinkerton. Pinkerton claimed to
17 be acting as attorney in fact for Root, individually and as successor in interest to the claims of his
18 deceased spouse (Sharon Root). The complaint alleged the Roots owned MFS common stock and that
19 the lawsuit was also a shareholder derivative action on behalf of MFS." (Ex. 311, p. 2) Beck v.
20 Catanzarite Law Corp., No. G059766, 6 (Cal. Ct. App. Jul. 13, 2022)

21      Roger Root was not a shareholder of MFS. (Ex. 128, pp. 11-13). "[T]he Roots asserted "MFS
22 and Root" relied on their fiduciaries…O'Connor, Cooper[]." Beck v. Catanzarite Law Corp., No.
23 G059766, 8 (Cal. Ct. App. Jul. 13, 2022) "Several causes of actions were based on the factual
24 allegation…O'Connor, Cooper,…Porche received illegal commissions on the sale of MFS securities to
25 the Roots….More importantly, Roger Root knew CTI was not MFS's subsidiary because he was invited
26 (on Jolly Roger's behalf) to participate in CTI's stock offering but he had declined. (Ex. 325, p. 2)
27 Second…Jolly Roger was a "defunct" corporation when the lawsuit was filed [September 14, 2018].
28 The documents revealed Jolly Roger filed articles of dissolution in early 2015 (Ex. 215, p. 2) and was

not reinstated until January 17, 2019. (Ex. 215, pp. 3-6) Beck v. Catanzarite Law Corp., No. G059766, 8-10 (Cal. Ct. App. Jul. 13, 2022)

### 2. Improper Settlement Demands by Wire on October 4, 2018, for Root, not MFS

"Another issue was the inherent inconsistency in the requested remedies. On one hand, the Roots were willing to settle their direct action for 10,000,000 CTI Founders shares and a seat on the CTI board. On the other hand, the Roots derivative claims sought cancellation of all CTI stock certificates because MFS allegedly owned 100 percent of CTI. (Ibid.) (Ex. 316, p. 3)

"Despite these issues, Catanzarite diligently prosecuted the case by serving MFS's counsel (Anderson, McPharlin &Conners) with over 500 discovery requests. (Ex. 174, p. 6, Lines 18:19) Cooper was assigned counsel under CTI's policy." Beck v. Catanzarite Law Corp., No. G059766, 10 (Cal. Ct. App. Jul. 13, 2022) (Catanzarite uses discovery to steal information and file fake cases in perpetuity).

### 3. Extorting Shareholder Consents by Wire in January 2019 to Harm Beck

Cooper and O'Connor each admitted to Beck that they used Mobile Farming Systems, Inc. to pay $340,000 in illegal commissions to Joseph Porche. (Beck Declaration in Support of Summary Judgment "Beck Decl." ¶3) "On December 13, 2018, Catanzarite dismissed Porche, and in early January it dismissed Mobin, two of the primary wrongdoers named in the Pinkerton Action." Beck v. Catanzarite Law Corp., No. G059766, 11 (Cal. Ct. App. Jul. 13, 2022).

On January 3, 2019, Cliff Higgerson filed demurrer to the Pinkerton Action (Ex. 271, p. 2). On January 7, 2019, Mobile Farming Systems, Inc. counsel filed a motion for security to post bond: "Roger D. Root has never been "a shareholder, of record or beneficially, or the holder of trust certificates" of MFS…[Pinkerton] is alleging claims by a third-party not named in the operative complaint – Jolly Roger…a Washington Corporation." (Ex. 174, p. 4, Lines 23:26) (See F.R.Civ.P. 23.1(c).)

Using the wire, on January 17, 2019 (Ex. 215, p. 3), Catanzarite Law Corporation (Ex. 215, p. 4) revived Jolly Rogers Investments, Inc., dissolved May 1, 2015 (Ex. 215, p. 2). Kenneth Catanzarite made direct or indirect contact with the represented party Amy Jeanette Cooper, whose counsel Stephen Erigero "represented Amy Cooper from October 18, 2018 to January 23, 2019" and who declares "[n]either I, nor our firm, were involved in any settlement discussions in connection with her dismissal from the [Pinkerton Action]. (Ex. 262, p. 2, ¶ ¶ 2-4, Lines 9:13) (See F. R. Civ. P. 23.1(c) where

compromise of derivative action requires court approval). Using the threat of fear under color of right, Catanzarite extorted O'Connor, Cooper to produce evidence for Kenneth Catanzarite's scheme:

On January 22, 2019, "Richard Francis O'Connor, II" and "Scott Unfug" were dismissed from the Pinkerton Action using the wire by Kenneth J. Catanzarite of Catanzarite Law Corporation (Ex. 263, p. 3) On January 23, 2019, "Amy Jeanette Cooper and Cliff Higgerson Only" were dismissed from the Pinkerton Action by wire by Kenneth J. Catanzarite of Catanzarite Law Corporation (Ex. 263, p. 4).

On "January ___, 2019," Richard Francis O'Connor II signed "Written Consent of the Shareholders of Mobile Farming Systems, Inc." (Ex. 261, p. 2) On January 23, 2019, Denise Pinkerton signed. (Id at p. 3). On January 23, 2019, Scott Unfug signed. (Id. at p. 3). On January 25, 2019, Amy Jeanette Cooper signed. (Id. at p. 6). On January 23, 2019, Rick Mesa signed (Id. at p. 10). On January 23, 2019, Jeff Ray Schunk signed. (Id. at p. 13).

On January 23, 2019 (Ex. 327, p. 2-3), O'Connor executed a "unanimous written consent of the sole shareholder of [CTI]" (2019 Consent), stating he was CEO of MFS and had authority to act by unanimous written consent without a meeting to adopt several resolutions. The first resolution stated MFS was the sole shareholder of CTI and O'Connor, in his capacity as CEO, could issue the written consent stating MFS fully paid for 28,000,000 shares of CTI common stock in March 2015. The next resolution stated the Amended Acts contained the false contention MFS "had not fully paid for all of its stock [was] facilitated by the wrongful and self-serving conduct" of Probst and Beck. Accordingly, all actions, issuance of shares, and promisors were void or voidable acts. In essence, the written consent sought to unwind three years of CTI's corporate acts. In addition, the 2019 Consent "resolved" that the entire CTI board of directors was wrongly elected "by shareholders other than MFS" and they were immediately removed. MFS rescinded all CTI's stocks and promissory notes. It elected O'Connor, Zakhireh, and [Duffy] to serve as CTI's directors. It terminated CTI's auditor and legal counsel. Beck v. Catanzarite Law Corp., No. G059766, 11-12 (Cal. Ct. App. Jul. 13, 2022). Before January 23, 2019, Richard Francis O'Connor acted as principal in at least 158 separate securities transactions to sell or transfer shares of CTI shares. (Ex. 170, p. 2 summarizing; pp. 3-7 details). James Duffy emailed Beck on June 7, 2017 "Beck has to resign from CTI and forfeit his Common & Preferred Stock." (Ex. 328, p. 3) Zakhireh sued Beck about the Preferred Shares April 28, 2017. (Ex. 145)

3:22-CV-01616-BAS-DDL

1          4. "Tolling Claims" Against O'Connor, Cooper, Higgerson Producing Evidence

2          On January 25, 2019, Kenneth Catanzarite sent a letter "we would like to immediately take

3     control of the assets and operations of CTI for the benefit of the sole shareholder MFS." (Ex. 267, p. 2)

4     "MFS will now assert all claims directly and not derivatively and this firm will serve as counsel." (Ibid.)

5     "All shares issued after March 30, 2015 are a nullity." (Ibid.) "This is also notice that law enforcement

6     is looking at both MFS and CTI. We are fully cooperating with them and expect that your clients will

7     do the same." Signed, "Catanzarite Law Corporation" and "Kenneth J. Catanzarite." (Id. at p. 3)

8     (showing the fear over O'Connor, Cooper to obtain signatures or property with their consent).

9          "On January 28, 2019, Catanzarite filed the MFS Action (Ex. 311, pp. 6-7). The claims were

10    brought "derivatively on behalf of its wholly owned subsidiary [n]ominal [d]efendant [CTI]." It named

11    as defendants CTI's board of directors (Probst, Beck, Kamm, and Motta), CTI attorneys (Einhorn and

12    Bernheimer) and several entities (EM2, RAD, and Tow and Grow). CTI was named as a nominal

13    defendant. MFS raised nine causes of action and sought declaratory relief and a permanent injunction.

14    MFS asserted it was entitled to file a derivative action because it organized CTI and acquired 28,000,000

15    shares of CTI common stock, and therefore, CTI was its wholly owned subsidiary." Beck v. Catanzarite

16    Law Corp., No. G059766, 12 (Cal. Ct. App. Jul. 13, 2022)

17         According to the MFS Action, "Founders O'Connor, Cooper, TGAP, Cliff Higgerson, Aroha

18    Holdings, Inc. and Scott Unfug have agreed to renounce their Founders' Shares [of CTI] in favor of

19    MFS." (Ex. 329, p. 2) In July 2015, O'Connor and Cooper retained a transfer agent for CTI in their duly

20    authorized capacity without naming MFS a shareholder. (Ex. 330, p. 3, ¶¶ 6-10, Lines 14:28, p. 4, ¶¶

21    11-12, Lines 1:7).

22         An April 19, 2019, an email by wire from Han Le of Catanzarite Law Corporation addressed to

23    "MFS Shareholders" on behalf of "Kenneth J. Catanzarite for Richard O'Connor," states "I want to be

24    clear that neither I, Richard O'Connor, Tony Scudder nor anyone else sued in the Root Case or the

25    Mobile Farming Case have settled any claims with Root or anyone else. All we did was agree to toll the

26    statute of limitations to allow claims to be brought against us later. No conflict." (Ex. 313, pp. 2-3) (each

27    were providing signatures, property to Catanzarite)

28         5. Suborning (4) Acts of Perjury by Wire of Richard Francis O'Connor, Jr.

9

3:22-CV-01616-BAS-DDL

*Suborned Perjury Submitted by Wire (1)* O'Connor's March 20, 2019, affidavit reads "[a]s CEO and director of MFS acting on its behalf, MFS is rightfully and properly the owner as holder of 28,000,000 CTI shares of Common Stock...and to not suffer dilution." (Richard Francis O'Connor, Jr. Affidavit, Filed by Catanzarite Law Corporation <u>Ex. 140, p. 6, ¶ 15</u>)

*Suborned Perjury Submitted by Wire (2)* O'Connor's November 4, 2019, affidavit reads "I sold my [CTI] common shares to Mr. Jim Duffy." On August 27, 2019 "I [O'Connor]...elected myself, Jim Duffy and Amy Cooper to the Board of Directors and to officer positions at CTI with my 51.15% proxies." (Richard Francis O'Connor, Jr. Affidavit Filed by Catanzarite Law Corporation <u>Ex. 141, p. 3, ¶ 4; Ex. 141, p. 4, ¶ 10</u>) See <u>Action</u>, 41 Cal. 4th at 1246 (privilege does not apply to perjury/subornation)

*Suborned Perjury Submitted by Wire (3)* O'Connor's November 11, 2019, declaration reads "From inception of [CTI] until May 5, 2016 I was the Chief Executive Officer and a member of the three member Board of Directors with Richard Probst...and Amy Cooper...On May 5, 2016 I resigned as an officer and director of CTI." O'Connor continues "[a]s Chief Executive I issued 5,000,000 Founders Shares when CTI was formed at $.001 per share to...Justin Beck for...contributions to the startup effort." (Richard Francis O'Connor, Jr. Declaration Filed by Catanzarite Law Corporation <u>Ex. 142, p. 3, ¶¶ 3, 5</u>) See <u>Action</u>, 41 Cal. 4th at 1246 ("particular provisions over general provisions")

*Suborned Perjury Submitted by Wire (4)* O'Connor's December 27, 2019, declaration reads "I am the Chief Executive officer of [MFS]. I am the Chief Financial Officer and Chief Operating Officer of [CTI] having been appointed by the Board of Directors." O'Connor declared "[t]he very first time that the CTI shareholders learned of the purported issuance of the Preferred Stock was...November 29, 2018." (Zakhireh sued Beck April 2017) (Richard Francis O'Connor, Jr. Declaration Filed by Catanzarite Law Corporation <u>Ex. 143, p. 3, ¶ 2; p. 7, ¶ 29</u>) See again, <u>Action</u>, 41 Cal. 4th at 1246

<u>4. Filing the Scottsdale Action by Wire in OCSC Sep. 6, 2019 for Non-Client CTI</u>

Catanzarite filed the Scottsdale Action (<u>Ex. 311, p. 26-31</u>) claiming to be CTI's ...counsel...CTI dismissed the action..."in its entirety" (<u>Id. at p. 36</u>) on November 15, 2019...disqualifying Catanzarite...[who] could not represent two client adversaries." <u>Beck v. Catanzarite Law Corp.</u>, No. G059766, 33 (Cal. Ct. App. Jul. 13, 2022) (attorney fraud by wire is wire fraud using plain language)

<u>6. Re-Filing Adjudicated, False Claims by Wire in OCSC Aug. 10, 2020 against Beck</u>

10                                      3:22-CV-01616-BAS-DDL

As above, Catanzarite Law Corporation's Kenneth J. Catanzarite extorted the signatures and property of O'Connor and Cooper under color of official right and litigated the MFS Action lacking probable cause through a trial of fact on May 1, 2019 (Ex. 268, pp. 2-58). Kenneth J. Catanzarite, appearing with Amy Jeanette Cooper and Richard Francis O'Connor, Jr. sought to unwind all shares of CTI on the knowingly false premise that MFS was CTI's sole shareholder (Beck Decl., ¶ 3). "The Court: Mr. Catanzarite, every fiber of my being says that the facts are overwhelming against your position in this case (Ex. 268, p. 43, Lines 16:18)…we have repudiation of the [only evidence, dated from before June 15, 2015] by people who were the same principals in [MFS, namely O'Connor and Cooper]. The delay in bringing this action is consistent with that conclusion, that [MFS] has been of the view they are not a stockholder [of CTI]…The Court concludes that [MFS] is not a stockholder in CTI." (Id. at p. 45, Lines 6:15). (extortion for signatures and property obtained and submitted by wire is also wire fraud)

"[T]he record shows that when Catanzarite learned MFS lacked standing to bring a derivative suit on CTI's behalf, it did not dismiss the lawsuits. Catanzarite filed FACs instead." (Ex. 311, pp. 19-20 on July 23, 2019 in Pinkerton Action; pp. 22-23 in MFS Action) Beck v. Catanzarite Law Corp., No. G059766, 32 (Cal. Ct. App. Jul. 13, 2022) (FACs meant to deceive, defraud by wire are wire fraud)

"In this case, Catanzarite dismissed two complaints [against Beck] on the same day, March 5, 2020." (Ex. 311, pp. 33-5) Beck v. Catanzarite Law Corp., No. G059766, 32 (Cal. Ct. App. Jul. 13, 2022) "Beck alleged all the defendants were liable for malicious prosecution because the Pinkerton Action, MFS Action, and Scottsdale Action were initiated and prosecuted without probable cause and with malice." Beck v. Catanzarite Law Corp., No. G059766, 30 (Cal. Ct. App. Jul. 13, 2022). (The Court of Appeal agreed that the scheme was fraudulent, and that it targeted Beck. The scheme continues).

Even after Catanzarite Law Corporation took over MFS, appeared in a trial of fact in which the fraudulent claims were rejected "with every fiber of [the Court's] being," and despite extorting the signatures and property of O'Connor and Cooper to takeover MFS – Catanzarite Law Corporation re-filed the MFS Action styled as a "Cross Action" against Beck in Orange County Superior Court on August 10, 2020. (Ex. 311, pp. 39-40) (proof that Kenneth J. Catanzarite knew he could rely upon The State Bar of California enterprise and Eli David Morgenstern to protect him, no matter what).

**b. Pattern of Racketeering Activity for The State Bar of California Against Beck**

11

1      1. <u>Carrying on Serial Fraud of Catanzarite Law Corporation Before Sep. 14, 2018</u>

2      Before Catanzarite Law Corporation continued its pattern of racketeering activity by wire and

3      mail against Beck using Orange County Superior Court and The State Bar of California's authority, The

4      State Bar of California knew the firm engaged in serial fraud as a practice according to public records

5      produced to Beck (e.g., <u>Ex. 3 for No. 21-12766</u>, <u>Ex. 35</u>) (no other state or court system allows this)

6      By way of example, in 2007, Catanzarite Law Corporation placed a lien on Deborah Breuner

7      Davis', its own client's home, at 26000 Vista Valley Ct., Steamboat Springs, CO 80487 for legal fees in

8      the amount of $120,000. (<u>Ex. 332, p. 7</u>) On December 1, 2017, the same ~$1.2 million property was

9      transferred for a value of $99,500 from Kenneth J. Catanzarite to Valusek, Robert J | Valusek, Charla J.

10     (<u>Id. at p. 6</u>) The same client Deborah Breuner Davis published online "Orange County Superior Court

11     docket of filings...had listed at least twenty-five laws[uits] filed AGAINST Catanzarite (personally) or

12     his family...Apparently the court has decided...to give all these cases the same title: ANIL V SHAN

13     vs. AJAY MEKA...CalBar should have thrown Catanzarite in prison." (<u>Ex. 331, pp. 2-3</u>) (Davis

14     allegedly told State Bar per her comments, and State Bar allegedly did nothing, just as with Beck)

15     On June 14, 2022, The State Bar of California produced public records to Beck about Catanzarite

16     Law Corporation. (<u>Ex. 35, 2-3</u>) In Re Perrine, "Catanzarite took the property to pay his fees, but did not

17     tell the Court about this, violating this strict rule." (<u>Ex. 35, p. 4</u>) In Alexandros v. Cole, "Catanzarite

18     violated the court rules by making statements to the court without any proof...Some statements were

19     completely incorrect...Catanzarite does not care about the truth in making statements to the Court."

20     (<u>Ibid.</u>) In Edwards v. Noroski, "the Court punished Catanzarite for saying one thing, then switching his

21     story. The court stated that Catanzarite's case was a sham." (<u>Ibid.</u>) The State Bar of California knows

22     this, does nothing. (Cal. Auditor identified statistical anomaly of 700 attorneys; <u>Ex. 34, p. 21 and p. 27</u>)

23     In a declaration from Beck summarizing orders attached, a Court found that Mr. Catanzarite filed

24     "a false affidavit...was in fact suspended from the practice of law in New York...refuses to be

25     governed...published contained misleading information [online]...sought to undermine the bankruptcy

26     process...filed false emergency that was completely meritless. (<u>Docket #10, Document 10-37,</u>

27     <u>PageID.1455</u>) The State Bar of California knows this, too.

28     2. <u>April 3, 2020, Postal Mail from State Bar's Eli David Morgenstern</u>

1       Mistakenly believing The State Bar of California protected the public, Beck delivered detailed

2 notice of injury November 15, 2019, against Kenneth Joseph Catanzarite, Esq., Brandon Woodward,

3 and Tim James O'Keefe for: "concurrently representing parties with adverse interests...direct and

4 indirect contact with parties represented by counsel...corruptly or willfully and without authority filing

5 multiple complaints...solicitation of clients through apparent coercion or extortion...filing knowingly

6 fraudulent documents before the Orange County Superior Court...making knowingly false

7 representations to an Orange County Superior Court judge...offering cash payments to shareholders in

8 exchange for voting proxies in an ongoing takeover attempt...generating or aiding in the generation of

9 knowingly perjur[i]ous declarations on at least four occasions..."selling out" the class or derivative

10 interests of multiple corporations with adverse interests...settling and compromising derivative causes

11 of action without court approval" (Ex. 172, p. 3) and supported those allegations with cited exhibits and

12 court orders. (See Carlos Calixto declaration May 17, 2019 for more Catanzarite acts by wire, Ex. 210)

13       On April 3, 2020, The State Bar of California did use postal mail: "This letter is to inform you

14 of the disposition of your complaint against Messrs. Catanzarite, Woodward, and Okeefe. After carefully

15 reviewing the information you provided...the Office of Chief Trial Counsel ...has decided to close your

16 complaint...The violation must be serious enough to support both a finding of culpability and the

17 imposition of discipline...In your complaint, you identified five lawsuits filed in Orange County

18 Superior Court...You are one of the named defendants in all but one of the lawsuits...In light of the fact

19 that, to date, there are no final orders disqualifying the attorneys, the State Bar...will take no further

20 action...You may telephone my legal advisor, Senior Trial Counsel Eli Morgenstern, at 213-765-

21 1334...To request review by the Complaint Review Unit, you must submit your request in writing, post-

22 marked within 90 days of the date of this letter, to: The State Bar of California, Complaint Review Unit,

23 Office of General Counsel, 180 Howard Street, San Francisco, CA 94105-1617" (Ex. 172, pp. 2-4)

24                     3. August 12, 2020, Postal Mail from "Complaint Review Unit"

25       Beck did adhere to these instructions, and by postal mail two days after the fraudulent "MFS

26 Cross Action" (Ex. 150) was filed in apparent collusion, he did receive another letter.

27       Citing that frivolous mail that ignored all material law and evidence (Ex. 176, pp. 2-4) ("The

28 Complaint Review Unit received your correspondence on June 18, 2020...An attorney reviewed all the

        3:22-CV-01616-BAS-DDL

information provided and has determined there is not a sufficient basis to recommend reopening your complaint…The Complaint Review Unit has carefully reviewed your initial complaint as well as your request for review and we affirm the decision of OCTC to close your complaint without further investigation….If you disagree with this decision, you may file an accusation…with the California. Supreme Court…you must do so within 60 days of the date of the mailing of this letter….If you have not already done so, you may wish to consult with an attorney…by contacting a lawyer referral service certified by the State Bar in your area…by visiting the State Bar website at: http://www.calbar.ca.gov/Public/Need-Legal-Help/Lawyer-Referral-Service") Beck shows the true purposes of "Complaint Review Unit": to pay more lawyers and get paid for lead generation.

### 4. May 2022 Wire Communications of Duran, Andresen, Cardona, Wilson

On May 19, 2022, Beck delivered formal request for Board of Trustees to exercise its duty in noticing the public of the serial fraud of which it was aware involving Catanzarite Law Corporation (Ex. 120, p. 8-11). Beck also cites the special relationship doctrine and decisional law from California Supreme Court concerning the known harm to Beck as it related to the knowledge of The State Bar of California (Id. at p. 11; "after concluding that USAT *did* have a special relationship with plaintiffs, the court went on to apply *Rowland* to determine whether to limit that potential duty - deciding the answer to that question was no. This, too, was the correct approach." Brown v. USA Taekwondo, S259216, (Cal. Apr. 1, 2021).)

At 11:03 AM on May 19, 2022, Ruben Duran wrote George Cardona, Chief Trial Counsel and Leah Wilson, Executive Director copying Carissa Andresen, Office of General Counsel (Ex. 120, p. 8) In relevant part, the malice of the decision-making and protectionist behavior is summarized: "Both these matters remain open in abated status awaiting resolution of the pending civil matters." (Id. at p. 6) Further, the story from Carissa Andresen is wholly inaccurate and reflects Catanzarite's false narrative (the firm engaged in serial fraud). (Ex. 120, pp. 2-7) (showing that The State Bar of California's unlawful trust retains public rights, and makes decisions based not on merits – but based on protecting attorneys despite known harm to Beck; this is akin to saying a house must burn down before putting fires out).

### 5. July 20, 2022, Malicious Wire Communications of Grandt for Board of Trustees

14

3:22-CV-01616-BAS-DDL

1   "Via U.S. Mail and email to: justintimesd@gmail.com" responding to "May 19 and July 12,

2   2022 emails to the Chair of the State Bar Board of Trustees, Ruben Duran. Mr. Duran has referred this

3   matter to the Office of General Counsel for response…As Chair of the Board of Trustees, Mr. Duran

4   declines to waive confidentiality…such waiver is not warranted for protection of the public…[because]

5   claims regarding attorney misconduct…have been heavily litigated…and you have a pending lawsuit

6   against the State Bar in which you repeat your claims." (This is the unlawful trust in action. State Bar

7   operates with ongoing malice to Beck as if fraudulent claims against Beck were evidence against Beck).

8            State Bar knew that after filing a fraudulent derivative action for Pinkerton, "trial court granted

9   CTI's disqualification motion…Catanzarite could not represent…(1) CTI; (2) three CTI subsidiaries…;

10  and (3) a group of CTI shareholders bringing a derivative lawsuit. Fincanna Capital Corp. v. Cultivation

11  Tech., No. G058700, 1 (Cal. Ct. App. Jun. 28, 2021) "[I]t would be absurd [for State Bar] to suggest the

12  same attorney could simultaneously represent these two factions of shareholders." (Id. at p. 23)

13  "Catanzarite's simultaneous representation of CTI and interests adverse to CTI compel the firm's

14  disqualification." (Id. at p. 11) "Catanzarite, a law firm filing six lawsuits while simultaneously

15  representing two corporations, three corporate subsidiaries, and a group of minority shareholders of both

16  corporations…(1) MFS, the plaintiff in the MFS Action, (2) CTI, the cross-complainant and

17  defendant…(3) CTI Subsidiaries, the cross-complainants and defendants…, and (4) CTI, the plaintiff in

18  the Scottsdale Action. The minority shareholders groups include members of the **O'Connor** Faction as

19  follows: (1) **Pinkerton**, a MFS shareholder and plaintiff in the Pinkerton Action; (2) Mesa, **Cooper**,

20  Mebane and a class action of shareholders, all plaintiffs in the **Mesa** Action; (3) **Cooper** and Mebane,

21  who are MFS/CTI shareholders and plaintiffs in the Cooper action." "It is improper for Catanzarite to

22  now suggest this unethical conduct is somehow protected petitioning activity." Cultivation Techs. v.

23  Duffy, No. G059457, 10-11 (Cal. Ct. App. Nov. 12, 2021) "Catanzarite tainted all litigation involving

24  CTI after purporting to represent the corporation and at the same time prosecuting a derivative

25  shareholder action against CTI." Fincanna Capital Corp. v. Cultivation Tech., No. G058700, 29 (Cal.

26  Ct. App. Jun. 28, 2021)

27            6. July 29, 2022, False Assertions of Law to Delay OCSC Adjudication

28

                                     15                      3:22-CV-01616-BAS-DDL

"Justin S. Beck filed a malicious prosecution action against Catanzarite…and the firm's clients ([] Cooper…Higgerson…Zakhireh)" <u>Beck v. Catanzarite Law Corp</u>., No. G059766, 1 (Cal. Ct. App. Jul. 13, 2022) "Beck asserts most of his claims are not based on petitioning activity and he would be successful on the merits of his malicious prosecution action. We conclude his contentions have merit and reverse the court's orders." (<u>Ibid.</u>)

After July 20, 2022 (<u>Ex. 26</u>) postal/wire letter from Grandt ratifying Catanzarite's serial fraud, he delivered a deposition subpoena July 26, 2022, for The State Bar of California to appear at its own address on September 9, 2022 (<u>Ex. 290, p. 2</u>) with a list of (22) matters (<u>Id. at p. 5</u>).

7-months into OCSC Case No. 30-2021-01237499, in response to subpoena one day later July 27, 2022, "the State Bar…filed and served…["Anti-SLAPP"]…the State Bar has no obligation to respond to your July 26, 2022 subpoena…will also not be responding to your pending [discovery]…if the Court grants our anti-SLAPP motion, you will be liable for the State Bar's [pro se] attorney's fees and costs…I encourage you to dismiss your case now." (<u>Ex. 304</u>)

### 7. <u>Judicial Fraud by Wire on Demurrer of Grandt, Duran, and Andresen in OCSC</u>

Much like she defrauded federal judge Hon. William Alsup about State Bar Court providing due process (<u>Ex. 2, pp. 2-14</u>; e.g., "Ms. Grandt told me something that wasn't true, and I relied on it"), Grandt told Judge John C. Gastelum "all information concerning disciplinary investigations are confidential within the Office of Chief Trial Counsel." (<u>Ex. 282, p. 16, Lines 25:27</u>). "Duran is the Chair of the State Bar Board of Trustees" (<u>Id. at p. 17, Line 15</u>). "Grandt and Andresen are Assistant General Counsel…[Duran, Grandt, and Andresen do not] work in the Office of Chief Trial Counsel." Beck shows that these statements were also fraudulent, and worse, Grandt tried to cover it up with malice as if fraud were protected or privileged, just like Catanzarite's patterns and the ongoing abuse of "Anti-SLAPP" in California for the benefit of lawyers engaged in fraud. (<u>Ex. 120, p. 2</u> "you received an email…inform us immediately if you have disseminated this record to any third parties.") (Contrary to Grandt's fraudulent statements to OCSC and Gastelum: Duran, Andresen, Grandt, Cardona, Wilson operated in conspiracy to defraud the public and Courts. The U.S. must consider implied effects on interstate commerce).

### 8. <u>Manipulation of Beck's Antitrust Petition S276517 by Grandt, Retana, OGC</u>

16                                    3:22-CV-01616-BAS-DDL

1   Beck filed antitrust petition S276517 with four volumes of exhibits, served on Office of General

2   Counsel, Ruben Duran [DOJ, FTC] (Ex. 68, p. 2 "Ms. Calanoc, thank you for the call today. I can

3   confirm, and attach for your files, that the petition for review was served on the Office of General

4   Counsel…as well as its Board of Trustees…All parties were thus served the petition and the exhibit files

5   marked [1 to 3] and then [4 of 3] with a verification.") The proof of service binder reflects the same.

6   (Ex. 70, p. 2-5). On September 27, 2022, California Supreme Court struck Beck's petition as

7   "premature;" it was sent back to Office of General Counsel to make an antitrust determination for itself

8   (Ex. 28, p. 2). On October 17, 2022, Beck received "Antitrust Determination 2022-0001" after four

9   volumes of exhibits were removed from his actual petition, which determination ignores United States

10  Supreme Court decisional law (Ex. 60, pp. 1-140, e.g. Beck's allegations "gratuitous" at p. 3 as OGC

11  ignores U.S. laws). California Supreme Court docket reflects Beck's actual petition. (Ex. 65, p. 2)

12  ### 9. Threatening Letter of Davtyan by Postal Mail and Wire December 15, 2022

13  In an impressive display of public service by postal mail and wire, General Counsel Ellin

14  Davtyan steps in to conceal Grandt's disclosures and fraud as above (Ex. 120, pp. 2-3): "As we have

15  already informed you…you received an email containing communication that is confidential and

16  privileged…you have no right to share or retain the State Bar's privileged communications…identify

17  all persons to whom you have distributed the communication and destroy any copies in your possession.

18  Sincerely, Ellin Davtyan." (Ex. 186, p. 2)

19  ### 10. Overt Recommendation of Three Court of Appeal Justices to Obstruct OCSC

20  The State Bar of California controls not only public rights and equity through Office of General

21  Counsel and Office of Chief Trial Counsel with Board of Trustees in a unity of unlawful interests (Ex.

22  120), it also controls the judiciary itself. (Ex. 252, p. 2) In Beck's case, three Court of Appeal justices

23  were nominated, recommended, or confirmed overtly on specific dates, which Justices preside over

24  Orange County Superior Court proceedings. (Ex. 227, Ex. 230, Ex. 231). Office of Governor had "no

25  records," so this was State Bar, too. (Ex. 239, p. 3, "no records").

26  ### 11. Refusal to Investigate Board of Trustees and Management by Postal Mail

27  Beck incorporates January 13, 2023, letter as if set forth fully (Ex. 214, pp. 2-5)

28  **c. Pattern of Racketeering Activity for State of California Against Beck**

17                                          3:22-CV-01616-BAS-DDL

1    RICO does not require that either the racketeering enterprise or the predicate acts of racketeering
2    be motivated by an economic purpose. Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 262
3    (1994). Gov. Cod. § 815.6 makes 18 U.S.C. 1962(c) violations state liability.

4                    1. Postal Mail for "In Re: Walker" Scheme by Jorge E. Navarrete in CSC, OGC

5    After "Complaint Review Unit" (Office of General Counsel) ratified Catanzarite's schemes
6    again, Beck noticed California Supreme Court of his need for neutral hearing within the arbitrary 60-
7    days instructed by Office of General Counsel, to which Jorge Navarette replied with an ambiguous case
8    from 1948 on September 29, 2020 ("In RE Walker" scheme). (Ex. 182, p. 2-10). Beck prepared the case
9    and complied with several demands to deliver new copies to Office of General Counsel, Office of Chief
10   Trial Counsel, and each Supreme Court Justice – which resulted in a new letter from Jorge Navarette
11   March 22, 2021: "The court has directed that the accusation…be returned to you unfiled, and on this
12   date." (Ex. 183, p. 2) (see also Navarette stamping a fraudulent "En Banc" decision on false petition).

13   On February 14, 2022, involved in the overt acts of May 19, 2022, with Duran, Grandt, Wilson,
14   and Cardona in advocating for Catanzarite's false stories (Ex. 120) – Carissa Andresen filed in Orange
15   County Superior Court (Ex. 179, pp. 2-3) Beck's "unfiled" accusation from 2021 as if it were dispositive
16   of The State Bar of California's duty to protect Beck or to stop the serial fraud alleged and shown by
17   overwhelming evidence (Ex. 179, pp. 5-61). (All of Beck's allegations are shown to be true)

18                    2. Overt Appointment of Three Court of Appeal Justices to Obstruct OCSC Cases

19   Upon the recommendation of The State Bar of California to obstruct Beck's Government Claims
20   Act litigation in Orange County Superior Court (Ex. 227, Ex. 230, Ex. 231), Governor Newsom
21   appointed Associate Justices Sanchez, Motoike, and Delaney (Ibid.) And Beck's writ petitions were
22   obstructed on December 28, 2022 (Ex. 233, p. 2, e.g., G061896 obstructed in OCSC/4DCA).

23                    3. Filing of a Fraudulent Antitrust Petition for Beck by Jorge E. Navarrete in CSC

24   October 17, 2022, Retana delivers Jorge Navarette a wire communication (Ex. 305, p. 2, "VIA
25   EMAIL TO JORGE.NAVARRETE@JUD.CA.GOV "Requestor has 60 days from October 17th to file
26   a Petition for Review…Sincerely, Robert G. Retana") One day later, a case is commenced on behalf of
27   Beck in California Supreme Court on a petition Beck did not file, based on a record that was altered by
28   Office of General Counsel, S276939 (Ex. 63, p. 2) On November 29, 2022, Beck warned State Bar,

1  Duran, Grandt of potential obstruction of federal proceedings (Ex. 71, p. 2-3). One day later, a fraudulent

2  "En Banc" decision is stamped by Navarrete November 30, 2022 in a case Beck did not authorize based

3  on a false record manipulated by Office of General Counsel. (Ex. 61, p. 2). Worse, Ellin Davtyan (Ex.

4  305, p. 7) in another impressive display of public service (see also Ex. 186, p. 2) maintains "State Bar

5  rejects that S276939 was filed by OGC without authority." (Ex. 305, p. 6, "Request No. 5").

6      4. Postal Mail Refusing to Appear in Federal Court Despite Being Named Defendant

7      State of California refused to accept service of 3:22-CV-01616-BAS-DDL despite being named

8  defendant stating: "These documents were delivered to the Office of Attorney General in error. We are

9  not authorized to receive documents on behalf of the party you are trying to serve." (Ex. 241, p. 2). State

10  of California Department of Justice has failed to produce records about disclosure of Beck's claims act

11  litigation. (DOJ PRA 2022-02717, Ex. 234, p. 2) Beck's December 8, 2022, request was delayed until

12  January 3, 2023, then ignored. (Beck Decl., ¶ 4). Instead, Charles Tsai of California Department of

13  Justice (Ex. 223, p. 2) overtly transitioned from that office to Office of General Counsel for The State

14  Bar of California. ("I believe you may be attempting to use a prior email address of mine

15  (Charles.Tsai@doj.ca.gov) for other communications. Please note that this email address is no longer

16  valid/active. Please use this email address (Charles.Tsai@calbar.ca.gov) to contact me.") (Ex. 238, p. 2)

17  **(6) Damages to Beck's business or property by the conduct constituting the violations.**

18      Beck suffered $1,268,036.89 in damages as "third-party beneficiary" to Beck's collateral source

19  (Damages, Ex. A, p. 2; Ex. A1, p. 14-5 "Insured Person"). Beck has been damaged in the amount of

20  $8,433,000 (Beck Decl., ¶ 5; Damages, ¶ 2; Exhibit B for last employment agreement; Exhibit B for last

21  W2 for partial year). Beck is the victim of a smear campaign. Alexander Grant & Co. v. Tiffany Indus.,

22  Inc., 770 F.2d 717, 719 (8th Cir. 1985) (injury to reputation as national accounting firm compensable

23  under RICO); Lewis v. Lhu, 696 F. Supp. 723, 727 (D.D.C. 1988) (damages for reputation of

24  telecommunications consultant caused by "smear campaign" recoverable under RICO). $365,000

25  (Damages, ¶ 5, Ex. G); $1,000,000 inherited IRA (Id. ¶ 9)

26      In Diaz v. Gates, the divided *en banc* Ninth Circuit held that a plaintiff's pecuniary loss was a

27  discrete "injury to business or property" that was not derivative of personal injuries suffered due to

28  wrongful detention. The court rejected the defendant's argument that a RICO cause of action is only

1    available to remedy injuries to business or property interests that are the direct target of the predicate

2    acts. Diaz v. Gates, 420 F.3d 897 (9th Cir. 2005).

3         Beck is entitled damages by money judgment for $9,798,000 (Complaint PageID.518, ¶ 561)

4    plus the $1,268,036.89 for $11,066,036.90 total jointly and severally against Count I Defendants. Beck

5    is entitled treble damages for $33,198,110.70 jointly and severally against Count I Defendants, minus

6    any TRO relief granted Beck (**Docket #10**) Beck seeks racketeering investigation against State Bar and

7    Catanzarite Law Corporation under 18 U.S.C. § 1968 for cause shown. (also Count XII)

8    ## COUNT II: INVESTING OR USING PROCEEDS OF RACKETEERING IN AN

9    ## INTERSTATE ENTERPRISE – 18 U.S.C. § 1962(a)

10        Plaintiff states § 1962(a) claims where defendants have worked to conceal their racketeering by

11   investing to conceal the actual value of interests, In re ClassicStar Mare Lease Litig., 361 F.Supp.3d

12   677, 686 (E.D. Ky. 2019) and bribing government officials, attorneys, and the defendant's employees

13   to cover up the fraudulent activity and deter victims from seeking assistance. Doe I v. Reddy. No. C02-

14   05570, 20023 WL 23893010, at *5-6 (N.D. Cal. Aug. 4, 2003). The rationale underlying the majority

15   rule is that § 1962(a) is intended to prevent the investment of racketeering income (through money

16   laundering and similar activities) into legitimate businesses. Kane v. Bank of Am., No. 13 C 8053, 2015

17   WL 3798142, at *5 (N.D. Ill. June 17, 2015) (quoting Brittingham v. Mobil Corp., 943 F.2d 297, 303

18   (3d Cir. 1991), overruled on other grounds by Jaguar Cars, Inc. v. Royal Oak Motor Car Co., 46 F.3d

19   258 (3d Cir. 1995).

20        Beck moves for summary judgment or adjudication on this Count II against The State Bar of

21   California, Catanzarite Law Corporation, Ruben Duran, Esq., Leah Wilson, Esq., and State of California

22   ("Count II Defendants"). To succeed on this claim, Beck must prove each element by a preponderance

23   of the evidence.  Beck incorporates the foregoing evidence and elements cited for this claim as being a

24   pattern of racketeering activity in which Count II Defendants have engaged, including Catanzarite Law

25   Corporation, where Kenneth J. Catanzarite is CEO and who pays State Bar as an active licensee.

26   (1) **The State Bar of California enterprise derived income, either directly or indirectly, from a**

27   **pattern of racketeering activity**.

28

"The 'enterprise' is the actor, and the 'pattern of racketeering activity' is an activity in which the actor engages." <u>Odom</u>, 486 F.3d at 549. Duran leads State Bar, which was paid $515 per active licensee and $182 per inactive licensee in 2021 per audited financials from MGO (<u>Ex. 251, p. 8</u>). State Bar also derives income from interest only trust accounts ("IOLTA") (<u>Ex. 40, pp. 2-3</u>) used for racketeering activity.  Some active licensees were engaged in racketeering activity, which paid The State Bar of California: State Bar's Thomas V. Girardi's conduct was determined by a federal judge to have been "unquestionably criminal" (<u>Ex. 42, p. 4</u>). State Bar's Michael Avenatti was convicted of at least four counts of wire fraud involving trusts (<u>Ex. 83, pp. 2-10</u>). State Bar's Matthew Charles Elstein was convicted of one count of wire fraud involving sham court documents (<u>Ex. 81, p. 2</u>). State Bar's Stephen Young Kang was convicted of one count of wire fraud (<u>Ex. 52, p. 2 for November 12, 2015, guilty plea</u>). Robert Irving Slater was convicted of 11 felonies. (<u>Ex. 44, p. 2</u>) California State Auditor Report 2022-030 cites convictions for trust "money laundering" after "20 years" of complaints (<u>Ex. 34, p. 4</u>).

**(2) <u>The State Bar of California, Ruben Duran, Leah Wilson, and State of California participated as a principal in the pattern of racketeering activity</u>.**

### a. Ruben Duran

Duran is the Chairman of State Bar Board of Trustees, which controls Office of General Counsel, Office of Chief Trial Counsel, Executive Director (<u>Ex. 254 for January 21, 2023, org. chart</u>) as well as Client Security Fund appointments and rules (<u>Ex. 256, Ex. 257</u>). Commission on Judicial Nominees Roster is also appointed by Board of Trustees, Ruben Duran is chair. (<u>Ex. 252, p. 2-4</u>). So, Duran was a principal in all racketeering. Duran refuses to investigate negative balances of trusts, too (<u>Ex. 246, p. 6</u>)

### b. Leah Wilson

A November 25, 2019, press release headlines "State Bar Launches Leadership Bank Program to Maximize Funds for Legal Aid." It reads "Financial institutions in California hold nearly $5 billion in IOLTA accounts, the interest on which goes to support legal aid," said Leah Wilson, Executive Director. (<u>Ex. 334, p. 2</u>) A June 9, 2021, article for Law.com from Cheryl Miller reads "Wilson served as the bar's executive director for two years until she resigned in January 2019 to pursue what she described as a venture mixing public and private dollars with philanthropy." (<u>Ex. 303, p. 2</u>) On July 23, 2022 "Whenever we speak about funds of this magnitude, it is easy to lose sight of the fact that each

21                                                3:22-CV-01616-BAS-DDL

1    dollar represents profound change in the lives of the people our legal aid partners assist," said Leah
2    Wilson, State Bar Executive Director." (Ex. 40, p. 2) Leah Wilson was involved as to Beck on May 19,
3    2022 (Ex. 120), too.

4    (3) **Some part of that income, or proceeds of that income, was used to acquire or maintain an**
5    **interest in, or to operate, The State Bar of California enterprise**.

6        The State Bar of California enterprise includes the legal aid organizations. "The State Bar of
7    California announced today that this year's $308 billion State Budget will furnish more than $105
8    million in funding for access to justice efforts through the State Bar." (Ex. 40, p. 2)        The    State
9    Bar of California invests these funds back to The State Bar of California enterprise while the public and
10   Beck suffers (Ibid.). From 2018 through 2022 while Beck was and is being injured, State Bar spent
11   $1.058 billion including $257,204,211 on OCTC and $57,328,388 on State Bar Court (Ex. 251, p. 3).
12   State Bar invested income into The State Bar of California enterprise while it overtly claimed that it
13   lacked resources to investigate IOLTA and trust complaints (Ex. 246, p. 6, Duran: 'disagree'), and while
14   non-attorney members of the public including Beck suffered from its continuing protectionist behavior
15   and "discretion." (as above).

16   (4) **The State Bar of California enterprise engaged in, or had some effect on, interstate commerce**.

17       After State Bar leadership visited Mongolia in 2014 (Ex. 1, p. 5) and Leah Wilson's "mixing of
18   public and private dollars with philanthropy," many of the "Leadership Banks" are now Chinese or
19   Taiwanese (Ex. 334, p. 2, American Continental Bank, Bank of the Orient, New Omni Bank, N.A.,
20   CTBC Bank).  State Bar will invest "$20 million in federal homeless prevention funds." (Ex. 40, p 2.).
21   "Girardi Keese was a law firm based in California…Edelson…based in Chicago. In 2019, Girardi Keese
22   brought Edelson…into a fee-sharing…Edelson would receive fifty percent." Edelson PC v. Girardi, 20
23   C 7115, (N.D. Ill. Aug. 9, 2022). "Girardi's conduct is unquestionably criminal." (Ex. 42, pp. 2-15).

24   (5) **Investments in The State Bar of California enterprise injured Beck's business or property**.

25       Beck incorporates the same case law as in Count I, here. Beck provides reasonable bases for
26   $25,000,000 in lifetime damages to business and property (Damages, ¶ 8), plus $27,407,250 loss of
27   earnings capacity to business and property where median total CEO compensation is $1.68 million in
28   San Diego and he is 42 years old. (Damages, ¶ 1-¶ 9; Ex. B with last employment agreement with annual

1  bonuses up to $325,000 and increases; Ex. D Salary.com data for CEOs in San Diego; Ex. J with BIG

2  Innovation Award for Beck's technology; Ex. K with (2) AVA Awards for an award-winning healthcare

3  podcast co-produced and hosted by Beck; Ex. L showing Beck was to produce and host a podcast with

4  A-List Celebrity Will Ferrell; Ex. N for proof of a seizure caused by the conduct at issue and related

5  acute depression; Ex. O for a surgery that will result in 20% loss of his left arm forever; and (2)

6  transactions Ex. E showing knowledge of Catanzarite on Feb. 5, 2019 of the value destroyed; Ex. F

7  supporting Ex. E with third-party evidence; Ex. H/I, another company destroyed by racketeering).

8          Beck is entitled damages by money judgment for $52,407,250 (Complaint PageID.521, ¶ 582)

9  jointly and severally against Count II Defendants. Beck is entitled treble damages for $157,221,750

10  jointly and severally against Count II Defendants. Beck seeks racketeering investigation against State

11  Bar and Catanzarite under 18 U.S.C. § 1968 for cause shown. (also pleaded in Count XII)

## COUNT VI: SHERMAN ACT

### Violation of 15 U.S.C. § 1

14          In Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 448 (1993), the Supreme Court held: "The

15  purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to **protect**

16  **the public from the failure of the market** [emphasis]." Per the California Supreme Court, "[a]lthough

17  focused on private conduct, antitrust laws may apply to public entities under certain circumstances."

18  (Ex. 8, p. 3) "The fact that the State Bar is a state agency for some limited purposes does not create an

19  antitrust shield that allows it to foster anticompetitive practices for the benefit of [Duran, Wilson, Grandt,

20  Girardi, Girardi-Keese, Catanzarite, or Catanzarite Law Corporation]"). Goldfarb v. Virginia State Bar,

21  421 U.S. 773, 791, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975)

22          State of California assigned its sovereignty to The State Bar of California through California

23  Supreme Court (Ex. 260). State of California, through California Supreme Court, issued "Administrative

24  Order 2017-09-20" which embodies "State Bar Antitrust Policy" and specifically includes N.C. State

25  Bd. of Dental Examiners v. Fed. Trade Comm'n, 574 U.S. 494, (2015) (Ex. 8 for Administrative Order

26  2017-09-20) (no immunity is available to State Bar or its actors in this case as a matter of federal law)

27          "Actions of the State Bar that have the effect of advancing the interests of attorneys without a

28  clear benefit to the public must be scrutinized closely for potential antitrust violations...antitrust

1   immunity is available only if the regulatory entity's action is subject to active state supervision and is

2   undertaken pursuant to a clearly articulated policy." (Ex. 8) State had a duty under Gov. Cod. § 815.6.

3   **(1) There exist no clearly articulated state policies for State Bar's anticompetitive acts.**

4       Attorney Misconduct Complaint (Ex. 172), State Bar Court (Ex. 173, p. 2-4), abatement (Ex.

5   120, pp. 6-7, 10-12)   Complaint Review Unit (Ex. 176, pp. 2-4), "In RE: Walker," (Ex. 179, Ex. 182,

6   Ex. 183) Legal Aid (lawyer) payments while State Bar fails its duties (Ex. 40, pp. 2-3), Antitrust

7   Petitions obstructed sent to Office of General Counsel, each lack clearly articulated polices to allow

8   these benefits to attorneys, where the detriment to the public is not debatable (except by active market

9   participants. Indeed, each of these functions are unquestionably operated in furtherance of attorneys, to

10  the direct and ongoing detriment of Justin S. Beck, the citizenry broadly, and the United States itself).

11  **(2) There exists no active state supervision, as defined by federal law, for the foregoing acts.**

12      This ongoing lack of supervision is demonstrated by State of California's refusal to appear

13  despite being served as a defendant (Ex. 241, p. 2). The office of the Governor cites no knowledge of

14  material claims against State of California (Ex. 239, p. 3). "The full 13-member Board [of Trustees for

15  State Bar] is comprised of: Five attorneys appointed by the California Supreme Court…Two attorneys

16  appointed by the Legislature…Six "public" or nonattorney members." (Ex. 209, p. 2-3) (showing

17  "majority of active market participant" control without active state supervision).

18  **(3) Justin S. Beck and the United States were damaged by State Bar's antitrust violations.**

19      Beck was actually damaged by antitrust violations as an alternative to RICO Count I, II. Section

20  4 of the Clayton Act, 15 U.S.C. § 15 provides that "any person who shall be injured in his business or

21  property by anything forbidden in the antitrust laws may sue therefor in any district court of the United

22  States…" for treble damages, prejudgment interest, and costs of suit, including attorney fees. A

23  claimant's injury is "inextricably intertwined" with the alleged conduct if the claimant was directly

24  targeted and its harm was "the essential component of [the defendant's] anticompetitive scheme as

25  opposed to an ancillary byproduct of it." Hanover 3201 Realty, LLC v. Village Supermarkets, Inc., 806

26  F.3d 162 (3d Cir. 2015). Beck was damaged as direct byproduct of The State Bar of California's

27  protectionist schemes and is due all damages in Count I and Count II on this motion above. United States

28  is due $100,000,000 from The State Bar of California and State of California jointly and severally, too.

## IV.   CONCLUSION

"The statutes that provide for liability [against the government and its actors] do not need to be part of the Government Claims Act, and do not need to provide specifically on their face that they apply to public entities." See, <u>Rodriguez v. Inglewood Unified School Dist.</u> (1986) 186 Cal.App.3d 707. The State Bar of California and State of California are liable in this action.

"[D]iscrimination may be so unjustifiable as to be violative of due process." <u>Bolling v. Sharpe</u>, 347 U.S. 497, 498-99 (1954). "In view of our decision that the Constitution prohibits the states from maintaining racially segregated public schools, it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government" to restrain racketeering by state actors and those working with them without clearly articulated policy. (<u>Id.</u>) The United States has a duty, here.

"If left unchecked, [corruption] poses a powerful threat to democratic society. It erodes public confidents in the institutions of government. [Corruption] distorts the democratic process that it is supposed to fairly resolve competing meritorious claims to limited resources on a rational basis—almost always to the detriment of the most disadvantaged members of society. This undermines the legitimacy of government and short-circuits the hope of those who have not prevailed or benefited that there is someone in government who will faithfully serve, rather than sellout, their interest." (<u>Ex. 279, p. 4, from William F. Weld, Asst. AG, Feb. 1988 US DOJ</u>)

Beyond Beck, about 44 times per day (<u>Ex. 136</u>), the interests of United States citizens are being sold out in favor of corrupt lawyers who abuse the public trust in California, and across the United States using California's authority via pro hac vice admittance. (e.g., <u>Ex. 42 for Girardi, Griffin, and Lira, Ex. 3 for Catanzarite</u>). This causes harm to the entire insurance industry and interstate commerce.

Beck requests this Court enter summary judgment on Counts I, II, VI and order money judgments in his favor, or summary adjudication. Beck requests this Court exercise its authority under 18 U.S.C. 1964(a) to prevent and restrain the RICO violations of Catanzarite Law Corporation and The State Bar of California, at least in a manner that it does not further harm Beck or compromise this proceeding. Beck requests this Court utilize F.R.Civ.P. 65 to order permanent injunctive relief as it deems just.

Respectfully Submitted,

January 28, 2023

Justin S. Beck, *In Propria Persona, Guardian to U.S.A.*

25

**FILED**

JAN 30 2023

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

## PROOF OF SERVICE

I, Justin S. Beck, hereby declare: that I am over the age of eighteen years, and I am a party to this action and acting in propria persona, and that my address is 3501 Roselle St., Oceanside, CA 92056. On January 28, 2023, I served one copy of the following documents:

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; DECLARATION OF JUSTIN S. BECK IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT; EXHIBITS IN SUPPORT OF ELEMENTS; DECLARED DAMAGES AND COMPUTATIONS; EXHIBITS IN SUPPORT OF DAMAGES**

Participants in the case who are registered CM/ECF users will be served.

**BY ELECTRONIC MAIL by personally transmitting a true copy thereof via an electronic mail service connected to the internet, addressed to the email addresses:**

kcatanzarite@catanzarite.com

charles.tsai@calbar.ca.gov

eli.morgenstern@calbar.ca.gov

suzanne.grandt@calbar.ca.gov

ruben.duran@calbar.ca.gov

AGelectronicservice@doj.ca.gov

amycooper05@yahoo.com

chhiggerson@gmail.com

jim.duffy55@comcast.net

mo.zakhireh@gmail.com

And a Copy By Mail:

State of California
Office of Attorney General
1300 "I" Street
Sacramento, CA 95814

The State Bar of California
Office of General Counsel
180 Howard Street
San Francisco, CA 94105

Catanzarite Law Corporation
2331 W. Lincoln Ave.
Anaheim, CA 92801

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

JANUARY 29, 2023

Justin S. Beck

POS1                              8:23-CV-00018-JVS-DFM

1

## **PROOF OF SERVICE**

2

3

4

I, Justin S. Beck, hereby declare: that I am over the age of eighteen years, and I am a party to this action and acting in propria persona, and that my address is 3501 Roselle St., Oceanside, CA 92056. On January 28, 2023, I served one copy of the following documents:

5

6

7

8

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; DECLARATION OF JUSTIN S. BECK IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT; MEMORANDUM IN SUPPORT; EXHIBITS IN SUPPORT OF ELEMENTS; DECLARED DAMAGES AND COMPUTATIONS; EXHIBITS IN SUPPORT OF DAMAGES**

Participants in the case who are registered CM/ECF users will be served.

9

10

11

**BY ELECTRONIC MAIL by personally transmitting a true copy thereof via an electronic mail service connected to the internet, addressed to the email addresses:**

12

kcatanzarite@catanzarite.com

13

charles.tsai@calbar.ca.gov

14

eli.morgenstern@calbar.ca.gov

15

suzanne.grandt@calbar.ca.gov

16

ruben.duran@calbar.ca.gov

17

AGelectronicservice@doj.ca.gov

18

amycooper05@yahoo.com

19

chhiggerson@gmail.com

20

jim.duffy55@comcast.net

21

mo.zakhireh@gmail.com

22

jorge.navarette@jud.ca.gov        jtt@tice.lawyer        todd.spitzer@da.ocgov.com

And a Copy By Mail:

State of California
Office of Attorney General
1300 "I" Street
Sacramento, CA 95814

The State Bar of California
Office of General Counsel
180 Howard Street
San Francisco, CA 94105

Catanzarite Law Corporation
2331 W. Lincoln Ave.
Anaheim, CA 92801

23

24

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

25

26

JANUARY 29, 2023

Justin S. Beck

27

28

POS1                                           3:22-CV-01616-BAS-DDL