# EXHIBIT
1



PRIVILEGED AND CONFIDENTIAL

# Independent Investigation for the State Bar of California:
## Summary of Findings and Recommendations

Mark B. Helm
Bart H. Williams
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100

24870086.1

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 002
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

This report summarizes the major findings and recommendations of an independent investigation that Munger, Tolles & Olson LLP conducted as outside counsel for the State Bar of California ("State Bar" or "Bar"). We will provide a fuller recitation of the results of the investigation to the Board of Trustees ("Board") at a closed session meeting scheduled for October 17, 2014.

## I.    BACKGROUND AND SCOPE OF INVESTIGATION

The investigation began on August 26, 2014, in response to a July 31, 2014 Report of Improper Activity from the Bar's Chief Trial Counsel, Jayne Kim. Attachment 1. Among other things, Kim reports "concerns related to certain actions by Executive Director Joseph Dunn (ED), Chief Financial Officer Peggy Van Horn (CFO) and General Counsel Thomas Miller (GC) that demonstrate a disturbing [] lack of transparency at the highest levels within the organization." She claims that "State Bar leadership is failing to adhere to basic principles of governance" and that a "'five layer chess game' with key stakeholders and other executives" has "systematically fostered a culture of intimidation and isolation within the organization and resulted in dishonest communications to the Board of Trustees." In the investigation's early stages, we also received a memorandum from Deputy Executive Director Robert Hawley raising some issues relating to Van Horn's handling of various finance matters, including her handling of certain expense reports for Dunn's travel. Attachment 2.

We conducted an initial investigation consisting of interviews of five designated witnesses and a preliminary review of documents. This culminated in an interim report to the Board at a closed session meeting held September 14, 2014. The Bar then engaged us to undertake a second phase of the investigation that has involved, among other things, interviews of nineteen additional witnesses, collection and review of additional documents, and further legal analysis.

Our investigation probed the issues raised in Kim and Hawley's memoranda with particular focus on the following issues:

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 003
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

- Whether Joseph Dunn misled the Board or allowed the public to be misled about the use of Bar funds in connection with travel to Mongolia;
- Whether Dunn and Thomas Miller failed adequately to inform the Board about the California Supreme Court's reservations about pending legislation (A.B. 852) when the Board was voting to sponsor that bill;
- Whether Van Horn mishandled expense reports relating to Dunn's travel, and whether she knowingly concealed those reports from the Bar's auditors;
- Whether Dunn engaged in cronyism or violated Bar procedures in his hiring of certain Bar employees (including General Counsel Thomas Miller), his handling of certain contracts for the provision of services, and/or offers of assistance to Board members or others.

The third phase of the investigation involved the preparation of this report. We reach the following major conclusions and recommendations:

- Dunn failed on several occasions to satisfy his contractual and fiduciary duties to provide complete and accurate disclosures to the Board. In particular, he misled the Board or allowed the public to be misled about the use of Bar funds in connection with travel to Mongolia; failed to inform the Board of the Supreme Court's concerns regarding A.B. 852; and made misstatements to a Board committee regarding the Supreme Court's views on the Bar's possible move to Sacramento. These concerns are aggravated by Dunn's lack of candor on several issues during the investigation. This misconduct justifies termination of Dunn's at will employment, although the Board should consider various factors discussed below in deciding whether to take that action.
- The quality and effectiveness of Van Horn's work as the Bar's chief financial officer are subject to serious question. In particular, Van Horn failed to correct improper accounting for the Mongolia travel and did not properly handle expense

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 004
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

reports relating to Dunn's travel.  For these reasons, we recommend that Van
Horn be reprimanded and that the Board take appropriate steps to bring about that
result.

- If it decides not to terminate Dunn, the Board should consider taking steps to
  strengthen the General Counsel position as a possible independent check on the
  Executive Director.  First, it may want to consider replacing Miller, whose ability
  to serve as an independent counterweight is questionable in light of his
  performance at the Board meetings on A.B. 852.  Second, whoever continues in
  that role, the Board should reinvigorate the policy that the General Counsel
  reports directly to both the Board and the Executive Director.

## II.    MAJOR FINDINGS

### A.    Mongolia Travel

In January 2014, Dunn, Bar employee Thomas Layton, and former State Bar President
Howard Miller of the Girardi Keese law firm traveled to Mongolia in response to a request from
the Mongolian government for help in implementing a new regulatory system for lawyers.  In
April 2014, Layton and Miller traveled to Mongolia a second time.  Our investigation has
focused on whether false statements were made about the use of Bar funds for the trip and how
the Bar accounted for expenses related to the trip.

#### 1.    Statements concerning the use of Bar funds for travel to Mongolia

There is substantial evidence that Dunn (i) misinformed the Board that Bar funds would
not be used for the Mongolia trip, and (ii) failed to correct Howard Miller's public statement that
Bar funds had not been used—or at least failed to bring the issue to the Board's attention for its
consideration.

The evidence strongly suggests that Dunn told the Board no Bar funds would be used for
travel to Mongolia.  Three trustees recall that, at a meeting in November 2013, Dunn told the
Board that no Bar funds would be used because Mongolia would cover the expenses.  Another

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 005
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

trustee could not recall whether Dunn affirmatively denied whether Board funds would be used for that purpose. No interviewees recalled Dunn ever telling the Board that Bar funds would be spent on trips to Mongolia, either in November or later. And several persons interviewed believed that, if Dunn *had* disclosed that information, it would have prompted Board discussion.

Dunn's representation that no Bar funds would be used proved to be untrue. In connection with the January trip, the Bar paid $6,041.72 in mandatory Bar dues for Dunn and Layton's airfare and cell phone roaming charges.[1] In connection with the April trip, the Bar paid $1,046.72 in expenses from the Administration of Justice Fund to cover Layton's hotel, meals and taxis. *Id.* Indeed, Dunn and Past President Luis Rodriguez acknowledge that they decided from the outset to use Bar funds for at least some of the costs of the January trip to Mongolia.

The extent to which Bar funds were used for the trip is complicated somewhat by the deposit into a State Bar fund on April 3, 2014 of a $5,000 check from the Girardi Keese firm dated March 20, 2014. Howard Miller said that the check was intended to cover past and future expenses related to Mongolia, and Van Horn has said she plans at some point to account for that deposit as a credit against Mongolia expenses. For several reasons, however, this check does not significantly mitigate the inaccuracy of Dunn's statement to the Board.

First, as of the start of this investigation on August 27, 2014, more than seven months after the first trip to Mongolia, and nearly five months after the check was received by the Bar, no accounting entry has been made to credit the donation against the expenses.

Second, the intent of the donation remains ambiguous, which may account for the delay in accounting treatment. Although Miller told us that the check dated March 20 was meant to reimburse the Bar for both past and future expenses, his contemporaneous email to Dunn indicated that the check was timed to enable booking the future *April* trip to Mongolia. That the

---

[1] This figure does not include $107.60 in expenses relating to meals and travel to and from the airport that Dunn submitted for reimbursement but that have not been processed.

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 006
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

check was intended to cover only future expenses is also consistent with Dunn and Rodriguez's stated understanding, noted above, that Bar funds *would* be used for the first trip.

Third, even if accounted for to cover past expenses, the $5,000 check is insufficient to cover the full $7,088.44 in expenses incurred by the Bar.

The inaccurate information that Bar funds had not been used for the Mongolia trip later appeared in an article written by Howard Miller, published in the *Daily Journal* on April 23, 2014. Miller wrote:

> *Under the direction of State Bar President Luis Rodriguez, and discussions with CEO/Executive Director Joseph Dunn, it was decided* since a sovereign state had asked for help in the administration of justice in a unique area of its expertise, the State Bar would designate representatives to visit and work with Mongolia, *so long as no bar funds were used*, and the State Bar would simply be acting as a facilitator and advisor.
>
> *With that understanding, three of us, including Dunn and Thomas Layton . . . .went to Ulaan Bataar, Mongolia* in January.

Miller, *The Mongolian Connection*, DAILY JOURNAL, Apr. 23, 2014 at 5 (emphasis added). Dunn admitted that he saw the article at the time and noticed the statement. Several trustees and State Bar staff reported that they read the article at the time it was published and noted the statement that no Bar funds would be used. But Dunn took no steps to correct the statement, either by requesting Miller to do so or by issuing his own correction. The two explanations Dunn offered for his failure to correct the statement were troubling and, in our view, were inadequate to explain the failure to take any corrective action.

First, he claimed that the article is ambiguous and can be read to say only that no Bar funds would be used for *future* trips (an interpretation Rodriguez echoed). But this is an untenable interpretation of the article's plain meaning.

Second, Dunn said that he felt no obligation to correct the inaccurate statement because he did not write it. But Miller was (or at least appeared to outsiders to be) acting as an agent of the Bar in connection with the trip to Mongolia: he participated in the official trips; he was the Bar's representative at a ceremony in Mongolia in April; and he was designated in the

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

memorandum of understanding between the State Bar and the Mongolian Bar Association as someone who, along with Dunn and Layton, would "manage all activities" related to that memorandum. *See* Memorandum of Understanding, ¶ 6; *see also* Cal. Civ. Code § 2317 ("Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess."). For this reason, the Bar had an obligation to correct misstatements by Miller about the trip. *See* Restatement (Second) Agency § 256, cmt b ("If the principal discovers the untruth of a statement made by an agent on his account, he is under the same duty to reveal the truth to the other party as if he himself had innocently spoken an untruth.").

Indeed, quite apart from any legal obligations involved, Dunn's apparent insensitivity to the problems that could be created by perceived inaccurate statements by persons affiliated with the Bar—particularly in the area of how Bar funds are used—is troubling. The unique role of the organization he heads—administrator of the state's legal profession and the system of ethical rules governing the profession—heightens the need for the chief executive to be sensitive to such issues. This is particularly true in light of the Bar's recent pledge to make its commitment to transparency "paramount." *See* Five-Year Strategic Plan, p. 5.

At the very least, Dunn should have brought the inaccuracy of Miller's public statement to the Board's attention so that it could decide whether a correction was warranted. Instead, Dunn appears to have done the opposite, by taking steps to minimize attention paid to the trip-related expenditures. Communications officer Laura Ernde reported that Rex Bossert told her that Dunn was unhappy that she had circulated within the office a different article about the Bar's work with Mongolia—allegedly because Dunn believed the issue was causing problems with the Board. Dunn also asked Ernde to edit a draft of an article about the Mongolian delegation's visit to the Bar in June to remove a statement that no Bar funds were used for the two previous trips to Mongolia, presumably because he knew the statement was not true. According to Ernde, she told Dunn that the statement was from Miller's April article. Instead of

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

telling Ernde that the Miller article was inaccurate, Dunn simply told her that that article was not authorized by the Bar.

Dunn's inaccurate disclosures, failures to correct, and/or failures to disclose violated various duties he had. Under his contract, one of Dunn's "essential duties" is to "keep the Board and its President fully informed on matters of significance." Employment Agreement § II(E)(1). Likewise, as a senior executive of the Bar and the Board's agent, Dunn has a fiduciary duty to disclose material facts to the Board. *See Salahutdin v. Valley of Cal., Inc.*, 24 Cal. App. 4th 555, 562 (1994) ("The failure of the fiduciary to disclose a material fact to his principal which might affect the fiduciary's motives or the principal's decision, which is known (or should be known) to the fiduciary, may constitute constructive fraud . . . ."); *People ex rel. Harris v. Rizzo*, 214 Cal. App. 4th 921, 950-51 (2013) (city reposed trust and confidence in its assistant chief administrative officer giving rise to fiduciary duties owed by the officer); *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997) (liability for nondisclosure of information may lie where the defendant is in a fiduciary relationship with the plaintiff). Other duties could also be implicated by Dunn's lack of candor with and failures to make disclosures to the Board.[2]

## 2. Improper accounting of the Mongolia travel expenses

As noted above, the Bar has charged the $6,041.72 in expenses for the January trip to a mandatory dues account. Although Van Horn stated that she thought a case might be made for use of mandatory funds for the trip, no one else has suggested that this would be appropriate, and

---

[2] Although our findings and recommendations do not depend on it, Dunn's failure to keep the Board informed also could implicate his ethical duties as a lawyer. *See Sodikoff v. State Bar*, 14 Cal. 3d 422, 429 (1975) ("When an attorney assumes a fiduciary relationship and violates his duty in a manner that would justify disciplinary action if the relationship had been that of attorney and client, he may properly be disciplined for his misconduct."); Cal. Ethics Op. 1995-141 at *3 ("[W]hen rendering professional services that involve a fiduciary relationship, a member of the State Bar must conform to the professional standards of a lawyer even if the services performed could also be rendered by one licensed in a different profession."); *cf.* Cal. R. Prof. Conduct 3-500 ("A member shall keep a client reasonably informed about significant developments relating to the employment or representation . . . .").

24870086.1

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 009
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

it plainly would not be. *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990), requires that expenditures of mandatory dues be "necessarily or reasonably incurred for the purpose of regulating the legal profession or improving the quality of legal service available to the *people of the State.*" *Id.* at 13-14 (emphasis added). Helping Mongolia to implement a new regulatory regime, though a laudable goal, hardly satisfies this standard, and the accounting for these expenses raises two concerns.

First, although Van Horn has stated that she intends to change the accounting of these expenses so that they are no longer charged to mandatory dues, as of the date of her interview that had not happened. Under these circumstances, it is unclear whether, absent this investigation, Van Horn would have changed the accounting for these expenses to an appropriate voluntary account.

Second, Dunn himself showed a troubling lack of attention to whether expenses for the trip would be charged to mandatory or voluntary fees. The expense report he submitted for his own expenses for the January trip included an account code for mandatory fees. Seeking to disclaim responsibility for this allocation, he noted that his practice is to give his travel expenses to his administrative assistant and to let her and Van Horn decide how the expenses should be treated.

This explanation is not adequate. Given the unusual nature of the Mongolia trip, Dunn should have taken pains to direct Van Horn to make sure that *all* expenses were allocated to voluntary fees, which he did not do. Indeed, Sonja Oehler reported that she received no training on the circumstances under which mandatory Bar dues may be used to cover expenses. His failure even to ensure that his *own* expenses were properly allocated shows an inadequate sensitivity to what is a centrally important issue for the Bar, its reputation, and its relationship with its constituencies.

At a minimum, the Board should reprimand or counsel Dunn on his lack of leadership on this issue. It should also direct him to institute additional internal controls or training to ensure

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

that incidents of this kind do not occur in the future and that his CFO is more closely attuned to the need for scrupulous compliance in this area.

### B.    Dunn's communications with the Board regarding A.B. 852

After the Governor vetoed A.B. 888, the Bar was involved in promoting A.B. 852, which would have permitted it to bring civil enforcement actions against persons engaged in the unlawful practice of law (UPL). Last April, Beth Jay emailed Tom Miller (who forwarded it to Dunn) that the Chief Justice wants to "delay further action" – and emailed Dunn and Miller that the Chief Justice "wants this bill stopped" – pending the Bar's development of further information showing a need for the measure. The request that the Bar stand down on further efforts was repeated at a May 1, 2014 regular quarterly meeting attended by three Court and eight Bar representatives, including Dunn.

Dunn nonetheless thought it appropriate to ask the Board at its May meeting, just over a week later, to authorize the Bar to sponsor the legislation. Given constraints in the legislative calendar, Dunn says, the bill would have died had it not proceeded further that month, and he believed that killing the bill for this legislative session went beyond the Court's request. Dunn reasoned he could always pull the plug later if the Court ultimately so directed, but he could not later resurrect it if the Court ultimately were persuaded to let the bill proceed. He did not discuss this rationale with Court representatives, however, before making the request to the Board at its May meetings.

Nor did Dunn mention the Supreme Court's concerns to the Board so it could make its own decision on the wisdom of his rationale for proceeding despite the Court's request to stand down. In a memorandum dated May 6, 2014, to the Board Committee on Operations and the Board of Trustees outlining the proposed legislation, Dunn stated "[t]here is no known opposition to the measure." Dunn did not mention the Supreme Court's concerns in this memorandum, in his presentation to the Board Operations Committee on May 8, or in any discussions with the full Board on May 9, where the measure was on the consent calendar.

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 011
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

Dunn said that he felt constrained not to mention directly to the Board the Court's possible opposition to the bill, because the Board meeting was held in public, and Beth Jay had previously said that Court views should not be mentioned in public, especially on possible legislation that might come before the Court later. He claimed in his interview, however, that he reconciled this dilemma by giving the Board a coded reference to the Court's directive, stating to the Board that a "critical stakeholder has concerns" and "we are trying to resolve them to decide if the bill can move forward." When Beth Jay asked Dunn after the Board meeting why he had not shared the Court's position with the Board, Dunn claimed in an email to her that the Board was "quietly aware" of the Supreme Court's interest.

The weight of the evidence contradicts Dunn's claim that he told the Board at one or more of the May meetings that a "critical stakeholder has concerns." No trustee we interviewed recalled any such reference, nor did his co-presenter at the May 8 meeting Jennifer Wada (though she said she could not rule it out). Moreover, two people who were present at one or more of the meetings, Jayne Kim and Jim Fox, were keenly listening to Dunn's remarks on this subject, because they were present at the May 1 meeting with Court representatives and were expecting some form of disclosure about the Court's concerns. Both are quite certain Dunn made no such reference, and they complained to Beth Jay afterwards precisely because they say he did not.

Indeed, Fox was so upset with the lack of disclosure that he says he specifically requested an exit interview with Dunn before leaving his employment at the Bar so he could voice his objection. Dunn and Fox met for that interview on July 29, 2014. When Dunn defended his conduct at that meeting by noting the constraints on mentioning Court views at open meetings, Fox told us (without any prior prompting) that he told Dunn he could easily have advised the Board that "there are unresolved issues with some of the key stakeholders that need to be resolved." The similarity between this phrase and the phrase that Dunn *claimed* during his interview with us to have used at the Board meeting is too striking to be pure coincidence—and

24870086.1

10

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 012
22-CV-01616-BAS-DDL

it seems unlikely that it was he who borrowed the phrase from Dunn rather than the other way around.

For these reasons, we think a factfinder would most likely conclude that Dunn did not tell the Board, either directly or through a veiled reference, about the Supreme Court's concerns regarding the bill. Further, the Court's concerns were plainly material to the decision Dunn was asking the Board to make and therefore should have been disclosed—as he implicitly concedes when he claims that he in fact attempted to make a disclosure of some kind. Finally, Dunn's evident violation of his duties discussed above to disclose material information to the Board was compounded by his (evidently) false claims to us in his interview that he in fact made a disclosure of some kind.

## C.    Misstatements Regarding Move to Sacramento

Our investigation has uncovered misrepresentations that Rodriguez and Dunn made to a Board committee about the Supreme Court's views regarding the Bar's possible move to Sacramento following a sale of its building in San Francisco. Rodriguez told the Board Operations Committee at a meeting held September 2, 2014, as well as at one or more earlier meetings in August, that the Supreme Court was aware of the possible move to Sacramento and supported or was amenable to it. Some present at that September 2, 2014 meeting also recall that Dunn made similar statements to the effect that the Chief had no problem with moving the Bar to Sacramento, that the issue had been "socialized" through both the Supreme Court and the Legislature, and that the Court was behind the Bar if it decided to move to Sacramento.

Rodriguez knew his statements were false. The Chief Justice told us that, although she said she was intrigued when she was told that the Bar's real estate brokers felt that the Bar could fetch an enormous sum for the building, she told him in the July 2014 time period that she did not think a move to Sacramento was a good idea. Specifically, she told him she was concerned about displacing long-term employees (which she said Rodriguez told her was a concern he shared). The Chief Justice also reported that, in a call held the day after the September 2

meeting, she expressed the view that she did not think it was wise to have the Bar headquartered near the Legislature, though she does not believe she mentioned that concern in the call before that September 2 meeting.  The Chief Justice did not believe that her comments to Luis Rodriguez could fairly be characterized as supportive of a move to Sacramento.

The evidence also indicates that Dunn knew that his statements about Supreme Court amenability to the move were severely exaggerated at best and false at worst.  First, Beth Jay reported that she attended a lunch with Dunn in June or July 2014, where the possible sale of the building was discussed.  She says that she told him:  "I hope you won't be moving to Sacramento!"  Ms. Jay reported that she made the comment because she knew that Dunn had an affinity for the Sacramento setting but she was concerned that such a move would be inappropriate.  Second, the Chief Justice recalls having a few conversations with Dunn before or during the Summer of 2014 when Dunn mentioned the possibility of selling the building and moving to Sacramento.  Although she was not asked and did not express her opinion on the move, let alone express the opinion of the full Court, the Chief Justice told us she said nothing from which Dunn could have fairly concluded that she or the Court supported the move.

Based on this input from Court representatives, Dunn's statements to the Board committee that the Court supported the move, that the matter had been "socialized" with the Supreme Court and the Legislature, and that the Court was behind the Bar if it decided to move to Sacramento were unfounded and inaccurate.  Dunn's claim that he in fact told the Board committee that the Chief Justice saw both downsides and upsides to the move does not accord with committee members' recollections of his statements to them—nor with the Chief's recollection of the import of her statements to Dunn.

### D.    Treatment of Dunn's expense reports

Hawley's memorandum provided twenty-three expense reports by which Dunn was seeking reimbursement for various expenses, which included some minor expenses associated with the Mongolia trip and other trips.  Kim alleges that Van Horn knowingly concealed a

PRIVILEGED AND CONFIDENTIAL

Mongolia-related expense report in that set from the State Bar's auditors. While we are unable to conclude whether or not Van Horn knowingly concealed any of these expense reports, the treatment of the expense reports raises concerns regarding Van Horn's leadership and the Bar's internal controls.

On February 4, 2014, Van Horn received nineteen Dunn expense reports seeking reimbursement for meals and other travel expenses incurred between August and December 2013 (including for foreign travel). On or about April 7, 2014, Van Horn received four expense reports from Dunn seeking reimbursement for travel in the beginning of 2014 (including approximately $110 incurred on the January Mongolia trip). Van Horn signed the first seven expense reports and asked Office of Finance Director Andrew Conover to look into certain taxi expenses on one report. Van Horn never signed the remaining sixteen reports. It was not until late May or early June 2014 that she provided the expense reports to Hawley, who needed to approve them for late processing because the reports had been submitted beyond the Bar's 60-day limit.

According to Hawley, Van Horn told him in words or substance that the expense reports "are late from Joe" and that she had held onto the reports, including the reports submitted several months earlier in February, because she did not want the auditors to see them. Hawley stated that the Bar's auditors had recently concluded a review of the Bar's 2013 Statement of Expenditures of Mandatory Membership Fees at the time Van Horn made this remark. A primary focus of the audit was whether the Bar had properly accounted for 2013 expenditures as between those chargeable to mandatory fees or not, as required under *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990). Hawley expressed concern that Dunn and Van Horn proposed to charge the travel expenses to mandatory fees, even though in Hawley's view it would be improper to treat the expenses in that manner. Hawley also expressed concern that, in presenting the 2013 audit to the Board in July 2014, Van Horn failed to disclose that she had withheld these expenditures from the auditors. To date Hawley has not approved the expense reports.

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 015
22-CV-01616-BAS-DDL

Van Horn does not deny that she gave the February expense reports to Hawley approximately two months after she received them. But Van Horn denied trying to conceal documents from the auditors, and she denied telling Hawley that she had done such a thing. Van Horn repeatedly stated that she never would have sent expense reports to Hawley without signing them first. During our initial interview with her (we had a few follow-up telephonic interviews as well), Van Horn stated that she felt so certain of this fact that she wondered whether Hawley had obtained the unsigned expense reports from her unlocked office. She further disputed that the *de minimis* amounts reflected in the expense reports would have been likely to prompt concerns with an auditor. Van Horn also noted that the auditors had conducted a review of expenses for calendar year 2013, and that the Mongolian travel all occurred during 2014.

When Andrew Conover of the procurement office was shown the unsigned expense reports during his initial interview, he did not supply an explanation for how Hawley would have received the reports unsigned. Conover told us in a subsequent email, however, that expense reports that are older than 60 days late are usually sent directly to Hawley for "late" approval before the procurement processing continues. Hawley rejected this explanation and stated that expense reports must be signed by the authorizing approver and submitted to him with an explanation (generally in writing) as to why they are late. Hawley reported that one of the reasons why he did *not* approve the late expense reports that he received in his in-box from Van Horn was that the vast majority of them had not been signed by Van Horn, the only person authorized to approve Dunn's expense reports.

Because there are no known other witnesses to the conversation between Van Horn and Hawley, we cannot definitively establish that Van Horn made the remarks attributed to her concerning the Bar's auditors, and the evidence points in conflicting directions.

On the one hand, it is difficult to understand why she would have confided in Hawley that she was withholding the reports from the auditors given that she does not like or trust

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 016
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

Hawley, and he could have used such an admission against her. It also is hard to understand why Van Horn would have been motivated to conceal the expense reports from the auditors. In comparison to airfare and cell phone roaming charges associated with Dunn's overseas trips—which no one claims anyone sought to conceal—the amounts that Dunn claimed on the expense reports (for meals and taxis on those and other trips) are small. The reports for the Mongolia travel in particular reflect expenses that are *de minimis* by any measure—just over one hundred dollars. Moreover, because Dunn incurred the Mongolia trip expenses in 2014, the auditors would not have examined them in connection with the 2013 audit in any event.

On the other hand, certain idiosyncrasies in these reports raise questions that no one has been able to answer, and there is some reason to credit Hawley's recollection of the conversation.

First, Van Horn has been unable to explain why she delayed for so long in submitting the expense reports to Hawley and why she gave Hawley sixteen unsigned expense reports, some of which refer to foreign travel, when it is her responsibility to review Dunn's expense reports as part of the approval process.[3] Hawley vehemently denies Van Horn's speculation that Hawley may have taken unsigned Dunn expense reports from her office or that he would have had any reason to do so. Second, although the Mongolia trip expenses were small, the Mongolia trip expenses were the subject of some discussion among Bar employees, particularly in light of the Miller article published on April 23, 2014. Van Horn read the Miller article at the time and may have had on her mind these concerns about of the use of Bar funds before she gave the expense reports to Hawley. Third, Hawley has shown himself to be a careful individual with respect to

---

[3] Van Horn said that she reviewed the expense reports all at once and stopped reviewing the reports when she came across one with an apparent $70 error in taxi expenses. She asked Andrew Conover to investigate the taxi expenses, and Conover provided her with corrections on a copy of the expense report. For reasons that are unclear, Van Horn did not correct the original expense report, and gave that report and the rest of the reports in the set to Hawley at some later date.

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 017
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

international travel and expenditures generally. When he travels internationally on behalf of the Bar, he does so on his personal time and refuses to have the Bar pay for any of his expenses.

In short, we cannot determine whether or not Van Horn knowingly concealed the Dunn expense reports from auditors as alleged by Kim. At the same time, the evidence suggests several deficiencies in how Van Horn is performing her duties.

- Although she criticizes Hawley for failing to process the expense reports since she provided them to him in late May or early June, Van Horn did not deal promptly with the expense reports she received in February and instead let them sit for over three months.

- She approved for payment expense reports for the Mongolian trip (*e.g.*, approximately $600 in cell phone roaming charges) using mandatory Bar dues coding.

- As of the date that this investigation commenced – nearly five months after the second Mongolian trip took place and seven months after the first trip – she had not taken any steps to ensure that ledger entries were made on the Bar's books and records to connect the $5,000 check from the Girardi firm to the Mongolian trip expenses.

- Van Horn did not ensure that Dunn and his assistant are familiar with the account coding system.

### E.    Expense Budget Modifications

Van Horn's handling of Dunn's expense reports has fueled a troubling perception among Bar staff that Van Horn does not audit Dunn's expenses with the same level of attention and care afforded to other expenses. In particular, some witnesses reported that Van Horn polices each executive's use of the business expense account, except Dunn. Administrative Advisory No. 14-01 provides in part:

> Senior management may budget for "Business Expenses" (account code 40570). The amount in this account is determined by the Executive Director annually during the

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 018
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

budget planning process and is to be funded with non-mandatory fee revenues. This account is to be used at the senior managers' discretion in the course of their duties to cover applicable business expenses for themselves and others. . . .

No reimbursement will be made against the Business Expense Account unless there is a sufficient amount budgeted in the account to cover the expense. . . .

Business expenses that may be covered under this section include meals during which discussion of State Bar business occurs and there is a business need to keep participants together. Expenses for business meals will not be authorized for meetings where State Bar business is only nominally discussed or meetings with potential or existing vendors.

Administrative Advisory No. 14-01, VII A, C and D.

Both Van Horn and Hawley explained that the implementation of this policy changed sometime during Dunn's tenure. Before that policy change, senior executive staff members each had an individual expense budget of approximately $1,500 for their respective cost centers. Executives were expected to manage to the budgeted amount each year. Sometime during Dunn's tenure, all of the expense budget limits were aggregated into one budget line item. An expense budget limit of $50,000 was set for all senior management. Hawley, for example, explained that he no longer had visibility into how management was doing against the expense budget limit, and he does not have an individual expense limit to manage against.

Our review of financial records indicated that, during 2013, Dunn alone expensed at least $13,576.93 against the $50,000 limit, not including additional business expenses charged by employees within the Executive Director's business unit. Van Horn reported that the $50,000 limit was not exceeded even if all of the senior executives' expenses were combined. While we do not believe that this policy change constitutes a basis for discipline, the effect of this change was essentially to give Dunn an unlimited business expense budget. We recommend that the Board set a business expense budget limit for the Executive Director and that the finance committee of the board take over responsibility for review and approval of the Executive Director's expense reports.

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 019
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

### F.    Issues Related to General Counsel Thomas Miller

#### 1.    Hiring Issues

Kim alleged that the Bar hired Thomas Miller as the General Counsel over allegedly more qualified candidates because he is friends with Dunn.  The selection process, however, even if not perfect, did proceed with input and involvement by the Board, so we do not see a basis for finding wrongdoing in how Miller was selected.  Rules & Regs. Pertaining to the Employment of Executive Staff Employees § 9(A) (senior executives are appointed by and serve at the pleasure of the Executive Director); Board Book, Tab 18 § 7(b) (Board approves selection of General Counsel); see also *id.* Tab 5, § 2(b)(11(D) (president's role is to manage the Executive Director by, inter alia, providing input with respect to the selection of the General Counsel).

#### 2.    Travel issues

Kim also complained that Miller has improperly billed for travel between Southern California, where he lives, and San Francisco, where the Office of General Counsel is based. We have learned that, between March and July 2014, Miller spent some forty-three nights in hotels in the Bay Area for a total cost of $7,855.88.  Air fare expenses for the same period totaled $8,746, and Miller incurred $4,415.76 in additional expenses in this period for ground transportation, lodging, meals, and other miscellaneous travel expenses.  Total travel related expenses for the period were therefore $21,017.64.

Expenses at these levels are not surprising, as the Bar clearly appears to have contemplated that Miller would be incurring travel expenses in order to take the position.  His employment offer letter provides that he "will work out of the San Francisco and Los Angeles State Bar offices with frequent travel.  As the Office of General Counsel is based in San Francisco, that office will be your 'home base.'"  Because everyone seems to have known that Miller lived in San Clemente and never committed to move to the Bay Area, but he was told he would be based in San Francisco, the travel expenses were an expected result of this arrangement.  The travel records also confirm that, at least through July, he lived up to the

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 020
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

requirement that he spend most of his time in San Francisco—something he did three or four days a week.

There is, however, a discrepancy in the parties' expectations going forward. Miller says that he told the Board members who interviewed him that he would spend most of his time (usually three days a week) in San Francisco for the first six months but that after he had established himself he hoped to spend most of his time (usually three days a week) in Los Angeles. Miller still believes that was the arrangement to which the parties agreed. At least one board member confirms that Miller said this in his first interview with a Board working group, which recommended he not be hired in part for that reason. But the board member also recalls Dunn and/or Rodriguez stating at a later time that Miller was now willing to commit indefinitely to having his home base be San Francisco—and that his hiring was approved on that basis. Miller was not aware of this but rather expects to wind down his San Francisco travel to two days per week rather than three. This suggests that Dunn and/or Rodriguez's representations to the Board about Miller's intentions and understanding were not accurate. For that reason, the Board will need to reach some common understanding with Miller about his future plans.

### 3. Disclosure Issues

Miller was aware that Beth Jay had directed the Bar to stand down on A.B. 852 before the May 8 and 9 Bar Board meetings and was present during Dunn's discussion of that bill, but he did nothing to inform the Board about the Supreme Court's concerns. Although he did not clearly recall that Dunn failed to mention Supreme Court concerns at the Board meetings, Miller said he would not have taken it upon himself to make this disclosure to the Board even if Dunn had not done so, for two reasons. First, he believed that Luis Rodriguez had been informed of the Supreme Court's concerns, though he admits he was not sure at the time of the May Board meeting that he knew this. Second, he thought the Board did not need to know about the Supreme Court's concerns, because he and Dunn were still trying to persuade the Court about the need for the bill and needed to keep the bill moving forward to avoid having it die for that

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 021
22-CV-01616-BAS-DDL

session.  As with Dunn, Miller's nondisclosure raises questions about his commitment to giving the Board all of the information it needs to do its job.

### G.    Perceived Girardi Keese Influence at the Bar

Although we have not uncovered instances of any sort of misconduct involving or untoward influence exerted by Tom Girardi or his firm, the closeness of the relationship between some senior managers and that firm does raise potentially troubling perceptions that the Board should take action to rectify going forward.

The frequency with which Girardi's firm has surfaced in matters we investigated is striking.

- Kim alleged that Dunn violated Bar policy in sending OCTC employees to a seminar in Las Vegas for a group that Girardi supports or is affiliated with.  Although we did not consider the policy so important that a deviation from it would be grounds for discipline, it is an example where Dunn bent (or attempted to bend) the normal rules to accommodate a request perceived as helpful to Girardi.

- Girardi surfaced in an extremely unusual meeting with Craig Holden before he was elected as Bar president.  Luis Rodriguez indicated that Holden should have lunch with Tom Layton, because Layton was not yet sure if he would throw his support to Holden for president.  That a bar employee is believed to have such an important role in who is elected bar president is unusual enough.  But when Holden attended the meeting, Girardi showed up, suggesting that the "power broker" on whose support Holden's election depended was in fact Girardi.

- Girardi's name has also come up in other (disputed) allegations discussed below about offers of professional assistance to Jayne Kim.

- Dunn chose Girardi's partner Howard Miller to be an emissary for the Mongolia trip.  We believe that Miller was eminently qualified for and deserving of this role, but others certainly would have fit the bill too.  In light of the other accommodations

PRIVILEGED AND CONFIDENTIAL

Dunn has made for members of that firm, the selection forms a smaller piece of a larger pattern.

- In emails we reviewed on other topics, we noted that Miller was being consulted on matters related to A.B. 1515, a bill concerning client trust accounts. Again, we assume there are completely valid reasons for his involvement, and that he served admirably in whatever role he had, but the continuing connections are notable.

- During the investigation, Girardi suddenly and unexpectedly appeared as counsel for Sonja Oehler. In that capacity, he launched an unprofessional tirade of threats that we will recount more fully at the Board meeting. Although Girardi claims he became involved because our firm was rude during interviews and he is a long-time friend of Oehler's, his involvement also could be explained because he perceives a threat to Dunn as a threat to his possibly favored position with the Bar.

Although we do not believe that these incidents, either individually or collectively, form a basis for discipline, the pattern contributes to a potentially troubling perception that the Board should address.

## H.      Interference with Investigation

Luis Rodriguez engaged in various improper efforts to impede or influence the course of this investigation. The extent to which Dunn may or may not have participated in these efforts cannot be established conclusively. Although these efforts do not form a basis for imposing discipline at this time, the Board should consider taking steps to avoid problems like these in the future.

*First*, after Kim's complaint was sent, Rodriguez recused himself from the investigation and set up a working group composed of then-President Elect Craig Holden and two members of the Audit Committee (Heather Rosing and Michael Colantuono). As we discussed at the September Board meeting, Rodriguez later decided to rescind his recusal and form a newly configured working group based on two dubious grounds.

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 023
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

One such ground was that Holden had supposedly revealed to one of his partners information about the investigation. Rodriguez made this claim as a result of questions Tom Layton asked Rodriquez, which questions in turn arose from an oblique comment by Holden's partner at a lunch Layton had with him. In fact, Holden did nothing more than make a routine, confidential request to two of his partners for a referral without revealing the substance of the allegations or the identity of any complainant. Layton later told us he was wrong to leap to conclusions based on the stray comment from the partner—and said he had since apologized to the partner for doing so.

The second such ground was that the investigation might result in civil liability to the Bar by thwarting Dunn's chance to become Administrative Director of the Judicial Council. Rodriguez asserted that "Joe has been tapped" for that position and "is number one on [the Chief Justice's] list." Dunn told us the Chief Justice told him in the third week in July that he was "at the top of her list," something he repeated at the time to Rodriguez.

The Chief Justice told us, however, that this was not true. She told Dunn that, while some justices supported him, she had someone else in mind for the job, not Dunn; that she had not asked and would not ask him to apply for the job; but that, only in the event the other applicants did not work out, she might come back to him to offer him the job. When asked if there was any way Dunn could have concluded from their conversation that he was at the top of her list, she said there was not, because she was very clear that she had her eye on someone else (who in fact was offered the job).

*Second*, after rescinding his recusal and forming a new working group, Rodriguez attempted to influence the investigation by calling Van Horn just fifteen minutes before her interview was scheduled to begin and instructing her not to appear. During his call with Van Horn, Rodriguez raised a challenge to our firm's involvement in the investigation. When asked for his basis for advising Van Horn not to appear, he said that he did not think it was fair that Dunn's interview was postponed, while Van Horn's interview was not.

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 024
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

*Third*, an issue arose at the last Board meeting whether our firm should question the Chief Justice on certain matters relating to the investigation. Apparently in an effort to stop this line of inquiry, Rodriguez advised Heather Rosing that the Chief Justice and Beth Jay were upset at the prospect of being pulled into the investigation as witnesses. The Chief Justice, however, denies that she ever conveyed such a sentiment to Rodriguez. According to the Chief Justice, Rodriguez told her that he was having disputes with Craig Holden, and she merely responded that any such dispute was between the two of them. Far from being reluctant to be questioned as part of this investigation, she told us she was happy to do so and spoke to us freely on more than one occasion. Beth Jay similarly reported that she was not at all reluctant to be interviewed in connection with this investigation and that she had never told anyone that that was the case.

Rodriguez's actions to interfere with the investigation were ill-advised and improper. Although they provide a cautionary tale for the Board about the handling of investigations in the future, we are not aware of any statute Rodriguez violated. Further, although he may well have violated his fiduciary duties, we see no reason to consider taking action against him unless he continues to receive Bar funding to permit him to represent the Bar as a past President.

If it could be shown that Dunn wrongfully participated in efforts to impede the investigation, this would violate his legal duty to "withdraw from any participation in" matters as to which he had a personal interest and to "refrain from attempting to influence" such matters[4] – violations that potentially could give rise to criminal liability.[5] However, evidence that he did so is inconclusive. The evidence does clearly show that Dunn misrepresented in July his status as the front-runner for the Administrative Director position. But we found no direct evidence that,

---

[4] Cal. Bus. & Prof. Code § 6036(d); *id.* (b) (Board members must disqualify themselves "where there exists a personal nonfinancial interest that will prevent the member from applying disinterested skill and undivided loyalty to the State Bar in making or participating in the making of decisions"); *id.* §6038 (subjecting to section 6036 employees designated in the Conflict of Interest Code of the State Bar); Conflict of Interest Code of the State Bar section 2, App. A (designating Executive Director).

[5] Cal. Bus. & Prof. Code § 6037.

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 025
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

after the Kim complaint was lodged, he reasserted this falsehood in an effort to persuade Rodriguez to change the course of the investigation.[6]  The misrepresentation may still be relevant to other issues raised in this investigation relating to Dunn's truth-telling propensities, but we have not concluded that it amounts to proof of interference with the investigation that would provide a basis for imposing discipline.

### I.      Consultant Hiring Irregularities

We uncovered certain irregularities in connection with the contract for communications contractor Richie Ross.  Ross had previously assisted Dunn in his races for Senate and Controller.  At Dunn's request, the State Bar retained Ross on a sole source basis in June 2011 at $6,000 a month to provide communications services, especially in connection with the Sergio Garcia litigation.  Although State Bar procurement rules require the approval of a written memorandum justifying a sole source contract, Ross provided services for three months without a sole source memorandum.

For consulting services performed in June, July and August of 2011, Van Horn placed Ross's contract within the budget of the Office of General Counsel as a litigation related cost, which is excluded from the Bar's procurement process.  Van Horn pressured Cathy Torney, then Director of Administration in the Office of the General Counsel, to approve the first three $6,000 invoices, which were for amounts over her approval authority.  Torney alerted then-General Counsel Starr Babcock to the situation, and Babcock apparently took steps to prevent Ross's contract from being added to his office's budget.  It was only then that Hawley prepared a sole

---

[6] There is circumstantial evidence suggesting he likely did so.  An email from Rodriguez stated that Dunn was "very upset" about possible violations of his privacy rights, which implies that they did have a conversation about Dunn's concerns before Rodriguez rescinded his recusal. Further, Dunn told us in his interview that he believed the timing of Kim's complaint was calculated to interfere with his chances as front-runner for the job.  Given that Dunn apparently expressed to Rodriguez other concerns that made him "very upset," it seems highly likely he also expressed his concern that the complaint was designed to upset his chances for the new job, for which he inaccurately claimed he was the front-runner—but we have no admission from either Dunn or Rodriguez that he in fact did so.

24870086.1

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 026
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

source memorandum, dated September 23, 2011. It was not until December 5, 2011 that a fully-executed contract was finalized for Richie Ross, though it was executed with a retroactive effective date of June 1, 2011.

On March 29, 2013, the Recorder published an article discussing the Bar's contracts with Ross and his daughter Esperanza Ross, as well as the Bar's refusal to release copies of the contracts. Kim alleges that Dunn did not inform the senior executive management team of Richie Ross's contract before this article was published. This claim is inaccurate at least with respect to Hawley, Van Horn, and Babcock—all of whom became aware of the contract relationship sometime in 2011. The article, however, does appear to have prompted another action by the Bar—an April 9, 2013 Request for Proposal for the consulting services that Ross had been providing since June of 2011. In May of 2013, seven contractors (including Ross) submitted competitive bids, and Ross was selected as the most responsive bid.

The gravamen of Kim's observations regarding Ross is that the Bar's competitive bidding and sole source contracting procedures lack sufficient controls and are potentially subject to abuse. The foregoing episode confirms some of those concerns. On the one hand, the Bar's decision to initiate a RFP after the publication of the Recorder article raises questions about the propriety of the Bar's decision to contract Ross on a sole source basis. Torney's account also suggests that Van Horn attempted to "fix" a paperwork error by accounting for the sole source requisition in a way that may have been inappropriate. On the other hand, several witnesses reported a misunderstanding that Richie Ross was performing legal work, as his services related in part to the Sergio Garcia matter. If Babcock had agreed that Ross's work fell within his office's budget, the contract would have been excluded from the procurement process.

Although the Ross contracting process, by itself, does not serve as a basis for discipline, we recommend that the Board instruct senior management to adhere strictly to the competitive bidding and sole source requirements. The Board may also wish to ensure that senior management has a clear, shared understanding of the cost center that will be charged for any

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 027
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

contractor providing services on litigation related issues, directly or indirectly, *before* any fees are incurred. Finally, the senior manager who requests that the Bar retain a vendor on a sole source basis must take personal responsibility for the prompt completion of a memorandum supporting the sole source request.

### J.   Governance Issues Arising From Promises of or Requests for Assistance

We investigated certain governance issues arising from promises of assistance to Board members or others. In her interview, Kim said that Tom Layton came to her when she first became Chief Trial Counsel to offer assistance from Tom Girardi in helping her to become a judge or to achieve some other professional goal. Although Layton denies this, it is undisputed that Dunn made similar offers (without necessarily mentioning Girardi) to various Bar Presidents. Both Dunn and Craig Holden have confirmed that Dunn initiated a discussion in which Dunn asked how he could help Holden achieve any aspirations he had of becoming a judge or running for office. (Holden says that Dunn also offered Layton's assistance, and Layton and Holden both confirm that Holden later asked Layton to meet with a friend whom Holden recommended for a district court position.) While not recalling necessarily that he initiated other conversations, Dunn admits to making similar offers to Luis Rodriguez, who openly had political aspirations, and Jon Streeter, who wanted to become a judge.

Although we do not rely on these events as a basis to recommend discipline, we do believe that conversations like this during the term of a Bar President (or other trustee, if such conversations took place) pose unhealthy risks to proper governance. The provision of such assistance could make the Board President or trustee feel beholden to the chief executive or other staff member in a way that undermines the Board member's exercise of proper supervisory control.

## III.   ISSUES AS TO WHICH NO RECOMMENDATIONS ARE MADE

Several issues arose during our investigation that either did not result in recommendations or that we did not investigate.

24870086.1

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 028
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

- *UPL unit.* Kim complained that the development of the UPL unit raises concerns regarding cost inefficiency, overlapping jurisdiction with OCTC, and a lack of independence by the General Counsel. This appeared to us to be a turf issue that has been aggravated by a perception of favoritism and insularity within the organization. While we do not believe that this issue has resulted in any actionable wrongdoing, the Board may wish to consider giving an opportunity to be heard on this issue to Kim, who feels that her concerns on the issue have been ignored and disrespected.

- *Speakers fees.* Kim also raised concerns regarding the cost of outside speakers' fees. For reasons discussed on September 14, we did not see a problem here and have not pursued the issue further.

- *Retaliation.* Jayne Kim provided Hawley with a supplemental memorandum, dated September 16, 2014, regarding her concerns of a hostile work environment and potential retaliatory efforts towards her. Attachment 3. These issues seemed collateral to the thrust of our investigation, and with the agreement of the working group we have not pursued them. The Board should consider what if any additional action to take on the allegations.

- *Alleged manipulation of backlog numbers.* OCTC's Managing Director of Investigation John Noonen said during our interview that he believed Jayne Kim was manipulating her backlog numbers, but he expressed a fear of retaliation if Kim ever learned that he was making such accusations. We agreed with the working group that this matter was more appropriately addressed in some forum other than the present investigation.

## IV.    RECOMMENDATIONS

### A.    Joseph Dunn

Although certain other deficiencies in Dunn's performance would warrant counseling or reprimand only (such as his inattention to proper allocation of expenses between mandatory and

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 029
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

voluntary fees), Dunn's repeated failure to provide adequate or truthful information to the Board plainly provides an adequate basis to terminate his at will employment. Whether the Board should do so is a slightly different question, which requires evaluation of factors including how strongly Dunn has been performing in other ways—something as to which the Board has more information than we do. Nonetheless, however strong his performance has otherwise been, the nature of the misconduct involved here and the attitude Dunn showed when questioned by counsel could certainly justify termination.

Dunn repeatedly provided inadequate or inaccurate information to the Board in a way that undermined its ability to exercise its decision-making authority. He told (or implied to) the Board that no Bar funds would be used for the trip to Mongolia, when that was not the case. He failed to inform the Board about the Supreme Court's concerns regarding A.B. 852 that were highly relevant to a decision it was being asked to make about sponsoring the legislation. He misrepresented the Supreme Court's views about moving Bar operations to Sacramento even though the Board's discussions made plain to him that the Supreme Court's views were a central factor the Board was considering in making a hugely important decision for the Bar's future.

His truth-telling tendencies have also been called into question more generally based on how he described (or allowed to be described) to the Board Tom Miller's intentions about working in San Francisco, how he described to Luis Rodriguez his chances for a Judicial Council position, and how he described to Beth Jay and to us in his interview his disclosures to the Board about A.B. 852.

One piece of information that is often relevant to termination decisions of this kind is how effective and valuable the individual has been to the organization. Boards may be willing to tolerate more problems associated with an executive who is bringing huge value than with an executive who is a more average performer. The Board is far better able to judge the importance of Dunn's contributions to the Bar than we are. At the same time, two considerations are relevant to weighing this factor in the termination decision.

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 030
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

First, while Boards sometimes are willing to overlook or seek work-arounds for certain deficiencies in a high-performing executive, the deficiency of failing to be candid and truthful with the Board seems to strike at the very core of what a Board requires in its single employee.

Second, in assessing whether the problem is one that can be avoided in the future through reprimand or counseling, the Board should consider how Dunn responded on this issue when interviewed. It would be one thing if he were contrite and apologetic, acknowledging that his behavior in certain respects fell short of Board expectations. Dunn was the opposite: unapologetic, disingenuous, and (at least in one instance) untruthful. This reaction bodes ill for the possibility that future performance will be better.

Should it decide to do so, the Board plainly has the authority to terminate Dunn. Dunn's agreement provides that he is an at will employee who "serves at the pleasure and discretion of the Board and shall be terminable at will." Employment Agreement, § IV(C). "The Board as a whole has the authority to hire, supervise, and fire the Executive Director, and may do so through its designated leadership of Board President or other designate." Board Book Tab 18, Art. 3.

### B.     Peggy Van Horn and Financial Controls

Van Horn should be reprimanded for failing to perform her duties in accordance with applicable standards. There are constraints, however, on the extent to which the Board may do so directly.

Section 5 of the Rules and Regulations Pertaining to the Employment of Executive Staff Employees ("Exec. Staff Rules") provides: "Unless the Board has retained to itself the discretion to appoint or terminate an Executive Staff Employee, an Executive Staff employee serves at the pleasure of the State Bar and may be terminated, disciplined or demoted at will by the Executive Director." Exec. Staff Rules § 5(A) (emphasis added); see also Board Book, Tab 17, Art. 4, § 2 ("No personnel action . . . shall be undertaken without the approval of the Executive Director, or designee, through the Office of Human Resources."). The Board's Lines

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

PRIVILEGED AND CONFIDENTIAL

of Authority Policy Statement provides that the Board "may provide advice to the Executive Director to support her/his management, but will not assume the role of managing other staff members unless there is a compelling reason to do so. Such a step would be considered a temporary and emergency action." Board Book, Tab 18, Art. 3, p. 18.

If the Board decides that Van Horn should be reprimanded, we recommend that it instruct Dunn (or his replacement) to do so. If he refuses, the Board may (1) "assume the role of managing" Van Horn in light of the "compelling" concerns raised by the investigation's findings and Dunn's refusal to take appropriate action; and/or (2) take Dunn's conduct into account in his performance review and the re-negotiation of his contract.

Further, management should implement additional internal controls and/or training to ensure that State Bar funds are appropriately administered and accounted for in accordance with all legal requirements. Specifically, we recommend the following:

- All members of the Board, senior management, and any Office of Finance staff member responsible for auditing travel and business expenses should undergo training on the *Keller* requirements, as well as the business unit account codes applicable to chargeable versus non-chargeable expenses.

- At a minimum, management should ensure that travel expenses for the Mongolia trip are properly allocated to voluntary fees.

- The Board should instruct senior management to allocate each executive staff member with an individual business expense budget each year. These allocations should be included in the annual budget to be approved by the Board, and internal controls should be implemented to ensure that each executive staff member's business expenses are appropriately audited by the Office of Finance. The Executive Director's business expenses should be audited by the finance committee of the Board.

24870086.1

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 032
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

### C.   Thomas Miller

The Board should consider several matters with respect to Miller's position as General Counsel.

First, as noted above, unless it has changed its view, the Board should instruct Miller that it has always understood that he would spend a majority of his time in San Francisco indefinitely, and that it expects that practice to continue. It may deliver that feedback through the existing evaluation process. See Board Book Tab 18, Art. 3, p. 22 ("The General Counsel is subject to an annual performance review by both the Executive Director and the Board.").

Second, if the Board decides to reprimand but not terminate Dunn, it may want to revisit whether Miller is the best person for the General Counsel job. Having a strong General Counsel can act as a valuable check on a chief executive whose trustworthiness or candor has been called into question. Given the problems that have now come to light about Dunn, the Board may feel a greater need to have such a General Counsel in place than it did when Miller was hired, and it may question whether Miller is the right person if Dunn remains. Certainly, Miller failed to take action to correct the non-disclosure regarding AB 852 though he was in a position to do so, and his party-line explanation for failing to do so raises questions whether he has the gumption and independence to stand up to Dunn when the Board would want him to.

If the Board concludes that Miller should be replaced, we can discuss further at the Board meeting how to go about doing so. While the Executive Director must bring his or her choice for General Counsel to the Board for approval, it is unclear whether the Board has retained the discretion to dismiss someone from the General Counsel position. Compare Board Book Tab 18, Art. 1, § 7 (stating that Board must approve General Counsel hiring, but "otherwise all personnel decisions reside exclusively in the executive director"), with Board Book Tab 18, Art. 3, p. 17 ("The Executive Director will make recommendations for hiring and dismissal of these positions to the Board for their final approval.").

Finally, whoever continues in the role of General Counsel, the Board should reinvigorate the policy that the General Counsel reports directly to both the Board and the Executive Director.

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 033
22-CV-01616-BAS-DDL

PRIVILEGED AND CONFIDENTIAL

See Board Book, Tab 18 § 7 Authority of the General Counsel. The job description posted, and Miller's understanding of the reporting relationship, do not precisely track the stated policy. The Board should take steps to cultivate a direct relationship with the General Counsel and express an expectation that he or she perform a watchdog role.

### D.   Other Recommendations

1.   The State Bar should make a corrective public statement to clarify that Bar funds were in fact used for the Mongolia trip.

2.   The Board should adopt a policy that prohibits Bar employees from providing or offering to Board members during their terms of service assistance in professional matters unrelated to Bar activities and prohibits Board members from requesting such assistance.

3.   At some appropriate meeting, retreat, or other forum, the Board should receive from an outside expert training in protocols related to the proper conduct of independent investigations and should consider adopting written guidelines for the handling of such investigations in the future.

4.   The Board should instruct senior management how important it is to cultivate and maintain a public perception that the Bar represents all attorneys, and that no one law firm or segment of the bar has a special position. It should further instruct management that its conduct to date may have created an unhealthy perception that Girardi and his firm have special influence or receive special treatment – and that management should take steps to dispel and avoid contributing further to this perception in the future.

5.   The Board should instruct all senior management to ensure strict adherence to the Bar's competitive bidding and sole source requirements.

6.   Bar management should be instructed to conduct all Bar business through their official email accounts and not to use personal email addresses for such matters (as it appeared to us that Dunn did on many occasions).

ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT

Exhibit #1: 034
22-CV-01616-BAS-DDL