EXHIBIT 60



**The State Bar of California**

**OFFICE OF GENERAL COUNSEL**

180 Howard Street, San Francisco, CA 94105

TELEPHONE: 415-538-2000
FAX: (415) 538-2220
http://www.ca.bar.ca.gov

October 17, 2022

## ANTITRUST DETERMINATION 2022-0001

A. <u>Authority</u>

This determination is made pursuant to California Supreme Court Administrative Order 2017-09-20, which mandates that the State Bar Office of General Counsel provide a determination on issues submitted to it for resolution of potential antitrust concerns.

B. <u>Issue Presented</u>

<u>Request for Antitrust Determination</u>:  On September 17, 2022, Justin S. Beck ("Requestor") emailed a Request for Antitrust Determination on the State Bar to various individuals affiliated with the State Bar. His email message was addressed to the Chair of the State Bar Board of Trustees (BOT) and the Office of the General Counsel ("OGC").

The Request states as follows:

> This determination is to be made by the California Supreme Court or United States District Court where the pro se violations of federal antitrust laws exist and Office of General Counsel is controlled by active market participants in violation of federal law.

<u>Petition for Review</u>:  The accompanying "Petition for Review of Per Se + Alleged Antitrust Violations Presented by Member of the Public" ("Petition") was filed with the California Supreme Court on September 21, 2022 (Case No. S276517). On September 27, 2022, the California Supreme Court ordered the Petition stricken as premature.

The Petition's "Statement of Case" alleges that OGC and the BOT Board each lack direct oversight in regulation despite being controlled by a majority of active market participants. The Petition further alleges that "No state actor may claim sovereign immunity as of 2015 under binding decisional law of the highest Court of the United States." Petition, p. 2.

The Petition alleges that the State Bar "is not operated in a manner consistent with public statements made by the Chairman of the Board of Trustees. Ongoing patterns of conduct prejudicial to public, courts, and legal profession exist, each failing to objectively under the Court's own Rules of Professional Conduct (CRPC) which is binding upon every lawyer under Bus. and Prof. Cod. § 6077. It continues under color of law. CRPC 5.1" *Id.*

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 South Figueroa Street
Los Angeles, CA 90017

Exhibit #60: 002
22-CV-01616-BAS-DDL

Antitrust Determination 2022-0001
October 17, 2022
Page 2

Moreover, the Petition asserts that: "This Court must review because the horizontal trade of law, namely lawyer controlling $3.4 trillion gross state product annually cannot govern themselves as a matter of law. *They have not adequately governed themselves,* where no reasonable mind could differ, and anticompetitive conduct has become the rule rather than the exception. Where this Court lacked transparency before, the record is now overwhelming."

The Petition's Statement of Case lists various conclusions of fact about the State Bar, including that:

- The State Bar is controlled by the BOT and the OGC in a Unity of Interest;
- A majority of the BOT is comprised of active market participants in the horizontal market for legal services;
- The BOT substantially influences California and Interstate Commerce;
- The State Bar's divisions are controlled by active market participants;
- The BOT controls decisions by various offices of the State Bar;
- The BOT controls every aspect of the California Legal Industry

*Id.* at p. 3. No evidence or citations are offered to support these sweeping conclusions other than a footnote citing various appeals and "ROAs." How those matters relate to these allegations is not explained.

The Petition's Argument section states various legal conclusions citing *North Carolina State Board of Dental Examiners v. FTC* (2015) 547 U.S 494. To the extent it can be understood, the Petition appears to concern the handling of his complaints against attorneys submitted to the State Bar's Office of Chief Trial Counsel ("OCTC") that were not resolved to his satisfaction. The two Superior Court lawsuits Requestor references pertain to disputes with his attorneys and with the State Bar, given his dissatisfaction with how OCTC handled his complaints. *Id.* at p. 5. The Requestor also takes issue with various motions filed by OGC in those cases but fails to explain how responding to his complaints in a court of law amounts to a violation of the federal antitrust laws. *Id.* at 6.

The Petition also makes many references to allegations of racketeering, money laundering, wire fraud, and mail fraud. *Id.* at 7. Given that the allegations are not comprehensible and this Request is related explicitly to antitrust concerns, no response to such allegations is warranted or given in this Response. Should Requestor make such allegations in other proceedings, the State Bar reserves all rights to defend against such allegations that appear gratuitous.

As discussed below, Requestor's complaints about how OGC is responding to his civil complaints now pending in Superior Court do not fall within the scope of federal antitrust laws, and no order or decision therein is ripe for consideration by this Court. Whatever dissatisfaction he may feel about said litigation should be taken up with the Superior Court as appropriate or on appeal.

Antitrust Determination 2022-0001
October 17, 2022
Page 3

Moreover, this Request does not provide a premature appeal to the California Supreme Court of matters pending in the Superior Courts simply because Requestor is unhappy with the State Bar's positions. By its very nature, litigation involves parties with differing viewpoints. Such disagreements cannot form the basis of a federal antitrust complaint. Thus, the State Bar has tried to distill the Petition to the essence of the issue(s) raised related to antitrust concerns. At bottom, this appears to be a dissatisfaction with the State Bar's handling of Requestor's complaints against his attorneys. See Petition at p. 10.

    C.  <u>Analysis</u>

    1.  **Attorney Discipline Is State Action Immune From Antitrust Prohibitions.**

The U.S. Supreme Court has held that the antitrust laws do not apply to state legislative enactments, regardless of anti-competitive intent or effect. (*See, e.g., Parker v. Brown* (1943) 317 U.S. 341, 350-51 ["We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature."]; *Hoover v. Ronwin* (1984) 466 U.S. 558, 568-69 ["When the conduct is that of the sovereign itself . . . the danger of unauthorized restraint of trade does not arise. Where the conduct is that of the state legislature or supreme court, we do not need to address the issues of clear articulation and active supervision."].)  This immunity is known as the state action doctrine.

The State Bar is mandated by statute to investigate and recommend to the Supreme Court discipline of attorneys.[1] The State Bar's role in the attorney discipline process is merely precatory; the Supreme Court retains its inherent authority to regulate the practice of law and attorney discipline can only be effectuated by order of the Court.[2] The California Supreme Court

---

[1] (Bus & Prof. Code, § 6078 ["After a hearing for any of the causes set forth in the laws of the State of California warranting disbarment, suspension, or other discipline, the board has the power to recommend to the Supreme Court the disbarment or suspension from practice of members or to discipline them by reproval, public or private, without such recommendation."].)

[2] (*In re Rose* (2000) 22 Cal. 4th 430, 436 [93 Cal. Rptr. 2d 298, 302, 993 P.2d 956, 960] ["The State Bar Court exercises no judicial power, but rather makes recommendations to [the Supreme Court], which then undertakes an independent determination of the law and the facts, exercises its inherent jurisdiction over attorney discipline, and enters the first and only disciplinary order."]; *Brotsky v. State Bar of Cal.* (1962) 57 Cal. 2d 287, 301 [19 Cal. Rptr. 153, 160, 368 P.2d 697, 704] [holding "in matters of discipline and disbarment, the State Bar is but an arm of [the Supreme Court], and that this court retains its power to control any such disciplinary proceeding at any step."]; Bus & Prof. Code, § 6100 ["For any of the causes provided in this article, arising after an attorney's admission to practice, he or she may  be disbarred or suspended by the Supreme Court.  Nothing in this article limits the inherent power of the Supreme Court to discipline, including to summarily disbar, any attorney."]; State Bar of California Rules of Procedure, rule 5.120 ["Unless the Court orders otherwise, the State Bar court's final recommendation to suspend or disbar a member and the accompanying record will be sent to the Supreme Court after all applicable cost certificates have been filed, or an additional 30 days has expired, whichever is earlier."].)

Antitrust Determination 2022-0001
October 17, 2022
Page 4

has held explicitly that the discipline of California attorneys by the Court, acting on recommendation of the State Bar, is exempt from antitrust laws. (*Lebbos v. The State Bar of California* (1991) 53 Cal. 3d 37, 47 ["Our enforcement of disciplinary rules by suspending or disbarring an attorney is state action and, as such, is immune from Sherman Antitrust Act liability."].)

### D. Conclusion

Based on the foregoing analysis, there is no antitrust violation related to the State Bar's attorney discipline system, which falls within the immunity of the state action doctrine.

### E. Reviewability

OGC's determination of potential antitrust violations may be reviewed de novo by filing a petition with the California Supreme Court, pursuant to rule 9.13, subsections (d) through (f), California Rules of Court, **within 60 days of the date of this determination.**



# California Rules of Court

Print this page

Close this window when you finish printing

## (Revised January 1, 2022)

### Rule 9.13. Review of State Bar Court decisions

#### (a) Review of recommendation of disbarment or suspension

A petition to the Supreme Court by a licensee to review a decision of the State Bar Court recommending his or her disbarment or suspension from practice must be served and filed within 60 days after a certified copy of the decision complained of is filed with the Clerk of the Supreme Court. The State Bar may serve and file an answer to the petition within 15 days after filing of the petition. Within 5 days after filing of the answer, the petitioner may serve and file a reply. If review is ordered by the Supreme Court, the State Bar must serve and file a supplemental brief within 45 days after the order is filed. Within 15 days after filing of the supplemental brief, the petitioner may serve and file a reply brief.

*(Subd (a) amended effective January 1, 2019; previously relettered and amended effective October 1, 1973; previously amended effective July 1, 1968, December 1, 1990, and January 7, 2007.)*

#### (b) Review of recommendation to set aside stay of suspension or modify probation

A petition to the Supreme Court by a licensee to review a recommendation of the State Bar Court that a stay of an order of suspension be set aside or that the duration or conditions of probation be modified on account of a violation of probation must be served and filed within 15 days after a certified copy of the recommendation complained of is filed with the Clerk of the Supreme Court. Within 15 days after filing of the petition, the State Bar may serve and file an answer. Within 5 days after filing of the answer, the petitioner may serve and file a reply.

*(Subd (b) amended effective January 1, 2019; adopted effective October 1, 1973; previously amended effective December 1, 1990; and January 1, 2007.)*

#### (c) Review of interim decisions

A petition to the Supreme Court by a licensee to review a decision of the State Bar Court regarding interim suspension, the exercise of powers delegated by rule 9.10(b)-(e), or another interlocutory matter must be served and filed within 15 days after written notice of the adverse decision of the State Bar Court is mailed by the State Bar to the petitioner and to his or her counsel of record, if any, at their respective addresses under section 6002.1. Within 15 days after filing of the petition, the State Bar may serve and file an answer. Within 5 days after filing of the answer, the petitioner may serve and file a reply.

*(Subd (c) amended effective January 1, 2019; adopted effective December 1, 1990; previously amended effective January 1, 2007.)*

#### (d) Review of other decisions

A petition to the Supreme Court to review any other decision of the State Bar Court or action of the Board of Trustees of the State Bar, or of any board or committee appointed by it and authorized to make a determination under the provisions of the State Bar Act, or of the chief executive officer of the State Bar or the designee of the chief executive officer authorized to make a determination under article 10 of the State Bar Act or these rules of court, must be served and filed within 60 days after written notice of the action complained of is mailed to the petitioner and to his or her counsel of record, if any, at their respective addresses under Business and Professions Code section 6002.1. Within 15 days after filing of the petition, the State Bar may serve and file an answer and

California Rules of Court

brief. Within 5 days after filing of the answer and brief, the petitioner may serve and file a reply. If review is ordered by the Supreme Court, the State Bar, within 45 days after filing of the order, may serve and file a supplemental brief. Within 15 days after filing of the supplemental brief, the petitioner may serve and file a reply brief.

*(Subd (d) amended effective January 1, 2019; previously amended effective July 1, 1968, May 1, 1986, April 2, 1987, and January 1, 2007; previously relettered and amended effective October 1, 1973, and December 1, 1990.)*

### (e) Contents of petition

(1) A petition to the Supreme Court filed under (a) or (b) of this rule must be verified, must specify the grounds relied upon, must show that review within the State Bar Court has been exhausted, must address why review is appropriate under one or more of the grounds specified in rule 9.16, and must have attached a copy of the State Bar Court decision from which relief is sought.

(2) When review is sought under (c) or (d) of this rule, the petition must also be accompanied by a record adequate to permit review of the ruling, including:

(A) Legible copies of all documents and exhibits submitted to the State Bar Court or the State Bar supporting and opposing petitioner's position;

(B) Legible copies of all other documents submitted to the State Bar Court or the State Bar that are necessary for a complete understanding of the case and the ruling; and

(C) A transcript of the proceedings in the State Bar Court leading to the decision or, if a transcript is unavailable, a declaration by counsel explaining why a transcript is unavailable and fairly summarizing the proceedings, including arguments by counsel and the basis of the State Bar Court's decision, if stated; or a declaration by counsel stating that the transcript has been ordered, the date it was ordered, and the date it is expected to be filed, which must be a date before any action is requested from the Supreme Court other than issuance of a stay supported by other parts of the record.

(3) A petitioner who requests an immediate stay must explain in the petition the reasons for the urgency and set forth all relevant time constraints.

(4) If a petitioner does not submit the required record, the court may summarily deny the stay request, the petition, or both.

*(Subd (e) amended effective January 1, 2019; previously repealed and adopted by the Supreme Court effective December 1, 1990, and February 1, 1991; previously repealed and adopted effective March 15, 1991; previously amended effective January 1, 2007.)*

### (f) Service

All petitions, briefs, reply briefs, and other pleadings filed by a petitioner under this rule must be accompanied by proof of service of three copies on the General Counsel of the State Bar at the San Francisco office of the State Bar, and of one copy on the Clerk of the State Bar Court at the Los Angeles office of the State Bar Court. The State Bar must serve the licensee at his or her address under Business and Professions Code section 6002.1, and his or her counsel of record, if any.

*(Subd (f) amended effective January 1, 2019; adopted by the Supreme Court effective December 1, 1990; previously amended by the Supreme Court effective February 1, 1991; previously amended effective March 15, 1991, and January 1, 2007.)*

*Rule 9.13 amended effective January 1, 2019; adopted as rule 59 by the Supreme Court effective April 20, 1943, and by the Judicial Council effective July 1, 1943; previously amended and renumbered as rule 952 effective October 1, 1973, and as 9.13 effective January 1, 2007; previously amended effective July 1, 1976, May 1, 1986, April 2, 1987, December 1, 1990, February 1, 1991, and March 15, 1991.*

Exhibit #60: 007
22-CV-01616-BAS-DDL

10/16/22, 9:53 AM

California Rules of Court

42

Exhibit #60: 008
22-CV-01616-BAS-DDL

| | |
|---|---|
| **From:** | Randolph, Joan |
| **To:** | Retana, Robert |
| **Subject:** | FW: TrueFiling for Antitrust Review in California Supreme Court [CC: Federal Trade Commission] |
| **Date:** | Monday, September 19, 2022 7:04:00 AM |
| **Attachments:** | ReceivedAntitrustFile 9_17_22.pdf |
| | Antitrust form to OGC.pdf |

**From:** Justin Beck <justintimesd@gmail.com>
**Sent:** Saturday, September 17, 2022 10:01 AM
**To:** Grandt, Suzanne <Suzanne.Grandt@calbar.ca.gov>; Ruben Duran <ruben.duran@bbklaw.com>;
Duran, Ruben <Ruben.Duran@calbar.ca.gov>; hailyn.chen@mto.com;
AGelectronicservice@doj.ca.gov; electronicfilings@ftc.gov
**Cc:** Yarbrough, Amy <Amy.Yarbrough@calbar.ca.gov>; Randolph, Joan
<Joan.Randolph@calbar.ca.gov>; eric.garner@bbklaw.com; Davtyan, Ellin
<Ellin.Davtyan@calbar.ca.gov>
**Subject:** TrueFiling for Antitrust Review in California Supreme Court [CC: Federal Trade Commission]

> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

The State Bar of California
Board of Trustees
Chairman Ruben Duran
Office of General Counsel

Saturday, September 17, 2022

CC: Office of Attorney General for State of California and Federal Trade Commission

Mr. Duran and Counsel:

You are hereby served with the attached Antitrust Review filed with the California Supreme Court today. It will be electronically served via TrueFiling [duplicate], The Antitrust Review exhibits contain a binding United States decision from 2015, as well as Administrative Order 2017-09-20 from California Supreme Court that is instructive.

Where the Office of General Counsel for defendant The State Bar of California lacks objective capacity to make antitrust determinations and for good cause, I filed directly to CA Supreme Court and will follow up with FTC and/or United States Courts as needed.

Respectfully,

Justin S. Beck
**760-449-2509**

Exhibit #60: 009
22-CV-01616-BAS-DDL

Exhibit #60: 010
22-CV-01616-BAS-DDL



# The State Bar *of California*

## REQUEST FOR ANTITRUST DETERMINATION
### Pursuant to Supreme Court of California Admin. Order 2017-09-20

## Requester Information

Date  September 15, 2022

First Name  JUSTIN          Last Name  BECK

Organization  Public Interest; OCSC No. 30-2021-01237499 + No. 30-2020-01145998

Address  3501 ROSELLE ST

City  OCEANSIDE          State  CA          Zip Code  92056

Email  justintimesd@gmail.com     Phone  760-449-2509     Fax

It is the policy of the State Bar of California to comply with all laws. An important aspect of this policy is our commitment to obey the letter and the spirit of the antitrust laws. Pursuant to the Supreme Court of California's Administrative Order 2017-09-20, any member of the public may report a potential antitrust violation to the State Bar. When notifying the State Bar of your concerns, please include the following information:

- The nature of the potentially anticompetitive action;
- The department(s) or committee(s) of the State Bar undertaking the action;
- The specific type(s) of market impacts you believe may arise from that action; and
- Why you believe the State Bar does not enjoy immunity from antitrust laws for the action in question.

## Request for Antitrust Determination
*Please be as specific as possible. Attach additional sheets of paper as necessary.*

Please see the attached filing for Supreme Court.

This determination is to be made by the California Supreme Court or United States District Court where pro se violations of federal antitrust laws exist and Office of General Counsel is controlled by active market participants in violation of federal law.

## SUBMIT THIS FORM

1) *By E-mail*: AntitrustRequest@calbar.ca.gov   2) *By Mail*:

The State Bar of California
Office of General Counsel
Attn:  Antitrust Request
180 Howard Street
San Francisco, California  94105

Exhibit #60: 011
22-CV-01616-BAS-DDL

Case No. S_____

## IN THE SUPREME COURT OF CALIFORNIA

JUSTIN S. BECK,
Petitioner,

vs.

RUBEN DURAN,
Respondent,

CALIFORNIA SUPREME COURT, STATE BAR OF CALIFORNIA,
STATE OF CALIFORNIA, UNITED STATES OF AMERICA, ROES 1-
150,000, PUBLIC, COURTS, LEGAL PROFESSION et al.
Real Parties in Interest

## PETITION FOR REVIEW OF PER SE + ALLEGED ANTITRUST VIOLATIONS PRESENTED BY MEMBER OF PUBLIC

### SUBJECT TO SUPREME COURT ADMINISTRATIVE ORDER 2017-09-20 AND BINDING FEDERAL LAW AFTER 2015

AFTER DECISIONS BY THE BOARD OF TRUSTEES AND OFFICE

OF GENERAL COUNSEL FOR THE STATE BAR OF CALIFORNIA

**Service on Attorney General of The State of California and Federal Trade Commission Required by Antitrust Laws**

Justin S. Beck
*In Pro Per*
*Guardian Ad Litem for State of California, United States,*
*ROES 1-150,000, Public, Courts, and Legal Profession*
3501 Roselle St.  Oceanside, CA 92056
(760) 449-2509   justintimesd@gmail.com

*Document received by the CA Supreme Court.*

## STATEMENT OF CASE

Do The State Bar of California's operations violate federal antitrust laws?

## I. WHY REVIEW SHOULD BE GRANTED

In exercise of its inherent authority and obligations under federal law of the United States Supreme Court, this Honorable Court must conduct a de novo review then modify and/or reject policies, and/or operational decisions, and/or actions relating to the practice of law shown where State Bar actors continue to create and implicate antitrust/competition issues.

The State Bar of California, Office of General Counsel, Office of Chief Trial Counsel, and Board of Trustees each lack direct oversight in regulation despite being controlled by a majority of active market participants. No state actor shown may claim sovereign immunity as of 2015 under binding decisional law of the highest Court in the United States.

For whatever reason, The State Bar of California is not operated in a manner consistent with public statements made by Chairman Duran. Ongoing patterns of conduct prejudicial to public, courts, and legal profession exist, each failing objectively under this Court's own Rules of Professional Conduct (CRPC) which is binding upon every lawyer under Bus. & Prof. Cod. § 6077. It continues under color of law. CRPC 5.1.

This Court must review because the horizontal trade of law, namely, lawyers controlling $3.4 trillion gross state product annually *cannot* govern themselves as a matter of law. *They have not adequately governed themselves*, where no reasonable mind could differ, and anticompetitive conduct has become the rule rather than the exception. Where this Court lacked transparency before, the record is now overwhelming.

Document received by the CA Supreme Court.

2

## II. STATEMENT OF FACTS

*Per se* and alleged anticompetitive acts, fraud, oppression, and malice remain unanswered, undertaken by "discretion" or complete "immunity." [1]

A. The State Bar of California is Controlled by its Board of Trustees and its Office of General Counsel in a Unity of Interests ("Board")

B. Majority of Board Comprised of Active Participants in the Horizontal Professional Market for Services in Legal Markets

C. Board Substantially Influences California + Interstate Commerce

    1. Calfornia's Annual Gross State Product Est. $3.4 Trillion
    2. California Would Rank 5th as a Country in Global Economy

D. State Bar Divisions Controlled by Active Market Participants:

    1. Admissions
    2. Access and Inclusion
    3. Office of Chief Trial Counsel
    4. State Bar Court
    5. Office of General Counsel
    6. Executive Director's Office
    7. Board of Trustees

E. Decisions Controlled *Per Se* by Board Include:

    1. Office of Chief Trial Counsel
    2. Complaint Review Unit
    3. Defense of Civil Claims Against The State Bar of California
    4. Defense of Individual Government Actors for Alleged Fraud*
    5. Producing or Denying Public Records Requests
    6. Executive Director's Office and Board of Trustees
    7. Anti-Trust Determinations

F. Board Controls Every Aspect of California Legal Service Industry

---

[1] See Court of Appeal Nos. G059766, G058700, G059457. Rule 8.1115(b). See Case 1, ROA #2 with Case 2, ROA #49, ROA #60, ROA #103, ROA #107, ROA #111.

Document received by the CA Supreme Court.

## III. ARGUMENT

Petitioner respectfully and humbly submits this petition with the utmost urgency and objectivity requested of the Honorable Justices of the California Supreme Court. He built and judicially noticed a record of outrageous schemes advanced through anticompetitive conduct prejudicial to public interest under this Court's purview. See Case 1 and Case 2, generally. See ROA #677 in Case 1, ROA #103 in Case 2.

The issues involving the Board of Trustees and each respective division of The State Bar of California affect the entirety of the public, courts, and legal profession. They also affect commerce across state lines, under authority and "discretion" of State Bar. Unfortunately, and at issue with this petition, the conduct shows virtual certainty of continuing based on its recency, veracity without answer, and cumulative judicially noticed evidence from 2002-2022 from the California State Auditor and petitioner. Schemes show similar methods, actors, victims, beneficiaries with one common denominator. Without reasonable mitigation, severe public injuries will persist. CRPC 5.1.

California Supreme Court must use its authority in equity, and to uphold federal law restricting anticompetitive activity for <u>all divisions of The State Bar of California</u>. Parties bound to protect the public are shown to abuse official authority and public funding for corrupt motives of passion or interest. BPC § 6068. Absent complete adherence to federal law and actual supervision by State, the United States must act in the interests of a free and fair marketplace under the Sherman Act.

As a layman member of the public, petitioner does not purport to understand what this Court will or should do, but it must be resolute.

Document received by the CA Supreme Court.

4

**A. The State Bar of California and its Actors Lack Sovereign Status**
*N.C. State Bd. Of Dental Exam'rs. v. FTC,* 574, U.S _____,135 S.
Ct. 1101, 191 L.Ed.2d 35 (2015) ("Binding Antitrust Law")

Limits on state-action immunity are most essential when the State
seeks to delegate its regulatory power to active market participants [like
Duran, The State Bar of California, Board of Trustees, Office of Chief Trial
Counsel, State Bar Court, Office of General Counsel, Legislature,
Executive Director, law firms, lawyers in the horizontal profession or trade
controlled and regulated by the same persons without direct supervision by
State], for established ethical standards may blend with private
anticompetitive motives in a way difficult even for market participants to
discern. Binding Antitrust Law. Quoting *Goldfarb v. Virginia State Bar,*
421, U.S. 773, 791, 95 S. Ct. 2004, 44 L. Ed. 2d. 572 (1975).

The fact that the State Bar is a state agency for some limited
purposes does not create an antitrust shield that allows it to foster
anticompetitive practices for the benefit of its [licensees, public employees,
elected officials, Board of Trustees, Office of Chief Trial Counsel, IOLTA,
non-profits providing paid legal services through horizontal active market
participants, or law firms associated therewith, public or private]. *Id.*

**B. Private Anticompetitive Motives Shown Difficult for Active
Market Participants to Discern within All State Bar Divisions**

1. *Beck v. State Bar* et al. Sup. Ct. No. 30-2020-01145998 (Case 1)
2. *Beck v. State Bar* et al. Sup. Ct. No. 30-2021-01237499 (Case 2)

Petitioner shows active market participants' disregard for public
interest, and that most spending by the nonsovereign actor The State Bar of
California goes directly or indirectly to active market participants under its
control. See Court of Appeal G059766. See also ROA #60 in Case 2.

5

Document received by the CA Supreme Court.

Exhibit #60: 016
22-CV-01616-BAS-DDL

### C. State Bar Betrays Rules of Professional Conduct (BPC § 6077)

1. <u>CRPC 1.7(d)(3) Governs Unwaivable Conflict</u>

2. <u>CRPC 5.1 Governs Supervisory Lawyer, Law Firm Conduct</u>

3. <u>CRPC 8.4 Governs Willful Violations, Enablement of Violations</u>

For whatever reason, intended or not, State Bar actors defend operational conduct with decisional law pre-dating Government Claims Act of 1963 and notably after the **fundamental tenets** of *Muskopf* in 1961. Petitioner shows that "Complaint Review Unit" and "In Re: Walker," while perhaps well intended, were converted to conceal, apply non-existent discretion in equity or law, and to <u>enable</u> anticompetive conduct. Intentions of Legislature passing AB 3249, legal scholars shaping Rules of Professional Conduct and State Bar Act, and framers of the United States Constitution are subordinate to anticompetitive acts veiled by "discretion."

Petitioner incorporates the records in Case 2 namely ROA #103 p. 21-59 and ROA #49 as being what was actually known by State Bar actors before and after September 14, 2018. See also Case 1, and G059766.

Petitioner incorporates the records in Case 2 namely ROA #85 with cited exhibits on State Bar operations from 2002-2022 by official reports of State Auditor to State leadership including Report 2022-030; Case 2 ROA #101 showing ongoing fraud, oppression, legal malice, and/or corruption prejudicial to petitioner, public, courts, legal profession; ROA #103, leading to abuse of CCP § 425.16 as shown ROA #139; all summarized in ROA #107 and shown further in ROA #111, ROA #121 as to recent acts.

The Court of Appeal's findings (G059766) specific to petitioner are but a microcosm of broader anticompetitive conduct shown. Respectfully, this is not rhetoric. Evidence remains unanswered, deliberately delayed. Petitioner shows "demurrers" and "Anti-SLAPP" are also abused by Duran.

6

Document received by the CA Supreme Court.

### D. State Bar Violates Decisions from California Supreme Court

1. *Muskopf* (1961) (after *Walker*, after *Bollotin*) is Binding

Having pled and shown this already, petitioner incorporates by reference his operative complaint in Case 1 under ROA #2 and Case 2 under ROA #60. Petitioner specifically cites Government Claims Act cases, and the (necessary) distinction between operational and policy decisions.

Shown by Petitioner, undisputed by Respondent, State Bar actors purport to have absolute immunity for *any act* undertaken in *any capacity*. Unanswered conduct meets the federal definition of racketeering activity. See Case 1, Case 2. IOLTAs have been shown to be used for money laundering, wire fraud, and mail fraud. See Case 2, ROA #85, and exhibits. See also Case 1 ROA #677 and Case 2 ROA #103. See Court of Appeal G059766, with selections of G058700 and G059457 as to petitioner, courts.

2. *Baral* (2016) inc. Fundamental Tenets of CCP § § 425.16, 425.17

Even after petitioner overturned Anti-SLAPP rulings in the Court of Appeal citing *Baral*, Duran used CCP § 425.16 to intimidate, conceal, and delay discovery. See Case 2, ROA #165 under CCP 128.7. See also ROA #139, ROA #141 for petitioner opposition to defective papers from Duran.

3. *Brown v. USA Taekwondo* (2021); Special Relationship Doctrine

Duran misunderstands this Court's direction in *Guzman* as if it were dispositive of all duties or claims from the public, without regard for *Muskopf*, nor *Rowland's* implications, AB 3249, or the Court's recent direction in *Brown v. USA Taekwondo* in 2021. The point is that members of the public, courts, and legal profession *rely* on Duran to remain objective and neutral, just as with a Court. The Government Claims Act exists to impose liability for damages done where no immunity exists. Here, no immunity exists after 2015, and administrative action is needed.

7

Document received by the CA Supreme Court.

**E. Duran Abuses CCP § 425.16 in Favor of Active Market Participants and to Induce Signatures via Threat of Legal Fees**

Abuse of 425.16 is plead, shown in Case 2 ROA #60. Orders overturned three times in Court of Appeal No. G059766 in Case 1 show State Bar actors are substantial factors in eleven combined causes of action arising from conduct that is <u>not protected</u>, malicious prosecution of three lawsuits and counting, and several predicate and parallel schemes to defraud via mail/wire with actual knowledge and full authority of active market participant State Bar actors before and after September 14, 2018. See Case 2, ROA #103, p. 21-59 and ROA #141, and ROA #165. See also Case 1, ROA #677 and ROA #678. *This conduct is anticompetitive.*

**F. State Policy Lacks Clear Communication or Articulation for the Purpose of Anticompetitive Conduct Involving State Bar Actors**

Were conduct prejudicial to public, courts and legal profession objectively reasonable in the first instance to claim any form of immunity – such immunity would require a showing of adherence to Binding Anti-Trust Law. GOV 815.6. GOV 815.3. While this Court can act in reasonable mitigation through its administrative powers, petitioner believes a deliberate gap exists in the legal profession concerning malpractice, opposition to CCP § 425.16; application of EVID § 956 for good cause; CCP § 128.5 and CCP § 128.7 on a presumption of State Bar competence; or the confines of litigation privilege as it relates to malicious prosecution under common law and enactments more specific than the privilege itself. Put simply, where the Court seeks to enable free speech and the right of petition to redress grievances in a neutral Court, the same requires strict oversight of the very means of redress in the active market at issue. CCP § 425.17. The Board is a substantial factor (CACI 430) in *all lawyer conduct* and the conduct is out of control.

8

Document received by the CA Supreme Court.

**G. Active Market Market Participants Distributing, Converting Funds**

Most, if not all, funding to nonsovereign The State Bar of California goes to horizontal market partcipants within the legal profession that it purports to regulate under absolute discretion and immunity. See Case 2, ROA #49, ROA #79, ROA #119, ROA #128, ROA #139, ROA #141, ROA #161, ROA #180, ROA #184. See also State Bar Strategic Plan 2022-2027. See also State Bar Adopted Budget February 28, 2022. BPC § 6140.10. See also exhibits in support request for review.

    1. <u>State Bar to Receive $52 million via IOLTA Proceeds in 2023</u>

    2. <u>State Bar Pays Most of its Revenue to Active Market Participants</u>

    3. <u>State Bar Invests IOLTA Proceeds to Active Market Participants</u>

    4. <u>State Bar Distributes Aid Funding to Active Market Participants</u>

**H. Court Must Invoke Administrative Powers Immediately**

While prosecuting two civil cases against State Bar actors, petitioner identified the multi-faceted role that Office of General Counsel plays to misdirect, conceal, and obscure operations of State Bar from this Court.

On July 20, 2022, responding to several formal requests of the Chairman Ruben Duran in his capacity for The State Bar of California and in his concurrent capacity as a private law firm partner at Best Best & Krieger under BPC 6077, CRPC 5.1 and CRPC 8.4, Mr. Duran made an evidentiary showing with Office of General Counsel's Suzanne Grandt that undermines virtually *everything* that The State Bar of California reports, says, or does. State Bar actors are like anticompetitive excuse factories.

Chairman Ruben Duran is misrepresenting the operations of public agency The State Bar of California to the public and this Court. The conduct is violative of Binding Antitrust Law on its face (per se). State Bar actors disregard the law as if it were reasonable. CRPC 1.7. CRPC 8.4.

9

Document received by the CA Supreme Court.

## I. Petitioner Seeks Relief for ROES 1-150,000 Who Cannot Help Themselves Due to Rule 9.40, Binding Antitrust Law Violations

From 2012-2022, as shown by investigations into Girardi, Catanzarite, and Auditor reports – virtually any person who seeks protection from State Bar fails to receive reasonable exercise of care under GOV 815.2, *Brown v. USA Taekwondo* (2021). Very few receive "damages" done to them, which usually requires the retention of yet *another active market participant*. Petitioner shows <u>absolute disregard</u> for up to 150,000 ROES, being those who submitted complaints that were spuriously closed at intake, like those targeting the 700 lawyers identified by State Auditor with 4+ complaints who are in fact benefiting from public funding and State Bar's anticompetitive behavior. Petitioner is attorney-in-fact *guardian ad litem* to those who have been unreasonably injured by anticompetitive conduct undertaken with at least legal malice by State Bar.

Petitioner should be granted permission under this Court's inherent authority over the practice of law in California to file claims in trial court for ROES 1-150,000 in Case 2, failing settlement. The State Bar of California is not permitted to engage in, ratify, or enable public employees, elected officials, nonsovereign actors, or active market participants within the profession it regulates to lie, cheat, steal, defraud, and unlawfully take from persons outside of the horizontal profession of law. It must end.

Petitioner suggests California State Auditor act as direct supervisor under Binding Antitrust Law to assess damages shown for ROES 1-150,000, that this Court expressly permit petitioner to present trial claims for those who cannot help themselves in Case 2, or petitioner be allowed to submit to Legislative committee for appropriations if the Courts are in fact so compromised that ROES 1-150,000 are denied a neutral forum entirely.

10

Document received by the CA Supreme Court.

## IV. CONCLUSION

Office of General Counsel (once) had a role in assessing anticompetitive activity undertaken by State Bar actors. Now, it lacks objective capacity to review or comment on petitioner's showings. CRPC 1.7. RICO § 1962. Binding Antitrust Law. Sherman Act.

Petitioner concedes conduct may have been concealed or misrepresented to this Court and its Honorable Justices previously despite its best efforts. Overwhelming evidence is since judicially noticed for the Court to consider objectively in its administrative capacity. See Case 1. See Case 2. Where fundamental rights of persons are actually being compromised and converted into real, perceived, undue, implied consideration or benefit, whether directly or indirectly, in any way toward active market participants, there are no band-aids. The Court must act.

WHEREFORE, Petitioner prays this Honorable Court:

1) Review Case 1, Case 2, and Duran's decisions related thereto

2) Direct State to supervise State Bar in accordance with federal law

3) Permit petitioner to file discipline cases to Supreme Court directly

4) License petitioner to file ROES 1-150,000 claims in Case 2 trials

5) Enjoin Duran, State Bar actors from violating RICO § 1962(a)-(d)

6) Enjoin State Bar from further violating Binding Antitrust Law

7) Grant a hearing to petitioner if this request fails to show cause

September 16, 2022

Very Respectfully Submitted,

_____

Justin S. Beck, petitioner, *In Pro Per*

11

Document received by the CA Supreme Court.



# The State Bar *of California*

## REQUEST FOR ANTITRUST DETERMINATION
### Pursuant to Supreme Court of California Admin. Order 2017-09-20

### Requester Information

Date  September 15, 2022

First Name  JUSTIN        Last Name  BECK

Organization  Public Interest; OCSC No. 30-2021-01237499 + No. 30-2020-01145998

Address  3501 ROSELLE ST

City  OCEANSIDE        State  CA        Zip Code 92056

Email  justintimesd@gmail.com        Phone  760-449-2509        Fax

It is the policy of the State Bar of California to comply with all laws. An important aspect of this policy is our commitment to obey the letter and the spirit of the antitrust laws. Pursuant to the Supreme Court of California's Administrative Order 2017-09-20, any member of the public may report a potential antitrust violation to the State Bar. When notifying the State Bar of your concerns, please include the following information:

- The nature of the potentially anticompetitive action;
- The department(s) or committee(s) of the State Bar undertaking the action;
- The specific type(s) of market impacts you believe may arise from that action; and
- Why you believe the State Bar does not enjoy immunity from antitrust laws for the action in question.

### Request for Antitrust Determination

*Please be as specific as possible. Attach additional sheets of paper as necessary.*

Please see the attached filing for Supreme Court.

This determination is to be made by the California Supreme Court or United States District Court where pro se violations of federal antitrust laws exist and Office of General Counsel is controlled by active market participants in violation of federal law.

*Document received by the CA Supreme Court.*

### SUBMIT THIS FORM

1) *By E-mail:* AntitrustRequest@calbar.ca.gov    2)  *By Mail:*
The State Bar of California
Office of General Counsel
Attn:  Antitrust Request
180 Howard Street
San Francisco, California  94105

Exhibit #60: 023
22-CV-01616-BAS-DDL

 **Gmail**

Justin Beck <justintimesd@gmail.com>

## Justin S. Beck v. State Bar of California, et al.; Orange County Superior Court Case No. 30-2021-01237499-CU-PN-CJC

**Justin Beck** <justintimesd@gmail.com>                                                      Fri, Jul 29, 2022 at 5:06 PM
To: "Randolph, Joan" <Joan.Randolph@calbar.ca.gov>
Cc: "Andresen, Carissa" <Carissa.Andresen@calbar.ca.gov>, "Grandt, Suzanne" <Suzanne.Grandt@calbar.ca.gov>
Bcc: fbi_ncra_duty@fbi.gov, Michael Esola <mesola@ficto.tv>

July 29, 2022

California State Auditor Whistleblower Case No. I2022-1019

Defendant The State Bar of California (served FAC on May 2, 2022)
Defendant Joy Nunley (served FAC on May 2, 2022)
Defendant Anand Kumar (served FAC on May 2, 2022)
Defendant Eli David Morgenstern (served FAC on May 2, 2022)
Defendant DOES 1-27 (each acting in an official capacity, served FAC on May 2, 2022)
Defendant Carissan Andresen (former DOE, no order needed, served FAC on May 2, 2022)
Defendant Ruben Duran (former DOE, no order needed, served FAC on May 2, 2022)
Defendant Suzanne Grandt (former DOE, no order needed, served FAC on May 2, 2022)

Counsel:

Your motion under CCP 425.16 is untimely (at minimum) and another act of deliberate disregard for public equity and my rights. I will defeat it if we see a Court hearing after October 4, 2022 in this matter. I am not withdrawing *anything*. Violations of the Rules of Professional Conduct are not protected activity (nor is fraud or criminal conduct). You do not intimidate me. Apparently you misunderstand not only the Government Claims Act, but the law upon which this motion is based, too.

How is your <u>untimely</u> Anti-SLAPP filed after a motion for summary judgment hearing is scheduled and fully briefed by me for October 4, 2022 hearing? The action was served on May 2, 2022. The conduct doesn't arise from protected activity -- as evidenced by the government claim and virtually everything else in this action. Your demurrer is floating in the wind, too. You seek to dispose of a case on more than one law that you don't understand.

The mere fact that you, a defendant in this case on behalf of the government, are threatening me with legal fees is malicious under the circumstances. You've already enabled serial fraud all the way up to Chairman Duran as recently as this month in an official capacity. This is unconscionable, and your confidence in immunities or procedural mechanisms is misplaced. This is not what Anti-SLAPP was for. I'm going to move that you are sanctioned for the Anti-SLAPP motion itself when I move to strike your demurrer for the same reasons. These motions just give me more pages to move the Court against your untenable defenses to expedite a jury trial if I'm not awarded summary judgment.

The forum of courts in the United States are PRIVATE, and the speech therein is REGULATED by the same laws you enforce for some but avoid for yourselves (and a special list for reasons that should be clear to any person acting reasonably).

The overall acts of government are NOT beyond claims in tort or intentional tort (namely -- the acts of each of you). The conduct upon which my claims are based are not rooted in protected activity -- rather -- they arise from conduct meeting the federal definitions of racketeering activity. The very **appellate court for the district in which this case is in trial court has already overturned Anti-SLAPP rulings because I showed a likelihood of prevailing on the merits for malicious prosecution (three lawsuits), slander of title, unfair business practices, and intentional infliction of emotional distress under your watch. You actually know of the same evidence, and the final rulings associated with them.**

For this <u>civil</u> matter, my only burden (by a preponderance, to be clear) is to show that any official actor for State Bar, or any violation of any duty in law designed to protect me, was a substantial factor in my injuries. And/or that the intentional infliction of emotional distress or conversion was. You think the Court is going to uphold an untimely Anti-SLAPP motion on the grounds in your motion set for hearing December 27, 2022?

*Document received by the CA Supreme Court.*

Exhibit #60: 024
22-CV-01616-BAS-DDL

The "fraud" provisions are codified under CRPC, federal law, bar litigation privilege under CCP 47, and have no reach through this section of law. You don't even have attorney-client privilege where I've shown EVID 956 to apply.

**CCP 425.16 was designed to prevent strategic lawsuits against public participation. This lawsuit is public participation in a matter arising from willful oppression, fraud, dereliction of duty, legal malice, actual malice, and civil rights violations. I'm going to** *eviscerate* **this frivolous motion in Court and use it as evidence of your lack of capacity.**

This is another bad faith action or tactic to avoid discovery of your acts of fraud, and to suppress evidence.  I already defeated a series of Anti-SLAPP rulings in the trial court filed by your licensees, under your control. Good luck with these arguments. They are unreasonable.

I'll seek other means to reduce your deliberate, unnecessary delays or see you on October 4, 2022 in any event. This is a new low for the State Bar / Complaint Review Unit / Client Security Fund / Government Protection Agency / Regulators of Law or whatever role you purport to be playing at this point in time.

By the way... If you don't want to produce anything in discovery, I've already made clear to the Court that I expected this conduct. It isn't going to delay anything on my end. I've also noticed you of my pending action in federal court, and desire for a referee for discovery and relation of the state action for judicial efficiency. I'm not waiting until October (or December, for that matter) to get more facts from you and your conspirators.

Thank you,

Justin Beck


[Quoted text hidden]
--
===========
**Justin Beck**
**760-449-2509**

*This email is informational and planning purposes only and does not constitute an offer or solicitation to sell shares or securities in any company (the "Company"). Any offer or solicitation will be made only by means of a confidential Offering Memorandum and in accordance with the terms of all applicable securities and other laws. None of the information or analyses presented are intended to form the basis for any investment decision, and no specific recommendations are intended. Accordingly, this email does constitute investment advice or counsel or solicitation for investment in any security. This email or its contents and attachments do not constitute or form part of, and should not be construed as, any offer for sale or subscription of, or any invitation to offer to buy or subscribe for, any securities, nor should it or any part of it form the basis of, or be relied on in any connection with, any contract or commitment whatsoever. The Company and Justin Beck expressly disclaim any and all responsibility for any direct or consequential loss or damage of any kind whatsoever arising directly or indirectly from: (i) reliance on any information contained in this email or its attachments, (ii) any error, omission or inaccuracy in any such information or (iii) any action resulting therefrom. The Company and Justin Beck make no warranties or representations on the ability to finalize any initiatives outlined within this email or its attachments. This information is being provided upon request only.*

Document received by the CA Supreme Court.

Exhibit #60: 025
22-CV-01616-BAS-DDL

SUPREME COURT
# FILED

SEP 2 6 2017

Jorge Navarrete Clerk

Deputy

ADMINISTRATIVE ORDER 2017-09-20

# IN THE SUPREME COURT OF CALIFORNIA

## EN BANC

## STATE BAR ANTITRUST POLICY

Document received by the CA Supreme Court.

## PREAMBLE

The California Supreme Court has the inherent authority to regulate the practice of law in this state. The State Bar of California is the administrative arm of the Supreme Court for attorney licensing, regulation, and discipline. The State Bar acts under the authority and at the direction of the Supreme Court in these matters. The Supreme Court's authority over the State Bar includes the authority to review State Bar actions for antitrust issues and impacts on competition. The Supreme Court, in the exercise of its inherent authority, may conduct a de novo review and may modify or reject any policy or action of the State Bar relating to the regulation of the practice of law, including any that may implicate antitrust and competition issues.

Antitrust laws are designed to promote vigorous and fair competition in the marketplace of competitors and to provide consumers with the best combination of price and quality. The antitrust laws are set forth in the Sherman Act, Federal Trade Commission Act, the Clayton Act, and the Robinson-Patman Act, among other statutes. These laws prohibit anticompetitive activities, including price fixing, attempts to monopolize, and other unreasonable restraints on trade. Unless

1

Exhibit #60: 026
22-CV-01616-BAS-DDL

otherwise lawfully mandated by the California Legislature or the California Supreme Court, the State Bar must take no action in violation of the antitrust laws.

Although focused on private conduct, antitrust laws may apply to public entities under certain circumstances.  When the action complained of is that of a sovereign arm of the state (such as a state legislature or a state Supreme Court acting in a legislative capacity), the state as a sovereign may enjoy immunity from the antitrust laws, notwithstanding any impact on competition.  (*N.C. State Bd. of Dental Exam'rs v. FTC* (2015) __ U.S. __, __ [135 S.Ct. 1101, 1110]; *Hoover v. Ronwin* (1984) 466 U.S. 558, 567-568.)

The State Bar is a public licensing and regulatory entity that acts under the authority lawfully delegated to it by the sovereign arms of the State of California: the Supreme Court and the Legislature.  The United States Supreme Court has held that, under certain circumstances, state licensing entities or boards must prove two elements before they may invoke the state action doctrine:  first, the challenged restraint has been adopted pursuant to clearly articulated state policy; and second, the policy is being actively supervised by a state official (or state agency) that is not a participant in the market that is being regulated.  (*N.C. State Bd. of Dental Exam'rs v. FTC, supra*, 135 S.Ct. at p. 1110; see also Fed. Trade Com., FTC Staff Guidance on Active Supervision of State Regulatory Boards Controlled by Market Participants (Oct. 2015) <https://www.ftc.gov/system/files/attachments/competition-policy-guidance/active_supervision_of_state_boards.pdf.> [as of Sept. 20, 2017].)

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

2

Document received by the CA Supreme Court.

# ORDER

Pursuant to this court's authority over the State Bar, the court hereby orders the State Bar's adherence to the antitrust policy and guidelines below.

## I. ANTITRUST POLICY

The State Bar must conform to the highest standards of conduct and promote the principles of fair and open competition in all of its policies and actions in pursuit of its overarching public protection mission. Actions of the State Bar that have the effect of advancing the interests of attorneys without a clear benefit to the public must be scrutinized closely for potential antitrust violations. This antitrust policy is intended to assist in the identification and analysis of potential antitrust issues and the compliance with antitrust laws by all employees, entities, and committees that comprise the State Bar. Given the important public mission of the State Bar to enforce and uphold the law, the identification and analysis of any potential antitrust issue must be robust.

It is the responsibility of the State Bar Office of the General Counsel (OGC) to monitor antitrust issues for the State Bar. If any person has a question as to whether a proposed or current State Bar course of action implicates antitrust concerns, the matter should be submitted to OGC. OGC must analyze the matter thoroughly and determine whether the action implicates antitrust concerns. OGC's determinations may be reviewed de novo by the California Supreme Court in accordance with the Supreme Court's procedures. Any action determined by OGC to implicate antitrust concerns may not be implemented unless the Supreme Court determines the action may proceed.

## II. GUIDELINES FOR IDENTIFYING AND ADDRESSING POTENTIAL ANTITRUST ISSUES AT THE STATE BAR

### A. Actions that Have Anticompetitive Effects May Implicate the Antitrust Laws

The threshold inquiry in antitrust analysis is whether an action has an effect that could impact competition or could be an unreasonable restraint of trade in the market for legal services. Unreasonable restraints on trade generally: raise prices; reduce output; diminish quality; limit choice; or create, maintain, or enhance market power. Anticompetitive practices may arise when a state empowers a group of active market participants to decide who can participate in its market and on what terms.

3

Document received by the CA Supreme Court.

If the action or proposed action does not affect competition or has only a de minimis impact, the antitrust laws are not implicated. Courts have held that individualized decisions on admissions or discipline do not impact overall competition in the market to sufficiently raise antitrust concerns. A number of the State Bar's public protection programs have no foreseeable impact on competition in the market for legal services, e.g., the Client Security Fund (compensation of victims), the Lawyer Assistance Program (counseling services for attorneys), and the Commission on Judicial Nominees Evaluation (advisory role to the Governor).

## B. The Role of the California Supreme Court Must Be Analyzed

### 1. California Supreme Court as Final Decision Maker

The California Supreme Court enjoys immunity from the antitrust laws when it acts in its sovereign legislative capacity, such as when it adopts the Rules of Professional Conduct. (*Bates v. State Bar of Arizona* (1977) 433 U.S. 350, 360.) Where the State Bar makes only recommendations to the Supreme Court, and the Supreme Court makes the final decision after the opportunity for a de novo review of the recommendation, the actions are those of the state and may be immune from the antitrust laws, notwithstanding any impact on competition. (See, e.g., Supreme Court Order Approving Modifications to the Cal. Bar Exam, S232907, Mar. 16, 2016.)

The California Supreme Court often exercises its inherent authority to modify or disapprove proposed rules recommended by the State Bar. (See, e.g., Supreme Court Order re Request for Approval of Amends. to Rule 5-110 and Rule 5-220 of the Rules of Professional Conduct of the State Bar of Cal., S239387, May 1, 2017 [granting in part request for approval of recommended amendments to the Rules of Professional Conduct; denying in part and remanding to State Bar to develop further recommendations].)

### 2. Actions and Decisions of the State Bar

If an action of a regulatory agency such as the State Bar has a potential anticompetitive effect, and is not an action of the Supreme Court or the Legislature acting as sovereign, closer analysis will be required. Under these circumstances antitrust immunity is available only if the regulatory entity's action is subject to *active state supervision* and is undertaken pursuant to a *clearly articulated state policy*.

(a) **Active State Supervision:** Federal Trade Commission staff has issued nonbinding advisory guidelines stating that the following factors should

4

Document received by the CA Supreme Court.

be considered in determining whether the active supervision requirement is met:

    (i)    Whether the state supervisor of the regulatory entity has obtained the information necessary for a proper evaluation of the action approved by the regulatory entity.

    (ii)    Whether the state supervisor has evaluated the substantive merits of the regulatory entity's action and assessed whether it comports with the standards established by the Supreme Court or the Legislature.

    (iii)    Whether the state supervisor has issued a written decision approving, modifying, or disapproving the regulatory entity's action and explaining the reasons and rationale for such decision.

(b) **Clearly Articulated State Policy**:  When undertaking action that may be anticompetitive, the regulatory entity must also act pursuant to a clearly articulated state policy of the Supreme Court or Legislature to displace competition.

Example:  A state bar could be in violation of the antitrust laws if it acts in an anticompetitive manner outside of a clearly articulated state policy.  In *Goldfarb v. Virginia State Bar* (1975) 421 U.S. 773, the Virginia State Bar took action to enforce a minimum fee schedule for lawyers that had not been authorized by the Virginia Supreme Court. The Virginia Supreme Court had not supervised this anticompetitive action, nor was there any clearly articulated statutory or court policy authorizing enforcement of the fee schedule.  The United States Supreme Court held the Virginia State Bar's actions constituted illegal price fixing and were not immune from the antitrust laws.

(c) **Detailed Statute or Rule of Court**:  The active state supervision and clearly articulated state policy requirements are met when the applicable statute or Rule of Court is so detailed and prescriptive as to remove the regulatory entity's discretion.  The detailed legislation or court rule itself articulates the policy and satisfies the supervision requirement. (98 Ops.Cal.Atty.Gen. 12 (2015).)

Example:  The State Bar is required by law to place on inactive status attorneys who fail to comply with mandatory continuing legal education requirements. (Bus. & Prof. Code, § 6070, subd. (a); Cal. Rules of Court, rule 9.31(d).)  Although the State Bar's actions to remove these

Document received by the CA Supreme Court.

5

attorneys from practice temporarily may impact competition, such actions are only a ministerial activity to enforce the statute and likely would not violate the antitrust laws.

## C.  State Bar Personnel Must Report Potential Antitrust Violations Immediately

### 1.  Sensitive Topics

Actions such as collusion among attorneys to fix prices, limit market entry, or otherwise limit competition, whether or not under the auspices of the State Bar, violate the antitrust laws.  Meetings convened by the State Bar often involve groups of attorneys who may be considered competitors in the marketplace under the antitrust laws, and discussions in such meetings of price or costs, such as prevailing hourly billing rates and associate or staff salaries, may implicate antitrust concerns.  The State Bar may not take actions that have an anticompetitive effect on the marketplace unless authorized by law.

### 2.  Mandatory Reporting

State Bar personnel must comply with the antitrust laws and must immediately report to OGC potential antitrust violations, including but not limited to potential violations caused by actions of the State Bar or the Board of Trustees. In the event OGC reviews a current or proposed action, program, or policy decision and opines there is no potential antitrust violation, OGC remains obligated to forward its analysis to the California Supreme Court, which may choose whether to review the action, program, or policy decision as it deems appropriate.

## D.  Potential Antitrust Violations Reported by Members of the Public

Any member of the public may report a potential antitrust violation to the State Bar.  The State Bar's determinations on reports of potential antitrust violations brought by members of the public are subject to review by the California Supreme Court in accordance with the Supreme Court's procedures. (Cal. Rules of Court, rule 9.13(d), (e).)

//
//
//
//
//
//
//

6

Document received by the CA Supreme Court.

Exhibit #60: 031
22-CV-01616-BAS-DDL

This order is final forthwith.

**CANTIL-SAKAUYE**
_____
*Chief Justice*

**CHIN, J.**
_____
*Associate Justice*

**CORRIGAN, J.**
_____
*Associate Justice*

**LIU, J.**
_____
*Associate Justice*

**CUÉLLAR, J.**
_____
*Associate Justice*

**KRUGER, J.**
_____
*Associate Justice*

_____
*Associate Justice*

Document received by the CA Supreme Court.

7

Case 3:22-cv-01616-AGS-DDL   Document 15-16   Filed 01/30/23   PageID.3029   Page 33 of 140

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NORTH CAROLINA STATE BOARD OF DENTAL EXAMINERS *v.* FEDERAL TRADE COMMISSION

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 13–534.   Argued October 14, 2014—Decided February 25, 2015

North Carolina's Dental Practice Act (Act) provides that the North Carolina State Board of Dental Examiners (Board) is "the agency of the State for the regulation of the practice of dentistry." The Board's principal duty is to create, administer, and enforce a licensing system for dentists; and six of its eight members must be licensed, practicing dentists.

The Act does not specify that teeth whitening is "the practice of dentistry." Nonetheless, after dentists complained to the Board that nondentists were charging lower prices for such services than dentists did, the Board issued at least 47 official cease-and-desist letters to nondentist teeth whitening service providers and product manufacturers, often warning that the unlicensed practice of dentistry is a crime. This and other related Board actions led nondentists to cease offering teeth whitening services in North Carolina.

The Federal Trade Commission (FTC) filed an administrative complaint, alleging that the Board's concerted action to exclude nondentists from the market for teeth whitening services in North Carolina constituted an anticompetitive and unfair method of competition under the Federal Trade Commission Act. An Administrative Law Judge (ALJ) denied the Board's motion to dismiss on the ground of state-action immunity. The FTC sustained that ruling, reasoning that even if the Board had acted pursuant to a clearly articulated state policy to displace competition, the Board must be actively supervised by the State to claim immunity, which it was not. After a hearing on the merits, the ALJ determined that the Board had unreasonably restrained trade in violation of antitrust law. The FTC again sustained the ALJ, and the Fourth Circuit affirmed the FTC in

Document received by the CA Supreme Court.

Exhibit #60: 033
22-CV-01616-BAS-DDL

all respects.

*Held:* Because a controlling number of the Board's decisionmakers are active market participants in the occupation the Board regulates, the Board can invoke state-action antitrust immunity only if it was subject to active supervision by the State, and here that requirement is not met. Pp. 5–18.

(a) Federal antitrust law is a central safeguard for the Nation's free market structures. However, requiring States to conform to the mandates of the Sherman Act at the expense of other values a State may deem fundamental would impose an impermissible burden on the States' power to regulate. Therefore, beginning with *Parker* v. *Brown,* 317 U. S. 341, this Court interpreted the antitrust laws to confer immunity on the anticompetitive conduct of States acting in their sovereign capacity. Pp. 5–6.

(b) The Board's actions are not cloaked with *Parker* immunity. A nonsovereign actor controlled by active market participants—such as the Board—enjoys *Parker* immunity only if "'the challenged restraint . . . [is] clearly articulated and affirmatively expressed as state policy,' and . . . 'the policy . . . [is] actively supervised by the State.'" *FTC* v. *Phoebe Putney Health System, Inc.,* 568 U. S. ___, ___ (quoting *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.,* 445 U. S. 97, 105). Here, the Board did not receive active supervision of its anticompetitive conduct. Pp. 6–17.

(1) An entity may not invoke *Parker* immunity unless its actions are an exercise of the State's sovereign power. See *Columbia* v. *Omni Outdoor Advertising, Inc.,* 499 U. S. 365, 374. Thus, where a State delegates control over a market to a nonsovereign actor the Sherman Act confers immunity only if the State accepts political accountability for the anticompetitive conduct it permits and controls. Limits on state-action immunity are most essential when a State seeks to delegate its regulatory power to active market participants, for dual allegiances are not always apparent to an actor and prohibitions against anticompetitive self-regulation by active market participants are an axiom of federal antitrust policy. Accordingly, *Parker* immunity requires that the anticompetitive conduct of nonsovereign actors, especially those authorized by the State to regulate their own profession, result from procedures that suffice to make it the State's own. *Midcal's* two-part test provides a proper analytical framework to resolve the ultimate question whether an anticompetitive policy is indeed the policy of a State. The first requirement—clear articulation—rarely will achieve that goal by itself, for entities purporting to act under state authority might diverge from the State's considered definition of the public good and engage in private self-dealing. The second *Midcal* requirement—active supervision—seeks to avoid this

Document received by the CA Supreme Court.

Cite as: 574 U. S. ____ (2015)          3

Syllabus

harm by requiring the State to review and approve interstitial policies made by the entity claiming immunity. Pp. 6–10.

(2) There are instances in which an actor can be excused from *Midcal*'s active supervision requirement. Municipalities, which are electorally accountable, have general regulatory powers, and have no private price-fixing agenda, are subject exclusively to the clear articulation requirement. See *Hallie* v. *Eau Claire*, 471 U. S. 34, 35. That *Hallie* excused municipalities from *Midcal*'s supervision rule for these reasons, however, all but confirms the rule's applicability to actors controlled by active market participants. Further, in light of *Omni*'s holding that an otherwise immune entity will not lose immunity based on ad hoc and *ex post* questioning of its motives for making particular decisions, 499 U. S., at 374, it is all the more necessary to ensure the conditions for granting immunity are met in the first place, see *FTC* v. *Ticor Title Ins. Co.*, 504 U. S. 621, 633, and *Phoebe Putney*, *supra*, at ___. The clear lesson of precedent is that *Midcal*'s active supervision test is an essential prerequisite of *Parker* immunity for any nonsovereign entity—public or private—controlled by active market participants. Pp. 10–12.

(3) The Board's argument that entities designated by the States as agencies are exempt from *Midcal*'s second requirement cannot be reconciled with the Court's repeated conclusion that the need for supervision turns not on the formal designation given by States to regulators but on the risk that active market participants will pursue private interests in restraining trade. State agencies controlled by active market participants pose the very risk of self-dealing *Midcal*'s supervision requirement was created to address. See *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, 791. This conclusion does not question the good faith of state officers but rather is an assessment of the structural risk of market participants' confusing their own interests with the State's policy goals. While *Hallie* stated "it is likely that active state supervision would also not be required" for agencies, 471 U. S., at 46, n. 10, the entity there was more like prototypical state agencies, not specialized boards dominated by active market participants. The latter are similar to private trade associations vested by States with regulatory authority, which must satisfy *Midcal*'s active supervision standard. 445 U. S., at 105–106. The similarities between agencies controlled by active market participants and such associations are not eliminated simply because the former are given a formal designation by the State, vested with a measure of government power, and required to follow some procedural rules. See *Hallie*, *supra*, at 39. When a State empowers a group of active market participants to decide who can participate in its market, and on what terms, the need for supervision is manifest. Thus,

Document received by the CA Supreme Court.

4            NORTH CAROLINA STATE BD. OF DENTAL
                    EXAMINERS *v.* FTC
                        Syllabus

the Court holds today that a state board on which a controlling num-
ber of decisionmakers are active market participants in the occupa-
tion the board regulates must satisfy *Midcal's* active supervision re-
quirement in order to invoke state-action antitrust immunity.
Pp. 12–14.

    (4) The State argues that allowing this FTC order to stand will
discourage dedicated citizens from serving on state agencies that
regulate their own occupation.  But this holding is not inconsistent
with the idea that those who pursue a calling must embrace ethical
standards that derive from a duty separate from the dictates of the
State.  Further, this case does not offer occasion to address the ques-
tion whether agency officials, including board members, may, under
some circumstances, enjoy immunity from damages liability.  Of
course, States may provide for the defense and indemnification of
agency members in the event of litigation, and they can also ensure
*Parker* immunity is available by adopting clear policies to displace
competition and providing active supervision.  Arguments against the
wisdom of applying the antitrust laws to professional regulation ab-
sent compliance with the prerequisites for invoking *Parker* immunity
must be rejected, see *Patrick* v. *Burget*, 486 U. S. 94, 105–106, partic-
ularly in light of the risks licensing boards dominated by market par-
ticipants may pose to the free market.  Pp. 14–16.

    (5) The Board does not contend in this Court that its anticompet-
itive conduct was actively supervised by the State or that it should
receive *Parker* immunity on that basis.  The Act delegates control
over the practice of dentistry to the Board, but says nothing about
teeth whitening.  In acting to expel the dentists' competitors from the
market, the Board relied on cease-and-desist letters threatening
criminal liability, instead of other powers at its disposal that would
have invoked oversight by a politically accountable official.  Whether
or not the Board exceeded its powers under North Carolina law, there
is no evidence of any decision by the State to initiate or concur with
the Board's actions against the nondentists.  P. 17.

    (c) Here, where there are no specific supervisory systems to be re-
viewed, it suffices to note that the inquiry regarding active supervi-
sion is flexible and context-dependent.  The question is whether the
State's review mechanisms provide "realistic assurance" that a non-
sovereign actor's anticompetitive conduct "promotes state policy, ra-
ther than merely the party's individual interests." *Patrick*, 486 U. S.,
100–101.  The Court has identified only a few constant requirements
of active supervision: The supervisor must review the substance of
the anticompetitive decision, see *id.*, at 102–103; the supervisor must
have the power to veto or modify particular decisions to ensure they
accord with state policy, see *ibid.*; and the "mere potential for state

Document received by the CA Supreme Court.

Cite as:  574 U. S. ____ (2015)          5

Syllabus

supervision is not an adequate substitute for a decision by the State,"
*Ticor*, *supra*, at 638.  Further, the state supervisor may not itself be
an active market participant.  In general, however, the adequacy of
supervision otherwise will depend on all the circumstances of a case.
Pp. 17–18.

717 F. 3d 359, affirmed.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS,
C. J., and GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined.
ALITO, J., filed a dissenting opinion, in which SCALIA and THOMAS, JJ.,
joined.

Document received by the CA Supreme Court.

1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 13–534

## NORTH CAROLINA STATE BOARD OF DENTAL EXAMINERS, PETITIONER *v.* FEDERAL TRADE COMMISSION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[February 25, 2015]

JUSTICE KENNEDY delivered the opinion of the Court.

This case arises from an antitrust challenge to the actions of a state regulatory board. A majority of the board's members are engaged in the active practice of the profession it regulates. The question is whether the board's actions are protected from Sherman Act regulation under the doctrine of state-action antitrust immunity, as defined and applied in this Court's decisions beginning with *Parker* v. *Brown*, 317 U. S. 341 (1943).

I

A

In its Dental Practice Act (Act), North Carolina has declared the practice of dentistry to be a matter of public concern requiring regulation. N. C. Gen. Stat. Ann. §90–22(a) (2013). Under the Act, the North Carolina State Board of Dental Examiners (Board) is "the agency of the State for the regulation of the practice of dentistry." §90–22(b).

The Board's principal duty is to create, administer, and enforce a licensing system for dentists. See §§90–29 to

Document received by the CA Supreme Court.

Exhibit #60: 038
22-CV-01616-BAS-DDL

90–41. To perform that function it has broad authority over licensees. See §90–41. The Board's authority with respect to unlicensed persons, however, is more restricted: like "any resident citizen," the Board may file suit to "perpetually enjoin any person from . . . unlawfully practicing dentistry." §90–40.1.

The Act provides that six of the Board's eight members must be licensed dentists engaged in the active practice of dentistry. §90–22. They are elected by other licensed dentists in North Carolina, who cast their ballots in elections conducted by the Board. *Ibid.* The seventh member must be a licensed and practicing dental hygienist, and he or she is elected by other licensed hygienists. *Ibid.* The final member is referred to by the Act as a "consumer" and is appointed by the Governor. *Ibid.* All members serve 3-year terms, and no person may serve more than two consecutive terms. *Ibid.* The Act does not create any mechanism for the removal of an elected member of the Board by a public official. See *ibid.*

Board members swear an oath of office, §138A–22(a), and the Board must comply with the State's Administrative Procedure Act, §150B–1 *et seq.*, Public Records Act, §132–1 *et seq.*, and open-meetings law, §143–318.9 *et seq.* The Board may promulgate rules and regulations governing the practice of dentistry within the State, provided those mandates are not inconsistent with the Act and are approved by the North Carolina Rules Review Commission, whose members are appointed by the state legislature. See §§90–48, 143B–30.1, 150B–21.9(a).

                                B

In the 1990's, dentists in North Carolina started whitening teeth. Many of those who did so, including 8 of the Board's 10 members during the period at issue in this case, earned substantial fees for that service. By 2003, nondentists arrived on the scene. They charged lower

Document received by the CA Supreme Court.

Opinion of the Court

prices for their services than the dentists did. Dentists soon began to complain to the Board about their new competitors. Few complaints warned of possible harm to consumers. Most expressed a principal concern with the low prices charged by nondentists.

Responding to these filings, the Board opened an investigation into nondentist teeth whitening. A dentist member was placed in charge of the inquiry. Neither the Board's hygienist member nor its consumer member participated in this undertaking. The Board's chief operations officer remarked that the Board was "going forth to do battle" with nondentists. App. to Pet. for Cert. 103a. The Board's concern did not result in a formal rule or regulation reviewable by the independent Rules Review Commission, even though the Act does not, by its terms, specify that teeth whitening is "the practice of dentistry."

Starting in 2006, the Board issued at least 47 cease-and-desist letters on its official letterhead to nondentist teeth whitening service providers and product manufacturers. Many of those letters directed the recipient to cease "all activity constituting the practice of dentistry"; warned that the unlicensed practice of dentistry is a crime; and strongly implied (or expressly stated) that teeth whitening constitutes "the practice of dentistry." App. 13, 15. In early 2007, the Board persuaded the North Carolina Board of Cosmetic Art Examiners to warn cosmetologists against providing teeth whitening services. Later that year, the Board sent letters to mall operators, stating that kiosk teeth whiteners were violating the Dental Practice Act and advising that the malls consider expelling violators from their premises.

These actions had the intended result. Nondentists ceased offering teeth whitening services in North Carolina.

C

In 2010, the Federal Trade Commission (FTC) filed an

Document received by the CA Supreme Court.

administrative complaint charging the Board with violating §5 of the Federal Trade Commission Act, 38 Stat. 719, as amended, 15 U. S. C. §45.  The FTC alleged that the Board's concerted action to exclude nondentists from the market for teeth whitening services in North Carolina constituted an anticompetitive and unfair method of competition.  The Board moved to dismiss, alleging state-action immunity.  An Administrative Law Judge (ALJ) denied the motion.  On appeal, the FTC sustained the ALJ's ruling.  It reasoned that, even assuming the Board had acted pursuant to a clearly articulated state policy to displace competition, the Board is a "public/private hybrid" that must be actively supervised by the State to claim immunity.  App. to Pet. for Cert. 49a.  The FTC further concluded the Board could not make that showing.

Following other proceedings not relevant here, the ALJ conducted a hearing on the merits and determined the Board had unreasonably restrained trade in violation of antitrust law.  On appeal, the FTC again sustained the ALJ.  The FTC rejected the Board's public safety justification, noting, *inter alia*, "a wealth of evidence . . . suggesting that non-dentist provided teeth whitening is a safe cosmetic procedure." *Id.,* at 123a.

The FTC ordered the Board to stop sending the cease-and-desist letters or other communications that stated nondentists may not offer teeth whitening services and products.  It further ordered the Board to issue notices to all earlier recipients of the Board's cease-and-desist orders advising them of the Board's proper sphere of authority and saying, among other options, that the notice recipients had a right to seek declaratory rulings in state court.

On petition for review, the Court of Appeals for the Fourth Circuit affirmed the FTC in all respects.  717 F. 3d 359, 370 (2013).  This Court granted certiorari.  571 U. S. ___ (2014).

Document received by the CA Supreme Court.

Opinion of the Court

## II

Federal antitrust law is a central safeguard for the Nation's free market structures. In this regard it is "as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States* v. *Topco Associates, Inc.*, 405 U. S. 596, 610 (1972). The antitrust laws declare a considered and decisive prohibition by the Federal Government of cartels, price fixing, and other combinations or practices that undermine the free market.

The Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. §1 *et seq.*, serves to promote robust competition, which in turn empowers the States and provides their citizens with opportunities to pursue their own and the public's welfare. See *FTC* v. *Ticor Title Ins. Co.*, 504 U. S. 621, 632 (1992). The States, however, when acting in their respective realm, need not adhere in all contexts to a model of unfettered competition. While "the States regulate their economies in many ways not inconsistent with the antitrust laws," *id.*, at 635–636, in some spheres they impose restrictions on occupations, confer exclusive or shared rights to dominate a market, or otherwise limit competition to achieve public objectives. If every duly enacted state law or policy were required to conform to the mandates of the Sherman Act, thus promoting competition at the expense of other values a State may deem fundamental, federal antitrust law would impose an impermissible burden on the States' power to regulate. See *Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117, 133 (1978); see also Easterbrook, Antitrust and the Economics of Federalism, 26 J. Law & Econ. 23, 24 (1983).

For these reasons, the Court in *Parker* v. *Brown* interpreted the antitrust laws to confer immunity on anticompetitive conduct by the States when acting in their sovereign capacity. See 317 U. S., at 350–351. That ruling

Document received by the CA Supreme Court.

recognized Congress' purpose to respect the federal bal-
ance and to "embody in the Sherman Act the federalism
principle that the States possess a significant measure of
sovereignty under our Constitution." *Community Com-
munications Co.* v. *Boulder*, 455 U. S. 40, 53 (1982). Since
1943, the Court has reaffirmed the importance of *Parker's*
central holding. See, *e.g., Ticor, supra*, at 632–637; *Hoover*
v. *Ronwin*, 466 U. S. 558, 568 (1984); *Lafayette* v. *Louisi-
ana Power & Light Co.*, 435 U. S. 389, 394–400 (1978).

### III

   In this case the Board argues its members were invested
by North Carolina with the power of the State and that, as
a result, the Board's actions are cloaked with *Parker*
immunity. This argument fails, however. A nonsovereign
actor controlled by active market participants—such as
the Board—enjoys *Parker* immunity only if it satisfies two
requirements: "first that 'the challenged restraint . . . be
one clearly articulated and affirmatively expressed as
state policy,' and second that 'the policy . . . be actively
supervised by the State.'" *FTC* v. *Phoebe Putney Health
System, Inc.*, 568 U. S. ___, ___ (2013) (slip op., at 7) (quot-
ing *California Retail Liquor Dealers Assn.* v. *Midcal Alu-
minum, Inc.*, 445 U. S. 97, 105 (1980)). The parties have
assumed that the clear articulation requirement is satis-
fied, and we do the same. While North Carolina prohibits
the unauthorized practice of dentistry, however, its Act is
silent on whether that broad prohibition covers teeth
whitening. Here, the Board did not receive active super-
vision by the State when it interpreted the Act as ad-
dressing teeth whitening and when it enforced that policy
by issuing cease-and-desist letters to nondentist teeth
whiteners.

### A

   Although state-action immunity exists to avoid conflicts

Document received by the CA Supreme Court.

Opinion of the Court

between state sovereignty and the Nation's commitment to a policy of robust competition, *Parker* immunity is not unbounded. "[G]iven the fundamental national values of free enterprise and economic competition that are embodied in the federal antitrust laws, 'state action immunity is disfavored, much as are repeals by implication.'" *Phoebe Putney, supra,* at ___ (slip op., at 7) (quoting *Ticor, supra,* at 636).

An entity may not invoke *Parker* immunity unless the actions in question are an exercise of the State's sovereign power. See *Columbia* v. *Omni Outdoor Advertising, Inc.,* 499 U. S. 365, 374 (1991). State legislation and "decision[s] of a state supreme court, acting legislatively rather than judicially," will satisfy this standard, and "*ipso facto* are exempt from the operation of the antitrust laws" because they are an undoubted exercise of state sovereign authority. *Hoover, supra,* at 567–568.

But while the Sherman Act confers immunity on the States' own anticompetitive policies out of respect for federalism, it does not always confer immunity where, as here, a State delegates control over a market to a non-sovereign actor. See *Parker, supra,* at 351 ("[A] state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful"). For purposes of *Parker,* a nonsovereign actor is one whose conduct does not automatically qualify as that of the sovereign State itself. See *Hoover, supra,* at 567–568. State agencies are not simply by their governmental character sovereign actors for purposes of state-action immunity. See *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773, 791 (1975) ("The fact that the State Bar is a state agency for some limited purposes does not create an antitrust shield that allows it to foster anticompetitive practices for the benefit of its members"). Immunity for state agencies, therefore, requires more than a mere facade of state involvement, for it is necessary in light of

Document received by the CA Supreme Court.

*Parker*'s rationale to ensure the States accept political accountability for anticompetitive conduct they permit and control. See *Ticor,* 504 U. S., at 636.

Limits on state-action immunity are most essential when the State seeks to delegate its regulatory power to active market participants, for established ethical standards may blend with private anticompetitive motives in a way difficult even for market participants to discern. Dual allegiances are not always apparent to an actor. In consequence, active market participants cannot be allowed to regulate their own markets free from antitrust accountability. See *Midcal, supra,* at 106 ("The national policy in favor of competition cannot be thwarted by casting [a] gauzy cloak of state involvement over what is essentially a private price-fixing arrangement"). Indeed, prohibitions against anticompetitive self-regulation by active market participants are an axiom of federal antitrust policy. See, *e.g., Allied Tube & Conduit Corp.* v. *Indian Head, Inc.,* 486 U. S. 492, 501 (1988); *Hoover, supra,* at 584 (Stevens, J., dissenting) ("The risk that private regulation of market entry, prices, or output may be designed to confer monopoly profits on members of an industry at the expense of the consuming public has been the central concern of . . . our antitrust jurisprudence"); see also Elhauge, The Scope of Antitrust Process, 104 Harv. L. Rev. 667, 672 (1991). So it follows that, under *Parker* and the Supremacy Clause, the States' greater power to attain an end does not include the lesser power to negate the congressional judgment embodied in the Sherman Act through unsupervised delegations to active market participants. See Garland, Antitrust and State Action: Economic Efficiency and the Political Process, 96 Yale L. J. 486, 500 (1986).

*Parker* immunity requires that the anticompetitive conduct of nonsovereign actors, especially those authorized by the State to regulate their own profession, result from procedures that suffice to make it the State's own.

Document received by the CA Supreme Court.

Opinion of the Court

See *Goldfarb, supra*, at 790; see also 1A P. Areeda & H. Hovencamp, Antitrust Law ¶226, p. 180 (4th ed. 2013) (Areeda & Hovencamp). The question is not whether the challenged conduct is efficient, well-functioning, or wise. See *Ticor, supra*, at 634–635. Rather, it is "whether anticompetitive conduct engaged in by [nonsovereign actors] should be deemed state action and thus shielded from the antitrust laws." *Patrick* v. *Burget*, 486 U. S. 94, 100 (1988).

To answer this question, the Court applies the two-part test set forth in *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97, a case arising from California's delegation of price-fixing authority to wine merchants. Under *Midcal*, "[a] state law or regulatory scheme cannot be the basis for antitrust immunity unless, first, the State has articulated a clear policy to allow the anticompetitive conduct, and second, the State provides active supervision of [the] anticompetitive conduct." *Ticor, supra*, at 631 (citing *Midcal, supra*, at 105).

*Midcal*'s clear articulation requirement is satisfied "where the displacement of competition [is] the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature. In that scenario, the State must have foreseen and implicitly endorsed the anticompetitive effects as consistent with its policy goals." *Phoebe Putney*, 568 U. S., at ___ (slip op., at 11). The active supervision requirement demands, *inter alia*, "that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." *Patrick, supra*, U. S., at 101.

The two requirements set forth in *Midcal* provide a proper analytical framework to resolve the ultimate question whether an anticompetitive policy is indeed the policy of a State. The first requirement—clear articulation— rarely will achieve that goal by itself, for a policy may

Document received by the CA Supreme Court.

satisfy this test yet still be defined at so high a level of generality as to leave open critical questions about how and to what extent the market should be regulated.  See *Ticor, supra,* at 636–637.  Entities purporting to act under state authority might diverge from the State's considered definition of the public good.  The resulting asymmetry between a state policy and its implementation can invite private self-dealing.  The second *Midcal* requirement— active supervision—seeks to avoid this harm by requiring the State to review and approve interstitial policies made by the entity claiming immunity.

*Midcal*'s supervision rule "stems from the recognition that '[w]here a private party is engaging in anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State.'"  *Patrick, supra,* at 100.  Concern about the private incentives of active market participants animates *Midcal*'s supervision mandate, which demands "realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests."  *Patrick, supra,* at 101.

### B

In determining whether anticompetitive policies and conduct are indeed the action of a State in its sovereign capacity, there are instances in which an actor can be excused from *Midcal*'s active supervision requirement.  In *Hallie* v. *Eau Claire,* 471 U. S. 34, 45 (1985), the Court held municipalities are subject exclusively to *Midcal*'s "'clear articulation'" requirement.  That rule, the Court observed, is consistent with the objective of ensuring that the policy at issue be one enacted by the State itself. *Hallie* explained that "[w]here the actor is a municipality, there is little or no danger that it is involved in a private price-fixing arrangement.  The only real danger is that it will seek to further purely parochial public interests at the

Document received by the CA Supreme Court.

Opinion of the Court

expense of more overriding state goals." 471 U. S., at 47.
*Hallie* further observed that municipalities are electorally
accountable and lack the kind of private incentives charac-
teristic of active participants in the market. See *id.,* at 45,
n. 9. Critically, the municipality in *Hallie* exercised a
wide range of governmental powers across different eco-
nomic spheres, substantially reducing the risk that it
would pursue private interests while regulating any single
field. See *ibid.* That *Hallie* excused municipalities from
*Midcal's* supervision rule for these reasons all but con-
firms the rule's applicability to actors controlled by active
market participants, who ordinarily have none of the
features justifying the narrow exception *Hallie* identified.
See 471 U. S., at 45.

Following *Goldfarb, Midcal,* and *Hallie,* which clarified
the conditions under which *Parker* immunity attaches to
the conduct of a nonsovereign actor, the Court in *Colum-
bia* v. *Omni Outdoor Advertising, Inc.,* 499 U. S. 365,
addressed whether an otherwise immune entity could lose
immunity for conspiring with private parties. In *Omni,* an
aspiring billboard merchant argued that the city of Co-
lumbia, South Carolina, had violated the Sherman Act—
and forfeited its *Parker* immunity—by anticompetitively
conspiring with an established local company in passing
an ordinance restricting new billboard construction. 499
U. S., at 367–368. The Court disagreed, holding there is
no "conspiracy exception" to *Parker. Omni, supra,* at 374.

*Omni,* like the cases before it, recognized the importance
of drawing a line "relevant to the purposes of the Sherman
Act and of *Parker*: prohibiting the restriction of competi-
tion for private gain but permitting the restriction of
competition in the public interest." 499 U. S., at 378. In
the context of a municipal actor which, as in *Hallie,* exer-
cised substantial governmental powers, *Omni* rejected a
conspiracy exception for "corruption" as vague and un-
workable, since "virtually all regulation benefits some

Document received by the CA Supreme Court.

segments of the society and harms others" and may in that sense be seen as "'corrupt.'"  499 U. S., at 377.  *Omni* also rejected subjective tests for corruption that would force a "deconstruction of the governmental process and probing of the official 'intent' that we have consistently sought to avoid."  *Ibid.*  Thus, whereas the cases preceding it addressed the preconditions of *Parker* immunity and engaged in an objective, *ex ante* inquiry into nonsovereign actors' structure and incentives, *Omni* made clear that recipients of immunity will not lose it on the basis of ad hoc and *ex post* questioning of their motives for making particular decisions.

*Omni*'s holding makes it all the more necessary to ensure the conditions for granting immunity are met in the first place.  The Court's two state-action immunity cases decided after *Omni* reinforce this point.  In *Ticor* the Court affirmed that *Midcal*'s limits on delegation must ensure that "[a]ctual state involvement, not deference to private price-fixing arrangements under the general auspices of state law, is the precondition for immunity from federal law."  504 U. S., at 633.  And in *Phoebe Putney* the Court observed that *Midcal*'s active supervision requirement, in particular, is an essential condition of state-action immunity when a nonsovereign actor has "an incentive to pursue [its] own self-interest under the guise of implementing state policies."  568 U. S., at ___ (slip op., at 8) (quoting *Hallie*, *supra*, at 46–47).  The lesson is clear: *Midcal*'s active supervision test is an essential prerequisite of *Parker* immunity for any nonsovereign entity—public or private—controlled by active market participants.

### C

The Board argues entities designated by the States as agencies are exempt from *Midcal*'s second requirement. That premise, however, cannot be reconciled with the Court's repeated conclusion that the need for supervision

Document received by the CA Supreme Court.

Opinion of the Court

turns not on the formal designation given by States to
regulators but on the risk that active market participants
will pursue private interests in restraining trade.

State agencies controlled by active market participants,
who possess singularly strong private interests, pose the
very risk of self-dealing *Midcal*'s supervision requirement
was created to address. See Areeda & Hovencamp ¶227,
at 226. This conclusion does not question the good faith of
state officers but rather is an assessment of the structural
risk of market participants' confusing their own interests
with the State's policy goals. See *Patrick*, 486 U. S., at
100–101.

The Court applied this reasoning to a state agency in
*Goldfarb*. There the Court denied immunity to a state
agency (the Virginia State Bar) controlled by market
participants (lawyers) because the agency had "joined in
what is essentially a private anticompetitive activity" for
"the benefit of its members." 421 U. S., at 791, 792. This
emphasis on the Bar's private interests explains why
*Goldfarb*, though it predates *Midcal*, considered the lack
of supervision by the Virginia Supreme Court to be a
principal reason for denying immunity. See 421 U. S., at
791; see also *Hoover*, 466 U. S., at 569 (emphasizing lack
of active supervision in *Goldfarb*); *Bates* v. *State Bar of
Ariz.*, 433 U. S. 350, 361–362 (1977) (granting the Arizona
Bar state-action immunity partly because its "rules are
subject to pointed re-examination by the policymaker").

While *Hallie* stated "it is likely that active state super-
vision would also not be required" for agencies, 471 U. S.,
at 46, n. 10, the entity there, as was later the case in
*Omni*, was an electorally accountable municipality with
general regulatory powers and no private price-fixing
agenda. In that and other respects the municipality was
more like prototypical state agencies, not specialized
boards dominated by active market participants. In im-
portant regards, agencies controlled by market partici-

Document received by the CA Supreme Court.

pants are more similar to private trade associations vested by States with regulatory authority than to the agencies *Hallie* considered. And as the Court observed three years after *Hallie*, "[t]here is no doubt that the members of such associations often have economic incentives to restrain competition and that the product standards set by such associations have a serious potential for anticompetitive harm." *Allied Tube*, 486 U. S., at 500. For that reason, those associations must satisfy *Midcal*'s active supervision standard. See *Midcal*, 445 U. S., at 105–106.

The similarities between agencies controlled by active market participants and private trade associations are not eliminated simply because the former are given a formal designation by the State, vested with a measure of government power, and required to follow some procedural rules. See *Hallie*, *supra*, at 39 (rejecting "purely formalistic" analysis). *Parker* immunity does not derive from nomenclature alone. When a State empowers a group of active market participants to decide who can participate in its market, and on what terms, the need for supervision is manifest. See Areeda & Hovencamp ¶227, at 226. The Court holds today that a state board on which a controlling number of decisionmakers are active market participants in the occupation the board regulates must satisfy *Midcal*'s active supervision requirement in order to invoke state-action antitrust immunity.

### D

The State argues that allowing this FTC order to stand will discourage dedicated citizens from serving on state agencies that regulate their own occupation. If this were so—and, for reasons to be noted, it need not be so—there would be some cause for concern. The States have a sovereign interest in structuring their governments, see *Gregory* v. *Ashcroft*, 501 U. S. 452, 460 (1991), and may conclude there are substantial benefits to staffing their

Document received by the CA Supreme Court.

Opinion of the Court

agencies with experts in complex and technical subjects, see *Southern Motor Carriers Rate Conference, Inc.* v. *United States*, 471 U. S. 48, 64 (1985). There is, moreover, a long tradition of citizens esteemed by their professional colleagues devoting time, energy, and talent to enhancing the dignity of their calling.

Adherence to the idea that those who pursue a calling must embrace ethical standards that derive from a duty separate from the dictates of the State reaches back at least to the Hippocratic Oath. See generally S. Miles, The Hippocratic Oath and the Ethics of Medicine (2004). In the United States, there is a strong tradition of professional self-regulation, particularly with respect to the development of ethical rules. See generally R. Rotunda & J. Dzienkowski, Legal Ethics: The Lawyer's Deskbook on Professional Responsibility (2014); R. Baker, Before Bioethics: A History of American Medical Ethics From the Colonial Period to the Bioethics Revolution (2013). Dentists are no exception. The American Dental Association, for example, in an exercise of "the privilege and obligation of self-government," has "call[ed] upon dentists to follow high ethical standards," including "honesty, compassion, kindness, integrity, fairness and charity." American Dental Association, Principles of Ethics and Code of Professional Conduct 3–4 (2012). State laws and institutions are sustained by this tradition when they draw upon the expertise and commitment of professionals.

Today's holding is not inconsistent with that idea. The Board argues, however, that the potential for money damages will discourage members of regulated occupations from participating in state government. Cf. *Filarsky* v. *Delia*, 566 U. S. ___, ___ (2012) (slip op., at 12) (warning in the context of civil rights suits that the "the most talented candidates will decline public engagements if they do not receive the same immunity enjoyed by their public employee counterparts"). But this case, which does not

Document received by the CA Supreme Court.

Exhibit #60: 052
22-CV-01616-BAS-DDL

present a claim for money damages, does not offer occasion to address the question whether agency officials, including board members, may, under some circumstances, enjoy immunity from damages liability. See *Goldfarb*, 421 U. S., at 792, n. 22; see also Brief for Respondent 56. And, of course, the States may provide for the defense and indemnification of agency members in the event of litigation.

States, furthermore, can ensure *Parker* immunity is available to agencies by adopting clear policies to displace competition; and, if agencies controlled by active market participants interpret or enforce those policies, the States may provide active supervision. Precedent confirms this principle. The Court has rejected the argument that it would be unwise to apply the antitrust laws to professional regulation absent compliance with the prerequisites for invoking *Parker* immunity:

> "[Respondents] contend that effective peer review is essential to the provision of quality medical care and that any threat of antitrust liability will prevent physicians from participating openly and actively in peer-review proceedings. This argument, however, essentially challenges the wisdom of applying the antitrust laws to the sphere of medical care, and as such is properly directed to the legislative branch. To the extent that Congress has declined to exempt medical peer review from the reach of the antitrust laws, peer review is immune from antitrust scrutiny only if the State effectively has made this conduct its own." *Patrick*, 486 U. S. at 105–106 (footnote omitted).

The reasoning of *Patrick* v. *Burget* applies to this case with full force, particularly in light of the risks licensing boards dominated by market participants may pose to the free market. See generally Edlin & Haw, Cartels by Another Name: Should Licensed Occupations Face Antitrust Scrutiny? 162 U. Pa. L. Rev. 1093 (2014).

Document received by the CA Supreme Court.

Opinion of the Court

### E

The Board does not contend in this Court that its anti-competitive conduct was actively supervised by the State or that it should receive *Parker* immunity on that basis.

By statute, North Carolina delegates control over the practice of dentistry to the Board. The Act, however, says nothing about teeth whitening, a practice that did not exist when it was passed. After receiving complaints from other dentists about the nondentists' cheaper services, the Board's dentist members—some of whom offered whitening services—acted to expel the dentists' competitors from the market. In so doing the Board relied upon cease-and-desist letters threatening criminal liability, rather than any of the powers at its disposal that would invoke oversight by a politically accountable official. With no active supervision by the State, North Carolina officials may well have been unaware that the Board had decided teeth whitening constitutes "the practice of dentistry" and sought to prohibit those who competed against dentists from participating in the teeth whitening market. Whether or not the Board exceeded its powers under North Carolina law, cf. *Omni*, 499 U. S., at 371–372, there is no evidence here of any decision by the State to initiate or concur with the Board's actions against the nondentists.

### IV

The Board does not claim that the State exercised active, or indeed any, supervision over its conduct regarding nondentist teeth whiteners; and, as a result, no specific supervisory systems can be reviewed here. It suffices to note that the inquiry regarding active supervision is flexible and context-dependent. Active supervision need not entail day-to-day involvement in an agency's operations or micromanagement of its every decision. Rather, the question is whether the State's review mechanisms provide "realistic assurance" that a nonsovereign actor's anticom-

Document received by the CA Supreme Court.

petitive conduct "promotes state policy, rather than merely the party's individual interests." *Patrick, supra,* at 100–101; see also *Ticor,* 504 U. S., at 639–640.

The Court has identified only a few constant requirements of active supervision: The supervisor must review the substance of the anticompetitive decision, not merely the procedures followed to produce it, see *Patrick,* 486 U. S., at 102–103; the supervisor must have the power to veto or modify particular decisions to ensure they accord with state policy, see *ibid.*; and the "mere potential for state supervision is not an adequate substitute for a decision by the State," *Ticor, supra,* at 638. Further, the state supervisor may not itself be an active market participant. In general, however, the adequacy of supervision otherwise will depend on all the circumstances of a case.

\*      \*      \*

The Sherman Act protects competition while also respecting federalism. It does not authorize the States to abandon markets to the unsupervised control of active market participants, whether trade associations or hybrid agencies. If a State wants to rely on active market participants as regulators, it must provide active supervision if state-action immunity under *Parker* is to be invoked.

The judgment of the Court of Appeals for the Fourth Circuit is affirmed.

*It is so ordered.*

Document received by the CA Supreme Court.

ALITO, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 13–534

## NORTH CAROLINA STATE BOARD OF DENTAL EXAMINERS, PETITIONER *v.* FEDERAL TRADE COMMISSION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[February 25, 2015]

JUSTICE ALITO, with whom JUSTICE SCALIA and JUSTICE THOMAS join, dissenting.

The Court's decision in this case is based on a serious misunderstanding of the doctrine of state-action antitrust immunity that this Court recognized more than 60 years ago in *Parker* v. *Brown*, 317 U. S. 341 (1943). In *Parker*, the Court held that the Sherman Act does not prevent the States from continuing their age-old practice of enacting measures, such as licensing requirements, that are designed to protect the public health and welfare. *Id.*, at 352. The case now before us involves precisely this type of state regulation—North Carolina's laws governing the practice of dentistry, which are administered by the North Carolina Board of Dental Examiners (Board).

Today, however, the Court takes the unprecedented step of holding that *Parker* does not apply to the North Carolina Board because the Board is not structured in a way that merits a good-government seal of approval; that is, it is made up of practicing dentists who have a financial incentive to use the licensing laws to further the financial interests of the State's dentists. There is nothing new about the structure of the North Carolina Board. When the States first created medical and dental boards, well before the Sherman Act was enacted, they began to staff

Document received by the CA Supreme Court.

them in this way.[1] Nor is there anything new about the suspicion that the North Carolina Board—in attempting to prevent persons other than dentists from performing teeth-whitening procedures—was serving the interests of dentists and not the public. Professional and occupational licensing requirements have often been used in such a way.[2] But that is not what *Parker* immunity is about. Indeed, the very state program involved in that case was unquestionably designed to benefit the regulated entities, California raisin growers.

The question before us is not whether such programs serve the public interest. The question, instead, is whether this case is controlled by *Parker*, and the answer to that question is clear. Under *Parker*, the Sherman Act (and the Federal Trade Commission Act, see *FTC* v. *Ticor Title Ins. Co.*, 504 U. S. 621, 635 (1992)) do not apply to state agencies; the North Carolina Board of Dental Examiners is a state agency; and that is the end of the matter. By straying from this simple path, the Court has not only distorted *Parker*; it has headed into a morass. Determining whether a state agency is structured in a way that militates against regulatory capture is no easy task, and there is reason to fear that today's decision will spawn confusion. The Court has veered off course, and therefore I cannot go along.

---

[1] S. White, History of Oral and Dental Science in America 197–214 (1876) (detailing earliest American regulations of the practice of dentistry).

[2] See, *e.g.*, R. Shrylock, Medical Licensing in America 29 (1967) (Shrylock) (detailing the deterioration of licensing regimes in the mid-19th century, in part out of concerns about restraints on trade); Gellhorn, The Abuse of Occupational Licensing, 44 U. Chi. L. Rev. 6 (1976); Shepard, Licensing Restrictions and the Cost of Dental Care, 21 J. Law & Econ. 187 (1978).

Document received by the CA Supreme Court.

ALITO, J., dissenting

## I

In order to understand the nature of *Parker* state-action immunity, it is helpful to recall the constitutional landscape in 1890 when the Sherman Act was enacted. At that time, this Court and Congress had an understanding of the scope of federal and state power that is very different from our understanding today. The States were understood to possess the exclusive authority to regulate "their purely internal affairs." *Leisy* v. *Hardin,* 135 U. S. 100, 122 (1890). In exercising their police power in this area, the States had long enacted measures, such as price controls and licensing requirements, that had the effect of restraining trade.[3]

The Sherman Act was enacted pursuant to Congress' power to regulate interstate commerce, and in passing the Act, Congress wanted to exercise that power "to the utmost extent." *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533, 558 (1944). But in 1890, the understanding of the commerce power was far more limited than it is today. See, *e.g., Kidd* v. *Pearson,* 128 U. S. 1, 17–18 (1888). As a result, the Act did not pose a threat to traditional state regulatory activity.

By 1943, when *Parker* was decided, however, the situation had changed dramatically. This Court had held that the commerce power permitted Congress to regulate even local activity if it "exerts a substantial economic effect on interstate commerce." *Wickard* v. *Filburn,* 317 U. S. 111, 125 (1942). This meant that Congress could regulate many of the matters that had once been thought to fall exclusively within the jurisdiction of the States. The new interpretation of the commerce power brought about an expansion of the reach of the Sherman Act. See *Hospital*

---

[3]See Handler, The Current Attack on the *Parker* v. *Brown* State Action Doctrine, 76 Colum. L. Rev. 1, 4–6 (1976) (collecting cases).

Document received by the CA Supreme Court.

*Building Co.* v. *Trustees of Rex Hospital*, 425 U. S. 738, 743, n. 2 (1976) ("[D]ecisions by this Court have permitted the reach of the Sherman Act to expand along with expanding notions of congressional power"). And the expanded reach of the Sherman Act raised an important question. The Sherman Act does not expressly exempt States from its scope. Does that mean that the Act applies to the States and that it potentially outlaws many traditional state regulatory measures? The Court confronted that question in *Parker*.

In *Parker*, a raisin producer challenged the California Agricultural Prorate Act, an agricultural price support program. The California Act authorized the creation of an Agricultural Prorate Advisory Commission (Commission) to establish marketing plans for certain agricultural commodities within the State. 317 U. S., at 346–347. Raisins were among the regulated commodities, and so the Commission established a marketing program that governed many aspects of raisin sales, including the quality and quantity of raisins sold, the timing of sales, and the price at which raisins were sold. *Id.*, at 347–348. The *Parker* Court assumed that this program would have violated "the Sherman Act if it were organized and made effective solely by virtue of a contract, combination or conspiracy of private persons," and the Court also assumed that Congress could have prohibited a State from creating a program like California's if it had chosen to do so. *Id.*, at 350. Nevertheless, the Court concluded that the California program did not violate the Sherman Act because the Act did not circumscribe state regulatory power. *Id.*, at 351.

The Court's holding in *Parker* was not based on either the language of the Sherman Act or anything in the legislative history affirmatively showing that the Act was not meant to apply to the States. Instead, the Court reasoned that "[i]n a dual system of government in which, under the Constitution, the states are sovereign, save only as Con-

Document received by the CA Supreme Court.

ALITO, J., dissenting

gress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." 317 U. S., at 351. For the Congress that enacted the Sherman Act in 1890, it would have been a truly radical and almost certainly futile step to attempt to prevent the States from exercising their traditional regulatory authority, and the *Parker* Court refused to assume that the Act was meant to have such an effect.

When the basis for the *Parker* state-action doctrine is understood, the Court's error in this case is plain. In 1890, the regulation of the practice of medicine and dentistry was regarded as falling squarely within the States' sovereign police power. By that time, many States had established medical and dental boards, often staffed by doctors or dentists,[4] and had given those boards the authority to confer and revoke licenses.[5] This was quintessential police power legislation, and although state laws were often challenged during that era under the doctrine of substantive due process, the licensing of medical professionals easily survived such assaults. Just one year before the enactment of the Sherman Act, in *Dent* v. *West Virginia*, 129 U. S. 114, 128 (1889), this Court rejected such a challenge to a state law requiring all physicians to obtain a certificate from the state board of health attesting to their qualifications. And in *Hawker* v. *New York*, 170 U. S. 189, 192 (1898), the Court reiterated that a law

---

[4] Shrylock 54–55; D. Johnson and H. Chaudry, Medical Licensing and Discipline in America 23–24 (2012).

[5] In *Hawker* v. *New York*, 170 U. S. 189 (1898), the Court cited state laws authorizing such boards to refuse or revoke medical licenses. *Id.*, at 191–193, n. 1. See also *Douglas* v. *Noble*, 261 U. S. 165, 166 (1923) ("In 1893 the legislature of Washington provided that only licensed persons should practice dentistry" and "vested the authority to license in a board of examiners, consisting of five practicing dentists").

Document received by the CA Supreme Court.

specifying the qualifications to practice medicine was clearly a proper exercise of the police power. Thus, the North Carolina statutes establishing and specifying the powers of the State Board of Dental Examiners represent precisely the kind of state regulation that the *Parker* exemption was meant to immunize.

## II

As noted above, the only question in this case is whether the North Carolina Board of Dental Examiners is really a state agency, and the answer to that question is clearly yes.

- The North Carolina Legislature determined that the practice of dentistry "affect[s] the public health, safety and welfare" of North Carolina's citizens and that therefore the profession should be "subject to regulation and control in the public interest" in order to ensure "that only qualified persons be permitted to practice dentistry in the State." N. C. Gen. Stat. Ann. §90–22(a) (2013).
- To further that end, the legislature created the North Carolina State Board of Dental Examiners "as the agency of the State for the regulation of the practice of dentistry in th[e] State." §90–22(b).
- The legislature specified the membership of the Board. §90–22(c). It defined the "practice of dentistry," §90–29(b), and it set out standards for licensing practitioners, §90–30. The legislature also set out standards under which the Board can initiate disciplinary proceedings against licensees who engage in certain improper acts. §90–41(a).
- The legislature empowered the Board to "maintain an action in the name of the State of North Carolina to perpetually enjoin any person from . . . unlawfully practicing dentistry." §90–40.1(a). It authorized the Board to conduct investigations and to hire legal

Document received by the CA Supreme Court.

ALITO, J., dissenting

counsel, and the legislature made any "notice or statement of charges against any licensee" a public record under state law. §§ 90–41(d)–(g).

- The legislature empowered the Board "to enact rules and regulations governing the practice of dentistry within the State," consistent with relevant statutes. §90–48. It has required that any such rules be included in the Board's annual report, which the Board must file with the North Carolina secretary of state, the state attorney general, and the legislature's Joint Regulatory Reform Committee. §93B–2. And if the Board fails to file the required report, state law demands that it be automatically suspended until it does so. *Ibid.*

As this regulatory regime demonstrates, North Carolina's Board of Dental Examiners is unmistakably a state agency created by the state legislature to serve a prescribed regulatory purpose and to do so using the State's power in cooperation with other arms of state government.

The Board is not a private or "nonsovereign" entity that the State of North Carolina has attempted to immunize from federal antitrust scrutiny. *Parker* made it clear that a State may not "'give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful.'" *Ante*, at 7 (quoting *Parker*, 317 U. S., at 351). When the *Parker* Court disapproved of any such attempt, it cited *Northern Securities Co.* v. *United States*, 193 U. S. 197 (1904), to show what it had in mind. In that case, the Court held that a State's act of chartering a corporation did not shield the corporation's monopolizing activities from federal antitrust law. *Id.*, at 344–345. Nothing similar is involved here. North Carolina did not authorize a private entity to enter into an anticompetitive arrangement; rather, North Carolina *created a state agency* and gave that agency the power to regulate a particular subject affecting public health and

Document received by the CA Supreme Court.

safety.

Nothing in *Parker* supports the type of inquiry that the Court now prescribes. The Court crafts a test under which state agencies that are "controlled by active market participants," *ante*, at 12, must demonstrate active state supervision in order to be immune from federal antitrust law. The Court thus treats these state agencies like private entities. But in *Parker*, the Court did not examine the structure of the California program to determine if it had been captured by private interests. If the Court had done so, the case would certainly have come out differently, because California conditioned its regulatory measures on the participation and approval of market actors in the relevant industry.

Establishing a prorate marketing plan under California's law first required the petition of at least 10 producers of the particular commodity. *Parker*, 317 U. S., at 346. If the Commission then agreed that a marketing plan was warranted, the Commission would "select a program committee *from among nominees chosen by the qualified producers.*" *Ibid.* (emphasis added). That committee would then formulate the proration marketing program, which the Commission could modify or approve. But even after Commission approval, the program became law (and then, automatically) only if it gained the approval of 65 percent of the relevant producers, representing at least 51 percent of the acreage of the regulated crop. *Id.*, at 347. This scheme gave decisive power to market participants. But despite these aspects of the California program, *Parker* held that California was acting as a "sovereign" when it "adopt[ed] and enforc[ed] the prorate program." *Id.*, at 352. This reasoning is irreconcilable with the Court's today.

### III

The Court goes astray because it forgets the origin of the

Document received by the CA Supreme Court.

ALITO, J., dissenting

*Parker* doctrine and is misdirected by subsequent cases that extended that doctrine (in certain circumstances) to private entities. The Court requires the North Carolina Board to satisfy the two-part test set out in *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97 (1980), but the party claiming *Parker* immunity in that case was not a state agency but a private trade association. Such an entity is entitled to *Parker* immunity, *Midcal* held, only if the anticompetitive conduct at issue was both "'clearly articulated'" and "'actively supervised by the State itself.'" 445 U. S., at 105. Those requirements are needed where a State authorizes private parties to engage in anticompetitive conduct. They serve to identify those situations in which conduct *by private parties* can be regarded as the conduct of a State. But when the conduct in question is the conduct of a state agency, no such inquiry is required.

This case falls into the latter category, and therefore *Midcal* is inapposite. The North Carolina Board is not a private trade association. It is a state agency, created and empowered by the State to regulate an industry affecting public health. It would not exist if the State had not created it. And for purposes of *Parker*, its membership is irrelevant; what matters is that it is part of the government of the sovereign State of North Carolina.

Our decision in *Hallie* v. *Eau Claire*, 471 U. S. 34 (1985), which involved Sherman Act claims against a municipality, not a State agency, is similarly inapplicable. In *Hallie*, the plaintiff argued that the two-pronged *Midcal* test should be applied, but the Court disagreed. The Court acknowledged that municipalities "are not themselves sovereign." 471 U. S., at 38. But recognizing that a municipality is "an arm of the State," *id.*, at 45, the Court held that a municipality should be required to satisfy only the first prong of the *Midcal* test (requiring a clearly articulated state policy), 471 U. S., at 46. That municipalities

Document received by the CA Supreme Court.

are not sovereign was critical to our analysis in *Hallie*, and thus that decision has no application in a case, like this one, involving a state agency.

Here, however, the Court not only disregards the North Carolina Board's status as a full-fledged state agency; it treats the Board less favorably than a municipality. This is puzzling. States are sovereign, *Northern Ins. Co. of N. Y.* v. *Chatham County*, 547 U. S. 189, 193 (2006), and California's sovereignty provided the foundation for the decision in *Parker, supra*, at 352. Municipalities are not sovereign. *Jinks* v. *Richland County*, 538 U. S. 456, 466 (2003). And for this reason, federal law often treats municipalities differently from States. Compare *Will* v. *Michigan Dept. of State Police*, 491 U. S. 58, 71 (1989) ("[N]either a State nor its officials acting it their official capacities are 'persons' under [42 U. S. C.] §1983"), with *Monell* v. *City Dept. of Social Servs., New York*, 436 U. S. 658, 694 (1978) (municipalities liable under §1983 where "execution of a government's policy or custom . . . inflicts the injury").

The Court recognizes that municipalities, although not sovereign, nevertheless benefit from a more lenient standard for state-action immunity than private entities. Yet under the Court's approach, the North Carolina Board of Dental Examiners, a full-fledged state agency, is treated like a private actor and must demonstrate that the State actively supervises its actions.

The Court's analysis seems to be predicated on an assessment of the varying degrees to which a municipality and a state agency like the North Carolina Board are likely to be captured by private interests. But until today, *Parker* immunity was never conditioned on the proper use of state regulatory authority. On the contrary, in *Columbia* v. *Omni Outdoor Advertising, Inc.*, 499 U. S. 365 (1991), we refused to recognize an exception to *Parker* for cases in which it was shown that the defendants had

Document received by the CA Supreme Court.

ALITO, J., dissenting

engaged in a conspiracy or corruption or had acted in a way that was not in the public interest. *Id.,* at 374. The Sherman Act, we said, is not an anticorruption or good-government statute. 499 U. S., at 398. We were unwilling in *Omni* to rewrite *Parker* in order to reach the allegedly abusive behavior of city officials. 499 U. S., at 374–379. But that is essentially what the Court has done here.

### III

Not only is the Court's decision inconsistent with the underlying theory of *Parker*; it will create practical problems and is likely to have far-reaching effects on the States' regulation of professions. As previously noted, state medical and dental boards have been staffed by practitioners since they were first created, and there are obvious advantages to this approach. It is reasonable for States to decide that the individuals best able to regulate technical professions are practitioners with expertise in those very professions. Staffing the State Board of Dental Examiners with certified public accountants would certainly lessen the risk of actions that place the well-being of dentists over those of the public, but this would also compromise the State's interest in sensibly regulating a technical profession in which lay people have little expertise.

As a result of today's decision, States may find it necessary to change the composition of medical, dental, and other boards, but it is not clear what sort of changes are needed to satisfy the test that the Court now adopts. The Court faults the structure of the North Carolina Board because "active market participants" constitute "a controlling number of [the] decisionmakers," *ante,* at 14, but this test raises many questions.

What is a "controlling number"? Is it a majority? And if so, why does the Court eschew that term? Or does the Court mean to leave open the possibility that something less than a majority might suffice in particular circum-

Document received by the CA Supreme Court.

stances?  Suppose that active market participants constitute a voting bloc that is generally able to get its way?  How about an obstructionist minority or an agency chair empowered to set the agenda or veto regulations?

Who is an "active market participant"?  If Board members withdraw from practice during a short term of service but typically return to practice when their terms end, does that mean that they are not active market participants during their period of service?

What is the scope of the market in which a member may not participate while serving on the board?  Must the market be relevant to the particular regulation being challenged or merely to the jurisdiction of the entire agency?  Would the result in the present case be different if a majority of the Board members, though practicing dentists, did not provide teeth whitening services?  What if they were orthodontists, periodontists, and the like?  And how much participation makes a person "active" in the market?

The answers to these questions are not obvious, but the States must predict the answers in order to make informed choices about how to constitute their agencies.

I suppose that all this will be worked out by the lower courts and the Federal Trade Commission (FTC), but the Court's approach raises a more fundamental question, and that is why the Court's inquiry should stop with an examination of the structure of a state licensing board.  When the Court asks whether market participants control the North Carolina Board, the Court in essence is asking whether this regulatory body has been captured by the entities that it is supposed to regulate.  Regulatory capture can occur in many ways.[6]  So why ask only whether

--------

[6]See, *e.g.*, R. Noll, Reforming Regulation 40–43, 46 (1971); J. Wilson, The Politics of Regulation 357–394 (1980).  Indeed, it has even been

Document received by the CA Supreme Court.

ALITO, J., dissenting

the members of a board are active market participants? The answer may be that determining when regulatory capture has occurred is no simple task. That answer provides a reason for relieving courts from the obligation to make such determinations at all. It does not explain why it is appropriate for the Court to adopt the rather crude test for capture that constitutes the holding of to-day's decision.

## IV

The Court has created a new standard for distinguishing between private and state actors for purposes of federal antitrust immunity. This new standard is not true to the *Parker* doctrine; it diminishes our traditional respect for federalism and state sovereignty; and it will be difficult to apply. I therefore respectfully dissent.

---

charged that the FTC, which brought this case, has been captured by entities over which it has jurisdiction. See E. Cox, "The Nader Report" on the Federal Trade Commission vii–xiv (1969); Posner, Federal Trade Commission, Chi. L. Rev. 47, 82–84 (1969).

Document received by the CA Supreme Court.

Case No. S_____

## IN THE SUPREME COURT OF CALIFORNIA

JUSTIN S. BECK,
Petitioner,

vs.

RUBEN DURAN,
Respondent,

CALIFORNIA SUPREME COURT, STATE BAR OF CALIFORNIA,
STATE OF CALIFORNIA, UNITED STATES OF AMERICA, ROES 1-
150,000, PUBLIC, COURTS, LEGAL PROFESSION et al.
Real Parties in Interest

**PETITION FOR REVIEW OF PER SE + ALLEGED ANTITRUST
VIOLATIONS PRESENTED BY MEMBER OF PUBLIC**

**SUBJECT TO SUPREME COURT ADMINISTRATIVE ORDER
2017-09-20 AND BINDING FEDERAL LAW AFTER 2015**

AFTER DECISIONS BY THE BOARD OF TRUSTEES AND OFFICE

OF GENERAL COUNSEL FOR THE STATE BAR OF CALIFORNIA

**Service on Attorney General of The State of California and Federal
Trade Commission Required by Antitrust Laws**

Justin S. Beck
*In Pro Per*
*Guardian Ad Litem for State of California, United States,
ROES 1-150,000, Public, Courts, and Legal Profession*
3501 Roselle St.  Oceanside, CA 92056
(760) 449-2509   justintimesd@gmail.com

Document received by the CA Supreme Court.

Exhibit #60: 069
22-CV-01616-BAS-DDL

<u>STATEMENT OF CASE</u>

Do The State Bar of California's operations violate federal antitrust laws?

## I. WHY REVIEW SHOULD BE GRANTED

In exercise of its inherent authority and obligations under federal law of the United States Supreme Court, this Honorable Court must conduct a de novo review then modify and/or reject policies, and/or operational decisions, and/or actions relating to the practice of law shown where State Bar actors continue to create and implicate antitrust/competition issues.

The State Bar of California, Office of General Counsel, Office of Chief Trial Counsel, and Board of Trustees each lack direct oversight in regulation despite being controlled by a majority of active market participants. No state actor shown may claim sovereign immunity as of 2015 under binding decisional law of the highest Court in the United States.

For whatever reason, The State Bar of California is not operated in a manner consistent with public statements made by Chairman Duran. Ongoing patterns of conduct prejudicial to public, courts, and legal profession exist, each failing objectively under this Court's own Rules of Professional Conduct (CRPC) which is binding upon every lawyer under Bus. & Prof. Cod. § 6077. It continues under color of law. CRPC 5.1.

This Court must review because the horizontal trade of law, namely, lawyers controlling $3.4 trillion gross state product annually *cannot* govern themselves as a matter of law. *They have not adequately governed themselves*, where no reasonable mind could differ, and anticompetitive conduct has become the rule rather than the exception. Where this Court lacked transparency before, the record is now overwhelming.

Document received by the CA Supreme Court.

2

## II. STATEMENT OF FACTS

*Per se* and alleged anticompetive acts, fraud, oppression, and malice remain unanswered, undertaken by "discretion" or complete "immunity." [1]

A. The State Bar of California is Controlled by its Board of Trustees and its Office of General Counsel in a Unity of Interests ("Board")

B. Majority of Board Comprised of Active Participants in the Horizontal Professional Market for Services in Legal Markets

C. Board Substantially Influences California + Interstate Commerce

   1. Calfornia's Annual Gross State Product Est. $3.4 Trillion
   2. California Would Rank 5th as a Country in Global Economy

D. State Bar Divisions Controlled by Active Market Participants:

   1. Admissions
   2. Access and Inclusion
   3. Office of Chief Trial Counsel
   4. State Bar Court
   5. Office of General Counsel
   6. Executive Director's Office
   7. Board of Trustees

E. Decisions Controlled *Per Se* by Board Include:

   1. Office of Chief Trial Counsel
   2. Complaint Review Unit
   3. Defense of Civil Claims Against The State Bar of California
   4. Defense of Individual Government Actors for Alleged Fraud*
   5. Producing or Denying Public Records Requests
   6. Executive Director's Office and Board of Trustees
   7. Anti-Trust Determinations

F. Board Controls Every Aspect of California Legal Service Industry

---

[1] See Court of Appeal Nos. G059766, G058700, G059457. Rule 8.1115(b). See Case 1, ROA #2 with Case 2, ROA #49, ROA #60, ROA #103, ROA #107, ROA #111.

3

Document received by the CA Supreme Court.

## III. ARGUMENT

Petitioner respectfully and humbly submits this petition with the utmost urgency and objectivity requested of the Honorable Justices of the California Supreme Court. He built and judicially noticed a record of outrageous schemes advanced through anticompetitive conduct prejudicial to public interest under this Court's purview. See Case 1 and Case 2, generally. See ROA #677 in Case 1, ROA #103 in Case 2.

The issues involving the Board of Trustees and each respective division of The State Bar of California affect the entirety of the public, courts, and legal profession. They also affect commerce across state lines, under authority and "discretion" of State Bar. Unfortunately, and at issue with this petition, the conduct shows virtual certainty of continuing based on its recency, veracity without answer, and cumulative judicially noticed evidence from 2002-2022 from the California State Auditor and petitioner. Schemes show similar methods, actors, victims, beneficiaries with one common denominator. Without resasonable mitigation, severe public injuries will persist. CRPC 5.1.

California Supreme Court must use its authority in equity, and to uphold federal law restricting anticompetive activity for all divisions of The State Bar of California. Parties bound to protect the public are shown to abuse official authority and public funding for corrupt motives of passion or interest. BPC § 6068. Absent complete adherence to federal law and actual supervision by State, the United States must act in the interests of a free and fair marketplace under the Sherman Act.

As a layman member of the public, petitioner does not purport to understand what this Court will or should do, but it must be resolute.

4

Document received by the CA Supreme Court.

## A. The State Bar of California and its Actors Lack Sovereign Status

*N.C. State Bd. Of Dental Exam'rs. v. FTC,* 574, U.S _____,135 S. Ct. 1101, 191 L.Ed.2d 35 (2015) ("Binding Antitrust Law")

Limits on state-action immunity are most essential when the State seeks to delegate its regulatory power to active market participants [like Duran, The State Bar of California, Board of Trustees, Office of Chief Trial Counsel, State Bar Court, Office of General Counsel, Legislature, Executive Director, law firms, lawyers in the horizontal profession or trade controlled and regulated by the same persons without direct supervision by State], for established ethical standards may blend with private anticompetitive motives in a way difficult even for market participants to discern. Binding Antitrust Law. Quoting *Goldfarb v. Virginia State Bar,* 421, U.S. 773, 791, 95 S. Ct. 2004, 44 L. Ed. 2d. 572 (1975).

The fact that the State Bar is a state agency for some limited purposes does not create an antitrust shield that allows it to foster anticompetitive practices for the benefit of its [licensees, public employees, elected officials, Board of Trustees, Office of Chief Trial Counsel, IOLTA, non-profits providing paid legal services through horizontal active market participants, or law firms associated therewith, public or private]. *Id.*

## B. Private Anticompetitive Motives Shown Difficult for Active Market Participants to Discern within All State Bar Divisions

1. *Beck v. State Bar* et al. Sup. Ct. No. 30-2020-01145998 (Case 1)
2. *Beck v. State Bar* et al. Sup. Ct. No. 30-2021-01237499 (Case 2)

Petitioner shows active market participants' disregard for public interest, and that most spending by the nonsovereign actor The State Bar of California goes directly or indirectly to active market participants under its control. See Court of Appeal G059766. See also ROA #60 in Case 2.

Document received by the CA Supreme Court.

### C. State Bar Betrays Rules of Professional Conduct (BPC § 6077)

1. <u>CRPC 1.7(d)(3) Governs Unwaivable Conflict</u>
2. <u>CRPC 5.1 Governs Supervisory Lawyer, Law Firm Conduct</u>
3. <u>CRPC 8.4 Governs Willful Violations, Enablement of Violations</u>

For whatever reason, intended or not, State Bar actors defend operational conduct with decisional law pre-dating Government Claims Act of 1963 and notably after the **fundamental tenets** of *Muskopf* in 1961. Petitioner shows that "Complaint Review Unit" and "In Re: Walker," while perhaps well intended, were converted to conceal, apply non-existent discretion in equity or law, and to <u>enable</u> anticompetive conduct. Intentions of Legislature passing AB 3249, legal scholars shaping Rules of Professional Conduct and State Bar Act, and framers of the United States Constitution are subordinate to anticompetitive acts veiled by "discretion."

Petitioner incorporates the records in Case 2 namely ROA #103 p. 21-59 and ROA #49 as being what was actually known by State Bar actors before and after September 14, 2018. See also Case 1, and G059766.

Petitioner incorporates the records in Case 2 namely ROA #85 with cited exhibits on State Bar operations from 2002-2022 by official reports of State Auditor to State leadership including Report 2022-030; Case 2 ROA #101 showing ongoing fraud, oppression, legal malice, and/or corruption prejudicial to petitioner, public, courts, legal profession; ROA #103, leading to abuse of CCP § 425.16 as shown ROA #139; all summarized in ROA #107 and shown further in ROA #111, ROA #121 as to recent acts.

The Court of Appeal's findings (G059766) specific to petitioner are but a microcosm of broader anticompetitive conduct shown. Respectfully, this is not rhetoric. Evidence remains unanswered, deliberately delayed. Petitioner shows "demurrers" and "Anti-SLAPP" are also abused by Duran.

6

*Document received by the CA Supreme Court.*

### D. State Bar Violates Decisions from California Supreme Court

#### 1. *Muskopf* (1961) (after *Walker*, after *Bollotin*) is Binding

Having pled and shown this already, petitioner incorporates by reference his operative complaint in Case 1 under ROA #2 and Case 2 under ROA #60. Petitioner specifically cites Government Claims Act cases, and the (necessary) distinction between operational and policy decisions.

Shown by Petitioner, undisputed by Respondent, State Bar actors purport to have absolute immunity for *any act* undertaken in *any capacity*. Unanswered conduct meets the federal definition of racketeering activity. See Case 1, Case 2. IOLTAs have been shown to be used for money laundering, wire fraud, and mail fraud. See Case 2, ROA #85, and exhibits. See also Case 1 ROA #677 and Case 2 ROA #103. See Court of Appeal G059766, with selections of G058700 and G059457 as to petitioner, courts.

#### 2. *Baral* (2016) inc. Fundamental Tenets of CCP § § 425.16, 425.17

Even after petitioner overturned Anti-SLAPP rulings in the Court of Appeal citing *Baral*, Duran used CCP § 425.16 to intimidate, conceal, and delay discovery. See Case 2, ROA #165 under CCP 128.7. See also ROA #139, ROA #141 for petitioner opposition to defective papers from Duran.

#### 3. *Brown v. USA Taekwondo* (2021); Special Relationship Doctrine

Duran misunderstands this Court's direction in *Guzman* as if it were dispositive of all duties or claims from the public, without regard for *Muskopf*, nor *Rowland's* implications, AB 3249, or the Court's recent direction in *Brown v. USA Taekwondo* in 2021. The point is that members of the public, courts, and legal profession *rely* on Duran to remain objective and neutral, just as with a Court. The Government Claims Act exists to impose liability for damages done where no immunity exists. Here, no immunity exists after 2015, and administrative action is needed.

7

Document received by the CA Supreme Court.

### E. Duran Abuses CCP § 425.16 in Favor of Active Market Participants and to Induce Signatures via Threat of Legal Fees

Abuse of 425.16 is plead, shown in Case 2 ROA #60. Orders overturned three times in Court of Appeal No. G059766 in Case 1 show State Bar actors are substantial factors in eleven combined causes of action arising from conduct that is <u>not protected</u>, malicious prosecution of three lawsuits and counting, and several predicate and parallel schemes to defraud via mail/wire with actual knowledge and full authority of active market participant State Bar actors before and after September 14, 2018. See Case 2, ROA #103, p. 21-59 and ROA #141, and ROA #165. See also Case 1, ROA #677 and ROA #678. *This conduct is anticompetitive.*

### F. State Policy Lacks Clear Communication or Articulation for the Purpose of Anticompetitive Conduct Involving State Bar Actors

Were conduct prejudicial to public, courts and legal profession objectively reasonable in the first instance to claim any form of immunity – such immunity would require a showing of adherence to Binding Anti-Trust Law. GOV 815.6. GOV 815.3. While this Court can act in reasonable mitigation through its administrative powers, petitioner believes a deliberate gap exists in the legal profession concerning malpractice, opposition to CCP § 425.16; application of EVID § 956 for good cause; CCP § 128.5 and CCP § 128.7 on a presumption of State Bar competence; or the confines of litigation privilege as it relates to malicious prosecution under common law and enactments more specific than the privilege itself. Put simply, where the Court seeks to enable free speech and the right of petition to redress grievances in a neutral Court, the same requires strict oversight of the very means of redress in the active market at issue. CCP § 425.17. The Board is a substantial factor (CACI 430) in *all lawyer conduct* and the conduct is out of control.

8

Document received by the CA Supreme Court.

### G. Active Market Market Participants Distributing, Converting Funds

Most, if not all, funding to nonsovereign The State Bar of California goes to horizontal market partcipants within the legal profession that it purports to regulate under absolute discretion and immunity. See Case 2, ROA #49, ROA #79, ROA #119, ROA #128, ROA #139, ROA #141, ROA #161, ROA #180, ROA #184. See also State Bar Strategic Plan 2022-2027. See also State Bar Adopted Budget February 28, 2022. BPC § 6140.10. See also exhibits in support request for review.

1. State Bar to Receive $52 million via IOLTA Proceeds in 2023
2. State Bar Pays Most of its Revenue to Active Market Participants
3. State Bar Invests IOLTA Proceeds to Active Market Participants
4. State Bar Distributes Aid Funding to Active Market Participants

### H. Court Must Invoke Administrative Powers Immediately

While prosecuting two civil cases against State Bar actors, petitioner identified the multi-faceted role that Office of General Counsel plays to misdirect, conceal, and obscure operations of State Bar from this Court.

On July 20, 2022, responding to several formal requests of the Chairman Ruben Duran in his capacity for The State Bar of California and in his concurrent capacity as a private law firm partner at Best Best & Krieger under BPC 6077, CRPC 5.1 and CRPC 8.4, Mr. Duran made an evidentiary showing with Office of General Counsel's Suzanne Grandt that undermines virtually *everything* that The State Bar of California reports, says, or does. State Bar actors are like anticompetitive excuse factories.

Chairman Ruben Duran is misrepresenting the operations of public agency The State Bar of California to the public and this Court. The conduct is violative of Binding Antitrust Law on its face (per se). State Bar actors disregard the law as if it were reasonable. CRPC 1.7. CRPC 8.4.

9

Document received by the CA Supreme Court.

## I. Petitioner Seeks Relief for ROES 1-150,000 Who Cannot Help Themselves Due to Rule 9.40, Binding Antitrust Law Violations

From 2012-2022, as shown by investigations into Girardi, Catanzarite, and Auditor reports – virtually any person who seeks protection from State Bar fails to receive reasonable exercise of care under GOV 815.2, *Brown v. USA Taekwondo* (2021). Very few receive "damages" done to them, which usually requires the retention of yet *another active market participant*. Petitioner shows <u>absolute disregard</u> for up to 150,000 ROES, being those who submitted complaints that were spuriously closed at intake, like those targeting the 700 lawyers identified by State Auditor with 4+ complaints who are in fact benefiting from public funding and State Bar's anticompetitive behavior. Petitioner is attorney-in-fact *guardian ad litem* to those who have been unreasonably injured by anticompetitive conduct undertaken with at least legal malice by State Bar.

Petitioner should be granted permission under this Court's inherent authority over the practice of law in California to file claims in trial court for ROES 1-150,000 in Case 2, failing settlement. The State Bar of California is not permitted to engage in, ratify, or enable public employees, elected officials, nonsovereign actors, or active market participants within the profession it regulates to lie, cheat, steal, defraud, and unlawfully take from persons outside of the horizontal profession of law. It must end.

Petitioner suggests California State Auditor act as direct supervisor under Binding Antitrust Law to assess damages shown for ROES 1-150,000, that this Court expressly permit petitioner to present trial claims for those who cannot help themselves in Case 2, or petitioner be allowed to submit to Legislative committee for appropriations if the Courts are in fact so compromised that ROES 1-150,000 are denied a neutral forum entirely.

Document received by the CA Supreme Court.

Exhibit #60: 078
22-CV-01616-BAS-DDL

## IV. CONCLUSION

Office of General Counsel (once) had a role in assessing anticompetitive activity undertaken by State Bar actors. Now, it lacks objective capacity to review or comment on petitioner's showings. CRPC 1.7. RICO § 1962. Binding Antitrust Law. Sherman Act.

Petitioner concedes conduct may have been concealed or misrepresented to this Court and its Honorable Justices previously despite its best efforts. Overwhelming evidence is since judicially noticed for the Court to consider objectively in its administrative capacity. See Case 1. See Case 2. Where fundamental rights of persons are actually being compromised and converted into real, perceived, undue, implied consideration or benefit, whether directly or indirectly, in any way toward active market participants, there are no band-aids. The Court must act.

WHEREFORE, Petitioner prays this Honorable Court:

1) Review Case 1, Case 2, and Duran's decisions related thereto

2) Direct State to supervise State Bar in accordance with federal law

3) Permit petitioner to file discipline cases to Supreme Court directly

4) License petitioner to file ROES 1-150,000 claims in Case 2 trials

5) Enjoin Duran, State Bar actors from violating RICO § 1962(a)-(d)

6) Enjoin State Bar from further violating Binding Antitrust Law

7) Grant a hearing to petitioner if this request fails to show cause

September 16, 2022

Very Respectfully Submitted,

Justin S. Beck, petitioner, *In Pro Per*

11

Document received by the CA Supreme Court.



# The State Bar *of California*

## REQUEST FOR ANTITRUST DETERMINATION
### Pursuant to Supreme Court of California Admin. Order 2017-09-20

---

### Requester Information

Date  September 15, 2022

First Name  JUSTIN          Last Name  BECK

Organization  Public Interest; OCSC No. 30-2021-01237499 + No. 30-2020-01145998

Address  3501 ROSELLE ST

City  OCEANSIDE          State  CA          Zip Code  92056

Email  justintimesd@gmail.com     Phone  760-449-2509     Fax

It is the policy of the State Bar of California to comply with all laws. An important aspect of this policy is our commitment to obey the letter and the spirit of the antitrust laws. Pursuant to the Supreme Court of California's Administrative Order 2017-09-20, any member of the public may report a potential antitrust violation to the State Bar. When notifying the State Bar of your concerns, please include the following information:

- The nature of the potentially anticompetitive action;
- The department(s) or committee(s) of the State Bar undertaking the action;
- The specific type(s) of market impacts you believe may arise from that action; and
- Why you believe the State Bar does not enjoy immunity from antitrust laws for the action in question.

### Request for Antitrust Determination

*Please be as specific as possible. Attach additional sheets of paper as necessary.*

Please see the attached filing for Supreme Court.

This determination is to be made by the California Supreme Court or United States District Court where pro se violations of federal antitrust laws exist and Office of General Counsel is controlled by active market participants in violation of federal law.

*Document received by the CA Supreme Court.*

### SUBMIT THIS FORM

1) *By E-mail:* AntitrustRequest@calbar.ca.gov

2) *By Mail:*
   The State Bar of California
   Office of General Counsel
   Attn:  Antitrust Request
   180 Howard Street
   San Francisco, California  94105

 Gmail

**Justin Beck <justintimesd@gmail.com>**

## Justin S. Beck v. State Bar of California, et al.; Orange County Superior Court Case No. 30-2021-01237499-CU-PN-CJC

**Justin Beck <justintimesd@gmail.com>**                                                        Fri, Jul 29, 2022 at 5:06 PM
To: "Randolph, Joan" <Joan.Randolph@calbar.ca.gov>
Cc: "Andresen, Carissa" <Carissa.Andresen@calbar.ca.gov>, "Grandt, Suzanne" <Suzanne.Grandt@calbar.ca.gov>
Bcc: fbi_ncra_duty@fbi.gov, Michael Esola <mesola@ficto.tv>

July 29, 2022

California State Auditor Whistleblower Case No. I2022-1019

Defendant The State Bar of California (served FAC on May 2, 2022)
Defendant Joy Nunley (served FAC on May 2, 2022)
Defendant Anand Kumar (served FAC on May 2, 2022)
Defendant Eli David Morgenstern (served FAC on May 2, 2022)
Defendant DOES 1-27 (each acting in an official capacity, served FAC on May 2, 2022)
Defendant Carissan Andresen (former DOE, no order needed, served FAC on May 2, 2022)
Defendant Ruben Duran (former DOE, no order needed, served FAC on May 2, 2022)
Defendant Suzanne Grandt (former DOE, no order needed, served FAC on May 2, 2022)

Counsel:

Your motion under CCP 425.16 is untimely (at minimum) and another act of deliberate disregard for public equity and my rights.  I will defeat it if we see a Court hearing after October 4, 2022 in this matter. I am not withdrawing *anything*. Violations of the Rules of Professional Conduct are not protected activity (nor is fraud or criminal conduct). You do not intimidate me. Apparently you misunderstand not only the Government Claims Act, but the law upon which this motion is based, too.

How is your <u>untimely</u> Anti-SLAPP filed after a motion for summary judgment hearing is scheduled and fully briefed by me for October 4, 2022 hearing? The action was served on May 2, 2022. The conduct doesn't arise from protected activity -- as evidenced by the government claim and virtually everything else in this action. Your demurrer is floating in the wind, too. You seek to dispose of a case on more than one law that you don't understand.

The mere fact that you, a defendant in this case on behalf of the government, are threatening me with legal fees is malicious under the circumstances. You've already enabled serial fraud all the way up to Chairman Duran as recently as this month in an official capacity. This is unconscionable, and your confidence in immunities or procedural mechanisms is misplaced. This is not what Anti-SLAPP was for. I'm going to move that you are sanctioned for the Anti-SLAPP motion itself when I move to strike your demurrer for the same reasons. These motions just give me more pages to move the Court against your untenable defenses to expedite a jury trial if I'm not awarded summary judgment.

The forum of courts in the United States are PRIVATE, and the speech therein is REGULATED by the same laws you enforce for some but avoid for yourselves (and a special list for reasons that should be clear to any person acting reasonably).

The overall acts of government are NOT beyond claims in tort or intentional tort (namely -- the acts of each of you). The conduct upon which my claims are based are not rooted in protected activity -- rather -- they arise from conduct meeting the federal definitions of racketeering activity. The very **appellate court for the district in which this case is in trial court has already overturned Anti-SLAPP rulings because I showed a likelihood of prevailing on the merits for malicious prosecution (three lawsuits), slander of title, unfair business practices, and intentional infliction of emotional distress under your watch. You actually know of the same evidence, and the final rulings associated with them.**

For this <u>civil</u> matter, my only burden (by a preponderance, to be clear) is to show that any official actor for State Bar, or any violation of any duty in law designed to protect me, was a substantial factor in my injuries. And/or that the intentional infliction of emotional distress or conversion was. You think the Court is going to uphold an untimely Anti-SLAPP motion on the grounds in your motion set for hearing December 27, 2022?

*Document received by the CA Supreme Court.*

Exhibit #60: 081
22-CV-01616-BAS-DDL

The "fraud" provisions are codified under CRPC, federal law, bar litigation privilege under CCP 47, and have no reach through this section of law. You don't even have attorney-client privilege where I've shown EVID 956 to apply.

**CCP 425.16 was designed to prevent strategic lawsuits against public participation. This lawsuit is public participation in a matter arising from willful oppression, fraud, dereliction of duty, legal malice, actual malice, and civil rights violations. I'm going to *eviscerate* this frivolous motion in Court and use it as evidence of your lack of capacity.**

This is another bad faith action or tactic to avoid discovery of your acts of fraud, and to suppress evidence.  I already defeated a series of Anti-SLAPP rulings in the trial court filed by your licensees, under your control. Good luck with these arguments. They are unreasonable.

I'll seek other means to reduce your deliberate, unnecessary delays or see you on October 4, 2022 in any event. This is a new low for the State Bar / Complaint Review Unit / Client Security Fund / Government Protection Agency / Regulators of Law or whatever role you purport to be playing at this point in time.

By the way... If you don't want to produce anything in discovery, I've already made clear to the Court that I expected this conduct. It isn't going to delay anything on my end. I've also noticed you of my pending action in federal court, and desire for a referee for discovery and relation of the state action for judicial efficiency. I'm not waiting until October (or December, for that matter) to get more facts from you and your conspirators.

Thank you,

Justin Beck


[Quoted text hidden]
--
============
**Justin Beck**
**760-449-2509**

*This email is informational and planning purposes only and does not constitute an offer or solicitation to sell shares or securities in any company (the "Company"). Any offer or solicitation will be made only by means of a confidential Offering Memorandum and in accordance with the terms of all applicable securities and other laws. None of the information or analyses presented are intended to form the basis for any investment decision, and no specific recommendations are intended. Accordingly, this email does constitute investment advice or counsel or solicitation for investment in any security. This email or its contents and attachments do not constitute or form part of, and should not be construed as, any offer for sale or subscription of, or any invitation to offer to buy or subscribe for, any securities, nor should it or any part of it form the basis of, or relied on in any connection with, any contract or commitment whatsoever. The Company and Justin Beck expressly disclaim any and all responsibility for any direct or consequential loss or damage of any kind whatsoever arising directly or indirectly from: (i) reliance on any information contained in this email or its attachments, (ii) any error, omission or inaccuracy in any such information or (iii) any action resulting therefrom. The Company and Justin Beck make no warranties or representations on the ability to finalize any initiatives outlined within this email or its attachments. This information is being provided upon request only.*

Document received by the CA Supreme Court.

Exhibit #60: 082
22-CV-01616-BAS-DDL

SUPREME COURT
# FILED

SEP 2 6 2017

**Jorge** Navarrete Clerk

_____

Deputy

ADMINISTRATIVE ORDER 2017-09-20

# IN THE SUPREME COURT OF CALIFORNIA

## EN BANC

## STATE BAR ANTITRUST POLICY

## PREAMBLE

The California Supreme Court has the inherent authority to regulate the practice of law in this state. The State Bar of California is the administrative arm of the Supreme Court for attorney licensing, regulation, and discipline. The State Bar acts under the authority and at the direction of the Supreme Court in these matters. The Supreme Court's authority over the State Bar includes the authority to review State Bar actions for antitrust issues and impacts on competition. The Supreme Court, in the exercise of its inherent authority, may conduct a de novo review and may modify or reject any policy or action of the State Bar relating to the regulation of the practice of law, including any that may implicate antitrust and competition issues.

Antitrust laws are designed to promote vigorous and fair competition in the marketplace of competitors and to provide consumers with the best combination of price and quality. The antitrust laws are set forth in the Sherman Act, Federal Trade Commission Act, the Clayton Act, and the Robinson-Patman Act, among other statutes. These laws prohibit anticompetitive activities, including price fixing, attempts to monopolize, and other unreasonable restraints on trade. Unless

Document received by the CA Supreme Court.

1

otherwise lawfully mandated by the California Legislature or the California Supreme Court, the State Bar must take no action in violation of the antitrust laws.

Although focused on private conduct, antitrust laws may apply to public entities under certain circumstances. When the action complained of is that of a sovereign arm of the state (such as a state legislature or a state Supreme Court acting in a legislative capacity), the state as a sovereign may enjoy immunity from the antitrust laws, notwithstanding any impact on competition. (*N.C. State Bd. of Dental Exam'rs v. FTC* (2015) __ U.S. __, __ [135 S.Ct. 1101, 1110]; *Hoover v. Ronwin* (1984) 466 U.S. 558, 567-568.)

The State Bar is a public licensing and regulatory entity that acts under the authority lawfully delegated to it by the sovereign arms of the State of California: the Supreme Court and the Legislature. The United States Supreme Court has held that, under certain circumstances, state licensing entities or boards must prove two elements before they may invoke the state action doctrine: first, the challenged restraint has been adopted pursuant to clearly articulated state policy; and second, the policy is being actively supervised by a state official (or state agency) that is not a participant in the market that is being regulated. (*N.C. State Bd. of Dental Exam'rs v. FTC, supra*, 135 S.Ct. at p. 1110; see also Fed. Trade Com., FTC Staff Guidance on Active Supervision of State Regulatory Boards Controlled by Market Participants (Oct. 2015) <https://www.ftc.gov/system/files/attachments/competition-policy-guidance/active_supervision_of_state_boards.pdf> [as of Sept. 20, 2017].)

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

Document received by the CA Supreme Court.

Exhibit #60: 084
22-CV-01616-BAS-DDL

# ORDER

Pursuant to this court's authority over the State Bar, the court hereby orders the State Bar's adherence to the antitrust policy and guidelines below.

## I. ANTITRUST POLICY

The State Bar must conform to the highest standards of conduct and promote the principles of fair and open competition in all of its policies and actions in pursuit of its overarching public protection mission. Actions of the State Bar that have the effect of advancing the interests of attorneys without a clear benefit to the public must be scrutinized closely for potential antitrust violations. This antitrust policy is intended to assist in the identification and analysis of potential antitrust issues and the compliance with antitrust laws by all employees, entities, and committees that comprise the State Bar. Given the important public mission of the State Bar to enforce and uphold the law, the identification and analysis of any potential antitrust issue must be robust.

It is the responsibility of the State Bar Office of the General Counsel (OGC) to monitor antitrust issues for the State Bar. If any person has a question as to whether a proposed or current State Bar course of action implicates antitrust concerns, the matter should be submitted to OGC. OGC must analyze the matter thoroughly and determine whether the action implicates antitrust concerns. OGC's determinations may be reviewed de novo by the California Supreme Court in accordance with the Supreme Court's procedures. Any action determined by OGC to implicate antitrust concerns may not be implemented unless the Supreme Court determines the action may proceed.

## II. GUIDELINES FOR IDENTIFYING AND ADDRESSING POTENTIAL ANTITRUST ISSUES AT THE STATE BAR

### A. Actions that Have Anticompetitive Effects May Implicate the Antitrust Laws

The threshold inquiry in antitrust analysis is whether an action has an effect that could impact competition or could be an unreasonable restraint of trade in the market for legal services. Unreasonable restraints on trade generally: raise prices; reduce output; diminish quality; limit choice; or create, maintain, or enhance market power. Anticompetitive practices may arise when a state empowers a group of active market participants to decide who can participate in its market and on what terms.

Document received by the CA Supreme Court.

3

If the action or proposed action does not affect competition or has only a de minimis impact, the antitrust laws are not implicated. Courts have held that individualized decisions on admissions or discipline do not impact overall competition in the market to sufficiently raise antitrust concerns. A number of the State Bar's public protection programs have no foreseeable impact on competition in the market for legal services, e.g., the Client Security Fund (compensation of victims), the Lawyer Assistance Program (counseling services for attorneys), and the Commission on Judicial Nominees Evaluation (advisory role to the Governor).

## B. The Role of the California Supreme Court Must Be Analyzed

### 1. California Supreme Court as Final Decision Maker

The California Supreme Court enjoys immunity from the antitrust laws when it acts in its sovereign legislative capacity, such as when it adopts the Rules of Professional Conduct. (*Bates v. State Bar of Arizona* (1977) 433 U.S. 350, 360.) Where the State Bar makes only recommendations to the Supreme Court, and the Supreme Court makes the final decision after the opportunity for a de novo review of the recommendation, the actions are those of the state and may be immune from the antitrust laws, notwithstanding any impact on competition. (See, e.g., Supreme Court Order Approving Modifications to the Cal. Bar Exam, S232907, Mar. 16, 2016.)

The California Supreme Court often exercises its inherent authority to modify or disapprove proposed rules recommended by the State Bar. (See, e.g., Supreme Court Order re Request for Approval of Amends. to Rule 5-110 and Rule 5-220 of the Rules of Professional Conduct of the State Bar of Cal., S239387, May 1, 2017 [granting in part request for approval of recommended amendments to the Rules of Professional Conduct; denying in part and remanding to State Bar to develop further recommendations].)

### 2. Actions and Decisions of the State Bar

If an action of a regulatory agency such as the State Bar has a potential anticompetitive effect, and is not an action of the Supreme Court or the Legislature acting as sovereign, closer analysis will be required. Under these circumstances antitrust immunity is available only if the regulatory entity's action is subject to *active state supervision* and is undertaken pursuant to a *clearly articulated state policy*.

(a) **Active State Supervision:** Federal Trade Commission staff has issued nonbinding advisory guidelines stating that the following factors should

Document received by the CA Supreme Court.

Exhibit #60: 086
22-CV-01616-BAS-DDL

be considered in determining whether the active supervision requirement is met:

(i)    Whether the state supervisor of the regulatory entity has obtained the information necessary for a proper evaluation of the action approved by the regulatory entity.

(ii)    Whether the state supervisor has evaluated the substantive merits of the regulatory entity's action and assessed whether it comports with the standards established by the Supreme Court or the Legislature.

(iii)    Whether the state supervisor has issued a written decision approving, modifying, or disapproving the regulatory entity's action and explaining the reasons and rationale for such decision.

(b) **Clearly Articulated State Policy:**  When undertaking action that may be anticompetitive, the regulatory entity must also act pursuant to a clearly articulated state policy of the Supreme Court or Legislature to displace competition.

Example:  A state bar could be in violation of the antitrust laws if it acts in an anticompetitive manner outside of a clearly articulated state policy.  In *Goldfarb v. Virginia State Bar* (1975) 421 U.S. 773, the Virginia State Bar took action to enforce a minimum fee schedule for lawyers that had not been authorized by the Virginia Supreme Court. The Virginia Supreme Court had not supervised this anticompetitive action, nor was there any clearly articulated statutory or court policy authorizing enforcement of the fee schedule.  The United States Supreme Court held the Virginia State Bar's actions constituted illegal price fixing and were not immune from the antitrust laws.

(c) **Detailed Statute or Rule of Court:**  The active state supervision and clearly articulated state policy requirements are met when the applicable statute or Rule of Court is so detailed and prescriptive as to remove the regulatory entity's discretion.  The detailed legislation or court rule itself articulates the policy and satisfies the supervision requirement. (98 Ops.Cal.Atty.Gen. 12 (2015).)

Example:  The State Bar is required by law to place on inactive status attorneys who fail to comply with mandatory continuing legal education requirements. (Bus. & Prof. Code, § 6070, subd. (a); Cal. Rules of Court, rule 9.31(d).)  Although the State Bar's actions to remove these

5

Document received by the CA Supreme Court.

attorneys from practice temporarily may impact competition, such actions are only a ministerial activity to enforce the statute and likely would not violate the antitrust laws.

## C. State Bar Personnel Must Report Potential Antitrust Violations Immediately

### 1. Sensitive Topics

Actions such as collusion among attorneys to fix prices, limit market entry, or otherwise limit competition, whether or not under the auspices of the State Bar, violate the antitrust laws. Meetings convened by the State Bar often involve groups of attorneys who may be considered competitors in the marketplace under the antitrust laws, and discussions in such meetings of price or costs, such as prevailing hourly billing rates and associate or staff salaries, may implicate antitrust concerns. The State Bar may not take actions that have an anticompetitive effect on the marketplace unless authorized by law.

### 2. Mandatory Reporting

State Bar personnel must comply with the antitrust laws and must immediately report to OGC potential antitrust violations, including but not limited to potential violations caused by actions of the State Bar or the Board of Trustees. In the event OGC reviews a current or proposed action, program, or policy decision and opines there is no potential antitrust violation, OGC remains obligated to forward its analysis to the California Supreme Court, which may choose whether to review the action, program, or policy decision as it deems appropriate.

## D. Potential Antitrust Violations Reported by Members of the Public

Any member of the public may report a potential antitrust violation to the State Bar. The State Bar's determinations on reports of potential antitrust violations brought by members of the public are subject to review by the California Supreme Court in accordance with the Supreme Court's procedures. (Cal. Rules of Court, rule 9.13(d), (e).)

//
//
//
//
//
//
//

6

Document received by the CA Supreme Court.

This order is final forthwith.

**CANTIL-SAKAUYE**
_____
*Chief Justice*

**CHIN, J.**
_____
*Associate Justice*

**CORRIGAN, J.**
_____
*Associate Justice*

**LIU, J.**
_____
*Associate Justice*

**CUÉLLAR, J.**
_____
*Associate Justice*

**KRUGER, J.**
_____
*Associate Justice*

_____
*Associate Justice*

Document received by the CA Supreme Court.

7

(Slip Opinion)          OCTOBER TERM, 2014                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NORTH CAROLINA STATE BOARD OF DENTAL EXAMINERS *v.* FEDERAL TRADE COMMISSION

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 13–534.  Argued October 14, 2014—Decided February 25, 2015

North Carolina's Dental Practice Act (Act) provides that the North Carolina State Board of Dental Examiners (Board) is "the agency of the State for the regulation of the practice of dentistry." The Board's principal duty is to create, administer, and enforce a licensing system for dentists; and six of its eight members must be licensed, practicing dentists.

The Act does not specify that teeth whitening is "the practice of dentistry." Nonetheless, after dentists complained to the Board that nondentists were charging lower prices for such services than dentists did, the Board issued at least 47 official cease-and-desist letters to nondentist teeth whitening service providers and product manufacturers, often warning that the unlicensed practice of dentistry is a crime. This and other related Board actions led nondentists to cease offering teeth whitening services in North Carolina.

The Federal Trade Commission (FTC) filed an administrative complaint, alleging that the Board's concerted action to exclude nondentists from the market for teeth whitening services in North Carolina constituted an anticompetitive and unfair method of competition under the Federal Trade Commission Act. An Administrative Law Judge (ALJ) denied the Board's motion to dismiss on the ground of state-action immunity. The FTC sustained that ruling, reasoning that even if the Board had acted pursuant to a clearly articulated state policy to displace competition, the Board must be actively supervised by the State to claim immunity, which it was not. After a hearing on the merits, the ALJ determined that the Board had unreasonably restrained trade in violation of antitrust law. The FTC again sustained the ALJ, and the Fourth Circuit affirmed the FTC in

Document received by the CA Supreme Court.

Document received by the CA Supreme Court.

2          NORTH CAROLINA STATE BD. OF DENTAL
                    EXAMINERS *v.* FTC
                         Syllabus

all respects.

*Held*: Because a controlling number of the Board's decisionmakers are
active market participants in the occupation the Board regulates, the
Board can invoke state-action antitrust immunity only if it was sub-
ject to active supervision by the State, and here that requirement is
not met. Pp. 5–18.

   (a) Federal antitrust law is a central safeguard for the Nation's free
market structures. However, requiring States to conform to the
mandates of the Sherman Act at the expense of other values a State
may deem fundamental would impose an impermissible burden on
the States' power to regulate. Therefore, beginning with *Parker* v.
*Brown*, 317 U. S. 341, this Court interpreted the antitrust laws to
confer immunity on the anticompetitive conduct of States acting in
their sovereign capacity. Pp. 5–6.

   (b) The Board's actions are not cloaked with *Parker* immunity. A
nonsovereign actor controlled by active market participants—such as
the Board—enjoys *Parker* immunity only if "'the challenged restraint
. . . [is] clearly articulated and affirmatively expressed as state poli-
cy,' and . . . 'the policy . . . [is] actively supervised by the State.'"
*FTC* v. *Phoebe Putney Health System, Inc.*, 568 U. S. ___, ___ (quoting
*California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445
U. S. 97, 105). Here, the Board did not receive active supervision of
its anticompetitive conduct. Pp. 6–17.

   (1) An entity may not invoke *Parker* immunity unless its actions
are an exercise of the State's sovereign power. See *Columbia* v. *Omni
Outdoor Advertising, Inc.*, 499 U. S. 365, 374. Thus, where a State
delegates control over a market to a nonsovereign actor the Sherman
Act confers immunity only if the State accepts political accountability
for the anticompetitive conduct it permits and controls. Limits on
state-action immunity are most essential when a State seeks to dele-
gate its regulatory power to active market participants, for dual alle-
giances are not always apparent to an actor and prohibitions against
anticompetitive self-regulation by active market participants are an
axiom of federal antitrust policy. Accordingly, *Parker* immunity re-
quires that the anticompetitive conduct of nonsovereign actors, espe-
cially those authorized by the State to regulate their own profession,
result from procedures that suffice to make it the State's own.
*Midcal's* two-part test provides a proper analytical framework to re-
solve the ultimate question whether an anticompetitive policy is in-
deed the policy of a State. The first requirement—clear articula-
tion—rarely will achieve that goal by itself, for entities purporting to
act under state authority might diverge from the State's considered
definition of the public good and engage in private self-dealing. The
second *Midcal* requirement—active supervision—seeks to avoid this

Exhibit #60: 091
22-CV-01616-BAS-DDL

Syllabus

harm by requiring the State to review and approve interstitial policies made by the entity claiming immunity. Pp. 6–10.

(2) There are instances in which an actor can be excused from *Midcal*'s active supervision requirement. Municipalities, which are electorally accountable, have general regulatory powers, and have no private price-fixing agenda, are subject exclusively to the clear articulation requirement. See *Hallie* v. *Eau Claire*, 471 U. S. 34, 35. That *Hallie* excused municipalities from *Midcal*'s supervision rule for these reasons, however, all but confirms the rule's applicability to actors controlled by active market participants. Further, in light of *Omni*'s holding that an otherwise immune entity will not lose immunity based on ad hoc and *ex post* questioning of its motives for making particular decisions, 499 U. S., at 374, it is all the more necessary to ensure the conditions for granting immunity are met in the first place, see *FTC* v. *Ticor Title Ins. Co.*, 504 U. S. 621, 633, and *Phoebe Putney, supra,* at ___. The clear lesson of precedent is that *Midcal*'s active supervision test is an essential prerequisite of *Parker* immunity for any nonsovereign entity—public or private—controlled by active market participants. Pp. 10–12.

(3) The Board's argument that entities designated by the States as agencies are exempt from *Midcal*'s second requirement cannot be reconciled with the Court's repeated conclusion that the need for supervision turns not on the formal designation given by States to regulators but on the risk that active market participants will pursue private interests in restraining trade. State agencies controlled by active market participants pose the very risk of self-dealing *Midcal*'s supervision requirement was created to address. See *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, 791. This conclusion does not question the good faith of state officers but rather is an assessment of the structural risk of market participants' confusing their own interests with the State's policy goals. While *Hallie* stated "it is likely that active state supervision would also not be required" for agencies, 471 U. S., at 46, n. 10, the entity there was more like prototypical state agencies, not specialized boards dominated by active market participants. The latter are similar to private trade associations vested by States with regulatory authority, which must satisfy *Midcal*'s active supervision standard. 445 U. S., at 105–106. The similarities between agencies controlled by active market participants and such associations are not eliminated simply because the former are given a formal designation by the State, vested with a measure of government power, and required to follow some procedural rules. See *Hallie, supra,* at 39. When a State empowers a group of active market participants to decide who can participate in its market, and on what terms, the need for supervision is manifest. Thus,

Document received by the CA Supreme Court.

the Court holds today that a state board on which a controlling number of decisionmakers are active market participants in the occupation the board regulates must satisfy *Midcal's* active supervision requirement in order to invoke state-action antitrust immunity. Pp. 12–14.

(4) The State argues that allowing this FTC order to stand will discourage dedicated citizens from serving on state agencies that regulate their own occupation. But this holding is not inconsistent with the idea that those who pursue a calling must embrace ethical standards that derive from a duty separate from the dictates of the State. Further, this case does not offer occasion to address the question whether agency officials, including board members, may, under some circumstances, enjoy immunity from damages liability. Of course, States may provide for the defense and indemnification of agency members in the event of litigation, and they can also ensure *Parker* immunity is available by adopting clear policies to displace competition and providing active supervision. Arguments against the wisdom of applying the antitrust laws to professional regulation absent compliance with the prerequisites for invoking *Parker* immunity must be rejected, see *Patrick* v. *Burget*, 486 U. S. 94, 105–106, particularly in light of the risks licensing boards dominated by market participants may pose to the free market. Pp. 14–16.

(5) The Board does not contend in this Court that its anticompetitive conduct was actively supervised by the State or that it should receive *Parker* immunity on that basis. The Act delegates control over the practice of dentistry to the Board, but says nothing about teeth whitening. In acting to expel the dentists' competitors from the market, the Board relied on cease-and-desist letters threatening criminal liability, instead of other powers at its disposal that would have invoked oversight by a politically accountable official. Whether or not the Board exceeded its powers under North Carolina law, there is no evidence of any decision by the State to initiate or concur with the Board's actions against the nondentists. P. 17.

(c) Here, where there are no specific supervisory systems to be reviewed, it suffices to note that the inquiry regarding active supervision is flexible and context-dependent. The question is whether the State's review mechanisms provide "realistic assurance" that a nonsovereign actor's anticompetitive conduct "promotes state policy, rather than merely the party's individual interests." *Patrick*, 486 U. S., 100–101. The Court has identified only a few constant requirements of active supervision: The supervisor must review the substance of the anticompetitive decision, see *id.*, at 102–103; the supervisor must have the power to veto or modify particular decisions to ensure they accord with state policy, see *ibid.*; and the "mere potential for state

Document received by the CA Supreme Court.

Cite as: 574 U. S. ____ (2015)       5

Syllabus

supervision is not an adequate substitute for a decision by the State," *Ticor, supra*, at 638. Further, the state supervisor may not itself be an active market participant. In general, however, the adequacy of supervision otherwise will depend on all the circumstances of a case. Pp. 17–18.

717 F. 3d 359, affirmed.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. ALITO, J., filed a dissenting opinion, in which SCALIA and THOMAS, JJ., joined.

Document received by the CA Supreme Court.

Cite as: 574 U. S. ____ (2015)          1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 13–534

## NORTH CAROLINA STATE BOARD OF DENTAL EXAMINERS, PETITIONER *v.* FEDERAL TRADE COMMISSION

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[February 25, 2015]

JUSTICE KENNEDY delivered the opinion of the Court.

This case arises from an antitrust challenge to the actions of a state regulatory board. A majority of the board's members are engaged in the active practice of the profession it regulates. The question is whether the board's actions are protected from Sherman Act regulation under the doctrine of state-action antitrust immunity, as defined and applied in this Court's decisions beginning with *Parker* v. *Brown*, 317 U. S. 341 (1943).

I

A

In its Dental Practice Act (Act), North Carolina has declared the practice of dentistry to be a matter of public concern requiring regulation. N. C. Gen. Stat. Ann. §90–22(a) (2013). Under the Act, the North Carolina State Board of Dental Examiners (Board) is "the agency of the State for the regulation of the practice of dentistry." §90–22(b).

The Board's principal duty is to create, administer, and enforce a licensing system for dentists. See §§90–29 to

Document received by the CA Supreme Court.

90–41. To perform that function it has broad authority over licensees. See §90–41. The Board's authority with respect to unlicensed persons, however, is more restricted: like "any resident citizen," the Board may file suit to "perpetually enjoin any person from . . . unlawfully practicing dentistry." §90–40.1.

The Act provides that six of the Board's eight members must be licensed dentists engaged in the active practice of dentistry. §90–22. They are elected by other licensed dentists in North Carolina, who cast their ballots in elections conducted by the Board. *Ibid.* The seventh member must be a licensed and practicing dental hygienist, and he or she is elected by other licensed hygienists. *Ibid.* The final member is referred to by the Act as a "consumer" and is appointed by the Governor. *Ibid.* All members serve 3-year terms, and no person may serve more than two consecutive terms. *Ibid.* The Act does not create any mechanism for the removal of an elected member of the Board by a public official. See *ibid.*

Board members swear an oath of office, §138A–22(a), and the Board must comply with the State's Administrative Procedure Act, §150B–1 *et seq.*, Public Records Act, §132–1 *et seq.*, and open-meetings law, §143–318.9 *et seq.* The Board may promulgate rules and regulations governing the practice of dentistry within the State, provided those mandates are not inconsistent with the Act and are approved by the North Carolina Rules Review Commission, whose members are appointed by the state legislature. See §§90–48, 143B–30.1, 150B–21.9(a).

                                    B

In the 1990's, dentists in North Carolina started whitening teeth. Many of those who did so, including 8 of the Board's 10 members during the period at issue in this case, earned substantial fees for that service. By 2003, nondentists arrived on the scene. They charged lower

Document received by the CA Supreme Court.

prices for their services than the dentists did.  Dentists soon began to complain to the Board about their new competitors.  Few complaints warned of possible harm to consumers.  Most expressed a principal concern with the low prices charged by nondentists.

Responding to these filings, the Board opened an investigation into nondentist teeth whitening.  A dentist member was placed in charge of the inquiry.  Neither the Board's hygienist member nor its consumer member participated in this undertaking.  The Board's chief operations officer remarked that the Board was "going forth to do battle" with nondentists.  App. to Pet. for Cert. 103a.  The Board's concern did not result in a formal rule or regulation reviewable by the independent Rules Review Commission, even though the Act does not, by its terms, specify that teeth whitening is "the practice of dentistry."

Starting in 2006, the Board issued at least 47 cease-and-desist letters on its official letterhead to nondentist teeth whitening service providers and product manufacturers.  Many of those letters directed the recipient to cease "all activity constituting the practice of dentistry"; warned that the unlicensed practice of dentistry is a crime; and strongly implied (or expressly stated) that teeth whitening constitutes "the practice of dentistry."  App. 13, 15.  In early 2007, the Board persuaded the North Carolina Board of Cosmetic Art Examiners to warn cosmetologists against providing teeth whitening services.  Later that year, the Board sent letters to mall operators, stating that kiosk teeth whiteners were violating the Dental Practice Act and advising that the malls consider expelling violators from their premises.

These actions had the intended result.  Nondentists ceased offering teeth whitening services in North Carolina.

C

In 2010, the Federal Trade Commission (FTC) filed an

Document received by the CA Supreme Court.

administrative complaint charging the Board with violating §5 of the Federal Trade Commission Act, 38 Stat. 719, as amended, 15 U. S. C. §45.  The FTC alleged that the Board's concerted action to exclude nondentists from the market for teeth whitening services in North Carolina constituted an anticompetitive and unfair method of competition.  The Board moved to dismiss, alleging state-action immunity.  An Administrative Law Judge (ALJ) denied the motion.  On appeal, the FTC sustained the ALJ's ruling.  It reasoned that, even assuming the Board had acted pursuant to a clearly articulated state policy to displace competition, the Board is a "public/private hybrid" that must be actively supervised by the State to claim immunity.  App. to Pet. for Cert. 49a.  The FTC further concluded the Board could not make that showing.

Following other proceedings not relevant here, the ALJ conducted a hearing on the merits and determined the Board had unreasonably restrained trade in violation of antitrust law.  On appeal, the FTC again sustained the ALJ.  The FTC rejected the Board's public safety justification, noting, *inter alia,* "a wealth of evidence . . . suggesting that non-dentist provided teeth whitening is a safe cosmetic procedure." *Id.,* at 123a.

The FTC ordered the Board to stop sending the cease-and-desist letters or other communications that stated nondentists may not offer teeth whitening services and products.  It further ordered the Board to issue notices to all earlier recipients of the Board's cease-and-desist orders advising them of the Board's proper sphere of authority and saying, among other options, that the notice recipients had a right to seek declaratory rulings in state court.

On petition for review, the Court of Appeals for the Fourth Circuit affirmed the FTC in all respects.  717 F. 3d 359, 370 (2013).  This Court granted certiorari.  571 U. S. ___ (2014).

Document received by the CA Supreme Court.

Opinion of the Court

## II

Federal antitrust law is a central safeguard for the Nation's free market structures. In this regard it is "as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States* v. *Topco Associates, Inc.*, 405 U. S. 596, 610 (1972). The antitrust laws declare a considered and decisive prohibition by the Federal Government of cartels, price fixing, and other combinations or practices that undermine the free market.

The Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. §1 *et seq.*, serves to promote robust competition, which in turn empowers the States and provides their citizens with opportunities to pursue their own and the public's welfare. See *FTC* v. *Ticor Title Ins. Co.*, 504 U. S. 621, 632 (1992). The States, however, when acting in their respective realm, need not adhere in all contexts to a model of unfettered competition. While "the States regulate their economies in many ways not inconsistent with the antitrust laws," *id.*, at 635–636, in some spheres they impose restrictions on occupations, confer exclusive or shared rights to dominate a market, or otherwise limit competition to achieve public objectives. If every duly enacted state law or policy were required to conform to the mandates of the Sherman Act, thus promoting competition at the expense of other values a State may deem fundamental, federal antitrust law would impose an impermissible burden on the States' power to regulate. See *Exxon Corp.* v. *Governor of Maryland*, 437 U. S. 117, 133 (1978); see also Easterbrook, Antitrust and the Economics of Federalism, 26 J. Law & Econ. 23, 24 (1983).

For these reasons, the Court in *Parker* v. *Brown* interpreted the antitrust laws to confer immunity on anticompetitive conduct by the States when acting in their sovereign capacity. See 317 U. S., at 350–351. That ruling

Document received by the CA Supreme Court.

recognized Congress' purpose to respect the federal balance and to "embody in the Sherman Act the federalism principle that the States possess a significant measure of sovereignty under our Constitution." *Community Communications Co.* v. *Boulder,* 455 U. S. 40, 53 (1982). Since 1943, the Court has reaffirmed the importance of *Parker*'s central holding. See, *e.g., Ticor, supra,* at 632–637; *Hoover* v. *Ronwin,* 466 U. S. 558, 568 (1984); *Lafayette* v. *Louisiana Power & Light Co.,* 435 U. S. 389, 394–400 (1978).

### III

In this case the Board argues its members were invested by North Carolina with the power of the State and that, as a result, the Board's actions are cloaked with *Parker* immunity. This argument fails, however. A nonsovereign actor controlled by active market participants—such as the Board—enjoys *Parker* immunity only if it satisfies two requirements: "first that 'the challenged restraint . . . be one clearly articulated and affirmatively expressed as state policy,' and second that 'the policy . . . be actively supervised by the State.'" *FTC* v. *Phoebe Putney Health System, Inc.,* 568 U. S. ___, ___ (2013) (slip op., at 7) (quoting *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.,* 445 U. S. 97, 105 (1980)). The parties have assumed that the clear articulation requirement is satisfied, and we do the same. While North Carolina prohibits the unauthorized practice of dentistry, however, its Act is silent on whether that broad prohibition covers teeth whitening. Here, the Board did not receive active supervision by the State when it interpreted the Act as addressing teeth whitening and when it enforced that policy by issuing cease-and-desist letters to nondentist teeth whiteners.

### A

Although state-action immunity exists to avoid conflicts

Document received by the CA Supreme Court.

Opinion of the Court

between state sovereignty and the Nation's commitment to
a policy of robust competition, *Parker* immunity is not
unbounded. "[G]iven the fundamental national values of
free enterprise and economic competition that are embod-
ied in the federal antitrust laws, 'state action immunity is
disfavored, much as are repeals by implication.'" *Phoebe
Putney, supra*, at ____ (slip op., at 7) (quoting *Ticor, supra*,
at 636).

An entity may not invoke *Parker* immunity unless the
actions in question are an exercise of the State's sovereign
power. See *Columbia* v. *Omni Outdoor Advertising, Inc.*,
499 U. S. 365, 374 (1991). State legislation and "deci-
sion[s] of a state supreme court, acting legislatively rather
than judicially," will satisfy this standard, and "*ipso facto*
are exempt from the operation of the antitrust laws" be-
cause they are an undoubted exercise of state sovereign
authority. *Hoover, supra*, at 567–568.

But while the Sherman Act confers immunity on the
States' own anticompetitive policies out of respect for
federalism, it does not always confer immunity where, as
here, a State delegates control over a market to a non-
sovereign actor. See *Parker, supra*, at 351 ("[A] state does
not give immunity to those who violate the Sherman Act
by authorizing them to violate it, or by declaring that their
action is lawful"). For purposes of *Parker*, a nonsovereign
actor is one whose conduct does not automatically qualify
as that of the sovereign State itself. See *Hoover, supra*, at
567–568. State agencies are not simply by their govern-
mental character sovereign actors for purposes of state-
action immunity. See *Goldfarb* v. *Virginia State Bar*, 421
U. S. 773, 791 (1975) ("The fact that the State Bar is a
state agency for some limited purposes does not create an
antitrust shield that allows it to foster anticompetitive
practices for the benefit of its members"). Immunity for
state agencies, therefore, requires more than a mere fa-
cade of state involvement, for it is necessary in light of

Document received by the CA Supreme Court.

*Parker*'s rationale to ensure the States accept political accountability for anticompetitive conduct they permit and control. See *Ticor*, 504 U. S., at 636.

Limits on state-action immunity are most essential when the State seeks to delegate its regulatory power to active market participants, for established ethical standards may blend with private anticompetitive motives in a way difficult even for market participants to discern. Dual allegiances are not always apparent to an actor. In consequence, active market participants cannot be allowed to regulate their own markets free from antitrust accountability. See *Midcal, supra,* at 106 ("The national policy in favor of competition cannot be thwarted by casting [a] gauzy cloak of state involvement over what is essentially a private price-fixing arrangement"). Indeed, prohibitions against anticompetitive self-regulation by active market participants are an axiom of federal antitrust policy. See, *e.g., Allied Tube & Conduit Corp.* v. *Indian Head, Inc.*, 486 U. S. 492, 501 (1988); *Hoover, supra,* at 584 (Stevens, J., dissenting) ("The risk that private regulation of market entry, prices, or output may be designed to confer monopoly profits on members of an industry at the expense of the consuming public has been the central concern of . . . our antitrust jurisprudence"); see also Elhauge, The Scope of Antitrust Process, 104 Harv. L. Rev. 667, 672 (1991). So it follows that, under *Parker* and the Supremacy Clause, the States' greater power to attain an end does not include the lesser power to negate the congressional judgment embodied in the Sherman Act through unsupervised delegations to active market participants. See Garland, Antitrust and State Action: Economic Efficiency and the Political Process, 96 Yale L. J. 486, 500 (1986).

*Parker* immunity requires that the anticompetitive conduct of nonsovereign actors, especially those authorized by the State to regulate their own profession, result from procedures that suffice to make it the State's own.

Document received by the CA Supreme Court.

Opinion of the Court

See *Goldfarb, supra,* at 790; see also 1A P. Areeda & H. Hovencamp, Antitrust Law ¶226, p. 180 (4th ed. 2013) (Areeda & Hovencamp). The question is not whether the challenged conduct is efficient, well-functioning, or wise. See *Ticor, supra,* at 634–635. Rather, it is "whether anticompetitive conduct engaged in by [nonsovereign actors] should be deemed state action and thus shielded from the antitrust laws." *Patrick* v. *Burget,* 486 U. S. 94, 100 (1988).

To answer this question, the Court applies the two-part test set forth in *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.,* 445 U. S. 97, a case arising from California's delegation of price-fixing authority to wine merchants. Under *Midcal,* "[a] state law or regulatory scheme cannot be the basis for antitrust immunity unless, first, the State has articulated a clear policy to allow the anticompetitive conduct, and second, the State provides active supervision of [the] anticompetitive conduct." *Ticor, supra,* at 631 (citing *Midcal, supra,* at 105).

*Midcal*'s clear articulation requirement is satisfied "where the displacement of competition [is] the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature. In that scenario, the State must have foreseen and implicitly endorsed the anticompetitive effects as consistent with its policy goals." *Phoebe Putney,* 568 U. S., at ___ (slip op., at 11). The active supervision requirement demands, *inter alia,* "that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." *Patrick, supra,* U. S., at 101.

The two requirements set forth in *Midcal* provide a proper analytical framework to resolve the ultimate question whether an anticompetitive policy is indeed the policy of a State. The first requirement—clear articulation— rarely will achieve that goal by itself, for a policy may

Document received by the CA Supreme Court.

satisfy this test yet still be defined at so high a level of generality as to leave open critical questions about how and to what extent the market should be regulated. See *Ticor, supra,* at 636–637. Entities purporting to act under state authority might diverge from the State's considered definition of the public good. The resulting asymmetry between a state policy and its implementation can invite private self-dealing. The second *Midcal* requirement—active supervision—seeks to avoid this harm by requiring the State to review and approve interstitial policies made by the entity claiming immunity.

*Midcal*'s supervision rule "stems from the recognition that '[w]here a private party is engaging in anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State.'" *Patrick, supra,* at 100. Concern about the private incentives of active market participants animates *Midcal*'s supervision mandate, which demands "realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests." *Patrick, supra,* at 101.

                          B

In determining whether anticompetitive policies and conduct are indeed the action of a State in its sovereign capacity, there are instances in which an actor can be excused from *Midcal*'s active supervision requirement. In *Hallie* v. *Eau Claire,* 471 U. S. 34, 45 (1985), the Court held municipalities are subject exclusively to *Midcal*'s "'clear articulation'" requirement. That rule, the Court observed, is consistent with the objective of ensuring that the policy at issue be one enacted by the State itself. *Hallie* explained that "[w]here the actor is a municipality, there is little or no danger that it is involved in a private price-fixing arrangement. The only real danger is that it will seek to further purely parochial public interests at the

Document received by the CA Supreme Court.

Opinion of the Court

expense of more overriding state goals." 471 U. S., at 47. *Hallie* further observed that municipalities are electorally accountable and lack the kind of private incentives characteristic of active participants in the market. See *id.,* at 45, n. 9. Critically, the municipality in *Hallie* exercised a wide range of governmental powers across different economic spheres, substantially reducing the risk that it would pursue private interests while regulating any single field. See *ibid.* That *Hallie* excused municipalities from *Midcal's* supervision rule for these reasons all but confirms the rule's applicability to actors controlled by active market participants, who ordinarily have none of the features justifying the narrow exception *Hallie* identified. See 471 U. S., at 45.

Following *Goldfarb, Midcal,* and *Hallie,* which clarified the conditions under which *Parker* immunity attaches to the conduct of a nonsovereign actor, the Court in *Columbia* v. *Omni Outdoor Advertising, Inc.,* 499 U. S. 365, addressed whether an otherwise immune entity could lose immunity for conspiring with private parties. In *Omni,* an aspiring billboard merchant argued that the city of Columbia, South Carolina, had violated the Sherman Act— and forfeited its *Parker* immunity—by anticompetitively conspiring with an established local company in passing an ordinance restricting new billboard construction. 499 U. S., at 367–368. The Court disagreed, holding there is no "conspiracy exception" to *Parker. Omni, supra,* at 374.

*Omni,* like the cases before it, recognized the importance of drawing a line "relevant to the purposes of the Sherman Act and of *Parker*: prohibiting the restriction of competition for private gain but permitting the restriction of competition in the public interest." 499 U. S., at 378. In the context of a municipal actor which, as in *Hallie,* exercised substantial governmental powers, *Omni* rejected a conspiracy exception for "corruption" as vague and unworkable, since "virtually all regulation benefits some

Document received by the CA Supreme Court.

segments of the society and harms others" and may in that sense be seen as "'corrupt.'" 499 U. S., at 377. *Omni* also rejected subjective tests for corruption that would force a "deconstruction of the governmental process and probing of the official 'intent' that we have consistently sought to avoid." *Ibid.* Thus, whereas the cases preceding it addressed the preconditions of *Parker* immunity and engaged in an objective, *ex ante* inquiry into nonsovereign actors' structure and incentives, *Omni* made clear that recipients of immunity will not lose it on the basis of ad hoc and *ex post* questioning of their motives for making particular decisions.

*Omni*'s holding makes it all the more necessary to ensure the conditions for granting immunity are met in the first place. The Court's two state-action immunity cases decided after *Omni* reinforce this point. In *Ticor* the Court affirmed that *Midcal*'s limits on delegation must ensure that "[a]ctual state involvement, not deference to private price-fixing arrangements under the general auspices of state law, is the precondition for immunity from federal law." 504 U. S., at 633. And in *Phoebe Putney* the Court observed that *Midcal*'s active supervision requirement, in particular, is an essential condition of state-action immunity when a nonsovereign actor has "an incentive to pursue [its] own self-interest under the guise of implementing state policies." 568 U. S., at ___ (slip op., at 8) (quoting *Hallie*, *supra*, at 46–47). The lesson is clear: *Midcal*'s active supervision test is an essential prerequisite of *Parker* immunity for any nonsovereign entity—public or private—controlled by active market participants.

### C

The Board argues entities designated by the States as agencies are exempt from *Midcal*'s second requirement. That premise, however, cannot be reconciled with the Court's repeated conclusion that the need for supervision

Document received by the CA Supreme Court.

Opinion of the Court

turns not on the formal designation given by States to regulators but on the risk that active market participants will pursue private interests in restraining trade.

State agencies controlled by active market participants, who possess singularly strong private interests, pose the very risk of self-dealing *Midcal*'s supervision requirement was created to address.  See Areeda & Hovencamp ¶227, at 226.  This conclusion does not question the good faith of state officers but rather is an assessment of the structural risk of market participants' confusing their own interests with the State's policy goals.  See *Patrick*, 486 U. S., at 100–101.

The Court applied this reasoning to a state agency in *Goldfarb*.  There the Court denied immunity to a state agency (the Virginia State Bar) controlled by market participants (lawyers) because the agency had "joined in what is essentially a private anticompetitive activity" for "the benefit of its members." 421 U. S., at 791, 792.  This emphasis on the Bar's private interests explains why *Goldfarb*, though it predates *Midcal*, considered the lack of supervision by the Virginia Supreme Court to be a principal reason for denying immunity.  See 421 U. S., at 791; see also *Hoover*, 466 U. S., at 569 (emphasizing lack of active supervision in *Goldfarb*); *Bates* v. *State Bar of Ariz.*, 433 U. S. 350, 361–362 (1977) (granting the Arizona Bar state-action immunity partly because its "rules are subject to pointed re-examination by the policymaker").

While *Hallie* stated "it is likely that active state super-vision would also not be required" for agencies, 471 U. S., at 46, n. 10, the entity there, as was later the case in *Omni*, was an electorally accountable municipality with general regulatory powers and no private price-fixing agenda.  In that and other respects the municipality was more like prototypical state agencies, not specialized boards dominated by active market participants.  In im-portant regards, agencies controlled by market partici-

Document received by the CA Supreme Court.

pants are more similar to private trade associations vested
by States with regulatory authority than to the agencies
*Hallie* considered. And as the Court observed three years
after *Hallie*, "[t]here is no doubt that the members of such
associations often have economic incentives to restrain
competition and that the product standards set by such
associations have a serious potential for anticompetitive
harm." *Allied Tube*, 486 U. S., at 500. For that reason,
those associations must satisfy *Midcal*'s active supervision
standard. See *Midcal*, 445 U. S., at 105–106.

The similarities between agencies controlled by active
market participants and private trade associations are not
eliminated simply because the former are given a formal
designation by the State, vested with a measure of gov-
ernment power, and required to follow some procedural
rules. See *Hallie, supra*, at 39 (rejecting "purely formalis-
tic" analysis). *Parker* immunity does not derive from
nomenclature alone. When a State empowers a group of
active market participants to decide who can participate
in its market, and on what terms, the need for supervision
is manifest. See Areeda & Hovencamp ¶227, at 226. The
Court holds today that a state board on which a control-
ling number of decisionmakers are active market partici-
pants in the occupation the board regulates must satisfy
*Midcal*'s active supervision requirement in order to invoke
state-action antitrust immunity.

### D

The State argues that allowing this FTC order to stand
will discourage dedicated citizens from serving on state
agencies that regulate their own occupation. If this were
so—and, for reasons to be noted, it need not be so—there
would be some cause for concern. The States have a sov-
ereign interest in structuring their governments, see
*Gregory* v. *Ashcroft*, 501 U. S. 452, 460 (1991), and may
conclude there are substantial benefits to staffing their

Document received by the CA Supreme Court.

Opinion of the Court

agencies with experts in complex and technical subjects, see *Southern Motor Carriers Rate Conference, Inc.* v. *United States*, 471 U. S. 48, 64 (1985). There is, moreover, a long tradition of citizens esteemed by their professional colleagues devoting time, energy, and talent to enhancing the dignity of their calling.

Adherence to the idea that those who pursue a calling must embrace ethical standards that derive from a duty separate from the dictates of the State reaches back at least to the Hippocratic Oath. See generally S. Miles, The Hippocratic Oath and the Ethics of Medicine (2004). In the United States, there is a strong tradition of professional self-regulation, particularly with respect to the development of ethical rules. See generally R. Rotunda & J. Dzienkowski, Legal Ethics: The Lawyer's Deskbook on Professional Responsibility (2014); R. Baker, Before Bioethics: A History of American Medical Ethics From the Colonial Period to the Bioethics Revolution (2013). Dentists are no exception. The American Dental Association, for example, in an exercise of "the privilege and obligation of self-government," has "call[ed] upon dentists to follow high ethical standards," including "honesty, compassion, kindness, integrity, fairness and charity." American Dental Association, Principles of Ethics and Code of Professional Conduct 3–4 (2012). State laws and institutions are sustained by this tradition when they draw upon the expertise and commitment of professionals.

Today's holding is not inconsistent with that idea. The Board argues, however, that the potential for money damages will discourage members of regulated occupations from participating in state government. Cf. *Filarsky* v. *Delia*, 566 U. S. ___, ___ (2012) (slip op., at 12) (warning in the context of civil rights suits that the "the most talented candidates will decline public engagements if they do not receive the same immunity enjoyed by their public employee counterparts"). But this case, which does not

Document received by the CA Supreme Court.

present a claim for money damages, does not offer occasion to address the question whether agency officials, including board members, may, under some circumstances, enjoy immunity from damages liability. See *Goldfarb*, 421 U. S., at 792, n. 22; see also Brief for Respondent 56. And, of course, the States may provide for the defense and indemnification of agency members in the event of litigation.

States, furthermore, can ensure *Parker* immunity is available to agencies by adopting clear policies to displace competition; and, if agencies controlled by active market participants interpret or enforce those policies, the States may provide active supervision. Precedent confirms this principle. The Court has rejected the argument that it would be unwise to apply the antitrust laws to professional regulation absent compliance with the prerequisites for invoking *Parker* immunity:

> "[Respondents] contend that effective peer review is essential to the provision of quality medical care and that any threat of antitrust liability will prevent physicians from participating openly and actively in peer-review proceedings. This argument, however, essentially challenges the wisdom of applying the antitrust laws to the sphere of medical care, and as such is properly directed to the legislative branch. To the extent that Congress has declined to exempt medical peer review from the reach of the antitrust laws, peer review is immune from antitrust scrutiny only if the State effectively has made this conduct its own." *Patrick*, 486 U. S. at 105–106 (footnote omitted).

The reasoning of *Patrick* v. *Burget* applies to this case with full force, particularly in light of the risks licensing boards dominated by market participants may pose to the free market. See generally Edlin & Haw, Cartels by Another Name: Should Licensed Occupations Face Antitrust Scrutiny? 162 U. Pa. L. Rev. 1093 (2014).

Document received by the CA Supreme Court.

Opinion of the Court

### E

The Board does not contend in this Court that its anti-competitive conduct was actively supervised by the State or that it should receive *Parker* immunity on that basis.

By statute, North Carolina delegates control over the practice of dentistry to the Board. The Act, however, says nothing about teeth whitening, a practice that did not exist when it was passed. After receiving complaints from other dentists about the nondentists' cheaper services, the Board's dentist members—some of whom offered whitening services—acted to expel the dentists' competitors from the market. In so doing the Board relied upon cease-and-desist letters threatening criminal liability, rather than any of the powers at its disposal that would invoke oversight by a politically accountable official. With no active supervision by the State, North Carolina officials may well have been unaware that the Board had decided teeth whitening constitutes "the practice of dentistry" and sought to prohibit those who competed against dentists from participating in the teeth whitening market. Whether or not the Board exceeded its powers under North Carolina law, cf. *Omni,* 499 U. S., at 371–372, there is no evidence here of any decision by the State to initiate or concur with the Board's actions against the nondentists.

### IV

The Board does not claim that the State exercised active, or indeed any, supervision over its conduct regarding nondentist teeth whiteners; and, as a result, no specific supervisory systems can be reviewed here. It suffices to note that the inquiry regarding active supervision is flexible and context-dependent. Active supervision need not entail day-to-day involvement in an agency's operations or micromanagement of its every decision. Rather, the question is whether the State's review mechanisms provide "realistic assurance" that a nonsovereign actor's anticom-

Document received by the CA Supreme Court.

18          NORTH CAROLINA STATE BD. OF DENTAL
                   EXAMINERS *v.* FTC
                   Opinion of the Court

petitive conduct "promotes state policy, rather than merely the party's individual interests." *Patrick, supra,* at 100–101; see also *Ticor,* 504 U. S., at 639–640.

The Court has identified only a few constant requirements of active supervision: The supervisor must review the substance of the anticompetitive decision, not merely the procedures followed to produce it, see *Patrick,* 486 U. S., at 102–103; the supervisor must have the power to veto or modify particular decisions to ensure they accord with state policy, see *ibid.*; and the "mere potential for state supervision is not an adequate substitute for a decision by the State," *Ticor, supra,* at 638. Further, the state supervisor may not itself be an active market participant. In general, however, the adequacy of supervision otherwise will depend on all the circumstances of a case.

\*          \*          \*

The Sherman Act protects competition while also respecting federalism. It does not authorize the States to abandon markets to the unsupervised control of active market participants, whether trade associations or hybrid agencies. If a State wants to rely on active market participants as regulators, it must provide active supervision if state-action immunity under *Parker* is to be invoked.

The judgment of the Court of Appeals for the Fourth Circuit is affirmed.

                                        *It is so ordered.*

Document received by the CA Supreme Court.

Cite as: 574 U. S. ____ (2015)          1

ALITO, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 13–534

## NORTH CAROLINA STATE BOARD OF DENTAL EXAMINERS, PETITIONER *v.* FEDERAL TRADE COMMISSION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

[February 25, 2015]

JUSTICE ALITO, with whom JUSTICE SCALIA and JUSTICE THOMAS join, dissenting.

The Court's decision in this case is based on a serious misunderstanding of the doctrine of state-action antitrust immunity that this Court recognized more than 60 years ago in *Parker* v. *Brown*, 317 U. S. 341 (1943). In *Parker*, the Court held that the Sherman Act does not prevent the States from continuing their age-old practice of enacting measures, such as licensing requirements, that are designed to protect the public health and welfare. *Id.*, at 352. The case now before us involves precisely this type of state regulation—North Carolina's laws governing the practice of dentistry, which are administered by the North Carolina Board of Dental Examiners (Board).

Today, however, the Court takes the unprecedented step of holding that *Parker* does not apply to the North Carolina Board because the Board is not structured in a way that merits a good-government seal of approval; that is, it is made up of practicing dentists who have a financial incentive to use the licensing laws to further the financial interests of the State's dentists. There is nothing new about the structure of the North Carolina Board. When the States first created medical and dental boards, well before the Sherman Act was enacted, they began to staff

Document received by the CA Supreme Court.

them in this way.[1]  Nor is there anything new about the suspicion that the North Carolina Board—in attempting to prevent persons other than dentists from performing teeth-whitening procedures—was serving the interests of dentists and not the public.  Professional and occupational licensing requirements have often been used in such a way.[2]  But that is not what *Parker* immunity is about. Indeed, the very state program involved in that case was unquestionably designed to benefit the regulated entities, California raisin growers.

The question before us is not whether such programs serve the public interest.  The question, instead, is whether this case is controlled by *Parker*, and the answer to that question is clear.  Under *Parker*, the Sherman Act (and the Federal Trade Commission Act, see *FTC* v. *Ticor Title Ins. Co.*, 504 U. S. 621, 635 (1992)) do not apply to state agencies; the North Carolina Board of Dental Examiners is a state agency; and that is the end of the matter.  By straying from this simple path, the Court has not only distorted *Parker*; it has headed into a morass.  Determining whether a state agency is structured in a way that militates against regulatory capture is no easy task, and there is reason to fear that today's decision will spawn confusion.  The Court has veered off course, and therefore I cannot go along.

---

[1] S. White, History of Oral and Dental Science in America 197–214 (1876) (detailing earliest American regulations of the practice of dentistry).

[2] See, *e.g.*, R. Shrylock, Medical Licensing in America 29 (1967) (Shrylock) (detailing the deterioration of licensing regimes in the mid-19th century, in part out of concerns about restraints on trade); Gellhorn, The Abuse of Occupational Licensing, 44 U. Chi. L. Rev. 6 (1976); Shepard, Licensing Restrictions and the Cost of Dental Care, 21 J. Law & Econ. 187 (1978).

Document received by the CA Supreme Court.

ALITO, J., dissenting

## I

In order to understand the nature of *Parker* state-action immunity, it is helpful to recall the constitutional landscape in 1890 when the Sherman Act was enacted. At that time, this Court and Congress had an understanding of the scope of federal and state power that is very different from our understanding today. The States were understood to possess the exclusive authority to regulate "their purely internal affairs." *Leisy* v. *Hardin*, 135 U. S. 100, 122 (1890). In exercising their police power in this area, the States had long enacted measures, such as price controls and licensing requirements, that had the effect of restraining trade.[3]

The Sherman Act was enacted pursuant to Congress' power to regulate interstate commerce, and in passing the Act, Congress wanted to exercise that power "to the utmost extent." *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533, 558 (1944). But in 1890, the understanding of the commerce power was far more limited than it is today. See, *e.g., Kidd* v. *Pearson*, 128 U. S. 1, 17–18 (1888). As a result, the Act did not pose a threat to traditional state regulatory activity.

By 1943, when *Parker* was decided, however, the situation had changed dramatically. This Court had held that the commerce power permitted Congress to regulate even local activity if it "exerts a substantial economic effect on interstate commerce." *Wickard* v. *Filburn*, 317 U. S. 111, 125 (1942). This meant that Congress could regulate many of the matters that had once been thought to fall exclusively within the jurisdiction of the States. The new interpretation of the commerce power brought about an expansion of the reach of the Sherman Act. See *Hospital*

---

[3] See Handler, The Current Attack on the *Parker* v. *Brown* State Action Doctrine, 76 Colum. L. Rev. 1, 4–6 (1976) (collecting cases).

Document received by the CA Supreme Court.

*Building Co.* v. *Trustees of Rex Hospital*, 425 U. S. 738, 743, n. 2 (1976) ("[D]ecisions by this Court have permitted the reach of the Sherman Act to expand along with expanding notions of congressional power"). And the expanded reach of the Sherman Act raised an important question. The Sherman Act does not expressly exempt States from its scope. Does that mean that the Act applies to the States and that it potentially outlaws many traditional state regulatory measures? The Court confronted that question in *Parker.*

In *Parker*, a raisin producer challenged the California Agricultural Prorate Act, an agricultural price support program. The California Act authorized the creation of an Agricultural Prorate Advisory Commission (Commission) to establish marketing plans for certain agricultural commodities within the State. 317 U. S., at 346–347. Raisins were among the regulated commodities, and so the Commission established a marketing program that governed many aspects of raisin sales, including the quality and quantity of raisins sold, the timing of sales, and the price at which raisins were sold. *Id.*, at 347–348. The *Parker* Court assumed that this program would have violated "the Sherman Act if it were organized and made effective solely by virtue of a contract, combination or conspiracy of private persons," and the Court also assumed that Congress could have prohibited a State from creating a program like California's if it had chosen to do so. *Id.*, at 350. Nevertheless, the Court concluded that the California program did not violate the Sherman Act because the Act did not circumscribe state regulatory power. *Id.*, at 351.

The Court's holding in *Parker* was not based on either the language of the Sherman Act or anything in the legislative history affirmatively showing that the Act was not meant to apply to the States. Instead, the Court reasoned that "[i]n a dual system of government in which, under the Constitution, the states are sovereign, save only as Con-

Document received by the CA Supreme Court.

ALITO, J., dissenting

gress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." 317 U. S., at 351. For the Congress that enacted the Sherman Act in 1890, it would have been a truly radical and almost certainly futile step to attempt to prevent the States from exercising their traditional regulatory authority, and the *Parker* Court refused to assume that the Act was meant to have such an effect.

When the basis for the *Parker* state-action doctrine is understood, the Court's error in this case is plain. In 1890, the regulation of the practice of medicine and dentistry was regarded as falling squarely within the States' sovereign police power. By that time, many States had established medical and dental boards, often staffed by doctors or dentists,[4] and had given those boards the authority to confer and revoke licenses.[5] This was quintessential police power legislation, and although state laws were often challenged during that era under the doctrine of substantive due process, the licensing of medical professionals easily survived such assaults. Just one year before the enactment of the Sherman Act, in *Dent* v. *West Virginia*, 129 U. S. 114, 128 (1889), this Court rejected such a challenge to a state law requiring all physicians to obtain a certificate from the state board of health attesting to their qualifications. And in *Hawker* v. *New York*, 170 U. S. 189, 192 (1898), the Court reiterated that a law

---

[4] Shrylock 54–55; D. Johnson and H. Chaudry, Medical Licensing and Discipline in America 23–24 (2012).

[5] In *Hawker* v. *New York*, 170 U. S. 189 (1898), the Court cited state laws authorizing such boards to refuse or revoke medical licenses. *Id.*, at 191–193, n. 1. See also *Douglas* v. *Noble*, 261 U. S. 165, 166 (1923) ("In 1893 the legislature of Washington provided that only licensed persons should practice dentistry" and "vested the authority to license in a board of examiners, consisting of five practicing dentists").

Document received by the CA Supreme Court.

6     NORTH CAROLINA STATE BD. OF DENTAL
EXAMINERS *v.* FTC

ALITO, J., dissenting

specifying the qualifications to practice medicine was clearly a proper exercise of the police power. Thus, the North Carolina statutes establishing and specifying the powers of the State Board of Dental Examiners represent precisely the kind of state regulation that the *Parker* exemption was meant to immunize.

## II

As noted above, the only question in this case is whether the North Carolina Board of Dental Examiners is really a state agency, and the answer to that question is clearly yes.

- The North Carolina Legislature determined that the practice of dentistry "affect[s] the public health, safety and welfare" of North Carolina's citizens and that therefore the profession should be "subject to regulation and control in the public interest" in order to ensure "that only qualified persons be permitted to practice dentistry in the State." N. C. Gen. Stat. Ann. §90–22(a) (2013).

- To further that end, the legislature created the North Carolina State Board of Dental Examiners "as the agency of the State for the regulation of the practice of dentistry in th[e] State." §90–22(b).

- The legislature specified the membership of the Board. §90–22(c). It defined the "practice of dentistry," §90–29(b), and it set out standards for licensing practitioners, §90–30. The legislature also set out standards under which the Board can initiate disciplinary proceedings against licensees who engage in certain improper acts. §90–41(a).

- The legislature empowered the Board to "maintain an action in the name of the State of North Carolina to perpetually enjoin any person from ... unlawfully practicing dentistry." §90–40.1(a). It authorized the Board to conduct investigations and to hire legal

Document received by the CA Supreme Court.

ALITO, J., dissenting

counsel, and the legislature made any "notice or
statement of charges against any licensee" a public
record under state law. §§ 90–41(d)–(g).

- The legislature empowered the Board "to enact rules
  and regulations governing the practice of dentistry
  within the State," consistent with relevant statutes.
  §90–48. It has required that any such rules be in-
  cluded in the Board's annual report, which the Board
  must file with the North Carolina secretary of state,
  the state attorney general, and the legislature's Joint
  Regulatory Reform Committee. §93B–2. And if the
  Board fails to file the required report, state law de-
  mands that it be automatically suspended until it
  does so. *Ibid.*

As this regulatory regime demonstrates, North Caro-
lina's Board of Dental Examiners is unmistakably a state
agency created by the state legislature to serve a pre-
scribed regulatory purpose and to do so using the State's
power in cooperation with other arms of state government.

The Board is not a private or "nonsovereign" entity that
the State of North Carolina has attempted to immunize
from federal antitrust scrutiny. *Parker* made it clear that
a State may not "'give immunity to those who violate the
Sherman Act by authorizing them to violate it, or by de-
claring that their action is lawful.'" *Ante,* at 7 (quoting
*Parker,* 317 U. S., at 351). When the *Parker* Court disap-
proved of any such attempt, it cited *Northern Securities
Co.* v. *United States,* 193 U. S. 197 (1904), to show what it
had in mind. In that case, the Court held that a State's
act of chartering a corporation did not shield the corpora-
tion's monopolizing activities from federal antitrust law.
*Id.,* at 344–345. Nothing similar is involved here. North
Carolina did not authorize a private entity to enter into an
anticompetitive arrangement; rather, North Carolina
*created a state agency* and gave that agency the power to
regulate a particular subject affecting public health and

Document received by the CA Supreme Court.

safety.

Nothing in *Parker* supports the type of inquiry that the Court now prescribes. The Court crafts a test under which state agencies that are "controlled by active market participants," *ante*, at 12, must demonstrate active state supervision in order to be immune from federal antitrust law. The Court thus treats these state agencies like private entities. But in *Parker*, the Court did not examine the structure of the California program to determine if it had been captured by private interests. If the Court had done so, the case would certainly have come out differently, because California conditioned its regulatory measures on the participation and approval of market actors in the relevant industry.

Establishing a prorate marketing plan under California's law first required the petition of at least 10 producers of the particular commodity. *Parker*, 317 U. S., at 346. If the Commission then agreed that a marketing plan was warranted, the Commission would "select a program committee *from among nominees chosen by the qualified producers.*" *Ibid.* (emphasis added). That committee would then formulate the proration marketing program, which the Commission could modify or approve. But even after Commission approval, the program became law (and then, automatically) only if it gained the approval of 65 percent of the relevant producers, representing at least 51 percent of the acreage of the regulated crop. *Id.*, at 347. This scheme gave decisive power to market participants. But despite these aspects of the California program, *Parker* held that California was acting as a "sovereign" when it "adopt[ed] and enforc[ed] the prorate program." *Id.*, at 352. This reasoning is irreconcilable with the Court's today.

### III

The Court goes astray because it forgets the origin of the

Document received by the CA Supreme Court.

ALITO, J., dissenting

*Parker* doctrine and is misdirected by subsequent cases that extended that doctrine (in certain circumstances) to private entities. The Court requires the North Carolina Board to satisfy the two-part test set out in *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97 (1980), but the party claiming *Parker* immunity in that case was not a state agency but a private trade association. Such an entity is entitled to *Parker* immunity, *Midcal* held, only if the anticompetitive conduct at issue was both "'clearly articulated'" and "'actively supervised by the State itself.'" 445 U. S., at 105. Those requirements are needed where a State authorizes private parties to engage in anticompetitive conduct. They serve to identify those situations in which conduct *by private parties* can be regarded as the conduct of a State. But when the conduct in question is the conduct of a state agency, no such inquiry is required.

This case falls into the latter category, and therefore *Midcal* is inapposite. The North Carolina Board is not a private trade association. It is a state agency, created and empowered by the State to regulate an industry affecting public health. It would not exist if the State had not created it. And for purposes of *Parker*, its membership is irrelevant; what matters is that it is part of the government of the sovereign State of North Carolina.

Our decision in *Hallie* v. *Eau Claire*, 471 U. S. 34 (1985), which involved Sherman Act claims against a municipality, not a State agency, is similarly inapplicable. In *Hallie,* the plaintiff argued that the two-pronged *Midcal* test should be applied, but the Court disagreed. The Court acknowledged that municipalities "are not themselves sovereign." 471 U. S., at 38. But recognizing that a municipality is "an arm of the State," *id.*, at 45, the Court held that a municipality should be required to satisfy only the first prong of the *Midcal* test (requiring a clearly articulated state policy), 471 U. S., at 46. That municipalities

Document received by the CA Supreme Court.

are not sovereign was critical to our analysis in *Hallie*, and thus that decision has no application in a case, like this one, involving a state agency.

Here, however, the Court not only disregards the North Carolina Board's status as a full-fledged state agency; it treats the Board less favorably than a municipality. This is puzzling. States are sovereign, *Northern Ins. Co. of N. Y. v. Chatham County*, 547 U. S. 189, 193 (2006), and California's sovereignty provided the foundation for the decision in *Parker, supra*, at 352. Municipalities are not sovereign. *Jinks v. Richland County*, 538 U. S. 456, 466 (2003). And for this reason, federal law often treats municipalities differently from States. Compare *Will v. Michigan Dept. of State Police*, 491 U. S. 58, 71 (1989) ("[N]either a State nor its officials acting it their official capacities are 'persons' under [42 U. S. C.] §1983"), with *Monell v. City Dept. of Social Servs., New York*, 436 U. S. 658, 694 (1978) (municipalities liable under §1983 where "execution of a government's policy or custom . . . inflicts the injury").

The Court recognizes that municipalities, although not sovereign, nevertheless benefit from a more lenient standard for state-action immunity than private entities. Yet under the Court's approach, the North Carolina Board of Dental Examiners, a full-fledged state agency, is treated like a private actor and must demonstrate that the State actively supervises its actions.

The Court's analysis seems to be predicated on an assessment of the varying degrees to which a municipality and a state agency like the North Carolina Board are likely to be captured by private interests. But until today, *Parker* immunity was never conditioned on the proper use of state regulatory authority. On the contrary, in *Columbia v. Omni Outdoor Advertising, Inc.*, 499 U. S. 365 (1991), we refused to recognize an exception to *Parker* for cases in which it was shown that the defendants had

Document received by the CA Supreme Court.

engaged in a conspiracy or corruption or had acted in a way that was not in the public interest. *Id.,* at 374. The Sherman Act, we said, is not an anticorruption or good-government statute. 499 U. S., at 398. We were unwilling in *Omni* to rewrite *Parker* in order to reach the allegedly abusive behavior of city officials. 499 U. S., at 374–379. But that is essentially what the Court has done here.

### III

Not only is the Court's decision inconsistent with the underlying theory of *Parker*; it will create practical problems and is likely to have far-reaching effects on the States' regulation of professions. As previously noted, state medical and dental boards have been staffed by practitioners since they were first created, and there are obvious advantages to this approach. It is reasonable for States to decide that the individuals best able to regulate technical professions are practitioners with expertise in those very professions. Staffing the State Board of Dental Examiners with certified public accountants would certainly lessen the risk of actions that place the well-being of dentists over those of the public, but this would also compromise the State's interest in sensibly regulating a technical profession in which lay people have little expertise.

As a result of today's decision, States may find it necessary to change the composition of medical, dental, and other boards, but it is not clear what sort of changes are needed to satisfy the test that the Court now adopts. The Court faults the structure of the North Carolina Board because "active market participants" constitute "a controlling number of [the] decisionmakers," *ante,* at 14, but this test raises many questions.

What is a "controlling number"? Is it a majority? And if so, why does the Court eschew that term? Or does the Court mean to leave open the possibility that something less than a majority might suffice in particular circum-

Document received by the CA Supreme Court.

stances?  Suppose that active market participants consti-
tute a voting bloc that is generally able to get its way?
How about an obstructionist minority or an agency chair
empowered to set the agenda or veto regulations?

Who is an "active market participant"?  If Board mem-
bers withdraw from practice during a short term of service
but typically return to practice when their terms end, does
that mean that they are not active market participants
during their period of service?

What is the scope of the market in which a member may
not participate while serving on the board?  Must the
market be relevant to the particular regulation being
challenged or merely to the jurisdiction of the entire agency?
Would the result in the present case be different if a
majority of the Board members, though practicing den-
tists, did not provide teeth whitening services?  What if
they were orthodontists, periodontists, and the like?  And
how much participation makes a person "active" in the
market?

The answers to these questions are not obvious, but the
States must predict the answers in order to make in-
formed choices about how to constitute their agencies.

I suppose that all this will be worked out by the lower
courts and the Federal Trade Commission (FTC), but the
Court's approach raises a more fundamental question, and
that is why the Court's inquiry should stop with an exam-
ination of the structure of a state licensing board.  When
the Court asks whether market participants control the
North Carolina Board, the Court in essence is asking
whether this regulatory body has been captured by the
entities that it is supposed to regulate.  Regulatory cap-
ture can occur in many ways.[6]  So why ask only whether

_____

[6] See, e.g., R. Noll, Reforming Regulation 40–43, 46 (1971); J. Wilson,
The Politics of Regulation 357–394 (1980).  Indeed, it has even been

Document received by the CA Supreme Court.

ALITO, J., dissenting

the members of a board are active market participants? The answer may be that determining when regulatory capture has occurred is no simple task.  That answer provides a reason for relieving courts from the obligation to make such determinations at all.  It does not explain why it is appropriate for the Court to adopt the rather crude test for capture that constitutes the holding of today's decision.

## IV

The Court has created a new standard for distinguishing between private and state actors for purposes of federal antitrust immunity.  This new standard is not true to the *Parker* doctrine; it diminishes our traditional respect for federalism and state sovereignty; and it will be difficult to apply.  I therefore respectfully dissent.

charged that the FTC, which brought this case, has been captured by entities over which it has jurisdiction.  See E. Cox, "The Nader Report" on the Federal Trade Commission vii–xiv (1969); Posner, Federal Trade Commission, Chi. L. Rev. 47, 82–84 (1969).

Document received by the CA Supreme Court.

Case No. S_____

## IN THE SUPREME COURT OF CALIFORNIA

JUSTIN S. BECK,
Petitioner,

vs.

RUBEN DURAN,
Respondent,

CALIFORNIA SUPREME COURT, STATE BAR OF CALIFORNIA,
STATE OF CALIFORNIA, UNITED STATES OF A MERICA, ROES 1-
150,000, PUBLIC, COURTS, LEGAL PROFESSION et al.
Real Parties in Interest

## VERIFICATION OF JUSTIN S. BECK

AFTER DECISIONS BY THE BOARD OF TRUSTEES A ND OFFICE

OF GENERAL COUNSEL FOR THE STATE BAR OF CALIFORNIA

**Service on Attorney General of The State of California and Federal
Trade Commission Required by Antitrust Laws**

Justin S. Beck
*In Pro Per*
*Guardian Ad Litem for State of California, United States,*
*ROES 1-150,000, Public, Courts, and Legal Profession*
3501 Roselle St.  Oceanside, CA 92056
(760) 449-2509    justintimesd@gmail.com

Document received by the CA Supreme Court.

Exhibit #60: 126
22-CV-01616-BAS-DDL

I, Justin S. Beck, declare as follows under penalty of perjury:

    1. I am the petitioner in this administrative action, and plaintiff in two cases captioned *Justin S. Beck v. The State Bar of California et al.* (OCSC Case No. 30-2021-0123749 ) and Justin S. Beck v. Catanzarite Law Corporation et al. (OCSC Case No. 30-2020-0114599 8) where I've evidenced anticompetitive conduct among active market participants within their own horizontal profession.

    2. I confirm my submission to California Supreme Court in this administrative action against Ruben Duran in his concurrent capacity as Chairman of the Board of Trustees of The State Bar of California, controlled by active market participant lawyers purporting to regulate their own profession, and his capacity as partner of Best Best & Krieger, a private law firm also within the same horizontal legal profession, each represented by Suzanne Grandt, Esq. fom Office of General Counsel of The State Bar of California, which is the Complaint Review Unit, which is also defending claims in tort while retaining my right to peitition this Court regarding discipline (not tort) of my allegations of serial fraud undertaken with the express authority of or involving purported sovereign actors.

    3. I have personal knowledge of each fact set forth in this declaration based upon my observation of, participation in, recollection of, the matters to which I declare, except to those matters which I say I believe, I believe to be true.  If called upon, I could and would testify competently in any court or tribunal as to the truth or authenticity of any statement or writing herein or attached hereto as exhibits.

    4. I offer this declaration in support of my allegations of per se antitrust/competition violations undertaken by nonsovereign actors under a false claim of immunity or discretion. Demand on State Bar is futile.

2

Document received by the CA Supreme Court.

Exhibit #60: 127<br>22-CV-01616-BAS-DDL

5. I offer this declaration in support of my claims of fraud, larceny, oppression, corruption, legal malice, extortion, unlawful taking, conversion, securities fraud, judicial fraud, conduct meeting the definition of racketeering activity, and unwaivable conflict violative of BPC § 6077, CRPC 1.7(d)(3), CRPC 8.4 with state liability codified under GOV § 815, GOV § 815.2, GOV § 815.3, GOV § 815.6 and/or GOV § 835.

6. I offer this declaration in opposition to bad faith actions and tactics of active market participants seeking to delay my hearings on the merits despite my showings, or to strike my complaint without foundation in law.

7. For Ex. [1], I printed this from LegInfo.gov for the parties and Court's convenience, and it is a true and correct copy of relevant code sections where "The State Bar and officers and employees are subject to the rules governing liability of public entities, officers, and employees specified in Division 3.6 (commencing with Section 810) of Title 1 of the Government Code." I have an undisputed, vested right to sue the government as of November 2021, and I promptly filed an action in Superior Court according to Government Claims Act as per ¶ 1.

8. For Ex. [2], I printed this public press release issued by the duly licensed State Bar entity Catanzarite Law Corporation. This is a true and correct copy from October 4, 2018. Catanzarite Law Corporation actors lacked standing to file a derivative action (G059766) because Root was never a CTI or MFS shareholder.

9. For Ex. [3], this is a true and correct copy of Catanzarite's dismissal of Tony Scudder from the fraudulent* derivative action January 4, 2019, without court approval, where compromise of a derivative action

3

Document received by the CA Supreme Court.

requires court approval under binding state and federal law to avoid collusion.

10. For Ex. [4], this is a true and correct copy of one of several notices of injury and mandatory law violations I researched and filed with defendant The State Bar of California. This one was from November 2019.

11. For Ex. [5], this is my filed motion for preference with other evidentiary showings.

12. For Ex. [6], this is my filed opposition to any motions to strike my complaint as if I can't even state a claim, or as if the protected activity I'm showing doesn't give context to the unprotected activity I've pleaded.

13. For Ex. [7], this is a true and correct copy of exhibits attached to the operative complaint in *Justin S. Beck v. The State Bar of California et al.* filed on December 21, 2021.

    A.    2009-030 Fact Sheet Regarding State Bar Operational Decisions, Antitrust Issues

    B.    2015-030 Fact Sheet Regarding State Bar Operational Decisions, Antitrust Issues

    C.    2021-030 Fact Sheet Regarding State Bar Operational Decisions, Antitrust Issues

    D.    Binding Law CRPC 1.7 Under BPC § 6077 as Pleaded and Shown

    E.    CLC Press Release Against CTI, MFS, Cooper (Each Purported Clients Now)

    F.    Fraudulent Consent Coerced by Catanzarite Under Color of Law 1_23_19

    G.    Spotlight on Ethics: Unwaivable Conflicts of Interest ("Unthinkable" Klemm) 1.7(d)(3)

4

Document received by the CA Supreme Court.

H.     State Bar "Carefully Reviews" Serial Fraud Despite Injuries, Evidence 4_3_20

I.     "Complaint Review Unit" (Office of General Counsel) Also Ratifies Serial Fraud 8_12_20

J.     Morgenstern Shows Conflict Between OCTC, OGC, Tort Liability, Regulation 11_22_21

K.     Amy Cooper Counsel Confirms No Involvement in Catanzarite's Derivative "Settlement"

L.     James Duffy, "CEO of MFS," Waives Catanzarite Conflict 8_31_21 in Court of Appeal

M.     Amy Cooper, after 1_23_19, Waives Catanzarite Conflict 8_31_21 in Court of Appeal

N.     Court of Appeal Ruling in G058700 – All Known to State Bar Actors (Antitrust Issues)

O.     Court of Appeal Ruling in B285691 Predicate Sham Pleadings (Antitrust Issues)

P.     Carlos Calixto Declares Catanzarite Tried to Pay Him for Signatures/Property

14. For Ex. [8], I sent that after reviewing the frivolous response I received from people paid to

protect me. It's a true and correct copy.

15. For Ex. [9], Joy Nunley directed me to the "Complaint Review Unit" without informing me that it's also the Office of General Counsel. They were reviewing CRPC 1.7(d)(3) violations, which are among the statutory schemes I've pleaded in tort.

16. For Ex. [10], I sent this notice two days before I received the "Complaint Review Unit" decision.

5

Document received by the CA Supreme Court.

17. For Ex. [12], "Complaint Review Unit" denies review after new allegations of serial fraud.

18. For Ex. [13], I sent these new complaints which were not acknowledged.

19. For Ex. [14], the Supreme Court of California rejected my accusations. I spent hundreds of hours, followed by thousands of dollars, to conform to various demands of various people to deliver copies and re-deliver copies of accusations. They were ultimately rejected, although they were filed in *Justin S. Beck v. The State Bar of California et al.* (OCSC Case No. 30-2021-0123749) action under ROA #49 as showing some of what was actually known by defendants in this action.

20. For Ex. [15], these are the instructions that people receive when they are offered a chance to pursue disciplinary charges where the State Bar fails. Unfortunately, what isn't disclosed to people like me, are the "abatement" procedures that are selectively used for some but not others, or the concealment of conduct by actors within the same horizontal profession.

21. For Ex. [16], I received this email from my counsel and waive privilege for the express purpose of showing more of what is actually known and what was actually known by defendants. Here, it applies to Catanzarite, Tice, and Morgenstern again, as well as legal malice for State Bar actors, and to show anticompetitive activity in "regulation" after 2015.

22. For Ex. [17], Supreme Court rejected my case after I met formatting, pleading, and onerous copy delivery requirements defined by various persons in response to my accusations. I feel completely oppressed, disregarded, and betrayed by nonsovereign state actors who are

Document received by the CA Supreme Court.

Exhibit #60: 131
22-CV-01616-BAS-DDL

concurrently claiming to regulate their own profession without required state supervision.

23. For Ex. [18], I delivered notice of a Court of Appeal decision that shows violations of mandatory law relevant to me, my damages, and the standard of care from other active market participant actors in this case.

24. For Ex. [19], Anand Kumar, Esq. sent me this email as purported supervisor for Eli David Morgenstern and Joy Nunley. This is a true and correct copy.

25. For Ex. [20], I send more details to Anand Kumar, Esq. This is a true and correct copy.

26. For Ex. [21], Anand Kumar, Esq. confirms receipt of more information and binding Court of Appeal decisions upholding mandatory law violations by active market participant defendants shown. This is a true and correct copy.

27. For Ex. [22], this is a true and correct copy of another notice of injury I filed to State Bar when Jim Travis Tice purported to advocate another sham pleading and action after Catanzarite was disqualified. Importantly, the "lead" plaintiff for Mr. Tice's case, Mr. Mesa, terminated counsel in early July 2022.

28. For Ex. [23], this is a true and correct copy of CTI's counsel noticing defendant Eli David Morgenstern of severe injury caused by State Bar actors associated with Catanzarite, here confirming the destruction among active market participants of $261M in CTI shareholder value under Morgenstern's "careful review" and "protection."

29. For Ex. [24], this is a true and correct copy of my notice to California Department of Justice on November 16, 2021, of complex schemes to defraud undertaken by Catanzarite Law Corporation actors.

7

Document received by the CA Supreme Court.

30. For Ex. [25], this is a true and correct copy of my criminal allegations to defendant Eli David Morgenstern and The State Bar of California, adding to existing cases, on November 18, 2021.

31. For Ex. [26], this is a true and correct copy of the claim denial letter I received from the government, vesting my right to sue under liability sections of Government Claims Act as of November 12, 2021.

32. For Ex. [27], this is a true and correct copy of Eli David Morgenstern's letter to me officially from The State Bar of California, which gives context to various unprotected activity allegedly undertaken by active market participants like fraud, oppression, corruption, legal malice, actual malice, and reckless disregard for public interest, and me specifically. I also use this evidence to support my pleadings of 5th, 14th Amendment of the United States Constitution violations, and BPC 6077, CRPC 5.1, CRPC 8.4 allegations. To the extent this would be privileged, I waive the privilege, and believe there are no privileges owed Morgenstern nor State Bar where there are shown, unanswered acts of judicial and non-judicial fraud beyond reasonable doubt under EVID § 956.

33. For Ex. [28], I received this letter from Jim Travis Tice. Importantly, I tried to file a motion for sanctions because my insurance assigned counsel wouldn't move to strike the frivolous complaint filed by Catanzarite Law Corporation in April 2019 on behalf of a "Richard Mesa." Despite the fact that Mr. Tice and Mr. Catanzarite were maintaining a fraudulent "class action" lawsuit in the first instance, the Court rejected my motion procedurally without ruling on its merits after the Catanzarite actors *objected* on procedural grounds. I offer this as but another example of conduct that is subject to binding decisional law of the United States Supreme Court in 2015 related to antitrust/competition laws.

8

Document received by the CA Supreme Court.

34. For Ex. [29], I sent this to Tice so I could later show the warning when I file malicious prosecution charges upon "favorable termination" of the fraudulent lawsuit "advocated" for "plaintiff" "Richard Mesa" by Mr. Tice as "class" counsel for "CTI shareholders." I've also noticed Mr. Tice and other active market participants of a forthcoming complaint for RICO § 1962(a)-(d) in federal court, supported by my California Supreme Court administrative review concerning antitrust and anticompetitive conduct shown by active market participants purporting to regulate their own profession while publicly stating they are acting to protect me and others in my suspect class of the "public."

35. For Ex. [30], this is a true and correct copy of a confirmation letter that Office of Chief Trial Counsel opened a case into Nicole Marie Catanzarite Woodward. This letter does not relate to protected activity, it gives context to violations of the Rules of Professional Conduct which are binding upon all licensees under BPC § 6077, violations of State Bar Act, and per se violations of federal antitrust law.

36. For Ex. [31], this is true and correct copy of a confirmation letter that Office of Chief Trial Counsel opened a case into Kenneth Joseph Catanzarite on August 21, 2022. This letter does not relate to protected activity, it gives context to violations of the Rules of Professional Conduct which are binding upon all licensees under BPC § 6077, violations of State Bar Act, and per se violations of federal antitrust law. I received this letter on a Sunday, August 21, 2022, at 5:37PM which was the night before an ex parte filed by defendant Suzanne Grandt, Esq. on behalf of Duran, State Bar seeking to continue my hearing on the merits for want of discovery from *me*.

9

Document received by the CA Supreme Court.

37. For Ex. [32], this is an email I received from Amy Yarbrough after I rejected the news that Eli David Morgenstern was still acting in any investigative capacity when he was concurrently a civil defendant facing allegations of receiving unlawful consideration, or alternative allegations of willful negligence and disregard. Mr. Morgenstern is still purportedly assigned to all cases, while Office of General Counsel unduly, unethically retains all "Complaint Review Unit" cases to prevent my pursuit of disciplinary charges in California Supreme Court, which are discrete of my litigation for "money or damages" subject to ¶ 7 citing BPC § 6094 then GOV § 815, GOV 815.2, GOV 815.3, GOV 815.6, and/or GOV 835, as pleaded and referenced in ¶ 1. This is evidence of per se anticompetitive conduct prejudicial to public, courts, and legal profession.

38. For Ex. [33], this is another submission I filed with "Complaint Review Unit." I did not know at the time that "Complaint Review Unit" was actually the Office of General Counsel, which I later learned is also assigned with making antitrust determinations, and also charged with defending the same conduct while being bound to report violations or potential violations to California Supreme Court. I alleged Sherman Act violations against State Bar actors in my original complaint filed December 21, 2021, and believe they remain unreported to California Supreme Court, where Office of General Counsel fails reasonable belief (objectively) not only due to its purported self-regulation in its own trade and for its own conduct, but here also controlling every tribunal associated with The State Bar of California and the practice of law in California and across state lines.

39. For Ex. [34], this is a true and correct copy of a public press release issued by The State Bar of California on January 24, 2022, where it concedes lawyers within the horizontal profession of legal services that it

10

Document received by the CA Supreme Court.

regulates benefitted from the anticompetitive and/or protectionist behavior undertaken officially within the same horizontal profession without defined supervision of State, just as shown here with Catanzarite, Morgenstern, and others.

40. For Ex. [36], this is a true and correct copy of a public press release issued by The State Bar of California on February 7, 2022, announcing State Bar General Counsel Vanessa Holton retirement, which purportedly took effect in July 2022. She once appeared on a responsive pleading in my other case in ¶ 1. This public press release discloses that Office of General Counsel is also Complaint Review Unit, which was also defending claims in tort against me following receipt of the January 24, 2022, shown in ¶ 38, Ex. [33] while retaining my (misrepresented, and/or fraudulently concealed) right to pursue disciplinary charges according to ambiguous case law from 1948 that fails to align, from intake, with the public's process of The State Bar of California.

41. For Ex. [37], this is a true and correct copy of a public press release issued by The State Bar of California "adopting a five-year strategic plan" while it "approves next steps on client trust account protection."

42. For Ex. [38], this is a true and correct copy communicating decisions from active market participants Suzanne Grandt, Esq., Ruben Duran, Esq., Board of Trustees, each in the horizontal profession of legal services regulating their own profession. The conduct at issue was shown through final adjudication of deliberate schemes to defraud from 2007-2022, including one parallel scheme involving 13,800 investors and at least $400M in investor capital. The "plaintiff," a Mr. Richard Carlson, testified that he did not believe he had suffered damages when Kenneth J. Catanzarite, Esq. solicited him at his home. After that, at least nine putative

11

Document received by the CA Supreme Court.

class actions were filed without standing, all ratified by active market participants purporting to regulate their own profession under color of law, discretion, and non-existent immunity.

43. For Ex. [40], this is a true and correct copy noticing Kenneth J. Catanzarite, Esq. and all active market participants and/or defendants and/or both involved directly and indirectly and/or substantial factors in, the unlawful conduct at issue on September 20, 2022. I sent this to Mr. Catanzarite and concurrent regulator defendants in the same market for legal services and included my filed Supreme Court Case against Ruben Duran for anticompetitive conduct that eliminates a claim of sovereignty under binding federal law, which is relevant to GOV § 815, GOV § 815.2, GOV § 815.3, and GOV § 815.6 because you cannot violate the Sherman Act and exercise a reasonable degree of care under any statute, enactment, or duty that I show.

44. For the filed administrative action in California Supreme Court to exhaust State remedies for the reasons shown, I did not request a stay in any trial court action, and do not want a stay in any trial court action because I've already defeated purported immunities where defendants fail to meet the claims or causes of action shown among those available in Ex. [1], where no immunity is available for conduct meeting the definition of racketeering activity shown. I also show that violations of mandatory duty are not subject to any form of immunity, also lacking answer by state actors. I include my pleadings showing anticompetitive conduct.

45. At the end of my notice to Active Market Participants in ¶ 43, Ex. [40], Mr. Catanzarite is seeking professional legal fees for "work" performed on behalf of Mr. Scudder, who is among the defendants sued without standing by Mr. Catanzarite on September 14, 2018. Kenneth

12

Document received by the CA Supreme Court.

Catanzarite, Catanzarite Law Corporation, The State Bar of California, Nicole Marie Catanzarite Woodward, Brandon Woodward, Tim James Okeefe, Jim Travis Tice, Ruben Duran, Suzanne Grandt, and Eli David Morgenstern would not seek to impose legal fees upon members of the public in violation of their oath as attorneys unless they were protected by undue, unethical, unlawful protection by members of their own horizontal profession. Their conduct defies logic, objective reason.

46. I believe, and show without dispute, that all "licensing, regulatory, and disciplinary functions" are used by public employees, elected officials, approximately 700 attorneys, and The State Bar of California in a manner which unjustly enriches licensees and enterprises within the same horizontal market of legal services, favors private interests of the same "regulators" or horizontal market participants, converts public interests into private interest in favor of horizontal market participants, delays rights under artifice of law and "discretion" in favor of horizontal market participants, all while concealing damages caused to non-licensees outside their profession under artifice of discretion or non-existent immunity in violation of federal law.

47. A 2015 United States Supreme Court in *North Carolina State Board of Dental Examiners v. Federal Trade Commission* eliminates any possible state action immunity under GOV § 815, GOV § 815.2, § GOV 815.3 or GOV § 815.6 because defendant The State Bar of California and its Board of Trustees are comprised of a majority of market participant lawyers* and because "the [Board of Trustees] must be actively supervised by the State to claim immunity, which it was not." (p. 1) and "[b]ecause a controlling number of the [Board of Trustees'] decisionmakers are active market participants in the occupation the [Board of Trustees] regulates

13

*Document received by the CA Supreme Court.*

[lawyers*], the [Board of Trustees] can invoke state-action antitrust immunity only if it was subject to active supervision by the State, and here that requirement is not met. Pp. 5-18. "(a) Federal antitrust law is central to safeguard for the Nation's free market structures." Pp. 5-6.   "A nonsovereign actor [State Bar] controlled by active market participants [including defendants Ruben Duran, Suzanne Grandt]—such as the [Board of Trustees]—enjoys Parker immunity only if "the challenged restraint...[is] clearly articulated and affirmatively expressed as state policy,' and...'the policy...[is] actively supervised by the State...Here, the [Board of Trustees] did not receive active supervision of the State."

48. I offer this declaration in support of my antitrust allegations filed with California Supreme Court, and to confirm the contents and authenticity of that submission and all of its exhibits, as well as to verify the authenticity of the underlying records in each trial court case as they relate to anticompetitive activity from the period 2002-2022 undertaken under purported discretion of this Court's authority.

49. I ask that the Honorable Court and Honorable Justices review the decisions communicated July 20, 2022 by Ruben Duran, in his concurrent public capacity as a lawyer bound by oath to BPC § 6068, further bound in his duties as an elected official regulating his own horizontal trade, further bound not to oppress the public or allow injury known to him, further bound to uphold the California Rules of Professional Conduct and not to enable violations of the same, which decisions actually ratify predicate, parallel, and acutely threatening schemes to defraud by mail and wire undertaken by State Bar actors under purported discretion, as communicated by Suzanne Grandt, acting for Office of General Counsel which is also assigned to make antitrust determinations, on July 20, 2022.

14

Document received by the CA Supreme Court.

Exhibit #60: 139
22-CV-01616-BAS-DDL

50. I ask that the Honorable Court and Honorable Justices review the decision by Mr. Duran and The State Bar of California to file an Anti-SLAPP [ROA #119 and ROA #128] without a showing of protected activity that meets my pleading under the Court's direction in *Baral* after 2016 as I show in ROA #139 and #141 in oposition, that the Court determine my allegations do not arise from protected activity (they arise from judicial and non-judicial schemes to defraud and violations of the Rules of Professional Conduct, see G059766 as specifically to me). I ask the Honorable Court and Honorable Justices review the threat by Suzanne Grandt, acting for Duran, to impose legal fees on me (representing myself, challenging the government) despite the government representing itself pro se, or the equities and unfortunate antitrust issues I've exposed as an objective matter and issue of urgent public interest.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. I'm signing this from Oceanside, California in San Diego County.

SEPTEMBER 21, 2022

Justin S. Beck
Declarant

Document received by the CA Supreme Court.

15

Exhibit #60: 140
22-CV-01616-BAS-DDL