EXHIBIT 140

3:22-CV-01616-BAS-DDL
EXHIBIT #140: 001

Kenneth J. Catanzarite (SBN 113750)
kcatanzarite@catanzarite.com
Brandon Woodward (SBN 284621)
bwoodward@catanzarite.com
Tim James O'Keefe (SBN 290175)
tokeefe@catanzarite.com
CATANZARITE LAW CORPORATION
2331 West Lincoln Avenue
Anaheim, California 92801
Tel: (714) 520-5544
Fax: (714) 520-0680

Attorneys for Plaintiffs

IN THE SUPERIOR COURT OF CALIFORNIA

FOR THE COUNTY ORANGE

| | |
|---|---|
| MOBILE FARMING SYSTEMS, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> RICHARD JOSEPH PROBST, et al., <br><br> Defendants <br><br> and, <br><br> Nominal Defendant: CULTIVATION TECHNOLOGIES, INC., a California corporation. | 30-2019-01046904-CU-BT-CJC <br><br> Assigned for All Purposes to <br> Hon. James L. Crandall <br> Dept. C33 <br><br> **AFFIDAVIT OF RICHARD FRANCIS O'CONNOR II** <br><br> DATE: March 20, 2019 <br> TIME: 8:30 a.m. <br> CTRM: C33 <br><br> Case Filed: September 14, 2018 <br> Trial Date: July 29, 2019 |

## DECLARATION OF RICHARD FRANCIS O'CONNOR II

I, Richard Francis O'Connor II., have personal knowledge of each fact set forth in this affidavit based upon my observation of, participation in, and recollection of, the matters and events to which I declare. I could and would competently testify to each fact set forth in this affidavit if called and duly sworn by this Court. I certify and declare as follows:

1. I am over the age of eighteen.

2. I am presently a resident of Orange County, California.

3. MOBILE FARMING SYSTEMS, INC. ("MFS") was organized August 27, 2008.

4. I developed and promoted the MFS product Instant Garden. MFS continued to develop related products including Advanced Mobile Hydroponic Growth Systems that used trailers and our grow system.

5. Attached as Exhibit "1" is a power point answering the question posed to MFS of "What Do We Do?" Included is a description of the mobile grow systems which used 32' Trailers and 40' Containers in particular. MFS had a number of trailers and containers as its assets.

6. I am familiar with Roger Root and his wife Sharon having met them in Florida related to the MFS stock purchases.

7. In late 2014 MFS determined that our Advanced Mobile Hydroponic Growth Systems were a good fit for marijuana cultivation.

8. The directors of MFS, myself, Richard Probst "Probst" and Amy Cooper ("Cooper") discussed how we would capitalize on the MFS marijuana cultivation business opportunity and concluded that MFS would form a wholly owned subsidiary to be named Cultivation Technologies, Inc. ("CTI").

9. In February of 2015, on behalf of MFS, I engaged attorney Eric M. Willens and the law firm of Cummins and White to incorporate CTI. MFS paid Cummins and White $10,000 for the incorporation work as reflected in the Profit and Loss statement for the period January 1 through April 29, 2015 under "Expenses ... Legal & Professional Fees" Column "FEB 2015 $10,000", a copy of which is attached hereto as Exhibit "2" and incorporated herein by this reference. MFS also had incurred additional overhead, legal and other expenses related to the

2.
Affidavit of Richard Francis O'Connor

1 | organization of CTI and as of March 30, 2015 had easily spent in excess of $25,000 pursuing the
2 | cannabis CTI business opportunity because MFS Income shows $0 for the first four months of
3 | 2015, and incurred expenses of $302,938.37. MFS was devoting all of its resources to the
4 | cannabis cultivation market.

5 |     10. The Articles of Incorporation of CTI were signed by Willens of Cummins and
6 | White on March 4, 2015 and filed on March 5, 2015 as Secretary of State No.: C3761902. A
7 | copy of the filed Articles of Incorporation are attached hereto as Exhibit 3" and incorporated
8 | herein by this reference. The CTI Articles provided at Article IV for the issuance of 120,000,000
9 | shares of stock in two classes, consisting of 100,000,000 shares of Common Stock and
10 | 20,000,000 shares of Preferred Stock.

11 |     11. On March 30, 2015 on behalf of MFS, I executed its ACCEPTANCE AND
12 | CONSENT BY THE SOLE SHAREHOLDER to the ORGANIZATIONAL ACTS &
13 | RESOLUTIONS OF CULTIVATION TECHNOLOGIES, INC. (the "Acts & Resolutions") a
14 | true and correct copy of which is attached hereto as Exhibit "4" and incorporated herein by this
15 | reference. Pursuant to said Acts & Resolutions":

16 |     a. MFS as the Sole Shareholder of CTI did " ... consent to, approve, accept,
17 | ratify, and adopt, as our own, the foregoing Organizational Acts and Resolutions of the
18 | Incorporator of this corporation, waive any and all rights, claims, or causes of action we
19 | may have against said Incorporator arising out of his incorporation and adoption of said
20 | Organizational Acts and Resolutions of this corporation...";

21 |     b. MFS was issued the only shares, namely 28,000,000 common shares then
22 | outstanding or subscribed of CTI Common Stock pursuant to the following:

23 |         WHEREAS, it is deemed to be in the best interests of this
24 |         corporation to issue and sell shares of its common stock to the
25 |         persons, in the amounts, and for the consideration set forth below:

| NAME OF ISSUEE | NUMBER AND CLASS OF SHARES | CONSIDERATION |
|---|---|---|
| Mobile Farming Systems, | 28,000,000 shares of | Contribution of |

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

3.

Affidavit of Richard Francis 8:22-CV-01616-BAS-BLM

EXHIBIT #140: 004

| | | |
|---|---|---|
| Inc. | Common Stock | certain assets more particularly described in Exhibit A attached hereto |

c. The consideration for the CTI Common Stock issued to MFS was provided as follows:

### EXHIBIT A
### Consideration for Shares

Mobile Farming Systems, Inc. shall contribute the following assets to Cultivation Technologies, Inc.:

1) 32' seedling trailer

2) 40' shipping container

3) Payment of certain start-up expenses of Cultivation Technologies, Inc. in an amount not to exceed $25,000

See Exhibit "4" page 12.

    d.    The resolution provided that Probst, O'Connor and Cooper were elected by as Directors of CTI with a provision for up to a five member board. See Exhibit "4" page

    e.    The resolution provided that CTI's officers would be:

| | |
|---|---|
| Richard O'Connor | Chief Executive Officer |
| Richard Probst | Chairman of the Board/Chief Financial Officer/Chief Operating Officer |
| Amy Cooper | President/Secretary |

See Exhibit "4" page 7.

12. In accordance with the Acts & Resolutions CTI issued the 28,000,000 shares of Common Stock to MFS and commenced business as a subsidiary of MFS using immediately the office space, personnel, equipment, products, technology and ideas for the marijuana marketplace that had been under MFS development for years and in particular at the end of 2014 and early

1  2015. In addition MFS paid all CTI startup costs as well as operating costs through at least
2  October 2015.
3     13.   The MFS payment for its CTI stock called for by the Acts and Resolutions was in
4  fact transferred and paid as required, entitling MFS to its 28,000,000 shares of CTI Common
5  Stock. I confirmed this fact in a letter to MFS shareholders in mid April 2015, a copy of which is
6  attached hereto as Exhibit "5" and incorporated herein by this reference, as follows:

> "Recently, <u>Mobile Farming Systems **has created** a wholly-owned subsidiary company named Cultivation Technologies, Inc. (CTI)</u>. Consistent with MFS' overall indoor and portable farming business ventures, this division plans to build and lease specially designed 32' - 40' transportable grow containers for use in the MMJ and hydroponic farming markets. <u>In order to capitalize CTI, Mobile Farming Systems **has contributed certain assets to CTI**, including a 32' seeding trailer, 40' shipping container and the payment of certain start-up expenses. CTI intends to lease grow containers to various collectives, including **Pacific Cultivators Association, Inc.**</u>, a collective managed by Rick Probst and Amy Cooper, each of whom are shareholders, directors and officers of both Mobile Farming Systems and CTI.
>
> ...
>
> Our commitment to you remains unchanged and we will work honestly and tirelessly on your behalf.
>
> Warm Regards,
>
> Richard O'Connor, CEO"
>
> *Underline and bold emphasis added.*

25    14.   CTI immediately commenced business using the space, personnel and assets
26  "contributed" by MFS and MFS continued to pay CTI start up costs. On April 2, 2015 Probst as
27  Chairman of Pacific Cultivators Association, Inc. ("Pacific Cultivators") and myself as CEO of
28  CTI entered into lease, a copy of which is attached hereto as Exhibit "6" and incorporated herein

by this reference, for use of the 32' seedling trailer and 40' shipping container that had been transferred from MFS to CTI.

15. As CEO and director of MFS acting on its behalf, MFS is rightfully and properly the owner as holder of 28,000,000 CTI shares of Common Stock and entitled to all of the rights, benefits and privileges of said shares, including the right to vote said shares and to not suffer dilution of nor interference with such rights. As to the consideration that CTI was to receive from MFS:

    a. The 32' seedling trailer was and remained in the yard leased by MFS from Probst and was used by CTI as its asset including a lease to Pacific Cultivators.

    b. The 40' shipping container also remained in the yard leased by MFS from Probst and was used by CTI as its asset including a lease to Pacific Cultivators.

    c. More than $25,000 of CTI startup expenses were paid by MFS. In fact MFS paid virtually all operating expenses of CTI and was owed money for such advances in excess of $100,000 based upon the September 28, 2018 CTI Combined Balance Sheet, a copy of which is attached hereto as Exhibit "7" and incorporated herein by this reference, the amount of $75,007.24 plus a accrued interest of $12,444.29 remains outstanding. (See Exhibit 7 Long Term Liabilities ... MFS Loan and MFS Loan Accrued Interest.)

16. On May 9, 2015 Probst sent me an email, a copy of which is attached hereto as Exhibit "8" and incorporated herein by this reference, "Subject: CLARITY" discussing CTI and stated "Right now CTI is owned 100% by MFS." In addition he and I were operating CTI as a company doing business on its behalf and using MFS funds as startup expenses. CTI used MFS offices, equipment and personnel in the ordinary course of its operations.

17. At this same time, May and June 2015, Justin Beck and his attorneys were arguing that he should be included in the ownership of CTI and made a number of proposals.

18. In June I was approached by Probst and Beck who indicated that Beck's attorneys had advised him that CTI needed to issue "Founders" shares and asked me to sign minutes to do so. I did so without reviewing those minutes or having the same explained to me. I reject those

minutes as inconsistent with the true facts. MFS had fully paid for its 28,000,000 shares and it was the sole shareholder of CTI. The "Founders" shares, including my own, were issued under false pretenses, and should be cancelled as improperly and wrongfully issued. Further, any action taken after March 30, 2015 that failed to consider the required approval by MFS and its 28,000,000 fully issued and paid for shares is in my view as an officer and director of both MFS and up to 2016 CTI improper and taken against the interests of MFS the sole owner of the stock of CTI.

19. I was terminated as an officer and forced to resign as a director of CTI in 2016 and Probst and Beck took control of CTI in a series of transactions that were not approved by MFS. I know this to be the case because I remained CEO of MFS and a member of its Board of Directors. I can state that MFS was never asked to vote its 28,000,000 shares of CTI stock on any of the fundamental corporate changes and purported stock issuance.

20. In fact the Probst and Beck led management, as indicated in the CTI and Subsidiaries Financial Statements for 2017 and for nine months through September 30, 2018, a copy of which is attached hereto as Exhibit "9" and incorporated herein by this reference, issued just prior to the November 2018 shareholders' meeting, have caused CTI to incur:

    a. Massive debt approximately $7,000,000 as of 2018;

    b. A massive loss of roughly $9,500,000 as of September 30, 2018;

    c. Payroll expenses of roughly $1,800,000 for the nine months ending September 30, 2018;

    d. Legal fees and expenses in 2017 in excess of $500,000 and in the nine months ending September 30, 2018 another $327,000;

    e. A consolidated Gross Profit of $1,363,823 offset by Operating Costs of $4,197,624 for a nine month loss of $2,833,800.

21. The excessive salary compensation for alleged key personnel for 2017 total $2,000,000 as indicated in Exhibit "10" a copy of which is attached hereto and incorporated herein by this reference.

//

7.
Affidavit of Richard Francis 3:22-CV-01616-BAS-DDL
EXHIBIT #140: 008

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

22. I have also learned from attendance at the November 2018 shareholders meeting that the Probst and Beck led board of directors caused CTI to issue them 13,000,000 CTI preferred shares a $.01 per share with 3 times voting rights and claim to completely control CTI. The purported board of directors of CTI and its officers and legal counsel support this wrongful issuance of shares.

23. I was preparing for the 709 Proceeding on March 7 when I received notice the hearing had been continued. Immediately after I received that notice MFS and CTI shareholders started to send me notices from Beck dated March 6 sent after the court continued the hearing, a copy of which is attached as Exhibit "11" as follows:

> CTI Shareholders:
> We are pleased to announce that CTI has closed on the <u>sale of the Coachella property as approved by the shareholders at our meeting held in November 2018.</u> <u>The sale price was $3,900,000 USD</u>, with 100% of the proceeds going to FinCanna Capital Corp. ("FinCanna") to reduce CTI's indebtedness with FinCanna.
> CTI also closed on the <u>sale of the Colusa property for approximately $300,000.</u> Given the company's inability to raise capital with the pending litigation, Colusa was a non-performing asset not central to the current core strategy of the company (manufacturing and distribution from Palm Desert).
> The company is now <u>wholly-focused upon capitalizing the Palm Desert location, with the intention of moving existing operations to Palm Desert before June 30, 2019, and closing the proposed merger with Western Troy Capital (TSXV: WRY).</u> CTI engaged an auditor as part of the RTO/merger process (the "RTO") and expects the 3-year audited financials to be completed as part of the RTO process, assuming CTI can maintain its payment obligations to the auditor.
> It is important for shareholders to realize that, while unlikely, a negative outcome for CTI from existing litigation would result in the RTO not closing. It would also most likely lead to FinCanna asserting immediate control over CTI pursuant to the general security agreement in an effort to recoup its unpaid balances which exceed $4,000,000.
> In addition to litigation, CTI has a long road ahead to move to Palm Desert and complete the proposed merger. Thank you for your continued support. We will update you as more information becomes available.

24. On March 17 I received an additional forward of the CTI email, attached as Exhibit "12" and incorporated herein by this reference, announcing the sale of the Palm Dessert building as follows:

> Dear CTI Shareholders:
> We are pleased to announce that <u>CTI closed escrow on a "sale leaseback" transaction for the Palm Desert building.</u> This means we have sold the Palm Desert building to an investor who is leasing it back to CTI for our long-term manufacturing operations. The investor is providing a total of $1.575M in capital, of which approximately $807K was used to take out existing financing on the

8.
Affidavit of Richard Francis 3:22-CV-01616-BAS-DDL

EXHIBIT #140: 009

Document received by the CA 4th District Court of Appeal Division 3.

building, pay closing costs and pay real estate commissions. The remaining balance will used exclusively for security deposits on the lease, engineering, and tenant improvements to the building specifically for our manufacturing operations. The lease terms were generally favorable to CTI.

While the transaction is promising, CTI may still require additional capital to complete the move to Palm Desert, and the timing associated with our intended move is extremely tight. You may recall that CTI's "interim use" from the Coachella site expires on June 30, 2019, and this deadline cannot be extended. Should there be delays in engineering, permitting, or tenant improvements in Palm Desert – it would have a materially negative effect upon operations as we transition from Coachella.

Thank you for your continued support. We will continue providing updates as they become available.

Sincerely,
Justin Beck
CEO

25. By announcements dated March 6 and 17, 2018 irreversible fundamental changes are occurring led by a disputed Board of Directors and implemented by Probst and Beck's 39,000,000 disputed shareholder votes. Recall they paid nothing for the issuance of these 13,000,000 shares and stated to me at the shareholders meeting in November 2018 that they could vote and control the corporation as they wanted because of the overwhelming shares they then held.

26. As CEO of MFS I want to exercise its 28,000,000 votes and take action to set aside the Probst and Beck disputed 13,000,000 votes and its hand picked Board of Directors which rubber stamps their self serving transactions.

27. The 28,000,000 CTI shares issued to MFS were part of a plan to distribute those shares to MFS shareholders after CTI became successful as a stock dividend. The share ratio was to be 1 CTI share for each MFS common share, 1.5 CTI shares for each MFS Preferred A share and 2.0 CTI shares for each MFS Preferred B share. Based upon the outstanding MFS shares per the internally prepared MFS share ledger set out in Exhibit "13" attached hereto and incorporated herein by this reference had that stock dividend occurred the MFS shareholders would have received 26,353,000 CTI shares. Excluding the 15,000,000 MFS shares held by myself, Probst and Cooper, the other MFS shareholders would have held 11,353,000 shares and 43% of CTI and with ether myself or Cooper would have had control of CTI. Of course the 39,000,000 voting shares now held by Probst and Beck now control CTI by themselves relegating all other

1 shareholders to minority and no control status.

2     28.    CTI claims that it accomplished the same thing as to what MFS had described as MFS eventually distributing CIT shares as a stock dividend through a "Friends and Family" offering at one cent per share. That is not the case because out of the targeted 28,000,000 shares with 23,500,000 issued to insiders including Beck that left only 4,500,000 shares for the MFS shareholders or only 16% of the shares versus the 11,353,000 and 43% they should have received.

    29.    The Troy Resources reverse merger proposes to further dilute MFS because Troy shareholders would retain 12% of the shares meaning that MFS shareholders would end up with only 88% of 4,500,000 shares equivalent or 3,960,000 or only 14% of CTI. These changes are clearly fundamental when MFS promised its shareholders that at some point MFS would distribute the CTI shares and they would have 43% of the CTI shares. A share ownership reduction from 43% to 14% of CTI, a reduction of over two thirds, is clearly not what MFS had promised its shareholders from the transfer and use of its assets by CTI.

    30.    MFS is against the Troy Merger and against the continued conduct of Probst, Beck and their hand picked Board Members who rubber stamp their self serving actions.

I certify and declare under penalty of perjury under the laws of the State of California and the United States that the forgoing is true and correct.

Executed March 19, 2019 at Newport Beach, California.

_____
Richard Francis O'Connor II

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

Document received by the CA 4th District Court of Appeal Division 3.

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California        )
County of ~~Los Angeles~~ Orange, JP )

Subscribed and sworn to (or affirmed) before me on this _19_ day of _March_, 2019, by _Richard Francis O'Connor II_, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature: _____

(Seal)

> JONATHAN PATRICK
> Notary Public – California
> Orange County
> Commission # 2187299
> My Comm. Expires Mar 20, 2021

11.
Affidavit of Richard Francis O'Connor II
3:22-CV-01616-BAS-DDL
EXHIBIT #140: 012
Document received by the CA 4th District Court of Appeal Division 3

Catanzarite Law Corporation
2331 West Lincoln Avenue
Anaheim, California 92801
Tel: (714) 520-5544 • Fax: (714) 520-0680