EXHIBIT 246

3:22-CV-01616-BAS-DDL
Exhibit #246: 001

# RESPONSE

## The State Bar of California

Michael Tilden, CPA
Acting California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, CA 95814

RE: State Bar of California Response to Audit Report No. 2022-030

Dear Mr. Tilden:

The State Bar has been working diligently to improve the effectiveness, timeliness, and fairness of its discipline system. Based on proposals from the Board of Trustees' (Board) Special Discipline Case Audit Committee convened in response to clear failings in responding to complaints regarding licensee Thomas Girardi, the State Bar is currently implementing a comprehensive Client Trust Account Protection Program, among other efforts. Additionally, in accordance with directives in Senate Bill 211 (Umberg), we are working with outside experts to develop and propose new case processing standards aimed at resolving attorney discipline cases in a timely, effective, and efficient manner while minimizing backlogs of attorney discipline cases and best protecting the public. We continue our efforts to address previous reports regarding racial disparities in the discipline system. And, just last week, we adopted a five-year strategic plan that puts front and center our commitment to administer an attorney discipline system that is efficient, accountable, and transparent.

Given the Board's intense focus on the discipline system, and our understanding of the gravity of the deficiencies that the Girardi matter laid bare, some of the findings in your recent report are profoundly eye-opening and troubling. In particular, our failure to promulgate clear and comprehensive policies in the areas identified, and to develop corresponding accountability measures to ensure compliance with those policies, are unacceptable. We are proud to have appointed a new chief trial counsel who manifests this sentiment, as reflected by the many steps he has already taken to address identified deficiencies so far in his short tenure, as well as his responsiveness during the audit process itself, a characteristic well-documented in your report. Our executive director shares this sentiment as well, and her responsiveness during the audit process is also well-documented in your report. We appreciate the insights provided by your report, and we will continue to work with both the executive director and the chief trial counsel to incorporate your findings into our ongoing efforts to improve the attorney discipline system.

As outlined below, we generally agree with the majority of your recommendations; there is only one area where we disagree on policy grounds. We also believe it is important that we explicitly address the resource needs associated with the implementation of the reforms you have outlined. To that end, we have included a fiscal impact section in this response. Because of the very real resource constraints we face, our agreement with any particular recommendation is, respectfully, not a commitment to implement that recommendation absent new resources. We have made this distinction where applicable.

3:22-CV-01616-BAS-DDL
Exhibit #246: 002

**State Bar Responses to Audit Recommendations**

1. *Recommendation:* To ensure that it uses nonpublic measures to close complaints only when such use is consistent and appropriate, the State Bar should revise its policies by October 2022 to define specific criteria for which cases are eligible to be closed using nonpublic measures and which are not eligible.

    *Response:* Agree. As noted, the Office of Chief Trial Counsel (OCTC) has in place a policy, issued in June 2021, that addresses nonpublic alternatives to discipline—resource, directional, and warning letters and agreements in lieu of discipline (ALDs)—and provides guidance on their content and how to decide when to issue them. We agree that this policy should be modified to address private reprovals issued prior to filing of a Notice of Disciplinary Action—a nonpublic form of discipline—and to provide additional and more specific criteria for which cases are and are not eligible for closure or resolution using any of these nonpublic measures. No later than October 2022, OCTC will adopt specific criteria that provide more guidance for the exercise of staff discretion in determining whether use of any of these nonpublic measures is or is not appropriate based on the particular facts.

2. *Recommendation:* To ensure that it fulfills its duties to investigate attorney misconduct, by April 2023, the State Bar should begin monitoring compliance with its new policy for identifying the circumstances in which investigators should continue to investigate even if the complainant withdraws the complaint.

    *Response:* Agree; full implementation dependent on resources.

    ①As noted, in February 2022, OCTC put in place a new policy making clear that a complainant's withdrawal of or failure to cooperate in the investigation of their complaint is not alone a basis for closure and setting out the circumstances under which, in both intake and investigation, complaints should continue to be pursued despite a complainant's withdrawal or failure to cooperate. In conjunction with the implementation of the new policy, closing codes in OCTC's case management system have been modified to accord with the policy. We will monitor compliance with this policy by regularly conducting a randomized review of files closed using certain of these codes. This will require State Bar staff to pull files closed using these codes, review the substance of the files, and check the closing letters to ensure that closures complied with the policy. As noted below, such monitoring will require additional resources.

3. *Recommendation:* The State Bar should notify the public on its website when other jurisdictions determine that an attorney that is also licensed in California presents a substantial threat of harm to the public.

    *Response:* The State Bar agrees that if we learn of an interim action and finding in another jurisdiction regarding an attorney that is also licensed in California, we will notify the public on our website by posting of a consumer alert setting out the nature of the interim action and finding while also advising that the attorney is presumed innocent of the disciplinary charges in the other jurisdiction unless and until those charges have been established.

② Please understand that our ability to learn of interim actions in other jurisdictions is limited, however. The American Bar Association (ABA) data bank referenced in the next recommendation depends on reporting to that data bank by other jurisdictions, and it is not clear how often interim actions are reported.

4. *Recommendation:* To ensure that it identifies discipline imposed on California attorneys in other jurisdictions, the State Bar should use the American Bar Association's data bank to identify attorneys disciplined in other jurisdictions who do not report that discipline.

   *Response:* Agree. OCTC staff have access to the ABA data bank and are now set up to receive automated emails when another jurisdiction notifies the ABA data bank of discipline imposed on an attorney identified in the data bank as also being admitted in California.

5. *Recommendation:* To allow its staff to more easily identify patterns of similar complaints made against attorneys, by July 2022, the State Bar should begin using its general complaint type categorizations when determining whether to investigate a complaint.

   *Response:* Agree; full implementation dependent on resources.

   As noted, in February 2022 OCTC implemented a policy regarding intake's consideration of prior closed complaints in determining whether to move a current complaint forward for investigation. As also noted, the State Bar has recently developed a set of general complaint type categorizations that group particular allegations into more general categories. We agree that OCTC should begin using the general complaint type categorizations for the purpose of identifying possible patterns of similar complaints among both previously closed and currently open complaints. The identification of a pattern may signal additional steps that should be taken, either in intake or investigation, before making a determination as to how to proceed with the current complaint or whether to reopen older complaints for further action.

   Pursuant to a Board resolution adopted to address findings regarding racial disparities in the discipline system, complaints closed without discipline or an alternative to discipline that are more than five years old are archived and will not be reviewed as part of the effort to identify patterns of similar complaints.

6. *Recommendation:* To improve its ability to identify and prevent conflicts of interest that its staff may have with attorneys who are subjects of complaints, the State Bar should develop a process by July 2022 for monitoring the accuracy of the information in its case management system used to flag attorneys with whom its staff have declared that they have a conflict of interest.

   *Response:* Agree; full implementation dependent on resources.

7. *Recommendation:* To ensure that State Bar staff do not inappropriately close cases against attorneys on the conflict list, the State Bar should create a formal process by October 2022 for determining whether it is able to objectively assess whether such a complaint should be closed or whether the decision should be made by the independent administrator. The State Bar should document this assessment in its case files for each case against an attorney on the conflict list.

*Response:* Agree; full implementation dependent on resources.

The Board's Special Discipline Case Audit Committee identified as a priority the need to ensure that all OCTC investigative and charging decisions are free from conflicts or outside influence. Accordingly, we agree that decisions to close cases should be made only after conflicts determinations are made and documented. We will work with the chief trial counsel to establish a formal process under which OCTC staff are required to review cases prior to closure to identify potential conflicts, refer any cases posing a potential conflict to the independent administrator of the Special Deputy Trial Counsel program for a final determination regarding the potential conflict, and document this process and the final determination regarding conflicts in OCTC's case management system.

8. *Recommendation:* To ensure the independence and objectivity of the external review of its case files, the State Bar should amend its policies by July 2022 to do the following:

    - Require the external reviewer to select the cases for the semiannual review.

    - Establish formal oversight to ensure that it follows up and addresses the external reviewer's findings.

    *Response:* Agree; full implementation dependent on resources.

    In November 2021 the chief trial counsel began providing to the Board a summary of the external reviewer's report and recommendations together with OCTC's response to the recommendations. In January 2022, with the Board's agreement, the chief trial counsel issued a policy formalizing this practice. We will work with the chief trial counsel to implement policies and procedures for OCTC to also report back to the Board on its progress in implementing actions to address the external reviewer's findings.

9. *Recommendation:* To ensure it appropriately reviews complaints involving overdrafts and alleged misappropriations from client trust accounts, the State Bar should perform the following by July 2022:

    a. Discontinue its use of informal guidance for review of bank reportable actions and direct all staff to follow the policies established in it is intake manual.

    b. Revise its intake manual to disallow de minimis closures if the attorney has a pending or prior bank reportable action or case alleging a client trust account violation.

    c. Establish a monitoring system to ensure staff are following its policies for de minimis closures.

    d. When investigating client trust account related cases and bank reportable actions not closed de minimis, require its staff to obtain both the bank statements and the attorney's contemporaneous reconciliation of the client trust account, and determine if the relevant transactions are appropriate.

e. Require a letter with client trust account resources to be sent to the attorney after the closure of every bank reportable action.

*Response:* Agree in part, disagree in part, as outlined below.

9a. Discontinue its use of informal guidance for review of bank reportable actions and direct all staff to follow the policies established in it is intake manual.

Agree.

9b. Revise its intake manual to disallow de minimis closures if the attorney has a pending or prior bank reportable action or case alleging a client trust account violation.

③ Agree in part. While manual revisions are still pending, there will be some exceptions to the approach recommended by the State Auditor, primarily designed to take into account the age and amount of prior reportable actions and the age and disposition of prior client trust account violation complaints.

9c. Establish a monitoring system to ensure staff are following its policies for de minimis closures.

Agree; full implementation dependent on resources.

④ To monitor compliance with policies for de minimis closures of bank reportable actions, a randomized review of such closures will need to be conducted at regular intervals. This will require State Bar staff to pull files underlying these closures, review the substance of the files, and check closing letters to ensure that closures have accorded with policies. As noted below, we believe such monitoring will require additional resources.

9d. When investigating client trust account related cases and bank reportable actions not closed de minimis, require its staff to obtain both the bank statements and the attorney's contemporaneous reconciliation of the client trust account, and determine if the relevant transactions are appropriate.

Disagree.

⑤⑥ This approach would consume inordinate amounts of resources and time, requiring the State Bar in every such case to: (a) request from the attorney and/or subpoena from the bank statements for the account and wait for their receipt; (b) request the attorney's contemporaneous reconciliation and wait for its receipt; and (c) do a financial analysis of the statements and reconciliation to determine if the relevant transactions are appropriate. Many bank reportable actions and client trust account complaints do not warrant this level of investigation. For example, some non de minimis bank reportable actions are explained by extended holds on deposits of which the attorney was unaware, resulting in the issuance of checks at a time when the attorney believed funds had cleared but they had not—if a more truncated investigation shows this to be the case, there is no justification for the more extensive further investigation recommended by the State Auditor. A study the State Bar conducted last year of over 70,000 bank reportable action matters found that 22 percent did

not involve a negative bank balance in actuality—the reportable action was triggered only by check deposit holds. Doing an investigation of the scope recommended by the State Auditor for every bank reportable action and client trust account complaint regardless of the underlying facts and merits would result in a waste of limited investigative resources and is not sound public policy.

⑦In addition, given data that shows that Black male attorneys are ten times more likely than their white male counterparts to be the subject of bank reportable actions, the impact of the approach recommended by the State Auditor will fall heavily on this group of attorneys. Black male attorneys will be disproportionately required to take time away from their practices to gather and submit documentation to the bar and respond to investigative inquiries. Given that the data indicates that there is a significant percentage of cases for which this level of intervention is not required, the potentially disparate impact of the State Auditor's approach is difficult to justify.

As noted above, OCTC has already modified its policy for identifying the circumstances in which complaints should continue to be pursued despite a complainant's withdrawal or failure to cooperate, and it will be revising its policies and practices regarding the use of alternatives to discipline and the identification of patterns of similar complaints against attorneys. All of these policy changes will apply to the State Bar's handling of bank reportable actions and complaints alleging client trust account violations. In addition, OCTC will revise its policies to define specific criteria in which bank reportable actions and complaints alleging client trust account violations should not be closed in the absence of obtaining both bank statements and the attorney's contemporaneous reconciliation of a client trust account and determining if the relevant transactions are appropriate and will implement a monitoring system to ensure these policies are being followed. We believe that this more targeted approach will more efficiently and effectively use the State Bar's limited investigative resources to further the goal of public protection while at the same time minimizing disparate impacts from increased investigations of bank reportable actions and client trust account complaints.

9e. Require a letter with client trust account resources to be sent to the attorney after the closure of every bank reportable action.

Agree.

## Resources Needed to Implement the State Auditor's Recommendations

⑴The fiscal impact of the State Auditor's recommendations are as follows:

A. Increased oversight and monitoring. [recommendations 2, 6, 7, 8, and 9c]

Given the volume of complaints handled by OCTC, the proactive regulation and compliance monitoring mechanisms reflected in the audit recommendations will require both human and technological capital:

| Recommendation | FTE Impact | Contractual Impact | Notes |
|---|---|---|---|
| #2: Withdrawn Complaint Policy | 1 | | Additional staff resources needed to audit compliance with policy. This effort will involve random selection and review of a statistically significant sample of case files. |
| #6 and #7: Improve Conflict Identification and Response | 1.5 | $200,000 annually | Additional staff resources needed to audit conflict flags in case management system against staff reported conflicts of interest as well as to implement more rigorous approach to case closure determination where conflict identified; additional workload for the Special Deputy Trial Counsel program (conflicts counsel) also anticipated as more cases will be directed to that program for closure determination. |
| #8: Oversight of Compliance with External Reviewer's Findings | 1 | | Formal monitoring and tracking of implementation actions taken in response to each external review (two per year) will require additional staff resources. |
| #9c: Monitor de minimis closures of bank reportable actions | 3 | | Additional staff resources needed to audit compliance with policy. This effort will involve random selection and review of a statistically significant sample of case files. |

B. Identifying patterns of complaints using new complaint categorizations. [recommendation 5]

Implementation of this recommendation will require significant work to categorize previously closed and currently open cases in accordance with the general complaint type categorizations and ensure that this categorization is available in a readily accessible way to investigators and attorneys.

| FTE Impact | Contractual Impact | Notes |
|---|---|---|
| 2 | $500,000 | Contractual dollars needed to configure case management system to reflect new categorization system and to identify complaint patterns; additional staff needed to support continued implementation of categorization system and analysis of results. |

C. Investigate all reportable actions not closed as de minimis and all client trust account complaints. [recommendation 9d]

As noted above, the State Bar disagrees with this recommendation on policy grounds. That being said, irrespective of policy concerns, the fiscal impact of this recommendation is significant:

| FTE Impact | Contractual Impact | Notes |
|---|---|---|
| 22 | $500,000 | Contractual resources needed to develop platform for automated transmittal of bank and attorney records and 1 FTE needed to maintain platform; one trial team (19 FTE [1]) needed to investigate all reportable actions not closed as de minimis (estimated at approximately 1,500 annually) and |

| FTE Impact | Contractual Impact | Notes |
|---|---|---|
| | | all client trust account complaints (estimated at 1,000 annually); additionally, 2 forensic accountants needed to support review of bank and reconciliation records. |

In total, full implementation of the State Auditor's recommendations would require an additional 30.5 FTE and $200,000 annually on a go-forward basis, as well as $1 million in one-time funds. Absent new resources, the State Bar's implementation of these recommendations will be limited to what can be done within existing funding parameters.

In closing, we thank you for your review, which has helped sharpen the focus of discipline system improvements currently underway and identified areas for further improvement. It is gratifying to know that the Board's and our staff's focused efforts align with issues and recommendations set forth in your report. We have set improvement of the attorney discipline system as our number one goal in our recently adopted five-year strategic plan and have worked with the executive director and new chief trial counsel to identify strategies and implementation steps for accomplishing this goal beyond those already underway. Current externally facing efforts include the Client Trust Account Protection Program, which, when fully implemented, will reflect the first comprehensive proactive regulation of legal client trust accounts in the state's history, and the Ad Hoc Commission on the Discipline System, which is charged with conducting a wide-ranging review of the efficiency, effectiveness, and fairness of the attorney discipline system. Less visible has been our inward focus on strengthening Board oversight of the chief trial counsel and OCTC. Of particular note is the fact that beginning in 2021, performance targets have been set for the chief trial counsel; progress in relation to those targets is formally assessed on a quarterly basis under the direction of the leadership of the Board's Regulation and Discipline Committee.

Reflecting the value we see in many of your recommendations as well as their alignment with initiatives in progress under the leadership of the new chief trial counsel, we have already taken significant steps towards implementing several. In November 2021 the chief trial counsel began to present to the Board of Trustees a summary of the external reviewer's report and recommendations together with OCTC's response to those recommendations. In February 2022 several reforms were initiated including issuance of a new policy outlining the circumstances in which staff should continue to pursue allegations of misconduct even if a complainant withdraws their complaint, and a clarification of office policy regarding consideration of prior closed complaints. Information technology staff has also been engaged to ensure that conflicts information in the case management system reflects the most current information from the conflict-of-interest database. While it is undeniable that there is much work to do to address challenges that have been decades in the making and are reflective of a complex and unproductive cycle of insufficient funding, poor outcomes, and low morale, I am confident that the Board will continue to both demand and support meaningful improvement in all areas of OCTC's operations.

We are committed to doing the internal work needed to ensure that our attorney discipline system is effective, efficient, transparent, and fair. Although we cannot fully implement the State Auditor's recommendations absent additional funding, we will advance the majority of them to the full extent possible given the resource constraints we face.

Sincerely,

3:22-CV-01616-BAS-DDL
Exhibit #246: 009

Ruben Duran
Chair, Board of Trustees

# CALIFORNIA STATE AUDITOR'S COMMENTS ON THE RESPONSE FROM THE STATE BAR OF CALIFORNIA

To provide clarity and perspective, we are commenting on the response to our audit from the State Bar. The numbers below correspond to the numbers we have placed in the margin of the response.

1) We did not assess the changes the State Bar made to its case management system. <u>As we noted, the State Bar issued a policy directive in February 2022 regarding those cases in which the complainant withdraws the complaint or otherwise fails to cooperate in the investigation.</u> Because our audit fieldwork was substantially complete, we did not perform testing to determine whether the State Bar's modification of closing codes would help alleviate our concern. We look forward to reviewing the details of the State Bar's efforts to address this issue in its 60-day response to our recommendations.

2) The State Bar's reference to the American Bar Association's data bank in response to this recommendation is misleading. Our recommendation regarding the data bank pertains to final orders of discipline. We did not recommend that the State Bar use the data bank for identifying interim actions. Therefore, the State Bar's mention of the data bank in this context is not relevant.

3) The State Bar's response addressing proposed revisions to its intake manual may not result in a meaningful change to its existing policy. <u>As Figure 4 shows, one attorney had 34 cases closed as *de minimis* and was ultimately disbarred based on a federal conviction of money laundering through their client trust accounts.</u> Without additional details on the exceptions that the State Bar plans to make to the approach that we recommended, it is unclear whether this policy will address this type of concern and others we describe.

4) <u>The State Bar's description of the actions necessary to monitor compliance with policies for closing bank reportable actions indicates that it does not plan to implement our recommendation for limiting *de minimis* closures as we stated.</u> If the State Bar were to implement our recommendation for revising its intake manual, there would be no need to review the underlying files or check the closing letters. Instead, supervisors could determine whether staff followed the change to the State Bar's policies we recommend by simply reviewing an attorney's case history whenever a case is closed as *de minimis*.

5) The State Bar's response overstates the level of review we recommended and does not address the significant failures of its investigative process that we identified. Our recommendation does not suggest that the State Bar should conduct a full financial analysis involving a forensic accountant for every bank reportable action or client trust account case. Rather, when investigating such cases the State Bar should, at a minimum, obtain more reliable evidence, including bank statements and the client trust account reconciliations that the attorney is already required to maintain.

The recommendation is intended to address the inadequate evidence that the State Bar has relied on in the past when closing cases, such as those instances we identified in which the State Bar should have conducted a more thorough review. For example, in its investigation of the attorney we describe in Case Example 9, the State Bar relied on the attorney's narrative detailing certain transactions pertaining to overdrafts in a particular month and a bank statement for a different month. Similarly, the State Bar accepted the attorney's explanation when investigating a complaint described in Case Example 6 and closed the complaint without taking further action. Ultimately, the State Bar determined that the attorney had been withdrawing funds from the client trust account to pay for personal expenses. Finally, as we illustrate in Figure 4, after a long history of closing complaints against an attorney as *de minimis*, the State Bar determined that the attorney had used the client trust account for impermissible purposes to pay for personal expenses. The inappropriate transactions that the State Bar did ultimately find were identified through its review of bank records.

Accordingly, we stand by our recommendation regarding obtaining bank statements and the attorney's contemporaneous reconciliations, which are more reliable forms of evidence for investigating client trust account related cases and bank reportable actions than attorney assertions.

) The statistic that the State Bar describes does not support its conclusions. Based on the State Bar's statement that 22 percent of the bank reportable action matters it reviewed did not involve a negative balance, it appears to be acknowledging that the remaining 78 percent of those matters did involve a negative balance. Such a substantial number of bank reportable actions involving actual negative bank balances is indicative of high risk and the need for more thorough investigations. In contrast, the State Bar suggests that investigating these matters without considering the underlying facts and merits would be a waste of limited investigative resources and is not sound public policy. However, as we illustrate throughout the report, the State Bar has regularly failed to effectively assess the underlying facts and merits of bank reportable actions, resulting in harm to the public. Thus, the State Bar's objections to investigating bank reportable actions on a more consistent basis are unreasonable.

) We disagree with the State Bar's assertion that our recommendation would disproportionately require certain attorneys to take time away from their practices to gather and submit documentation. Providing the information we recommend should not represent a significant workload. As we noted, the State Bar's Rules of Professional Conduct require attorneys to maintain, among other things, monthly reconciliations of their client trust accounts. Thus, attorneys should have the required information readily available to comply with a request from the State Bar. Further, as we described, in some cases the State Bar closed complaints without contacting the attorney to obtain additional information or to provide guidance for avoiding future complaints. If the State Bar were to consistently provide information on client trust account resources to attorneys after closing each bank reportable action, as we recommended, this information may help reduce the number of bank reportable actions for all attorneys. With respect to the State Bar's disparate impact concerns, it is the responsibility of the State Bar, just like all auditees, to implement our recommendations in a manner consistent with federal and state law.

) The resources the State Bar asserts that it needs to implement our recommendations appear to be significantly inflated and based on questionable estimates. For example, the State Bar indicates that it needs three full-time staff to monitor *de minimis* closures of bank reportable actions. This number appears excessive because its supervisors should already be performing some monitoring of staff's compliance with the existing policy. Moreover, the change described in our recommendation

<u>regarding *de minimis* closures would not require the State Bar to randomly select and review case files, as it proposes to do.</u>

The State Bar also asserts that it would need contractual resources to develop a platform for the automated transmittal of bank and attorney records, as well as personnel to maintain that platform. However, it already maintains an electronic case management system that documents records of the type that it would collect pursuant to our recommendation. Thus, we question why the State Bar believes that it needs a new platform for the collection of such information.

<u>Further, as we discussed, the State Bar overstates the level of review we recommend, thereby inflating its estimate of the resources it would need to investigate client trust account complaints.</u> In particular, it states that our recommendation would add about 1,500 cases to its investigation caseload per year. <u>Such a statement is misleading because the State Bar already performs some level of review during the intake stage for each case, as Figure 1 illustrates.</u> In addition, the State Bar's estimated resource needs for addressing these cases is unreasonably high because it is including staff resources for conducting a financial analysis of each of these cases—an action that we did not recommend. Rather, we recommended that the State Bar obtain bank statements and attorneys' client trust account reconciliations when reviewing overdrafts and alleged misappropriations from client trust accounts, which would be more reliable evidence for determining whether the relevant transactions are appropriate. Moreover, although obtaining documents for cases that were previously closed as *de minimis* would require some additional effort, we question whether that additional effort requires the resources that the State Bar estimates.

¹⁾ The State Bar misrepresents our conclusions regarding its 2018 workforce plan. A state law that took effect in 2016 required the State Bar to implement a workforce plan that included the development of an appropriate backlog goal and an assessment of needed staffing. The resulting workforce plan made numerous recommendations, including that the State Bar reorganize the structure of its trial counsel's office. However, in our 2019 report titled *State Bar of California: It Should Balance Fee Increases With Other Actions to Raise Revenue and Decrease Costs*, Report 2018-030, we did not recommend that the State Bar should add positions based on the workforce plan. Rather, we recommended a fee increase that would allow the State Bar to hire 19 additional staff—constituting one additional investigative team—and we recommended that the State Bar analyze performance data to make more informed estimates of its future staffing needs. We made that recommendation because the staffing study the State Bar performed as part of its workforce plan was conducted in the midst of its efforts to make a number of significant changes to how it performed its work, including the implementation of a digital case management system, which may have had a significant impact on staff workloads and the associated case processing times. Therefore, we question whether the State Bar's estimated resource needs are accurate, given the nature of the changes it has implemented since it conducted the staffing study it used as the basis for those estimates.

⁾ We question why the State Bar is proposing a new system of proactively monitoring attorney client trust accounts when it is not yet effectively responding to the risks represented by bank reportable actions and complaints. As we describe in <u>Case Example 6</u>, <u>Case Example 7</u>, and <u>Case Example 8</u>, the State Bar did not effectively investigate cases involving bank reportable actions and complaints against attorneys regarding their client trust accounts. According to a November 2021 report to its board, the State Bar's proposal would include financial and compliance reviews of attorney client trust accounts chosen using both random and risk-based methods. It is not clear why the State Bar believes that random reviews of attorney client trust accounts would be a more effective method of identifying client trust account

violations than thoroughly reviewing the complaints it receives regarding specific attorneys. Further, the State Bar's proposed new program may be more expensive than its estimates of the costs to implement our recommendations—which it describes as unreasonable. In its presentation to its board, the State Bar estimated that its program would cost $500,000 initially and $3.35 million annually.