EXHIBIT 279

NCJRS

MAR 15 1988

ACQUISITIONS

INTRODUCTION

WHY PUBLIC CORRUPTION IS NOT A VICTIMLESS CRIME

One of the most challenging problems we face in combating corruption today is the widely held public perception that corruption is a victimless crime. For years prosecutors have encountered this frustrating attitude in our dealings with witnesses, jurors and even judges who think we should be spending our time going after "real criminals" -- guys who say "dese, dem and dose" -- rather than the buttoned-down type puzzled to find himself in the dock of the court. Far too often even the people who have been victimized by corruption and who should be outraged and eager to cooperate shrug their shoulders, in effect saying, "Hey, what are you going to do?"

In many parts of the country, a certain laxity in the conduct of public business has developed over time that is unacceptable, and an attitude of resignation on the part of the public has, also over time, allowed the system to grow and flourish. One poll in Massachusetts indicated that ninety-two percent of the people believed that corruption in the state was widespread. While the attitude that "you can't fight city hall" is not as widely held as it once was in Chicago, Boston, Philadelphia, New York and other cities, there is still far too much of it. This should be disturbing to private citizens, not just to investigators and prosecutors.

The myth that corruption is a "consensual crime" that harms no one is one of the biggest lies in public life today. Public corruption is not a victimless crime. There are many victims and one has only to look at the headlines to know who they are.

In Boston, for example, where public buildings have had to be closed because of the fear that they may collapse from shoddy construction attributable in part to a corrupt system of selecting architectural and construction firms, public corruption is not a victimless crime.

In Atlanta, where some residents have had to live with the fear that their tenements may burn down or fall apart as

a result of substandard electrical wiring or the use of low grade building materials that have never been properly inspected because the inspectors were paid off to look the other way, public corruption is not a victimless crime.

In Chicago and Philadelphia, where judges and lawyers have been caught taking money in exchange for fixing criminal cases and the result is that drug dealers and other dangerous criminals have been turned back out on the streets, public corruption is not a victimless crime.

In New York, where contracts for all manner of public services have been given out not to the low bidder but to the company that best lines the pockets of those making the contracting decision, with the result that the city budget goes through the roof and public programs for transportation, insurance, schools, medical care and other necessities are underfunded, public corruption is not a victimless crime.

On Capitol Hill and in State Houses across the country, when lobbyists and special interest groups win the hearts of legislators by wining and dining, by lavish trips, fees and boondoggles and the result can be special interest legislation that counts its costs in jobs and taxpayers' money and helps no one but the promoters of the legislation, public corruption is not a victimless crime.

In Alabama and Louisiana, where voter fraud, ballot box stuffing and corruption in the electoral system have deprived the poor and the elderly and minorities of their right to vote in public elections and have ensured the election of corrupt state and local officials, public corruption is not a victimless crime.

In New Jersey, where environmental inspectors have been caught taking payoffs to allow toxic wastes to be dumped illegally on local lands and lakes and streams endangering the health and safety of the public, public corruption is not a victimless crime.

In Washington, D.C., and anywhere military contracts involving vital defense and weapons systems have been the subject of fraud, bribery, payoffs and kickbacks, with the resulting drain on our budget and potential harm to national security, public corruption is not a victimless crime.

In Miami, where police officers have been put on the payroll of narcotics enterprises to protect the flow of illegal drugs into this country and onto our streets and

when drug-related deaths and suicides and emergency room admissions continue to rise because of it, public corruption is certainly not a victimless crime.

Corruption has other less obvious victims as well. If left unchecked it poses a powerful threat to democratic society. It erodes public confidence in the institutions of government. It distorts the democratic process that is supposed to fairly resolve competing meritorious claims to limited resources on a rational basis -- almost always to the detriment of the most disadvantaged members of society. This undermines the legitimacy of government and short-circuits the hope of those who have not prevailed or benefited that there is someone in government who will faithfully serve, rather than sell out, their interest.

Corruption also deters honest and able citizens from seeking public office, and that is particularly troubling to me because, in the long run, it is the participation in public life of many civic-minded men and women that provides the best hope that our democratic processes will function freely and fairly.

Another consequence of corruption and political favoritism in many states has been the acceptance of work in the public sector that would not be tolerated in the private sector, and should not be tolerated in public projects. For example, in 1980 a Massachusetts blue ribbon commission found that corruption was one of the principal reasons why so many public buildings, including government offices, parking garages, courthouses, hospitals, libraries, and prisons, were in substandard shape and why many had to be closed.

It should not be surprising that those in the business community who pay tribute, whether through payoffs or required "campaign contributions," will make their money back many times over by inferior work, substituting a lesser grade of materials or lower quality products, or cutting corners on workmanship. Even the out-of-pocket cost of a bribe is never borne for long by a contractor: it is plowed back into the contract, or a change order to the contract, and passed directly on to the taxpayers, usually with interest.

A perception that the system is corrupt or rigged will, by a sort of political Gresham's Law, eventually drive the good players out of the game. That is precisely what we found to have occurred in Massachusetts. Over time, many reputable contractors refused to bid on government contracts.

From a law enforcement perspective, any public perception that corruption hurts no one makes it much harder for us to do our jobs. Witnesses who do not see bribery or extortion as serious crimes do not want to come forward, do not see the need to testify, and will not cooperate in investigations. Prosecutors who are reluctant to challenge the power structure, and judges who let corrupt officials stay on the street, have unwittingly aided and abetted this problem.

What can be done to change this? The most effective thing the Justice Department can do is to bring more corruption cases, cases designed to attack the corrupt power structure wherever it exists and cases which challenge the assumption of any of those on top who may believe they are above the law. It is important that we bring cases that are designed to change public attitudes, cases that make it apparent who has profited at the public's expense.

The best kind of cases for reshaping public attitudes in this area are the kind that make the average citizen and taxpayer angry. I recall in Boston we prosecuted a series of pension fraud cases against a number of politically well-connected officials in the City's budget office. All had claimed "slip-and-fall" accidents in their final year in office and after a falling-out with the Mayor had retired from City government on $30,000-per-year disability pensions with a total value of $1 million each over the rest of their lifetimes. These phoney pensions would have cost the taxpayers of Boston millions of dollars and I can remember seeing a secretary as she was typing the indictments, punching out the keys one at a time saying "I'VE--WORKED --SINCE--I--WAS--FIFTEEN--YEARS--OLD. I--PAY--MY--TAXES --AND--THIS--REALLY--MAKES--ME--MAD."

This type of case makes a good point -- not only to the citizens who read and hear about it but to the corrupt officials as well. And the results can sometimes be dramatic. In fact, in 1981, the year before our investigations started, the City of Boston awarded 260 disability pensions. In 1983 and 1984 respectively, after several officials were convicted, only forty-eight and forty-four such pensions were awarded.

What happens when cases like this change public perception is that people become less tolerant and more likely to express outrage. Tougher state laws against corruption are passed. More pressure is put on state and local law enforcement to do their job. Auditors and Inspectors General are appointed. Ethics rules are complied with and enforced. Government agencies which had served as

political dumping grounds start to be restructured and recharged. Integrity in government starts to become part of the political dialogue and part of candidates' platforms. Gradually public attitudes are reshaped and the public's interest in honest government is vindicated.

My suggestion is that we try to design, in each District, an anti-corruption program that is not simply reactive to the problems that appear on the surface (the walk-ins), but one that proactively attacks all corrupt elements or aspects of the power structure in the community. This means setting up a specialized corruption unit, developing an intelligence base that taps into the corrupt infrastructure, and then using all the tools at our disposal -- including the most intrusive investigative techniques -- to develop cases that will have an impact. This Manual is intended to outline the basic ingredients of such a program.

William F. Weld

William F. Weld *
Assistant Attorney General
Criminal Division
U.S. Department of Justice
February 1988

* Prior to being appointed Assistant Attorney General in charge of the Criminal Division, William F. Weld served as the United States Attorney in Boston, Massachusetts for five years. During his tenure, the prosecution of public corruption cases was the number one priority of his office.

110010

PROSECUTION OF PUBLIC CORRUPTION CASES

TABLE OF CONTENTS


INTRODUCTION: WHY PUBLIC CORRUPTION IS NOT A VICTIMLESS CRIME
By William F. Weld . . . . . . . . . . . . . . . . . . . i

TYPICAL PATTERNS OF CORRUPTION AND HOW TO APPROACH THEM

1. JUDICIAL CORRUPTION
By Anton R. Valukas and Ira Raphaelson . . . . . . . . 1

110011 2. CORRUPTION IN GOVERNMENT CONTRACTS: BRIBERY, KICKBACKS, BID-RIGGING AND THE REST
By John R. Hailman . . . . . . . . . . . . . . . . . 15

110012 3. REGULATORY AGENCY CORRUPTION
By Rudolph W. Giuliani and Rhea Kemble Brecher . . . . . . . . . . . . . . . . 29

110013 4. NARCOTICS-RELATED CORRUPTION
By Leon B. Kellner . . . . . . . . . . . . . . . . 39

110014 5. LEGISLATIVE CORRUPTION
By Reid H. Weingarten . . . . . . . . . . . . . . . 55

110015 6. INVESTIGATION AND PROSECUTION OF POLICE CORRUPTION CASES
By Edward S. G. Dennis, Jr. and Dennis O. Wilson . . . . . . . . . . . . . . . . 65

110016 7. ELECTION CRIMES
By Craig C. Donsanto . . . . . . . . . . . . . . . 77

110017 8. CONFLICTS OF INTEREST CRIMES
By G. Allen Carver, Jr. . . . . . . . . . . . . . . 91

SELECTED TACTICS AND STRATEGIES

110018 9. THE USE OF THE UNDERCOVER TECHNIQUE IN CORRUPTION INVESTIGATIONS
By Gerald E. McDowell . . . . . . . . . . . . . . . 101

110019 10. THE SUCCESSFUL USE OF INFORMANTS AND CRIMINALS AS WITNESSES FOR THE PROSECUTION IN A CRIMINAL CASE
By Stephen S. Trott . . . . . . . . . . . . . . . . 115

110020 11. ADDITIONAL COVERT TECHNIQUES IN CORRUPTION INVESTIGATIONS
By William A. Keefer . . . . . . . . . . . . . . . 135




3:22-CV-01616-BAS-DDL
Exhibit #279: 007

110021 12. OVERT INVESTIGATIONS
By Daniel Small . . . . . . . . . . . . . . . . . . 145

110022 13. HOW TO OBTAIN COOPERATION IN A PUBLIC CORRUPTION INVESTIGATION
By Mark E. Robinson . . . . . . . . . . . . . . . . 157

110023 14. TRACKING DOWN CASH GENERATION SCHEMES
By James Schweitzer . . . . . . . . . . . . . . . . 175

110024 15. THE USE OF POLYGRAPHS IN CORRUPTION CASES
By Lee J. Radek . . . . . . . . . . . . . . . . . . 199

110025 16. CHARGING DECISIONS
By H. Marshall Jarrett . . . . . . . . . . . . . . 209

110026 17. TRIAL TACTICS
By Wayne A. Rich, Jr. . . . . . . . . . . . . . . . 217

110027 18. COMMON DEFENSES
By H. Marshall Jarrett . . . . . . . . . . . . . . 229

110028 19. SENTENCING ADVOCACY
By Eric H. Holder . . . . . . . . . . . . . . . . . 241

110029 20. MEDIA RELATIONS
By Robert C. Bonner . . . . . . . . . . . . . . . . 249

HOW TO APPROACH THE PUBLIC CORRUPTION PROBLEM IN YOUR DISTRICT

110030 21. ORGANIZING A PUBLIC CORRUPTION INVESTIGATIONS AND PROSECUTIONS UNIT
By Jeremiah T. O'Sullivan . . . . . . . . . . . . . 257

110031 22. LEARNING THE PLAYERS AND IDENTIFYING TARGETS: TACTICS FOR SMALLER OFFICES
By Joseph M. Lawless . . . . . . . . . . . . . . . 269

110032 23. THE FBI'S PERSPECTIVE . . . . . . . . . . . . . . . . 277

APPENDICES: STATUTES AND SAMPLE INDICTMENTS

Appendix A - Bribery and Gratuities
By Susan M. Kuzma . . . . . . . . . . . . . 293

Appendix B - Conflicts of Interest Statutes
By G. Allen Carver, Jr. . . . . . . . . . . 305

Appendix C - Perjury
By John C. Campbell . . . . . . . . . . . . 341

Appendix D - False Statements
By John C. Campbell . . . . . . . . . . . . . 363

Appendix E - Election Crimes Statutes
By Craig C. Donsanto . . . . . . . . . . . . 373

Appendix F - Hobbs Act
By Lee J. Radek . . . . . . . . . . . . . . . 413

Appendix G - RICO and the Travel Act
By Paul E. Coffey . . . . . . . . . . . . . . 429

Appendix H - Mail and Wire Fraud
By James M. Cole . . . . . . . . . . . . . . 445

Appendix I - Conspiracy to Defraud the United States
By James M. Cole . . . . . . . . . . . . . . 463

Appendix J - Tax Charges
By Joseph A. Groff . . . . . . . . . . . . . 471


* * * * * * * *

The preparation of this Manual was coordinated by the Public Integrity Section, Criminal Division, with the assistance of the Division's Office of Policy and Management Analysis. The Department wishes to acknowledge the valuable support and editorial contributions of the following people: Julie Samuels, Suzanne Gesin, Edith Levine and Debra Russell, of the Office of Policy and Management Analysis; Jo Ann Farrington and Diane Blakely of the Public Integrity Section; and Velia Valencia, Sherry Flower, Joyce Cason and Diane Roberts of the Office of the Assistant Attorney General.

Each chapter reflects the personal experiences and viewpoint of the author, and is not intended to represent Department of Justice policy. It is hoped that by presenting the varying views and perspectives of experienced corruption prosecutors nationwide, valuable insights and enthusiasm for pursuing these cases will be communicated.

This Manual is not intended to confer any rights, privileges or benefits on prospective or actual witnesses or defendants. It is also not intended to have the force of law or of a United States Department of Justice directive. See United States v. Caceres, 440 U.S. 741 (1979).

# CHAPTER ONE

## JUDICIAL CORRUPTION

BY

ANTON R. VALUKAS*

United States Attorney
Northern District of Illinois

AND

IRA RAPHAELSON**

Chief, Special Prosecutions Division
Northern District of Illinois

* Anton R. Valukas has been United States Attorney in the Northern District of Illinois since 1985, and has supervised Operation Greylord since then. He also was the lead prosecutor in the trial of Judge Raymond Sodini, described herein.

** Ira Raphaelson, Chief of the Special Prosecutions Division in the U. S. Attorney's Office, participated in Operation Greylord and Operation Incubator, both judicial corruption investigations.

## JUDICIAL CORRUPTION

> "How can anyone tell how a judge would have ruled if he had not been bribed?" United States v. Holzer, 816 F.2d 304, 308 (7th Cir.), vacated and remanded for reconsideration in light of McNally v. United States, 108 S. Ct. 53 (1987).

Nothing is more loathsome to a prosecuting attorney than a member of the judiciary who sells his office in connection with the disposition of cases over which he presides. There have been many corruption probes of judges taking money around the country. Nowhere has there been as much judicial corruption exposed as in the ongoing Greylord [1] investigation of the Circuit Court of Cook County, Illinois.

In order to effectively prosecute judicial corruption, a prosecutor should develop an understanding of the types of corruption, theories of prosecution and methods of investigation.

### Forms of Corruption

> "They tell a story about a judge who called the parties into his chambers and announced: 'I have received $1,500 from the plaintiff to decide the case in his favor and $1,000 from the defendant to decide the case for the defense. In fairness to the parties, I will return $500 to the plaintiff and decide this case on the merits.'"
>
> -- Chicago Courthouse folklore as related by Irv Kupcinet, columnist for the Chicago Sun-Times.

The Greylord experience identified at least three distinct forms of corruption: the outright fix, hustling and brokering.

#### The Fix

The most obvious form of judicial corruption involves the direct promise by a judge, or someone acting on his behalf, that the judge will give a specific disposition or consideration to a case (quid) in exchange for (pro) money or other things of value (quo).

---

1/ To date, 65 persons have been convicted including ten former or sitting judges. This seven-year probe would not have succeeded without the efforts of the Greylord "core group," former AUSAs Daniel E. Reidy, Charles Sklarsky, Candace Fabri and Scott Lassar.

Greylord revealed substantial corruption within the traffic courts. In those courts a corrupt chief judge assigned other judges to the "big rooms", (courts where driving under the influence cases were heard) based on their willingness to accommodate the corrupt defense lawyers who practiced there. These defense lawyers were called "miracle workers" because they never lost a case. These same lawyers got their results by paying judges, often through middlemen, for favorable disposition of their clients' drunk driving cases. Often the arresting police officer was also paid to testify in a way that created a reasonable doubt. The weakened evidence gave the corrupt judge "something to hang his hat on" in finding the defendant not guilty. Greylord found the corruption in traffic court to be open and notorious. In one example cited by the Seventh Circuit, the corrupt judge openly complained that the corrupt defense lawyer had just let his client confess, giving the judge no basis to rule in his favor. Nonetheless, the judge acquitted the defendant. The fix was in so the evidence did not matter. See United States v. Murphy, 768 F.2d 1518 (7th Cir. 1985).

In contrast to the overt corruption evident in Murphy, a subtler form of corruption was practiced in Holzer, supra, the most intricate of the Greylord cases. Holzer, a chancery judge, was convicted of racketeering, Hobbs Act extortion, mail fraud and tax charges arising from his extortion of "loans" from the attorneys who practiced regularly before him. While the judge did not expressly threaten the lawyers with adverse rulings, the Seventh Circuit found that the implied threat there was sufficient for purposes of the Hobbs Act.

Hustling

Greylord also revealed that lawyers would pay off judges for permission to "hustle" clients in large volume criminal courtrooms. These same lawyers often paid other courtroom personnel such as clerks or sheriffs to steer clients to them. At one point, the hustlers were organized into a hustlers' bribery club where corrupt lawyers paid the chief judge of the district $500 a month for the privilege of cutting a deal with the judge assigned to the courtroom where they wanted to work. Illinois canons of ethics, of course, prohibited lawyers from soliciting clients and judges from allowing hustling.

Nonetheless, business was good and in some courtrooms, an attorney could make a six figure salary even after paying off courtroom personnel and judges for the privilege of hustling the courtroom. 2/

---

2/ See United States v. Reynolds, 821 F.2d 427 (7th Cir. 1987) and United States v. LeFevour, 798 F.2d 977 (7th Cir. 1986).

In the Criminal Courts of Cook County, defendants can bond out of jail by posting 10% of the bond imposed by a judge in cash. The bond is refundable to the defendant or his designee at the conclusion of his case in the form of a cash bond refund (CBR) which the Clerk of the Court mails to the defendant or his designee. Typically, the hustler kept one third of the CBR, gave one third to the judge and used one third to pay his taxes.

Brokering

Some judges branch out to fix cases not only in their own courtrooms but in the courtrooms of other judges as well. See LeFevour, supra. This practice is called "brokering" and may involve a chief judge leaning on another judge for a particular result because of politics or because of payoffs. It can also involve judicial colleagues exchanging "favors" or sharing in payoffs. It can involve judges simply introducing a lawyer to the judge who will hear the case so they can "work out their own deal." One judge even brokered extra-judicial corruption using his office as a judge to obtain liquor licenses and zoning changes for money. 3/

## Theories of Prosecution

### Mail Fraud, 18 U.S.C. § 1341

The Supreme Court in McNally v. United States, ___ U.S. ___, 107 S. Ct. 2875 (1987) gutted the intangible rights theory of mail fraud prosecution, though Carpenter v. United States, ___ U.S. ___, 108 S. Ct. 316 (1987) reopened some doors. In looking for alternative theories of prosecution, we should consider using 18 U.S.C. § 1952, the Travel Act, where the bribery scheme is furthered or facilitated through the use of the mails. An open issue is whether the statute reaches intrastate mailings. See also the chapter in the appendix of this Manual concerning possible strategies remaining available under the mail fraud statute.

### Hobbs Act, 18 U.S.C. § 1951

"A threat is not a state of mind in the threatener; it is an appearance to the victim." Holzer at 310.

The Hobbs Act prohibits effects on interstate commerce through extortion under threat or fear of economic harm or under color of official right. Because judges are clearly public officials who act "under color of official right," we will focus on how the money is obtained and whether that act affects commerce.

---

3/ United States v. Salerno, 87 CR 460 (N.D. Ill. (1987)).

1. Fear or Threat:

In the Seventh Circuit, extortion "under color of official right" means "the knowing receipt of bribes; they need not be solicited." 4/ It is enough "if the official knows that the bribe, gift or other favor is motivated by a hope that it will influence him in the exercise of his office and if, knowing this, he accepts the bribe." Holzer, at 311. Murphy at 1530.

The Seventh Circuit has distinguished between payments made out of fear of retribution by the official and those made in hopes of obtaining a benefit from the office holder. In the latter situation, extortion is committed by the officeholder "where bribes are offered and accepted even without having been solicited." Holzer, at 310.

2. Effect on Commerce:

As long as we can show the extortionate conduct affected commerce "in any degree" or would have done so (in attempt cases), the commerce element is satisfied. Two theories are generally advanced -- direct effect and indirect effect. In the latter type of case, the Government must show that the extortionate payment depleted the victim's assets, and that those assets were used in the purchase of goods in interstate commerce. In that regard, it should be noted that the courts have distinguished between business and personal assets. 5/ This distinction may cause difficulties where the "victim" is an individual paying to fix his case. However, in United States v. Freeman, 568 F.Supp. 450 (N.D. Ill. 1983), an effect on commerce was found in the depletion of the assets of a bribe-paying criminal whose activities affected commerce. Commerce may be found if the lawyer as "victim" has a business effect on commerce. See Murphy at 1530.

While the majority of Hobbs Act cases are prosecuted on an indirect effect theory, a direct effect theory may also be advanced in many judicial corruption cases. For instance, the fixing of a case involving the possible loss of a business license for a business involved in interstate commerce has been

---

4/ The Second Circuit in United States v. O'Grady, 742 F.2d 682 (2nd Cir. 1984) has required proof of solicitation in order to satisfy the Hobbs Act extortion element.

5/ Compare United States v. Boulahanis, 677 F.2d 586 (7th Cir.) cert. denied, 459 U.S. 1016 (1982) and United States v. Mattson, 671 F.2d 1020 (7th Cir. 1982).

held to have a potential direct effect on commerce. [6/] This approach applies even with FBI-supplied funds to cooperating "victims." See United States v. Tuchow, 768 F.2d 855 (7th Cir. 1985).

RICO, 18 U.S.C. § 1962 et seq.

The most powerful weapon in the Federal prosecutor's arsenal is well-suited for use in judicial corruption prosecutions.

A person who conducts, through a pattern of racketeering, directly or indirectly, the affairs of an enterprise with which he is associated and which affect interstate commerce, faces RICO conviction and possible forfeiture of his ill-gotten gains and interests.

The "enterprise" may be the court system, Murphy, a judgeship, United States v. Hunt, 749 F.2d 1078 (4th Cir. 1978), a local prosecutor's office, United States v. Yonan, 800 F.2d 164 (7th Cir. 1986), or a law firm Yonan. However, an individual lawyer may not under all circumstances be an enterprise. [7/]

RICO commerce is more easily satisfied than commerce under the Hobbs Act. Murphy at 1531. Only the enterprise need affect commerce. Id. at 1531. Even if it is the racketeering activity itself that affects commerce, the element is satisfied. United States v. Conn, 769 F.2d 420 (7th Cir. 1985).

A person "associates" with the enterprise even if he works against the goals of the enterprise, e.g., a person who bribes a prosecutor is still associated with the prosecutor's office. See Yonan.

The pattern of racketeering activity is most easily found in the pattern of bribery and extortion charged. RICO forfeiture can reach judgeships, salaries and bribes.

RICO Conspiracy

A group of people, associated in fact, who agree to conduct the affairs of the court/enterprise through bribery of the judge and courtroom personnel can be prosecuted as a RICO conspiracy. In United States v. Sodini (85 CR 813, N.D. Ill.) the judge, the hustlers, the bagmen, sheriffs and clerks, nineteen defendants in

---

6/ Compare United States v. Irali, 503 F.2d 1295 (7th Cir. 1974); and United States v. Staszcyk, 517 F.2d 53 (7th Cir. cert. denied 413 U.S. 837 (1975)).

7/ Compare Yonan and United States v. McCollum, 815 F.2d 1087 (7th Cir. 1987).

all, were charged together. Eleven cooperated and pled and another seven went to trial.

The advantages of this type of prosecution are many. The eleven cooperators all pled to the indictment charging the defendants on trial and faced sentencing before the judge in whose courtroom they testified against the defendants. When the jury heard the full picture of a corrupt judge presiding over a courtroom where bribery of clerks and sheriffs ran wild, it was obvious that the judge took money too.

Tax Laws

A lengthy discussion of this common prosecutive tool is impossible here. Greylord revealed that no corrupt judge discloses his bribe income. This gives rise to charges under 26 U.S.C. § 7206 (filing a false return) and 7201 (tax evasion). Few lawyers can afford to declare their true income and pay taxes on the bribes they pay. They are equally accessible targets. Surprisingly, we found many Greylord targets did not even bother to file returns, apparently calculating that the risk of prosecution under 26 U.S.C. § 7203 (failure to file), a misdemeanor, was more acceptable than filing a false return and exposure to a tax felony or revelation of his bribery and risking his license to practice law. Net worth and expenditures prosecutions are effective means of exposing corruption. See Reynolds and LeFevour.

## Investigative Strategies

### Undercover Operations

> "It may be necessary to offer bait to trap a criminal. Corrupt judges will take the bait, and honest judges will refuse . . . Operation Greylord harmed only the corrupt."-- Hon. Frank Easterbrook on behalf of the Seventh Circuit upholding the propriety of the use of phantom cases in the undercover investigation of judicial corruption in Cook County, Illinois. United States v. Murphy, 768 F.2d 1518, 1529 (1985).

Nothing stirs greater controversy than the question of undercover operations to "find" corruption. Critics will complain of entrapment and outrageous Government conduct. Ethical issues abound. For instance, what steps need be taken before a Federal prosecutor authorizes the fixing of a state court case? If the case being fixed is criminal, do we violate the defendant's Sixth Amendment rights by purchasing his acquittal from a corrupt judge? In doing so, have we defrauded the public or the state courts? Should we utilize contrived cases to avoid fixing real ones? In contriving cases, do we suborn state court perjury and defraud the state court system? In an undercover investigation of judicial corruption, do

individual AUSAs risk disbarment or discipline by the state courts?

In analyzing the propriety of particular undercover approaches, Sixth Amendment and ethical concerns must also be evaluated. In a Memorandum for William H. Webster (U.S. Department of Justice, June 16, 1981) the Office of Legal Counsel (OLC) concluded for the then-head of the FBI that the use of undercover agents as lawyers for real defendants in judicial corruption probes was prohibited by the Sixth Amendment even if the defendants were acquitted. The OLC memo concluded:

> Particular procedures are guaranteed absolutely, not merely as a means to an end: and they are required for constitutional compliance not merely because the defendant has a right not to be convicted in violation of these rights. The specific rights are guaranteed as an end in themselves: a system of justice characterized by fair process and regularized procedures . . . The defendant is deprived of his rights under the Sixth Amendment if he is not provided with this certain treatment in the course of the process. Intentional conduct that would deprive the defendant of these certain procedures is inconsistent with the duty of Federal officers to uphold the Constitution; and without regard to what might be the remedy for a deprivation of Sixth Amendment rights, the existence of the rights defines the limits of the officers' conduct.

Memo at 9-10. These conclusions are under further study by OLC in light of recent Supreme Court decisions in the area of ineffective assistance of counsel which requires a showing of prejudice, so consultation with OLC is recommended if a similar investigation is under consideration. See United States v. Cronic, 466 U.S. 658 (1984) and Strickland v. Washington, 466 U.S. 668 (1984).

A related troublesome issue is the use of a real private lawyer in an undercover capacity. If he represents defendants in contrived cases as well as regular clients, might the regular clients later claim ineffective assistance of counsel? Compare United States v. DeFalco, 644 F.2d 132 (3rd Cir. 1980) and Roach v. Martin, 757 F.2d 1463 (4th Cir.) cert. denied, 106 S.Ct. 185 (1985). The resolution seems to be that use of target attorneys in undercover capacities poses a greater risk of a conflict of interest rising to the level of ineffective assistance than the use of volunteer attorneys. The use of a Federal target in a state investigation as in the analogous case of Roach also seems safer because of the dual sovereigns than the use of a Federal target lawyer against another Federal target defendant-client where disclosure of attorney-client communication is a constant risk. While the ethical questions must be closely and continuously monitored, the Sixth Amendment issues where the defendant is acquitted seem resolved by the fact that the defendant suffered no harm.

In Greylord, the Seventh Circuit noted that the staged cases that were "fixed" to gather evidence were part of a "nasty but necessary business" to expose corruption. Murphy at 1529. The impact on third parties was reduced by fixing "staged" rather than "real" cases. Moreover, notice was given to the State's Attorney, Attorney General, Governor and Presiding Judge of the State Court before staged cases were put into the state court system. The Supremacy Clause might protect a Federal prosecution that did not include such notices, [8/] but notice protects the integrity of the project and may be required by the realities of local bar requirements. The best advice to the Federal prosecutor in this regard is to consult with both the Office of Legal Counsel and the Criminal Division of the Department of Justice. It would also be prudent to explore local disciplinary rules to avoid risking individual AUSA's licenses for authorizing such an operation.

Title III

The nonconsensual recording of corrupt activity is an effective method of evidence-gathering once there is sufficient proof that payoffs are occurring at a given location. In Greylord, through consensual monitoring by an undercover agent, evidence was gathered that a narcotics court judge would receive payoffs in chambers. Ultimately a "bug" was placed in the judge's chambers and substantial evidence was gathered against the judge and the corrupt lawyers who paid him. [9/]

Immunity, Doe Immunity, and Cross Immunity

The creative and tactical use of immunity is an effective tool in prosecuting judicial corruption. After a group of lawyers is convicted for underreporting their income, they should be immunized and forced to testify against those whom they bribed.

In Holzer, the Government subpoenaed the defendant's personal financial records which he tendered after testifying (his Fifth Amendment privilege had been waived). Included in the records were a list of "loans" from friends. The friends were the extortion victims alleged in the indictment (and others). Having testified to sloppy recordkeeping on direct, the defendant was devastated by his own detailed list of creditors.

---

8/ See Baucom v. Martin, 677 F.2d 1346 (11th Cir. 1982).

9/ See United States v. Costello, 610 F. Supp. 1450 (N.D. Ill. 1985), aff'd sub nom., United States v. Olson, 830 F.2d 195 (No. 86-1496, 7th Cir., Sept. 11, 1987).

Doe ("act of production") immunity can also be used to obtain a corrupt judge's personal financial records. In United States v. McCollum, 815 F.2d 1087 (7th Cir. 1987) the production order led to the destruction of records by the judge and his wife. Detection of that act of obstruction led to the judge's mid-trial guilty plea. The McCollum case contains an excellent discussion of this procedure.

Cross-immunity involves the creation of Chinese Walls between separate prosecutive teams and cross-immunization of targets. The tactic is to immunize the lawyer to testify against the bagman and the bagman against the lawyer. There are risks aplenty to this procedure but when "you've got nothing, you (might) have nothing to lose." It is best to have a proffer (or tape) to force the truth in these situations because if both witness-defendants tell the same lie (nothing happened) you might be stuck.

Court Record Analysis

A traditional, historical (labor intensive) method used to find lawyers who got favorable treatment by particular judges simply involves statistical comparisons of dispositions of cases where a public defender is involved to cases where the suspect lawyer is involved. The Greylord investigation of Chicago's traffic court, for instance, found that 90% of defendants represented by public defenders were convicted of drunk driving while the miracle workers won almost all their cases. See Murphy and Conn.

Court Personnel Interviews

Again, a labor intensive approach, this method often results in corroborative testimony and anecdotes from local prosecutors, defense lawyers, courtroom personnel and observers. Sometimes these personnel are also corrupt but may be "flipped" for the right deal.

More Leads

Try subpoenas to bar groups, judicial candidate evaluation committees, judicial inquiry boards, campaign disclosure officers and anyone who gets judicial ethics statements. Look for places the judge spends money and do a financial analysis.

Financial Analysis: Wine, Women and the IRS

An old-fashioned Internal Revenue Service case is sometimes the best way to catch a crooked judge. Find a starting point. Find his bank loan applications that are filled out under penalty of 18 U.S.C. § 1014. Find his vices. One Greylord judge spent thousands in cash at a bar. Another spent thousands on a boat. Two others spent tens of thousands of dollars in cash on girlfriends they kept secret from their wives and families.

Ex-girlfriends and ex-wives (particularly those who become "ex" after learning of each other's existence for the first time during the investigation) make great sources for admissions, cash hordes and safe deposit boxes stuffed with cash.

Find the grocer, mailman, laundry and everywhere else the target spends cash. Analyze his bank deposits and find insufficient cash generation. With a couple of bribe-paying witnesses supplying the "likely source of income," you have a great expenditures tax evasion prosecution.

The Internal Revenue Service in our District did a computer match of Clerk's Office CBRs to lawyers and their reported income. Naturally the hustlers underreported to avoid paying tax on the one third they paid to the judge as bribes. We made tax cases on the lawyers and then flipped them on the judges.

Financial analysis has also shown some judges who saved their salaries (checks into bank accounts) and paid their most routine bills in cash (bribe money). See <u>LeFevour</u> and <u>Reynolds</u>. Judge Reynolds paid his daughter's college tuition in cash. At trial, he said he got his cash from his sock drawer. He was convicted.

<u>Trial Suggestions</u>

1. Start strong -- end strong, both in argument and evidence. Begin with a bribe-paying witness, and end with one. Start with a clean judge to testify that he threw the hustlers out of the corrupt judge's courtroom when he sat there. End with an IRS expert testifying to excess cash expenditures.

2. Corroborate the bagman <u>before</u> he testifies. That way by the time he is cross-examined about his inconsistencies, faulty memory and general unsavoriness, he is already believable because the jury has heard six bribe-paying lawyers confirm his testimony.

3. Use your strongest flipper/witness first. That way, the jury will have heard (and believed) that the judge is corrupt before your weaker flippers are impeached till the cows come home.

4. Take the sting out. Put the cooperator's deal in front of the jury in opening statement and your direct examination.

5. Charts -- make them understandable and use them. Compare public defender dispositions to the miracle workers'. Chart the number and amount of cases going to hustlers in the bribery club. Show how the hustlers underreport their own taxes in relation to their illicit income. Chart the judge's cash generation and cash expenditures.

6. Use pictures and tapes. An audiotaped bribe is worth a thousand flippers. A videotaped bribe is a conviction. Pictures of a condo in Florida (if the defendant is a frost-belt judge), a boat and the girlfriend's fur coat are all good for jury appeal.

7. Explain the cooperating victim's failure to report the attempted extortion by a judge, e.g., "The judicial inquiry board would not have believed me." "I'm ashamed but it would have ruined my career in the atmosphere that existed before this probe exposed the corruption."

8. Protect your sources. The "mole" who worked undercover is not a ratfink flipper, he is a hero. Tell the jury.

9. Try to keep out instances of "good acts." There is legal authority for excluding cases where the defendant-judge ruled the same way as he did in a fixed case, for a good reason. See LeFevour, supra.

10. Remember to use specific instances of misconduct in cross examining a defense character witness. Don't be afraid to show bias. In LeFevour, a newspaper reporter testifying as a character witness got a free rental car from the same company that LeFevour did. LeFevour also routinely dismissed the rental car company's parking tickets.

11. Have anti-character witnesses available, e.g., the state prosecutor who felt the case was fixed or heard the judge was a crook but never saw cash pass hands.

12. How much deference on cross-examination of a judge? It depends on your style, the presiding judge and the jury. In Holzer, the lead prosecutor called Holzer "judge" throughout the trial including a sometimes heated cross-examination. In rebuttal, his method was made clear when he described to the jury the special "status" society confers on judges, even when they themselves are on trial for using that status to unlawfully and unfairly enrich themselves. The argument was devastating and Holzer was sentenced to eighteen years in jail, the longest Greylord jail term.