**Exhibit 1**

Electronically Filed by Superior Court of California, County of Orange, 05/26/2020 12:49:40 PM.
30-2020-01145998-CU-BT-CJC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By Richard Clark, Deputy Clerk.

Richard D. McCune (Bar No. 132124)
rdm@mccunewright.com
Steven A. Haskins (Bar No. 238865)
sah@mccunewright.com
McCUNE WRIGHT AREVALO LLP
3281 E. Guasti Road, Suite 100
Ontario, CA 91761
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

***Attorneys for Plaintiff Justin S. Beck***

**IN THE SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF ORANGE**

JUSTIN S. BECK, an individual,

Plaintiff,

vs.

KENNETH CATANZARITE, ESQ., an individual; CATANZARITE LAW CORPORATION, a California corporation; MOBILE FARMING SYSTEMS, INC., a California corporation; BRANDON WOODWARD, ESQ., an individual; TIM JAMES OKEEFE, ESQ., an individual; RICHARD FRANCIS O'CONNOR, JR., an individual; AMY JEANETTE COOPER, an individual; CLIFF HIGGERSON, an individual; TONY SCUDDER, an individual; JAMES DUFFY, an individual; MOHAMMED ZAKHIREH, an individual; TGAP HOLDINGS, LLC, a Nevada limited liability corporation; AROHA HOLDINGS, INC., a California corporation; and DOES 1-15

Defendants.

Case No.:

Assigned for All Purposes to:

**COMPLAINT FOR DAMAGES**

1) Malicious Prosecution
2) Unfair Business Practices
3) Slander of Title
4) Intentional Infliction of Emotional Distress

**DEMAND FOR JURY TRIAL**

1.      Plaintiff JUSTIN S. BECK ("Beck" or "Plaintiff"), for his complaint against Defendants CATANZARITE LAW CORPORATION, KENNETH J. CATANZARITE, BRANDON WOODWARD, TIM JAMES OKEEFE, MOBILE FARMING SYSTEMS, INC., RICHARD FRANCIS O'CONNOR, JR., AMY JEANETTE COOPER, TGAP HOLDINGS, LLC, JAMES DUFFY, TONY SCUDDER, AROHA HOLDINGS, INC., MOHAMMED ZAKHIREH, and DOES 1 through 15 (collectively "Defendants") alleges as follows:

## OVERVIEW

2.      Defendants have engaged in an unlawful scheme against Plaintiff involving the malicious prosecution of various lawsuits designed to harass and vex Plaintiff without any probable cause supporting those lawsuits. Defendants have further conspired to engage in various extra-judicial acts designed to harm plaintiff and his reputation, and to damage the value of his material financial interests. These malicious and harassing acts were preformed in bad faith, with malice, and without regard for the truth known to Defendants in the course of their actions, as demonstrated herein.

3.      The history of this case begins in 2015 with a then-existing corporation called Mobile Farming Systems, Inc. ("MFS"). MFS had been formed as a California corporation in August 2008 with the name Gazoo Direct, Inc., before changing its name in 2011. MFS was intending to market a product called the "Instant Garden," a product conceived as a home gardening system for hydroponic vegetables to be sold to the public through "infomercials." The MFS board at the time consisted of three individuals: Richard O'Connor, Jr., Amy Cooper, and Richard Probst (the "2015 MFS Board"). While MFS had been formed with good intentions, it had been a commercial failure and the 2015 MFS Board was interested in pursuing new commercial opportunities. One potential opportunity was to engage in the legal cannabis industry.

4.      At the time, global and domestic acceptance of cannabis use was increasing, and investors were eager to enter a market whose regulatory profile was likely to yield growth, as legalization opened up new markets.

5.      In the 1970s, California was one of the first states to hold a vote on legalizing the cultivation and use of cannabis products. Though the vote failed, California law was soon changed to provide that the penalty for possession of one ounce or less of cannabis would be a citable misdemeanor.

Other states followed suit, including Colorado, Ohio, Minnesota, New York, and North Carolina. In 1996, California became one of the first states to legalize cannabis cultivation and use for medical reasons.

6.     Two decades later, the winds shifted further toward legalization. After the 1980s and 1990s saw a general retrenchment in enforcing drug laws, Nevada decriminalized cannabis in 2001. Several states and localities followed suit, though California voters in 2010 narrowly rejected a proposition legalizing recreational cannabis use.

7.     But two years later, the States of Colorado and Washington became the first to affirmatively legalize recreational cannabis use. Both states implemented a regulatory scheme similar to that of alcohol, allowing possession of up to an ounce for adults ages 21 and over. Colorado permitted a small level of personal cultivation, and both states allowed for commercial cultivation and sales, which would be subject to their own set of regulations and taxation schemes. Alaska and Oregon followed suit two years later, leaving California as the only west-coast state where recreational cannabis use remained illegal.

8.     Thus, all eyes were on California. Because California was already a relatively robust cannabis market based on its two-decade experiment with medical cannabis, it was widely expected that legalization would again end up on the state's agenda.

9.     Analysts predicted that if California legalized recreational cannabis, the market for cannabis cultivation and use would change drastically and shift toward legal consumption from licensed producers. Whereas the commercial cannabis market had previously required a doctor's note, legalization of recreational cannabis would change cannabis distribution channels and a regulatory framework would ultimately professionalize what would soon become the world's largest cannabis market—California. Replacing black-market cannabis transactions would be domestically-grown product sold to licensed retailers and then resold at the retail level from established storefronts. The expected result was that legalization would create new business opportunities. Using Colorado and adjusting for expectations based on a per capita analysis, the regulated California cannabis market is expected to grow beyond $10 billion annually.

10. In November 2016, California voters approved the legalization of recreational cannabis. The law allowed California citizens to possess and use recreational cannabis after January 1, 2018.

11. It was against this backdrop that the 2015 MFS Board decided to pursue a venture called Cultivation Technologies, Inc. ("CTI"). The plan was to prepare for the liberalization of cannabis policy in California and, then, nationwide. At the time, the 2015 MFS Board determined that CTI would be an MFS subsidiary.

12. CTI was formed in March 2015, and O'Connor, Cooper, and Probst appointed themselves to the CTI Board of Directors. The CTI Board authorized the issuance of 100,000,000 common shares and 20,000,000 "blank check"[1] Preferred Series A shares, a fact made known to all of CTI's potential and actual shareholders.

13. Plaintiff met these individuals shortly after CTI's formation. Plaintiff had previous experience in the cannabis industry and had nurtured several businesses through the complicated steps from small investor-based start-up through an exit or a public merger. CTI sought out Plaintiff's expertise and insight to execute its business plan and retained Plaintiff as a consultant. The 2015 CTI Board also expressly authorized the sale of founder shares to an entity Plaintiff controlled.

14. While Plaintiff was consulting for CTI in 2015, CTI—through the 2015 CTI Board—reconsidered its corporate structure. In particular, the Board was concerned that if CTI was an MFS subsidiary, it could potentially be burdened by MFS' previous business failures. With this concern in mind, the CTI Board—O'Connor, Cooper, and Probst, acting in their capacity as members of the CTI Board of Directors—revised CTI's proposed corporate structure. They decided it was in both entities' best interests for CTI to exist separately from MFS. They also decided that MFS shareholders would be given the opportunity to participate as CTI shareholders if they elected to do so.

15. CTI thus remained a separate corporate entity. Plaintiff continued serving as a CTI consultant for several months, assisting CTI with its business strategy, local licensing, and setting up

---

[1] The term "blank check" shares references the issuance of a class of preferred shares where the Board of Directors has authority to determine the voting rights, dividends, and conversion conditions that attach to the shares without shareholder approval. In particular, the issuance of "blank check shares" permit the Board to issue such shares under different terms than those set forth in the company's articles of incorporation.

operations. Plaintiff was then appointed to the CTI Board in February 2016, and shortly thereafter became the President and CEO of CTI.

16. As Plaintiff successfully assisted CTI through the difficult and complicated path from start-up to operations, eventually entrenching CTI as a leader in California cannabis extraction, O'Connor's increasingly erratic behavior became detrimental to CTI's best interests. O'Connor was ultimately asked to resign from CTI in or around April 2016, a decision that resulted in O'Connor holding a grudge against Plaintiff. O'Connor spent several years threatening and vowing revenge. O'Connor also made several malicious statements about Plaintiff both personally and professionally, demonstrating his malice toward Plaintiff.

17. After California's legalization framework was enacted and set to begin on January 1, 2018, Plaintiff assisted CTI in obtaining land to cultivate cannabis and operations sufficient to support CTI's commercial goals. Plaintiff also led the legislative effort to legalize solvent-based extraction in California, AB2679. In particular, CTI determined that its highest and best purpose was to produce "live resin" concentrates for use in vaporizers, which only became legal due to Plaintiff and CTI's efforts in Sacramento. Using the brand names Coachella Premium, Coachella Manufacturing, and Coachella Distributors, CTI commenced operations in January 2018 and achieved an annual revenue run rate of approximately $4 million in 2018 alone. In August 2018, CTI achieved approximately $500,000 in revenue. Moreover, CTI was planning to open a new manufacturing facility intended to exponentially increase its commercial capacity.

18. As one of the original MFS shareholders, but one of the small handful who had previously elected not to participate in CTI's offer to buy stock, Roger Root (through purported attorney-in-fact Denise Pinkerton) reappeared in September 2018 to file a lawsuit alleging several causes of action against a list of defendants, including Beck (the "Root Action"). O'Connor, Scudder, Aroha, TGAP, Cooper, and Higgerson were all named co-Defendants. Root was represented by Kenneth Catanzarite, Brandon Woodward, and Tim James O'Keefe of Catanzarite Law Corporation ("CLC").

19. But it was through the Root Action that CLC and its attorneys, led by Catanzarite, discovered the bad blood existing toward Beck by other previous participants in MFS and CTI—particularly O'Connor and Cooper. Indeed, Beck had been highly critical of O'Connor, Cooper, and

others that had been wasting corporate resources on personal matters. Defendants soon agreed that the Root Action could act as cover for a plot to use the judicial system not to resolve a legitimate legal dispute, but for the purpose of displacing and slandering Plaintiff, attempting to destroy his reputation in the business community, and attempting to wrest his valuable CTI shares from him.

20. Defendants all received valuable cooperation to reach their purposes and goals. For Catanzarite and CLC, conspiring with the other Defendants to obtain false evidence was critical to the Root Action, because the Root Action depended on the argument that MFS was a shareholder of CTI. Defendants agreed to provide sham declarations in which the declarants would state that MFS was the "sole shareholder" of CTI. In other words, Defendants conspired to *knowingly* provide materially false information to support the Root Action.

21. Catanzarite maintained pressure on Plaintiff in particular. In January 2019, based on Beck's position at CTI, Catanzarite delivered a letter to Plaintiff demanding that he turn over all CTI operations on the premise that MFS was the sole shareholder of CTI. Of course, Plaintiff refused because MFS was not a shareholder of CTI. Nevertheless, this false assertion would have devastating consequences on Plaintiff.

22. Indeed, soon after Catanzarite dismissed many of the Defendants named herein from the Root Action, Catanzarite filed an action against Beck and others, purporting to include direct actions on behalf of MFS and derivative actions on behalf of CTI (the "MFS Action").

23. Catanzarite and the other Defendants did not cause the MFS Action to be filed in good faith. Defendants filed the MFS Action for the purpose of harassing Plaintiff, causing him economic harm, and attempting to strip Beck of his beneficial interests in CTI. Defendants were apparently angry at Beck because his leadership of CTI had created value where none had ever existed at MFS.

24. Later, in September 2019, Catanzarite filed yet another new complaint, purportedly on CTI's behalf, against Scottsdale Insurance Co. ("Scottsdale Action"). Catanzarite lacked any authorization to file this lawsuit. The Scottsdale Action again lacked probable cause and was a malicious and deliberate act by Defendants for the sole purpose of continuing to harass and malign Plaintiff.

25. Like the MFS Action, the Scottsdale Action had no legal basis whatsoever. No reasonable attorney or person would purport to represent CTI, *ultra vires*, in a lawsuit for any reason,

much less to harass a former CTI officer. The Scottsdale Action has since been favorably terminated by dismissal, after a trial court ruling disqualifying CLC from other litigation noted that the Scottsdale Action was an attempt, inferring improper purpose, to remove defense coverage for Plaintiff.

26. Because of Defendants' harassment and misrepresentations, Plaintiff has been harmed in his personal and business reputation, and in his financial interests. He has expended thousands of hours of time and resources defending himself from these baseless actions. Plaintiff has lost actual and prospective business opportunities as industry leaders have followed from afar the successive litigations targeted against him and have expressed concern that the false and malicious statements Defendants have made are true. Plaintiff seeks to recover the monetary damages resulting from the losses Defendants have caused as a result of their scheme.

**JURISDICTION AND VENUE**

27. Jurisdiction is proper in this court pursuant to Article VI, section 10 of the California Constitution, which grants the Superior Court "original jurisdiction in all cases except those given by statute to other trial courts."

28. This Court has jurisdiction over this action because each Defendant is a person, corporation, or association that is a citizen or entity of the State of California, and/or has sufficient minimum contacts in the State to warrant exercising jurisdiction.

29. Venue is proper in the Superior Court for the County of Orange, pursuant to Code of Civil Procedure §§ 395 and 395.5, because one or more instances of wrongful conduct occurred, and continue to occur, in this county, and/or because Defendants, or some of them, reside in, and/or have conducted, and continue to conduct, business in Orange County.

30. Plaintiff requests that this Court designate this instant action as complex, as it involves myriad parties with adverse interests represented by the same counsel who has been disqualified for the same by a trial court, securities in several companies, and the evaluation of several complex legal and factual issues underlying Plaintiff's claims.

## PARTY IDENTIFICATION

31. Plaintiff Justin S. Beck is an individual residing in Oceanside, California. Plaintiff beneficially owns or controls 8,435,000 shares of CTI stock—4,935,000 common shares and 3,500,000 Preferred Series A shares. Plaintiff was an officer and director of CTI from approximately March 2016 to May 2019, when he resigned out of concern for the effect of Defendants' malicious prosecution on Plaintiff personally and on CTI as a business concern.

32. Defendant MFS is, and at all times herein has been, a California corporation. MFS was formed in 2008.

33. Defendant CLC is a California corporation having its principal place of business in or around Anaheim, California. The principals of CLC are alleged to be Kenneth J. Catanzarite, Timothy James O'Keefe, and Brandon Woodward.

34. Defendant Kenneth J. Catanzarite ("Catanzarite") is, and at all times herein has been, an individual having his residence in the State of California, in or around the County of Orange, alleged by Plaintiff to be Corona Del Mar. Catanzarite is purportedly the managing partner of CLC.

35. Defendant Timothy James O'Keefe is, and at all times herein has been, an individual having his place of residence in the State of California, alleged to be in or around the County of Orange. As an agent or principal of CLC, O'Keefe appears on pleadings that were maliciously prosecuted against Plaintiff.

36. Defendant Brandon Woodward is, and at all times herein has been, an individual having his place of residence in the State of California, alleged to be in or around the County of Orange. As an agent or principal of CLC, Woodward appears on pleadings that were maliciously prosecuted against Plaintiff.

37. Defendant Richard Francis O'Connor, Jr. is, and at all times herein has been, an individual having his place of residence in the State of California. O'Connor has been at times a board member and officer of both MFS and CTI. O'Connor remains a significant shareholder of MFS common stock, although O'Connor has allegedly sold, disposed, hypothecated, transferred, or pledged all shares beneficially owned by him in CTI. O'Connor is alleged to have conspired with Defendants in

a scheme to aid and abet the malicious prosecution of Plaintiff. O'Connor at all times was aware that MFS was not a CTI shareholder.

38.     Defendant Amy Jeanette Cooper is, and at all times herein has been, an individual with her place of residence in California, in or around the County of Marin. At various times, Cooper has been a board member and officer of both of MFS and CTI. Cooper is alleged to have conspired with Defendants in a scheme to aid and abet the malicious prosecution of Plaintiff. Following the Amended Acts, Cooper at all times was aware that MFS was not a CTI shareholder and that there was no basis for filing the MFS Action.

39.     Defendant TGAP Holdings LLC ("TGAP") is, and at all times herein has been, an LLC registered in the State of Nevada. TGAP has, at various times, been owned or controlled by each Cooper and/or O'Connor. Plaintiff alleges TGAP has received more than $2 million from the sale of CTI shares. TGAP's receipt of this money makes O'Connor and Cooper's claim that MFS was the sole shareholder of CTI in January 2019 factually untenable, on facts known to each of them and other Defendants. As an entity controlled by Cooper and/or O'Connor, TGAP is alleged to have conspired with Defendants in the scheme to aid and abet the malicious prosecution of Plaintiff. TGAP at all times was aware that MFS was not a CTI shareholder and there was no basis for filing the MFS Action.

40.     Defendant Cliff Higgerson is, and at all times herein has been, an individual having his place of residence in the State of California, in or around the County of Marin.  Higgerson is Cooper's father and a Venture Partner at the firm of Walden International. Higgerson provided MFS with $500,000 in debt. When CTI was formed, Higgerson became a CTI shareholder by purchasing 1,000,000 shares of common stock. Higgerson owned no shares in MFS. Nevertheless, Higgerson purported to renounce his CTI shares in favor of MFS. Higgerson is alleged to have conspired with Defendants in the scheme to aid and abet the malicious prosecution of Plaintiff. Higgerson at all times was aware that MFS was not a CTI shareholder and there was no basis for filing or amending the MFS Action.

41.     Defendant Dr. Mohammed Zakhireh is, and at all times herein has been, an individual having his place of residence in the State of California, in or around the County of Riverside. Zakhireh is O'Connor's former plastic surgeon. In January 2019, Zakhireh alleged that he was an MFS board

member and officer as part of the conspiracy with the other Defendants to maliciously prosecute Plaintiff. Zakhireh at all times was aware that MFS was not a CTI shareholder and that there was no basis for filing or amending the MFS Action.

42. Defendant James Duffy is, and at all times herein has been, an individual having his place of residence in the State of Washington, in or around the County of Skagit. In 2019, Duffy alleged that he was a board member and officer of MFS as of January 2019, a result of entering into the conspiracy with the other Defendants to maliciously prosecute Plaintiff. Duffy is alleged to have conspired with CLC and the other Defendants in a scheme to aid and abet the malicious prosecution of Plaintiff. Duffy at all times was aware that MFS was not a CTI shareholder and that there was no basis for filing or amending the MFS Action.

43. Defendant Tony Scudder is, and at all times herein has been, an individual having his place of residence in the State of California, in the County of San Diego. Scudder is an associate and alleged proxy of O'Connor. Scudder is allegedly the principal and sole shareholder of Aroha Holdings, Inc., discussed further below. Scudder is alleged to have conspired with CLC and the other Defendants in a scheme to aid and abet the malicious prosecution of Plaintiff. Scudder at all times was aware that MFS was not a CTI shareholder and that there was no basis for filing or amending the MFS Action.

44. Defendant Aroha Holdings, Inc. ("Aroha") is, and at all times herein has been, a corporation in the State of California. Scudder is allegedly the principal and sole shareholder of Aroha, with Aroha operated by Scudder. Aroha used Scudder as part of the conspiracy with Defendants to aid and abet the malicious prosecution of Plaintiff. Aroha at all times was aware that MFS was not a CTI shareholder and that there was no basis for filing or amending the MFS Action.

45. The true names and capacities of defendants sued herein as Does 1-15, together and inclusive, are unknown at this time. Plaintiff will seek leave of this Court to amend its complaint, in order to add the true names and capacities of Does 1-15 at such time as they are understood by Plaintiff.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The Formation of CTI And Plaintiff's Role In CTI

46. MFS was formed as a California corporation on August 27, 2008, and formerly known as Gazoo Direct, Inc. before a 2011 name change. The MFS business was predicated upon the Instant

Garden concept—a home gardening system for hydroponic vegetables MFS planned to sell via infomercial.

47.     MFS generated little, if any, revenue from 2008 to 2015. In 2015, the 2015 MFS Board began to explore new potential business opportunities to kickstart what had otherwise been a moribund business.

48.     After several discussions, the 2015 MFS Board decided to enter into the cannabis industry through CTI. MFS at first intended to form CTI by paying CTI to issue shares of stock in which MFS would take possession.

49.     CTI was formed in March 2015 with the same board of directors as MFS: O'Connor, Cooper, and Probst. The 2015 CTI Board authorized CTI to issue 100,000,000 common shares and 20,000,000 "blank check" Preferred Series A shares. Pursuant to the express intent of the 2015 CTI Board, it had the exclusive right to assign the rights and privileges of the Preferred Series A shares. This latter fact was fully disclosed to participants in CTI's share subscription agreements.

50.     Plaintiff met the 2015 CTI Board in or about April 2015. These individuals were alleged to be interested in meeting Plaintiff as an investor, and because of his background in the cannabis industry, particularly his experience helping small start-up businesses plan and define their strategy, begin operations, and grow to a size sufficient to justify a public stock offering or merger. Plaintiff initially acted as a consultant to CTI, eventually assuming a board and executive role in 2016.

51.     Between March and June 2015, the 2015 CTI Board reconsidered its plan to create CTI as an MFS subsidiary. The 2015 CTI Board became concerned that if CTI was ever found to be a potential successor in interest to MFS, CTI could be responsible for financial problems arising from MFS. The 2015 CTI Board wanted CTI to have a "fresh start." Therefore, the 2015 CTI Board adopted an amended structure that granted MFS shareholders the opportunity to purchase stock in CTI if they elected to do so. Plainly, it was the express intent of the 2015 CTI Board—and the individuals who sat on that Board—to become independent of MFS.

52.     In June 2015, O'Connor, Cooper, and Probst met in their capacity as both the 2015 MFS Board and the 2015 CTI Board. On behalf of both MFS and CTI, both boards executed binding corporate resolutions ("Amended Acts") stating that MFS had not paid any consideration to CTI, and

MFS had received no shares. (*See* Exhibit 1.) This was true, and CTI operated for more than three years consistent with this basic premise—including the years when Defendants O'Connor and Cooper each (or both) served on the CTI Board of Directors. MFS had not paid money to CTI to purchase any shares, and no CTI shares had been conveyed to MFS. Indeed, this was all expressly understood and known to O'Connor, Cooper, and Probst.

53. Cooper and O'Connor relied many times on the Amended Acts in their capacities as board members of both MFS and CTI. Cooper and O'Connor both participated in efforts to raise capital that required thorough disclosures of existing shareholders, including disclosure of any shareholder owning more than 5% of CTI's capital stock. Likewise, Cooper, O'Connor, TGAP, Scudder, and Aroha each engaged in multiple private sales of CTI shares owned personally or by entities beneficially controlled by them.

54. Instead of issuing shares to MFS, the Amended Acts explicitly and deliberately authorized CTI's issuance of 23,000,000 total "Founder" shares, including the following allocations:

**a.** O'CONNOR 2,500,000 shares of Common Stock

**b.** COOPER 2,500,000 shares of Common Stock

**c.** TGAP 5,500,000 shares of Common Stock

**d.** HIGGERSON 1,000,000 shares of Common Stock

**e.** AROHA 1,000,000 shares of Common Stock

55. Defendants knew that this "Founder" distribution of shares comprised CTI's first issuance of capital stock. Indeed, the 2015 CTI Board—including Cooper and O'Connor—represented to an SEC-registered transfer agent in July 2015 that these shares constituted CTI's initial issuance of capital stock.

56. Higgerson—Cooper's father—was also aware that CTI issued its first share issuance with the "Founder" distribution. Higgerson acquired 1,000,000 CTI shares as a result of the Founder distribution. Because of his relationship with Cooper and involvement in MFS, Higgerson was regularly given information about MFS and CTI. Higgerson had furnished MFS with a $500,000 loan prior to CTI's formation that would never be repaid due to MFS's commercial failure. Higgerson's purchase of 1

million Founder shares in CTI was fully consistent—if not a tacit admission of—the fact that CTI was a separate entity from MFS.

57.    Aroha was controlled by Scudder, who knew that CTI was a separate entity from MFS. Aroha and Scudder had a longstanding personal and professional relationship with O'Connor, in which each would provide support for the other's financial ventures. Aroha acquired 1,000,000 CTI shares from the Founder allocation pursuant to an investor relations agreement between CTI and Aroha, in recognition of Scudder's role in directing CTI's early investor relations efforts. Because of those efforts, Scudder and Aroha had detailed knowledge of CTI's capital structure, which showed that MFS had no beneficial ownership of even a single CTI share. Thus, during all times relevant, on information and belief, in aiding and abetting in the malicious prosecution of Plaintiff, each Scudder and Aroha knew that MFS was not a shareholder of CTI.

58.    To ensure that MFS shareholders would have the opportunity to participate in the CTI opportunity despite CTI's separate existence from MFS, CTI granted MFS shareholders the ability to purchase CTI shares. Most of the Defendants, including Cooper, O'Connor, TGAP, Scudder, and Aroha, aided in reaching subscription agreements with the vast majority of existing MFS shareholders. Indeed, by the time this offering closed, approximately 50 out of 53 existing MFS shareholders had purchased CTI shares.

59.    Every shareholder of MFS was granted this opportunity, with Scudder and Aroha aiding in the process. All MFS shareholders were notified of the CTI share offer and were instructed about CTI's structure being separate from MFS. All MFS shareholders, whether they participated in purchasing CTI shares or not, made that decision knowing that CTI was intended to be—and was in practice—an entirely separate entity from MFS.

60.    One of the approximately 53 MFS shareholders at the time was Jolly Roger, Inc. ("JRI"), an entity with a principal whom, by information and belief, is an individual named Roger Root. When Root was contacted about JRI's interest in investing in CTI, Root expressed that the capital was not available to accept CTI's offer of $4,500 for 450,000 common CTI shares. Root did, however, express to Scudder that he "supported" the structure under which CTI was being created.

61. In October 2015, CTI authorized a private placement memorandum ("PPM") for its securities pursuant to Regulation D of the United States Securities and Exchange Act. As part of its PPM, CTI was required to detail any shareholder or affiliates which beneficially owned or controlled more than 5% of CTI's capital stock. MFS was not listed as a shareholder, because O'Connor and Cooper—the MFS board members—knew that MFS was not a CTI shareholder.

62. CTI raised approximately $9.4 million between 2015 and Plaintiff's resignation in 2019. It raised $3.5 million from private investors, including Duffy and Zakhireh. It also raised approximately $5.9 million from venture capital lender and public issuer FinCanna Capital Corp. In every case where CTI attempted to raise funds, CTI correctly and truthfully represented that CTI was not an MFS subsidiary.

63. Months after CTI adopted the Amended Acts and took existence under the control of the same individuals that had made up the 2015 MFS Board, MFS stopped operating. MFS did not recognize any CTI shares on its balance sheet, because no such shares existed. The 2015 MFS Board—including Cooper and O'Connor—even communicated that MFS should be shut down because it had no assets or business prospects. MFS's primary asset in 2019 was an executive loan for approximately $674,000 O'Connor owed to MFS.

64. Defendants knew that CTI was a separate entity from MFS. O'Connor himself participated in dozens of separate securities transactions involving his personally-owned CTI shares. Scudder would act as an agent selling CTI shares for O'Connor, receiving commissions after a successful sale.[2] The PPM did not mention MFS, and O'Connor was aware of his own responsibility for spinning off CTI as a separate entity.

65. In approximately October 2015, Duffy subscribed to buy CTI shares through the PPM. Duffy allegedly invests often in projects O'Connor is involved in, and they have a relationship deriving from these experiences together. Duffy had no knowledge of, or interest in, MFS at the date of that

[2] At one point, Scudder and Aroha were sent a cease and desist letter demanding that they stop sending the PPM of the company to private investors, as it gave potential investors the misleading impression that they were acquiring shares from CTI directly, not from CTI shareholders re-selling their shares.

subscription to acquire CTI shares from CTI, upon which PPM CTI and Plaintiff relied. Duffy was aware from the PPM disclosures that MFS was not a CTI shareholder.

66.     Also in October 2015, Cooper left CTI due to complications resulting from an extra-marital affair between Cooper and O'Connor.

67.     Plaintiff was retained as a consultant to CTI in or around May 2015.  On or around March 1, 2016, Plaintiff was appointed as director and officer of CTI.  Plaintiff occupied various positions with CTI including consultant, Chairman of the Board, CEO, President, Chief Strategy Officer, or director from March 2016 to May 2019, when Plaintiff resigned from CTI as a result of Defendants' actions. Plaintiff dedicated four years to CTI, prioritizing CTI, missing valuable industry opportunities due to his duties to CTI, all through the loss of both parents.  Plaintiff's reputation was inextricably intertwined with CTI and its fortunes, and Defendants' misrepresentations and frauds have tainted Plaintiff's opportunities to pursue or realize other opportunities, according to proof at trial.

**Plaintiff Arouses The Anger Of Several Defendants After Helping CTI Become Commercially Successful**

68.     On or around March 2016, Zakhireh subscribed to buy CTI shares. Zakhireh received the PPM and was aware that MFS was not listed as a shareholder to CTI.

69.     In April 2016, O'Connor resigned from CTI at the CTI board's request. For several months, O'Connor had conducted himself in a manner contrary—and detrimental—to CTI's best interests, including not coming into the office, spending money irrationally, and other erratic behaviors. O'Connor believed that Beck was behind the request and was angry that he had been asked to leave CTI, particularly as CTI was perceived to have far better commercial prospects than MFS ever did. O'Connor began to regularly contact Plaintiff and third parties, making both veiled and explicit threats of revenge against Plaintiff.

70.     Meanwhile, Plaintiff and others at CTI took steps to ensure CTI's business success. CTI's business plan was first to build a $40 million cultivation and manufacturing facility in Southern California. Throughout 2016, CTI met with venture capitalists and project financiers nationwide in an effort to obtain funding for CTI's business plan. CTI also identified and secured an impressive

management team, including a former Monsanto executive, a former official with the Securities and Exchange Commission, and an expert in California government affairs.

71. On September 30, 2016, Governor Jerry Brown signed key legislation—which Plaintiff as CEO of CTI at the time helped draft, lobbied for, and supported—legalizing solvent-based extraction in California. The landmark legislation received bipartisan support—in no small part because of Plaintiff's stakeholder visits to legislators in Summer 2016—passing by a 70-5 vote in the Assembly and a 32-7 vote in the Senate.

72. On November 8, 2016, California voters passed Proposition 64, also known as the Adult Use of Marijuana Act ("AUMA"). By passing AUMA, California voters allowed individuals to possess and use modest amounts of marijuana for personal, recreational use. The passage of Proposition 64 was an important predicate for CTI to proceed with its business plan, and its success further encouraged CTI's business prospects. In combination with CTI's sponsored legislation AB2679, the path was set for CTI to participate in what was, and still is, expected to become the largest legal cannabis market in the world.

73. In April 2017, CTI executed a $14 million funding agreement with FinCanna, which involved rigorous due diligence of multiple investment bankers. Through several amendments, this agreement led to the receipt of approximately $5.9M in funding from FinCanna. This funding agreement allowed CTI to begin funding operations, including constructing a temporary facility that would permit CTI to begin manufacturing. It also made CTI an attractive business opportunity for potential additional investors and later, for a potentially valuable public merger.

74. These events made CTI—and Plaintiff—a target for various enemies that already bore a grudge. Immediately following the announcement of the FinCanna financing, O'Connor and Zakhireh each filed complaints against CTI. O'Connor's complaint alleged breach of contract related to payments associated with his 2016 settlement agreement. On behalf of a group of shareholders, Zakhireh's complaint challenged the FinCanna transaction and issuance of the certain duly authorized and issued Preferred Series A shares. In June 2017, the parties settled their respective claims.

75. As part of the June 2017 settlement, O'Connor received payments from CTI. O'Connor was also slated to receive additional funds on the condition that he not breach the settlement agreement

or hold himself out as an officer or director of CTI. Duffy also executed this settlement personally, and on behalf of a family trust. Indeed, Duffy even obtained the signatures of other shareholders that were affiliates, associates, or family members—all of which bound themselves in June 2017. But O'Connor and Duffy were so committed to their scheme against Plaintiff that their later acts violated these binding covenants as well.

76. By Summer 2018, CTI was aggressively pursuing its business plan. CTI engaged an investment bank to raise $25 million or more to pursue additional business initiatives. CTI also signed a letter of intent with Tidal Royalty for a $5 million round of financing in or around August 2016. From a temporary facility, CTI was generating over $500,000 in revenue per month, a rate equal to $6 million per year. CTI also revised its business plan, pivoting its focus away from cultivation and manufacturing to cannabis extraction. CTI was winning awards and attracting as clients multi-state operator customers and leading cultivators in California. Indeed, CTI also signed production and distribution agreements with several notable and high-profile retail cannabis companies and brands, including (but not limited to) Mike Tyson's "Tyson Ranch" brand and multi-state operator Cresco Labs, then-valued at several billion dollars. These agreements were widely publicized as CTI undertook efforts to raise its profile and leverage these efforts into further and future growth.

**The Root Action Encourages Defendants' Malicious And Illegal Scheme**

77. Given CTI's burgeoning success, it was not coincidence that CTI's enemies again began to circle and attack. In September 2018, Defendant CLC filed a complaint on behalf of Roger Root as an individual (the "Root Action") alleging several causes of action against a list of individual defendants, and derivative causes of action purportedly on behalf of MFS. O'Connor, Scudder, Aroha, TGAP, Cooper, and Higgerson were all originally named as defendants in that lawsuit, with Root alleging direct claims against each of them. Plaintiff was also named as a defendant in this lawsuit. Root alleged these claims as an individual despite the fact that JRI was the shareholder in MFS. Indeed, JRI did not exist when the lawsuit was filed, having been dissolved in 2015.

78. Root's claims were premised on an argument that he was entitled to benefit from CTI's success as an MFS shareholder. But (1) JRI, not Root, was the actual shareholder in MFS; (2) CTI was a separate entity from, and not a subsidiary of, MFS; (3) MFS owned no CTI stock and never did; and (4)

Root knew it because he had been invited on JRI's behalf to participate in CTI's stock offering and had declined to do so.

79. On October 4, 2018, Catanzarite, again purportedly acting on Root's behalf, served a settlement demand to Plaintiff, demanding that Plaintiff surrender 10,000,000 CTI shares and $600,000 to Root. Plaintiff refused.

80. In November 2018, CTI held a shareholder meeting involving Plaintiff. At no time did any CTI shareholder present discuss MFS, or MFS's right to vote in any of CTI's corporate affairs. Indeed, Cooper furnished her proxy to Probst to vote approximately 4,900,000 shares of CTI stock, an act entirely without purpose if MFS had supposedly owned CTI's stock. According to O'Connor at this meeting, by this time MFS shareholders were not even aware that MFS still existed, much less that it purportedly owned shares in CTI. Prior to the meeting, O'Connor, Cooper, and Probst even discussed formally winding down MFS, given its previous business failures, lack of operations, and its lack of purpose going forward.

81. Indeed, Probst, O'Connor and Cooper also discussed a settlement of the derivative claims involved in the Root Action, but without involving CLC or Catanzarite. But at some point between November 2018 and January 2019, Catanzarite and O'Connor made contact and set into motion the scheme laid forth herein, including involving the other Defendants in that scheme. There was no basis for any reasonable person or attorney to assert that MFS was a shareholder at any time during that meeting, or at any other time after the Amended Acts were adopted in 2015.

82. Meanwhile, it became clear that the Root Action had been inappropriately filed as well. In responding to Root's complaint, MFS pointed out that Root did not have standing to bring such an action because JRI was a shareholder of MFS, not Root. Indeed, it turns out that JRI had been dissolved in May 2015, four years earlier. Documents were filed soon thereafter purportedly seeking reinstatement as a corporate entity. In January 2019—just before filing the MFS Action—the documents were filed stating that JRI's address was the same building where CLC has its office in Orange County.

83. In or around January 2019, many of the named defendants entered into purported settlement agreements to resolve the Root Action. Upon information and belief, and according to representations of Defendants contained within the MFS Action in which they "renounce their CTI

shares in favor of MFS," these defendants entered into separate agreements to allege—now, for the first time—that CTI had been a subsidiary of MFS all along, and at least since 2015.

84. In conspiracy with the other Defendants, O'Connor, Duffy, and Zakhireh also purported to reconstitute the MFS board as newly-appointed officers and directors. In its new guise, MFS touted itself as "the sole shareholder of CTI," an obvious falsehood completely contrary to everyone's actions prior to these events—including several actions O'Connor and Cooper personally executed themselves while comprising the majority of the 2015 MFS Board. This new "MFS board" purported to also be empowered to take actions on behalf of CTI, which it falsely claimed was an MFS subsidiary.

85. On January 23, 2019, O'Connor, Duffy and Zakhireh—acting as part of the conspiracy with the other Defendants—effected, or caused to be effected, fraudulent and knowingly false shareholder consents of each MFS and CTI, each claiming that Defendants had the consent of MFS shareholders to remove the then-existing MFS board, and the consent of CTI shareholders, with MFS acting as CTI's supposed "sole shareholder." This non-functional MFS board nevertheless allegedly "renounced" the Amended Acts and claimed that they had no force or efficacy. In short, this rogue MFS Board suggested that it could eliminate the valuable share holdings of dozens of CTI stockholders—many of whom had nothing to do with their misbegotten grievances—including Plaintiff's shares. Defendants made these false representations in pursuit of their illegal scheme.

86. Two days later, Catanzarite delivered a letter demanding that Plaintiff and other CTI officers and directors turn over all CTI operations, again on the unsupportable and untenable premise that MFS was CTI's sole shareholder. Such letter ignored not only Plaintiff's own beneficial rights in his CTI stock ownership, but the rights of all CTI stockholders.

87. Later that week, the MFS Action was filed, based on facts known by Defendants to be false at the time of its filing, including the falsified evidence that MFS was supposedly a shareholder of CTI.

88. As part of the MFS Action, the trial court held a bench trial ("709 Hearing") pursuant to California Corporations Code section 709(b) to hear factual evidence related to (1) MFS's asserted demand for an injunction and (2) an affirmative motion filed pursuant to Section 709(b) asking the Court to establish that MFS did not own CTI shares. As a result of this proceeding, the court was asked to

consider all evidence of CTI's ownership. During the 709 Hearing, CLC and Catanzarite (unsurprisingly) offered no evidence outside of Defendants' false statements supporting MFS's supposed ownership of shares in CTI. As a result, the Court denied the request for a preliminary injunction and affirmatively granted the Section 709 motion establishing that MFS did not have ownership of CTI shares.

**Defendants Engage In Multiple False And Bad Faith Actions In Pursuit Of Their Scheme**

89.     On April 14, 2019, CLC filed the CTI Action, even as the MFS Action and Root Action were also pending, alleging a separate set of facts and circumstances, while representing myriad parties with adverse interests. But even as Catanzarite and CLC were suing CTI on a direct and derivative basis, Catanzarite and CLC later purported to represent CTI *directly* by filing lawsuits on CTI's behalf. Catanzarite and CLC had no basis for making any of these claims. They were simply invented for the purpose of furthering Defendants' scheme against Plaintiff and CTI.

90.     Catanzarite also sent an email on O'Connor's behalf stating that O'Connor, Cooper, and other Defendants had not been dismissed from the direct or derivative claims contained within the Root Action, but instead had agreed to toll the statute of limitations.  Catanzarite also referred to the earlier-described "renouncements" of duly authorized and issued CTI shares in favor of MFS which did not lead to a dismissal with prejudice of the same parties. Again, all of this was a made-up story Defendants had arranged to misuse the judicial process for purposes of malice against Plaintiff and CTI.

91.     On or about May 14, 2019, CLC and Catanzarite purported to accept legal representation on CTI's behalf, supposedly taking a role as counsel to CTI when O'Connor, Duffy, and Zakhireh purported to appoint themselves as CTI's Board of Directors through another fraudulent shareholder vote—this time by voting their CTI shares which they had allegedly never "renounced in favor of MFS," as they had earlier claimed in their sham declarations in the MFS Action.  This alleged CTI board also purported to remove and supplant the real CTI Board. This fraudulent vote was necessary so that Defendants could cover the tracks they left because of the failed Root Action and MFS Action. Defendants thus continued to harass Plaintiff and CTI, using a playbook of similar acts as they had previously employed.

92.     On May 15, 2019, CLC amended the MFS Action pleadings following the 709 Hearing. The amended complaint, however, still alleged without probable cause that MFS possessed financial interests in CTI. Meanwhile, it deliberately omitted the Amended Acts and made no reference at all to the evidence that had been presented in the 709 Hearing. Further, Defendants continued to allege that Plaintiff had fiduciary duties to MFS, though they knew—many from personal experience—that Plaintiff never had any position entailing any fiduciary duties to MFS, having never assumed any position of responsibility for MFS or its management.

93.     When CLC and Catanzarite amended the MFS Action in May 2019, the "renouncing" of CTI shares in MFS' favor was noticeably absent from the MFS Action, as the renouncement was fraudulent and non-existent. Indeed, Cooper at that point had stated to Plaintiff that no such "renouncement" agreement existed which would convert her CTI shares to MFS ownership.

94.     On July 2, 2019, Catanzarite and CLC filed another cross-complaint—purportedly on CTI's behalf—against FinCanna ("FinCanna Action"). Again, this filing was *ultra vires*, inconsistent with all legitimate actions that Defendants had previously taken before, and for good measure constituted a complete ethical conflict with Catanzarite's and CLC's inherent duties of loyalty.

95.     CLC was later disqualified from representing any of the parties in the CTI Action after the court found that it was representing adverse parties in a manner expressly forbidden under California's Rules of Professional Conduct for attorneys. The filing of the FinCanna Action without authority also violated California Business and Professions Code Section 6104, a legal violation for which the statute proposes serious professional discipline as a remedy.

96.     On September 11, 2019, Catanzarite and CLC filed yet another complaint purportedly on CTI's behalf, *ultra vires*, this time against Scottsdale Insurance Co. (the "Scottsdale Action"). Like the MFS Action, the Scottsdale Action lacked probable cause, and was a malicious and deliberate act filed solely to interfere with Plaintiff's defense insurance coverage in the MFS Action. The Scottsdale Action was maliciously filed to attack Plaintiff's current and future rights, as Plaintiff is a covered party, and Defendants filed the Scottsdale Action only for the purpose of disrupting Plaintiff's insurance coverage. No reasonable attorney or person would have prosecuted the Scottsdale Action without permission from the actual CTI board of directors.

97. On October 11, 2019, the plaintiffs in the CTI Action filed a motion to appoint a receiver for CTI, while Catanzarite concurrently purported to represent the interests of CTI, the corporate entity (and MFS, and Root, and a faction of shareholders with conflicting ownership interests in MFS and CTI). Again, Defendants filed false supporting declarations, including O'Connor, Zakhireh, Duffy, Scudder, Aroha, and Higgerson, repeating the false and malicious statements they had made numerous times to this point, including their fraudulent statements about the ownership of CTI shares.

98. On November 4, 2019, Defendants filed an *ex parte* application for a temporary restraining order against Plaintiff to prohibit voting any of his Preferred Series A Shares in CTI. The TRO application included yet another declaration from O'Connor, in which he declared (under penalty of perjury, no less) that "the first time the shareholders knew about the Preferred Series A shares [of CTI] was the November 2018 shareholder meeting." This was not only false, but self-evidently so. O'Connor was one of a number of Defendants—including Zakhireh, Duffy, and TGAP—that had already purported to release claims against Plaintiff in 2017, in the course of a litigation centered on the very same Preferred Series A shares O'Connor disclaimed knowing about until November 2018. At this point, on information and belief, knowingly false statements by O'Connor claiming that MFS owned CTI stock were simply "par for the course." O'Connor repeated this statement numerous though it was self-evidently false and he knew it.

99. Only after Defendants' scheme was exposed as a sham was the Scottsdale Action dismissed in December 2019.

**Defendants' Actions Unduly Damage Plaintiff's Financial Prospects And Business Reputation**

100. On or around February 20, 2019, CTI executed a letter of intent to merge with Western Troy Capital Resources ("Troy") and list on the Canadian Stock Exchange ("CSE") or Aequitas NEO Stock Exchange ("NEO"). According to the terms of the proposed merger, Plaintiff would have owned a total of 8,435,000 shares of the combined entity, which was to comprise a total of 67,392,515 total shares outstanding per the merger's terms.

101. At the time of the proposed Troy merger, and throughout 2019 as the MFS Action was pending, valuations for cannabis companies were peaking, with a median valuation of approximately

**81x revenue** according to information provided by CTI's investment bank in late 2018. According to proof at trial:

      f.   CTI's revenue was approximately $3 million, after only the first year of commercial operations, for the twelve months prior to executing the LOI with Troy;

      g.   If public companies were valued at 81x revenue, this equated to a public valuation potential of $243,000,000 for all shares outstanding;

      h.   As Plaintiff would have owned 8,435,000 out of a total 67,392,515 shares in the proposed transaction, Plaintiff would have owned approximately 12.6% of the combined entity proposed by the merger.

102.    Defendants directly interfered with the Troy merger for the purpose of harming Plaintiff and CTI. For example, Catanzarite emailed Western Troy stating that any merger discussions needed to occur through O'Connor, whom Catanzarite claimed was the CEO of CTI. Of course, Catanzarite was just parroting the false and fraudulent line Defendants had adopted throughout the entire scheme, knowing as he did that CTI had legitimate officers, directors, and shareholders. The only basis for Catanzarite's claims were the obviously fraudulent actions O'Connor and the other Defendants had taken to claim authority over CTI.

103.    Defendants' acts of interference—including forming a fake board of directors purporting to have ownership of MFS—led to the involved parties terminating the proposed Troy/CTI merger. Plaintiff on that basis alleges, therefore, notwithstanding any punitive damages or other relief according to proof at trial, alleges monetary damages resulting from Defendants' malicious and false actions leading to the cancellation of the proposed merger.

104.    Catanzarite also interfered with Plaintiff and CTI's relationship with FinCanna, claiming in correspondence that CTI had a "new board" that "wanted to work with FinCanna." But when this alleged "new board" started to purport to act on CTI's behalf, FinCanna became understandably confused and unwilling to get itself stuck in a litigation quagmire of Defendants' malicious making.

105.    Defendants' acts became so egregious in nature that they directly led to the foreclosure of CTI assets by FinCanna on or around April 30, 2019. Even after CTI and Plaintiff prevailed on the

merits in the 709 Hearing to demonstrate that Defendants had invented their story of MFS' ownership of CTI stock, the damage was done. Not only did the MFS Action cause significant personal damages to Plaintiff, but FinCanna elected to maintain its position of foreclosure, citing the mere existence of the MFS Action.

106. In or around February 2020, CTI and FinCanna executed a settlement agreement which withdrew FinCanna's foreclosure of CTI assets as caused by Defendants' wrongful acts. The previous royalty agreement between CTI and FinCanna provided for a payment of approximate 3.5% of topline revenue in CTI, with certain buyback provisions inherent in the proposed merger with Troy (or other mergers and acquisitions transaction).

107. The FinCanna settlement with CTI reduces the value of Plaintiff's equity in CTI by 25% to 50% and increases the top-line royalty attributed to Plaintiff's equity in CTI by more than 200%. It further reduces the likelihood that Plaintiff will recover duly-earned wages or fees payable by CTI to Plaintiff. According to proof at trial, Plaintiff suffered damages to his CTI shares based on potential valuation of public companies at the time of prosecuting the Root Action and MFS Action, damages to personal reputation from the untenable accusations in the MFS Action and the obvious effect on past and future business opportunities, emotional distress based upon the MFS Action, and other such damages as may be proven at trial.

108. In addition to these damages, Plaintiff has also spent thousands of dollars in out-of-pocket costs defending himself from the false allegations against him made by Defendants in both public and private settings. Concerned about the effect of Defendants' malicious campaign against him, Plaintiff also decided to resign from CTI, giving up a valuable salary and benefits in order to protect the commitment of time and investment Plaintiff had already put into making CTI a success.

**FIRST CAUSE OF ACTION**

**MALICIOUS PROSECUTION**

**(Based on California Law)**

**(PLAINTIFF against ALL DEFENDANTS)**

109. The prosecution of the MFS Action was without probable cause because the MFS Action was factually and legally untenable. It was wholly rooted on the fraudulent assertion of MFS's

ownership of CTI, without which the MFS Action had no basis. Based upon facts known to Defendants at the time of its filing and amendment, no reasonable attorney or person would have filed or amended the MFS Action.

110.    Catanzarite, CLC, MFS, O'Connor, Duffy, and Zakhireh caused the MFS Action to be filed on the false pretense that MFS was a shareholder in CTI. O'Connor, Cooper, TGAP, Higgerson, and Aroha each knowingly lied about MFS's ownership of shares in CTI, all for the purpose of advancing Defendants' scheme against Plaintiff.

111.    Catanzarite and CLC each caused the Root Action to be filed on the false pretense that Root was a shareholder in MFS or CTI, or that JRI was not offered shares in CTI in 2015. CLC and Catanzarite took several actions to conceal this lack of standing, including filing the MFS Action, all for the improper purpose of advancing Defendants' scheme against Plaintiff.

112.    No probable cause exists where the prosecuting parties know that the factual basis for the action was false, as was the case here.

113.    All actions filed against Plaintiff resulted in favorable, final termination for Plaintiff on the merits.

114.    Defendants prosecuted all actions against Plaintiff with malice on each Defendant's part. Here, all Defendants cooperated in the prosecution of these actions not because these asserted legitimate good-faith claims, but for the purpose of obtaining revenge on Plaintiff for various imagined slights and grievances, or for other improper purposes not involving a bona fide or good faith claim against Plaintiff. Defendants acted with reckless disregard as to the obvious implications of their outrageous actions against Plaintiff, and the damages directly or proximately related thereto.

115.    Plaintiff, according to proof at trial, has suffered substantial damages as a direct and proximate cause of Defendants' actions. Plaintiff suffered compensatory damages resulting from the loss of value in Plaintiff's CTI stock, which loss was caused wholly or partially through malicious prosecution of Plaintiff by Defendants. Plaintiff also seeks relief for additional losses, including:

  i.    Out-of-pocket costs incurred in the course of defending against the malicious legal actions filed against him;

ii. Compensatory damages, including those related to mental suffering and loss of opportunities for Plaintiff concurrent to the abuse of process, and those related to the loss of value in capital stock held by Plaintiff in CTI;

iii. Punitive damages;

iv. Attorney fees and costs;

v. Any other such damages as may be available to Plaintiff.

116. Defendants' aforementioned conduct was willful, intentional and designed to injure Plaintiff in connection with all previously enumerated and specific torts and acts, and was despicable and committed with malice, oppression, or fraud. By virtue of the foregoing, Plaintiff is entitled to collect punitive and exemplary damages from Defendants according to proof at trial.

**SECOND CAUSE OF ACTION**

**UNFAIR BUSINESS PRACTICES**

**(Calif. Bus. & Prof. Code § 17200, et seq.)**

**(PLAINTIFF against CLC, CATANZARITE, WOODWARD, OKEEFE, MFS, O'CONNOR, ZAKHIREH, AND DUFFY)**

117. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

118. Defendants' conduct described herein violates California's Unfair Competition Law (the "UCL"), codified at Business and Professions Code section 17200, *et seq*. The UCL prohibits, and provides civil remedies for, unlawful and unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language. By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to serve as the basis of an independently actionable unfair competition claim, and sweeps within its scope acts and practices not specifically proscribed by any other law.

119. The UCL expressly provides for injunctive relief, and contains provisions denoting its public purpose. A claim for injunctive relief under the UCL is brought by a plaintiff acting in the capacity of a private attorney general.

120.    As further alleged herein, Defendants' conduct violates the UCL's "unfair" prong insofar as Defendants engaged in a pattern and practice of false and malicious product for the purpose of harming Plaintiff. Defendants' conduct was not motivated by any legitimate business or economic need or rationale. The harm and adverse impact of Defendants' conduct was neither outweighed nor justified by any legitimate reasons, justifications, or motives. The harm to Plaintiff arising from Defendants' unfair practices outweighed by far the utility, if any, of those practices.

121.    Defendants' unfair business practices as alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff. Defendants' conduct was substantially injurious to Plaintiff for the reasons previously alleged.

122.    Defendants have violated the unlawful prong of California's UCL by repeatedly abrogating California Corporations Code section 1507, which provides that individuals shall not "make, issue, deliver or publish" various documents or statements about a corporate entity "which is false in any material respect, knowing it to be false, or participate in the making, issuance, delivery or publication thereof with knowledge that the same is false in a material respect."

123.    Defendants CLC, Catanzarite, Woodward, and O'Keefe have violated various of the State Bar of California's Rules of Professional Conduct, Rule 1.7(a) in particular. These rules were adopted pursuant to California Business and Professions Code sections 6076 and 6077 to protect the public, the courts, and the legal profession; protect the integrity of the legal system; and promote the administration of justice and confidence in the legal profession.

124.    Defendants CLC, Catanzarite, Woodward, and O'Keefe have violated California Business and Professions Code section 6104, which provides that an attorney may not "corruptly or willfully and without authority appear[] as attorney for a party to an action or proceeding." Defendants were well aware that they lacked authority to appear on behalf of CTI and other parties and they did so anyway—aided and abetted by O'Connor, Zakhireh, and Duffy—in their desire to harass and harm Plaintiff.

125.    Defendants should be permanently enjoined from engaging in any of the unlawful, unfair, and fraudulent business acts and practices described in this Complaint, and be required to take such

actions and adopt such measures as are necessary to further prevent CLC, Catanzarite, Woodward, O'Keefe, or any successor or assign of CLC, from engaging in any further such acts and practices.

126. Absent injunctive relief forcing Defendants to disgorge any ill-gotten gains and public injunctive relief prohibiting Defendants from further action in the future, including but not limited to representing parties with adverse interests within the same litigation, Plaintiff will suffer from and be exposed to Defendants' conduct violative of the UCL.

127. As a direct and proximate cause of these unfair and unlawful business practices in violation of Business and Professions Code Section 17200, et seq., Plaintiff has endured harm directly and proximately caused by CLC, Catanzarite, Woodward, and O'Keefe, including loss of money and/or property in the form of out-of-pocket costs of defending against Defendants' bad acts.

**THIRD CAUSE OF ACTION**

**SLANDER OF TITLE**

**(Based On California Law)**

**(PLAINTIFF against O'CONNOR, DUFFY, ZAKHIREH, CATANZARITE, and CLC)**

128. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

129. Slander of title in California occurs when "one who, without a privilege to do so, publishes matter which is untrue and disparaging to another's property in land, chattels or intangible things under such circumstances as would lead a reasonable man to foresee that the conduct of a third person as purchaser or lessee thereof might be determined thereby is liable for pecuniary loss resulting to the other from the impairment of vendibility thus called."

130. Defendants effected, or caused to be effected, certain shareholder consents of MFS and CTI which they knew to be false, stating that MFS was the sole shareholder of CTI. On the basis of these alleged consents, title to ownership by Plaintiff of CTI shares was thereby compromised. Indeed, such slander also prevented Plaintiff from pursuing valuable business opportunities or growth capital on behalf of CTI.

131. Defendants acted with reckless regard in making statements that they knew were false. Defendants knew that other parties would rely upon their statements. Here, the slander of title by

Defendants destroyed Plaintiff's opportunity to sell shares in the public markets through a proposed merger with Troy, or other public offering as an alternative, each at times when public market valuations in 2019 were superior to current market conditions.

132. Plaintiff did in fact suffer immediate and direct financial harm because someone else acted in reliance upon the slander of title. Here, Defendants' slander of title caused the termination of a valuable merger and disrupted Plaintiff's business relations with other third parties. Defendants' slander of title also eliminated a $5 million financing with Tidal Royalty, which was expected to help launch CTI's revenue beyond $36 million annually, and terminated capital formation efforts through CTI's investment bank at the time, DelMorgan & Co.

133. Defendants' slander of title also affected the direct saleability of Plaintiff's shares, as third parties were unwilling to purchase shares from Plaintiff given the cloud of title imposed upon Plaintiff's shares by Defendants' wrongdoing.

134. Damages to Plaintiff, as outlined herein, caused by Defendants for this cause of action are sought for in compensatory damages related to the loss of value to Plaintiff's assets caused by the slander, loss of Plaintiff's personal business opportunities, loss of past and future income, and other such relief as may be afforded to Plaintiff in light of Defendants' actions.

135. Defendants' aforementioned conduct was willful, intentional, and designed to injure Plaintiff in connection with all previously enumerated and specific torts and acts, and was despicable and committed with malice, oppression, or fraud. By virtue of the foregoing, Plaintiff is entitled to punitive and exemplary damages according to proof at trial.

## FOURTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**(Based On California Law)**

**(PLAINTIFF against ALL DEFENDANTS)**

136. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

137. Plaintiff alleges that Defendants' conduct causes him to suffer severe emotional distress.

138. Plaintiff alleges that Defendants' conduct in conducting their malicious prosecution scheme was intended to cause Plaintiff emotional distress. Plaintiff further alleges that Defendants engaged in conduct with reckless disregard of the probability that Plaintiff would suffer emotional distress, knowing that Plaintiff would be required to answer to baseless claims made against him on the basis of knowingly false statements made by Defendants.

139. Plaintiff alleges that Defendants engaged in a pattern of despicable conduct, as set forth in the allegations described herein.

140. Plaintiff alleges that he suffered damages resulting from the severe emotional distress caused by Defendants' actions.

**REQUEST FOR JUDGMENT & PRAYER FOR RELIEF**

WHEREFORE, for the reasons outlined herein as specifically enumerated in this Complaint, Plaintiff hereby prays for judgment against Defendants, and each of them, as follows:

a. For compensatory damages, consequential damages, special damages, and restitution according to proof, but exceeding in any instance accounting for the loss of potential value of Plaintiff's CTI shares, loss of income, out-of-pocket costs incurred as a result of Defendants' acts, and all loss of Plaintiff's previous, current, and future other economic opportunities, according to proof;

b. For punitive and exemplary damages proven at time of trial in an amount sufficient to deter and punish Defendants and each of them;

c. For injunctive relief in the form of preventing Defendants from undertaking additional malicious and bad-faith litigation for the purpose of harming Plaintiff;

d. For any and all fees and costs, expenses and costs of suit herein incurred, including but not limited to actual attorneys' fees, statutory costs, professional, technical consultant and other expert witness fees and costs, investigative expenses, and all other expenses incurred by Plaintiff;

e. An award of pre- and post-judgment interest on damages;

f. For such other and further appropriate relief as the Court may deem just, equitable and proper.

//

//

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 19, 2020

**MCCUNE WRIGHT AREVALO, LLP**

By: ______________________________

Richard D. McCune
Steven A. Haskins
Attorneys for Plaintiff

# EXHIBIT 1

# UNANIMOUS WRITTEN CONSENT OF DIRECTORS OF CULTIVATION TECHNOLOGIES, INC., a California corporation

## AMENDED ORGANIZATIONAL ACTS & RESOLUTIONS

Pursuant to the authority granted to the directors to take action by unanimous written consent without a meeting pursuant to Section 307(b) of the California General Corporation Law, the Directors of **CULTIVATION TECHNOLOGIES, INC.**, a California corporation (the "Corporation") do hereby consent to, adopt, ratify, confirm and approve, as of the date indicated below, the following recitals and resolutions, as evidenced by their signatures hereunder:

## AMENDMENT OF ORIGINAL ORGANIZATIONAL ACTS & RESOLUTIONS

**WHEREAS**, pursuant to a unanimous written consent (the "Organizational Consent") of the Board of Directors (the "Board") of the Corporation dated March 30, 2015, the Corporation enacted certain initial organizational acts on behalf of the Corporation;

**WHEREAS**, certain aspects of the Organizational Consent were made in error and need to be amended;

**WHEREAS**, the Board believes it is in the best interests of the Corporation to amend the Organizational Consent to correct the errors made therein; and

**NOW THEREFORE, IT IS HEREBY RESOLVED** that the Organizational Consent previously approved by the Board is hereby amended as set forth in this "Amended Organizational Consent." Resolutions previously approved in the Organizational Consent and not otherwise amended herein will remain in full force and effect.

## ISSUANCE OF SECURITIES

**WHEREAS**, the Organizational Consent purported to authorize the issuance of 28,000,000 shares of common stock of the Corporation to Mobile Farming Systems, Inc. in exchange for the contribution of certain assets and cash consideration;

**WHEREAS**, Mobile Farming Systems, Inc. failed to provide any consideration as required pursuant to the Organizational Consent and, as a result, was not issued the common stock set forth in the Organizational Consent;

**WHEREAS**, the Board deems it in the best interests of the Corporation to issue and sell shares of its common stock to its founding shareholders (the "Founders") pursuant to that certain Common Stock Purchase Agreement (a form of which is attached hereto as Exhibit A) in the amounts and for the consideration set forth below:

| NAME OF FOUNDER | NUMBER AND CLASS OF SHARES | CONSIDERATION |
|---|---|---|
| Richard O'Connor | 2,500,000 shares of Common Stock | $2,500.00 |
| Richard Probst | 5,000,000 shares of Common Stock | $5,000.00 |
| Amy Cooper | 2,500,000 shares of Common Stock | $2,500.00 |
| TGAP Holdings, LLC | 5,500,000 shares of Common Stock | $5,500.00 |
| EM2 Strategies LLC | 2,000,000 shares of Common Stock | $2,000.00 |
| I'm Rad LLC | 3,000,000 shares of Common Stock | $3,000.00 |
| Cliff Higgerson | 1,000,000 shares of Common Stock | $1,000.00 |
| Aroha Holdings Inc. | 1,000,000 shares of Common Stock | $1,000.00 |
| Scott Unfug | 500,000 shares of Common Stock | $500.00 |

**WHEREAS**, the Board deems it to be in the best interest of the Corporation that 23,000,000 shares of its common stock be issued and sold as set forth above; and

**NOW THEREFORE, IT IS HEREBY RESOLVED**, that the officers of the Corporation is hereby authorized and instructed to issue and sell the shares of stock of the Corporation for the consideration above stated and in compliance with all the terms and conditions of Section 25102(f) of the California Corporations Code; and

**RESOLVED FURTHER**, that each of the officers of the Corporation is authorized, directed, and empowered on behalf of the Corporation and in its name to execute any other applications, certificates, agreements or any other instruments or documents, or amendments or supplements thereto, or to do and to cause to be done any and all other acts and things such officers may in their discretion deem necessary or appropriate to carry out the purposes of the foregoing resolutions; and

**RESOLVED FURTHER**, the prior authorization of issuance of common stock to Mobile Farming Systems, Inc. is hereby null and void in its entirety.

**INCENTIVE STOCK PLAN**

**WHEREAS**, the Organizational Consent purported to authorize the adoption of an Incentive Stock Plan of up to 5,000,000 shares of common stock which shares were thereby reserved for future issuance to employees, officers, directors and/or consultants of the Corporation;

**WHEREAS**, no such Incentive Stock Plan has been formally adopted and the Board deems it in the best interest of the Corporation to cancel the Incentive Stock Plan; and

**NOW THEREFORE, IT IS HEREBY RESOLVED** that the Incentive Stock Plan is hereby canceled in its entirety.

**COMPENSATION OF DIRECTORS**

**WHEREAS**, the Organizational Consent purported to grant 30,000 options to purchase common stock of the Corporation to the directors of the Corporation for services provided as directors;

**WHEREAS**, the Incentive Stock Plan has been canceled by the above resolution of the Board and no such option grants were formally made by the Corporation and the Board deems it in the best interest of the Corporation to cancel any option grants purportedly made thereby;

**RESOLVED**, that the Corporation hereby cancels any options granted under the Incentive Stock Plan, including any such options granted to the directors of the Corporation.

**OMNIBUS RESOLUTIONS**

**RESOLVED**, that any of the officers of the Corporation be, and each of them hereby is, authorized (i) to prepare, execute, deliver and perform, as the case may be, such agreements, amendments, applications, approvals, certificates, communications, consents, demands, directions, documents, further assurances, instruments, notices, orders, requests, resolutions, supplements or undertaking, (ii) to pay or cause to be paid on behalf of the Corporation any related costs and expenses and (iii) to take such other actions, in the name and on behalf of the Corporation, as each such officer, in such officer's discretion, shall deem necessary and advisable to complete and effect the foregoing resolutions or to carry out the intent and purposes of the foregoing resolutions;

**RESOLVED FURTHER**, that all actions heretofore taken by the officers and directors of the Corporation with respect to the foregoing resolutions and all other matters contemplated thereby are hereby approved, adopted, ratified and confirmed.

**COUNTERPARTS**

**RESOLVED**, that this Unanimous Written Consent may be signed in as many counterparts as may be necessary, each of which so signed shall be deemed to be an original (and each signed copy sent by electronic facsimile transmission shall be deemed to be an original) and such counterparts together shall constitute one and the same instrument and notwithstanding the date of the execution shall be deemed to bear the date as set forth below.

**IN WITNESS WHEREOF**, the undersigned have set forth their hand as of this 15th day of June, 2015.

**DIRECTORS:**

______________________________
**RICHARD O'CONNOR**

______________________________
**RICHARD PROBST**

Amy Cooper
______________________________
**AMY COOPER**

# EXHIBIT "A"

**CULTIVATION TECHNOLOGIES, INC.**

**COMMON STOCK PURCHASE AGREEMENT**

This Common Stock Purchase Agreement (this "Agreement") is made as of June 15, 2015 by and between Cultivation Technologies, Inc., a California corporation (the "Company"), and ______________________ ("Purchaser").

1. **Sale of Stock.** Subject to the terms and conditions of this Agreement, simultaneously with the execution and delivery of this Agreement by the parties or on such other date as the Company and Purchaser shall agree (the "Purchase Date"), the Company will issue and sell to Purchaser, and Purchaser agrees to purchase from the Company, __________ shares of the Company's Common Stock (the "Shares") at a purchase price of $0.001 per share for a total purchase price of $____________ (the "Aggregate Purchase Price"). On the Purchase Date, Purchaser will deliver the Aggregate Purchase Price to the Company and the Company will enter the Shares in Purchaser's name as of such date in the books and records of the Company or, if applicable, a duly authorized transfer agent of the Company. The Company will deliver to Purchaser a stock certificate representing the Shares as soon as practicable following such date. As used elsewhere herein, the term "Shares" refers to all of the Shares purchased hereunder and all securities received in connection with the Shares pursuant to stock dividends or splits, all securities received in replacement of the Shares in a recapitalization, merger, reorganization, exchange or the like, and all new, substituted or additional securities or other property to which Purchaser is entitled by reason of Purchaser's ownership of the Shares.

2. **Consideration for Shares.** As consideration for the Shares, Purchaser will deliver the Aggregate Purchase Price by a check or wire transfer made out to the Company as payment in full of the Aggregate Purchase Price.

3. **Investment and Taxation Representations.** In connection with the purchase of the Shares, Purchaser represents to the Company the following:

(a) Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares. Purchaser is purchasing the Shares for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act or under any applicable provision of state law. Purchaser does not have any present intention to transfer the Shares to any other person or entity.

(b) Purchaser understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

(c) Purchaser further acknowledges and understands that the securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Purchaser further acknowledges and understands that the Company is under no obligation to register the securities.

(d) Purchaser is familiar with the provisions of Rule 144, promulgated under

the Securities Act, which, in substance, permits limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer of the securities (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions.    Purchaser understands that the Company provides no assurances as to whether he or she will be able to resell any or all of the Shares pursuant to Rule 144, which rule requires, among other things, that the Company be subject to the reporting requirements of the Exchange Act, that resales of securities take place only after the holder of the Shares has held the Shares for certain specified time periods, and under certain circumstances, that resales of securities be limited in volume and take place only pursuant to brokered transactions.    Notwithstanding this Section 3(d), Purchaser acknowledges and agrees to the restrictions set forth in Section 3(e) below.

(e)    Purchaser further understands that in the event all of the applicable requirements of Rule 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption will be required; and that, notwithstanding the fact that Rule 144 is not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rule 144 will have a burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

(f)    Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the Shares.    Purchaser represents that Purchaser has consulted any tax consultants Purchaser deems advisable in connection with the purchase or disposition of the Shares and that Purchaser is not relying on the Company for any tax advice.

4.    **Restricted Legend; Selling Restrictions.**

(a)    **Restricted Legend.**  Any stock certificate or, in the case of uncertificated securities, notice of issuance, for the Shares, shall bear the following legend (as well as any legends required by applicable state and federal corporate and securities laws):

**"THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF.  NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."**

(b)    **Selling Restrictions.**  Commencing upon the date the Company begins publicly trading, and ending twelve (12) months after (the "Trading Restriction End Date"), the undersigned Purchaser will be restricted to selling, pledging or otherwise disposing of no more than five percent (5%) of the Shares per calendar month, either directly or indirectly until the Trading Restriction End Date. Following the Trading Restriction End Date, no further contractual trading or lock-up restrictions will remain, subject to state and federal securities laws.

5.    **No Employment Rights.**  Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a parent, subsidiary or affiliate of the Company, to terminate Purchaser's employment or consulting relationship (if any), for any reason, with or without cause.

6. **Certain Defined Terms.**

(a) "**Affiliate**" means an entity other than a Subsidiary which, together with the Company, is under common control of a third person or entity.

(b) "**Consultant**" means any person, including an advisor but not an Employee, who is engaged by the Company, or any Parent, Subsidiary or Affiliate, to render services (other than capital-raising services) and is compensated for such services, and any Director whether compensated for such services or not.

(c) "**Director**" means a member of the Board of Directors of the Company.

(d) "**Employee**" means any person employed by the Company, or any Parent, Subsidiary or Affiliate, with the status of employment determined pursuant to such factors as are deemed appropriate by the Board of Directors of the Company in its sole discretion, subject to any requirements of applicable laws, including the Code. The payment by the Company of a director's fee shall not be sufficient to constitute "employment" of such director by the Company or any Parent, Subsidiary or Affiliate.

(e) "**Parent**" means any corporation (other than the Company) in an unbroken chain of corporations ending with the Company if each of the corporations other than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

(f) "**Subsidiary**" means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

7. **Miscellaneous.**

(a) **Governing Law.** The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of California, without giving effect to principles of conflicts of law. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to the exclusive jurisdiction of the state of California and agree that any such litigation shall be conducted only in the courts of California or the federal courts of the United States located in California and no other courts.

(b) **Entire Agreement.** This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(c) **Amendments and Waivers.** No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. No delay or failure to require performance of

any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

(d)      **Successors and Assigns.**    Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement.    No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

(e)      **Notices.**   Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(f)      **Severability.**    If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(g)      **Construction.**    This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(h)      **Counterparts.**    This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement.

(i)      **Electronic Delivery.**   The Company may, in its sole discretion, decide to deliver any documents related to this Agreement or any notices required by applicable law or the Company's Certificate of Incorporation or Bylaws by email or any other electronic means. Purchaser hereby consents to receive such documents and notices by such electronic delivery and agrees to participate through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

(j) **California Corporate Securities Law.** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF THE SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO THE QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

The parties have executed this Common Stock Purchase Agreement as of the date first set forth above.

**THE COMPANY:**

CULTIVATION TECHNOLOGIES, INC.

By:______________________________
(Signature)

Name:____________________________
Title:_____________________________

Address:

____________________

____________________

**PURCHASER:**

________________________________
(PRINT NAME)

By:______________________________
(Signature)

Name:____________________________
Title:_____________________________

Address:

____________________

____________________

Email:

____________________