1  Justin S. Beck
2  3501 Roselle St.,
   Oceanside, CA 92056
3  760-449-2509
   justintimesd@gmail.com
4  *In Propria Persona*

5

6

**FILED**

APR 0 3 2023

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

7  JUSTIN S. BECK,                         ) Case No.: 3:22-CV-01616-AGS-DDL
                                          )
8              Plaintiffs,                 ) Judge:      Hon. Andrew G. Schopler
                                          )
9                                          )
       vs.                                 ) **PLAINTIFF JUSTIN S. BECK'S**
10                                         ) **OPPOSITION TO DEFENDANTS**
    CATANZARITE LAW CORPORATION;           ) **KENNETH J. CATANZARITE,**
11  STATE OF CALIFORNIA; THE STATE BAR     ) **CATANZARITE LAW CORPORATION,**
    OF CALIFORNIA; ORANGE COUNTY           ) **BRANDON WOODWARD, TIM JAMES**
12  SUPERIOR COURT; ORANGE COUNTY          ) **O'KEEFE, AMY JEANETTE COOPER,**
    DISTRICT ATTORNEY'S OFFICE; RUBEN      ) **CLIFF HIGGERSON, MOHAMMED**
13  DURAN, ESQ.; SUZANNE CELIA             ) **ZAKHIREH, RICHARD FRANCIS**
    GRANDT, ESQ.; RICHARD FRANCIS          ) **O'CONNOR, JR., JAMES DUFFY,**
14  O'CONNOR, JR.; MOHAMMED                ) **ANTHONY B. SCUDDER, AND NICOLE**
    ZAKHIREH; JAMES DUFFY; KENNETH         ) **M. CATANZARITE-WOODWARD**
15  CATANZARITE, ESQ.; JIM TRAVIS TICE,    ) **MOTION TO DISMISS SECOND**
16  ESQ.; NICOLE MARIE CATANZARITE         ) **AMENDED COMPLAINT; SUPPORTING**
    WOODWARD, ESQ.; BRANDON                ) **MEMORANDUM OF POINTS AND**
17  WOODWWARD, ESQ.; TIM JAMES             ) **AUTHORITIES**
    O'KEEFE, ESQ.; AMY JEANETTE            )
18  COOPER; CLIFF HIGGERSON; ELI DAVID     ) Filed Concurrently With:
19  MORGENSTERN, ESQ.; LEAH WILSON,        )
    ESQ.; ROBERT GEORGE RETANA, ESQ.;      )     Request for Judicial Notice
20  ELLIN DAVTYAN, ESQ.; JOHN C.           )
21  GASTELUM; JORGE E. NAVARETTE;          ) Hearing Date: May 8, 2023
    GEORGE SARGENT CARDONA, ESQ.;          )
22  ANTHONY B. SCUDDER                     ) REQUEST FOR ORAL ARGUMENT
23                                         )
               Defendants,                 ) Action Filed: January 30, 2023
24                                         )
    UNITED STATES ATTORNEY GENERAL;        ) Trial Date:   None Set
25  UNITED STATES OF AMERICA               )
26                                         )
               Nominal Defendants          )
27                                         )
28 _____)

i                          3:22-CV-01616-AGS-DDL

TABLE OF CONTENTS

I.     **INTRODUCTION**............................................................................................1

II.    **RELEVANT BACKGROUND**.........................................................................2

III.   **ARGUMENT**...............................................................................3, 6-19

       **A. Short and Plain Statement will Not Suffice for RICO Based on Fraud or Conspiracy**

       **B. SAC and RICO Case Statement Do Not Fail to Plead Facts Sufficient to State Claims**

             1. Legal Standard

             2. Catanzarite Law Corporation is Now Added by Supplement to Fix Error

             3. Count I is Properly Pleaded in SAC + Supplement

                   **a. Plaintiff Properly Alleges Racketeering Activity by KJC, BW, TJO**

                         (1) Predicate Acts Not Protected Litigation Activity in CA, 9th Circuit

                         (2) Electronic Filing of Sham Court Documents in a Scheme is Wire Fraud

                         (3) Plaintiff Alleges Extortion Under California Law w/1+ Year Jail Time

                         (4) Dismissal of Fraud Allegations Improper on Motion to Dismiss

                         (5) "Miscellaneous Conduct" Constitutes Predicate Racketeering Acts

                   **b. Plaintiff Properly Alleges Pattern of Racketeering Activity**

             4. Count V is Properly Pleaded in SAC + Supplement

             5. Order Lying in Alleged Predicate Acts Not Dispositive of RICO v. Scudder Here

             6. Due Process Right to Pursue Genuine Claims Lying in RICO, Corruption, Antitrust

IV.   **CONCLUSION** ...........................................................................................19

1

## TABLE OF AUTHORITIES

2

### Cases—State

3   *Action Apartment Ass'n, Inc. v. City of Santa Monica,* ...........................................................7

4        41 Cal. 4th 1246 (2007)

5   *Beck v. Catanzarite Law Corp.,*.......................................................................... 14, 18

6        No. G059766, 14 (Cal. Ct. App. Jul. 13, 2022)

7   *Kennedy v. Kennedy,* ...............................................................................................15

8        235 Cal.App.4th 1474

9   *Kimmel v. Goland,* ......................................................................................................7

10        51 Cal.3d 202, 204 (Cal. 1990)

11  *People v. Persolve,* .....................................................................................................7

12        218 Cal.App.4th 1267, 1274 (2013)

13

### Statutes & Rules—State

14  Cal. Bus. & Prof. Cod. 6068..........................................................................................20

15        List of Attorney Duties in California

16  Cal. Bus. & Prof. Cod. § 6077.................................................................................*passim*

17        Cal. Rul. Prof. Cond. Binding on All Licensee Defendants & Counsel, Here

18  Cal. Rul. Prof. Cond. 1.0.1(d)[3]..................................................................................1

19        Binding Definition of "Fraud" and "fraudulent" for Licensees and their Counsel Here

20  Cal. Rul. Prof. Cond. 1.7(d)(3) ...............................................................................*passim*

21        Un-waivable Conflicts of Interest for CLC, KJC, NMC, BW, TJO in Representing Movants

22  Cal. Pen. Cod. § 518...................................................................................................5

23        Extortion

24  Cal. Pen. Cod. § 519.............................................................................................5, 9

25        Defining Fear for Extortion

26  Cal. Pen. Cod. § 520.............................................................................................5, 9

27        California Extortion Statutes Meet Racketeering Activity (One Year or More in Prison)

28

3:22-CV-01616-AGS-DDL

Cal. Pen. Cod. § 522.............................................................................5, 9

    Extortion for Signatures

Cal. Pen. Cod. § 523.............................................................................5, 9

    Attempted Extortion for Signatures or Property

Cases—Federal

*Ashcroft v. Iqbal,* .................................................................................1, 4

    556 U.S. 662, 679, 129 S.Ct. 1937, 1950, 173 L.Ed. 2d 868 (2009)

*Ashland Oil, Inc. v. Arnett,* ......................................................................4

    875 F.2d 1271 (7th Cir. 1998)

*Baumer v. Pachl,* .....................................................................................14

    8 F.3d 1341, 1346 (9th Cir. 1993)

*Bell Atlantic Corp. v. Twombly,* ...............................................................3

    550 U.S. 544, 555 (2007)

*Bui v. Nguyen,* .........................................................................................8

    712 Fed. Appx. 606, 609 (9th Cir. 2017)

*Burgert v. Lokelani Bernice Pauahi Bishop Trust,* ...................................4

    200 F.3d 661, 663 (9th Cir. 2000)

*Conley v. Gibson,* .....................................................................................3

    355 U.S. 41, 47, 78 S.Ct. 99, 103, 2L.Ed. 2d. 80 (1957)

*Diaz v. Int'l Longshore and Warehouse Union, Local 13,* .........................3

    474 F.3d 1202, 1205 (9th Cir. 2007)

*Gadda v. Ashcroft,* ...................................................................................1

    377 F.3d 934, 942-43 (9th Cir. 2004)

*Gilligan v. Jamco Dev. Corp.,* ..................................................................3

    108 F.3d 246, 248-49 (9th Cir. 1997)

*Goldfarb v. Virginia State Bar,*...........................................................*passim*

    421 U.S. 773, 791, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975)

        3:22-CV-01616-AGS-DDL

*Grimmett v. Brown,* ............................................................................................5

    75 F.3d 506, 510 (9th Cir. 1996)

*H.J., Inc. v. Nw. Bell Tel. Co.,* ....................................................................13

    492 U.S. 229, 238 (1989)

*Hook v. Idaho,* ....................................................................................................3

    1:21-cv-00199-BLW, 3 (D. Idaho Feb. 4, 2022)

*Howard,* ..........................................................................................................13, 14

    208 F.3d 741, 751 (9th Cir. 2000)

*Kim v. Kimm* (2d Cir. 2018) ............................................................................6, 8

    884 F.3d 98, 104

*Lipton v. Pathogenesis Corp.,* ......................................................................3

    284 F.3d 1027, 1039 (9th Cir. 2002)

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.,* ...................1, 5, 6, 11, 12, 17

    431 F.3d 353, 361 (9th Cir. 2005)

*Matsuura III,* ........................................................................................................6

    330 F.Supp.2d at 1133

*Medallion Television Enters., Inc. v. SelecTV of Cal., Inc.,* ............13

    833 F.2d 1360, 1363 (9th Cir. 1987)

*Miranda v. Ponce Federal Bank,* ..........................................................*passim*

    948 F.2d 41, 44 n.3 (1st Cir. 1991)

*Odom v. Microsoft,* ...........................................................................................5

    486 F.3d at 548

*Oki Semiconductor Co. v. Wells Fargo Bank,* ........................................13, 14

    298 F.3d 768, 774-75 (9th Cir. 2002)

*Pelayo v. Nestle USA, Inc. et al.,* ..................................................................3, 9

    989 F.Supp.2d 973 978 (C.D.Cal. 2013)

*Rae v. Union Bank,* ...................................................................................................5
     725 F.2d 478, 481 (9th Cir. 1984)

*Salinas v. United States,* .............................................................................................14
     522 U.S. 52, 63, 65 (1997)

*Sedima, S.P.R.L. v. Imrex Co., Inc.,* .....................................................................5, 12
     473 U.S. 479, 495 (1985)

*Sever v. Alaska Pulp Corp.,* .......................................................................................13
     978 F.2d at 1529

*Snow Ingredients, Inc. v. SnoWizard, Inc.,* ................................................................6
     833 F.3d 512, 525 (5th Cir. 2016)

*United States v. Fernandez,* ........................................................................................14
     388 F.3d 1199, 1229-30 (9th Cir. 2004)

*United States v. Weaver,* ...............................................................................................8
     860 F.3d 90, 94 (2nd Cir. 2017)

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.,* ............................................................8
     No. 92-CV-2808, 1993 WL 8340 (N.D. Ill. Jan. 8, 1993),
     *judgment aff'd,* 20 F.3d 771 (7th Cir. 1994).

*Webster v. Omnitron Int'l,* 79 F.3d 776, 787 ...............................................................4
     (9th Cir. 1996)

*Wilcox v. First Interstate Bank,* ...................................................................................6
     815 F.2d 522, 531-32 (9th Cir. 1987)

*Wool v. Tandem Computers, Inc.* .................................................................................3
     818 F.2d 1433, 1439 (9th Cir. 1987)

Statutes & Rules—Federal

18 U.S.C. § 1341................................................................................................5, 8, 13
    Mail Fraud

18 U.S.C. § 1343................................................................................................5, 8, 13
    Wire Fraud

18 U.S.C. § 1344.................................................................................5, 13

    Bank Fraud

18 U.S.C. § 1346................................................................................11, 12

    Fraudulent Scheme Includes Intangible Right to Good and Honest Services in Government

18 U.S.C. § 1503(a) ........................................................................5, 6, 13

    Obstruction of Justice

18 U.S.C. § 1512..................................................................................6

    Tampering with Witness, Victim, or Informant

18 U.S.C. § 1961(1) .............................................................................6, 9

    Racketeering Activity Definition

18 U.S.C. § 1961(4) ..............................................................................5

    Enterprise Definition

18 U.S.C. § 1961(5) ..............................................................................13

    Pattern of Racketeering Activity Definition

18 U.S.C. § 1962(a)-(d) .........................................1, 4, 5, 10, 11, 13, 14, 15, 18

    RICO Code Sections

F.R.Civ.P. 8(a).................................................................................3

    Pleading Standards (Non-Fraud or Mistake)

F.R.Civ.P. 8(a)(2) .............................................................................3

    Pleading Standards (Non-Fraud or Mistake)

F.R.Civ.P. 8(d)(1) .............................................................................3

    Pleading Standards (Simple, Concise, Direct)

F.R.Civ.P. 9(b) ...........................................................................3, 9, 11, 14

    Pleading Standards (Fraud or Mistake Specificity)

F.R.Civ.P. 12(b)(6) ...........................................................................3, 4

    Motion to Dismiss for Inability to State a Claim

F.R.Civ.P. 12(d)................................................................................4

      Conversion of Motion to Dismiss to Summary Judgment; Parties Right to present Pertinent

      Material under F.R.Civ.P. 56

F.R.Civ.P. 56.............................................................................2, 20

      Motion for Summary Judgment

<u>Other Authorities</u>

The Structure of Modern Free Speech Doctrine: Strict Scrutiny, Intermediate Review, and "Reasonableness Balancing" Elon Law Review, Vol. 8: 291. R. Randall Kelso, Spurgeon E. Bell Distinguished Professor of Law, South Texas College of Law/Houston.

3:22-CV-01616-AGS-DDL

## I.   INTRODUCTION

Plaintiff concedes that a fine line exists between protecting free speech and access to Courts and using the Courts to exact fraudulent racketeering schemes under that guise. This line is more specifically drawn in "The Structure of Modern Free Speech Doctrine: Strict Scrutiny, Intermediate Review, and "Reasonableness Balancing" Elon Law Review, Vol. 8: 291. R. Randall Kelso, Spurgeon E. Bell Distinguished Professor of Law, South Texas College of Law/Houston." Plaintiff RJN, Ex. 1. ("RJN").

Objective review of Catanzarite Law Corporation's conduct shows it crosses that line – and stays on the other side. It is undertaken on behalf of lawyers *intending to defraud through straw litigants*, furthered by procedural waste, aided by public employees of a non-sovereign regulatory agency allegedly bribed in collusion. It involves wire fraud convictions of related conduct, and a RICO conspiracy conviction, all for "litigation activity." Plaintiff humbly requests the Court remain objective.

Plaintiff is victim of a pattern of racketeering activity, not protected "litigation activity." The lead § 1962(c) case in the 9th is *Living Designs, Inc. v. E.I. Dupont De Nemours and Co.*, 431 F.3d 353 (9th Cir. 2005) (RICO enterprise consisting of a law firm engaged in "litigation activity" as being racketeering). Indeed, "[m]embership in the bar is a privilege burdened with conditions." *Gadda v. Ashcroft,* 377 F.3d 934, 942-43 (9th Cir. 2004). It is not a license to racketeer and defraud non-attorneys.

Frivolous: "Not having any serious purpose or value." (Oxford). Fraudulent: "Obtained, done by, or involving deception, especially criminal deception." (Oxford). "Fraud" or "fraudulent" means conduct that is fraudulent under the law of the applicable jurisdiction and has a purpose to deceive." Cal. R. Prof. Cond. 1.0.1(d). "Fraud*" [3] [] it is not necessary that anyone has suffered damages or relied on the misrepresentation or failure to inform because requiring the proof of those elements of fraud* would impede the purpose of certain rules to prevent fraud* or avoid a lawyer assisting in the perpetration of a fraud,* or otherwise frustrate the imposition on lawyers who engage in fraudulent* conduct. Ibid. Fraudulent conduct might also be frivolous, but they are not the same thing.

On March 10, 2023, The State Bar of California announced it had been compromised by corruption and bribery of its employees. Catanzarite allegedly bribed Eli David Morgenstern and local law enforcement to allow fraudulent schemes via CLC. Catanzarite allegedly extorted corporate acts and manufactured evidence. Motion to Dismiss must be denied, and CLC should be disqualified (again).

## II.    RELEVANT BACKGROUND

Defendants Kenneth J. Catanzarite ("KJC"), Catanzarite Law Corporation ("CLC"), Brandon Woodward ("BW"), Tim James O'Keefe ("TJO"), Amy Jeanette Cooper ("Cooper"), Cliff Higgerson ("Higgerson"), Mohammed Zakhireh ("Zakhireh"), Richard Francis O'Connor, Jr. ("O'Connor"), James Duffy ("Duffy"), Anthony Scudder ("Scudder"), and Nicole Marie Catanzarite Woodward ("NMC") (collectively "Movants") seek wholesale dismissal of Plaintiff's genuine claims (Motion to Dismiss).

This case is about acute public corruption centered on a regulator majority-controlled by active market participants (The State Bar of California), and some of its alleged miscreants led by KJC who "does not care about the truth when making statements to the Court" due to a protection racket. RICO Case Statement & Supplement to Second Amended Complaint for Damages & Injunctive Relief, Dkt. #50, ("Supplement"), p. 30 (26:27). Plaintiff alleges KJC, TJO, and BW engage in racketeering using Courts and conspiracy to steal from the public and insurance companies through bribes and fraud.

KJC led a CLC scheme of *non-judicial conduct* to file and maintain six knowingly fraudulent cases on behalf of directly adverse parties targeting Plaintiff that continues in Orange County Superior Court. He did so as he filed and maintained nine putative class actions on behalf of Richard Carlson who didn't believe he had suffered damages and wasn't seeking an attorney when *solicited at home* by KJC. For pursuing genuine <u>unresolved</u> claims under different theories, Movants represented by ringleader KJC assert Plaintiff is "splitting his cause of action." This is disingenuous and par for the course.

This case lies in alleged crimes leading to, enabled, and what followed, Plaintiff's ongoing, undeniable malicious prosecution, and naming The State Bar of California and State of California. SAC, p. 2, ¶ 3. It alleges related crimes of KJC via CLC prior to, and as, the scheme targeted Plaintiff. Id., ¶ 13. It alleges KJC, CLC, NMC, BW, TJO to be part of a broader criminal enterprise at a time when The State Bar of California conceded to its own corruption March 10, 2023. Id., p. 10, ¶ 51-5. Plaintiff alleges improper control over Orange County Superior Court, alleged enterprise defendant. Id., p. 44, ¶ 179.

KJC, CLC, BW, TJO, and NMC were disqualified four times in targeting Plaintiff in Orange County Superior Court, upheld by Court of Appeal. Id., p. 3, ¶¶ 9-10. Despite express disqualification from representing CTI shareholders, KJC is once more representing Cooper, Higgerson, Zakhireh, O'Connor, Duffy, and Scudder in overt defiance because the law and truth do not matter to him. Ibid.

## III.    ARGUMENT

The Ninth Circuit is particularly hostile to motions to dismiss under Rule 12(b)(6). *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 248-49 (9th Cir. 1997). ("The Rule 8 standard contains a powerful presumption against rejecting pleadings for failure to state a claim.")

If the Court does not find the SAC and Supplement sufficient yet, Plaintiff must be granted opportunity to amend. "In exercising its discretion to summarily dismiss claims on its own motion or by motion of the defendants, the Court takes into consideration that, in any case, and more so in pro se cases, the law requires that plaintiffs be given an opportunity to amend their pleadings to remedy any deficiencies that were identified during screening or after a motion to dismiss has been adjudicated. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 (9th Cir. 2002) ("It is not unreasonable that plaintiffs may seek amendment after an adverse ruling, and in the normal course district courts should freely grant leave to amend when a viable case may be presented."). The issue is not whether plaintiff will prevail but whether he "is entitled to offer evidence to support the claims." *Diaz v. Int'l Longshore and Warehouse Union, Local 13*, 474 F.3d 1202, 1205 (9th Cir. 2007) (citations omitted)." *Hook v. Idaho*, 1:21-cv-00199-BLW, 3 (D. Idaho Feb. 4, 2022) Plaintiff can't be denied due process yet again, here.

### A. Short and Plain Statement will Not Suffice for RICO Based on Fraud or Conspiracy

F.R.Civ.P. 8(a)(2)'s purpose is to "give the defendant fair notice of what the…claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2L.Ed. 2d. 80 (1957). For claims that do not involve fraud or mistake, Plaintiff need only plead a "short and plain statement of the claim showing the pleader is entitled to relief." F.R.Civ.P. 8(a). (A short and plain statement will not suffice for fraud, however).

The SAC with Supplement is "sufficient under rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations. While statements of the time, place, and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient." *Wool v. Tandem Computers, Inc.* 818 F.2d 1433, 1439 (9th Cir. 1987). "The question of whether a business practice is deceptive in most cases presents a question of fact not amenable to resolution on a motion to dismiss." *Pelayo v. Nestle USA, Inc. et al.*, 989 F.Supp.2d 973 978 (C.D.Cal. 2013). Fraud allegations against Movants are not subject to dismissal.

**B. SAC and RICO Case Statement Do Not Fail to Plead Facts Sufficient to State Claims**

1. Legal Standard

F.R.Civ.P. 12(b)(6) allows a party to assert "failure to state a claim upon which relief can be claimed" by motion. Quoting *Burgert v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000), "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party" (Plaintiff). "A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 1950, 173 L.Ed. 2d 868 (2009). SAC and Supplement satisfy this.

F.R.Civ.P. 12(d) converts the Motion to Dismiss into one for summary judgment under Rule 56 if "matters outside the pleadings are presented to and not excluded by the Court," as here, granting all parties opportunity to present pertinent material. (Movants filed a pleading from Superior Court, here, which they have yet to even answer after nearly 3-years; thus no "settled" cause of action is "split.") Honorable Cynthia A. Bashant was already misled by Charles Tsai as if Plaintiff could not support claims, yet there exist two terminated motions for summary judgment at Docket #15 and Docket #26. Plaintiff cannot legally be prevented from showing and discovering *more* proof of public corruption.

2. Catanzarite Law Corporation is Now Added by Supplement to Fix Curable Error

Plaintiff fixed the error concerning CLC, which is now added to the SAC. "¶ 203 on PageID.4703 is amended to included "Catanzarite Law Corporation" as a defendant under Count V—RICO § 1962(d) on the basis that a corporation can conspire with its own officers and directors, here, Kenneth J. Catanzarite. Plaintiff alleges Catanzarite Law Corporation agreed to commit all alleged racketeering activity of Kenneth J. Catanzarite." Supplement, p. 144, PageID.5048, Lines 9:13. See *Webster v. Omnitron Int'l*, 79 F.3d 776, 787 (9th Cir. 1996) (quoting with approval *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271 (7th Cir. 1998), for the proposition that "intracorporate conspiracies...threaten RICO's goals of preventing the infiltration of legitimate businesses by racketeers and separating racketeers from their profits.") CLC is alleged to be part of the broader State Bar Enterprise. SAC, p. 10, ¶ 51.

3. <u>Count I is Properly Pleaded in SAC + Supplement (Docket #50)</u>

The elements of a civil RICO claim are as follows: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as `predicate acts') (5) causing injury to plaintiff's `business or property.'" *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996) (citing 18 U.S.C. §§ 1964(c), 1962(c)). *Living Designs, Inc. v. E.I. Dupont De Nemours and Co.*, 431 F.3d 353, 361 (9th Cir. 2005)

"An enterprise includes any individual, **corporation,** association, or other legal entity, and any union or group of individuals associated in fact though not a legal entity." 18 U.S.C. § 1961(4). For the CLC (a corporation) enterprise, the "definition is not very demanding." *Odom v. Microsoft*, 486 F.3d at 548. For purposes of § 1962(c), a single individual or entity cannot be both the RICO enterprise and an individual defendant. *Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir. 1984) (holding that plaintiff could not assert 1962(c) claim against defendant bank because bank was also alleged to be RICO enterprise).

As "framework for the complaint" and plain statement, non-fraud allegations, "Catanzarite Law Corporation is an enterprise engaged in and whose activities affect interstate commerce. The Count I Defendant(s) [KJC, BW, and TJO] are employed by or associated with the enterprise." SAC, p. 35, ¶ 127. "The Count I Defendant(s) agreed to and did conduct and participate in the conduct of the Catanzarite Law Corporation's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff." Id., ¶ 128. Plaintiff was directly harmed in his business and property by the racketeering activity. Id, ¶¶ 143-4. SAC, Supplement provide specific allegations.

### a. Plaintiff Properly Alleges Racketeering Activity by KJC, BW, TJO

To constitute racketeering activity, the relevant conduct must consist of at least one of the indictable predicate acts listed in 18 U.S.C. § 1961. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 (1985) ("`[R]acketeering activity' consists of no more and no less than commission of a predicate act."). Plaintiff alleges indictable predicate acts violative of 18 U.S.C. § 1341, 18 U.S.C. § 1343, 18 U.S.C. § 1344, Cal. 18 U.S.C. § 1503(a), Cal. Pen. Cod. §§ 518-520, 522-523 PC. SAC, Supplement.

Plaintiff alleges CLC to be an enterprise (as a corporation, this box is checked), but *also* part of a broader criminal enterprise associated-in-fact: State Bar Enterprise. Supplement, p. 14, pp. 95-102. Movants would like to ignore related enterprise conduct resulting in convictions for "litigation activity" in California; where racketeering is "no more and no less than commission of a predicate act."

Predicate acts must be proved by a preponderance of the evidence. *See Wilcox v. First Interstate Bank*, 815 F.2d 522, 531-32 (9th Cir. 1987). Conduct of CLC enterprise preceding Plaintiff's harm in related schemes, and concurrent to Plaintiff's harm, is indeed relevant as much as Movants would like the Court to ignore it. Motion to Dismiss, p. 2 (14:16). Conduct of State Bar Enterprise with convictions establish a pattern of racketeering activity as a matter of law. SAC, p. 37, ¶ 141. Id., p. 39-40, ¶ 161.

Movants rely on *Kim v. Kimm* (2d Cir. 2018) 884 F.3d 98, 104 while disregarding the civil jury instructions in the 9th Circuit: *Living Designs, Inc. v. E.I. Dupont De Nemours and Co.*, 431 F.3d 353, 361 (9th Cir. 2005) is all about a law firm engaged in "litigation activity" that was deemed properly pleaded racketeering activity. In fact, the RICO statute, itself, provides that conduct relating to prior litigation may constitute racketeering activity. 18 U.S.C. § 1961(1)(B) (defining racketeering activity as including an act indictable under 18 U.S.C. § 1512, which relates to tampering with a witness, victim, or informant). Therefore, the district court erroneously determined that Plaintiffs' "RICO claims, which are based on immune litigation conduct, fail as a matter of law." *Matsuura III,* 330 F.Supp.2d at 1133. *Living Designs, Inc. v. E.I. Dupont De Nemours and Co.*, 431 F.3d 353, 365 (9th Cir. 2005). Showing Congress did not intend a bar license to equal racketeering license, another predicate act is defined:

> 18 U.S.C. § 1503 **(a)** Whoever corruptly...endeavors to influence...impede any...officer in or of any court of the United States...in the discharge of his duty, or by any...communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b).

Thomas V. Girardi, who is compared to KJC in the SAC, was indicted for related conduct for "litigation activity." Supplement, p. 24. Matthew Charles Elstein was convicted of wire fraud in related conduct for filing "sham court documents" like CLC frequently uses in California for "litigation activity." SAC, p. 29, ¶ 111. Orange County Superior Court clerk Jose Lopez, Jr. was indicted for RICO Conspiracy in related conduct for "litigation activity" in fixing more than 1,000 cases. Id., p. 13, ¶ 70.

A license to practice law, in California and the 9th Circuit, is not a gauzy cloak to engage in fraudulent schemes against non-attorneys and banks using the judicial system. Most notably, Movants ignore one key aspect of the findings in *Kim*. "Although we have not spoken directly on the issue, other courts have held that "**[i]n the absence of corruption**," such litigation activity "cannot act as a predicate offense for a civil-RICO claim." *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016)" *Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018) The facts of this case, and allegations are different.

6

3:22-CV-01616-AGS-DDL

1    Plaintiff does allege predicate acts by TJO and BW. SAC, pp. 13-15, ¶¶ 71, 76, 79; p. 36, ¶¶ 132,

2    135-37. Plaintiff also alleges Brandon Woodward and Tim James O'Keefe appear on "pleadings, notices

3    of motion, and similar papers allegedly targeting the Plaintiff" amidst the fraudulent scheme lying in

4    non-judicial fraud, corruption, and sham court documents. Supplement, p. 15 (1:27).

5                    (1) <u>Predicate Acts Not Protected Litigation Activity in CA, 9th Circuit</u>

6            Litigation privilege in California "precludes recovery for tortiously inflicted injury resulting

7    from publications or broadcasts made during the course of judicial and quasi-judicial proceedings, but

8    [not] from tortious conduct <u>regardless of the purpose for which such conduct is undertaken</u>." *Kimmel v.*

9    *Goland*, 51 Cal.3d 202, 204 (Cal. 1990). See *People v. Persolve*, 218 Cal.App.4th 1267, 1274 (2013)

10   (holding that the litigation privilege does not apply to alleged violations of certain state and federal

11   unfair debt collection statutes); See *Action Apartment Ass'n, Inc. v. City of Santa Monica*, 41 Cal. 4th

12   1246 (2007) (the litigation privilege does not apply to criminal prosecution of perjury, false reporting,

13   and **attorney deceit** because the statutes at issue are "more specific than the litigation privilege and

14   would be significant or wholly inoperable if its enforcement were barred when in conflict with the

15   privilege.")  In the United States, attorney fraud is subject to statutory restraint as it is not based on

16   viewpoint of a speaker – it is felonious (here, RICO and antitrust scrutiny). Free Speech Doctrine.

17           Plaintiff did not allege, nor had he discovered alleged bribery of public employees by KJC when

18   filing his malicious prosecution claims (as yet, unanswered nearly three years later). SAC, p. 38, ¶ 149.

19   Nor had Plaintiff's other company been destroyed at that time through related conduct. Supplement, p.

20   3, ¶ 15, p. 9, ¶¶ 52-6. Plaintiff did not discover binding federal antitrust laws for regulators, nor had he

21   filed antitrust petition in California Supreme Court that was overtly obstructed. Id., p. 28, ¶ 109, p. 28,

22   ¶ 113. Plaintiff's cases in Orange County Superior Court had not yet been compromised through conduct

23   of The State Bar of California, nor State of California's refusal to appear. Id. p. 11, ¶ 69. The State Bar

24   of California had not yet conceded its own corruption, nor had Report 2022-030 released by California

25   State Auditor supporting all Plaintiff's corruption allegations. SAC, p. 10, ¶ 54. Supplement, p. 10, ¶¶

26   57-9, p. 11, ¶ 68. Predicate acts were conceded by The State Bar of California involving corruption by

27   its own admission. Ibid. Plaintiff alleges KJC bribed Eli David Morgenstern and local law enforcement

28   in a manner like Thomas V. Girardi's bribery of public employees in related conduct. Id, p. 14.

This case does not feature any "absence of corruption," allegations (or proof) – corruption and protectionist behavior violative of U.S. antitrust law is foundational to every claim. SAC, p. 10-11. Supplement, pp. 2-3. Nor does *Kim*, in the 2nd Circuit, involve six *competing* lawsuits against directly adverse parties lacking standing, four disqualification orders that continue to be violated with impunity, or alleged systemic corruption of a state court system through bribery and collusion, as here. Ibid.

In summary, *Kim* is not instructive here, and it is wholly-off point where racketeering activity statutes pleaded by Plaintiff are "more specific" than the privilege itself in California, and Plaintiff's federal cases lie in corruption with proof. Nor does *Kim* allege prior, parallel, and ongoing conduct of similar character to defraud the public, convictions for "litigation activity" in related enterprise conduct, or conduct relying on bribery and corruption. Movants arguments all fail at threshold; importantly, the Motion to Dismiss does not even seek to disclaim fraudulent conduct, instead casting such schemes as being somehow authorized by The State Bar of California, which goes to public actor corruption alleged.

(2) Electronic Filing of Sham Court Documents in a Scheme is Wire Fraud

Criminal mail and wire fraud under 18 U.S.C. §§ 1341 and 1343 involves: (1) a scheme based on an intent to defraud; and (2) the use of the mails or the wires to further that scheme. *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017); *Bui v. Nguyen*, 712 Fed. Appx. 606, 609 (9th Cir. 2017). A scheme to defraud encompasses "acts of artifice or deceit which are intended to deprive [Plaintiff] of his property or money." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.* No. 92-CV-2808, 1993 WL 8340 (N.D. Ill. Jan. 8, 1993), *judgment aff'd*, 20 F.3d 771 (7th Cir. 1994). Plaintiff alleges the use of the wire in furtherance of a fraudulent CLC enterprise scheme involving predicate acts by KJC, TJO, and BW. SAC, p. 14, ¶ 76. No extravagant definition is required or permitted, here (not in California).

(3) Plaintiff Alleges Extortion Under California Law w/1+ Year Jail Time

Plaintiff properly pleads allegations of extortion which constitute racketeering activity. SAC, p. 14, ¶ 76. Supplement, p. 4, ¶ 18. Id., Predicate Act #20, p. 46 (20:28), p. 47 (1:9). Id., Predicate Act #20, p. 47 (10:18). Id., Predicate Act #27, p. 49 (17:28), p. 50 (1:12). Id., Predicate Act #34, p. 56 (24:28), p. 57, (1:16). Id., Predicate Act #38, p. 59 (15:27). Id., Predicate Act #39, p. 60 (1:15). Id., Predicate Act #41, (7:19). Id., Predicate Act #42, p. 61 (20:28), p. 62 (1:18). It is unclear why Movants cite statutes and conduct that Plaintiff did not even plead. Motion to Dismiss, p. 5-6.

KJC, BW, and TJO threatened O'Connor and Cooper with securities fraud and abuse of the elderly charges starting September 14, 2018, then used "law enforcement" threat for each to create fraudulent "evidence." Supplement, p. 4, ¶ 18, p. 6, ¶ 34, 35. Higgerson's family member, Cooper, was implicated and thereby acted under that threat to aid in the fraudulent scheme by fear. Id., p. 6, ¶ 35.

18 U.S.C. § 1961(1) holds "racketeering activity" means (A) any act or threat involving…extortion…which is chargeable under State law and punishable by imprisonment for more than one year.

Cal. Pen. Cod. 518(a) holds "Extortion is the obtaining of property or other consideration from another, with his or her consent, or the obtaining of an official act of a public officer, induced by a wrongful use of force or fear, or under color of official right."

Cal. Pen. Cod. § 519 holds "Fear, such as will constitute extortion, may be induced by a threat of any of the following: 2. To accuse the individual threatened, or a relative of his or her, or a member of his or her family, of a crime. 3. To expose, or to impute to him, her, or them a deformity, disgrace, or crime. 4. To expose a secret affecting him, her, or them. []"

Cal. Pen. Cod. § 520 holds "Every person who extorts property or other consideration from another, under circumstances not amounting to robbery or carjacking, by means of force, or any threat, such as is mentioned in Section 519, shall be punished by imprisonment pursuant to subdivision (h) of Section 1170 for two, three or four years."

Cal. Pen. Cod. § 522 holds "Every person who, by any extortionate means, obtains from another his signature to any paper or instrument, whereby, if such signature were freely given, any property would be transferred, or any debt, demand, charge, or right of action created, is punishable in the same manner as if the actual delivery of such debt, demand, charge, or right of action were obtained."

Cal. Pen. Cod. § 523 holds "(a) Every person who, with intent to extort property or other consideration from another, sends or delivers to any person any letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat such as is specified in Section 519 is punishable in the same manner as if such property or other consideration were actually obtained by means of such threat." Cal. Pen. Code § 523

### (4) Dismissal of Fraud Allegations Improper on Motion to Dismiss

F.R.Civ.P. 9(b) holds "Fraud or Mistake; Conditions of Mind. In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally. "The question of whether a business practice is deceptive in most cases presents a question of fact not amenable to resolution on a motion to dismiss." *Pelayo v. Nestle USA, Inc. et al.*, 989 F.Supp.2d 973 978 (C.D.Cal. 2013)

1    Once more, Movants proffer off-point cases without regard for California law (attorney deceit is

2    not privileged, nor extortion, mail, wire, or bank fraud) or civil jury instructions in the 9th Circuit. Motion

3    to Dismiss, p. 8. Movants suggest Plaintiff needs to "prove" his allegations of mail or wire fraud now.

4    Ibid. Movants disregard pleadings entirely citing BW and TJO. Ibid. Any reasonable person would agree

5    the prior, parallel, and ongoing conduct of Catanzarite Law Corporation intends to defraud. Id. (17:20).

6    Plaintiff describes CLC enterprise operations and their reliance upon public corruption.

7    Supplement, pp. 92-4. Plaintiff alleges CLC is permitted to engage in serial non-judicial fraud and

8    judicial fraud using bribery, obstruction of justice, malicious prosecution, and commingling of

9    operations with public employees. Id. p. 14 (10:21). For § 1962(c), Plaintiff alleges roles of each TJO

10   (Id., p. 15, 1:17), BW (Id. p. 15, 18:27), led by KJC (Id., p. 94, 3:28, p. 95, 1:6). Plaintiff alleges two

11   fraudulent schemes below involving Movants, and the Motion to Dismiss does nothing to address them.

12   Id., p. 88, (21:28), p. 89, (1:28).

13   "Common Plan #1: For the Catanzarite Law Corporation enterprise, it is alleged that the plan

14   consists of bribing public employees of The State Bar of California, Anaheim Police Department,

15   Orange County District Attorney's Office, filing fraudulent cases that lack legal standing or probable

16   cause predicated upon non-judicial fraud and the ongoing protection of The State Bar of California and

17   law enforcement, then calling it "litigation activity" as if it were protected speech. Examples of impunity

18   supporting this allegation are provided In Re Perrine, Alexandros v. Cole, Edwards v. Noroski, Richard

19   Carlson as lead plaintiff in 9 putative class actions when he did not believe he had suffered damages nor

20   did he seek an attorney when he was visited at his home by Mr. Catanzarite, and then Denise Pinkerton

21   as "attorney-in-fact" for a Roger Root, who was not a shareholder but commenced a campaign of

22   fraudulent cases for which the register of actions s in the thousands targeting the Plaintiff. After the first

23   knowingly fraudulent case is manufactured through sham court documents and filed, discovery is

24   propounded with intent to defraud litigants and their counsel, leading to private information to which

25   Mr. Catanzarite and his associates are allegedly not entitled, thereby causing or enabling more fraudulent

26   litigation under color of official right. Sham declarations are provided under penalty of perjury (often

27   extorted) that conflict with each other, as if each case or filing were a vacuum unrelated to its related

28   cases or filings. This plan is supported by deliberate indifference, active concealment, or bribery by or

of Office of Chief Trial Counsel, Office of General Counsel, and Board of Trustees for The State Bar of California. It is alleged this plan is consistent with that of the Girardi-Keese law firm. It is alleged that Courts and judges are selected for these schemes according to their willingness to permit conduct without striking it for fraud, or by ex parte communications involving actual exchange of consideration. It is alleged Court clerks aid in this process by communicating with State Bar Enterprise and Catanzarite Law Corporation in Orange County Superior Court. It is alleged this plan is evidenced by public records requests reflecting actual knowledge of State Bar Enterprise, and its refusal to mitigate public harm over more than a decade, and the impunity with which Catanzarite Law Corporation enterprise conducts itself against innocent members of the public with intent to defraud." Supplement, p. 88.

"Common Plan #2: For the Catanzarite Law Corporation enterprise in targeting Plaintiff, it is alleged the plan consists of taking money and property from the Plaintiff through non-judicial fraud supporting judicial fraud, taking the merger valued at $261 million, by any means through ongoing protection of, bribery or coercion of, and collusion with State Bar Enterprise. Not less than six cases were filed on behalf of directly adverse parties for this fraudulent scheme supported by knowingly false and fabricated evidence and alleged bribery of Eli David Morgenstern and later Suzanne Grandt. This is not "litigation activity" if it involves deliberate attorney fraud, as most cases from Catanzarite do. Attorney fraud is not protected in the United States, nor are violations of RICO subject to litigation privilege under California law." Supplement, p. 89. See *Living Designs, Inc. v. E.I. Dupont De Nemours and Co.*, 431 F.3d 353, 361 (9th Cir. 2005) See also 18 U.S.C. § 1346 regarding corruption.

Via short and plain statements so they can answer easily, Plaintiff summarizes conduct of CLC enterprise in which KJC, BW, and TJO participated. Supplement, p. 35-6. To conform with F.R. 9(b), Plaintiff offers specific allegations in the SAC, and further specificity in his Supplement. Dkt. #50.

For KJC, Plaintiff alleges specific conduct of CLC enterprise supporting his § 1962(c) claim: SAC, p. 13, ¶ 71. Ibid, ¶¶ 72-4. Id., p 14, ¶¶ 75-7. Id., p. 15, ¶¶ 78-80. Id., p. 16, ¶¶ 81-3. Id., p. 17, ¶ 84. Id., pp. 17-8., ¶ 87. Id., p. 18, ¶ 88. Beyond those acts violative of California extortion statutes, *supra*, Plaintiff alleges historical context on CLC, preceding context before CLC and State Bar Enterprise engaged in the scheme targeting Plaintiff, and the scheme's fraudulent nature generally. Supplement, p. 5-12, ¶¶ 13-75. To comply further with 9(b), Plaintiff alleges more detail on predicate acts by KJC. Id.,

3:22-CV-01616-AGS-DDL

1  Predicate Act #13, p. 35-6. Id., Predicate Act #14, p. 36-7. Id., Predicate Act #16, pp. 38-9. Id., Predicate

2  Act #17, p. 39-44. Id., Predicate Act #18, pp. 45-6. Id., Predicate #19, p. 46. Id., Predicate Acts 21-30,

3  pp. 47-54. Id., Predicate Act #31, p. 54. Id., Predicate Act #32, p. 55. Id., Predicate Act #33, p. 56. Id.,

4  Predicate Act #34, p. 56. Id., Predicate Act #35, p. 57. Id., Predicate Act #36, p. 58. Id., Predicate Act

5  #37, p. 58. Id., Predicate Act #38, p. 59. Id., Predicate Act #39, p. 60. Id., Predicate Act #41, p. 61. Id.,

6  Predicate Act #42, pp. 61-2. Id., Predicate Act #43, pp. 62-3. Plaintiff further alleges a right to good

7  faith, honest services in government allegedly corrupted by KJC bribery of public employees, including

8  Eli David Morgenstern as Senior Trial Counsel for The State Bar of California. SAC, Supplement. 18

9  U.S.C. § 1346.

10      For BW, Plaintiff alleges specific conduct of CLC enterprise supporting his § 1962(c) claim:

11  SAC, p. 13, ¶ 71. Id., p. 14, ¶ 76. Id., p. 15, ¶ 79. Predicate Act #18, pp. 45-6. Id, Predicate Act #32, p.

12  55. Plaintiff further alleges a right to good faith, honest services in government allegedly corrupted by

13  KJC bribery of public employees for BW to carry out CLC conduct, including Eli David Morgenstern

14  as Senior Trial Counsel for The State Bar of California. SAC, Supplement. 18 U.S.C. § 1346.

15      For TJO, Plaintiff alleges specific conduct of CLC enterprise supporting his § 1962(c) claim:

16  SAC, p. 13, ¶ 71. Id., p. 14, ¶ 76. Id., Predicate Act #13, p. 35-6. Predicate Act #18, pp. 45-6. Id.,

17  Predicate Act #20, p. 46-7. Id., Predicate Act #32, p. 55. Plaintiff further alleges a right to good faith,

18  honest services in government allegedly corrupted by KJC bribery of public employees for TJO to carry

19  out CLC conduct, including Eli David Morgenstern as Senior Trial Counsel for The State Bar of

20  California. SAC, Supplement. 18 U.S.C. § 1346.

21                    (5) "Miscellaneous Conduct" Constitutes Predicate Racketeering Acts

22      Movants' arguments that they are allowed to conduct or conspire to conduct fraudulent schemes

23  by mail, wire, corruption, and extortion owing to license to practice law from The State Bar of California

24  fail in the 9th Circuit and California. *Living Designs, Inc. v. E.I. Dupont De Nemours and Co.*, 431 F.3d

25  353 (9th Cir. 2005) (RICO enterprise consisting of a law firm engaged in "litigation activity" as being

26  racketeering). *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 (1985) ("'[R]acketeering activity'

27  consists of no more and no less than commission of a predicate act.") Paragraph 141 merely summarizes

28  conduct of the CLC enterprise as set forth above, and within Predicate Acts #1-72. Supplement.

1    Paragraph 87 sets forth a series of knowingly fraudulent cases parallel to scams targeting Plaintiff, where

2    "KJC knew this letter was false, because a February 12, 2020, deposition of Richard Carlson reveals he

3    did not believe he had suffered damages, nor was he seeking an attorney, when he was visited at his

4    home by KJC before 9 putative class actions were filed on his behalf by KJC in several jurisdictions."

5    This mail was used to further a fraudulent scheme. Ibid. See also Supplement, Predicate Acts #16-17,

6    pp. 38-40. (These were *all* "sham court documents," too.)

7                    **b. Plaintiff Properly Alleges Pattern of Racketeering Activity**

8            A pattern is defined as "at least two acts of racketeering activity" within ten years of each other.

9    18 U.S.C. § 1961(5). Proving two predicate acts is a necessary condition for finding a violation, but may

10   not be sufficient. *See H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238 (1989). To establish a "pattern

11   of racketeering activity," the predicate acts must be both "related" and "continuous." *Id.*; *Sever v. Alaska*

12   *Pulp Corp.*, 978 F.2d at 1529. Related conduct "embraces criminal acts that have the same or similar

13   purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by

14   distinguishing characteristics and are not isolated events." *H.J., Inc.*, 492 U.S. at 240. Relatedness of the

15   alleged or proven predicate acts is rarely an issue. *See Medallion Television Enters., Inc. v. SelecTV of*

16   *Cal., Inc.*, 833 F.2d 1360, 1363 (9th Cir. 1987) (finding alleged predicate acts to be related when all

17   were directed toward plaintiff or inducing plaintiff).

18           Once more, Movants rely upon case law without regard of California law (predicate acts are not

19   privileged under California law) or 9th Circuit jury instructions. Catanzarite Law Corporation is not

20   allowed to engage in racketeering activity just because KJC, BW, TJO, and NMC are attorneys licensed

21   by The State Bar of California. 18 U.S.C. § 1341, 18 U.S.C. § 1343, 18 U.S.C. § 1344, Cal. 18 U.S.C.

22   § 1503(a), Cal. Pen. Cod. § 518-523 PC are more specific than the privilege in California: not inoperable.

23                    4. Count V is Properly Pleaded in SAC + Supplement

24           A RICO conspiracy under § 1962(d) may be established by proof of an agreement to commit a

25   substantive violation of RICO. *Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 774-75 (9th

26   Cir. 2002) ("It is the mere agreement to violate RICO that § 1962(d) forbids; it is not necessary to prove

27   any substantive RICO violations ever occurred as a result of the conspiracy"). The conspirator need not

28   have agreed to commit or facilitate each and every part of the substantive offense. *Howard*, 208 F.3d

                                        13                     3:22-CV-01616-AGS-DDL

741, 751 (9th Cir. 2000) (citing *Salinas v. United States*, 522 U.S. 52, 65 (1997)). However, the conspirator must have been "aware of the essential nature and scope of the enterprise and intended to participate in it." *Id.* (citing *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993)).

The "agreement need not be express as long as its existence can be inferred from words, actions, or interdependence of activities and persons involved." *Oki Semiconductor Co.*, 298 F.3d at 775. If a RICO conspiracy is demonstrated, "[a]ll conspirators are liable for the acts of their co-conspirators." *Id.*

A defendant can be held liable for a RICO conspiracy if the evidence shows that he or she "knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise." *United States v. Fernandez*, 388 F.3d 1199, 1229-30 (9th Cir. 2004). Plaintiff has not yet been furnished opportunity to show evidence, so it is not appropriate that his genuine § 1962(d) claims be dismissed as Movants would sincerely prefer. Although a substantive RICO offense requires proof that each defendant committed at least two racketeering acts, it is settled law that to establish a criminal RICO conspiracy charge, Plaintiff need not prove that any defendant committed any racketeering act or any overt act (a person can agree to the commission of a crime by someone else). *Salinas v. United States*, 522 U.S. at 63. (Holding that RICO's conspiracy provision "does not…excuse from [its] reach…an actor who does not himself commit…the two or more predicate acts requisite to the underlying offense." "The RICO conspiracy statute, simple in formulation, provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). *Salinas v. United States*, 522 U.S. 52, 63 (1997)

Via short and plain statements they can answer easily, Plaintiff summarizes conduct of CLC enterprise, State Bar Enterprise, and Orange County Superior Court enterprise in which Movants Scudder, O'Connor, Higgerson, Cooper, Zakhireh, Duffy, and NMC allegedly agreed to participate. SAC, pp. 47-50. Supplement, pp. 3-12. To conform with F.R. 9(b), Plaintiff offers specific allegations in the SAC of RICO violations, and further specificity in his Supplement.

KJC filed a fraudulent derivative action without standing on behalf of non-shareholder Denise Pinkerton against MFS, O'Connor, Cooper, Higgerson, Scudder. SAC, p. 13 (4:13). "KJC, BW, TJO, and CLC knew neither Ms. Pinkerton nor Mr. Root were a shareholder in MFS but filed it anyway to commence an open-ended, fraudulent CLC and State Bar Enterprise scheme that continues today." Ibid.

O'Connor, Cooper, Higgerson, Scudder, Zakhireh, and Duffy were each a shareholder of CTI. Supplement, p. 4, ¶ 19. With help from Scudder, O'Connor privately sold many of his shares in CTI for more than $2,000,000. Id. p. 5, ¶ 26. "In exchange for producing non-judicial fraud asserting MFS was "sole shareholder," O'Connor, Cooper, Higgerson were dismissed from the false Pinkerton Action as Catanzarite was tolling claims to "bring later." Each "agreed to renounce" their CTI shares "in favor of MFS." Id. p. 6, ¶ 35. "Using the manufactured evidence, to conceal a lack of standing in the Pinkerton Action, Catanzarite took control of MFS as "counsel" (while he was suing the company). Dismissal of a derivative claim requires court approval [to prevent collusion or conspiracy]. *Kennedy v. Kennedy*, 235 Cal. App. 4th 1474, 1485 (2015).

Plaintiff details the use of Mobile Farming Systems, Inc. and the reliance of alleged bribery of Eli David Morgenstern and public employees for the scheme. Supplement, p. 18. Plaintiff alleges why NMC's (Id., p. 14, (22:28),) O'Connor's (Id., p. 17 (21:28), p. 18 (1:10), Cooper's (Id., p. 19 (11:25),) Higgerson's (Id., p. 18 (26:28), p. 19 (1:7),) Scudder's (Id., p. 20 (8:28),) conduct after January 23, 2019, *indicates* agreement to violate RICO. "Scudder's agreement to violate § 1962(c) is shown by his conduct for CTI prior to, then dismissal submitted January 3, 2019, in OCSC, from a false derivative action against MFS, and the subsequent filings for all times thereafter involving KJC, TJO, BW, and CLC." SAC, p. 47, ¶ 207. "Cooper, Higgerson, O'Connor's agreement to violate § 1962(c) is shown by their conduct before January 23, 2019, related to MFS and CTI followed by their dismissals from a false derivative action between January 22, 2019, and January 23, 2019, submitted by wire in OCSC." Id., ¶ 208. "O'Connor, Zakhireh, and Duffy's agreement to violate § 1962(c) is shown in that each are named directors and officers of CTI on the face of a fraudulent shareholder consent dated January 23, 2019, submitted by wire in OCSC." Id., ¶ 210. O'Connor and Duffy's agreement to violate § 1962(c) is shown by false affidavits or declarations of O'Connor on March 19, 2019, November 4, 2019, November 11, 2019, and December 27, 2019, which were suborned or extorted by KJC in continuance of the scheme [and filed in OCSC]. Id., p. 48, ¶ 211. O'Connor's agreement to violate § 1962(c) is shown in that he acted as proxy on May 15, 2019, for CTI shareholders after claiming those shareholders did not exist January 23, 2019, and voted shares for Duffy, and shares for Carlos Calixto whose signature was declared to be forged." Id., ¶ 212. "NMC's agreement to violate § 1962(c) is shown in that she appeared

1   in Court of Appeal G058700 [*for non-client CTI*]." Id., ¶ 213. "We note Catanzarite filed the MFS

2   Action acting as MFS's purported corporate counsel while still representing different a [non-

3   ]shareholder in a derivative action against both MFS and CTI (Pinkerton Action)." *Beck v. Catanzarite*

4   *Law Corp.*, No. G059766, 14 (Cal. Ct. App. Jul. 13, 2022) "O'Connor's 2019 Consent rescinded CTI

5   shares he and others sold to third parties such as [Duffy,] Zakhireh, Cooper, and Higgerson." *Beck v.*

6   *Catanzarite Law Corp.*, No. G059766, 14 (Cal. Ct. App. Jul. 13, 2022) "In January 2020, the trial court

7   disqualified Catanzarite and its attorneys from representing CTI and the Mesa Action plaintiffs.

8   (*FinCanna, supra*, G058700.)" *Beck v. Catanzarite Law Corp.*, No. G059766, 18 (Cal. Ct. App. Jul. 13,

9   2022). (Catanzarite is still representing CTI shareholders in this case, and NMC appealed CLC's right

10  to represent non-client, CTI.)

11       "Nicole Marie Catanzarite Woodward appeared in Court of Appeal challenging the fraudulent

12  representation by Catanzarite Law Corporation of CTI which led to the firm's disqualification. The

13  Court of Appeal agreed the conduct was undertaken without authority." Supplement, p. 131. Her role in

14  conspiracy is further demonstrated as a principal of CLC, thereby indicating agreement for violations

15  by KJC, BW, and TJO. Id., p. 14 (22:28).

16       "If Kenneth J. Catanzarite had not extorted Richard Francis O'Connor, Jr. and Amy Jeanette

17  Cooper for signatures and property under a threat of securities fraud and elder abuse allegations in

18  January 2019, Kenneth J. Catanzarite, Brandon Woodward, and Tim James O'Keefe could not have

19  assumed control over Mobile Farming Systems, Inc. in January 2019. Had Kenneth J. Catanzarite not

20  conspired with Mohammed Zakhireh and James Duffy through non-judicial fraud to agree to the January

21  23, 2019 shareholder consent – which each knew to be fraudulent – the scheme could not have continued.

22       Plaintiff describes in detail the facts showing the existence of an alleged conspiracy in his RICO

23  Case Statement, and the reliance upon alleged bribery of public employees. Supplement, p. 126-36.

24  Once more, Movants suggest the mere existence of credentials from The State Bar of California equals

25  a license to racketeer, which is not so in California or the 9th Circuit.

26       5. Order Lying in Alleged Predicate Acts Not Dispositive of RICO v. Scudder Here

27       Movants contend a prior order allegedly procured by racketeering estops Plaintiff claims for

28  conspiracy against Scudder. Motion to Dismiss, p. 12. For all the reasons set forth above, this argument

                                         16                          3:22-CV-01616-AGS-DDL

fails. Plaintiff was not yet aware of the pattern of racketeering activity preceding, parallel to, and ongoing involving CLC. Supplement, p. 3, ¶ 13, pp. 30-31, Predicate Acts #1-3. The State Bar of California had not yet publicly conceded to its own corruption through bribery of public employees on March 10, 2023. Id., p. 3, ¶¶ 11-12. Plaintiff had not yet deduced similar practices by CLC involving The State Bar of California and local law enforcement, which corruption is foundational to every claim. Supplement, p. 3, ¶ 15. Nor had he deduced CLC's role in a broader alleged criminal enterprise. Id., p. 10, ¶¶ 51-2.

Further, as we learned in *Living Designs, Inc. v. E.I. Dupont De Nemours and Co.*, 431 F.3d 353 (9th Cir. 2005), a criminal enterprise can be formed by a law firm and persons working with that law firm – here, Scudder. This is why Plaintiff seeks the value of that judgment allegedly procured by racketeering. Supplement, p. 50, ¶ 228 ($13,482.18 damages, $40,446.54 treble damages).

Movants once more indirectly contend that The State Bar of California grants license for KJC, NMC, BW, TJO to conduct racketeering through CLC. Where each were disqualified by the trial court, upheld by Court of Appeal, for representing adverse interests in the same or substantially related matters – they want this Court to ignore that KJC continues to represent the same persons in this Court. Cal. Rul. Prof. Cond. 1.7(d)(3). They also want the Court to ignore they refiled fraudulent claims lacking standing or probable cause targeting Plaintiff after they were adjudicated and rejected "with every fiber of [Court's] being." Supplement, p. 7, ¶ 41 (10:13). They want to the Court to ignore they assumed the role of counsel for two inanimate corporate entities they were suing directly and derivatively as if that were legal (MFS, CTI). Id., pp. 7-8, ¶ 44. They want the Court to ignore KJC, somehow counsel now, is *adverse to Scudder*. SAC, p. 13, ¶¶ 71-2.

Subject of collateral estoppel: Roger Root is not, and never was, a shareholder of MFS nor CTI. Supplement, p. 5, ¶ 29. MFS is not, and never was a shareholder of CTI. Id., p. 7, ¶ 41 (10:13). Plaintiff made a *prima facie* case for three counts of malicious prosecution before learning of corruption at The State Bar of California, and before California State Auditor 2022-030 was released. Id., p. 3, ¶¶ 11-15. KJC, NMC, BW, TJO are expressly forbidden (upheld by Court of Appeal) from representing Cooper, Higgerson, Zakhireh, Duffy, and Scudder. Supplement, p. 3, ¶ 9-11. Yet here we are again.

//

//

6. <u>Due Process Right to Pursue Genuine Claims Lying in RICO, Corruption, Antitrust</u>

In *Diaz v. Gates*, the divided *en banc* 9th Circuit held that a plaintiff's pecuniary loss was a discrete "injury to business or property" that was not derivative of personal injuries suffered due to wrongful detention (akin to three counts of malicious prosecution against Plaintiff). The court rejected the defendant's argument that a RICO cause of action is only available to remedy injuries to business or property interests that are the direct target of the predicate acts. *Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005). None of Plaintiff's malicious prosecution claims allege bribery of public officials, nor do they discuss Plaintiff's other company destroyed, nor did they allege violations of 18 U.S.C. § 1962(a)-(d). The do not cite related conduct of CLC enterprise or convictions involving State Bar Enterprise.

Movants argue CLC can file six fraudulent cases on behalf of directly adverse parties while pursuing nine putative class actions for a lead plaintiff Richard Carlson who did not seek counsel, and didn't believe he suffered damages, and solicited at his home – but Plaintiff can't pursue his genuine claims in parallel, unresolved cases with varied legal theories. This is, for lack of a better term, hogwash.

Movants have not even answered Plaintiff's malicious prosecution case; indeed, they contend that he can't even state a claim on demurrer scheduled for June 2023 (for an action filed May 26, 2020). RJN, Ex. 2. They further contend "Kenneth Catanzarite, Catanzarite Law Corporation, Brandon Woodward, Tim James O'Keefe's due process rights to present a defense would be violated by inability to disclose their client's confidential information" *for their own conflicts, here.* RJN, Ex. 2, p. 3 (19:23).

[1] It is clearly established that a party may not split up a <u>single cause of action</u> and make it the basis of separate suits, and in such case the first action may be pleaded in abatement of any subsequent suit on the same claim. (1 C.J.S. § 102, p. 1306; *Quirk v. Rooney*, 130 Cal. 505 [62 P. 825]; *Bingham v. Kearney*, 136 Cal. 175 [68 P. 597]; *Palodini v. Municipal Markets Co.*, 185 Cal. 672 [200 P. 415].) [2] The **[24 Cal. 2d 895]** rule against splitting a cause of action is based upon two reasons: (1) That the defendant should be protected against vexatious litigation; and (2) that it is against public policy to permit litigants to consume the time of the courts by relitigating matters already judicially determined, or by asserting claims which properly should have been settled in some prior action. Thus, it is said in *Bingham v. Kearney*, supra, at page 177: "It is not the policy of the law to allow a new and different suit

1    between the same parties, concerning the same subject-matter, that has already been litigated; neither

2    will the law allow the parties to trifle with the courts by piecemeal litigation."

3         The public should have been protected from vexatious litigation and fraudulent schemes filed by

4    CLC over more than a decade, but The State Bar of California protects CLC actors due to alleged

5    corruption and bribery. Indeed, had The State Bar of California performed its duty, KJC, BW, TJO,

6    NMC would have been disbarred well before Plaintiff was ever targeted. Cal. Bus. & Prof. Cod. 6068.

7         Plaintiff's two federal cases provide different legal theories for recovery, and Plaintiff alleges all

8    his State claims are compromised in Orange County Superior Court. Racketeering, conspiracy, and

9    control of a RICO enterprise have not been judicially determined yet. What has been determined: The

10   State Bar of California admitted to its own corruption as of March 10, 2023, which supports by a

11   preponderance (or at least provides foundation) that Plaintiff is similarly victimized since he had already

12   alleged bribery by CLC actors before this express admission of guilt by the non-sovereign regulator.

13        It should be clear by now why Movants (and State, State Bar) prefer Plaintiff's claims remain in

14   Orange County Superior Court, where The State Bar of California's alleged corruption reigns supreme.

15   **IV.    CONCLUSION**

16        RICO, antitrust, and anti-corruption laws upon which Plaintiff's claims rely in this case and its

17   related case act as prior statutory restraints upon Movants' conduct and speech inside and outside of

18   Courts. RJN, Ex. 1, p. 388. Put differently, Movants are free to use public and non-public forums for

19   free speech, but that does not estop claims for the same conduct which are subject to strict scrutiny.

20   Litigation privilege does not extend to violations of statutes more specific than the privilege itself, here.

21        KJC, BW, TJO, NMC, and CLC are held to a higher standard for their speech and conduct (not

22   a lesser standard), which standard is governed as a matter of law by California Rules of Professional

23   Conduct *and* RICO, antitrust. A license from The State Bar of California, while it may appear so to the

24   public at this unfortunate point in time in United States and California history, is not a license to

25   racketeer and defraud non-attorneys or financial institutions inside or outside of Court. California law

26   expressly holds the litigation privilege does not reach conduct involving attorney deceit and fraud, and

27   the 9th Circuit does not preclude RICO charges against attorneys, or the public employees allegedly

28   bribed by them within a protection racket.

Named after the curly wigs worn by British judges, "Operation Greylord" was one of the most important cases in the annals of public corruption investigations in the United States. "And in the end—through undercover operations that used honest and very courageous judges and lawyers posing as crooked ones and with the strong assistance of the Cook County court and local police—92 officials were indicted, including 17 judges, 48 lawyers, eight policemen, 10 deputy sheriffs, eight court officials, and one state legislator. Nearly all were convicted, most of them pleading guilty. It was an important first step to cleaning up the administration of justice in Cook County." The RICO enterprise can be the court system itself amidst "litigation activity." *United States v. Murphy*, 768 F.2d 1518. RJN, Ex. 3.

The citizens of the United States require protection from The State Bar of California and attorneys like those associated with Catanzarite Law Corporation and Girardi-Keese. Whether Operation Greylord Volume II is currently underway in California or not, the conduct to which Plaintiff and other innocent people have been subject is not legal through any lens but those of active market participants and racketeer peers. The very fabric of our society relies upon an independent judiciary, but California Courts are unfortunately compromised. Plaintiff recognizes his Honor didn't sign up to hear this case, but hear it he must, impartially.

For the foregoing reasons, Movants' Motion to Dismiss must be denied, and Catanzarite Law Corporation (and each of its past and current actors KJC, NMC, BW, TJO, Anderton, and Tice) should be disqualified from representing their alleged conspirators Scudder, Cooper, Higgerson, O'Connor, Zakhireh, and Duffy. KJC, TJO, and BW already frivolously asserted in State Court their own conflict violates *their* due process rights. The Court can expect more of the same to obstruct this proceeding.

Respectfully Submitted,

April 2, 2023,

_____

Justin S. Beck, Opposing Party, Plaintiff

**PROOF OF SERVICE**

I, Brian Bargabus, hereby declare that I am over 18 years of age and am not a party to this action, and that my address is 3501 Roselle St., Oceanside, CA 92056.

On April 3, 2023, I served one copy of the following documents:

**PLAINTIFF JUSTIN S. BECK'S OPPOSITION TO DEFENDANTS KENNETH J. CATANZARITE, CATANZARITE LAW CORPORATION, BRANDON WOODWARD, TIM JAMES O'KEEFE, AMY JEANETTE COOPER, CLIFF HIGGERSON, MOHAMMED ZAKHIREH, RICHARD FRANCIS O'CONNOR, JR., JAMES DUFFY, ANTHONY B. SCUDDER, AND NICOLE M. CATANZARITE-WOODWARD MOTION TO DISMISS SECOND AMENDED COMPLAINT; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES; REQUEST FOR JUDICIAL NOTICE**

Participants in the case who are registered CM/ECF users will be served when these papers are filed with the Court.

*See the CM/ECF service list.*

Electronic service is scheduled for delivery April 3, 2023, to the following email addresses:

| | |
|---|---|
| Corey Amundson | corey.amundson@usdoj.gov |
| Todd Gee | todd.gee@usdoj.gov |
| Robert Heberle | Robert.heberle@usdoj.gov |
| Sean Mulryne | sean.mulryne@usdoj.gov |
| U.S. Attorney's Office | efile.dkt.civ@usdoj.gov |

By electronic mail by personally transmitting a true copy thereof via an electronic email service connected to the internet, addressed to the email address listed above [X].

I declare the foregoing to be true under penalty of perjury under the laws of the State of California and United States. I am signing this from Oceanside, California on April 3, 2023.

_____
Brian Bargabus, Declarant

21                                    3:22-CV-01616-AGS-DDL

1 Justin S. Beck
  3501 Roselle St.,
2 Oceanside, CA 92056
  760-449-2509
3 justintimesd@gmail.com
4 *In Propria Persona*

```
                                   FILED

                                 APR 0 3 2023

                        CLERK, U.S. DISTRICT COURT
                      SOUTHERN DISTRICT OF CALIFORNIA
                      BY                      DEPUTY
```

5

6   **IN THE UNITED STATES DISTRICT COURT**
   **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

7

8 JUSTIN S. BECK,      )   Case No.: 8:22-CV-01616-AGS-DDL
            )
9    Plaintiffs,    )   Judge: Hon. Andrew G. Schopler
            )
10  vs.       )   **REQUEST FOR JUDICIAL NOTICE IN**
            )   **SUPPORT OF PLAINTIFF JUSTIN S.**
11 CATANZARITE LAW CORPORATION; )   **BECK'S OPPOSITION TO**
 STATE OF CALIFORNIA; THE STATE BAR )   **DEFENDANTS KENNETH J.**
12 OF CALIFORNIA; ORANGE COUNTY )   **CATANZARITE, CATANZARITE LAW**
 SUPERIOR COURT; ORANGE COUNTY )   **CORPORATION, BRANDON**
13 DISTRICT ATTORNEY'S OFFICE; RUBEN )   **WOODWARD, TIM JAMES O'KEEFE,**
 DURAN, ESQ.; SUZANNE CELIA )   **AMY JEANETTE COOPER, CLIFF**
14 GRANDT, ESQ.; RICHARD FRANCIS )   **HIGGERSON, MOHAMMED**
15 O'CONNOR, JR.; MOHAMMED )   **ZAKHIREH, RICHARD FRANCIS**
 ZAKHIREH; JAMES DUFFY; KENNETH )   **O'CONNOR, JR., JAMES DUFFY,**
16 CATANZARITE, ESQ.; JIM TRAVIS TICE, )   **ANTHONY B. SCUDDER, AND NICOLE**
17 ESQ.; NICOLE MARIE CATANZARITE )   **M. CATANZARITE-WOODWARD**
 WOODWARD, ESQ.; BRANDON )   **MOTION TO DISMISS SECOND**
18 WOODWWARD, ESQ.; TIM JAMES )   **AMENDED COMPLAINT**
19 O'KEEFE, ESQ.; AMY JEANETTE )
 COOPER; CLIFF HIGGERSON; ELI DAVID )
20 MORGENSTERN, ESQ.; LEAH WILSON, )   Filed concurrently with:
21 ESQ.; ROBERT GEORGE RETANA, ESQ.; )
 ELLIN DAVTYAN, ESQ.; JOHN C. )    Opposition to Motion to Dismiss
22 GASTELUM; JORGE E. NAVARETTE; )
23 GEORGE SARGENT CARDONA, ESQ.; )    Memorandum of Points and Authorities
 ANTHONY B. SCUDDER )
24         )
25    Defendants,  )
            )
26 UNITED STATES ATTORNEY GENERAL; )
 UNITED STATES OF AMERICA )
27         )
28    Nominal Defendants )
            )

              1       8:22-CV-01616-AGS-DDL

1  **TO DEFENDANTS, DEFENDANTS ACTING AS DEFENSE COUNSEL AND**
2  **DEFENSE LAW FIRM CONCURRENTLY, AND THEIR ATTORNEYS OF RECORD:**

3      **PLEASE TAKE NOTICE** that pursuant to Federal Rule of Evidence 201, Plaintiff Justin S.
4  Beck will and hereby does request this Court take judicial notice of the following documents in
5  opposition to Defendants Kenneth J. Catanzarite, Catanzarite Law Corporation, Brandon Woodward,
6  Tim James O'Keefe, Amy Jeanette Cooper, Cliff Higgerson, Mohammed Zakhireh, Richard Francis
7  O'Connor, Jr., James Duffy, Anthony B. Scudder, and Nicole M. Catanzarite Woodward Motion to
8  Dismiss ("Motion to Dismiss") Second Amended Complaint ("SAC").

9      1. "The Structure of Modern Free Speech Doctrine: Strict Scrutiny, Intermediate Review, and
10  "Reasonableness Balancing" Elon Law Review, Vol. 8: 291. R. Randall Kelso, Spurgeon E. Bell
11  Distinguished Professor of Law, South Texas College of Law/Houston" a true and correct copy of which
12  is attached hereto as Exhibit 1. Exhibit 1 is cited in Plaintiff's opposition to the Motion to Dismiss, and
13  the issues presented are "not subject to reasonable dispute because [the article and contents]…(2) can
14  be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."
15  F.R. Evid. 201(b). (Attorney fraud, crimes are not protected activity in the United States).

16      2. "Amended Notice of Defendants Kenneth Catanzarite, Catanzarite Law Corporation, Brandon
17  Woodward, Tim James O'Keefe, Amy Jeanette Cooper, Cliff Higgerson, Mohammed Zakhireh, Richard
18  Francis O'Connor, Jr., James Duffy, TGAP Holdings, LLC, and Mobile Farming Systems, Inc.
19  Demurrer to Complaint" a true and correct copy of which is attached hereto as Exhibit 2, with a page
20  from the demurrer in which it is asserted "Kenneth Catanzarite, Catanzarite Law Corporation, Brandon
21  Woodward, Tim James O'Keefe's due process rights to present a defense would be violated by inability
22  to disclose their client's confidential information" due to their own conflicts of interest. These were filed
23  in Orange County Superior Court, where "[a] trial court may presume that public records are authentic
24  and trustworthy." *Gillbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999).

25      3. "Operation Greylord" a true and correct summary of which is attached hereto as Exhibit 3,
26  which is a public record available from https://www.fbi.gov/history/famous-cases/operation-greylord.
27  In Operation Greylord amidst RICO allegations, "92 officials were indicted, including 17 judges, 48
28  lawyers, eight policemen, 10 deputy sheriffs, eight court officials, and one state legislator."

4. Plaintiff's RICO Case Statement filed at Docket #50, pp. 1-144 in the instant case as it relates to the Motion to Dismiss asserting Plaintiff's claims lack clarity or specificity. This is a public record and filing in the Court accepted by the Clerk. This document is a supplement to the Second Amended Complaint subject of the Motion to Dismiss the SAC.

Rule 201 of the Federal Rules of Evidence authorizes a Court to take judicial notice of a fact that is not subject to reasonable dispute because the fact "is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

"A trial court may presume that public records are authentic and trustworthy." *Gillbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999).

Plaintiff's RICO case statement and supplement is an extension of the SAC. *Miranda v. Ponce Federal Bank*, 948 F.2d 41, 44 n.3 (1st Cir. 1991)

For the foregoing reasons, Plaintiff requests this Court take judicial notice of <u>Exhibit 1</u>, <u>Exhibit 2</u>, <u>Exhibit 3</u>, and Plaintiff's RICO Case Statement and supplement to SAC at Docket #50.

Dated:        April 2, 2023                           Respectfully Submitted,

Justin S. Beck, In Pro Per

3                                   8:22-CV-01616-AGS-DDL

EXHIBIT 1
RJN

# THE STRUCTURE OF MODERN FREE SPEECH DOCTRINE: STRICT SCRUTINY, INTERMEDIATE REVIEW, AND "REASONABLENESS" BALANCING

R. Randall Kelso[*]

## I. Introduction

The structure of modern First Amendment free speech doctrine—modern defined in this Article as beginning with the Warren Court in 1954—has evolved consistent with the more formalized structure of doctrine under modern Equal Protection and Due Process review. That doctrine involves more explicit use of strict scrutiny, intermediate review, "reasonableness" balancing, and minimum rationality review.[1] Because free speech doctrine involves the "fundamental" right of speech,[2] modern free speech doctrine does not use minimum rationality review, applicable to cases of social or economic regulation not involving fundamental rights under the Equal Protection or Due Process Clauses.[3] Instead, the lowest level of free speech protection the Court uses is a "reasonableness" balancing test similar to the "reasonableness" balancing test implemented under the Due Process Clause for less than substantial burdens on unenumerated fundamental rights, such as the right to vote involved in ballot access cases, the right to marry, the right to travel, the right of access to courts, and

---

[*] Spurgeon E. Bell Distinguished Professor of Law, South Texas College of Law/Houston. B.A., 1976, University of Chicago; J.D., 1979, University of Wisconsin-Madison.

[1] *See infra* text accompanying notes 16, 19–23, 42 (strict scrutiny); 15, 24–42 (intermediate review); 43, 102–15 ("reasonableness balancing"); 43, 101 (minimum rationality review).

[2] Since 1925, in *Gitlow v. New York*, 268 U.S. 652 (1925), the Court has consistently viewed the First Amendment freedom of speech as a "fundamental right." *Id.* at 666–70.

[3] *See infra* text accompanying note 101 (discussing Heller v. Doe, 509 U.S. 312 (1993)).

(291)

reproductive rights cases involving contraception and abortion.[4] As discussed in Part II, for regulations of free speech in a public forum or on individual private property, the Court uses strict scrutiny for content-based regulations of speech and intermediate review for content-neutral regulations.[5] As discussed in Part III, for regulations of speech in a government-owned, non-public forum, or speech supported by government grants or subsidies, the Court uses strict scrutiny for viewpoint discrimination, and "reasonableness" balancing for subject-matter and content-neutral regulations.[6] In some cases, certain kinds of speech do not trigger free speech protection at all. As discussed in Part IV, this includes cases of government speech or regulations of alleged symbolic speech that are viewed as involving conduct only.[7] Other kinds of speech, like advocacy of illegal conduct, fighting words, or obscenity, get limited free speech protection: strict scrutiny for viewpoint discrimination, but otherwise no free speech review, as discussed in Part V.[8] As discussed in Part VI, content-based regulations of certain kinds of speech in a public forum trigger less than strict scrutiny review. This can involve regulations of commercial speech, speech by government employees on matters of public concern, or alleged tortious speech, such as defamation or invasion of privacy, among others.[9] Free speech doctrines involving prior restraints, injunctions, vagueness, substantial overbreadth, and other such matters are discussed in Part VII.[10] Part VIII provides a brief conclusion.

---

[4] *See infra* text accompanying notes 102–15; R. Randall Kelso, *The Structure of* Planned Parenthood v. Casey *Abortion Rights Law: "Strict Scrutiny" for "Substantial Obstacles" on Abortion Choice and Otherwise "Reasonableness Balancing"*, 34 Quinnipiac L. Rev. 75, 90–111 (2015).

[5] *See infra* text accompanying notes 11–69.

[6] *See infra* text accompanying notes 71–154.

[7] *See infra* text accompanying notes 155–203 (discussing, *inter alia*, Rust v. Sullivan, 500 U.S. 173 (1991) (government speech) and Dallas v. Stanglin, 490 U.S. 19 (1989) (conduct only)).

[8] *See infra* text accompanying notes 204–430, (discussing, *inter alia*, R.A.V. v. City of St. Paul, 505 U.S. 377 (1992) (viewpoint discrimination); Miller v. California, 413 U.S. 15 (1973) (obscene speech); Brandenburg v. Ohio, 395 U.S. 444 (1969) (advocacy of illegal conduct); Chaplinsky v. New Hampshire, 315 U.S. 568 (1942) (fighting words)).

[9] *See infra* text accompanying notes 431–603 (discussing, *inter alia*, Bartnicki v. Vopper, 532 U.S. 514 (2001) (invasion of privacy); Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557 (1980) (commercial speech); Pickering v. Bd. of Educ. of Will Cty., 391 U.S. 563 (1968) (government workers); N.Y. Times Co. v. Sullivan, 376 U.S. 254 (1964) (defamation)).

[10] *See infra* text accompanying notes 603–700.

## II. Free Speech Doctrine in Public Forums or on Individual Private Property

### A. *Introduction to Standard Free Speech Doctrine*

Regulations of speech that involve viewpoint discrimination are given strict scrutiny review no matter where the speech occurs.[11] Strict scrutiny also applies in a public forum or on private property for content-based, subject-matter regulations of speech not involving viewpoint discrimination.[12] In contrast, regulations of speech in a public forum or on private property that are content neutral are given intermediate review.[13] This intermediate standard was stated in *Ward v. Rock Against Racism*, where Justice Kennedy wrote for the Court:

> Our cases make clear, however, that even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of information."[14]

These standards track strict scrutiny and intermediate review under Equal Protection and Due Process Clause doctrine. Under intermediate review, the government must prove the government action: (1) advances important/significant/substantial government ends; (2) is substantially related to advancing those ends; and (3) is not substantially more burdensome than necessary to advance those ends.[15]

---

[11] *See, e.g.,* Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 393–94 (1993) (addressing strict scrutiny in limited public forum opened to the public); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 48–49 (1983) (addressing strict scrutiny for viewpoint discrimination even in a non-public forum); *R.A.V.,* 505 U.S. at 385–92 (discussing viewpoint discrimination triggers strict scrutiny even in a case involving regulation of fighting words).

[12] *See, e.g.,* United States v. Alvarez, 567 U.S. __, __, 132 S. Ct. 2537, 2548–51 (2012) (discussing the Stolen Valor Act).

[13] *See* Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).

[14] *Id.* (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)).

[15] *See generally* Erwin Chemerinsky, Constitutional Law: Principles and Policies 695 (4th ed. 2011) ("Under intermediate scrutiny, a law is upheld if it is substantially related to an important government purpose . . . . The means used need not be necessary, but must have a 'substantial relationship' to the end being sought."); *see also* 2 Charles D. Kelso & R. Randall Kelso, American Constitutional Law: An E-Coursebook 911–17 & nn.12–15, 22–24 & 28 (2015) (ebook), http://libguides.stcl.edu/kel somaterials [hereinafter 2 Kelso & Kelso, American Constitutional Law]. For the requirement of an "important/significant/substantial" interest at intermediate review, higher than a mere "legitimate/permissible" interest at minimum rationality review or reasonableness balancing, see United States v. Virginia, 518 U.S. 515, 533 (1996) (discussing intermediate review used for gender discrimination, the Court noted: "The

3:22-CV-01616-AGS-DDL

Opp. to Motion to Dismiss RJN Ex. #1: 003

*Elon Law Review* [Vol. 8: 291

Under strict scrutiny, the statute must: (1) advance compelling or over-riding government ends; (2) be directly and substantially related to advancing those ends; and (3) be the least restrictive, effective means to advance the ends.[16] The Court often phrases the last two parts of

---

State must show 'at least that the [challenged] classification serves "*important* governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives." '") (emphasis added) (citations omitted)); *Clark*, 468 U.S. at 293 (discussing intermediate review applicable to content-neutral time, place, or manner regulations under the First Amendment free speech doctrine, the Court noted: "[R]estrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a *significant* governmental interest, and that they leave open ample alternative channels for communication of the information") (emphasis added)); *id.* at 294 ("Symbolic expression of this kind may be forbidden or regulated if the conduct itself may constitutionally be regulated, if the regulation is narrowly drawn to further a *substantial* governmental interest, and if the interest is unrelated to the suppression of free speech.") (emphasis added)); Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 566 (1980) (discussing the intermediate review level of interest necessary in commercial speech cases, the Court stated,"[W]e ask whether the asserted government interest is *substantial*") (emphasis added)).

[16] *See* CHEMERINSKY, *supra* note 15, at 695 ("Under strict scrutiny a law is upheld if it is proved necessary to achieve a compelling government interest. The government . . . must show that it cannot achieve its objective through any less discriminatory alternative."); *see also* 2 KELSO & KELSO, AMERICAN CONSTITUTIONAL LAW, *supra* note 15, at 911–17 & nn.1–11, 15–22 & 25–28. For discussion of the strict scrutiny requirement of a "compelling/overriding" interest to regulate, see Fisher v. Univ. of Tex. at Austin, 570 U.S. __, __, 133 S. Ct. 2411, 2419 (2013) ("Strict scrutiny is a searching examination, and it is the government that bears the burden to prove . . . [its] 'classifications are constitutional only if they are narrowly tailored to further compelling governmental interests.'") (emphasis added) (citations omitted)); Loving v. Virginia, 388 U.S. 1, 11 (1967) (applying strict scrutiny to a ban on interracial marriage, the Court noted: "There is patently no legitimate overriding purpose independent of invidious racial discrimination which justifies this classification") (emphasis added). Because the regulation must be "necessary" to advance the government's ends under strict scrutiny, this means "unnecessary" underinclusiveness will render the regulation unconstitutional. Phrased in the affirmative, the regulation must adopt, to the extent possible, means that "directly advance" the government ends, not merely "substantially advance" those ends, as at intermediate review. Otherwise, the regulation is not "precisely tailored" enough. It is clear that this requirement of a "direct relationship" exists at strict scrutiny. Commercial speech cases involve a less rigorous form of scrutiny than strict scrutiny, as discussed *infra* text accompanying notes 511–24. Yet the Court has stated that for commercial speech regulation, under *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 566, the regulation must "directly advance the government's interest." Since a "direct relationship" is required in commercial speech cases, *a fortiori* such a requirement exists at strict scrutiny. *See generally Alvarez*, 567 U.S. at __, 132 S. Ct. at 2549 (Kennedy, J.) (plurality opinion) ("The First Amendment requires that the Government's chosen restriction on the speech at issue be 'actually necessary' to achieve its interest. There must be a direct causal link between the restriction imposed and the injury to be prevented.") (citation omitted)).

strict scrutiny as requiring the statute or regulation be "precisely tailored" or "necessary"; for intermediate review, the last two prongs are often phrased as the statute or regulation must be "narrowly drawn."[17] But sometimes the Court uses the phrase "narrowly drawn" even under strict scrutiny.[18] Predictability would be aided, of course, if the Court would reserve the term "narrowly drawn" for intermediate review, and consistently use the term "necessary" or "precisely tailored" for strict scrutiny.

The various levels of scrutiny used in modern free speech doctrine—strict scrutiny, intermediate review, and "reasonableness balancing"—are summarized in the following Table:

LEVELS OF REVIEW FOR PROTECTED SPEECH

| | **Public Forum or Private Property** (Discussed in Part II.B of this Article) | **Non-Public Forum Owned by the Government** (Discussed in Part III of this Article) | **Speech with Limited Free Speech Protection** (Discussed in Part V of this Article) |
|---|---|---|---|
| Content-Based Regulation of Speech: Viewpoint Discrimination | Strict Scrutiny | Strict Scrutiny | Strict Scrutiny |
| Content-Based Regulation of Speech: Subject-Matter Discrimination | Strict Scrutiny | Reasonableness Balancing | No Further Free Speech Review |
| Content-Neutral Regulation of Speech | Intermediate Review | Reasonableness Balancing | No Further Free Speech Review |

[17] *Cf.* Austin v. Mich. Chamber of Commerce, 494 U.S. 652, 666 (1990) ("precisely tailored to serve [a] compelling state interest"); Palmore v. Sidoti, 466 U.S. 429, 432 (1984) ("necessary"); Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 299 (1978) (Powell, J., announcing the judgment of the Court) ("precisely tailored") *with* Bd. of Tr. of the State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989) ("narrowly drawn" at intermediate review).

[18] *See* Adarand Constructors, Inc. v. Peña, 515 U.S. 200, 235 (1995) ("narrowly drawn"); Boos v. Barry, 485 U.S. 312, 317 (1988) ("narrowly drawn"); United States v. Grace, 461 U.S. 171, 177 (1983) ("narrowly drawn").

B. *Strict Scrutiny and Intermediate Review in Public Forum*
*or Private Property Regulation*

In 1991, in *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board*, the Court adopted a strict scrutiny approach to content-based regulations of speech.[19] As the Court stated in *Simon & Schuster*, to justify its "content-based" regulation of speech, "the State must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end."[20] Justice Kennedy, in his concurring opinion, noted that this adoption of the Equal Protection strict scrutiny approach in a First Amendment case was not required by prior precedents, and that while "the compelling interest inquiry has found its way into our First Amendment jurisprudence of late . . . the Court appears to have adopted this formulation in First Amendment cases by accident rather than as the result of a considered judgment."[21] In contrast to this approach, Justice Kennedy preferred Justice Black's absolutist approach, which would prevent the state from enacting any content-based regulation of fully protected speech, without regard to a compelling governmental interest analysis.[22] The majority of the Court in the modern era has consistently rejected Justice Kennedy's views,[23] and applied a strict scrutiny analysis to content-based regulations of speech.

The use of intermediate scrutiny for content-neutral regulations of symbolic speech or reasonable time, place, or manner regulations of speech is best illustrated in the 1989 case of *Ward v. Rock Against Racism*.[24] Previously, in 1968, in *United States v. O'Brien*,[25] the Court had upheld the conviction of a protester who had violated federal law by burning his draft card on the steps of a courthouse as part of a demonstration against the Vietnam War.  Chief Justice Warren stated:

> [A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the

---

[19] 502 U.S. 105, 117–18 (1991).
[20] *Id.* at 106.
[21] *Id.* at 125 (Kennedy, J., concurring).
[22] *Id.* at 124–25.
[23] *See, e.g.*, Republican Party of Minn. v. White, 536 U.S. 765, 774–75 (2002) (applying strict scrutiny); *id.* at 793 (Kennedy, J., concurring) ("I adhere to my view, however, that content-based speech restrictions that do not fall within any traditional exception should be invalidated without any inquiry into narrow tailoring or compelling governmental interests.").
[24] 491 U.S. 781 (1989).
[25] 391 U.S. 367, 369–72 (1968).

suppression of free expression, and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.[26]

The *O'Brien* principle—although framed in the context of a regulation applied to a content-neutral regulation of symbolic speech—was extended in 1984 by *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, to time, place, and manner regulations.[27] The Court upheld a Los Angeles ordinance that prohibited the posting of signs on public property.[28] The challengers were supporters of a candidate for the City Council whose posters were removed from utility poles by city employees.[29] To justify the ordinance, the city said the law protected its interests in beauty, the safety of workers who must climb poles, and eliminated traffic hazards.[30] The Court pointed out that the ordinance was a content-neutral regulation of a certain manner of communication, and the relevant standard for review was thus set forth in *United States v. O'Brien*.[31] In both *O'Brien* and *Vincent*, however, the *O'Brien* test was not explicitly phrased as an intermediate standard of review.[32]

In *Ward*, the Court defined the *O'Brien* test more explicitly in intermediate terms.[33] The Court held in *Ward* that New York City did not deprive musicians of free speech rights by insisting that bandshell performers in Central Park use sound-amplification equipment and a sound technician provided by the city.[34] For the Court, Justice Kennedy held that the regulation was content neutral because two of its justifications (controlling noise in the park and avoiding undue intrusion into residential areas) had nothing to do with content, and that under the *O'Brien* test (1) the city's interest was substantial in that inadequate sound application had an adverse effect on the audience, and (2) the city had a substantial interest in limiting the sound emanating from the bandshell.[35]

Justice Kennedy next held that the court of appeals erred in drawing on *O'Brien* for a least intrusive means requirement, which the

---

[26] *Id.* at 377.
[27] 466 U.S. 789, 803–05 (1984).
[28] *See id.*
[29] *Id.* at 792.
[30] *Id.* at 794.
[31] *Id.* at 804–05.
[32] *See Vincent*, 466 U.S. at 817; United States v. O'Brien, 391 U.S. 367, 382 (1968).
[33] *See* Ward v. Rock Against Racism, 491 U.S. 781, 797–98 (1989).
[34] *See id.*
[35] *Id.* at 791–97.

Court uses for strict scrutiny analyses, since the Supreme Court had already made clear that there is little, if any, difference between the *O'Brien* test and the usual rule for time, place, or manner regulations, which does not require the least intrusive means.[36] Justice Kennedy said, "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so."[37] In sum, a content-neutral regulation of speech cannot burden substantially more speech than necessary to further the government's substantial interests, nor can it place a substantial burden on speech by failing to "leave open ample alternative channels of communication."[38] It has become commonplace, as stated in the 2002 case of *City of Los Angeles v. Alameda Books, Inc.*, that regulations of speech "receive only intermediate scrutiny if they are content neutral."[39]

Consistent with the standards of review under Equal Protection and Due Process, under strict scrutiny, the content-based reasons must be *actual* government purposes to be considered by a court.[40] Under intermediate review, the content-neutral reasons must be for *actual or plausible* government purposes.[41] For restrictions on free speech in a non-public forum that trigger reasonableness review, any *conceivable* content-neutral reason for a regulation can be used.[42] Naturally, *illegitimate interests* for regulation cannot be used at strict scrutiny, intermediate review, reasonableness review, or minimum rationality review, nor

---

[36] *Id.* at 797–98.

[37] *Id.* at 798.

[38] *Id.* at 799, 803.

[39] 535 U.S. 425, 440 (2002).

[40] *See generally* 3 CHARLES D. KELSO & R. RANDALL KELSO, THE PATH OF CONSTITUTIONAL LAW 1101–04 & nn.85–99 (2007) (ebook), http://libguides.stcl.edu/kelsomaterials [hereinafter 3 KELSO & KELSO, THE PATH OF CONSTITUTIONAL LAW] (discussing the burden of proof and what governmental interests can be considered under the different standards of review).

[41] *See generally id.* (citing, *inter alia*, Edwards v. Aguillard, 482 U.S. 578, 594 (1987) (discussing "actual" purpose only used at strict scrutiny); Michael M. v. Superior Court, 450 U.S. 464, 470 (1981) (addressing how the "actual" purpose or purpose which "could have plausibly motivated an impartial legislature" can be used at intermediate review)).

[42] 3 KELSO & KELSO, THE PATH OF CONSTITUTIONAL LAW, *supra* note 40, at 1101 & nn.83–84 (citing Heller v. Doe, 509 U.S. 312, 320 (1993); U.S. R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 179 (1980)).

can *illegitimate pretexts* be a permissible basis for regulation, as discussed in *McCulloch v. Maryland.*[43]

It has been argued that the Court in "dual motive" cases (i.e., there is both a content-neutral and content-based justification for the regulation) should embrace a suggestion by Justice Stevens and determine what is the predominant motive of the regulation considering the "content, character, context, nature, and scope" of the regulation.[44] However, the better approach is to recognize that the discussion in the Court's "dual motive" cases regarding the content-neutral aspect of the regulation is focused on whether the content-neutral reason is an *actual or plausible* purpose of the government action, or merely a *pretext* to justify content-based discrimination.[45] If it is a *pretext,* then only strict scrutiny will be applied to the content-based reason for the regulation. If the content-neutral reason is an *actual* or *plausible* purpose, then intermediate review will be applied to that content-neutral reason for regulating, while strict scrutiny will be applied to the content-based reason. As with all constitutional cases, if the government has one reason to act, then the government action is constitu-

---

[43] 3 KELSO & KELSO, THE PATH OF CONSTITUTIONAL LAW, *supra* note 40, at 1087–88 & nn.16–21 (addressing illegitimate interests) (citing, *inter alia,* Palmore v. Sidoti, 466 U.S. 429, 433 (1984) (finding prejudice against interracial marriage not a legitimate interest); U.S. Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973) (addressing the purpose to discriminate against hippie communes as an illegitimate interest)); 2 CHARLES D. KELSO & R. RANDALL KELSO, THE PATH OF CONSTITUTIONAL LAW 708–09 & nn.31–34 (2007) (ebook) http://libguides.stcl.edu/kelsomaterials [hereinafter 2 KELSO & KELSO, THE PATH OF CONSTITUTIONAL LAW] (addressing illegitimate pretexts and discussing *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 423 (1819)); *see also* J. Randy Beck, *The Heart of Federalism: Pretext Review of Means-End Relationships,* 36 U.C. DAVIS L. REV. 407, 412–22 (2003).

[44] Wilson R. Huhn, *Assessing the Constitutionality of Laws That Are Both Content-Based and Content-Neutral: The Emerging Constitutional Calculus,* 79 IND. L.J. 801, 804–09 (2004) (citing R.A.V. v. City of St. Paul, 505 U.S. 377, 429–31 (1992) (Stevens, J., concurring)).

[45] *See* Hill v. Colorado, 530 U.S. 703, 719–25 (2000) (citing Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (stating that the "principal inquiry" is whether the regulation was adopted "because of disagreement with the message it conveys")); *see also* Reed v. Town of Gilbert, 576 U.S. __, __, 135 S. Ct. 2218, 2237 (2015) (Kagan, J., concurring) ("This Court's decisions articulate two important and related reasons for subjecting content-based regulations to the most exacting standard of review. The first is 'to preserve an uninhibited marketplace of ideas in which the truth will ultimately prevail.'" (quoting McCullen v. Coakley, 573 U.S. __, __, 134 S. Ct. 2518, 2529 (2014)); *id.* ("The second is to ensure that the government has not regulated speech 'based on hostility—or favoritism—towards the underlying message expressed.'") (quoting *R.A.V.,* 505 U.S. at 386)). Justices Ginsburg and Breyer joined Justice Kagan. *Id.* at __, 135 S. Ct. at 2236.

tional—in these cases typically the content-neutral reason. In such cases, the act is constitutional, even if the content-based reason cannot survive constitutional scrutiny.

A famous example of a "dual motive" case is *Texas v. Johnson*.[46] In this case, the majority held that a state flag desecration statute was invalid as applied to the defendant, who had burned a flag as part of a political protest.[47] The majority noted that the state's interest in banning flag burning to prevent breaches of the peace was a content-neutral reason for the regulation.[48] It thus triggered the *O'Brien* standard of intermediate review.[49] Since no breach of the peace was imminent and there was no substantial interest involved in the case, intermediate review was not met.[50] The state's second interest was an interest in preserving the flag as a symbol of nationhood and national unity.[51] The majority said that this interest was related to the suppression of expression and, thus, was content based.[52] Therefore, strict scrutiny was applied to the consideration of that interest, and the ban on flag burning was unconstitutional because "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive;"[53] the proper, less burdensome, effective alternative would be counter-speech to support the flag as a symbol of national unity.

With regard to whether a regulation is content neutral or content based, the Court muddied the waters a bit in 2015 in *Reed v. Town of Gilbert*.[54] *Reed* involved a sign code regulation that provided different sizes and lengths of posting times for signs based upon whether the sign was an "Ideological Sign," "Political Sign," or "Temporary Directional Sign Relating to a Qualifying Event."[55] Under traditional doctrine, use of intermediate review would depend on the town proving that it had "actual" or "plausible" content-neutral, substantial government interests (e.g., visual clutter, aesthetics, etc.) to justify the regulation. Concurring in the judgment, Justice Kagan noted, joined by

---

[46] 491 U.S. 397, 399 (1989).
[47] *Id.*
[48] *Id.* at 407–10.
[49] *Id.* at 407.
[50] *Id.* at 407–10.
[51] *Id.* at 410.
[52] *Id.* at 407–10.
[53] *Id.* at 414.
[54] Reed v. Town of Gilbert, 576 U.S. __, __, 135 S. Ct. 2218, 2232 (2015).
[55] *Id.* at __, 135 S. Ct. at 2224–25.

Justices Ginsburg and Breyer, that in this case, the town provided "no reason at all" and "no coherent justification" for the distinctions it drew among signs, and thus the regulation "d[id] not pass strict scrutiny, intermediate scrutiny, or even the laugh test."[56]

Contrary to this analysis, the majority in *Reed* adopted a rigid rule that if a regulation is content based "on its face," then strict scrutiny is automatically triggered.[57] As Justice Kagan's opinion noted, this is inconsistent with traditional doctrine, such as in *Renton v. Playtime Theatres, Inc.*, where zoning regulations employing "on their face" content-based regulation of "adult motion picture theaters" triggered only intermediate review because the regulation was justified, in part, by the "actual" or "plausible" secondary effects concerned with increased "crime" around such theaters, particularly prostitution and drug trafficking, and the impact such theaters have on "retail trade" and maintaining "property values."[58] It seems unlikely the majority in *Reed* would adopt strict scrutiny in a *Renton*-like case, although that is the logic of their opinion.[59]

The breadth of the *dicta* in *Reed* was mitigated by a separate concurrence listing a number of ways sign ordinances could avoid strict scrutiny.[60] Consistent with such caution, hopefully *Reed*'s approach that any use of a content distinction "on its face" triggers strict scrutiny, even where "actual" or "plausible" substantial content-neutral reasons exist, will not be extended widely. The majority opinion does counsel cities and towns to phrase any sign regulation in explicit, content-neutral terms.[61]

---

[56] *Id.* at __, 135 S. Ct. at 2239 (Kagan, J., concurring).

[57] *Id.* at __, 135 S. Ct. at 2228 (majority opinion).

[58] *Id.* at __, 135 S. Ct. at 2238 (Kagan, J., concurring) (citing Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48 (1986)).

[59] For further discussion of review in a *Renton*-like case, see 3 CHARLES D. KELSO & R. RANDALL KELSO, AMERICAN CONSTITUTIONAL LAW: AN E-COURSEBOOK 344–51 (2015) (ebook), http://libguides.stcl.edu/kelsomaterials [hereinafter 3 KELSO & KELSO, AMERICAN CONSTITUTIONAL LAW].

[60] *Reed*, 576 U.S. at __, 135 S. Ct. at 2223 (Alito, J., concurring) (analyzing an ordinance regulating size for all signs, lighted versus unlighted signs, signs on public versus private property, signs on commercial versus residential property, total number of signs, or signs advertising a one-time event).

[61] On content-based versus content-neutral regulations, see also Norton v. City of Springfield, 768 F.3d 713, 714 (7th Cir. 2014) (analyzing a city ordinance against "spoken" requests for donations, while allowing "signs," and concluding that it was content neutral based on greater coercive effect of spoken request); *id.* at 718–20 (Manion, J., dissenting) (noting that other circuits have held such ordinances are content based since regulation triggered by speaking), *rev'd on motion for reh'g*, 806 F.3d 411 (7th Cir.

In applying strict scrutiny and intermediate review in First Amendment free speech cases, it is useful to note that there are four questions regarding benefits and burdens that can be asked about any statute. Two relate to Equal Protection Clause issues (underinclusiveness and overinclusiveness), and two relate to Due Process Clause issues (service and oppressiveness/restrictiveness). Because First Amendment scrutiny addresses both Equal Protection and Due Process concerns when applied to free speech issues, both questions of benefits (underinclusiveness and service) and both questions of burdens (overinclusiveness and oppressiveness) are necessary for free speech analysis.

More precisely, in analyzing how the government is advancing its interests under the second prong of strict scrutiny and intermediate review, the Court considers both the Equal Protection Clause question of the extent to which the government action fails to regulate all individuals who are part of some problem (underinclusiveness inquiry)[62] and the Due Process Clause question of how the government action serves to achieve its benefits on those whom the action does regulate (service inquiry).[63] Similarly, under the third prong of strict scrutiny and intermediate review, the Court considers both the Equal Protection question of the extent to which the government action burdens individuals not intended to be regulated (overinclusiveness inquiry),[64] and the Due Process question of the amount of burden on individuals who are the focus of the action (oppressiveness inquiry).[65]

For example, as the Court noted in *City of Ladue v. Gilleo*, "[T]he notion that a regulation of speech may be impermissibly underinclu-

---

2015) (finding that the regulation fails strict scrutiny, now required post-*Reed v. Town of Gilbert*, since regulation distinguishes on its face based on whether content of speech is sign or verbal speech); Survivors Network of Those Abused by Priests, Inc. v. Joyce 779 F.3d 785, 793 (8th Cir. 2015) (holding a Missouri law criminalizing "profane," "rude," or "indecent behavior" outside any house of worship is content based and fails strict scrutiny as not least burdensome alternative to advance interest in protecting free exercise of religion); Saint John's Church in the Wilderness v. Scott, 296 P.3d 273, 279 (Colo. App. 2012) (finding an injunction prohibiting use of large posters depicting gruesome images of mutilated fetuses or dead bodies in a manner reasonably likely to be viewed by children attending church services constitutional under strict scrutiny).

[62] *See generally* 3 KELSO & KELSO, THE PATH OF CONSTITUTIONAL LAW, *supra* note 40, at 1088–89 & nn.25–27 (discussing Equal Protection heightened scrutiny tests).

[63] *Id.* at 1224 & nn.43, 45.

[64] *Id.* at 1089–90 & nn.28–31.

[65] *Id.* at 1224 & nn.44–45. *See generally* R. Randall Kelso, *Considerations of Legislative Fit Under Equal Protection, Substantive Due Process, and Free Speech Doctrine: Separating Questions of Advancement, Relationship and Burden*, 28 U. RICH. L. REV. 1279, 1298 (1994).

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 012

sive is firmly grounded in basic First Amendment principles."[66] As Justice Kennedy noted in *Ward v. Rock Against Racism*, a content-neutral regulation of speech cannot burden substantially more speech than necessary to further the interest (the overinclusiveness inquiry), nor can it place a substantial burden on speech that fails to leave open ample alternative channels for communication (the oppressiveness inquiry) or that do not serve to advance its goals (the service inquiry).[67] Thus, in *City of Los Angeles v. Alameda Books, Inc.,* Justice Kennedy correctly observed that free speech analysis must consider both benefits and burdens on the speech.[68] Justice Kennedy noted, "[T]he necessary rationale for applying intermediate scrutiny is the promise that zoning ordinances like this one may reduce the costs of secondary effects [the service inquiry] without substantially reducing speech [the oppressiveness inquiry]."[69]

## III. Free Speech Doctrine in Government-Owned Non-Public Fora

### A. *Distinguishing Public Fora from Non-Public Fora*

The Court applies a different standard of scrutiny to government regulations of speech in non-public fora owned by the government.[70] The leading case on which standard of review to apply in such non-public fora remains *Perry Education Ass'n v. Perry Local Educators' Ass'n.*[71] Decided in 1983, *Perry* held that a school could reserve access to an interschool mail system and teacher mailboxes to the union certified as the exclusive representative of the teachers.[72] Justice White noted that strict scrutiny applied to content-based regulations in a public forum, on public property which the state has opened for use by the public as a place for expressive activity, or for government attempts to regulate individual speech on an individual's own "non-public" private

---

[66] 512 U.S. 43, 51 (1994).

[67] 491 U.S. 781, 798–99 (1989).

[68] 535 U.S. 425, 449–50 (2002) (Kennedy, J, concurring).

[69] *Id.* at 450. For further discussion of the proper inquiry applying intermediate and strict scrutiny review in free speech cases, see generally 3 Kelso & Kelso, American Constitutional Law, *supra* note 59, at 125–28.

[70] *See, e.g.,* Int'l Society for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672 (1992); United States v. Kokinda, 497 U.S. 720 (1990); Thornburgh v. Abbott, 490 U.S. 401 (1989); Perry Educ. Ass'n v. Perry Local Educator's Ass'n, 460 U.S. 37 (1983); Brown v. Glines, 444 U.S. 348 (1980); Greer v. Spock, 424 U.S. 828 (1976); Se. Promotions, Ltd. v. Conrad, 420 U.S. 546 (1975); Adderly v. Florida, 385 U.S. 39 (1966); Cox v. Louisiana, 379 U.S. 559 (1965).

[71] 460 U.S. at 38–39.

[72] *Id.* at 55.

property.[73]  However, with regard to non-public forum property owned by the government, the state can impose time, place, or manner restrictions, and also may reserve the forum for its intended purposes, as long as the regulation on speech is "reasonable in light of the purpose which the forum at issue serves" and not an effort to suppress speech because the public officials oppose the speaker's view, i.e., viewpoint discrimination.[74]

The decision in *Perry* was based on earlier decisions involving property owned by the government not dedicated to expressive activity. For example, in *Adderley v. Florida*, a case upholding a criminal trespass conviction of demonstrators on prison grounds, Justice Black wrote, "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."[75]  Similarly, a prison can regulate speech of prisoners for reasons "reasonably related to penological objectives," as noted in *Thornburgh v. Abbott*.[76]  Similar results have been reached in cases involving regulations on military bases.[77]

Where government-owned property has been open to the public, standard free speech public forum doctrine applies.[78]  For example, in *Southeastern Promotions, Ltd. v. Conrad*, the promoters of the musical *Hair* requested to use the municipal auditorium in Chattanooga, Tennessee.[79]  The auditorium managers denied the request on the ground that the production would not be in the best interest of the community.[80]  The promoters sought an injunction, which was denied on the ground that the production was obscene.[81]  The Court reversed, holding that the production was not obscene, and the auditorium, having been dedicated to expressive activities, was a public forum.[82]  Since the theater could accommodate the production, the denial of a request

---

[73] *Id.*

[74] *Id.* at 46–49.

[75] 385 U.S. at 47.

[76] Thornburgh v. Abbott, 490 U.S. 401, 409 (1989).

[77] *See, e.g.*, Greer v. Spock, 424 U.S. 828, 836–40 (1976) (justifying the regulation on handbill distribution on military base because of concerns for military "loyalty, discipline, or morale"); Brown v. Glines, 444 U.S. 348, 354–58 (1980) (justifying the regulation of petitions on a military base).

[78] *Perry Educ. Ass'n*, 460 U.S. at 45.

[79] Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 547 (1975).

[80] *Id.* at 548.

[81] *Id.* at 548–49.

[82] *Id.* at 552.

was unconstitutional unless the minimal procedural safeguards of strict scrutiny, established in *Freedman v. Maryland*, were met.[83]

In deciding whether a government-owned forum is a public forum or non-public forum, some justices tend to focus on the government's intent, and whether the government has expressly opened the forum for public use, or whether the forum has been viewed historically or traditionally as a public forum. This approach was adopted in Chief Justice Rehnquist's majority opinion in *International Society for Krishna Consciousness v. Lee*, which concluded that the walkways in a public airport were a non-public forum.[84]  In contrast, other justices tend to focus more on whether the objective nature of the forum is "compatible" with free speech uses, as in Justice Kennedy's concurrence in *Lee*, which concluded that such walkways in a public airport were a public forum.[85]

A similar example of the two different approaches to determine what is a public or non-public forum occurred in *United States v. Kokinda*.[86]  The Court upheld a postal regulation, which forbade soliciting charitable contributions on postal premises, as applied to solicitors for the National Democratic Policy Committee who had set up a table for in-person solicitation on a sidewalk outside the post office.[87]  Justice O'Connor's plurality opinion, joined by Chief Justice Rehnquist, and Justices White and Scalia, reasoned that because the sidewalk leading to and from the post office was constructed for the purpose of entering and leaving the post office, not for general use of the public, the sidewalk was a non-public forum.[88]  The regulation barring solicitation on postal premises was constitutional as viewpoint neutral and reasonable in view of the fact that solicitation was inherently disruptive of the Postal Service's business.[89]  Justice Kennedy concurred only in the judgment, noting that "the public's use of postal property for communicative purposes means the surrounding sidewalks" may be a public forum.[90]  However, he said it was unnecessary to decide whether the sidewalk was a public or a non-public forum because the postal

---

[83] *Id.* at 552–60; *see infra* text accompanying notes 607–17 (discussing the *Freedman* standards for a prior restraint as adopting a strict scrutiny approach).

[84] 505 U.S. 672, 683 (1992).

[85] *Id.* at 698–99 (Kennedy, J., concurring).

[86] 497 U.S. 720 (1990).

[87] *Id.* at 736.

[88] *Id.* at 725.

[89] *Id.* at 732–33.

[90] *Id.* at 737.

regulations met intermediate review standards for a content-neutral time, place, and manner regulation in a public forum.[91]

Sidewalks around courthouses tend to be viewed as public forums, with limitations on demonstration, picketing, and other First Amendment activities analyzed under intermediate review, applicable to regulations advancing the content-neutral reasons of protecting the "judicial system from the pressures which picketing near a courthouse might create" to ensure "a fair trial [and] exclude influence or domination by either a hostile or friendly mob."[92] In contrast, actual courtrooms in courthouses are viewed as government-owned, non-public fora, dedicated to the business of conducting trials.[93] Thus, reasonable regulations to maintain the order and dignity of courtroom proceedings are routinely upheld.[94]

Given the current membership of the Court, a majority of justices, including Justices Kennedy, Ginsburg, Breyer, Sotomayor, and Kagan, would likely follow Justice Kennedy's approach in *Kokinda* and *Lee* to determine whether some property is a public forum or non-public forum. Consistent with this view, and reflecting on more the objective characteristics of the property approach of the Kennedy concurrence in *Lee*, lower federal courts since *Lee* have held that a private sidewalk encircling a privately owned sports arena complex, which appears like any public sidewalk and is used as a public thoroughfare, is a public forum, and that a mass transit agency's acceptance of advertisements on a wide range of topics under contracts for display in its stations and

---

[91] *Id.* at 738 (Kennedy, J., concurring). In dissent, Justice Brennan said that a sidewalk adjacent to a public building to which citizens are freely admitted is a natural location for speech to occur and, thus, is a public forum. *Id.* at 740 (Brennan, J., dissenting). Brennan added that even if strict scrutiny were not required, the regulation was not reasonable because the government did not subject to the same categorical prohibition many other types of speech presenting the same risk of disruption as solicitation, such as soapbox oratory, pamphleteering, distributing literature for free, or even flag burning. *Id.*

[92] Cox v. Louisiana, 379 U.S. 559, 562 (1965).

[93] *E.g.*, Huminski v. Corsones, 396 F.3d 53, 90–91 (2d Cir. 2005).

[94] *See, e.g., id.* (holding courtrooms are non-public fora); Mezibov v. Allen, 411 F.3d 712, 718 (6th Cir. 2005) (holding courtrooms are non-public fora); Berner v. Delahanty, 129 F.3d 20, 26 (1st Cir. 1997) (holding courtrooms are non-public fora); *cf.* Cohen v. California, 403 U.S. 15, 21–22 (1971) (treating a courthouse corridor as a public forum to which standard public forum free speech standards applied).

Case 3:22-cv-01616-AGS-DDL   Document 57   Filed 04/03/23   PageID.5463   Page 50 of 157

vehicles, for the purpose of raising revenue, made such areas designated public fora, triggering public forum review.[95]

The same standards apply to privately owned property, if sufficiently entwined with the state, triggering First Amendment analysis under the state action doctrine.[96] This could apply to private airports built with state funds, privately run prisons performing the public function of incarceration, charter schools with sufficient connections to the state, or otherwise.[97]

## B. *Standard of Review for Non-Viewpoint-Based Discrimination in a Non-Public Forum*

In contrast to strict scrutiny or intermediate review, on government-owned, non-public forum property (that is, government property not generally open to the public), content-based, subject-matter regulations of speech, or content-neutral regulations of speech, are given only some version of rational review. The Court has not been as clear as one would like regarding whether this is "minimum rationality review," used for non-fundamental right social or economic regulation under the Equal Protection or Due Process Clauses, or "reasonableness balancing," which the Court applies to less than substantial burdens on fundamental rights, such as the fundamental right to vote.[98] The better view is that in non-public forum cases, the Court should be using a reasonableness balancing test, since all First Amendment rights, similar to the right to vote, are viewed by the Court as fundamental.[99] This appears to be what the Court is doing in fact.

The difference between the two approaches is the following. Under minimum rationality review, as used under the Equal Protec-

---

[95] *See* United Church of Christ v. Gateway Econ. Dev. Corp., 383 F.3d 449, 451–53 (6th Cir. 2004) (sports arena case); Christ's Bride Ministries, Inc. v. Se. Pa. Trans. Auth., 148 F.3d 242, 255 (3d Cir. 1998) (transit agency case).

[96] For an overview of the state action doctrine, see 2 KELSO & KELSO, AMERICAN CONSTITUTIONAL LAW, *supra* note 15, at 669–73.

[97] *See, e.g.*, Pruneyard Shopping Ctr. v. Robins, 447 U.S. 74, 80–88 (1980) (treating a privately owned shopping center, held to be state actor by California Supreme Court, as public entity for First Amendment free speech analysis, not as a private party).

[98] *See infra* notes 101 (discussing minimum rationality review), 102–09 (discussing reasonableness balancing), and accompanying text.

[99] *See supra* text accompanying note 2. As Justice Scalia noted for the Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), whatever level of review might be appropriate for minor burdens on the fundamental Second Amendment right to "keep and bear arms," it has to be higher than minimum rationality review because a fundamental right is involved. *Id.* at 628 & n.27.

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 017

*Elon Law Review* [Vol. 8: 291

tion Clause, the legislation must (1) advance legitimate government ends, (2) be rationally related to advancing these ends (not be irrationally underinclusive), and (3) not impose irrational burdens (not be irrationally overinclusive).[100] This test only ensures that the government is not engaged in illegitimate or arbitrary/irrational action. As the Court stated in the Equal Protection case of *Heller v. Doe,*

> A classification "must be upheld [under minimum rationality review] if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." . . . "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." A statute is presumed constitutional, and "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it," whether or not the basis has a foundation in the record . . . . A classification does not fail rational-basis review because it "'is not made with mathematical nicety or because in practice it results in some inequality.'" . . . [On the other hand,] even the standard of rationality as we so often have defined it must find some footing in the realities of the subject addressed by the legislation.[101]

Under reasonableness balancing, the challenger still has the burden to prove the regulation is unconstitutional.[102] But the Court makes its own "independent judgment" on the strengths of the government's legitimate interests and the burden on the individual, and then weighs the two to determine if the burden, even if not irrational, is nevertheless "unreasonable[ ]" or "excessive" because the burden is too great given the minimal interests supporting the regulation.[103] As phrased in the context of a less than substantial or less than severe

---

[100] *See, e.g.,* Heller v. Doe, 509 U.S. 312, 320 (1993).

[101] *Id.* at 320–21 (see cases cited therein). A similar standard of minimum rationality review applies for non-fundamental right social or economic regulation involving the Due Process Clause. *See, e.g.,* United States v. Carolene Prods. Co., 304 U.S. 144, 154 (1938); Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 489–91 (1955) (holding that a regulation must only be rationally related to advancing legitimate interests (the *service* inquiry), and not impose irrational burdens (the *oppressiveness* inquiry)).. For discussion of the *underinclusiveness, overinclusiveness, service,* and *oppressiveness* inquiries under Equal Protection and Due Process Clause doctrine, see *supra* text accompanying notes 62–65.

[102] *See, e.g.,* Burdick v. Takashi, 504 U.S. 428, 434, 437–38, 441–42 (1992) (placing the burden of proof on challenger, rejecting the petitioner's argument). For similar use of this reasonableness balancing test in cases involving less than substantial burdens on the fundamental right to marry, right to travel, and right of access to courts, see Kelso, *supra* note 4, at 97–111; *id.* at 90–97 (discussing reasonableness balancing used for less than "substantial obstacles" on the fundamental right to abortion in *Planned Parenthood v. Casey,* 505 U.S. 833 (1992), and *Gonzales v. Carhart,* 550 U.S. 124 (2007)).

[103] *See Burdick,* 504 U.S. at 434.

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 018

burden on the fundamental right to vote, the Court said the following in *Burdick v. Takushi*:

> A court . . . must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."[104]

Despite the Court determining for itself the extent to which the alleged governmental interests are actually supported by fact, some deference to governmental judgment is still given in reasonableness balancing.[105] For example, in *Thornburgh v. Abbott*, reviewing the burden on a prisoner's fundamental right to marry, the Court said that while *Turner v. Safley*'s "reasonableness" standard for determining marriage rights of prisoners "is not toothless," i.e., not minimum rationality review, "[i]n the volatile prison environment, it is essential that prison officials be given broad discretion to prevent . . . disorder."[106] In *Gonzales v. Carhart*, considering a less than undue burden on the fundamental right of privacy of access to an abortion, the Court stated, "Although we review congressional factfinding under a deferential standard, we do not in the circumstances here place dispositive weight on Congress' findings. The Court retains an independent constitutional duty to review factual findings where constitutional rights are at stake."[107] Under reasonableness balancing, a court, not a legislature, must make the ultimate constitutional conclusion, making an "independent examination of the whole record" to determine whether a law exceeds constitutional boundaries.[108] But some deference still remains.[109]

---

[104] *Id.* (quoting Anderson v. Celebrezze, 460 U.S. 780, 788–89 (1983)).

[105] *See, e.g.*, Thornburgh v. Abbott, 490 U.S. 401, 413–14 (1989).

[106] *Id.*

[107] 550 U.S. 124, 165 (2007).

[108] Randall v. Sorrell, 548 U.S. 230, 249 (2006) (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 285 (1964)). Justice Breyer wrote the opinion. *Id.* at 235.

[109] *See* District of Columbia v. Heller, 554 U.S. 570, 690 (2008) (Breyer, J., dissenting) (discussing less than substantial burdens on the Second Amendment right to keep and bear arms); *id.* ("In applying this kind of standard the Court normally defers to a legislature's empirical judgment in matters where a legislature is likely to have greater expertise and greater institutional factfinding capacity."). Justices Stevens, Souter, and Ginsburg joined Justice Breyer's dissent. *Id.* at 681. Under similar reasonableness balancing used in *Mathews v. Eldridge*, 424 U.S. 319 (1976), to determine what process is due under procedural due process analysis, the Court noted, "[S]ubstantial weight [will] be given to the good-faith judgments of the individuals charged by Congress with the administration of . . . programs." *Id.* at 349.

*Elon Law Review*

In *Breard v. Banks,* a majority of the Supreme Court extended the reasonableness balancing test used in *Thornburgh v. Abbott* and *Turner v. Safley,* to a case involving burdening a prisoner's access to newspapers, magazines, and photographs while in the prison's long-term segregation unit.[110] Such reasonableness review involved standard means to an end reasoning balancing: (1) the government's legitimate interest in effective prison management (*Turner* factor one); (2) the manner in which the regulation achieved its benefits for prison guards and other inmates, including considering less burdensome alternatives (*Turner* factors three and four), and (3) the burdens imposed on the prisoner, including alternative means of exercising First Amendment rights (*Turner* factor two), with the burden placed on the prisoner to establish that the government's regulation was unreasonable.[111]

Military bases are classic examples of government-owned property not open to the public. Thus, for speech on military bases, a reasonableness standard applies.[112] In *Greer v. Spock,* the Court upheld, as reasonably related to the legitimate interest of maintaining "a politically neutral military establishment[,]" regulations banning on military bases speeches and demonstrations of a political nature and prohibiting distribution of literature without approval of post headquarters.[113] In *Brown v. Glines,* the Court similarly upheld Air Force regulations relating to the circulation of petitions on air force bases.[114] In *United States v. Apel,* the Court held that a portion of a military base that contained a protest area and easement for a public road was still a military non-public forum.[115]

In *American Freedom Defense Initiative v. Suburban Mobility Authority for Regional Transportation (SMART),* the Sixth Circuit held that a state transportation agency's refusal to display an anti-jihad advertisement

---

[110] 548 U.S. 521, 528–29 (2006) (plurality opinion) (citing Turner v. Safley, 482 U.S. 78, 89 (1987)); *id.* at 542 (Stevens, J., dissenting); Thornburgh v. Abbott, 490 U.S. 401, 412–19 (1989).

[111] *See Breard,* 548 U.S. at 529. Of course, if the concern is with outgoing correspondence, and thus First Amendment rights of non-prisoners are involved, the Court will apply public forum standards, typically intermediate review, based on a content-neutral concern with security and public safety, as was applied in *Procunier v. Martinez,* 416 U.S. 396, 409, 413–14 (1974).

[112] *See infra* text accompanying notes 113–15.

[113] 424 U.S. 828, 836–40 (1976).

[114] 444 U.S. 348, 354–58 (1980) (relying on *Spock,* 424 U.S. at 840 (1976)). An isolated reference to the adoption of intermediate review in *Procunier v. Martinez,* discussed *supra* note 111, was not necessary to decide the case. *Id.* at 356.

[115] 571 U.S. __, __, 134 S. Ct. 1144, 1150–53 (2014).

on city buses was a reasonable and viewpoint-neutral based on its general policy against political advertisements.[116] The ban was thus upheld under a reasonableness balancing approach, since the bus system was a non-public forum.[117]

### C. *School Regulations as an Example of Non-Public Forum Analysis*

Although the initial set of cases involving the government as educator did not use precise strict scrutiny, intermediate review, or reasonableness review terminology, the cases were decided consistent with standard free speech doctrine. Thus, where the regulation involved an aspect of school life viewed as occurring in a non-public forum, such as government control over school classrooms or school auditoriums, reasonableness review has been applied. Where the regulation involved an aspect of school life on playgrounds or in a school lunchroom, which are viewed more as places designated for free speech, and thus public fora, content-neutral regulations have been subjected to intermediate scrutiny, and content-based regulations have triggered strict scrutiny.

The foundational case in the modern era regarding the constitutional rights of students in school is *Tinker v. Des Moines Independent Community School District*, decided in 1969.[118] In that case, several students had been disciplined for wearing black armbands in violation of a school policy against wearing such bands.[119] The Court said that wearing black bands in protest of the Vietnam War was "symbolic speech," and the school could not sanction the behavior unless it "materially disrupts class work or involves substantial disorder or invasion of the rights of others," i.e., whether school authorities could reasonably forecast "material and substantial interference with schoolwork or discipline."[120] The Court said that to justify prohibition of a particular

---

[116] 698 F.3d 885, 892 (6th Cir. 2012).

[117] *Id.* at 890–92 (citing Lehman v. City of Shaker Heights, 418 U.S. 298, 299–302 (1974) (finding city transit vehicles are non-public fora)). The court distinguished cases which had held that the exterior of city buses were designated public forums, as in *New York Magazine v. Metropolitan Transit Authority*, 136 F.3d 123, 129–30 (2d Cir. 1998), because in such cases the city accepted commercial and political ads. *Id.; see also* Minn. Majority v. Mansky, 708 F.3d 1051, 1057–58 (8th Cir. 2013) (finding prohibition of solicitation and display of political material within one-hundred feet of polling place "reasonable" are not facially unconstitutional; treating polling place as a non-public forum).

[118] 393 U.S. 503 (1969).

[119] *Id.* at 504.

[120] *Id.* at 511–13.

expression having no relation to schoolwork, school officials must show more than a desire to avoid "the discomfort and unpleasantness that always accompany an unpopular viewpoint."[121] Applying its material disruption test, the Court noted that only a few of the 18,000 students in the school system wore armbands, and there was no indication that work of any class was substantially disrupted.[122] Outside class, only a few students made hostile remarks to children who wore the armbands, and there was no evidence of any threats or acts of violence on school premises.[123]

Although *Tinker* did not use precise intermediate scrutiny language, its requirement that the threat of disruption be "substantial" or "material" to justify school regulation follows the requirement of intermediate scrutiny that the government have an "important or substantial" government interest to regulate and the government action be "substantially related" to advancing that interest.[124] That standard of review is appropriate in *Tinker* because *Tinker* involved an attempt to regulate the wearing of armbands even on the playground or the lunchroom, typically viewed as public fora, based on a content-neutral, secondary effects concern of disruption of the school's educational mission.

Justice Black, dissenting, said the record showed that the armbands did divert students' minds from their regular lessons and diverted them to thoughts about the highly emotional subject of the Vietnam War.[125] He also seemed to view *Tinker* as applying its approach even to aspects of regulation in the classroom, and thus was concerned that the Court might apply the heightened *Tinker* standard, and not a "reasonableness" standard, to those kinds of regulations.[126] In Justice Black's view, this case could subject all public schools to "the whims and caprices of their loudest-mouthed, but maybe not their brightest, students."[127] As noted in the cases discussed below, Justice Black's fears on this score have not materialized, and reasonableness review is applied to school regulations of matters in the curriculum and, typically, to matters of school dress codes or school uniforms to

---

[121] *Id.* at 509.
[122] *Id.* at 508.
[123] *Id.*
[124] *See supra* notes 15, 118–21 and accompanying text.
[125] *Tinker*, 393 U.S. at 518 (Black, J., dissenting).
[126] *Id.* at 519–20.
[127] *Id.* at 525.

be worn in school classrooms.[128] Justice Harlan, also dissenting, would have cast on the challengers the burden of showing that a particular school measure was motivated by other than legitimate school concerns; for example, a desire to prohibit the expression of a particular point of view, while allowing a dominant view to be expressed is viewpoint discrimination.[129] This view is inconsistent with the general rule that for cases applying intermediate scrutiny, the government bears the burden of defending its action, rather than the challenger bearing the burden of establishing that the action is unconstitutional.[130]

Where school cases involve activities focused more on curricular matters or school-sponsored events, which are non-public forums (because schools have not opened classrooms or school-sponsored events for generic free speech, but for speech related to the school-directed curriculum or school-directed events) a reasonableness balancing approach is applied. For example, in 1986, in *Bethel School District No. 403 v. Fraser*, the Court held that the First Amendment does not prohibit a school district from disciplining a high school student for a "lewd" speech at a high school assembly.[131] As part of supporting a candidate for a student government office, the speaker used phrases like, "he's firm in his pants, he's firm in his shirt, his character is firm," and he "doesn't attack things in spurts—he drives hard, pushing and pushing until finally—he succeeds."[132] Chief Justice Burger wrote that the freedom of students to advocate unpopular and controversial views must be balanced against society's interest in teaching students the boundaries of socially appropriate behavior.[133] It was appropriate and reasonable for the school to prohibit the use of vulgar terms in public

---

[128] *See infra* text accompanying notes 131–42.

[129] *Tinker*, 393 U.S. at 526 (Harlan, J., dissenting).

[130] *See supra* text accompanying notes 15–16; United States v. Virginia, 518 U.S. 515, 533 (1996) ("The burden of justification [at intermediate review] is demanding and rests entirely on the State. The State must show 'at least that the [challenged] classification serves "important governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives."'") (citations omitted)). The burden is also on the government at strict scrutiny. Fisher v. Univ. of Tex. at Austin, 570 U.S. __, __, 133 S. Ct. 2411, 2419 (2013) ("Strict scrutiny is a searching examination, and it is the government that bears the burden . . . .'") (citations omitted)). The burden is on the challenger to prove government action is unconstitutional under minimum rationality review or reasonableness balancing. *See supra* text accompanying notes 101–02.

[131] 478 U.S. 675, 677–78, 686 (1986).

[132] *Id.* at 687 (Brennan, J., concurring).

[133] *Id.* at 681 (majority opinion).

discourse, particularly in an assembly where students as young as fourteen years old were in attendance.[134]

A general test for the appropriate standard of review when regulating behavior encompassed by the curriculum was stated in *Hazelwood School District v. Kuhlmeier*.[135]  In sum, Justice White said that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns."[136]

These cases make clear that indecency by students in the school environment can be sanctioned in order to advance curricular goals, such as teaching students the boundaries of "socially appropriate behavior,"[137] and a student newspaper supervised by faculty members can be censored by the school to ensure that the audience is not exposed to material, inappropriate for their level of maturity, analyzing whether the actions of educators are "reasonably related to legitimate pedagogical concerns."[138]  Reflecting a view widely shared among the lower federal courts, the Ninth Circuit held in *Chandler v. McMinnville School District* that the goal of teaching students the boundaries of appropriate behavior applies throughout the school grounds to any "vulgar, lewd, obscene, or plainly offensive speech," and thus *Fraser* applies to such speech anywhere in the school.[139]

Consistent with the analysis of *Fraser* and *Hazelwood,* in *Morse v. Frederick,* the Supreme Court indicated reasonableness review would be applied to student speech made in the context of the non-public forum of a "school-sanctioned and school-supervised event"—here, students being led out of the classroom to watch the Olympic Torch Relay pass by their school—even though the speech could not be said to bear the "imprimatur" of the school, as in *Hazelwood,* or was "vulgar," as in *Fraser*.[140]  In all three cases—*Morse, Hazelwood,* and *Fraser*—the speech occurred in a non-public forum—the school curriculum—and thus reasonableness review should be applied absent viewpoint discrimina-

---

[134] *Id.* at 683.

[135] 484 U.S. 260, 266–67 (1988).

[136] *Id.* at 273.

[137] *Fraser,* 478 U.S. 675, 681 (1986).

[138] *Kuhlmeier,* 484 U.S. at 273.

[139] 978 F.2d 524, 528–29 (9th Cir. 1992).

[140] 551 U.S. 393, 396–400, 405 (2007) (quoting *Kuhlmeier,* 484 U.S. at 271); *Morse,* 551 U.S. at 422 (Alito, J., concurring) (citing *Fraser,* 478 U.S. at 685).

tion. In *Morse*, the school had a legitimate interest in regulating speech "at a school event, when that speech is reasonably viewed as promoting illegal drug use."[141] A concurrence by Justices Kennedy and Alito, whose votes were critical to make up the *Morse* majority, indicated that where the speech is not so connected to the school curriculum, and is student generated, even if in conflict with the "educational mission" of the school, the *Tinker* test would still apply.[142]

### D. *Government Grants or Subsidies as Applying Non-Public Forum Standards*

When making grants, subsidies, or other aid available to individuals or groups to develop their own message, rather than requiring individuals be conduits for the government's message, the Court has held that viewpoint discrimination triggers strict scrutiny.[143] For example, in *Rosenberger v. Rector and Visitors of the University of Virginia*, the Court applied strict scrutiny "when the [government] does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers."[144] In this case, the University of Virginia engaged in viewpoint discrimination when it funded printing costs for a variety of student publications, but not for those who "manifest a particular belie[f] in or about a deity."[145] The Court extended this principle in *Legal Services v. Velasquez* to a program "designed to facilitate private speech, not to promote a governmental message."[146] In *Velasquez*, the Court found viewpoint discrimination when a government funding restriction prohibited "legal representation funded by receipts of LSC [Legal Services Corporation] moneys if the representation involves an effort to amend or otherwise change existing welfare law."[147] In contrast, as discussed in Part IV.A below, if

---

[141] *Morse*, 551 U.S. at 403.

[142] *Id.* at 422–23 (Alito, J., concurring). For discussion of recent school cases struggling with whether to invoke *Tinker*'s intermediate standard of review, or the reasonableness balancing approach of *Fraser/Hazelwood/Morse*, and then how to apply each to various fact patterns involving regulations of the school curriculum or school-sponsored events, see 3 KELSO & KELSO, AMERICAN CONSTITUTIONAL LAW, *supra* note 59, at 175–77 & nn.36–48.

[143] *See, e.g.*, Legal Serv. Corp. v. Velazquez, 531 U.S. 533, 507 (2001); Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 845–46 (1995).

[144] *Rosenberger*, 515 U.S. at 834.

[145] *Id.* at 823.

[146] *Legal Serv. Corp.*, 531 U.S. at 542.

[147] *Id.* at 536–37.

the case involves pure government speech, like in *Rust v. Sullivan*, the government can engage in viewpoint discrimination.[148]

When grants or subsidies to aid individuals in developing their own message involve subject-matter discrimination, or content-neutral regulations, the Court adopts a reasonableness analysis, as in *National Endowment for the Arts v. Finley*.[149] The standards of review in these cases thus mirror standard non-public forum free speech analysis. In *Finley*, the Court upheld a provision in the National Foundation on the Arts and Humanities Act of 1965 that required the National Endowment for the Arts to ensure that "artistic excellence and artistic merit are the criteria by which [grant] applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public."[150] The Court said the regulation did not involve viewpoint discrimination because "merely [taking] 'decency and respect' into consideration . . . undercut[s] respondents' argument that the provision inevitably will be utilized as a tool for invidious viewpoint discrimination."[151] The Court concluded that "decency" and "the respect for diverse beliefs" are "permissible" factors, citing, in passing, *Fraser*'s reasonableness balancing approach and its discussion of "vulgar and offensive terms in public discourse."[152] Justices Scalia and Thomas concurred, saying there is a distinction between abridging speech and funding speech.[153] Funding speech leaves free those who wish to create indecent art, and in their view is not a regulation of speech at all.[154]

---

[148] 500 U.S. 173, 193 (1991); *see infra* text accompanying notes 155–60.

[149] 524 U.S. 569, 581, 583, 585 (1998).

[150] *Id.* at 572 (quoting 20 U.S.C. § 954(d)(1) (2012)).

[151] *Id.* at 582.

[152] *Id.* at 584–86 (citing, *inter alia*, Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 683 (1986)).

[153] *Id.* at 599 (Scalia, J., concurring).

[154] *Id.* at 595, 599; *id.* at 600–01 (Souter, J., dissenting) (contending that the statute makes clear that Congress's purpose was viewpoint based (e.g., to prevent the funding of art that conveys an offensive message in Congress's judgment, as implemented by the NEA)).

## IV. GOVERNMENT SPEECH AND GOVERNMENT REGULATIONS OF CONDUCT

### A. *Pure Government Speech*

#### 1. *Rust v. Sullivan* Line of Cases

Although the Court's initial decisions in the modern era upheld government funding of speech on the questionable ground that the funding did not involve viewpoint discrimination, subsequent decisions have clarified that the government can engage in viewpoint discrimination when spending its own money. The starting point is *Rust v. Sullivan*.[155]

*Rust* involved a facial challenge to federal regulations that barred persons working for federally funded health programs from discussing abortion as a lawful option.[156] Chief Justice Rehnquist wrote for a 6-3 Court, "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way."[157] In so doing, the government did not unlawfully discriminate on the basis of viewpoint; "it has merely chosen to fund one activity to the exclusion of the other."[158] The challenged regulation was held not to violate First Amendment rights of free speech or Fifth Amendment rights of privacy regarding abortion choice, because it left a pregnant woman with the same choices as if the government had chosen not to operate any public hospitals.[159]

The majority's attempt to categorize the regulation in *Rust v. Sullivan* as not involving viewpoint discrimination has not withstood the test of time. However, the holding of *Rust v. Sullivan* remains good law. In *Rosenberger v. Rector and Visitors of the University of Virginia,* the Court noted:

---

[155] 500 U.S. 173, 193 (1991).

[156] *Id.* at 177–78.

[157] *Id.* at 193.

[158] *Id.*

[159] *Id.* at 193–94, 201–03. *But see id.* at 204 (Blackmun, J., dissenting) (contending that the regulation constituted a content-based regulation of speech that was also clearly viewpoint-based). Further, the challenged regulation had the practical effect of obliterating the freedom to choose, particularly for the poor, "as surely as if it had banned abortions outright." *Id.* at 217. Thus, for the dissent, strict scrutiny should have been triggered in the case, and the regulation should have been declared unconstitutional. *Id.* at 204, 209, 214.

> [W]e have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message. In the same vein, in *Rust v. Sullivan* . . . [w]e recognized that when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes. When the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee.[160]

Thus, in this context, viewpoint discrimination is permissible.

A similar result was reached in 2009 in *Pleasant Grove City v. Summum*.[161] In *Summum*, a religious organization filed a § 1983 action against various local officials, asserting that they had violated the Free Speech Clause by rejecting a proposed Seven Aphorisms monument for a local park that already contained a donated Ten Commandments monument.[162] The Court held that permanent monuments displayed on public property typically represent government speech, and although "the Free Speech Clause restricts government regulation of private speech, it does not regulate government speech at all."[163] The Court stated that the government need not maintain viewpoint neutrality in the selection of donated monuments, for "if public parks were considered to be traditional public forums for the purpose of erecting privately donated monuments, most parks would have little choice but to refuse all such donations."[164]

In general, in deciding whether particular speech is government speech or the speech of a private individual, courts have examined: (1) the central "purpose" of the program in which the speech in question occurs; (2) the degree of "editorial control" exercised by the government or private entities over the content of the speech; (3) the identity of the "literal speaker;" and (4) whether the government or the private entity bears the "ultimate responsibility" for the content of the speech, in analyzing circumstances where both government and a private entity are claimed to be speaking.[165]

---

[160] 515 U.S. 819, 833 (1995) (citations omitted).
[161] 555 U.S. 460, 464, 467 (2009).
[162] *Id.* at 466.
[163] *Id.* at 467.
[164] *Id.* at 464, 480.
[165] *See, e.g.,* Wells v. City and Cty. of Denver, 257 F.3d 1132, 1140–41 (10th Cir. 2001) (contending that a sign listing private sponsors of a public holiday display constituted government speech); Knights of the Ku Klux Klan v. Curators of the Univ. of Mo., 203 F.3d 1085, 1093, 1095 (8th Cir. 2000) (determining that announcements of sponsors' names and brief messages from sponsors on a public radio station constituted government speech, and thus the Klan had no viewpoint discrimination complaint when they

For example, in *ACLU of Tennessee v. Bredesen*, the United States Court of Appeals for the Sixth Circuit held that Tennessee's "Choose Life" license plates were government speech exempt from standard free speech analysis.[166]  However, other circuit courts of appeal have held differently.[167]

In *Walker v. Texas Division Sons of Confederate Veterans, Inc.*, a 5-4 Court adopted the *Bredesen* view that license plates are government speech, and so government regulations—here, denying a specialized plate featuring the Confederate battle flag—was not subject to free speech review.[168]  The dissent in *Walker* properly observed that individually-chosen specialty license plates are not really "government speech," but then applied a viewpoint discrimination, strict scrutiny analysis to hold unconstitutional the Texas ban.[169]  A better approach might have been either to find that the state had a compelling government interest not to promote the Confederate battle flag (as a symbol of rebellion or racism), and thus uphold the regulation despite it being viewpoint discrimination, or to hold that the ban reflected a subject-matter regulation related to "decency," as in *Finley*,[170] and uphold the ban under a reasonableness review for the non-public forum of government-issued license plates.

In *Alliance for Open Society International Inc. v. United States Agency for International Development*, a 2-1 panel of the United States Court of Ap-

---

were denied sponsorship rights); Downs v. Los Angeles Unified Sch. Dist., 228 F.3d 1003, 1012–13 (9th Cir. 2000) (determining that postings to school bulletin boards were government speech, not private speech).

[166] 441 F.3d 370, 375, 380 (6th Cir. 2006).

[167] *See e.g.*, Ariz. Life Coal., Inc. v. Stanton, 515 F.3d 956, 961, 971–72 (9th Cir. 2008) (holding that Arizona's rejection of "Choose Life" plates constituted impermissible viewpoint discrimination in a non-public forum, since Arizona permitted specialized license plates as long as they were not offensive or promote discrimination, a product brand, or a specific religion or anti-religious belief); *see also* Planned Parenthood of S.C., Inc. v. Rose, 361 F.3d 786, 795, 798–99 (4th Cir. 2004) (holding that South Carolina had created a limited license place forum for expression giving its own viewpoint privilege above others). *But see* Choose Life Ill., Inc. v. White, 547 F.3d 853, 865–67 (7th Cir. 2008) (determining that while non-public forum analysis did apply, the state's rejection of a "Choose Life" specialty license plate was subject-matter regulation, and thus triggered only reasonableness review under non-public forum analysis and the Seventh Circuit viewed Illinois as excluding the "entire subject of abortion" from its license plate program, and thus was subject-matter, not viewpoint discrimination).

[168] 576 U.S. __, __, 135 S. Ct. 2239, 2245–46 (2015).

[169] *Id.* at __, 135 S. Ct. at 2254–55 (Alito, J., dissenting). Chief Justice Roberts and Justices Scalia and Kennedy also joined in Justice Alito's dissent. *Id.* at 2254.

[170] *See supra* text accompanying notes 149–54.

*Elon Law Review*

peals for the Second Circuit ruled that a federal statute's requirement that any group receiving federal funds in the international fight against AIDS have a policy "explicitly opposing prostitution" compels speech, and thus is unconstitutional; the majority distinguished *Rust v. Sullivan* on the grounds that in *Rust,* the strings on funding merely required the recipient not to speak about abortion, whereas here the strings on funding required the recipient to take a position inconsistent with the speaker's views.[171] In *Agency for International Development v. Alliance for Open Society International, Inc.,* the Supreme Court affirmed the Second Circuit on the independent ground that, since the speech restriction regarding prostitution was not related to the government program, which was about fighting HIV/AIDS, the *Rust* doctrine, involving strings placed on funding in the context of a government program, did not apply.[172] Under standard free speech doctrine, the content-based restriction was unconstitutional viewpoint discrimination.

## 2. Government Advertising Line of Cases

In *Glickman v. Wileman Bros. & Elliott, Inc.,* the Court upheld California legislation that required growers of certain crops to pay assessments that were used by the state for generic advertising of those crops.[173] The Court said this was an economic regulation and did not abridge anyone's right to speak.[174] For the Court, Justice Stevens pointed out that the marketing orders did not restrain anyone from communicating any message.[175] Nor did they compel "any person to engage in any actual or symbolic speech."[176] Further, they did not require "the producers to endorse or to finance any political or ideological views."[177] And for the most part, none of the generic advertising conveyed any message with which the challengers disagreed.[178] They

---

[171] 651 F.3d 218, 224 (2d Cir. 2011) (quoting 22 U.S.C. § 7631(f) (2012)), *en banc review denied,* 678 F.3d 127, 128 (2d Cir. 2012).

[172] 570 U.S. __, __, 133 S. Ct. 2321, 2330–32 (2013). The dissent viewed the string on funding as part of the program, and thus constitutional under *Rust,* discussed *supra* text accompanying notes 155–60, even if viewpoint discriminatory. *Id.* at 2332–33 (Scalia, J., dissenting).

[173] 521 U.S. 457, 460, 473 (1997).

[174] *Id.* at 470, 477.

[175] *Id.* at 469.

[176] *Id.*

[177] *Id.* at 469–70.

[178] *Id.* at 470.

complained of having less money for their own advertising.[179] But Justice Stevens said that is equally true of assessments to cover employee benefits, inspection fees, or any other activity authorized by a marketing order.[180]

The *Glickman* case was narrowly interpreted and distinguished in *United States v. United Foods, Inc.*[181] In this case, the Court struck down a federal program that mandated assessments on handlers of fresh mushrooms to fund, for the most part, generic advertising to promote mushroom sales.[182] The majority opinion by Justice Kennedy acknowledged that the case was similar to *Glickman* in that: (1) the program did not impose restraints on the freedom of any producer to communicate any message to any audience; (2) no person was compelled to engage in any actual or symbolic speech; and (3) producers were not compelled to endorse or finance any political or ideological views.[183] However, for Justices Kennedy and Stevens, who switched sides from their votes in *Glickman*, that case was distinguishable on the ground that the tree fruits involved in that case were marketed pursuant to detailed marketing orders that had displaced many aspects of independent business activity. The mandated participation in an advertising program was part of a valid scheme of economic regulation. Here, in contrast, almost all of the funds collected were for one purpose: generic advertising. Because it had not been raised below, the Court did not consider an alternative argument that its advertising was government speech that could be upheld under *Rust v. Sullivan*.[184]

Reliance on the speech being government speech was the basis of the 2005 decision of *Johanns v. Livestock Marketing Ass'n*.[185] In *Johanns*, the government imposed an assessment on cattle sales and used the money to fund generic advertisements, which usually said, "Beef. It's

---

[179] *Id.*

[180] *Id.* at 470, 476 (citing Lehnert v. Ferris Faculty Ass'n, 500 U.S. 507, 527–29 (1991)). *But see id.* at 480–81 (Souter, J., dissenting) (discussing and concluding that compelling speech officially is just as suspect as suppressing it, and should typically be given the same level of scrutiny); *see also id.* at 491–92 (Souter, J., dissenting) (discussing that this case involved commercial speech, and calls for the intermediate scrutiny used in *Central Hudson*, discussed *infra* text accompanying notes 496–98); *id.* at 504–05 (Thomas, J., dissenting) (contending that strict scrutiny should apply to all content-based regulations of commercial speech)).

[181] 533 U.S. 405, 411 (2001).

[182] *Id.* at 408–09.

[183] *Id.* at 411.

[184] *Id.* at 416–17.

[185] 544 U.S. 550, 553, 562 (2005).

What's for Dinner." The ads usually bore the attribution, "Funded by America's Beef Producers."[186] In an opinion by Justice Scalia, a majority of the Court upheld the law on the ground that the message, set out in the beef promotions, was from beginning to end a message established by the federal government, although some ideas for ads were submitted by a private advisory board.[187] Justice Scalia noted that citizens have no First Amendment right not to fund government speech through general taxes or targeted assessments, and that when "the government sets the overall message to be communicated and approves every word that is disseminated, it is not precluded from relying on the government speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages."[188] Following *Johanns*, the Supreme Court remanded a number of cases to lower courts to reconsider their decisions in light of *Johanns*. Lower courts followed the *Johanns* precedent in those reconsidered cases.[189]

A related case in this series is *Board of Regents of University of Wisconsin System v. Southworth*.[190] There, the Court upheld a mandatory student activity fee that was used in part to support student organizations engaging in political or ideological speech, so long as there was viewpoint neutrality.[191] Justice Kennedy said for the Court, "When a university requires its students to pay fees to support the extracurricular

---

[186] *Id.* at 555.

[187] *Id.* at 563.

[188] *Id.* at 562. Justices Breyer and Ginsburg concurred in the result, voting, as they did in *United Foods*, to view this as a standard economic regulation not warranting First Amendment scrutiny. *Id.* at 569 (Breyer, J., concurring); *id.* at 569–70 (Ginsburg, J., concurring in the judgment). Justice Souter dissented in the case, joined by Justices Stevens and Kennedy. *Id.* at 570 (Souter, J., dissenting). In their view, a compelled subsidy should not be justified as a government speech program similar to *Rust v. Sullivan*, 500 U.S. 173 (1991), unless the government clearly put the speech forward as its own. *Id.* at 580. This was not true here on the face of the statute, which did not require the ads to show any sign of speech by the government, or as applied, because the ads did not in fact show any such sign and were misleading as to their origin. *Id.*

[189] *See, e.g.,* Cochran v. Veneman, 359 F.3d 263, 279–80 (3d Cir. 2004) (finding mandatory assessments on milk producers to finance generic "Got Milk?" advertising unconstitutional based on *United Foods*), *vacated*, 544 U.S. 1058 (2005), *rev'd*, No. 02-CV-00529, 2005 WL 2755711 (3d Cir. 2005) (finding government program constitutional in light of *Johanns*); Pelts & Skins, LLC v. Landreneau, 365 F.3d 423 (5th Cir. 2004) (finding mandatory assessment on harvested alligator skins to finance generic advertising of alligator products unconstitutional), *vacated*, 544 U.S. 901, 1058 (2005), *remanded*, 448 F.3d 743 (5th Cir. 2006) (remanding to the district court to develop evidence regarding the extent of government control over the speech in the case).

[190] 529 U.S. 217 (2000).

[191] *Id.* at 221.

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 032

speech of other students, all in the interest of open discussion, it may not prefer some viewpoints to others."[192] Since the government in this case was not advancing its own message, but expending funds to "faciliat[e] the free and open exchange of ideas by, and among, its students,"[193] the *Rosenberger* line of cases controlled, not *Rust* or *Johanns*.[194] The Court remanded a referendum aspect of the university's program, explaining it was not clear how allowing a vote of the student body to control the funding of particular grants could protect viewpoint neutrality.[195]

## B. *Government Regulations of Conduct*

By its terms, the First Amendment proscribes only governmental regulations "abridging the freedom of speech," not conduct.[196] Governmental regulations of conduct, therefore, are outside of the ambit of the First Amendment. In determining whether the regulation is one of speech or conduct, the Court has noted that "symbolic speech" is protected by the First Amendment.[197] "Symbolic speech" exists where conduct is not "pure speech," such as talking, writing, or wearing informative clothing, but is nevertheless intended to be expressive and conveys a message reasonably likely to be understood.[198] Case examples of symbolic conduct include burning a flag or cross to convey a particular message.[199] While criminalizing the "symbolic expression" triggers a free speech analysis, a regulation of conduct alone, such as applying a trespass statute to a person who entered on someone else's property to burn a cross, would pose no First Amendment problems.

Sometimes, it is not so clear whether the regulation is one of speech or conduct. For example, the Court held in *Dallas v. Stanglin* that "recreational dancing" by patrons of a dance hall was not expressive activity, but mere conduct, and thus a city ordinance that restricted admission to certain dance halls to persons between fourteen

---

[192] *Id.* at 233.

[193] *Id.* at 229, 233 (citing Rosenberger v. Rectors and Visitors of Univ. of Va., 515 U.S. 819 (1995)); *see supra* text accompanying notes 144–45.

[194] *See* Rosenberger, 515 U.S. 819 (1995). *But see* Rust v. Sullivan, 500 U.S. 173 (1991); Johanns v. Livestock Mktg. Ass'n, 544 U.S. 550 (2005).

[195] *Bd. of Regents of Univ. of Wis. Sys.*, 529 U.S. at 232.

[196] U.S. CONST. amend. 1.

[197] United States v. O'Brien, 391 U.S. 367, 376 (1968).

[198] Tinker v. Des Moines Indep. Comm. Sch. Dist., 393 U.S. 503, 505–06 (1969).

[199] *See, e.g.*, Virginia v. Black, 538 U.S. 343, 358 (2003) (burning a cross is "symbolic speech"); United States v. O'Brien, 391 U.S. 367, 377–78 (1968) (burning draft card to protest the Vietnam War is "symbolic speech").

and eighteen years old, to protect teenagers, did not raise First Amendment issues concerning the freedom of association rights of persons between fourteen and eighteen to associate with persons outside that age group.[200] In contrast, in *Barnes v. Glen Theatre, Inc.*, the Court held that a statute barring public nudity applied to nude dancing by performers at an adult entertainment establishment was expressive activity because part of the purpose of the performance was "erotic expression"; focused more on literalism than purpose, Justice Scalia said the First Amendment did not apply, since nude dancing literally was not symbolic speech, but conduct.[201]

In a recent court of appeals case, the Ninth Circuit held in *Pickup v. Brown* that a California law banning state-licensed mental health providers from treating patients under eighteen years old with "sexual orientation change efforts" was a regulation of conduct, not speech.[202] Similarly, the Fourth Circuit held in *United States v. Hassen* that an agreement to provide material support to terrorism was not protected speech, but conduct used to show conspiracy to commit illegal acts.[203]

## V. Speech Triggering Limited First Amendment Review

The Court has identified certain categories of speech that, as traditionally defined, are not protected by the First Amendment. The four basic categories of such speech involve advocacy of illegal conduct, fighting words, obscenity, and indecency involving the use of children.[204] While libel was also historically viewed as an additional category of "unprotected" speech, libelous speech has been entitled to some First Amendment protection since *New York Times Co. v. Sullivan* in 1964.[205] In addition, while historically commercial speech received no First Amendment protection, since 1976, truthful, lawful representations involving commercial speech are provided First Amendment protection under the *Central Hudson* test for commercial speech.[206]

---

[200] 490 U.S. 19, 24–25 (1989); *see also* Willis v. Town of Marshall, 426 F.3d 251, 261, 264 (4th Cir. 2005) (holding lewd recreational dancing at a community center not entitled to First Amendment protection, but discriminatory enforcement may trigger Equal Protection complaint).

[201] 501 U.S. 560, 565–66 (1991); *id.* at 572 (Scalia, J., concurring).

[202] 740 F.3d 1208, 1214–15 (9th Cir. 2014) (*en banc* hearing denied).

[203] 742 F.3d 104, 127–28 (4th Cir. 2014).

[204] *See infra* text accompanying notes 213–315 (discussing advocacy of illegal conduct); 316–24 (addressing fighting words); 325–72 (addressing obscenity); 373–427 (discussing indecency involving the use of children).

[205] *See infra* text accompanying notes 431–47.

[206] *See infra* text accompanying notes 511–24.

The Court has sometimes stated that all these categories of "unprotected" speech are not protected at all by the First Amendment.[207] For example, prior to the modern era, in 1942, in *Chaplinsky v. New Hampshire*, a case involving fighting words, the Court noted the following:

> There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.[208]

In 1992, that perspective was clarified in *R.A.V. v. City of St. Paul*.[209] Writing for the Court, Justice Scalia noted that such statements are not literally true.[210] He stated,

> What they mean is that these areas of speech can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content* . . . not that they are categories of speech entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content.[211]

Noting the presumptive invalidity of content-based regulations on speech, Justice Scalia said that this principle applied to impose a viewpoint discrimination limit on these kinds of proscribable speech.[212]

### A. *Advocacy of Illegal Conduct*

There are four kinds of cases that generally fall under the category of speech involving the advocacy of illegal conduct. The classic case involves advocacy by a speaker to a group at a demonstration, or the distribution of leaflets or other literature, advocating lawless action.[213]

---

[207] *See, e.g.*, Schenck v. United States, 249 U.S. 47 (1919) (upholding punishments for sending intimidating letters to recruit citizens to fight abroad); Watts v. United States, 394 U.S. 705 (1969) (discussing verbal threats as constitutionally protected); Near v. Minnesota, 283 U.S. 697 (1931) (holding that obscenity is not protected by prior restraint); Ashcroft v. Free Speech Coal., 535 U.S. 234 (2002) (assessing the constitutionality of the Child Pornography Prevention Act of 1996).

[208] 315 U.S. 568, 571–72 (1942).

[209] 505 U.S. 377, 383 (1992).

[210] *Id.*

[211] *Id.* at 383–84.

[212] *Id.* at 382.

[213] *See infra* text accompanying notes 217–52.

A second kind of case involves advocacy where the speaker indicates a possible intent to commit violence. The Court has defined these cases as those where the speaker's statement indicates a "true threat" to commit violence.[214] A third kind of case involves speech concerning violence done in the context of ongoing illegal actions. These cases involve application of special "hate crimes" statutes that make the related speech a crime independent of the ongoing illegal action.[215] Finally, some statutes or government regulations have attempted to regulate or ban certain kinds of "hate speech" where no other illegal or violent conduct was taking place.[216]

### 1. Advocacy of Illegal Conduct by Others

In 1919, in *Schenck v. United States*, the Court upheld punishment for distributing circulars urging conscripts not to submit to intimidation and saying the United States had no power to send citizens abroad to fight.[217] In oft-quoted language, Justice Holmes said, "[T]he question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent."[218] In 1941, the Court took a step toward firmly accepting the clear and present danger test when, in *Bridges v. California*, the Court set aside the contempt fine imposed on Harry Bridges and a newspaper for publications that tended to interfere with the fair and orderly administration of justice.[219] Justice Black said that the Holmes test amounted to a working principle that, at a minimum, "the substantive evil must be *extremely serious* and the degree of *imminence extremely high* before utterances can be punished."[220] In fact, this phrasing was a step beyond the language adopted by Justices Holmes and Brandeis in *Whitney v. California* for regulation to be a clear and present danger under the *Schenck* test, which only required that the threat be "*relatively serious*" and "*imminent.*"[221]

The Court took a step backwards in 1951, in *Dennis v. United States*, when a plurality characterized the situation as one involving a party

---

214 *See infra* text accompanying notes 217–90.

215 *See infra* text accompanying notes 291–301.

216 *See infra* text accompanying notes 302–15.

217 249 U.S. 47, 51–52 (1919).

218 *Id.* at 52.

219 314 U.S. 252, 263 (1941) (emphasis added).

220 *Id.*

221 274 U.S. 357, 376–77 (1927) (Brandeis, J., concurring).

designed and dedicated to the overthrow of the Government, the Communist Party, in the context of world crises.[222] The Smith Act was held validly applicable to convict the leaders of the Communist Party for advocating violent overthrow with intent to cause it as soon as circumstances permit because "the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger."[223] The plurality opinion said that neither Holmes nor Brandeis ever envisioned that their test should be an absolute, applied without regard to its reasons.[224] Justice Frankfurter agreed, where the type of speech ranks low in the scale of values.[225] Adopting an even more extreme limitation on the clear and present danger test, Justice Jackson wrote that he would use a clear and present danger test only for street corner cases, leaving the problem to the executive and legislative branches for larger, organized conspiracies.[226] Justices Black and Douglas, dissenting, would require, as did Holmes, that some immediate injury to society be imminent.[227]

More vigorous protection of free speech is evident in cases since 1954. In 1957, the Court cautioned in *Yates v. United States* that advocacy of overthrow as a doctrine, divorced from efforts to instigate action, is protected by the Constitution, even if there is evil intent.[228] Thus, the Smith Act was read to apply only where there is incitement to illegal action and a sufficient orientation toward action that it likely will occur.[229] The Court read *Dennis* as holding that even incitement is protected unless the group being indoctrinated is of sufficient size and cohesiveness, is sufficiently oriented towards action, and other circumstances reasonably justify apprehension that action will occur.[230] In 1961, the Court imposed, in *Scales v. United States*, rigorous proof requirements for punishing membership in the Communist Party.[231] The member must be active, know of the party's illegal advocacy, and

---

[222] 341 U.S. 494, 495–98 (1951) (plurality opinion). Chief Justice Vinson wrote for the plurality. *Id.* at 494. Justices Reed, Burton, and Minton joined it. *Id.* Justice Clark took no part in the consideration or decision of the case. *Id.* at 517.

[223] *Id.* at 510.

[224] *Id.* at 508.

[225] *Id.* at 544–45 (Frankfurter, J., concurring).

[226] *Id.* at 568 (Jackson, J., concurring).

[227] *Id.* at 580 (Black, J., dissenting); *id.* at 585 (Douglas, J., dissenting).

[228] 354 U.S. 298, 318 (1957).

[229] *Id.* at 319–20.

[230] *Id.* at 321.

[231] 367 U.S. 203, 229 (1961).

have a specific intent to bring about overthrow as speedily as circumstances permit.[232]

In 1964, addressing itself to the value of political speech, the Court said in *New York Times Co. v. Sullivan* that the First Amendment reflects a "profound national commitment" to the principle that "debate on public issues should be uninhibited, robust, and wide-open."[233] Consistent with such a commitment, the Court formulated in 1969 a new test for regulating the advocacy of illegal action.[234] In *Brandenburg v. Ohio*, the Court held that a state may not proscribe advocacy of force or law violation except where such advocacy is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action."[235]

The Court applied the *Brandenburg* test in *Hess v. Indiana*.[236] In *Hess*, the Court set aside a conviction for disorderly conduct based upon the fact that defendant, an anti-war demonstrator who, with his companions, had been moved off a street by the sheriff and said in a loud voice, "We'll take the fucking street later."[237] In a 6-3 *per curiam* opinion, the Court noted, "At best, however, the statement could be taken as counsel for present moderation; at worst, it amounted to nothing more than advocacy of illegal action at some indefinite future time."[238] Thus, although the words might tend to lead to violence, this did not satisfy the requirement that advocacy be directed at inciting or producing *imminent* lawless action that is likely to be produced.[239]

Also, no imminence was found in *Cohen v. California*.[240] In *Cohen*, the Court reversed a conviction for disorderly conduct.[241] In a corridor outside a courtroom, the defendant wore a jacket, which bore the words "Fuck the Draft."[242] The Court said that so long as there is no showing of intent to incite disobedience to or disruption of the draft,

---

[232] *Id.* at 229–30.
[233] N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964).
[234] *See* Brandenburg v. Ohio, 395 U.S. 444, 448 (1969).
[235] *Id.* at 447.
[236] Hess v. Indiana, 414 U.S. 105, 108 (1973) (citing *Brandenburg*, 395 U.S. at 447).
[237] *Id.* at 107.
[238] *Id.* at 108.
[239] Justice Rehnquist, dissenting with Chief Justice Burger and Justice Blackmun, said the Court had exceeded the proper scope of judicial review in not considering the evidence in the light most favorable to the appellee state. *Id.* at 111–12 (Rehnquist, J., dissenting).
[240] 403 U.S. 15, 18 (1970) (citing Yates v. United States, 354 U.S. 298 (1957)).
[241] *Id.* at 26.
[242] *Id.* at 16.

defendant could not, consistently with the First Amendment, be punished for asserting his opposition to the draft.[243] The word was not an obscenity since it was in no sense erotic.[244] It could not be regarded as fighting words, since no individual could have found it to be a personal insult.[245]

Since 1986, the Court has not decided a major case on advocacy of illegal conduct. Most of the post-1986 cases on political speech have involved the question of whether a standard lower than strict scrutiny should be applied because the speech was possibly uttered in a non-public forum, or because of audience reactions, e.g., where a case might involve fighting words.[246] The Court has said a number of times, as in *Boos v. Barry*, that if the *Brandenburg* test for which speech constitutes "advocacy of illegal conduct" is not met, then "content-based restrictions on political speech in a public forum" are given strict scrutiny, i.e., the government must show "that the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'"[247] In passing, Justice Thomas noted in *Lorillard Tobacco Co. v. Reilly* that regulations banning tobacco ads within 1,000 feet of schools or playgrounds, as part of an effort to proscribe solicitation for unlawful conduct, the sale of cigarettes to minors, "clearly fail the *Brandenburg* test" as not involving speech likely to incite imminent lawless action of cigarette purchases by minors.[248]

Because the Court has not had a recent major case on the advocacy of illegal conduct, possible limits on a *Brandenburg* analysis for larger, organized conspiracies, rather than street corner cases, as suggested by Justice Jackson in his concurrence in *Dennis*, have not been tested. Thus, it is unresolved whether *Brandenburg* would be applied to groups, including terrorist groups, better organized and more effective than the Communist Party, whose members in retrospect posed not as great an internal threat to the stability and security of the United States during the 1950s as was feared at the time. Similarly, although the *Brandenburg* rule would likely apply, it is unresolved whether *Brandenburg* would be used in a prosecution involving religious speech advocat-

---

[243] *Id.* at 18 (citing *Yates*, 354 U.S. at 298).

[244] *Id.* at 20.

[245] *Id.*

[246] Boos v. Barry, 485 U.S. 312, 321 (1983).

[247] *Id.* (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983)).

[248] Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 579 (2001) (Thomas J., concurring in part and concurring in the judgment).

ing the violent overthrow of government, such as a cleric's speech or sermons regarding *jihad,* that went beyond mere abstract doctrine and was directed to advocacy of action.[249] A statute banning "material support" to terrorist groups, including "advice" or "personnel," but permitting "independent advocacy," was upheld in *Holder v. Humanitarian Law Project,* not under *Brandenburg,* but as meeting strict scrutiny review.[250]

Even more so than in cases of speech by terrorists, it is likely that *Brandenburg* supplies the relevant precedent for cases of "media-inspired violence," whether based on a movie or a violent video game. For example, in *Byers v. Edmondson,* the producers of the film *Natural Born Killers* were not held liable for distributing a film which "glorif[ied]" violence and treated "individuals who commit such violence as celebrities and heroes," because no intent to cause immediate harm could be shown under *Brandenburg.*[251] In contrast, in *Rice v. Paladin Enterprises, Inc.,* liability was found against a publisher of a book entitled *Hit Man,* which offered detailed instructions on how to commit a contract murder, because the publisher had "the intent that the book would immediately be used by criminals."[252]

---

[249] *See* John Alan Cohan, *Seditious Conspiracy, the Smith Act, and Prosecution for Religious Speech Advocating the Violent Overthrow of Government,* 17 St. John's J. Legal Comm. 199, 205 (2003).

[250] Holder v. Humanitarian Law Project, 61 U.S. 1, 8–9, 11–12 (2010) (quoting 18 U.S.C. §§ 2339(b)(1), 805(a)(2)(B) (2012)).

[251] Byers v. Edmonson, 712 So. 2d 681, 685 (La. App. 1 Cir. May 15, 1998); *see also* Brown v. Entm't Merchs Ass'n, 564 U.S. __, __, 131 S. Ct. 2729, 2742 (2011) (finding a state ban on selling violent videos games to children unconstitutional under a strict scrutiny analysis); Interactive Digital Software Ass'n v. St. Louis Cty., 329 F.3d 954, 958, 959 (8th Cir. 2003) (finding an ordinance making it unlawful to distribute graphically violent video games to minors without parental consent unconstitutional, since no "imminent" incitement to violence, and under standard First Amendment doctrine the state did not establish that its compelling interest in protecting the psychological well-being of minors was "real, not merely conjectural") (quoting Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664 (1994)); Herceg v. Hustler Magazine, Inc., 814 F.2d 1017, 1030 (5th Cir. 1987) (finding no liability against *Hustler* for publishing article on autoerotic asphyxiation found on floor beneath fourteen-year-old found hanging in his closet); Olivia N. v. Nat'l Broad. Co., 126 Cal. App. 3d 488, 496 (Cal. Ct. App. 1981) (finding no liability against NBC for showing movie, *Born Innocent,* that depicted a rape scene using a "plumber's helper," when copy-cat teenage boys soon thereafter raped a nine-year-old girl in the same fashion).

[252] Rice v. Paladin Entm't, 128 F.3d 233, 248 (4th Cir. 1997); *see also* United States v. Freeman, 761 F.2d 549, 552 (9th Cir. 1985) (holding defendant could be held criminally liable for counseling tax evasion at seminars held in protest of tax laws). *See generally* Eugene Volokh, *Crime-Facilitating Speech,* 57 Stan. L. Rev. 1095 (2005); Rodney A.

### 2. "True Threats"

A second kind of case involving advocacy of illegal conduct occurs where the speaker indicates an intent for the speaker to commit violence, rather than advocating for third parties to commit violence, as in *Brandenburg*. The Court has defined these cases as involving whether the speaker's statement indicates a "true threat" to commit violence.

A case where a "true threat" was not found is *Watts v. United States*.[253] This case involved a demonstrator in Washington, D.C., protesting the draft in 1966, who yelled out, "And now I have already received my draft classification as 1A—and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J."[254] Interpreting a statute that embodied the constitutional requirement of a "true threat" for the government to regulate, the Court stated,

> But whatever the "willfulness" requirement implies, the statute initially requires the Government to prove a true "threat." We do not believe that the kind of political hyperbole indulged in by petitioner fits within that statutory term. . . . . We agree with petitioner that his only offense here was "a kind of very crude offensive method of stating a political opposition to the President."[255]

In applying the "true threat" test, the courts have adopted an objective test that focuses on whether a reasonable person would interpret the threat as a serious expression of an intent to cause a present or future harm.[256] However, there is a split among the courts in determining from whose viewpoint the statement should be interpreted. Some courts ask whether a reasonable person standing in the shoes of the speaker would foresee the recipient and perceive the statement as a threat,[257] whereas others ask how a reasonable person standing in the recipient's shoes would view the threat.[258]

Those courts that adopt the speaker's viewpoint have noted:

---

Smolla, *Should the* Brandenburg v. Ohio *Incitement Test Apply in Media Violence Tort Cases*, 27 N. Ky. L. Rev. 1 (2000).

[253] 394 U.S. 705, 708 (1969).

[254] *Id.* at 706.

[255] *Id.* at 708.

[256] *See* United States v. Miller, 115 F.3d 361, 363 (1997) (citing United States v. Smith, 928 F.2d 740, 741 (6th Cir. 1991)).

[257] *See infra* text accompanying note 259.

[258] *See infra* text accompanying notes 260–62.

This standard not only takes into account the factual context in which the statement was made, but also better avoids the perils that inhere in the "reasonable-recipient standard," namely that the jury will consider the unique sensitivity of the recipient. We find it particularly untenable that, were we to apply a standard guided from the perspective of the recipient, a defendant may be convicted for making an ambiguous statement that the recipient may find threatening because of events not within the knowledge of the defendant.[259]

On the other hand, if the concern is to "protect[ ] individuals from the fear of violence" and "from the disruption that fear engenders," as stated by the Supreme Court in *Virginia v. Black*,[260] the perspective of recipients seems the better perspective. Under that perspective, courts have set forth "a nonexhaustive list of factors relevant to how a reasonable recipient would view the purported threat."[261]

Those factors include: 1) the reaction of those who heard the alleged threat; 2) whether the threat was conditional; 3) whether the person who made the alleged threat communicated it directly to the object of the threat; 4) whether the speaker had a history of making threats against the person purportedly threatened; and 5) whether the recipient had a reason to believe that the speaker had a propensity to engage in violence."[262]

Such factors should diminish the threat that the analysis will focus on a "uniquely sensitive" recipient, but rather on a reasonable recipient of the speech.

In most circumstances, of course, either test will yield the same result in practice, since both focus on objective evidence regarding the individual's speech. As the Eighth Circuit Court of Appeals noted, "the result will differ *only* in the extremely rare case when a recipient suffers from some unique sensitivity *and* that sensitivity is unknown to the speaker."[263] In addition, the Ninth Circuit has noted that even under the speaker's viewpoint standard

"[a]lleged threats should be considered in light of their entire factual context, including the surrounding events and the reaction of the listeners." 'So long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific . . . as to convey a gravity of purpose and imminent prospect of execution, the statute may properly be applied.'[264]

---

[259] United States v. Fulmer, 108 F.3d 1486, 1491 (1st Cir. 1997).

[260] 538 U.S. 343, 360 (2003) (citations omitted).

[261] Doe v. Pulaski Cty. Special Sch. Dist., 306 F.3d 616, 623 (8th Cir. 2002).

[262] *Id.* at 623.

[263] *Id.* For discussion of the "true threat" test generally, see Jennifer Rothman, *Freedom of Speech and True Threats*, 25 HARV. J.L & PUB. POL'Y 283, 303 (2011).

[264] Lovell v. Poway Unified Sch. Dist., 90 F.3d 367, 372 (9th Cir. 1996) (citations omitted).

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 042

In *Elonis v. United States,* while avoiding the constitutional issue of what is required to be a "true threat," the Court held that 18 U.S.C. § 875(c), which makes it a federal crime to transmit in interstate commerce "any communication containing any threat . . . to injure the person of another," requires that the defendant have "subject intent" to issue a threat or "know" communication would be viewed as a threat; the Court left unanswered whether "reckless disregard" of how the speech could be viewed by others would count as "knowledge."[265] In reaching this decision, the Court overruled the Third Circuit's view that it was sufficient under the statute to show that defendant's Facebook page about murdering his estranged wife, massacring a class of kindergartners, and slitting an FBI agent's throat would be viewed by a "reasonable observer" as a true threat, regardless of whether defendant's "subject intent" was to cause fear.[266]

Courts have had to face whether speech represents a "true threat" in a variety of circumstances.[267] While the issue is not without dispute, the better argument is that, to constitute a "true threat," the speaker must threaten that *the speaker* will cause the harm, or someone with whom the speaker *controls, directs, or otherwise* is involved in a conspiracy. If the speaker merely advocates violence by others, that speech should be governed by the *Brandenburg* test regarding the advocacy of illegal conduct.[268] For example, in *Virginia v. Black,* the Supreme Court applied the "true threat" analysis because the relevant statute made it a crime "for *any person or persons,* with the intent of intimidating any per-

---

[265] Elonis v. United States, 575 U.S. __, __, __, __, 135 S. Ct. 2001, 2004, 2011, 2017–18 (2015) (citations omitted).

[266] *Id.* at __, __, 135 S. Ct. at 2006, 2013, *rev'g,* 730 F.3d 1293 (11th Cir. 2013).

[267] *See, e.g.,* United States v. Alaboud, 347 F.3d 1293, 1298 (11th Cir. 2003) (holding that threats to Jewish lawyer and his law firm by former, disgruntled Iraqi client, including statements you "will burn" and "ax and sledgehammers would be used to make justice," held to constitute a "true threat"); United States v. Hanna, 293 F.3d 1080, 1082, 1087 (9th Cir. 2002) (remanding for new trial on true threat issue for handwritten words, drawings, and other notes, such as "Kill the Beast," referring to President Clinton and his pro-choice selection of Ruth Bader Ginsburg to be on the Supreme Court); Nat'l Org. for Women, Inc. v. Scheidler, 267 F.3d 687, 702 (7th Cir. 2001) (holding that abortion protestors who had physically assaulted abortion clinic staff, and destroyed some clinic property, including medical equipment, made "true threats" when they sent letters to other clinics saying they would be subjected to similar attacks); United States v. Landham, 251 F.3d 1072, 1084 (6th Cir. 2001) (holding that a sequence of harassing statements made by estranged husband, including that wife will not get to raise the children, was not a true threat, as there was no communication of intent to kidnap children or physically harm wife).

[268] *See supra* text accompany notes 235–52.

son or group of persons, *to burn, or cause to be burned,* a cross on the property of another, a highway or other public place."[269] This is consistent with the test for the "true threat" in *Black* that "the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."[270] This requires that the "speaker . . . commit an act," not some third party.[271]

Despite this analysis, it has been suggested that as long as a reasonable person would perceive that a threat has been made, a true threat exists no matter who would carry out the threat.[272] This has been particularly suggested for threats made on the Internet because "the unique characteristics of the Internet blur the distinction between threats and incitement by allowing speakers to threaten by incitement—that is, creating fear by increasing the likelihood of ensuing violence without actually threatening to carry out the violence themselves."[273] While no Supreme Court case supports this theory, a case used to support the theory is the Ninth Circuit's *en banc* opinion in *Planned Parenthood v. American Coalition of Life Activists (ACLA).*[274] This case involved the posting, on an Internet website, the names and addresses of doctors performing abortions, with context suggesting harm be done.[275] While superficially this case may suggest that advocating that third persons do harm to these doctors could constitute a "true threat," in fact the Ninth Circuit did find a direct connection between the website and harm to doctors sufficient to satisfy a "harm, or caused to be harmed" analysis, as in *Black.*[276] The Justices in dissent in *Planned Parenthood* similarly noted, "Although the majority's definition does not specify who is to inflict the threatened harm, use of the active verb 'inflict' rather than a passive phrase, such as 'will be harmed,' strongly suggests that the speaker must indicate he will take an active role in the

---

[269] 538 U.S. 343, 348 (2003) (citation omitted) (emphasis added).

[270] *Id.* at 359.

[271] *Id.*

[272] Scott Hammack, *The Internet Loophole: Why Threatening Speech On-Line Requires a Modification of the Courts' Approach to True Threats and Incitement,* 36 COLUM. J.L. SOC. PROB. 65, 67 (2002).

[273] *Id.; see also* Thomas E. Crocco, *Inciting Terrorism on the Internet: An Application of Brandenburg to Terrorist Websites,* 23 ST. LOUIS U. PUB. L. REV. 451, 456 (2004).

[274] Planned Parenthood v. Am. Coal. of Life Activists, 290 F.3d 1058, 1063 (9th Cir. 2002).

[275] *Id.* at 1062.

[276] *Id.* at 1086.

inflicting."[277] Academic commentary also supports the view that this requirement is an integral component of "true threat" analysis.[278] Further, the Supreme Court has squarely rejected in the context of child pornography the view that different First Amendment standards should apply for speech on the Internet.[279] After an extensive review of the Internet, the Court stated, without dissent, in *Reno v. ACLU*, "[O]ur cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium."[280]

Recent cases of "true threats" include *United States v. Dillard*.[281] The district court concluded in *Dillard* that a Kansas woman's letter, meant to dissuade a doctor from providing abortion services, which used language threatening the doctor with statements such as "[w]e will not let this abomination continue," raised a triable issue of fact of whether the statements constituted a true threat.[282] The court noted that the doctor was receiving training to provide abortion services after her friend, Dr. George Tiller, a prominent provider of abortion services, had been killed by an anti-abortion activist.[283] Another "true threat" case occurred in *United States v. Turner*.[284] In this case, a blogger was unhappy with the Seventh Circuit's decision in *NRA of America v. City of Chicago*, which held that the Second Amendment was not incorporated into the Fourteenth Amendment Due Process Clause, and thus applicable against the states, a decision later reversed by the Su-

---

[277] *Id.* at 1089 (Kozinski, J., dissenting). This dissent was joined by Justices Reinhardt, O'Scannlain, Kleinfeld, and Berzon. *Id.* at 1088.

[278] *See, e.g.*, Steven G. Gey, *The Nuremberg Files and the First Amendment Value of Threats*, 78 Tex. L. Rev. 541, 590 (2000) (stating that part of what "separates constitutionally unprotected true threats from constitutionally protected . . . political intimidation is [that] . . . the speaker communicates the intent to carry out the threat personally or to cause it to be carried out"); Jennifer E. Rothman, *Freedom of Speech and True Threats*, 25 Harv. J.L. & Pub. Pol'y 283, 289 (2001) (stating that "determining what is a true threat . . . [should] require[ ] proof that the speaker explicitly or implicitly suggest that he or his co-conspirators will be the ones to carry out the threat").

[279] Reno v. ACLU, 521 U.S. 844, 870 (1997).

[280] *Id.*

[281] 835 F. Supp. 2d 1120 (D. Kan. 2011).

[282] *Id.* at 1122.

[283] *Id.* at 1121.

[284] 720 F.3d 411, 414 (2d Cir. 2013) (citing NRA of America v. City of Chicago, 567 F.3d 856 (7th Cir. 2009), *rev'd and remanded sub nom.* McDonald v. City of Chicago, 561 U.S. 742 (2010), and *cert. granted, cause remanded sub nom.* Nat'l Rifle Ass'n of Am., Inc. v. City of Chicago, 561 U.S. 1041 (2010)); *see also* Brewington v. Indiana, 7 N.E.3d 946 (Ind. 2014) (discussing "true threats" to district court judge, judge's wife, and psychologist who was an expert witness in divorce case).

preme Court.[285] The blogger wrote that the Seventh Circuit judges on the panel "deserve[d] to be killed," were "traitors" to the United States, and judges should "[o]bey the Constitution or die."[286] The court held that the individual could be convicted under 18 U.S.C. Section 115(a)(1)(B), which makes it unlawful to threaten to "assault, kidnap, or murder, a United States official, a United States judge, a Federal law enforcement officer, or [other covered federal] official."[287] In the absence of a "true threat," normal First Amendment doctrine would apply.[288]

A number of cases involving "true threats" have occurred in the context of schools. Typically, threats of violence against other students or teachers, or violent images relating to students or teachers, have been held to create "true threats."[289] In other cases, without regard to "true threat" analysis, courts have regulated such speech under the *Tinker* standard of a "substantial and material disruption" to the school environment.[290]

---

[285] 720 F. 3d 411, 414. *See generally McDonald*, 561 U.S. at 1041 (2010).

[286] *Turner*, 720 F.3d at 415.

[287] *Id.* at 420, 429.

[288] *See, e.g.*, United States v. Cassidy, 814 F. Supp. 2d 574, 588 (D. Md. 2011) (discussing a federal interstate stalking statute that did not meet intermediate review for content-neutral regulation of speech as applied to defendant charged for using an Internet blog and a real-time information network to cause substantial emotional distress to a person in another state).

[289] *See, e.g.*, Doe v. Pulaski Cty. Special Sch. Dist., 306 F.3d 616, 619, 624 (8th Cir. 2002) (discussing that a threat by an eighth grade student to "molest, rape, and murder" a former girlfriend, which was found in a letter by a classmate in the boy's room, constituted a "true threat," given finding that student intended to communicate the letter because he allowed a classmate to read the letter and discussed the contents with him); Jones v. State, 64 S.W.3d 728, 736–37 (Ark. 2002) (lyrics to rap song which fifteen-year-old wrote and gave to classmate, in which he threatened to kill classmate and her family, constitutes a "true threat"); *see also* LaVine v. Blaine Sch. Dist., 257 F.3d 981, 987 (9th Cir. 2001) ("We live in a time when school violence is an unfortunate reality that educators must confront on an all too frequent basis. The recent spate of school shootings have put our nation on edge and have focused attention on what school officials, law enforcement and others can do or could have done to prevent these kinds of tragedies."); William Bird, Comment, *True Threat Doctrine and Public School Speech*, 26 U. Ark. Little-Rock L. Rev. 111 (2003); Fiona Ruthven, *Is the True Threat the Student or the School Board? Punishing Threatening Student Expression*, 88 Iowa L. Rev. 931 (2003).

[290] *See, e.g.*, LaVine v. Blaine Sch. Dist., 257 F.3d 981, 990–92 (9th Cir. 2001) (holding that a school had enough facts to expel a student who made threats); J.S. v. Bethlehem Sch. Dist., 807 A.2d 847, 856 (Pa. 2002) (discussing that a school is entitled to take action against a student for statements that amounted to a true threat).

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 046

### 3. Hate Crimes Statutes

In addition to cases involving the advocacy of illegal conduct, or cases involving true threats, another category of speech raising similar concerns involves "hate speech" made in the context of ongoing illegal activity. While ongoing conduct can be regulated without regard to the First Amendment, since it involves conduct, not speech, if the government attempts to make the related "hate speech" an independent crime, then that raises First Amendment concerns.

Such a law was involved in the 1992 decision of *R.A.V. v. City of St. Paul.*[291] An ordinance in St. Paul provided the following:

> Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.[292]

The Minnesota Supreme Court said that the law reached only fighting words and, thus, triggered that exception to "limited protected speech."[293] The only question then for the Court to review was whether the statute was nonetheless viewpoint discrimination, which would trigger strict scrutiny.[294] The Court did find that the statute constituted viewpoint discrimination.[295]

In other cases, "hate crimes" statutes have gone beyond regulating mere fighting words, and have triggered a more extended free speech analysis. In many of these cases, courts have interpreted the statutes so that the "hate crimes" aspect of the statute only applied to "true threats," and thus met that test for "limited protected speech."[296] For example, the Ninth Circuit observed in *Lovell By and Through Lovell v. Poway United School District:*

> California courts have also considered the issue of First Amendment protection for threats. *See, e.g.,* In re M.S., 10 Cal.4th 698, 42 Cal. Rptr.2d 355, 896 P.2d 1365 (1995) (upholding the constitutionality of state hate crimes statutes that punish threats if the speaker has the apparent ability to carry out the threat and has reasonably induced fear of violence in the victim); People v. Fisher, 12 Cal. App.4th 1556, 15 Cal. Rptr.2d 889

---

[291] 505 U.S. 377 (1992).
[292] *Id.* at 380.
[293] *Id.* On the fighting words exception, see *infra* text accompanying notes 316–24.
[294] *Id.* at 403–04 (White, J., concurring).
[295] *Id.* at 391 (majority opinion).
[296] *Id.* at 436 (Stevens, J., concurring).

(1993) (upholding a conviction . . . "as long as the circumstances are such that the threats are so unambiguous and have such immediacy that they convincingly express an intention of being carried out."). In these cases, the California courts relied on both *Orozco-Santillan* and *Kelner* to determine whether a threat is a "true threat" and therefore may be criminalized.[297]

In the modern age, the Court has never held that any "hate crimes" statute is constitutional unless it was narrowly defined to reach only other categories of "limited protected speech," such as advocacy of illegal conduct, true threats, or fighting words. The best chance for such a statute would probably be to relate the "hate speech" to certain negative "secondary effects" to trigger intermediate review under standard free speech doctrine, as the University of Michigan attempted in *Doe v. University of Michigan*.[298] On the other hand, the Supreme Court made it clear in *Wisconsin v. Mitchell* that if the relevant statute merely enhances the penalty for a crime based on bias-inspired conduct, rather than making that bias an independent crime, such a statute is constitutional.[299]

A related issue involves the enforcement of laws, such as banning racially or sexually hostile work environments, where the hostile work environment is caused by speech. Without much extended analysis, the Court has permitted such hostile work environment cases to go forward, implicitly viewing the underlying hostile work environment as produced by discriminatory conduct, not speech.[300] Regarding other kinds of issues that can arise in the employment context, alternatives to

---

[297] 90 F.3d 367, 372 (9th Cir. 1996).

[298] 721 F. Supp. 852, 863–64 (E.D. Mich. 1989); *see infra* text accompanying notes 302–08.

[299] 508 U.S. 476, 485, 490 (1993) (holding that an "enhancement" statute is constitutional because sentencing judges traditionally consider a wide variety of factors in addition to evidence bearing on guilt, including the defendant's motive, when making a sentencing decision).

[300] *See, e.g.,* Harris v. Forklift Sys., Inc., 510 U.S. 17, 21–22 (1993) (holding that a company president's repeated comments to an employee were sufficient under Title VII (1) to be viewed subjectively as harassment by the victim and (2) were severe or pervasive enough that an objective reasonable person would agree that it is harassment); R.A.V. v. St. Paul, 505 U.S. 377, 389 (1992) (noting that "sexually derogatory 'fighting words,' . . . may produce a violation of Title VII's general prohibition against sexual discrimination in employment practices"); Jennie Randall, *"Don't You Say That!": Injunctions Against Speech Found to Violate Title VII Are Not Prior Restraints,* 3 U. PA. J. CONST. L. 990, 998 (2001) (applying similar analysis to cases of racially hostile work environments under Title VII). Many European countries ban any workplace speech or conduct that constitutes an insult to human dignity, or "mobbing," in addition to the American model of workplace harassment based only on the "status" of race, gender, religion, or national

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 048

direct regulation of offensive speech might involve: counter-speech promoting the opposite viewpoint; economic boycotts of companies or individuals supporting controversial causes; or adverse employment decisions, particularly for spokesperson-entertainers or radio or television commentators. Without regard to any statutory ban on employment discrimination based on race, sex, religion, or other such grounds, existing social norms pressure most employers to tolerate a wide-range of viewpoints among their workforce, even if the employer disagrees with those viewpoints, as long as the employees do their jobs well.[301]

### 4. Hate Speech

In some cases, statutes or government regulations have attempted to regulate or ban certain kinds of "hate speech" where no illegal or other violent conduct was taking place.[302] In many of these cases, courts have viewed such "hate speech" statutes as unconstitutionally vague.[303] For example, in *Doe v. University of Michigan*, a district court concluded that words in a university policy that required the language must "stigmatize" or "victimize" are "general and elude precise definition."[304] In addition, the "secondary effects" clause of the law required that the language, in order to be sanctionable, had to "involve an express or implied threat" affecting "an individual's academic efforts, employment, participation in University sponsored extra-curricular activities or personal safety."[305] As the court noted,

> It is not clear what kind of conduct would constitute a "threat" to an individual's academic efforts. It might refer to an unspecified threat of future retaliation by the speaker. Or it might equally plausibly refer to the threat to a victim's academic success because the stigmatizing and victimizing speech is so inherently distracting. Certainly the former would be unprotected speech. However, it is not clear whether the latter would.[306]

---

origin. *See generally* Vicki Schultz, *Global Perspectives on Workplace Harassment Law*, 8 EMP. RTS. & EMP. POL'Y J. 151 (2004).

[301] *See generally* Eugene Volokh, *Deterring Speech: When is it "McCarthyism"? When Is it Proper?*, 93 CAL. L. REV. 1413, 1424–42 (2005).

[302] 1 CHARLES D. KELSO & R. RANDALL KELSO, THE PATH OF CONSTITUTIONAL LAW 324 (2007) (ebook), http://libguides.stcl.edu/kelsomaterials [hereinafter 1 KELSO & KELSO, THE PATH OF CONSTITUTIONAL LAW].

[303] *Id.*; *see also* Elena Kagan, *Regulation of Hate Speech and Pornography after* R.A.V., 60 U. CHI. L. REV. 873, 889 (1993).

[304] 721 F. Supp. 852, 867 (E.D. Mich. 1989).

[305] *Id.* at 867.

[306] *Id.*

Further, under the policy, it was not clear what conduct would be held to "interfere" with an individual's academic efforts. The court noted, "The language of the policy alone gives no inherent guidance. The one interpretive resource the University provided was withdrawn as 'inaccurate,' an implicit admission that even the University itself was unsure of the precise scope and meaning of the Policy."[307] In addition, the court also concluded in *Doe v. University of Michigan* that independent of the vagueness problem, the policy was substantially overbroad in reaching protected speech, such as not exempting statements made in the course of classroom discussions from the sanctions of the policy.[308]

A similar conclusion was reached by the Third Circuit in *Saxe v. State College Area School District* regarding a school's anti-harassment policy that prohibited a substantial amount of non-vulgar, non-sponsored student speech that would not cause a substantial disruption of the work of the school.[309] Of course, vulgar or school-sponsored speech could be regulated under *Fraser*, while speech causing a substantial disruption could be regulated under *Tinker*.[310]

As with "hate crimes" statutes, in the modern era, the Court has never held that any "hate speech" statute is constitutional unless it was narrowly defined to reach only other categories of "limited protected speech," such as advocacy of illegal conduct, true threats, or fighting words. A 1952, 5-4 decision, *Beauharnais v. Illinois*, did uphold a "group libel" law that made it unlawful to expose "the citizens of any race, color, creed or religion to contempt, derision, or obloquy or which is productive of breach of the peace or riots."[311] Since 1954,

---

[307] *Id.* at 864–65.

[308] *Id.* at 861, 864, 866.

[309] 240 F.3d 200, 214, 216 (3d Cir. 2001). *But see* O'Brien v. Welty, No. 13–16279, 2016 WL 1382240 (9th Cir. Apr. 7, 2016) (less vague and less overbroad campus speech regulation focused on "harassing" or "intimidating" speech upheld). On such hate speech statutes generally, see, for example, Roni Cohen, *Regulating Hate Speech: Nothing Customary About It*, 15 CHI. J. INT'L L. 229 (2014) (contrasting international norms with current norms in the United States regarding speech); Alexander Tsesis, *Burning Crosses on Campus: University Hate Speech Codes*, 43 CONN. L. REV. 617 (2010) (discussing whether hate speech attacks an individual's First Amendment rights); Catherine B. Johnson, Note, *Stopping Hate Without Stifling Speech: Re-Examining the Merits of Hate Speech Codes on University Campuses*, 27 FORDHAM URB. L.J. 1821 (2000) (discussing the nature of free speech on college campuses).

[310] *See supra* text accompanying notes 118–36.

[311] 343 U.S. 250, 251, 266 (1952); *id.* at 270 (Black, J., dissenting) (expressing an absolutist view that "no legislature is charged with the duty or vested with the power to

*Beauharnais* has not been followed in the United States.[312] Writing for the Court in *Terminiello v. Chicago*, Justice Douglas noted that free speech may "best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger."[313] Even for "politically incorrect" speech, such as displays of the Confederate flag given the history of the Confederacy in supporting slavery, the First Amendment would likely protect such displays if attempts were made to make such displays unlawful, absent the particular context suggesting an advocacy of illegal conduct, true threat, or fighting words analysis.[314] An injunction was denied to prevent a neo-Nazi party from holding a demonstration and marching through Skokie, Illinois, which has a large Jewish population; anticipation of hostile audience cannot justify a prior restraint.[315]

### B. *Fighting Words*

In 1942, the Court unanimously sustained a conviction in *Chaplinsky v. New Hampshire*.[316] The case involved calling a police officer a "damned Fascist."[317] The statute banning annoying words was construed only to ban words that ordinary people know are "likely to cause a breach of the peace."[318]

---

decide what public issues Americans can discuss"); *id.* at 277, 281–82 (Reed, J., dissenting) (asserting that statute is unconstitutionally vague); *id.* at 302, 304 (Jackson, J., dissenting) (asserting a state could regulate only if these words constituted "clear and present danger" of fomenting "racial or sectarian hatreds").

[312] 1 KELSO & KELSO, THE PATH OF CONSTITUTIONAL LAW, *supra* note 302, at 326.

[313] 337 U.S. 1, 4 (1949). Unlike America, "group libel" statutes are viewed as constitutional in Europe. *See* John C. Knechtle, *When to Regulate Hate Speech*, 110 PENN ST. L. REV. 539, 548–49 (2006).

[314] *See, e.g.*, Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dept. of Motor Vehicles, 288 F.3d 610, 623–24 (4th Cir. 2002) (holding that the prohibition against the use of logos on specially made license plates, where the ban is to "ensure that the battle flag does not appear on the special license plate" of Sons of Confederate Veterans is unconstitutional viewpoint discrimination), *rev'd on other grounds*, Walker v. Texas Div. Sons of Confederate Veterans, Inc., 576 U.S. __, __, 135 S. Ct. 2239, 2245–46 (2015) (holding that license plates are government speech, rendering free speech doctrine inapplicable in this context). *But see* Alexander Tsesis, *The Problem of Confederate Symbols: A Thirteenth Amendment Approach*, 75 TEMPLE L. REV. 539, 554–55 (2002) (arguing bans on use of the Confederate flag should be constitutional under a Thirteenth Amendment analysis as a "badge or incident" of slavery).

[315] Skokie v. Nat'l Socialist Party of Am., 69 Ill. 2d 605, 609, 621, 373 N.E.2d 21, 25–26 (Ill. 1978).

[316] 315 U.S. 568 (1942).

[317] *Id.* at 569.

[318] *Id.* at 573–74.

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 051

Cases in the modern era have tended to yield different results. In 1972, in *Lewis v. New Orleans*, the Court held a mother did not utter "fighting words" when she yelled at police who were arresting her son, "god-damn-mother-fucker-police."[319]  In 1973, in *Hess v. Indiana*, the Court said that a statement during an anti-war protest that "[w]e'll take the fucking street later" was constitutionally protected where the words were not aimed at anyone in particular.[320]  In 1987, the Court noted in *City of Houston v. Hill* that an ordinance that made it unlawful to "oppose, molest, abuse or interrupt any policeman in the execution of his duty" was not limited to fighting words or obscene language, and held that the Constitution does not allow such speech to be made a crime.[321] Such a law, the Court said, is substantially overbroad.[322]

Despite limited use of *Chaplinsky* in the modern era, a few lower federal courts and state courts have upheld convictions, or otherwise failed to protect speech by denying actions for wrongful arrest for speech or imposing civil fines, based upon a "fighting words" rationale, particularly for derogatory comments directed at police officers, with many of those reported cases involving comments by racial minorities.[323]  Even when the defendant prevailed, time, money, and energy had to be expended on the defense.  For these reasons, some commentators have argued that *Chaplinsky* continues to represent a threat to free speech values and should be overruled.[324]

### C.  Obscene Speech

Originally, Congress was not very active in dealing with obscenity, and did not bar the import of obscene pictorial matter until 1842.  In response to publishers sending material to Union soldiers during the Civil War, that statute was extended in 1865 to barring obscene material from the mails.[325]  As recounted by the Court in *Roth v. United*

---

[319] 408 U.S. 913 (1972) (Powell, J., concurring).

[320] 414 U.S. 105, 107, 108–09 (1973).

[321] 482 U.S. 451, 455, 462 (1987).

[322] *Id.* at 467.

[323] 1 KELSO & KELSO, THE PATH OF CONSTITUTIONAL LAW, *supra* note 302, at 319.

[324] *See, e.g.*, Burton Caine, *The Trouble with "Fighting Words": Chaplinsky v. New Hampshire is a Threat to First Amendment Values and Should be Overruled*, 88 MARQ. L. REV. 441 (2004) (including an Appendix discussing eighty-nine "fighting words" cases decided from 1996–2001, with thirty-nine federal cases and fifty state cases, noting the racially discriminatory effect in those cases).

[325] *See* Donna I. Dennis, *Obscenity Law and the Conditions of Freedom in Nineteenth-Century United States*, 27 LAW & SOC. INQUIRY 367, 384 (2002) (citing, *inter alia*, 17 Stat. 599 (1842)).

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 052

*States*,[326] general regulation of obscenity in the states began in 1821; after 1868, a few states adopted the English test, found in *Regina v. Hicklin*, which involved asking whether even isolated passages in a publication had a tendency to corrupt minds open to immoral influences.[327]

In 1873, Congress passed the Comstock Act.[328] It barred from the mails any "obscene, lewd, or lascivious book, pamphlet, picture, paper, print, or other publication of an indecent character, or any article or thing designed or intended for the prevention of conception or procuring of abortion, nor any article or thing intended or adapted for any indecent or immoral use or nature."[329] In *Ex parte Jackson*, a case involving the use of the mail to support an illegal lottery, the Court noted, referring to the Comstock Act, that "the object of Congress has not been to interfere with the freedom of the press, or with any other rights of the people; but to refuse its facilities for the distribution of matter deemed injurious to the public morals."[330] In 1925, the Court did assume in *Gitlow v. New York* that freedom of speech and the press were among the fundamental personal liberties protected from state action by the Fourteenth Amendment Due Process Clause.[331] In 1931, reflecting the limited view of the First Amendment, the Court indicated in *Near v. Minnesota* that protections from prior restraint do not apply to obscenity, saying that "the primary requirements of decency may be enforced . . . against obscene publications."[332]

In 1934, the Second Circuit rejected *Regina v. Hicklin* and, in an opinion widely followed thereafter, suggested concentrating on how the dominant theme of the work "taken as a whole" affects the "objective" reader, rather than a focus on the effect of mere "isolated passages" on particularly sensitive readers "open to immoral influ-

---

[326] 354 U.S. 476, 482–90 (1957) (citing, *inter alia*, Regina v. Hicklin, L.R. 3 Q.B. 360, 368 (1868)).

[327] *Id.* at 488–89.

[328] Craig L. LaMay, *America's Censor: Anthony Comstock and Free Speech*, 19 COMM. & L. 1, 2 (1997).

[329] 17 Stat. 599 (1873). *See generally* Margaret A. Blanchard, *The American Urge to Censor: Freedom of Expression Versus the Desire to Sanitize Society—From Anthony Comstock to 2 Live Crew*, 33 WM. & MARY L. REV. 741, 744–60 (1992) (explaining the historical background of Anthony Comstock's censorship movement).

[330] 96 U.S. 727, 736 (1877).

[331] 268 U.S. 652, 666 (1925).

[332] 283 U.S. 697, 716 (1931).

ences."[333] In 1942, the Court stated in *Chaplinsky* that the "lewd and obscene" are among "certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."[334] In 1948, a divided 4-4 Court affirmed a New York conviction for obscenity.[335] In 1952, the Court reaffirmed that obscenity, like libel, is not protected speech.[336]

During the modern era, the Court has given potentially obscene speech much greater protection by limiting the amount of speech that could be defined as constitutionally obscene. The Court's first effort to define obscenity for both state and federal statutes was made in 1957 by Justice Brennan, writing for the Court in *Roth v. United States*.[337] *Roth* held that obscene material is "utterly without redeeming social importance," and that material is obscene and without constitutional protection if "to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest."[338] Under *Roth*, obscenity was clearly different than immorality, because New York could not refuse, under *Roth*, to license a film on the ground that it presented adultery as a desirable, acceptable, and proper pattern of behavior.[339] Despite this seemingly tough test, the petitioner's convictions were upheld for distributing material that would not likely be viewed as patently offensive obscene material under the current *Miller* test.

In 1959, the Court required in *Smith v. California* that scienter, i.e., intent or recklessness, be found before a bookseller could be convicted of possessing obscenity.[340] In 1964, the Court created an added check in *Jacobellis v. Ohio* by holding that appellate courts must make an independent judgment on whether materials are protected, and not defer to jury judgment on that issue.[341] On the other hand, the Court said in *Ginzburg v. United States*, in 1966, that it may be decisive in proving

---

[333] United States v. One Book Called "Ulysses", 5 F. Supp. 182 (S.D.N.Y. 1933), *aff'd sub nom.* United States v. One Book Entitled Ulysses by James Joyce, 72 F.2d 705, 706–09 (2d Cir. 1934).
[334] Chaplinsky v. New Hampshire, 315 U.S. 568, 571–72 (1942).
[335] Doubleday & Co. v. New York, 335 U.S. 848, 849 (1948). Justice Frankfurter, a friend of the author, did not participate in the consideration or decision of the case. *Id.*
[336] Beauharnais v. Illinois, 343 U.S. 250, 266 (1952).
[337] 354 U.S. 476, 479–80 (1957).
[338] *Id.* at 484, 489.
[339] *See* Kingsley Int'l. Pictures Corp. v. Regents of the Univ. of N.Y., 360 U.S. 684 (1959).
[340] 361 U.S. 147, 149–55 (1959).
[341] 378 U.S. 184, 189–90 (1964).

material is obscene that "the purveyor's sole emphasis [is] on the sexually provocative aspects of his publications."[342] In addition, the Court pointed out the following in 1974 in *Hamling v. United States* regarding the scienter requirement:

> It is constitutionally sufficient that the prosecution show that a defendant had knowledge of the contents of the materials he distributed, and that he knew the character and nature of the materials. To require proof of a defendant's knowledge of the legal status of the materials [that is, he knew the materials were obscene] would permit the defendant to avoid prosecution by simply claiming that he had not brushed up on the law.[343]

By 1966, there was no longer majority support for the definition of obscenity given in *Roth*. In the *Memoirs* case, Justices Douglas and Black continued with their view that there could be no censorship of expression not intertwined with illegal conduct.[344] Justice Brennan, joined by Chief Justice Warren and Justice Fortas, transformed a reason given in *Roth* for regulating obscenity into part of its definition, by saying that material could not be found obscene under *Roth* unless it was "utterly without redeeming social value."[345] Justice Stewart, concurring, also seemed to go beyond *Roth* based upon his dissent in *Ginzburg v. United States*, which had spoken in terms of "hard core" pornography. He had said two years earlier in *Jacobellis v. Ohio* that he could not define obscenity, but "I know it when I see it."[346] Giving some greater content to that test, Justice Stewart noted in *Ginzburg* that problematic materials include the following:

> [P]hotographs, both still and motion picture, with no pretense of artistic value, graphically depicting acts of sexual intercourse, including various acts of sodomy and sadism, and sometimes involving several participants in scenes of orgy-like character. They also include strips of drawings in comic-book format grossly depicting similar activities in an exaggerated fashion. There are, in addition, pamphlets and booklets, sometimes with photographic illustrations, verbally describing such activities in a bizarre manner with no attempt whatsoever to afford portrayals of character or situation and with no pretense to literary value.[347]

---

[342] 383 U.S. 463, 470 (1966).

[343] 418 U.S. 87, 123 (1974).

[344] Memoirs v. Massachusetts, 383 U.S. 413, 421 (1966) (Black, J., concurring); *see also Ginzburg*, 383 U.S. at 476–77 (1966) (Black, J., dissenting); *id.* at 430–32 (Douglas, J., concurring).

[345] *Id.* at 419 (Brennan, J., plurality).

[346] *Jacobellis*, 378 U.S. at 197 (Blackmun, J., dissenting).

[347] *Memoirs*, 383 U.S. at 421 (Stewart, J., concurring); *see also Ginzburg*, 383 U.S. at 499 n.3 (Stewart, J., dissenting) (citing *Jacobellis*, 378 U.S. at 197 (Stewart, J., concurring)).

Three dissents in *Memoirs* indicated that each wanted continued adherence to the views he had expressed in *Roth*.[348] Thereafter, in thirty-one cases, the Court reversed obscenity convictions when five members of the Court, applying their own tests, deemed the material not to be obscene.[349] This was said to be the *Redrup* approach, after *Redrup v. New York*, decided in 1967.[350]

Greater clarity came with the Supreme Court's decision in 1973 in *Miller v. California*.[351] The *Miller* definition of obscenity requires the trier of fact to decide: (1) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to prurient interest; (2) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (3) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.[352] Under *Miller*, the "contemporary community standards" need not be national; a jury can be instructed to apply standards of its state—but the impact of the materials will be judged by their effect on an average person, rather than one particularly susceptible or sensitive.[353] The Court has said that prurient material is that which tends to excite lustful thoughts, including "having itching, morbid or lascivious longings; of desire, curiosity, or propensity, lewd."[354]

This new test differs from Justice Brennan's plurality opinion in *Roth* in that it shifts away from requiring that the work be "utterly" without social value to requiring only that it "lack serious" value; it returns the decision on obscenity more to juries applying the majority's definition of obscenity, rather than *ad hoc* court review as under the *Redrup* approach; and it adds the requirement that statutes regulating obscenity "specifically define" the regulated conduct to minimize possible vagueness or overbreadth problems with the statute.

Soon after *Miller* was decided, the Court clarified *Miller* in *Jenkins v. Georgia*[355] by refusing to find obscene a movie, *Carnal Knowledge*, star-

---

[348] *Id.* at 441–42 (Clark, J., dissenting); *id.* at 455–56 (Harlan, J., dissenting); *id.* at 460–61 (White, J., dissenting).
[349] Paris Adult Theatre I v. Slaton, 413 U.S. 49, 82 n.8 (1973) (Brennan, J., dissenting).
[350] 386 U.S. 767, 768–71 (1967) (per curiam).
[351] 413 U.S. 15, 24–26 (1973).
[352] *Id.* at 24.
[353] *Id.* at 30.
[354] Roth v. United States, 354 U.S. 476, 487 n.20 (1957).
[355] 418 U.S. 153, 157–61 (1974).

ring Jack Nicholson, Ann Margaret, Candice Bergen, and Art Garfunkel, that did not fall within either of the two illustrations given in *Miller* of what is obscene: (1) patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated, and (2) patently offensive representations of masturbation, excretory functions, and lewd exhibitions of the genitals. The Court said that no one can be subjected to prosecution for the sale or exposure of obscene materials unless they depict or describe patently offensive, i.e., "hard core," sexual conduct, such as conduct described in the *Miller* examples.[356]

Since 1973, the Court has refined *Miller* by holding that the community standard applies only to the first branch of the test, which relates to prurient interest.[357] Whether the work is "patently offensive" under the second branch is determined by a jury under a reasonable person standard, and not by community standards.[358] Whether the work "lacks serious value" is now determined by the court as a matter of law rather than being considered a fact determined by the trier of facts, also under a reasonable person test.[359] The Ninth Circuit held in *United States v. Kilbride* that national, rather than local, community standards should be applied to whether images transmitted over the Internet were obscene.[360]

In recent years, the number of Supreme Court cases on obscenity has declined. Perhaps not as many prosecutions are being brought. Local communities may be dealing with adult movies by zoning laws, rather than by bans. Thus, the law regarding obscenity seems to have become stabilized. Despite this stabilization, Professor Tribe has predicted that over the long run, the definition of obscenity will not be at rest until the Court allows regulation only "in the interest[ ] of unwilling viewers, captive audiences, young children, and beleaguered neighborhoods—but *not* in the interest of a uniform vision of how human sexuality should be regarded and portrayed."[361] While the Court has not adopted Professor Tribe's vision, as a practical matter, the amount of sexually explicit material available to adults today mirrors his stan-

---

[356] *Miller*, 413 U.S. at 26.

[357] *See* Pope v. Illinois, 481 U.S. 497, 500 (1987).

[358] *Id.* at 500–01.

[359] *Id.* at 498.

[360] 584 F.3d 1240, 1254 (9th Cir. 2009).

[361] Laurence H. Tribe, American Constitutional Law 909–10 (2d ed. 1988) (citations omitted).

*Elon Law Review* [Vol. 8: 291

dard. Whether through VHS, DVD, or Internet access, the adult pornography industry is a multi-billion dollar industry; even "hard-core" pornography, although officially banned, as a practical matter, is available to most who wish to acquire it, in the same manner as many illegal drugs are available to those who wish to purchase them. This is notably important because, as the Court held in *Stanley v. Georgia*, an individual has a constitutional right to possess obscene material in the privacy of one's home, and such possession cannot be made the subject of a criminal prosecution.[362] For this reason, despite an occasional prosecution for obscenity involving the sale of adult pornography to a consenting adult, the focus of constitutional law in this area has turned principally to child pornography, and keeping obscene, indecent, or patently offensive images away from children.[363]

Despite arguments to the contrary, the courts apply the same "obscenity" doctrine for pornography depicting women in subordinate sexually explicit imagery. In *American Booksellers v. Hudnut*, the Seventh Circuit declared invalid an ordinance that sanctioned pornography, defined as the subordination of women in sexually explicit ways, including various kinds of sadomasochistic imagery in pictures or words.[364] The statute also provided that "use of men, children, or transsexuals in the place of women" shall constitute pornography under this section.[365] There was no effort to fit pornography, so defined, into the *Miller* definition of obscenity because the ordinance did not refer to prurient interests, community standards, or whether the work, as a whole, had any value.[366] Since the law was not limited to regulating "obscenity" as defined in *Miller*, the court applied standard First Amendment doctrine.[367] Characterizing the ordinance as viewpoint discrimination, the Seventh Circuit held the ordinance violated

---

[362] 394 U.S. 557, 565 (1969).

[363] *See* Clay Calvert & Robert D. Richards, *Adult Entertainment and the First Amendment: A Dialogue and Analysis with the Industry's Leading Litigator and Appellate Advocate*, 6 VAND. J. ENT. L. & PRAC. 147, 149 (2004). For an article bemoaning the availability of sexually explicit material under *Miller*, see Daniel Mark Cohen, *Unhappy Anniversary: Thirty Years Since* Miller v. California: *The Legacy of the Supreme Court's Misjudgment on Obscenity*, 15 St. THOMAS L. REV. 545, 549 (2003).

[364] Am. Booksellers Ass'n, Inc. v. Hudnut, 771 F.2d 323, 324–32 (7th Cir. 1985) (citing, *inter alia*, Catharine A. MacKinnon, *Pornography, Civil Rights, and Speech*, 20 HARV. C.R-C.L L. REV. 1, 21 (1985) (supporting constitutionality of the ordinance)).

[365] *Id.* at 324.

[366] *Id.* at 324–25.

[367] *Id.*

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 058

FILED

APR 0 3 2023

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

strict scrutiny.[368] The court said that the government does not have a compelling interest in barring opinions it thinks are wrong or harmful, even if the depictions of subordination of women tend to perpetuate subordination, and, like racial bigotry, anti-Semitism, or violence on television, "influence the culture and shape our socialization," even if the speech is not directly answerable by more speech.[369] The court said that any other approach would leave the government "in control of all of the institutions of culture, the great censor and director of which thoughts are good for us."[370] Of course, the government could punish the cause of injury during the course of producing such pornography. The Supreme Court denied certiorari, with Chief Justice Burger, and Justices Rehnquist and O'Connor, saying the case should have been set for argument.[371]

Similar issues have arisen regarding artwork pushing the boundaries of societal conventions, such as Robert Mapplethorpe's images of sadomasochistic sex, Andres Serrano's "Piss Christ" (a photograph of a crucifix submerged in urine), or Karen Finley's nude performances, where Finely "places, dabs, smears, pours and sprinkles food on her body to symbolize the violation of the female characters whose tales she shrieks" on stage. While such works are granted First Amendment protection, one author has noted the "potential consequences of a continued failure to afford Postmodern and Contemporary art sufficient protection, namely arbitrary law enforcement, self-censorship, and regulation based on secondary effects."[372]

## D. *Indecency Involving Use of Children*

Child pornography refers primarily to the use of children in the production of pornography, including live performances and depic-

---

[368] *Id.* at 325–26.

[369] *Id.* at 330.

[370] *Id.*

[371] Am. Booksellers Ass'n, Inc. v. Hudnut, 771 F.2d 323 (7th Cir. 1985), *aff'd sub nom.* Hudnut v. Am. Booksellers Ass'n, Inc., 475 U.S. 1001 (1986) (noting that Chief Justice Berger and Justices Rehnquist and O'Conner would find probable jurisdiction and set the case for argument).

[372] Cara L. Newman, *Eyes Wide Open, Minds Wide Shut: Art, Obscenity, and the First Amendment in Contemporary America*, 53 DEPAUL L. REV. 121, 122, 140–58 (2003) (discussing Mapplethorpe, Finley, and other examples of modern art and problems of selective enforcement) (citing Edward de Grazia, *Girls Lean Back Everywhere: The Law of Obscenity and the Assault on Genius*, 11 CARDOZO ARTS & ENT. L.J. 777, 782 (1993) (describing Mapplethorpe's performance)).

tions of children engaging in sexual acts or displays.[373] Like obscene speech, such material falls into the category of "limited protected speech."[374] Justices have uniformly recognized that the exploitive use of children in the production of pornographic material continues to be a serious national problem.[375] The Court has held that although governments may not criminalize possession in the home of obscene material depicting adult activity, a state may bar the possession and viewing of child pornography in the home.[376] Further, the advertising or selling of child pornography can be barred to advance the state's interest in preventing sexual exploitation of children, since, as the Court explained, closing the channels of communication is necessary to control initial production of the material.[377]

Given that the purpose of the ban on distributing materials depicting sexual acts or displays of children is to protect the sexual exploitation of children, the Court held, in 1982, in *New York v. Ferber,* that the *Miller* test is modified so as not to require that the sexual depiction appeal to the prurient interest, or that the conduct be portrayed in a patently offensive manner, or that the material need be considered as a whole.[378] Thus, isolated depictions of children engaging in sexual acts or displays can constitute child pornography under *Ferber.*[379] Further, while under *Miller,* material that "does no more than arouse, 'good, old fashioned, healthy' interest in sex" cannot be obscene,[380] the Court has never indicated that any form of child pornography could meet that test.

In 1990, the Court held in *Osborne v. Ohio* that as long as a state's law requires proof of scienter, i.e., intent or recklessness, it may bar the possession and viewing of child pornography involving a lewd exhibition or a graphic focus on the genitals, provided the statute is sufficiently narrowly tailored.[381] The statute in *Osborne* was narrowly

---

[373] New York v. Ferber, 458 U.S. 747, 749–51 (1982).

[374] *Id.* at 754–56.

[375] *Id.* at 749 nn.1–2.

[376] *Compare* Stanley v. Georgia, 394 U.S. 557, 564–68 (1969) (holding that a state cannot criminalize adult pornography possession in the home) *with* Osborne v. Ohio, 495 U.S. 103, 108–11 (1990) (holding that a state can criminalize child pornography possession in the home).

[377] *Osborne,* 495 U.S. at 110–11.

[378] *Ferber,* 458 U.S. at 764.

[379] *See id.*

[380] Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 499 (1985) (quoting J-R Distributors, Inc. v. Eikenberry, 725 F.2d 482, 492 (1984)).

[381] *Osborne,* 495 U.S. at 106–07.

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 060

tailored because it did not apply to nude photos where the person depicted was "the child or the ward of the person charged," i.e., unobjectionable family photos, or if

> the material or performance is sold, disseminated, displayed, possessed, controlled, brought or caused to be brought into this state, or presented for a bona fide artistic, medical, scientific, educational, religious, governmental, judicial, or other proper purpose, by or to a physician, psychologist, sociologist, scientist, teacher, person pursuing bona fide studies or research, librarian, clergyman, prosecutor, judge, or other person having a proper interest in the material or performance.[382]

The Court explained that states have a compelling interest in the physical and psychological well-being of minors, can determine that using children in pornography is harmful, and can proscribe possession because it is difficult, if not impossible, to solve the child pornography problem by attacking only production and distribution.[383] The Court's concern with a scienter requirement was evidenced in *United States v. X-Citement Video, Inc.*, where the Court held that the term "knowingly" in the statutes being reviewed extended both to the sexually explicit nature of the material and the age of the performer.[384] This made it easier to uphold the statute, since the scienter requirement applied to both the age of the performer and the nature of the material.

For *Ferber* to apply, children must actually be involved.[385] In *Ashcroft v. The Free Speech Coalition*, the Court considered whether the Child Pornography Prevention Act of 1996 was unconstitutionally overbroad insofar as it criminalized the production or possession of images that appeared to depict minors engaged in sexual intercourse, even though those images may have been computer images.[386] Because no actual minors were involved in the case, the Court rejected an analysis based on viewing the speech as "unprotected," and instead applied standard free speech analysis.[387] The Court held the government did not show a strong enough connection between the thoughts that might be generated and subsequent illegal actions that would justify a restriction based on a "secondary effects" rationale of discouraging pedophiles from engaging in illegal conduct.[388]

---

[382] *Id.* at 106.
[383] *Id.* at 109–11.
[384] 513 U.S. 64, 78 (1994).
[385] *See* Ashcroft v. Free Speech Coal., 535 U.S. 234, 251 (2002).
[386] *Id.* at 249–55.
[387] *Id.* at 244–58.
[388] *Id.* at 251–54.

In a subsequent pandering and solicitation Act, Congress focused on prohibiting the expression of an intent to distribute or to acquire what was believed to be child pornography.[389] In *United States v. Williams*, the Court upheld the Act against an overbreadth and vagueness challenge.[390] The Act punished any person who knowingly promoted or solicited in interstate commerce any material in a manner that reflects a belief or is intended to cause another to believe that the material contains an obscene visual depiction of a minor engaged in sexually explicit conduct or an actual minor engaged in such conduct.[391] A 7-2 Court upheld the law, as it was limited to regulating the recommendation of a particular piece of purported child pornography with the intent of initiating a transfer.[392] Nor was the Act vague since it required a jury make findings on clear questions of fact, i.e., that the defendant hold the belief and make a statement that reflects a belief that the material is child pornography, or that he communicate in a manner intended to cause another so to believe.[393] Justice Stevens concurred with Justice Breyer, saying that when the Act is interpreted in order to save its constitutionality, it is limited to situations where materials are advertised, promoted, presented, distributed, or solicited with a lascivious purpose—that is, with the intention of inciting sexual arousal.[394] Other cases have raised issues of what constitutes possession or procurement of child pornography or enticement of a minor to engage in sexual activity.[395]

---

[389] 18 U.S.C. § 2252A (2012).

[390] 553 U.S. 285, 292–307 (2008).

[391] *Id.* at 289–90.

[392] *Id.* at 292–97.

[393] *Id.* at 306.

[394] *See, e.g.*, *Id.* at 307–08 (Stevens, J., concurring). Justice Souter dissented and Justice Ginsburg joined the dissent. *Id.* at 310 (Souter, J., dissenting). Souter found overbreadth because the Act could apply to criminalize a proposal with regard to an existing representation, which did not involve an actual child. *Id.* at 319–21. He agreed that a defendant could be convicted where there was no such photograph because then no protected speech would exist. *Id.* However, where a relevant picture is a simulation of a child, the proposal would be for a transaction that could not itself be made criminal under *Free Speech Coalition*. *Id.*

[395] *See, e.g.*, People v. Kent, 970 N.E.2d 833 (N.Y. 2012) (finding that merely accessing Web images of child pornography, which the user does not intentionally store, but which are automatically stored in the computer, does not constitute procurement of child pornography); People v. Gumila, 981 N.E.2d 507 (Ill. App. Ct. 2012) (finding images automatically stored not enough to prove possession, but can be used as evidence that the defendant viewed the original images and intended that they be stored in the cache, from which he could view them at a later time); *see also* United States v. Anderson, 759 F.3d 891 (8th Cir. 2014) (finding that strict scrutiny is satisfied in distrib-

A related issue is the extent to which victims of child pornography can sue viewers in restitution for harm caused by the viewing, even when the viewer and victim have no pre-existing relationship. The Supreme Court addressed this issue in *Paroline v. United States*.[396]

A related concern involves "indecent" or "patently offensive" material that is considered harmful for children to hear or view.[397] Such material is not "limited protected speech," but rather is analyzed under standard First Amendment doctrine with the understanding that the state has a compelling government interest in preventing such material from being viewed by children.[398] However, consistent with strict scrutiny, the government must adopt the "least restrictive alternative" in

---

uting child pornography case for digitally morphing actual face of minor onto body of adult having sex). *See generally* United States v. Howard, 766 F.3d 414 (5th Cir. 2014) (discussing what "grooming" conduct, in absence of firm plans to meet, is sufficient to establish "substantial step" to prove enticement; sending sexually explicit photo to minor girl may be enough, but not to intermediary to give to girl); United States v. Fugit, 703 F.3d 248 (4th Cir. 2012) (holding that defendant who induced preteen girls into having sexually inappropriate telephone and online conversations with him violated federal law, making it a crime to entice a minor to engage in "sexual activity" even though there was no proof he intended to engage in physical conduct with the victims); United States v. D'Amelio, 565 F. App'x 61 (2d Cir. 2014) (upholding a conviction for attempted enticement of a minor when defendant showed up to meet who he thought was twelve-year-old girl).

[396] 572 U.S. __, 134 S. Ct. 1710 (2014) (finding restitution for pornography possession under 18 U.S.C. § 2259 should be awarded in amount comporting with defendant's role in "causal process" underlying victim's losses, those losses possibly including $3 million in lost income and $500,000 in future treatment and counseling in dealing with knowledge that filmed sexual assault has been, and continues to be, viewed by thousands of persons online; imposing all these losses on single or a few defendants actually convicted would likely be "excessive"; noting, on the other hand, defendants should be "made aware, through the concrete mechanism of restitution, of the impact of child-pornography possession on victims," and thus award should not be "trivial"); *id.* at 1730–35 (Roberts, C.J., dissenting) (reasoning that by being one of thousands who viewed the post, defendant did not literally "cause" the harm, so no damages should be awarded and noting that Congress should redraft statute); *id.* at 1735–37 (Sotomayor, J., dissenting) (reasoning that by viewing the post the defendant did "cause" the harm, and single or few convicted defendants should be jointly and severally liable under § 2259 for all of the victim's losses); *see also* United States v. Dunn, 777 F.3d 1171, 1180–81 (10th Cir. 2015) (holding that district court must use multi-factored approach to determine defendant's share of responsibility for posting child pornography picture to shared file).

[397] *See* Ginsberg v. New York, 390 U.S. 629, 635–43 (1968) (discussing restrictions on selling indecent materials to minors); *see also* David Greene, Book Review, 10 B.U. PUB. INT. L.J. 360 (2001) (reviewing MARJORIE HEINS, NOT IN FRONT OF THE CHILDREN: "INDECENCY," CENSORSHIP, AND THE INNOCENCE OF YOUTH (2001)).

[398] *Ginsberg*, 390 U.S. at 635–43.

---

order to take steps to avoid infringing the free speech rights of adults.[399] Thus, even while protecting children from indecency, the state may not reduce the adult population to reading only what is fit for children.[400] For example, wearing a jacket in a courthouse corridor that contained the phrase "Fuck the Draft" could not be the basis of a conviction for disturbing the peace when there was no evidence of any disturbance, even if a child might read the jacket.[401]

The modern Court has reviewed indecency limits with respect to live performances and electronic communications. An early case was *Sable Communications of California, Inc. v. FCC.*[402] There, the Court struck down a congressional ban intended to protect children from indecent dial-a-porn telephone services because the ban also affected adults, yet was not limited to *Miller*-defined obscenity.[403] The Court distinguished *FCC v. Pacifica Foundation*,[404] the George Carlin "seven dirty words" case, on the grounds that in *Sable*, affirmative steps would have to be taken to access the service, rather than the intrusion just coming in when the radio or television station was turned on, as in *Pacifica*.[405] Thus, a content-neutral, unwilling listener intermediate standard could not apply.[406] The Court did suggest that if a total ban were the only effective way to protect juveniles from such calls, the law might be upheld despite its invasion of adult First Amendment rights.[407]

More recent legislative efforts to deal with child pornography at the national level have concentrated on the Internet. The problem for lawmakers has been to erect barriers that protect children and yet do not unconstitutionally interfere with the free speech rights of adults.[408] In a sequence of cases, the Court has made it difficult for Congress to regulate, typically finding less burdensome effective alternatives to Congress's regulatory scheme. Typical is *Reno v. ACLU.*[409] There, the

---

[399] Sable Commc'ns of Cal., Inc. v. FCC, 492 U.S. 115, 126–31 (1989).

[400] Butler v. Michigan, 352 U.S. 380, 382–84 (1957).

[401] Cohen v. California, 403 U.S. 15, 16–22, 26 (1971).

[402] 492 U.S. 115 (1989).

[403] *Id.* at 124–31.

[404] 438 U.S. 726 (1978).

[405] *Sable Comms.*, 492 U.S. at 127–28 (citing *Pacifica Found.*, 438 U.S. at 726).

[406] *Id.* at 126–28.

[407] *See id.* at 126–31.

[408] *See generally* Alan E. Garfield, *Protecting Children from Speech*, 57 FLA. L. REV. 565 (2005) (discussing the muddied area of child-protection censorship. its tension with the First Amendment, and the appropriate body of government that should handle the issue of that censorship).

[409] 521 U.S. 844, 864–74 (1997).

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 064

Court struck down portions of the Telecommunications Act of 1996 that prohibited (1) the knowing transmission to a person under eighteen years of age any obscene or indecent message or any patently offensive depiction of sexual or excretory activities or organs, or (2) knowingly permitting any telecommunications facility under a person's control to be used for such activity.[410]  The Act could not pass strict scrutiny because it lacked the necessary precision and thus, was not narrowly tailored.[411]  In support of this conclusion, Justice Stevens provided several examples.  He pointed out, for example, that knowledge that one or more members of a one hundred-person group will be underage would burden communication among adults.[412]  Justice Stevens explained, "In order to deny minors access to potentially harmful speech, the CDA effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another."[413]  Other cases have reached similar results, often involving the Court recommending use of blocking or filtering technology.[414]

In 2004, in *Ashcroft v. ACLU (Ashcroft II)*, a 5-4 Court held that the district court did not abuse its discretion in entering a preliminary injunction against enforcing the Child Online Protection Act.[415]  The Act imposed criminal penalties for knowingly posting on the Internet, for commercial purposes, material that is harmful to minors.[416]  Justice

---

[410] *Id.* at 857–59.

[411] *Id.* at 874–79.

[412] *Id.* at 874.

[413] *Id.*  A concurrence agreed that the Act violated the First Amendment because with current technology, a speaker could not be reasonably assured that his or her speech could be confined in an "adult zone." *Id.* at 886, 891–93 (O'Connor, J., concurring in the judgment in part and dissenting in part).  However, the concurrence would uphold the Act insofar as it applied to indecent speech in communications between an adult and one or more minors. *Id.*

[414] *See, e.g.*, United States v. Playboy Entm't Grp., Inc., 529 U.S. 803 (2000) (holding it unconstitutional to ban adult cable channels from broadcasting during hours when children likely to be in the audience; giving parents option to block such channels as a less burdensome effective alternative); *see also* United States v. Am. Library Ass'n, 539 U.S. 194, 205–09 (2003) (plurality opinion) (holding reasonable and constitutional an Act denying federal funds to a public library unless it installed software to block obscene images or child pornography, preventing minors from obtaining access to material that is harmful to them, as library is a non-public forum); *id.* at 214–15 (Kennedy, J., concurring in the judgment) (discussing that it was constitutional, but only because a patron need only ask a librarian to unblock it or disable the filter and noting that the library is a public forum); *id.* at 217–18 (Breyer, J., concurring in the judgment) (finding it constitutional under a balancing approach similar to intermediate review).

[415] 542 U.S. 656, 666–73 (2004).

[416] *Id.* at 661.

Kennedy wrote that when plaintiffs challenge a content-based speech restriction, strict scrutiny applies and the government must show not only a compelling interest, but also that the challenged regulation is the least restrictive means among available, effective alternatives.[417] In view of the existence of filters, which impose selective restrictions on speech at the receiving end, and not universal restrictions at the source, filters may well be more effective in protecting children than the criminal penalties in the statute; this is especially so since filters can protect even against material posted in other countries, verification systems can be subject to evasion, and filters can be applied to all forms of Internet communication, including e-mail.[418] Thus, there were factual issues for trial that the government had not established, and so it was not an abuse of discretion to issue the preliminary injunction.[419]

An issue related to protecting children from viewing "indecent" material concerns the process of editing motion pictures to remove various kinds of objectionable content in terms of images or words, and then selling or renting such "sanitized" versions of the original work. Under the Family Movie Act of 2005, Congress immunized filtering editors (which filter out objectionable content) from copyright infringement litigation, as long as it is clear to the viewer that the original work has been edited, limiting the "moral right" of authors and producers to their initial unedited work.[420]

---

[417] *Id.* at 666.

[418] *Id.* at 667–68.

[419] Four Justices dissented. *Id.* at 676 (Scalia, J., dissenting); *id.* (Breyer, J., dissenting). While acknowledging that strict scrutiny applied, Justice Breyer wrote in his dissent, "Nonetheless, my examination of (1) the burdens the Act imposes on protected expression, (2) the Act's ability to further a compelling interest, and (3) the proposed 'less restrictive alternatives' convinces me that the Court is wrong. I cannot accept its conclusion that Congress could have accomplished its statutory objective—protecting children from commercial pornography on the Internet—in other, less restrictive ways." *Id.* at 677. Chief Justice Rehnquist and Justice O'Connor joined Justice Breyer's dissent. *Id.* at 676. Justice Scalia also dissented in the case, arguing that strict scrutiny should not be applied. *Id.* (Scalia, J., dissenting). Relying on *Ginzburg v. United States*, which predated both the *Miller* test in 1973, and the protection given to commercial speech after 1976, he reiterated a position he had held in other cases, stating, "[C]ommercial entities which engage in 'the sordid business of pandering' by 'deliberately emphasiz[ing] the sexually provocative aspects of [their non-obscene products], in order to catch the salaciously disposed,' engage in constitutionally unprotected behavior." *Id.* at 676 (quoting Ginzburg v. United States, 383 U.S. 463, 467, 472 (1966)).

[420] Family Movie Act of 2005, Pub. L. No. 109-9, 119 Stat. 223 (codified as amended at 17 U.S.C. § 110(11), 15 U.S.C. § 1114(3)(a)). Concerning the proper balance of rights in this area, see generally Matthew S. Bethards, *Can Moral Rights Be Used to Protect Immo-*

In 2011, in *Brown v. Entertainment Merchants Ass'n*, the Court used a content-based, strict scrutiny analysis to hold unconstitutional a California law that banned the sale of "violent video games" to children.[421] California could not show a direct causal link between violent video games and harm to minors, and thus the law was not directly related to any compelling government interest.[422] It was also overbroad, and thus not the least burdensome, effective alternative.[423] Two Justices concurred, but suggested the Court should be more deferential to legislatures "who may be in a better position than we are to assess the implications of new technology" and that there are "reasons to suspect that the experience of playing violent video games just might be very different from reading a book, listening to the radio, or watching a movie or a television show."[424] Two Justices dissented.[425] In his dissent, Justice Thomas concluded that the "original understanding" of free speech does not include a right to speak to minors, or a right of minors to access speech, without going through the minor's parents or guardians.[426] Justice Breyer, in his dissent, concluded that California has a compelling government interest in supporting parental child rearing and the well-being of children, that there is sufficient evidence that exposure to video games is positively associated with aggressive behavior, and that banning sales to children, while permitting parents to buy such games and give them to children, was the least restrictive, effective alternative to advance these interests.[427]

---

*rality? Editing Motion Pictures to Remove Objectionable Content*, 3 VA. SPORTS & ENT. L.J. 1 (2003) (arguing that third-party editors should not be barred from editing media, and presenting an analysis sympathetic to editors of initial works and viewers of the resulting sanitized copy); Joel M. Purles, *Balancing the Scales: Expanding the Family Movie Act to Protect Consumers after* Clean Flicks of Colorado, LLC v. Soderbergh, 81 S. CAL. L. REV. 351 (2008), (discussing Clean Flicks of Colorado, LLC v. Soderbergh, 433 F. Supp. 2d 1236 (D. Colo. 2006), and finding that "digital" editing of movie DVDs constitutes copyright infringement, as opposed to "filtering" technology applied to DVDs, which is protected by Family Movie Act of 2005); Cyrill P. Rigamonti, *Deconstructing Moral Rights*, 47 HARV. INT'L L.J. 353 (2006) (discussing the negative implications of adopting the civil law concept of moral rights, and presenting an analysis sympathetic to authors and producers of initial works).

[421] Brown v. Entm't Merchs. Ass'n, 564 U.S. __, __, 131 S. Ct. 2729, 2732–33 (2011).

[422] *Id.* at __, 131 S. Ct. at 2738.

[423] *Id.* at __, 131 S. Ct. at 2740–41.

[424] *Id.* at __, 131 S. Ct. at 2742 (Alito, J., concurring in the judgment). Chief Justice Roberts joined Justice Alito's concurrence. *Id.*

[425] *Id.* at __, 131 S. Ct. at 2751 (Thomas, J., dissenting); *id.* at __, 131 S. Ct. at 2761 (Breyer, J., dissenting).

[426] *Id.* at __, 131 S. Ct. at 2751 (Thomas, J., dissenting).

[427] *Id.* at __, 131 S. Ct. at 2771 (Breyer, J., dissenting).

In 2013, the Seventh Circuit held unconstitutional a law that prohibited sex offenders from accessing chat rooms and social media websites in *Doe v. Prosecutor, Marion County*.[428] Because the law applied without reference to the content of the offender's speech, the court applied intermediate review, and then held the law was substantially more burdensome than necessary, given other better-targeted methods to combat unwarranted and inappropriate communication between minors and sex offenders.[429] Other cases have reached similar results.[430]

## VI. Content-Based Regulations of Speech Triggering Free Speech Review, but Less Than Strict Scrutiny
### A. *Defamation and Related Torts ("Reasonableness" Balancing)*
#### 1. Defamation Cases

Cases of defamation and related torts involve laws that regulate based on the content of the individual's speech. Nonetheless, these cases do not involve application of a strict scrutiny approach normally applicable to content-based regulations of speech. Instead, in cases involving defamation and related torts, the Court has developed a number of tests that balance the state's interest in an effective tort law against the individual's interest in the freedom of speech.

Before 1964, common law provided a speaker's only free speech protection as defendant in a defamation action. As with obscenity or fighting words, once the case involved defamatory speech, there was no further First Amendment review.[431] That changed dramatically in 1964 when the Court decided *New York Times Co. v. Sullivan*, where the Court held that for a public official to succeed in a defamation case for

---

[428] 705 F.3d 694, 703 (7th Cir. 2013).

[429] *Id.* at 698, 703.

[430] *See, e.g.*, United States v. Gnirke, 775 F.3d 1155, 1163–67 (9th Cir. 2015) (finding overbroad a supervised release condition for child molester from possessing any sexual explicit material; limiting the condition to any material involving children or material deemed inappropriate by his probation officer); *Ex parte* Lo, 424 S.W.3d 10, 13–14, 17 (Tex. Crim. App. 2013) (defining Texas Penal Code § 33.021(b)(1) (2011), which makes it illegal for adults to engage a minor in sexually explicit online communications, as a content-based regulation, triggering strict scrutiny, and holding that the statute is not narrowly drawn to protecting children from sexual abuse).

[431] *See, e.g.*, Chaplinsky v. New Hampshire, 315 U.S. 568, 571–72 (1942) ("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words.").

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 068

statements relating to official duties, the individual must prove the statement was made with "actual malice."[432] To prove actual malice, the Supreme Court enumerated the following:

> Several kinds of evidence that may be utilized by plaintiffs, including proof that the defendant entertained serious doubts as to the truth of his or her publication, proof that the statement was fabricated by the defendant, proof that the statement was the product of the defendant's imagination, or proof that there exist obvious reasons to doubt the veracity of the informant upon whom the statement is based or the accuracy of the statement being relied upon. The courts have conceded that where proof of actual malice is at issue, information and facts that would tend to shed light on the reporter's state of mind are discoverable. To balance the defamation plaintiff's necessity to prove this element with society's interest in protecting the marketplace, the U.S. Supreme Court requires that proof of actual malice be made by clear and convincing evidence.[433]

In practice, it has been very difficult for plaintiffs to prove that defendants acted with the "actual malice" required under *Sullivan*, particularly as the decision on "actual malice," as an "ultimate" constitutional fact, is for the court to determine as a matter of law, not the jury as a trier of fact.[434] Indeed, it has been noted that, given *Sullivan*, the law of libel "poses little serious threat to the First Amendment rights of the media," although "fear of the relentless deep-pocket plaintiff, who pursues a libel claim despite having only a small chance of winning; the thinly-capitalized defendant, who is only one big judgment away from bankruptcy; and the high cost of discovery" remain "threats."[435]

---

[432] 376 U.S. 254, 279–80 (1964).

[433] Daniel Scardino, *Liberty and Defamation*, 20 COMM. L. 3, 5 (2002).

[434] *See generally* Lackland H. Bloom, Jr., *Proof of Fault In Media Defamation Litigation*, 38 VAND. L. REV. 247 (1985), (citing Bose Corp. v. Consumers Union of U.S., 466 U.S. 485, 508–11 (1984) (noting that actual malice is an issue for courts, not juries)). Occasionally, the test can be met. *See, e.g.*, Cantrell v. Forrest City Publ'g Co., 419 U.S. 245, 248–54 (1974) (upholding liability for false light invasion of privacy under actual malice standard); Burnett v. Nat'l Enquirer, Inc., 193 Cal. Rptr. 206, 219 (Cal. Ct. App. 1983) (finding liability for defamation under actual malice standard, but reducing punitive damage award).

[435] David A. Logan, *Libel Law in the Trenches: Reflections on Current Data on Libel Litigation*, 87 VA. L. REV. 503, 508, 524 (2001); *see also* Obsidian Fin. Grp., LLC v. Cox, 740 F.3d 1284, 1287–90 (9th Cir. 2014) (noting that liability for defamatory blog involving matter of public concern must meet the same *Sullivan* standard applied to the institutionalized press). *Cf.* Klayman v. Zuckerberg, 753 F.3d 1354, 1355–57 (D.C. Cir. 2014) (finding a lawsuit against Facebook for failing promptly to take down page calling for violence against Jews preempted by Communications Decency Act, providing that "interactive computer service" cannot be viewed as "publisher" of information posted online).

*Elon Law Review* [Vol. 8: 291]

Reflecting a balancing approach between the state's interest in an effective tort law against an individual's interest in the freedom of speech, in 1974, a 5-4 Court held in *Gertz v. Welch* that where the plaintiff is a private person and the substance of a defamatory statement makes substantial danger to reputation apparent, the state need not require more than proof of fault, i.e., negligence, to permit recovery for compensatory damages, even though the case involves a matter of public concern.[436] However, in recognition of danger from excessive damage awards, a state could permit recovery of presumed or punitive damages only on proof of actual malice.[437]

In 1985, the Court once again limited *Sullivan*.[438] In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, the Court addressed the protection given to private individuals in a defamation action where the matter in question was not of public concern.[439] The Court held that states could impose liability if fault is shown, and presumed or punitive damages can be recovered without showing actual malice.[440]

Although the Court does not make reference to this fact, the balancing in these cases tracks in rigor to the balancing done in Dormant Commerce Clause review. In Dormant Commerce Clause cases, the Court similarly balances the state's interests (there, the state's interest in various kinds of economic regulations) against the constitutional in-

---

[436] Gertz v. Welch, 418 U.S. 323, 347–52 (1974). Justice Brennan, dissenting, said that the *Sullivan* rule should apply in all civil actions concerning media reports on a private individual's involvement in events of public or general interest. *Id.* at 361 (Brennan, J., dissenting). Justice Douglas continued his absolutist view, stating that any libel law was unconstitutional. *Id.* at 356 (Douglas, J., dissenting). At the other extreme, Chief Justice Burger and Justice White disagreed that a negligence requirement should be imposed for cases involving private figures. *Id.* at 354–55 (Burger, C.J., dissenting); *id.* at 369–71 (White, J., dissenting). However, the majority supported Justice Powell's reasoning that private individuals need more protection than do public figures because they have less opportunity to correct a lie or error and they have not thrust themselves into the public eye, and thus they have not voluntarily exposed themselves to the increased risk of injury assumed by public figures, but that negligence is a bare minimum requirement for recovery of damages in a defamation or libel suit. *Id.* at 344–52 (majority opinion).

[437] *See id.* at 349 (holding "that the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth").

[438] Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 755–61 (1985).

[439] *Id.*

[440] *Id.* at 761.

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 070

terests at stake (there, an interest in free trade).[441] For commercial regulations that involve either facial discrimination against free trade or a discriminatory purpose, there is virtually a *per se* rule of unconstitutionality under the *Maine v. Taylor* test; for non-discriminatory regulations, the easier to meet *Pike v. Bruce Church* test is used to determine if a regulation is a "clearly excessive" burden on free trade.[442] Similarly, under *New York Times Co. v. Sullivan*, where the defamatory act concerns speech about a public official and the constitutional interest in freedom of speech is at its highest, there is a very difficult "actual malice" test to meet; in other cases, where the governmental interest is stronger and the constitutional interest is not as strong, as in cases that do not involve public officials or matters of public concern, such as *Dun & Bradstreet*, the constitutional test is easier for the government to meet.[443] In all defamation cases, the challenger retains the burden of establishing that the tort law is unconstitutional.[444] Under the levels of constitutional review presented in this Article, this kind of review reflects the same kind of reasonableness balancing used in non-public forum, non-viewpoint-based discrimination cases.[445] These similarities are summarized in Appendix A, Table 1 (Dormant Commerce Clause doctrine) and Table 2 (defamation and non-public forum, non-viewpoint-based discrimination cases).

It remains uncertain which rule should be applied if plaintiff is a public official or public figure, but the defamation did not relate to a matter of public concern. Professor Tribe, who has criticized the Court for its retreat from the actual malice rule, has stated that the actual malice rule should be applied whenever the plaintiff is a public official or public figure.[446] However, it can be argued that the *Dun & Bradstreet* rule should apply to all defamation cases involving private

---

[441] For an overview of Dormant Commerce Clause doctrine, see 1 CHARLES D. KELSO & R. RANDALL KELSO, AMERICAN CONSTITUTIONAL LAW: AN E-COURSEBOOK 584–603 (2015) (ebook), http://libguides.stcl.edu/kelsomaterials [hereinafter 1 KELSO & KELSO, AMERICAN CONSTITUTIONAL LAW] (discussing numerous cases addressing the Dormant Commerce Clause).

[442] Maine v. Taylor, 477 U.S. 131, 138 (1986); Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).

[443] N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964); *Dun & Bradsteet, Inc.*, 472 U.S. at 755–59, 763.

[444] *See, e.g., N.Y. Times Co.*, 376 U.S. at 264–65.

[445] *See supra* text accompanying notes 98–117. A similar reasonableness balancing has been alleged to apply in cases of invasion of privacy, see *infra* text accompanying notes 458–66.

[446] TRIBE, *supra* note 361, at 873–86.

conduct not a matter of public concern, since even a public person should be able to protect private matters from false public comment without having to meet the difficult "actual malice" standard.

In practice, it would be unlikely for any matter involving a public official or public figure to be viewed as a matter not of public concern.

> The cases suggest that generally the following will be considered matters of public concern in terms of the *Dun & Bradstreet* definition: politics and campaigns; operations of financial institutions; conduct of government and public officials; illegal or questionable business practices with ramifications for the general public; public health and safety; criminality and criminal justice; recruitment methods of a religious cult; pornography; and athletics. The following matters have been held not to be of public concern: employers' allegations of wrongdoing by employees or customers without ramifications for the general public; personal disputes between businesses and disgruntled customers; job recommendations; intra-professional disputes; intra- or inter-organizational business without ramifications for the general public; a paternity claim; a recommendation on tenure at a state university; inaccurate credit reports; and aspersions made in commercial advertising.[447]

### 2. False Light Cases

Three years after *New York Times Co. v. Sullivan*, the Supreme Court decided *Time, Inc. v. Hill*.[448] This was an action to redress invasion of privacy based on false reports regarding matters of public interest.[449] The Court held that truth is a complete defense and that the First Amendment bars recovery in the absence of proof that the defendant published the report with "actual malice," the *Sullivan* standard.[450] Justice Brennan explained that erroneous statements are no less inevitable in entertaining the public as in informing the public and, if innocent and merely negligent, such speech "must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.'"[451]

Although the Supreme Court has never ruled on the issue, lower courts have split on whether the actual malice standard must be met even if the case does not involve a public official or public figure.[452] It

---

[447] Robert E. Drechsel, *Defining "Public Concern" in Defamation Cases Since* Dun & Bradstreet v. Greenmoss Builders, 43 FED. COMM. L.J. 1, 12–14 (1990).

[448] 385 U.S. 374 (1967).

[449] *Id.* at 376–81.

[450] *Id.* at 387–88.

[451] *Id.* at 388 (citations omitted).

[452] *Proving Fault-Actual Malice and Negligence,* DIGITAL MEDIA L. PROJECT (Aug. 7, 2008), http://www.dmlp.org/legal-guide/proving-fault-actual-malice-and-negligence.

can be argued that *Gertz* impliedly overruled *Time, Inc. v. Hill* for false light cases involving non-public figures, just as *Gertz* limited the *Sullivan* actual malice doctrine for cases of defamation. Similarly, no Supreme Court case addresses the proper standard where the false light relates only to a matter of private concern. Using *Dun & Bradstreet* as an analogy suggests that a showing of fault would be sufficient for liability and that courts could permit recovery of presumed or punitive damages without a showing of actual malice. With regard to public official or public figure cases, application of the actual malice rule of *Hill* is clear. In 1988, the Court ruled in *Hustler Magazine v. Falwell* that the First Amendment bars recovery for intentionally inflicting emotional distress by a parody cartoon on a plaintiff who is a public official or a public figure unless the cartoon contains a false statement of fact made with actual malice.[453]

Proof of actual malice is difficult enough to establish in ordinary circumstances. *Masson v. New Yorker Magazine* made proof of actual malice even more difficult to establish in false light cases.[454] In *Masson*, the Court ruled that deliberately altering words in a quote does not equate with the actual malice rule unless the alteration results in a material change in the meaning conveyed by the statement.[455]

### 3. Invasion of Privacy by Truth

In 1975, the Court held in *Cox Broadcasting Corp. v. Cohn* that civil liability for invasion of privacy by a true publication may not be imposed on a broadcaster for accurately publishing information released to the public in official court records.[456] In 1989, this ruling was extended in *Florida Star v. B.J.F.* to protect a newspaper from liability for publishing the name of a rape victim obtained from a police report made available in the pressroom.[457]

If private information is illegally intercepted and then delivered to a broadcaster who publishes it, can the federal government sanction that broadcast? In *Bartnicki v. Vopper*, the Court held that the privacy

---

[453] Hustler Magazine v. Falwell, 485 U.S. 46, 50–57 (1988). *But see* Rodney K. Smith & Patrick A. Shea, *Religion and the Press: Keeping First Amendment Values in Balance*, 2002 UTAH L. REV. 177, 226–31 (2002) (arguing that given the special importance of moral integrity to religious figures, courts should be willing to more-often apply *Gertz* standards for false-light cases involving religious figures).

[454] 501 U.S. 496, 510–16 (1991).

[455] *Id.* at 497.

[456] Cox Broad. Corp. v. Cohn, 420 U.S. 469, 490–92 (1975).

[457] Fla. Star v. B.J.F., 491 U.S. 524, 526–32 (1989).

interests protected by the federal statute were not sufficient to justify its application to a broadcaster of an illegally intercepted communication containing information of public concern where the broadcaster did not illegally intercept the private communication or arrange for its interception.[458] The Court noted that the constitutional interests at stake in *Bartnicki* concerning making public information about a public concern were similar to the interests at stake in *Sullivan*.[459] The Court noted, however, that is was not deciding whether privacy interests would be strong enough to justify the application of the statute to "disclosures of trade secrets or domestic gossip or other information of purely private concern."[460]

In a concurrence, Justices Breyer and O'Connor underscored that this kind of case does not involve "strict scrutiny," but rather a balancing of interests, asking whether "the statutes strike a reasonable balance between their speech-restricting and speech-enhancing consequences."[461] In determining this "reasonable" balance, Justice Breyer indicated that a court should ask whether the relevant statutes "impose restrictions on speech that are disproportionate when measured against their corresponding privacy and speech-related benefits, taking into account the kind, the importance, and the extent of these benefits, as well as the need for the restrictions in order to secure those benefits[.]"[462] In dissent, Chief Justice Rehnquist, joined by Justices Scalia and Thomas, accused the majority of "tacit application of strict scrutiny."[463] Contrary to this view, the majority did not adopt strict scrutiny.[464] The majority did indicate, however, that to prevent a newspaper from publishing truthful information on a matter of public concern when the media played no part in the unlawful recording of the information would require a reason "of the highest order."[465] Such language is similar to that used in Dormant Commerce Clause cases, where there is the virtual *per se* rule of invalidity for facially discriminatory burdens against interstate commerce, which can only be overcome by strong state interests.[466] Like all the other cases involving interac-

---

[458] Bartnicki v. Vopper, 532 U.S. 514, 533–35 (2001).
[459] *Id.* at 534–35.
[460] *Id.* at 533.
[461] *Id.* at 536 (Breyer, J., concurring).
[462] *Id.* at 536–37.
[463] *Id.* at 544 (Rehnquist, C.J., dissenting).
[464] *Id.* at 514–15 (majority opinion).
[465] *Id.* at 527–28 (citing Smith v. Daily Mail Publ'g Co., 443 U.S. 97, 103 (1979)).
[466] *See supra* text accompanying note 442.

tion between tort law and free speech concerns, the scrutiny in *Bart-nicki* is best viewed as reasonableness review, with the burden on the challenger, as in *Bartnicki,* to prove the statute unconstitutional.

### 4. Unlawful Appropriation of Name or Likeness or Other Miscellaneous Tort or Contract Doctrines

Courts have had to struggle with the interplay between First Amendment doctrine and a number of other tort causes of action. In each case, the Court has engaged in a reasonableness balancing approach. For example, in 1977, in *Zacchini v. Scripps-Howard Broadcasting Co.,* the Court allowed a defendant to be found liable for videotaping fifteen seconds of the plaintiff's human cannonball act and playing it on the nightly news.[467] The Court held this was a form of unlawful appropriation of plaintiff's property.[468]

Courts have also allowed liability to be imposed for speech under the contract doctrine of promissory estoppel and the tort doctrine of negligence. For example, in *Cohen v. Cowles Media Co.,* the Court held that the First Amendment does not bar damages against a newspaper for breaching a promise of confidentiality to a source that relied on the promise in providing information to the paper, even for matters of public concern relating to a candidate in the upcoming election.[469] A four-Justice dissent would have held "the State's interest in enforcing a newspaper's promise of confidentiality insufficient to outweigh the interest in unfettered publication of the information revealed in this case."[470] The Fourth Circuit held in *Rice v. Paladin Enterprises* that there can be liability for negligence if a defendant author publishes methods for doing illegal things, e.g., how to be a hit man, and that publication results in others using the methods to injure someone.[471] The publica-

---

[467] 433 U.S. 562, 578–79 (1977). Justice Powell, dissenting, would have held that "the First Amendment protects the station from a 'right of publicity' or 'appropriation' suit, absent a strong showing by the plaintiff that the news broadcast was a subterfuge or cover for private or commercial exploitation." *Id.* at 581 (Powell, J., dissenting). Justice Stevens would have remanded the case to permit the lower state court to clarify whether its opinion rested on federal constitutional grounds or state tort grounds. *Id.* at 583 (Stevens, J., dissenting).

[468] *Id.* at 569.

[469] 501 U.S. 663, 672 (1991).

[470] *Id.* at 679 (Souter, J., dissenting). Justices Marshall, Blackmun, and O'Connor joined Justice Souter's dissent. *Id.* at 676. For a critique of the majority's opinion in *Cohen,* see Alan E. Garfield, *The Mischief of* Cohen v. Cowles Media Co., 35 GA. L. REV. 1087 (2001).

[471] Rice v. Paladin Enters., 128 F.3d 233, 267 (4th Cir. 1997).

tion was not protected under *Brandenburg*, as the Court held that the book was directed to inciting another to commit imminent lawless action and was likely to do so.[472]

In cases where the Court has allowed liability to be imposed for speech that injured another, the facts did not suggest that allowing recovery would seriously intrude on the press's right to make judgments regarding printing or broadcasting matters in which the public might be interested. Regarding possible constitutional protection of the press where it intruded on privacy by truthful matters obtained from sources other than official records, Justice White pointed out in *Cox Broadcasting Corp. v. Cohn* that the Court has left open the question whether the Constitution requires that truth be recognized as a defense in a defamation action brought by a private person.[473] Also open is the question of whether truthful publication of very private matters unrelated to public affairs may be proscribed by the Constitution, perhaps under a fundamental right to disclosure privacy, as attempted in *Whalen v. Roe*.[474]

---

[472] *See id.* at 244.

[473] Cox Broad. v. Cohn, 420 U.S. 469, 490 (1975).

[474] 429 U.S. 589, 599–600 (1977) (using reasonableness balancing to permit state to collect private medical information for public health purposes, where privacy protections were in place). As in *Whalen v. Roe*, the Court used a reasonableness balancing test in *Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. __, __, 131 S. Ct. 746, 750–51 (2011), where the Court held that assuming, without deciding, the Constitution protects a right to informational privacy, that NASA questions about an employee's prior drug use and open-ended questions to references about whether they had a reason to question the employee's honesty or trustworthiness did not violate such a right. *Id.* A concurrence concluded no such informational privacy right exists. *Id.* at 764 (Scalia, J., concurring in the judgment); *see also* Wyatt v. Fletcher, 718 F.3d 496, 508 (5th Cir. 2013) (holding that no Fourteenth Amendment privacy right afforded to a minor that prohibits a coach from "outing" her as possibly being a lesbian to the minor's parents); C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 179–82 (3d Cir. 2005) (declaring school survey on sexual activity, drug use, and participation in various extracurricular activities constitutional under reasonableness balancing, where privacy safeguards were in place to ensure anonymity). *But see* Sterling v. Borough of Minersville, 232 F.3d 190, 196 (3d Cir. 2000) ("[S]exual orientation [is] an intimate aspect of his personality entitled to privacy protection under *Whalen*"); Powell v. Schriver, 175 F.3d 107, 111 (2d Cir. 1999) (finding that the Constitution does "protect the right to maintain the confidentiality of one's transsexualism."); *cf.* ACLU v. U.S. Dep't of Justice, 750 F.3d 927 (D.C. Cir. 2014) (discussing protection of privacy of persons acquitted or those who had charges dismissed and determining docket information on warrantless mobile telephone tracking exempted from disclosure under Freedom of Information Act).

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 076

### B. *Government Workers on Matters of Public Concern (Heightened "Reasonableness" Balancing)*

In 1968, the Court held in *Pickering v. Board of Education of Will County, Illinois,* that a public employee's right to speak on matters of public concern must be balanced against the government's right as employer to make employment decisions based on whether the speech is disruptive to office efficiency or morale, or otherwise harms the government workplace.[475] As developed in cases after *Pickering,* to establish a claim of unlawful First Amendment retaliation a public employee must show that he or she suffered an adverse employment action that was causally connected to participation in a protected activity, i.e., speaking out on an issue of public concern.[476] Once the employee satisfies this initial burden, the burden shifts to the government employer to show a legitimate nondiscriminatory reason for the action, e.g., that the interest of the government in the efficient delivery of its services outweighs the interest of the employee in speaking out, or that the adverse action would have been taken even without the employee's speech having been made.[477] If the government meets this burden, the burden shifts back to the employee to show that the employer's actions were in fact a pretext for illegal retaliation.[478]

Because the government has the primary burden under *Pickering* of defending its decision once the plaintiff has established a *prima facie* case, this kind of reasonableness balancing reflects a higher standard of review than that used for non-viewpoint discrimination in a nonpublic forum,[479] or as used in defamation or other tort cases.[480] To distinguish the difference among the levels of scrutiny, which all permit the government to use "legitimate/permissible" interests to regulate (rather than the requirement of "significant/substantial/important" interests under intermediate review, or "compelling/overriding" interests under strict scrutiny),[481] perhaps the best terminology would be always to use "minimum rationality review" to refer to the "base" rational review test of *Heller v. Doe,*[482] but use "second-order reasonableness balancing" for reasonableness balancing where the bur-

---

[475] 391 U.S. 563, 568 (1968).
[476] *See* Duffy v. McPhillips, 276 F.3d 988, 991 (8th Cir. 2002) (citation omitted).
[477] *Id.* (citation omitted).
[478] *Id.* (citation omitted).
[479] *See supra* text accompanying notes 94–142.
[480] *See supra* text accompanying notes 431–74.
[481] *See supra* text accompanying notes 15–16.
[482] *See supra* text accompanying note 101.

den of proof remains on the challenger to prove unconstitutionality, as in the non-viewpoint discrimination in the non-public forum cases like *Breard v. Banks* and *Hazelwood*,[483] and tort cases like *Bartnicki*,[484] and then use "third-order reasonableness balancing" when the burden shifts to the government to justify its action as reasonable, as in *Pickering*.[485] That is the terminology used in Tables 1 and 2 in the Appendix to this Article summarizing the Court's doctrines in constitutional law: constitutional law generally (Table 1); and constitutional law under the First Amendment (Table 2).[486]

### C. *Over the Airwaves Radio and Television Regulation (Intermediate Review)*

The Court's concern about scarcity in the public airwaves has been used to justify a standard of review less than strict scrutiny for content-based regulations of speech regarding over-the-airwaves radio and television programming. In *Red Lion Broadcasting Company v. FCC*, the Court held that broadcasters can be required to allow free reply time to persons who have been personally attacked on their station.[487] The Court said that because of limited frequencies, the persons licensed to broadcast have no constitutional right to monopolize a radio frequency.[488] The Court said, "There is no sanctuary in the First Amendment for unlimited private censorship operating in a medium not open to all."[489] To the argument that allowing free reply time would force broadcasters into self-censorship and limited coverage, the Court said this was, at best, speculative.[490]

---

[483] *See supra* text accompanying notes 110–11 (*Breard*), 135–36 (*Hazelwood*).

[484] *See supra* text accompanying notes 458–66.

[485] *See supra* text accompanying notes 475–78.

[486] The Tables presented here are also discussed in the context of constitutional law doctrine generally in Kelso, *supra* note 4, at 134–39. Further discussion of the details of modern *Pickering* doctrine, including determining under *Garcetti v. Ceballos*, 547 U.S. 410 (2006), whether the speech is on a matter of public concern, which triggers the *Pickering* test, or is related to internal office management, where no free speech analysis applies, appears at 3 Kelso & Kelso, American Constitutional Law, *supra* note 59, at 413–31. Discussion of use of the *Pickering* balancing test in the context of government regulation of the political activities of government employees, such as in *United States Civil Service v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548 (1973), appears at 3 Kelso & Kelso, American Constitutional Law, *supra* note 59, at 432–38.

[487] 395 U.S. 367, 392 (1969).

[488] *Id.*

[489] *Id.*

[490] *Id.* at 393. In 1987, the FCC repealed both the "balanced coverage" and "right of reply" provisions on grounds that they "chilled" free speech rights of broadcasters. *See*

This decision can be contrasted with a similar kind of access regulation applied to newspapers. In 1974, in *Miami Herald Publishing Co. v. Tornillo*, the Court held that a law requiring newspapers to grant political candidates equal space to reply to criticism or to attacks on their personal character or official record was an invalid content-based restriction on editorial judgment.[491] The reasoning in the two cases was different, since in *Tornillo* the Court applied standard free speech doctrine adopting strict scrutiny for a content-based regulation of speech.[492]

In 1984, the Court clarified that the lower standard of review for content-based regulations of speech on over-the-airwaves radio and television stations in *Red Lion* called for intermediate scrutiny.[493] In *FCC v. League of Women Voters*, the Court was faced with a statute that forbade any noncommercial educational broadcasting station that received a grant from the Corporation for Public Broadcasting to engage in editorializing.[494] Relying upon *Red Lion*, the Court held that the proper standard of review was whether the regulation was "narrowly tailored to further a substantial governmental interest, such as ensuring adequate and balanced coverage of public issues."[495] Applying intermediate scrutiny resulted in the government's ban on editorializing being declared unconstitutional because "the specific interests sought to be advanced by [the] ban . . . are either not sufficiently substantial or are not served in a sufficiently limited manner to justify the substantial abridgement of important journalistic freedoms which the First Amendment jealously protects."[496]

---

Kenneth Karst, *Equality as a Central Principle in the First Amendment*, 43 U. CHI. L. REV. 20, 49 (1975) ("[C]ontinuing governmental surveillance over broadcasting content presents truly grave dangers . . . . Even though the right-of-reply portion . . . give[s] added encouragement to . . . editorial blandness."); *see also* Radio-Television News Dirs. Ass'n v. FCC, 229 F.3d 269, 272 (D.C. Cir. 2000) (repealing the entire "personal attack" and "political editorializing" aspects of the fairness doctrine). *See generally* R. Trevor Hall & James C. Phillips, *The Fairness Doctrine in Light of Hostile Media Perception*, 19 COMM-MLAW CONSPECTUS J. COMM. & POL'Y 395 (2011) (discussing the demise of the "fairness doctrine" and rise of "right-wing" and "left-wing" talk radio and cable news).

[491] 418 U.S. 241, 258 (1974).

[492] *Id.*

[493] *See* FCC v. League of Women Voters, 468 U.S. 364, 374–81 (1984).

[494] *Id.* at 366.

[495] *Id.* at 380.

[496] *Id.* at 402; *see also* Minority Television Project, Inc. v. FCC, 736 F.3d 1192, 1200 (9th Cir. 2013) (en banc) (9-2 decision) (upholding prohibition against for-profit and political advertisements on public broadcasting stations as constitutional under intermediate standard of review of *Red Lion* and *League of Women Voters* because regulation was nar-

*Elon Law Review*                [Vol. 8: 291

### D. *Commercial Speech (Intermediate Review with Bite)*

Commercial speech relates to economic transactions, including promotional advertisements, as well as offers.[497] Until 1975, commercial speech received no free speech protection. Thus, under Equal Protection and Due Process Clause analysis, only minimum rationality review was given to such economic regulation of advertisements, as in 1942 in *Valentine v. Chrestensen*.[498] Similar treatment was given to both offers made by door-to-door magazine sellers, as well as a ban on ads for optical appliances.[499] The result was that barriers to commercial speech were easily erected.

At first, the change in perspective came in small increments. In 1973, in *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations,* a state was allowed to ban gender discrimination in help-wanted newspaper ads based on *Valentine v. Chrestensen,* but four Justices dissented from that result.[500] The transitional case, decided in 1975, was *Bigelow v. Virginia*.[501] The Court said *Chrestensen* did not hold that all ads are unprotected *per se*.[502] Justice Blackmun wrote that even commercial ads deserve some First Amendment protection when, unlike the ads in *Chrestensen* and *Pittsburgh Press,* they contain factual information with a clear public interest.[503] Only Justices White and Rehnquist dissented.[504]

The decisive case, decided in 1976, was *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*.[505] There, the Court held that

---

rowly tailored to further government's substantial interest in maintaining educational mission and nature of public broadcasting). In *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502 (2009) (Thomas, J., concurring), Justice Thomas indicated his belief that the lower intermediate standard for content-based regulation of radio and televisions under *Red Lion* should be overruled, and standard strict scrutiny for content-based regulation should apply. *Id.* at 530–35.

[497] Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 561–64 (1980).

[498] 316 U.S. 52, 54–55 (1942).

[499] Breard v. City of Alexandria, 341 U.S. 622, 632–33 (1951) (door-to-door sellers); Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 486–88 (1955) (optical appliances).

[500] 413 U.S. 376, 389, 391 (1973) (stating that such an ad created a threat of unlawful employment discrimination); *id.* at 393 (Burger, C.J., dissenting); *id.* at 397 (Douglas, J., dissenting); *id.* at 400 (Stewart, J., dissenting); *id.* at 404 (Blackmun, J., dissenting).

[501] 421 U.S. 809 (1975).

[502] *Id.* at 819–20.

[503] *Id.* at 822.

[504] *Id.* at 829 (Rehnquist, J., dissenting). Justice White joined Justice Rehnquist's dissent. *Id.*

[505] 425 U.S. 748 (1976).

a state could not bar licensed pharmacists from publishing truthful information on drug prices.[506] Justice Blackmun said there is a public interest in the flow of truthful information concerning lawful activities, including speech that merely proposes a commercial transaction.[507] If information is not in itself harmful, the best means for persons to perceive their own best interests is to open the channels of communication. Less than strict review can be applied to commercial speech, however, because the disseminator may more easily verify truth, and there is little likelihood of chill because ads lead to commercial profits.[508] Thus, under *Virginia State Board*, content regulation of commercial speech that is not misleading or related to unlawful activity must directly advance a substantial governmental interest and not be more extensive than necessary.[509] Only Justice Rehnquist dissented.[510]

More important, perhaps, than such results was the creation of an analytical methodology for dealing with regulation of commercial speech. Justice Powell, in *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, summarized that approach in 1980, when he wrote the following:

> In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.[511]

Four aspects of the *Central Hudson* test are important. First, under this approach, minimum rational review would be given to regulations of unlawful, false, or misleading ads, since, without any special First Amendment protection, they would be viewed as standard economic regulations subject to minimum rationality review under the Equal Protection and Due Process clauses.[512] Second, as phrased, the test for

---

[506] *Id.* at 770.

[507] *Id.* at 765.

[508] *Id.* at 771–72 n.24.

[509] *Id.* at 766–69.

[510] *Id.* at 781 (Rehnquist, J., dissenting). On the *Virginia State Board* case, see generally Alan B. Morrison, *How We Got the Commercial Speech Doctrine: An Originalist's Recollections*, 54 Case W. Res. L. Rev. 1189 (2004) (discussing the history of the commercial speech doctrine).

[511] 447 U.S. 557, 566 (1980).

[512] *See, e.g.*, R.J. Reynolds Tobacco Co. v. FDA, 696 F.3d 1205, 1212 (D.C. Cir. 2012) (stating *Zauderer*'s standard "is akin to rational-basis review") (citing Zauderer v. Office

commercial speech is more stringent than regular intermediate scrutiny, since the test requires that the regulation directly advance the government's interest (the strict scrutiny requirement of direct relationship), rather than merely substantially advance the government's interest (the normal intermediate review requirement). This increase in review is what makes the *Central Hudson* test an example of intermediate review with bite.[513] Third, commercial speech cases do involve a less rigorous form of scrutiny than traditional free speech doctrine for content-based regulations of speech, which ordinarily trigger strict scrutiny. The Court made clear in *Board of Trustees of the State University of N.Y. v. Fox* that the fourth prong of the *Central Hudson* test does not involve the "least restrictive alternative" aspect of strict scrutiny, but only that "the regulation not 'burden substantially more speech than is necessary.'"[514] This tracks an intermediate standard of review, just as the requirement of a "substantial government interest" in *Central Hudson*, and not a compelling interest, tracks intermediate review. Fourth, the *Central Hudson* test lowers free speech protection only for content-based regulations of commercial speech. Content-neutral time, place, and manner restrictions of commercial speech, like content-neutral regulations of fully protected speech, are still tested under intermediate review.[515]

In applying *Central Hudson*, care must be taken to distinguish commercial from non-commercial speech. For example, in *Consolidated Edison Co. of New York, Inc. v. Public Service Commission of N.Y.*, the Court held that a state may not bar a utility from including a political message with its bills.[516] Justice Powell distinguished *Central Hudson* because the speech here involved a political message, rather than

---

of Disciplinary Counsel, 471 U.S. 626, 651 (1985) (stating that disclosure requirements that are permissible are "reasonably related to the State's interest in preventing deception of consumers")).

[513] *See generally* R. Randall Kelso, *Standards of Review Under the Equal Protection Clause and Related Constitutional Doctrines Protecting Individual Rights: The "Base Plus Six" Model and Modern Supreme Court Practice*, 4 U. PA. J. CONST. L. 225, 234–35, 258–59 (2002) (discussing the *Central Hudson* test as reflecting a heightened kind of intermediate review, called in Appendix A, Tables 1, and Table 2, an "intermediate with bite" standard of scrutiny).

[514] 492 U.S. 469, 478 (1989) (citing Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989)); *see also* United States v. Edge Broad. Co., 509 U.S. 418, 426 (1993); Boos v. Barry, 485 U.S. 312, 321 (1988).

[515] For discussion of intermediate review for content-neutral regulations of speech, see *supra* text accompanying notes 24–39.

[516] 447 U.S. 530, 537–40 (1980).

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 082

commercial speech.[517] Thus, under standard free speech doctrine, a restriction on the content of noncommercial speech, i.e., a content-based restriction, triggered strict scrutiny.[518] In *Board of Trustees of the State University of New York v. Fox*, the Court concluded that those aspects of university regulations that banned corporations from doing product demonstrations in campus dormitory rooms, such as "tupperware parties," were targeting commercial speech.[519] Both the majority and the dissent noted, however, that to the extent the regulation also prohibited a wide range of fully protected speech, e.g., speech in a dormitory room, such as consultation with a lawyer or doctor, even though it was speech for which the speaker received a profit, standard First Amendment doctrine would apply to that part of the regulation.[520] The majority remanded the case for determination of whether the statute could be held constitutional as applied to non-commercial speech, while the dissent concluded that the statute was unconstitutional on that ground.[521]

Unlike use of the "substantial overbreadth" doctrine in other areas of First Amendment law, a statute whose overbreadth consists of an unlawful restriction of commercial speech will not be facially invalidated on that ground. As the Court noted in *Bates v. State Bar of Arizona*, if a person has standing to challenge the application of a commercial speech regulation to himself or herself, then that person naturally can also challenge the facial validity of the regulation insofar as it might apply to noncommercial speech in which that person is also engaged.[522] But an individual cannot use the overbreadth doctrine to challenge overbreadth as to other individuals engaging in other kinds of speech.[523] The Court explained that because commercial speech is "hardy" since individuals have an economic incentive to engage in such speech, the overbreadth doctrine is not needed to ensure such speech is not chilled.[524]

---

[517] *Id.* at 537.

[518] *Id.*

[519] 492 U.S. 469, 472, 482–86 (1989); *id.* at 487–88 (Blackmun, J., dissenting). Justices Brennan and Marshall joined Justice Blackmun's dissent. *Id.*

[520] *Id.* at 482 (majority opinion); *id.* at 487 (Blackmun, J., dissenting).

[521] *Id.* at 476, 486 (majority opinion); *id.* at 487 n.2, 489 (Blackmun, J., dissenting).

[522] 433 U.S. 350, 380–81 (1977).

[523] *Id.* at 381.

[524] Central Hudson Gas & Elec. v. Pub. Serv. Comm'n, 477 U.S. 557, 564 n.6 (1980). The substantial overbreadth doctrine is discussed *infra* text accompanying notes 650–71; *see* 3 KELSO & KELSO, AMERICAN CONSTITUTIONAL LAW, *supra* note 59, at 452–93 (discussing the more relaxed application of commercial speech doctrine under Posadas

### E. *Cable and Satellite Radio and Television Regulation* (Loose Strict Scrutiny)

Cases involving regulation of cable television have posed difficult problems for the Court in determining whether standard First Amendment doctrine or *Red Lion* doctrine should apply. The arguments regarding scarcity and distribution through the public airways, which justified the lower standard of review in *Red Lion* and *League of Women Voters*,[525] do not apply in any meaningful way to cable or satellite television or radio as they have evolved. Arguments regarding the ability of cable or satellite television or radio to intrude into the privacy of one's home, like radio and television intruding as in *FCC v. Pacifica*,[526] can be dealt with under standard free speech doctrine viewing the privacy rationale as a content-neutral justification for regulation, triggering the intermediate scrutiny standard of *Pacifica*.

In *Turner Broadcasting Systems, Inc. v. FCC* (*Turner I*), the Court considered the constitutional validity of a federal statute that required cable systems with more than twelve active channels to set aside up to one-third of their channels for commercial broadcast stations that request carriage.[527] For the Court, Justice Kennedy said that the radio and television cases do not apply because cable does not have the limits of the broadcast medium.[528] On the other hand, a cable operator can silence the voice of competing speakers with a flick of the switch, raising some access concerns. Nevertheless, some degree of heightened scrutiny is required, although strict scrutiny need not apply because the must-carry provisions do not impose burdens or benefits with reference to the content of speech. Thus, even under standard free speech doctrine, a content-neutral regulation would only trigger intermediate review.[529] Justice Kennedy noted the lack of evidence that lo-

---

de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico, 478 U.S. 328 (1986), and the more vigorous use of the *Central Hudson* test since 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484 (1996)). Consistent with his calling for the lesser standard of intermediate review in *Red Lion* to be overruled, see *supra* note 496, Justice Thomas has indicated a desire to overrule the less-than-strict-scrutiny review of regulations of commercial speech. *See* Thompson v. W. States Med. Ctr., 535 U.S. 357, 377 (2002) (Thomas, J., concurring) (citing *44 Liquormart, Inc.*, 517 U.S. at 523 (Thomas, J., concurring in part and concurring in the judgment) (addressing why the *Central Hudson* test should not be used and noting that strict scrutiny should apply)).

[525] *See supra* text accompanying notes 487–96.

[526] *See supra* text accompanying note 405.

[527] 512 U.S. 622, 630 (1994).

[528] *Id.* at 633–36.

[529] *Id.* at 635, 642–43.

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 084

cal stations had fallen into bankruptcy, turned in licenses, curtailed broadcasting, or suffered a reduction in operating revenues.[530] Nor was there evidence on the availability of less restrictive means. Thus, there were factual issues to be resolved and it was an error to enter summary judgment for the defendant FCC.[531]

In *Turner Broadcasting Systems, Inc. v. FCC* (*Turner II*), the Court again rejected the comparison of a cable television company with a newspaper and, applying intermediate review, upheld requiring cable broadcasters to set aside up to one-third of their channels for use by local, over-the-air commercial broadcasters.[532] By a similar 5-4 vote as in *Turner I*, the Court held the record showed the government had an important interest unrelated to the suppression of free speech—the preservation of free, over-the-air broadcasting.[533] The majority said that Congress's judgment was supported by substantial evidence in the record before Congress.[534] Justice O'Connor's dissent concluded that even under intermediate scrutiny, the regulations should fail.[535] Her dissent underscored the fact that, unlike the substantial deference given to government at minimum rational review, at intermediate scrutiny, the Court has "an independent duty to identify with care the Government's interests supporting the scheme, to inquire into the reasonableness of congressional findings regarding its necessity, and to examine the fit between its goals and its consequences."[536]

Despite the argument that higher than intermediate review should apply to content-based regulations of cable televisions, the Court reviewed cases that failed to produce any clear standard of review, as indicated by *Denver Area Educational Telecommunications Consortium, Inc. v. FCC*.[537] While Justices Kennedy and Ginsburg opted for strict scrutiny for the content-based regulations applicable in the case, the plurality of Justices Stevens, O'Connor, Souter, and Breyer explicitly refused to articulate any fixed standard of review, refusing to adopt

---

[530] *Id.* at 667–68.

[531] *Id.* at 668.

[532] 520 U.S. 180, 199–205, 212–13, 223 (1997).

[533] *Id.* at 189.

[534] *Id.* at 196.

[535] *Id.* at 256.

[536] *Id.* at 229 (O'Connor, J., dissenting). Justices Scalia, Thomas, and Ginsburg joined Justice O'Connor's dissent. *Id.*

[537] 518 U.S. 727, 737–44 (1996) (plurality opinion); *id.* at 784–87 (Kennedy, J., concurring in part, concurring in the judgment in part, and dissenting in part). Justice Ginsburg joined Justice Kennedy's opinion. *Id.* at 780.

either standard intermediate review or standard strict scrutiny.[538] Some members of the Court perhaps think that strict scrutiny review, applicable to newspapers and books,[539] is too rigorous,[540] while other members of the Court understandably feel that intermediate review, applicable to over-the-air radio and television,[541] is simply not rigorous enough to protect free speech of cable television operators.[542]

There is a version of strict scrutiny that adopts the strict scrutiny requirement of a compelling government interest and a direct relationship between means and ends, but rejects the strict scrutiny least restrictive, effective alternative requirement in favor of the intermediate requirement of the regulation merely having to be not substantially more burdensome than necessary.[543] Because this level adopts two of the three levels of strict scrutiny, but waters down element three to an intermediate level of inquiry, this additional level can be called "loose" strict scrutiny.[544] The Supreme Court used this standard of review in the Equal Protection case of *Bush v. Vera*.[545] In that case, although generally applying a strict scrutiny compelling governmental interest analysis, the majority, per Justice O'Connor, "reject[ed], as impossibly stringent, the District Court's view of the narrow tailoring requirement, that 'a district must have the least possible amount of irregular-

---

[538] *Id.* at 802 (Kennedy, J., concurring in the judgment in part, and dissenting in part). Justice Ginsburg joined Justice Kennedy's opinion, concurring in part. *Id.* at 739–40 (plurality opinion) (comparing each Justice's categorical approach to the standard of review and finding that each approach had flaws).

[539] *See* Miami Herald Pub. Co. v. Tornillo, 418 U.S. 241, 258 (1974); *see also supra* text accompanying note 491.

[540] *See Denver Area*, 518 U.S. at 739–41 (plurality opinion); Justice Breyer wrote the opinion, joined by Justices Stevens, O'Connor and Souter. *Id.* at 777–78 (Souter, J., concurring).

[541] *See* FCC v. League of Women Voters, 468 U.S. 364, 374–80 (1984); *see supra* text accompanying notes 494–96.

[542] *See Denver Area*, 518 U.S. at 784–87 (Kennedy, J., concurring in part, concurring in the judgment in part, and dissenting in part) (asserting that strict scrutiny is the proper standard to use for content-based regulations of public forum public access channels). Justice Ginsburg joined Justice Kennedy's opinion. *Id.* at 780. *See also id.* at 820–23 (Thomas, J., concurring in the judgment in part and dissenting in part) (criticizing adoption of an intermediate standard of review for cable television regulation, rather than strict scrutiny). Chief Justice Rehnquist and Justice Scalia joined the opinion. *Id.* at 812.

[543] Bush v. Vera, 517 U.S. 952, 977, 979–80 (1996).

[544] *See* 3 KELSO & KELSO, THE PATH OF CONSTITUTIONAL LAW, *supra* note 40, at 1337–39 (citing *Vera*, 517 U.S. at 977, 979).

[545] 517 U.S. at 976–77.

ity in shape, making allowances for traditional districting criteria.'"[546] Instead, the Court adopted the intermediate requirement that racial redistricting not be "substantially more [burdensome] than is 'reasonably necessary.'"[547] It has also been used in dissent by some Justices in race-based affirmative action cases, such as *Parents Involved in Community Schools v. Seattle School District No. 1.*[548] This approach seems to track the plurality's approach in *Denver Area Educational.*

Perhaps a majority of five Justices might be able to reach a compromise to command a majority for loose strict scrutiny review. Or perhaps there are now five votes on the Court for traditional strict scrutiny for content-based regulations of cable or satellite television and radio. Perhaps some clearer standards of review would be helpful.

### F. *Campaign Financing Regulation (*Buckley *and Its Version of Exacting Scrutiny)*

In the realm of speech regarding elections, the Court has focused on four situations: regulations of expenditures, regulations of contributions, disclosure requirements, and regulating the process of electing judicial candidates. Fundamental First Amendment interests are implicated in each area, and the government thus has the burden of justifying its restrictions. These cases have their own special feel; however, since beginning with the foundational modern case in 1976 of *Buckley v. Valeo,* resort to explicit strict scrutiny language has not been a priority, and use of phrases like "exacting scrutiny" has muddied the waters in terms of the exact standard of review to apply.[549]

Regarding regulation of expenditures, in 1986, the Court struck down in *Federal Election Commission v. Massachusetts Citizens for Life, Inc.* a federal statute that required corporations to make independent political expenditures only through special segregated funds, as applied to a small nonprofit corporation that would face organizational and finan-

---

[546] *Id.* at 977 (quoting Vera v. Richards, 861 F. Supp. 1304, 1343 (1994)).

[547] *Id.* at 979.

[548] 551 U.S. 701, 836–37 (2007) (Breyer, J., dissenting) (comparing regular strict scrutiny, to be used for regulations using race to keep races apart, and a more flexible strict scrutiny approach used when race is used to bring the races together). Justices Stevens, Souter, and Ginsburg joined the opinion. *Id.* at 803. On this "loose strict scrutiny," see generally 3 KELSO & KELSO, THE PATH OF CONSTITUTIONAL LAW, *supra* note 40, at 1044–52.

[549] 424 U.S. 1, 16 (1976) (rejecting *O'Brien*'s intermediate scrutiny; instead, adopting "the exacting scrutiny required by the First Amendment").

*Elon Law Review* [Vol. 8: 291

cial hurdles in establishing a segregated political fund.[550] However, in 1990, in *Austin v. Michigan Chamber of Commerce*, a 6-3 Court distinguished *Citizens for Life* and upheld a state bar on corporations using corporate treasury funds for independent expenditures in support of or in opposition to any candidate for election to state office.[551] Justice Marshall said the state had a compelling interest in preventing the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas.[552] The law was narrowly tailored because it permitted corporations to make independent political expenditures through separate segregated funds.[553] Justice Marshall distinguished *Citizens for Life* on the ground that there the organization was formed for the express purpose of promoting political ideas, it had no persons with a claim on its assets or earnings, and it was independent from the influence of business corporations.[554] That is not true of the Chamber of Commerce, because more than three-quarters of its members are business corporations.[555] Justice Marshall continued that the law was not under-inclusive for not regulating unions because they lack the significant state-conferred advantages of the corporate structure.[556] Nor was the Equal Protection Clause violated by exempting media corporations because of their unique societal role.[557]

---

[550] 479 U.S. 238, 251–65 (1986).

[551] 494 U.S. 652, 657–66 (1990).

[552] *Id.* at 660.

[553] *Id.* at 655.

[554] *Id.* at 662.

[555] *Id.* at 656.

[556] *Id.* at 666.

[557] *Id.* at 660–61, 666–69. Justices Scalia, O'Connor, and Kennedy dissented. *Id.* at 679 (Scalia, J., dissenting); *id.* at 695 (Kennedy, J., dissenting). Justices Scalia and O'Connor joined Justice Kennedy's dissent. *Id.* Justice Scalia said that *Buckley* held that independent expenditures to express the political views of individuals and associations do not raise a sufficient threat of corruption to justify prohibition. *Id.* at 695 (Scalia, J., dissenting). Further, the government cannot be trusted to establish restrictions on speech for the purpose of assuring fair political debate. *Id.* Justice Scalia said, "The premise of our system is that there is no such thing as too much speech—that the people are not foolish but intelligent, and will separate the wheat from the chaff." *Id.* Justice Kennedy, dissenting with Justices O'Connor and Scalia, added that the majority's attempt to distinguish *Citizens for Life* rested on the fallacy that the source of a speaker's funds is somehow relevant to the speaker's right of expression or society's interest in hearing what the speaker has to say. *Id.* at 695–96 (Kennedy, J., dissenting). The state's interest in protecting members from the use of funds to support candidates whom they may oppose is not here a compelling interest, just as it was not in *Buckley*. *Id.* Finally, the First Amendment provides no basis for excluding media corporations from

In 2010, in *Citizens United v. Federal Election Commission,* the Court considered a statute, which barred corporations from making independent expenditures that referred to a clearly identified candidate within thirty days of a primary election or within sixty days of a general election for public office.[558] In his opinion for a 5-4 Court, Justice Kennedy held the law unconstitutional, overruling *Austin v. Michigan Chamber of Commerce.*[559] In *Citizens United,* Justice Kennedy said that regular strict scrutiny should apply, that independent expenditures do not give rise to corruption or the appearance of corruption, and that any concern with shareholder protection can be protected through the processes of corporate democracy.[560] Justice Kennedy said that the Court was not reaching the question of whether the Government has a compelling interest in preventing foreign corporations from influencing our Nation's political process.[561]

Four Justices dissented in the case.[562] The dissent claimed that *stare decisis* had been inappropriately departed from because *Austin* has long been relied upon by state legislatures and the case had not been proved unworkable.[563] Justice Stevens also insisted there was plenty of evidence supporting the reasonableness of Congress's concern to deal with corruption, distortion, and shareholder protection.[564] As to the danger of corruption from corporate participation in an election, Congress conducted much investigation and the Court should defer to its judgment. Stevens said the fact that corporations have "no consciences, no beliefs, no feelings, and no thoughts or desires" is a reminder that they themselves are not "We the People" by whom and for whom our Constitution was established.[565] He concluded that the majority view was contrary to the long recognition by the people of the need to "prevent corporations from undermining self-government."[566]

---

the ban, considering the tangled ownership links between media and non-media corporations. *Id.* Justices Scalia and O'Connor joined the opinion. *Id.*

[558] 558 U.S. 310, 318–19 (2010) (reviewing 2 U.S.C. § 441(b) (2012)).

[559] *Id.* at 365.

[560] *Id.* at 340, 356–57; *id.* at 361–62 (quoting First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 794 (1978)).

[561] *Id.* at 362.

[562] *Id.* at 393 (Stevens, J., concurring in part and dissenting in part). Justice Stevens was joined by Justices Ginsburg, Breyer, and Sotomayor. *Id.*

[563] *Id.* at 411–14.

[564] *Id.* at 461–64.

[565] *Id.* at 466.

[566] *Id.* at 479.

Regarding regulations limiting contributions to political campaigns, since *Buckley*, the Court has drawn a distinction between limitations on expenditures versus limitations on contributions in terms of the level of scrutiny to be applied. For example, in 2000, a divided Court upheld in *Nixon v. Shrink Missouri Government PAC* a Missouri campaign contribution law which, like the federal law, included a per election contribution limit ($1,000).[567] The Court held that a public perception of potential harm was sufficient to justify a contribution limit under *Buckley*, while acknowledging that the standard of review in *Buckley* was stricter than the *O'Brien* test or time, place, or manner tests of intermediate scrutiny.[568] Nonetheless, the Court refused to adopt regular strict scrutiny, drawing a "line between expenditures and contributions" and only required that the regulation be "closely drawn" to advance the compelling interests of "prevention of corruption and the appearance of corruption," not a strict scrutiny least restrictive alternative analysis.[569] So phrased, this seems to be an example of "loose strict scrutiny," replacing the strict scrutiny least restrictive alternative test with the intermediate "not substantially too burdensome" "closely drawn" test.[570] Justices Scalia, Kennedy, and Thomas dissented in *Shrink Missouri*, urging the Court to apply regular strict scrutiny analysis equally to contribution and expenditure regulations.[571]

In 2003, a majority of the Court reduced the level of review for contribution limitations further, with a five-Justice majority of the Court in *McConnell v. Federal Election Commission* holding that some version of intermediate scrutiny should be used for limitations on contributions, while strict scrutiny was appropriate for limitations on expenditures.[572] Justifying the lower level of scrutiny by noting that the contribution limitations at issue in the case "have only a marginal impact on the ability of contributors, candidates, officeholders, and par-

---

[567] 528 U.S. 377, 381–82, 397–98 (2000). Justice Souter delivered the opinion of the Court, joined by Chief Justice Rehnquist and Justice O'Connor. *Id.* at 381. Justices Stevens and Breyer concurred, with Justice Ginsburg joining Justice Breyer's concurrence. *Id.* at 398 (Stevens, J., concurring); *id.* at 399 (Breyer, J., concurring).

[568] *Id.* at 386, 390 (majority opinion).

[569] *Id.* at 386; *id.* at 387-88 (quoting Buckley v. Valeo, 424 U.S. 1, 25 (1976)).

[570] On "loose strict scrutiny," see *supra* text accompanying notes 543–48.

[571] *See Shrink Mo.*, 528 U.S. at 405–10 (Kennedy, J., dissenting); *id.* at 410 (Thomas, J., dissenting). Justice Scalia joined Justice Thomas' dissent. *Id.*

[572] 540 U.S. 93, 114, 134, 137 (2003). Justices Stevens and O'Connor delivered the opinion of the Court with respect to the Bipartisan Campaign Reform Act of 2002, Titles I & II. Justices Souter, Ginsburg, and Breyer joined Justices Stevens and O'Connor's opinion. *Id.* at 94.

ties to engage in effective political speech," the Court noted that contribution regulations are valid if they are "closely drawn" to match a "sufficiently important interest,"[573] an intermediate level of scrutiny.[574] Despite the Court's more vigorous review of campaign financing regulations since 2006, following Chief Justice Roberts and Justice Alito replacing Chief Justice Rehnquist and Justice O'Connor,[575] the Court has not yet overruled *McConnell*. However, the Court has substantially limited *McConnell* to its facts, and applied a more vigorous version of intermediate review to contribution limits.[576]

---

[573] *Id.* at 138 (citing Fed. Election Comm'n v. Beaumont, 539 U.S. 146, 161 (2003)); *id.* at 136 (quoting *Beaumont*, 539 U.S. at 162).

[574] *See id.* at 137–39.

[575] For the start of the 2005 Term in October, 2005, Chief Justice John G. Roberts, Jr. replaced Chief Justice William H. Rehnquist. *Biographies of Current Supreme Court Justices*, SUP. CT. OF THE U.S., http://www.supremecourt.gov/about/biographies.aspx (last visited Apr. 17, 2016). On January 31, 2006, Justice Samuel A. Alito, Jr. replaced Justice Sandra Day O'Connor. *Id.* Note that both Chief Justice Rehnquist and Justice O'Connor were in the majority in *Shrink Missouri*. *See supra* text accompanying notes 567–71. Justice O'Connor was the fifth vote for intermediate review in *McConnell*. *See supra* text accompanying notes 572–74.

[576] *See, e.g.,* McCutcheon v. Fed. Elections Comm'n, 572 U.S. __, __, __, __, 134 S. Ct. 1434, 1442, 1446, 1462 (2014) (holding, in a 5-4 decision, that aggregate contribution limits that are placed on an individual donor's political contributions during an election cycle fail even *Buckley's* less than strict scrutiny review, because they limit the number of separate candidates an individual can support, although a similar overall limit had been upheld in *Buckley*); *id.* at 1465 (Breyer, J., dissenting) (arguing that the limitations should be upheld limitations based on *Buckley's* less than strict scrutiny review); Randall v. Sorrell, 548 U.S. 230, 236–38 (2006) (holding Vermont's contribution limits on the amount any single individual can contribute to the campaign of a candidate for state office during a "two-year general election cycle" unconstitutional; those limits were: "governor, lieutenant governor, and other statewide offices, $400; state senator, $300; and state representative, $200"). In *Sorrell*, Justices Scalia, Kennedy, and Thomas concurred only in the judgment, with both Justices Kennedy and Thomas indicating a continuing willingness to depart from *McConnell's* less than strict scrutiny review for contribution limitations, and apply strict scrutiny instead. *Id.* at 264 (Kennedy, J., concurring in the judgment); *id.* at 265–67 (Thomas, J., concurring in the judgment). A three-Justice dissent would have upheld the contribution limitations under *McConnell's* intermediate review. *Id.* at 281–84 (Souter, J., dissenting). On recent cases involving contribution limitations to political campaigns, see generally Long Beach Area Chamber of Commerce v. City of Long Beach, 603 F.3d 684, 687, 693 (9th Cir. 2010) (finding unconstitutional a municipal cap on acceptance of contributions by any person that makes independent expenditures supporting or opposing a candidate applied to local chamber of commerce's PAC); Dallman v. Ritter, 225 P.3d 610, 616–18, 631 (Colo. 2010) (finding that prohibiting political contributions from holders of no-bid contracts with state entities unconstitutional, in suit brought by various labor unions, companies, and hospitals). *But see* United States v. Danielczyk, 683 F.3d 611, 614–16 (4th Cir. 2012) (finding valid century-old federal ban on direct corporate contributions to federal can-

*Elon Law Review* [Vol. 8: 291

Cases involving disclosure requirements were dealt with in *Buckley* under a strict scrutiny, direct relationship, and least restrictive alternative approach. Even under this standard, however, the disclosure requirements were viewed as constitutional.[577] Thus, the level of review for disclosure requirements has not been a matter of much debate, as disclosure requirements involving campaign financing tend to survive strict scrutiny anyway. In *Citizens United*, the statute included a disclaimer requirement mandating disclosure of who is responsible for the content of any advertisement, and a disclosure requirement for any person spending more than $10,000 on electioneering communications within a calendar year.[578] Justice Kennedy found no constitutional impediment to the application of those requirements to a movie broadcast via video-on-demand, as there had been no showing that these requirements would impose a chill on speech or expression.[579]

Under the reasoning of the five-Justice majority in *McConnell*, since disclosure requirements typically only "have a marginal impact on the ability of parties to engage in effective political speech," an argument can be made that they should trigger the intermediate scrutiny used for contribution limitations.[580] This is the standard seemingly adopted in 2010 in *John Doe No. 1 v. Reed*.[581] While the majority cited, in passing, precedents using the term "exacting scrutiny," which typically is used to suggest "strict scrutiny," the majority's official test in *Reed* only required a substantial relation between the disclosure re-

---

[577] Buckley v. Valeo, 424 U.S. 1, 64–68, 84 (1976).

didates); Minn. Citizens Concerned for Life, Inc. v. Swanson, 692 F.3d 864, 867, 877–79 (8th Cir. 2012) (holding a state limitation on corporations contributing directly to candidates constitutional); Preston v. Leake, 660 F.3d 726, 729, 741 (4th Cir. 2011) (holding that a North Carolina statute prohibiting lobbyists from making campaign contributions to candidates for certain state positions was constitutional under *Buckley*).

[577] Buckley v. Valeo, 424 U.S. 1, 64–68, 84 (1976).

[578] Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 366 (2010).

[579] *See id.* at 366–67, 370–71 (reviewing 2 U.S.C. §§ 434 (f), 441(d)). Only Justice Thomas dissented. *Id.* at 480 (Thomas, J., concurring in part and dissenting in part). Justice Thomas pointed to a number of examples wherein persons whose names and addresses were disclosed, as required by law, were subjected to attacks and were left subject to retaliation from elected officials. *Id.* at 480–83. While Court majorities have been willing to consider those risks to freedom of association as grounds for not requiring disclosure in specific cases, as in *NAACP v. Alabama*, 357 U.S. 449, 460–66 (1958), for Justice Thomas the possibility of bringing such an as-applied action would require litigation over an extended time during which there would be a risk of chilling speech.

[580] McConnell v. Fed. Election Comm'n, 540 U.S. 93, 138 (citing Fed. Election Comm'n v. Beaumont, 539 U.S. 146, 161 (2003)).

[581] 561 U.S. 186, 194–95, 202 (2010) (finding compelled disclosure of signatory information on referendum petitions constitutional).

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 092

quirement and a sufficiently important governmental interest.[582] This is intermediate scrutiny language.

Speech made during the course of election campaigns by judges raise special First Amendment problems. As Justice Ginsburg has noted,

> Unlike their counterparts in the political branches, judges are expected to refrain from catering to particular constituencies or committing themselves on controversial issues in advance of adversarial presentation. Their mission is to decide "individual cases and controversies" on individual records, neutrally applying legal principles, and, when necessary, "stand[ing] up to what is generally supreme in a democracy: the popular will."
>
> A judiciary capable of performing this function, owing fidelity to no person or party, is a "longstanding Anglo-American tradition," an essential bulwark of constitutional government, a constant guardian of the rule of law. The guarantee of an independent, impartial judiciary enables society to "withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." Without this, all the reservations of particular rights or privileges would amount to nothing." The Federalist No. 78, p. 466 (C. Rossiter ed. 1961).[583]

The ability of the judiciary to discharge its unique role rests to a large degree on the manner in which judges are selected. The Framers sought to advance the judicial function in the federal courts through the protections of Article III, Section 1, which provides for life

---

[582] *Id.* at 196 (citing *Citizens United*, 558 U.S. at 366–67). Justice Thomas's dissent in *Reed* did apply a strict scrutiny, least restrictive effective alternative analysis. *Id.* at 228–29 (Thomas, J., dissenting). It remains to be seen whether that intermediate standard will continue to be applied in later disclosure cases, or whether the court will return to strict scrutiny review in all disclosure cases, or adopt the suggestion by Justices O'Connor and Breyer in *Buckley v. American Constitutional Law Foundation* (*ACLF*), 525 U.S. 182, 217–18 (1999) (O'Connor, J., concurring in the judgment in part and dissenting in part), that strict scrutiny should be used for disclosure requirements which are substantial burdens on free speech, but only reasonableness balancing for less than substantial burdens, which is the test used in the ballot access cases involving the fundamental right to vote in *Burdick v. Takashi*, 504 U.S. 428, 434 (1992). For additional cases involving disclosure regulations, see, for example, Chula Vista Citizens for Jobs and Fair Competition v. Norris, 782 F.3d 520, 524, 543 (9th Cir. 2014) (holding a requirement that names of official proponents appear on text of proposition used by circulators to solicit voter signatures constitutional under less than strict scrutiny approach); Libertarian Party of Virginia v. Judd, 718 F.3d 308, 311, 317–19 (4th Cir. 2013) (holding that a Virginia law requiring witnesses to verify each signature gathered for a petition to nominate a candidate for the ballot in statewide elections is not narrowly tailored and fails strict scrutiny).

[583] Republican Party of Minn. v. White, 536 U.S. 765, 803–04 (2002) (Ginsburg, J., dissenting) (citations omitted).

tenure for Article III judges during "good Behavior," and the Article II, Section 2, Clause 2 Appointments Clause, which provides for Presidential selection of Supreme Court judges on the advice and consent of the Senate, with the same procedure applied through statute to district court and court of appeals federal judges.[584]  In many states, however, citizens choose judges directly in elections, which poses special problems of electoral accountability versus judicial independence.[585]  Recognizing these special problems, many states have sought to preserve the integrity of their judiciaries by either making judicial elections nonpartisan, or by preventing candidates for judicial office from publicly making known how they would decide issues likely to come before them as judges.

In *Republican Party of Minnesota v. White*, the Supreme Court considered such a regulation and declared it unconstitutional.[586]  The regulation in the case prohibited a judicial candidate from announcing his views "on any specific nonfanciful legal question within the province of the court for which he is running, except in the context of discussing past decisions—and in the latter context as well, if he expresses the view that he is not bound by *stare decisis*."[587]  A majority of

---

[584] U.S. Const. art. III, § 1; *id.* art. II, § 2, cl. 2.

[585] As noted in Rachel Paine Caufield, *In the Wake of White: How States are Responding to Republican Party of Minnesota v. White and How Judicial Elections are Changing*, 38 Akron L. Rev. 625, 628 & nn.23–28 (2005), as of 2005,

> Fourteen states [Alaska, Colorado, Connecticut, Delaware, Hawaii, Iowa, Maryland, Massachusetts, Nebraska, New Mexico, Rhode Island, Utah, Vermont, and Wyoming] and the District of Columbia use a merit selection process [where the Governor selects from a slate of judges (typically 3-5) recommended by an independent commission, with a retention election some years after service on the bench].  Another six states have opted to appoint their state judiciaries [directly] [with four (California, Maine, New Jersey, and New Hampshire) appointed by the Governor, while two (Virginia and South Carolina) appointed by the state legislature].  Eight states [Alabama, Illinois, Louisiana, Michigan, Ohio, Pennsylvania, Texas, and West Virginia] use partisan elections and thirteen [Arkansas, Georgia, Idaho, Kentucky, Minnesota, Mississippi, Montana, Nevada, North Carolina, North Dakota, Oregon, Washington, and Wisconsin] use nonpartisan elections.  The other nine states [Arizona, Florida, Indiana, Kansas, Missouri, New York, Oklahoma, South Dakota, and Tennessee] use a combination of methods, often referred to as 'hybrid' systems.

*Id.*; *see also* Lawrence Baum, *Judicial Elections and Judicial Independence: The Voter's Perspective*, 64 Ohio St. L.J. 13 (2003) (discussing the perspective of voters and different forms of elections in relation to their impact on judicial independence); Hon. Thomas R. Phillips, *Electoral Accountability and Judicial Independence*, 64 Ohio St. L.J. 137 (2003) (discussing the progression of judicial selection and the decreasing judicial independence stemming from the selection processes).

[586] *See White*, 536 U.S. at 788.

[587] *Id.* at 773.

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 094

the Court concluded that this regulation was not the least burdensome effective alternative to advance the government's interest in ensuring the impartiality of the judiciary, as judges should be free to announce their general views on legal issues as long as they remain open-minded and "willing to consider views that oppose [the individual judge's] preconceptions, and remain open to persuasion, when the issues arise in a pending case."[588]

Some commentators have argued that statements made in campaigns for judicial office may have a greater tendency to pressure judges to decide later cases consistent with those comments, which would undermine judicial independence. Such comments thus cause special problems that do not exist in campaigns for legislative and executive branch offices, since those office-holders are expected to act in political ways consistent with their campaign promises.[589] Further, the amount of money flowing to judicial elections is likely to increase given reduced limitations on the kinds of advertisements that can be run for candidates for judicial office. Indeed, after *White*, spending on judicial campaign ads more than doubled between 2002 and 2006.[590]

After *White*, a number of states amended their Codes of Judicial Conduct to forbid judicial candidates only from making "pledges or

---

[588] *Id.* at 778, 788. Four Justices dissented. *Id.* at 805 (Ginsburg, J., dissenting) ("I do not agree with th[e] unilocular, 'an election is an election,' approach . . . . I would differentiate elections for political offices, in which the First Amendment holds full sway, from elections designed to select those whose office it is to administer justice without respect to persons. Minnesota's choice to elect its judges, I am persuaded, does not preclude the State from installing an election process geared to the judicial office."). The majority acknowledged that some speech prohibited by the clause "may well exhibit a bias against parties—including Justice Stevens's example of an election speech stressing the candidate's unbroken record of affirming convictions for rape." *Id.* at 777 n.7 (majority opinion). However, the Court noted that the question under strict scrutiny is not whether the announce clause serves this interest at all, but whether it is narrowly tailored to serve this interest as the least burdensome effective alternative. *Id.*

[589] On the issue of free speech rights for judges after *White*, see generally David Schultz, Minnesota Republican Party v. White *and the Future of State Judicial Selection*, 69 ALB. L. REV. 985 (2006) (examining the future of the judicial selection process following *Republican Party of Minnesota v. White*); Howland W. Abramson & Gary Lee, *The ABA Model Code Revisions and Judicial Campaign Speech: Constitutional and Practical Implications*, 20 TOURO L. REV. 729 (2005) (discussing revisions to the American Bar Association Model Code of Judicial Conduct).

[590] *See generally* Caufield, *supra* note 585, at 638–39 & nn.97–102 (discussing the increase in spending on advertising for judicial campaigns).

*Elon Law Review* [Vol. 8: 291

promises" or "committing to issues" likely to come before the court.[591] Such limitations have typically been ruled unconstitutional under *White*. For example, in *Kansas Judicial Watch v. Stout*, a district court held as overbroad a "pledges and promises" clause in the context of chilling candidates' free speech rights who feared discipline for answering candidate questionnaires distributed by political action committees asking the candidate for views on a range of controversial social issues which might come before the court for review.[592] The court noted, however, that if the clause were narrowly drawn to ban only pledges, promises, or commitments to decide an issue in a particular way, rather than limiting any pledge or promise regarding conduct in office other than the faithful and impartial performance of duties, it would likely be constitutional as directly related to advancing the compelling interest identified in *White*: ensuring judges are impartial in the sense of "open-mindedness" in performing judicial duties.[593] As the court noted, "A campaign promise to rule a certain way on a legal issue likely to come before the court is so uniquely destructive of open-mindedness and confidence in the judiciary that recusal might not satisfactorily protect the state's interest in maintaining judicial open-mindedness."[594] As an example of the difference, the court noted that it would be legitimate for a candidate to say, "I promise to be tough on crime," or "I promise to uphold the First Amendment."[595] It would violate "open-mindedness" to say, "I promise to never invalidate a search on Fourth Amendment grounds."[596] Only the latter statement could be proscribed.[597]

In contrast, some state courts after *White* have upheld generic "pledges and promises" clauses against First Amendment attack to discipline judicial candidates for statements, such as I pledge to "assist

---

[591] *See, e.g.,* FLA. CODE JUD. CONDUCT, Canon 7 (2015).

[592] 440 F. Supp. 2d 1209, 1217–18, 1228–32, 1240 (D. Kan. 2006), (citing N.D. Family All., Inc. v. Bader, 361 F. Supp. 2d 1021, 1030 n.1, 1040 (D. N.D. 2005); Alaska Right to Life Political Action Comm. v. Feldman, 380 F. Supp. 2d 1080, 1082–84 (D. Alaska 2005), *vacated*, 504 F.3d 840 (9th Cir. 2007); Family Tr. Found. of Ky., Inc v. Wolnitzek, 345 F. Supp. 2d 672, 697, 702 n.12 (E.D. Ky. 2004)). The *Stout* case was dismissed on appeal as moot, and the opinion was vacated. Kan. Judicial Review v. Stout, 562 F.3d 1240 (10th Cir. 2009).

[593] *See id.* at 1230–31.

[594] *Id.* at 1231 (quoting Family Tr. Found. of Ky., Inc. v. Wolnitzek, 345 F. Supp. 2d 672, 702 n.12 (E.D. Ky. 2004)).

[595] *See id.* at 1232 (quoting Wolnitzek, 345 F. Supp. 2d at 697).

[596] *See id.* at 1232 (quoting Wolnitzek, 345 F. Supp. 2d at 701).

[597] *See id.* at 1232.

our law enforcement officers as they aggressively work towards cleaning up our city streets" or I promise "to help law enforcement by putting criminals where they belong . . . *behind bars.*"[598]

In *Siefert v. Alexander*, the Seventh Circuit held that a Wisconsin judicial ethics rule barring judges or judicial candidates from being members of a political party was unconstitutional under a strict scrutiny approach, but that a rule preventing judges or judicial candidates from personally soliciting campaign contributions was constitutional as advancing a compelling interest in preventing corruption and the appearance of corruption.[599] The Court also held that a ban on judges or judicial candidates endorsing others in partisan elections was constitutional, viewing it merely as a regulation of government workers, thus subject only to the *Pickering* reasonableness balancing test.[600] In *Wersel v. Sexton*, applying strict scrutiny, the Eighth Circuit, in a 7-5 en banc decision, held constitutional Minnesota Code of Judicial Conduct provisions prohibiting judicial candidates from publicly endorsing or opposing candidates for a different public office, and personally soliciting or accepting campaign contributions, viewing the provisions as narrowly tailored to serve the compelling interests in maintaining judicial impartiality and the appearance of judicial impartiality.[601] Although in *Wolfson v. Concannon*, an Arizona provision prohibiting judicial candidates from giving speeches on behalf of other candidates was held unconstitutional under strict scrutiny, disagreeing with *Wersel v. Sexton*, that case was superseded on rehearing en banc.[602] In *Williams-Yulee v. Florida Bar*, the Supreme Court narrowly held, by a 5-4 vote, that a rule prohibiting judicial candidates from personally soliciting campaign funds satisfied strict scrutiny.[603]

---

[598] *See In re* Watson, 794 N.E.2d 1, 2, 4–5 (N.Y. 2003); *In re* Kinsey, 842 So. 2d 77, 87–89 (Fla. 2003).

[599] 608 F.3d 974, 977, 981, 988–90 (7th Cir. 2010).

[600] *See id.* at 983, 985–86, 988.

[601] 674 F.3d 1010, 1019, 1024–25, 1028, 1031 (8th Cir. 2012) (en banc) (7-5 decision).

[602] *See* 750 F.3d 1145, 1152, 1158, 1160 (9th Cir. 2014).

[603] 575 U.S. __, __, 135 S. Ct. 1656, 1661–62, 1673 (2015); *see also In re* Judicial Campaign Complaint Against O'Toole, 24 N.E.3d 1114, 1118 (Ohio 2014) (holding a statute as constitutional regarding its provision prohibiting a judicial candidate from making knowingly false statements, but holding as overbroad the statute's provision regulating misleading or deceptive statements).

## VII. PROCEDURAL ASPECTS OF FREE SPEECH DOCTRINE

### A. *Prior Restraints on Speech: Permits or Licensing Systems*

A prior restraint is a legal sanction that has the effect of suppressing future speech before there is a judicial finding, after appropriate proceedings, that such speech is not constitutionally protected from speech.[604] The Court has often emphasized that any prior restraint has a "'heavy presumption' against its constitutional validity."[605] This is particularly true because of the collateral bar rule. While a person accused of violating a law can defend on the grounds that the law is unconstitutional, in the case of a prior restraint, "[A] court order must be obeyed until it is set aside" and "persons subject to the order who disobey it may not defend against the ensuing charge of criminal contempt on the ground that the order was erroneous or even unconstitutional."[606]

As the Court indicated in *Freedman v. Maryland,* for even a temporary prior restraint to be valid, the restraint must: (1) put the burden on the government to go to court and bear the burden of proving the speech unprotected; (2) merely preserve the status quo for the shortest fixed period compatible with sound judicial resolution; and (3) provide for a prompt, final judicial disposition of the case.[607] Further, due to the concern expressed by the Court about the repressive character of a prior restraint, strict scrutiny will apply to any injunction having a prior restraint impact on speech.[608] As an example, in *Tory v. Cochran,* the trial court had enjoined the defendant, who had engaged in a pattern of defamatory statements about famous trial attorney Johnnie Cochran, to stop picketing or uttering oral statements about Cochran or his law firm in any public forum.[609] While the case was on appeal, Mr. Cochran died.[610] After concluding the case was not moot because the injunction remained in force even after Cochran's death, the Court held that since picketing Cochran and his law office could no

---

[604] *See* Alexander v. United States, 509 U.S. 544, 550 (1993) (defining "prior restraint").

[605] CBS, Inc. v. Davis, 510 U.S. 1315, 1317 (1994) (citing Org. for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971)).

[606] Stephen Barnett, *The Puzzle of Prior Restraint,* 29 STAN. L. REV. 539, 552 (1977).

[607] Freedman v. Maryland, 380 U.S. 51, 58–59 (1965).

[608] *See* Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Rel., 413 U.S. 376, 390–91 (1973); Carroll v. President and Comm'rs of Princess Anne, 393 U.S. 175, 183 (1968).

[609] Tory v. Cochran, 544 U.S. 734, 734–36 (2005).

[610] *Id.* at 736.

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 098

longer achieve its objective of forcing Cochran to pay "a tribute" to stop the activity, the injunction was now an overly broad prior restraint upon speech.[611]

For the strict scrutiny, *Freedman v. Maryland* analysis to apply, a prior restraint must be involved.[612] In *Alexander v. United States*, the Court rejected an argument that a forfeiture of a bookstore under the RICO statute was a prior restraint.[613] Chief Justice Rehnquist noted that the forfeiture did not forbid any future expressive activities or require prior approval for actions.[614] It merely punished the defendant by depriving him of assets derived from prior racketeering activities.[615]

If the government has a content-neutral reason for regulating, only an intermediate standard of review applies, as the Court noted in *Thomas v. Chicago Park District*.[616] In 2004, the Supreme Court concluded in *City of Littleton, Colorado v. Z.J. Gifts D-4, L.L.C.* that for content-based prior restraints, which must meet *Freedman v. Maryland*, a "prompt judicial decision" is required.[617] However, for content-neutral regulatory systems, to which *Thomas v. Chicago Park District* applies, application of the state's "ordinary 'judicial review' rules" was adequate, absent "special problems of undue delay in individual cases as the ordinance is applied."[618]

---

[611] *Id.* at 738.

[612] *See Freedman*, 380 U.S. at 53–54.

[613] Alexander v. United States, 509 U.S. 544, 554 (1993). Justice Kennedy dissented, with Justices Blackmun and Stevens joining the dissent, saying that the forfeiture was a prior restraint because it served not only an interest in purging a criminal taint, but also an interest in deterring the activities of his speech-related business. *Id.* at 575 (Kennedy, J., dissenting).

[614] *Id.* at 550–51 (majority opinion).

[615] *Id.* at 551.

[616] *See* Thomas v. Chi. Park Dist., 534 U.S. 316, 322 (2001) (holding that a content-neutral permit scheme regulating speech in a public forum does not have to adhere to procedural safeguards set forth in *Freedman*).

[617] 541 U.S. 774, 776–84 (2004) (holding an ordinance for "adult business" licensing met the First Amendment requirement assuring prompt judicial review of an administrative decision denying said license).

[618] *Id.* at 784 (holding that where the regulation is conditioned on neutral criteria, application of normal judicial review rules is adequate, so long as problems of undue delay do not present themselves).

B. *Government Fees and Injunctions on Speech*
1. Fees on Speech

Where the government has a content-neutral justification for imposing a fee prior to permitting speech, such as ensuring that two groups are not trying to speak at the same time in the same place, or ensuring that the costs are covered of cleaning up any littering that might occur during an event, the Court applies an intermediate standard of review.[619] As typically phrased, such laws are only allowed if the government has: (1) an important, content-neutral reason for the regulation (the prong one requirement of intermediate review that requires an important or substantial interest); (2) there are clear criteria leaving no overly broad discretion to the licensing authority (the prong two requirement of ensuring the regulation is substantially related to advancing the content-neutral interest and is not a cover for content-based discrimination); and (3) procedural safeguards, such as requiring prompt determinations as to license requests and judicial review of license standards (the prong three requirement of the regulation not being substantially more burdensome than necessary).[620]

In *Cox v. New Hampshire*, the Court confronted a state statute that required payment of a license fee up to $300 to local governments for the right to parade in the public streets.[621] The fee could be adjusted based on the size of the parade, as the fee "for a circus parade or a celebration procession of length, each drawing crowds of observers, would take into account the greater public expense of policing the spectacle, compared with the slight expense of a less expansive and attractive parade or procession."[622] The Court stated,

> The suggestion that a flat fee should have been charged fails to take account of the difficulty of framing a fair schedule to meet all circumstances, and we perceive no constitutional ground for denying to local governments that flexibility of adjustment of fees which in the light of varying conditions would tend to conserve rather than impair the liberty sought.[623]

Because collecting a modest fee to reimburse for public expense in policing events is an important government interest that is not a substantial burden on free speech, and the permit system substantially limited the discretion of the licensing board in determining the amount

---

[619] *See* CHEMERINSKY, *supra* note 15, at 961, 993–96.
[620] *Id.* at 993–95.
[621] Cox v. New Hampshire, 312 U.S. 569, 576–77 (1941).
[622] *Id.* at 577.
[623] *Id.*

Case 3:22-cv-01616-AGS-DDL   Document 57   Filed 04/03/23   PageID.5547   Page 134 of 157

of the fee and required the permit to be granted as long as the area was not already committed to be used by another group, the Court indicated that the fee system was constitutional.[624]

In contrast, the Court considered the constitutionality of an assembly and parade ordinance that permitted a government administrator to vary the fee to reflect the estimated cost of maintaining public order.[625] The Court noted in *Forsyth County, Georgia v. Nationalist Movement,*

> This Court has held time and again, "Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." The county offers only one justification for this ordinance: raising revenue for police services. While this undoubtedly is an important government responsibility, it does not justify a content-based permit fee.
>
> Petitioner insists that its ordinance cannot be unconstitutionally content based because it contains much of the same language as did the state statute upheld in *Cox v. New Hampshire,* 312 U.S. 569 (1941). Although the Supreme Court of New Hampshire had interpreted the statute at issue in *Cox* to authorize the municipality to charge a permit fee for the "maintenance of public order," no fee was actually assessed. Nothing in this Court's opinion suggests that the statute, as interpreted by the New Hampshire Supreme Court, called for charging a premium in the case of a controversial political message delivered before a hostile audience. . . . [W]e do not read *Cox* to permit such a premium.[626]

In *Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton,* the Court used the intermediate review of *Thomas* to strike down an ordinance requiring individuals to obtain a permit prior to engaging in door-to-door advocacy and to display the permit upon demand.[627] Although the Court acknowledged that the prevention of fraud, the protection of residents' privacy, and crime prevention were important interests, the statute was not narrowly tailored, either because it was not substantially related to advancing the interests, as for fraud or crime prevention, or was substantially more burdensome than necessary, as for protection of residential privacy.[628]

---

[624] *Id.* at 576–77.
[625] Forsyth Cty. v. Nationalist Movement, 505 U.S. 123, 133 (1992).
[626] *Id.* at 135–36 (citations omitted).
[627] Watchtower Bible & Tract. Soc'y of N.Y., Inc. v. Vill. of Stratton, 536 U.S. 150, 160–64 (2002).
[628] *Id.* at 164–69.

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 101

## 2. Injunctions on Speech

The Supreme Court, in *Madsen v. Women's Health Center*, announced a refinement in the standard of review for content-neutral injunctions on speech.[629] Chief Justice Rehnquist stated that the differences between an injunction and a generally applicable ordinance required somewhat more stringent application of First Amendment principles regarding content-neutral injunctions than for time, place, or manner regulations.[630] Thus, in *Madsen*, the Court adopted an analysis under prong three of heightened scrutiny that was described as being somewhere between the intermediate "not substantially more burdensome" test and the strict scrutiny "least restrictive alternative" test.[631] It is not clear exactly how much more stringent this test is than traditional intermediate scrutiny, nor are other precedents of any help, since the standard is not used in any other case.

In fact, this additional version of the narrowly drawn analysis is unnecessary. It is understandable the Court might wish to adopt in *Madsen* a standard of review higher than traditional intermediate scrutiny, which applies to a content-neutral regulation of speech. The majority opinion in *Madsen* discussed the differences between ordinances and injunctions, including extra penalties like contempt of court for violating an injunction, and concluded that "these differences require a somewhat more stringent application of general First Amendment principles in this context."[632] The dissent in *Madsen* opted for strict scrutiny.[633] The majority could have achieved basically the same result it reached in the case by adopting the intermediate review with bite standard of *Central Hudson*.[634] As the majority's analysis reveals, where the injunction at issue in *Madsen* was constitutional, it was because it was "directly related" to the perceived harms and was a close enough fit to satisfy the intermediate "not substantially more burdensome than

---

[629] Madsen v. Women's Health Ctr., 512 U.S. 753, 764 (1994).

[630] *Id.* at 764–65.

[631] *Id.* at 764–66.

[632] *Id.* at 765.

[633] *Id.* at 792–94 (Scalia, J., concurring in part and dissenting in part) ("[A] restriction upon speech imposed by injunction (whether nominally content based or nominally content neutral) is at least as deserving of strict scrutiny as a statutory, content-based restriction."). Justices Kennedy and Thomas joined Justice Scalia's concurrence in part and dissent in part. *Id.* at 784.

[634] For discussion of the *Central Hudson* test, see *supra* text accompanying notes 511–19.

Case 3:22-cv-01616-AGS-DDL   Document 57   Filed 04/03/23   PageID.5549   Page 136 of 157

necessary" test.[635] The Court found that a thirty-six foot buffer zone in front of an abortion clinic was directly related to protecting unfettered ingress and egress from the clinic, and a close enough fit given the deference due to the state court's familiarity with the factual background; the Court concluded that the regulation of noise levels was directly related to the need for noise control around hospitals and medical facilities.[636] Where the injunction was unconstitutional, it was because it was not directly related to perceived harms, or not a close enough fit, and thus substantially overbroad.[637] The Court concluded that inclusion of a thirty-six foot buffer zone at the back and side of the clinic was not directly related to ingress and egress from clinic, nor was the prohibition on all uninvited approaches to persons seeking to enter the clinic directly related to preventing clinic patients from being stalked or shadowed; furthermore, the Court concluded that banning all images observable from the clinic was not narrowly drawn given the substantially less burdensome option for the clinic to pull its curtains, and that the three-hundred foot ban on picketing around the clinic was "much larger" than necessary and substantially overbroad.[638]

### C. *Vagueness and Overbreadth Doctrine*

#### 1. Vagueness

A law is unconstitutionally vague under the Due Process Clauses of the Fifth and Fourteenth Amendments if the law does not define with "sufficient definiteness" what conduct is permitted and what conduct is prohibited "in a manner that does not encourage arbitrary and discriminatory enforcement."[639] While any law can be unconstitutionally vague, the Court has expressed the greatest concern regarding vagueness in the context of criminal statutes and in the context of the First Amendment. Regarding vagueness in the context of the freedom of speech, Professor Erwin Chemerinsky has noted, "[C]ourts are particularly troubled about vague laws restricting speech out of concern that they will chill constitutionally protected speech."[640] In *NAACP v. Button*, the Court stated the following:

---

[635] *See Madsen*, 512 U.S. at 770–71 (holding that while the 36-foot buffer zone was constitutional regarding clinic entrances and driveway, the injunction was unconstitutional with respect to private property near the clinic).

[636] *Id.* at 768–70, 772.

[637] *Id.* at 771, 773–76.

[638] *Id.* at 771, 773–75.

[639] Kolender v. Lawson, 461 U.S. 352, 357 (1983).

[640] Chemerinsky, *supra* note 15, at 971.

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 103

> [S]tandards of permissible statutory vagueness are strict in the area of free expression . . . . Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity . . . . [The freedom of speech is] delicate and vulnerable, [and] the threat of sanctions may deter their exercise almost as potently as the actual application of sanctions.[641]

Based on concerns such as these, the Court has declared unconstitutionally vague a statute preventing any "subversive person" from being employed by the state and requiring persons to swear they are not members of a "subversive organization";[642] a statute that prohibited treating the flag of the United States "contemptuously";[643] and a statute making it unlawful to "interrupt" police officers in the performance of their duties, noting that the law was not clearly limited to "disorderly conduct or fighting words" and the law effectively grants police "the discretion to make arrests selectively on the basis of the content of the speech."[644] In *FCC v. Fox Television Stations, Inc.*, the Court held that FCC did not give television networks fair notice in advance of a change in policy whereby a fleeting expletive or brief shot of nudity could be held to be actionably indecent, and thus their new policy was unconstitutionally vague as applied to the charges filed in the case.[645]

Regarding provisions of the USA Patriot Act, a lower federal court ruled in *Humanitarian Law Project v. Gonzales* that the provisions of the Act that include within the definition of "knowingly provides material support or resources" to a terrorist group the activities of providing "training," "expert advice or assistance," or "service," are unconstitutionally vague provisions.[646] The court noted that such terms could be construed to ban pure speech or advocacy activities that presumably would be protected under the First Amendment, such as teaching international law for peacemaking resolutions or how to petition the United Nations to seek redress for human rights violations.[647] In contrast, the Supreme Court upheld these provisions in *Holder v. Humanitarian Law Project*, concluding that the line between "advocating for a

---

[641] NAACP v. Button, 371 U.S. 415, 432–33 (1963) (citations omitted).

[642] Baggett v. Bullitt, 377 U.S. 360, 367 (1964).

[643] Smith v. Goguen, 415 U.S. 566, 568-69, 574, 581–82 (1974).

[644] City of Houston v. Hill, 482 U.S. 451, 465 n.15 (1987).

[645] FCC v. Fox Television Stations, Inc., 567 U.S. __, __, 132 S. Ct. 2307, 2318–20 (2012).

[646] Humanitarian Law Project v. Gonzales, 380 F. Supp. 2d 1134, 1148–49 (C.D. Cal. 2005), *aff'd in part, rev'd in part sub nom.* Holder v. Humanitarian Law Project, 561 U.S. 1, 8–20 (2009) (affirming the vagueness claim under the First Amendment, but reversing the vagueness claim under the Due Process Clause of the Fifth Amendment).

[647] *Id.* at 1150–51.

cause," which is permitted, versus "providing service to a group that is advocating for a cause," which is prohibited, is sufficiently clear.[648]

## 2. Substantial Overbreadth

One exception to the normal rule that parties cannot bring cases to vindicate the rights of third parties involves the application of the substantial overbreadth doctrine, which is only applicable to free speech cases.[649] As explained by the Court in *Members of the City Council of Los Angeles v. Taxpayers for Vincent,*

> "[T]he transcendent value to all society of constitutionally protected expression is deemed to justify allowing 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' This is deemed necessary because persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression."
>
> . . . .
>
> In the development of the overbreadth doctrine the Court has been sensitive to the risk that the doctrine itself might sweep so broadly that the exception to ordinary standing requirements would swallow the general rule. In order to decide whether the overbreadth exception is applicable in a particular case, we have weighed the likelihood that the statute's very existence will inhibit free expression.
>
> "[T]here comes a point where that effect—at best a prediction–cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe.
>
> . . . .
>
> "The requirement of substantial overbreadth is directly derived from the purpose and nature of the doctrine. While a sweeping statute, or one incapable of limitation, has the potential to repeatedly chill the exercise of expressive activity by many individuals, the extent of deterrence of protected speech can be expected to decrease with the declining reach of the regulation."
>
> In short, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties

---

[648] *Holder,* 561 U.S. at 24 (2010), *rev'g Gonzales,* 380 F. Supp. 2d at 1143–44 (C.D. Cal. 2005) (holding that § 2339 is not unconstitutionally vague, and that a person of ordinary intelligence would understand the difference between advocating for a cause and providing a service to a group that is advocating for that cause).

[649] Members of the City Council v. Taxpayers for Vincent, 466 U.S. 789, 798 (1984) (citation omitted).

not before the Court for it to be facially challenged on overbreadth grounds.[650]

Given the purpose behind the substantial overbreadth doctrine, the Court has held that the doctrine does not apply in every free speech context. For example, because the incentive to engage in advertising is sufficiently strong to avoid worries that such speech will be chilled, the Court ruled in *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.* that "the overbreadth doctrine does not apply to commercial speech."[651] Further, particularly in cases of less protected speech, such as speech raising concerns of obscenity, the Court has been quite willing to allow courts wide latitude to construe a statute narrowly to limit any potential overbreadth problems. For example, in *Osborne v. Ohio*, the United States Supreme Court accepted a narrowing construction by the Ohio Supreme Court of an Ohio statute that literally made the possession of any photo of nude children unlawful, even "innocuous photographs" of babies.[652] The Ohio Supreme Court adopted a narrowing construction that applied the statute only to "lewd exhibition" or "a graphic focus on the genitals" and "where the person depicted is neither the child nor the ward of the person charged."[653] Given this narrowing, the statute was not unconstitutionally overbroad.[654]

The Court can avoid striking down a whole statute by "severing" the substantially overbroad part of the statute, and then enforcing the rest of the statute. An example is *Brockett v. Spokane Arcades, Inc.*, where the Court upheld the rest of an obscenity law by severing part of the statute that defined "lust," which was "unduly broad."[655] The Court observed in *Virginia v. Hicks* that a law, which punishes a substantial amount of protected free speech, "suffices to invalidate *all* enforcement of that law 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.'"[656]

---

[650] *Id.* at 799 n.17, 799–801 (citations omitted).

[651] Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497 (1982).

[652] Osborne v. Ohio, 495 U.S. 103, 113 (1990).

[653] *Id.*

[654] *Id.* at 112–22.

[655] 472 U.S. 491, 506–07 (1985).

[656] 539 U.S. 113, 119 (2003) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973)); *see* Stuart Buck & Mark L. Rienzi, *Federal Courts, Overbreadth, and Vagueness: Guiding Principles for Constitutional Challenges to Uninterpreted State Statutes*, 2002 UTAH L. REV. 381 (2002) (discussing ways that federal courts can protect individual liberty while

Reflecting that the doctrine of overbreadth is an exception to application of standard free speech analysis, the challenger bears the burden of establishing overbreadth, as is standard for most defenses.[657] This is true even for cases where the underlying First Amendment claim would be analyzed under an intermediate or strict scrutiny standard of review, where the burden is on the government.[658] In determining overbreadth, the court must consider not merely whether the part of the law involved in the instant case is overbroad, but whether the law "*taken as a whole*, is substantially overbroad judged in relation to its plainly legitimate sweep."[659]

In *United States v. Stevens*, an 8-1 Court held that a federal statute was substantially overbroad that criminalized commercial creation, sale, or possession of any visual or auditory depiction of "conduct in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed, if such conduct is illegal under Federal law or the law of the State in which the creation, sale, or possession takes place," except for depictions that have "serious religious, political, scientific, educational, journalistic, historical, or artistic value."[660] As written, the statute would make illegal videos of hunting activities or livestock slaughtering practices banned by one state, although legal in other states.[661] The Court noted it "need not and do[es] not decide whether a statute limited to crush videos [animals being crushed to death] or other depictions of extreme animal cruelty [such as commercial dog fighting where dogs are trained to fight to the death] would be constitutional."[662] In dissent, Justice Alito concluded fears of overbroad application were unwarranted, and would have remanded on whether the statute was unconstitutional as applied to activity involved in the case—commercialized dog fighting.[663] Subsequent to *Stevens*, Congress amended the statute to regulate only depictions of "animal crush videos," where the animal is "intentionally crushed, burned, drowned, suffocated, impaled, or otherwise subjected to serious bodily injury"

---

respecting the state's power to interpret their own laws regarding whether they are overbroad).

[657] Virginia v. Hicks, 539 U.S. 113, 122 (2003).

[658] *Id.* On the burden being on the government in cases of intermediate review or strict scrutiny, see *supra* text accompanying notes 15–16, 130.

[659] *Hicks*, 539 U.S. at 122.

[660] 559 U.S. 460, 465 n.1 (2010) (citation omitted).

[661] *Id.* at 475–80.

[662] *Id.* at 482.

[663] *Id.* at 482–84 (Alito, J., dissenting).

and "is obscene."[664] The statute would no longer apply to the "dogfighting" video involved in *Stevens*.[665]

In *United States v. Williams*, the Court upheld a distribution of child pornography act against an overbreadth and vagueness challenge.[666] In an opinion by Justice Scalia, the Court held 7-2 that the law did not ban a substantial amount of protected expressive activity as it was limited to regulating the recommendation of a particular piece of purported child pornography with the intent of initiating a transfer.[667] The Act was not vague since it required a jury make findings on clear questions of fact, i.e., that the defendant hold the belief and make a statement that reflects a belief that the material is child pornography, or that he communicate in a manner intended to cause another so to believe.[668] Justice Stevens concurred, with Justice Breyer joining the concurrence, limiting the Act to materials advertised, promoted, presented, distributed, or solicited with a lascivious purpose—that is, the intention of inciting sexual arousal. Protected material promoted or solicited for other purposes was not included.[669] Justice Souter dissented, with Justice Ginsburg joining the dissent.[670] They found overbreadth because the Act could apply to criminalize a proposal with regard to an existing representation, which did not involve an actual child, and that representation could not be made criminal under *Free Speech Coalition*.[671]

### D. *Balancing Speech and Fair Trial Rights*

The modern series of cases begin in 1966 with *Sheppard v. Maxwell*.[672] Prejudicial publicity about the defendant had saturated the community in which he was tried.[673] The Court said that the press

---

[664] 18 U.S.C.A § 48 (West 2010).

[665] *Compare* 18 U.S.C. § 48 (2000) *with* 18 U.S.C.A § 48 (West 2010).

[666] United States v. Williams, 553 U.S. 285 (2008).

[667] *Id.* at 297–99.

[668] *Id.* at 304–07.

[669] *Id.* at 307–09 (Stevens, J., concurring).

[670] *Id.* at 310–27 (Souter, J., dissenting).

[671] *Id.* at 310–14 (citing Ashcroft v. Free Speech Coal., 535 U.S. 234 (2002)); *see also* United States v. Simpson, 741 F.3d 539 (5th Cir. 2014) (deciding the CAN-SPAM Act, which makes it a federal crime to send bulk commercial e-mail messages with intent to deceive recipients about origin of messages, was neither unconstitutionally vague or overbroad). For further discussion of *Ashcroft*, see *supra* text accompanying notes 386–88.

[672] 384 U.S. 333 (1966).

[673] *See id.* at 333–34.

must have a free hand if there is no threat to the integrity of a trial.[674] However, where the accused might be prejudiced, the court can and should take appropriate steps.[675] The court can limit the presence of the press at judicial proceedings.[676] The judge can also continue the case until publicity subsides, transfer it to another county, or sequester the jury.[677] Failure to protect the defendant from inherently prejudicial publicity, as in this case, will result in reversal of the conviction.[678]

In contrast, direct efforts to stop pretrial publicity have been treated rather harshly by the Court. In *Nebraska Press Ass'n v. Stuart*, the trial judge had "restrained a news [service] from publishing or broadcasting accounts of confessions or admissions made by the accused . . . or facts 'strongly implicative' of the [accused's guilt]."[679] Reversing, the Court said that prior restraints are the most serious and least tolerable infringement of First Amendment rights and "it is nonetheless clear that the barriers to prior restraint remain high unless we are to abandon what the Court has said for nearly a quarter of our national existence and implied throughout all of it."[680] Here, there had been no finding that alternative measures, such as those mentioned in *Sheppard*, would not have protected defendant's rights.[681] Also, to the extent the order reached evidence adduced at an open hearing, it plainly violated settled principles.[682] Finally, as applied to "implicative" material, the order was too vague and too broad to survive scrutiny.[683]

Despite these statements, protective orders that would enhance the litigation process have been approved. For example, in *Seattle Times Co. v. Rhinehart*, the Court allowed a protective order restraining the parties to civil litigation from publishing material obtained through the discovery process.[684] The Court said this furthered a substantial interest unrelated to the suppression of expression, i.e., a purpose to assist in the preparation of trial or settlement, and then concluded that intermediate review was met.[685] The Court noted that

---

[674] *Id.* at 350.
[675] *Id.* at 362–63.
[676] *Id.* at 358.
[677] *Id.* at 363.
[678] *Id.*
[679] 427 U.S. 539 (1976).
[680] *Id.* at 561.
[681] *Id.* at 563–65.
[682] *Id.* at 568.
[683] *Id.*
[684] 467 U.S. 20, 34 (1984).
[685] *Id.*

this case did not involve the classic kind of prior restraint, to which strict scrutiny would be applied, because the protective order "prevent[ed] a party from disseminating only that information obtained through use of the discovery process. Thus, a party may disseminate the identical information covered by the protective order as long as the information is gained through means independent of the court's processes."[686]

Cases involving complete bans on persons, including the media, from criminal courtrooms have triggered strict scrutiny review. As the Supreme Court noted in *Globe Newspaper Co. v. Superior Court*, the Court's precedents have "firmly established" that "the press and general public have a constitutional right of access to criminal trials."[687] The Court has also held under a strict scrutiny approach that it is unconstitutional to exclude the public or the press from voir dire proceedings, since such proceedings are a key phase of a trial. The Court acknowledged in *Press-Enterprise Co. v. Superior Court* that closure might be justified to advance the compelling government interest of protecting prospective jurors from answering "deeply personal matters" in open court, but that "the presumption of openness may be overcome only by an overriding interest based on findings th[e] closure is essential to preserve higher values and is narrowly tailored to serve that interest."[688] Under this standard, the Court said, closure should be regarded as the last resort, i.e., a least restrictive effective alternative approach.[689]

In each of these cases the Court has treated the rights of the press and the rights of the public equally, confirming that for purposes of First Amendment law there is no difference in the standards of review applicable in "freedom of speech" and "freedom of the press" cases. Similarly, in *Branzburg v. Hayes*, the Court concluded that members of the press have no special protection to resist subpoenas requiring the disclosure of confidential sources, although the Court did note that for any person, the relevant test to justify a subpoena in these circumstances was a strict scrutiny "compelling state interest" test, and that this was met in the case.[690] In *Zurcher v. Stanford Daily*, the Court held

---

[686] *Id.*

[687] 457 U.S. 596, 603 (1982) (citing Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980)).

[688] 464 U.S. 501, 510–11 (1984).

[689] *See id.* at 511.

[690] 408 U.S. 665, 699–701 (1972).

3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #1: 110

that the press had no special right to resist searches and seizures of material in pressrooms which are otherwise constitutional under the Fourth Amendment.[691]

Reflecting a special solicitude for the press, Justice Stewart dissented in both *Branzburg* and *Zurcher*, as did a number of liberal Justices in each.[692] Despite this view, the majority of the Court has not adopted a doctrine granting the press special First Amendment protection. The press also has no special right of access to gather information, exemption from antitrust laws, or exemption from the application of any general law.[693] As a matter of state law, a large number of states have adopted shield laws to protect reporters from having to reveal their sources, but this is a matter of state law, not constitutional right.[694] No such federal statute exists regarding prosecutions in the federal courts.[695]

A separate issue arises when the press requests, and courts permit, either on their own motion or pursuant to statutory authorization, cameras to be placed in the courtroom to televise court proceedings live. The Court has held there is no constitutional right to televise court proceedings.[696] While in extreme circumstances such coverage can be viewed as interfering with the defendant's Sixth Amendment right to a fair trial, all fifty states have some provision for televised access in their state courts in some circumstances, although that access may be limited in certain cases.[697]

---

[691] 436 U.S. 547, 554–60, 563–68 (1978).

[692] *Branzburg*, 408 U.S. at 711 (Douglas, J., dissenting); *id.* at 725 (Stewart, J., dissenting); *Zurcher*, 436 U.S. at 570 (Stewart, J., dissenting); *id.* at 577 (Stevens, J., dissenting). In *Branzburg*, Justices Brennan and Marshall joined Justice Stewart's dissent. *Branzburg*, 408 U.S. at 725 (Stewart, J., dissenting). In *Zurcher*, Justice Marshall joined Justice Stewart's dissent. *Zurcher*, 436 U.S. at 570 (Stewart, J., dissenting).

[693] *See Branzburg*, 408 U.S. at 682–84; *see also* Baltimore Sun Co. v. Ehrlich, 437 F.3d 410, 415–17 (4th Cir. 2006) (explaining the Governor's directive forbidding all state executive employees to speak with two specific news reporters because of their perceived bias in reporting had only *de minimis* impact on reporters' exercise of their First Amendment rights to speak and therefore did not give rise to retaliation claim based upon activity "sufficient to chill the exercise of First Amendment rights" actionable under 42 U.S.C. § 1983, despite the inconvenience to reporters of relying on other sources to gather information).

[694] *See generally* CHEMERINSKY, *supra* note 15, at 1215–16 (citation omitted).

[695] *Id.* at 1216.

[696] *See* Chandler v. Florida, 449 U.S. 560, 569–70 (1981).

[697] *See generally Cameras in the Court: State By State Guide,* RADIO TELEVISION DIG. NEWS ASS'N, http://www.rtnda.org/cameras_in_court (last visited Feb. 25, 2016) (discussing the use of cameras in courtrooms and the guide on each state's rules).

In contrast to this more receptive attitude regarding cameras in the courtroom in state courts, the federal courts and United States Supreme Court have continued their historic reluctance to permit cameras in the courtroom.[698] Only a couple of federal Circuit Courts of Appeals, the Second Circuit and the Ninth Circuit, have rules providing for televising appellate proceedings in some limited circumstances, pursuant to authority granted to them by the Judicial Conference in 1996.[699] Beginning with the 2006 Term, the Supreme Court has made same-day written transcripts available of all oral arguments, and oral tapes are made available in high profile cases.[700]

## VIII. CONCLUSION

The structure of modern First Amendment free speech doctrine has evolved consistent with the more formalized structure of doctrine under modern Equal Protection and Due Process review. This involves more explicit use of strict scrutiny, intermediate review, "reasonableness" balancing, and minimum rationality review. As discussed in Part II of this Article, for regulations of free speech in a public forum or on individual private property, the Court uses strict scrutiny for content-based regulations and intermediate review for content-neutral regulations. As discussed in Part III, for regulations of speech in a government-owned, non-public forum, or speech supported by government grants or subsidies, the Court uses strict scrutiny for viewpoint discrimination and "reasonableness" balancing for subject-matter and content-neutral regulations.

In some cases, certain kinds of speech do not trigger free speech protection at all. As discussed in Part IV, this includes cases of pure government speech or regulations of alleged symbolic speech that is viewed by the Court as involving conduct only. Other kinds of speech, like advocacy of illegal conduct, fighting words, or obscenity, get limited free speech protection: strict scrutiny for viewpoint discrimination, but otherwise no further free speech review, as discussed in Part V. When free speech principles do not apply, there are only then

---

[698] *See generally* Robert Kessler, *Why Aren't Cameras Allowed at the Supreme Court Again?*, THE WIRE (Mar. 28, 2013, 8:39 AM), http://www.thewire.com/national/2013/03/case-allowing-cameras-supreme-court-proceedings/63633/ (discussing the different opinions of the Justices on this issue).

[699] *See* Harry J. Reske, *A Repeat Performance: Judicial Conference Allows Cameras Back in the Appeals Courts*, 82 A.B.A. 14, 38 (1996); Daniel Stepniak, *A Comparative Analysis of First Amendment Rights and the Televising of Court Proceedings*, 40 IDAHO L. REV. 315, 316 (2004).

[700] SUP. CT. OF THE U.S., www.supremecourt.gov (last visited Feb. 25, 2016).

other kinds of constitutional review, such as minimum rationality review under the Due Process and Equal Protection Clauses for social or economic regulations not involving fundamental rights.

In addition to these categories of speech, content-based regulations of certain kinds of speech in a public forum trigger less than normal strict scrutiny review. As discussed in Part VI, this can involve regulations of commercial speech, speech by government employees on matters of public concern, or alleged tortious speech, such as defamation or invasion of privacy, among others. Special First Amendment free speech doctrines for cases of prior restraints, injunctions, vagueness, substantial overbreadth, and other such matters are discussed in Part VII.

This overall structure is reproduced in Appendix, Table 2 to this Article. In Appendix, Table 1, the same standards of review used in First Amendment free speech cases are presented as used in other parts of constitutional interpretation. Together, Tables 1 and 2 provide a general summary of standards of review used by the Supreme Court in individual rights adjudication.

## APPENDIX

**A version of the Tables in this Appendix appeared in R. Randall Kelso,** *The Structure of* **Planned Parenthood v. Casey** *Abortion Rights Law: "Strict Scrutiny" for "Substantial Obstacles" to Abortion Choice and Otherwise "Reasonableness Balancing,"* **34** QUINNIPIAC L. REV. 75 (2015).

*Elon Law Review*

TABLE 1: STANDARD CONSTITUTIONAL LAW DOCTRINE LEVELS OF REVIEW OF GOVERNMENT ACTION: THE "BASE PLUS SIX" MODEL OF REVIEW

| Levels of Scrutiny | Gov't Ends or Interests to be Advanced | Means to Ends: Relationship to Benefits | Means to Ends: Relationship to Burdens | Typical Areas Where Used |
|---|---|---|---|---|
| **I. "Base" Minimum Rational Review (Three Requirements are Separate Elements to Meet)** "Minimum Rational Review": Burden on Challenger to Prove Action Unconstitutional | Legitimate (substantial deference to government) | Rational (substantial deference to government) (Does gov't have a "rational basis" to act) | Not Irrational burden (substantial deference to gov't) | 1. Standard Social or Economic Regulation: *Williamson v. Lee Optical* for Due Process; *Heller v. Doe* for Equal Protection 2. Aliens: Illegal; Job Part of Self-Gov't, or Federal Reg. under Equal Protection 3. Contract Clause: *Energy Reserves* |
| **II. The "Plus Six" Standards of Increased Scrutiny A. Heightened Rational Review (Reasonableness Balancing)** "Second-Order Reasonableness Review": Burden on Challenger to Prove Action Unconstitutional | Legitimate Ends (No substantial deference to government, but some deference given, as discussed *supra* notes 106–09 in this Article) | "Reasonable" (Balance government interests and availability of less burdensome alternatives v. burden on individuals) | Given Means (Given balance, conclude whether given strength of gov't interests and availability of less burdensome alternatives the burden is "unreasonable," "excessive," or "undue") | 1. Dormant Commerce Clause: *Pike* 2. Contract Clause: *U.S. Trust/Spannaus* 3. Takings Clause: *Penn Central* 4. Punitive Damages: *BMW v. Gore* 5. Less than Substantial Burden on Unenumerated Fundamental Rights: *Casey/Celebreze* 6. Proc. Due Process: *Mathews v. Eldridge* |
| "Third-Order Reasonableness Balancing": Burden on Gov't to Justify Action | Same as "Second-Order Reasonableness Review" | Burden shifts to gov't to justify action as "reasonable" or "not excessive" | Burden remains on gov't for all higher levels of review | 1. Dormant Commerce Clause: *Maine v. Taylor* 2. Takings Clause: *Dolan v. Tigard* |
| **B. Intermediate Review Standards (Three Requirements are Separate Elements to Meet)** "Intermediate Review" | Substantial/ Important/ Significant (Use of these terms seems interchangeable under this First Prong of intermediate review) | Substantially Related (Second & Third prongs of intermediate review often referred to as "closely drawn" or "narrowly tailored") | Not Substantially More Burdensome Than Necessary | 1. Gender Discrimination 2. Illegitimacy 3. Alien Children: *Plyler v. Doe* 4. Art. IV, § 2 Priv. & Imm. Clause |
| "Intermediate Review with Bite" | Substantial/ Important/ Significant | Directly Related | Not Substantially More Burdensome Than Necessary | 1. Commercial Speech: *Central Hudson Gas* |
| **C. Strict Scrutiny Standards (Three Requirements are Separate Elements to Meet)** "Loose Strict Scrutiny" | Compelling/ Overriding | Directly Related | Not Substantially More Burdensome Than Necessary | 1. Racial Redistricting Cases: *Bush v. Vera* |
| "Strict Scrutiny Review" | Compelling/ Overriding (Use of these terms seems interchangeable under this First Prong of strict scrutiny review) | Directly Related (Second & Third prongs of strict scrutiny referred to as "precisely tailored," although sometimes "narrowly tailored" is used) | Least Restrictive Effective Alternative | 1. Race, Ethnicity, National Origin 2. Aliens: State Reg. of Aliens Not Involving Self-Gov't 3. Substantial Burden on Unenumerated Fundamental Rights: *Timmons v. Twin Cities*; *Zablocki v. Redhail* |
| **III. Categorical Barrier to Constitutionality** | Gov't Action Unconstitutional no matter what interests used to support it | | | For examples, see cited article above, Kelso, 34 QUINNIPIAC L. REV. 75, at Part VII, footnote 250 (2015). |

### TABLE 2: FIRST AMENDMENT DOCTRINE

| Levels of Scrutiny | Gov't Ends or interests to be Advanced | Means to Ends: Relationship to Benefits | Means to Ends: Relationship to Burdens | Typical Areas Where Used |
|---|---|---|---|---|
| **I. "Base" Minimum Rational Review (Three Requirements are Separate Elements to Meet)** "Minimum Rational Review": Burden on Challenger to Prove Action Unconstitutional | Legitimate (substantial deference to government) | Rational (substantial deference to government) (Does gov't have a "rational basis" to act) | Not Irrational burden (substantial deference to government) | If No First Amend. Review*, then only *Williamson v. Lee Optical* for Due Process; *Heller v. Doe* for Equal Protection<br><br>*1. Regulation of Conduct: *Dallas v. Stanglin* 2. Gov't Funding Own Speech: *Summum/Johanns* 3. Non-viewpoint discrimination involving advocacy of illegal conduct, true threats, fighting words, obscenity, or use of a child in production of indecent images. |
| **II. The "Plus Six" Standards of Increased Scrutiny** **A. Heightened Rational Review (Reasonableness Balancing)** "Second-Order Reasonableness Review": Burden on Challenger to Prove Action Unconstitutional | **Legitimate Ends** (No substantial deference to government, but some deference given, as discussed *supra* notes 106–09 in this article) | **"Reasonable"** (Balance government interests and availability of less burdensome alternatives v. burden on individuals) | **Given Means** (Given balance, conclude whether given strength of gov't interests and availability of less burdensome alternatives the burden is "unreasonable", "excessive" or "undue") | 1. Non-Public Forum: Subject-Matter or Content-Neutral Regulations of Speech 2. Government Grants or Subsidies 3. Defamation and Related Torts 4. Less Than Substantial Burdens on Freedom of Assembly/Association |
| "Third-Order Reasonableness Balancing": Burden on Gov't to Justify Action | Same as "Second-Order Reasonableness Review" | Except Burden shifts to gov't to justify action as "reasonable" or "not excessive" | Burden remains on gov't for all higher levels of review | 1. Government Employees on Matters of Public Concern: *Pickering* |
| **B. Intermediate Review Standards (Three Requirements are Separate Elements to Meet)** "Intermediate Review" | Substantial/ Important/ Significant (Use of these terms seems interchangeable under this First Prong of intermediate review) | Substantially Related (Second & Third prongs of intermediate review often referred to as "closely drawn" or "narrowly tailored") | Not Substantially More Burdensome Than Necessary (which includes leaving open "ample alternative channels" for effective communication) | 1. Public Forum: Content-Neutral Regulations of Speech: *O'Brien* 2. Content-Based Regulations of Broadcast TV and Radio: *Red Lion* 3. Campaign Finance: Contributions: *McConnell* (2003) |
| "Intermediate Review with Bite" | Substantial/ Important/ Significant | Directly Related | Not Substantially More Burdensome Than Necessary | 1. Commercial Speech: *Central Hudson Gas* |
| **C. Strict Scrutiny Standards (Three Requirements are Separate Elements to Meet)** "Loose Strict Scrutiny" | Compelling/ Overriding | Directly Related | Not Substantially More Burdensome Than Necessary | 1. Cable/Satellite TV and Radio: *Denver Area Educ.* (Breyer, J., plurality opinion) 2. Campaign Finance: Contributions: *Shrink Missouri* (2000) |
| "Strict Scrutiny Review" | Compelling/ Overriding (Use of these terms seems interchangeable under this First Prong of strict scrutiny review) | Directly Related (Second & Third prongs of strict scrutiny referred to as "precisely tailored," although sometimes "narrowly tailored" is used) | Least Restrictive Effective Alternative | 1. Public Forum: Content-Based Reg. of Speech 2. All Viewpoint Discr. 3. Campaign Finance: Expenditures: *Citizens United* (2010) 4. Substantial Burdens on Freedom of Assembly/Assoc. 5. Free Exercise: *Employ. Division v. Smith* categories: e.g., *Lukumi Babalu Aye* |
| **III. Categorical Barrier to Constitutionality** | Gov't Action Unconstitutional no matter what interests used to support it | | | 1. Establishment Clause Doctrine |

EXHIBIT 2
RJN

1    Kenneth J. Catanzarite (SBN 113750)
     kcatanzarite@catanzarite.com
2    CATANZARITE LAW CORPORATION
     2331 West Lincoln Avenue
3    Anaheim, California 92801
     Tel: (714) 520-5544
4    Fax: (714) 520-0680

5    Attorneys for Defendants Kenneth Catanzarite, Catanzarite Law Corporation,
     Brandon Woodward, Tim James O'Keefe, Amy Jeanette Cooper, Cliff Higgerson,
6    Mohammad Zakhireh, Richard Francis O'Connor, Jr., James Duffy, Tony Scudder,
     Aroha Holdings, Inc., TGAP Holdings, LLC, Nicole M. Catanzarite-Woodward and
7    Defendant/Cross-Complainant Mobile Farming Systems, Inc.

8              IN THE SUPERIOR COURT OF CALIFORNIA

9                  FOR THE COUNTY ORANGE

10   JUSTIN S. BECK, an individual,          Case No. 30-2020-01145998-CU-BT-CJC

11          Plaintiff,                       Assigned for All Purposes to
                                             Hon. Randall J. Sherman, Dept. CX105
12   v.
                                             **AMENDED NOTICE OF DEFENDANTS
13   KENNETH CATANZARITE, ESQ., et           KENNETH CATANZARITE,
     al,                                     CATANZARITE LAW CORPORATION,
14                                           BRANDON WOODWARD, TIM JAMES
            Defendants.                      O'KEEFE, AMY JEANETTE COOPER,
15                                           CLIFF HIGGERSON, MOHAMMAD
                                             ZAKHIREH, RICHARD FRANCIS
16                                           O'CONNOR, JR., JAMES DUFFY, TGAP
                                             HOLDINGS, LLC, AND MOBILE FARMING
17                                           SYSTEMS, INC.'S DEMURRER TO
                                             COMPLAINT**
18
                                             **RELATED TO ROA # 2, 742, 773 & 781**
19
                                             **Hearing Information**
20                                           DATE:   June 30, 2023
                                             TIME:   10:00 a.m.
21                                           DEPT.:  CX105
                                             Reservation No. 73970803
22
                                             Complaint Filed: May 26, 2020
23                                           Cross-Complaint Filed: August 10, 2020
                                             Trial Date: TBD
24
25   AND RELATED CROSS-COMPLAINT

26

27

28

Amended Notice of Demurrer to Complaint
3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #2: 001

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 30, 2023 at 10:00 a.m., or as soon thereafter as the matter may be heard in Dept. CX105 of this Court, Defendants Kenneth Catanzarite, Catanzarite Law Corporation, Brandon Woodward, Tim James O'Keefe, Amy Jeanette Cooper, Cliff Higgerson, Mohammad Zakhireh, Richard Francis O'Connor, Jr., James Duffy, TGAP Holdings, LLC, and Mobile Farming Systems, Inc. (collectively "Defendants") will and do hereby demurrer to the Complaint as to them and seek an order sustaining the demurrer without leave to amend.

This Demurrer will be based upon this Amended Notice; on the Notice of Demurrer, the Demurrer, Memorandum of Points and Authorities, supporting Declaration of Kenneth J. Catanzarite, and Request for Judicial Notice filed and served on November 21, 2022; the Complaint; the complete files and records of this case; on argument of counsel; and such other matters as may come before the Court at the hearing on the Demurrer.

DATED: March 10, 2023.                    CATANZARITE LAW CORPORATION

By: _____

Kenneth J. Catanzarite
Attorneys for Defendants Kenneth Catanzarite, Catanzarite Law Corporation, Brandon Woodward, Tim James O'Keefe, Amy Jeanette Cooper, Cliff Higgerson, Mohammad Zakhireh, Richard Francis O'Connor, Jr., James Duffy, Tony Scudder, Aroha Holdings, Inc., TGAP Holdings, LLC, Nicole M. Catanzarite-Woodward and Defendant/Cross-Complainant Mobile Farming Systems, Inc.

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

2.
Amended Notice of Demurrer to Complaint
3:22-CV-01616-AGS-DDL
Opp. to Motion to Dismiss RJN Ex. #2: 002

PROOF OF SERVICE

STATE OF CALIFORNIA      )
COUNTY OF ORANGE         )      ss:

The undersigned certifies and declares as follows:

I am over the age of 18 and not a party to this action. My business address is 2331 West Lincoln Avenue, Anaheim, California 92801, which is in the county where the mailing described below took place.

On March 10, 2023 I served the within **Amended Notice of Defendants Kenneth Catanzarite, Catanzarite Law Corporation, Brandon Woodward, Tim James O'Keefe, Amy Jeanette Cooper, Cliff Higgerson, Mohammad Zakhireh, Richard Francis O'connor, Jr., James Duffy, TGAP Holdings, LLC, and Mobile Farming Systems, Inc.'s Demurrer to Complaint** by:

[ ]   (Mail) I placed a true and correct copy thereof in a sealed envelope addressed as set forth on the attached service list and caused such envelope, with first class postage thereon fully prepaid, to be placed in the U.S. Mail at Anaheim, California, and certify that such envelope was placed for collection and mailing following ordinary business practices.

[ ]   (Overnight Delivery) I placed a true and correct copy thereof in a sealed envelope addressed as set forth on the attached service list and caused such envelope to be delivered the next day by overnight courier to the addressee(s) listed on the attached service list.

[ ]   (Personal Service) I placed a true and correct copy thereof in a sealed envelope addressed as set forth on the attached service list and caused such envelope to be delivered by hand as set forth on the attached service list.

[X]   (By OneLegal Electronic Service) I caused the above-entitled document(s) to be served through OneLegal addressed to all parties appearing on the OneLegal electronic service list for the above-entitled case. The "OneLegal Filing Receipt" page(s) will be maintained with the original document(s) in our office.

[X]   (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed March 10, 2023 at Anaheim, California.

_____
Typed Name: Becky Phillips

SERVICE LIST

**In Pro-per Plaintiff Justin Beck:**
Justin Beck (Pro Per)
3501 Roselle St.
Oceanside, CA 92056
760-449-2509
justintimesd@gmail.com

**Attorneys for Cross-Defendants
Justin Beck, I'm Rad, LLC, EM2
Strategies, LLC, Robert A.
Bernheimer and Robert A.
Bernheimer, Inc.:**
Steve Belilove, Esq.
Rosely George, Esq.
KAUFMAN DOLOWICH VOLUCK LLP
11755 Wilshire Blvd., Ste. 2400
Los Angeles, CA 90025
Fax: (310) 575-9720
sbelilove@kdvlaw.com
rgeorge@kdvlaw.com

**Attorneys for Cross-Defendants
Horwitz + Armstrong, a Professional
Law Corporation, Lawrence W.
Horwitz, and John R. Armstrong II:**
John R. Armstrong, Esq.
Ryan Thomason, Esq.
Lawrence Horwitz, Esq.
Lockett + Horwitz, APLC
2 South Pointe, Ste. 275
Lake Forest, CA 92630
Fax: (949) 540-6578
jarmstrong@horwitzarmstrong.com
rthomason@lhlawpc.com
lhorwitz@lhlawpc.com

**Attorneys for Cross-Defendant
Richard Joseph Probst:**
Wendy M. Thomas
Jessica B. King
Tadjedin Thomas & Engbloom Law
Group LLP
6101 W Centinela Ave, Ste 270
Culver City, CA 90230
wendyt@ttelawgroup.com
jessicak@ttelawgroup.com

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL.: (714) 520-5544 • FAX: (714) 520-0680

**DEMURRER**

Defendants Kenneth Catanzarite, Catanzarite Law Corporation, Brandon Woodward, Tim James O'Keefe, Amy Jeanette Cooper, Cliff Higgerson, Mohammad Zakhireh, Richard Francis O'Connor, Jr., James Duffy, TGAP Holdings, LLC, and Mobile Farming Systems, Inc. (collectively "Defendants") demur as follows to the Complaint and the second, third and fourth causes of action therein:

## DEMURRER TO THE SECOND CAUSE OF ACTION
## FOR UNFAIR BUSINESS PRACTICES

Defendants Kenneth Catanzarite, Catanzarite Law Corporation, Brandon Woodward, Tim James O'Keefe, Mohammad Zakhireh, Richard Francis O'Connor, Jr., James Duffy and Mobile Farming Systems, Inc. demur as follows to the Second Cause of Action for Unfair Business Practices:

1.     The Second Cause of Action for Unfair Business Practices fails to state facts sufficient to constitute a cause of action. *Code Civ. Proc.*, § 430.10(e).

2.     The Second Cause of Action for Unfair Business Practices is uncertain. *Code Civ. Proc.*, § 430.10(f).

3.     The Second Cause of Action for Unfair Business Practices fails because Plaintiff lacks standing. *Code Civ. Proc.*, § 430.10(d).

4.     The Second Cause of Action for Unfair Business Practices fails because Defendants Kenneth Catanzarite, Catanzarite Law Corporation, Brandon Woodward, Tim James O'Keefe's due process rights to present a defense would be violated by inability to disclose their client's confidential information. *McDermott, Will & Emery v. Sup. Ct.*(2000) 83 Cal.App.4th 378.

5.     The Second Cause of Action for Unfair Business Practices fails because Plaintiff failed to meet the pre-filing requirements of Civil Code section 1714.l0.

6.     The Second Cause of Action for Unfair Business Practices fails because it is barred by the litigation privilege.

//

iii.

3:22-CV-01616-AGS-DDL
Opp to Motion to Dismiss RJN H2 005

EXHIBIT 3
RIN

An official website of the United States government. Here's how you know

# Operation Greylord



**OPERATION GREYLORD**

It was one of the most important cases in the annals of public corruption investigations in the United States.

On March 15, 1984, in a federal courtroom in Chicago, a jury found Harold Conn guilty on all four counts of accepting bribes to be passed on to Cook County, Illinois judges as payment for fixing tickets. The evidence? He had been caught live on FBI tapes.

This "bagman" had been the deputy traffic court clerk in the Cook County judicial system, and he was the first defendant to be found guilty in a mammoth sting investigation of crooked officials in the Cook County courts.

**It was called Operation Greylord,** named after the curly wigs worn by British judges.

And in the end—through undercover operations that used honest and very courageous judges and lawyers posing as crooked ones and with the strong assistance of the Cook County court and local police—92 officials were indicted, including 17 judges, 48 lawyers, eight policemen, 10 deputy sheriffs, eight court officials, and one state legislator. Nearly all were convicted, most of them pleading guilty. It was an important first step to cleaning up the administration of justice in Cook County.

That's really the whole point. Abuse of the public trust cannot and must not be tolerated. Corrupt practices in government strike at the heart of social order and justice. And that's why the FBI has the ticket on investigations of public corruption as a top priority.

Historically, of course, these cases were considered local matters. A county court clerk taking bribes? Let the county handle it.

But in the 1970s, state and local officials asked for help. They didn't have the resources to handle such intense cases, and they valued the authority and credibility that outside investigators brought to the table. By 1976, the Department of Justice had created a Public Integrity Section, and the FBI was tasked with the investigations, focusing on major, systemic corruption in the body politic.

## Resources

- Major Cases

**Most Wanted**

Ten Most Wanted
Fugitives
Terrorism
Kidnappings / Missing Persons
Seeking Information
Bank Robbers
ECAP
VICAP

**FBI Jobs**

Submit a Tip
Crime Statistics
History
FOIPA
Scams & Safety
FBI Kids
FBI Tour

**News**

Stories
Videos
Press Releases
Speeches
Testimony
Podcasts and Radio
Photos
Español
Apps

**How We Can Help You**

Law Enforcement
Victims
Parents and Caregivers
Students
Businesses
Safety Resources
Need an FBI Service or More Information?

**What We Investigate**

Terrorism
Counterintelligence
Cyber Crime
Public Corruption
Civil Rights
Organized Crime
White-Collar Crime
Violent Crime
WMD

**About**

Mission & Priorities
Leadership & Structure
Partnerships
Community Outreach
FAQs

**Contact Us**

Field Offices
FBI Headquarters
Overseas Offices

**Additional Resources**

Accessibility
eRulemaking
Freedom of Information / Privacy Act
Legal Notices
Legal Policies & Disclaimers
Privacy Policy
USA.gov
White House
No FEAR Act
Equal Opportunity



**FBI** FEDERAL BUREAU OF INVESTIGATION

FBI.gov Contact Center