Justin S. Beck
3501 Roselle St.,
Oceanside, CA 92056
760-449-2509
justintimesd@gmail.com
*In Propria Persona*

FILED
APR 24 2023
CLERK, U.S DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

JUSTIN S. BECK,

Plaintiffs,

vs.

CATANZARITE LAW CORPORATION; STATE OF CALIFORNIA; THE STATE BAR OF CALIFORNIA; ORANGE COUNTY SUPERIOR COURT; ORANGE COUNTY DISTRICT ATTORNEY'S OFFICE; RUBEN DURAN, ESQ.; SUZANNE CELIA GRANDT, ESQ.; RICHARD FRANCIS O'CONNOR, JR.; MOHAMMED ZAKHIREH; JAMES DUFFY; KENNETH CATANZARITE, ESQ.; JIM TRAVIS TICE, ESQ.; NICOLE MARIE CATANZARITE WOODWARD, ESQ.; BRANDON WOODWARD, ESQ.; TIM JAMES O'KEEFE, ESQ.; AMY JEANETTE COOPER; CLIFF HIGGERSON; ELI DAVID MORGENSTERN, ESQ.; LEAH WILSON, ESQ.; ROBERT GEORGE RETANA, ESQ.; ELLIN DAVTYAN, ESQ.; JOHN C. GASTELUM; JORGE E. NAVARETTE; GEORGE SARGENT CARDONA, ESQ.; ANTHONY B. SCUDDER

Defendants,

UNITED STATES ATTORNEY GENERAL; UNITED STATES OF AMERICA

Nominal Defendants

Case No.: 3:22-CV-01616-AGS-DDL

Judge: Hon. Andrew G. Schopler

**PLAINTIFF'S NOTICE OF MOTION AND MOTION TO DISQUALIFY CATANZARITE LAW CORPORATION AND ITS ATTORNEYS; DECLARATION OF JUSTIN S. BECK IN SUPPORT**

Hearing Date: [May 30, 2023]

Time: 3:00PM

Crtrm: 5C (5th Floor)

Trial Date: None Set

[Filed with Proposed Order]

NO ORAL ARGUMENT UNLESS ORDERED BY THE COURT

TO ALL PARTIES AND ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on [May 30, 2023], in the Courtroom of Honorable Andrew G. Schopler, Courtroom 5C, Edward J. Schwartz United States Courthouse, 221 W. Broadway, San Diego, CA 92101, in accordance with CivLR 7.1, Plaintiff Justin S. Beck ("Plaintiff") will move, and hereby does move, for an order disqualifying counsel of record Catanzarite Law Corporation, Kenneth J. Catanzarite, Brandon Woodward, Tim James O'Keefe, Eric V. Anderton, and Nicole Marie Catanzarite Woodward (together "Catanzarite") pursuant to California Rules of Professional Conduct 1.7, California Rules of Professional Conduct 1.9, and CivLR 2.2 ("Motion").

The Motion shall be made on the grounds that:

1. Plaintiff is unduly prejudiced under the Fourteenth & Fifth Amendment (U.S.) with standing to challenge un-waivable conflicts related to Catanzarite's adverse representation of Amy Jeanette Cooper, Cliff Higgerson, Richard Francis O'Connor, Jr., Anthony B. Scudder, Mohammed Zakhireh, and James Duffy (together "Adverse Parties"). See *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).

2. Catanzarite attorneys have already asserted in State Court that their own conflicts of interest harm their own due process rights preventing their ability to present their own defense. Catanzarite's representation of Adverse Parties is expressly barred by California Rules of Professional Conduct 1.7(d)(3) which is binding under Cal. Bus. & Prof. Cod. § 6077 on Catanzarite, and each of them.

3. There is a substantial relationship between Catanzarite's representation of Adverse Parties, an original direct and derivative action filed in State Court that was compromised without Court approval, and four prior disqualification orders as set forth within the accompanying memorandum.

4. Catanzarite now has a duty of loyalty to current or former clients Mobile Farming Systems, Inc., Cultivation Technologies, Inc. where Plaintiff was CEO, and Adverse Parties, whose interests are directly adverse to Catanzarite in this proceeding. California Rules of Professional Conduct 1.9 applies.

5. *Flatt v. Superior Court*, 9 Cal.4th 275, 36 Cal. Rptr. 2d 537, 885 P.2d 950 (Cal. 1994) is instructive. (Holding that where the requisite substantial relationship exists, "access to confidential information by the attorney in the course of the first representation [for "Roger Root"] (relevant, by definition, to the second representation) is presumed and disqualification of the attorney's representation of the second client is mandatory; indeed, the disqualification extends vicariously to the entire firm."

6. *Klemm v. Superior Court*, 75 Cal.App.3d 893 (1977) is also instructive as to why the representation of Adverse Parties is frivolous. "Though an informed consent be obtained, no case we have been able to find sanctions dual representation of conflicting interests if that representation is in conjunction with a trial or hearing where there is an actual, present, existing conflict and the discharge of duty to one client conflicts with the duty to another. (See *Anderson* v. *Eaton* (1930) 211 Cal. 113 [293 P. 788]; *Hammett* v. *McIntyre* (1952) 114 Cal. App.2d 148, 153-154 [249 P.2d 885]; *McClure* v. *Donovan* (1947) 82 Cal. App.2d 664, 666 [186 P.2d 718].) (1) As a matter of law a purported consent to dual representation of litigants with adverse interests at a contested hearing would be neither intelligent nor informed. Such representation would be per se inconsistent with the adversary position of an attorney in litigation, and common sense dictates that it would be unthinkable to permit [Catanzarite] to assume a position at a trial or hearing where he could not advocate the interests of one client without adversely injuring those of the other."

The Motion will be based on this notice of Motion, the accompanying Memorandum of Points and Authorities, the Second Amended Complaint, the accompanying Declaration of Justin S. Beck in support with exhibits, other flings in this case, and such other evidence or arguments as may be presented during the hearing.

Respectfully Submitted,

April 24, 2023

Justin S. Beck, Plaintiff,

*In Pro Per*

Moving Party

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Plaintiff brings this motion to disqualify attorneys whose ethical violations are expressly prohibited by California Rules of Professional Conduct, Local Rules, and the reasonable attorney test.

The district court applies California law in determining whether a disqualification is proper. *Wininger v. SI Mgmt. L.P.*, 201 F.3d 1115, 1122 (9th Cir. 2002). California attorneys Kenneth J. Catanzarite, Brandon Woodward, Tim James O'Keefe, Eric V. Anderton, and Nicole Marie Catanzarite Woodward of Catanzarite Law Corporation (together "Catanzarite") are California attorneys. CivLR 2.1 and 2.2 requires Catanzarite to adhere to California Rules of Professional Conduct.

California Rules of Professional Conduct 1.7(d)(3) precludes representation by Catanzarite of any adverse party in this proceeding. California Rules of Professional Conduct 1.9 precludes representation by Catanzarite of any client in this proceeding barred by substantial relationship tests. Decisional law in California holds that Catanzarite's disqualification is <u>mandatory</u> in this case.

Catanzarite is representing directly adverse parties in this case: Amy Jeanette Cooper, Cliff Higgerson, Richard Francis O'Connor, Jr., Anthony B. Scudder, Mohammed Zakhireh, and James Duffy ("Adverse Parties") as well as its own attorneys associated with Catanzarite: Kenneth J. Catanzarite, Brandon Woodward, Tim James O'Keefe, Nicole Marie Catanzarite Woodward ("Catanzarite Defendants"). Catanzarite is also suing and tolling claims against Amy Jeanette Cooper, Cliff Higgerson, Richard Francis O'Connor, Jr., and Anthony B. Scudder from a false derivative action it filed against each before compromising it without court approval. *Kennedy v. Kennedy,* 235 Cal.App.4th 1474, 1485 ("Dismissal of a derivative claim requires court approval.") See also *Whitten v. Dabney*, 171 Cal. 621, 631 (1915) and F.R.Civ.P. 23.1(c). Catanzarite allegedly extorted Adverse Parties in furtherance of a fraudulent scheme that continues in Orange County. Dkt. #37, pp. 13-14. "Catanzarite does not care about the truth when making statements to the court," according to The State Bar of California's own summary to Plaintiff in public records requests. Beck Decl. in Support ("Decl."), Ex. 35, p. 4.

The Court will be hard pressed to find any single logical basis to allow Catanzarite to represent any party but themselves in this action, much less a reason to deny Plaintiff's Motion. If the Court denies Plaintiff's Motion, it must be aware of the impact upon all parties to this case and integrity of the Bar.

## II.    PROCEDURAL HISTORY

On September 14, 2018, Catanzarite for a "Denise Pinkerton" as "attorney-in-fact" for a non-shareholder of Mobile Farming Systems, Inc. ("MFS") (Roger Root, not Jolly Roger) filed a derivative action against MFS, Beck, O'Connor, Cooper, Higgerson, and Scudder, without standing and a direct action against Cooper and O'Connor for securities fraud and elder abuse. Id. ¶¶ 17-18. Ex. 18. October 4, 2018, Kenneth Catanzarite emailed Beck demanding 10,000,000 shares of CTI from its founders separately claiming those shares did not exist. Id. ¶ 19. On December 21, 2018, Ken Watnick, actual legal counsel for MFS, was served or notified of over 5,000 discovery requests from Catanzarite against MFS (more than 500 requests) and others including Beck, O'Connor, Cooper, Higgerson. Id. ¶ 20, Ex. 6. See also Ex. 10 for motion from Higgerson while Catanzarite was suing him.

Cliff Higgerson demurred to the derivative MFS action, asserting Roger Root was not a shareholder of MFS and that Catanzarite lacked standing to pursue derivative claims. Id. ¶ 21. After that, MFS counsel Ken Watnick filed a motion for security on January 7, 2019. Ex. 6. In response to cover up a lack of standing, Catanzarite simply took over its adversary MFS through a series of non-judicial acts in January 2019 and started acting as its counsel without legal authority. Ibid., Ex. 6. Ex. 8. Ex. 9.

On January 23, 2019, Amy Jeanette Cooper's legal counsel resigned after learning the derivative action against MFS had been compromised or settled without court approval – declaring they were not involved in any negotiation or discussion with Catanzarite. Id. ¶¶ 22, 23., Ex. 7. (It is unknown how Ms. Cooper was contacted directly or indirectly by Catanzarite while she was represented by counsel).

On January 23, 2019, Richard Francis O'Connor, Jr. signed a knowingly fraudulent shareholder consent of CTI asserting MFS was its sole shareholder which purported to unwind three years of securities transactions for millions of dollars, many for which he acted principal within as he was threatened with securities fraud and abuse of the elderly charges. Id. ¶ 24. Ex. 8. Ex. 18. The fraudulent shareholder consent purported to place Richard Francis O'Connor, Jr., Mohammed Zakhireh, and James Duffy as officers and directors of CTI on the basis that MFS was its "sole shareholder" – but each O'Connor, Zakhireh, and Duffy were actually CTI shareholders. Id. ¶ 25. Kenneth Catanzarite sent Beck a threatening letter January 25, 2019, that he was "working with law enforcement" and to turn over all operations of CTI to him and his "clients" – Mr. Catanzarite knew this letter was false. Id. ¶ 26, Ex. 9.

After taking over MFS under the threat of "working with law enforcement," Catanzarite filed a direct lawsuit while it was suing MFS derivatively, and after serving MFS with 500 discovery requests and over 5,000 discovery requests on other defendants including O'Connor, Cooper, and Higgerson. Id. ¶ 27. Ex. 19. In doing so, Catanzarite relied upon purported exculpation of conflict waivers from parties defendant from the false derivative action as it was tolling claims to "bring later." Id. ¶ 32, Ex. 13. Ex. 18 for the direct and derivative action (Catanzarite is <u>still adverse to O'Connor, Cooper, and Higgerson</u>).

Catanzarite Law Corporation filed a declaration of Richard Francis O'Connor on or around March 19, 2019, and obtained a temporary restraining order under false pretenses, which it used to obtain a list of all CTI shareholders. Id., ¶ 30. Using this information, Catanzarite Law Corporation filed a direct and derivative action for CTI shareholders on April 16, 2019, as it was separately preparing for a trial of fact under Section 709 in which the firm sought to cancel or unwind all shares of CTI on April 30, 2019. Id. ¶ 31. Ex. 20 for yet another factually conflicting case on behalf of adverse parties.

During the 709 trial, the Court reviewed private placement memorandums signed by O'Connor, the transfer agent declaration signed by O'Connor and Cooper, transfer agent retention agreement signed by O'Connor and Cooper, initial share issuances from July 2015 approved by CTI's board. Id. ¶ 33. Ex. 14. The Court concluded that laches supports Mobile Farming Systems, Inc. had been of the belief that it was not a shareholder of Cultivation Technologies, Inc. Mr. Catanzarite knows, and it was adjudicated in an evidentiary hearing, that Mobile Farming Systems, Inc. is not and has never been a shareholder of Cultivation Technologies and that he is defrauding innocent people. Id. ¶ 34. Concluding the trial as verified by Beck as his own testimony here, the Court stated "every fiber of [its] being" concluded the facts were "overwhelming" against the contention that Mobile Farming Systems, Inc. was a shareholder of Cultivation Technologies, Inc. Id. ¶ 33-35. Ex. 14, p. 42 (16:18). The Court stated that Cooper and O'Connor would be "violating their fiduciary duties up the ying yang" if Mobile Farming Systems, Inc. had been a shareholder of Cultivation Technologies, Inc. all along – having participated in so many securities transactions without disclosing it. Id. ¶ 35, Ex. 14, p. 37 (2:9). [Relevant to this Motion, Catanzarite's defense of this action would impute further fraudulent acts upon its own Adverse Parties].

Convinced Beck could finally complete the Western Troy transaction valued at $261 million for CTI shareholders after confirming the lack of merit to Catanzarite Law Corporation's false claims in the

709 trial, Beck travelled to Italy after May 1, 2019, for a vacation as he negotiated the final merger agreement. Id. ¶¶ 33-36. During that trip, he spoke with Carlos Calixto who had received calls, texts, and voicemails from Tony Scudder on behalf of Kenneth J. Catanzarite, who ultimately filed a shareholder proxy containing Carlos Calixto's forged signature. Ex. 15. Beck resigned from Cultivation Technologies, Inc. on May 14, 2019, when it became clear that Catanzarite Law Corporation's fraudulent scheme would destroy the merger with Western Troy Capital Resources. Decl. ¶ 36. Calixto informed Beck that Mr. Catanzarite tried to bribe him for his Cultivation Technologies, Inc. shareholder vote for $5,000. Calixto declares his signature on the proxy was forged anyway when he declined Mr. Catanzarite's bribe. Id. ¶ 36, Ex. 15. Tony Scudder later confirmed to Beck that Mr. Catanzarite bribes witnesses and extorts litigants as a practice to support manufactured claims and fraudulent litigation – and that he even intended to bring witnesses during the 709 trial that were bribed to provide false testimony in support of his manufactured claims (including a former CTI consultant, Nick Fleig). Id. ¶ 37. Mr. Scudder informed Beck that he was afraid of Mr. Catanzarite, calling him a "powerful criminal." Ibid. Beck alleges Mr. Catanzarite also bribes State Bar staff (subject of racketeering claims). Id. ¶ 44.

.      Catanzarite Law Corporation commenced the scheme on September 14, 2018, for a non-shareholder of MFS, and has propounded thousands of discovery requests against parties without standing, factual, or legal probable cause to do so **amidst material conflicts of interests**. Id. ¶¶ 17-18.

"The Court: So we have got this written consent of directors of CTI signed on 06/15/15 [by O'Connor, Cooper, and Probst]..[MFS] failed to provide any consideration as required, and so it wasn't issued the stock. The board deems it to be in the best interest to sell to its founders listed there. Other people." Decl. ¶ 35, Ex. 14, pp. 10-11. "The Court: "[] I don't really care about, you know, what somebody declares under penalty of perjury. I want the underlying document." Id. p. 18 (21:23). "The Court: So this is dated 7/30/15, checklist reminder. And you are saying this lists the initial shareholders [of CTI]? Id. p. 19 (17:19)...So page 3 lists eight shareholders...none of which are the plaintiff [MFS]." Ibid. (23, 25). "Mr. Catanzarite: It is undisputed [O'Connor, Cooper, and Probst] are the same three people [who authorized all the transactions], but they did not act formally to acknowledge that MFS was never a shareholder." Id. p. 22 (3:5). "The Court: You say O'Connor also signed over 50 subscription agreements to sell CTI stock directly to MFS shareholders." Id. p. 21 (21:23). "The Court: O'Connor

represented and warranted to the CTI transfer agent that MFS was not a shareholder of CTI." Id. p. 22 (17:19). "[O'Connor] was bound under 1E...to give a complete list of all shares issued...MFS was not listed." Id. p. 24 (9:11). "The Court: So basically the documents support the position that CTI has taken the position that MFS doesn't own stock. CTI has done that through its three directors as of 2015: Probst, Cooper, and O'Connor, and those are the three directors of Mobile Farming Systems. So even though Mobile Farming Systems didn't per se itself adopt this position that it didn't own stock, then the three people did so, which for lack of a better term constitutes an admission against interest. If it wasn't true, they would be violating their fiduciary duties up the ying yang to sign documents on behalf of CTI saying that MFS is no longer a stockholder if, in fact, MFS was a stockholder."

"So let's assume for argument sake that all three of these modes of consideration were conveyed from the plaintiff [MFS] to the defendant [CTI], then you have got this resolution repudiating the shareholder signed off on by the three individuals in their representative capacity for CTI." Ex. 1.

"The Court: Mr. Catanzarite, every fiber of my being says that the facts are overwhelming against your position in this case...We have repudiation of the agreement by people who were the same principals in the plaintiff [MFS]. We have actions – repeated actions taken subsequently consistent with the notion that plaintiff [MFS] was not a stockholder. The delay in bringing this action [January 28, 2019] is consistent with that conclusion, that plaintiff [MFS] has been of the view they are not a shareholder....So the Court concludes that the challenge director election is denied, and the Court concludes that plaintiff [MFS] is not a stockholder in CTI." Ex. 14. See Cal. Rul. Prof. Cond. 4.1.

By May 1, 2019, "Catanzarite's concurrent and successive representation of adverse parties included the following: (1) Catanzarite was representing the Roots' elder abuse lawsuit **against CTI** and some of its Founders (the Probst Faction) as well as a derivative action **against MFS**; (2) Catanzarite had made a deal with a handful of CTI Founders [Cooper, Higgerson, O'Connor, Scudder] to dismiss them from the Pinkerton Action [without court approval as it tolls claims against them to "bring later," Ex. 13]; (3) it became MFS's counsel of record [using the threat of securities fraud and elder abuse allegations, with O'Connor and Cooper's signatures]; (4) Catanzarite filed a derivative shareholder lawsuit for MFS, claiming 100 percent control and ownership of CTI, despite having lawsuits filed by other people claiming to be MFS shareholders; and (5) after filing two *derivative* shareholder lawsuits,

Catanzarite filed a third derivative action (the Mesa Action) claiming to represent a different set of outsider shareholders, i.e., a class of derivative shareholders willing to join in the MFS Action but also independently seeking damages from CTI, its current shareholders, and board of directors. *Beck v. Catanzarite Law Corp.*, No. G059766, 17 (Cal. Ct. App. Jul. 13, 2022)

"At the end of May 2019, Catanzarite filed a lawsuit on behalf of Cooper and Mebane against CTI. The Cooper Action requested the court direct CTI to (1) hold a shareholder's meeting to elect a board of directors; (2) deliver an annual report; (3) appoint an accountant to conduct an audit; and (4) order CTI to pay the costs for an investigation, audit, and costs of the suit. CTI's corporate counsel filed an opposition, asserting a shareholder meeting was scheduled for August 2019." (See *FinCanna, supra,* G058700 [description of Catanzarite's six lawsuits].)

"In July 2019, Catanzarite filed first amended complaints (FAC) in the Pinkerton Action and the MFS Action. It removed all derivative action claims made on behalf of MFS and CTI. **Catanzarite claimed to be MFS's and CTI's corporate counsel**. Catanzarite next filed two lawsuits as CTI's corporate counsel (the FinCanna Action and Scottsdale Action). The Scottsdale Action is noteworthy in that Catanzarite demanded that CTI's insurance company stop providing a defense or indemnify Beck and other Probst Faction defendants in the Mesa Action. (See *FinCanna, supra,* G058700 [description of Catanzarite's six lawsuits].) *Beck v. Catanzarite Law Corp.*, No. G059766, 17-18 (Cal. Ct. App. Jul. 13, 2022) "[T] the record shows that when Catanzarite learned MFS lacked standing to bring a derivative suit on CTI's behalf, it did not dismiss the lawsuits. Catanzarite filed FACs instead." *Beck v. Catanzarite Law Corp.*, No. G059766, 33 (Cal. Ct. App. Jul. 13, 2022) Ex. 14. In November 2019, Catanzarite was disqualified for its representation of adverse interests. SAC, Dkt. #37, p. 3, ¶¶ 9-10. On January 10, 2020, Catanzarite was disqualified again. These four rulings were upheld by the Court of Appeal, and they expressly held Catanzarite was barred from representing shareholders of CTI (just one of Beck's companies Catanzarite destroyed in relentless pursuit of fraudulent judgments). Ibid. Ex. 14.

"Due to the undisputed contentious nature of their dispute, it would be absurd to suggest the same attorney could simultaneously represent these two factions of shareholders. Similarly, there was no need to determine which faction controlled CTI to disqualify an attorney simultaneously purporting to act as corporate counsel while pursuing a derivative action filed against the corporation. If the interests

of these two clients were in accord, there would be no need for a derivative action. (*Shen, supra,*212 Cal.App.4th at p. 58.) *Fincanna Capital Corp. v. Cultivation Tech.*, No. G058700, 23 (Cal. Ct. App. Jun. 28, 2021) "The undisputed nature of the lawsuits, involving parties with conflicting interests, and a corporation with adversarial directors, supported mandatory disqualification as a matter of law." *Fincanna Capital Corp. v. Cultivation Tech.*, No. G058700, 24 (Cal. Ct. App. Jun. 28, 2021)

"Catanzarite suggests its legal maneuverings, undertaken on behalf of the O'Connor Faction, actually benefitted the corporation...This and similar contentions CTI benefitted from Catanzarite's legal tactics are disingenuous. This is not a case where Catanzarite was comprised of neutral lawyers, hired by a cohesive board of directors...Indeed, it is undisputed that within six months, Catanzarite filed three separate shareholder derivative actions all designed to give its clients more control over CTI and to revoke business decisions made by directors from the Probst Faction. Catanzarite's involvement in these derivative actions, in which a corporation must remain neutral, highlights critical issues regarding its fiduciary duty of loyalty. Particularly troubling was Catanzarite's active role in helping its clients forcibly remove CTI's directors, after Catanzarite was unable to achieve this same result in the MFS Action's section 709 hearing. [See Ex. 14]....Even if we assume the transition of power was executed correctly with written consents, **the scheme** clearly demonstrated an allegiance to one faction of shareholders and corporate counsel's professional responsibilities and allegiances are owed to the corporate entity, not the officers, directors, or shareholders. (See *La Jolla Cove, supra,*121 Cal.App.4th at p. 784.) As stated earlier, "[O]nce a conflict has arisen between a corporation and one or more of its officers, directors or shareholders, corporate counsel may not simultaneously represent the corporation and the adverse officer, director or shareholder." (*Id.* at p. 785; see Rules Prof. Conduct rule 1.7.) *Fincanna Capital Corp. v. Cultivation Tech.*, No. G058700, 24-25 (Cal. Ct. App. Jun. 28, 2021)

"Thus, Catanzarite's role in bringing the derivative action conflicts with the corporation's obligation to remain neutral in the action. Filing the lawsuit was an act against the corporation's wishes. Thus, Catanzarite's decision to reuse the same derivative type claims in a cross-complaint, filed directly by the corporation in a different lawsuit against a third party, was plainly disloyal to the corporation (regardless of whether the directors were recently replaced)." *Fincanna Capital Corp. v. Cultivation Tech.*, No. G058700, 24-26 (Cal. Ct. App. Jun. 28, 2021)

## III. ARGUMENT

During a five-year fraudulent scheme in Orange County Superior Court wherein the firm has been repeatedly disqualified and where Catanzarite is shown to have loyalty to nobody but itself – Catanzarite is appearing on behalf of Adverse Parties once more seeking to control a narrative to prevent criminal or civil prosecution and prevent Plaintiff from fair proceedings as is his right.

### A. Plaintiff Has Standing to Bring this Motion Under Federal Law

Plaintiff will suffer imminent, concrete, and particularized invasion of a legally protected interest if this Court does not exercise its duty to disqualify Catanzarite under *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 112 S. Ct. 2130 (1992). Specifically, Catanzarite will continue to control a narrative on behalf of parties the Court cannot even ascertain that they legally represent but for their own appearance – and despite four prior disqualification orders and mandatory law barring that appearance. The Due Process Clause of the Fourteenth Amendment and similarly in the Fifth Amendment states that Plaintiff shall not be "deprived of life, liberty, or property without due process of law." Due process refers to fair procedures, and it is anything but fair that Plaintiff continue to face Catanzarite's fraud and impunity.

According to Catanzarite in Superior Court: "The Second Cause of Action for Unfair Business Practices fails because Defendants Kenneth Catanzarite, Catanzarite Law Corporation, Brandon Woodward, Tim James O'Keefe's due process rights to present a defense would be violated by inability to disclose their client's confidential information." Ex. 36, p. 3, ¶ 4 (19:22). The same frivolous assertion – that their own conflicts are somehow harming them but not Plaintiff – is re-asserted for Slander of Title. Id. p. 4, ¶ 4 (12:14). It is also asserted for Intentional Infliction of Emotional Distress. Id. p. 5, ¶ 3 (1:4). This Court will see similar frivolous tactics to deprive Plaintiff of his due process rights, here.

### B. California Rules of Professional Conduct 1.7(d)(3) Bars Catanzarite's Representation

Catanzarite is barred by mandatory law from representing any of the Adverse Parties here.

> Rule 1.7 Conflict of Interest: Current Clients holds: "Representation [of Adverse Parties] is permitted under this rule only if the lawyer complies with paragraphs (a), (b), and (c), <u>and</u>: (1) the lawyer reasonably believes* that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; <u>and</u> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal."

*Flatt v. Superior Court*, 9 Cal.4th 275, 36 Cal. Rptr. 2d 537, 885 P.2d 950 (Cal. 1994) is instructive. (Holding that where the requisite substantial relationship exists, "access to confidential information by the attorney in the course of the first representation (relevant, by definition, to the second representation) is presumed and disqualification of the attorney's representation of the second client is **mandatory**; indeed, the disqualification extends vicariously to the **entire firm**." Beck shows evidence of this proving the conflicts cannot continue, here. Decl. ¶¶ 1-44, Ex. 14. Ex. 18-26 for captions and signature pages of lawsuits filed for and against adversaries in the same or substantially related matters which are subject to RICO claims in this Court as a fraudulent scheme. SAC, Dkt. #37, RICO Case Statement, Dkt. #50. The Court cannot allow the violations to continue here under Due Process clause.

*Klemm v. Superior Court*, 75 Cal.App.3d 893 (1977) is also instructive as to why the Catanzarite representation is frivolous, and why Catanzarite cannot be allowed to represent Adverse Parties because they cannot possibly be informed as to the extent of Catanzarite's fraud or its implications. Clearly, Catanzarite will seek to avoid liability for itself and claim "privilege" or place the blame on its "clients" who were actually acting under a defined threat – including one from "law enforcement." See Ex. 18, Ex. 1, Ex. 8, Ex. 9, Ex. 13. "Though an informed consent be obtained [from Adverse Parties], no case we have been able to find sanctions dual representation of conflicting interests if that representation is in conjunction with a trial or hearing where there is an actual, present, existing conflict and the discharge of duty to one client conflicts with the duty to another. (See *Anderson* v. *Eaton* (1930) 211 Cal. 113 [293 P. 788]; *Hammett* v. *McIntyre* (1952) 114 Cal. App.2d 148, 153-154 [249 P.2d 885]; *McClure* v. *Donovan* (1947) 82 Cal. App.2d 664, 666 [186 P.2d 718].) (1) As a matter of law a purported consent to dual representation of litigants with adverse interests at a contested hearing would be neither intelligent nor informed. Such representation would be per se inconsistent with the adversary position of an attorney in litigation, and common sense dictates that it would be **unthinkable to permit [Catanzarite] to assume a position at a trial or hearing where he could not advocate the interests of one client without adversely injuring those of the other**." And yet, that's what Catanzarite is doing.

**C. California Rules of Professional Conduct 1.9 Also Bars Catanzarite's Representation**

As if the ongoing violations of California Rules of Professional Conduct 1.7(d)(3) were not enough, or four prior disqualification orders, Catanzarite has a duty to Plaintiff's former company.

"These three consolidated appeals concern Cultivation Technologies, Inc.'s (CTI) motion to disqualify its own legal counsel, the Catanzarite Law Corporation (Catanzarite), in related cases. The trial court granted CTI's disqualification motion relating to two lawsuits, deciding Catanzarite could not represent the following parties (1) CTI; (2) three CTI subsidiaries (Coachella Manufacturing, LLC, Coachella Distributors, LLC, and DS Gen, LLC, hereafter collectively referred to as CTI Subsidiaries); and (3) a group of CTI shareholders bringing a derivative lawsuit [which includes Amy Jeanette Cooper]. We conclude the trial court was correct and we affirm its disqualification orders." *Fincanna Capital Corp. v. Cultivation Tech.*, No. G058700, 1 (Cal. Ct. App. Jun. 28, 2021) See Rule 8.1115(b) for reliance upon unpublished opinions, and Ex. 22 and 25 for complaints filed on behalf of CTI before the attorney-client relationship was terminated and upheld by Court of Appeal.

Cal. Rul. Prof. Conduct 1.9 fn. Holds "[1] After termination of a lawyer-client relationship [as above], the lawyer owes two duties to a former client [CTI]. The lawyer may not (i) do anything that will injuriously affect the former client [CTI] in any matter in which the lawyer represented the former client [CTI], or (ii) at any time use against the former client knowledge or information acquired by virtue of the previous relationship [defending this case]. (See *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811 [124 Cal.Rptr.3d 256]; *Wutchumna Water Co. v. Bailey* (1932) 216 Cal. 564 [15 P.2d 505].) For example, (i) a lawyer [Catanzarite] could not properly seek to rescind on behalf of a new client a contract drafted on behalf of the former client and (ii) a lawyer who has prosecuted an accused person* could not represent the accused in a subsequent civil action against the government concerning the same matter. (See also Bus. & Prof. Code, § 6131; 18 U.S.C. § 207(a).)"

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests Catanzarite be disqualified from this case. It can take no act in defense that is not adverse to CTI, where Plaintiff was CEO. It can take no act which is not undertaken in violation of California Rules of Professional Conduct. It is adverse to its own clients who face RICO conspiracy charges, as Catanzarite faces RICO charges. Dkt. #37, Dkt. #50.

Respectfully Submitted,

April 23, 2023

Justin S. Beck, Plaintiff In Pro Per, Moving Party

**DECLARATION OF JUSTIN S. BECK IN SUPPORT OF PLAINTIFF'S MOTION TO DISQUALIFY CATANZARITE LAW CORPORATION AND ITS ATTORNEYS**

I, Justin S. Beck, declare as follows under penalty of perjury under the laws of the United States and State of California. I am over the age of 18. I have personal knowledge, could, and would competently testify as to the truth and authenticity of each statement to which I declare. For those statements I make on information and belief, I believe them to be true. I have personal knowledge as to the authenticity of each exhibit filed with this declaration.

1. I met Richard Francis O'Connor, Jr., Amy Jeanette Cooper, and Richard Probst after April 7, 2015.
2. I have never been officer, director, employee, consultant, or manager for Mobile Farming Systems, Inc.
3. Richard Francis O'Connor, Jr. and Amy Jeanette Cooper each admitted to me that they visited Roger Root at his home in Florida in or around 2012 or 2013, and that they paid $340,000 in illegal commissions to a Joseph Porche out of a ~$450,000 investment in Mobile Farming Systems, Inc. through a company called Jolly Rogers Investments, Inc. or Jolly Roger, Inc. Those transactions have nothing to do with me, and never did.
4. It was the express intent of Richard Francis O'Connor, Jr., Amy Jeanette Cooper, and Richard Probst – as officers and directors of Mobile Farming Systems, Inc. – that Mobile Farming Systems, Inc. never receive shares of Cultivation Technologies, Inc. to avoid successor liability issues of the failed company, a balance sheet with almost $700,000 in loans owed by O'Connor to MFS, and the illegal commissions paid by Mobile Farming Systems, Inc. to Joseph Porche at the direction of O'Connor and Cooper.
5. Richard Francis O'Connor, Jr., Amy Jeanette Cooper, and Richard Probst, in their duly authorized capacities for Cultivation Technologies, Inc. and Mobile Farming Systems, Inc., each executed the "Unanimous Written Consent of Directors of Cultivation Technologies, Inc." on June 15, 2015, which constituted the "Amended Organizational Acts & Resolutions" of Cultivation Technologies, Inc.

6. Richard Francis O'Connor, Jr., Amy Jeanette Cooper, and Richard Probst, in their duly authorized capacities for Cultivation Technologies, Inc. and Mobile Farming Systems, Inc., offered every Mobile Farming Systems, Inc. shareholder shares in Cultivation Technologies, Inc. Approximately fifty-three of fifty-eight accepted the offer recognizing Mobile Farming Systems, Inc. failed to execute its business strategy and would be unwound or dissolved. Each agreed to buy shares of Cultivation Technologies, Inc. I later issued 65,000 shares to two shareholders that could not be reached (50,000 and 15,000 shares, respectively).
7. Roger Root, on behalf of the entity Jolly Rogers Investments, Inc. or Jolly Roger, Inc., was offered shares of Cultivation Technologies, Inc. in August 2015 but declined. Mr. Root told Tony Scudder, who performed investor relations services, that he supported what Cultivation Technologies, Inc. was doing.
8. From June 15, 2015, through September 14, 2018, no person ever claimed Mobile Farming Systems, Inc. to own shares or rights to any interests of Cultivation Technologies, Inc. Richard Francis O'Connor, Amy Jeanette Cooper, and Richard Probst communicated about bankrupting or unwinding the company.
9. Richard Francis O'Connor, Jr. participated in approximately 158 separate securities transactions from June 15, 2015, through January 23, 2019, involving the sale or transfer of Cultivation Technologies, Inc. shares on behalf of the issuer in an authorized capacity, or privately for personal benefit. I believe he personally made more than $2,000,000 from these transactions before January 23, 2019, when he would claim the shares didn't exist for Catanzarite's scheme.
10. No securities sale or transfer agreement from June 15, 2015, through January 23, 2019, reflected ownership by Mobile Farming Systems, Inc. of Cultivation Technologies, Inc. shares because Mobile Farming Systems, Inc. was never issued shares of Cultivation Technologies, Inc. as a matter of fact.
11. The first private placement memorandums (PPM) of Cultivation Technologies, Inc. were approved by Richard Francis O'Connor, Jr. and did not reflect ownership by Mobile Farming Systems, Inc. of Cultivation Technologies, Inc. shares. No subsequent PPM disclosed them because Mobile Farming Systems, Inc. was not a shareholder according to O'Connor, Cooper.

12. Richard Francis O'Connor, Jr., Amy Jeanette Cooper, and Richard Probst retained a transfer agent in July 2015 to issue the first shares of Cultivation Technologies, Inc. No shares were issued then to Mobile Farming Systems, Inc., and no shares were ever issued after that to Mobile Farming Systems, Inc. (except for the acts of January 23, 2019, outlined herein).

13. Mohammed Zakhireh and James Duffy each purchased shares of Cultivation Technologies, Inc. through the issuer via private placement memorandums authorized by the board of directors. Those PPMs did not reflect any Cultivation Technologies, Inc. shares owned by Mobile Farming Systems, Inc. – which were required to list any shareholder having more than 5% of stock.

14. Mohammed Zakhireh and James Duffy each purchased shares of Cultivation Technologies, Inc. through Richard Francis O'Connor, Jr. in private transactions from him or TGAP Holdings, LLC.

15. In April 2017 after Cultivation Technologies, Inc. executed a $14 million funding agreement, Mohammed Zakhireh and Richard Francis O'Connor, Jr. each sued me and Cultivation Technologies, Inc. with standing based on their ownership of Cultivation Technologies, Inc. shares. They settled those claims in June 2017 with James Duffy also agreeing to the settlement and signing it. They would later agree those shares did not exist for Catanzarite's scheme.

16. In July 2017, Mohammed Zakhireh and Richard Francis O'Connor, Jr. complained to the United States Securities Exchange Commission about Cultivation Technologies, Inc. and me due to a grudge harbored by Richard Francis O'Connor, Jr. following his resignation in 2016. The SEC investigated and reviewed approximately 25,000 pages of securities documents. None of those documents reflected any ownership by Mobile Farming Systems, Inc. of shares of Cultivation Technologies, Inc. That investigation concluded in January 2018 with the SEC finding no wrongdoing for enforcement by me or CTI. Those documents reviewed by the SEC included the purportedly "undisclosed" Preferred Series A shares. (SEC Investigation #LA-4837).

17. On September 14, 2018, Catanzarite Law Corporation sued Mobile Farming Systems, Inc, Richard Francis O'Connor, Amy Jeanette Cooper, Cliff Higgerson, Anthony B. Scudder, me, and others directly and/or derivatively. At no point did a Court authorize compromise or settlement of that derivative action.

18. Catanzarite Law Corporation's allegations filed on September 14, 2018, for a "Denise Pinkerton" as "attorney-in-fact" for "Roger Root" included securities fraud and abuse of the elderly charges against Amy Jeanette Cooper and Richard Francis O'Connor, Jr. This would later form the basis of Mr. Catanzarite extorting them to produce evidence while defrauding this Court and innocent people, including me, with false evidence produced by O'Connor and Cooper.

19. On October 4, 2018, Kenneth Catanzarite emailed my counsel demanding 10,000,000 shares of Cultivation Technologies, Inc. be issued Roger Root without regard for the derivative interests of Mobile Farming Systems, Inc. Roger Root was never a shareholder of Mobile Farming Systems, Inc., either. It is unclear if Mr. Root's "attorney-in-fact" Denise Pinkerton even knows him beyond the factual representations of Kenneth J. Catanzarite, whom I believe is a serial liar.

20. On December 21, 2018, Kenneth Catanzarite served approximately 5,000 total discovery requests upon Mobile Farming Systems, Inc., Amy Jeanette Cooper, Richard Francis O'Connor, Jr., me, and others.

21. Cliff Higgerson demurred to the derivative MFS action January 3, 2019, asserting Roger Root was not a shareholder of MFS and that Catanzarite Law Corporation had no standing to pursue derivative claims. After that, MFS counsel Ken Watnick filed a motion for security on January 7, 2019. In response to cover up a lack of standing, Catanzarite Law Corporation took over MFS in January 2019 and started acting as its counsel while it was suing the company derivatively.

22. On January 23, 2019, Amy Jeanette Cooper's insurance-assigned counsel resigned and later declared under penalty of perjury they were not involved in any compromise of the derivative action against MFS.

23. O'Connor, Cooper, Higgerson, and TGAP Holdings, LLC were each dismissed from the false derivative action against MFS between January 22, 2019, and January 23, 2019, without court approval.

24. On January 23, 2019, Richard Francis O'Connor, Jr. signed a fraudulent shareholder consent of "sole shareholder" of Cultivation Technologies, Inc. being Mobile Farming Systems, Inc. purporting to unwind three years of securities transactions. O'Connor was principal in many of these transactions for millions of dollars.

25. The fraudulent January 23, 2019, shareholder consent appointed Richard Francis O'Connor, Jr., Mohammed Zakhireh, and James Duffy as officers and directors of Cultivation Technologies, Inc. on the knowingly false basis that Mobile Farming Systems, Inc. was a shareholder. Each were shareholders of Cultivation Technologies, Inc. through transactions with the issuer and with O'Connor himself as set forth above.

26. On January 25, 2019, Kenneth Catanzarite sent a letter that he was "working with law enforcement" and that I was to turn over all operations of Cultivation Technologies, Inc. on the basis that Mobile Farming Systems, Inc. was its sole shareholder. Catanzarite knew this letter was false. I believe Mr. Catanzarite bribes local law enforcement to enable these schemes.

27. On January 28, 2019, Catanzarite Law Corporation filed a direct lawsuit on behalf of Mobile Farming Systems, Inc. while he and his firm were concurrently suing Mobile Farming Systems, Inc. derivatively about a month after serving more than 500 discovery requests on Mobile Farming Systems, Inc.

28. On February 5, 2019, Catanzarite Law Corporation received details on the merger transaction valued at $261 million with a Canadian issuer Western Troy Capital Resources that was at risk of failing if the knowingly false claims filed, and non-judicial fraud supporting those claims, were continued. The scheme continued anyway with knowledge of damages.

29. On February 6, 2019, Cultivation Technologies, Inc. entered a letter of intent to complete the merger with Western Troy Capital Resources. Rex Loesby later confirmed the causation of the merger's failure as being the conduct of Catanzarite.

30. On March 19, 2019, Catanzarite Law Corporation suborned and then filed a declaration from O'Connor which contained materially false statements of fact to obtain a temporary restraining order and steal more information on CTI shareholders. Catanzarite is now seeking the same information again from me through motions to compel in Superior Court.

31. On April 16, 2019, Catanzarite Law Corporation filed a competing, direct and derivative lawsuit on behalf of Cultivation Technologies, Inc. shareholders that the firm was concurrently and separately claiming did not exist which would be tried on April 30, 2019, before Honorable Randall J. Sherman in CX105 of Orange County Superior Court through a 709 hearing. The

factual findings of that trial were ignored and concealed. After the firm as disqualified, former associate of Catanzarite Law Corporation and proxy Jim Travis Tice is now "counsel."

32. On April 19, 2019, "Kenneth J. Catanzarite for Richard O'Connor" emailed MFS shareholders that "neither I, Richard O'Connor, Tony Scudder, nor anyone else sued in the Root Case or the Mobile Farming Case have settled any claims with Root or anyone else. All we did was agree to toll the statute of limitations to allow claims to be brought against us later. No conflict."

33. Between April 30, 2019, and May 1, 2019, I participated in the trial of fact wherein the Court reviewed evidence and concluded that Mobile Farming Systems, Inc. was not a shareholder of Cultivation Technologies, Inc. The hearing sought to cancel all shares of CTI in favor of MFS under knowingly false pretenses.

34. During the 709 trial the Court reviewed private placement memorandums signed by O'Connor. It reviewed the transfer agent declaration signed by O'Connor and Cooper. It reviewed the transfer agent retention agreement signed by O'Connor and Cooper. It reviewed the initial share issuances from July 2015. The Court concluded that laches supports Mobile Farming Systems, Inc. had been of the belief that it was not a shareholder of Cultivation Technologies, Inc. Whether or not this was captured in the Court order following that trial, Mr. Catanzarite knows that Mobile Farming Systems, Inc. is not and has never been a shareholder of Cultivation Technologies and that he is defrauding courts and innocent people. Those claims are just re-filed and somehow allowed again to defraud litigants and Scottsdale Insurance Company further.

35. Concluding the trial, the Court stated "every fiber of [its] being" concluded the facts were "overwhelming" against the contention that Mobile Farming Systems, Inc. was a shareholder of Cultivation Technologies, Inc. The Court stated that Cooper and O'Connor would be "violating their fiduciary duties up the ying yang" if Mobile Farming Systems, Inc. had been a shareholder of Cultivation Technologies, Inc. all along – having participated in many securities transactions without disclosing it. Now, O'Connor and Cooper are acting under Catanzarite's extortion.

36. I resigned from Cultivation Technologies, Inc. on May 14, 2019, when it became clear that Catanzarite Law Corporation's fraudulent scheme would destroy the merger with Western Troy Capital Resources. I spoke with Carlos Calixto while I was on vacation in Italy around that date,

who informed me Mr. Catanzarite contacted him and tried to bribe him for his Cultivation Technologies, Inc. shareholder vote for $5,000.

37. I agreed to settle federal racketeering and conspiracy allegations against Anthony B. Scudder over the Summer 2022. During our discussions, Mr. Scudder informed me that Mr. Catanzarite had bribed several witnesses who were to attend the 709 trial on April 30, 2019 and May 1, 2019 (including a "Nick Fleig") – and that Mr. Catanzarite was a "powerful criminal." Catanzarite would not allow me to settle with Scudder because of a fraudulently derived judgment in Superior Court – in other words – Catanzarite placed its own interests over those of Scudder to protect themselves.

38. Mr. Scudder confirmed by phone my suspicion that Mr. Catanzarite engages in bribery and extortion of witnesses and litigants as a practice to suit false narratives and fraudulent litigation such as the cases I have faced since September 14, 2018 in Superior Court.

39. Whenever Catanzarite obtains discovery or information in good faith, it is used to file more knowingly false claims against innocent people without objective probable cause amidst material conflicts. Even after facts are adjudicated, the same false claims are re-filed. I believe this is enabled through bribery of The State Bar of California staff and law enforcement.

40. Catanzarite Law Corporation has in its possession the answers to virtually all material discovery of which it seeks to compel me to produce. My damages were noticed before CTI and the merger were destroyed with malice. I have provided extensive details to Mr. Catanzarite in Federal Court, too but it is ignored just as with the material facts that estop all of his false claims.

41. Catanzarite Law Corporation has in its possession information from two public issuers – FinCanna Capital detailing Cultivation Technologies, Inc., and Contakt World Technologies Corp. detailing that company which was indirectly destroyed by the conduct at issue in this case. The information is public and readily available to anyone with internet access.

42. As direct and proximate cause of non-judicial fraud leading to fraudulent litigation, and now the representation of adverse parties in this Court, I am unemployed and suffer from a new onset seizure disorder commencing in December 2022.

43. I do not understand why Catanzarite Law Corporation is enabled by Courts to conduct serial fraud on innocent litigants if not through bribery, nor do I understand how Catanzarite Law Corporation is representing its adversaries who are producing evidence as it tolls claims against them in a fraudulent derivative action that was compromised without Court approval.

44. I believe Kenneth Catanzarite is bribing Eli David Morgenstern of The State Bar of California to protect him, so there are no other avenues of recourse for me or the public but for the Court to exercise its powers to disqualify the firm here. The State Bar of California recently admitted to its own bribery and corruption schemes by press release on March 10, 2023, in two published, heavily redacted investigative reports.

45. The adverse representation of O'Connor, Cooper, Scudder, Zakhireh, and Duffy – and motions to compel me to produce information amidst these conflicts in Superior Court – are harassing, oppressive, and duplicative and make the Court process seem illegitimate. They acutely threaten my health.

46. I do not expect to obtain discovery from Adverse Parties or Catanzarite until Catanzarite is disqualified in this Court because they confessed that their conflicts are not curable and that it will restrict production to me and harm their "due process rights."

47. Attached as EXHIBIT 1 is a true and correct copy of the June 15, 2015, Amended Acts of Organization of Cultivation Technologies, Inc. signed by Richard Francis O'Connor, Jr. and Amy Jeanette Cooper in their duly authorized capacities. This is part of the bona fide corporate records of Cultivation Technologies, Inc. upon which I relied as CEO in raising capital after 2016.

48. Attached as EXHIBIT 2 is a true and correct copy of an email confirming Tony Scudder's conversation with Roger Root declining to purchase CTI shares. I received this email in the normal course of business as a consultant to Cultivation Technologies, Inc.

49. Attached as EXHIBIT 3 is a true and correct copy of a list of 158 transactions involving the sale or transfer of Cultivation Technologies, Inc. shares by Richard Francis O'Connor, Jr. I prepared this list with assistance from company counsel for the 709 trial on April 30, 2019 and May 1, 2019. I am readily familiar with the securities transactions of Cultivation Technologies, Inc.

50. Attached as EXHIBIT 4 is a true and correct copy of the transfer agent agreement for Cultivation Technologies, Inc. signed by Richard Francis O'Connor and Amy Jeanette Cooper, and a declaration from the transfer agent. The Court reviewed this agreement and the share issuance list in the 709 trial leading to its findings May 1, 2019 as set forth below. I am readily familiar with the issuances of stock by Cultivation Technologies, Inc. reflected therein.

51. Attached as EXHIBIT 5 is a true and correct copy of a letter I received from the SEC concluding its investigation of CTI's securities transactions. I received this in the normal course of business.

52. Attached as EXHIBIT 6 is a true and correct copy of a January 7, 2019, motion for security from Mobile Farming Systems, Inc. actual counsel. I received this as a defendant.

53. Attached as EXHIBIT 7 is a true and correct copy of a declaration from Amy Jeanette Cooper's former counsel Stephen Erigero, Esq. who resigned from that role January 23, 2019. I received this in the normal course of defending claims.

54. Attached as EXHIBIT 8 is a true and correct copy of a shareholder consent of Cultivation Technologies, Inc. dated January 23, 2019, signed by Richard Francis O'Connor, Jr. I received this from Catanzarite Law Corporation.

55. Attached as EXHIBIT 9 is a true and correct copy of a letter I received from Catanzarite Law Corporation dated January 25, 2019, signed by Kenneth Catanzarite.

56. Attached as EXHIBIT 10 is a true and correct copy of a motion filed by Cliff Higgerson dated January 3, 2019, in Orange County Superior Court Case No. 30-2018-0108922.

57. Attached as EXHIBIT 13 is a true and correct copy of an email I received from Richard Probst from Han Le of Catanzarite Law Corporation. I spoke with Richard Probst after this was received, who confirmed its authenticity. I am readily familiar with its contents.

58. Attached as EXHIBIT 14 is a true and correct copy of a trial transcript dated May 1, 2019, which I hereby certify as being true and correct. I further swear the factual findings of the Court to be true and correct, and that Catanzarite is still defrauding innocent litigants with malice.

59. Attached as EXHIBIT 15 is a true and correct copy of a declaration from Carlos Calixto dated May 17, 2019, filed in Orange County Superior Court Case No. 30-2019-01046904. I am readily familiar with its contents.

60. Attached as EXHIBIT 18 is a true and correct copy of the caption and signature page in Case No. 30-2018-01018922 filed against O'Connor, Cooper, Higgerson, Scudder, me, Mobile Farming Systems, Inc. and Cultivation Technologies, Inc. September 14, 2018, in Orange County Superior Court.

61. Attached as EXHIBIT 19 is a true and correct copy of the caption and signature page in Case No. 30-2019-01046904 filed on behalf of Mobile Farming Systems, Inc. against Cultivation Technologies, Inc. January 28, 2019, in Orange County Superior Court.

62. Attached as EXHIBIT 20 is a true and correct copy of the caption and signature page in Case No. 30-2019-01064267 filed April 16, 2019, in Orange County Superior Court, which was the third conflicting derivative action filed by Catanzarite.

63. Attached as EXHIBIT 21 is a true and correct copy of the caption and signature page in the first amended complaint for Case No. 30-2019-01064267 filed May 15, 2019, in Orange County Superior Court.

64. Attached as EXHIBIT 22 is a true and correct copy of the caption and signature page in a cross complaint filed on behalf of Cultivation Technologies, Inc. by Catanzarite Law Corporation in Case No. 30-2019-01072088-CU-BC-CJC on July 2, 2019, in Orange County Superior Court.

65. Attached as EXHIBIT 23 is a true and correct copy of the caption and signature page in Case No. 30-2019-01046904 signed July 22, 2019, and filed in Orange County Superior Court.

66. Attached as EXHIBIT 24 is a true and correct copy of the caption and signature page in the first amended complaint for Case No. 30-2018-01018922 signed July 22, 2019, and filed in Orange County Superior Court. Settlement of this derivative action was never approved by the Court.

67. Attached as EXHIBIT 25 is a true and correct copy of the complaint in Case No. 30-2019-01096233 filed on behalf of Cultivation Technologies, Inc. by Catanzarite Law Corporation filed September 11, 2019, in Orange County Superior Court before it was removed by defendant Scottsdale Insurance Company October 19, 2019, in U.S. Central District, Southern Division Case No. 8:19-cv-01993.

68. Attached as EXHIBIT 26 is a true and correct copy of the caption and signature page in the cross complaint for Case No. 30-2020-01145998 filed on behalf of Mobile Farming Systems, Inc. by Catanzarite Law Corporation on August 10, 2020, in Orange County Superior Court.

69. Attached as EXHIBIT 28 is a true and correct copy of Mobile Farming Systems, Inc. Statement of Information dated 12/22/2022 showing a street address of Catanzarite Law Corporation 2331 West Lincoln Avenue, Anaheim, CA 92801 with officers Richard F. O'Connor II and James Duffy and directors James A. Duffy, Amy J. Cooper, and Richard F. O'Connor II with the agent name Kenneth J. Catanzarite. I obtained this from California Secretary of State's website on April 17, 2022.

70. Attached as EXHIBIT 29 is a true and correct copy of Mobile Farming Systems, Inc. Statement of Information dated 11/17/2020 showing a street address of Catanzarite Law Corporation 2331 West Lincoln Avenue, Anaheim, CA 92801 with officers Richard F. O'Connor II and James Duffy and directors James A. Duffy, Amy J. Cooper, and Richard F. O'Connor II with the agent name Kenneth J. Catanzarite. I obtained this from California Secretary of State's website on April 17, 2022.

71. Attached as EXHIBIT 35 is a true and correct copy of a public records request response I received from The State Bar of California on June 14, 2022. I received this personally after requesting information known to The State Bar of California about Catanzarite.

72. Attached as EXHIBIT 36 is a true and correct copy of a demurrer to my malicious prosecution, unfair business practices, slander of title, and intentional infliction of emotional distress complaint in Orange County Superior Court Case No. 30-2020-01145998 filed on behalf of "Kenneth Catanzarite, Catanzarite Law Corporation, Brandon Woodward, Tim James O'Keefe, Amy Jeanette Cooper, Cliff Higgerson, Mohammad Zakhireh, Richard Francis O'Connor, Jr., James Duffy, TGAP Holdings, LLC, and Mobile Farming Systems, Inc." I received this in the normal course of litigation, it is filed in Orange County Superior Court, and now scheduled to be heard on June 30, 2023.

[Signature Page Follows]

I DECLARE THE FOREGOING TO BE TRUE UNDER PENALTY OF PERJURY, SIGNED TODAY, APRIL 23, 2023, FROM OCEANSIDE CALIFORNIA

Justin S. Beck, Declarant

**PROOF OF SERVICE**

I, Brian Bargabus, hereby declare that I am over 18 years of age and am not a party to this action, and that my address is 3501 Roselle St., Oceanside, CA 92056.

I served or scheduled for service one copy of the following documents:

**PLAINTIFF'S NOTICE OF MOTION AND MOTION TO DISQUALIFY CATANZARITE LAW CORPORATION AND ITS ATTORNEYS; DECLARATION OF JUSTIN S. BECK IN SUPPORT**

Participants in the case who are registered CM/ECF users will be served when these papers are filed with the Court.

*See the CM/ECF service list.*

Electronic service is scheduled for delivery April 19, 2023, to the following email addresses:

| | |
|---|---|
| Corey Amundson | corey.amundson@usdoj.gov |
| Todd Gee | todd.gee@usdoj.gov |
| Robert Heberle | Robert.heberle@usdoj.gov |
| Sean Mulryne | sean.mulryne@usdoj.gov |

By electronic mail by personally transmitting a true copy thereof via an electronic email service connected to the internet, addressed to the email address listed above [X].

I declare the foregoing to be true under penalty of perjury under the laws of the State of California and United States. I am signing this from Oceanside, California on April 23, 2023.

Brian Bargabus, Declarant

EXHIBIT 1

**UNANIMOUS WRITTEN CONSENT OF DIRECTORS OF CULTIVATION TECHNOLOGIES, INC., a California corporation**

**AMENDED ORGANIZATIONAL ACTS & RESOLUTIONS**

Pursuant to the authority granted to the directors to take action by unanimous written consent without a meeting pursuant to Section 307(b) of the California General Corporation Law, the Directors of **CULTIVATION TECHNOLOGIES, INC.**, a California corporation (the "Corporation") do hereby consent to, adopt, ratify, confirm and approve, as of the date indicated below, the following recitals and resolutions, as evidenced by their signatures hereunder:

**AMENDMENT OF ORIGINAL ORGANIZATIONAL ACTS & RESOLUTIONS**

**WHEREAS**, pursuant to a unanimous written consent (the "Organizational Consent") of the Board of Directors (the "Board") of the Corporation dated March 30, 2015, the Corporation enacted certain initial organizational acts on behalf of the Corporation;

**WHEREAS**, certain aspects of the Organizational Consent were made in error and need to be amended;

**WHEREAS**, the Board believes it is in the best interests of the Corporation to amend the Organizational Consent to correct the errors made therein; and

**NOW THEREFORE, IT IS HEREBY RESOLVED** that the Organizational Consent previously approved by the Board is hereby amended as set forth in this "Amended Organizational Consent." Resolutions previously approved in the Organizational Consent and not otherwise amended herein will remain in full force and effect.

**ISSUANCE OF SECURITIES**

**WHEREAS**, the Organizational Consent purported to authorize the issuance of 28,000,000 shares of common stock of the Corporation to Mobile Farming Systems, Inc. in exchange for the contribution of certain assets and cash consideration;

**WHEREAS**, Mobile Farming Systems, Inc. failed to provide any consideration as required pursuant to the Organizational Consent and, as a result, was not issued the common stock set forth in the Organizational Consent;

**WHEREAS**, the Board deems it in the best interests of the Corporation to issue and sell shares of its common stock to its founding shareholders (the "Founders") pursuant to that certain Common Stock Purchase Agreement (a form of which is attached hereto as Exhibit A) in the amounts and for the consideration set forth below:

| NAME OF FOUNDER | NUMBER AND CLASS OF SHARES | CONSIDERATION |
|---|---|---|
| Richard O'Connor | 2,500,000 shares of Common Stock | $2,500.00 |
| Richard Probst | 5,000,000 shares of Common Stock | $5,000.00 |
| Amy Cooper | 2,500,000 shares of Common Stock | $2,500.00 |
| TGAP Holdings, LLC | 5,500,000 shares of Common Stock | $5,500.00 |
| EM2 Strategies LLC | 2,000,000 shares of Common Stock | $2,000.00 |
| I'm Rad LLC | 3,000,000 shares of Common Stock | $3,000.00 |
| Cliff Higgerson | 1,000,000 shares of Common Stock | $1,000.00 |
| Aroha Holdings Inc. | 1,000,000 shares of Common Stock | $1,000.00 |
| Scott Unfug | 500,000 shares of Common Stock | $500.00 |

**WHEREAS**, the Board deems it to be in the best interest of the Corporation that 23,000,000 shares of its common stock be issued and sold as set forth above; and

**NOW THEREFORE, IT IS HEREBY RESOLVED**, that the officers of the Corporation is hereby authorized and instructed to issue and sell the shares of stock of the Corporation for the consideration above stated and in compliance with all the terms and conditions of Section 25102(f) of the California Corporations Code; and

**RESOLVED FURTHER**, that each of the officers of the Corporation is authorized, directed, and empowered on behalf of the Corporation and in its name to execute any other applications, certificates, agreements or any other instruments or documents, or amendments or supplements thereto, or to do and to cause to be done any and all other acts and things such officers may in their discretion deem necessary or appropriate to carry out the purposes of the foregoing resolutions; and

**RESOLVED FURTHER**, the prior authorization of issuance of common stock to Mobile Farming Systems, Inc. is hereby null and void in its entirety.

**INCENTIVE STOCK PLAN**

**WHEREAS**, the Organizational Consent purported to authorize the adoption of an Incentive Stock Plan of up to 5,000,000 shares of common stock which shares were thereby reserved for future issuance to employees, officers, directors and/or consultants of the Corporation;

**WHEREAS**, no such Incentive Stock Plan has been formally adopted and the Board deems it in the best interest of the Corporation to cancel the Incentive Stock Plan; and

**NOW THEREFORE, IT IS HEREBY RESOLVED** that the Incentive Stock Plan is hereby canceled in its entirety.

**COMPENSATION OF DIRECTORS**

**WHEREAS**, the Organizational Consent purported to grant 30,000 options to purchase common stock of the Corporation to the directors of the Corporation for services provided as directors;

**WHEREAS**, the Incentive Stock Plan has been canceled by the above resolution of the Board and no such option grants were formally made by the Corporation and the Board deems it in the best interest of the Corporation to cancel any option grants purportedly made thereby;

**RESOLVED**, that the Corporation hereby cancels any options granted under the Incentive Stock Plan, including any such options granted to the directors of the Corporation.

**OMNIBUS RESOLUTIONS**

**RESOLVED**, that any of the officers of the Corporation be, and each of them hereby is, authorized (i) to prepare, execute, deliver and perform, as the case may be, such agreements, amendments, applications, approvals, certificates, communications, consents, demands, directions, documents, further assurances, instruments, notices, orders, requests, resolutions, supplements or undertaking, (ii) to pay or cause to be paid on behalf of the Corporation any related costs and expenses and (iii) to take such other actions, in the name and on behalf of the Corporation, as each such officer, in such officer's discretion, shall deem necessary and advisable to complete and effect the foregoing resolutions or to carry out the intent and purposes of the foregoing resolutions;

**RESOLVED FURTHER**, that all actions heretofore taken by the officers and directors of the Corporation with respect to the foregoing resolutions and all other matters contemplated thereby are hereby approved, adopted, ratified and confirmed.

**COUNTERPARTS**

**RESOLVED**, that this Unanimous Written Consent may be signed in as many counterparts as may be necessary, each of which so signed shall be deemed to be an original (and each signed copy sent by electronic facsimile transmission shall be deemed to be an original) and such counterparts together shall constitute one and the same instrument and notwithstanding the date of the execution shall be deemed to bear the date as set forth below.

**IN WITNESS WHEREOF,** the undersigned have set forth their hand as of this 15th day of June, 2015.

**DIRECTORS:**

______________________
**RICHARD O'CONNOR**

______________________
**RICHARD PROBST**

Amy Cooper
______________________
**AMY COOPER**

# EXHIBIT "A"

Motion to DQ Catanzarite 3:22-CV-01616-AGS-DDL
Exhibit #1: 006

**CULTIVATION TECHNOLOGIES, INC.**

**COMMON STOCK PURCHASE AGREEMENT**

This Common Stock Purchase Agreement (this "Agreement") is made as of June 15, 2015 by and between Cultivation Technologies, Inc., a California corporation (the "Company"), and ____________________ ("Purchaser").

1. **Sale of Stock.** Subject to the terms and conditions of this Agreement, simultaneously with the execution and delivery of this Agreement by the parties or on such other date as the Company and Purchaser shall agree (the "Purchase Date"), the Company will issue and sell to Purchaser, and Purchaser agrees to purchase from the Company, __________ shares of the Company's Common Stock (the "Shares") at a purchase price of $0.001 per share for a total purchase price of $___________ (the "Aggregate Purchase Price"). On the Purchase Date, Purchaser will deliver the Aggregate Purchase Price to the Company and the Company will enter the Shares in Purchaser's name as of such date in the books and records of the Company or, if applicable, a duly authorized transfer agent of the Company. The Company will deliver to Purchaser a stock certificate representing the Shares as soon as practicable following such date. As used elsewhere herein, the term "Shares" refers to all of the Shares purchased hereunder and all securities received in connection with the Shares pursuant to stock dividends or splits, all securities received in replacement of the Shares in a recapitalization, merger, reorganization, exchange or the like, and all new, substituted or additional securities or other property to which Purchaser is entitled by reason of Purchaser's ownership of the Shares.

2. **Consideration for Shares.** As consideration for the Shares, Purchaser will deliver the Aggregate Purchase Price by a check or wire transfer made out to the Company as payment in full of the Aggregate Purchase Price.

3. **Investment and Taxation Representations.** In connection with the purchase of the Shares, Purchaser represents to the Company the following:

(a) Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares. Purchaser is purchasing the Shares for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act or under any applicable provision of state law. Purchaser does not have any present intention to transfer the Shares to any other person or entity.

(b) Purchaser understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

(c) Purchaser further acknowledges and understands that the securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Purchaser further acknowledges and understands that the Company is under no obligation to register the securities.

(d) Purchaser is familiar with the provisions of Rule 144, promulgated under

the Securities Act, which, in substance, permits limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer of the securities (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions. Purchaser understands that the Company provides no assurances as to whether he or she will be able to resell any or all of the Shares pursuant to Rule 144, which rule requires, among other things, that the Company be subject to the reporting requirements of the Exchange Act, that resales of securities take place only after the holder of the Shares has held the Shares for certain specified time periods, and under certain circumstances, that resales of securities be limited in volume and take place only pursuant to brokered transactions. Notwithstanding this Section 3(d), Purchaser acknowledges and agrees to the restrictions set forth in Section 3(e) below.

(e) Purchaser further understands that in the event all of the applicable requirements of Rule 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption will be required; and that, notwithstanding the fact that Rule 144 is not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rule 144 will have a burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

(f) Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the Shares. Purchaser represents that Purchaser has consulted any tax consultants Purchaser deems advisable in connection with the purchase or disposition of the Shares and that Purchaser is not relying on the Company for any tax advice.

4. **Restricted Legend; Selling Restrictions.**

(a) **Restricted Legend.** Any stock certificate or, in the case of uncertificated securities, notice of issuance, for the Shares, shall bear the following legend (as well as any legends required by applicable state and federal corporate and securities laws):

**"THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."**

(b) **Selling Restrictions.** Commencing upon the date the Company begins publicly trading, and ending twelve (12) months after (the "Trading Restriction End Date"), the undersigned Purchaser will be restricted to selling, pledging or otherwise disposing of no more than five percent (5%) of the Shares per calendar month, either directly or indirectly until the Trading Restriction End Date. Following the Trading Restriction End Date, no further contractual trading or lock-up restrictions will remain, subject to state and federal securities laws.

5. **No Employment Rights.** Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a parent, subsidiary or affiliate of the Company, to terminate Purchaser's employment or consulting relationship (if any), for any reason, with or without cause.

6. **Certain Defined Terms**.

(a) "**Affiliate**" means an entity other than a Subsidiary which, together with the Company, is under common control of a third person or entity.

(b) "**Consultant**" means any person, including an advisor but not an Employee, who is engaged by the Company, or any Parent, Subsidiary or Affiliate, to render services (other than capital-raising services) and is compensated for such services, and any Director whether compensated for such services or not.

(c) "**Director**" means a member of the Board of Directors of the Company.

(d) "**Employee**" means any person employed by the Company, or any Parent, Subsidiary or Affiliate, with the status of employment determined pursuant to such factors as are deemed appropriate by the Board of Directors of the Company in its sole discretion, subject to any requirements of applicable laws, including the Code. The payment by the Company of a director's fee shall not be sufficient to constitute "employment" of such director by the Company or any Parent, Subsidiary or Affiliate.

(e) "**Parent**" means any corporation (other than the Company) in an unbroken chain of corporations ending with the Company if each of the corporations other than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

(f) "**Subsidiary**" means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

7. **Miscellaneous**.

(a) **Governing Law**. The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of California, without giving effect to principles of conflicts of law. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to the exclusive jurisdiction of the state of California and agree that any such litigation shall be conducted only in the courts of California or the federal courts of the United States located in California and no other courts.

(b) **Entire Agreement**. This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.

(c) **Amendments and Waivers**. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. No delay or failure to require performance of

any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance.

(d) **Successors and Assigns**. Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement. No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

(e) **Notices**. Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(f) **Severability**. If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(g) **Construction**. This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(h) **Counterparts**. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement.

(i) **Electronic Delivery**. The Company may, in its sole discretion, decide to deliver any documents related to this Agreement or any notices required by applicable law or the Company's Certificate of Incorporation or Bylaws by email or any other electronic means. Purchaser hereby consents to receive such documents and notices by such electronic delivery and agrees to participate through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

(j) **California Corporate Securities Law**. THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF THE SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO THE QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

The parties have executed this Common Stock Purchase Agreement as of the date first set forth above.

**THE COMPANY:**

CULTIVATION TECHNOLOGIES, INC.

By:____________________________
(Signature)

Name:__________________________
Title:___________________________

Address:

________________
________________

**PURCHASER:**

______________________________
(PRINT NAME)

By:____________________________
(Signature)

Name:__________________________
Title:___________________________

Address:

________________
________________

Email:

________________

EXHIBIT 2

Richard Probst <rick@cultivationtech.com>

## Roger Root - Jolly Roger Bus Opportunity

**Tony Scudder** <tony@cultivationtech.com> Fri, Aug 21, 2015 at 10:58 AM
To: Richard O'Connor <richard@cultivationtech.com>, Justin Beck <justin@cultivationtech.com>, Richard Probst <rick@cultivationtech.com>, Amy Cooper <amy@cultivationtech.com>
Cc: Christopher Tinen <ctinen@horwitzarmstrong.com>, Rana Foroughi <rana@cultivationtech.com>

Roger is excited about what we are doing. Is trying to figure out a way to come up with funds for his shares.

He has a son who has a dispensary in Aberdeen Washington.
His sons Name is Brent Rothwell
360.591.9732 Cell
360.627.9421 Dispensary

Roger said we could use his name to see if we could connect with his son for a Washington presence.

We need to have someone from our team call to explore.

Best Regards,

Tony Scudder
Executive Vice President of Client Relations
Cultivations Technologies Inc.
3 Park Plaza
Irvine, CA 92614
Cell 714.728.3123
Office (888) 851-9802
tony@cultivationtech.com
https://www.linkedin.com/in/tonyscudder1

**E-MAIL CONFIDENTIALITY NOTICE:** This message and any attachments are intended only for the use of the addressee and may contain information that is privileged and confidential. If the reader of the message is not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to this e-mail message or by telephone at 888-851-9802 and delete the message and any attachments from your system. Thank you.

EXHIBIT 3

# (158) Separate Securities Transactions Effected by Richard O'Connor

Stock Documents Executed and or Authorized by Richard O'Connor as Officer/Director of CTI

- **June 2015** (8) founder share subscription agreements for 22M shares
- **June 2015/July 2015** Board resolutions authorizing 22M share issuance
- **July 2015** Retention of transfer agent, Quicksilver Stock Transfer
- **July 2015/August 2015** (53) subscription agreements for 4,587,500 shares
- **2015/2016** (28) subscription agreements for 932,119 shares
- **2015/2016** Associated Reg. D and state blue sky exemptions

Stock Documents Executed by Richard O'Connor Individually or as TGAP Holdings LLC Member

- **June 2015 to Present** (69) private sales or transfers of CTI shares
- Multiple settlement and release agreements

**SUBSCRIPTION AGREEMENTS AUTHORIZED BY BOD INCLUDING O'CONNOR**

**PRIVATE SALE OR TRANSFER OF SHARES BY O'CONNOR OR ENTITY HE CONTROLS**

***Approximately 69 private transactions conducted by O'Connor or TGAP since 2015.***

| | |
|---|---|
| Richard O'Connor (Founder Shares @ Par) | 2,200,000 |
| - Unknown RFO Breakout | 300,000 |
| Richard Probst (Founder Shares @ Par) | 5,000,000 |
| Amy Cooper (Founder Shares @ Par) | 2,500,000 |
| TGAP Holdings LLC (Founder Shares @ Par) | 520,900 |
| - Amy Cooper (breakout) | 2,400,000 |
| - Charles G. Oxford Family Trust (breakout) | 100,000 |
| - Marc Ranpour (breakout) | 10,000 |
| - Norva Jalayne Johnson (Breakout) | 50,000 |
| - Jared & Gloria Tietjen (Breakout) | 5,000 |
| - Duffy Revocable Living Trust (Breakout) | 100,000 |
| - Michael R. Duffy (Breakout) | 25,000 |
| - Katherin M. Duffy (Breakout) | 25,000 |
| - Rylan Reynolds (Breakout) | 10,000 |
| - Lisa Elbert Pulver (Breakout) | 20,000 |
| - Chris Cummings (Breakout) | 140,000 |
| - Jeff Ray Schunk IRA (Breakout) | 220,000 |
| - Rodney M. Mebane (Breakout) | 250,000 |
| - Grisha R. Ovanesian (Breakout) | 4,000 |
| - Gevark Gharbi (Breakout) | 20,000 |
| - Meghedi Hagnazarian (Breakout) | 2,000 |
| - GRISHA R. OVANESIAN (Breakout) | 20,000 |
| - GRISHA R. OVANESIAN (Breakout) | 6,000 |
| - ALEN MIRZIAN (Breakout) | 10,000 |
| - ALEN MIRZIAN (Breakout) | 10,000 |
| - RICHARD MESA (Breakout) | 15,000 |
| - CHASE HOIBERG (Breakout) | 20,000 |
| - MOHAMMED ZAKHIREH (Breakout) | 35,000 |
| - ENTRUST GROUP INC FBO MAGNUS (Breakout) | 160,000 |
| - CAROLE A RENFROW (Breakout) | 100,000 |
| - CHRIS CUMMINGS (Breakout) | 100,000 |
| - NEIL CLARK (Breakout) | 50,000 |
| - LUIS ELIAS (Breakout) | 50,000 |
| - CARLOS CALIXTO (Breakout) | 50,000 |
| - ODAY AL HALASA (Breakout) | 10,000 |
| - ODAY AL HALASA (Breakout) | 4,000 |
| - KIMBERLY KNAPP LEITER (Breakout) | 2,000 |
| - NEIL CLARK (Breakout) | 50,000 |
| - HERB ALCORN (Breakout) | 10,000 |
| - WALLACE HUFF (Breakout) | 100,000 |

| | |
|---|---|
| - ANOUSHEH ASHOURI MD (Breakout) | 20,000 |
| - ELG FAMILY TRUST (Breakout) | 70,000 |
| - FARIDA ZOHOURI (Breakout) | 106,000 |
| - DIANA JULIA GEVEN (Breakout) | 10,000 |
| - GRISHA R. OVANESIAN (Breakout) | 5,000 |
| - ALAN MIRZIAN (Breakout) | 10,000 |
| - KIMBERLY KNAPP LEITTER (Breakout) | 2,000 |
| - JOHNNY YBARRA (Breakout) | 100,000 |
| - THE J F GILBERT LIVING TRUST (Breakout) | 25,000 |
| - GARY GUSEWITCH (Breakout) | 20,000 |
| - ANOUSHEH ASHOURI MD (Breakout) | 20,000 |
| - KAREN ROCHE (Breakout) | 20,000 |
| - Edward Lindsay (Breakout) | 12,500 |
| - Wendy Pontious (Breakout) | 5,000 |
| - Jose Rodriquez Jr. (Breakout) | 20,000 |
| - Johnny Ybarra (Breakout) | 2,000 |
| - Johnny Ybarra (Breakout) | 100,000 |
| - Johnny Ybarra (Breakout) | 50,000 |
| - Sandra Scudder (Breakout) | 20,000 |
| - ANOUSHEH ASHOURI MD (Breakout) | 3,000 |
| - Jose Rodriquez Jr (Breakout) | 4,000 |
| - Shawdi Rahbar (Breakout) | 5,000 |
| - Shawyan Rahbar (Breakout) | 5,000 |
| - Soharb Rahbar (Breakout) | 10,000 |
| - Mina Katani (Breakout) | 10,000 |
| - Richard Lopez (Breakout) | 40,000 |
| - Fred Elg (Breakout) | 20,000 |
| - Jeremiah Cartwe (Breakout) | 3,000 |
| - Annabelle Pontious (Breakout) | 2,000 |
| - Shauna Gudnich (Breakout) | 6,000 |
| - Jeff Ray Schunk (Breakout) | 60,000 |
| - Duffy Revocable Living Trust (Breakout) | 10,000 |
| - Jeremiah Carter (Breakout) | 600 |
| I'm Rad LLC (Founder Shares @ Par) | 3,000,000 |
| Justin Beck (Founder Shares @ Par) | 1,935,000 |
| F&F Straggler (Founder Shares @ Par) | 65,000 |
| Cliff Higgerson (Founder Shares @ Par) | 1,000,000 |
| Scott Unfug (Founder Shares @ Par) | 500,000 |
| **Total Founders** | **22,000,000** |

**SUBSCRIPTION AGREEMENTS AUTHORIZED BY BOD INCLUDING O'CONNOR**

***Exemption Under 506(b) and State Blue Sky Laws***

***Approximately 28 Subscription Agreements with Registration Exemption***

| PPM 506(b) Offering | Shares |
|---|---|
| Duffy Revoc. Living Trust | 50,000 |
| Duffy Revoc. Living Trust | 25,000 |
| Kirk Duffy | 25,000 |
| Richard Duffy | 25,000 |
| Everett J. and Linda K. Lindholm | 25,000 |
| Everett J. and Linda K. Lindholm | 25,000 |
| Grisha Ovanesian | 5,000 |
| Oday Al-Halasa | 10,000 |
| Katherine M. Duffy | 25,000 |
| Michael R. Duffy | 25,000 |
| Mountain West IRA, Inc. (Jordan Berry) | 50,000 |
| Mike Blair | 25,000 |
| Gilbert Keshish | 10,000 |
| Kirk Duffy | 25,000 |
| Richard Duffy | 25,000 |
| Michael R. Duffy | 37,500 |
| Katherine M.Duffy | 37,500 |
| Duffy Revoc. Living Trust (EXE James Duffy) | 150,000 |
| Jordan Berry | 50,000 |
| James Stokos | 5,000 |
| Duffy Revocable Living Trust | 25,000 |
| Dorothy Ann Piazza | 50,000 |
| Dr. Mo Zakhireh | 20,000 |
| Dr. Klaus Yi | 20,000 |
| Bronwen J. Waggoner | 11,249 |
| Magnus Lakovics SEP IRA | 111,768 |
| F. Mitchell | 11,271 |
| Michael Blair | 27,831 |
| TOTAL PPM 506(b) -- Closed 3/2/16 | 932,119 |

**SUBSCRIPTION AGREEMENTS SIGNED BY O'CONNOR & AUTHORIZED BY BOD**

***Primarily MFS Shareholders @ $.01 Per Share***

***Approximately 53 Subscription Agreements with Board Resolutions***

| Name | Shares |
|---|---|
| Frank and Brenda Pestano | 5,000 |
| Coleen Quinn | 10,000 |
| Natalia Panzarini | 10,000 |
| Grisha R. Ovanesian | 20,000 |
| Luis Elias | 100,000 |
| Mayra Elias | 30,000 |
| Luis Maxemin | 5,000 |
| Oday Al Halasa | 15,000 |
| Mario and Emilio Gutierrez | 5,000 |
| Monty and Suzanne Goodman | 20,000 |
| Steven L. Creps | 10,000 |
| Michael Gora | 5,000 |
| Wadid & Nelly Fattouch | 5,000 |
| Carlos Calixto | 30,000 |
| Carlos A. Calixto | 5,000 |
| Dennis and Tina Norheim | 10,000 |
| Chris Cummings | 5,000 |
| Kaswit, Inc. | 15,000 |
| Richard Mesa | 30,000 |
| The Kloenne Family Trust dated 5/30/07 | 50,000 |
| John Broders | 50,000 |
| Joseph Miano | 50,000 |
| James Probst | 50,000 |
| Richard Caruso | 50,000 |
| The Janell Christiansen Beck Trust Estate | 70,000 |
| Gordon & Betty Overbey Trust | 75,000 |
| Robert J. Brongo | 12,500 |
| Kenneth Miller IRA | 40,000 |
| Ronald Beck | 10,000 |
| Kyle J. Gerber | 20,000 |
| Samuel J. Gerber | 20,000 |
| Dr. Tom Mebane | 660,000 |
| Tom S Mebane IRA | 400,000 |
| Nell M. Clark | 150,000 |
| Nell Clark IRA | 100,000 |
| Christopher Rod | 20,000 |
| Douglas A & Janet R. Hunt | 25,000 |
| The J.F. Gilbert Living Trust | 50,000 |
| Jeff Ray Schunk | 800,000 |
| Charles G. Oxford Family Trust | 70,000 |

| Brian L. and Sally J Broderius | 25,000 |
|---|---|
| Harvey W. Stern IRA | 50,000 |
| Elg Family Trust | 25,000 |
| Curtis Sparks IRA | 50,000 |
| Gary A. Gusewitch and Rebecca A.Gusewitch JTROS | 50,000 |
| Herbert R Alcorn | 100,000 |
| Daniel G Phelps | 25,000 |
| Jeff Ray Schunk IRA | 400,000 |
| Joseph Hughes | 25,000 |
| Douglas Scott | 670,000 |
| Thomas A. Nilsen | 50,000 |
| Joseph and Susan Funkey | 5,000 |
| Mike and Annette Bonetti | 5,000 |
| **TOTAL Shares Issued in 2015** | **4,587,500** |

EXHIBIT 4

**O'HAGAN MEYER, LLC**
SAMUEL Y. EDGERTON, III (CA Bar No. 127156)
sedgerton@ohaganmeyer.com
JOHNNY L. ANTWILER (CA Bar No. 288772)
jantwiler@ohaganmeyer.com
4695 MacArthur Court, Suite 210
Newport Beach, California 92660
Tel: (949) 942-8500 | Fax: (949) 942-8510

Attorneys for Defendants Cultivation Technologies, Inc., Justin Beck, Robert Kamm, Robert Bernheimer, Irving Einhorn, and Miguel Motta

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF ORANGE**

MOBILE FARMING SYSTEMS, INC., et al.

Plaintiffs,

v.

RICHARD JOSEPH PROBST, et al.

Defendants,

-and-

CULTIVATION TECHNOLOGIES, INC.,

Nominal Defendant.

Case No.: 30-2019-01046904-CU-BT-CJC

**DECLARATION OF ALAN SHINDERMAN**

Assigned for All Purposes to
Honorable James L. Crandall
Dept. C33

Complaint Filed: January 29, 2019
Trial Date: None Set

ocument received by the CA 4th District Court of Appeal Division 3.

I, Alan Shinderman, declare:

1. I am over the age of 18, and I currently reside in Las Vegas, Nevada. The following facts are personally known to me and if called upon as a witness, I can and will competently testify thereto.

2. I have been the president and sole owner of Quicksilver Stock Transfer, LLC, a Nevada limited liability company, ("Quicksilver") since 2008.

3. Quicksilver is headquartered in Las Vegas, Nevada.

4. Quicksilver has been registered as a transfer agent with the United States Securities and Exchange Commission since August 8, 2007.

5. Since July 2015, Quicksilver has acted as the transfer agent for Cultivation Technologies, Inc. ("CTI"). On or around July 22, 2015, CTI retained Quicksilver pursuant to a Client Securities Agreement ("Agreement"). Attached as **"Exhibit 1"** is a true and correct copy of the executed Client Securities Agreement I received from CTI and executed on or around July 22, 2015.

6. On or around July 22, 2015, the Agreement was executed and delivered to Quicksilver by Richard O'Connor ("O'Connor") in his represented capacity as the Chief Executive Officer of CTI.

7. As CTI represented that it had not previously engaged a transfer agent, O'Connor agreed to deliver to Quicksilver, among other things, a complete list of issued and outstanding securities of CTI and the capitalization of CTI pursuant to the Agreement. *See* **Ex. 1**, p. 1.

8. Neither O'Connor nor CTI represented that Mobile Farming Systems, Inc. was a shareholder of CTI. O'Connor never produced or delivered any list of issued and outstanding securities of CTI, and it was represented that CTI had no outstanding shares prior to the initial issuance processed by Quicksilver.

9. On July 30, 2015, Quicksilver processed the initial issuance of CTI common stock. This initial issuance was referenced as Batch 10645.

10. The initial issuance of CTI common stock, Batch 10645, consisted of 22 million certificated shares of common stock to eight different shareholders effective as of June 15, 2015, which includes the first ever stock certificate of CTI being issued to Richard O'Connor for 2,500,000 shares, represented by certificate number 1000. The initial issuance was pursuant to the <u>Amended</u>

Document received by the CA 4th District Court of Appeal Division 3.

Organizational Acts & Resolutions by the Unanimous Written Consent of Directors of Cultivation Technologies, Inc., a California Corporation.

11. Batch 10645 serves as the initial shareholder register of CTI based solely on information provided by CTI and O'Connor.

12. I have reviewed the register of CTI shareholders from the engagement of Quicksilver in July 2015 through the date of this declaration, and at no time was Mobile Farming Systems, Inc. designated a shareholder of CTI.

I declare under penalty of perjury of the laws of the State of Nevada that the foregoing is true and correct.

Executed this 11th day of April 2019 at Las Vegas, Nevada.

Alan Shinderman

ocument received by the CA 4th District Court of Appeal Division 3.



# CLIENT SECURITIES AGREEMENT

This Transfer Agent Agreement ("Agreement") is made and entered into as of the date set forth herein below by and between Cultivation Technologies, Inc. the Appointing Company, herein also referred to as ("Issuer"). **CUSIP Number:** ____________________, **TAX ID#** 47-3677191 and Quicksilver Stock Transfer, a Nevada Corporation. Herein also referred to as ("QST") for the considerations named agree to the following:

WHEREAS, QST, is a transfer agent in the business of maintaining Stock ownership and transfer records for companies.

WHEREAS, Issuer wishes to utilize the service of QST as its transfer agent under the term of this agreement as follows.

NOW, THEREFORE, in consideration of the mutual promises herein contained, the parties hereto hereby agree as follows.

**Documents to be filled with appointment if "Issuer" has not had a prior Transfer Agent:**

Documents to be delivered -

The Issuer must provide to QST the following documents, certified as required:

a.) Filed Stamped copy of Articles of Incorporation including all amendments
b.) True and correct copy of by-laws as presently in force
c.) Resolution of Board of Directors appointing Quicksilver Stock Transfer
d.) Current copy of filed list of Officers, including signatures of officers to be used for the purpose of certificate printing
e.) Complete list of issued and outstanding securities of the Issuer, Including but not limited to:
   a. Date of issue, certificate number and share denomination for each outstanding certificate
   b. Registered owner name, address and taxpayer identification number
   c. Document certifying that the list is true and correct
   d. List of shares subject to restrictions conspicuously noticed
   e. If provided via electronic media, physical copy is also required
f.) Capitalization history of the company
g.) Certificate of Secretary
h.) Stop transfer orders against any certificate due to:
   1. Loss of certificate
   2. "Investment Stock"
   3. "Control Stock"
   4. Litigation
i) Copy of the Federal/State Form D

ocument received by the CA 4th District Court of Appeal Division 3.



**Documents to be filed with appointment if "Issuer" has a Transfer Agent:**

Documents to be delivered

The Issuer must provide to QST the following documents, certified as required:

a.) Resolution of Board of Directors appointing Quicksilver Stock Transfer

**Recapitalization or Readjustment**

In the event of any recapitalization or readjustment, involving increase or decrease in the number of the shares/ amount which QST as Transfer Agent or registrar is authorized to issue, transfer or register, including shares issued as Stock dividend or any change in the classes of Stock, there shall be filed the following:

A. A filed Stamped copy of the relative amendment, if necessary, to the Articles of Incorporation
B. A copy of the authorizing resolution of the Board of Directors and shareholders (if required) of the Issuer, certified as provided in paragraph 7.
C. An opinion of counsel as to the validity of such recapitalization or readjustment and as to the compliance with federal and state securities laws of any issue of Stock pursuant to such recapitalization or readjustment.

**Change of Officers of an Issuer**

In the event that the Officers of an Issuer change due to death, termination or resignation, The Issuer shall promptly furnish to QST a resolution showing the appointment of the new officers, as well as any resignation letters from the prior Officers.

**Future Amendment of Charter and By-Laws**

The Issuer shall file promptly with QST a filed stamped copy of all amendments to it Articles of Incorporation or By-Laws affected after the date of this agreement within 30 days of the Amendment.

**Instructions from the Appointing Company and Opinion of Counsel**

QST at any time may apply to any Officer of the Issuer for instructions, and may seek advice from the counsel of record of the Issuer or its own legal counsel, at the expense of the Issuer, with respect to any matter relating to the agency. QST shall not be held liable for its actions, and shall be indemnified and held harmless by the Issuer if said actions were performed in good faith in accordance with the instructions from opinion of either counsel. In the event of litigation, QST has the right to obtain their own counsel to review the case and Documentation. QST reserves the right to independent counsel and the Issuer is responsible for any and all fees incurred for consultation and/or representation of independent counsel.

**Signatures**

QST shall be protected and held harmless by the company in action upon or recognizing any paper or document believed by it to be genuine and believed by it to have been signed by the person or persons by

ocument received by the CA 4th District Court of Appeal Division 3.



whom it purports to be signed. It shall also be protected and held harmless by the Issuer in acting upon or recognizing such certificates, which it reasonably believes to bear the genuine or facsimile seal thereof and the genuine counter signature of the Transfer Agent or Registrar of any Co-Transfer Agent or CoRegistrar.

**Successor Transfer Agent**

QST may rely on the accuracy of any existing records provided to it by or from any prior transfer agent for the Issuer. Issuer will hold harmless and save QST from any and all liability, cost or expense it may incur for acting in reliance of those or any other records provided to QST.

**Records**

QST may retain all records which it deems proper or necessary in connection with its agency during and upon termination of the agency.

**Resignation**

QST may resign at any time by giving the written notice of such resignation to the Issuer as its last known address of record on file with QST, and thereupon its duties as Transfer Agent and Registrar shall cease.

**Compensation**

QST shall be entitled to reasonable compensation for all services rendered or expenses incurred in connection with this agency. **QST does not offer any credit terms: all transactions are due and payable upon receipt.** QST reserves the right to discontinue processing transactions requested by the company on their behalf should their account status become past due, until satisfactory payment arrangements can be made. QST may, at any time, amend its fees for services with written notice to the Issuer's last known address of record with QST. The current fee schedule in effect is incorporated into this Agreement as Attachment A.

**Non-Responsibility**

Anything herein to the contrary notwithstanding, QST shall in no event be held liable for any damage resulting from any action taken, omitted or suffered by it in connection with any of the foregoing agencies, unless resulting from its gross negligence or willful misconduct. In no event shall QST be liable for any consequential or incidental damages of the Issuer.

**Indemnity**

Issuer assumes the full responsibility and agrees to indemnify and save harmless QST from and against all liabilities, losses, damages, costs, charges, counsel fees and other expenses of every kind, nature and character, which QST may incur as a result of action as Issuer's Transfer Agent, or as a result of any actions of any predecessor transfer agent.

The responsibility of the Issuer to indemnify, hold harmless and contribute as herein provided is limited to acts, which were conducted by QST in good faith.

ocument received by the CA 4th District Court of Appeal Division 3.



QST may request Issuer to post collateral which is sufficient in the opinion of QST or its counsel to secure this indemnity agreement. QST shall not be under any obligation to prosecute or to defend any action or suit in relation to the Transfer Agent relationship between QST and the Issuer which, in the opinion of QST or its counsel may involve an expense or liability on behalf or against QST, unless the Issuer shall, when such occasion arises, furnish QST with satisfactory security for expense or liability.

Additionally, the Issuer grants QST the following rights and remedies:

1.) Right of contribution to QST by Issuer for amounts paid to third parties, based on an act or acts of QST as the transfer agent for the Issuer.
2.) QST may request opinion of counsel when relative to any matter that may arise in the performance of QST duties as Issuers transfer agent, which opinion shall be at the expense of the Issuer.
3.) A security interest in any books, records or memoranda that are required by QST in defense of any claims, which may arise in the performance of QST's duties as transfer agent.

**Certificates**

The Issuer shall furnish QST with a sufficient supply of unissued certificates if requested and from time to time shall renew such supply upon request of QST. Unissued certificates shall be signed by the Officers authorized to sign certificates and shall bear the corporate seal, or shall bear, to the extent permitted by law, the facsimile signature of each officer and or corporate seal.

**Original Issue of Shares of Stock**

QST will make original issue of shares of Stock upon the written instruction of any Officer of the Issuer whose name and specimen signature appears of the Certificate of Authority filed with QST. QST shall be furnished with a certificate of the Treasurer or other proper Officer of the Issuer stating that it has received full consideration for the shares which are to be issued and a certified copy of the resolutions authorizing the original issuance of the shares if Stock and authorizing such action by QST. All new issuances will bear restrictive legends in the absence of an opinion of counsel demonstrating compliance with applicable securities laws for the issuance of non-legended shares

**Transfer of Stock**

Transfer of shares will be registered and

a.) new certificates issued upon surrender of old certificates properly endorsed for transfer or
b.) uncertificated shares issued upon submission of an Internal Transfer Instruction; with all necessary endorsers' signature guaranteed in such manner and such form as QST may require, by a guarantor reasonably believed to be responsible by QST; accompanied by such assurances as QST shall deem necessary or appropriate to evidence that genuineness and effectiveness of each necessary endorsement; and accompanied by satisfactory transfers. QST may rely upon the Uniform Commercial Code or any other statutes, which complete documentation, in registering transfer without inquiry, or in refusing registration where in its judgment an adverse claim requires such refusal. QST reserves the right at all times to require a medallion signature guarantee.

ocument received by the CA 4th District Court of Appeal Division 3.



**Withholding**

The Issuer shall notify QST of any and all amounts to be withheld from holders subject to withholding by the Internal Revenue Service or other regulatory agencies. The Issuer indemnifies and holds QST harmless against any expenses, losses, claims, damages or liabilities to which QST may become liable by virtue of the Issuer's failure to notify QST of any such withholdings.

**Shareholders lists/reports**

QST will furnish a shareholders list or any other reports to the Issuer at any time upon receiving a written request, duly signed by a duly authorized Officer of the Issuer.

**Notice, Proxy Issuance and Tabulation**

QST upon receiving written instructions signed by a duly authorized officer of the Issuer, and upon being provided with the sufficient number of proxies prior to the announced record date, will address and mail said proxies to all shareholders as of the given record date. QST shall also, if requested, examine and tabulate said proxies, and report that result of said tabulation to the Issuer provided QST is provided with the necessary signed instructions which will include directions as to the acceptance and rejection of proxies.

**Reliance upon Representation**

The Issuer assigns QST and, and in connection with the performance of its duties, QST may rely on any and all representation, warranties or guarantees, statutory or otherwise, made to the Issuer by or on behalf of presenters or endorsers of certificates or instructions or otherwise in connection with the transfer or registration process or the issuance of the Issuer's securities.

**Sole Agent**

QST shall act solely as agent for the Issuer under this Agreement and owes no duties hereunder to any other person or entity. QST undertakes to perform its duties and only the duties that are specifically set forth herein, and no implied covenants or obligations shall be read into this Agreement against it. Issuer will not contract with any other Transfer Agent to perform, or the Issuer itself performs any issuance, rescission or corporate action on behalf of the Issuer.

**Complete Agreement**

This Agreement constitutes the complete, exclusive, and final expression of the agreement between the parties with respect to the subject matter herein, and replaces and supersedes all prior written and oral agreements, discussions, understanding and statements by and between parties hereto. This agreement, or any provision thereof, may only be amended or waived in writing and signed by an authorized person representing both parties.

ocument received by the CA 4th District Court of Appeal Division 3.



**Termination**

This agreement may be terminated by either party upon giving written notice to the other party at its last known address of record, but no termination shall effect the obligation of the Issuer to pay for services rendered prior to the effective date of such termination. QST will surrender to the Issuer or its designee, all records and documents of the Issuer upon receipt of a corporate resolution termination QST dated no earlier than the Close of Business of the date the resolution is received by QST, instructions to facilitate the transfer of books and records and any payment of all fees owed to QST. If less than 10 (ten) days' notice is given, all pending transfer requests will be completed by QST; If more the 10 (ten) days' notice is given, the company may request that any pending transfers be rejected back to the persons who submitted them with instructions to resubmit the transfer to the succeeding Transfer agent. The Issuer herein grants to QST a lien on any and security interest in the books and records of the Issuer which are in possession of QST. In the event of a termination of the Agreement, QST shall be entitle to retain all books and records of the Issuer in its possession until all monies due, including any termination fee, is paid in full.

**Jurisdiction**

QST services shall be performed in the State of Nevada; this agreement shall be construed and enforced in accordance with the laws of the State of Nevada and in the executive jurisdiction of the State and Federal courts of Nevada for the resolution of disputes. This agreement shall be binding upon and inure to the benefits of the parties, their transferees, successors, and assignees. In the event any legal action is brought to collect any sums due hereunder, or to enforce any of the provisions of this agreement, the prevailing party shall be entitled to collect such reasonable attorney fees and costs as may be awarded by the court upon any trial or appeal.

IN WITNESS WHEREOF, the parties have executed this agreement on the 22 day of July 20 15.

| BY: Quicksilver Stock Transfer | BY: Cultivation Technologies, Inc. Appointing Company |
|---|---|
| [signature] | [signature] |
| Signature | Signature |
| AL SHILOEN MHV | Richard O'Connor |
| Print Name | Print Name |
| PRESIDENT | CEO |
| Title | Title |
| 7/22/15 | July 22, 2015 |
| Date | Date |

ocument received by the CA 4th District Court of Appeal Division 3.



QUICK SILVER
STOCK TRANSFER

## SIGNATURE PAGE

**(Please sign in the center of the box)**

| CEO ~~President~~ **Signature** |
| --- |
| |

| **Secretary Signature** |
| --- |
| Amy |

1980 Festival Plaza Dr., Suite 530 Las Vegas, NV 89135

Page 7 of 12

Motion to DQ Catanzarite 3:22-CV-01616-AGS-DDL
Exhibit #4: 011

ocument received by the CA 4th District Court of Appeal Division 3.



Please complete all information in case we need to notify your company of any situation or occurrence:

ISSUER NAME: Cultivation Technologies, Inc.

MAILING ADDRESS: 3 Park Plaza Suite #490, Irvine, CA 92614

CONTACT NAME: Rick Probst

OFFICE NUMBER: 888-851-9802 ext. 101

ALTERNATE NUMBER: 626-367-6628

FAX NUMBER: 877-678-8009

EMAIL ADDRESS: rick@cultivationtech.com

**Alternate contact:**

CONTACT NAME: Rana Foroughi

OFFICE NUMBER: 888-851-9802 ext. 105

ALTERNATE NUMBER: ______

EMAIL ADDRESS: rana@cultivationtech.com

**Email Address to send Invoices:** ______

**Corporate Counsel:**

Company Name: Horwitz & Armstrong, LLP

Contact Name: Christopher L. Tinen

Company Address: 26475 Rancho Parkway South, Lake Forest, CA 92630

Number: 949-540-6540

Email Address: ctinen@horwitzarmstrong.com

ocument received by the CA 4th District Court of Appeal Division 3.



## AUTHORIZATION FOR CERTIFICATE REPLACEMENT

Company Name: Cultivation Technologies, Inc.

Company Address: 3 Park Plaza Suite #490

Irvine, CA 92614

RESOLVED, that QST, as Transfer Agent and Registrar is hereby authorized to issue and register such new certificates for the Stock offering of this Company as many from to time to time be requested. To replace lost, stolen or destroyed certificates, each such replacement to be made (a) upon being furnished with an affidavit as to the loss, theft or destruction of such certificates and (b) upon being properly indemnified against any and all loss that the Company, its Transfer Agents and Registrars may incur by reason of the replacement. Such indemnification shall consist of an open penalty lost instruments bond.

IT IS FURTHER RESOLVED, that since QST is covered by an Insurance Surety Company Indemnity Bond, with said coverage including indemnification for any Registrar, co-registrar, or co-transfer agent, this Company will approve this bond for use in replacing any of our lost, stolen or destroyed securities as being consistent with our corporate requirements and the Transfer Agent is authorized to issue said securities with no further Corporate approval required.

I, Amy Cooper Secretary of Cultivation Technologies, Inc., do hereby certify the foregoing to be a full, true and correct copy of a resolution duly adopted at a regular meeting of the Board of Directors of said Company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of said Company on this 22 day of July, 20 15.

By: [signature]

Title: President / Secretary

1980 Festival Plaza Dr., Suite 530 Las Vegas, NV 89135

ocument received by the CA 4th District Court of Appeal Division 3.



# CERTIFICATE OF SECRETARY

I, Amy Cooper, Secretary of Cultivation Technologies, Inc., a corporation duly organized and existing under the laws of the State of CA.

DO HEREBY CERTIFY:

A. That the foregoing is a true copy of a certain Resolution duly adopted, in accordance with the by-laws, by the Board of Directors of the said Company, at, and recorded in the minutes of a meeting of the said Board duly held on __________, and of the whole of the said Resolution, and that the said Resolution has not been rescinded or modified. B. That accompanying this certificate are:

a. A copy of the Charter or Certificate of Incorporation of the said Company, with all amendments to date, duly certified under official seal by the state officer having custody of the original thereof.

b. A true and complete copy of the by-laws of the said Company, as at present in force:

c. A signature card bearing the names and specimen signatures of all the officers of said Company.

d. Specimens of certificates of each denomination and class of Stock of the Company in the form adopted by the said Company; and

e. An opinion by counsel for the Company covering validity of the outstanding total offering referred to in the above-mentioned Resolution and their registration or exemption from registration under the Securities Act of 1933 as amended.

C. That the total authorized Stock of said Company is: __________Shares, divided into:

| | | | | | |
|---|---|---|---|---|---|
| | Auth Shares | common | Stock Of | | Par Value Each |
| | Auth Shares | | Stock Of | | Par Value Each |

That of the said authorized Stock, there are now issued:

| | | | |
|---|---|---|---|
| | Shares of the Said | | Stock |

That such issue has been duly authorized and that all of the said shares are fully paid.

D. That the following are true and correct with respect to the said Company:

| Title | Name | Address |
|---|---|---|
| President | Amy Cooper | 3 Park Plaza Suite #490, Irvine, CA 92614 |
| V. President | | |
| Secretary | Amy Cooper | 3 Park Plaza Suite #490, Irvine, CA 92614 |
| Officer | Richard O'Connor | 3 Park Plaza Suite #490, Irvine, CA 92614 |

Company Address: 3 Park Plaza Suite #490, Irvine, CA 92614

CUSIP Number: __________ Company Phone: 888-851-9802

State of Incorporation: California

(Corporate Seal) July 22, 2015 [signature]

Date Secretary

1980 Festival Plaza Dr., Suite 530 Las Vegas, NV 89135

Motion to DQ Catanzarite 3:22-CV-01616-AGS-DDL
Exhibit #4: 014

ocument received by the CA 4th District Court of Appeal Division 3.



# CERTIFICATE OF AUTHORITY OF OFFICERS

To: Quicksilver Stock Transfer, LLC

The undersigned, Secretary of the above Company, hereby certifies that by resolution duly adopted by the Board of Directors of said Company, the officers named upon this certificate have been duly elected, are now acting and are qualified to sign written instructions, consents, Stock certificates of said Company, that the specimen signatures appearing opposite the names and titles are genuine signatures of such officers and that said resolutions electing these officers are now in full force and effect. You are further authorized to recognize these signatures until you receive our written instructions to the contrary.

| Name | Title | Signature |
|---|---|---|
| Richard O'Connor | CEO | [signature] |
| Amy Cooper | President / Secretary | [signature] |
| Rick Probst | CFO / COO | [signature] |
| | | |
| | | |

Corporation Name: Cultivation Technologies, Inc.

Address: 3 Park Plaza Suite #490

Irvine, CA 92614

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of said Company on this 22 day of July, 20 15.

By: [signature]

Title: ~~CEO~~ CFO

1980 Festival Plaza Dr., Suite 530 Las Vegas, NV 89135

ocument received by the CA 4th District Court of Appeal Division 3.



## CERTIFICATE OF AUTHORITY OF OFFICERS

To: Quicksilver Stock Transfer, LLC

The undersigned, Secretary of the above Company, hereby certifies that by resolution duly adopted by the Board of Directors of said Company, the officers named upon this certificate have been duly elected, are now acting and are qualified to sign written instructions, consents, Stock certificates of said Company, that the specimen signatures appearing opposite the names and titles are genuine signatures of such officers and that said resolutions electing these officers are now in full force and effect. You are further authorized to recognize these signatures until you receive our written instructions to the contrary.

| Name | Title | Signature |
|---|---|---|
| Richard O'Connor | CEO | [signature] |
| Amy Cooper | President / Secretary | [signature] |
| Rick Probst | CFO / COO | |
| | | |
| | | |

Corporation Name: Cultivation Technologies, Inc.

Address: 3 Park Plaza Suite #490

Irvine, CA 92614

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of said Company on this 22 day of July, 20 15.

By: [signature]

Title: CEO

1980 Festival Plaza Dr., Suite 530 Las Vegas, NV 89135

ocument received by the CA 4th District Court of Appeal Division 3.





QUICK SILVER
STOCK TRANSFER

**ADDENDUM 1**

**NOTARY IN LIEU OF SIGNATURE/MEDALLION GUARUNTEE AUTHORIZATION**

This addendum will become a part of the original contract between the Transfer Agent and ("Issuer")

Cultivation Technologies, Inc.

Whereas Cultivation Technologies, Inc. ("Issuer") authorizes the Transfer Agent to accept a Notarized signature on the back of the certificate or a separate Stock Power on lieu of the Signature/Medallion Guarantee from any shareholder who does not reside on the United States and is not able to obtain the Signature/Medallion Guarantee.

Authorized Signature

July 22, 2015
Date

CEO
Title

1980 Festival Plaza Dr., Suite 530 Las Vegas, NV 89135

Page 12 of 12

Motion to DQ Catanzarite 3:22-CV-01616-AGS-DDL
Exhibit #4: 017

ocument received by the CA 4th District Court of Appeal Division 3.

[illegible]

| Fee Description | Price | Fee Period |
|---|---|---|
| **Account Setup less than 500 shareholders** | $ 500.00 | One time fee |
| **Account Setup more than 500 shareholders** | $ 0.75 | Per shareholder, one time fee |
| **Initial Stock Certificate Design & Printing** | Quote | Please Call |
| **Private Company Maintenance Fee** | $ 75.00 | Per month |
| **Public Company Maintenance Fee** | $ 150.00 | Per month |
| **Storage Access/Special Requests** | $ 150.00 | Per hour (1 hr min) |
| **DTC Fast Set Up** | $ 400.00 | One time fee |
| **DTC FAST Account Management** (12mo commitment) | $ 350.00 | Per month |
| **Shareholder FAST/DWAC Transfer Fee** | $ 200.00 | Per Transaction |
| **Issuer Initiated FAST/DWAC Transfer/Broker Desposit** | $ 100.00 | Per Transaction |
| **Shareholder Book Entry** (no certificate) | $ 50.00 | Per Transaction |
| **Issuer Book Entry** (no certificate) | $ 35.00 | Per Transaction |
| **Issuer Initiated Warrants/Treasury Issuances** | $ 35.00 | Per Transaction |
| **Routine Transfer/New Certificate Fee** | $ 50.00 | Per Certificate |
| **Shipping Fee** | $45/$85 | Domestic/International |
| **Rejection Fee** | $ 75.00 | Per Transaction (plus shipping) |
| **Special Legend Fee** | $ 75.00 | Per Special Legend |
| **Lost Certificate Replacement** (w/ bond waiver) | $ 100.00 | Per Certificate (plus shipping & cert) |
| **Non-Routine Transfer:** Legend Removal, Warrants, Options, Rescissions, Legal Deposits | $ 100.00 | Per Certificate (plus shipping & cert) |
| **Cancellation Fee** | $ 35.00 | Per Transaction (plus shipping) |
| **Reports:** Holder List, Stock History, Auth Issue, Reg Control | $ 35.00 | Per Report |
| **Shareholder Mailing Labels** | $ 1.00 | Per Shareholder ($25 minimum) |
| **Proxy Service:** NOBO List, postage, mailing supplies, voting tabulation, reporting, labor costs | Quote | Please Call |
| **Stock Splits** | $ 3.50 | Per Shareholder |
| **Dividends/Interest Payments** (excluding postage) | $ 2.50 | Per Shareholder |
| **CUSIP Request for Corporate Actions** | $ 250.00 | Regular |
| **CUSIP Request for Corporate Actions** | $ 750.00 | EXPEDITED |
| **FINRA Attestation Form for Corporate Action** | $ 500.00 | Per Corporate action |
| **1099 Preparation** | $ 2.50 | Per Shareholder |
| **CPA Requested Audit Confirmation** | $ 75.00 | Per Request |
| **Eschreatment Services** | $ 2.50 | Per Account |
| **EDGAR Work** | $ 2,000.00 | Per year |
| **XBRL Shell Company** | $ 3,500.00 | 3 Q's and a 10K |
| **XBRL Operating Company** | $ 6,500.00 | 3 Q's and a 10K |
| **Termintation Fee** - outstanding balance must be paid in full in adltion to termination fee. Includes final processing, packing/shipping of all records & stock certificates. Frowarding of electronic shareholder file & notifying the securities dealers & depositories of change in transfer agent | $ 3,500.00 | Plus shipping fee |

Officer Signature

Cultivation Technologies, Inc.
Company Name (Issuer)

Richard O'Connor / CEO
Print Name & Title

22-Jul-15
Date

Motion to DQ Catanzarite 3:22-CV-01616-AGS-DDL
Exhibit #4: 018

ocument received by the CA 4th District Court of Appeal Division 3.

ocument received by the CA 4th District Court of Appeal Division 3.

# EXHIBIT B

Motion to DQ Catanzarite 3:22-CV-01616-AGS-DDL
Exhibit #4: 019

EXHIBIT 5



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
LOS ANGELES REGIONAL OFFICE
444 SOUTH FLOWER STREET, SUITE 900
LOS ANGELES, CALIFORNIA 90071

DIRECT DIAL: (323) 965-3975
FAX NUMBER: (213) 443-1905

January 23, 2018

Via email

Sam Y. Edgerton, III, Esq.
Freeman Mathis & Gary, LLP
2615 Pacific Coast Highway, Suite 300
Hermosa Beach, CA 90254
sedgerton@fmglaw.com

Re: In the Matter of Cultivation Technologies, Inc. (LA-4837)

Dear Mr. Edgerton:

We have concluded the investigation as to Cultivation Technologies, Inc. Based on the information we have as of this date, we do not intend to recommend an enforcement action by the Commission against Cultivation Technologies, Inc. We are providing this notice under the guidelines set out in the final paragraph of Securities Act Release No. 5310, which states in part that the notice "must in no way be construed as indicating that the party has been exonerated or that no action may ultimately result from the staff's investigation." (The full text of Release No. 5310 can be found at: http://www.sec.gov/divisions/enforce/wells-release.pdf.)

Very truly yours,

Marc J. Blau
Assistant Regional Director

EXHIBIT 6

ELECTRONICALLY FILED
Superior Court of California,
County of Orange
01/07/2019 at 01:13:00 PM
Clerk of the Superior Court
By Jeannette Dowling,Deputy Clerk

KENNETH D. WATNICK (Bar No. 150936)
kdw@amclaw.com
ANDERSON, McPHARLIN & CONNERS LLP
707 Wilshire Boulevard
Suite 4000
Los Angeles, California 90017-3623
TELEPHONE: (213) 688-0080 ♦ FACSIMILE: (213) 622-7594

Attorneys for Nominal Defendant MOBILE FARMING SYSTEMS, INC.

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF ORANGE, CENTRAL JUSTICE CENTER**

DENISE PINKERTON, an individual as attorney in fact for ROGER D. ROOT, individually and as successor in interest to the claims of his deceased Spouse Sharon K. Root, and derivatively on behalf of MOBILE FARMING SYSTEMS, INC., a California corporation,

Plaintiffs,

vs.

CULTIVATION TECHNOLOGIES, INC., a California corporation; RICHARD JOSEPH PROBST, an individual; RICHARD FRANCIS O'CONNOR II, an individual; AMY JEANETTE COOPER, an individual; JOSEPH R. PORCHE, an individual; JUSTIN S. BECK, an individual; TGAP HOLDINGS, LLC, a limited liability company; EM2 STRATEGIES, LLC, a limited liability company; I'M RAD, LLC, a limited liability company; CLIFF HIGGERSON, an individual; AROHA HOLDINGS INC., a California corporation; ANTHONY SCUDDER, a.k.a. TONY SCUDDER, an individual; SCOTT UNFUG, an individual; RANA FOROUGHI MOBIN, an individual; ROBERT KAMM, an individual; ROBERT A. BERNHEIMER, an individual; IRVING MARK EINHORN, an individual; MIGUEL MOTTA, an individual; and Does 1-150,

Defendants.

Nominal Defendant: MOBILE FARMING SYSTEMS, INC., a California corporation,

Case No. 30-2018-01018922-CU-FR-CJC

Hon. James Crandall, Dept. C33

Action Filed: September 14, 2018

**NOTICE OF MOTION AND MOTION FOR SECURITY; MEMORANDUM OF POINTS AND AUTHORITIES**

**[Declarations of Richard Probst and Kenneth D. Watnick Filed Concurrently Herewith]**

DATE: March 7, 2019
TIME: 1:30 p.m.
DEPT.: C33

Trial Date: None

Document received by the CA 4th District Court of Appeal Division 3.

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on March 7, 2019, at 1:30 p.m., or as soon thereafter as the matter may be heard in Department 33 of the above-entitled Court, located at 700 Civic Center Drive West, Santa Ana, California, Nominal Defendant MOBILE FARMING SYSTEMS, INC. ("MFS") will, and hereby does, move for an order requiring Plaintiff DENISE PINKERTON, an individual as attorney in fact for ROGER D. ROOT, individually and as successor in interest to the claims of his deceased Spouse Sharon K. Root, and derivatively on behalf of MOBILE FARMING SYSTEMS, INC., a California corporation ("Plaintiff") to furnish a bond to secure reimbursement of reasonable litigation expenses incurred by MFS in this shareholder derivative action.

This Motion is based on Corporations Code §800(c), *et. seq.* and specifically requests that Plaintiff be required to post a bond in the amount of no less than Fifty Thousand Dollars ($50,000.00) in accordance with Corporations Code §800 (d).

This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the Declarations of Kenneth D. Watnick and Richard Probst, all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court at the hearing prior to its ruling.

DATED: January 7, 2019

ANDERSON, McPHARLIN & CONNERS LLP

By: ______________________
Kenneth D. Watnick
Attorneys for Nominal Defendant MOBILE FARMING SYSTEMS, INC.

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

ocument received by the CA 4th District Court of Appeal Division 3.

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I. <u>INTRODUCTION</u>**

Plaintiff Denise Pinkerton, an individual as attorney in fact for Roger D. Root ("Plaintiff") filed a derivative action "on behalf of Nominal Defendant MFS" (Complaint, ¶¶1 and 2) and against MOBILE FARMING SYSTEMS, INC. ("MFS"); against management defendants Richard Joseph Probst, Richard Francis O'Connor II, and Amy Jeanette Cooper (collectively "Management Defendants") and other defendants. In accordance with Corporations Code §800(c) and (d), MFS requests that the Court require Plaintiff to furnish a bond of not less than $50,000.00 to secure reimbursement of reasonable litigation expenses incurred by MFS with respect to this action.

MFS is entitled to security to cover their reasonable litigation expenses if "there is no reasonable possibility that the prosecution of the cause of action alleged in the complaint against the moving party will benefit the corporation or its shareholders." (Corp. Code. §800 (c)(1).) To properly assess "whether there is no reasonable possibility the action will benefit the corporation, the court 'must evaluate the possible defenses which the plaintiffs would have to overcome before they could prevail at trial.'" (*Donner Management Co. v. Schaffer* (2006) 142 Cal.App.4th 1296, 1304.)

Lack of standing is a clear defense in this action. The plaintiff in a derivative action must be "a shareholder, of record or beneficially, or the holder of voting trust certificates." (Corp. Code §800 (b)(1).) Section 800 "prohibits an individual from bringing a derivative action unless he was a shareholder both at the time he filed the derivative action and at the time of the transaction of which he complains." (*Pacific Lumber Co. v. Sup. Ct.* (1990) 226 Cal.App.3d 371, 376.) According to the available information, Roger D. Root ("Root") has never been "a shareholder, of record or beneficially, or the holder of trust certificates" of MFS. (Declaration of Richard Probst ("Probst Decl."), at ¶3.) Instead, it appears that Plaintiff is alleging claims by a third-party not named in the operative complaint – Jolly Roger, Inc., a Washington Corporation. (*Id.*)

Even if Root has standing, a shareholder must prosecute a derivative action to "benefit the corporation or its shareholders." (Corp. Code. §800(c)(1).) Here, Plaintiff has already served over

Document received by the CA 4th District Court of Appeal Division 3.

500 separate discovery requests upon MFS, including Requests for Admission that ask MFS to admit that it has no defenses to the different causes of action in the Complaint and Form Interrogatories seeking the facts, witnesses, and documents supporting each denial. MFS has no insurance for this action and will incur substantial expense in responding to this initial set of 500 discovery requests. Accordingly, MFS believes that this derivative action will not benefit MFS; it likely will damage MFS in direct contradiction to the express purpose of a derivative action.

MFS is filing this Motion as a last resort. Prior to filing this action, MFS requested that Plaintiff narrow or focus the discovery directed to MFS. Plaintiff declined this request.

## II. FACTUAL BACKGROUND

Plaintiff filed her Complaint on September 14, 2018. Plaintiff's Complaint alleges she "sues derivatively on behalf of Nominal Defendant MFS." (Complaint, ¶1.) Paragraph 2 of the Complaint alleges that "Plaintiffs" means "ROOT and MFS." (*Id.*, ¶2.) It also alleges that it would have been futile to make a demand for relief on the MFS Board of Directors because the Board is comprised of Management Defendants "who will not bring suit against themselves [or] their co-conspirators and aiders and abetters." (Complaint, ¶29.)

MFS was not aware it had been served with the Complaint. (Probst Decl., ¶¶4 and 5.) MFS is informed and believes that during a Case Management Conference on December 18, 2018, Plaintiff's counsel advised, for the first time, that the Court that MFS was allegedly served by substitute service on October 11, 2018. Prior to the conference, Plaintiff filed a Case Management Conference Statement which described the status of service on defendants, but did not reflect that MFS had been served. (Attachment 4a to CMC Statement, Ex. 6 to Declaration of Kenneth D. Watnick ("Watnick Decl.").)

On December 21, MFS retained counsel. (Watnick Decl., at ¶3.) Upon being retained, MFS's counsel contacted Plaintiff's counsel to introduce himself and request a service list. (Watnick Decl., ¶4.) In response, Plaintiff's counsel advised that he had or was serving discovery on MFS. (*Id.*) Specifically, on December 21, Plaintiff served discovery which contained over 500 separate requests for testimony, documents, and information. Plaintiff propounded the following discovery on MFS:

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

Document received by the CA 4th District Court of Appeal Division 3.

- Amended Notice of Deposition of MFS with 90 categories of examination, 207 requests for production of documents and 11 requests for production of "things",
- Amended First Request for Production containing 207 requests for production of documents and 11 requests for production of "things",
- First Set of Special Interrogatories containing 70 special interrogatories,
- First Set of Request for Admissions with 69 requests for admission, and
- First Set of Form Interrogatories, with 28 form interrogatories, including Form Interrogatory No. 17.1.

(Exs. 1 through 5 to Watnick Decl.)

MFS understands that Plaintiff has propounded similar discovery requests upon Defendants Probst, O'Connor, Cooper, and all other named defendants. In total, Plaintiff has propounded approximately **two thousand (2,000)** separate written discovery requests upon just MFS and the Management Defendants. (Watnick Decl., ¶5.) MFS understands that when combined with the other named defendants, plaintiff has served in excess of **five thousand (5,000)** separate written discovery requests. (*Id.*)

After receiving the voluminous discovery, MFS contacted Plaintiff regarding the discovery directed to MFS. (*Id.*, at ¶6.) MFS explained that it did not have insurance, would incur substantial expense in responding to over 500 discovery requests, and did not believe that such expensive discovery was consistent with the purpose of a derivative action. (*Id.*) MFS proposed that Plaintiff: (a) narrow the scope of discovery to MFS or (b) post security of $50,000.00 pursuant to Corporations Code §800. (*Id.*) Plaintiff declined to narrow the discovery. (*Id.*) It also stated that Plaintiff was not in a financial position to post security. (*Id.*)

## III. PLAINTIFF SHOULD BE REQUIRED TO POST SECURITY IN THIS DERIVATIVE ACTION

### A. Legal Standards Governing a Motion for Security

Corporation Code §800(c) provides as follows:

> (c) In any action referred to in subdivision (b), at any time within 30 days after service of summons upon the corporation or upon any defendant who is an officer or director of the corporation, or held

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

Motion to DQ Catanzarite 3:22-CV-01616-AGS-DDL
Exhibit #6: 006

Document received by the CA 4th District Court of Appeal Division 3.

> such office at the time of the acts complained of, the corporation or the defendant may move the court for an order, upon notice and hearing, requiring the plaintiff to furnish a bond as hereinafter provided. The motion shall be based upon one or both of the following grounds:
>
> (1) That there is no reasonable possibility that the prosecution of the cause of action alleged in the complaint against the moving party will benefit the corporation or its shareholders.
>
> (2) That the moving party, if other than the corporation, did not participate in the transaction complained of in any capacity.
>
> The court on application of the corporation or any defendant may, for good cause shown, extend the 30-day period for an additional period or periods not exceeding 60 days.

Corporations Code Section 800(d) provides:

> (d) At the hearing upon any motion pursuant to subdivision (c), the court shall consider such evidence, written or oral, by witnesses or affidavit, as may be material (1) to the ground or grounds upon which the motion is based, or (2) to a determination of the probable reasonable expenses, including attorneys' fees, of the corporation and the moving party which will be incurred in the defense of the action. If the court determines, after hearing the evidence adduced by the parties, that the moving party has established a probability in support of any of the grounds upon which the motion is based, the court shall fix the amount of the bond, not to exceed fifty thousand dollars ($50,000), to be furnished by the plaintiff for reasonable expenses, including attorneys' fees, which may be incurred by the moving party and the corporation in connection with the action, including expenses for which the corporation may become liable pursuant to Section 317. A ruling by the court on the motion shall not be a determination of any issue in the action or of the merits thereof. If the court, upon the motion, makes a determination that a bond shall be furnished by the plaintiff as to any one or more defendants, the action shall be dismissed as to the defendant or defendants, unless the bond required by the court has been furnished within such reasonable time as may be fixed by the court.

The purpose of the §800 security provision is to prevent unwarranted shareholder derivative lawsuits. (*Donner Management Co. v. Schaffer* (2006) 142 Cal.App.4th 1296, 1305.) As explained by the California Supreme Court: "[E]very stockholder who ... is unable to induce the corporation, through its board of directors, to institute a particular action on its own behalf, and who undertakes as its volunteer representative to sue on the cause asserted by him, may be required to furnish security." (*Beyerbach v. Juno Oil Co.* (1954) 42 Cal.2d 11, 21.) "In these

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

Document received by the CA 4th District Court of Appeal Division 3.

circumstances the Legislature, for the protection of third persons who have dealt with the corporation, as well as for the protection of the corporation and its officers and employe[e]s, can constitutionally require that the stockholder who would act as in the nature of a guardian ad litem must, as a condition of prosecuting the action on behalf of the corporation, either show a reasonable probability that the suit will be successful or secure the payment of the defendants' expenses should they prevail." (*Donner Management Co., supra*, 142 Cal.App.4th at 1305.)

Plaintiff must post sufficient security to cover MFS's reasonable legal fees if she cannot establish the reasonable probability that her suit will be successful. (*Id.*, at 1303; Corp. Code §800(c)(1).) Here, Plaintiff cannot establish the reasonable probability that her suit will succeed because MFS is not aware of information showing that Root was a shareholder of record of MFS, a condition precedent to initiating a derivative claim. (Probst Dec., ¶3; *Pacific Lumber Co. v. Sup. Ct., supra*, 226 Cal.App.3d at 377; Corp. Code §800(b)(1).) Also, security is appropriate because Plaintiff does not appear to be pursuing this derivative action to benefit the corporation, MFS. It has propounded expensive discovery that will require MFS to incur over $30,000 in legal fees in order to respond to the initial sets of discovery. (Watnick Decl., ¶7.)

**B. <u>Plaintiff Cannot Establish A Reasonable Probability Of Success</u>**

As a condition precedent to initiating a derivative claim, the plaintiff must be "a shareholder, of record or beneficially, or the holder of voting trust certificates." (Corp. Code § 800 (b) (1).) Section 800 "prohibits an individual from bringing a derivative action unless he was a shareholder both at the time he filed the derivative action and at the time of the transaction of which he complains." (*Pacific Lumber Co.*, supra (1990) 226 Cal.App.3d at 377.) Failure to comply to with the requirements of section 800 "deprives a litigant of standing." (*Shields v. Singelton* (1993) 15 Cal.App.4th 1611, 1618.)

As reflected in the Declaration of Richard Probst, MFS does not have any information showing that Root is or was a shareholder. (Probst Decl., at ¶3.) Although it may be speculation, Plaintiff may have some connection to Jolly Roger, Inc., a Washington Corporation, which is a shareholder of MFS. (Probst Decl.,¶ 3.) However, a derivative action must be prosecuted

///

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

Document received by the CA 4th District Court of Appeal Division 3.

by a shareholder, not an individual with some connection to a shareholder. (Corp. Code §800(b)(1).)

Because Plaintiff does not appear to have standing, she should be required, at a minimum to post security pursuant to §800(c)(1) to protect MFS against litigation costs should she be unable to establish that Root was a shareholder of record of MFS.

**C. Plaintiff Is Causing MFS To Incur Substantial Expense In Complying With Over 500 Discovery Requests**

The plaintiff shareholder in a derivative action is a nominal plaintiff. Even though the corporation is joined as the nominal defendant, it is the real party in interest to which any recovery usually belongs. (*Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1108.)

As a general rule, a shareholder cannot initiate a derivative action on behalf of a corporation without informing the directors about the action and making a reasonable effort to induce them to commence suit otherwise secure relief. (Corp. Code §800(b)(2).) However, a plaintiff is excused from this demand requirement if he can show that such demand would be futile. (*Bader v. Anderson* (2009) 179 Cal.App.4th 775, 789-790.) Plaintiff alleges that a demand would have been futile in this circumstance because the directors are defendants, co-conspirators and aiders and abetters. (Complaint, ¶29.)

Even if a demand would have been futile in this circumstance, Plaintiff must pursue this derivative action in a manner that will benefit the corporation. (Corp. Code. § 800(c)(1).) Here, Plaintiff has aggressively propounded an initial round of discovery on MFS that contains over 500 separate requests. (Exs. 1 to 5 to Watnick Decl.) MFS is informed and believes that these requests are largely duplicative of requests served on the Management Defendants. (Watnick Decl., ¶5.) More importantly, MFS estimates it will incur approximately $30,000 in legal expense in responding to this initial set of discovery requests. (Watnick Decl., ¶6.) It is difficult to understand how such expense benefits, rather than harms, the corporation.

Many of the discovery requests exceed the acceptable bound of discovery in a shareholder derivative action. In a derivative action, a corporation is a nominal defendant with limited, procedural defenses. (*See*, *generally*, 2 California Practice Guide: Corporations, §6:611.1 (Rutter

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

Document received by the CA 4th District Court of Appeal Division 3.

Group February 2018). The corporation may not oppose the derivative action on the merits. (*Id.*; *Patrick v. Alacer Corp.* (2008) 167 Cal.App.4th 995, 1004-1010.) Notwithstanding the foregoing, Plaintiff's First Set of Requests for Admission asks MFS to admit that it does not have any defenses to Causes of Action 1 through 10. (Request Nos. 56-64 of First Set of Requests for Admission, Ex. 4 to Watnick Decl.) Plaintiff's First Set of Form Interrogatories requests that MFS state the facts and identify the witnesses and documents supporting MFS's failure to provide an unqualified admission. (Form Interrogatory No. 17.1, Ex. 5 to Watnick Decl.) Plaintiff's Form Interrogatories also request that MFS state whether there has been a breach of a contract, whether any agreement alleged in the pleadings was excused or terminated, and whether there has been an oral modification of any contract. (Form Interrogatory Nos. 50.1-50.5, Ex. 5 to Watnick Decl.) Thus, Plaintiff appears to request that MFS address the merits of the dispute and provide substantive responses to extremely broad discovery requests.

Plaintiff's Amended Notice of Deposition also broadly demands that MFS produce a designee to testify about its entire operations, including, for example, all "MATTERS REGARDING ROOT. . .[,] PINKERTON[,]. . . MUIRHEAD[,] . . . [and] SCOTT" as well as corporate filings, trade credit applications, loan applications, lease applications, sales of products, sales of services, and legal opinions regarding the issuance of common stock. (Category Nos. 14, 16, 20-23, and 51-58 of Amended Notice of Deposition, Ex. 1 to Watnick Decl.) Plaintiff's Amended First Request for Production contain over 200 requests for production that arguably demand that MFS search for and produce every document relating to MFS, including electronic documents and e-mails. (Ex. 2 to Watnick Decl.)

MFS believes that compliance with Plaintiff's initial discovery requests will substantially burden MFS and cause it to incur approximately $30,000 in legal expense. (Watnick Decl., ¶7.) MFS does not have insurance in this action. (Probst Decl., ¶6.) Moreover, the volume of the initial discovery requests creates concern given the questions as to whether Plaintiff has legal standing to pursue this action.

/ / /

/ / /

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

Motion to DQ Catanzarite 3:22-CV-01616-AGS-DDL
Exhibit #6: 010

Document received by the CA 4th District Court of Appeal Division 3.

D. **MFS's Motion For Security Is Timely**

A motion for security pursuant to section 800 must be filed "at any time within 30 days after service of summons upon the corporation." (Corp. Code §800(c).) This deadline may be extended by the Court upon a showing of good cause. (*Id.*)

MFS was unaware that it had been served until the December 18, 2018 Case Management Conference. (Probst Decl., ¶5.) MFS retained counsel immediately thereafter. (Watnick Decl., ¶3) MFS's counsel met and conferred with Plaintiff's counsel and only filed this Motion after Plaintiff declined to limit the scope of discovery. (Watnick Decl., ¶4.) Regardless, there is good cause for the Court to extend any potentially applicable deadline since MFS promptly filed this Motion after appearing in the action.

IV. **IN THE ALTERNATIVE, ALL DISCOVERY SHOULD BE STAYED UNTIL PLAINTIFF ESTABLISHES THAT SHE HAS STANDING**

If the Court is not inclined to require Plaintiff to post the requested security, MFS respectfully request that the Court should stay all discovery until Plaintiff can establish to the Court's satisfaction that Root was an actual shareholder of record of MFS. Corporation Code §800(f) mandates that "no pleadings need be filed by the corporation or any other defendant and the prosecution of the action shall be stayed until 10 days after the motion is disposed of." (*Id.*)

Written discovery and taking depositions have been held to be part and parcel to "prosecution of the action." (*Barber v. Lewis & Kaufman* (1954) 125 Cal.App.2d 95, 98 ["To permit the taking of depositions before the determination by the court as to whether the security provided for by. . . the Corporations Code should be furnished would defeat the purpose of that section"]; 2 California Practice Guide: Corporations, ¶ 6:648 (The Rutter Guide Group February 2018) ["The filing of such a motion. . .stays all further proceedings (including discovery) until 10 days after the motion is disposed of. No further pleadings need be filed by the corporation or any other defendant (including third parties) until the stay expires."].)

/ / /

/ / /

/ / /

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

Document received by the CA 4th District Court of Appeal Division 3.

V. **CONCLUSION**

The Court should require Plaintiff to post security of not less than $50,000 as a condition of prosecuting this action. At minimum, the Court should stay discovery until and unless Plaintiff presents prima facie evidence that she has legal standing to pursue this derivative action.

DATED: January 7, 2019

ANDERSON, McPHARLIN & CONNERS LLP

By: ______________________
Kenneth D. Watnick
Attorneys for Nominal Defendant MOBILE FARMING SYSTEMS, INC.

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

Document received by the CA 4th District Court of Appeal Division 3.

1937386.1 06183-001

11

NOTICE OF MOTION AND MOTION FOR SECURITY; MEMORANDUM OF POINTS AND AUTHORITIES

Motion to DQ Catanzarite 3:22-CV-01616-AGS-DDL
Exhibit #6: 012

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 707 Wilshire Boulevard, Suite 4000, Los Angeles, California 90017-3623.

On January 7, 2019, I sent/transmitted the following document(s) described as **NOTICE OF MOTION AND MOTION FOR SECURITY; MEMORANDUM OF POINTS AND AUTHORITIES** on the interested parties as follows:

**SEE ATTACHED LIST**

**BY ELECTRONIC TRANSMISSION TO ONE LEGAL:** I electronically served the above-referenced document(s) through One Legal. E-service in this action was completed on all parties listed on the attached Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on January 7, 2019, at Los Angeles, California.

*Maureen Allen*

Maureen Allen

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

Motion to DQ Catanzarite 3:22-CV-01616-AGS-DDL
Exhibit #6: 013

Document received by the CA 4th District Court of Appeal Division 3.

**SERVICE LIST**
**Denise Pinkerton, etc., et al. v. Cultivation Technologies, Inc., et al.**
**OCSC - 30-2018-01018922-CU-FR-CJC**

| | |
|---|---|
| Kenneth J. Catanzarite, Esq.<br>Catanzarite Law Corporation<br>2331 West Lincoln Avenue<br>Anaheim, CA 92801<br>Telephone: (714) 520-5544<br>Facsimile: (714) 520-0680<br>E-Mail: kcatanzarite@catanzarite.com | Attorneys for Plaintiff DENISE PINKERTON, an individual as attorney in fact for ROGER D. ROOT, individually and as successor in interest to the claims of his deceased Spouse Sharon K. Root, and derivatively on behalf of MOBILE FARMING SYSTEMS, INC., a California corporation |
| Ivan L. Tjoe, Esq.<br>Ropers, Majeski, Kohn & Bentley<br>445 S. Figueroa St., Suite 3000<br>Los Angeles, CA 90071<br>Telephone: (213) 312-2000<br>Facsimile: (213) 312-2001<br>E-Mail: ivan.tjoe@rmkb.com | Attorneys for Defendant Richard Joseph Probst, Rana Foroughi Mobin and Amy Jeanette Cooper |
| Samuel Y. Edgerton, III, Esq.<br>O'Hagan Meyer, LLC<br>4695 MacArthur Court, Suite 210<br>Newport Beach, CA 92660<br>Telephone: (949) 942-8500<br>Facsimile: (949) 942-8510<br>E-Mail: sedgerton@ohaganmeyer.com | Attorneys for Defendants Cultivation Technologies, Inc., Justin Beck, Robert Kamm, Robert Bernheimer, Irving Einhorn, Miguel Motta, and I'm Rad, LLC |
| David M. Friedman, Esq.<br>Ogloza Fortney LLP<br>535 Pacific Avenue, Suite 201<br>San Francisco, CA 94133<br>Telephone: (415) 912-1850<br>Facsimile: (415) 887-5349<br>E-Mail: dfriedman@oglozafortney.com | Attorneys for Defendant Cliff Higgerson |
| Richard L. Charnley Esq.<br>Charnley Rian LLP<br>12121 Wilshire Boulevard, Suite 6000<br>Los Angeles, CA 90025<br>Telephone: (310) 321-4300<br>Facsimile: (310) 893-0273<br>E-Mail: rlc@charnleyrian.com | Attorneys for Defendant Richard Francis O'Connor II |

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

Document received by the CA 4th District Court of Appeal Division 3.

Matthew T. Ward Esq.
Ward Law Group, PC
44-651 Village Court, Suite 121
Palm Desert, CA 92260
Telephone: (760) 834-8210
Facsimile: (760) 860-6600
E-Mail: mward@mwardlawcorp.com

Attorneys for Defendant, Scott Unfug

ANDERSON, MCPHARLIN & CONNERS LLP
LAWYERS
707 WILSHIRE BOULEVARD, SUITE 4000
LOS ANGELES, CALIFORNIA 90017-3623
TEL (213) 688-0080 • FAX (213) 622-7594

Motion to DQ Catanzarite 3:22-CV-01616-AGS-DDL
Exhibit #6: 015

ocument received by the CA 4th District Court of Appeal Division 3.

EXHIBIT 7

Ropers Majeski Kohn & Bentley
A Professional Corporation
Los Angeles

**DECLARATION OF STEPHEN J. ERIGERO**

I, Stephen J. Erigero, declare as follows:

1. I am an attorney-at-law duly licensed to practice before all courts in the State of California and am a partner with the law firm of Ropers, Majeski, Kohn & Bentley, former attorneys of record for defendant Richard J. Probst in this action. I have personal knowledge of the matters set forth herein, and if called upon as a witness to testify thereto, I could and would competently do so.

2. I represented Amy Cooper from October 18, 2018 to January 23, 2019.

3. Neither I, nor our firm, were involved with any settlement discussions in connection with her dismissal from the [Root Case].

4. When Ms. Cooper filed suit against Richard Probst as plaintiff, we substituted out of the case and ended our representation of Richard Probst.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on November 25, 2019.

Stephen J. Erigero

EXHIBIT 8

UNANIMOUS WRITTEN CONSENT
OF
THE SOLE SHAREHOLDER
OF
CULTIVATION TECHNOLOGIES, INC.

The undersigned, being the sole shareholder of CULTIVATION TECHNOLOGIES, INC., a
California corporation (the "Corporation"), acting by unanimous written consent without a
meeting pursuant to Section 603 of the California Corporations Code, hereby adopts the
following resolutions.

WHEREAS, the person signing this consent is the Chief Executive Officer of the sole
shareholder of the Corporation, namely MOBILE FARMING SYSTEMS, INC. ("MFS");

WHEREAS, the undersigned desires to execute this Written Consent in lieu of formally holding
a shareholder meeting;

WHEREAS, MFS is the sole shareholder of Corporation having acquired and fully paid for its
28,000,000 of common stock on March 30, 2015;

WHEREAS, the purported action on June 15, 2015 falsely contending that MFS, as the sole
shareholder of Corporation, had not fully paid for all of its stock was false having been facilitated
by the wrongful and self-serving conduct of RICHARD JOSEPH PROBST and JUSTIN S.
BECK; and

WHEREAS, all actions by Corporation that resulted in the issuance of shares of Corporation
stock and/or promissory notes on and after March 30, 2015 are a nullity, void or voidable acts.

NOW THEREFORE LET IT BE:

RESOLVED, that the entire Board of Directors of Corporation, wrongly elected by shareholders
other than MFS, are hereby immediately removed and they individually and collectively shall no
longer have any power to act on behalf of Corporation.

RESOLVED, that all of the Officers of Corporation are hereby immediately removed.

RESOLVED, that all CORPORATION stock, options, warrants, convertible debt, convertible
notes and/or promissory notes are hereby rescinded for want of authority to have issued the same.

RESOLVED, that the Board of Directors shall have three members who shall immediately act on
behalf of Corporation, effective immediately, as follows:

     RICHARD FRANCIS O'CONNOR II

     DR. MO ZAKHIREH

JAMES DUFFY

RESOLVED, that the officers of the Corporation shall, effective immediately, be as follows:

| | |
|---|---|
| President and Chief Executive Officer | RICHARD FRANCIS O'CONNOR II |
| Treasurer and Chief Financial Officer | DR. MO ZAKHIREH |
| Secretary | JAMES DUFFY |

RESOLVED, that all signature cards for all bank accounts shall be immediately changed to be signed by both the President and Treasurer; and

RESOLVED, that all legal counsel engaged by the Corporation are hereby terminated.

RESOLVED, that the auditor for the Corporation is hereby terminated.

The undersigned directs that the Secretary of the Corporation file an executed copy of this Unanimous Written Consent with the minutes of the proceedings of the shareholders of the Corporation.

IN WITNESS WHEREOF, the undersigned shareholder has duly executed this Unanimous Written Consent as of January23, 2019.

MOBILE FARMING SYSTEMS, INC.

By: ____________________
RICHARD FRANCIS O'CONNOR II

EXHIBIT 9

CATANZARITE LAW CORPORATION
ATTORNEYS & COUNSELORS AT LAW
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
(714) 520-5544
FACSIMILE: (714) 520-0680

KENNETH J. CATANZARITE
ATTORNEY AT LAW

DIRECT DIAL:
(714) 678-2100

E-MAIL ADDRESS:
KCATANZARITE@CATANZARITE.COM

DIRECT FAX:
(714) 399-0577

January 25, 2019

**<u>Via U.S. Mail & Email:</u>**
Samuel Y. Egerton, III
Jonnny L. Antwiler
O'HAGAN MEYER, LLC
4695 MacArthur Court, Ste. 210
Newport Beach, CA 92660
sedgerton@ohaganmeyer.com
jantwiler@ohaganmeyer.com

Ken Watnick
Anderson, McPharlin & Conners
707 Wilshire Blvd, Suite 4000
Los Angeles, California 90017-3623
kdw@amclaw.com

Stephen J. Erigero, Esq.
Ivan L. Tjoe, Esq.
Alan J. Hart, Esq.
Ropers Majeski Kohn & Bentley PC
445 South Figueroa St., Ste 3000
Los Angeles, CA 90071-1608
Facsimile: (213) 312-2001
Email: stephen.erigero@rmkb.com
Email: ivan.tjoe@rmkb.com
Email: alan.hart@rmkb.com

**Re:** ***Denise Pinkerton v. Cultivation Technologies, Inc., et al.,*** **Case No. 30-2018-01018922: Meet & Confer Re CTI's Discovery Responses.**

**Notice by Mobile Farming Systems, Inc. ("MFS") as sole shareholder of Cultivation Technologies, Inc. ("CTI") of Actions**

**Notice of MFS Shareholders that Board of Directors is Removed**

Counsel,

I write this letter to provide notice of the enclosed actions. We would like to immediately take control of the assets and operations of CTI for the benefit of the sole shareholder MFS. We have confirmation now that the share issuance on March 30, 2015 was in fact fully paid and that the shares were issued and due to MFS which is therefore the sole shareholder.

MFS will now assert all claims directly not derivatively and this firm will serve as counsel. An amended complaint is being prepared and will be circulated for possible stipulation or motion if necessary.

We would like to avoid any unnecessary disruption of corporate activity and therefore notify you that we will defer notice to all third parties until Monday January 28 in the hope that your clients will handle the transition in the interests of the shareholders. All shares issued after March 30, 2015 are a nullity, including the highly dilutive unauthorized shares issued to Messrs.

Probst and Beck. It is our intention to offer those persons who purchased CTI shares, MFS shares after a determination of amounts of money actually invested. The new directors and officers will require turnover of:

1. All books and records
2. Probst and Beck to leave offices and turnover records and keys
3. Bank accounts to be turned over
4. Cash control to be turned over to new board
5. Hand off of operative contracts
6. Inventory of subsidiaries
7. Personnel lists
8. Office security codes and systems
9. All computer pass codes to computer and security systems
10. All office pass codes and security systems

This is also notice that law enforcement is looking at both MFS and CTI. We are fully cooperating with them and expect that your clients will do the same.

After you review the above please call me.

Very truly yours,

**CATANZARITE LAW CORPORATION**

Kenneth J. Catanzarite

EXHIBIT 10

Motion to DQ Catanzarite 3:22-CV-01616-AGS-DDL
Exhibit #10: 001

OGLOZA FORTNEY LLP
David M. Friedman (SBN 209214)
*dfriedman@oglozafortney.com*
Michelle L. Covington (SBN 312642)
*mcovington@oglozafortney.com*
535 Pacific Avenue, Suite 201
San Francisco, California 94133
Telephone: (415) 912-1850
Facsimile: (415) 887-5349

Attorneys for Plaintiff
CLIFF HIGGERSON

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange
**01/03/2019** at 05:39:00 PM
Clerk of the Superior Court
By Jeannette Dowling, Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE

DENISE PINKERTON, an individual as attorney in fact for ROGER D. ROOT, individually and as successor in interest to the claims of his deceased Spouse Sharon K. Root, and derivatively on behalf of MOBILE FARMING SYSTEMS, INC., a California corporation,

Plaintiffs,

v.

CULTIVATION TECHNOLOGIES, INC. a California corporation; RICHARD JOSEPH PROBST, an individual; RICHARD FRANCIS O'CONNOR II, an individual; AMY JEANETTE COOPER, an individual; JOSEPH R. PORCHE, an individual; JUSTIN S. BECK, an individual; TGAP HOLDINGS, LLC, a limited liability company; EM2 STRATEGIES, LLC, a limited liability company; I'M RAD, LLC, a limited liability company; CLIFF HIGGERSON, an individual, AROHA HOLDINGS INC., a California corporation; ANTHONY SCUDDER, a.k.a. TONY SCUDDER, an individual; SCOTT UNFUG, an individual; RANA FOROUGHI MOBIN, an individual; ROBERT KAMM, an individual; ROBERT A. BERNHEIMER, an individual; IRVING MARK EINHORN, an individual; MIGUEL MOTTA, an individual; and DOES 1-150,

Defendants,

Nominal Defendant: MOBILE FARMING SYSTEMS INC., a California Corporation.

CASE NO. 30-2018-01018922-CU-FR-CJC

**DEFENDANT CLIFF HIGGERSON'S STATEMENT IN SUPPORT OF COMPLEX CASE DESIGNATION AND REPLY TO PLAINTIFF'S OPPOSITION THERETO**

Defendant Cliff Higgerson respectfully submits this statement in support of the complex case counter-designation made by the Nominal Defendant, Mobile Farming Systems, Inc. ("MFS"), and agrees with, and requests, that this matter be deemed complex pursuant to Rule 3.400 et seq.[1] Plaintiff's opposition to the complex case designation is replete with half-truths, misleading statements about the nature of the case, and is belied by Plaintiff's own initial discovery conduct.

As Plaintiff rightly describes, a "complex case" is an action that requires exceptional judicial management to avoid placing unnecessary burdens on the court or the litigants and to expedite the case, keep costs reasonable, and promote effective decision making by the court the parties and counsel." Cal. R. 3.400(a). This is such an action.

First, contrary to Plaintiff's attestations, this is indeed a securities action, with the gravamen of the case, sounding in, and relating to, securities. The bulk of Plaintiff's allegations relate to alleged breaches of fiduciary duties by directors, officers, and investors of two companies, MFS, and defendant Cultivation Technologies, Inc. In addition to breach of fiduciary duty claims, Plaintiff alleges claims for aiding and abetting these purported breaches and conspiracy to breach fiduciary duties. These claims, and several others, are alleged derivatively. That is, the claims belong to the Nominal Defendant, MFS, and as a result, the case has unique procedural and substantive requirements. In short, these claims all relate to the internal affairs of the corporation, and are not, despite Plaintiff's attestations, ordinary torts.

Second, there will be, and are significant pre-trial motions raising difficult legal issues. Two individual defendants have demurred to the complaint, and there is a separate motion to strike pending. The nominal defendant has yet to respond to the complaint, but it is possible that the nominal defendant may file a motion to require Plaintiff to furnish a bond pursuant to Cal. Corp. Code § 800. If such a motion is filed, the Court will be asked to consider evidence, at the initial stages of the case, and make a determination as to whether there is "no reasonable possibility that the prosecution of the cause[s] of action alleged in the complaint" will benefit the corporation. *Id.*

---

1 This is defendant Higgerson's first substantive appearance. Otherwise, Higgerson would have requested the case be designated complex earlier.

1

OGLOZA FORTNEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

HIGGERSON STATEMENT REGARDING COMPLEX CASE DESIGNATION

Motion to DQ Catanzarite 3:22-CV-01616-AGS-DDL
Exhibit #10: 003

Beck Decl ISO Protective Order
Exhibit #10: 002

In addition to the motion for bond, Higgerson anticipates there will be several discovery motions filed, including a motion to bifurcate or stage discovery. As this case involves derivative claims, a gating issue is whether Plaintiff Root was an MFS shareholder at the time of the alleged wrongdoing, and whether he has owned such shares continuously and through today. Cal. Corp. Code § 800(b)(1). If Root did not hold shares continuously, his derivative claims must be dismissed. This issue of derivative standing should come before defendants are forced to respond to comply with the voluminous amounts of discovery Plaintiff has already served (see below), and that will no doubt increase. Finally, if a settlement is reached with one or more of the defendants, the Court will be required to determine whether such a settlement was fair to the corporation. *See, e.g., Kennedy v. Kennedy*, 235 Cal. App. 4th 1474, 1485 (2015); *Whitten v. Dabney*, 171 Cal. 623, 631 (1915). Simply put, this is not a run-of-the-mill case, with run-of-the-mill motion practice, as Plaintiff attempts to argue.[2]

Third, this case involves a substantial amount of documentary evidence and discovery, contrary to Plaintiff's claims. *See* Cal. R. 3.400(b) (court shall consider whether action is likely to involve the management of a large number of witnesses or a substantial amount of documentary evidence). Indeed, prior to all of the parties responding to the Complaint, Plaintiff has already served at least 12 sets of document requests, 11 sets of requests for admission, eight deposition notices (some with document requests attached thereto), two deposition subpoenas (directed towards counsel), and 10 sets of special interrogatories. The document requests directed to the Nominal Defendant, on whose behalf this action is supposedly brought, number more than 400. Some of the individual defendants have been served with more than 100 individual discovery requests, not including subparts. Plaintiff's claim that discovery is "manageable" is disingenuous.

Finally, Plaintiff alleges that the case does not involve a large number of separately represented parties, apparently because two law firms represent multiple defendants. It is indeed

---

[2] Plaintiff has also alleged, albeit not derivatively and not against Higgerson, a cause of action for trade secret misappropriation. It is possible that the defendants to that cause of action may file a motion for protective order pursuant to the California Uniform Trade Secret Act, Cal. Civ. Proc. Code § 2019.210, which requires that before commencing discovery relating to the trade secret, the party alleging the misappropriation to identify the trade secret with reasonable particularity.

true that two law firms represent multiple parties. However, there are, to date, five law firms representing the defendants, not including the law firm representing the nominal defendant. Thus, the Court and counsel will need to coordinate with seven separate law firms.

In sum, this case fits the definition of "complex" under Cal. R 3.400(a) and 3.400(b), and defendant Higgerson requests the Court designate it as such.

Dated: January 3, 2019

OGLOZA FORTNEY LLP

By: ______________________

David M. Friedman

Attorneys for Defendant Cliff Higgerson

3

OGLOZA FORTNEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

HIGGERSON STATEMENT REGARDING COMPLEX CASE DESIGNATION

Motion to DQ Catanzarite 3:22-CV-01616-AGS-DDL
Exhibit #10: 005

Beck Decl ISO Protective Order
Exhibit #10: 004

EXHIBIT 13

**Wednesday, October 30, 2019 at 8:08:03 AM Pacific Daylight Time**

**Subject:** Fwd: MFS SHAREHOLDERS - DO NOT SIGN CONSENT DOCUMENT JUST SENT BY POBST--SUPPLEMENTAL EMAIL
**Date:** Friday, April 19, 2019 at 2:31:49 PM Pacific Daylight Time
**From:** Richard Probst
**To:** Justin Beck
**Attachments:** image001.gif

Thank You
Rick Probst

Begin forwarded message:

**From:** Han Le <hle@catanzarite.com>
**Date:** April 19, 2019 at 2:27:53 PM PDT
**Cc:** Kenneth Catanzarite <kcatanzarite@catanzarite.com>, Becky Phillips <bphillips@catanzarite.com>, Jenifer Weaver <jweaver@catanzarite.com>, "Richard O'Connor (Richard@tgapholdings.com)" <Richard@tgapholdings.com>
**Subject: MFS SHAREHOLDERS - DO NOT SIGN CONSENT DOCUMENT JUST SENT BY POBST--SUPPLEMENTAL EMAIL**

Dear Shareholders:

**Supplement to Email**

I want to be clear that neither I, Richard O'Connor, Tony Scudder nor anyone else sued in the Root Case or the Mobile Farming Case have settled any claims with Root or anyone else. All we did was agree to toll the statute of limitations to allow claims to be brought against us later. No conflict. Instead we are working together in the best interests of Mobile Farming and Cultivation Technologies.

There is no conflict as they contend. Instead **the conflict identified is those named Defendants taking the 17,000,000 Series A Preferred Shares with 3 times voting to your common shares, for $0, control of the company and their undisclosed compensation. That is the conflict. They want to keep that against your interest and we seek to cancel those shares and secret compensation arrangements. THEY COULD HAVE SETTLED THIS CASE BY AGREEMING TO CANCEL THEIR PREFERRED SHARES AND CONTROL AND SALARIES--- *YOU NEED TO KNOW THAT THEY REFUSED. THAT IS WHY WE HAVE THIS DISPUTE.***

**The consent form should not be signed**. It does not allow you to reject the proposal so any signature would approve their request which I say is against the interests of Mobile Farming and Cultivation Technologies shareholders. If you have any questions feel free to call my cell at 760-409-6464.

Richard O'Connor
Director and Officer

***Kenneth J. Catanzarite For Richard O'Connor***
Catanzarite Law Corporation
2331 West Lincoln Avenue
Anaheim, CA 92801
**Direct Dial: (714) 678-2100**
**Direct Fax: (714) 399-0577**
Office Phone: (714) 520-5544
Office Fax: (714) 520-0680

NOTICE: This E-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521, is confidential, may be legally privileged and exempt from disclosure under applicable law. If you are not the intended

EXHIBIT 14

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF ORANGE - CIVIL COMPLEX CENTER
DEPARTMENT CX105

MOBILE FARMING SYSTEMS, INC., PLAINTIFFS,
VS.
RICHARD JOSEPH PROBST, ET AL., DEFENDANTS.
AND
NOMINAL DEFENDANT: CULTIVATION TECHNOLOGIES, INC., A CALIFORNIA CORPORATION.

NO. 30-2019-01046904 CU-BT-CJC

HONORABLE RANDALL J. SHERMAN, JUDGE PRESIDING
REPORTER'S TRANSCRIPT
VOLUME II

WEDNESDAY, MAY 1, 2019

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:
CATANZARITE LAW CORPORATION
BY: KENNETH J. CATANZARITE, ESQ.

FOR THE DEFENDANT RICHARD JOSEPH PROBST:
ROPERS, MAJESKI, KOHN & BENTLEY
BY: IVAN L. TJOE, ESQ.

FOR THE DEFENDANTS JUSTIN BECK, ROBERT KAMM, ROBERT BERNHEIMER, IRVING EINHORN, AND MIGUEL MOTTA:
O'HAGAN MEYER
BY: SAMUEL Y. EDGERTON, III, ESQ.
BY: JOHNNY ANTWILER, ESQ.

CHERI A. VIOLETTE, CSR NO. 3584
OFFICIAL COURT REPORTER PRO TEMPORE



WITNESS INDEX

(WEDNESDAY MAY 1, 2019)

| PLAINTIFF'S WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
| --- | --- | --- | --- | --- |
| (NONE) | | | | |

| DEFENSE WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
| --- | --- | --- | --- | --- |
| (NONE) | | | | |

Veritext Legal Solutions
866-299-5127

Motion to DQ Catanzarite 3:22-CV-01616-AGS-DDL
Exhibit #14: 002

E X H I B I T S

(WEDNESDAY, MAY 1, 2019)

(ALL EXHIBITS PREMARKED FOR IDENTIFICATION UNLESS OTHERWISE INDICATED)

| EXHIBITS: | FOR IDENTIFICATION | RECEIVED |
|---|---|---|
| 58- DOCUMENT | 101 | |
| 59- DOCUMENT RE: SHARES INITIALLY ISSUED BY QUICK SILVER | 104 | |
| 60- 11/03/2017 E-MAIL EXCHANGE FROM MR. PROBST TO MS. COOPER AND MR. O'CONNOR | 111 | |
| 61- 10/02/2015 PRIVATE PLACEMENT MEMORANDUM | 118 | |
| 62- GROUP OF SIGNED SUBSCRIPTION AGREEMENTS | 119 | |

SANTA ANA, CALIFORNIA - WEDNESDAY, MAY 1, 2019

AFTERNOON SESSION

(THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN COURT:)

THE COURT: GOOD AFTERNOON.

ALL COUNSEL: GOOD AFTERNOON, YOUR HONOR.

THE COURT: BACK ON THE MOBILE FARMING SYSTEM VERSUS PROBST. DO YOU WANT APPEARANCES?

THE COURT REPORTER: PLEASE, YOUR HONOR.

MR. EDGERTON: SAM EDGERTON FOR CERTAIN DEFENDANTS WHO ARE DIRECTORS OF CTI: ROBERT KAMM, ROBERT BERNHEIMER, JUSTIN BECK, AND MIGUEL MOTTA, AND IRVING EINHORN.

MR. ANTWILER: JOHNNY ANTWILER FROM O'HAGAN MEYER ON THE SAME DEFENDANTS.

MR. TJOE: IVAN TJOE, ROPERS, MAJESKI FOR RICHARD PROBST.

MR. CATANZARITE: KEN CATANZARITE FOR THE PLAINTIFF.

THE COURT: YOU MAY BE SEATED.

SO THE REASON WE ARE HERE IS FOR A CORPORATIONS CODE 709 HEARING WHICH MANDATES A QUICK HEARING WITHIN FIVE DAYS, SO THE SCOPE OF THIS HEARING IS ONLY GOING TO BE WHAT IS MANDATED BY THE CODE TO BE EXPEDITED. IT IS NOT GOING TO INCLUDE ALL THESE OTHER THINGS THAT THE PARTIES MIGHT CONSIDER RELEVANT TO THE CASE IN GENERAL.

SO TO THE EXTENT --

WELL, OKAY. SPECIFICALLY THIS IS ABOUT, I SHOULD SAY THE CODE PRIORITY IS ABOUT TO TRY AND DETERMINE THE VALIDITY OF ANY ELECTION OR APPOINTMENT OF ANY DIRECTOR OF ANY DOMESTIC CORPORATION, AND THE ACTION AS FILED BY A SHAREHOLDER OR A PERSON WHO CLAIMS TO HAVE BEEN DENIED THE RIGHT TO VOTE. SO THE PROPER ISSUE FOR THIS COURT IS WHETHER MOBILE FARMING SYSTEMS WAS DENIED THE RIGHT TO VOTE IN THIS DIRECTOR ELECTION THAT TOOK PLACE AND ELECTED THESE FIVE DIRECTORS AS REFERENCED YESTERDAY IN THE OPENING STATEMENTS.

SO TO THE EXTENT THAT DEFENDANTS FEEL THERE ARE CERTAIN THINGS THAT NEED TO BE DECIDED FOR THE HEALTH OF THEIR COMPANY, THAT DOESN'T GET STATUTORY PRIORITY.

TO THE EXTENT THAT THE PLAINTIFFS FEEL THAT THERE IS SOME CHALLENGE TO SOME PREFERRED SHARE OFFERING THAT WOULD REDUCE THE NUMBERS OF SHARES, THAT'S IRRELEVANT TO THIS PROCEEDING.

THE ONLY THING THAT MATTERS IS WHETHER MOBILE FARMING SYSTEMS OWNS STOCK IN CTI. BECAUSE IF THEY DID, THEN THEY HAD A RIGHT TO VOTE, AND THAT WOULD HAVE CHANGED THE OUTCOME OF THE ELECTION. AND IF THEY DIDN'T HAVE THAT SHAREHOLDER RIGHT TO VOTE, THEN THE ELECTION STANDS. SO THE COURT IS ONLY GOING TO HEAR EVIDENCE WITH RESPECT TO THAT PARTICULAR ISSUE.

AND TO THAT END, SINCE COURTS HAVE THE POWER TO,

OR JUDGES, I SHOULD SAY, HAVE THE POWER TO CONTROL THE ORDER OF EVIDENCE, THE WAY I SEE THIS AS BEING THE MOST EFFICIENT WAY TO PROCEED IS FOR THE COURT TO RECEIVE WRITTEN DOCUMENTATION BEFORE ANY ORAL TESTIMONY. AND THEN AFTER ALL THE DOCUMENTATION, THE COURT CAN TRY TO ASSESS WHAT TESTIMONY MIGHT BE RELEVANT OR NECESSARY TO DECIDE THE ISSUE AT HAND.

SO SINCE THIS IS NOT THE USUAL TRIAL WHERE THERE IS EXHIBIT NOTEBOOKS WITH NUMBERED EXHIBITS, WHICH WOULD MAKE MY LIFE EASIER AND THINGS SEEM TO BE ATTACHED TO DECLARATIONS, I AM GOING TO NEED SOME HELP ALONG THE WAY TO GUIDE ME TO THE RIGHT EXHIBITS. BECAUSE BASICALLY I AM GOING TO GO THROUGH THE TRIAL BRIEFS IN ORDER. I MEAN I HAVE ALREADY KIND OF DONE THAT TO NOTE WHAT THINGS I AM LOOKING FOR. AND I WANT TO SEE DOCUMENTS TO SEE WHAT THEY SAY TO SEE IF (A) THEY SUPPORT WHAT IS CONTENDED, AND (B) WHAT EXACTLY THEY SAY AND HOW IT IS RELEVANT TO MY ISSUE TO DECIDE HERE TODAY.

SO I AM STARTING WITH THE DEFENDANT'S BRIEF AND -- OKAY. SO THE FIRST THING THAT LOOKS LIKE DOCUMENT WORTHY IS WHEN CTI SAYS: "MFS IS CONTENDING THAT A WRITTEN UNDERTAKING BETWEEN IT AND CTI CONTROLLED THIS ISSUE WHEN IT DOES NOT."

SO MY QUESTION WOULD BE, MR. EDGERTON, SHOW ME -- WHERE IS THIS WRITTEN UNDERTAKING THAT YOU ARE REFERRING TO? I MEAN IS IT A DOCUMENT THAT IS HERE IN MY

STACK?

MR. EDGERTON: YES, IT IS. GOOD AFTERNOON.

IT IS THE -- WHAT WAS MENTIONED YESTERDAY IS THE ORIGINAL ACTS UNDERTAKING DATED MARCH 30TH, 2015.

THE COURT: OKAY. WELL, THAT WAS ONE OF THE LATER DOCUMENTS, BUT THAT WAS NEXT ACTUALLY. SO THAT WOULD BE ATTACHED TO WHAT?

MR. EDGERTON: THAT IS ATTACHED TO THE DECLARATION OF RICHARD PROBST. SO WE CAN BRING THAT OUT FOR YOU IF YOU WOULD LIKE IT SEPARATE FOR THIS PROCEEDING, BUT THAT IS EXHIBIT -- ONE MOMENT. I WILL TELL YOU EXACTLY THE NUMBER. "E" AS IN EDGERTON.

MR. TJOE: NO. THE ORIGINAL ACTS?

MR. EDGERTON: RIGHT.

MR. TJOE: THAT IS EXHIBIT D, AS IN DAVID, TO MR. PROBST'S DECLARATION, YOUR HONOR.

THE COURT: OF WHAT DATE?

MR. TJOE: THAT WOULD HAVE BEEN FILED APRIL 12TH, 2019.

MR. CATANZARITE: YOUR HONOR, IF IT IS MORE CONVENIENT, THERE IS A BENCH BOOK THAT HAS THAT SAME DOCUMENT AS EXHIBIT 4.

THE COURT: THANK YOU. ALTHOUGH THE DECLARATION WAS COPIED FOR ME, THE EXHIBITS WERE NOT, SO....

MR. EDGERTON: AND WE HAVE NO OBJECTION TO THAT. THE ONLY DOCUMENT WE'RE DISCUSSING IN HIS BOOK IS --

I NEED TO TALK TO YOU ABOUT THAT.

-- IS ONE OF THE ACCOUNTING PREPARED DOCUMENTS, BUT EVERYTHING ELSE IN HIS BOOK IS NON-OBJECTIONABLE.

THE COURT: OH, AWESOME. WHICH REMINDS ME, I SHOULD HAVE MENTIONED THIS EARLIER, I THOUGHT I ASKED YOU TO MEET AND -- DID I ASK YOU TO MEET AND CONFER TO SEE IF YOU COULD AGREE ON ANYTHING?

MR. EDGERTON: YOU DID.

THE COURT: OUTCOME?

MR. EDGERTON: OUTCOME IS WE ARE DOING FINE. WE WERE SCRAMBLING, OF COURSE, TO GET OUR DOCUMENTS THERE. WE GAVE THEM TO MR. CATANZARITE. WE ARE STILL NOT COMPLETED IN THAT PROCESS, BUT WE WILL BE BY THE END OF TODAY. THEY ARE VERY MUCH A REPEAT.

THE COURT: THAT IS KIND OF NOT WHAT I MEANT. I MEANT, IS THERE A STIPULATION THAT CERTAIN DOCUMENTS ARE DEEMED RECEIVED IN EVIDENCE OR OTHERWISE PROPERLY CONSIDERED BY THE COURT?

MR. EDGERTON: NOT OTHER THAN WHAT I JUST REFERRED TO.

THE COURT: OKAY. SINCE WE HAVE THESE NUMBERED EXHIBITS, WHICH MAKES IT EASY, LET'S GO THROUGH THE ONES THAT I AM REFERRING TO HERE. SO WE'RE TALKING ABOUT EXHIBIT 4, ORGANIZATIONAL ACTS AND RESOLUTIONS OF CTI, CORRECT?

MR. EDGERTON: THAT IS CORRECT, YOUR HONOR.

THE COURT: SO SHOW ME THE PAGE NUMBER THAT -- IS THIS A WRITTEN UNDERTAKING ABOUT -- WELL, STOCK, I GUESS.

MR. EDGERTON: OKAY. SO ON PAGE 4 YOU WILL SEE THERE IS A "WHEREAS" CLAUSE.

THE COURT: OKAY. THE ONE THAT TALKS ABOUT 28,000,000 SHARES TO MFS?

MR. EDGERTON: THAT IS CORRECT, YOUR HONOR.

THE COURT: OKAY. AND THIS IS DATED 3/30/15, WAS IT?

MR. EDGERTON: THAT IS CORRECT, YOUR HONOR.

THE COURT: SO IT IS A RESOLUTION TO ISSUE STOCK WITH A CONSIDERATION IN EXHIBIT A, WHICH IS THE THREE THINGS MENTIONED IN THE OPENING STATEMENT.

MR. EDGERTON: AND THAT IS THE STATED CONSIDERATION FOR THE AGREEMENT. THAT IS A SHIPPING CONTAINER, TWO TRAILERS AND UP TO 25,000 IN CASH.

THE COURT: ALL RIGHT.

MR. ANTWILER: WAIT. YOUR HONOR, IT IS ON PAGE 12 AS EXHIBIT A.

THE COURT: I ALREADY FOUND IT. THANK YOU.

MR. ANTWILER: I AM SORRY, YOUR HONOR.

THE COURT: WHICH MENTIONED WHAT THE THREE THINGS WERE.

NOW YOU SAY JUNE 15, 2015 THIS WAS RESCINDED. SO WHERE IS THAT?

MR. CATANZARITE: I CAN GET YOU THAT. IT IS IN THE SAME BOOK.

MR. EDGERTON: THAT IS ALSO IN YOUR BOOK. LET'S TAKE IT FROM YOUR BOOK IF IT IS MORE CONVENIENT.

MR. CATANZARITE: IT MIGHT BE EASIER.

MR. EDGERTON: YES, I THINK SO, TOO. I THINK IT IS THE VERY BOTTOM OF YOURS.

MR. CATANZARITE: IS IT AT THE END?

MR. EDGERTON: I WENT THROUGH YOUR BOOK LAST NIGHT.

THE COURT: 53, INDEX SHOWS THAT DATE.

MR. CATANZARITE: YES, 53.

MR. EDGERTON: YOUR HONOR --

THE COURT: OKAY. WE'RE HERE.

MR. EDGERTON: AND THEN THE RELEVANT PARTS IF YOU NEED TO KNOW RIGHT NOW ARE ON PAGE 1 STARTING WITH THE "WHEREAS" CLAUSES.

THE COURT: YES, THAT IS THE WHOLE IDEA IS I WANT TO LOOK AT THE RELEVANT DOCUMENTS FIRST.

MR. EDGERTON: OKAY.

THE COURT: SO WE HAVE GOT WRITTEN CONSENT OF DIRECTORS OF CTI SIGNED ON 6/15/15. AND IT SAYS, "WHEREAS THE PROPORTION TO AUTHORIZE THE ISSUANCE OF 28,000,000 SHARES, FMS FAILED TO PROVIDE ANY CONSIDERATION AS REQUIRED, AND SO IT WASN'T ISSUED THE STOCK. THE BOARD DEEMS IT IN THE BEST INTEREST TO SELL

TO ITS FOUNDERS LISTED THERE. OTHER PEOPLE" --

OKAY. GOT IT. OKAY. YOU HAVE A STATEMENT THAT STATES, "O'CONNOR'S DECLARATION IS PATENTLY FALSE REGARDING HIS CLAIM THAT 28,000,000 SHARES WERE ISSUED TO MFS."

WAS THERE ANY DOCUMENT FROM PLAINTIFF TO SUPPORT THE CONTENTION THAT THE SHARES WERE ACTUALLY ISSUED?

MR. EDGERTON: THE CERTIFICATE WASN'T ISSUED. BUT IF YOU READ EXHIBIT 4, EXHIBIT 4 SAYS THEY WERE SOLD -- THE SHARES WERE SOLD AND ISSUED.

I MEAN IN EXHIBIT 4, AND THE LAST PAGE OF EXHIBIT 4 CONFIRMS THAT THE SHARES WERE ISSUED. AND THE TESTIMONY WOULD BE THAT THE CONSIDERATION --

THE COURT: YOU HAVE ANSWERED MY QUESTION. THERE IS NO ADDITIONAL DOCUMENT.

MR. CATANZARITE: WELL, THERE WOULD BE EVIDENCE OF CONSIDERATION PAID.

THE COURT: YOU MEAN THOSE THREE REQUIREMENTS?

MR. CATANZARITE: YES.

THE COURT: AND THAT IS IN YOUR NOTEBOOK HERE?

MR. CATANZARITE: YES.

THE COURT: WHERE IS IT?

MR. CATANZARITE: THE FINANCIAL STATEMENTS. EXHIBIT 31, YOUR HONOR.

THE COURT: OKAY, THERE. NOW WHAT AM I LOOKING AT, WHICH PAGE?

MR. CATANZARITE: EXHIBIT 31, FIRST PAGE -- I AM SORRY, EXHIBIT 31, SECOND PAGE, PAGE 2, THERE IS A REFERENCE TO SEEDLING TRAILERS. IF YOU LOOK, YOUR HONOR, THERE IS 50,740 UNDER 12/31/14.

THE COURT: DID YOU REALIZE THIS IS PLAINTIFF'S FINANCIAL STATEMENT, NOT DEFENDANT'S?

MR. CATANZARITE: CORRECT. BUT IF YOU LOOK AT THE NEXT YEAR, THE ENTRY TO THE RIGHT COLUMN 12/31/15 THE SEEDLING TRAILER IS GONE.

THE COURT: IS THERE ANYTHING SHOWING WHO IT WENT TO?

MR. CATANZARITE: IT WENT TO AND WAS USED, THE TESTIMONY WILL BE, IT WENT TO AND IT WAS USED BY CTI.

THE COURT: NO, YOU ARE PREMATURE. I AM NOT INTERESTED IN OFFERS OF TESTIMONY PROOF.

MR. CATANZARITE: SURE.

THE COURT: I AM INTERESTED IN DOCUMENTS.

MR. CATANZARITE: OKAY.

THE COURT: SO NOTHING SAYING LIKE A BILL OF SALE?

MR. CATANZARITE: NOTHING.

THE COURT: THANK YOU. SAME ANSWER WITH RESPECT TO THE OTHER ASSETS, CORRECT?

MR. CATANZARITE: THERE IS ANOTHER, ON PAGE 1, THERE IS A REFERENCE TO CTI EXPENSES PAID, YOUR HONOR. SAME EXHIBIT --

THE COURT: YES.

MR. CATANZARITE: -- SHOWS THAT 62,000 WAS ADVANCED IN 2015.

THE COURT: YES.

MR. CATANZARITE: EXHIBIT 2 SHOWS --

THE COURT: YOU MEAN PAGE 2 OR EXHIBIT 2?

MR. CATANZARITE: EXHIBIT 2 NOW.

THE COURT: YES.

MR. CATANZARITE: EXHIBIT 2 SHOWS LEGAL AND PROFESSIONAL FEES PAID OF 10,000 IN FEBRUARY OF 2015, WHICH WERE -- I DON'T HAVE AN INVOICE, AND YOU DON'T WANT TO HEAR WHAT THE ORAL TESTIMONY WOULD BE, BUT THAT WOULD BE -- THAT AND THE EXPENSES INCURRED IN THE FIRST FOUR MONTHS WOULD BE SUPPORTIVE OF PLAINTIFF'S POSITION THAT CONSIDERATION HAD PASSED.

EXHIBIT 6 --

THE COURT: YOU DON'T NEED TO BE REDUNDANT ON THE MONEY. DO YOU HAVE ANYTHING FOR THE OTHER TWO ASSETS?

MR. CATANZARITE: YES, EXHIBIT 6, YOUR HONOR. EXHIBIT 6 IS A LEASE WITH PACIFIC CULTIVATORS ASSOCIATION SIGNED BY MR. PROBST TO MR. O'CONNOR FOR LEASE OF A TRAILER.

THE COURT: 4/2/15, THREE DAYS AFTER THE ORIGINAL ACTS WERE SIGNED?

MR. CATANZARITE: YES, YOUR HONOR.

THE COURT: SO IT IS IN ANTICIPATION OF COMPLIANCE BY PLAINTIFF?

MR. CATANZARITE: YES.

THE COURT: WHICH DIDN'T HAPPEN?

MR. CATANZARITE: IT DID HAPPEN.

THE COURT: OKAY.

MR. CATANZARITE: EXHIBIT 5, YOUR HONOR.

THE COURT: WHAT ABOUT IT?

MR. CATANZARITE: EXHIBIT 5, PARAGRAPH 4 -- EXHIBIT 4 REFERENCES THE FORMATION OF THE SUBSIDIARY, THIS IS MOBILE FARMING TO BE KNOWN AS CTI.

THE COURT: AND IT SAYS THEY GAVE THEM A 32 FOOT SEEDING TRAILER AND 40 FOOT SHIPPING CONTAINER.

MR. CATANZARITE: YES. IN ORDER TO CAPITALIZE MOBILE FARMING SYSTEMS HAS CONTRIBUTED CERTAIN ASSETS TO CTI INCLUDING, IN OTHER WORDS, PAST TENSE, YOUR HONOR, AND THE 40 FOOT CONTAINER.

THE COURT: I DON'T SEE A DATE ON THIS LETTER. IS THERE ONE?

MR. CATANZARITE: I BELIEVE -- THE CONCURRENCE IS IS APRIL OF 2015, YOUR HONOR. THIS WAS SENT TO ALL MOBILE FARMING SHAREHOLDERS.

THE COURT: THANK YOU.

MR. CATANZARITE: AND EXHIBIT 8, YOUR HONOR, EXHIBIT 8 IS MAY 9TH, 2015, SECOND PARAGRAPH, QUOTE: "RIGHT NOW CTI IS OWNED 100 PERCENT BY MFS, MOBILE

FARMING, PROBST TO O'CONNOR."

AND EXHIBIT 7, YOUR HONOR, EXHIBIT 7, PAGE 4, UNDER "CULTIVATION" -- PAGE 4 UNDER THE "CULTIVATION TECHNOLOGY'S" COLUMN, YOUR HONOR, "LONG-TERM LIABILITIES," THERE IS A REFERENCE TO MFS LOAN, $75,000. MFS LOAN ACCRUED INTEREST 12,000, INDICATING THAT MONEY HAD PASSED. AND THE 2015 FINANCIAL STATEMENT I REFERRED YOU TO CONFIRMS THIS MUCH.

THE COURT: HOW IS A LOAN RELEVANT TO WHAT WE HAVE BEEN TALKING ABOUT?

MR. CATANZARITE: CONSIDERATION PAID UP TO 25,000.

THE COURT: SO IF IT IS A LOAN, IT IS NOT GIVEN?

MR. CATANZARITE: WELL, THEY ARE CALLING IT A LOAN, BUT THAT IS WHAT THEY ARE CALLING IT. THE EVIDENCE IS OTHERWISE.

THE COURT: OKAY. THANK YOU.

OKAY. THE THING ON PAGE 2 WHICH SAYS, "THE ANTICIPATED AGREEMENT TO MAKE MFS A SHAREHOLDER WAS RESCINDED BEFORE PERFORMANCE," THAT'S THE SAME THING YOU ARE TALKING ABOUT ABOUT THE JUNE 15TH, 2015 ACTION, THAT IS WHAT YOU ARE REFERRING TO THERE?

MR. EDGERTON: AS FAR AS THE DOCUMENTS, YES.

THE COURT: OKAY.

MR. EDGERTON: HOLD ON. LET ME CONSULT.

(DEFENSE COUNSEL AND CLIENTS CONFER OFF THE

RECORD.)

MR. EDGERTON: YES, THERE IS MORE, BUT IT IS MORE INDIRECT. IT IS EVERYTHING -- THE ENSUING SHAREHOLDER LIST DID NOT LIST MFS, THE SHAREHOLDER, IF THAT IS RELEVANT TO WHAT YOU WOULD LIKE TO SEE.

THE COURT: SURE.

MR. EDGERTON: OKAY.

THE COURT: DO YOU HAVE AN EXHIBIT NUMBER TIED TO THE PLAINTIFF BOOK?

MR. EDGERTON: I DON'T THINK SO.

THE COURT: DO YOU HAVE THEIR INDEX OF EXHIBITS?

MR. EDGERTON: I DO IN THE BOOK.

THE COURT: IF YOU CAN LOOK AT THE INDEX AND TELL ME WHICH ONE IT WOULD BE.

MR. EDGERTON: I WILL DO THAT RIGHT NOW.

THE COURT: SO THE PLAINTIFF EXHIBIT NOTEBOOK LEAVES OFF AT 57, SO WE'LL CALL IT 58.

MR. CATANZARITE: WHAT IS THAT? DO YOU HAVE AN EXTRA ONE?

MR. EDGERTON: YOUR HONOR, I WOULD LIKE TO ADDRESS THE COURT. FROM THIS, THERE IS A SERIES OF EXHIBITS THAT REINFORCE THROUGH EXTRINSIC EVIDENCE THAT MFS WAS NOT RECOGNIZED AS A SHAREHOLDER, SIGNED OFF BY THE CEO, MR. O'CONNOR, AND THAT GOES TO THE SHAREHOLDER CONSENTS. THERE IS ALSO DOCUMENTS WHERE SHARE --

WHAT HAPPENED LATER IN THE STORY WAS THEN THERE

WERE SHARES ON THE SWITCHOVER, AND IT HAD THE SHAREHOLDER TABLE WHERE MFS WAS ABSENT, AND THAT WAS SIGNED OFF BY MR. O'CONNOR.

NOW THAT EVIDENCE IS SOMEWHAT CUMULATIVE, AND WE CAN GIVE THAT TO THE COURT, BUT IT IS SORT OF A BACKUP AND REINFORCEMENT CORROBORATING EVIDENCE OF THE FACT THAT THAT WAS KNOWN.

THE COURT: WHAT PART OF EXHIBIT 58 AM I SUPPOSED TO LOOK AT HERE?

THE COURT REPORTER: I AM SORRY, YOUR HONOR --

THE COURT: OKAY. THERE IS A COURT REPORTER --

MR. ANTWILER: WE WILL ANSWER YOUR QUESTION.

THE COURT: -- YOU ARE TREATING THIS LIKE A ROUNDTABLE MEETING, BUT IT IS A COURT HEARING. ONE PERSON SPEAKS AT A TIME, AND THE COURT REPORTER NEEDS TO HEAR WHAT IS SAID.

MR. EDGERTON: OKAY. SO THE COURT IS REQUESTING WHAT PART OF THE PHYSICAL EXHIBIT SHOWS THAT FACT.

THE COURT: AND I THOUGHT -- I AM LOOKING FOR AN EXHIBIT THAT IS ATTACHED TO THE DECLARATION, NOT THE DECLARATION ITSELF, BECAUSE I DON'T REALLY CARE ABOUT, YOU KNOW, WHAT SOMEBODY DECLARES UNDER PENALTY OF PERJURY. I WANT THE UNDERLYING DOCUMENT.

SO WHAT AM I LOOKING AT?

MR. EDGERTON: IT IS EXHIBIT NUMBER 1.

THE COURT: PLAINTIFFS' SECURITIES AGREEMENT?

MR. EDGERTON: YES. WE CAN GIVE IT TO YOUR CLERK. WE JUST PULLED IT FROM THE DECLARATION.

THE COURT: WHAT PAGE DO I WANT?

MR. TJOE: YOUR HONOR, IT IS PAGE 1. SO IT IS PART OF THE SECURITIES AGREEMENT. SUBPARAGRAPH E: "THE ISSUER MUST PROVIDE TO QUICK SILVER THE FOLLOWING DOCUMENTS: SUBPARAGRAPH E IS A COMPLETE LIST OF ISSUED AND OUTSTANDING SECURITIES OF THE ISSUER INCLUDING BUT NOT LIMITED TO PARAGRAPHS A, B, C, D AND E, AND WHAT WAS THEREAFTER PROVIDED."

THE COURT: SO WHAT PAGE IS THE LIST ON?

MR. TJOE: THAT IS A SEPARATE EXHIBIT, YOUR HONOR.

THE COURT: OH.

MR. EDGERTON: WELL, I THINK --

MR. ANTWILER: YOUR HONOR, UNDER E IT REQUESTS A COMPLETE LIST OF ISSUED AND OUTSTANDING SECURITIES, AND AT THAT POINT --

THE COURT: SO WHAT ARE YOU TALKING ABOUT, A NEGATIVE INFERENCE?

MR. EDGERTON: YES.

THE COURT: OKAY.

MR. ANTWILER: THE ONLY SHARES THAT HAVE BEEN ISSUED WOULD BE THE FOUNDERS WHICH WERE ISSUED AT THAT TIME THROUGH THAT SECURITIES AGREEMENT.

MR. EDGERTON: YES, BUT IT IS A NEGATIVE

INFERENCE.

THE COURT: OKAY. I AM LOOKING FOR DOCUMENTARY SUPPORT FOR ALL THESE VARIOUS THEORIES. SO IF YOU DON'T HAVE A DOCUMENT ON THE SHAREHOLDER LIST, FINE.

MR. TJOE: YOUR HONOR, THE NEXT DOCUMENT WOULD BE 59. IT IS THE SHARES INITIALLY ISSUED BY QUICK SILVER. IN OTHER WORDS, THE INFERENCE, IF THAT MAY BE CALLED, IS THIS IS WHAT WAS ISSUED AT THE VERY BEGINNING, THE VERY FIRST SHARES.

THE COURT: SO PASS IT AROUND UNLESS IT IS ALREADY PART OF THE NOTEBOOK.

MR. ANTWILER: IT IS NOT, YOUR HONOR.

MR. CATANZARITE: IS THAT THIS ONE?

MR. ANTWILER: YES.

MR. CATANZARITE: IT IS THIS ONE?

MR. ANTWILER: CORRECT.

THE COURT: SO THIS IS DATED 7/30/15, CHECKLIST REMINDER. AND YOU ARE SAYING THIS LISTS THE INITIAL SHAREHOLDERS?

MR. TJOE: YES. AND IT ALSO HAS COPIES OF THE INITIAL SHARES THAT WERE ISSUED STARTING OUT CERTIFICATE 1001.

THE COURT: SO PAGE 3 LISTS EIGHT SHAREHOLDERS.

MR. TJOE: CORRECT.

THE COURT: NONE OF WHICH ARE THE PLAINTIFF.

MR. TJOE: CORRECT, YOUR HONOR.

THE COURT: WHICH MAY BE CONSISTENT WITH SOME OTHER PREVIOUS DOCUMENT I SAW ABOUT ISSUING SHARES TO CERTAIN PEOPLE INSTEAD OF TO THE PLAINTIFF.

MR. TJOE: YES, YOUR HONOR.

THE COURT: YOU KNOW, THERE ARE THINGS IN THIS DEFENSE BRIEF ABOUT THINGS HAPPENING, BUT IS THERE ANYTHING THAT SHOWS LIKE WHO ARE THE INDIVIDUALS WITH THE PLAINTIFF AT THIS TIME SUCH THAT THEIR ACTIONS CAN BE IMPUTED TO THE CORPORATION? IN OTHER WORDS, JUST BECAUSE RICHARD O'CONNOR, RICHARD PROBST AND AMY COOPER ON BEHALF OF CTI SAY WE ARE NOT GOING TO ISSUE STOCK TO MFS, THAT DOESN'T NECESSARILY MEAN MFS AGREES. HOWEVER, IF THOSE ARE THE SAME THREE PEOPLE THAT ARE IN CHARGE OF MFS, THEN THAT COULD SUPPORT AN INFERENCE THAT MFS DOES AGREE.

SO WHAT EVIDENCE IN WRITING IS THERE ABOUT WHO IS IN CHARGE OF MFS AT THIS POINT IN TIME?

MR. EDGERTON: THAT IS EASY TO PROVIDE. THAT JUST GOES TO PROOF, I WOULD THINK THAT AT THE TIME THERE IS AN MFS DOCUMENT SHOWING THAT THOSE ARE THE THREE SOLE BOARD MEMBERS. AND THAT COMES FROM THE DECLARATION OF RICHARD PROBST BECAUSE HE WAS THE ONE WHO PROVIDED ALL THE BACKGROUND INFORMATION ON MFS.

THE COURT: DID YOU JUST SAY IT IS THE SAME THREE PEOPLE?

MR. EDGERTON: IT IS.

THE COURT: OKAY.

MR. EDGERTON: THAT IS UNDISPUTED, CORRECT? THAT IS UNDISPUTED, RIGHT?

MR. CATANZARITE: IT IS UNDISPUTED THEY ARE THE SAME THREE PEOPLE, BUT THEY DID NOT ACT FORMALLY TO ACKNOWLEDGE THAT MFS WAS NEVER A SHAREHOLDER.

THE COURT: UNDERSTOOD.

MR. EDGERTON: SO YOU HAVE THE SAME THREE CONTROLLING TWO COMPANIES.

THE COURT: OKAY. MOVING RIGHT ALONG.

MR. EDGERTON: YOUR HONOR, I WANTED TO MENTION SOMETHING THAT I MENTIONED YESTERDAY THAT --

THE COURT: NO, I DON'T WANT TO HEAR IT.

MR. EDGERTON: OKAY.

THE COURT: MY NUMBER 1 GOAL TODAY IS TO FINISH TODAY. WHETHER OR NOT THAT IS GOING TO HAPPEN TODAY REMAINS TO BE SEEN. BUT IT IS ALL ABOUT ME ABSORBING INFORMATION.

MR. EDGERTON: SURE. BUT I JUST WANT TO ADD A DOCUMENT AT SOME POINT.

THE COURT: I AM GOING THROUGH YOUR TRIAL BRIEF. YOU SAY O'CONNOR ALSO SIGNED OVER 50 SUBSCRIPTION AGREEMENTS TO SELL CTI STOCK DIRECTLY TO MFS SHAREHOLDERS.

MR. EDGERTON: THAT IS CORRECT, YOUR HONOR.

THE COURT: IS THERE A DOCUMENT ON THAT ONE?

MR. EDGERTON: YES, THERE IS.

THE COURT: WHILE YOU ARE LOOKING FOR THAT, THE NEXT STATEMENT IS, "GREG D FILINGS AND PRIVATE PLACEMENT MEMORANDUMS CONFIRM WHO THE MAJOR SHAREHOLDERS WERE. MFS WAS NEVER LISTED AS A SHAREHOLDER IN ANY OF THESE DOCUMENTS."

SO YOU HAVE ALREADY GIVEN ME EXHIBIT 59. SO IS THERE ANYTHING THAT WOULD BE NOT REDUNDANT OF THAT THAT SUPPORTS THAT ASSERTION?

MR. EDGERTON: NO. IT IS CUMULATIVE.

THE COURT: OKAY.

MR. EDGERTON: PERHAPS YOU ARE RIGHT.

THE COURT: I MEAN THAT IS FINE, IF THERE WAS AN ISSUANCE TO ANOTHER BATCH OF SHAREHOLDERS --

MR. EDGERTON: RIGHT.

THE COURT: -- THAT WOULD BE NONREDUNDANT.

MR. EDGERTON: RIGHT.

THE COURT: AND YOU SAY, "O'CONNOR REPRESENTED AND WARRANTED TO THE CTI TRANSFER AGENT THAT MFS WAS NOT A SHAREHOLDER OF CTI. SEE OPTA INJUNCTION PAGE 7, SECTION F." OKAY. SO IS THERE A DOCUMENT FOR THIS STATEMENT?

MR. ANTWILER: IT WOULD BE 58, YOUR HONOR. WE ALREADY MARKED.

MR. EDGERTON: AND, YOUR HONOR, DO YOU HAVE 58 AS ONE PAGE OR THE WHOLE EXHIBIT THAT I HAVE?

THE COURT: I HAVE QUICK SILVER, 12 PAGES.

MR. EDGERTON: OKAY. YOU HAVE IT.

THE COURT: SO WHERE DOES IT SAY FOR MR. O'CONNOR THAT MFS ISN'T A SHAREHOLDER?

MR. ANTWILER: IT IS THROUGH A NEGATIVE INFERENCE, YOUR HONOR.

THE COURT: SO WHEN YOU SAY HE REPRESENTED AND WARRANTED THAT THEY WEREN'T A SHAREHOLDER, THAT IS FROM HIM SAYING THESE OTHER PEOPLE ARE SHAREHOLDERS?

MR. ANTWILER: HE WAS BOUND UNDER 1E THAT WE DISCUSSED TO GIVE A COMPLETE LIST OF ALL SHARES ISSUED AND OUTSTANDING, AND MFS WAS NOT LISTED.

THE COURT: SO WHERE DID HE PROVIDE THIS LIST? IS THAT THE EXHIBIT 59 LIST?

MR. ANTWILER: 59 IS THE ONLY THING THAT WAS PROVIDED, THAT IS CORRECT, YOUR HONOR.

THE COURT: I AM NOT SURE THAT THAT ANSWERED MY QUESTION.

MR. EDGERTON: I DON'T THINK IT DID. IT IS NOT A GOOD ANSWER. BUT ON PAGE 1 IT'S HE IS REPRESENTING HE IS ANSWERING THESE QUESTIONS AS HE IS BEING ASKED BY THE TRANSFER AGENT TO ANSWER.

THE COURT: PAGE 1 OF?

MR. EDGERTON: OF THE QUICK SILVER DOCUMENT. AND THAT IS WHAT HE IS SUPPOSED TO BE PROVIDING, AND HE PROVIDES A LIST, WHICH CONSPICUOUSLY ABSENT IS MFS AS A SHAREHOLDER.

THE COURT: AND THIS LIST IS AT PAGE 2 OF EXHIBIT 59 THAT LISTS SHARES 1000 THROUGH 1007?

MR. TJOE: CORRECT, YOUR HONOR.

MR. EDGERTON: THAT IS CORRECT, YOUR HONOR.

THE COURT: IS THERE SOMETHING SAYING THIS CAME FROM HIM? I MEAN IT MAY NOT EVEN BE DISPUTED. I JUST WANT TO KNOW IF IT IS IN WRITING.

MR. EDGERTON: I UNDERSTAND.

MR. ANTWILER: ACTUALLY, YOUR HONOR, ON EXHIBIT 58, IF I MAY, IT ATTACHES EXHIBIT -- I AM SORRY. ONE MOMENT, YOUR HONOR, I THINK I CAN FIND IT.

MR. TJOE: AND, YOUR HONOR, ALSO EXHIBIT 58, PAGE 10, MIGHT HAVE BEEN A MISSTATEMENT THAT MR. O'CONNOR SAID THIS. BUT MS. COOPER AT PAGE 10 OF 12, YOUR HONOR, I BELIEVE THAT SHE TESTIFIED -- DECLARES EFFECTIVELY UNDER PENALTY OF PERJURY THAT, UNDER WHERE IT SAYS TOWARDS THE BOTTOM HALF OF THE PAGE, "SHARES OF SAID STOCK HAVE BEEN ISSUED," AND THERE IS NONE.

THE COURT: I AM NOT SEEING THAT.

MR. TJOE: SO TWO-THIRDS DOWN THE PAGE "THAT OF SAID AUTHORIZED STOCK THEY ARE NOW ISSUED" --

THE COURT: YES.

MR. TJOE: AND THERE IS NOTHING. NO STOCK HAD BEEN INDICATED HAD BEEN ISSUED AS OF THIS DATE.

THE COURT: YES.

MR. TJOE: SO THAT WOULD BE INDICATIVE OF THE

FACT THAT NO SHARES OF CTI HAVE EVER BEEN ISSUED TO MFS AS OF THIS DATE.

THE COURT: OH, OKAY.

MR. TJOE: AS SIGNED BY MS. COOPER.

AND I BELIEVED THE CONFUSION IS THE INFERENCE, THE NEXT PAGE, THAT IS PAGE 11 OF 12, YOUR HONOR, THIS IS A CERTIFICATE OF AUTHORITY OF OFFICERS, AND THAT IS SIGNED BY MR. O'CONNOR, MISS COOPER, MR. PROBST, AND I DON'T THINK IT IS MUCH OF A LEAP TO SAY THAT THEY WERE EFFECTIVELY VALIDATING WHAT MS. COOPER SAID ON PAGE 10 OF 12.

THE COURT: OKAY.

MR. ANTWILER: AND, YOUR HONOR, IN EXHIBIT 59 WHERE THE FIRST CERTIFICATES WERE ISSUED IT DOES INCLUDE A COPY OF THE AMENDED ORGANIZATIONAL ACTS.

THE COURT: WHICH I HAVE ALREADY LOOKED AT?

MR. ANTWILER: CORRECT, YOUR HONOR.

THE COURT: SO THEN YOU SAY THAT ALL BUT SIX OF 59 PLAINTIFF SHAREHOLDERS AGREE TO PARTICIPATE AND PURCHASE STOCK IN CTI, PROBST'S DECLARATION SECTION PARAGRAPH 31 IN EXHIBIT J.

MR. TJOE: YES, YOUR HONOR. EXHIBIT J TO MR. PROBST'S DECLARATION IS UNFORTUNATELY NOT A VERY GOOD PRINTOUT OF -- IT SUMMARIZES AND HIGHLIGHTS IN YELLOW THE INDIVIDUALS THAT DID NOT PARTICIPATE IN THE FRIENDS AND FAMILY ROUND.

I CAN GIVE THE COURT CLERK WHAT I WILL MARK AS EXHIBIT 60.

MR. CATANZARITE: I HAVE GOT THAT ONE.

MR. ANTWILER: IT IS IN HIS BINDER.

MR. CATANZARITE: IT IS BLOWN-UP.

THE COURT: WHAT NUMBER IS IT?

MR. CATANZARITE: THERE IS A SET OF SPREADSHEETS; IT IS AT 52. WE MADE IT BIGGER.

MR. EDGERTON: OH, THIS IS THE ONE THAT I WAS NOT SURE ABOUT. IS THAT JUST THE BLOWUP?

MR. CATANZARITE: YES.

MR. EDGERTON: OKAY. SO I AM STIPULATING TO HIS WHOLE BOOK.

MR. CATANZARITE: IT IS BLOWN-UP AS AN 11-BY-17. I DON'T THINK IT HAS THE YELLOW ON IT.

MR. EDGERTON: SO THAT IS JUST REPLICATION?

MR. CATANZARITE: YES.

MR. EDGERTON: OKAY. THAT IS FINE.

MR. TJOE: SO TO THE EXTENT THAT IT IS HELPFUL --

THE COURT: OKAY. SO WE HAVE GOT CTI SHAREHOLDER LIST. WE HAVE GOT FIRST 1 THROUGH 9, AND THEN WE HAVE GOT 1 THROUGH 163, AND THEN YOU HAVE GOT MORE ON TOP OF THAT WITH ISSUE DATES SET FORTH. AND I TAKE IT THERE IS NO PLAINTIFF ON HERE?

MR. TJOE: NO, YOUR HONOR.

MR. EDGERTON: THAT IS CORRECT.

THE COURT: OKAY. IS THERE ANYTHING TYING THIS IN TO THE PLAINTIFF TAKING THE POSITION THAT THIS IS ACCURATE?

MR. EDGERTON: THE PLAINTIFF IS TAKING THE ADVERSE POSITION NOW THAT IT IS NOT ACCURATE, AND THAT IS THE EXHIBIT THAT I WANTED TO MARK.

THE COURT: THAT IS EXACTLY WHY I WANT TO SEE IF THEY TOOK THE POSITION IN THE PAST THAT IT WAS ACCURATE.

MR. EDGERTON: THEY DID NOT TAKE A POSITION IN THE PAST THAT IT WAS ACCURATE. THEY WENT WITH OUR POSITION. THREE-AND-A-HALF YEARS LATER IS WHEN THE DISPUTE AROSE.

THE COURT: I FEEL LIKE YOU ARE SAYING THE SAME THING THAT I WAS SAYING.

MR. EDGERTON: PROBABLY. I JUST WANT TO MAKE SURE IT IS JUST SAID THAT WAY.

THE COURT: I WILL REPEAT WHAT I AM SAYING: IF YOU HAVE ADMISSIONS BY THE PLAINTIFF THAT THEY ARE NOT A SHAREHOLDER, THEN THAT IS SOMETHING I WOULD WANT TO SEE.

SO IF A LIST OF SHAREHOLDERS THAT DOESN'T INCLUDE THE PLAINTIFF IS ARGUED BY THE DEFENDANT, OKAY, FINE. BUT IF THE PLAINTIFF HAS EMBRACED THIS LIST, THEN THAT IS MORE INTERESTING TO ME.

MR. EDGERTON: SO IT IS EXECUTED BY MR. O'CONNOR, SO A TACIT ADMISSION IS ACKNOWLEDGED BY

HIM.

THE COURT: OKAY. WHERE DO I FIND A SIGNATURE ON HERE?

MR. ANTWILER: YOUR HONOR, I DON'T KNOW IF IT'S -- WHICH DOCUMENT WE ARE REFERRING TO AT THE MOMENT, BUT WE HAVE --

THE COURT REPORTER: I AM SORRY, I DIDN'T HEAR YOU.

THE COURT: WHEN YOU FACE BACKWARD, NOBODY CAN HEAR YOU.

MR. ANTWILER: I AM SORRY, YOUR HONOR.

WE HAVE SUBSCRIPTION AGREEMENTS THAT ARE SIGNED, WHICH WOULD GO ALONG WITH THE NEW SHARE STRUCTURE, WHICH DOES NOT INCLUDE MFS THAT ARE SIGNED BY RICHARD O'CONNOR.

THE COURT: OKAY. WELL, I UNDERSTAND THAT THERE IS AN ARGUMENT IN YOUR BRIEF THAT HE SHOULDN'T BE HEARD TO COMPLAIN THAT OTHER PEOPLE OWN STOCK, BUT I AM NOT REALLY SURE THAT IS AN ISSUE FOR THIS HEARING. IT'S MORE ABOUT DOES PLAINTIFF ITSELF OWN ANY STOCK, WHETHER PLAINTIFF IS A 100 PERCENT SHAREHOLDER OR SOME LESSER PERCENTAGE SHAREHOLDER?

SO THE FACT THAT MR. O'CONNOR AGREED THAT THERE ARE THESE OTHER SHAREHOLDERS, IT CAN ONLY GO SO FAR.

MR. TJOE: YOUR HONOR, IF YOU ARE JUST LOOKING FOR DOCUMENTARY EVIDENCE, THERE IS AN E-MAIL EXCHANGE ON MOBILE FARMING SYSTEMS' LETTERHEAD. THIS IS BETWEEN

MR. PROBST, MR. COOPER -- EXCUSE ME, MS. COOPER AND MR. O'CONNOR.

THE COURT: IF IT IS RELEVANT, I WANT TO SEE IT. AND I WOULD RATHER READ IT MYSELF THAN HAVE YOU READ IT TO ME.

MR. TJOE: THAT IS FINE, YOUR HONOR.

MR. CATANZARITE, IS THIS E-MAIL PART OF YOUR TRIAL EXHIBIT BINDER?

MR. CATANZARITE: IS THERE A DATE?

MR. TJOE: IT IS NOVEMBER 3RD, 2017. IT WAS PREVIOUSLY ATTACHED --

MR. CATANZARITE: NO, WE DON'T HAVE THIS.

MR. TJOE: -- PREVIOUSLY ATTACHED AS EXHIBIT L TO MR. PROBST'S DECLARATION.

IF IT IS OKAY WITH MR. CATANZARITE, I WILL LABEL THIS AS 60.

MR. CATANZARITE: SURE.

THE COURT: WELL, ACTUALLY IT IS NOT OKAY -- IT DOESN'T HAVE TO BE OKAY WITH HIM IF IT IS MARKED, BUT ONLY IF IT IS ADMITTED. SO YOU CAN MARK IT AS EXHIBIT 60.

MR. TJOE: IDENTIFIED, EXACTLY, YOUR HONOR. MY APOLOGIES.

THE COURT: SO WE ARE CALLING THESE E-MAILS DATED 11/3/17.

SO POINT ME TO THE INTERESTING PART.

MR. TJOE: SURE, YOUR HONOR. SO BEGINNING AT THE BOTTOM OF THE PAGE, THIS IS FROM MY CLIENT, MR. PROBST; THIS IS ADDRESSED TO -- THIS WAS SENT TO MS. COOPER AND MR. O'CONNOR. "GUYS, WE NEED TO CLOSE THE COMPANY OR POSSIBLY B.K. IT. ITS ONLY ASSETS ARE THE STOCK IT OWNS IN GROW POD SOLUTIONS AND THE NOTE FROM CTI WHICH WON'T BE PAID ANY TIME SOON."

THE COURT: OKAY. SO YOUR POINT IS HE IS NOT IDENTIFYING CTI STOCK AS AN ASSET OF MFS?

MR. TJOE: CORRECT. AND IF YOU FOLLOW THE REST OF THE E-MAIL, NO ONE DISAGREES WITH THAT. NO ONE OBJECTS TO THAT POSITION.

THE COURT: OKAY.

MR. ANTWILER: YOUR HONOR, ALSO THERE ARE PPM'S THAT WOULD LIST ALL SHAREHOLDERS THAT OWN FIVE OR PERCENT MORE OF CTI. MFS IS NOT LISTED, AND THEY ARE EXECUTED -- SOME OF THEM ARE EXECUTED BY, OR AUTHORIZED BY MR. O'CONNOR.

THE COURT: WELL, AT THIS POINT I BELIEVE IT IS THE PLAINTIFF'S CONTENTION THAT THEY ACQUIRED STOCK AT THE VERY BEGINNING. SO THE FACT THAT THEY WEREN'T LISTED ON SOME SUBSEQUENT STOCK OFFERING I DON'T THINK REALLY MATTERS FOR PURPOSES OF THIS HEARING. CORRECT?

MR. ANTWILER: WELL, IT LISTED THE CURRENT SHAREHOLDERS THAT OWN FIVE OR PERCENT MORE, AND IT DOES NOT LIST MFS. SO IT IS A SHOWING THAT MFS WAS NOT A FIVE

PERCENT OR MORE SHAREHOLDER.

THE COURT: OH, I THOUGHT YOU WERE LISTING IT AS A LIST OF A NEW ISSUANCE AS OPPOSED TO A CUMULATIVE LIST OF ALL STOCKHOLDERS OF FIVE PERCENT OR MORE. SO YOU ARE SAYING IT IS THE LATTER. SO WHERE IS THAT?

MR. ANTWILER: IT IS THE LATTER.

THAT IS WHAT I AM TRYING TO GATHER, YOUR HONOR. I DON'T HAVE IT IN FRONT OF ME, BUT I CAN PROVIDE IT AT THE FIRST AVAILABLE BREAK.

THE COURT: OKAY. OR YOU CAN KEEP LOOKING FOR IT.

OKAY. THEN YOU HAVE GOT A REPRESENTATION THAT SINCE OCTOBER 2015 CTI RAISED OVER 3,000,000 FROM OVER 60 PRIVATE INVESTORS AND AN ADDITIONAL 6,000,000 IN FINANCING WITH REPRESENTATIONS THAT MFS DID NOT OWN ANY SHARES OF CTI STOCK. SO THAT IS SOMETHING I MIGHT WANT TO SEE IF WE CAN LABEL THAT AS A REPRESENTATION FROM THE PLAINTIFF.

MR. EDGERTON: SO EXTRINSICALLY THAT PROOF, A LOT OF THAT IS GOING TO COME INTRINSICALLY IS WHAT --

WHAT IS THE BACKUP, GENTLEMEN, FOR THAT DOCUMENT?

MR. ANTWILER: YOUR HONOR, THAT WILL ALSO BE INCLUDED ON SOME OF THE PRIVATE PLACEMENT MEMORANDUMS, AND IT IS ALSO ON I THINK WOULD BE REFLECTED IN SOME OF THESE SUBSCRIPTION AGREEMENTS.

ON SOME OF THE SUBSCRIPTION AGREEMENTS IT SAYS THERE IS 23,000,000 SHARES. SO YOU CAN ONLY READ THAT IN CONJUNCTION WITH THE AMENDED BECAUSE THERE IS 28,000,000 SHARES AS PURPORTEDLY ISSUED IS WHAT THEY ARE ARGUING. SO IF THERE ARE ONLY 23,000,000 OUTSTANDING SHARES, THEN NO SHARES CAN BE ISSUED TO MFS.

BUT THE OTHER DOCUMENTARY EVIDENCE IS THE PPM'S THAT WE ARE CURRENTLY TRYING TO FIND TO PROVIDE TO YOUR HONOR.

THE COURT: OKAY. THOSE AMENDED ACTS ARE COMING UP AGAIN. THAT WAS WHAT EXHIBIT?

MR. ANTWILER: I THINK IT'S -- LET ME JUST CONFIRM.

MR. CATANZARITE: 53.

MR. ANTWILER: 53, YOUR HONOR.

THE COURT: ALL RIGHT. I THINK WE ARE AT THE POINT WHERE I WANT TO HAVE PLAINTIFF NOW POINT ANY DOCUMENTS THAT THEY WISH OUT TO ME THAT SUPPORT THIS PLAINTIFF OWNS STOCK INTENTION.

MR. EDGERTON: CAN I JUST, THIS ONE DOCUMENT --

THE COURT: WHAT IS THAT?

MR. EDGERTON: -- IF IT IS APPROPRIATE?

SO YESTERDAY I MENTIONED THE DECLARATION ABOUT MR. O'CONNOR STILL CLAIMING THAT MFS IS THE SOLE SHAREHOLDER OF CTI. AND I APOLOGIZED TO THE COURT AND SAID, IT IS REALLY NOT BLACK AND WHITE IN HIS

DECLARATION, WHICH I ANALYZED, BUT IT IS IN A SHAREHOLDER CONSENT AGREEMENT THAT HE SERVED ON CTI PROCLAIMING HIMSELF TO BE THE CEO OF CTI AND REPRESENTED THAT MFS IS THE SOLE SHAREHOLDER.

SO THAT WAS SOMETHING THAT HE SERVED ON CTI IN JANUARY. SO AS LATE AS JANUARY HE WAS CLAIMING THAT MFS IS THE SOLE SHAREHOLDER OF CTI, A POSITION THAT WE CLAIM IS FALSE.

THE COURT: OKAY. ALL RIGHT, MR. CATANZARITE.

MR. EDGERTON: WOULD YOU LIKE TO HAVE THIS?

THE COURT: NO. IT SOUNDS REDUNDANT.

MR. EDGERTON: ALL RIGHT.

OH, WE JUST FOUND SOMETHING THAT YOU WERE LOOKING FOR.

THE COURT: NAMELY?

MR. TJOE: ONE OF THE PPM'S, YOUR HONOR.

MR. ANTWILER: WE WILL MARK THIS AS EXHIBIT 61?

THE COURT: YES.

MR. EDGERTON: WHAT PAGE?

MR. ANTWILER: I WILL HAND THIS TO THE COURT ATTENDANT.

MR. CATANZARITE: IS THERE A PAGE?

MR. ANTWILER: PAGE 27.

THE COURT: PRIVATE PLACEMENT MEMORANDUM.

MR. CATANZARITE: WHAT IS THE DATE ON IT?

MR. ANTWILER: THE DATE OF THIS MEMORANDUM IS

OCTOBER 2ND, 2015, AND IT IS LISTED ON THE BOTTOM OF THE FIRST PAGE.

THE COURT: PAGE WHAT?

MR. ANTWILER: 27, YOUR HONOR.

THE COURT: SECURITY OWNERSHIP.

MR. ANTWILER: AND IT IS THAT FIRST PARAGRAPH AND THE BELOW TABLE WHICH IS RELEVANT. I CAN READ IT IF YOUR HONOR LIKES.

THE COURT: I DON'T NEED THAT.

AND WHAT DO I HAVE THAT SAYS THAT THIS IS A STATEMENT FROM THE PLAINTIFFS' REPRESENTATIVES?

MR. ANTWILER: WE ARE -- WE HAVE AGREEMENTS THAT HAVE BEEN EXECUTED BY MR. O'CONNOR. I AM CURRENTLY JUST MAKING SURE THAT EVERY REDACTION IS MADE TO ANY SOCIAL SECURITY NUMBERS FOR THE INVESTORS.

THE COURT: YOU ARE GETTING THIS BACK AT THE END OF THE DAY PROBABLY.

MR. ANTWILER: OKAY. SO IT IS FINE IF WE SHOW THAT?

THE COURT: I AM NOT PUTTING IT ON THE INTERNET OR FILING IT AS A DOCUMENT FOR PUBLIC VIEWING.

MR. ANTWILER: IN THAT CASE WE WILL MARK AS EXHIBIT 62 A GROUP OF SIGNED SUBSCRIPTION AGREEMENTS. AND IF YOU WILL LOOK THROUGH SEVERAL OF THESE PAGES, YOU WILL SEE RICHARD O'CONNOR'S SIGNATURE THROUGH DOCUSIGN THERE ON THE BOTTOM OF EACH ONE.

THE COURT: SO THIS IS VARIOUS DATES IN LATE 2015/EARLY 2016. AND YOU ARE SAYING THIS IS PEOPLE GETTING STOCK IN CTI?

MR. ANTWILER: CORRECT, YOUR HONOR. PURSUANT TO THE SUBAGREEMENT THAT WAS EXHIBIT 61, I BELIEVE.

THE COURT: OKAY. I AM NOT SURE HOW HELPFUL THIS IS BECAUSE I AM NOT INTERESTED IN DETERMINING WHETHER PLAINTIFF IS THE ONLY SHAREHOLDER, BUT RATHER IF THEY ARE A SHAREHOLDER.

MR. ANTWILER: BUT THE ONLY REASON I POINTED IT OUT, YOUR HONOR, IS THAT, AS WE SAW ON PAGE 27, IT LISTS ALL SHAREHOLDERS WHO OWNED FIVE PERCENT OR MORE. MOBILE FARMING SYSTEMS, THE PLAINTIFF, IS NOT LISTED, AND WE HAVE O'CONNOR WHO IS AFFILIATED WITH BOTH PLAINTIFF AND CTI SIGNING OFF AND ACCEPTING THOSE.

THE COURT: YOU MEAN THE FACT THAT THESE PEOPLE ARE GETTING STOCK?

MR. ANTWILER: NOT THAT THEY ARE GETTING STOCK, BUT THAT HE IS AUTHORIZING THE PPM, WHICH DOES NOT REPRESENT MFS AS A FIVE PERCENT SHAREHOLDER.

MR. TJOE: IF I MAY CLARIFY?

THE COURT: ARE YOU TYING EXHIBIT 62 TO EXHIBIT 61? IS 62 CARRYING OUT 61?

MR. ANTWILER: CORRECT, YOUR HONOR.

THIS IS THE SIGNATURE PAGES THAT WOULD BE TIED TO EXHIBIT 61.

THE COURT: OKAY. THANK YOU. OKAY. ENOUGH FROM THE DEFENDANT. HAVE A SEAT.

MR. CATANZARITE, YOUR TURN TO SHOW ME DOCUMENTS THAT SUPPORT ANY NOTION OF PLAINTIFF OWNING STOCK IN THIS COMPANY.

MR. CATANZARITE: WELL, I GAVE YOU THE -- I GUESS I INTERRUPTED DEFENDANTS, BUT WE GAVE YOU A LIST OF -- I PROVIDED YOU WITH A LIST OF THE DOCUMENTS WE RELY UPON.

THE COURT: I DON'T KNOW WHAT YOU ARE REFERRING TO.

MR. CATANZARITE: YOU WANT ME TO GO BACK OVER THEM? I WILL. WE BEGAN WITH 2 --

THE COURT: ARE YOU TALKING ABOUT YOUR OPENING STATEMENT?

MR. CATANZARITE: I AM TALKING ABOUT YOU ASKED FOR WHAT ADDITIONAL EXHIBITS I HAD.

THE COURT: OH, THAT. OKAY. NO. WHAT I MEAN IS, DO YOU HAVE ANYTHING ELSE THAT YOU HAVEN'T TOLD ME ABOUT TODAY?

MR. CATANZARITE: NO.

THE COURT: OKAY. ALL RIGHT. SO BASICALLY THE DOCUMENTS SUPPORT THE POSITION THAT CTI HAS TAKEN THE POSITION THAT MFS DOESN'T OWN STOCK. CTI HAS DONE THAT THROUGH ITS THREE DIRECTORS AS OF 2015: PROBST, COOPER AND O'CONNOR, AND THOSE ARE THE THREE DIRECTORS OF MOBILE

FARMING SYSTEMS.

SO EVEN THOUGH MOBILE FARMING SYSTEMS DIDN'T PER SE ITSELF ADOPT THIS POSITION THAT IT DIDN'T OWN STOCK, THEN THE THREE PEOPLE DID SO, WHICH FOR LACK OF A BETTER TERM CONSTITUTES AN ADMISSION AGAINST INTEREST. IF IT WASN'T TRUE, THEY WOULD BE VIOLATING THEIR FIDUCIARY DUTIES UP THE YING YANG TO SIGN DOCUMENTS ON BEHALF OF CTI SAYING THAT MFS IS NO LONGER A STOCKHOLDER IF, IN FACT, MFS WAS A STOCKHOLDER.

SO YOU HAVE SOME SERIOUS EXPLAINING TO DO WHY I SHOULD CONCLUDE THAT MFS IS AS OF TODAY -- WELL, AS OF THE DATE OF THIS CORPORATE ELECTION A SHAREHOLDER OF CTI THAT WAS DENIED ITS RIGHT TO VOTE IN THIS DIRECTOR ELECTION THAT IS BEING CONTESTED.

MR. CATANZARITE: YOU WANT ME TO ADDRESS THAT RIGHT NOW?

THE COURT: YES.

MR. CATANZARITE: OKAY. SO I THINK THAT THE EVIDENCE -- THE OFFER OF PROOF WOULD BE THAT THE TESTIMONY WOULD BE SUCH THAT THE CONSIDERATION PASSED, TRAILERS, CONTAINER PASSED, WERE USED BY CULTIVATION TECHNOLOGIES AS A WHOLLY OWNED SUBSIDIARY. THE REPRESENTATION IN THE APRIL LETTER IS THAT THEY ARE A WHOLLY OWNED SUBSIDIARY AND WILL BE DISTRIBUTED AS A DIVIDEND AT SOME POINT IN TIME. OKAY? AT SOME POINT IN TIME, THAT IS EXHIBIT 5.

SO EXHIBIT 2 CONFIRMS THE AMOUNT OF MONEY SPENT. EXHIBITS -- THE FINANCIAL STATEMENTS CONFIRM THAT MORE THAN 29,000 -- MORE UPWARDS OF 75,000 WAS PAID ON BEHALF OF -- BY MOBILE FARMING FOR THE BENEFIT OF CTI.

THERE IS NO DOCUMENT THAT -- THERE IS NO DOCUMENT THAT SHOWS IT IS A LOAN. IN OTHER WORDS, CTI DOES NOT SIGN A NOTE THAT IT OWES MOBILE FARMING MONEY. THERE IS NO WRITTEN EVIDENCE OF A NOTE. THERE IS NO MOBILE FARMING SHAREHOLDER MEETING AUTHORIZING THE LOAN OF ANY MONEY.

THE LOAN TO MOBILE FARMING DOES NOT APPEAR -- DOES NOT APPEAR ON THE FINANCIAL STATEMENTS IN ANY AUTHORIZED CAPACITY, MEANING IT IS NOT AUTHENTICATED BY A DOCUMENT OF ANY KIND. IT IS JUST PUT FORWARD IN A SET OF RECORDS.

AND THE TESTIMONY WOULD BE THAT THEY WERE TOLD, THAT IS, COOPER AND O'CONNOR WERE TOLD THAT YOU HAVE TO DO IT THIS WAY BECAUSE OF THE FINANCIAL CONDITION OF MOBILE FARMING. SO SIGN THESE DOCUMENTS, WHICH THEY DID.

THE COURT: WHICH DOCUMENTS?

MR. CATANZARITE: WELL, SOME OF THE DOCUMENTS THEY ARE REFERRING TO, THE SHARE ISSUANCES AND THE LIKE THAT THEY ARE RELYING UPON FOR THE NEGATIVE INFERENCE.

THE COURT: SO LET'S ASSUME FOR ARGUMENT SAKE THAT ALL THREE OF THESE MODES OF CONSIDERATION WERE CONVEYED FROM THE PLAINTIFF TO THE DEFENDANT, THEN YOU

HAVE GOT THIS RESOLUTION REPUDIATING THE SHAREHOLDER SIGNED OFF ON BY THE THREE INDIVIDUALS IN THEIR REPRESENTATIVE CAPACITY FOR CTI, YES, BUT THEY ARE THE THREE PRINCIPALS OF THE PLAINTIFF, WHICH GIVES YOU AN ESTOPPEL ARGUMENT AMONG OTHER LEGAL ARGUMENTS AND DOCTRINES THAT COULD APPLY HERE, SO WHY WOULDN'T THAT SUPERSEDE THOSE PREVIOUS FACTS?

MR. CATANZARITE: WELL, BASED UPON -- WELL, THERE IS A COUPLE OF PROBLEMS WITH 53. IF YOU READ 53, IN PARTICULAR PAGE 4, IT PURPORTS TO BE A RESOLUTION OF DIRECTORS. BUT IF MOBILE FARMING WAS NEVER A SHAREHOLDER, THERE WERE NEVER ANY DIRECTORS BECAUSE MOBILE FARMING WOULD HAVE HAD TO VOTE FOR THE DIRECTORS.

IN OTHER WORDS, IF YOU LOOK AT EXHIBIT 4, EXHIBIT 4 HAS MOBILE FARMING ADOPTING THE ACTS AND RESOLUTIONS AS THE SOLE SHAREHOLDER OF CTI. BUT IF AS THEY SAY MOBILE FARMING NEVER PAID, NEVER WAS ENTITLED TO ANY SHARES, NEVER WAS ISSUED ANY SHARES, THEN THERE WOULDN'T BE THAT -- THAT MEETING WOULD BECOME A NULLITY. AND THE ONLY PERSON THAT COULD ACT ON BEHALF OF THE COMPANY IN THAT DEFAULT WOULD BE THE INCORPORATOR WHO RESIGNED ON THE VERY SAME DAY.

AND SO THE INCORPORATOR, MR. ERIC WILLENS, DOES NOT SIGN EXHIBIT 53. IT PURPORTS TO BE SIGNED BY PEOPLE WHO COULD ONLY HAVE BEEN ELECTED AS DIRECTORS BY MOBILE FARMING, AND MOBILE FARMING THEY CLAIM IS NOT A

SHAREHOLDER. SO IT CAN'T BE -- THEY CAN'T RELY UPON 53 IF, IN FACT, THE DIRECTORS ARE NOT AUTHORIZED TO ACT ON BEHALF OF THE COMPANY BECAUSE THEY WEREN'T DULY ELECTED BECAUSE THEY RECANT THAT MOBILE FARMING IS NOT A SHAREHOLDER.

IN OTHER WORDS, THEY DON'T GO BACK AND HAVE WILLENS CONDUCT A NEW MEETING AND SAY THAT MOBILE FARMING DIDN'T PASS THE CONSIDERATION. I WITHDRAW MY RESIGNATION. I NOW ACT AS INCORPORATOR AND I NOW START ANOTHER MEETING AND ALLOW YOU ALL TO PURCHASE SHARES.

THEY JUST HAVE THIS RESOLUTION THAT PURPORTS TO DO SOMETHING THAT THEY ARE NOT -- THEY DON'T HAVE CAPACITY TO DO.

THE COURT: WHEN WAS THIS ELECTION OF DIRECTORS THAT YOU ARE CHALLENGING?

MR. CATANZARITE: WELL, THE LATER -- WELL, THE SUBSEQUENT ACTS BY THE DIRECTORS OF THE COMPANY, BECAUSE IT HAD NO SHAREHOLDERS AS OF THIS POINT OF TIME, IT COULD NOT HAVE HAD DIRECTORS.

THE COURT: HOW DO YOU ADDRESS THE LACHES DEFENSE ARGUMENT THAT YOU WAITED TOO LONG IN THIS EQUITABLE PROCEEDING TO MAKE THIS CLAIM?

MR. CATANZARITE: WELL, I THINK -- LACHES IS AN EQUITABLE ARGUMENT. THE COUNTERPART INS UNCLEAN HANDS THAT THE SHARE --

THE COURT: I DIDN'T ASK YOU ABOUT UNCLEAN

HANDS. I ASKED YOU ABOUT LACHES, THE DELAY IN BRINGING THE PROCEEDING.

MR. CATANZARITE: WELL, I WOULD SAY THAT THE KNOWLEDGE THAT THE SHAREHOLDERS OF MOBILE FARMING HAD NOT RECEIVED THEIR 47 PERCENT OF THE INITIAL ISSUANCE OF THE 28,000,000 SHARES, THE LACK OF THAT KNOWLEDGE WAS NOT DISCOVERED UNTIL THE LAWSUITS WERE INITIATED.

THE COURT: YOU ARE SAYING THE THREE FOUNDERS DIDN'T KNOW THAT MFS NEVER GOT STOCK CERTIFICATES?

MR. CATANZARITE: I AM SAYING THREE FOUNDERS DIDN'T KNOW THAT THE WAY THE ATTORNEYS ENDED UP ISSUING THE SHARES WAS NOT IN ACCORDANCE WITH THE REPRESENTATION MADE IN THE MAY 5TH LETTER TO THE SHAREHOLDERS THAT THEY WOULD END UP WITH 47 PERCENT OF THOSE INITIAL SHARES.

THE COURT: WHO IS "THEY"?

MR. CATANZARITE: THEY MEANING MR. O'CONNOR AND MR. PROBST IN WRITING THE LETTER TO THE SHAREHOLDERS.

THE COURT: I DON'T CARE ABOUT THEIR PERSONAL OWNERSHIP OF SHARES. I AM ONLY REFERRING TO THE MFS OWNERSHIP OF SHARES.

MR. CATANZARITE: MFS, PURSUANT TO THE LETTER THAT WAS ANNOUNCED TO THE SHAREHOLDERS AS STATING THAT MOBILE FARMING OWNED CTI AS A SUBSIDIARY, PROMISED THAT THE SHAREHOLDERS WOULD RECEIVE ON A SPINOUT OR STOCK DIVIDEND WHAT AMOUNTS TO MATHEMATICALLY 13,000,000 SHARES; 47 PERCENT OF THE COMPANY. IT WAS NOT DISCOVERED

UNTIL MUCH LATER, 2018, THAT THE SHAREHOLDERS OF MOBILE FARMING IN RECEIPT OF THAT STOCK DIVIDEND DID NOT END UP WITH THE EQUIVALENT OF 13,000,000 SHARES. THEY ENDED UP WITH ONLY 11 PERCENT OR 4.5 MILLION SHARES. THAT'S THE DISPUTE. THAT WAS DISCOVERED MUCH LATER. BECAUSE THE SHAREHOLDERS DIDN'T HAVE A SHARE COUNT.

THE MOBILE FARMING SHAREHOLDERS DIDN'T HAVE KNOWLEDGE, THE NON-INSIDERS DID NOT HAVE KNOWLEDGE OF THE SHARE COUNT. SO LACHES WOULDN'T APPLY IF THERE IS NO KNOWLEDGE ATTRIBUTABLE TO THESE MATERIAL FACTS.

THE COURT: OKAY. WE ARE GOING TO TAKE OUR AFTERNOON RECESS UNTIL 3:15.

(RECESS.)

THE COURT: WE ARE BACK. NOW THAT I HAVE HAD TIME TO DECOMPRESS WITH THE AFTERNOON RECESS, MR. CATANZARITE, EVERY FIBER OF MY BEING SAYS THAT THE FACTS ARE OVERWHELMING AGAINST YOUR POSITION IN THIS CASE. SO UNLESS YOU CAN CONVINCE ME OTHERWISE, I AM PREPARED TO RULE THAT THIS ELECTION WAS VALID.

MR. CATANZARITE: WELL, THE ONLY THING I CAN SAY IS THAT THE SOLE DOCUMENT UPON WHICH THEY RELY IS EXHIBIT 53, WHICH IS WHAT YOU SAY, AND I UNDERSTAND THE POSITION IS AN ADMISSION AGAINST INTEREST AGAINST MOBILE FARMING BECAUSE IT IS SIGNED BY THREE PERSONS WHO WERE ALSO DIRECTORS AND IN CONTROL OF MOBILE FARMING.

BUT AT THE SAME TIME THE EVIDENCE AT TRIAL WOULD

BE THAT ALL OF THE CONSIDERATION PASSED, AND THE TRAILER PASSED, ALL THE CONSIDERATION -- CONSIDERATION OF MONEY PASSED, IN ALL MEANS PASSED, AND THAT THE SHARES WERE ISSUED AND SOLD.

THE FACT THAT THERE IS NO CERTIFICATE DOES NOT SOLVE -- DOES NOT CURE OR ERASE THAT FACT.

WHEN THEY SIGN ON JUNE 15TH OF 2015 THAT THE CONSIDERATION DID NOT PASS, THAT IS BASED UPON THE ADVICE OF COUNSEL, AND IT IS FLAT OUT WRONG, AND IT IS AGAINST THE INTEREST OF MOBILE FARMING TO HAVE SIGNED IF, IN FACT, MOBILE FARMING DID NOT RECEIVE THE SHARES IT WAS ENTITLED TO.

SO I THINK THAT WHEN YOU SAY THAT IT IS AN ADMISSION, IT IS NOT -- AN ADMISSION AGAINST INTEREST SIGNED BY THE LAWYER WHO TELLS THEM TO SIGN IT BECAUSE THIS IS THE WAY IT MUST BE DONE, THAT TYPE OF EXPLANATION, IF OFFERED, AND BELIEVED BY THE COURT, AND COUPLED WITH THE EVIDENCE THAT THE CONSIDERATION HAD, IN FACT, PASSED SHOULD ALONE BE SUFFICIENT, YOUR HONOR, TO AWARD THE 28,000,000 SHARES TO MOBILE FARMING.

THE COURT: THANK YOU.

SO, YOU KNOW, I NOTICED IN THE OPENING STATEMENT YESTERDAY MR. EDGERTON SAID THAT PLAINTIFFS WERE RELYING ON A CASE FROM 1880 SOMETHING. BUT WHEN I WAS LOOKING AT THE CASE AT THE STATUTORY ANNOTATIONS UNDER 709, THERE'S A CASE FROM 2009 CALLED HAAH, H-A-A-H, VERSUS KIM, 175

CAL.APP.4TH, 45, THAT HOLDS THAT STANDING REGARDING A 709 CLAIM INCLUDES SOMEONE WHO HAD ENTERED INTO AN AGREEMENT TO TAKE SHARES IN A CORPORATION, BUT WHO HAD NOT BEEN ISSUED THOSE SHARES.

SO I THINK THAT IS WHAT THE PLAINTIFF IS CLAIMING HERE. BUT WE HAVE REPUDIATION OF THE AGREEMENT BY PEOPLE WHO WERE THE SAME PRINCIPALS IN THE PLAINTIFF. WE HAVE ACTIONS -- REPEATED ACTIONS TAKEN SUBSEQUENTLY CONSISTENT WITH THE NOTION THAT PLAINTIFF WAS NOT A STOCKHOLDER. THE DELAY IN BRINGING THIS ACTION IS CONSISTENT WITH THAT CONCLUSION, THAT PLAINTIFF HAS BEEN OF THE VIEW THAT THEY ARE NOT A SHAREHOLDER.

SO THE COURT CONCLUDES THAT THE CHALLENGE DIRECTOR ELECTION IS DENIED, AND THE COURT CONCLUDES THAT PLAINTIFF IS NOT A STOCKHOLDER IN CTI.

AND DURING THE BREAK I LOOKED AT THE PRELIMINARY INJUNCTION, AND IT IS ALL SEEKING TO ENJOIN THINGS UNTIL THE 709 HEARING HAS BEEN HELD, WHICH IT NOW HAS BEEN. SO THE PRELIMINARY INJUNCTION IS DENIED, AND THE TRO IS DISSOLVED.

SO I AM NOT SURE WHAT THAT DOES FOR THE CASE AS A WHOLE, BUT, YOU KNOW, YOU CAN CONTINUE TO LITIGATE WHATEVER IS REMAINING IN THE CASE.

THERE ARE ONE OR MORE RELATED CASES, WHICH I GUESS AT LEAST ARE SET FOR STATUS CONFERENCES OR CMC'S ALONG THE WAY, BUT THAT IS THE RULING FOR TODAY.

LET'S HAVE AN ORDER PREPARED BY MR. EDGERTON FOR THE COURT.

MR. EDGERTON: WE SHALL PREPARE IT.

THE COURT: AND, YOU KNOW, THE COURT WILL WAIT FOR OBJECTIONS WITHIN THE STATUTORY TIME FROM MR. CATANZARITE OR ANYBODY ELSE TECHNICALLY WHO CAN OBJECT.

AND LET'S RETURN THE EXHIBITS, JOSE, WITH THEIR SOCIAL SECURITY NUMBERS ON HERE, 58 THROUGH 62, AND BOTH OF THESE NOTEBOOKS FROM THE PLAINTIFF.

IS THIS A COURTESY -- I MEAN, THIS GOES BACK TO YOU. I AM NOT SURE IF THIS IS LIKE A COURTESY COPY.

MR. EDGERTON: IS IT MINE? I THINK THAT WAS A WITNESS COPY.

MR. CATANZARITE: THERE WAS A BENCH BOOK AND A WITNESS BOOK.

THE COURT: OH, THERE IS SOMETHING, THAT THING ON THE WITNESS STAND.

COURTROOM ATTENDANT: YES, THAT IS THE WITNESS BOOK.

THE COURT: SO THEY CAN HAVE THIS BACK, TOO.

OKAY, THANK YOU.

MR. CATANZARITE: THANK YOU.

MR. EDGERTON: THANK YOU, YOUR HONOR.

MR. TJOE: THANK YOU, YOUR HONOR.

(ADJOURNMENT TAKEN.)

STATE OF CALIFORNIA )
) SS.
COUNTY OF ORANGE )

REPORTER'S CERTIFICATE

I, CHERI A. VIOLETTE, CSR NO. 3584, COURT REPORTER PRO TEMPORE, IN AND FOR THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ORANGE, DO HEREBY CERTIFY THAT THE FOREGOING TRANSCRIPT CONSISTING OF PAGES 89 THROUGH 130 IS A TRUE AND CORRECT TRANSCRIPT OF MY SHORTHAND NOTES IN THE ABOVE-ENTITLED CASE.

DATED THIS 2ND DAY OF MAY,2019.

Cheri A. Violette

CHERI A. VIOLETTE, CSR NO. 3584
OFFICIAL COURT REPORTER PRO TEMPORE

EXHIBIT 18

ELECTRONICALLY FILED
Superior Court of California,
County of Orange
09/14/2018 at 12:36:59 PM
Clerk of the Superior Court
By Clarissa Bustamante, Deputy Clerk

Kenneth J. Catanzarite (SBN 113750)
kcatanzarite@catanzarite.com
Brandon Woodward (SBN 284621)
bwoodward@catanzarite.com
Tim James O'Keefe (SBN 290175)
tokeefe@catanzarite.com
CATANZARITE LAW CORPORATION
2331 West Lincoln Avenue
Anaheim, California 92801
Tel: (714) 520-5544
Fax: (714) 520-0680

Attorneys for Plaintiffs

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

**IN THE SUPERIOR COURT OF CALIFORNIA**

**FOR THE COUNTY ORANGE**

DENISE PINKERTON, an individual as attorney in fact for ROGER D. ROOT, individually and as successor in interest to the claims of his deceased Spouse Sharon K. Root, and derivatively on behalf of MOBILE FARMING SYSTEMS, INC., a California corporation,

Plaintiffs,

v.

CULTIVATION TECHNOLOGIES, INC., a California corporation; RICHARD JOSEPH PROBST, an individual; RICHARD FRANCIS O'CONNOR II, an individual; AMY JEANETTE COOPER, an individual; JOSEPH R. PORCHE, an individual; JUSTIN S. BECK, an individual; TGAP HOLDINGS, LLC, a limited liability company; EM2 STRATEGIES, LLC, a limited liability company; I'M RAD, LLC, a limited liability company; CLIFF HIGGERSON, an individual; AROHA HOLDINGS INC., a California corporation; ANTHONY SCUDDER, a.k.a. TONY SCUDDER, an individual; SCOTT UNFUG, an individual; RANA FOROUGHI MOBIN, an individual; ROBERT KAMM, an individual; ROBERT A. BERNHEIMER, an individual; IRVING MARK EINHORN, an individual; MIGUEL MOTTA, an individual; and Does 1-150,

Defendants.

Case No. 30-2018-01018922-CU-FR-CJC

Assigned for All Purposes to
Hon. Judge Geoffrey T. Glass
Dept. __

**COMPLAINT FOR:**

1. **Breach of Fiduciary Duty**
2. **Constructive Fraud**
3. **Aiding and Abetting Breach of Fiduciary Duty**
4. **Conspiracy to Breach Fiduciary Duty**
5. **Conversion**
6. **Declaratory Relief for Order Directing Surrender and Exchange of Certificates (*Calif. Corp. Code*, § 422)**
7. **Misappropriation of Trade Secrets, California Civil Code Section 3426**
8. **Unfair Competition Under California Business & Professions Code Section 17200, et seq.**
9. **Fraudulent Concealment**
10. **Exploitation of the Elderly**
11. **Violation of *Florida Statute* § 517.301 Fraudulent Transaction and Falsification and Concealment of Facts Giving Rise to Remedies under *Florida Statue* § 517.211**

Document received by the CA 4th District Court of Appeal Division 3.



Nominal Defendant: MOBILE FARMING SYSTEMS, INC., a California corporation.

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

ocument received by the CA 4th District Court of Appeal Division 3.

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

7. For compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures suffered or incurred under the "tort of another" doctrine as required to act in the protection of Plaintiffs' interests by bringing this action in accordance with *Prentice v. North Am. Title Guaranty Corp., Alameda Division* (1963) 59 Cal.2d 618; *Electrical Electronic Control, Inc. v. Los Angeles Unified School Dist.* (2005) 126 Cal.App.4th 601;

8. For statutory attorneys fees and costs as appropriate under *Corporations Code*, § 25501.5 and *Code of Civil Procedure*, § 1029.8. Plaintiffs also allege they are entitled to the remedy afforded by *Code of Civil Procedure*, § *1029.8* which provides that where an unlicensed person, who took securities sales commissions, cause injury or damage to another person(s) as a result of providing services for which such license is required those defendants, jointly and severally, "...shall be liable to the injured person for treble the amount of damages assessed in a civil action in any court having proper jurisdiction." with such additional damages not to exceed $10,000. In addition the Court may "in its discretion award all costs and attorney's fees to the injured person if that person prevails in the action." See *Civil Code*, § *1029.8 (a)*;

9. Punitive, exemplary, and treble damages, and any other damages authorized by law;

10. For prejudgment and post-judgment interest at the maximum legal rate, as provided by California law, as applicable, as an element of damages which Plaintiffs has suffered as a result of Defendants' wrongful and unlawful acts;

11. For reasonable attorneys' fees and costs incurred herein as allowed by statute; and

12. For such other relief as the Court deems just and proper.

DATED: September 14, 2018. CATANZARITE LAW CORPORATION

Kenneth J. Catanzarite
Brandon E. Woodward
Tim James O'Keefe
Attorneys for Plaintiffs

Document received by the CA 4th District Court of Appeal Division 3.

EXHIBIT 19

Kenneth J. Catanzarite (SBN 113750)
kcatanzarite@catanzarite.com
Brandon Woodward (SBN 284621)
bwoodward@catanzarite.com
Tim James O'Keefe (SBN 290175)
tokeefe@catanzarite.com
CATANZARITE LAW CORPORATION
2331 West Lincoln Avenue
Anaheim, California 92801
Tel: (714) 520-5544
Fax: (714) 520-0680

Attorneys for Plaintiffs

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

**IN THE SUPERIOR COURT OF CALIFORNIA**

**FOR THE COUNTY ORANGE**

MOBILE FARMING SYSTEMS, INC., a California corporation, directly and derivatively on behalf of CULTIVATION TECHNOLOGIES, INC., a California corporation,

Plaintiffs,

v.

RICHARD JOSEPH PROBST, an individual; JUSTIN S. BECK, an individual; EM2 STRATEGIES, LLC, a limited liability company; I'M RAD, LLC, a limited liability company; ROBERT KAMM, an individual; ROBERT A. BERNHEIMER, an individual; IRVING MARK EINHORN, an individual; MIGUEL MOTTA, an individual; TOW AND GROW, INC., a California corporation, and Does 1-200,

Defendants.

Nominal Defendant: CULTIVATION TECHNOLOGIES, INC., a California corporation.

Case No. __________

Assigned for All Purposes to
Hon. ________________
Dept. __

**COMPLAINT FOR:**

1. **Violation of Cal. Corp. Code § 1507**
2. **Breach of Fiduciary Duty**
3. **Declaratory Relief**
4. **Permanent Injunction**
5. **Conversion- CTI Shares**
6. **Conversion- TOW-GROW**
7. **Declaratory Relief for Order Directing Surrender and Exchange of Certificates (*Calif. Corp. Code*, § 422)**
8. **Misappropriation of Trade Secrets, *California Civil Code* Section 3426**
9. **Unfair Competition under *California Business & Professions Code* Section 17200, Et. Seq. Breach of Fiduciary Duty**

**[REQUEST FOR HEARING UNDER *CAL. CORP. CODE* § 709(b)]**

ocument received by the CA 4th District Court of Appeal Division 3.

12. Punitive, exemplary, and treble damages, and any other damages authorized by law;

13. For prejudgment and post-judgment interest at the maximum legal rate, as provided by California law, as applicable, as an element of damages which Plaintiffs has suffered as a result of Defendants' wrongful and unlawful acts;

14. For reasonable attorneys' fees and costs incurred herein as allowed by statute; and

15. For such other relief as the Court deems just and proper.

DATED: January 28, 2019.

CATANZARITE LAW CORPORATION

Kenneth J. Catanzarite
Brandon E. Woodward
Tim James O'Keefe
Attorneys for Plaintiffs

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

ocument received by the CA 4th District Court of Appeal Division 3.

EXHIBIT 20

Kenneth J. Catanzarite (SBN 113750)
kcatanzarite@catanzarite.com
Brandon Woodward (SBN 284621)
bwoodward@catanzarite.com
Tim James O'Keefe (SBN 290175)
tokeefe@catanzarite.com
CATANZARITE LAW CORPORATION
2331 West Lincoln Avenue
Anaheim, California 92801
Tel: (714) 520-5544
Fax: (714) 520-0680

Attorneys for Plaintiffs

ELECTRONICALLY FILED
Superior Court of California,
County of Orange
04/16/2019 at 04:00:12 PM
Clerk of the Superior Court
By Sarah Loose, Deputy Clerk

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

**IN THE SUPERIOR COURT OF CALIFORNIA**

**FOR THE COUNTY ORANGE**

RICHARD MESA, individually and on behalf of himself and all others similarly situated and derivatively on behalf of CULTIVATION TECHNOLOGIES, INC., a California corporation,

Plaintiffs,

v.

RICHARD JOSEPH PROBST, an individual; JUSTIN S. BECK, an individual; ROBERT A. BERNHEIMER, an individual; ROBERT A. BERNHEIMER, INC., a California corporation; ROBERT KAMM, an individual; IRVING MARK EINHORN, an individual; MIGUEL MOTTA, an individual; MICHAEL BURDICK, an individual; FREDERICK HEIM, an individual; JEFFREY SHERWOOD, an individual; THOMAS BRODEUR, an individual; ERIC MATHUR, an individual; JASON PITKIN, an individual; BRYAN TIMMERMAN, an individual; KEVIN GILLIAN, an individual; ROBERT SCHMIDT, an individual; DARREN WETHERHOLD, an individual; EM2 STRATEGIES, LLC, a limited liability company; I'M RAD, LLC, a limited liability company; TOW AND GROW, INC., a California corporation; and Does 1-200,

Defendants.

Nominal Defendant: CULTIVATION TECHNOLOGIES, INC., a California corporation.

Case No. 30-2019-01064267-CU-MC-CXC

Assigned for All Purposes to
Hon. Judge Peter Wilson
Dept. CX102

**[PROPOSED] CLASS ACTION COMPLAINT FOR:**

1. **Violation of Cal. Corp. Code § 1507**
2. **Breach of Fiduciary Duty**
3. **Declaratory Relief**
4. **Permanent Injunction**
5. **Conversion- CTI Shares**
6. **Conversion- TOW-GROW**
7. **Declaratory Relief for Order Directing Surrender and Exchange of Certificates (*Calif. Corp. Code*, § 422)**
8. **Misappropriation of Trade Secrets, *California Civil Code* Section 3426**
9. **Unfair Competition under *California Business & Professions Code* Section 17200, Et. Seq. Breach of Fiduciary Duty**

**[REQUEST FOR HEARING UNDER *CAL. CORP. CODE* § 709(b)]**

Document received by the CA 4th District Court of Appeal Division 3.

14. For prejudgment and post-judgment interest at the maximum legal rate, as provided by California law, as applicable, as an element of damages which Plaintiffs has suffered as a result of Defendants' wrongful and unlawful acts;

15. For reasonable attorneys' fees and costs incurred herein as allowed by statute; and

16. For such other relief as the Court deems just and proper.

DATED: April 16, 2019.

CATANZARITE LAW CORPORATION

Kenneth J. Catanzarite
Brandon E. Woodward
Tim James O'Keefe
Attorneys for Plaintiffs

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

ocument received by the CA 4th District Court of Appeal Division 3.

EXHIBIT 21

Kenneth J. Catanzarite (SBN 113750)
kcatanzarite@catanzarite.com
Brandon Woodward (SBN 284621)
bwoodward@catanzarite.com
Tim James O'Keefe (SBN 290175)
tokeefe@catanzarite.com
CATANZARITE LAW CORPORATION
2331 West Lincoln Avenue
Anaheim, California 92801
Tel: (714) 520-5544
Fax: (714) 520-0680

Attorneys for Plaintiffs

ELECTRONICALLY FILED
Superior Court of California,
County of Orange
05/15/2019 at 11:08:00 AM
Clerk of the Superior Court
By Sarah Loose,Deputy Clerk

IN THE SUPERIOR COURT OF CALIFORNIA

FOR THE COUNTY ORANGE

RICHARD MESA, AMY COOPER, TOM S. MEBANE, individually and on behalf of himself/herself/themselves and all others similarly situated and derivatively on behalf of CULTIVATION TECHNOLOGIES, INC., a California corporation,

Plaintiffs,

v.

RICHARD JOSEPH PROBST, an individual; JUSTIN S. BECK, an individual; ROBERT A. BERNHEIMER, an individual; ROBERT A. BERNHEIMER, INC., a California corporation; ROBERT KAMM, an individual; IRVING MARK EINHORN, an individual; MIGUEL MOTTA, an individual; MICHAEL BURDICK, an individual; FREDERICK HEIM, an individual; JEFFREY SHERWOOD, an individual; THOMAS BRODEUR, an individual; ERIC MATHUR, an individual; JASON PITKIN, an individual; BRYAN TIMMERMAN, an individual; KEVIN GILLIAN, an individual; ROBERT SCHMIDT, an individual; DARREN WETHERHOLD, an individual; EM2 STRATEGIES, LLC, a limited liability company; I'M RAD, LLC, a limited liability company; TOW AND GROW, INC., a California corporation; FINCANNA CAPITAL CORP., a British Columbia corporation and Does 1-200,

Defendants.

(Caption Continues on Next Page)

Case No. 30-2019-01064267

Assigned for All Purposes to
Hon. ~~Peter Wilson~~ Randall Sherman SL
Dept. ~~CX-102~~ CX105 SL

**FIRST AMENDED ~~[PROPOSED]~~ SL CLASS ACTION COMPLAINT FOR:**

1. **Violation of Cal. Corp. Code § 1507**
2. **Breach of Fiduciary Duty**
3. **Declaratory Relief**
4. **Permanent Injunction**
5. **Conversion- CTI Shares**
6. **Conversion- TOW-GROW**
7. **Declaratory Relief for Order Directing Surrender and Exchange of Certificates (*Calif. Corp. Code*, § 422)**
8. **Wrongful Foreclosure - May 2, 2019**
9. **For Recovery of Treble Damages for Usurious Interest and Fees under California Civil Code § 1916-3**
10. **For Common Law Recovery or Offset of Usurious Interest & Fees**
11. **Unfair Competition under *California Business & Professions Code* Section 17200, Et. Seq.**

**[REQUEST FOR HEARING UNDER *CAL. CORP. CODE* § 709(b)]**

Document received by the CA 4th District Court of Appeal Division 3.

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

Nominal Defendant: CULTIVATION TECHNOLOGIES, INC., a California corporation.

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

ocument received by the CA 4th District Court of Appeal Division 3.

against CTI, and that CTI has no duty under the agreements to pay any interest or fees to FINCANNA;

15. Awarding treble damages and directing FINCANNA to pay the sum of $6,000,000 and $3,000,000 to CTI in accordance with California Civil Code § 1916-3 in connection with usurious interest and fees paid on the FINCANNA loans;

16. For compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures suffered or incurred under the "tort of another" doctrine as required to act in the protection of Plaintiffs' interests by bringing this action in accordance with *Prentice v. North Am. Title Guaranty Corp., Alameda Division* (1963) 59 Cal.2d 618; *Electrical Electronic Control, Inc. v. Los Angeles Unified School Dist.* (2005) 126 Cal.App.4th 601;

17. Punitive, exemplary, and treble damages, and any other damages authorized by law;

18. For prejudgment and post-judgment interest at the maximum legal rate, as provided by California law, as applicable, as an element of damages which Plaintiffs has suffered as a result of Defendants' wrongful and unlawful acts;

19. For reasonable attorneys' fees and costs incurred herein as allowed by statute; and

20. For such other relief as the Court deems just and proper.

DATED: May 15, 2019. CATANZARITE LAW CORPORATION

Kenneth J. Catanzarite
Brandon E. Woodward
Tim James O'Keefe
Attorneys for Plaintiffs

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

Document received by the CA 4th District Court of Appeal Division 3.

EXHIBIT 22

ELECTRONICALLY FILED
Superior Court of California, County of Orange
07/02/2019 at 12:34:00 PM
Clerk of the Superior Court
By Mark Gutierrez, Deputy Clerk

Kenneth J. Catanzarite (SBN 113750)
kcatanzarite@catanzarite.com
Brandon Woodward (SBN 284621)
bwoodward@catanzarite.com
Tim James O'Keefe (SBN 290175)
tokeefe@catanzarite.com
CATANZARITE LAW CORPORATION
2331 West Lincoln Avenue
Anaheim, California 92801
Tel: (714) 520-5544
Fax: (714) 520-0680

Attorneys for Defendants and Cross-Complainants

IN THE SUPERIOR COURT OF CALIFORNIA

FOR THE COUNTY ORANGE

FINCANNA CAPITAL CORP.,

Plaintiff,

v.

CULTIVATION TECHNOLOGIES, INC., COACHELLA MANUFACTURING, LLC, COACHELLA DISTRIBUTORS, LLC, and DS GEN, LLC, and DOES 1-100

Defendants.

CULTIVATION TECHNOLOGIES, INC., a California corporation, COACHELLA MANUFACTURING, LLC, a California limited liability company; COACHELLA DISTRIBUTORS, LLC, a California limited liability company; and DS GEN, LLC, a California limited liability company;

Cross-Complainants,

v.

FINCANNA CAPITAL CORP., a British Columbia corporation, ANDRIYKO HERCHAK , an individual; ROBERT KAMM, an individual; MIGUEL MOTTA, an individual, and Roes 1-100,

Cross-Defendants.

Case No. 30-2019-01072088-CU-BC-CJC

Assigned for All Purposes to
Hon. Linda Marks
Dept. C10

**CROSS-COMPLAINT FOR:**

1. **Breach of Fiduciary Duty**
2. **Conversion**
3. **Wrongful Foreclosure - May 2, 2019**
4. **For Recovery of Treble Damages for Usurious Interest and Fees under California Civil Code § 1916-3**
5. **For Common Law Recovery or Offset of Usurious Interest & Fees**
6. **Unfair Competition under California Business & Professions Code Section 17200, Et. Seq.**

Document received by the CA 4th District Court of Appeal Division 3.

11. For prejudgment and post-judgment interest at the maximum legal rate, as provided by California law, as applicable, as an element of damages which Cross-Complainants have suffered as a result of Cross-Defendants' wrongful and unlawful acts;

12. For reasonable attorneys' fees and costs incurred herein as allowed by contract and or statute; and

13. For such other relief as the Court deems just and proper.

DATED: June 25, 2019.

CATANZARITE LAW CORPORATION

By: ______________________
Kenneth J. Catanzarite, Esq.
Attorneys for Cross-Complainants

Catanzarite Law Corporation
2331 West Lincoln Avenue
Anaheim, California 92801
Tel: (714) 520-5544 • Fax: (714) 520-0680

Document received by the CA 4th District Court of Appeal Division 3.

EXHIBIT 23

Kenneth J. Catanzarite (SBN 113750)
kcatanzarite@catanzarite.com
Brandon Woodward (SBN 284621)
bwoodward@catanzarite.com
Tim James O'Keefe (SBN 290175)
tokeefe@catanzarite.com
CATANZARITE LAW CORPORATION
2331 West Lincoln Avenue
Anaheim, California 92801
Tel: (714) 520-5544
Fax: (714) 520-0680

Attorneys for Plaintiff

**IN THE SUPERIOR COURT OF CALIFORNIA**

**FOR THE COUNTY ORANGE**

MOBILE FARMING SYSTEMS, INC., a California corporation,

Plaintiff,

v.

RICHARD JOSEPH PROBST, an individual; JUSTIN S. BECK, an individual; I'M RAD, LLC, a limited liability company; ROBERT KAMM, an individual; ROBERT A. BERNHEIMER, an individual; IRVING MARK EINHORN, an individual; MIGUEL MOTTA, an individual; PRO FAB TECH, LLC, a California limited liability company, and Does 2-200,

Defendants.

Case No. 30-2019-01046904-CU-BT-CJC

Assigned for All Purposes to
Hon. Randall J. Sherman
Dept. CX105

**FIRST AMENDED COMPLAINT FOR:**

1. **Breach of Fiduciary Duty;**
2. **Conversion;**
3. **Common Count for Money Had and Received;**
4. **Accounting;**
5. **Misappropriation of Trade Secrets, *California Civil Code* Section 3426; and**
6. **Unfair Competition under *California Business & Professions Code* Section 17200, Et. Seq. Breach of Fiduciary Duty.**

ocument received by the CA 4th District Court of Appeal Division 3.

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

8. For reasonable attorneys' fees and costs incurred herein as allowed by statute; and

9. For such other relief as the Court deems just and proper.

DATED: July 22, 2019.

CATANZARITE LAW CORPORATION

Kenneth J. Catanzarite
Brandon E. Woodward
Tim James O'Keefe
Attorneys for Plaintiff

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

ocument received by the CA 4th District Court of Appeal Division 3.

EXHIBIT 24

Kenneth J. Catanzarite (SBN 113750)
kcatanzarite@catanzarite.com
Brandon Woodward (SBN 284621)
bwoodward@catanzarite.com
Tim James O'Keefe (SBN 290175)
tokeefe@catanzarite.com
CATANZARITE LAW CORPORATION
2331 West Lincoln Avenue
Anaheim, California 92801
Tel: (714) 520-5544
Fax: (714) 520-0680

Attorneys for Plaintiffs

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

**IN THE SUPERIOR COURT OF CALIFORNIA**

**FOR THE COUNTY ORANGE**

DENISE PINKERTON, an individual as attorney in fact for ROGER D. ROOT, individually and as successor in interest to the claims of his deceased Spouse Sharon K. Root,

Plaintiffs,

v.

RICHARD JOSEPH PROBST, an individual; JUSTIN S. BECK, an individual; I'M RAD, LLC, a limited liability company; ROBERT KAMM, an individual; ROBERT A. BERNHEIMER, an individual; IRVING MARK EINHORN, an individual; MIGUEL MOTTA, an individual; and Does 1-100,

Defendants.

Case No. 30-2018-01018922

Assigned for All Purposes to
Hon. Randall J. Sherman
Dept. CX-105

**FIRST AMENDED COMPLAINT FOR:**

1. **Breach of Fiduciary Duty**
2. **Fraudulent Concealment**
3. **Exploitation of the Elderly**
4. **Violation of *Florida Statute* § 517.301 Fraudulent Transaction and Falsification and Concealment of Facts Giving Rise to Remedies under *Florida Statue* § 517.211**

ocument received by the CA 4th District Court of Appeal Division 3.

4. For an Order directing Defendants to return all MFS property in their possession, custody or control;

5. For compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures suffered or incurred under the "tort of another" doctrine as required to act in the protection of Plaintiffs' interests by bringing this action in accordance with *Prentice v. North Am. Title Guaranty Corp., Alameda Division* (1963) 59 Cal.2d 618; *Electrical Electronic Control, Inc. v. Los Angeles Unified School Dist.* (2005) 126 Cal.App.4th 601;

6. For statutory attorneys fees and costs as appropriate under *Corporations Code*, § 25501.5 and *Code of Civil Procedure*, § 1029.8. Plaintiffs also allege they are entitled to the remedy afforded by *Code of Civil Procedure*, § *1029.8* which provides that where an unlicensed person, who took securities sales commissions, cause injury or damage to another person(s) as a result of providing services for which such license is required those defendants, jointly and severally, "...shall be liable to the injured person for treble the amount of damages assessed in a civil action in any court having proper jurisdiction." with such additional damages not to exceed $10,000. In addition the Court may "in its discretion award all costs and attorney's fees to the injured person if that person prevails in the action." See *Civil Code*, § *1029.8 (a)*;

7. Punitive, exemplary, and treble damages, and any other damages authorized by law;

8. For prejudgment and post-judgment interest at the maximum legal rate, as provided by California law, as applicable, as an element of damages which Plaintiff has suffered as a result of Defendants' wrongful and unlawful acts;

9. For reasonable attorneys' fees and costs incurred herein as allowed by statute; and

10. For such other relief as the Court deems just and proper.

DATED: July 23, 2019.

CATANZARITE LAW CORPORATION

Kenneth J. Catanzarite
Brandon E. Woodward
Tim James O'Keefe
Attorneys for Plaintiffs

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

ocument received by the CA 4th District Court of Appeal Division 3.

EXHIBIT 25



CSC

null / ALL
**Transmittal Number: 20418290**
**Date Processed: 09/20/2019**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | SOP Team nwsop@nationwide.com<br>Nationwide Mutual Insurance Company<br>Three Nationwide Plaza<br>Columbus, OH 43215 |
| **Electronic copy provided to:** | Ashley Roberts |
| **Entity:** | Scottsdale Insurance Company<br>Entity ID Number 3286058 |
| **Entity Served:** | Scottsdale Insurance Company |
| **Title of Action:** | Cultivation Technologies, Inc vs. Scottsdale Insurance Company; Ohio Stock Insurance Company, and Does 1 Through 20 |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Orange County Superior Court, CA |
| **Case/Reference No:** | 30-2019-01096233-CU-IC-CJC |
| **Jurisdiction Served:** | Ohio |
| **Date Served on CSC:** | 09/19/2019 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Catanzarite Law Corporation<br>N/A |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**
251 Little Falls Drive, Wilmington, Delaware 19808-1674 (888) 690-2882 | sop@cscglobal.com

Document received by the CA 4th District Court of Appeal Division 3.

Electronically Filed by Superior Court of California, County of Orange, 09/11/2019 09:00:00 AM.
DAVID H. YAMASAKI, Clerk of the Court By Jessica Edwards, Deputy Clerk. 30-2019-01096233-CU-IC-CJC ROA # 7

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***

SCOTTSDALE INSURANCE COMPANY, an Ohio Stock Insurance company, and Does 1 through 20, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***

CULTIVATION TECHNOLOGIES, INC., a California corporation

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

***¡AVISO!*** *Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Orange County Superior Court
Central Justice Center
700 Civic Center Drive West Santa Ana CA 92701

CASE NUMBER: *(Número del Caso):* 30-2019-01096233-CU-IC-CJC
Judge Glenn Salter

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Kenneth J. Catanzarite (SBN 113750) - 2331 West Lincoln Avenue Anaheim, CA 92801 Tel: (714) 520-5544

DATE: *(Fecha)* 09/11/2019 DAVID H. YAMASAKI, Clerk of the Court Clerk, by *(Secretario)* [signature], Deputy *(Adjunto)*
Jessica Edwards

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL] SUPERIOR COURT OF CALIFORNIA COUNTY OF ORANGE

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☐ on behalf of *(specify)*:
   under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. July 1, 2009]
**SUMMONS**
Code of Civil Procedure §§ 412.20, 465 www.courtinfo.ca.gov
American LegalNet, Inc. www.FormsWorkflow.com

Motion to DQ Catanzarite 3:22-CV-01616-AGS-DDL
Exhibit #25: 002

Document received by the CA 4th District Court of Appeal Division 3.

Electronically Filed by Superior Court of California, County of Orange, 10/03/2019 04:28:01 PM. DAVID H. YAMASAKI, Clerk of the Court By Miriam Cruz, Deputy Clerk. 30-2019-01096233-CU-IC-CJC ROA # 2

Kenneth J. Catanzarite (SBN 113750)
kcatanzarite@catanzarite.com
CATANZARITE LAW CORPORATION
2331 West Lincoln Avenue
Anaheim, California 92801
Tel: (714) 520-5544
Fax: (714) 520-0680

Attorneys for Plaintiff

IN THE SUPERIOR COURT OF CALIFORNIA

FOR THE COUNTY ORANGE

| | |
|---|---|
| CULTIVATION TECHNOLOGIES, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>SCOTTSDALE INSURANCE COMPANY, an Ohio Stock Insurance company, and Does 1 through 20, inclusive<br><br>Defendant. | Case No. 30-2019-01096233-CU-IC-CJC<br><br>Assigned for All Purposes to<br>Dept: Judge Glenn Salter<br>Hon.<br><br>**COMPLAINT FOR DECLARATORY RELIEF** |

Plaintiff, CULTIVATION TECHNOLOGIES, INC. (hereinafter "CTI" and "Plaintiff") alleges as follows:

1. CTI is and at all times relevant hereto was a duly organized and existing California corporation for times relevant conducting business from its offices in Orange County.

2. Plaintiff is informed and believes and on that basis alleges that defendant SCOTTSDALE INSURANCE COMPANY (hereinafter "SCOTTSDALE") is and at all times relevant hereto was a duly organized and existing corporation which is engaged in the business of insurance and doing business in the State of California.

3. The true names of Defendant Does 1 through 10, inclusive, are unknown to CTI at this time. CTI sues these defendants by these fictitious names pursuant to Section 474 of the Code of Civil Procedure. CTI is informed and believes and upon that basis alleges that each of the Defendants designated as a Doe is legally responsible for the events and happenings referred

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

Document received by the CA 4th District Court of Appeal Division 3.

to in this Complaint, and unlawfully caused the injuries and damages to CTI alleged in this Complaint. CTI is further informed and believes and on that basis alleges that each of the Defendants designated as a Doe is or was a resident or citizen of the State of California. CTI will amend this Complaint to substitute the true names and identities of the fictitiously sued defendants once they have been identified.

4. CTI is informed and believes and on that basis alleges that at all times herein mentioned, each defendant was the agent, principal, alter ego, partner and/or co-conspirator of each of the other defendants in the acts and conduct alleged herein, and therefore incurred liability to plaintiff for the acts and omissions alleged below.

5. This dispute involves at least one insurance policy issued be Defendants and Does 1-20 to CTI while doing business in Orange County.

6. There is at least one underlying lawsuit for which disputed directors and officers of CTI may have sought insurance coverage from SCOTTSDALE specifically the matter styled *Richard Mesa, et al. v. Richard Joseph Probst, et al.*, Orange County Superior Court case number 30-2019-01064267 (the "Mesa Action").

7. Upon information and belief SCOTTSDALE is currently the insurer of a Business and Management Indemnity Policy with CTI, Policy No. EKS3206247 for $3,000,000 coverage for the directors, officers and CTI (the "Policy").

8. Upon information and belief CTI alleges that SCOTTSDALE is providing defense and potentially indemnity to the individual defendants in the Mesa Action under the Policy after having been notified that those persons have not had any indemnity approved by the disinterested common shareholders and as such have not met and cannot meet the requirements of *California Corp. Code*, § 317 which provides:

> (e) Except as provided in subdivision (d), any indemnification under this section shall be made by the corporation only if authorized in the specific case, upon a determination that indemnification of the agent is proper in the circumstances because the agent has met the applicable standard of conduct set forth in subdivision (b) or ©, by any of the following:
> (1) A majority vote of a quorum consisting of directors who are not parties to such proceeding.
> (2) If such a quorum of directors is not obtainable, by independent legal counsel in a written opinion.
> (3) Approval of the shareholders (Section 153), with the shares owned by the person to be

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

Motion to DQ Catanzarite 3:22-CV-01616-AGS-DDL
Exhibit #25: 004
Document received by the CA 4th District Court of Appeal Division 3.

indemnified not being entitled to vote thereon.
(4) The court in which the proceeding is or was pending upon application made by the corporation or the agent or the attorney or other person rendering services in connection with the defense, whether or not the application by the agent, attorney or other person is opposed by the corporation.
*California Corp. Code*, § 317

9. Further, CTI informed SCOTTSDALE that its Bylaws required an undertaking prior to providing any indemnity or defense.

10. Finally, CTI has notified SCOTTSDALE of its demand that no defense or indemnity be provided to the individual defendants in the Mesa Action under the Policy until and unless the disinterested common shareholders approve the same and a suitable undertaking has been provided by each such defendant.

11. SCOTTSDALE has refused to communicate with the officers and directors elected by the common shareholders of CTI who are of the position that only they and their elected officers and directors speak for CTI.

12. Upon information and belief SCOTTSDALE is following instructions from directors and officers, and counsel engaged thereby, based upon votes by Series A Preferred Stock, the issuance of which is disputed by CTI's common shareholders.

13. An actual controversy now exists between CTI, on the one hand, and SCOTTSDALE, on the other hand, with respect to the rights and liabilities of the parties under the Policy. CTI contends that no defense or indemnity can be provided absent compliance with *California Corp. Code*, § 317 including a vote by the disinterested common shareholders and an adequate undertaking.

14. CTI is informed and believes, and on that basis alleges, that SCOTTSDALE, contends to the contrary.

15. CTI seeks a declaration of its rights under the Policy specifically including, without limitation, a judicial declaration that:

a. No further defense may be provided under the Policy unless and until the vote of the disinterested common shareholders of CTI is obtained, and

//

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

Document received by the CA 4th District Court of Appeal Division 3.

b. An adequate undertaking is provided by any person provided defense or indemnity.

WHEREFORE, plaintiff CTI prays for judgment as follows:

1. For a declaration that SCOTTSDALE is required under the terms and conditions of the Policy to withhold defense and indemnity until a majority vote of disinterested common shareholders of CTI is obtained and an adequate undertaking is provided;

2. For costs of suit; and

3. For such other and further relief as the Court may deem just and proper.

DATED: September 6, 2019. CATANZARITE LAW CORPORATION

Kenneth J. Catanzarite
Attorneys for Plaintiff

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

Document received by the CA 4th District Court of Appeal Division 3.

Electronically Filed by Superior Court of California, County of Orange, 09/06/2019 DAVID H. YAMASAKI, Clerk of the Court By Miriam Cruz, Deputy Clerk. 30-2019-01096233-CU-IC-CJC ROA # 3

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Kenneth J. Catanzarite (SBN 113750)
Nicole M. Catanzarite-Woodward (SBN 205746)
CATANZARITE LAW CORPORATION
2331 W. Lincoln Avenue, Anaheim, CA 92701
TELEPHONE NO.: (714) 520-5544 FAX NO.: (714) 520-0680
ATTORNEY FOR (Name): Plaintiffs

FOR COURT USE ONLY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Orange
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS: same
CITY AND ZIP CODE: Santa Ana, CA 92701
BRANCH NAME: Central Justice Center

CASE NAME:
Cultivation Technologies, Inc. v. Scottsdale Insurance Company et al.

**CIVIL CASE COVER SHEET**

☑ Unlimited (Amount demanded exceeds $25,000) ☐ Limited (Amount demanded is $25,000 or less)

Complex Case Designation
☐ Counter ☐ Joinder
Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: 30-2019-01096233-CU-IC-CJC
JUDGE: Judge Glenn Salter
DEPT:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☑ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. ☐ Large number of separately represented parties
b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. ☐ Substantial amount of documentary evidence
d. ☐ Large number of witnesses
e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. ☐ monetary b. ☑ nonmonetary; declaratory or injunctive relief c. ☐ punitive
4. Number of causes of action *(specify)*: one
5. This case ☐ is ☑ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: September 6, 2019
Kenneth J. Catanzarite
(TYPE OR PRINT NAME) (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]
CIVIL CASE COVER SHEET
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov
American LegalNet, Inc. www.FormsWorkflow.com

Motion to DQ Catanzarite 3:22-CV-01616-AGS-DDL
Exhibit #25: 007

Document received by the CA 4th District Court of Appeal Division 3.

EXHIBIT 26

Electronically Filed by Superior Court of California, County of Orange, 08/10/2020 02:57:00 PM.
30-2020-01145998-CU-BT-CJC - ROA # 27 - DAVID H. YAMASAKI, Clerk of the Court By Brenda Sanchez, Deputy Clerk.

Kenneth J. Catanzarite (SBN 113750)
kcatanzarite@catanzarite.com
Brandon Woodward (SBN 284621)
bwoodward@catanzarite.com
CATANZARITE LAW CORPORATION
2331 West Lincoln Avenue
Anaheim, California 92801
Tel: (714) 520-5544
Fax: (714) 520-0680

Attorneys for Cross-Complainant

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

**IN THE SUPERIOR COURT OF CALIFORNIA**

**FOR THE COUNTY ORANGE**

JUSTIN S. BECK, an individual,

Plaintiff,

v.

KENNETH CATANZARITE, ESQ., an individual; CATANZARITE LAW CORPORATION, a California corporation; MOBILE FARMING SYSTEMS, INC., a California corporation; BRANDON WOODWARD, ESQ., an individual; TIM JAMES OKEEFE, ESQ., an individual; RICHARD FRANCIS O'CONNOR, JR., an individual; AMY JEANETTE COOPER, an individual; CLIFF HIGGERSON, an individual; TONY SCUDDER, an individual; JAMES DUFFY, an individual; MOHAMMED ZAKHIREH, an individual; TGAP HOLDINGS, LLC, a Nevada limited liability corporation; AROHA HOLDINGS, INC., a California corporation; and DOES 1-15

MOBILE FARMING SYSTEMS, INC., a California corporation,

Cross-Complainant,

v.

JUSTIN S. BECK, an individual; I'M RAD, LLC, a Nevada limited liability company; EM2 STRATEGIES, LLC, a Nevada limited liability company; CTI NEVADA I, LLC, a Nevada limited liability company;

(Caption Continues on Next Page)

Case No. 30-2020-01145998-CU-BT-CJC

Assigned for All Purposes to
Hon. Deborah C. Servino
Dept. C21

**CROSS-COMPLAINT FOR:**

1. **Breach of Fiduciary Duty**
2. **Fraud And Deceit**
3. **Conversion**
4. **Violations of California Prohibitions Against Computer Crimes, California Penal Code Section 502**
5. **Legal Malpractice**
6. **Breach of Contract - Management Agreement**
7. **Breach of Contract - Membership Purchase**
8. **Violation of Business & Professions Code Section 17200 et seq.**

**Jury Trial Requested**

Document received by the CA 4th District Court of Appeal Division 3.

RICHARD J. PROBST, an individual; TOW AND GROW, INC., a California corporation; ROBERT A. BERNHEIMER, an individual; ROBERT A. BERNHEIMER, INC., a California corporation; LAWRENCE W. HORWITZ, an individual; JOHN R. ARMSTRONG II, an individual; HORWITZ + ARMSTRONG, A PROFESSIONAL LAW CORPORATION, a California corporation; TWELVE TWELVE LLC, a Nevada limited liability company; WILLIAM MOORE, an individual; BRIAN MOORE, an individual and Roes 1-100,

Cross-Defendants.

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

ocument received by the CA 4th District Court of Appeal Division 3.

12. For compensation for the reasonably necessary loss of time, attorneys' fees, and other expenditures suffered or incurred under the "tort of another" doctrine as required to act in the protection of MFS' interests by bringing this action in accordance with *Prentice v. North Am. Title Guaranty Corp., Alameda Division* (1963) 59 Cal.2d 618 and/or *Electrical Electronic Control, Inc. v. Los Angeles Unified School Dist.* (2005) 126 Cal.App.4th 601.

13. Punitive, exemplary, and any other damages authorized by law;

14. For prejudgment and post-judgment interest at the maximum legal rate, as provided by California law, as applicable, as an element of damages which MFS has suffered as a result of Cross-Defendants' wrongful and unlawful acts;

15. Costs of suit; and,

16. For such other relief as the Court deems just and proper.

DATED: August 10, 2020.

CATANZARITE LAW CORPORATION

Kenneth J. Catanzarite
Brandon E. Woodward
Attorneys for Cross-Complainants

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

ocument received by the CA 4th District Court of Appeal Division 3.

EXHIBIT 28

BA20221301281

B1343-7687 12/22/2022 5:12 PM Received by California Secretary of State

**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**STATEMENT OF INFORMATION**
**CORPORATION**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

For Office Use Only
**-FILED-**
File No.: BA20221301281
Date Filed: 12/22/2022

Entity Details

| | |
|---|---|
| Corporation Name | MOBILE FARMING SYSTEMS, INC. |
| Entity No. | 3159363 |
| Formed In | CALIFORNIA |

Street Address of Principal Office of Corporation

| | |
|---|---|
| Principal Address | 2331 WEST LINCOLN AVENUE<br>ANAHEIM, CA 92801 |

Mailing Address of Corporation

| | |
|---|---|
| Mailing Address | 2331 WEST LINCOLN AVENUE<br>ANAHEIM, CA 92801 |
| Attention | |

Street Address of California Office of Corporation

| | |
|---|---|
| Street Address of California Office | 2331 WEST LINCOLN AVENUE<br>ANAHEIM, CA 92801 |

Officers

| Officer Name | Officer Address | Position(s) |
|---|---|---|
| JAMES A. DUFFY | 2331 WEST LINCOLN AVENUE<br>ANAHEIM, CA 92801 | Chief Executive Officer, Secretary |
| Richard F. O'Connor II | 2331 West Lincoln Avenue<br>Anaheim, CA 92801 | Chief Financial Officer |

Additional Officers

| Officer Name | Officer Address | Position | Stated Position |
|---|---|---|---|
| None Entered | | | |

Directors

| Director Name | Director Address |
|---|---|
| James A. Duffy | 2331 West Lincoln Avenue<br>Anaheim, CA 92801 |
| Amy J. Cooper | 2331 West Lincoln Avenue<br>Anaheim, CA 92801 |
| Richard F. O'Connor II | 2331 West Lincoln Avenue<br>Anaheim, CA 92801 |

The number of vacancies on Board of Directors is: 0

Agent for Service of Process

| | |
|---|---|
| Agent Name | KENNETH J. CATANZARITE |
| Agent Address | 2331 WEST LINCOLN AVENUE<br>ANAHEIM, CA 92801 |

Type of Business

| | |
|---|---|
| Type of Business | AGRICULTURE EQUIPMENT MFG. AND HOLDING C |

Email Notifications

Motion to DQ Catanzarite 3:22-CV-01616-AGS-DDL
Exhibit #28: 001

| Opt-in Email Notifications | Yes, I opt-in to receive entity notifications via email. |
|---|---|

Labor Judgment

No Officer or Director of this Corporation has an outstanding final judgment issued by the Division of Labor Standards Enforcement or a court of law, for which no appeal therefrom is pending, for the violation of any wage order or provision of the Labor Code.

Electronic Signature

☒ By signing, I affirm that the information herein is true and correct and that I am authorized by California law to sign.

*Kenneth J. Catanzarite* — Signature

*12/22/2022* — Date

B1343-7688 12/22/2022 5:12 PM Received by California Secretary of State

EXHIBIT 29

**California Secretary of State**
Electronic Filing

FILED
Secretary of State
State of California

# Corporation - Statement of Information

Entity Name: MOBILE FARMING SYSTEMS, INC.

Entity (File) Number: C3159363
File Date: 11/17/2020
Entity Type: Corporation
Jurisdiction: CALIFORNIA
Document ID: GM13209

**Detailed Filing Information**

1. Entity Name: MOBILE FARMING SYSTEMS, INC.

2. Business Addresses:
   a. Street Address of Principal Office in California:
   2331 West Lincoln Avenue
   Anaheim, California 92801
   United States of America

   b. Mailing Address:
   2331 West Lincoln Avenue
   Anaheim, California 92801
   United States of America

   c. Street Address of Principal Executive Office:
   2331 West Lincoln Avenue
   Anaheim, California 92801
   United States of America

3. Officers:
   a. Chief Executive Officer:
   James A. Duffy
   2331 West Lincoln Avenue
   Anaheim, California 92801
   United States of America

   b. Secretary:
   James A. Duffy
   2331 West Lincoln Avenue
   Anaheim, California 92801
   United States of America

Document ID: GM13209

*Use bizfile.sos.ca.gov for online filings, searches, business records, and resources.*

**California Secretary of State**
Electronic Filing

Officers (cont'd):

   c.   Chief Financial Officer:                    Richard F. O'Connor II
                                                    2331 West Lincoln Avenue
                                                    Anaheim, California 92801
                                                    United States of America

4.  Director:                                       James A. Duffy
                                                    2331 West Lincoln Avenue
                                                    Anaheim, California 92801
                                                    United States of America

    Number of Vacancies on the Board of
    Directors:                                      0

5.  Agent for Service of Process:                   Kenneth J. Catanzarite
                                                    2331 West Lincoln Avenue
                                                    Anaheim, California 92801
                                                    United States of America

6.  Type of Business:                               Agriculture Equipment Mfg. and holding
                                                    company subsidiaries.

By signing this document, I certify that the information is true and correct and that I am authorized by
California law to sign.


Electronic Signature:   James A. Duffy


*Use bizfile.sos.ca.gov for online filings, searches, business records, and resources.*

Document ID: GM13209

**California Secretary of State**
Electronic Filing

## Corporation - Attachment to Statement of Information

**List of Additional Directors**:

1. Amy J. Cooper
2331 West Lincoln Avenue
Anaheim, California 92801
United States of America

2. Richard F. O'Connor II
2331 West Lincoln Avenue
Anaheim, California 92801
United States of America

3.

4.

5.

6.

7.

Document ID: GM13209

*Use bizfile.sos.ca.gov for online filings, searches, business records, and resources.*

# EXHIBIT
# 35

The State Bar
*of California*

**OFFICE OF CHIEF TRIAL COUNSEL**

845 S. Figueroa Street, Los Angeles, CA 90017 213-765-1000 ctc.cpra@calbar.ca.gov

*Via e-mail only* - justintimesd@gmail.com

June 14, 2022

Justin S. Beck

RE: Request for State Bar Records

Dear Mr. Beck:

This letter is an additional response to your Public Records Act request dated May 7, 2022, addressed to Assistant General Counsel Carissa Andresen and received by the State Bar of California on May 12, 2022. You requested the following:

- Per BPC 6086.10: (c) Notwithstanding the confidentiality of investigations, the State Bar shall disclose to any member of the public so inquiring, any information reasonably available to it pursuant to subdivision (o) of Section 6068, and to Sections 6086.7, 6086.8, and 6101, concerning a licensee of the State Bar that is otherwise a matter of public record, including civil or criminal filings and dispositions."

  Please send me "any information [from State Bar, from courts in any jurisdiction, from State Bar licensees on mandatory reporting, from insurers on mandatory reporting] reasonably available to [public entity State Bar and its public employees] pursuant to subdivision (o) of Section 6068, and to Sections 6086.7, 6086.8, and 6101, concerning a licensee of the State Bar [see below] that is otherwise a matter of public record, including all judgments, orders, civil or criminal filings and dispositions related to the following:

  1) Kenneth Joseph Catanzarite

Please be advised that State Bar disciplinary complaints and investigatory records are confidential and not subject to disclosure. (Gov. Code, § 6254 subd. (f) [Investigatory files

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 S. Figueroa Street
Los Angeles, CA 90017

Exhibit #35: 002
22-CV-01616-BAS-DDL

compiled by a state agency for licensing purposes are not subject to disclosure under the California Public Records Act]; Bus. & Prof. Code, § 6086.1 subd. (b) ["[D]isciplinary investigations ... shall not be disclosed pursuant to any state law, including, but not limited to, the California Public Records Act."].)

Without waiving said exemptions, please see the enclosed records.

7) Drexel Bradshaw

State Bar disciplinary complaints and investigatory records are confidential and not subject to disclosure. (Gov. Code, § 6254 subd. (f); Bus. & Prof. Code, § 6086.1 subd. (b).)

Without waiving said exemptions, the State Bar has conducted a diligent search of its records and has located no documents responsive to your request. The State Bar reserves the right to determine whether the requested records are exempt from disclosure pursuant to the California Public Records Act should we later locate responsive documents.

If you wish to discuss this matter further, I can be reached at the telephone number above.

Best regards,

Alex Hackert
Senior Trial Counsel



# 1. SANCTIONS AGAINST KENNETH CATANZARITE

**(See Attached Cases)**

- **Edwards v. Noroski (2013) $14,000 sanction** + $1,200 - see order (11/28/12)

In this case that is ongoing, the Court punished Catanzarite for saying one thing, then switching his story. The court stated that Catanzarite's case was a "sham." First, Catanzarite claimed that the dental practice run by Dr. Noroski and Dr. Schneider should give back money to patients who had been treated at the dental office, but did not say anything was wrong with the dentistry. Then, Catanzarite realized he had no case, because the plaintiffs who were former patients had their depositions and said they were happy with Dr. Noroski and happy with Dr. Schneider. (See attached.) The plaintiffs dropped out and Catanzarite had no case. Catanzarite asked to file an amended complaint that now said that the dental services were bad. The Court punished Catanzarite by sanctioning him $14,000 for wasting everybody's time.

- **Alexandros v. Cole (2011) $10,000 sanction**

Catanzarite violated court rules by making statements to the court without any proof. The court said: "But here plaintiffs [Catanzarite] admit they violated several rules. They also continued to cite the excluded evidence in their reply brief even after defendants noted the error in their briefs." The Court pointed out that Catanzarite's brief made 39 unsupported factual statements, and paragraphs lacking references. Some statements were completely incorrect. Catanzarite does not care about the truth in making statements to the Court. The Court said "Kenneth J. Catanzarite and Laurence M. Rosen are ordered to pay defendants the $10,000 sanctions award…"

- **In Re Perrine (2007) $30,000 or refund of fees**

Catanzarite did not tell the Court that his client, who was declaring bankruptcy, deeded his home to Catanzarite. In bankruptcy, the person declaring bankruptcy cannot sell or give away without telling the Court. Catanzarite took the property to pay for his fees, but did not tell the Court about this, violating this strict rule. The Court took away all of Catanzarite's fees: "Given the gravity of Catanzarite's non-disclosure, the court will deny all fees to Catanzarite for legal services rendered to Perrine to the petition date due to its failure to comply with Section 329(a) and Rule 2016(b). Catanzarite was ordered to give back either his fees, or the property he took. (p. 586)

3

| 3 | 11-510638 Edwards vs. Noroski | | 1. Plt., Edwards and Gans, Motion for Leave to File Fifth Amended Complaint --- Granted; Despite serious reservations as to the sham nature of the pleading at least as to FPS, the court applies the rule of allowing liberal amendments to pleadings. The court finds that it is in the interests of justice for the Plt. to pay monetary compensation to Def.s for the time they spent in the preparation of the summary judgment motions currently pending. The court finds that the delay in filing the amended complaint has caused injustice to the Def. by their filing a motion for summary judgment that Plt. knew would be brought yet Plt. delayed the filing of their request for leave to amend until 1 week before the motion for summary judgment is to be heard. In furtherance of justice the court orders that the ruling granting leave to amend is predicated on the condition that payment by Plt. to Def. the amount of $11,374.85 is to be made for the costs and fees Def. incurred in preparing and filing the summary judgment. CCP 473(a)(1). Plt. delayed filing this motion for leave to amend until after Def.'s filed their motion for summary judgment even though Plt. had knowledge that Def. intended to file such a motion and the cost such a motion would be to Def. Def., Noroski, request for reimbursement for prior investigation and discovery in the amount of $17,915 is denied. This discovery is still useable in this action. All discovery is ordered "stayed" except that discovery related to the Doherty standing issue. The court would like Counsel to submit a time line for briefing schedule |
|---|---|---|---|
| | | | as to MSJ re standing of Doherty. Counsel should meet and confer regarding any issues and the amount of discovery needed relating to the Doherty standing. When can Plt. be ready for a motion to certify and what discovery is needed for that motion?<br><br>**FINAL RULING:**<br><br>Tentative ruling is final. In addition, Plt. is to pay to Def., Noroski the amount of $2500 for the depositions/discovery for the Edwards and Gans depositions. |

Exhibit #35: 005
22-CV-01616-BAS-DDL

ELECTRONICALLY RECEIV
Superior Court of California,
County of Orange
11/20/2012 at 10:30:48 AM
Clerk of the Superior Court
By Irma Cook,Deputy Clerk

ALAN CARLSON, Clerk of the Court
L. LABRADOR

SUPERIOR COURT OF CALIFORNIA

COUNTY OF ORANGE – CIVIL COMPLEX CENTER

| | |
|---|---|
| JUDITH L. EDWARDS and SCOTT C. GANS, individually and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>DANIEL NOROSKI, D.D.S., an individual; DANIEL A. NOROSKI, D.D.S., INC., A PROFESSIONAL DENTAL CORPORATION, a California Corporation; FIRST PACIFIC CORPORATION, an Oregon corporation; and DOES 1 through 100, inclusive,<br><br>Defendants.<br><br>AND RELATED CROSS-ACTION. | CASE NO.: 30-2011-00510638-CU-MC-CXC<br>ASSIGNED TO HON. STEVEN L. PERK, DEPT. CX102<br><br>UNLIMITED JURISDICTION<br><br>AMENDED ~~[PROPOSED]~~ **ORDER GRANTING DEFENDANT DANIEL NOROSKI, D.D.S., INC.'S MOTION TO COMPEL DEPOSITIONS OF PLAINTIFF JUDITH L. EDWARDS AND PLAINTIFF SCOTT C. GANS AND TO PRODUCE RESPONSIVE DOCUMENTS TO DEPOSITION DOCUMENT DEMANDS; AND FOR SANCTIONS IN THE AMOUNT OF $1,200**<br><br>FILE DATE: September 23, 2011<br>TRIAL DATE SET: No Date Set |

On November 16, 2012 at 10:30 a.m. in Department CX102 of the above-entitled court, located at 751 Civic Center Drive West, Santa Ana, California, 92701, defendant Daniel A. Noroski, D.D.S., Inc. ("Noroski APC") motion to compel depositions of Plaintiffs Judith Edwards and Scott Gans came on for a regularly noticed hearing.

After considering the moving papers, opposing papers, reply papers and oral argument, the Court orders as follows:

NEWMEYER & DILLION LLP

RECEIVED IN DEPT CX 102 ON 11/28/12
AT 8:00 AM/PM

1. That Plaintiff Judith Edwards and Plaintiff Scott Gans must attend their depositions at Daniel A. Noroski, D.D.S., Inc.'s counsel's office located at 895 Dove Street, 5th Floor, Newport Beach, California by no later than December 10, 2012.

2. By no later than November 26, 2012, both Plaintiff Judith Edwards and Scott Gans are to produce all responsive documents to Request Nos. 1-34 with respect to the deposition document demands that are attached to the notices of deposition of plaintiffs. If a protective order is needed, Defendants' counsel will prepare a draft protective order and circulate the same to all and file it with the Court. Plaintiff will have five days from receipt of the protective order to submit any objections.

3. The Court awards sanctions in the amount of $1,200 to Daniel Noroski, D.D.S., Inc. against Plaintiffs' Judith Edwards and Scott Gans, jointly and severally. The sanctions shall be paid in full on or before December 7, 2012 to Daniel Noroski, D.D.S. Inc., to be made payable to Newmeyer & Dillion, LLP. The Court finds that there was no substantial justification presented for the objections raised by Plaintiffs. There is no authority supporting Plaintiffs theory of "priority" setting of depositions. *Young vs. Rosenthal*, 212 Cal. App. 3d 96 does not stand for the proposition cited by Plaintiffs in their opposing papers. *Young* involved a priority established by express agreement which is lacking in this case. Nothing in this case triggers the application of the "priority" contemplated in *Weil and Brown* either. The objections to these depositions and documents production are not well taken and are stricken.

4. Defendants' counsel is to give notice.

Dated: 11/28/2012

[signature]
JUDGE OF SUPERIOR COURT
**STEVEN L. PERK**

NEWMEYER & DILLION LLP

**PROOF OF SERVICE**

*Judith L. Edwards, et al. v. Daniel Noroski, D.D.S., et al.*
OCSC Case No. 30-2011-00510638-CU-MC-CXC

STATE OF CALIFORNIA )
) ss.
COUNTY OF ORANGE )

I, DEE NOVOA, declare:

I am a citizen of the United States and employed in Orange County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 895 Dove Street, 5th Floor, Newport Beach, California 92660. On November 20, 2012, I served a copy of the within document(s):

AMENDED
**[PROPOSED] ORDER GRANTING DEFENDANT DANIEL NOROSKI, D.D.S., INC.'S MOTION TO COMPEL DEPOSITIONS OF PLAINTIFF JUDITH L. EDWARDS AND PLAINTIFF SCOTT C. GANS AND TO PRODUCE RESPONSIVE DOCUMENTS TO DEPOSITION DOCUMENT DEMANDS; AND FOR SANCTIONS IN THE AMOUNT OF $1,200**

☐ by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☒ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Newport Beach, California addressed as set forth below.

☐ by placing the document(s) listed above in a sealed NORCO OVERNITE/FEDERAL EXPRESS envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a NORCO OVERNITE/FEDERAL EXPRESS agent for delivery.

☐ by transmitting via e-mail or electronic transmission the document(s) listed above to the person(s) at the e-mail address(es) set forth below.

**PLEASE SEE ATTACHED SERVICE LIST**

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on November 20, 2012, at Newport Beach, California.

Dee Novoa
DEE NOVOA

NEWMEYER & DILLION LLP

**SERVICE LIST**

*Judith L. Edwards, et al. v. Daniel Noroski, D.D.S., et al.*
OCSC Case No. 30-2011-00510638-CU-MC-CXC

Kenneth J. Catanzarite, Esq.
Nicole Catanzarite-Woodward, Esq.
CATANZARITE LAW CORPORATION
2331 West Lincoln Ave.
Anaheim, CA 92801

Tel: (714) 520-5544
Fax: (714) 520-0680
Email: kcatanzarite@catanzarite.com
Email: ncatanzarite@catanzarite.com
**[PLAINTIFFS]**

Robert L. Kenny, Esq.
Law Office of Robert L. Kenny
501 West Broadway, Ste. 1370
San Diego, CA 92101

Tel: (619) 234-1616
Fax: (619) 233-1969
Email: rkenny@kennylaw.net
**[FIRST PACIFIC CORPORATION]**

NEWMEYER & DILLION LLP

This Document is Provided by Leagle.com

# IN RE PERRINE

*369 B.R. 571 (2007)*

**In re Eugene H. PERRINE, Jr., Debtor.**

**No. RS 05-13979 PC.**

United States Bankruptcy Court, C.D. California, Riverside Division.

April 13, 2007.

Kenneth J. Catanzarite, Anaheim, CA, for Debtor.

Thomas H. Casey, Rancho Santa Margarita, CA, for Chapter 7 Trustee.

## AMENDED MEMORANDUM DECISION

The v

PETER H. CARROLL, Bankruptcy Judge.

Steven M. Speier, Chapter 7 Trustee ("Speier") seeks an order compelling Kenneth J. Catanzarite, Richard Vergel de Dios and the Catanzarite Law Corporation (collectively, "Catanzarite"), attorneys for Debtor, Eugene H. Perrine, Jr. ("Perrine") to disgorge undisclosed fees received by Catanzarite within one year before the filing of Perrine's bankruptcy petition allegedly "in contemplation of or in connection with" his bankruptcy case. Catanzarite objects to the disgorgement of the fees, claiming that the compensation was not received for services rendered either "in contemplation of or in connection with" Perrine's bankruptcy case. At the continued hearing, Kathleen Goldberg appeared for Speier and Richard Vergel de Dios appeared for Catanzarite and Perrine. The court, having considered Speier's motion and the opposition of Catanzarite and Perrine thereto, the evidentiary record, and arguments of counsel, makes the following findings of fact and conclusions of law[1] pursuant to Fed.R.Civ.P. 52, as incorporated into Fed. R. Bankr.P. 7052 and made applicable to contested matters by Fed. R. Bankr.P. 9014 (c).

## I. STATEMENT OF FACTS

Prior to August 8, 2003, Perrine owned as his separate property a 30.32 acre tract of land located in Klamath Falls, Oregon ("Oregon Property"). On August 8, 2003, Perrine transferred the Oregon Property to the Eugene H. Perrine and Vicki L Perrine Family Trust dated August 8, 2003 ("Perrine Trust") by Trust Transfer Grant Deed recorded on August 22, 2003, at Volume M03, Page 61460, Real Property Records, Klamath County, Oregon.

The Perrine Trust is an *intervivos* revocable trust established in the name of Perrine and his wife, Vicki. Perrine is the trustor, co-trustee and beneficiary of the Perrine Trust. In addition to the Oregon Property, the assets of the Perrine Trust ostensibly included at its inception the following marital property:

> *Community Property:* "All items of tangible personal property, including, but not limited to, furniture and furnishings, silverware, clothing, books, collections of tangible personal property, and
>
> [369 B.R. 575]
>
> other tangible personal property usually kept at the Trustor's residence."[2]

Exhibit #35: 010
22-CV-01616-BAS-DDL

This Document is Provided by Leagle.com

> *Perrine's Separate Property:* (a) Real property and improvements located at 285 West Skyline Drive, La Habra Heights, California ("La Habra Property"), transferred into the Trust by Trust Transfer Grant Deed recorded on September 26, 2003, as Instrument No. 03-2864459, Official Records, Los Angeles County, California; (b) 50 shares of stock in Perrine Electric Company, Inc. and (c) a pension at Schwab & Company, Inc.[3]

Section 1.02 of the Perrine Trust states, in pertinent part:

> "All property now or hereafter conveyed or transferred to the [Trust] . . . shall remain, respectively, community property, quasi-community property, or the separate property of the Trustor transferring such property to the Trustee."

Perrine is also the president of Perrine Electric Company, Inc. ("Perrine Electric"). On April 29, 2004, Perrine was sued by AAA Electrical Supply, Inc. ("AAA") in Case No. BC 324665, styled *AAA Electrical Supply, Inc. v. Perrine Electric Company, Inc. and Eugene H. Perrine, Jr.*, in the Superior Court of Los Angeles County, for the sum of $71,167.05, plus attorneys fees and costs, based upon his personal guaranty of the debts of Perrine Electric. Catanzarite was the attorney of record for Perrine and Perrine Electric in the state court action.

On January 11, 2005, Perrine and Vicki Perrine, Individually and as trustee, executed a document entitled "Retainer Agreement and Application of In Kind Payment" agreeing to transfer the Oregon Property to Catanzarite at a stipulated value of $30,000 for payment of accrued attorneys fees and costs and as a credit for future attorneys fees and costs to be incurred by Perrine and Vicki Perrine. The Retainer Agreement states specifically that the payment is "for the purpose of securing the continued representation of the Trust and the individuals in future litigation including without limitation, with creditors and to protect the home equity of Vicki and the pension of Eugene." On January 13, 2005, Perrine and Vicki Perrine, as Co-Trustees of the Trust, executed a Statutory Bargain and Sale Deed conveying the Oregon Property to Kenneth J. Catanzarite for $30,000. The deed was recorded on January 14, 2005, at Volume M05, Page 03482, Real Property Records, Klamath County, Oregon. Ten days later, Perrine stipulated to entry of a judgment in the state court action in favor of AAA in the amount of $76,767.

On April 21, 2005, Perrine filed his voluntary petition under chapter 7 of the Bankruptcy Code.[4] Speier was appointed as trustee. In his schedules filed on May 6, 2005, Perrine disclosed assets valued at $415,740 and liabilities in excess of $174,073.[5] According to Schedule A, Perrine

[ 369 B.R. 576 ]

did not own an interest in any real property on the petition date. Perrine's assets, as disclosed in Schedule B, consisted of cash, clothing, two vehicles, and his interest in a profit sharing plan valued at $400,000. Perrine declared under penalty of perjury that he neither owned stock or an interest in a business at the time of bankruptcy[6] nor any interest in a trust on the petition date.[7]

In his Statement of Financial Affairs filed on May 6, 2005, Perrine declared under penalty of perjury that he had not made any payments to creditors within 90 days preceding the commencement of the case[8] nor transferred any property (other than in the ordinary course of business or financial affairs of the debtor) within one year preceding the date of bankruptcy.[9] In response to Question # 9 of the Statement of Financial Affairs, Perrine disclosed that he had paid the sum of $3,000 to Catanzarite on January 14, 2005, for debt counseling or bankruptcy.

On May 6, 2005, Catanzarite filed a document entitled "Disclosure of Compensation of Attorney for Debtor" ("Rule 2016(b) Statement") signed by Richard Vergel de Dios on behalf of Catanzarite, stating:

> Pursuant to 11 U.S.C. § 329(a) and Fed. Bankr.P.2016(b), I certify that I am the attorney for the above-named debtor(s) and that compensation paid to me within one year before the filing of the petition in

This Document is Provided by Leagle.com

bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

| | |
|---|---|
| For legal services, I have agreed to accept | $3,000.00 |
| Prior to the filing of this statement I have received | $3,000.00 |
| Balance Due | $ 0.00 |

Mr. de Dios further certified that Catanzarite had agreed to accept $3,000 for the following legal services in the case:

a. Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;

b. Preparation and filing of any petition, schedules, statements of affairs and plan which may be required;

c. Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof; [and]

d. Representation of the debtor in adversary proceedings and other contested bankruptcy matters.[10]

Mr. de Dios's signature on the Rule 2016(b) Statement appears beneath the following certification:

I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceedings.[11]

On May 23, 2005, Perrine appeared and was examined by Speier under oath at a meeting of creditors conducted pursuant to § 341(a).[12] Based upon the examination

[369 B.R. 577]

and his investigation of Perrine's actions before bankruptcy, Speier filed a complaint in Adversary No. RS-05-01243 PC, styled *Steven M. Speier, Chapter 7 Trustee v. Vicki L. Perrine, et. al.*, on June 15, 2005, seeking, in part, to recover as a fraudulent conveyance funds received by Perrine from the sale of the La Habra Property prior to bankruptcy, which were then transferred to Vicki and used to purchase, as her separate property, certain real property located at 4025 Prarie Dunes Drive, Corona, California.

On July 15, 2005, Perrine filed a motion to dismiss his case pursuant to § 707(a), alleging that Speier's fraudulent conveyance claims were unfounded and that the unsecured non-priority creditors holding claims in excess of $174,000 would not suffer significant legal prejudice by a dismissal of the case.[13] Perrine's dismissal motion was opposed by Speier and Perrine's largest creditor, AAA.[14] On August 15, 2005, the court denied Perrine's motion to dismiss finding that dismissal of the case would be prejudicial to creditors.[15] An Order Denying Debtor's Motion for Voluntary Dismissal of Case was entered on September 20, 2005. Shortly thereafter, Speier filed a complaint in Adversary No. RS 05-01473 PC, styled *Steven M. Speier, Chapter 7 Trustee v. Eugene H. Perrine, Jr.*, objecting to Perrine's discharge pursuant to § 727(a)(2)(A), (a)(3), (a)(4)(A) and (a)(5).

On November 2, 2006, Speier filed a motion seeking an order compelling Catanzarite to amend its Rule 2016(b) Statement to disclose the transfer of the Oregon Property claiming that the property was received for services "in contemplation of or in connection with" Perrine's bankruptcy case. Perrine and Catanzarite opposed the motion, asserting that the fees incurred "in contemplation of or in connection with" the bankruptcy case were limited to the $3,000 disclosed in the Rule 2016(b) Statement on May 6, 2005, and that the Oregon Property was transferred to Catanzarite primarily for non-bankruptcy services. Catanzarite explained that there

was an outstanding balance of $12,000 due the Catanzarite firm when it received the Oregon Property on January 14, 2005. After payment of the outstanding balance, the $18,000 credit was used to pay $3,000 in fees for preparation of the bankruptcy petition and "the remaining amount was used to pay fees incurred pre-bankruptcy related to the AAA Electric

[369 B.R. 578]

litigation."[16]

At a hearing on December 4, 2006, the court determined that Perrine's transfer of the Oregon Property to Catanzarite on January 14, 2005, within 97 days prior to the filing of Perrine's bankruptcy petition, was made "in contemplation of or in connection with" Perrine's bankruptcy case. Catanzarite was ordered to amend its Rule 2016(b) Statement to disclose all facts concerning its receipt of the Oregon Property. A hearing on the issue of disgorgement was continued to February 26, 2007.

On December 15, 2006, Catanzarite filed an Amended Disclosure of Compensation of Attorney for Debtor ("Amended Rule 2016(b) Statement"). Catanzarite's Amended Rule 2016(b) Statement did not mention the Oregon Property nor explain the method used by Catanzarite and Perrine to arrive at the $30,000 "stipulated" value. Catanzarite's Amended Rule 2016(b) Statement stated only that "payments and credits received from the Debtor in the amount of $30,000 were paid on behalf of the following categories: $21,000 in defense of the AAA Electrical litigation; $3,000 with regard to the dispute with MBNA, $3,000 for pension work and $3,000 for preparation of bankruptcy petition and schedules."[17] Prior to the continued hearing, Speier and Catanzarite filed supplemental memorandums of points and authorities on the issue of disgorgement. At the continued hearing on February 26, 2007, the matter was taken under submission.

## II. DISCUSSION

This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(b) and 1334(b). This matter is a core proceeding under 28 U.S.C.

[369 B.R. 579]

§ 157(b)(2)(A), (B), (E) and (O). Venue is appropriate in this court. 28 U.S.C. § 1409(a).

### A. *Strict Duty of Disclosure*

Section 329(a) requires a debtor's attorney to disclose to the court the amount of compensation paid or promised for services rendered "in contemplation of or in connection with the case."[18] Section 329(a) is implemented by Rule 2016(b) which requires the filing of the statement required by § 329(a) not later than 15 days after the order for relief.[19] Rule 2016(b) imposes a continuing duty on debtor's counsel to supplement the original statement pursuant to § 329(a).[20] The disclosure requirements of § 329(a) apply "whether or not the attorney ever applies for compensation" *Consumer Seven Corp. v. United States Trustee (In re Fraga),* 210 B.R. 812, 822 (9th Cir. BAP 1997).

Rule 2017(a) directs the court to determine, either *sua sponte* or upon motion by a party in interest, whether any payment or transfer of property to an attorney "in contemplation of" the filing of the bankruptcy petition is excessive.[21] Taken together, § 329(a) and Rule 2017(a) "furnish the court with express power to review payments to attorneys for excessiveness and to restore the status quo when assets have improvidently been bartered for legal services[.]" *In re Martin,* 817 F.2d 175, 180 (1st Cir.1987).

Section 329's disclosure requirements are "'mandatory, not permissive.'" *Turner v. Davis, Gillenwater & Lynch (In re Investment Bankers, Inc.),*4 F.3d 1556, 1565 (10th Cir.1993) (quoting *In re Bennett,*133 B.R. 374, 378 (Bankr. N.D.Tex.1991)); *In re Keller Fin. Servs. of Fla., Inc.,*248 B.R. 859, 883 (Bankr. M.D.Fla.2000). Section 329(a), which is derived from § 60(d) of the Bankruptcy Act of 1898,[22] seeks to prevent over-reaching

[369 B.R. 580]

by debtor's attorneys and serves to counteract the temptation of a failing debtor to deal too liberally with his property in employing counsel to protect him in view of financial reverses and probable failure.'" *Conrad, Rubin & Lesser,* 289 U.S. at 477-78, 53 S.Ct. 703 (quoting *In re Wood,*210 U.S. 246, 28 S.Ct. 621, 52 L.Ed. 1046 (1908)). Section 329(a) demands that an attorney be forthright in disclosing "the precise nature of the fee arrangement" with the debtor. *Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park — Helena Corp.),*63 F.3d 877, 881 (9th Cir.1995) (quoting *In re. Glenn Elec. Sales Corp.,*99 B.R. 596, 600 (D.N.J.1988)). "Counsel's fee revelations must be direct and comprehensive. Coy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient." *In re Saturley,*131 B.R. 509, 517 (Bankr.D.Me.1991).

Congress intended to permit bankruptcy courts to reexamine the reasonableness of fees within the one-year look back period, irrespective of the nature of the services rendered. *See Keller Fin. Servs.,* 248 B.R. at 878 (concluding that § 329 permits the court to review fees paid for services "performed at a time when the debtor was contemplating bankruptcy," regardless of the nature of the services (internal quotations omitted)); *Wootton v. Ravkind (In re Dixon),*143 B.R. 671, 678 (Bankr.N.D.Tex.1992) (stating that § 329 "imposes no restriction on the nature of the services rendered . . ."); *Rheuban,* 121 B.R. at 378 (observing that § 329 does not limit the nature of the legal services that are subject to reexamination). Absent complete disclosure, the court is unable to make an informed judgment regarding the nature and amount of compensation paid or promised by the debtor for legal services in contemplation of bankruptcy.

The failure to satisfy the disclosure requirements of § 329(a) and Rule 2016(b) may result in sanctions, "even if proper disclosure would have shown that the attorney had not actually violated any Bankruptcy Code provision or any Bankruptcy Rule." *Park-Helena Corp.,* 63 F.3d at 880; *Fraga,* 210 B.R. at 822. An attorney who violates § 329(a) and Rule 2016(b)

[369 B.R. 581]

forfeits any right to receive compensation for services rendered on behalf of the debtor and may be ordered to disgorge fees already received. *See, e.g., Law Offices of Nicholas A. Franke v. Tiffany (In re Lewis),*113 F.3d 1040, 1045 (9th Cir. 1997) (concluding that "[a]n attorney's failure to obey the disclosure and reporting requirements of the Bankruptcy Code and Rules gives the bankruptcy court the discretion to order disgorgement of attorney's fees"); *Park-Helena Corp.,* 63 F.3d at 882 ("Even a negligent or inadvertent failure to disclose fully relevant information [in a Rule 2016 statement] may result in a denial of all requested fees."); *Jensen v. U.S. Trustee (In re Smitty's Truck Stop, Inc.),*210 B.R. 844, 849 (10th Cir. BAP 1997) (stating that an attorney's failure to disclose a retainer in his Rule 2016(b) statement is sufficient to deny all fees, even if the non-disclosure was negligent or inadvertent); *Fraga,* 210 B.R. at 822 ("The consequences of an attorney's violation of the disclosure requirements regarding fees include denial of all fees requested.").

B. *Services "In Contemplation of" the Bankruptcy Case*

Courts broadly apply a *subjective test* to determine whether attorneys fee payments were made "in contemplation of" bankruptcy. *Dixon,* 143 B.R. at 675 n. 3 (observing that "[a] subjective and not an objective test applies in determining whether payments to attorneys were

Exhibit #35: 014
22-CV-01616-BAS-DDL

made `in contemplation of bankruptcy.'"); *Rheuban,* 121 B.R. at 378 (stating that a "*subjective* review [is] embodied in the `in contemplation of' language of § 329 and its predecessors, § 60(d) and Bankruptcy Rule 220"). The subjective inquiry is "whether the debtor was influenced by the possibility or imminence of a bankruptcy proceeding in making the transfer." *Brown v. Luker (In re Zepecki),*258 B.R. 719, 724 (8th Cir. BAP 2001), *aff'd,*277 F.3d 1041 (8th Cir.2002); *see Dixon,* 143 B.R. at 675 n. 3 (articulating the standard as "whether, in making the transfer, the debtor is influenced by the possibility or imminence of a bankruptcy proceeding"). The "controlling question," as the Supreme Court explained in *Conrad, Rubin & Lesser,* "is with respect to the state of mind of the debtor and whether the thought of bankruptcy was the impelling cause of the transaction." 289 U.S. at 477, 53 S.Ct. 703.

> If the payment or transfer was thus motivated, it may be re-examined and its reasonableness be determined. Undoubtedly, while the question thus relates to the debtor's motive, the nature of the services which he seeks and for which he pays may be taken into consideration as it may throw light upon his motive. It is not impossible that the services may have been so wholly separate from any exigency of bankruptcy as to indicate that the thought of bankruptcy was in no sense controlling. But, given the fact that the payment or transfer was in contemplation of bankruptcy, the inducement of the transaction affords, from the standpoint of the statute, sufficient ground for authorizing a summary inquiry into its reasonableness. The manifest purpose of the provision is to safeguard the assets of those who are acting in contemplation of bankruptcy, so that these assets may be brought quickly and without unnecessary expense into the hands of the trustee, and to provide a restraint upon opportunities to make an unreasonable disposition of property through arrangement for excessive payments for prospective legal services.

*Id.*

Services aimed at the *prevention* of bankruptcy likewise necessarily contemplate bankruptcy, and compensation received

[369 B.R. 582]

for such services falls within the ambit of § 329(a). *See, e.g., Conrad, Rubin & Lesser,* 289 U.S. at 479, 53 S.Ct. 703 (holding that the court had jurisdiction to review fees paid to an attorney retained by debtor to negotiate a 50% cash settlement with creditors prior to bankruptcy, and opining that "[a] man is usually very much in contemplation of a result which he employs counsel to avoid"); *Matter of Prudhomme,*43 F.3d 1000, 1004 (5th Cir. 1995) (holding that evidence suggesting that the debtors, who in desperate financial straits, consulted an attorney for representation to restructure debt and resolve disputes with their largest creditor supported a finding that the fee was paid in contemplation of or in connection with the case); *In re Greco,*246 B.R. 226, 231 (Bankr.E.D.Pa.2000) (holding that a $2,200 payment to an attorney two months before bankruptcy for legal research concerning the effect of bankruptcy on the debtor's student loans was "in contemplation of" bankruptcy); *Rheuban,* 121 B.R. at 379 (finding that debtor acted "in contemplation of bankruptcy" upon entering into a fee agreement with a firm to represent him in connection with investigation and litigation of possible criminal and regulatory matters arising out of debtor's business relationship with a savings & loan); *GIC Gov't Sec.,* 92 B.R. at 533 (concluding that payments made to attorneys retained on the eve of bankruptcy to resist efforts by the State of Florida to revoke the debtor's securities registration were "in contemplation of" bankruptcy). Those cases in which a debtor's counsel has received undisclosed non-exempt assets shortly before bankruptcy as compensation primarily for future services have merited particularly close scrutiny by bankruptcy courts.

In *Dixon,* an attorney, William H. Ravkind ("Ravkind") was employed by Don Ray Dixon ("Dixon") in November 1986, to represent him in criminal matters arising out of his association with Dondi Financial Corporation and Vernon Savings & Loan Association for a flat fee of $450,000. 143 B.R. at 673. Ravkind ultimately received $200,000 in cash and certain artwork valued at $100,000 as payment in full. *Id.* at 674. The cash and artwork, which were Dixon's non-exempt assets, were paid for future services to be rendered by Ravkind. *See id.* At the time he

Exhibit #35: 015
22-CV-01616-BAS-DDL

received the transfer, Ravkind was aware that Dixon was considering bankruptcy. *Id.* Ravkind and Dixon were concerned that the federal government was planning to seize Dixon's assets pursuant to the Racketeer Influenced and Corrupt Organizations Act.[23] *Id.* Ravkind immediately deposited the $200,000 cash in his operating account and used the funds to pay business expenses. *Id.* Ravkind then sold most of the artwork for less than $25,000. *Id.* at 675.

On April 22, 1987, Dixon filed a voluntary petition under chapter 11 of the Code. *Id.* at 673. Ravkind was not Dixon's general counsel in the bankruptcy case, but continued to represent him on criminal matters after the petition date. *Id.* at 674. Dixon disclosed the $300,000 transfer to Ravkind in his statement of financial affairs. *See id.* at 675. However, Ravkind failed to timely disclose the $300,000 fee and his agreement with Dixon pursuant to § 329(a) and Rule 2016(b). *Id.* Furthermore, Ravkind neither sought authorization to act as special counsel for Dixon under § 327(e) nor authorization to use any unearned portion of the $300,000 retainer in his possession. *Id.*

On October 14, 1987, Dale Wooten, as chapter 11 trustee, filed a complaint seeking to recover the $300,000 fee from Ravkind as a fraudulent transfer under

[ 369 B.R. 583 ]

§ 548(a). *Id.* at 673. It was undisputed that at all material times, Dixon was insolvent within the meaning of § 548(a). *See id.* at 674. Ravkind had not kept time records, but the evidence supported a finding that he had earned approximately $35,000 for legal services rendered to Dixon prior to bankruptcy. *Id.* It was also undisputed that the reasonable value of Ravkind's post-petition criminal defense work, which accounted for the majority of his services to Dixon, exceeded the amount that he had been paid. *Id.*

Although relief was sought by the trustee under § 548(a), the bankruptcy court concluded that "the more appropriate standard" for review of Ravkind's fee arrangement with Dixon was § 329(a) and § 330. *Id.* at 673. Applying a subjective test, the bankruptcy court found that Dixon's $300,000 transfer to Ravkind was made in contemplation of bankruptcy, stating:

> Prior to the filing of the bankruptcy proceedings, Dixon was the target of several major criminal investigations, and had received national media attention as an alleged central figure in the savings and loan scandal. At the time [Ravkind] received the money and art as a payment from Dixon, both he and Dixon were concerned that Dixon's assets might be seized under a RICO seizure. Bankruptcy counsel had already been retained for the Debtors in California, and Debtors were insolvent. From the testimony adduced at trial, it was clear the cash payment and art represented part of the last liquid and available assets of the Debtors. At the time [Ravkind] was engaged, he undertook representation of Dixon in several criminal investigations, and related civil suits with the Federal Deposit Insurance Corporation (the "FDIC"). In addition, he participated with Dixon's California bankruptcy lawyers in some bankruptcy planning. At the time [Ravkind] received the transfers of Dixon's money and property, Dixon's general counsel Simmons was parceling out funds and property for retainers. The Court finds that the transfers were received by [Ravkind] within a year of the filing of bankruptcy, in contemplation of a bankruptcy proceeding, and that, therefore, [Ravkind's] fee arrangement is subject to review under § 329 of the Code.

*Id.* at 675 n. 3. The court then ordered Ravkind to disgorge all but $35,000 of the payment received from Dixon, *i.e.,* the remaining art on hand, $160,000 of the cash received, and $90,000 representing the value of the artwork disposed of, finding that the fee arrangement was excessive and violated § 329 and § 330. *Id.* at 679. The court also determined that Ravkind's failure to disclose the $300,000 fee and agreement with Dixon pursuant to § 329(a) and Rule 2016(b) constituted "an independent and alternative basis" for disgorgement of the fees. *Id.* at 680. In ordering the disgorgement, the court concluded that Ravkind's criminal defense work was personal to Dixon and resulted in no benefit to creditors or the estate, stating "the only thing the transfers to [Ravkind] achieved was to further deplete the assets of the bankruptcy estate." *Id.* at 679.

In *Zepecki*, Robert Zepecki ("Zepecki") filed a voluntary chapter 7 petition on February 7, 1996. 277 F.3d at 1043. Three months earlier, Zepecki's attorney, Steven C.R. Brown ("Brown") had received the net proceeds of $102,989 from the sale of certain real property owned by Zepecki in Illinois pursuant to a "1031 Exchange of Property Escrow Agreement."[24] *Id.* at 1044. Acting as escrow agent under the

[369 B.R. 584]

agreement, Brown disbursed the sum of $65,000 to the bank account of a third party, Ted Holder ("Holder") prior to Zepecki's bankruptcy. *Id.* The balance was disbursed by Brown to Holder shortly after the petition date. *Id.* Brown received $40,000 in attorneys fees as part of the transaction, $20,000 following each payment to Holder. *Id.*

Zepecki failed to disclose in his schedules and statements either the sale of the Illinois property or the transfer of the sale proceeds to Brown. *Id.* at 1043. The bankruptcy court denied Zepecki's discharge under § 727(a)(4), and *sua sponte* ordered Brown to account for the $40,000 fee received under the agreement. *Id.* at 1043-44. Brown documented attorneys fees and expenses totaling $7,160 incurred prior to Zepecki's bankruptcy in conjunction with the tax-free exchange. *Id.* at 1044. Ultimately, the bankruptcy court determined that the $40,000 fee was paid to Brown in contemplation of or in connection with Zepecki's bankruptcy. *Id.* at 1046. Brown was ordered to disgorge fees of $32,840 to the estate, representing the entire post-petition fee of $20,000 and $12,840 of the $20,000 fee, received prior to the petition date. *Id.* at 1044. Brown appealed and the Bankruptcy Appellate Panel for the Eighth Circuit affirmed. *Zepecki*, 258 B.R. at 726. The Eighth Circuit then affirmed the judgment of the Bankruptcy Appellate Panel, holding:

> We also find no clear error in the bankruptcy court's finding that Brown's representation was in connection with or in contemplation of the possibility or imminence of a bankruptcy proceeding. The Illinois land transaction occurred within one month after Zepecki's divorce from Ms. Kania, who was Zepecki's largest creditor, and within four months prior to the bankruptcy filing. The proceeds of the land sale constituted Zepecki's largest asset with which to satisfy Ms. Kania's judgment. The bankruptcy court found that the land transaction was a sham and was performed in an effort to prevent the asset from becoming property of Zepecki's bankruptcy estate and prevent his ex-wife from recovering on her judgment. Zepecki lost his right to a bankruptcy discharge because he failed to identify the transaction or its proceeds on his bankruptcy schedules, which further supports the court's conclusion that Zepecki was trying to keep the asset from his wife. These facts support the bankruptcy court's conclusion that Zepecki was contemplating bankruptcy when he transferred the Illinois property and when Brown assisted in the attempted section 1031 transfer of that same property.

*Zepecki*, 277 F.3d at 1046.

C. *Perrine Transferred the Oregon Property to Catanzarite In Contemplation of Bankruptcy*

As the Supreme Court explained in *Conrad, Rubin & Lesser*, the test for determining if a payment or transfer was made "in contemplation of" bankruptcy hinges upon the debtor's state of mind and, more precisely, "whether the thought of bankruptcy was the impelling cause of the transaction." 289 U.S. at 477, 53 S.Ct. 703. Four months prior to bankruptcy, Perrine was embroiled in a lawsuit with AAA, his largest creditor. On the eve of trial, Perrine transferred the Oregon Property from the Perrine Trust to his attorney, Catanzarite. The Perrine Trust specifically provided that the Oregon Property remained Perrine's separate property,

[369 B.R. 585]

notwithstanding its inclusion in the trust. The Oregon Property was Perrine's last and most significant non-exempt asset. At the time of the transfer, Catanzarite and Perrine had to have been concerned that the Oregon Property would be seized by AAA to satisfy any judgment that might be entered against Perrine in the state court action. Catanzarite concedes that once it received the Oregon Property, there was "no property remaining in the trust to satisfy

creditors."[25] With the Oregon Property in the hands of Catanzarite, Perrine stipulated to a judgment with AAA ten days later.

Moreover, the language of Catanzarite's retainer agreement belies any notion that the Oregon Property was not transferred in contemplation of bankruptcy. Like *Dixon,* the transfer was intended to barter non-exempt assets primarily for future legal services to be rendered by Catanzarite. Perrine transferred the Oregon Property to Catanzarite 97 days prior to his bankruptcy, after exhausting efforts to litigate with his largest creditor, and for the stated purpose of "securing the continued representation of the Trust and the individuals in future litigation including without limitation, with creditors and to protect the home equity of Vicki and the pension of Eugene."[26] The Oregon Property was given a "stipulated" value of $30,000 by Perrine to Catanzarite, but Catanzarite was owed only $12,000 at the time of the transfer. As in *Dixon,* the effect of the transfer was to further deplete the assets of the estate.

Catanzarite argues that Perrine did not contemplate or intend to file bankruptcy at the time he was sued by AAA on April 29, 2004.[27] The critical date, however, is the date of the transfer of the Oregon Property. The only direct evidence of Perrine's state of mind on January 14, 2005, is Perrine's deposition testimony that he "never really wanted to declare bankruptcy" and, in response to a question as to whether he was thinking about filing bankruptcy in January 2005, Debtor responded "I don't know." Even Perrine's deposition testimony lacks credibility when weighed against the facts as they existed 97 days prior to bankruptcy.

At the hearing on December 4, 2006, Catanzarite conceded that Perrine "wanted to avoid bankruptcy." Catanzarite explained that Perrine's business "operated from one large job to another," and that his client had been "down in the hole before" but he would receive "the golden phone call . . . where it was a big job would come in and it, pull his company out of its abyss, financial abyss." Taken together, these facts support a finding that Perrine was contemplating the possibility or imminence of bankruptcy when he transferred the Oregon Property to Catanzarite on January 14, 2005, and that the transfer is subject to review under § 329(a) and Rule 2017(a).

D. *Catanzarite Failed to Disclose Property Transferred to Catanzarite in Payment for Legal Services Rendered, or To Be Rendered, in Contemplation of Perrine's Bankruptcy Case*

Section 329(a) and Rule 2016(b) required that Catanzarite's disclosures be

[ 369 B.R. 586 ]

full, candid and complete. Catanzarite timely filed a Rule 2016(b) Statement in this case, but failed to disclose fully and candidly in its Rule 2016(b) Statement the precise nature of its fee agreement with Perrine. Catanzarite's failure to disclose its complete relationship with Perrine was neither negligent or inadvertent. Notwithstanding its receipt of the Oregon Property pursuant to its retainer agreement with Perrine, Catanzarite made a purposeful calculation of the amount that it chose to disclose in its Rule 2016(b) Statement. Catanzarite did not receive the sum of $3,000 from Perrine for legal services, as certified in its Rule 2016(b) Statement. On the contrary, Catanzarite received a transfer of the Oregon Property from the Perrine Trust on January 14, 2005, with a stipulated value of $30,000. Catanzarite then apportioned a value of $3,000 from the $30,000 transfer for legal services ostensibly rendered to Perrine in contemplation of or in connection with his bankruptcy case. No facts concerning Catanzarite's retainer agreement nor its receipt of the Oregon Property 97 days prior to bankruptcy were disclosed in either the Rule 2016(b) Statement or the Amended Rule 2016(b) Statement. Nor did Catanzarite disclose the method used to calculate the $30,000 "stipulated" value of the Oregon Property. Neither the retainer agreement nor the transfer of the Oregon Property to Catanzarite were disclosed by Perrine in the statement of financial affairs prepared by Catanzarite and filed with the court.

This Document is Provided by Leagle.com

An attorney who neglects to satisfy the disclosure requirements of § 329(a) and Rule 2016 (b), whether willfully or inadvertently, forfeits any right to receive compensation for services rendered on behalf of the debtor and may be ordered to return fees already received. *See Keller Fin. Servs.*, 248 B.R. at 885 (stating that "[t]here are no measurable damages which result from the non-disclosure of compensation required by § 329"). Given the gravity of Catanzarite's non-disclosure, the court will deny all fees to Catanzarite for legal services rendered to Perrine to the petition date due to its failure to comply with § 329(a) and Rule 2016(b).[28] Catanzarite will be ordered to disgorge and turn over to Speier either the Oregon Property or its stipulated value of $30,000, at the election of the trustee, for the benefit of the estate.

## III. CONCLUSION

Ninety-seven days prior to bankruptcy, Perrine transferred the Oregon Property to Catanzarite for legal services rendered, or to be rendered, in contemplation of his bankruptcy case. Catanzarite's failure to disclose both its retainer agreement with Perrine and its receipt of the Oregon

[369 B.R. 587]

Property pursuant to such retainer agreement, as mandated by § 329(a) and Rule 2016(b), warrants disgorgement of the Oregon Property and denial of fees.

A separate order will be entered consistent with this opinion.

---

## Footnotes

1. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. On March 30, 2007, Perrine filed a Notice of Request by Debtor's Counsel for Additional Findings of Fact and Conclusions of Law Re: Memorandum Decision Filed and Entered March 23, 2007 ("Notice"). The court has supplemented its findings of fact in this Amended Memorandum Decision in response to the Notice to clarify the factual basis for the court's decision. Insofar as the additional findings of fact and conclusions of law set forth in the Notice have not been incorporated into this Amended Memorandum Decision, Perrine's request is denied.

**Back to Reference**

2. The Eugene H. Perrine Jr. and Vicki L. Perrine Family Trust Declaration of Trust, Schedule A.

**Back to Reference**

3. *See* The Eugene H. Perrine Jr. and Vicki L. Perrine Family Trust Declaration of Trust, Schedule B.

**Back to Reference**

4. Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 prior to its amendment by the Bankruptcy Abuse and Consumer Prevention Act of 2005, Pub.L. 109-8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr.P."), which make applicable certain Federal Rules of Civil Procedure ("Fed. R. Civ.P.").

**Back to Reference**

5. In Schedule F, Perrine listed 9 creditors holding unsecured non-priority claims totaling $174,073.53. According to Schedules D and E, Perrine did not have any secured creditors or unsecured priority creditors on the petition date.

**Back to Reference**

6. Schedule B, # 12.

**Back to Reference**

7. Schedule B, # 19.

**Back to Reference**

Exhibit #35: 019
22-CV-01616-BAS-DDL

8. Statement of Financial Affairs, Question # 3.

Back to Reference

9. Statement of Financial Affairs, Question # 10.

Back to Reference

10. Rule 2016(b) Statement, p. 1.

Back to Reference

11. Rule 2016(b) Statement, p. 2.

Back to Reference

12. The Code requires a debtor to appear and submit to examination under oath at a meeting of creditors. 11 U.S.C. § 343; Fed. R. Bankr.P.2003. The examination focuses on the debtor's acts, conduct, property, liabilities and financial condition, as well as any matter which might affect the administration of the bankruptcy estate and the debtor's right to a discharge. Fed. R. Bankr.P.2004(b).

Back to Reference

13. In fact, Perrine's unsecured debt was substantially in excess of the amount disclosed in Schedule F. On January 13, 2006, Perrine filed an Amended Schedule F disclosing 12 holders of unsecured non-priority claims totaling $202,277.65.

Back to Reference

14. On November 29, 2005, AAA filed a proof of claim in the amount of $76,767 based upon the Stipulation for Entry of Judgment entered in the state court action.

Back to Reference

15. A debtor has no absolute right to dismiss a chapter 7 case. *Bartee v. Ainsworth (In re Bartee),*317 B.R. 362, 366 (9th Cir. BAP 2004); *Leach v. U.S. (In re Leach),*130 B.R. 855, 857 n. 5 (9th Cir. BAP 1991). In the Ninth Circuit, "a voluntary Chapter 7 debtor is entitled to dismissal of his case so long as such dismissal will cause no 'legal prejudice' to interested parties." *Leach,* 130 B.R. at 857. The debtor bears the burden of proving that dismissal will not prejudice creditors. *Bartee,* 317 B.R. at 366. In this case, Speier anticipated that there would be funds available to pay unsecured creditors, at least in part. Dismissal would have resulted in prejudice to creditors because there was no guarantee that Perrine would have paid their claims outside of bankruptcy. *Id.*

Back to Reference

16. Catanzarite's Opposition to Trustee's Motion to Compel Disclosure of Compensation and Disgorgement of Compensation for Failure to Disclose on Statement 2016, p. 3, 1.6-10. In a letter to Speier's attorney, Thomas H. Casey dated December 15, 2005, Catanzarite enclosed a document entitled "Client Ledger Report" reflecting amounts billed to Perrine for legal services rendered by Catanzarite for the period from May 3, 2004 through April 26, 2005. In the letter, Catanzarite explained that the ledger report demonstrated that

> "[A]s of December 22, 2004, the sum of $11,857.91 was due. After receipt and credit of the land transfer amount on January 13, 2005 for $30,000, there was an $18,000 credit balance. However, fees incurred pre-bankruptcy related to the then pending litigation, as through the statement dated April 26, 2005, consumed all but $1,040.44. The statement dated April 26, 2005 did not cover the services for the period of April 15, 2005 through April 20, 2005. . . . the total amount accrued pre-petition was the sum of $2,615."
>
> As such, on the date of petition, there was no credit balance. In fact, Perrine actually owed the firm approximately $1,600 at that point in time.

Trustee's Motion to Compel Disgorgement of Compensation for Failure to Disclose on Statement 2016, Ex. 10. In his statement of financial affairs, Perrine stated under penalty of perjury that he paid the $3,000 fee to Catanzarite on January 14, 2005. The Client Ledger Report does not contain a specific billing entry for the $3,000 fee disclosed in the Rule 2016(b) Statement nor is the absence of the entry explained in Catanzarite's letter of December 15, 2005.

Back to Reference

17. Amended Rule 2016(b) Statement, p. 3, 1.14-18. Catanzarite actually received payments and credits totaling $33,616.50 between April 22, 2004 and April 21, 2005, for legal services rendered and costs advanced on behalf of Perrine. This amount included the sum of $3,616.50 received by Catanzarite on August 18, 2004, for services rendered in conjunction with certain accounting and compliance issues that arose under a stipulated order concerning the division of a qualified retirement plan previously entered in Perrine's divorce case. At the hearing on December 4,

2006, the court determined that the sum of $3,616.50 was not paid to Catanzarite on August 18, 2004, in contemplation of Perrine's bankruptcy case.

Back to Reference

18. Section 329(a) states:

> Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

11 U.S.C. § 329(a).

Back to Reference

19. Rule 2016(b) provides:

> Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 15 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 15 days after any payment or agreement not previously disclosed.

Fed. R. Bankr.P.2016(b).

Back to Reference

20. *Id.*

Back to Reference

21. Rule 2017(a) states, in pertinent part:

> On motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money *or any transfer of property by the debtor,* made directly or indirectly and *in contemplation of the filing of a petition under the Code* by or against the debtor or before entry of the order for relief in an involuntary case, *to an attorney for services rendered or to be rendered is excessive.*

Fed. R. Bankr.P.2017(a) (emphasis added).

Back to Reference

22. Section 60(d) of the Bankruptcy Act of 1898 provided:

> If a debtor shall, directly or indirectly, in contemplation of the filing of a petition by or against him, pay money or transfer property to an attorney and counselor at law, solicitor in equity, or proctor in admiralty for services to be rendered, the transaction shall be reexamined by the court on petition of the trustee or any creditor, and shall only be held valid to the extent of a reasonable amount to be determined by the court, and the excess may be recovered by the trustee for the benefit of the estate.

Bankruptcy Act of 1898, ch. 541, 30 Stat. 544, § 60(d), *superceded by* Bankruptcy Reform Act of 1978, Pub.L.No. 95-598, 11 U.S.C. § 329. In *Conrad, Rubin & Lesser v. Pender,* the Supreme Court discussed the scope of § 60 (d), explaining:

> It contains no intimation of an intention to limit the jurisdiction to re-examine to a particular sort of legal services for the payment of which the debtor has disposed of his property. The point of the provision conferring jurisdiction for a summary reexamination is not the specific nature of the legal services to be rendered, but that the payment or transfer to provide for them is made "in contemplation of" bankruptcy. The purpose is shown by the sweeping description of payments or transfers "to an attorney and counselor at law, solicitor in equity, or proctor in admiralty."

289 U.S. 472, 476-77, 53 S.Ct. 703, 77 L.Ed. 1327 (1933) (quoting Bankruptcy Act of 1898, § 60(d)). This broad scope of review survives in the language of Rule 2017(a). *See In re Rheuban,*121 B.R. 368, 376 (Bankr.C.D.Cal. 1990) (concluding that "decisions interpreting and applying predecessors of § 329 and Bankruptcy Rule 2017(a) remain persuasive and, in certain instances, are controlling. . . ."); *rev'd in Part on other grounds,*124 B.R. 301 (C.D.Cal.1990), *on remand,*128 B.R. 551 (Bankr.C.D.Cal.1991); *In re GIC Gov't Sec., Inc.,*92 B.R. 525, 530 (Bankr.M.D.Fla. 1988) (stating that "the principles enunciated by pre-Code cases interpreting § 60(d) of the Bankruptcy Act of 1898 are still controlling").

Back to Reference

23. 18 U.S.C. § 1961, *et. seq.*

Back to Reference

This Document is Provided by Leagle.com

4. Zepecki sought avoid capital gains on the sale of the Illinois property by effectuating a tax-free exchange of roperty under § 1031 of the Internal Revenue Code. 26 U.S.C. § 1031. The parties to the 1031 Exchange of Property scrow Agreement drafted by Brown included *Zepecki, B & B Diversified* Resources, Inc., Zepecki's closely held orporation, Brown, and the purchaser of the real estate identified as James Burch. *Zepecki,* 277 F.3d at 1044.

**Back to Reference**

5. Reply in Support of Supplemental Memorandum of Points and Authorities in Support of Reasonableness of Fees curred By Catanzarite Law Corporation, p. 3, 1.19-20.

**Back to Reference**

26. Retainer Agreement and Application of In Kind Payment, executed on January 11, 2005, Eugene H. Perrine and Vicki L. Perrine, Individually and as Trustee and Kenneth J. Catanzarite, Individually and as President of Catanzarite Law Corporation.

**Back to Reference**

27. Opposition to Trustee's Motion to Compel Disclosure of Compensation and Disgorgement of Compensation for Failure to Disclose on Statement 2016, p. 2, 23-24.

**Back to Reference**

28. In reaching its conclusion, the court makes no finding as to the reasonableness of the fees sought by Catanzarite for legal services rendered on behalf of Perrine prior to bankruptcy. *See Lewis,* 113 F.3d at 1046 (holding that where non-disclosure results in an order for disgorgement of all fees, an inquiry into the appropriate amount of the fee is not required). The court notes, however, that the bulk of Catanzarite's pre-petition fees were incurred defending Perrine in the AAA litigation for which Catanzarite ultimately disclosed a fee of $21,077.93. Under § 329(b), Catanzarite bore the burden of establishing the reasonableness of its fees. *Hale v. United States Trustee (In re Basham),*208 B.R. 926, 931 32 (9th Cir. BAP 1997) (stating that "[t]he burden is on the applicant to demonstrate that the fees are reasonable"). he court questions the reasonableness of Catanzarite's fee for the AAA litigation, particularly in light of the results btained. AAA sued Perrine for $71,167.05, plus interest, attorneys fees and costs. The AAA litigation was concluded, ith a stipulated judgment for $75,000-10 days after Catanzarite received the Oregon Property. Moreover, Catanzarite dmitted that, at the time of the transfer, fees attributable to the AAA litigation were only $12,000.

**Back to Reference**

---

Exhibit #35: 022
22-CV-01616-BAS-DDL

 Warning
As of: Feb 15, 2013

**MIKE ALEXANDROS et al., Plaintiffs and Appellants, v. JAMES A. COLE et al., Defendants and Respondents.**

**G043715 (Consol. with G044362)**

**COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION THREE**

***2011 Cal. App. Unpub. LEXIS 9984***

**December 30, 2011, Filed**

**NOTICE:** NOT TO BE PUBLISHED IN OFFICIAL REPORTS. *CALIFORNIA RULES OF COURT, RULE 8.1115(a)*, PROHIBITS COURTS AND PARTIES FROM CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY *RULE 8.1115(b)*. THIS OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED FOR THE PURPOSES OF *RULE 8.1115.*

**PRIOR HISTORY:** [*1]
Appeal from a judgment of the Superior Court of Orange County. Super. Ct. No. 06CC07881. Gary L. Taylor, Temporary Judge. (Pursuant to *Cal. Const., art. VI, § 21.*).

**DISPOSITION:** Motion for sanctions. Judgment affirmed. Motion granted.

**COUNSEL:** The Rosen Law Firm, Laurence M. Rosen; Catanzarite Law Corporation and Kenneth J. Catanzarite for Plaintiffs and Appellants.

Foley & Lardner, Sonia Salinas, Roger A. Lane, and Courtney Worcester for Defendants and Respondents New Enterprise Associates IV, L.P. and Spectra Enterprise Associates, L.P.

DLA Piper, Robert Brownlie, Gerard A. Trippitelli, David F. Gross, and Francesca Cicero for Defendants and Respondents James A. Cole, Kevin M. Carnino, Albert Jicha, Eugene Hovanec, Gregory T. George, Robert Kohler and KOR Electronics.

**JUDGES:** RYLAARSDAM, ACTING P. J.; BEDSWORTH, J., O'LEARY, J. concurred.

**OPINION BY:** RYLAARSDAM

**OPINION**

Plaintiffs Mike Alexandros, Richard Damon, Mike Maridakis, Rick Jensen, Vincent Battaglia, James Struble, Douglas Dwyer, David Schwartz, Mike Thielen, Howard Arnold Lefevre, Dean Groce, Susan Lovern Kahaunaele, Young Lu, Charles D. Cartledge, and David Conrad are minority shareholders owning common stock in defendant KOR Electronics (KOR), a privately held company. In 2006 [*2] they sued defendants New Enterprise Associates IV, L.P. (NEA IV), Spectra Enterprise Associates, L.P. (Spectra), and KOR's directors James Cole, Kevin Carnino, Albert Jicha, Eugene Havanec, Gregory George, and Robert Kohler for breach of fiduciary duty and related claims.

Following a bench trial, the court entered judgment in favor of defendants. It also awarded costs to defendants as the prevailing party under *Code of Civil Procedure section 1032.*

Plaintiffs appeal from both the judgment and the order awarding costs. We consolidated the appeals. (Conrad separately appeals from the order awarding attorney

fees and the denial of his motion to vacate that order in consolidated case Nos. G044682 and G044457.)

Plaintiffs contend the court erred in (1) applying the business judgment rule to two interested directors (Cole and Carnino), (2) finding the independent directors were properly informed and acted in good faith, (3) requiring plaintiffs to show "control and abuse of that control" by the controlling shareholders, and (4) failing to rule on Carnino's claim for breach of fiduciary duty as KOR's CEO and the issues of inherent unfairness, gross mismanagement, waste of corporate assets, and [*3] unjust enrichment. They also assert the court may have erroneously relied on Delaware law, California's public policy in "protect[ing] the public from fraud and deception in securities transactions" supports reversal, and if the underlying judgment is reversed so should the award of costs. Finding no error, we affirm the judgment and the award of costs.

Defendants filed a joint motion for sanctions based on plaintiffs' numerous violations of the California Rules of Court (all further rule references are to these rules) governing appendices and record citations. We grant the motion.

FACTS

Plaintiffs rely on "the undisputed facts and the [s]uperior court's factual findings." Accordingly, the facts are taken from the statement of decision, the joint list of uncontroverted issues, and trial testimony. We construe any disputed facts and all reasonable inferences in the light most favorable to defendants as the prevailing parties. (*Cuiellette v. City of Los Angeles (2011) 194 Cal.App.4th 757, 765.*)

Between 1987 and 1999, "NEA IV and Spectra made venture capital investments in KOR . . . and received convertible participating preferred stock[, which among other things,] had demand registration [*4] rights, permitting it to require KOR to undertake a public offering." "[I]n late 2005, NEA IV advised [KOR's] board [it] would exercise its demand registration rights or negotiate a KOR recapitalization to buy out NEA IV." "To evaluate NEA IV's proposal, KOR's board appointed a Special Committee (Committee) of four directors [George, Jicha, Kohler, and Havanec] who owned no preferred stock, but held KOR common stock or options for common stock."

Because Carnino and Spectra both owned preferred stock, and Cole was affiliated with Spectra, neither Carnino nor Cole was a member of the Committee. Nevertheless, Carnino, with his knowledge, background, and document access as KOR's CEO, carried out certain tasks for the Committee, such as preparing financial analyses and negotiating with third parties. Carnino did not participate in the Committee's decisions.

"In early 2006, on the recommendation of the . . . Committee to KOR's board of directors, KOR recapitalized by repurchasing all the shares of its preferred stock for $40.3 million cash and $9 million in promissory notes, and selling new preferred stock at $40.3 million to new NEA venture capital investment groups" (transaction). Carnino [*5] and Cole abstained from voting. In a shareholder vote, a majority of KOR's preferred stockholders and common stockholders with no preferred stock voted to approve the transaction.

Plaintiffs sued defendants, asserting direct claims for breach of fiduciary duty against KOR's board of directors, breach of fiduciary duty against NEA IV, Spectra, Cole, and Carnino in their capacities as "controlling shareholders," and constructive fraud against all defendants, as well as derivative claims on KOR's behalf (not at issue in this appeal). During trial, plaintiffs voluntarily dismissed the constructive fraud count.

The court ruled in favor of defendants on all causes of action. In its statement of decision, it noted plaintiffs' claims were all premised on the same factual basis involving breach of fiduciary duty in approving the transaction. Applying the business judgment rule, it found "the evidence shows no conflict of interest, fraud, bad faith, or gross overreaching contaminated the . . . Committee's decision. On the contrary, the evidence shows the Committee members acted appropriately, using a process that was rational and used in a good faith effort to advance corporate interests."

"Faced [*6] with NEA IV's decision to conclude its investment by exercising its demand registration rights if KOR did not take it out by recapitalization, the KOR board of directors was compelled to study the alternatives and make what then appeared to be in the best business decision on what to do. This was a delicate and controversial issue because different interests would be impacted adversely, and there were different views about the best long-range plan."

"Considering all factors, the evidence shows the . . . Committee acted diligently and independently, and its members acted in good faith. Their testimony revealed a sincere and earnest interest in seeking to do the right thing for the long-term interests of the company and the common shareholders. At first, they disliked the NEA IV proposal. They viewed their task as a negotiation to buy NEA IV's demand registration rights and keep the company unsold and private, which they viewed as the best long range course. The evidence shows, and the Court finds, the . . . Committee and its members performed their task with due care and without negligence, they made reasonable inquiry into the facts and alternatives,

Exhibit #35: 024
22-CV-01616-BAS-DDL

and they weighed the advantages [*7] and disadvantages. They rejected [a] proposal alternative for what they found to be good and sufficient reasons. The evidence did not show that alternatives were ignored or brushed aside, and there was no evidence of a purpose or plan to give a special deal to favored persons."

"Carnino was an interested party, being a preferred shareholder, but he was the person most familiar with the details of the business. He was not a . . . Committee member, but he was used by the Committee to look for other options, provide data, and act as Committee secretary. Although there might have been a better choice than to have him connected to the . . . Committee, there is no evidence his involvement tainted the Committee's work or decision. He was the CEO with connections to possible alternatives. His stocks interests would probably have benefited from any alternative that was selected, and he was not a decision-maker on the Committee. To use him was within the range of reason.

" . . . Cole had interests which would have disqualified him from sitting on the independent . . . Committee. But, there is no evidence he improperly influenced the Committee."

As to plaintiffs' breach of fiduciary duty claim against [*8] "controlling shareholders," the court ruled that "[t]o establish . . . liability, control and abuse of that control must be shown." Assuming without deciding "the preferred shareholders were a controlling shareholder group, in the sense that they had the power to control certain aspects of the corporation's life," including "the lawful power to exercise 'veto' power and negotiation leverage because of the preferred shareholder rights they had" "the evidence does not show they abused that power. The evidence does not support a finding that they abused their relationship with the . . . Committee, tainted its work, or improperly used their corporate rights. On the contrary, the evidence shows the . . . Committee made its own independent decision about what to do."

The court concluded the Committee's decision to have KOR pay "a premium rate to retire NEA IV and chart its new course . . . had an immediate stock value disadvantage to the common shareholders, but the . . . Committee and full board concluded it was in the best long range interest of the company and the common stockholders. The decision making process used, and the decision that was made, were rational, in good faith, and within [*9] the range of reason. [¶] In addition to the rulings already made, the [c]ourt finds that, for the same reasons, the evidence does not support [p]laintiffs on the theories of gross mismanagement, waste of corporate assets, or unjust enrichment."

DISCUSSION

*1. Plaintiffs' Appeal*

*a. Erroneous Application of Business Judgment Rule*

*(1) General Legal Principles*

The business judgment rule "'establishes a presumption that directors' decisions are based on sound business judgment, and it prohibits courts from interfering in business decisions made by the directors in good faith and in the absence of a conflict of interest. [Citations.]' [Citation.]" (*Berg & Berg Enterprises, LLC v. Boyle (2009) 178 Cal.App.4th 1020, 1045.*) ""'A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be "attributed to any rational business purpose.' [Citation.]'" [Citation.]" (*Ibid.*)

"An exception to the presumption afforded by the business judgment rule . . . exists in 'circumstances which inherently raise an inference of conflict of interest' and the rule 'does not shield actions taken without reasonable inquiry, with improper motives, [*10] or as a result of a conflict of interest.' [Citations.] But . . . more is needed than 'conclusory allegations of improper motives and conflict of interest. Neither is it sufficient to generally allege the failure to conduct an active investigation, in the absence of (1) allegations of facts which would reasonably call for such an investigation, or (2) allegations of facts which would have been discovered by a reasonable investigation and would have been material to the questioned exercise of business judgment.' [Citation.] In most cases, 'the presumption created by the business judgment rule can be rebutted only by affirmative allegations of facts which, if proven, would establish fraud, bad faith, overreaching or an unreasonable failure to investigate material facts. [Citation.] Interference with the discretion of directors is not warranted in doubtful cases.' [Citation.]" (*Berg & Berg Enterprises, LLC v. Boyle, supra, 178 Cal.App.4th at p. 1045.*) "Once it is shown a director received a personal benefit from the transaction, . . . the burden shifts to the director to demonstrate not only the transaction was entered in good faith, but also to show its inherent fairness from the viewpoint [*11] of the corporation and those interested therein. [Citations.]" (*Heckmann v. Ahmanson (1985) 168 Cal.App.3d 119, 128.*)

*(2) Cole and Carnino*

Plaintiffs contend the business judgment rule should not have been applied to Carnino and Cole because they "voted with the full board to approve the transaction" and "also participated in the negotiating process, even though they stood on both sides of the transaction." But plaintiffs' failure to provide any supporting citations to the

Exhibit #35: 025
22-CV-01616-BAS-DDL

record forfeits the argument. (*Nwosu v. Uba (2004) 122 Cal.App.4th 1229, 1246* [argument not supported by record citations treated as waived]; *City of Lincoln v. Barringer (2002) 102 Cal.App.4th 1211, 1239, fn. 16* [record citations in statement of facts do not cure lack of citations in argument].) Even if not waived, the contention lacks merit.

Contrary to plaintiffs' claim, the record affirmatively shows Carnino and Cole abstained from voting on the transaction. Accordingly, they "are not subject to liability on the ground of having approved the [subject] agreement[]." (*Gaillard v. Natomas (1989) 208 Cal.App.3d 1250, 1268.*)

Plaintiffs acknowledge this but argue that under *Gaillard*, Carnino and Cole were not entitled [*12] to rely on the business judgment rule because of their participation in the negotiation process. But *Gaillard* reversed the summary judgment in the defendant's favor because there were issues of fact regarding "the nature and extent of [one defendant's] participation in the events" leading to the subject agreement's adoption, which "raise[d] . . . the inference that the agreement was not in the [corporation's] best interests . . . at the time of its adoption." (*Gaillard v. Natomas, supra, 208 Cal.App.3d at p. 1268.*) The judgment here, in contrast, occurred after a 12-day trial following which the court specifically found "no evidence [Carnino's] involvement tainted the Committee's work or decision" or that Cole "improperly influenced the Committee." Plaintiffs have not challenged these findings.

Plaintiffs maintain *Jones v. H. F. Ahmanson & Co. (1969) 1 Cal.3d 93* required Carnino and Cole, "as conflicted directors, . . . to prove . . . their transaction with KOR was inherently fair." But that rule only applies to "[m]ajority shareholders . . . [who] use their power to control corporate activities to benefit themselves alone or in manner detrimental to the minority. Any use to which they [*13] put the corporation or their power to control the corporation must benefit all shareholders proportionately and must not conflict with the proper conduct of the corporation's business. [Citations.]" (*Id. at p. 108.*) In that event, "'the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.'" [Citation.]" (*Ibid.*)

At trial, plaintiffs' counsel conceded this standard does not apply unless interested directors "exercise control in connection with the transaction" or "use their position in connection with assisting that transaction to come to fruition." In this case, it was unnecessary to reach the question of inherent fairness given the court's determination neither defendant had used any power or control in a manner that affected the Committee's ultimate decision to approve the transaction.

For the same reason, *Tenzer v. Superscope, Inc. (1985) 39 Cal.3d 18* does not aid plaintiffs. There, Tenzer, a member of Superscope's board of directors, helped secure a purchaser for the corporation's property and requested a 10 percent finder's fee. Tushinsky, [*14] Superscope's president, orally agreed but after the deal was consummated the board denied Tenzer a finder's fee. The Supreme Court reversed the summary judgment granted in favor of Superscope.

Among other things, Superscope argued that given Tenzer's fiduciary duties as a board member any reliance on Tushinsky's promise was unreasonable. Although the Court agreed Tenzer owed fiduciary duties, it concluded triable issues of material fact precluded summary judgment: "As a corporate director, Tenzer is charged with the knowledge that any contract he entered into with his own corporation, even if valid and enforceable in all other respects, could be avoided at the corporation's option if it were determined to be unfair or unreasonable to the corporation. Thus, in order to prove that his reliance upon Tushinsky's promise was justifiable, Tenzer will be required to prove that the arrangement was fair and reasonable to the corporation. [¶] Establishing whether Tenzer's agreement with Superscope was fair and reasonable involves determination of the particular factual circumstances of the agreement, and application of the standards of fairness and good faith required of a fiduciary to these [*15] facts. These are functions mainly for the trier of facts. [Citations.]" (*Tenzer v. Superscope, Inc., supra, 39 Cal.3d at p. 32.*)

Here, in contrast, because the trier of fact determined Cole and Carnino did not participate in the transaction in any manner that affected the Committee's decision, it had no occasion to determine whether their conduct was fair and reasonable. Plaintiffs maintain that under *Tenzer*, Cole and Carnino's "fiduciary duties imposed on them a duty not to use [their additional bargaining] leverage in a way that was not inherently fair." But the court's finding shows they did not do that.

*(3) Directors on Committee*

Plaintiffs argue the directors on the Committee were not entitled to the business judgment presumption because they were "not properly informed and not acting in good faith." (Underscoring omitted.) They assert "[t]he directors on the [C]ommittee wrongfully abdicated their duty to inform themselves by relying on Carnino, who, as a directly interested, conflicted, preferred stockholder, was not . . . someone whom any director could 'believe[] to be reliable.'" We are not persuaded, given the findings the Committee members "performed their task with due

care [*16] and without negligence, . . . ma[king] reasonable inquiry into the facts and alternatives, and . . . weigh[ing] the advantages and disadvantages," and that Carnino's actions in "look[ing] for other options, provid[ing] data, and act[ing] as Committee secretary" did not affect their evaluation.

Nor does the case plaintiffs cite, *Everest Investors 8 v. McNeil Partners (2003) 114 Cal.App.4th 411, 430,* support their claim it was "unreasonable as a matter of law" for the Committee to have Carnino assist them. Rather, as plaintiffs' acknowledge, that case merely held the business judgment rule "does not shield actions taken without reasonable inquiry . . . ." (*Ibid.*)

As to the good faith requirement, plaintiffs contend the court applied the wrong standard by limiting it "to an 'effort to advance corporate interests'" when in fact "directors, officers, and controlling shareholders owe a duty of good faith to all shareholders." (Underscoring omitted.) But none of the cases on which they rely--*Small v. Fritz Companies, Inc. (2003) 30 Cal.4th 167*; *Kennerson v. Burbank Amusement Co. (1953) 120 Cal.App.2d 157,* and *Remillard Brick Co. v. Remillard-Dandini Co. (1952) 109 Cal.App.2d 405*--involve application [*17] of the business judgment rule.

The argument further lacks merit in that the court specifically found the Committee members had "a sincere and earnest interest in seeking to do the right thing for[, and based its decision on,] the long-term interests of the company *and the common shareholder*" (italics added), despite its "immediate stock value disadvantage to the" latter. Plaintiffs cite certain evidence to purportedly show the Committee members "knowingly acted in bad faith in approving a transaction that they knew was not fair to the common shareholders . . . ." Such resolutions of fact were for the trial court and we will not reweigh the evidence. (*Cuiellette v. City of Los Angeles, supra, 194 Cal.App.4th at p. 765.*)

Plaintiffs also argue the court applied the wrong burden of proof in finding the Committee members "us[ed] a process that was rational and used in a good faith effort to advance corporate interests." They reason that after the directors carry their "initial burden of proving . . . the business judgment rule affirmatively applies (i.e., that the director[s have] no conflict of interest)" and plaintiffs rebut that "presumption by proving any one of the four bases for rebuttal," [*18] "the burden shifts back to the director[s] to prove inherent fairness." In their view, "the court reversed the burden of proof . . . [by] plac[ing] the burden on [p]laintiffs to prove . . . the process used was not 'rational.'" It did no such thing.

To the contrary, the court determined plaintiffs had failed to carry their burden of rebutting the business judgment presumption in "that the evidence shows no conflict of interest, fraud, bad faith, or gross overreaching contaminated the . . . Committee's . . . decision." Although it could have ended its analysis there, it went on to find "the evidence shows the Committee members acted appropriately, using a process that was rational and used in a good faith effort to advance corporate interests." In other words, defendants affirmatively showed they used a rational process, as plaintiffs contend they were obligated to do. But in no event did the court require plaintiffs to prove the process was not rational.

*b. NEA IV and Spectra*

As to NEA IV and Spectra, plaintiffs assert that because the business judgment rule does not apply to shareholders, and the court found NEA IV and Spectra were controlling shareholders and "the transaction disadvantaged [*19] the common shareholders," the court erred in requiring plaintiffs to prove "'control and abuse of that control.'" Rather, they claim, once they proved control, the burden shifted to the controlling shareholders to prove "the transaction is inherently fair to the minority shareholders." We disagree.

The court assumed NEA IV and Spectra "were a controlling shareholder group, in the sense . . . they had the power to control certain aspects of [KOR's] life[,] . . . includ[ing] the lawful power to exercise 'veto' power and negotiation leverage." Even so, it found the "Committee made its own independent decision about what to do" and there is no evidence NEA IV and Spectra "abused that power [or] . . . their relationship with the . . . Committee, tainted its work, or improperly used their corporate rights." Thus, as in the case of Carnino and Cole, there was no need to establish inherent fairness because any use by NEA IV and Spectra of their asserted powers as controlling shareholders did not influence the Committee's decision. Because the court did not err in declining to reach the issue of inherent fairness as plaintiffs contend, we reject their claim the case should be remanded for a [*20] trial on damages for that reason.

*c. Failure to Address Carnino's Breach of Fiduciary Duties as CEO*

Plaintiffs argue the court erred in failing to analyze Carnino's breach of fiduciary duties in his capacity as CEO, separate from his capacity as a director and preferred stockholder, as alleged in their first cause of action for breach of fiduciary duty against KOR's officers and directors. But if there was error plaintiffs invited it by failing to litigate the issue at trial or identifying it to the court during opening or closing arguments. (*Portola Hills Community Assn. v. James (1992) 4 Cal.App.4th 289, 294,* disapproved of on other grounds in *Nahrstedt v. Lakeside Village Condominium Assn. (1994) 8 Cal.4th 361, 386* [error, if any, in not addressing issue invited

where "subject . . . was not included in the stipulated facts or plaintiff's trial brief and was not presented orally during the evidentiary phase or argued to the court"].) As such, they are "'estopped from asserting it as a ground for reversal' on appeal. [Citation.]" (*Norgart v. Upjohn Co. (1999) 21 Cal.4th 383, 403.*)

Moreover, plaintiffs' failure to either request a statement of decision on this issue, or specifically note, [*21] in their objections to the proposed statement of decision, the court's omission of the issue, "absolutely forecloses any consideration of it now [citation]." (*Portola Hills Community Assn. v. James, supra, 4 Cal.App.4th at p. 294*; *In re Marriage of Arceneaux (1990) 51 Cal.3d 1130, 1138* ["It is clearly unproductive to deprive a trial court of the opportunity to correct such a purported defect by allowing a litigant to raise the claimed error for the first time on appeal"].)

Plaintiffs maintain Carnino is liable as a matter of law for breach of fiduciary duty in his capacity as CEO based on the court's undisputed factual findings he was the CEO and "an interested party" who was "used by the Committee to look for other options, provide data, and act as Committee secretary." From this, plaintiffs jump to the conclusion "Carnino violated his fiduciary duties to the common shareholder . . . ." But at most these demonstrate Carnino owed fiduciary duties as CEO. They do not prove breach of those duties or proximate damages. (*Pierce v. Lyman (1991) 1 Cal.App.4th 1093, 1101* [absence of damage proximately caused by breach defeats claim for breach of fiduciary duty].) Nor do plaintiffs cite any [*22] evidence showing Carnino proximately caused their damages by breaching his fiduciary duties as CEO.

*d. Remaining Issues*

We reject plaintiffs' remaining claims. First, as to their contention the court erroneously "relied on Delaware law of special committees," they failed to show the court actually did so, as no out of state authority was referenced in its statement of decision. Their own reliance upon Delaware law and the fact plaintiffs never claimed California does not recognize special committees in the trial court also precludes them from asserting it for the first time on appeal. (*Portola Hills Community Assn. v. James, supra, 4 Cal.App.4th at p. 294.*)

Second, plaintiffs cite "California's policy . . . to protect the public from fraud and deception in security transactions." (*Hall v. Superior Court (1983) 150 Cal.App.3d 411, 417.*) But they voluntarily dismissed their constructive fraud claim and have not shown the court's findings were inconsistent with public policy.

Third, plaintiffs assert the court committed reversible error in "failing to reach [their] claims for gross mismanagement, waste of corporate assets, and unjust enrichment." (Capitalization, bold and underscoring omitted.) [*23] This is belied by the statement of decision's express ruling those claims failed on the same grounds as the breach of fiduciary duty causes of action.

Plaintiffs' final argument is that if the underlying judgment is reversed so should the award of costs. We affirm both the judgment and the costs award.

*2. Defendants' Motion for Sanctions*

Defendants filed a combined motion for sanctions on the grounds plaintiffs failed to comply with various Rules of Court by including in their appendix documents never admitted at trial and documents unnecessary to the appeal, the majority of which was not referenced in their briefs, and by failing to include record references for many factual statements. Plaintiffs acknowledge their "technical rule violations" but claim they "did not cause the degree of prejudice, confusion or additional work for the clerk's office or for [defendants] as to warrant the imposition of sanctions." We disagree.

*a. Appendix*

Under rule 8.124(b)(3), "[a]n appendix must not: [¶] (A) Contain documents or portions of documents filed in superior court that are unnecessary for proper consideration of the issues." Including in an "appendix . . . all of the parties' proposed trial exhibits, [*24] without any accompanying indication as to which exhibits were actually admitted in evidence" violates this rule (*Kreutzer v. City and County of San Francisco (2008) 166 Cal.App.4th 306, 319, fn. 8*, italics omitted), as does including "documents never referenced by plaintiffs" and those that are "not necessary to our determination of the issues" (*Evans v. Centerstone Development Co. (2005) 134 Cal.App.4th 151, 167).*

Here, plaintiffs included 76 documents in their 12-volume appendix, consisting of 2,958 pages, but only cited to 16 in their opening brief and 12 in their reply. Of those 76 documents, 39 were not admitted at trial.

Plaintiffs concede neither those 39 nonadmitted documents nor the volumes of foreign authorities lodged in the trial court were necessary to the appeal and should not have been included in the appendix, and that "they should have exercised more discretion and selected a smaller number of documents . . . ." But they ask sanctions not be imposed because although sanctions may be imposed for filing a faulty appendix (rule 8.124(g)), the Advisory Comment states such "sanctions do not depend on the degree of culpability of the filing party--i.e., on whether the party's [*25] conduct was willful or negligent--but on the nature of the inaccuracies and the importance of the documents they affect." (Advisory Com.

Exhibit #35: 028
22-CV-01616-BAS-DDL

com., 23 pt. 2 West's Ann. Codes, Rules (2006 ed.) foll. rule 8.124, p. 552.)

Plaintiffs conclusorily assert "the nature of the over-inclusiveness, while regrettably contributing to the bulk of papers filed, did not substantially hamper the [c]ourt or [defendants]," there were no inaccuracies that affected important documents, and that defendants' authorities suggest their "technical violations" were not "so egregious that sanctions should be imposed." They are correct *Evans v. Centerstone Development Co., supra, 134 Cal.App.4th 151* is the only case cited by defendants in which sanctions were awarded. They seek to distinguish *Evans* on the basis it involved violations of many rules and the prosecution of a frivolous appeal, whereas this case was meritorious and the "12-[volume] . . . [a]ppendix, though excessive, should not have hampered or caused confusion . . . ."

But here plaintiffs admit they violated several rules. They also continued to cite the excluded evidence in their reply brief even after defendants noted the error in their briefs. As for [*26] hampering, defense counsel's declarations supporting the sanctions motion state plaintiffs' deficient appendix required them to "review[] all documents submitted . . . to determine which documents were admitted trial exhibits, which documents were actually cited by [a]ppellants[] in their briefs, what additional admitted exhibits were necessary to the issues on appeal, and the selection of additional documents to be included in [r]espondents' [j]oint [a]ppendix." This is sufficient to support an award, especially given plaintiffs failure to cite any contrary evidence.

*b. Plaintiffs' Briefs*

Rule 8.204(a)(1)(C) requires parties to "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." Rule8.204(a)(2)(C) also requires appellants to "[p]rovide a summary of the significant facts limited to matters in the record."

Plaintiffs' opening brief makes 39 unsupported factual statements, including full paragraphs lacking record references. Some assertions are contradicted by the record. The reply brief similarly contains 34 statements, and full paragraphs, without citations to the record.

Plaintiffs' counsel Laurence M. [*27] Rosen acknowledges noncompliance with these rules but claims "[t]he factual assertions in all material respects were accurate and can be supported by proper citations to the record." Because he "will be mindful of the [r]ules . . . in the future" and the violations were neither unintentional nor misleading, he states "there is no need for an imposition of monetary or other sanctions . . . ." According to him, the infractions were the fault of his "overwrought" associate who made some mistakes and the hampering of his supervision by two serious emergencies--his mother's admission to the hospital and subsequent death, and his emergency back surgery to repair two herniated discs. He asserts the reply brief "supplies a better, more focused summary and substantial additional citations to the record" and goes on to address each of the unsupported factual statements identified by defendants. These efforts "at this point [were] too little, too late. Although we are not required to plow through mounds of appendices, at times we did, and we have no doubt defendants had to expend substantial additional and unnecessary time because of this violation." (*Evans v. CenterStone Development Co., supra, 134 Cal.App.4th at p. 167.*) [*28] We thus deny his request for leniency.

Plaintiffs maintain that because they "challenge[d] . . . the sufficiency of the evidence" the court's obligation to review the entire record "reduce[d] somewhat the otherwise burdensome efforts of [the] violations. But although plaintiffs assert "[t]he [statement of d]ecision is riddled with demonstrably false factual findings," the opening brief never actually claimed the evidence was insufficient to support the judgment. Even if they had, the burdens of their violations would not have been decreased.

*c. Sanctions Amount*

The repeated violation of appellate rules, compounded by the failure to correct the infractions in the reply brief after respondents brought the deficiencies to his attention, justifies imposition of sanctions in this case. *(Pierotti v. Torian (2000) 81 Cal.App.4th 17, 30-31* [sanctions warranted for "unreasonable infraction of the rules" made worse by further violations in reply brief after respondents pointed out violations].) Defendants request $30,000 in monetary sanctions. Plaintiffs contend this amount is "grossly inflated" (bold and capitalization omitted) because defendants double billed for the same tasks, erroneously included [*29] time spent to prepare the respondents' appendix, needlessly "spent time in determining which factual statements were supported by admitted evidence and which documents were admitted trial documents" and "spent an inordinate amount of time preparing charts and their motion for sanctions . . . ."

Attorney fees are a common measure of sanctions payable to an opposing party. (See, e.g., *Periotti v. Torian, supra, 81 Cal.App.4th at p. 33.*) Of the $30,000 in sanctions requested by defendants, only $10,000 appears to be for attorney fees. The remaining $20,000 is for "[a] portion of the costs incurred" by defendants. We conclude a sanction of in the amount of $10,000 is appropriate in this case to compensate defendants for additional burdens imposed on it and to deter similar conduct in the future.

Defendants request the sanctions be payable by plaintiffs, their counsel, or both. Plaintiffs' attorneys should be held liable for the sanctions, as they were the ones who failed to comply with the rules of the appellate court. (See *Pierotti v. Torian, supra, 81 Cal.App.4th at pp. 36-37.*) The $10,000 sanctions award shall be payable joint and severally by plaintiffs' attorneys, Kenneth J. Catanzarite [*30] and Laurence M. Rosen, to defendants. Although we could order the sanctions be paid instead to this court, or impose additional sanctions, to defray the extra cost to taxpayers to process the appeal (*Alicia T. v. County of Los Angeles (1990) 222 Cal.App.3d 869, 885*), we decline to do so. Because we did not rely on any documents that were not admitted at trial or any of the unsupported factual statements in the opening or reply briefs, we deny defendants' request to strike these items.

DISPOSITION

The judgment is affirmed. The motion for sanctions is granted in the amount of $10,000. Counsel for plaintiffs, Kenneth J. Catanzarite and Laurence M. Rosen, are ordered to pay defendants the $10,000 sanctions award jointly and severally individually without contribution from plaintiffs, within 30 days of the filing of the remittitur. They shall provide this court with an affidavit stating they have not and will not bill their clients for any portion of the sanctions and are ordered to report the sanctions to the State Bar. (*Bus. & Prof. Code, § 6068, subd. (o)(3).*) The clerk of this court is directed to forward a copy of this opinion to the State Bar. (*Bus. & Prof. Code, § 6086.7, subd. (a)(3).*) [*31] Defendants shall recover their costs on appeal.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

BEDSWORTH, J.

O'LEARY, J.

EXHIBIT 36

Kenneth J. Catanzarite (SBN 113750)
kcatanzarite@catanzarite.com
CATANZARITE LAW CORPORATION
2331 West Lincoln Avenue
Anaheim, California 92801
Tel: (714) 520-5544
Fax: (714) 520-0680

Attorneys for Defendants Kenneth Catanzarite, Catanzarite Law Corporation, Brandon Woodward, Tim James O'Keefe, Amy Jeanette Cooper, Cliff Higgerson, Mohammad Zakhireh, Richard Francis O'Connor, Jr., James Duffy, Tony Scudder, Aroha Holdings, Inc., TGAP Holdings, LLC, Nicole M. Catanzarite-Woodward and Defendant/Cross-Complainant Mobile Farming Systems, Inc.

**IN THE SUPERIOR COURT OF CALIFORNIA**

**FOR THE COUNTY ORANGE**

| | |
|---|---|
| JUSTIN S. BECK, an individual,<br><br>Plaintiff,<br><br>v.<br><br>KENNETH CATANZARITE, ESQ., et al,<br><br>Defendants. | Case No. 30-2020-01145998-CU-BT-CJC<br><br>Assigned for All Purposes to<br>Hon. Randall J. Sherman, Dept. CX105<br><br>**NOTICE OF DEFENDANTS KENNETH CATANZARITE, CATANZARITE LAW CORPORATION, BRANDON WOODWARD, TIM JAMES O'KEEFE, AMY JEANETTE COOPER, CLIFF HIGGERSON, MOHAMMAD ZAKHIREH, RICHARD FRANCIS O'CONNOR, JR., JAMES DUFFY, TGAP HOLDINGS, LLC, AND MOBILE FARMING SYSTEMS, INC. DEMURRER TO COMPLAINT; DEMURRER TO COMPLAINT; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES; SUPPORTING DECLARATION OF COUNSEL**<br><br>**RELATED TO ROA # 2, 742, & ____**<br><br>(Request for Judicial Notice filed concurrently herewith)<br><br>**<u>Hearing Information</u>**<br>DATE: February 10, 2023<br>TIME: 10:00 a.m.<br>DEPT.: CX105<br>Reservation No. 73893105<br><br>Complaint Filed: May 26, 2020<br>Cross-Complaint Filed: August 10, 2020<br>Trial Date: TBD |
| AND RELATED CROSS-COMPLAINT | |

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on February 10, 2023 at 10:00 a.m., or as soon thereafter as the matter may be heard in Dept. CX105 of this Court, Defendants Kenneth Catanzarite, Catanzarite Law Corporation, Brandon Woodward, Tim James O'Keefe, Amy Jeanette Cooper, Cliff Higgerson, Mohammad Zakhireh, Richard Francis O'Connor, Jr., James Duffy, TGAP Holdings, LLC, and Mobile Farming Systems, Inc. (collectively "Defendants") will and do hereby demurrer to the Complaint as to them and seek an order sustaining the demurrer without leave to amend.

Pursuant to Code of Civil Procedure section 430.10 subdivisions (d), (e) and (f), the Demurrer is made on the grounds that: Beck lacks standing; the face of the Complaint, along with matters subject to judicial notice, demonstrates that the second, third and fourth causes of action alleged therein fail to state sufficient facts to constitute a cause of action against any of these Defendants; and that these causes of action are uncertain.

Prior to the filing of this demurrer, Defendants attempted to meet and confer with Plaintiff Justin Beck ("Beck") as to the bases underlying this demurrer in compliance with Code of Civil Procedure section 430.41; however, Plaintiff did not respond. Thus, Defendants now bring this matter before the Court to be ruled upon.

This Demurrer will be based upon this Notice of Demurrer, the Demurrer, the attached Memorandum of Points and Authorities and supporting Declaration of Kenneth J. Catanzarite, the Complaint and the complete files and records of this case, on argument of counsel, and such other matters as may come before the Court at the hearing on the Demurrer.

DATED: November 21, 2022. CATANZARITE LAW CORPORATION

By: ______________________
Kenneth J. Catanzarite
Attorneys for Defendants Kenneth Catanzarite, Catanzarite Law Corporation, Brandon Woodward, Tim James O'Keefe, Amy Jeanette Cooper, Cliff Higgerson, Mohammad Zakhireh, Richard Francis O'Connor, Jr., James Duffy, Tony Scudder, Aroha Holdings, Inc., TGAP Holdings, LLC, Nicole M. Catanzarite-Woodward and Defendant/Cross-Complainant Mobile Farming Systems, Inc.

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

**DEMURRER**

Defendants Kenneth Catanzarite, Catanzarite Law Corporation, Brandon Woodward, Tim James O'Keefe, Amy Jeanette Cooper, Cliff Higgerson, Mohammad Zakhireh, Richard Francis O'Connor, Jr., James Duffy, TGAP Holdings, LLC, and Mobile Farming Systems, Inc. (collectively "Defendants") demur as follows to the Complaint and the second, third and fourth causes of action therein:

**DEMURRER TO THE SECOND CAUSE OF ACTION**
**FOR UNFAIR BUSINESS PRACTICES**

Defendants Kenneth Catanzarite, Catanzarite Law Corporation, Brandon Woodward, Tim James O'Keefe, Mohammad Zakhireh, Richard Francis O'Connor, Jr., James Duffy and Mobile Farming Systems, Inc. demur as follows to the Second Cause of Action for Unfair Business Practices:

1. The Second Cause of Action for Unfair Business Practices fails to state facts sufficient to constitute a cause of action. *Code Civ. Proc.*, § 430.10(e).

2. The Second Cause of Action for Unfair Business Practices is uncertain. *Code Civ. Proc.*, § 430.10(f).

3. The Second Cause of Action for Unfair Business Practices fails because Plaintiff lacks standing. *Code Civ. Proc.*, § 430.10(d).

4. The Second Cause of Action for Unfair Business Practices fails because Defendants Kenneth Catanzarite, Catanzarite Law Corporation, Brandon Woodward, Tim James O'Keefe's due process rights to present a defense would be violated by inability to disclose their client's confidential information. *McDermott, Will & Emery v. Sup. Ct.*(2000) 83 Cal.App.4th 378.

5. The Second Cause of Action for Unfair Business Practices fails because Plaintiff failed to meet the pre-filing requirements of Civil Code section 1714.10.

6. The Second Cause of Action for Unfair Business Practices fails because it is barred by the litigation privilege.

//

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680

**DEMURRER TO THE THIRD CAUSE OF ACTION**

**FOR SLANDER OF TITLE**

Defendants Kenneth Catanzarite, Catanzarite Law Corporation, Mohammad Zakhireh, Richard Francis O'Connor, Jr. and James Duffy demur to the Third Cause of Action for Slander of Title as follows:

1. The Third Cause of Action for Slander of Title fails to state facts sufficient to constitute a cause of action. *Code Civ. Proc.*, § 430.10(e).

2. The Third Cause of Action for Slander of Title is uncertain. *Code Civ. Proc.*, § 430.10(f).

3. The Third Cause of Action for Slander of Title fails because Plaintiff lacks standing. *Code Civ. Proc.*, § 430.10(d).

4. The Third Cause of Action for Slander of Title fails because Defendants Kenneth Catanzarite and Catanzarite Law Corporation's due process rights to present a defense would be violated by inability to disclose their client's confidential information. *McDermott, Will & Emery v. Sup. Ct.*(2000) 83 Cal.App.4th 378.

5. The Third Cause of Action for Slander of Title fails because Plaintiff failed to meet the pre-filing requirements of Civil Code section 1714.10.

6. The Third Cause of Action for Slander of Title fails because it is barred by the litigation privilege.

**DEMURRER TO THE FOURTH CAUSE OF ACTION**

**FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

Defendants demur as follows to the Fourth Cause of Action for Intentional Infliction of Emotional Distress:

1. The Fourth Cause of Action for Intentional Infliction of Emotional Distress fails to state facts sufficient to constitute a cause of action. *Code Civ. Proc.*, § 430.10(e).

2. The Fourth Cause of Action for Intentional Infliction of Emotional Distress is uncertain. *Code Civ. Proc.*, § 430.10(f).

//

3. The Fourth Cause of Action for Intentional Infliction of Emotional Distress fails because Defendants Kenneth Catanzarite, Catanzarite Law Corporation, Brandon Woodward and Tim James O'Keefe's due process rights to present a defense would be violated by inability to disclose their client's confidential information. *McDermott, Will & Emery v. Sup. Ct.*(2000) 83 Cal.App.4th 378.

4. The Fourth Cause of Action for Intentional Infliction of Emotional Distress fails because Plaintiff failed to meet the pre-filing requirements of Civil Code section 1714.10.

5. The Fourth Cause of Action for Intentional Infliction of Emotional Distress fails because it is barred by the litigation privilege.

WHEREFORE, Defendants pray for relief as follows:

1. That their demurrer to the Complaint be sustained without leave to amend;

2. That they be awarded their costs of suit; and,

3. For such other and further relief as the Court deems just and proper.

DATED: November 21, 2022. CATANZARITE LAW CORPORATION

By: ______________________________
Kenneth J. Catanzarite
Attorneys for Defendants Kenneth Catanzarite, Catanzarite Law Corporation, Brandon Woodward, Tim James O'Keefe, Amy Jeanette Cooper, Cliff Higgerson, Mohammad Zakhireh, Richard Francis O'Connor, Jr., James Duffy, Tony Scudder, Aroha Holdings, Inc., TGAP Holdings, LLC, Nicole M. Catanzarite-Woodward and Defendant/Cross-Complainant Mobile Farming Systems, Inc.

CATANZARITE LAW CORPORATION
2331 WEST LINCOLN AVENUE
ANAHEIM, CALIFORNIA 92801
TEL: (714) 520-5544 • FAX: (714) 520-0680